1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

9

10

11 | JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON,

12

13                    Plaintiffs,

14        vs.

15 | SAM REED, in his official capacity as Secretary of State of Washington, DEBRA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,

16

17                    Defendants.

18

No. _____

**Plaintiffs' Notice of Motion and Motion for Temporary Restraining Order and Preliminary Injunction, and Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction**

NOTE ON MOTION CALENDAR: [DATE]

**ORAL ARGUMENT REQUESTED**

19

20

21

22

23

24

25

26

27

28

**Motion and Memo in Support of**
**TRO and Preliminary Injunction**
**(No. _____)**

1

**BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

# TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   A.   Standards for Issuance of a Temporary Restraining Order
        and Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   B.   The Standards for Issuance of a Temporary Restraining
        Order and a Preliminary Injunction are Satisfied Here . . . . . . . . . . . . . . . . . . . . . . . 9

      1.   Plaintiffs are likely to succeed on the merits. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         a.   The Public Records Act is unconstitutional
              as applied to referendum petitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            1)  Compelled disclosure provisions are
                subject to strict scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            2)  Research demonstrates that compelled
                disclosure has a significant chilling effect
                on speech. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            3)  The Public Records Act is unconstitutional
                as applied to referendum petitions because
                it is not narrowly tailored to serve a compelling
                government interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

         b.   The Public Records Act is unconstitutional as
              applied to Referendum 71 because there is a
              reasonable probability that the release of the names
              of the petition signers will subject those petition
              signers to threats, harassment, and reprisals. . . . . . . . . . . . . . . . . . . . . 18

            1)  Compelled disclosure provisions are subject
                to strict scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            2)  Disclosing the names of the petition signers
                will subject those Petition signers to a
                reasonable probability of threats, harassment,
                and reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

               a)  The standards of the reasonable-probability
                   disclosure exemption test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

               b)  The quantum and quality of evidence
                   required to meet the reasonable-probability
                   test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1

## TABLE OF CONTENTS - CONTINUED

i)  Plaintiffs are not required to establish a
    direct causal link between disclosure
    and specific instances of threats,
    harassment, and reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ii) Plaintiffs need not demonstrate that they,
    or their members, have been subjected to
    threats, harassment, and reprisals. . . . . . . . . . . . . . . . . . . . . . . 22

iii) The reasonable-probability test requires
     only that threats, harassment, and reprisals
     exist, not that they be severe. . . . . . . . . . . . . . . . . . . . . . . . . . 22

iv) The exemption is not limited to minor
    political parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

v)  The test does not require any threats,
    harassment, or reprisals to be directed
    at Plaintiffs by government officials. . . . . . . . . . . . . . . . . . . . . 25

3)  Disclosing the names of the petition signers is
    unconstitutional as applied to Plaintiffs, because
    there is a reasonable probability of threats,
    harassment, and reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2.  Plaintiffs have, and will continue, to suffer irreparable harm
    if defendants are not restrained. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3.  Defendants will suffer no meaningful harm from complying
    with a temporary restraining order and preliminary injunction. . . . . . . . . . . . . . . . 30

4.  Issuance of a temporary restraining order and a preliminary
    injunction will serve the public interest. . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

*Cases:*

*AFL-CIO v. FEC,*
   333 F.3 168 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Alaska Right to Life Comm. v. Miles,*
   441 F.3d 773 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Am. Civil Liberties Union of Nev. v. Heller,*
   378 F.2d 979 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Am. Constitutional Law Found., Inc. v. Meyer,*
   120 F.3d 1092 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ass'ns and Community Orgs. v. Browning,*
   No. 08-445 (N.D. Fla. Oct. 29, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Averill v. City of Seattle,*
   325 F. Supp.2d 1173 (W.D. Wash. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22, 23, 27

*Bay Area Citizens Against Lawsuit Abuse,*
   982 S.W.2d 371 (Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Brown v. Cal. Dept. of Transportation,*
   32 F.3d 1217 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Brown v. Socialist Workers '74 Campaign Committee,*
   459 U.S. 87 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 21, 23

*Buckley v. Am. Constitutional Law Found., Inc. ("Buckley II"),*
   525 U.S. 182 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 17

*Buckley v. Valeo,*
   424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Cal. Pro-Life Council, Inc. v. Getman ("CPLC I"),*
   328 F.3d 1088 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cal. Pro-Life Council, Inc. v. Randolph ("CPLC II"),*
   507 F.3d 1172 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 15

*Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth,*
   556 F.3d 1021 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15, 17

*Center for Individual Freedom v. Ireland,*
   Nos. 08-190 & 08-1133, WL 4642268 (S.D. W.Va. Oct. 17, 2008) . . . . . . . . . . . . . . . . 7, 8

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Citizens Against Rent Control v. Berkeley,*
   454 U.S. 290 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Davis v. FEC*,
   ___ U.S. ___, 128 S.Ct. 2759 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 18

*Elrod v. Burns*,
   427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*FEC v. Hall-Tyner Election Campaign Committee*,
   678 F.2d 416 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*FEC v. NRA*,
   254 F.3d 173 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*FEC v. Wisconsin Right to Life ("WRTL II")*,
   551 U.S. 449, 127 S.Ct. 449 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 11

*First National Bank v. Bellotti*,
   435 U.S. 765 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 24

*G & V Lounge, Inc., v. Mich. Liquor Control Comm'n*,
   23 F.3d 1071 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Gonzales v. O. Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers
Local No. 70 of Alameda County*,
   415 U.S. 423 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Indep. Newspapers, Inc. v. Brodie*,
   966 A.2d 432 (Md. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*McArthur v. Smith*,
   716 F. Supp. 592 (S.D. Fla. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*McConnell v. FEC*,
   540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*McConnell v. FEC*,
   251 F. Supp. 2d 176 (D. D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S.334 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 16

*Members of City Council v. Taxpayers for Vincent*,
   466 U.S. 789 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Meyer v. Grant*,
   486 U.S. 414 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*NAACP v. Alabama*,
   357 U.S. 449 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 24, 25

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Oregon Socialist Workers 1974 Campaign Comm. v. Paulus,*
   432 F. Supp. 1255 (D. Or. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*Pac. Frontier v. Pleasant Grove City,*
   414 F.3d 1221 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Republican Party of Minnesota v. White,*
   536 U.S. 765 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sammartano v. First Judicial District Court, in and for County of Carson City,*
   303 F.3d 959 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Stromberg v. People of the State of California,*
   283 U.S. 359 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Summum v. Pleasant Grove City,*
   483 F.3d 1044 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Turner Broad. Sys., Inc. v. FCC,*
   512 U.S. 622 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*University of Texas v. Camenisch,*
   451 U.S. 390 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Utah Licensed Beverage Ass'n v. Leavitt,*
   256 F.3d 1060 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Washington Initiatives Now v. Rippie,*
   213 F.3d 1132 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Winter v. Natural Res. Def. Council, Inc.,*
   ___ U.S. ___, 129 S.Ct. 365 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme,*
   433 F.3d 1199 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Constitutions, Statutes, and Court Rules:**

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 28, 29

Wash. Const. art. II, § 1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Wash. Rev. Code § 29A.72.230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

Wash. Rev. Code § 42.17.040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Wash. Rev. Code § 42.56.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

Wash. Rev. Code § 42.56.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Wash. Rev. Code § 42.56.070 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

***Other Authorities:***

Black's Law Dictionary (7th ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane,
     Federal Practice and Procedure § 2951 (2d ed. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 6, 29

Center for Governmental Studies, *Democracy by Initiative:*
     *Shaping California's Fourth Branch of Government* (2d ed. 2008) . . . . . . . . . . . . . . . . . 10

David Ammons, *Who Signs R-71? Foes May Post it Online*,
     Washington Secretary of State Blogs, June 2, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Dick Carpenter, PhD, *Disclosure Costs: Unintended Consequences of Campaign
     Finance Reform*, Institute for Justice, March 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Dick Carpenter, PhD, *Mandatory Disclosure for Ballot-Initiative Campaigns*,
     The Independent Review (Spring 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hilton, Miss California Take Sides on "Today"*, S.F. Chronicle, Apr. 23, 2009 . . . . . . . . . . . 23

James Bopp, Jr. & Josiah Neeley, *How Not to Reform Judicial Elections: Davis, White,
     and the Future of Judicial Campaign Financing*, 86 Denv. U. L. Rev. 195 (2008) . . . . . . 12

Jeffrey Milyo, PhD, *The Political Economics of Campaign Finance*,
     The Independent Review, Vol. 3, Issue 4 (Spring 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

William McGeveren, *Mrs. McIntyre's Checkbook: Privacy Costs of Political
     Contribution Disclosure*, 6 U. Pa. J. Const. L. 1 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 12

1    TO DEFENDANTS AND THEIR ATTORNEY(S) OF RECORD:

2        YOU ARE HEREBY GIVEN NOTICE THAT on A DATE TO BE DETERMINED BY

3    COURT ORDER, before a JUDGE TO BE DETERMINED in Courtroom TO BE

4    DETERMINED BY COURT ORDER of the United States District Court for the Western

5    District of Washington, Seattle Division, located at 700 Stewart Street, Seattle, Washington

6    98101, Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington, will and hereby

7    do move for a temporary restraining order and preliminary injunction against Defendants.

8        This motion for temporary restraining order and preliminary injunction is made pursuant to

9    Fed. R. Civ. P. 65, and on the grounds specified in this Notice of Motion and Motion, and

10   Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order and Preliminary

11   Injunction, the documents filed in support thereof, the Verified Complaint, and such other and

12   further evidence as may be presented to the Court at the time of the hearing.

13       Pursuant to this notice, Plaintiffs John Doe #1, John Doe #2, and Protect Marriage

14   Washington do hereby move for a preliminary injunction to:

15       (1)  Enjoin Defendants from making referendum petitions available to the public pursuant to

16            the Public Records Act, Wash. Rev. Code § 42.56.001 *et seq*., or otherwise;

17       (2)  Enjoin Defendants from making the Referendum 71 petition or any petition related to

18            the definition of marriage or the rights and responsibilities that should be accorded to

19            same-sex couples, available to the public pursuant to the Public Records Act, Wash.

20            Rev. Code § 42.56.001 *et seq*., or otherwise.

21       In support thereof, Plaintiffs present the following Memorandum in Support of Motion for

22   Temporary Restraining Order and Preliminary Injunction.

23                                  # I.  INTRODUCTION

24       Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington seek a temporary

25   restraining order and preliminary injunction to prevent Defendant Sam Reed, Secretary of State

26   for the State of Washington, and Defendant Debra Galarza, the Public Records Officer for the

27   Secretary of State of Washington, from releasing copies of the Referendum 71 petition pursuant

28   to the Washington Public Records Act, Wash. Rev. Code § 42.56.001, or otherwise.

**Motion and Memo in Support of**          1          **BOPP, COLESON & BOSTROM**
**TRO and Preliminary Injunction**                    **1 South Sixth Street**
**(No. _____)**                             **Terre Haute, Indiana 47807-3510**
                                                      **(812) 232-2434**

1    Upon information and belief, Plaintiffs fear that copies of the Petition will be made public

2    pursuant to the Public Records Act as early as Wednesday, July 29, 2009. This fear is premised

3    upon a statement by Defendant Galarza that referendum petitions are "public records" within the

4    meaning of the Public Records Act and well-documented reports that two groups intend to seek

5    their disclosure pursuant to that act. These groups, KnowThyNeighbor.org and WhoSigned.org,

6    have stated that they intend to make the names of the 138,500 petition signers available and

7    searchable on the internet in an attempt to encourage Washington citizens to have a personal and

8    uncomfortable conversation with any individual that has signed the petition. Ironically, the

9    creators of WhoSigned.org have exercised their First Amendment right to remain anonymous, a

10    choice the petition signers cannot make because of the Public Records Act.[1] (Decl. of Scott F.

11    Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 14.)

12    A temporary restraining order and preliminary injunction are necessary to protect Plaintiffs

13    from suffering immediate and irreparable deprivations of their First Amendment liberties that

14    will occur if Defendants release copies of the petition pursuant to the Public Records Act. As

15    shall be set forth below and in Plaintiffs' Verified Complaint, individuals whose names are

16    already connected with Referendum 71 have been subjected to threats, harassment, and reprisals

17    simply for exercising their First Amendment freedoms of speech and association. If a temporary

18    restraining order and preliminary injunction are not issued, each of the 138,500 Washington

19    residents who signed the Petition will suffer similar deprivations of their First Amendment

20    liberties.

21    Furthermore, if a temporary restraining order and preliminary injunction do not issue, the

22    campaign surrounding Referendum 71 will be irreparably prejudiced by the release of the petition

23    signers before this Court has an adequate opportunity to consider the merits of Plaintiffs' claims.

24

25

26    [1] Any individual seeking to learn the identity of the creators of WhoSigned.org would find that the task is extremely difficult given the sensitive First Amendment concerns. *See, e.g.*, *Indep. Newspapers, Inc. v. Brodie*, 966

27    A.2d 432, 456 (Md. 2009). By citing this case, Plaintiffs do not mean tot suggest that the creators of WhoSigned.org are entitled to any less protection by the First Amendment than should be afforded Plaintiffs. Instead, it is cited to

28    demonstrate just how zealous the courts are and should be in protecting First Amendment rights.

## II.  STATEMENT OF FACTS

On January 28, 2009, Washington State Senator Ed Murray introduced Senate Bill 5688 ("SB 5688"), a bill designed to expand the rights, responsibilities, and obligations accorded state-registered same-sex and senior domestic partners to be equivalent to those of married spouses. The bill is often referred to simply as the "everything but marriage" domestic partnership bill. After various amendments, the bill was passed by the Washington Senate as Second Substitute Senate Bill 5688 on March 10, 2009, and subsequently passed by the Washington House of Representatives on April 15, 2009. On May 18, 2009, Washington Governor Christine Gregoire signed Engrossed Second Substitute Senate Bill 5688.

On or about May 4, 2009, Larry Stickney, the Campaign Manager for Protect Marriage Washington, filed notice with the Secretary of State of his intent to circulate a referendum petition on SB 5688. (Verified Complaint, ¶ 21.)The proposed referendum was assigned the title Referendum 71 by the Secretary of State. On May 13, 2009, Protect Marriage Washington was organized as a State Political Committee pursuant to Wash. Rev. Code § 42.17.040. (Verified Compl., ¶ 22.) Protect Marriage Washington's major purpose is to collect the requisite number of signatures necessary to place Referendum 71 on the ballot pursuant to Wash. Const. art. II, § 1(b) and to encourage Washington citizens to reject SB 5688. (Verified Compl., ¶ 23.)

On Saturday, July 25, 2009, Protect Marriage Washington submitted a petition containing over 138,500 signatures to Defendant Reed, exceeding the number of signatures necessary to place Referendum 71 on the ballot. (Verified Compl., ¶ 40.) By filing the petition, Plaintiffs have delayed the effective date of SB 5688. If the Secretary of State determines that the petition contains a sufficient number of valid signatures, SB 5688 will become law only if a majority of Washington residents vote to "approve" the bill at the next general election.

Defendant Reed is responsible for verifying and canvassing the signatures on the Referendum 71 petition and proponents and opponents are permitted to have representatives present during the process. The statute prohibits proponents and opponents observing the verification and canvas process from making any records of the names, addresses, or other information contained on the petitions. Wash. Rev. Code § 29A.72.230.

**Motion and Memo in Support of**
**TRO and Preliminary Injunction**
**(No. _____)**                                      3                      **BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

1    Upon information and belief, Plaintiffs believe that two organizations,

2    KnowThyNeighbor.org and WhoSigned.org, intend to make an end run around this provision of

3    the Washington Code, by requesting copies of the petitions submitted pursuant to Washington's

4    Public Records Act, Wash. Rev. Code § 42.56.001 *et seq*. (*See* Verified Complaint at ¶¶ 33-39.)

5    Defendant Galarza has stated that referendum petitions are "public records" within the meaning

6    of Wash. Rev. Code § 42.56.10(2) and are subject to public disclosure pursuant to Wash. Rev.

7    Code § 42.56.070.

8    KnowThyNeighbor.org and WhoSigned.org have publicly stated that they intend to publish

9    the names of petition signers on the internet and to make the names searchable, with the purpose

10   of encouraging individuals to contact any person signing the petition. *See* (Decl. of Scott F.

11   Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., ¶ 6.)  The news media has widely reported

12   that KnowThyNeighbor.org and WhoSigned.org intend to publish the names of any individual

13   who signs the petition on the internet. (*See id*. at ¶¶ 6-13.)

14   Larry Stickney, the Campaign Manager for Protect Marriage Washington, has received a

15   large number of emails from people who disagree with his position on marriage. (Verified

16   Compl., Ex. 1.)  Some of these emails have been threatening and/or harassing. For example, one

17   threatening email states: "You better stay off the olympic peninsula. . it's a very dangerous place

18   filled with people who hate racists, gay bashers and anyone who doesn't believe in equality. Fair

19   is fair."  (*Id*. at p. 10.) Another email threatened the signers of the Referendum 71 petition with

20   boycotts: "We shall boycott the businesses of EVERYONE who signs your odious, bigoted

21   petition." (*Id*. at p. 21.) Other emails are offensive and harassing: "Dear God fearing hate

22   mongerers - . . . Maybe you just want to feel a cock in your ass and hate yourself for it. Whatever.

23   Praise Jeebus you retarded fuckholes!" (*Id*. at p. 20.)

24   These threats were not confined to email; Mr. Stickney received indirect threats to his safety

25   through blog posts: "If Larry Stickney can do 'legal' things that harm OUR family, why can't we

26   go to Arlington, WA to harm his family?" (Verified Compl., Ex. 2.)  Mr. Stickney reported this

27   particular threat to his local Sheriff. (Verified Compl., ¶ 29.)

28   Mr. Stickney has also been harassed through more traditional forms of media. For example,

---

**Motion and Memo in Support of**                    4                    **Bopp, Coleson & Bostrom**
**TRO and Preliminary Injunction**                                       **1 South Sixth Street**
**(No. _____)**                                                **Terre Haute, Indiana 47807-3510**
                                                                         **(812) 232-2434**

"The Stranger," an alternative Seattle newspaper, published details of his divorce that occurred fifteen years ago. (Verified Compl., Ex. 3.)

This harassment and threatening behavior extends to Mr. Stickney's home. In late June, an individual was seen taking pictures of Mr. Stickney's house while his daughter played outside. (Verified Compl., ¶ 28.) Shortly after Referendum 71 was presented to the Secretary of State on May 4, 2009, Mr. Stickney received a phone call at 2:00 a.m. from a woman who sounded frantic and deranged, and who said various obscene and vile things to him. (Verified Compl., ¶ 30.)

These threats to himself and his family have been taken extremely seriously by Mr. Stickney. For example, early in the campaign to circulate the Petition, Mr. Stickney made his children sleep in an interior living room because he feared for their safety if they slept in their own bedrooms. (Verified Compl., ¶ 27.)

Anyone who follows the debate over the definition of marriage would not be surprised by the harassment and threats that have been leveled at Mr. Stickney. Past supporters of traditional marriage have been subject to similar—and worse—threats, harassment, and reprisals for their support. (*See generally*, Decl. of Scott F. Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 12 & Ex. 13) (consisting of approximately sixty declarations from California each recounting at least one instance of threats, harassment, and reprisals directed at supporters of Proposition 8, a ballot proposition that added a definition of marriage as between one man and one woman to the California Constitution).)

The threatened publication of the names on the Referendum 71 petition has created an environment that discourages Washington citizens from exercising their First Amendment rights to participate in the referendum process. Plaintiffs and their supporters will suffer immediate and irreparable harm if the requested relief is not granted.

# III.  ARGUMENT

## A.  Standards for Issuance of a Temporary Restraining Order and Preliminary Injunction

In determining whether to grant injunctive relief prior to trial, the Court must consider four factors: (1) the plaintiff's likelihood of success in the underlying dispute between the parties; (2) whether the plaintiff will suffer irreparable injury if the injunction is not issued; (3) the injury to

Motion and Memo in Support of
TRO and Preliminary Injunction
(No. _____)

5

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

1  the defendant if the injunction is issued; and (4) the public interest. *Winter v. Natural Res. Def.*

2  *Council, Inc.*, 129 S.Ct. 365, 374 (2008) (rejecting the Ninth Circuit's "possibility" standard).

3      "Ex parte temporary restraining orders are no doubt necessary in certain circumstances, . . .

4  but under federal law they should be restricted to serving their underlying purpose of preserving

5  the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and

6  no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local*

7  *No. 70 of Alameda County*, 415 U.S. 423, 439 (1974) (citation omitted); 11A Charles Alan

8  Wright, Arthur R. Miller, & Mary Kay Kane ("Wright & Miller"), Federal Practice and

9  Procedure § 2951 (2d ed. 2009) ("The issuance of an ex parte temporary restraining order is an

10 emergency procedure and is appropriate only when the appellant is in need of immediate relief").

11 "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties

12 until a trial on the merits can be held**.** Given this limited purpose, and given the haste that is often

13 necessary if those positions are to be preserved, a preliminary injunction is customarily granted

14 on the basis of procedures that are less formal and evidence that is less complete than in a trial on

15 the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

16      Where free speech is involved, preliminary injunction standards must be speech-protective.

17 First, preliminary injunction standards involving expressive association must reflect our

18 constitutional principles that "[i]n a republic . . . the people are sovereign," *Buckley v. Valeo*, 424

19 U.S. 1, 14 (1976), and there is a "'profound national commitment to the principle that debate on

20 public issues should be uninhibited, robust, and wide-open,'" *id.* (citation omitted). *FEC v.*

21 *Wisconsin Right to Life*, 127 S. Ct. 2652 (2007) ("*WRTL II*") (opinion of Roberts, CJ, stating

22 holding), requires that we recall that we deal with the First Amendment, which mandated that

23 "'Congress shall make no law . . . abridging the freedom of speech,'" *id.* at 2674. So "no law,"

24 i.e., "freedom of speech" and expressive association, is the constitutional *default* and must be the

25 overriding *presumption* where expressive association is at issue.

26      Second, the "freedom of speech" presumption means that First Amendment protections must

27 be incorporated into the preliminary injunction standards, not limited to merits consideration. So

28 if exacting or strict scrutiny applies, as here, the preliminary injunction burden shifts to the state

to prove the elements of strict scrutiny, just as the state has the burden on the merits:

> The Government argues that, although it would bear the burden of demonstrating a compelling interest as part of its affirmative defense at trial on the merits, the [plaintiff] should have borne the burden of disproving the asserted compelling interests at the hearing on the preliminary injunction. This argument is foreclosed by our recent decision in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004). In *Ashcroft*, we affirmed the grant of a preliminary injunction in a case where the Government had failed to show a likelihood of success under the compelling interest test. We reasoned that '[a]s the Government bears the burden of proof on the ultimate question of [the challenged Act's] constitutionality, respondents [the movants] must be deemed likely to prevail unless the Government has shown that respondents' proposed less restrictive alternatives are less effective than [enforcing the Act].' Id., at 666. That logic extends to this case; here the Government failed on the first prong of the compelling interest test, and did not reach the least restrictive means prong, but that can make no difference. The point remains that the burdens at the preliminary injunction stage track the burdens at trial.

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006).[2]

Third, because exacting or strict scrutiny is the antithesis of deference or a presumption of constitutionality, no deference or favorable presumption must be afforded the regulation of speech in preliminary injunction balancing. This is required by the "freedom of speech" presumption and because "the *Government* must prove that applying [the challenged provision to the communication at issue] furthers a compelling interest and is narrowly tailored to achieve that interest." *WRTL II*, 127 S. Ct at 2664 (emphasis in original).

Fourth, the necessary incorporation of First Amendment protections into preliminary injunction standards requires that in determining the balance of harms and the public interest, courts must apply *WRTL II*'s requirement that "'[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor.'" *Center for Individual Freedom v. Ireland*, No. 08-190, slip. op. at *51 (S.D. W. Va. Oct. 17, 2008) (mem. op. granting prelim. inj.) (*quoting WRTL II*, 127 S. Ct. at 2669) (applying principle to consideration of public harm).

Fifth, the "freedom of speech" presumption means that state officials have no per se interest in regulating expressive association. Their first loyalty should be to the First Amendment.

---

[2] *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1060, 1072-73 (10th Cir. 2001) (placing the burden on the government to justify its speech restrictions in a preliminary injunction hearing); *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1231 (10th Cir. 2005) (in First Amendment challenge, government bears burden of establishing that content-based restriction will "more likely than not" survive strict scrutiny); *Ass'ns and Comty. Orgs. v. Browning*, No. 08-445, slip. op. at 11 (N.D. Fla. Oct. 29, 2008) (preliminary injunction burden tracks trial burden).

**Motion and Memo in Support of**
**TRO and Preliminary Injunction**
**(No. _____)**                    7                    **BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

1    Beyond that, their only interest is in enforcing the laws *as they exist*, with any interest in the

2    particular *content* of those laws being beyond their interest in the preliminary injunction

3    balancing of harms: "It is difficult to fathom any harm to Defendants [enforcement officials] as it

4    is simply their responsibility to enforce the law, whatever it says." *Id.*

5        Sixth, where First Amendment rights are involved, the government "must do more than

6    simply posit the existence of the disease sought to be cured. It must demonstrate that the recited

7    harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in

8    a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (internal

9    citation omitted).[3] Against this need for proof or real harm if a law of questionable

10   constitutionality is preliminarily enjoined is the paramount fact that "the protection of First

11   Amendment rights is very much in the public's interest." *Center for Individual Freedom v.*

12   *Ireland*, Nos. 08-190 & 08-1133, 2008 WL 4642268, at *27.

13       Under these principles, preliminary injunctive relief is not only possible but has been granted

14   in disclosure exemption cases such as this. In *Brown v. Socialist Workers '74 Campaign*

15   *Committee*, 459 U.S. 87 (1981), the northern Ohio district court "entered a temporary restraining

16   order barring enforcement of the disclosure requirements pending a determination of the merits,"

17   which temporary restraining order was renewed by the southern Ohio district court on transfer.

18   *Id.* at 90. In *Averill v. City of Seattle*, 325 F. Supp. 2d 1173 (W.D. Wash. 2004), a federal district

19   court in the Ninth Circuit issued a preliminary injunction until the case could be resolved on

20   summary judgment, noting that a candidate and campaign committee had submitted evidence that

21   those with similar views (though not plaintiffs themselves) had "been subjected to threats and

22   harassment." *Id.* at 1174. *Averill* provides much helpful guidance on how the reasonable-

23   probability test is to be interpreted and applied, and it was decided after *McConnell v. FEC*, 540

24   U.S. 93 (2003), clarified the proper reasonable-probability test and application, which will be

25

26       [3] S*ee also Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 n. 22 (1984) ("[This Court]
     may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its
27   abridgement of expressive activity."). *FEC v. NRA*, 254 F.3d 173, 191 (D.C. Cir. 2001) (same); *see also id.* at 192
     (FEC may not *speculate* that NRA received more because it did not record contributions of under $500, citing
28   *Turner*, 512 U.S. at 664).

**Motion and Memo in Support of**              8              **BOPP, COLESON & BOSTROM**
**TRO and Preliminary Injunction**                           **1 South Sixth Street**
**(No. _____)**                                     **Terre Haute, Indiana 47807-3510**
                                                             **(812) 232-2434**

discussed at Section B.1.b.2, *infra*. Under *Averill*'s analysis, Plaintiffs should also receive a preliminary injunction.

In this case, an emergency temporary restraining order and a preliminary injunction are both necessary and appropriate because Plaintiffs have a strong likelihood of success and would suffer immediate and irreparable harm if such interim relief is denied. Defendants, by contrast, will not be meaningfully harmed by the issuance of the requested temporary restraining order and a preliminary injunction, and the requested relief will best serve the public interest and the principles embodied in the First Amendment to the Constitution of the United States.

**B.    The Standards for Issuance of a Temporary Restraining Order and a Preliminary Injunction Are Satisfied Here.**

The standards for granting interim injunctive relief are satisfied in this case.

**1.    Plaintiffs are likely to succeed on the merits.**

For the reasons set for below, Plaintiffs have a substantial likelihood of proving that the Public Records Act is unconstitutional as applied to referendum petitions because disclosure of the names of those who signed a referendum petition violates the First Amendment to the United States Constitution, in that Washington lacks a compelling government interest sufficient to warrant public disclosure, and because there is a reasonable probability of threats, harassment, and reprisals if the Referendum 71 petition is made public.

**a.    The Public Records Act is unconstitutional as applied to referendum petitions.**

As set forth below, the Public Records Act is unconstitutional as applied to referendum petitions because the Washington lacks a compelling interest sufficient to warrant the public disclosure of referendum petitions.

**1)    Compelled disclosure provisions are subject to strict scrutiny.**

The First Amendment to the United States Constitution states, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[4] The freedoms of speech and association protected by the First Amendment have their "fullest and most urgent application

---

[4] The First Amendment is applicable to the states through the Fourteenth Amendment. *Stromberg v. People of the State of California*, 283 U.S. 359, 368 (1931).

**BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

1  precisely to the conduct of campaigns for political office," *Buckley*, 424 U.S. at 15 (citation

2  omitted), and the protections undoubtedly apply in the context of both candidate and ballot

3  measure elections. *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 295 (1981) (citation

4  omitted).

5  In the context of a ballot measure, the First Amendment is especially important because it

6  ensures that a collection of individuals "can make their views known, when, individually, their

7  voices would be faint or lost." *Id*. at 294; *see also* Center for Governmental Studies, *Democracy*

8  *by Initiative: Shaping California's Fourth Branch of Government*, 282 (2d ed. 2008) (discussing

9  the tremendous amount of resources it takes to circulate a petition and campaign for a ballot

10  measure).

11  Compelled disclosure provisions, such as the compelled disclosure of the Referendum 71

12  petition signers pursuant to the Public Records Act, impinge upon the core freedoms protected by

13  the First Amendment.[5] *Davis v. FEC*, _ U.S. _, 128 S. Ct. 2759, 2774-75 (2008). "[C]ompelled

14  disclosure cannot be justified by a mere showing of some legitimate government interest. . . . [It]

15  must survive exacting scrutiny. . . . [T]here must be a 'relevant correlation' or 'substantial

16  relation' between the governmental interest and the information required to be disclosed."

17  *Buckley*, 424 U.S. at 64.

18  Furthermore, exacting scrutiny is required "even if any deterrent effect on the exercise of

19  First Amendment rights arises, not through direct government action, but indirectly as an

20  unintended but inevitable result of the government's conduct in requiring disclosure." *Id.* at 65

21  (*citing NAACP v. Alabama*, 357 U.S. 449, 463 (1958)).[6]

22

23      [5] Although the cases cited by Plaintiffs deal with the disclosure of donor information, the situation of the

24  Petition signers is analogous to that of individuals who have chosen to contribute to a ballot measure campaign.  In both situations, the State is compelling the disclosure of the names those individuals who support a particular ballot

25  measure.  In the case of a contribution to a ballot measure campaign, this is the disclosure of those who have contributed above a certain, specified threshold.  Similarly, in the context of the signing of a petition, through a request under the Public Records Act, the State would be compelling the disclosure of all of those who signed the

26  petition.

27      [6] Washington is not required to take direct action to restrict the First Amendment rights of Plaintiffs for the

28  provisions challenged herein to be found unconstitutional. *NAACP v. Alabama*, 357 U.S. at 463. "In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that

"Exacting scrutiny," as used in *Buckley*, is "strict scrutiny." *Buckley* required "exacting scrutiny" of FECA's compelled disclosure provisions, *id.* at 64, which it referred to as the "strict test," *id.* at 66, and by which it meant "strict scrutiny." *See WRTL II*, 127 S.Ct. at n.7 (*Buckley*'s use of "exacting scrutiny," 424 U.S. at 44, was "strict scrutiny"); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (*citing First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978)) (equating "exacting" scrutiny with "strict" scrutiny).[7]

Under strict scrutiny, the State bears the burden of proving that the application of the Public Records Act is "'(1) narrowly tailored, to serve (2) a compelling state interest.'" *Cal. Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1178 (9th Cir. 2007) (*citing Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75 (2002)) ("*CPLC II*").

### 2) Research demonstrates that compelled disclosure has a significant chilling effect on speech.

While the burden is on the State to demonstrate that the release of referendum petitions pursuant to the Public Records Act is narrowly tailored to serve a compelling government interest, Plaintiffs wish to highlight differences between public perception regarding compelled disclosure provisions and personal sentiments regarding disclosure.

---

abridgement of such rights, *even though unintended*, may inevitably follow from varied forms of governmental action." *Id.* at 461. "The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the production order that private action takes hold." *Id.* at 463.

[7] In *Canyon Ferry*, the Ninth Circuit again declined to clarify whether strict scrutiny applies in the context of ballot measure disclosure. *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1031 (9th Cir. 2009) (striking Montana's disclosure statute under any standard of review). *See also Cal. Council Pro-Life , Inc. v. Randolph*, 507 F.3d 1172 (9th Cir. 2007)(applying strict scrutiny); *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 787-88 (9th Cir. 2006) (assuming without deciding that strict scrutiny applies); and *Am. Civil Liberties Union of Nev. v. Heller*, 378 F.3d 979, 992-93 (9th Cir. 2004) (applying strict scrutiny).
    Other cases have indicated that the "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis*, 128 S. Ct. at 2775. Severe burdens on First Amendment rights must be narrowly tailored to serve a compelling government interest. *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 206-07 (1999) (Thomas, J., concurring). Regulations that "entail only a marginal restriction upon [First Amendment rights]" are subject to "closely drawn scrutiny." *See McConnell*, 540 U.S. at 137 (2003) (discussing contribution limits and how such limits still permit individuals to exercise their First Amendment speech and associational rights). Such regulations need only be "closely drawn" to a "sufficiently important interest." *Id.* at 136.
    However, regardless of whether this Court accepts that "exacting scrutiny" is always the same as "strict scrutiny," or whether it first examines the extent of the burden on First Amendment rights, strict scrutiny must apply to the provisions because compelled disclosure provisions constitute substantial First Amendment burdens. *Davis*, 128 S. Ct. at 2774-75.

Public disclosure statutes are often trumpeted on the grounds that "sunlight is the best disinfectant" and as enjoying wide public support. *See Buckley*, 424 U.S. at 67; *CPLC II*, 507 F.3d at 1179; *see also* David Ammons, *Who Signs R-71? Foes May Post it Online*, Washington Secretary of State Blogs, June 2, 2009 (*available at* http://blogs.secstate.wa.gov/FromOurCorner/index.php/2009/06/who-signs-r-71-foes-may-post-it-online/) (discussing Secretary of State's commitment to "transparency").[8] Yet few have actually studied whether campaign disclosure actually solves the problems it seeks to address, and fewer still have probed voters about the specific costs associated with compelled disclosure statutes.[9]

In 2007, the Institute for Justice commissioned a study to examine the burdens of compelled disclosure provisions on First Amendment rights. *See* Dick Carpenter, Ph.D., *Disclosure Costs: Unintended Consequences of Campaign Finance Reform*, Institute for Justice, March 2007 (*available at* http://www.ij.org/publications/other/disclosurecosts.html) ("*Disclosure Costs*"). Prior to this study, "no one [had] analyzed systematically the effects of campaign-finance regulations on freedom of speech or association." Jeffrey Milyo, Ph.D., *The Political Economics of Campaign Finance*, The Independent Review, Vol. 3, Issue 4, 537, 537 (Spring 1999).

While the study involved financial disclosure provisions, its findings are illustrative of the disconnect between public perception and actual evidence regarding compelled disclosure. While there may be some minor difference between support indicated by a financial contribution to a

---

[8] David Ammons is the Communications Director for Defendant Reed.

[9] Evidence of the social costs associated with compelled public disclosure was part of the record in *McConnell v. FEC*. 251 F. Supp. 2d 176, 227-229 (D.D.C. 2003) (per curiam). The evidence ranged from large numbers of contributions at just below the disclosure trigger amount, to vandalism after public disclosure, to non-contribution because of concerns about a group's ability to retain confidentiality, to concerns about employers, neighbors, other business entities, and others knowing of support are not popular everywhere and the results of such disclosure. *Id. See also AFL-CIO v. FEC*, 333 F.3d 168, 176, 179 (D.C. Cir. 2003) (recognizing that releasing names of volunteers, employees, and members would make it hard to recruit personnel, applying strict scrutiny, and striking down an FEC rule requiring public release of all investigation materials upon conclusion of an investigation); Dick M. Carpenter II, *Disclosure Costs: Unintended Consequences of Campaign Finance Reform* (2007) (available at http://www.ij.org/publications/other/disclosurecosts.html); William McGeveran, *Mrs. McIntyre's Checkbook: Privacy Costs of Political Contribution Disclosure*, 6 U. Pa. J. Const. L. 1 (2003); James Bopp, Jr. & Josiah Neeley, *How Not to Reform Judicial Elections: Davis, White, and the Future of Judicial Campaign Financing*, 86 Denv. U. L. Rev. 195, 218-20 (2008) (discussing the burdens of disclosure).

---

**Motion and Memo in Support of**                    12                    **Bopp, Coleson & Bostrom**
**TRO and Preliminary Injunction**                                        **1 South Sixth Street**
**(No. _____)**                                        **Terre Haute, Indiana 47807-3510**
                                                                **(812) 232-2434**

political action committee and personally signing a referendum petition, the net result is the same: individual names and addresses ultimately appear on the internet and are easily accessible by the public.

The results of the study are consistent in one respect with prior studies on campaign finance disclosure—over 80% of the respondents agreed that the government should make public the identities of those who contribute to ballot measures.[10] *Id.* at 7. However, that is where the similarities end.

When the issue was personalized, support for public disclosure waned significantly. Only 40% of respondents were comfortable with their *own* name and address being posted on a government website as a result of a contribution to a ballot committee. *Id.* Even fewer respondents (24%) felt that their employer's name should be posted on the Internet because of their political contribution. *Id.* Nearly 60% of respondents indicated that they would think twice about donating if it meant that their name and address would be released to the public. *Id.* Furthermore, after comparing general support for disclosure laws with an individual's likelihood of contributing to a campaign if their information is made public, Carpenter found that "even those who strongly support forced disclosure laws will be less likely to contribute to an issue campaign if their contribution and personal information will be made public." *Id.* at 7. When asked why they would think twice before donating, respondents cited a desire to remain anonymous, fear of retaliation (both personal and economic), and that public disclosure would take away their right to a secret ballot. *Id. See also McIntyre*, 514 U.S. at 343 ("The specific holding in *Talley* related to advocacy of an economic boycott, but the Court's reasoning embraced a respected tradition of anonymity in the advocacy of political causes. This tradition is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation."). As Carpenter concluded

---

[10] Respondents were asked to state how they felt about the following statement. "The government should require that the identities of those who contribute to ballot issue campaigns should be available to the public." This finding is consistent with the findings of David Binder, relied upon by the court in *CPLC II*, where 71% of respondents felt that it was important to know the identities of individuals that contributed to a ballot measure committee. *CPLC II*, 507 F.3d at 1179.

Motion and Memo in Support of
TRO and Preliminary Injunction
(No. _____)

13

**BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

while voters appear to like the idea of disclosure in the abstract (that is, as it applies to someone else), their support weakens dramatically in the concrete (that is, when it involves them). Stated succinctly, it is 'disclosure for thee, but not for me.' . . . But the potential costs do not end there. Most respondents also reported themselves less likely to contribute to an issue campaign if their personal information was disclosed . . . . Thus, the cost of disclosure also seems to include a chilling effect on political speech and association as it relates to ballot issue campaigns. . . . The vast majority of respondents possessed no idea where to access lists of contributors and never actively seek out such information before they vote. At best, some learn of contributors through passive information sources, such as traditional media, but even then only a minority of survey participants could identify *specific* funders of campaigns related to the ballot issue foremost in their mind. . . . Such results hardly point to a more informed electorate as a result of mandatory disclosure . . . [11].

*Disclosure Costs* at 13. Thus, in addition to having a significant chilling effect on political

speech, the research also indicates that compelled disclosure provisions do little to solve the

---

[11] Carpenter's research has demonstrated just how little the information gleaned from compelled disclosure is used by voters. His research demonstrates that voters, in the abstract, want public disclosure and indicate that it would effect their vote. However, in the concrete, donors are reluctant to make their financial support public and almost never access the public disclosure reports. Moreover, even traditional information sources relied upon by voters, such as newspapers and television, tend to ignore campaign disclosure reports.

Campaign disclosure is typically justified on the ground that "[voters are] cognitively limited decision makers, processing only a small fraction of the information to which they are exposed. Rather than engaging in a comprehensive information search and then deliberating to achieve an optimal choice, the argument goes, individuals tend to rely on cues to make judgments." *Disclosure Costs* at 4.

Carpenter's research indicates that nearly two-thirds of the voters rely upon traditional forms of media, including newspaper, television, and radio, as sources of information on ballot measures. *Id*. at 12. Only 12% indicated that they used the Internet, but the study does not indicate how the Internet was used. In other words, the voter could have been visiting the websites of traditional news sources. *Id*. at 12.

In a later study, Carpenter analyzed how often traditional media–from which the typical voter obtains most of his or her information–used disclosure information in their stories. Carpenter found that traditional media rarely uses public disclosure in their stories: "Although voters enjoyed a wealth of information about ballot issues in 2006, little of that information included data that drew on, appeared to draw on, or made reference to information related to or resulting from campaign-finance disclosure laws. Despite the posting of disclosure information on the Colorado Secretary of State's website, and the alleged importance of such information to voters, only 4.8 percent of the information sources included any discussion of disclosure-related data. Instead, more than 95 percent of the sources in this sample focused on the content of the ballot issues, predicted effects of the issues' passage or defeat, and otherwise discussed the merits or demerits of the proposed initiatives without making any reference to information resulting from disclosure." Dick Carpenter, Ph.D., *Mandatory Disclosure for Ballot-Initiative Campaigns*, The Independent Review, 578 (Spring 2009) (*available at* http://www.independent .org/pdf/tir/tir_13_04_6_carpenter.pdf) ("*Mandatory Disclosure*"). Even as the election draws near, traditional media sources do not increase the number of stories relying on donor disclosure. *Id*. (97% of traditional media sources in two weeks immediately before election did not draw on, appear to draw on, or make reference to disclosure reports).

In conclusion, Carpenter noted: "It therefore appears that it is not only citizens who do not consult disclosure information directly, but also media, think tanks, and other 'elites' that, according to cue-taking literature, ordinarily assume a 'cue-giving' role to the general public." *Id.* at 578. The voters, who gain most of their information from the news media, rely on a source that, for all practical purposes, ignores the public disclosure system in its coverage of ballot measures. Thus, the voters are not gaining valuable information from the public disclosure of donors - particularly in light of the First Amendment harms being caused to citizens because of this compelled public disclosure.

---

**Motion and Memo in Support of**
**TRO and Preliminary Injunction**
**(No. _____)**

14

**BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

1  problem that they are meant to address, namely informing the public what special interests back a

2  particular ballot measure.

>    **3)  The Public Records Act is unconstitutional as applied to referendum
>         petitions because it is not narrowly tailored to serve a compelling
>         government interest.**

5  In *Buckley*, the Supreme Court stated that "disclosure requirements, as a general matter,

6  directly serve [three] substantial governmental interests." 424 U.S. at 68. "First, disclosure

7  provides the electorate with information as to where political campaign money comes from and

8  how it is spent by the candidate in order to aid the voters in evaluating those who seek federal

9  office [("Informational Interest")]. . . . Second, disclosure requirements deter actual corruption

10  and avoid the appearance of corruption by exposing large contributions and expenditures to the

11  light of publicity [("Corruption Interest")]. . . . Third, . . . recordkeeping, reporting, and

12  disclosure requirements are an essential means of gathering the data necessary to detect

13  violations of the contribution limits [("Enforcement Interest")]." *Id.* at 66-68.

14  Subsequent courts have clarified that the Corruption and Enforcement Interests are unique to

15  candidate elections, and therefore cannot be relied upon to justify compelled referendum

16  disclosure. *See Bellotti*, 435 U.S. at 789-90 (holding that the state lacked a compelling interest in

17  combating corruption in the context of a referendum election because there is no risk of *quid pro*

18  *quo* corruption); *Cal. Pro-Life Council, Inc. v. Getman,* 328 F.3d 1088, 1105 n.23 (9th Cir. 2003)

19  (same) ("*CPLC I*"). S*ee also Canyon Ferry Road*, 556 F.3d at 1031-32 (noting that the

20  Enforcement Interest cannot justify ballot-measure disclosure because its necessary only to

21  enforce contribution limits—limits that are unconstitutional in the context of a ballot-measure

22  election); *CPLC I,* 328 F.3d at 1105 n.23 (same). However, these courts have suggested that the

23  Informational Interest may be sufficient to justify compelled referendum disclosure, a conclusion

24  that appears to be premised on a misreading of *Buckley* and the Informational Interest discussed

25  therein. *See*, *e.g.*, *CPLC II*, 507 F.3d at 1178-80.

26  In *Buckley*, the Supreme Court stated that information regarding contributions and

27  expenditures "allows voters to place each candidate in the political spectrum" and that the

28  "sources of a candidate's financial support also alert the voter to the interests to which a

1  candidate is most likely to be responsive and thus facilitate predictions of future performance."

2  424 U.S. at 67. The need to provide this information to voters is a direct result of the realities of a

3  political campaign involving *candidates*; candidates often discuss their general policies regarding

4  education, health care, and taxes, but rarely disclose detailed policy positions about those topics.

5  Issues that escape the attention of the media are simply not discussed. Thus, information

6  regarding contributors to a candidate allows voters to better predict some of the difficult policy

7  decisions that an elected official is called to make in office, especially on those issues that are not

8  discussed publicly during a campaign.

9      By comparison, everything the voter needs to know about a referendum is contained in the

10  text of the measure itself. There is no "political spectrum" and certainly no "future performance."

11  A referendum can be an incredibly complex piece of legislation, but the first *Buckley* interest is

12  not about simplifying the message for voters. *See Bellotti*, 435 U.S. at 792 ("But if there be any

13  danger that the people cannot evaluate the information and arguments advanced . . . it is a danger

14  contemplated by the Framers of the First Amendment."). Information about contributors no doubt

15  may change perceptions about a referendum, but it simply does not change the nature of the

16  referendum itself. The First Amendment grants advocates the right to separate their message

17  from their identity to ensure that the message will not be prejudged simply because voters do not

18  like the proponent. *McIntyre*, 514 U.S. at 342. The identity of the speaker is no doubt helpful in

19  evaluating the message, "but the best test of truth is the power of the thought to get itself

20  accepted in the competition of the market." *Id.* at 348 n. 11 (citations omitted). "Don't

21  underestimate the common man. People are intelligent enough to evaluate the source of

22  anonymous writing. They can evaluate its anonymity along with its message, as long as they are

23  permitted, as they must be, to read that message. And then, once they have done so, it is for them

24  to decide what is 'responsible', what is valuable, and what is truth." *Id.*

25      Because the identity of the speaker does not change the message communicated and because

26  it simply cannot alter the text of the referendum itself, Washington lacks a compelling

27  government interest sufficient to compel the public disclosure of a referendum petition. *See id.*

28  *See also Buckley II*, 525 U.S. at 203 (noting that ballot-measure expenditure reporting adds little

1   insight as to the measure), *aff'g Am. Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092,

2   1104-05 (10th Cir. 1997) ("The first and third [*Buckley* interests] are inapplicable because [the

3   statute] addresses expenditures, not contributions.").

4        The U.S. Court of Appeals for the Ninth Circuit recently ruled that, in the context of ballot

5   measure campaigns, a state cannot compel the disclosure of the names of those people who have

6   made *de minimis* contributions to a campaign. *See Canyon Ferry Road Baptist Church of East*

7   *Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1034 (9th Cir. 2009). Signatories to a petition are like

8   *de minimis* contributors and the state cannot compel their disclosure under the First Amendment.

9   *Id.*; *see also id.* at 1036 (Noonan, J., concurring) ("How do the names of small contributors affect

10  anyone else's vote? Does any voter exclaim, 'Hank Jones gave $76 to this cause. I must be

11  against it!'"). Likewise, one could ask, "How do the names of petition signers affect anyone

12  else's vote? Does any voter exclaim, 'Hank Jones signed the petition. I must be against it!'"

13       In *Buckley II*, the Supreme Court also considered and rejected administrative efficiency and

14  fraud detection as potential state interests. *Buckley II*, 525 U.S. at 192. Even if fraud detection

15  were a legitimate interest, it is not compelling with respect to referendum petitions. First, the

16  Supreme Court has recognized that fraud is much less of a concern at the petition process stage.

17  *Meyer v. Grant*, 486 U.S. 414, 427-28 (1988). This flows from the very justification of the

18  petition process: ensuring that there is a sufficient level of public support to warrant the

19  expenditure of public and private funds to place the referendum on the ballot. The question is not

20  whether SB 5688 should or should not be enacted, but merely whether Washington citizens as a

21  whole should have the opportunity to voice their opinion on SB 5688.

22       Second, in *Washington Initiatives Now v. Rippie*, 213 F.3d 1132, 1139 (9th Cir. 2000), the

23  Ninth Circuit noted that fraud prosecutions during the petition process have been sparse (twice in

24  seven years) and that the fraud was detected by traditional methods of detecting and prosecuting

25  forgeries (i.e., signature comparison). *See also id.* at 1138 (noting that it is "precisely the risk that

26  people will refrain from advocating controversial positions that makes a disclosure scheme of

27  this kind especially pernicious"). Thus, the State's interest is in private disclosure (i.e., disclosure

28  to the government) to prevent fraud in the petition process. Public disclosure of a petition is not

**Motion and Memo in Support of**          17          **BOPP, COLESON & BOSTROM**
**TRO and Preliminary Injunction**                     **1 South Sixth Street**
**(No. _____)**                              **Terre Haute, Indiana 47807-3510**
                                                       **(812) 232-2434**

narrowly tailored to advance that interest and is therefore unconstitutional under the First Amendment.

Moreover, allowing the disclosure of the names of the petition signers would be an end run around Washington's petition statute, which specifically attempts to prevent the disclosure of the names of petition signers. Under Wash. Rev. Code § 29A.72.230, the names and addresses of petition signers are statutorily protected—the small and limited group of people who are allowed to observe the verification and canvass of the signatures may "make no record of the names, addresses, or other information on the petitions or related records during the verification process . . . ." Wash. Rev. Code § 29A.72.230. The petition statute thus prevents the release of the names of those who signed a petition. By releasing the names of those who signed a petition through a request made under Washington's Public Records Act, the State is allowing an unconstitutional end run around the statute.

> **b. The Public Records Act is unconstitutional as applied to Referendum 71 because there is a reasonable probability that the release of the names of the petition signers will subject those petition signers to threats, harassment, and reprisals.**

The Supreme Court has consistently held that compelled disclosure provisions impose substantial burdens on the First Amendment freedoms of speech and association. *Davis*, 128 S. Ct. at 2774-75 (*citing Buckley*, 424 U.S. at 64). In considering campaign donation thresholds, the Supreme Court predicted that compelled disclosure provisions might chill the speech of some individuals because of the risk that compelled disclosure would expose those individuals to harassment and retaliation. *Buckley*, 424 U.S. at 68; *see also id.* at 237 (Burger, C.J., concurring in part and dissenting in part) (discussing the social costs of public disclosure).

As set forth above, the Washington Public Records Act is not narrowly tailored to serve a compelling government interest. However, even if this Court finds that the Public Records Act is narrowly tailored to serve a compelling government interest, the release of the Referendum 71 petition is unconstitutional because there is a reasonable probability that its disclosure will subject the petition signers to a reasonable probability of threats, harassment, and reprisals. Under this "reasonable-probability test" articulated by the Supreme Court, when there is a

**Motion and Memo in Support of**
**TRO and Preliminary Injunction**
**(No. _____)**

**BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

reasonable probability that people espousing a certain opinion—such as support for a traditional definition of marriage—will be subject to threats, harassment, or reprisals, the government cannot compel the release of their names. Because the reasonable-probability test is met here, the Public Records Act is unconstitutional as applied and this Court should issue a temporary restraining order and preliminary injunction to prevent the public release of the Referendum 71 petition.

### 1) Compelled disclosure provisions are subject to strict scrutiny.

As set forth in Section III.B.1.a-.1, *supra*, compelled disclosure provisions, such as the compelled disclosure that will occur if the Referendum 71 petition is made public, are subject to strict scrutiny.

### 2) Disclosing the names of the petition signers will subject those petition signers to a reasonable probability of threats, harassment, and reprisals.

In the context of compelled disclosure, Plaintiffs must meet but one test for an exemption from the reporting requirements to be granted a temporary restraining order and a preliminary injunction—the "reasonable-probability test." Under this test, Plaintiffs must demonstrate a reasonable probability that the compelled disclosure of the names of those who signed the petition will subject those individuals to threats,[12] harassment,[13] or reprisals.[14] As set forth below, Plaintiffs have demonstrated: (1) that individuals and organizations circulating the petition have already been subject to threats, harassment, and reprisals; (2) that groups have already shown that the release of the names of the petition signers will be used to harass those petition signers; and (3) supporters of similar causes in the past have been subjected to the sort of threats, harassment,

---

[12] "Threat, *n*. 1. A communicated intent to inflict harm or loss on another or on another's property, esp. One that might diminish a person's freedom to act voluntarily or with lawful consent . . . . 2. An indication of an approaching menace . . . . 3. A person or thing that might well cause harm . . . ." Black's Law Dictionary 1489-90 (7th ed. 1999).

[13] "Harassment . . . . Words, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose." Black's Law Dictionary 721 (7th ed. 1999).

[14] "Reprisal . . . . 3. Any act or instance of retaliation, as by an employer against a complaining employee." Black's Law Dictionary 1305 (7th ed. 1999).

1  and reprisals prior courts have considered and found sufficient to grant a disclosure exemption.[15]

2  Given the existence and prevalence of the threats, harassment, and reprisals directed at people

3  already associated with Referendum 71 and similar causes, there is a reasonable probability that

4  any individual associated with Referendum 71 identified as a result of the State's disclosure of

5  the Referendum 71 petition pursuant to the Public Records Act will be subjected to similar

6  threats, harassment, and reprisals, unless a temporary restraining order and preliminary injunction

7  are issued to prevent the release of those names.

8            **a)  The standards of the reasonable-probability disclosure exemption test.**

9          In *Buckley*, the Court created the reasonable-probability test in response to, and in rejection

10  of, the argument that the proof of a chill on expressive association would be impossible. *Buckley*,

11  424 U.S. at 73. In the appellate court, a dissenting opinion argued that a blanket exemption must

12  be created for minor parties, because the "evils of chill and harassment are largely incapable of

13  formal proof." *Id.* (citation omitted). The dissenter noted the difficulty of obtaining "witnesses

14  who are too fearful to contribute but not too fearful to testify about their fear." *Id.* at 74. The

15  Supreme Court rejected this argument by establishing the reasonable-probability test, including

16  its mandate of "sufficient flexibility" in evidence to fit the situation where witnesses would be

17  difficult to obtain because they are chilled by fear of threats, harassment, or reprisals. *Id.* Rather

18  than create the blanket exemption urged by the appellate court's dissent, the Supreme Court

19  recognized the inherent problem created by the threat of threats, harassment, or reprisals after

20  disclosure (or the possibility of such threats, harassment, or reprisals), and then required only a

21  minimal amount of proof—but some proof, nonetheless—for those requesting an exemption

22  from reporting.

23          Thus, *Buckley* established that the sole test Plaintiffs must meet to obtain a disclosure

24  exemption: the Court must determine whether there is a "reasonable probability that the

25  compelled disclosure of a party's contributors' names will subject them to threats, harassment, or

26

27

28      [15] Plaintiffs are not required to establish a causal link between the compelled disclosure statute and the instances of threats, harassment, and reprisals. *Buckley*, 424 U.S. at 74.

**Motion and Memo in Support of**     20     **BOPP, COLESON & BOSTROM**
**TRO and Preliminary Injunction**     **1 South Sixth Street**
**(No. _____)**     **Terre Haute, Indiana 47807-3510**
     **(812) 232-2434**

1  reprisals from either Government officials or private parties." *McConnell*, 540 U.S. at 198

2  (citation omitted). If there is a such a reasonable probability, Plaintiffs must receive an

3  exemption from disclosure. There is no further test or balancing because the Supreme Court has

4  already done the balancing and established the reasonable-probability test as the sole criterion a

5  party needs to meet to gain a disclosure exemption.[16] *Id.*

### b) The quantum and quality of evidence required to meet the reasonable-probability test.

6

7  The First Amendment context and the reasonable-probability test govern the quantum and

8  quality of evidence that must be presented to establish a reasonable probability of threats,

9  harassment, and reprisals. The Supreme Court has set forth five requirements on the quantum and

10  quality of evidence required to meet the reasonable-probability test that are applicable here.

11

### i) Plaintiffs are not required to establish a direct causal link between disclosure and specific instances of threats, harassment, and reprisals.

12

13  First, the Supreme Court has rejected the notion that a causal link must be established

14  between the threats, harassment, and reprisals, and public disclosure. *Buckley*, 424 U.S. at 74 ("A

15  strict requirement that chill and harassment be directly attributable to the specific disclosure from

16  which the exemption is sought would make the task even more difficult."). In the present case,

17  the critical question is whether each particular individual was subjected to threats, harassment, or

18  reprisals because of his or her support for Referendum 71 or a traditional definition of marriage.[17]

19  If the answer is "yes," then the Court can assume, as a matter of law, that there is a reasonable

20  probability that any individual who is disclosed because he or she signed the Referendum 71

21  petition will likewise be subjected to threats, harassment, and reprisals. To the extent that

22

23

24  [16] Nevertheless, if the Court were to weigh Washington's interest in disclosure against the First Amendment harms, the balance tips even more in favor of Plaintiffs than it did in *Buckley* or *Brown v. Socialist Workers '74 Campaign Comm.*, because of the technological changes that have altered the dynamics of public disclosure, and the social science research that has illuminated these harms and dispelled the notion that donor information solves the problem of voter ignorance.

25

26

27  [17] The Second Circuit provides a helpful application of the reasonable-probability test in *FEC v. Hall-Tyner Election Campaign Committee*, 678 F.2d 416 (2d Cir. 1982), in which it, *inter alia*, makes clear that those seeking exemption have no burden to prove "harassment will certainly follow compelled disclosure" because "breathing space" is required in the First Amendment context. *Id.* at 421.

28

**Motion and Memo in Support of**
**TRO and Preliminary Injunction**
**(No. _____)**

21

1    Plaintiffs can demonstrate a causal link between the support for Referendum 71 or a traditional

2    definition of marriage, it only strengthens their case and demonstrates that the assumption is

3    well-justified.

### ii) Plaintiffs need not demonstrate that they, or their members, have been subjected to threats, harassment, and reprisals.

5    Similarly, the second "sufficient flexibility" standard of the reasonable-probability test

6    allows an organization to rely not only on evidence of specific incidents of harassment directed at

7    its members or the organization itself, but also on evidence of threats, harassment, or reprisals

8    directed at other individuals and organizations holding similar views. Thus, in *Averill v. City of*

9    *Seattle*, the court granted an exemption to a specific candidate's campaign committee primarily

10   upon evidence of threats and harassment directed at the Freedom Socialist Party and Radical

11   Women generally. 325 F. Supp. 2d 1173, 1175 (W.D. Wash. 2004). The only additional evidence

12   submitted by the committee consisted of several harassing and crank calls directed at contributors

13   to the committee. *Id.* at 1178.[18] Once Plaintiffs have established evidence of threats, harassment,

14   or reprisals directed at other individuals or organizations holding similar views, there is, as a

15   matter of law, a reasonable probability of threats, harassment, and reprisals. The fact that

16   members of the Plaintiffs' organization have been harassed only strengthens the case and

17   demonstrates that the analytical inference is well-justified.

### iii) The reasonable-probability test requires only that threats, harassment, and reprisals exist, not that they be severe.

20   The reasonable-probability test does not require threats, harassment, or reprisals to be

21   substantial or severe, only that threats, harassment, and reprisals exist. The test is one of

22   probability, making numerosity a logical criterion. However, the nature of the claim makes it

---

[18] In cases where the courts have found it inappropriate to look to evidence of harassment directed at other organizations, they have done so on the grounds that it was impossible to determine the specific cause of the harassment. *See, e.g., Oregon Socialist Workers 1974 Campaign Comm. v. Paulus*, 432 F. Supp. 1255, 1259 (D. Or. 1977) (noting that the harassment was "at least as likely to be the product of the other political activities of the affiants."). The Verified Complaint and other evidence presented by Plaintiffs leave little doubt as to the cause of the harassment—each individual was threatened or harassed because he or she supported a traditional definition of marriage. Together, this evidence demonstrates that there is a reasonable probability that any individuals advocating a traditional definition of marriage will be subjected to similar threats, harassment, and reprisals.

difficult to rely solely on the number of instances of threats, harassment, and reprisals that have

occurred. As the Court recognized in *Buckley*, plaintiffs in situations where there is a reasonable

probability of threats, harassment, or reprisals face a daunting task in trying to find witness who

are "too fearful to contribute but not too fearful to testify about their fear." 424 U.S. at 74.

Accordingly, the courts must look to a variety of other factors. The severity of reprisals

certainly has a proper role to play in the analysis. When the incidents occurred may be relevant.[19]

So too might the geographic dispersion and publicity surrounding the incidents.[20] However, it is

inappropriate to distinguish any case on a single factor. A few severe and public threats could be

sufficient to warrant an exemption. Likewise, relatively minor instances of threats, harassment,

and reprisals may be sufficient if they are widespread. In fact, *Averill* recognized that "even small

threats" could be sufficient. *Averill*, 325 F. Supp. 2d at 1176.

Thus, in determining whether there is a reasonable probability of threats, harassment, and

reprisals, the courts have considered everything from boycotts to death threats to determine

whether there is a reasonable probability of future threats, harassment, and reprisals. *See, e.g.*,

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. at 99 (threatening phone calls and

hate mail, the burning of organizational literature, destruction of members' property, police

harassment, and shots fired into organization's office); *Bay Area Citizens Against Lawsuit Abuse*,

982 S.W.2d 371 (Tex. 1998) (boycotts). Each has a proper role to play in the analysis and an

---

[19] The evidence presented in this case suggests that the threats, harassment, and reprisals directed at individuals supporting a traditional definition of marriage are not limited to the Petition on Referendum 71. For example, the declarations attached to the Declaration of Scott Bieniek as Exhibits 12 and 13, recite many instances of harassment directed at supporters of marriage between one man and one woman in light of California's Proposition 8, a ballot measure establishing a Constitutional definition of marriage in California. *See* (Decl. of Scott F. Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 12 & Ex. 13.) In late April, a national controversy erupted when Carrie Prejean, First Runner-Up, Miss USA, said she did not support gay marriage when answering a question from Miss USA judge Perez Hilton. *See Hilton, Miss California Take Sides on "Today"*, S.F. Chronicle, Apr. 23, 2009 (indicating that her answer may have cost her the Miss USA crown). The evidence suggests that the threats and harassment directed at individuals supporting a traditional definition of marriage are anything but isolated incidents.

[20] Incidents involving harassment, threats, and reprisals against supporters of marriage between one man and one woman are not geographically limited. *See* Decl. of Scott F. Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 13, Page 118-35 (John Doe #30 - California); *id.* at Page 42-44 (John Doe #19 - Louisiana); *id.* at Page 69-74 (John Doe #27 - Michigan); *id.* at Page 80-117 (John Doe #29 - New York); & *id.* at Page 142-44 (John Doe #32 - Ohio).)

---

**Motion and Memo in Support of**      23      **BOPP, COLESON & BOSTROM**
**TRO and Preliminary Injunction**      **1 South Sixth Street**
**(No. _____)**      **Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

1    exemption must be granted if the Court determines that there is a reasonable probability of

2    threats, harassment, and reprisals.

3    **iv) The exemption is not limited to minor political parties.**

4    While *Buckley* and *Brown* make references to "minor parties," nothing in *NAACP v.*

5    *Alabama*—the opinion on which the exemption is premised—suggests that the exemption is so

6    limited. The "minor party" language in *Buckley* results from the parties' argument for a "blanket

7    exemption" for minor parties from disclosure requirements without first having to demonstrate

8    the requisite level of harm under *NAACP v. Alabama.* 357 U.S. at 449; *see Buckley*, 424 U.S. at

9    68-74. As the *NAACP v. Alabama* Court put it, compelled disclosure is just as "likely to affect

10   adversely the ability of petitioner and its members to pursue their collective effort to foster

11   beliefs which they admittedly have the right to advocate, in that it may induce members to

12   withdraw from the Association and dissuade others from joining it because of fear of exposure of

13   their beliefs shown through their associations and of the consequences of this exposure." 357

14   U.S. at 462-63. Indeed, in *McConnell v. FEC*, the Court expressly affirmed the analysis and

15   holding of the district court, which applied the reasonable-probability test to entities that were, by

16   no stretch of the imagination, minor parties. *McConnell v. FEC*, 251 F. Supp. 2d 176, 245-47

17   (D.D.C. 2003) (applying the reasonable-probability test to a Chamber of Commerce coalition, the

18   American Builders and Contractors, Associated General Contractors of America, the American

19   Civil Liberties Union, and the National Rifle Association). The exemption has also been applied

20   in non-partisan elections. *McArthur v. Smith*, 716 F. Supp. 592, 594 (S.D. Fla. 1989). Non-

21   partisan elections, like ballot measures, are about the issues, not the political party of the

22   candidate. *See also Oregon Socialist Workers 1974 Campaign Comm. v. Paulus*, 432 F. Supp.

23   1255, 1257 (D. Or. 1977) (noting that courts must be especially vigilant in cases involving minor

24   parties, but in no way limiting the exemption to minor parties).

25   Furthermore, "the First Amendment does not 'belong' to any definable category of persons

26   or entities: It belongs to all who exercise its freedoms." *Bellotti*, 435 U.S. at 802 (Burger, J.,

27   concurring). As the *Buckley* court put it, age, size, and political success, are all poor factors upon

28   which to create a blanket exemption. *Buckley*, 424 U.S. at 73. The Court explained that some

1    "long-established parties are winners—some are consistent losers," and sometimes a new party

2    "may garner a great deal of support if it can associate itself with an issue that has captured the

3    public's imagination." *Id.* Today's winners might be tomorrow's losers, and the First

4    Amendment must protect both. Tying the *Brown* exemption to minor parties fails to protect the

5    First Amendment's goal of encouraging "uninhibited, robust, and wide-open" debate. *New York*

6    *Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). All parties, whether large or small, new or well-

7    established, winners or losers, must be free to advocate their position free from the deplorable

8    acts directed at supporters of Referendum 71 and a traditional definition of marriage.

9              **v)    The test does not require any threats, harassment, or reprisals to**
              **be directed at Plaintiffs by government officials.**

10        It is of little import that none of the threats, harassment, and reprisals introduced into

11    evidence come directly at the hands of state actors. As the Supreme Court said in *NAACP v.*

12    *Alabama*, "it is only after the initial exertion of state power represented by the production order

13    that private action takes hold." 357 U.S. at 463. An exemption is warranted from the most well-

14    intentioned disclosure statute if there is a reasonable probability of threats, harassment, and

15    reprisals. *See id.* (noting the deterrent effect of *unintended*, but *inevitable* results flowing from

16    compelled disclosure provisions); *McArthur*, 716 F. Supp. at 594 ("The Court clearly stated that

17    the first amendment prohibits compelled disclosure of contributors' or recipients' names if the

18    revelation would subject them to harassment from *either* government officials or private parties.

19    The Court's use of 'either' indicates that harassment, reprisals or threats from private persons is

20    sufficient to allow this court to enforce the plaintiff's first amendment rights by cloaking the

21    contributors and recipients' names in secrecy." (emphasis in original)). Under the First

22    Amendment and the reasonable-probability test announced in *Buckley*, Washington simply

23    cannot stick its head in the sand and ignore the real and inevitable consequences that flow from

24    the Public Records Act, however well-intentioned that statute may be. In light of these burdens,

25    Washington's interest in disclosure of those who signed the Petition must give way to greater

26    First Amendment concerns in order to protect the free and robust debate necessary to preserve

27    our form of government.

28

**Motion and Memo in Support of**          25          **BOPP, COLESON & BOSTROM**
**TRO and Preliminary Injunction**                     **1 South Sixth Street**
**(No. _____)**                               **Terre Haute, Indiana 47807-3510**
                                                       **(812) 232-2434**

1
2

    **3)**   **Disclosing the names of the Petition signers is unconstitutional as applied to Plaintiffs, because there is a reasonable probability of threats, harassment, and reprisals.**

3      The Verified Complaint and other evidence demonstrates that compliance with the

4  compelled disclosure provisions of Washington's interpretation of the Public Records Act will

5  expose Plaintiffs, and those who signed the Petition to a reasonable probability of threats,

6  harassment, and reprisals if their names are released to the public. The evidence demonstrates

7  that the reprisals directed at supporters of a traditional definition of marriage are not isolated

8  events perpetuated by one or two individuals, but are instead, part of a larger campaign designed

9  to silence any individual supporting Referendum 71 or a traditional definition of marriage. In

10  light of such evidence, Plaintiffs are entitled to a temporary restraining order and a preliminary

11  injunction because their right to exercise their First Amendment freedoms of expression and

12  association free from threats, harassment, and reprisals outweighs any interest Washington may

13  have in compelled disclosure.

14     As set forth in the Facts section of this Memorandum, Larry Stickney, the Campaign

15  Manager for Protect Marriage Washington, has received a large number of emails from people

16  who disagree with his position on marriage. (Verified Compl., Ex. 1.)  Rather than engage Mr.

17  Stickney in a civil conversation about the marriage issue, many of these emails threaten and/or

18  harass Mr. Stickney. He has been told to avoid an entire area of Washington, has been threatened

19  with a boycott, and harassed with obscenities. (Verified Compl., Ex. 1, p. 10, 20, & 21.)

20     Mr. Stickney also received indirect threats to his safety through blog posts, which threatened

21  harm not only to him, but to his entire family as well. (Verified Compl., Ex. 2, p. 2.)  Even

22  details of a divorce fifteen years ago have become the subject of a harassing newspaper article

23  about Mr. Stickney. (Verified Compl., Ex. 3, p. 1.)

24     More ominously, Mr. Stickney is also subjected to harassment and threats in his own home.

25  In late June, an individual was seen taking pictures of Mr. Stickney's home while his daughter

26  played outside. Shortly after Referendum 71 was presented to the Secretary of State on May 4,

27  2009, Mr. Stickney received a phone call at 2:00 a.m. from a woman who sounded frantic and

28  deranged, and who said various obscene and vile things to him. (Verified Compl., ¶¶ 28 & 30.)

**Motion and Memo in Support of**       26
**TRO and Preliminary Injunction**
**(No. _____)**

**BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

1     Mr. Stickney has taken these threats seriously. For example, early in the campaign to

2    circulate the petition, Mr. Stickney made his children sleep in an interior living room because he

3    feared for their safety if they slept in their own bedrooms. (Verified Compl., ¶ 27.)

4     Unfortunately, anyone who follows the debate over marriage would not be surprised by the

5    harassment and threats that have been leveled at Mr. Stickney. This sort of behavior is commonly

6    directed at supporters of traditional marriage, and past supporters of a definition of marriage as

7    between one man and one woman have been subjected to similar—and often worse—threats,

8    harassment, and reprisals for their support. *See* (Decl. of Scott F. Bieniek in Supp. of Pls. Mot.

9    for TRO & Prelim. Inj., Ex. 12 & Ex. 13.) (consisting of nearly sixty declarations from

10   California, each recounting at least one instance of threats, harassment, and reprisals directed at

11   supporters of Proposition 8, a ballot proposition that added a definition of marriage as between

12   one man and one woman to the California Constitution)

13     As set forth above, under the reasonable-probability test, the similar situations of the

14   California supporters of Proposition 8 to Referendum 71 allows the Court to consider the threats,

15   harassment, and reprisals directed at supporters of Proposition 8 when determining whether to

16   issue a preliminary injunction in this similar situation. *See Buckley*, 424 U.S. at 74; *Averill*, 325

17   F. Supp. 2d at 1175.

18     Supporters of traditional marriage in California were physically assaulted and threatened.

19   For example, an individual participating in a sign-waving event supporting traditional marriage

20   had an object thrown at her. (Decl. of Scott F. Bieniek in Supp. of Pls. Mot. for TRO & Prelim.

21   Inj., Ex. 13, p. 31 (John Doe #16).) Another supporter of Proposition 8 received an email that

22   stated, "I tolerate you because I don't come to where you are and slaughter you." (Decl. of Scott

23   F. Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 13, p. 122 (John Doe #30).)

24     Supporters of traditional marriage were also harassed and threatened in their own homes.

25   One supporter had the back window of her car broken out while it sat in front of her home. (Decl.

26   of Scott F. Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 13, p. 7 (John Doe #11).)

27   Another supporter's home was egged and floured on multiple occasions. (Decl. of Scott F.

28   Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 13, p. 17 (John Doe #14).) Still another

**Motion and Memo in Support of**    27    **BOPP, COLESON & BOSTROM**
**TRO and Preliminary Injunction**    **1 South Sixth Street**
**(No. _____)**    **Terre Haute, Indiana 47807-3510**
    **(812) 232-2434**

1  supporter of traditional marriage had a stairway at her home doused in urine. (Decl. of Scott F.

2  Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 13, p. 10 (John Doe #12).) Threats

3  aimed at people in their homes are of particular concern here, where the individuals running the

4  websites that will seek the names of the petition signers will have the addresses of the petition

5  signers, *See*  (Decl. of Scott F. Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 2, p. 2,

6  Ex. 8, p. 1.)

7       Exacerbating the problems of the supporters of traditional marriage in California was a lack

8  of response from public officials. A supporter of traditional marriage reported vandalism and

9  theft of materials supporting traditional marriage on three separate occasions to the local police

10  department, yet never once received a response from the police department. (Decl. of Scott F.

11  Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 13, p. 182 (John Doe #42).)

12       The possibility that such physical harm could be directed at supporters of traditional

13  marriage has chilled the speech of supporters of traditional marriage, and will continue to do so

14  in the future. One father, concerned about the safety of his children, will no longer speak out

15  publicly in support of traditional marriage. (Decl. of Scott F. Bieniek in Supp. of Pls. Mot. for

16  TRO & Prelim. Inj., Ex. 13, p. 119 (John Doe #30).) Another supporter of traditional marriage

17  refused to make a public display of her support, because of aggression directed toward her family

18  and friends. (Decl. of Scott F. Bieniek in Supp. of Pls. Mot. for TRO & Prelim. Inj., Ex. 13, p.

19  164 (John Doe #39).)

20       The evidence of threats, harassment, and reprisals already occurring in Washington, together

21  with the evidence of past threats, harassment, and reprisals directed at supporters of  similar

22  causes elsewhere demonstrate that there is a reasonable probability that those who signed the

23  Petition will be subject to threats, harassment, and reprisals, unless this Court prevents the

24  compelled disclosure of the names of the Petition signers through a temporary restraining order

25  and preliminary injunction.

26       **2.    Plaintiffs have, and will continue, to suffer irreparable harm if defendants are not restrained.**

27       Plaintiffs find themselves in the emergency situation contemplated by FRCP 65(b):

28

Motion and Memo in Support of              28              **BOPP, COLESON & BOSTROM**
TRO and Preliminary Injunction                                  **1 South Sixth Street**
(No. _____ )                                  **Terre Haute, Indiana 47807-3510**
                                                              **(812) 232-2434**

"Applicants for injunctive relief occasionally are faced with the possibility that irreparable injury will occur before the hearing for a preliminary injunction required by Rule 65(a) can be held. In that event a temporary restraining order may be available under Rule 65(b)." 11A Wright & Miller, Federal Practice and Procedure § 2951 (2d ed. 2009).

A Rule 65(b) temporary restraining order "is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction and may be issued with or without notice to the adverse party." *Id.* As soon as the names of those who signed the Referendum 71 petition become public, the First Amendment rights of those individuals will be immediately and irreparably harmed. Issuing a temporary restraining order will secure the status quo—and the all-important First Amendment rights of those who signed the petition—until a preliminary injunction hearing can be held.

Even if this Court ultimately decides at the preliminary injunction hearing that a preliminary injunction enjoining the release of the names of the petition signers should not issue, Defendants and the individuals who may seek the names of the petition signers will only suffer a delay of several days in their seeking of the information contained on the petition. When weighing the rights of those seeking the names of those who signed the petition against the First Amendment rights of the petition signers themselves, the rights of the petition signers must be protected.

Here, the Secretary of State's office has informed Plaintiffs' counsel that they will be releasing the names of those who signed the petition to anyone desiring such names as early as the middle of this week. This release will be done without notifying any of the petition signers. Without a temporary restraining order, Plaintiffs will suffer the irreparable injury of the loss of their First Amendment right to remain anonymous, and prevent threats, harassment, and reprisals.

"Deprivations of speech rights presumptively constitute irreparable harm for purposes of a preliminary injunction: 'The loss of First Amendment freedoms, even for minimal periods of time, constitute[s] irreparable injury.'" *Summum v. Pleasant Grove City*, 483 F.3d 1044 (10th Cir. 2007) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976); s*ee also Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1234 (9th Cir. 2006) (quoting *Elrod*);

Motion and Memo in Support of
TRO and Preliminary Injunction
(No. _____)

29

**Bopp, Coleson & Bostrom**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

1   *Brown v. Cal. Dept. Of Transportation*, 32 F.3d 1217, 1226 (9th Cir. 2003) (noting that a risk of

2   irreparable injury may be presumed when Plaintiffs state a colorable First Amendment claim);

3   *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) ("Where a

4   plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature

5   of the harm may be presumed.").

6         If the names of the petition signers are disclosed to the public by the State, those petition

7   signers will be denied their First Amendment rights twice over —even though each one of the

8   reasons alone would prevent the disclosure of the names of the petition signers. First, because the

9   State has no compelling state interest in the disclosure of the names of the petition signers, the

10  Public Records Act a applied violates the First Amendment rights of the petition signers. Second,

11  by disclosing the names of the petition signers, the State would subject those signers to threats,

12  harassment, and reprisals, thus chilling the First Amendment rights of the petition signers.

13      **3.    Defendants will suffer no meaningful harm from complying with a temporary
               restraining order and preliminary injunction.**

14        In the Ninth Circuit, "[T]he fact that a case raises serious First Amendment questions

15  compels a finding that there exists the potential for irreparable injury, or that at the very least the

16  balance of hardships tips sharply in [Appellants'] favor." *Sammartano v. First Judicial District*

17  *Court, in and for County of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002) (internal quotations

18  and citations omitted). This is true even where "the merits of the constitutional claim were not

19  clearly established at this early stage in the litigation." *Id.* (internal quotations and citations

20  omitted). In the case at bar, however, Plaintiffs have firmly established the merits of their

21  constitutional claims.

22        Once the names of the petition signers are released to the groups that have indicated they

23  will be placing the names of the signers on the internet, who plan to contact the petition signers,

24  and encourage the harassment of the petition signers, the First Amendment rights of those who

25  signed the Referendum 71 petition will be violated. Issuing a temporary restraining order will

26  secure the status quo —and the all-important First Amendment rights of the petition signers

27  —until a preliminary injunction hearing can be held.

28

**Motion and Memo in Support of**          30          **BOPP, COLESON & BOSTROM**
**TRO and Preliminary Injunction**                          **1 South Sixth Street**
**(No. _____)**                          **Terre Haute, Indiana 47807-3510**
                                                          **(812) 232-2434**

1
2
3
4
5
6

In the meantime, if this Court ultimately decides at the preliminary injunction hearing that a preliminary injunction enjoining the release of the petition signers should not issue, Defendants and the individuals who may seek the names of the petition signers will only suffer a delay of several days in their seeking of the information contained on the petition. When weighing the rights of those seeking the names of the petition signers against the First Amendment rights of the Petition signers themselves, the rights of the petition signers must be protected.

7
8
9

**4.  Issuance of a temporary restraining order and a preliminary injunction will serve the public interest.**

10
11
12
13
14
15
16
17
18
19
20
21
22
23

The Ninth Circuit Court of Appeals has recognized that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Sammartano*, 303 F.3d at 974 (quoting with approval *G & V Lounge, Inc. v. Mich. Liquor Control Com'n*, 23 F.3d 1071, 1079 (6th Cir.1994)). While the public interest in protecting First Amendment liberties has, on occasion, been overcome by "a strong showing of other competing public interests," *Sammartano*, 303 F.3d at 974, there must be *some showing* of an *actual*, strong competing interest in order for a court to find that it is in the public interest to deny injunctive relief. *Id*. (noting that the appellees had made no showing that their challenged regulation, which infringed on appellants' First Amendment rights, could "plausibly be justified," and so granting appellants' request for injunctive relief). In the case before this Court, there simply is no interest—strong or otherwise—which can justify the challenged laws. It is, however, in the public interest that First Amendment freedoms be preserved. The political speech of Plaintiffs will be burdened and chilled if the names of the petition signers are released. Enjoining the offending conduct is the only way to overcome that pernicious effect. Thus, an injunction is in the public interest and this Court should grant it.

## IV.  CONCLUSION

24
25
26
27
28

For the foregoing reasons, a temporary restraining order should immediately issue, and a preliminary injunction should issue after a proper hearing. Because of the complex constitutional issues involved here, Plaintiffs believe that oral argument would be helpful to the Court in determining whether a preliminary injunction should issue, and therefore request oral argument.

Motion and Memo in Support of
TRO and Preliminary Injunction
(No. _____)

31

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

1    No security should be required, or it should be nominal, because Defendants have no

2    monetary stake in the outcome of this litigation.

3

4    Dated this 28th day of July, 2009.

5    Respectfully submitted,

6

7    James Bopp, Jr. (Ind. Bar No. 2838-84)*        Stephen Pidgeon
     Sarah E. Troupis (Wis. Bar No. 1061515)*       ATTORNEY AT LAW, P.S.

8    Scott F. Bieniek (Ill. Bar No. 6295901)*        10900 NE 8th Street, Suite 900
     BOPP, COLESON & BOSTROM                        Bellevue, Washington 98004

9    1 South Sixth Street                            (425) 605-4774
     Terre Haute, Indiana 47807-3510                 Counsel for All Plaintiffs

10   (812) 232-2434
     *Counsel for All Plaintiffs*

11   *Pro Hac Vice Application Pending*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28