The Honorable Benjamin H. Settle

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON, | NO. 09-cv-05456-BHS |
| Plaintiffs, | DEFENDANTS' RESPONSE OPPOSING MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| SAM REED, in his official capacity as Secretary of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, | |
| Defendants. | |

## I.     INTRODUCTION

Defendants Sam Reed and Brenda Galarza oppose the Plaintiffs' Motion for a Preliminary Injunction, for the reasons stated below.

## II.     STATEMENT OF FACTS

In the state of Washington, laws may be enacted in either of two ways:  through the acts of the state's elected legislature, or directly by the people through the use of the initiative and

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

1

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

referendum powers. Under the state constitution, a referendum "may be ordered on any act, bill, law, or any part thereof passed by the legislature" with exceptions not at issue in this case. Wash. Const., art. II, § 1(b). If constitutionally established prerequisites for a referendum election are met, then the electorate votes on whether to accept or reject the bill passed by the legislature. *Id.*

In order to trigger the referendum process, the state constitution requires the filing of petitions with the Secretary of State that contain the valid signatures of Washington registered voters in a number equal to four percent of the votes cast for the Office of Governor at the last gubernatorial election preceding the filing of the text of the referendum measure with the Secretary of State. *Id.* Under the Washington Constitution, absent an emergency clause or an effective date specified in a bill, bills enacted by the legislature become effective 90 days after adjournment of the session in which they are enacted. Wash. Const., art. II, § 1(c), (d). If a referendum petition is submitted to the Secretary of State within this 90-day period, the effective date of the bill approved by the legislature is suspended until the Secretary of State determines whether the petition sheets contain valid signatures of voters registered in Washington in sufficient numbers to cause an election to be held, and, if so, until after the election. Wash. Const., art. II, §1 (c). During the 90-day period, proponents of the petition seek signatures from Washington voters in a number sufficient to trigger a referendum election.

As an exercise of this public constitutional referendum process, the text of Referendum Measure 71 was filed with the Office of the Secretary of State as a proposed ballot measure on May 4, 2009. Decl. of Nick Handy, ¶ 4. Referendum 71 asks voters to either accept or reject Engrossed Second Substitute Senate Bill 5688, passed by the 2009 Legislature, relating

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

2

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

to the rights, responsibilities, and obligations accorded state-registered same-sex and senior domestic partners.[1]  *Id.*

On July 25, 2009, the proponents of Referendum 71 submitted 9,359 signature petitions.  As the law requires, the signature petitions are directed to the Secretary of State.  Decl. of Catherine S. Blinn, ¶ 3, Ex. A.  As provided in Wash. Rev. Code § 29A.72.130, signers "order and direct that Referendum Measure No. 71 . . . shall be referred to the people of the state for their approval or rejection at the regular election to be held on the 3rd day of November, 2009; and each of us for himself or herself says:  I have personally signed this petition; I am a legal voter of the State of Washington, in the city (or town) and county written after my name, my residence address is correctly stated, and I have knowingly signed this petition only once."  Decl. of Blinn, ¶ 4, Ex. A.  As provided in Wash. Rev. Code § 29A.72.140, the signature petition also contains a warning that:  "Every person who signs this petition with any other than his or her true name, knowingly signs more than one of these petitions, signs this petition when he or she is not a legal voter, or makes any false statement on this petition may be punished by a fine or imprisonment or both."

The signature petitions were delivered in an open, public forum.  Decl. of Handy, ¶ 6.  Referendum supporters and opponents were in attendance, as were several members of the news media.  *Id.*  The petition sheets were counted by Elections Division staff under observation by representatives from organizations supporting and opposing the referendum.

---

[1]  Terms such as support, oppose, vote for or vote against a referendum measure are potentially confusing.  By state statute, voters on a referendum measure have a choice of "approving" or "rejecting" the bill on which a referendum measure is ordered.  Wash. Rev. Code §29A.72.050(5).  Those who seek a referendum on a bill, and circulate and submit petitions for the referendum, typically hope the voters will "reject" the underlying bill.  Those who support the underlying bill's enactment would generally oppose conducting a referendum on the bill and, if a referendum is held, would vote to "approve" the bill.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

3

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

*Id.* Since July 27, the staff at the secretary of state's office have been engaged in counting and verifying the signatures on the petitions, in order to determine whether enough registered voters signed the petitions to qualify Referendum 71 for the November 2009 election ballot. *Id.*, ¶ 8.

Washington also has a public disclosure law (referred to in this brief as the Public Records Act or Act) that generally makes all public records available for public inspection and copying. Wash. Rev. Code §42.56.070. The term "public record" is defined as "any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency." Wash. Rev. Code § 42.56.010(2). Referendum petitions filed with the Secretary of State meet this definition, as they must be submitted to the State, and are used by the State to determine whether a referendum petition is supported by the requisite number of valid signatures of Washington voters to qualify the measure to the ballot. Although the Act exempts a number of specific categories of records from public disclosure (*see, e.g.,* Wash. Rev. Code §§ 42.56.210-.480), none of the exemptions apply to referendum petitions.[2]

On July 28, 2009, Plaintiffs filed this action, challenging the constitutionality of Washington's Public Records Act on the theory that it violates their First Amendment rights by making the names of persons who sign referendum petitions subject to disclosure. The Plaintiffs seek to enjoin the Secretary of State from releasing to the public any information

---

[2] Nor does the state election code prohibit disclosure of petition signers' names, either before or after submission of the signature petitions to the Secretary of State. It merely provides that during the process of verifying and canvassing signatures on a petition, observers representing the advocates and opponents of a proposed measure may be present "so long as they make no record of the names, addresses, or other information on the petitions or related records during the verification process except upon the order of the superior court of Thurston County." Wash. Rev. Code § 29A.72.230. The evident purpose of this provision is to preserve the order and integrity of the signature verification process.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

4

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

revealing the names of persons who sign referendum petitions, including petitions for Referendum 71.  On July 29, 2009, this Court entered a temporary restraining order barring the public release of petition information with respect to persons who signed petitions for Referendum 71, set a briefing schedule on the Motion for a Preliminary Injunction, and set a hearing date of September 3.  The Secretary of State has received several requests from citizens for access to the petitions filed on behalf of Referendum 71 (Decl. of Handy, ¶ 9) and the Defendants have moved to join the requesters as additional defendants in this action.

### III.    ARGUMENT

**A.    The Plaintiffs do not meet the standards for a preliminary injunction.**

**1.    Preliminary injunction standards.**

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, ___ U.S. ___, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008).  In exercising their sound discretion, courts of equity should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 376-77 (citations omitted).  A plaintiff seeking a preliminary injunction must establish "that he is likely to succeed on the merits, [of his claim], that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 374 (citations omitted).  The *Winter* Opinion goes to some length to emphasize that courts should not enter preliminary injunctions without carefully weighing the factors listed above.[3]

---

[3] The circumstances of *Winter* illustrate the Supreme Court's concern.  The Court reversed lower court decisions granting injunctive relief against the U.S. Navy's use of mid-frequency sonar in training exercises, based upon asserted harm to various species of marine mammals.  The Court found that the trial court had given

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

5

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

Accordingly, Plaintiffs are not entitled to a preliminary injunction unless they demonstrate that:

1. they are *likely* to prevail on the merits of their claim;

2. they are likely to suffer *irreparable harm*;

3. the *equities* tip in their favor; and

4. an injunction is in the *public interest*, paying particular regard to the public consequences of employing an injunction.

Recognizing that *Winter* superseded prior case law, the Ninth Circuit recently applied these standards in reversing a preliminary injunction granted by the trial court. *Stormans, Inc. v. Selecky,* 571 F.3d 960 (9th Cir. 2009) (discussing and applying preliminary injunction standards). The *Stormans* Court specifically rejected the mere possibility of harm as sufficient to meet a plaintiff's burden. *Id.* at 977-78.

### 2. Plaintiffs cannot demonstrate a likelihood of success on the merits of their claim.

Plaintiffs assert that Washington's Public Disclosure Act violates the First Amendment insofar as it requires public disclosure of the identity of persons who sign referendum petitions. According to Plaintiffs, "Washington lacks a compelling government interest sufficient to warrant public disclosure, and there is a reasonable probability of threats, harassment and reprisals if the Referendum 71 petition is made public." Pls.' Notice of Mot. and Prelim. Inj. Mem. at 9.

In this respect, Plaintiffs seek to bring themselves within a line of cases that carve out a narrow exemption from ordinary public disclosure requirements relating to campaign

---

too much weight to the plaintiffs' assertions of possible harm, while greatly under-weighing the potential harm to the Navy in restraining military operations.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

6

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

contributions. As articulated in the case law, the exception protects the identity of members of disfavored minority groups when disclosure of their names would seriously undermine their First Amendment right to associate for purposes of speech. As is explained below, Plaintiffs do not fit within this narrow exception to disclosure, and their allegations with respect to the nature of the State's interests in disclosure and the probability of harm to Plaintiffs are not well founded. Indeed, the court in *ProtectMarriage.com v. Bowen*, 599 F. Supp. 2d 1197 (E.D.Cal. 2009) rejected plaintiffs' claim as applied to California's law requiring disclosure of campaign contributions, on almost exactly the same evidence as the Plaintiffs present in this case.

> **a.** **Plaintiffs do not have a First Amendment associational right to anonymity because they disclosed their names to the government and the public when they signed the Referendum 71 petitions in a public governmental process.**

The Plaintiffs' claim that their First Amendment rights are violated because of a reasonable probability of threats and harassment is not well taken. (*See* section III, 2, b, *infra,* p 11-15.) Nor is their characterization of the State's interest in public access to the names of persons who sign referendum petitions. *See* section III, 2, c, *infra,* p. 16-17. However, Plaintiffs' claim fails for additional fundamental reasons.

First, the Plaintiffs' argument is predicated on the erroneous assumption that apart from their availability under the Public Records Act, the names of persons who sign referendum petitions are not public. Put differently, they assume that but for the Public Records Act, petition signers would enjoy anonymity. This simply is incorrect.

Under the Washington Constitution and implementing election statutes, which Plaintiffs do *not* challenge, persons who choose to sign a referendum petition must publicly

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

7

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

identify themselves.  Wash. Const., art. II, § 1(d) ("All such petitions shall be filed with the secretary of state[.]").  The right to petition for a referendum is limited to "registered voters[.]"  Wash. Const., art. II, § 1(b).  Under the implementing statutes, the petition must be in substantially the following form:

PETITION FOR REFERENDUM

*To the Honorable .........., Secretary of State of the State of Washington:*
*We, the undersigned citizens and legal voters* of the State of Washington, *respectfully order and direct* that Referendum Measure No. .........., filed to revoke a (or part or parts of a) bill that (concise statement required by RCW 29A.36.071) and that was passed by the .......... legislature of the State of Washington at the last regular (special) session of said legislature, shall be referred to the people of the state for their approval or rejection at the regular (special) election to be held on the ... day of November, (year); and each of us for himself or herself says: I have personally signed this petition; *I am a legal voter of the State of Washington, in the city (or town) and county written after my name, my residence address is correctly stated, and I have knowingly signed this petition only once.*

Wash. Rev. Code § 29A.72.130 (emphasis added).

Thus, the petition itself is directed to the Secretary of State and explains that the persons signing the petition are ordering the Secretary to hold a referendum election.  The petition also plainly warns persons who sign it that providing false identifying information can result in criminal punishment.  Thus, persons who sign a referendum petition are made well aware that they are identifying themselves as part of a governmental process that has significant public consequences.  For a referendum to qualify for an election, the Secretary of State, in turn, must verify that persons who sign the signature petitions are registered voters and that the number of valid signatures satisfies the constitutionally-established threshold.  Wash. Rev. Code § 29A.72.230.  None of this can be done without government access to the names of petition signers.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

8

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

During the signature gathering process, there is no law protecting the identities of petition signers from public disclosure. The sponsors of a referendum petition and those managing the petition campaign have access to the names of petition signers. They may take the opportunity to copy the names and addresses of petitioner signers to create a mailing list to seek campaign contributions if the measure qualifies for the ballot, or to keep for possible use in subsequent ballot measure campaigns. Signature gatherers also necessarily have access to the names and addresses of petition signers, and would be free to copy and distribute the information if they chose to do so. In addition, the names of persons who sign a petition are visible to others who sign the petition and to those who peruse a signature petition, but decide not to sign. Nothing prevents any of these persons from disclosing the identity of petition signers to others.

Under these circumstances, Plaintiffs' contention that they have a First Amendment interest in private association that is infringed by Washington's Public Records Act is not well-taken. Long before the Public Records Act comes into play, Plaintiffs already have disclosed their names to government and to multiple private parties as a necessary part of an open public referendum process.[4] Plaintiffs cite no authority for the notion that the First Amendment somehow serves to shield the names of persons who have chosen to submit them to the government for review and verification in order to invoke a public election, and who have made them available in that process to an essentially unlimited segment of private citizens. The predicate for Plaintiffs' First Amendment challenge to Washington's Public Records Act–that it compels public disclosure of otherwise constitutionally protected private

---

[4] The Plaintiffs raise no challenge to the referendum process itself, and are closely associated with the referendum sponsors who seek to use this very process.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

9

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   information–simply fails.  None of the cases cited in support of the Plaintiffs' motion suggest

2   otherwise.

3        There is a second reason why Plaintiffs cannot shoehorn their circumstances into the

4   narrow exemption from public disclosure recognized in cases such as *National Association*

5   *for the Advancement of Colored People* (NAACP) v. *Alabama ex rel. Patterson*, 357 U.S. 449,

6   462-463, 78 S. Ct. 1163 (1958), *Brown v. Socialist Workers '74 Campaign Committee (Ohio)*,

7   459 U.S. 87, 103 S. Ct. 416, 74 L. Ed. 2d. 250 (1982), and *Federal Election Commission v.*

8   *Hall-Tyner Election Campaign Committee*, 678 F.2d 416 (2nd Cir. 1982) upon which

9   Plaintiffs rely.  As discussed more fully in section III, 2, b, *infra*, p. 11-15, those cases

10  concern private organizations engaged in private organization activities, including campaign

11  contributions.  The organizations opposed government reporting requirements with respect to

12  their private activities.  In contrast, a citizen who signs a referendum petition is engaged in a

13  public legislative process.  "A referendum or an initiative measure is an exercise of the

14  reserved power of the people to legislate[.]"  *State ex rel. Heavey v. Murphy*, 138 Wash.2d

15  800, 808, 982 P.2d 611 (1999).  "In approving an initiative [or referendum] measure, the

16  people exercise the same power of sovereignty as the Legislature does when enacting a

17  statute."  *Amalgamated Transit Union Local 587 v. State*, 142 Wash.2d 183, 204, 11 P.3d

18  762 (2000).

19        As a petition signer, a citizen acts in a governmental capacity, joining with others to

20  propose legislation for consideration by the electorate.  The signer's act is inherently public.  By

21  contrast, a contributor to a campaign acts in a private capacity, making an individual decision

22

23

24

25

26

whether to contribute financial support to one side or another of a political debate.[5]  The act of making a contribution is private, except for laws requiring disclosure.  Nor are Plaintiffs simply individuals involved in private advocacy organizations as was the case in *NAACP* or *Brown*.  Rather, Plaintiffs have chosen to identify themselves in order to invoke a governmental public process and, having done so, now complain that the public should not be allowed to know who has triggered the process.  There is no basis for extending the narrow First Amendment exemption developed in the case law, protecting the disclosure of the names of the members of organizations engaged in private activity, to the context of the public activity of signing a referendum petition to invoke a public legislative process.

>   **b.    Plaintiffs cannot establish a reasonable probability of threats and harassment if the Referendum 71 petitions are made available to the public.**

Even if the Public Records Act infringed on any First Amendment interest on the part of the Plaintiffs in disclosure of their names (and for reasons explained above, it does not), Plaintiffs' claim still would lack merit.  Plaintiffs claim that their First Amendment rights will be violated if their names are disclosed, because they will be subject to threats, harassment, and reprisals.  To succeed in this claim, Plaintiffs must establish "a 'reasonable probability' that the compelled disclosures will subject those identified to 'threats, harassment, or reprisals.'"  *Brown*, 459 U.S. at 88 (quoting *Buckley v. Valeo*, 424 U.S. 1, 74, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)).  Plaintiffs' evidence consists primarily of 58 declarations (John Doe No. 1 through John Doe No. 58) that were filed in

---

[5]  The Defendants by no means suggest that Plaintiffs would prevail in this motion if the issue were campaign contributions rather than petition signatures.  Campaign contributions are not before the Court in this case.  The point simply is that there is a fundamental analytical difference between signing a referendum petition and making a financial contribution to a campaign.

*ProtectMarriage.com*, 599 F. Supp. 2d 1197.  *See* Decl. of Scott F. Bieniek dated July 29, 2009, Ex. 12 and 13, attached to Pls.' Notice of Mot. & Mot. for TRO & Prelim. Inj., & Mem. in Support of Mot. for TRO & Prelim. Inj.  These declarations deal with the election in California with regard to Proposition 8, which amended the California Constitution to prohibit same-sex marriage.  Even assuming that the events related to Proposition 8 can be directly translated to Referendum 71, Plaintiffs' evidence does not meet the reasonable probability standard.

First, the courts have extended this exception only to established groups who could demonstrate that they were unpopular and disadvantaged in comparison to their adversaries and who thus could demonstrate a reasonable probability that disclosure of the names of their members would result in threats, harassment, and reprisals that would seriously undermine their ability to associate for First Amendment purposes.  The seminal case of this nature is *NAACP v. Alabama*, 357 U.S. at 462-463, in which the state of Alabama sought to compel disclosure of membership information from the NAACP.  The Court held that the NAACP had "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility.")  *Id.* at 462.  Of course, the context of the case is that the NAACP was challenging the official state policy of segregation in Alabama in the 1950s.

*Brown v. Socialist Workers*, 459 U.S. 87, dealt with the disclosure of names of the members of the Ohio Socialist Workers Party (SWP).  The SWP was "a small political party with approximately sixty members" whose goal was "the abolition of capitalism and the

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

12

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   establishment of a workers' government to achieve socialism." *Id.* at 88. The evidence in

2   *Brown* established that in the four years preceding the trial there were "threatening phone

3   calls and hate mail, the burning of SWP literature, the destruction of SWP members' property,

4   police harassment of a party candidate, and the firing of shots at an SWP office." *Id.* at 99.

5   "There was also evidence that in the 12-month period before trial 22 SWP members, including

6   four in Ohio, were fired because of their party membership." *Id.* The evidence also established

7

8   that the Federal Bureau of Investigation "had conducted surveillance of the Ohio SWP and had

9   interfered with its activities within the State." *Id.* at 100.

10      Similarly in *Federal Election Commission v. Hall-Tyner Election Campaign*

11  *Committee*, 678 F.2d 416, the court held that the Communist Party was exempt from

12  disclosure under the Federal Election Campaign Act. For evidence of threats and

13  harassment, the court pointed to the fact that "[n]umerous statutes purport to subject

14  members of the Communist Party to both civil disabilities and criminal liability. *Id.*, at 422.

15

16  The court also pointed to the fact that states have enacted "laws which place supporters of the

17  Committee in danger of legal sanctions or harassment if their ties with the Communist Party

18  should be made public. It is still illegal in many states simply to be a member of the

19  Communist Party." *Id.* Finally, the court pointed to a senate report that detailed "extensive

20  governmental surveillance and harassment long directed at the Communist Party and its

21

22  members." *Id.* at 423.

23      These cases all involve threats against groups which were (1) small in number;

24  (2) espoused views which were far outside the mainstream in their community and in their time;

25  and (3) demonstrated a pervasive history of threats and harassment by private parties and

26

DEFS.' RESP. TO MOT.       13      ATTORNEY GENERAL OF WASHINGTON
FOR PRELIM. INJ. -                  1125 Washington Street SE
NO. 09-CV-05456-BHS               PO Box 40100
                                Olympia, WA 98504-0100
                                (360) 753-6200

government. By contrast, the Plaintiffs in this case are not part of a small or even identifiable group. They are not known to have anything in common except that they individually signed petitions to place Referendum 71 on the ballot. There is no evidence that they constitute a small minority which has been marginalized or historically disadvantaged relative to their opponents or that by virtue of such a status, the purpose for which they have "associated"–to submit requisite signatures to place Referendum 71 on the ballot–has been thwarted. On the contrary, they obviously hope that opponents of SB 5688 will be in the majority in the November election, and present no evidence that their campaign is a futile effort by a disfavored minority group.

In *ProtectMarriage.com*, the court rejected the Plaintiffs' claim on basically the same evidence, concluding that in "light of clearly established precedent, this Court is unable to say that the State's interest here is similarly diminished or that the Plaintiffs' potential burden is even remotely comparable [to that in *Brown*]." *ProtectMarriage.com*, 599 F. Supp. 2d at 1214. According to the court, there "is surely no evidence that the seven million individuals who voted in favor of Proposition 8 can be considered a 'fringe organization' or that their beliefs would be considered unpopular or unorthodox." *Id.* at 1215. Similarly, in this case, the sponsors of Referendum 71 submitted 137,000 signatures in 68 days. This is not evidence of a minority group with unorthodox beliefs. Simply put, the Plaintiffs in this case are not in the same position as the NAACP, the SWP, or the Communist Party.

The second reason that Plaintiffs cannot demonstrate a reasonable probability of serious harassment, threats, or reprisals is that their evidence is insubstantial. In considering 58 John Doe declarations in *ProtectMarriage.com,* the court found that "[p]laintiffs' claim would have

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS                    14            ATTORNEY GENERAL OF WASHINGTON
                                                    1125 Washington Street SE
                                                    PO Box 40100
                                                    Olympia, WA 98504-0100
                                                    (360) 753-6200

little chance of success in light of the relatively minimal occurrences of threats, harassment, and reprisals." *ProtectMarriage.com*, 599 F. Supp. 2d at 1216.  We discuss the John Doe declarations in greater detail in section III, 2, d, *infra*, p. 17-23.  The court explained that in "prior cases . . . plaintiffs alleged to have suffered mistreatment over extended periods of time[.]"  *Id.* at 1217.  The court found that "the alleged harassment directed at Proposition 8 supporters occurred over the course of a few months during the heat of an election battle surrounding a hotly-contested ballot initiative.  Only random acts of violence directed at a very small segment of the supporters of the initiative are alleged."  *Id.*  The court held that the plaintiffs "cannot, allege that the movement to recognize marriage in California as existing only between a man and a woman is vulnerable to the same threats as were socialist and communist groups, or, for that matter, the NAACP."  *Id.*  Thus, "Proposition 8 supporters promoted a concept entirely devoid of governmental hostility.  Plaintiffs' belief in the traditional concept of marriage . . . ha[s] not historically invited animosity.  The Court is at a loss to find any principled analogy between two such greatly diverging sets of circumstances."  *Id.*  The conclusions of the court in *ProtectMarriage.com* are equally applicable in this case.

Finally, the court in *ProtectMarriage.com* stated that plaintiffs' "argument appears to be premised . . . on the concept that individuals should be free from even legal consequences of their speech.  That is simply not the nature of their right.  Just as contributors to Proposition 8 are free to speak in favor of the initiative, so are opponents free to express their disagreement through proper legal means."  *Id.*, 599 F. Supp. 2d at 1217.  The same is true in this case.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

15

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

c.      **The State's interests in public access to names of persons who sign referendum petitions outweigh any legally cognizable interest of the Plaintiffs in shielding them from public access.**

First, even if the narrow exemption from public disclosure laws upon which Plaintiffs rely had any application to their circumstances, the question of whether they could invoke the exemption would require the court to balance the Plaintiff's alleged First Amendment interests against the State's interests in disclosure. When those interests are appropriately balanced, the State's interest in the public availability of the Plaintiffs' names outweighs any alleged First Amendment interest Plaintiffs conceivably could have in preventing such access.

To prevail on the merits, Plaintiffs would have to demonstrate that viewing referendum signers as a whole, "the threat to the exercise of first Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the [disclosure] requirement cannot be constitutionally applied." *Buckley v. Valeo*, 424 U.S. at 71. Plaintiffs cannot make such a showing.

The State's interests are far from insubstantial; they are weighty. The first State interest served by public access to the names of petition signers is protecting the integrity of the State's referendum election process. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cy. Democratic Cent. Comm.*, 489 U.S. 214, 231, 109 S. Ct. 1013, 1024 (1989), citing *Rosario v. Rockefeller,* 410 U.S. 752, 761, 93 S. Ct. 1245, 1251-52, 36 L. Ed. 2d 1 (1973). Absent access to the names of persons who signed referendum petitions, the public would not be able to independently examine whether the State acted properly in determining whether a referendum measure qualified for the ballot. Without access to the names of signers, the public would not be able to even verify the

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS                16                ATTORNEY GENERAL OF WASHINGTON
                                                     1125 Washington Street SE
                                                     PO Box 40100
                                                     Olympia, WA 98504-0100
                                                     (360) 753-6200

gross number of signatures submitted, whether the State accepted duplicate signatures, or whether the State accepted signatures from persons disqualified from voting. Public access to signature petitions thus provides an important check on the integrity of the referendum election process.

Second, the State has an important interest in making available to the electorate information about who is essentially lobbying for their vote, and thus, who likely will benefit from the measure. *See California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1105-07 (9th Cir. 2003) ("Voters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat legislation. We think Californians, as lawmakers, have an interest in knowing who is lobbying for their vote[.]"). While such information may not be determinative to a voter, it certainly is a factor that the electorate is entitled to take into account in deciding how to vote. When these important State interests are balanced against whatever legally cognizable interest, if any, Plaintiffs may have in shielding from public access the names of referendum petition signers who have made their names public, the State's interests certainly outweigh the Plaintiffs'.

For all of these reasons, Plaintiffs have failed to demonstrate a likelihood of prevailing on the merits of their claim and their motion for a preliminary injunction should be denied.

        **d.**      **The Plaintiffs have not shown that they are likely to suffer irreparable harm if a preliminary injunction is denied.**

As discussed above, Plaintiffs have not shown that public access to referendum signature petitions implicates their First Amendment rights in any legally cognizable fashion.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

17

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

Just as Plaintiffs cannot demonstrate "a 'reasonable probability' that the compelled disclosures will subject those identified to 'threats, harassment, or reprisals'", *Brown v. Socialist Workers*, 459 U.S. at 88 (quoting *Buckley v. Valeo,* 424 U.S. at 74), they have not offered evidence sufficient to meet the more demanding second prong of the *Winter* standard: showing a likelihood of irreparable harm if a preliminary injunction is not entered.[6]

Plaintiffs have offered numerous declarations and exhibits apparently designed to show that signers of petitions for Referendum 71 would be harmed by public access to their names. At best, the declarations establish a *possibility* of harm, but that is precisely the standard rejected by *Winter, supra*, for granting a preliminary injunction. The question is whether signers of petitions would *likely* suffer harm. Moreover, Plaintiffs must demonstrate that such harm would be *irreparable*. Taken as a whole, the declarations suggest legitimate concern about the civility of the debate on the referendum, but provide very few examples of actual or threatened harm to persons or property, let alone irreparable harm.

As previously noted, Referendum 71 seeks an election in which voters would determine whether to accept or reject a bill enacted by the state legislature which relates to the rights, responsibilities, and obligations accorded state-registered same-sex and senior domestic partners. Engrossed Second Substitute Bill 5688 (Laws of 2009, ch. 521). This is a controversial subject, and feelings run deep among both supporters and opponents of the legislation. But that state of affairs falls far short of meeting Plaintiffs' burden in seeking a

---

[6] The dictionary definition of "irreparable harm" cross-references the synonym "irreparable injury." *Black's Law Dictionary* 848 (8th ed. 2004). The term "irreparable injury", in turn, is defined as an injury (that is, a legally cognizable wrong) "that cannot be adequately measured or compensated by money and is therefore often considered remediable by injunction." *Id.* at 801.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

18

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

preliminary injunction to preclude public access to the names of persons who signed Referendum 71.

None of the material submitted by the Plaintiffs recounts any examples of physical injury to any persons, and only a handful mention actual harm to property. Virtually all of the examples derive from California's experience with Proposition 8, not from Referendum 71. Moreover, none of the declarations involves someone whose only connection to the ballot proposition was a signature on a petition.

The examples include a broken window in a California church which had a "Yes on Proposition 8" sign in its yard (Decl. of Bieniek, Ex. 12, Decl. of John Doe No. 3, pp. 15-25); a smashed window in a car with a bumper sticker (Id., Ex. 13, Decl. of John Doe No. 11, pp. 6-8); the "keying" of cars with bumper stickers, and letting air out of tires (Id., Ex. 13, Decl. of John Doe No. 12, pp. 9-11, and Decl. of John Doe No. 13, pp. 12-15); vandalizing houses and cars with eggs, flour, and honey (Id., Ex. 13, Decl. of John No. 14, pp. 16-19); and painting a statue outside a church on the night Proposition 8 passed (Id., Ex. 13, Decl. of John Doe No. 23, pp. 57-59).[7] All of these events were unfortunate, and all were probably violations of criminal laws, but even taken together, they fall short of showing that Referendum 71 petition signers are likely to suffer irreparable harm as a result of public access to their names.

A large number of the declarations supporting Plaintiffs' Motion recount removal or defacement of yard signs and bumper stickers. This behavior is illegal, uncivil, and wrong, but

---

[7] Although California's Proposition 8 concerned a subject similar in some respects to Referendum 71, the Court should be particularly cautious in automatically assuming that Washington citizens will behave the same way as California citizens if Referendum 71 qualifies for the ballot and a campaign ensues. It also is questionable that Plaintiffs may rely on such evidence to prove likelihood of irreparable harm where, as here, they cannot successfully invoke the narrow First Amendment-based exemption from disclosure laws recognized in cases such as NAACP v. Alabama.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS                    19                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   does not amount to a threat of irreparable harm, and certainly is not of the scope that would

2   justify a preliminary injunction foreclosing public access to Referendum 71 petition

3   information.  The same point must be made concerning declarations describing rude gestures,

4   obscene shouts, intemperate e-mail messages, or unwelcome information left on car windows or

5   under doormats.  However uncomfortable these actions made their recipients, they do not

6   constitute any substantial harm, let alone "irreparable harm."

7

8        In fact, many of the Plaintiffs' declarations describe behavior that was clearly lawful and

9   well within the discourse conducted among citizens in a diverse society.  For instance, one

10  declarant describes a protest at a Proposition 8 fundraiser, described by the newspapers as

11  "polite."  Decl. of Bieniek, Ex. 12, Decl. of John Doe No. 4, pp. 26-44.  Another complains of

12  receiving an e-mail message suggesting that his company's donation to Proposition 8 might hurt

13  the image of his business.  *Id.*, Ex. 12, Decl. of John Doe No. 5, pp. 45-50.  Another complained

14  that a lesbian couple stopped doing business with him after seeing a sign in his yard.  *Id.*, Ex. 13,

15  Decl. of John Doe No. 20, pp. 45-50.  And yet another stated that members of his country club

16  were no longer friendly, and made rude comments.  *Id.*, Ex. 13, Decl. of John Doe No. 21

17  pp. 51-53.

18

19       On issues of public importance, citizens sometimes disagree.  Engaging in a protest at a

20  fundraiser, refusing to do business with persons whose position on a political issue one finds

21  unacceptable, or snubbing fellow citizens on the street or at the country club are examples of

22  ordinary social interaction.  Though these incidents may make people sad or uncomfortable,

23  they are not legitimate examples of "harassment", let alone irreparable harm.  Anyone who

24  takes a public stand on an issue knows that others may disagree and may express disagreement

25

26

1    in many different ways.  Some of those ways are unlawful, perhaps even violations of criminal

2    laws.  The remainder are an expected part of participation in public affairs.[8]  Even assuming that

3    the Plaintiffs submitted the worst examples they could find to the California court and here,

4    most of the declarations, with a few exceptions, describe conduct that was relatively moderate or

5    even innocuous, in light of the strong emotions raised by the ballot measure before the

6    California voters.

7           The California court in the Proposition 8 case, relying on much of the same evidence as

8    presented here, noted that "the Court cannot say that the threats and harassment here rise to the

9    level previously found to justify the exemption sought." *ProtectMarriage.com*, 599 F. Supp. 2d

10   at 1217.  The court observed that the plaintiffs in that case appeared to premise their argument

11   "on the concept that individuals should be free from even legal consequences of their speech."

12   *Id.*  Noting the tactics such as business boycotts are lawful expressions, the court noted that it

13   "cannot condemn those who have legally exercised their own constitutional rights in order to

14   display their dissatisfaction with Plaintiffs' cause." *Id.* at 1218.

15          As in the California case, the Plaintiffs here appear to base their argument on the

16   premise that business boycotts, social snubs, rude remarks, and leaflet distribution are all

17   "harassment" deserving of protection.   This view is inconsistent with the case law, and

18   inconsistent with the notion that vigorous public debate on public issues is an important value

19   that should be protected absent a compelling showing of circumstances necessitating restriction.

---

[8]   The Court should also be cautious in extrapolating the experiences of Mr. Stickney, the campaign manager for Protect Marriage Washington, to everyone who signs a referendum petition.  Verified Compl., Ex. 1, 2, and 3.  Without minimizing the disturbing and distasteful nature of some of the e-mails and phone calls Mr. Stickney reports receiving, a spokesperson for a controversial issue will receive more than an ordinary share of attention, some of it negative.  It does not follow that anyone known to have signed a Referendum 71 petition is likely to suffer harm as a result.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

21

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Plaintiffs' evidence thus is seriously deficient to show that Referendum petition signers are

2    likely to suffer irreparable harm unless the court denies the public access to their names.

3         The Plaintiffs' evidence is completely deficient as to whether petitions on all

4    referendum measures should be blocked from public release. The Plaintiffs assert, as Count 1

5    of their Complaint, that *all* Washington referendum petitions should be exempt from public

6    disclosure. However, the Plaintiffs offer evidence only about a single proposed referendum, one

7    that deals with an emotionally charged issue. They offer no argument why all referendum

8    petitions on all referendum measures should be enjoined from public scrutiny.[9]

9

10        Although referendum measures involve issues of public interest, most are not highly

11   emotionally charged. The four referendum measures qualifying for the ballot in the last 20

12   years involved land use regulation (Referendum Measure 48), proposed revisions to the

13   unemployment insurance laws (Referendum Measure 53), charter public schools (Referendum

14   Measure 55), and insurance coverage and benefits (Referendum Measure 67). Decl. of Handy,

15   ¶ 11. There is no evidence in the record before the court that petition signers for any of these

16   measures suffered any harm on that account and it is entirely speculative that petition signers on

17   referendum petitions in the future would be subject to serious threats.[10]

18

19

20

21   _____

22        [9] The Plaintiffs devote considerable time to a study asserting that public disclosure of campaign contributions enjoys diminished public support if those surveyed realize that their own names might be disclosed as a result of an "open government" policy. Pls.' Mot. for Prelim. Inj. at 12-15. Even assuming the

23   study's conclusions are correct, they are irrelevant in analyzing Plaintiffs' claim, and are policy arguments best directed to the legislative branch of government.

24        [10] It appears that no one requested copies of the petitions in any of the referendum measures introduced in recent years. However, petitions submitted for initiative measures (which present virtually

25   identical issues as referendum petitions) have commonly been subjected to public disclosure. Decl. of Handy, ¶ 10. The Defendants are unaware of any reports of harm attributable to the disclosure of any citizen's status as a

26   petition signer.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

22

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

In sum, Plaintiffs' evidence with respect to harm from public access to Referendum 71 petition information is decidedly deficient, and Plaintiffs have made no showing at all with respect to their request that the court enjoin public access to all referendum petitions. Plaintiffs' motion for a preliminary injunction should be denied for this additional reason.

e.    **When the equities are balanced, the public interest is in open government and denying injunctive relief.**

In addition to determining whether the Plaintiffs are likely to suffer irreparable harm without injunctive relief, the *Winter* formulation always requires the Court to weigh the equities, including public policies that would be frustrated if injunctive relief were granted. Here, granting injunctive relief would frustrate important public policies. As discussed in section III, 2, c, *supra*, pp. 16-17, the State's interests in access to referendum signature petitions are weighty.

In addition to them, the people of the State, acting both through the legislature and through direct legislation, have set a strong policy in favor of public disclosure of public records, and have not provided any exception for referendum signature petitions. The Public Records Act, Wash. Rev. Code § 42.56.070, was originally enacted by the people in an initiative measure (Initiative Measure No. 276, Laws of 1973, ch. 1). It includes this unequivocal statement of the public interest:

> The people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created. This chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy and to assure that the public interest will be fully protected. In the event of conflict between the provisions of this chapter and any other act, the provisions of this chapter shall govern.

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS

23

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

Wash. Rev. Code § 42.56.030. As the people of Washington have determined, public access to records relating to the conduct of government, including referendum petitions, is critical if Washington's citizens are to be informed "so that they may maintain control over the instruments that they have created." *Id.* Plaintiffs wish to shield from the public information that they have provided to government and private parties necessary to invoke a public legislative process. The equities do not favor Plaintiffs' desire and it is contrary to the public interest. For this additional reason, Plaintiffs' Motion for a Preliminary Injunction should be denied.

## IV.   CONCLUSION

For all of the reasons stated above, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

DATED this 14th day of August, 2009.

ROBERT M. MCKENNA
Attorney General

JAMES K. PHARRIS, WSBA #5313
Deputy Solicitor General
PO Box 40100
Olympia, WA 98504-0100
360-664-3027
jamesp@atg.wa.gov

DEFS.' RESP. TO MOT.
FOR PRELIM. INJ. -
NO. 09-CV-05456-BHS                    24                    ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2009, I electronically filed Defendants' Response to Motion for Preliminary Injunction in the above-referenced case with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the following:

>Stephen Pidgeon, attorney@stephenpidgeon.com
>James Jr Bopp, jboppjr@aol.com
>Scott F. Bieniek, sbieniek@bopplaw.com
>Sarah E. Troupis, stroupis@bopplaw.com

DATED this 14th day of August, 2009.

James K. Pharris