UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>SAM REED, in his official capacity as Secretary of State of Washington; and DEBRA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>Defendants. | CASE NO. C09-5456BHS<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

This matter comes before the Court on the Plaintiffs' motion for preliminary injunction (Dkt. 3). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file, and hereby grants the motion for the reasons stated herein.

**I. BACKGROUND**

**A.    PROCEDURAL BACKGROUND**

On July 28, 2009, Plaintiffs filed a complaint and motion for temporary restraining order and preliminary injunction, seeking to enjoin the Secretary of State of Washington ("Secretary of State") from any public release of documents showing the names and contact information of those individuals who signed petitions in support of Referendum

ORDER - 1

Measure No. 71 ("R-71"). Dkts. 2 (Plaintiffs' Complaint) and 3 (Motion for Temporary Restraining Order and Preliminary Injunction).

In Count I of the complaint, Plaintiffs allege that the Washington Public Records Act, RCW 42.56.001, violates the First Amendment as applied to referendum petitions because the act is not narrowly tailored to serve a compelling governmental interest. Dkt. 2 at 10. In Count II, Plaintiffs allege that the Public Records Act is unconstitutional as applied to R-71 because "there is a reasonable probability that the signatories of the R-71 petition will be subjected to threats, harassment, and reprisals." *Id*.

On July 29, 2009, the Court granted Plaintiffs' motion for temporary restraining order, scheduled a preliminary injunction hearing for September 3, 2009, and set a briefing schedule. Dkt. 9. On August 14, 2009, Defendants filed a response. Dkt. 25. On August 21, 2009, Plaintiffs filed a reply. Dkt. 31. The Court held a preliminary injunction hearing on September 3, 2009. Dkt. 62.

At the hearing, the Court entered the following rulings: (a) Pursuant to Federal Rule of Civil Procedure 24(b) (permissive intervention), the Court granted the motions to intervene filed by Washington Families Standing Together ("WFST") and Washington Coalition for Open Government ("WCOG"); (b) the Court denied the motion to intervene filed by Mr. Arthur West because no motion was on the docket; and (c) the Court denied Plaintiffs' motion to consolidate the preliminary injunction hearing with a trial on the merits. Dkt. 62.

**B.    WASHINGTON'S REFERENDUM PROCESS**

In Washington, while legislative authority is vested in the state legislature, the people reserve to themselves the power to reject any bill or law through the referendum process. Wash. Const., art. II, § 1 and 1(b).[1] A referendum petition against any bill passed by the legislature must be filed with the Secretary of State within 90 days after

---

[1] The state constitution provides some exceptions to the people's power to reject laws passed by the legislature that do not apply in this case.

ORDER - 2

1  adjournment of the legislative session at which the bill was enacted. *Id.*, § 1(d); RCW
2  29A.72.160; *see also* WAC 434-379-005 (filing of proposed referendum with Secretary
3  of State).

4  In order to initiate the referendum process, the state constitution requires the filing
5  of petitions with the Secretary of State that contain the valid signatures of Washington
6  registered voters in a number equal to four percent of the votes cast for the Office of
7  Governor at the last gubernatorial election preceding the filing of the text of the
8  referendum measure with the Secretary of State. Wash. Const., art II, § 1(b); *see also*
9  RCW 29A.72.150. Referendum petition sheets must include a place for each signer to
10 sign and print his or her name, and the address, city, and county at which he or she is
11 registered to vote. RCW 29A.72.130.

12 Once the referendum petition has been filed, the Secretary of State verifies and
13 canvasses the names of the legal voters on the petition. RCW 29A.72.230. The signature
14 on a petition sheet must be matched to the signature on file in state voter registration
15 records. WAC 434-379-020. In order to determine whether a petition is valid, the
16 Secretary of State may employ statistical sampling techniques. RCW 29A.72.230; WAC
17 434-379-010. In addition, under state statute,

> [t]he verification and canvass of signatures on the petition may be observed by persons representing the advocates and opponents of the proposed measure so long as they make no record of the names, addresses, or other information on the petitions or related records during the verification process except upon the order of the superior court of Thurston county. The secretary of state may limit the number of observers to not less than two on each side, if in his or her opinion, a greater number would cause undue delay or disruption of the verification process. Any such limitation shall apply equally to both sides.

23 *Id.*

24 Upon completion of this verification and canvassing process, the Secretary of State
25 must issue a determination as to whether a referendum petition does or does not contain
26 the requisite number of valid signatures. *See* RCW 29A.72.240. Any citizen dissatisfied
27 with the Secretary of State's determination may file an action in state superior court for a
28 citation requiring the Secretary of State to submit the petition to the state court "for

ORDER - 3

examination, and for a writ of mandate compelling the certification of the measure and petition, or for an injunction to prevent the certification thereof to the legislature, as the case may be." *Id*. Within five days of the state superior court's decision, the party may seek review by the Washington Supreme Court. *Id*.

If it is ultimately determined that a petition contains the requisite number of valid signatures, the referendum is submitted for vote at the next general election. Wash. Const., art. II, § 1(d).

### C. WASHINGTON'S PUBLIC RECORDS ACT

Washington's Public Records Act generally makes all public records available for public inspection and copying. RCW 42.56.070.[2] The term "public record" is defined as "any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used or retained by any state or local agency." RCW 42.56.010(2). The Public Records Act provides that "[i]n the event of conflict between the provisions of [the Public Records Act] and any other act, the provisions of [the Public Records Act] shall govern." RCW 42.56.030. Exemptions to the Public Records Act must either be included in the act itself, or clearly expressed in another statute. RCW 42.56.070(1).

The Public Records Act also contains the following language:

> The people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created. This chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy and to assure that the public interest will be fully protected.

RCW 42.56.030.

---

[2] While the Public Records Act exempts specific categories of records from public disclosure, the parties appear to agree that no exemption applies in this case.

ORDER - 4

**D.   OTHER RELEVANT STATE LAW**

Under RCW 29A.08.720(2), "poll books, precinct lists, and current lists of registered voters are public records and must be made available for public inspection and copying under such reasonable rules and regulations as the county auditor or secretary of state may prescribe."[3] State law provides certain "fundamental rights" for voters, including "the right of absolute secrecy of the vote." RCW 29A.04.206(2). In addition, "no voter may be required to disclose political faith or adherence in order to vote." *Id*.

The parties have not identified any Washington State law that specifically addresses whether personally identifying information provided by the signers of referendum petitions may be publicly disclosed.

**E.   REFERENDUM MEASURE NO. 71**

On May 18, 2009, the Washington Governor signed Engrossed Second Substitute Senate Bill 5688 ("SB 5688"). This bill expands the rights, responsibilities, and obligations accorded state-registered domestic partners to be equivalent to those of married spouses.

On or about May 4, 2009, Larry Stickney, the Campaign Manager for Protect Marriage Washington ("Protect Marriage"), filed notice with the Secretary of State of his intent to circulate a referendum petition on SB 5688. Dkt. 2 at 4 (Verified Complaint). The proposed referendum was assigned the title R-71 by the Secretary of State. If referred to the next general election ballot, R-71 would ask voters to either accept or reject SB 5688.

On May 13, 2009, Protect Marriage was organized as a state political action committee pursuant to RCW 42.17.040. *Id.* According to Plaintiffs' complaint, Protect Marriage's major purpose is to collect the requisite number of signatures necessary to place R-71 on the ballot and to encourage Washington voters to reject SB 5688. *Id.*

On July 25, 2009, Protect Marriage submitted a petition containing over 138,500

---

[3] It is unclear whether records of voter signatures are available to the public.

signatures to the Secretary of State for verification and canvassing. *Id*. at 7. According to Nick Handy, Director of Elections for the Secretary of State, the petition sheets were delivered in an "open, public forum," with R-71 supporters and opponents in attendance. Dkt. 26 at 2 (Declaration of Nick Handy). The Elections Division began the process of counting and verifying individual signatures shortly after the petition sheets were filed. *Id*. at 3.

The petition appears to conform with Washington state's formatting requirements set out in RCW 29A.72.130 and contains the following language:

> To the Honorable Sam Reed, Secretary of State of the State of Washington:
>
> We, the undersigned citizens and legal voters of the State of Washington, respectfully order and direct that Referendum Measure No. 71 . . . shall be referred to the people for their approval or rejection at the regular . . . election to be held on the 3rd day of November, 2009; and each of us for himself or herself says: I have personally received this petition, I am a legal voter for the State of Washington, in the city (or town) and county written after my name, my residence address is correctly stated, and I have knowingly signed this petition only once.

Dkt. 27 at 2 (Declaration of Catherine S. Blinn); *id*., 3-12 (Exhibit A) (R-71 petition).

In addition, as required by RCW 29A.72.140, the petition contains a warning that: "Every person who signs this petition with any other than his or her true name, knowingly signs more than one of these petitions, signs this petition when he or she is not a legal voter, or makes any false statement on this petition may be punished by a fine or imprisonment or both." *Id*.

The petition included a table, which requested the following information: (1) the printed name of the registered voter, (2) the signature of the voter, (3) the voter's home address, (4) the voter's city and county, and (5) the voter's email address. Dkt. 27 at 4. The petition indicated that inclusion of the voter's email address was "optional." *Id*.

As of August 20, 2009, the Secretary of State has received public record requests of the Referendum 71 petition from the following individuals or entities: (1) Brian Murphy of WhoSigned.org (Dkt. 23 at 10); (2) Toby Nixon, President of the Washington Coalition for Open Government (*id*. at 12); (3) Arthur West (*id*. at 14); (4) Brian Spencer,

ORDER - 6

on behalf of Desire Enterprises (Dkt. 30 at 9); and (5) Anne Levinson, on behalf of Washington Families Standing Together (*id*. at 11).[4]

On or about June 9, 2009, the groups Whosigned.org and KnowThyNeighbor.org issued a joint press release, stating that the groups intended to publish the names on the internet of every individual signing the Referendum 71 petition. Dkt. 2 at 6; *see* Dkt. 4-5 (Exhibit 4). Plaintiffs maintain that some of the public record requesters have publicly stated that they intend to publish the names of the petition signers on the internet and make the names searchable. *Id*. Plaintiffs also claim that the purpose of placing the names on the internet is to "encourage individuals to contact" and to have a "personal and uncomfortable conversation" with any person who signed the petition. *Id*.; Dkt. 3 at 9.

## II. PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

As a threshold matter, the following opinion addresses only an individual's right to participate in a political process and the government's authority to intrude on that right. Once narrowed to these two issues, the Court finds it unnecessary to address the content of SB 5688 or the content of R-71.

Here, pursuant to the Washington Public Records Act, Defendants requested that the Secretary of State disclose the contents of petitions filed to refer R-71 as a measure for the next ballot, a proposed measure to undo SB 5688. Plaintiffs argue that such disclosure would be unconstitutional, as it would violate their fundamental right to free speech. The issue before the Court is limited to whether Plaintiffs have such an individual right and, if so, whether the government is entitled to intrude on that right in this instance.

---

[4] Ms. Levinson's request excluded "any and all information subject to [this Court's July 29, 2009] temporary restraining order" (Dkt. 30-11) which restrained Defendants from releasing "the names, addresses, or other contact information of those individuals who signed the Referendum 71 petition" (Dkt. 9 at 4).

ORDER - 7

A. **PRELIMINARY INJUNCTION STANDARD**

The basic function of injunctive relief is to preserve the status quo pending a determination of the action on the merits. *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that a balance of the equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, ___ U.S. ___, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008). Traditionally, injunctive relief was also appropriate under an alternative "sliding scale" test. *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008). However, the Ninth Circuit overruled this standard in keeping with the Supreme Court's decision in *Winter*. *American Trucking Ass'ns Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (holding that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable").

    **1.    Likelihood of Success**

Plaintiffs contend that it is unconstitutional for Defendants, acting under authority of the Public Records Act, to comply with public record requests for referendum petitions that contain identifying information of those who support referral of a referendum to the next ensuing general election. Dkt. 3 at 9. Plaintiffs argue that releasing these petitions and the information contained therein would violate the signers' fundamental, First Amendment right to freedom of speech. *Id*. at 9-10. To succeed on this motion for preliminary relief, Plaintiffs must first establish that it is likely that supporting the referral of a referendum should be considered protected political speech.

        **a.    Individual Right**

Plaintiffs assert that the signers of the referendum petition are likely entitled to protections under an individual's fundamental, First Amendment right to free speech. *Id*.

The type of free speech in question is anonymous political speech. As the Honorable Thomas S. Zilly, United States District Judge, has previously stated:

> The right to speak anonymously was of fundamental importance to the establishment of our Constitution. Throughout the revolutionary and early federal period in American history, anonymous speech and the use of pseudonyms were powerful tools of political debate. The Federalist Papers (authored by Madison, Hamilton, and Jay) were written anonymously under the name "Publius." The anti-federalists responded with anonymous articles of their own, authored by "Cato" and "Brutus," among others. *See generally* [*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-342, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995)]. Anonymous speech is a great tradition that is woven into the fabric of this nation's history.
> When speech touches on matters of public political life, such as debate over the qualifications of candidates, discussion of governmental or political affairs, discussion of political campaigns, and advocacy of controversial points of view, such speech has been described as the "core" or "essence" of the First Amendment. *See McIntyre*, 514 U.S. at 346-47.

*Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1092-93 (W.D. Wash. 2001).

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. amend. I.[5] The Supreme Court has consistently held that a component of the First Amendment is the right to anonymously participate in a political process. *See e.g., Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 200, 119 S. Ct. 636, 142 L. Ed. 2d 599 (1999) (invalidating, on First Amendment Grounds, a Colorado statute that required initiative petition circulators to wear identification badges); *McIntyre*, 514 U.S. at 357 (overturning an Ohio law that prohibited the distribution of campaign literature that did not contain the name and address of the person issuing the literature, holding that "[u]nder our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and dissent. Anonymity is a shield from the tyranny of the majority."); *Talley v. California*, 326 U.S. 60, 65, 80 S. Ct. 536, 4 L. Ed. 2d 559 (1960) (invalidating a California statute prohibiting the distribution of "any handbill in any place under any circumstances" that did not contain the name and address of the

---

[5] The First Amendment is applicable to the states through the Fourteenth Amendment. *Stromberg v. People of the State of California*, 283 U.S. 359, 368, 51 S. Ct. 532 (1931).

ORDER - 9

1 person who prepared it, holding that identification and fear of reprisal might deter
2 "perfectly peaceful discussions of public matters of importance").

3       In this case, the Court must determine whether it is likely that referendum petitions
4 that were submitted to the Secretary of State should be considered protected political
5 speech. Defendants argue that petition signers waived any First Amendment protections
6 because the signers supported the referral of the referendum in an open and public forum.
7 Dkt. 25 at 7-10. But Defendants have neither cited nor submitted any authority in support
8 of this proposition. Moreover, the Court is unaware of any authority, including the
9 Washington Constitution or RCW Chapter 29A.72, which stands for the proposition that
10 signatures in support of a referral must be obtained in a public forum. Therefore, at this
11 time, the Court is not persuaded that waiver of one's fundamental right to anonymous
12 political speech is a prerequisite for participation in Washington's referendum process.

13       Defendants do assert that Washington's Constitution requires public disclosure of
14 the personally identifying information provided when a person signs a referendum
15 petition. Dkt. 25 at 8. But Washington's Constitution states only that "all such petitions
16 shall be filed with the secretary of state," and it does not state that the information
17 contained on the petition must also be considered public information. *See* Wash. Const.,
18 art. II, § 1(d). In fact, both the Supreme Court and the Washington Supreme Court have
19 previously held that an initiative process falls within the protections of political speech.
20 *Meyer v. Grant*, 486 U.S. 414, 421, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988);
21 *Alderwood Associates v. Washington Environmental Council*, 96 Wn.2d 230, 239 ("It is
22 undisputed that gathering initiative signatures in some manner, at some place, is a
23 constitutionally guaranteed practice. It is at the core of both the First Amendment and
24 Const. art. 1, s 5.").

25       Defendants also argue that participation should not be considered protected
26 political speech because the petition signers act as quasi-legislators. Dkt. 25 at 10-11.
27 Defendants reason that because the referendum and initiative processes are reserved
28 powers by the people to legislate, the petition signer acts like a legislator with such action

ORDER - 10

being inherently public. *Id*. To support this argument, Defendants rely on *State ex rel. Heavey v. Murphy*, 138 Wn.2d 800, 808, 982 P.2d 611 (1999), and *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 204, 11 P.3d 762 (2000). Dkt. 25 at 10. But both of these cases are distinguishable. First, the *Heavey* court addressed the question of whether a writ of mandamus should issue against a state officer when the officer defended the constitutionality of a referendum. 138 Wn.2d at 803-804. While the *Heavey* court did state that referendum and initiative measures involve the people in their legislative capacity, it was only to note that such legislation "remain[s] subject to the mandates of the Constitution." *Id*. at 808. The court did not hold that a "quasi-legislative" action requires waiver of a fundamental right to anonymous political speech.

Second, in *Amalgamated Transit Union Local 587*, the court addressed a challenge to the constitutionality of a statute enacted through the initiative process. 142 Wn.2d at 193-199. The court did not address the issue of the political nature of the initiative process itself. Therefore, the Court is not persuaded by Defendants' "quasi-legislative" arguments.

In this case, it is important to note that the Court is unaware of any authority that is directly on point for the question before the Court. The weight of authority, however, counsels toward the finding that supporting the referral of a referendum is likely protected political speech. For example, in *Meyer*, the Court noted that, of necessity, "the circulation of an initiative petition . . . involves both the expression of a desire for political change and a discussion of the merits of the proposed change." 486 U.S. at 421. In fact, the Court explicitly stated that the "record in this case demonstrates that the circulation of appellees' petition involved political speech." *Id*., n.4. Moreover, in *Buckley*, the Court held that petition circulation is "core political speech," because it involves "*interactive* communication concerning political change." 525 U.S. at 187 (quoting *Meyer*, 486 U.S. at 422) (emphasis added). The *Buckley* Court also noted that "First Amendment protection for such *interaction* . . . is at its zenith." *Id*. at 187 (internal quotations omitted) (emphasis added). It would seem that if the circulator is protected by

ORDER - 11

the First Amendment and the process is at the core of the First Amendment, then the people singing the petition in support of referral of the referendum would also be entitled to the protections of the First Amendment. In fact, the *Buckley* Court touched upon the protection of the "interaction" in the circulation process, which involved a "political conversation" and the "exchange of ideas." *Id*. at 192. By necessity, an interaction involves the circulator as well as one who may support the referral of a referendum. Based on these authorities, the Court finds that it is likely that an individual who supports the referral of a referendum is entitled to protection under the First Amendment.

Therefore, the Court finds that Plaintiffs have established that it is likely that supporting the referral of a referendum is protected political speech, which includes the component of the right to speak anonymously. The next step in the Court's analysis is based on the fact that the right to freedom of speech is not absolute.

The Supreme Court has recognized that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id*. at 187 (quoting *Storer v. Brown*, 415 724, 730, 94 S. Ct. 1274, 39 L. Ed. 2d 714 (1974)). In other words, the government is not without an interest in the integrity of the referendum process. As such, the government may infringe on an individual's right to free speech but only to the extent that such infringement is narrowly tailored to achieve a compelling governmental interest. *See McIntyre*, 514 U.S. at 346-47 (holding that governmental restrictions on core political speech are entitled to "exacting" scrutiny, and upheld only where they are narrowly tailored to serve an overriding state interest.").[6]

---

[6] Some of the relevant cases discuss a level of review called "exacting" scrutiny. *Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976) (a compelled disclosure case). But "exacting" scrutiny is "strict" scrutiny. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (citing *First Nat'l Bank of Boston v. Bellotti*, 436 U.S. 765, 786 (1978) (equating "exacting" scrutiny with "strict" scrutiny). *See also Fed. Elec. Comm'n v. Public Citizen*, 268 F.3d 1283, 1286 (11th Cir. 2001) (reiterating *McIntyre's* holding that "exacting" scrutiny is applied to determine whether the law is narrowly tailored to serve an overriding state interest and applying "strict" scrutiny to a federal campaign statute).

ORDER - 12

**b.     Governmental Interest**

Under a strict scrutiny analysis, the Court must first identify the asserted compelling governmental interest. In this case, Defendants argue that "[a] state indisputably has a compelling interest in preserving the integrity of its election process." Dkt. 25 at 17 (citing *Eu v. San Francisco Cy. Democratic Cent. Comm.*, 489 U.S. 214, 231, 109 S. Ct. 1013, 1024, 103 L. Ed. 2d 271 (1989) (citing *Rosario v. Rockefeller*, 410 U.S. 752, 761, 93 S. Ct. 1245, 1251-52, 36 L. Ed. 2d 1 (1973))). The Court agrees with Defendants on this point as it is undisputed that the State must employ some measures to prevent fraud in the referendum process. What is disputed, however, is the extent of the government intrusion on the individual's right to anonymously participate in a political activity, i.e., whether the Public Records Act is narrowly tailored to accomplish the interest of preserving the integrity of the referendum process.

It is important to reiterate two points: (1) for the purposes of preliminary relief, the Court must determine only whether Plaintiffs are likely to succeed on the merits of their claim (*see Winter, supra*); and (2) Plaintiffs are only challenging the Public Records Act that requires disclosure of public documents and are not challenging the requirement of RCW 29A.72.130 that those who sign in support of referral of the referendum disclose identifying information. Based on the record before the Court, the Court finds that Plaintiffs have established a likelihood of success on the claim that the Public Records Act is not narrowly tailored to achieve the compelling governmental interest of preserving the integrity of the referendum process.

In *Buckley*, the Court addressed a challenge to several statutes that were enacted by Colorado's Legislature that regulated the state's initiative and referendum petition process. *Id*. at 187-189. One particular statute, of relevance to the present matter, required initiative-petition circulators to wear a badge identifying their name. *Id*. at 187. The Court stated that:

> We have several times said no litmus-paper test will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon no substitute for the hard judgments that must be made. But the

ORDER - 13

> First Amendment requires us to be vigilant in making those judgments, to guard against undue hindrances to political conversations and the exchange of ideas. We therefore . . . are satisfied that . . . the restrictions in question significantly inhibit communication with voters about proposed political change, and are not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions.

*Id.* (internal citations and quotations omitted). The Court held that the law violated the petition circulators' First Amendment free speech guarantee. *Id.* at 205. In reaching this conclusion, the Court separated what it considered necessary or proper ballot-access controls from restrictions that unjustifiably inhibit the circulation of ballot initiative petitions. *Id.* at 192-93. The Court noted that evidence was presented that "demonstrated that compelling circulators to wear identification badges inhibits participation in the petitioning process." *Id.* at 197-98 (internal citations omitted).

In this case, the State argues that its "interest in the public availability of the Plaintiffs' names outweighs any alleged First Amendment interest . . . ." Dkt. 25 at 16. The State further argues as follows:

> Absent access to the names of persons who signed referendum petitions, the public would not be able to independently examine whether the State acted properly in determining whether a referendum measure qualified for the ballot. Without access to the names of signers, the public would not be able to even verify the gross number of signatures submitted, whether the State accepted duplicate signatures, or whether the State accepted signatures from persons disqualified from voting. Public access to the signature petitions thus provides an important check on the integrity of the referendum election process.

Dkt. 25 at 17. The State's argument would be more persuasive if there was not a more narrowly tailored signature verification procedure. *See* RCW 29A.72.230

Under RCW 29A.72.230, the Secretary of State must "verify and canvass the names of the legal voters on the petition." The statute also provides for public access to that verification process:

> The verification and canvass of signatures on the petition may be observed by persons representing the advocates and opponents of the proposed measure so long as they make no record of the names, addresses, or other information on the petitions or related records during the verification process.

ORDER - 14

*Id*. Moreover, the Washington Supreme Court has held that statutory referendum provisions "evidence an intent on the part of the Legislature to make them the only safeguards looking to the prevention of fraud, forgery, and corruption, in the exercise of this constitutional right by the people . . . ." *State v. Superior Court of Thurston County*, 81 Wn. 623, 647, 143 P. 461 (1914).

In light of the State's own verification process and the State's own case law, at this time the Court is not persuaded that full public disclosure of referendum petitions is necessary as "an important check on the integrity of the referendum election process."

In the alternative, Defendants assert that there exists a second "compelling" interest in favor of disclosure. Dkt. 25 at 17. Defendants argue that the electorate is entitled to know "who is essentially lobbying for their vote, and thus, who likely will benefit from the measure." *Id.* (citing *California Pro-Life Council v. Getman*, 328 F. 3d 1088, 1105-07) (9th Cir. 2003). But this argument is unavailing because neither the Court nor the parties have the ability to identify whether an individual who supports referral of a referendum to the next ensuing general election actually supports the content of the referendum or whether that individual simply agrees that the referendum should be placed before the voting public. In other words, the identity of the person who supports the referral of a referendum is irrelevant to the voter as the voting public must consider the content of the referendum and be entitled to a process by which it can ensure that the petitions are free from fraud.

Therefore, the Court finds that Plaintiffs have established that it is likely that the Public Records Act is not narrowly tailored to achieve the compelling governmental interest of preserving the integrity of the referendum process.

        **c.**    **Conclusion - Likelihood of Success**

The Court finds that Plaintiffs have established that it is likely that supporting the referral of a referendum is protected political speech. The Court also finds that Plaintiffs have established that it is likely that the Public Records Act is not narrowly tailored to achieve the compelling governmental interest of preserving the integrity of the

ORDER - 15

1  referendum process. Therefore, the Court concludes that Plaintiffs have established that
2  they are likely to succeed on the merits of their claim that the Public Records Act is
3  unconstitutional as applied to the disclosure of referendum petitions. At this time, the
4  Court need not reach the merits of Plaintiffs' second claim for relief.

5  **2.    Likelihood of Irreparable Harm in the Absence of Preliminary Relief**

6  Plaintiffs contend that the denial of their request for a preliminary injunction will
7  cause them irreparable harm. Their claim is premised on the argument that their First
8  Amendment right to free speech will be violated, irreparably, if the State complies with
9  the public record request. *See* Dkt. 3 at 29.

10  "Deprivations of speech rights presumptively constitute irreparable harm for
11  purposes of a preliminary injunction: 'The loss of First Amendment Freedoms, even for
12  minimal periods of time, constitute[s] irreparable injury.'" *Summum v. Pleasant Grove*
13  *City*, 483 F.3d 1044 (10th Cir. 2007) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.
14  Ct. 2673, 49 L. Ed. 547 (1976); *See also Brown v. Cal. Dept. of Transportation*, 32 F.3d
15  1217, 1226 (9th Cir. 2003) (noting that a risk of irreparable injury may be presumed when
16  a plaintiff states a colorable First Amendment claim; *Chaplaincy of Full Gospel Churches*
17  *v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) ("Where a plaintiff alleges injury from a
18  rule or regulation that directly limits speech, the irreparable nature of the harm may be
19  presumed."). Because this court finds that referendum petitions are likely to be protected
20  under the First Amendment, Plaintiffs are entitled to the presumption that they will be
21  irreparably harmed absent preliminary relief. Defendants have failed to overcome this
22  presumption.

23  Therefore, the Court finds that Plaintiffs have established that they are likely to
24  suffer irreparable harm in the absence of preliminary relief.

25  **3.    Balance of the Equities**

26  In determining whether to grant or deny a motion for preliminary injunction, the
27  court must balance the equities of the respective parties' interests. *Winter, supra*. Where
28  a case raises serious First Amendment questions, a court is compelled to find the potential

ORDER - 16

for irreparable harm, "or that at the very least the balance of hardships tips sharply in [the moving party's] favor" *Summartano v. First Judicial District Court, in and for County of Carson City*, 303 F. 3d 959, 973 (9th Cir. 2002) (internal quotations and citations omitted). Because this Court finds that Plaintiffs have established that this case likely raises serious First Amendment questions in regard to protected speech and this Court thereby presumes irreparable injury, under *Summartano,* this court also finds that the equities tip in favor of the Plaintiffs. *See id*.

### 4. Public Interest

Plaintiffs argue that granting the preliminary injunction is in the public's interest. In *Sammartano,* the Ninth Circuit Court of Appeals held "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 974. The *Sammartano* court went on to state that the public's interest in protecting First Amendment rights may sometimes be overcome where there is "a strong showing of other competing public interests."

In this case, Defendants have failed to make a strong showing of other competing public interests. Therefore, the Court finds that granting the preliminary injunction is in the public's interest to prevent the likely violation of Plaintiffs' First Amendment rights.

### III. ORDER

Therefore, it is hereby

**ORDERED** that Plaintiffs' motion for preliminary injunction (Dkt. 3) is **GRANTED**.

DATED this 10th day of September, 2009.

BENJAMIN H. SETTLE
United States District Judge