**United States District Court**
**Western District of Washington**
**Tacoma Division**

| | |
|---|---|
| **John Doe #1**, et al.,<br><br>    Plaintiffs,<br><br> v.<br><br>**Sam Reed**, et al.,<br><br>    Defendants. | No. 3:09-CV-05456-BHS<br><br>The Honorable Benjamin H. Settle<br><br>**Plaintiffs' Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment**<br><br>Note on Motion Calendar: August 5, 2011<br><br>**Oral Argument Requested** |

# Motion for Summary Judgment

Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington hereby move for summary judgment on Count II of their complaint on grounds "that there is no genuine issue as to any material fact and that [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In support, Plaintiffs file this brief in support, together with Exhibits 1 through 6. Plaintiffs also rely on all evidence of record previously submitted in this case, including, but not limited to, their verified complaint (Dkt. 2) and exhibits attached thereto; Declaration of Scott F. Bieniek in Support of Plaintiffs' Motion for a TRO and Preliminary Injunction (Dkt. 4) and exhibits attached thereto; and the Declarations of John Does 3, 4, and 5 in Support of Plaintiffs' Motion for Preliminary Injunction (Dkts. 52, 53, 54).

Plaintiffs respectfully request oral argument on this motion.

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

# Table of Contents

Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Brief in Support of Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.   The Exposure of R-71 Petition Signers Is Unconstitutional, As-Applied,
     Because There Is a Reasonable Probability that Such Exposure Will Lead to
     Threats, Harassment, or Reprisals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     A.   The Exposure Exemption Test Calls for "Flexibility in the Proof of Injury". . . . . . 8

     B.   Exposure In this Case Would Lead to Threats, Harassment, and Reprisals,
          and Would Seriously Chill Speech and Association. . . . . . . . . . . . . . . . . . . . . . . . . 9

     C.   Exposure Exemptions Are Available As a Safeguard to Liberty. . . . . . . . . . . . . . 14

     D.   That Plaintiffs' Views Are Repugnant to Some Is Not Reason
          to Deny First Amendment Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     E.   In this Case, the State Itself Acknowledged the Realistic Prospect of Reprisals. . . 16

     F.   It Is No Answer to Point to Existing Laws Against Threats,
          Harassment, and Intimidation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     G.   Evidence from Across the Country Is Pertinent to the Exposure Exemption
          Calculation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     H.   The Limitless Exposure Enabled by the Internet Counsels Strongly
          in Favor of Granting an Exposure Exemption. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     I.   A Word on the Burden of Proof. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Certificate of Service

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

ii

# Table of Authorities

*Cases*

*AFL-CIO v. FEC*,
   333 F.3d 168 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9 n.9

*Am. Commc'ns Ass'n, CIO v. Douds*,
   339 U.S. 382 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Averill v. City of Seattle*,
   325 F. Supp. 2d 1173 (W.D. Wash. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 14, 19

*Brown v. Socialist Workers '74 Campaign Committee (Ohio)*,
   459 U.S. 87 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18, 20

*Buckley v. Valeo*,
   424 U.S. 1 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8, 9, 14, 18, 23, 24

*Citizens United v. FEC*,
   130 S. Ct. 876 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*Dickerson v. United States*,
   530 U.S. 428 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Doe v. Reed*,
   661 F. Supp. 2d 1194 (W.D. Wash. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Doe v. Reed*,
   586 F.3d 671 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Doe v. Reed*,
   130 S. Ct. 2811 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 n.3, 6, 7, 8, 9, 14, 17

*Familias Unidas v. Briscoe*,
   619 F.2d 391 (5th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*FEC v. Hall-Tyner Election Campaign Comm.*,
   678 F.2d 416 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14, 15, 16

*FEC v. Wisc. Right to Life, Inc.*,
   551 U.S. 449 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gill v. Office of Pers. Mgmt.*,
   699 F. Supp. 2d 374 (D. Mass. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Greenwood v. CompuCredit Corp.*,
   615 F.3d 1204 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7 n.8

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

iii

*Hollingsworth v. Perry*,
    130 S. Ct. 705 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

*McConnell v. FEC*,
    251 F. Supp. 2d 176 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*McConnell v. FEC*,
    540 U.S. 93 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 9 n.9, 23

*NAACP ex rel. Patterson v. Alabama*,
    357 U.S. 449 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Perry v. Schwarzenegger*,
    704 F. Supp. 2d 921 (N.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Perry v. Schwarzenegger*,
    591 F.3d 1147, 1159–60 (9th Cir. 2010), *cert. dismissed*, 130 S. Ct. 2432 (U.S. 2010). . . . . 2

*Romer v. Evans*,
    517 U.S. 620 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Texas v. Johnson*,
    491 U.S. 397 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

*United States v. Playboy Entm't Group, Inc.*,
    529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Utahns for Ethical Gov't v. Barton*,
    2:10-CV-333, 2011 WL 1085754 (D. Utah Mar. 21, 2011). . . . . . . . . . . . . . . . . . . . . . 5 n.3

*Whitney v. California*,
    274 U.S. 357 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

***Constitutions***

U.S. Const. pmbl.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U.S. Const. amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Wash. Const. art. II, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 n.4

***Rules***

Fed. R. Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

iv

*Statutes*

Senate Bill 5688. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Wash. Rev. Code § 29A.72.230. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Wash. Rev. Code § 42.56.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Secondary Sources*

Black's Law Dictionary (7th ed. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7 n. 8

CNN News (CNN television broadcast Nov. 23, 2010), *available at*
   www.cnn.com/video/#/video/bestoftv/2010/11/23/exp.nr.gay.bullying.savage.
   cnn?iref˜allsearch. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

John Diaz, *The Ugly Backlash Over Proposition 8*, S.F. Chron., Nov. 23, 2008,
   http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2008/11/23/INOQ147155.DTL. . . . . 13, 14

*Domestic Partnership Referendum Makes Washington Ballot*, FoxNews, Aug. 31, 2009,
   http://www.foxnews.com/us/2009/08/31/domestic-partnership-referendum-
   makes-washington-ballot/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n. 16

Oren Dorell, *State Ballots Tackle Controversial Issues*, USA Today, Nov. 1, 2009,
   http://www.usatoday.com/news/nation/2009-11-01-referendums-state_N.htm. . . . . 19 n. 16

William C. Duncan, *Marriage Update: Vermont and Washington*, Nat'l Rev. Online,
   Sept. 1, 2009, http://www.nationalreview.com/corner/186361/marriage-update-
   vermont- and-washington/william-c-duncan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n. 16

Editorial, *A Big Leap Forward in the State of Washington*, The Oregonian (Portland),
   Nov. 5, 2009, 2009 WLNR 22230056. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n. 17

Editorial, *Prop. 8—Boycott, or Blacklist? Shunning Businesses Is One Thing;
   Intimidation Crosses the Line*, L.A. Times, Dec. 10, 2008,
   http://www.latimes.com/news/opinion/
   editorials/la-ed-boycott10-2008dec10,0,2703213.story. . . . . . . . . . . . . . . . . . . . . . . . . . 10

Editorial, *Six Tests for Equality and Fairness*, N.Y. Times, Nov. 1, 2009,
   http://www.nytimes.com/2009/11/02/opinion/02mon1.html?scp=9&sq=
   %22Referendum%2071. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n. 16

Lane Hudson, *In Washington State, Yes Means No to Hate*, Huffington Post, Sept. 23,
   2009, http://www.huffingtonpost.com/lane-hudson/in-wa-yes-means-no-to-hat
   _b_296271.html. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n. 16

Sarah Kliff, *The Other Gay-Rights Vote: Why Referendum 71 in Washington Matters*,
   Newsweek, Nov. 4, 2009, http://www.newsweek.com/blogs/the-gaggle/2009/
   11/04/the- other-gay-rights-vote-why-referendum-71-in-washington-matters.html. . 19 n. 17

Thomas M. Messner, *The Price of Prop 8*, Heritage Foundation Backgrounder, No. 2328
   (Oct. 22, 2009), *available at* www.heritage.org/research/family/bg2328.cfm. . . . . . . . . 6 n.7

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

v

Dallin H. Oaks, Religious Freedom, Speech Delivered at BYU-Idaho (Oct. 13, 2009)
    (transcript available at http://beta-newsroom.lds.org/article/oaks-religious-
    freedom#_ednref15). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3 n.1, 3 n.2

Brad Stone, *Prop 8 Donor Web Site Shows Disclosure Law Is 2-Edged Sword*,
    N.Y. Times, Feb. 8, 2009, www.nytimes.com/2009/02/08/business/08stream.html. . . . . . . 6

U.S. Dep't of Justice, National Crime Victimization Survey: Criminal Victimization, 2007
    (2008), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/cv07.pdf. . . . . . . . . . . . . . 6 n.6

Posting of Eugene Volokh to Election Law Listserve, http://mailman.lls.edu/pipermail/
    election-law/2011-April/024671.html (Apr. 7, 2011, 07:38:22 PDT). . . . . . . . . . . . . . . . . . . . . 17

*Washington State Approves Gay Partnerships*, CBS News, Nov. 5, 2009,
    http://www.cbsnews.com/stories/2009/11/05/politics/main5543317.shtml. . . . . . . . 19 n. 17

*Washington State Voters Approve Gay Partnership Measure*, FoxNews, Nov. 6, 2009,
    http://www.foxnews.com/politics/2009/11/06/washington-state-voters-approve-
    gay-partnership-measure/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n. 17

*Washington State OKs Gay Partnership Measure*, MSNBC, Nov. 5, 2009,
    http://www.msnbc.msn.com/id/33701486/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n. 17

William Yardley, *Early Vote Favors Domestic Partner Law*, N.Y. Times, Nov. 4, 2009,
    http://www.nytimes.com/2009/11/04/us/04washington.html?scp=5&sq=
    %22Referendum%2071%22&st=cse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n. 17

William Yardley, *Referendum Would Extend Protections to Gay Couples*, N.Y. Times,
    Oct. 31, 2009, http://www.nytimes.com/2009/11/01/us/01referendum.html. . . . . . . . 19 n. 16

William Yardley, *Washington: Same-Sex Unions Vote*, N.Y. Times, Nov. 5, 2009,
    http://www.nytimes.com/2009/11/06/us/06brfs-SAMESEXUNION_BRF.html?
    scp=7&sq=%22Referendum%2071%22&st=cse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n. 17

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

vi

# Brief in Support of Motion for Summary Judgment

## Introduction

This case is about protecting the liberty *of all* to engage in public political discourse. The freedom of speech enshrined in the First Amendment is at the core of our civic belief system. It is a fountain in which all other rights flourish and without which they quickly fade. As it gives life to every other liberty, it is, in that respect, synonymous with freedom itself. To be an American, to be free, is to have that right. The freedom of all to participate in the public square defines America as much as political censorship and suppression define tyrannical and totalitarian regimes, past and present.

In this case, no despot has risen up, erecting laws directly extinguishing the freedom of speech. But a more subtle hazard threatens to smother it just the same. Some groups and individuals, certainly a minority, have resorted to advancing their cause, not by debating the merits of the issue but by discouraging participation in the democratic process through acts calculated to intimidate. What has emerged, in short, is an established pattern of overt political browbeating designed to cow the opposition into silence. History has witnessed these thuggish tactics before, *see, e.g.*, *NAACP ex rel. Patterson v. Alabama*, 357 U.S. 449, 462–63 (1958), and now they are on the rise again—not just in Washington but throughout the country.

And we all are the lesser for it. For this decline in civility is matched step for step by a corresponding loss to liberty. When private citizens are pressed to refrain from participating in public discourse, for fear of reprisals against them or their families, the freedom of speech is rendered a nullity, and what a dictator could never accomplish directly is made possible, indirectly, by the tawdry acts of a small but boorish crowd. As the Supreme Court recognized more than half a century ago, "indirect 'discouragements' [may] undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes." *Am. Commc'ns Ass'n, CIO v. Douds*, 339 U.S. 382, 402 (1950). To that, the Ninth Circuit Court of Appeals recently added:

> The government may abridge the freedom to associate directly or . . . , even though unintended, [indirectly] . . . . Thus, the government must justify its actions not only when

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

1

1    it imposes direct limitations on associational rights, but also when governmental action
2    would have the *practical effect* of discouraging the exercise of constitutionally protected
     political rights. Such actions have a chilling effect on, and therefore infringe, the exercise
     of fundamental rights. . . .
3          The compelled disclosure of political associations can have just such a chilling effect.

4    *Perry v. Schwarzenegger*, 591 F.3d 1147, 1159–60 (9th Cir. 2010), *cert. dismissed*, 130 S. Ct. 2432

5    (U.S. 2010) (emphasis added) (citations and internal quotation marks omitted).

6    To the extent such "indirect discouragements" chill speech, liberty is lost and tyranny inches

7    forward. And, because no freedom can long endure the absence of freedom of speech, all our

8    constitutional liberties are thereby endangered.

9    The backdrop to this case is a citizen referendum that asked Washingtonians to decide whether

10   to grant same-sex partners a host of legal rights and obligations popularly described as "everything

11   but marriage." The referendum touched on a political question of great national import, the question

12   being, To what extent is society willing to recognize, accept, and embrace homosexuality? We, as

13   Americans, are in the midst of a formidable struggle to answer that question. And taking sides on

14   this issue has proven to be controversial. *Extremely* controversial.

15   There is no getting around the controversy. One side claims they are defending the institutions

16   of marriage and family, as designed by God, to the greater good of society. They warn that laws

17   advancing the homosexual movement will have the unintended consequence of diminishing civil

18   and religious liberties. The other side claims they are defending the equal rights of all, to the greater

19   good of society. Theirs is a battle to eliminate discrimination. They warn that those who fight against

20   laws that advance the homosexual movement will be judged, generations hence, just as harshly as

21   if they had been denying rights to persons of color. Both sides believe they are firmly in the right.

22   Of course, there is nothing unconstitutional about a controversial political debate. As the

23   Supreme Court has held time and again, the answer to speech with which one disagrees is "more

24   speech." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring); *accord, e.g.*,

25   *Texas v. Johnson*, 491 U.S. 397, 419 (1989). Speech counters speech. That is the American way. But

26   unfortunately, many have been unable or unwilling to keep the debate civil. Regrettably, there is

27   ample evidence that some citizens on both sides of this issue have resorted to tactics of intimidation

28

Pls.' Mot. for Summ. J. & Brief in            BOPP, COLESON & BOSTROM
Supp. of Mot. for Summ. J.                         1 South Sixth Street
(No. 3:09-CV-05456-BHS)                        Terre Haute, Indiana 47807
                                                      (812) 232-2434
                              2

and retaliation aimed at silencing the opposition. Because of the nature of the claim in this case, the evidence presented here focuses solely on reprisals against supporters of traditional marriage and similar causes.

The evidence compiled is overwhelming in demonstrating a "pattern of threats" and "specific manifestations of public hostility," *Buckley v. Valeo*, 424 U.S. 1, 74 (1976), against those who have, often out of a sense of religious conviction, voiced opposition to the homosexual movement. At their core, however, these reprisals are "not so much anti-religious as anti-democratic."[1] For when dialogue and disagreement degenerate into the thuggery of intimidation and retaliation, civility is lost, and with it our liberties.

To "secure the blessings of liberty to ourselves and our posterity," U.S. Const. pmbl., Americans of every persuasion must collectively insist, as Dallin H. Oaks has advocated, on one "companion condition of democratic government"—namely, that when any organization and its members "act or speak out on public issues, win or lose, *they have a right to expect freedom from retaliation*."[2]

This case is about fulfilling that "expect[ation of] freedom from retaliation." In this case, that expectation can best be met by granting a permanent injunction enjoining Defendants from publicizing the identities of R-71 petition signers.

## Procedural History

In May 2009, Washington Governor Christine Gregoire signed into law Senate Bill 5688 ("SB 5688"), popularly referred to as the "everything but marriage" bill, which gave a number of legal rights to same-sex partners in Washington. On or about May 4, 2009, Larry Stickney, campaign manager for Protect Marriage Washington, notified the Secretary of State of his intent to circulate a referendum petition on SB 5688. (Compl. ¶ 21.) The Secretary of State assigned the proposed referendum the title "Referendum 71" ("R-71"). (Compl. ¶ 21.)

---

[1] Dallin H. Oaks, Religious Freedom, Speech Delivered at BYU-Idaho (Oct. 13, 2009) (transcript available at http://beta-newsroom.lds.org/article/oaks-religious-freedom#_ednref15).

[2] *Id.* (emphasis added).

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

3

To get R-71 on the ballot, Protect Marriage Washington needed to file with the Secretary of State at least 120,577 valid signatures by July 25, 2009. (Ex. 6 (Certification of Referendum 71); Compl. Ex. 4, p. 1 (Dkt. 2-7).) In June 2009, in an obvious attempt to dissuade people from signing the R-71 petition, two homosexual advocacy groups—Massachusetts-based KnowThyNeighbor.org and Washington-based WhoSigned.org—announced their intentions to obtain the identities of every person who signed the R-71 petition; to publicly expose those persons on their respective web sites; and to make their web sites "accessible and searchable on the Internet." (Decl. of Scott Bieniek in Supp. of Pls.' Mot. for TRO & Prelim. Inj. [hereinafter Bieniek Decl.], Ex. 1, p. 1 (Dkt. 4-2); Bieniek Decl. Exs. 2, 4 (Dkts. 4-3, 4-5)). Shortly thereafter, WhoSigned.org launched a campaign—"Decline to Sign Referendum 71"—urging voters not to sign the petition. (*See* Bieniek Decl. Ex. 2, p. 1 (Dkt. 4-3).)

On June 2, 2009, Dave Ammons, communications director for Defendant Sam Reed, posted a blog entry on the Secretary of State's web site explaining that the alleged reason for wanting to publicly expose R-71 petition signers was to get "voters to think twice about signing the petition[ ]" and to allow opponents to "be able to talk with their neighbors and townspeople who signed to explain the ramifications." (Compl. Ex. 4, p. 1 (Dkt. 2-7).) In the same post, Ammons also indicated that the Secretary of State would cooperate in releasing the names and addresses because, he explained, the petition becomes a "public record" after it is submitted and therefore, under Washington law, the State "has no authority to withhold the identities of people who sign." (Compl. Ex. 4, p. 1 (Dkt. 2-7).)

On July 25, 2009, Protect Marriage Washington submitted a petition with 137,881 signatures. (Ex. 6; Compl. ¶ 40; Compl. Ex. 4, p. 1.) On July 23, 2009—two days before Plaintiffs submitted their petition—Plaintiffs spoke with Defendant Brenda Galarza and confirmed that the Secretary of State considered the R-71 petition signatures to be "public records" within the meaning of Washington's Public Records Act ("PRA"); and further, that the Secretary of State intended to release the names and addresses of petition signers as soon as they could be electronically scanned, which could be as soon as July 29, 2009. (Bieniek Decl. ¶ 2.)

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

4

Believing that the public exposure of their identities as R-71 petition signers would unconstitutionally abridge their First Amendment rights, Plaintiffs filed a two-count complaint in this Court on July 28, 2009, seeking to enjoin Defendants from publicizing the names and addresses of R-71 petition signers. (Compl. ¶¶ 50–66.) Count I alleged that the PRA was unconstitutional as applied to referendum petitions in general. Count II alleged that the PRA was unconstitutional as applied in this case, based on the reasonable probability that, if exposed, R-71 petition signers would be subjected to threats, harassment, or reprisals. (Compl. ¶¶ 61–66.)

On the same date, Plaintiffs also filed motions for a temporary restraining order and a preliminary injunction. On July 29, 2009, this Court granted Plaintiffs' motion for a temporary restraining order, and scheduled a hearing for September 3, 2009, to resolve Plaintiffs' motion for a preliminary injunction. (Order Granting Pls.' Mot. for TRO (Dkt. 9).)

On September 2, 2009, Defendant Reed formally "declare[d] Referendum 71 to be sufficient," having found 122,007 valid signatures. (Ex. 6.) Reed certified that he had examined "[e]ach signature"[3] to determine "[1] if the signer was a registered voter of the state, [2] if the signature was reasonably similar to the signature appearing in the voter registration record of that voter, and [3] if the same signature appeared more than once on the petition."[4] (Ex. 6.)

On September 10, 2009, this Court preliminarily enjoined the state Defendants from releasing copies of the R-71 petition. *Doe v. Reed*, 661 F. Supp. 2d 1194, 1205 (W.D. Wash. 2009). Because

---

[3] When the Supreme Court analyzed the strength of Washington's interest in detecting invalid signatures, it relied heavily on the fact that during the verification process of a typical referendum, the Secretary "ordinarily checks 'only 3 to 5% of signatures.'" *Doe v. Reed*, 130 S. Ct. 2811, 2820 (2010) (citation omitted). The Court reasoned that allowing private citizens to voluntarily canvass the other 95% of signatures would "help cure the inadequacies" of the verification process. *Id.* In this case, however, the Secretary examined *every* signature. (Ex. 6.) Thus, in this case, there was no need to rely on the help of "citizen-canvassers."

Indeed, it is difficult to pinpoint exactly what the State's interest is at this point in the litigation, now that the election is long past. Its interest in ferreting out fraud and detecting invalid signatures is now nonexistent because the whole point of those activities is to help ensure that only valid signatures are counted so that only petitions with enough valid signatures are certified for the ballot. *See Doe*, 130 S. Ct. at 2820. And its interest in promoting its own transparency and accountability is meek indeed, since the only interest it has in that regard is, at best, allowing its citizens to determine whether a referendum that has since failed at the ballot box was in fact worthy of being voted on in the first place. *Cf. Utahns for Ethical Gov't v. Barton*, 2:10-CV-333, 2011 WL 1085754, at \*5 (D. Utah Mar. 21, 2011) (finding no state interest where government was not then verifying signatures).

[4] The legal effect of certifying R-71 was that SB 5688 would not become law unless a majority of Washingtonians voted to "approve" it at the November 2009 general election. Wash. Const. art. II, § 1. At the November 2009 general election, SB 5688 was upheld by the people, with slightly more than 53% voting in favor of the law and nearly 47% against it. (Ex. 4-203 (election results).)

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

5

the Court was able to dispose of the case under Count I of the complaint, the Court did not reach Count II. *Id.*

On October 22, 2009, the Ninth Circuit Court of Appeals reversed this Court's judgment, holding that the PRA was likely constitutional as applied to referendum petitions in general. *Doe v. Reed*, 586 F.3d 671, 680–81 (9th Cir. 2009). The court of appeals did not address Count II of the complaint. *Id.*

On June 24, 2010, the U.S. Supreme Court rejected Plaintiffs' "broad challenge" (i.e., Count I of their complaint) and held that the PRA was constitutional as applied to "referendum petitions in general." *Doe v. Reed*, 130 S. Ct. 2811, 2821 (2010). But like the courts below, the Court did not decide whether the PRA is constitutional as applied to R-71 petition signers.

Plaintiffs now "press the narrower challenge in Count II of their complaint." *Id.*

## Statement of Facts

As documented in Exhibits 1 through 6 filed concurrently with this brief, together with evidence of record previously filed with the Court, this case includes virtually countless reports of threats, harassment, and reprisals.[5] In addition, it is worth noting that the evidence presented here—as extensive as it is—is, in one sense, incomplete, because many reprisals have gone unreported for fear of further reprisals.[6] Even so, the accounts that have been reported paint a disturbing picture of what *The New York Times* has called the "ugly specter of intimidation" enabled

---

[5] Plaintiffs prepared a thorough Statement of Facts that sorted through the evidence in this case and summarized it in a comprehensive, organized format. They were, however, prevented from submitting their Statement of Facts, absent what could be included in this 24-page motion and brief. *See* Pls.' Mot. to File Over-length Motion for Summ. J. (Dkt. 194); Order Denying Pls.' Mot. to File Over-length Mot. for Summ. J. (Dkt. 195).

[6] *See, e.g.*, Ex. 1-11, at 62:15–21 ("[T]here were some things I didn't want to even go public with at the time and I hesitate to now."); Ex. 4-176 (stating that some individuals who had been threatened or harassed for supporting traditional marriage "were unwilling to submit declarations because of the fear that, despite the protective order, their names would become public knowledge and they would be subject to further threats and harassment").

Moreover, data compiled by the federal government confirms that, as a matter of course (i.e., when reprisals are not necessarily at issue), *most* crimes go unreported. For example, during 2007 only 46% of all violent crimes and only 37% of all property crimes were reported to the police. Bureau of Justice Statistics, U.S. Dep't of Justice, National Crime Victimization Survey: Criminal Victimization, 2007, at 2, 6 (2008), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/cv07.pdf.

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

6

by the public exposure of private citizens' controversial political views.[7]

## Legal Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Of course, a requirement that there be no "genuine issue as to any material fact" does not mean that summary judgment is inappropriate if there is some dispute as to *any* fact. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Here, there is no genuine issue as to any material fact and Plaintiffs are entitled to judgment as a matter of law.

## Argument

### I.   The Exposure of R-71 Petition Signers Is Unconstitutional, As-Applied, Because There Is a Reasonable Probability that Such Exposure Will Lead to Threats, Harassment, or Reprisals.

In June 2010, the Supreme Court held that, as a general proposition, a state may publicize the names and addresses of citizens who have signed a referendum petition. *Doe v. Reed*, 130 S. Ct. 2811, 2821 (2010). It also held, however, that the First Amendment demands that an exception be made if a group can show "'a reasonable probability that the compelled disclosure of personal information will subject them to threats, harassment, or reprisals from either Government officials or private parties.'" *Id.* (internal brackets omitted) (*quoting Buckley*, 424 U.S. at 74); *see also Citizens United v. FEC*, 130 S. Ct. 876, 915 (2010); *McConnell v. FEC*, 540 U.S. 93, 198 (2003).

Thus, Plaintiffs' task in this case is to present evidence sufficient to show a "reasonable

---

[7] Brad Stone, *Prop 8 Donor Web Site Shows Disclosure Law Is 2-Edged Sword*, N.Y. Times, Feb. 8, 2009, www.nytimes.com/2009/02/08/business/08stream.html. Some of the incidents documented in this brief have been set forth in a report previously published by The Heritage Foundation. *See* Thomas M. Messner, *The Price of Prop 8*, Heritage Foundation Backgrounder, No. 2328 (Oct. 22, 2009), *available at* www.heritage.org/research/family/bg2328.cfm. Restatements of parts of that report in this document are used with permission of Thomas M. Messner.

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

7

probability" that the public exposure of their names and addresses, in connection with the R-71 petition, will result in "threats, harassment, or reprisals."[8]

**A.  The Exposure Exemption Test Calls for "Flexibility in the Proof of Injury."**

When the Supreme Court announced the exposure exemption test in *Buckley v. Valeo*, 424 U.S. 1, 74 (1976), it was concerned that "unduly strict requirements of proof" could impose an unworkable, "heavy burden" on speech. It therefore based the exposure exemption test on this foundational principle: *Groups must be allowed "sufficient flexibility in [their] proof of injury to assure a fair consideration of their claim." Id.* (emphasis added). "Flexibility" is the rule. And therefore, to obtain an exemption, groups "need show *only* a reasonable probability" that exposure will lead to reprisals. *Id.* (emphasis added); *see also Doe*, 130 S. Ct. at 2820.

A "reasonable probability" that exposure will lead to reprisals does not mean, of course, that reprisals will, "beyond question," "certainly follow" exposure. *FEC v. Hall-Tyner Election Campaign Comm.*, 678 F.2d 416, 421, 423 (2d Cir. 1982); *accord Brown v. Socialist Workers '74 Campaign Committee (Ohio)*, 459 U.S. 87, 101 n.20 (1982). "[W]hen First Amendment rights are at stake and the spectre of significant chill exists, courts have never required such a heavy burden to be carried," *Hall-Tyner*, 678 F.2d at 421, because First Amendment freedoms are "fragile and precious," *id.* at 424, and "'need breathing space to survive,'" *id.* at 421 (*quoting Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967)). Similarly, groups need not prove that those who have made threats against them "are likely to carry out their threats." *Averill v. City of Seattle*, 325 F. Supp. 2d 1173, 1177 (W.D. Wash. 2004). Rather, "[i]t is the likelihood that supporters will receive threats that must be determined by the Court." *Id.*

---

[8] The Supreme Court has not defined the terms "threat," "harassment," or "reprisal." In the absence of any official definition, the terms are accorded their "plain and ordinary meaning," which "can be deduced through reference sources, including Black's Law Dictionary and general usage dictionaries." *Greenwood v. CompuCredit Corp.*, 615 F.3d 1204, 1208 (9th Cir. 2010) (defining undefined statutory terms).

A *threat* is a "communicated intent to inflict harm or loss on another or on another's property, esp. one that might diminish a person's freedom to act voluntarily or with lawful consent." Black's Law Dictionary 1489–90 (7th ed. 1999).

*Harassment* is "[w]ords, conduct, or action (usu. repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress in that person and serves no legitimate purpose." *Id.* at 721

A *reprisal* is "[a]ny act or instance of retaliation, as by an employer against a complaining employee." *Id.* at 1305.

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

8

In making their case, groups may rely on a wide array of evidence, including "specific evidence of past or present harassment of [group] members due to their associational ties," "harassment directed against the organization itself," or a "pattern of threats or specific manifestations of public hostility." *Buckley*, 424 U.S. at 74.

Moreover, direct evidence of the actual "chill" on speech is not necessary to grant an exposure exemption. *See Doe*, 130 S. Ct. at 2820; *Citizens United*, 130 S. Ct. at 915; *McConnell*, 540 U.S. at 198. Rather, a finding of a reasonable probability of threats, harassment, or reprisals creates a "legal presumption" that exposure would chill speech and thus would violate the First Amendment. *Averill*, 325 F. Supp. 2d at 1179. Conversely, to the extent there is evidence of chill, it serves to reinforce the conclusion that there is a "reasonable probability" of reprisals. *Id.*

**B. Exposure in this Case Would Lead to Threats, Harassment, and Reprisals, and Would Seriously Chill Speech and Association.**

The evidence of intimidation and retaliation in this case is more than sufficient to warrant granting an exposure exemption. It is as sobering as it is extensive. There have been death threats (*e.g.*, Ex. 1-3, at 18:9–10); physical assaults and threats of violence (*e.g.*, Ex. 4-23; Ex. 1-8, at 16:18–19:24); vandalism and threats of destruction of property (*e.g.*, Exs. 4-49; 4-195); arson and threats of arson (*e.g.*, Exs. 4-83; 4-86); angry protests (*e.g.*, Exs. 4-58, 4-73); lewd and perverse demonstrations (*e.g.*, Ex. 1-8, at 22:24–24:14); intimidating emails and phone calls (*e.g.*, Compl. Ex. 1, p. 10 (Dkt. 2-4); Ex. 1-11, at 58:19–59:5); hate mail (the old-fashioned kind) (*e.g.*, Ex. 4 to Ex. 1-7); mailed envelopes containing white suspicious powder (*e.g.*, Ex. 4-75); multiple web sites dedicated to blacklisting those who support traditional marriage and similar causes (*e.g.*, Exs. 4-164; 4-190); loss of employment and job opportunities (*e.g.*, Ex. 2 ¶¶ 36–44; Ex. 4-107); intimidation and reprisals on campus and in the classroom (*e.g.*, Exs. 4-100; 4-110); acts of intimidation through photography (*e.g.*, Decl. of John Doe #5 in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 9–10 (Dkt. 54)); economic reprisals[9] and demands for "hush money"(*e.g.*, Ex. 4-58); and gross expressions of

---

[9] Courts recognize that "economic reprisals" arising from state-mandated exposure of private citizens' unpopular political views can chill speech just as surely as other forms of reprisals can. *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 198 (2003) ("In *Buckley*, unlike *NAACP*, we found no evidence that any party had been exposed to *economic reprisals* or physical threats as a result of the compelled disclosures.") (emphasis added); *AFL-CIO v. FEC*, 333 F.3d 168, 176 (D.C. Cir. 2003) ("Although we agree that the evidence in this case is far less compelling

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

9

anti-religious bigotry, including vandalism and threats directed at religious institutions and religious adherents (*e.g.*, Exs. 4-7; 4-84). There is also ample evidence that protected speech and association has been chilled because of the prospect of reprisals. (*E.g.*, Ex. 1-1, at  48:5–9, 56:16–23.)

The evidence is too voluminous to discuss in any detail in this brief. Even a brief overview, however, gives insight to the gravity and the scale of what the *Los Angeles Times* called the "vengeful campaign" against supporters of traditional marriage.[10] The following real threats were directed at traditional-marriage supporters:

"I will kill you and your family." (Ex. 1-3, at 18:9–10.)

"Oh my God, this woman is so fucking stupid. Someone please shoot her in the head, again and again. And again." (Exs. 1-3, at 54:3–7; 4-188.)

I'm going to kill the pastor. (Ex. 1-13, at 24:24–25:6, 26:8–11.)

"If I had a gun I would have gunned you down along with each and every other supporter. . . ." (Exs. 4-2, 4-3, 4-4.)

"Keep letting [the pastor] preach hate and he'll be sorry." (Exs. 4-2, 4-3, 4-4.)

"We're going to kill you." (Ex. 5-2.)

"You're dead. Maybe not today, maybe not tomorrow, but soon... you're dead." (Ex. 4-12.)

"I'm a gay guy who owns guns, and he's my next target." (Ex. 4-12.)

"You better stay off the olympic peninsula. . it's a very dangerous place filled with people who hate racists, gay bashers and anyone who doesn't believe in equality. fair is fair." (Compl., Ex. 1, at 10.)

"If Larry Stickney can do 'legal' things that harm OUR family, why can't we go to Arlington WA to harm his family?" (Ex. 4-189.)

"I advocate using violence against the property of ALL of those who are working tirelessly

than the evidence presented in cases involving groups whose members had been subjected to violence, *economic reprisals*, and police or private harassment, that difference speaks to the strength of the First Amendment interests asserted, not to their existence.") (emphasis added) (citations omitted).

Boycotting businesses that engage in behavior consumers find objectionable is a time-honored form of civil activism in American society. And, as a matter of principle, Plaintiffs support the freedom to boycott business establishments. Surely, those who voluntarily and publicly make their position known (e.g., by placing a sign in a store window) should be prepared to accept the lawful consequences of their speech.

But this case is not about individuals who voluntarily chose to publicly air their controversial political views. If the views of R-71 petition signers are publicly exposed, it will be because their political *opponents* wanted it so, and the State cooperated. No one should be compelled to choose between making a living and participating in democratic processes affecting fundamental matters of public concern.

[10] Editorial, *Prop. 8—Boycott, or Blacklist? Shunning Businesses Is One Thing; Intimidation Crosses the Line*, L.A. Times, Dec. 10, 2008, www.latimes.com/news/opinion/editorials/la-ed-boycott10-2008dec10,0,2703213.story.

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

10

to HURT my family; starting with churches and government property. Government is enabling a vote on whether or not I 'should be allowed' to see my husband while he is dying in the hospital—any NORMAL man would be driven to get a gun and kill those who tried such evil cruelty against his loved ones." (Ex. 4-195.)

"I wanna fight you. I wanna fight you right now." (Ex. 1-11, at 58:19–59:5.)

"I warn you, I know how to kill, I'm an ex-special forces person." (Ex. 1-11, at 86:21–87:1, 90:10–11.)

"Throw Rocks Here" (sign with arrow pointing to pastor's head) (Exs. 4-20, 4-21.)

"You guys deserve to die" (uttered during a physical attack) (Ex. 1-8, at 19:5–6, 19:19–24.)

"I'll bust your cap." (Ex. 1-8, at 31:6–15.)

"You're on my block now, bro. [If] you guys don't leave within 20 minutes, there's gonna be some problems. . . . I'm telling you right now, 20 minutes." (Ex. 5-9.)

"[I'll] see you in my trunk." (Ex. 5-9.)

"I'm going to give them something to be f--ing scared of....I'm a radical who is now on a mission to make them all pay for what they've done." (Ex. 4-56.)

"I tolerate you because I don't come to where you are and slaughter you." (Bieniek Decl. Ex. 13, p. 122 (John Doe #30) (Dkt. 4-14).)

"STUPID MOTHER FUCKER. MAKE A DONATION Like that AND YOU ARE LISTED." (Bieniek Decl. Ex. 13, p. 240 (John Doe #54) (Dkt. 4-14).)

"YOU LOST!!!!!!! Hahahahahahahahahaha Get ready for retribution all you bigots!!!!!!" (email sent within hours of Supreme Court's decision in *Doe v. Reed*) (Ex. 3-1, at 13.)

There is also significant evidence of actual violence and vandalism, including, among other things, physical assaults (*e.g.*, Ex. 4-99), keyed cars (*e.g.*, Bieniek Decl. Ex. 13, p. 10 (John Doe #12)), spray-painted homes and buildings (*e.g.*, Exs. 4-38, 4-41), slashed tires (*e.g.*, Ex. 4-91), stolen and mangled signs (*e.g.*, Ex. 1-3, at 35:15–22; Ex. 1-11, at 105:8–17), and smashed windows in cars, homes, and other structures (*e.g.*, Exs. 4-7, 4-34; Bieniek Decl. Ex. 13, p. 7 (John Doe #11)). Such acts seemed to convey implicitly the same message made explicit to one traditional-marriage supporter—"You should really be ashamed of yourselves; get the fuck out of our town." (Ex. 5-9.)

In addition, displays of anti-religious bigotry carried an overt tone of violence and hatred:

"You conservative Christians are fucking poison." (Ex. 5-9.)

"Can someone in CA please go burn down the Mormon temples there, PLEASE. I mean seriously. DO IT." (Ex. 4-56.)

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

11

"Burn their f--ing churches to the ground, and then tax the charred timbers" (Ex. 4-56.)

"Fuck you Mormons. Yeah you heard me. Fuck you. Fuck you and your narrow minded hypocritical asses. Fuck you for putting money into taking away a persons right. . . ." (Ex. 4-55.)

"As far as mormons and catholics...I warn them to watch their backs." (Ex. 4-56.)

"Oh Mormons, go fuck yourselves!" (sung to cheering crowds at same-sex marriage demonstrations) (Ex. 5-17, 5-19.)

"The Mormon church (just like most churches) is a cesspool of filth. It is a breeding ground for oppression of all sorts and needs to be confronted, attacked, subverted and destroyed." (Exs. 4-34, 4-82.)

"I fully support violence against churches who are politically-active as anti-gay . . . ." (Ex. 4-84.)

The vitriol of these threats was reflected in word and in deed. Churches had graffiti scrawled across their walls and artwork (*e.g.*, Ex. 4-47; Bieniek Decl. Ex. 13, p. 58, ¶ 7 (John Doe #23) (Dkt. 4-14)), swastikas left on lawns and walls (*e.g.*, Exs. 4-45; 4-50), bricks thrown through their windows and glass doors (*e.g.*, Ex. 4-91), adhesive poured in their locks (*e.g.*, Ex. 4-7), suspicious packages filled with white powder mailed to their sanctuaries (*e.g.*, Ex. 4-78), and calls for the revocation of their tax-exempt status (*e.g.*, Ex. 3-1, at 26–27; Ex. 4-179)—all for doing nothing more than supporting traditional marriage. In one case, a sacred text was burned on the front steps of a church (Ex. 4-80), and in another case, a militant homosexual group took over a church service while it was in progress, while two women kissed each other near the podium (Ex. 4-53).

On two occasions, both in Washington state, a group called Bash Back! boldly accepted credit for vandalizing houses of worship, writing, in one case, "When we [graffitied your walls] and glued all the doors shut, we threw open our own doors and tattooed those words on hour [sic] hearts. Welcome to our world shitheads. We may have written on your walls, but you've written anti-queer rhetoric into law." (Ex. 4-42.) And in the other case, "Last night, under the veil of fog, we visited the Church of Latter Day Saints. We left their locks glued with anarchist messages scrawled in spray paint over their boring veneer. . . . Let this be a warning to the Mormon church, dissolve completely or be destroyed. The choice is yours." (Exs. 4-34, 4-82.)

When some activists could sense that intimidation was not working (i.e., supporters were

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

12

courageous enough to speak despite the threats and reprisals), they resorted to threatening the families—even the children—of supporters. In one case, the perpetrator threatened to "kill" the supporter's child and the whole family (Ex. 1-3, at 18:9–10); in another, to "harm" the supporter's family (Ex. 4-189); and in another, to rape the supporters' daughter (Ex. 4-10). And in many cases, activists lashed out, promising emotional harm to supporters' children by threatening to convert them to homosexuality. (*E.g.*, Ex. 1-9, at 11:25–12:20.) One angry man wrote, "If you were afraid that your kids learning about homosexuals would corrupt them, you have no IDEA what I'm going to do to them." (Ex. 4-55.) And there is evidence of at least one physical assault against the thirteen-year-old child of a prominent supporter. (Ex. 1-3, 41:23–43:19.)

Countless are the examples of harassing and intimidating emails, phone calls, and Internet blog comments. (*See generally, e.g.*, Ex. 3-1; Bieniek Decl. Exs. 12, 13 (Dkts. 4-13, 4-14).) In one case, typical of so many others, a man who supported traditional marriage wrote a letter to the editor pleading, "Please show respect for democracy." "What he encountered instead was an utter lack of respect for free speech."[11] Indeed, the backlash he received was so stunning that it prompted a journalist from the *San Francisco Chronicle* to write his own piece entitled "The Ugly Backlash over Proposition 8."[12] The journalist, who emphasized his unwavering support for same-sex marriage, related what had happened in the wake of this man's letter to the editor:

> Within hours, the intimidation game was on. Because his real name and city were listed—a condition for publication of letters to *The Chronicle*—opponents of Prop. 8 used Internet search engines to find the letter writer's small business, his Web site (which included the names of his children and dog), his phone number and his clients. And they posted that information in the "Comments" section of SFGate.com—urging, in ugly language, retribution against the author's business and its identified clients.
> "They're intimidating people that don't have the same beliefs as they do . . . so they'll be silenced," he told me last week. "It doesn't bode well for the free-speech process. People are going to have to be pretty damn courageous to speak up about anything. Why would anyone want to go through this?"[13]

The journalist was "disturbed by the vicious, highly personalized attacks against the letter writer and others." "This out-of-scale attempt to isolate and intimidate decidedly small players is no way

---

[11] John Diaz, *The Ugly Backlash Over Proposition 8*, S.F. Chron., Nov. 23, 2008, http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2008/11/23/INOQ147155.DTL.

[12] *Id.*

[13] *Id.*

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

13

to win the issue in a court of law or the court of public opinion," and "[e]qually disappointing is the lack of a forceful denunciation from leaders of the honorable cause of bringing marriage equality to California." The journalist ended where he had begun—by reminding his readers that what is at issue here, and what is endangered here, is the First Amendment freedom of speech: "Intimidation, through attempts to chill free speech . . . should have no part in this debate," and "leaders on both sides should have the honesty to recognize it . . . and the courage to condemn it."[14]

**C.  Exposure Exemptions Are Available As a Safeguard to Liberty.**

"First Amendment freedoms need breathing space to survive." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967). Therefore, "[w]here there is a significant risk that the exercise of First Amendment rights would be chilled by forced disclosure, the Court should err on the side of protecting those freedoms which are essential to the continuing health of our republic." *Averill v. City of Seattle*, 325 F. Supp. 2d 1173, 1178 (W.D. Wash. 2004) (*citing Hall-Tyner*, 678 F.2d at 421–22). Put differently, in close cases "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 474 (2007).

Preventing the state-mandated, public exposure of private citizens' political views and associations is essential to the maintenance of liberty where there stands a reasonable probability that, if exposed, those who express unpopular political views will be targeted with threats and reprisals. *See, e.g.*, *Doe*, 130 S. Ct. at 2820; *Buckley*, 424 U.S. at 73–74; *NAACP*, 357 U.S. at 462; *cf. Hollingsworth v. Perry*, 130 S. Ct. 705, 707, 709 (2010) (staying district court's order to broadcast "Prop 8" trial, in part because of reports of reprisals against traditional-marriage supporters). The Second Circuit Court of Appeals has gone so far as to proclaim that when a government publishes or threatens to publish the identities of a group of people, many of whom will likely face reprisals because of the resulting exposure, such a government abuses its power and commits an act "most repugnant to those who cherish the First Amendment and the unfettered political process it guarantees." *Hall-Tyner*, 678 F.2d at 424.

Publicly exposing private citizens' controversial political views chills protected speech and

---

[14] *Id*.

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

14

association, which in turn "dampens the vigor and limits the variety of public debate." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). Speech is chilled because "[t]he public opprobrium, reprisals, and threats of reprisals that attend the airing of one's affiliation with an unpopular cause or group are substantial disincentives to engaging in such affiliations." *Familias Unidas v. Briscoe*, 619 F.2d 391, 399 (5th Cir. 1980). The resulting diminution in speech and association is "*itself* a violation of the First Amendment." *Dickerson v. United States*, 530 U.S. 428, 459 (2000) (discussing the Supreme Court's First Amendment case law).

In addition, protecting the identities of those who have signed a controversial petition, when exposure may lead to retribution, is the constitutionally correct course not only because it protects those citizens from hostile acts but also because it "repels totalitarianism and the rise of dictators by permitting even those whose views [may be] anathema to ours" to participate in the democratic process "without fear of reprisal." *Hall-Tyner*, 678 F.2d at 420.

## D. That Plaintiffs' Views Are Repugnant to Some Is Not Reason to Deny First Amendment Protection.

There can be no question that in many areas in Washington, and around the country, views against same-sex marriage (and similar legal enactments) are extremely unpopular. Even our courts of law have characterized those who fight against such laws as advocates of hate and bigotry who act "without reason," *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 1003 (2010) (holding that law banning marriages between same-sex partners violated federal Constitution); whose actions are "irrational," *Gill v. Office of Pers. Mgmt.*, 699 F. Supp. 2d 374, 397 (D. Mass. 2010) (striking down federal Defense of Marriage Act); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996); and whose motives are "inexplicable by anything but animus," *Romer*, 517 U.S. at 632, or "irrational prejudice," *Gill*, 699 F. Supp. 2d at 397.

These unflattering depictions are declarations of state—words carefully crafted by jurists reasoned, seasoned, and reserved. Beyond the courthouse doors, where there is less of reason and reserve, opposition to the homosexual movement is openly labeled, in mainstream print, as "disgraceful" (Ex. 4-145), "patently wrong" (Ex. 4-191), something to "be ashamed of" (Ex. 4-192), "discriminat[ory]" (Ex. 4-144), "religion-based homophobia" (Ex. 4-74), "demoniz[ing]" (Ex. 4-

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

15

193), and "cruel and indefensible" (Ex. 4-194).

Still, it remains true that "[t]olerance of the unpopular and disagreeable [political speech] is the hallmark of a truly free society," *Hall-Tyner*, 678 F.2d at 420, and is the "bedrock principle" of the First Amendment, *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Indeed, "[t]he history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 826 (2000).

**E.   In this Case, the State Itself Acknowledged the Realistic Prospect of Reprisals.**

The fact that political exposure, at the hands of the State, is likely to have a chilling effect on the cherished freedoms of speech and association should come as no surprise. Indeed, at one time, the citizens of Washington, through laws enacted by their elected representatives, recognized this very threat to constitutional liberty. Under Washington Revised Code section 29A.72.230, Washington forbade the public exposure of the names and addresses of petition signers. The statute specifically provides that those who are allowed to observe the Secretary of State's verification of signatures are permitted to "make no record of the names, addresses, or other information on the petitions or related records during the verification process." Wash. Rev. Code § 29A.72.230. To protect the unfettered democratic process, then, observers by law are permitted to watch and object, but not write or record.

Washington's elected leaders now disregard the underlying significance of that law (which remains on the books and is as viable as any other). That law let out not a drop from the dam, and now the State has pledged to destroy the dam itself. That old law, if nothing else, stands as a reminder that Washingtonians, at a time of greater tranquility and sharper clarity, implicitly recognized, and repelled, the threat to liberty occasioned by the public exposure of private citizens' political views.

And, in fact, during the R-71 petition drive, one Washington State official—State Elections Director Nick Handy—publicly acknowledged the State's own misgivings about exposing those who signed the R-71 petition. "Nobody is comfortable with releasing personal information in situations like this," Handy said. (Compl. Ex. 4, p. 1 (Dkt. 2-7).) "[B]ut," he lamented, "it is part of

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

16

transparency in government. We hope people will keep their cool." (Compl. Ex. 4, pp. 1–2 (Dkt. 2-7).) The angst expressed by this official at the thought of releasing the names of petition signers reflects an implicit acknowledgment that such exposure is reasonably likely to lead to reprisals. Why else would he express unease and plea with Washingtonians to "keep their cool"?

**F.   It Is No Answer to Point to Existing Laws Against Threats, Harassment, and Intimidation.**

It has been suggested that the proper remedy in this case is simply to enforce existing laws against threats, harassment, and intimidation. *See, e.g.*, *Doe*, 130 S. Ct. at 2837 (Scalia, J., concurring in the judgment) ("There are laws against threats and intimidation . . . ."). There is reason to believe, however, that no matter how vigilant such law enforcement is, those who peddle in threats of violence and other forms of retribution will succeed in squelching speech.

This point has been made by constitutional scholar Eugene Volokh. Challenged to provide a "robust explanation of why present anti-harassment laws and the like are sufficient to protect everyone else but not political speakers," Volokh responded:

> First, if the worry is about violent attacks, we know that existing laws against violent attacks are not "sufficient" to deter violent attacks, or to make people feel safe about exercising their liberty when threatened with violent attacks. Laws against mugging don't mean that people feel safe walking in the park at night. Likewise, laws against violent attacks won't mean that people will feel safe saying things that might lead to violent retaliation. The difference is that we can't do that much beyond having laws against mugging to stop the park attacks, so we have to live with the deterrence of walking out at night. But we can do something about violent attacks against highly controversial speakers—we can help them be anonymous.
>
> Second, if the worry is about economic retaliation, the fact is that present laws in most states don't prohibit even employment discrimination based on political speech. . . . Moreover, such laws will always be highly underenforced, because proving that you were fired because of your political speech is quite hard—and proving that you weren't hired because of your political speech might be well-nigh impossible. So "present anti-harassment laws and the like" are not remotely sufficient to protect people against economic retaliation for their political speech. The consequence is that precluding anonymous speech will substantially deter—perhaps massively deter—controversial statements that people might think will lead them to lose job opportunities.
>
> Again, all this doesn't mean that anonymity must always be protected; maybe the harms outweigh the benefits, either in general or in some cases. But the limitations of "anti-harassment laws" here as means of preventing the deterrence of political speech are clear. That's why anonymity does provide a huge marginal benefit in preventing such deterrence.[15]

---

[15] Posting of Eugene Volokh to Election Law Listserve, http://mailman.lls.edu/pipermail/election-law/2011-April/024671.html (Apr. 7, 2011, 07:38:22 PDT).

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

17

**G.   Evidence from Across the Country Is Pertinent to the Exposure Exemption Calculation.**

In *Buckley*, the Supreme Court stated that "[n]ew [groups] that have no history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views." *Buckley*, 424 U.S. at 74. Because Protect Marriage Washington is a new group—it was formed on May 13, 2009, for the express purpose of collecting enough signatures to force a referendum vote on SB 5688 (Compl. ¶¶ 22–23)—it has little or "no history upon which to draw," *Buckley*, 424 U.S. at 74. Therefore, under *Buckley*'s provision for "new" groups, Plaintiffs are entitled to present evidence of reprisals against supporters of similar causes elsewhere. *See id.*

But the fact that Plaintiffs are part of a newly formed group is not the only reason for admitting evidence of reprisals beyond those strictly related to R-71. The overarching principle running through the exposure exemption analysis is "flexibility in the proof of injury." *Buckley*, 424 U.S. at 74. A rigid rule that evidence of reprisals must relate strictly and solely to R-71 is hardly "flexible." And the Supreme Court recognized as much in *Brown v. Socialist Workers '74 Campaign Committee (Ohio)*, which held, unanimously, and against argument to the contrary, that evidence of out-of-state reprisals against persons holding similar views is relevant to, and therefore should be considered in, the exposure exemption analysis. *Brown*, 459 U.S. at 99 (indicating, with approval, that appellants introduced "proof of specific incidents" of hostility, "*many of which* occurred in Ohio and neighboring states" (emphasis added)); *id.* at 100–01 (relying on "numerous instances of recent harassment . . . both in Ohio *and in other states*" (emphasis added)); *id.* at 101 n.20 (holding that incidents in Chicago and Pittsburgh were "certainly relevant" to the decision whether to grant an exposure exemption to a group in Ohio).

*Brown*'s decision to consider out-of-state threats and reprisals had nothing to do with how "new" the Socialist Workers Party of Ohio was. *Id.* at 88, 101 n.20. The analysis hinged rather on the similarity of political views linking the in-state and out-of-state groups together: "Surely," the Court found, "the Ohio [Socialist Workers Party] may offer evidence of the experiences of other chapters espousing the same political philosophy." *Id.* at 101 n.20.

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

18

Furthermore, this Court in *Averill v. City of Seattle*, 325 F. Supp. 2d 1173 (W.D. Wash. 2004), applied the same analysis and reached the same conclusion as *Brown*. *Averill* granted an exposure exemption to a group called "Advocates for Averill," when the only evidence of harassment against the group itself (at least the only evidence discussed by the court) was that its members received "frequent hang-ups and crank calls." *Id.* at 1178. Although the Court found that the crank calls in fact constituted "harassment," it was persuaded to grant the exemption not so much because of the crank calls, but rather, because of the evidence of reprisals "directed against individuals or organizations holding similar views." *Id.* Specifically, the Court reasoned that Advocates for Averill "advocat[ed] beliefs . . . that [were] virtually identical to those espoused by . . . the Freedom Socialist Party," and the Freedom Socialist Party and its members had been "threatened and harassed on a number of occasions" for advocating such beliefs. *Id.*

Likewise, here, evidence of reprisals against supporters of similar causes, both in and out of Washington, is pertinent to the merits of this case. The underlying controversy in this case is a pressing national issue. This debate does not stop at the Washington-Oregon border any more than the debate over slavery stopped at the Mason-Dixon line. Thus, it is not surprising that R-71 attracted national attention. Several national news outlets—from *The New York Times* and *Newsweek* to FoxNews and MSNBC—ran stories on R-71, both before[16] and after[17] the election. And a citizen-

---

[16] *E.g.*, William Yardley, *Referendum Would Extend Protections to Gay Couples*, N.Y. Times, Oct. 31, 2009, www.nytimes.com/2009/11/01/us/01referendum.html; Editorial, *Six Tests for Equality and Fairness*, N.Y. Times, Nov. 1, 2009, www.nytimes.com/2009/11/02/opinion/02mon1.html?scp=9&sq=%22Referendum%2071; Oren Dorell, *State Ballots Tackle Controversial Issues*, USA Today, Nov. 1, 2009, www.usatoday.com/news/nation/2009-11-01-referendums-state_N.htm; *Domestic Partnership Referendum Makes Washington Ballot*, FoxNews, Aug. 31, 2009, www.foxnews.com/us/2009/08/31/domestic- partnership-referendum-makes-washington-ballot/; William C. Duncan, *Marriage Update: Vermont and Washington*, Nat'l Rev. Online, Sept. 1, 2009, www.nationalreview.com/corner/186361/marriage-update-vermont-and-washington/william-c-duncan; Lane Hudson, *In Washington State, Yes Means No to Hate*, Huffington Post, Sept. 23, 2009, www.huffingtonpost.com/lane-hudson/in-wa-yes-means-no-to-hat_b_296271.html.

[17] *E.g.*, William Yardley, *Early Vote Favors Domestic Partner Law*, N.Y. Times, Nov. 4, 2009, www.nytimes.com/2009/11/04/us/04washington.html?scp=5&sq=%22Referendum%2071%22&st=cse; William Yardley, *Washington: Same-Sex Unions Vote*, N.Y. Times, Nov. 5, 2009, www.nytimes.com/2009/11/06/us/06brfs-SAMESEXUNION_BRF.html?scp=7&sq=%22Referendum%2071%22&st=cse; *Washington State Voters Approve Gay Partnership Measure*, FoxNews, Nov. 6, 2009, www.foxnews.com/politics/2009/11/06/washington-state-voters-approve-gay-partnership-measure/; Sarah Kliff, *The Other Gay-Rights Vote: Why Referendum 71 in Washington Matters*, Newsweek, Nov. 4, 2009, www.newsweek.com/blogs/the-gaggle/2009/11/04/the-other-gay-rights-vote-why-referendum-71-in-washington-matters.html; *Washington State Approves Gay Partnerships*, CBS News, Nov. 5, 2009, www.cbsnews.com/stories/2009/11/05/politics/main5543317.shtml; *Wash. State OKs Gay Partnership Measure*, MSNBC, Nov. 5, 2009, www.msnbc.msn.com/id/ 33701486/; Editorial, *A Big Leap Forward*

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

19

group on the other side of the continent, Massachusetts-based KnowThyNeighbor.org, got involved in R-71 from the very beginning when it announced in June 2009 that it intended to publish, on its web site and in searchable format, the identities of every person who would eventually sign the referendum. (Bieniek Decl. Ex. 4, p. 1 (Dkt. 4-5).)

Those who stood against SB 5688 made virtually the same arguments and advocated virtually the same beliefs that supporters of traditional marriage have made in every state in the Union. Therefore, evidence of reprisals against *those* supporters is relevant to calculating the likelihood of future reprisals against *these* supporters.

## H. The Limitless Exposure Enabled by the Internet Counsels Strongly in Favor of Granting an Exposure Exemption.

When evaluating laws that mandate political exposure, courts are more skeptical of longer-lasting exposure than of more fleeting exposure. Thus, for example, the Supreme Court in *Brown* was deeply troubled by the "dramatic increase in public exposure" enabled by an Ohio law that required public records to expose "a person's affiliation with the [Socialist Workers Party]" to "any one who wishe[d] to examine [the records] for a period of at least six years." *Brown*, 459 U.S. at 98. The Court found that "[t]he preservation of unorthodox political affiliations in public records" for a six-year period "substantially increase[d] the potential for harassment above and beyond the risk that an individual face[d] simply as a result of having worked for an unpopular party at one time." *Id.*

In this case, the political exposure of R-71 petition signers will be "preserv[ed]," for all practical purposes, for as long as time stands, because of the advent of the Internet. As indicated above, two homosexual advocacy groups (KnowThyNeighbor.org and WhoSigned.org) plan to obtain and publicize on their web sites, in searchable format, the identities of every person who signed the R-71 petition. (Bieniek Decl. Exs. 1, 2, 4 (Dkts. 4-2, 4-3, 4-5).) If, as *Brown* held, the preservation of records for six years "substantially increases the potential for harassment," then it surely is difficult to overstate the increased potential for harassment enabled by the *indefinite* preservation of records.

Moreover, *Brown* was concerned with a statute that permitted interested citizens to *physically*

---

*in the State of Washington*, The Oregonian (Portland), Nov. 5, 2009, 2009 WLNR 22230056.

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

20

*visit* a government office to "inspect" and "examine" state archives. Yet today, technology has advanced such that what formerly required planning, expense, and a good deal of initiative can now be accomplished by the click of a mouse—and the results can be shared just as easily with virtually the entire world.

If Washington is permitted to publicize the names and addresses of R-71 petition signers, the resulting exposure will be permanent and boundless. And who knows what the future holds. The debate over homosexuality is one of the most contentious and volatile issues in contemporary America. Although there is no telling where society will ultimately draw lines, some at the forefront of the homosexual community have been outspoken about the direction and the ultimate destination they envision as it concerns this debate. Consider the following argument, advanced by homosexual activist Dan Savage. During an interview on CNN, the anchorwoman asked Savage what more could be done to advance the homosexual movement. Savage responded:

> [W]e need a cultural reckoning around gay and lesbian issues. There was once two sides to the race debate. There was once a side, you could go on television and argue for segregation, you could argue against interracial marriage, against the Civil Rights Act, against extending voting rights to African Americans, and that used to be treated as one side . . . of a pressing national debate, and it isn't anymore. And we really need to reach that point with gay and lesbian issues. There are no "two sides" to the issues about gay and lesbian rights.[18]

If indeed such a "cultural reckoning" were to take place in our country, state-controlled permanent archives of those who cling to "unorthodox" (even un-American) political views would almost certainly lead to acts of retaliation. Recently, a news story surfaced that illustrates the point. In a widely reported development in May 2011, two-time gymnastics gold medalist Peter Vidmar resigned as head of the (entire) 2012 U.S. Olympic team after intense criticism from homosexual athletes and activists. (Ex. 4-144.) He had served in the position for all of eight days. (Ex. 4-144.) What exactly did Vidmar do? In 2008, he donated $2,000 to support the passage of Proposition 8 ("Prop 8") in California (defining marriage as between one man and one woman) and also attended a rally supporting traditional marriage. (Ex. 4-144.) How would anyone have known that three years ago Vidmar donated $2,000 to support traditional marriage? From records preserved and made

---

[18] CNN News (CNN television broadcast Nov. 23, 2010), *available at* www.cnn.com/video/#/video/bestoftv/2010/11/23/exp.nr.gay.bullying.savage.cnn?iref=allsearch, attached as Ex. 5-8.

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

21

available by the California Secretary of State.[19]

Vidmar's case was a clear-cut example of a group stooping to use a state's political exposure laws in a way that had nothing to do with the measure that was voted on (i.e., Prop 8), and everything to do with tearing down a private citizen who voiced, however civilly, opposition to the homosexual movement. After all, what does representing your country at the Olympics have to do with same-sex marriage? Very little, of course, unless being against same-sex marriage is tantamount to being un-American (and thus, unqualified to represent your country). And evidently it is—at least in the eyes of some. One former Olympic athlete, for example, called Vidmar's appointment as U.S. Olympic chief "disgraceful," and explained, "It isn't just about marriage, it is [about] being allowed equal rights as Americans." (Ex. 4-145.) Another commentator explained the propriety of Vidmar's resignation this way: "Peter Vidmar is such a good person, but he and some others think being against same-sex marriage is not discrimination. My feeling is that it is discrimination, hands down. It would be like speaking out against certain races or bashing women or bashing Asian-Americans." (Ex. 4-144.)

To those bent on using intimidation tactics to their advantage, Vidmar's resignation was a twofold triumph. They scored a formidable victory in forcing a traditional-marriage supporter to resign from a position of prominence. But even more monumental was the unmistakable message they sent reverberating across the country. A *New York Times* columnist recognized this deeper aspect to the story, commenting, "Vidmar's situation may be a lesson for others in the Olympic movement." (Ex. 4-144.) Indeed, the "lesson" extends well beyond the relatively small circle of those involved in the Olympics, and it is being transmitted loud and clear: A small group of dedicated zealots is willing and ready to shamelessly use the forced exposure of your political views to destroy, if possible, your professional aspirations. And they are willing to wait.

As one former Olympic swimmer said, in words more profound than she knew, "I just think we

---

[19] *USA Today* reported that a homosexual news outlet called Outsports.com was the first to break the news. (Ex. 4-145.) The Outsports.com article is attached in exhibit form. (Ex. 4-146 (characterizing the USOC's decision to appoint Vidmar as "a decision antagonizing the gay community").) The Outsports.com article gives credit for its information to a web page of the *Los Angeles Times* entitled "Proposition 8: Who gave in the gay marriage battle?"—and the *Times'* web page reveals its source as the California Secretary of State. (Ex. 4-201.)

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

22

live in a completely different era right now." (Ex. 4-144.) This "completely different era" is facilitated, and made possible, by the state-mandated exposure of private citizens' controversial political beliefs—not for six years, but forever.

## I.   A Word on the Burden of Proof.

As the Court contemplates the merits of Plaintiffs' motion for summary judgment, and specifically the threshold showing that must be made, it is worth recalling what this case is *not* about. This is not a criminal prosecution. If it were, Plaintiffs would have to prove their case beyond a reasonable doubt.

Nor is this a tort action seeking to hold liable the perpetrators of the violence, vandalism, and death threats that have been documented here. If it were, Plaintiffs would have to prove their case by a preponderance of the evidence.

This is a First Amendment case. Its object is not to mete out criminal justice or financial liability but rather to prevent, insofar as possible, the further chilling of free speech rights. Thus, the burden of proof here is one of "flexibility," *Buckley*, 424 U.S. at 74, and Plaintiffs need demonstrate "only a reasonable probability," *id.*, that exposure will lead to threats, harassment, or reprisals. A stricter standard would impose a "heavy," unconstitutional burden on speech. *Id.*

To contend that Plaintiffs must prove not only the existence of the underlying episodes of violence, vandalism, and intimidation, but also that the perpetrators' *motives* were directly related to the victims' support for traditional marriage or other similar causes—all by a preponderance of the evidence—is to ask Plaintiffs to prove more in this First Amendment case than they would have to prove in a civil suit for the same acts of violence, vandalism, and intimidation—for an action for damages would not depend on the perpetrator's motives.

Plaintiffs' evidence is more than sufficient to warrant granting an exposure exemption. In *McConnell v. FEC*, 540 U.S. 93, 199 (2003), the Supreme Court affirmed the lower court's denial of plaintiffs' application for an exposure exemption based on the lower court's finding that there was fear of, but "no evidence" of, threats, harassment, or reprisals, *McConnell v. FEC*, 251 F. Supp. 2d 176, 246 (D.D.C. 2003)—and therefore, in the words of the lower court, there was "no reasonable

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

23

basis for [those] fears," *id.* at 246–47. In contrast, here, the evidence easily meets the standard of "reasonableness." Almost innumerable are the accounts of citizens who, for doing nothing more than publicly standing against same-sex marriage or similar legal enactments, were targeted with threats and reprisals. In many cases, their families were also targeted. Other speech went unspoken for fear of such reprisals. That fear was, and continues to be, well-founded, objective, and reasonable—and the best evidence of that are the scores of "specific manifestations of public hostility," *Buckley*, 424 U.S. at 74, documented in this case, that, together, paint a compelling picture of a "pattern of threats," *id.*, and reprisals.

## Conclusion

The evidence of threats, harassment, and reprisals occurring in Washington, together with the evidence of reprisals directed at supporters of similar causes elsewhere, demonstrates that there is a reasonable probability that, if exposed, those who signed the R-71 petition will be subject to similar threats, harassment, and reprisals, resulting in a profound chill on protected expression. Accordingly, Plaintiffs seek a permanent injunction to prevent Defendants Reed and Galarza, and their successors in office, from releasing copies of the R-71 petition pursuant to the Washington Public Records Act, Wash. Rev. Code § 42.56.001 *et seq.*, or otherwise.

Dated this 29th day of June 2011.

Respectfully submitted,

_/s/ Jared Haynie_
James Bopp, Jr. (Ind. Bar No. 2838-84)*
  jboppjr@aol.com
Joseph E. La Rue (Ohio Bar No. 80643)*
  jlarue@bopplaw.com
Jared Haynie (Colo. Bar No. 41751)*
  jhaynie@bopplaw.com
Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434
*Counsel for All Plaintiffs*
*Pro Hac Vice Application Granted*

Stephen Pidgeon
Attorney at Law, P.S.
30002 Colby Avenue, Suite 306
Everett, Washington 98201
(360) 805-6677
*Counsel for All Plaintiffs*

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

24

# Certificate of Service

I, Jared Haynie, am over the age of eighteen years and not a party to the above-captioned action. My business address is 1 South Sixth Street, Terre Haute, Indiana 47807.

On June 29, 2011, I electronically filed the foregoing document, described as Plaintiffs' Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment, together with Exhibits 1 through 6 attached thereto, with the Clerk of Court using the CM/ECF system which will send notification of such filing (except as to Exhibits 1 and 5) to:

(1) Counsel for Defendants Sam Reed and Brenda Galarza:
    Anne E. Egeler — anne1@atg.wa.gov
    Jay Geck — jayg@atg.wa.gov
    James K. Pharris — jamesp@atg.wa.gov

(2) Counsel for Intervenor Washington Coalition for Open Government:
    Steven J. Dixson — sjd@wkdlaw.com
    Duane M. Swinton — dms@wkdlaw.com
    Leslie R. Weatherhead — lwlibertas@aol.com

(3) Counsel for Intervenor Washington Families Standing Together
    Ryan McBrayer — rmcbrayer@perkinscoie.com
    Kevin J. Hamilton — khamilton@perkinscoie.com
    William B. Stafford — wstafford@perkinscoie.com
    Rhonda L. Barnes — rbarnes@perkinscoie.com

On June 29, 2011, a copy of Exhibit 1 (deposition excerpts filed under seal) were served by FedEx overnight delivery on counsel at their physical addresses listed below. On the same date, and in accord with ECF Filing Procedure "III-J," Exhibit 5, which consists of non-paper evidence (i.e., video evidence), was filed conventionally and served on counsel (at the addresses listed below) by FedEx overnight delivery. A separate notice of such filing (i.e., the video evidence) was also filed and served on all counsel.

(1) Anne E. Egeler
    Jay Geck
    James K. Pharris
    Office of the Attorney General of Washington
    P.O. Box 40100
    Olympia, WA 98504-0100

(2) Steven J. Dixson
    Duane M. Swinton
    Leslie R. Weatherhead
    Witherspoon, Kelley, Davenport & Toole
    422 Riverside, Suite 1100

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434

Spokane, WA 99201

(3)  Ryan McBrayer
     Kevin J. Hamilton
     William B. Staffort
     Rhonda L. Barnes
     Perkins Coie Barnes & Bain
     1201 3rd Ave, Suite 4800
     Seattle, WA 98101-3099

I declare under the penalty of perjury under the laws of the State of Indiana that the above is true and correct.


Executed this 29th day of June, 2011.


 /s/ Jared Haynie
Jared Haynie
*Counsel for All Plaintiffs*

Pls.' Mot. for Summ. J. & Brief in
Supp. of Mot. for Summ. J.
(No. 3:09-CV-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807
(812) 232-2434