October 15, 2010

1

IN THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN DOE #1, et al., )
                     )
    Plaintiffs,      )
                     )
                     )
                     )
                     )
VS.                  )    3:09-CV-5456-BHS
                     )
SAM REED, et al.,    )
                     )
    Defendants.      )
                     )
                     )

DEPOSITION OF

Taken on behalf of the Defendants

October 15, 2010



**Exhibit A**

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -8

October 15, 2010

2

```
1    A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4    Mr. Scott Bieniek
     Bopp Coleson & Bostrom
5    1 S 6th St
     Terre Haute, IN 47460
6    sbieniek@bopplaw.com
     812-232-2434

7

8    FOR THE DEFENDANTS:

9    Ms. Rhonda L. Barnes
     Perkins, Coie, Brown & Bain
10   2901 N. Central Avenue, Suite 2000
     Phoenix, AZ 85012
11   rbarnes@perkinscoie.com
     602-351-8305

12

13   AND

     Ms. Anne E. Egler (Via telephone)
14   Deputy Solictor General
     P.O. Box 40100
15   Olympia, WA 98504
     anne1@atg.wa.gov

16

17

               E X A M I N A T I O N
18

19                                        PAGE
     Examination by Ms. Barnes...............    4
20   Examination by Ms. Egler................   46
     Examination by Mr. Bieniek..............   48
21   Examination by Ms. Egler................   50

22

23

24

25
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -9

October 15, 2010

4

1

2    was called as a witness, and after having

3    been first duly sworn, testified as follows:

4

5    EXAMINATION BY MS. BARNES:

6        Q.      Good morning.   Can you please

7    state your name for the record?

8        A.      My name is

9        Q.      And          is spelled how?

10       A.

11       Q.      And can you tell us your home

12   address?

13       A.

14

15       Q.      And

16       A.

17       Q.      And I'm not from          So

18   I'm not sure how it was spelled and where

19   it's from.

20               How long have you been in

21

22       A.      We moved here in June of 2010.

23       Q.      Okay.   And prior to that you lived

24   in Washington?

25       A.      Colville, Washington, for the two



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -10

October 15, 2010

8

1    Q.      And how did you become familiar
2  with Referendum 71?
3    A.      Hmm.  Probably most directly
4  through my social network, which involved
5  individuals who were intimately involved in
6  the petition drive and the formulation of
7  that petition drive.
8    Q.      So were you part of the
9  organization that -- that initiated the
10  petition drive?
11    A.      I was not.
12    Q.      You came in afterwards?
13    A.      Yes, ma'am.
14    Q.      Now let's talk about the petitions
15  themselves, then.  Did you sign the
16  Referendum 71 petition?
17    A.      I did.
18    Q.      Do you remember where or when that
19  was, approximately?
20    A.      Where I physically signed the
21  petition?
22    Q.      Uh-huh.
23    A.      I'm pretty sure that I signed it
24  after a church service sometime during April
25  or May.  I don't know specifically when, but



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -11

October 15, 2010

9

1  it was somewhere in the middle of the drive.
2  We had brought petitions in to church.  After
3  the service, we had them in the foyer area in
4  the back.  I signed it on one of those
5  occasions.
6      Q.    And you said "we" had brought the
7  petitions in to church.  Is that what you
8  said?
9      A.    Well, "we" in the sense that one
10 of the other people who was affiliated with
11 the petition drive also attended our church.
12 She brought them and I signed them.
13     Q.    Okay.  I see.  So when you were
14 saying "we," it wasn't you included in that?
15     A.    Correct.
16     Q.    Okay.  I just wanted to be clear.
17           And so was there -- the woman who
18 brought them who was involved, was she there
19 with a clipboard?  Is that how you were
20 handed the petition?  Do you remember?
21     A.    As I recall, it was simply set on
22 the table in the back of the room.  A brief
23 announcement was made that anyone who was
24 interested in signing the petition, that one
25 would be available in the back of the room.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -12

October 15, 2010

10

1  And I don't recall it being circulated.  Just
2  sitting there and after the service, if you
3  wanted to, you could sign on your way out.
4      Q.     So there was a table in the back
5  with sort of stacks of petitions, blank
6  petitions?
7      A.     I don't even recall there were
8  stacks.  There may have been one or two.
9      Q.     Okay.  So just a couple?
10     A.     (Witness moves head up and down.)
11  Sorry.  Yes, ma'am.
12     Q.     Thank you.
13            And were other individuals
14  standing around at that table when you were
15  signing?  Do you remember?
16     A.     That table -- that table's like a
17  multipurpose table.  I mean, that's also
18  where the usher sets the bulletins and things
19  like that.  So I don't know that anyone was
20  sitting at the table.  It's more like an
21  informational kind of a display table for
22  literature and such going in to the church.
23     Q.     So there were other brochures and
24  sort of papers on the table in addition to
25  the petitions?



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -13

October 15, 2010

11

1      A.      That's my recollection, yes.

2      Q.      And when you signed the petition,

3  were there other folks there either before

4  you signing it or behind you waiting to sign?

5      A.      I don't remember a line.  I

6  remember talking about the petition with a

7  couple of other individuals.

8      Q.      And you were -- let me just

9  clarify.  You were talking with individuals

10  sort of at that table or --

11      A.      No.  No.  I'll paint a better

12  picture.  After the service, during the

13  typical mull around and talk with people

14  time --

15      Q.      Uh-huh.

16      A.      -- since the petition had been

17  mentioned, we knew it was there.  A few of us

18  were speaking about it.  At that point, I

19  think I noticed that no one else was back

20  there, so I took that opportunity to sign the

21  petition.

22      Q.      And you said you took that

23  opportunity to sign because then you weren't

24  going to have to wait in line?

25      A.      Correct.



ESQUIRE
a Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -14

October 15, 2010

12

1     Q.     And so that was easier for you,

2  just to go straight up there and sign?

3     A.     Yes, ma'am.

4     Q.     And other -- you could see other

5  signatures on the form; is that correct?

6     A.     There were a couple.

7     Q.     And anybody who signed after you

8  could have seen your signature; correct?

9     A.     Yes, ma'am.

10     Q.     And you said you were talking to

11  other folks at that mulling around time?

12     A.     Uh-huh.

13     Q.     About the referendum?

14     A.     Yes, ma'am.

15     Q.     And did you tell them that you had

16  signed?

17     A.     You know, I don't really remember

18  specifically saying I did sign or I didn't.

19  I think it was within -- within my immediate

20  circle of -- of acquaintances, I think it was

21  general knowledge that all of us intended to

22  sign.

23     Q.     And do you know why that was

24  general knowledge?  Was it just something

25  that had came up in conversation?



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -15

1  formulated and he was ready to bounce ideas

2  off people about how to proceed.

3          In those early days leading up to

4  the campaign, we spoke about those issues

5  really more in a conceptual way, what are the

6  implications of this kind of legislation,

7  what's the implication of changing the

8  language of legislation, the historical

9  understandings of gender, for example, and

10  what would that mean for other laws, right,

11  that were on the books; what's the role of

12  the constitution or a state constitution in

13  either advancing or -- advancing the cause of

14  a legislature as opposed to advancing the

15  cause of the general population.

16          I mean, we spoke about those kinds

17  of questions in the sense of political

18  theory, not in the sense of strategy.

19     Q.      Okay.  And what you were saying

20  made me think of something back to that

21  reporter in the park.

22     A.      Yes, ma'am.

23     Q.      Did she tell you she was going to

24  post the story on-line?

25     A.      I think she indicated that she



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -16

1    would submit it.   Sometimes they aired it --

2    sometimes they would edit it down; sometimes

3    they would air it.

4         Q.      Okay.  And did you ever find it

5    on-line?  Did you ever go look for it?

6         A.      I think someone sent me a link to

7    it a week or so afterwards.  I couldn't even

8    tell you who sent me the link.  It was on

9    somebody's blog.

10        Q.      Uh-huh.

11        A.      I -- I couldn't even tell you

12   whose blog it was.  I remember thinking that

13   I wore a good shirt for the interview, had

14   vertical stripes.

15        Q.      All right.

16        A.      Slimming effect.

17        Q.      So you actually watched the video,

18   then?

19        A.      I did.

20        Q.      Okay.  I'll have to remember that,

21   vertical stripes.

22               All right.  So let's talk a little

23   bit more about that campaign.  You wrote a

24   check.  Did you ask anybody else to write a

25   check for the campaign?



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -17

October 15, 2010

27

1    way.

2            I qualified on both of those

3    measures and I indicated to him that if he

4    felt like I was a good fit for what they were

5    trying to do, that I was happy to -- I was

6    happy to serve as a name on the -- on the

7    docket.

8            Q.    To be a plaintiff?

9            A.    Yes, ma'am.

10           Q.    And you indicated that you fit

11   both of the criteria, one of which was that

12   you did not want your information made

13   public; is that correct?

14           A.    My personal information, yes.

15           Q.    And what do you mean by personal

16   information?

17           A.    Specifically name, address, phone

18   number.

19           Q.    And --

20           A.    Can I back up?  Specifically

21   address, phone number.  Less -- I was less

22   concerned about the name.

23           Q.    So you were more concerned about

24   the contact information?

25           A.    Yes, ma'am.



E. SQUIRE
in Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -18

October 15, 2010

28

1    Q.      And why were you concerned about

2  the contact information becoming public?

3    A.      That -- well, I have a family.  I

4  have young children.  And my professional

5  career deals with children, which means that

6  the safety of my students is a concern, as is

7  the safety of my family.  And while I was

8  happy to speak in a -- in somewhat of a

9  public way, for example, in the news article,

10 I also didn't hand her my -- my -- you know,

11 my private mailing address.

12    Q.      And by "her," you mean the

13 reporter?

14    A.      The report -- I didn't hand the

15 reporter my personal phone number.

16          So I was -- I was happy to have my

17 name associated with the campaign, but I

18 didn't -- I didn't feel that I wanted my

19 personal address, phone number, e-mail

20 address, that type of thing available to the

21 general public.

22          And I would add that in the real

23 world, I keep my number unlisted out of the

24 phonebook.  You know, you can't look up

25          and find that number in the



ESQUIRE
a Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -19

October 15, 2010

31

1   personally?

2        A.      No, ma'am.

3        Q.      And in regards to the Referendum

4   71, I know you weren't involved, but the --

5   your limited involvement in that campaign,

6   did anybody ever speak to you about it

7   directly in a sort of harassing or annoying

8   way?

9        A.      You mean from -- from the public

10  speaking to me?

11       Q.      Correct.

12       A.      No, ma'am.

13       Q.      No.  So the only conversations you

14  had with folks about Referendum 71, if I

15  understand your testimony correctly, were

16  those who were of a similar mind as you?

17       A.      Yes, ma'am.

18       Q.      Okay.  And when you became

19  involved in this lawsuit, were you told that

20  you would have to testify publicly?

21       A.      I was advised that it was a

22  possibility.

23       Q.      And did that concern you?

24       A.      It did not.

25       Q.      And why not?



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -20

1    A.    Well, because I -- in describing
2  the way that this -- this case would work,
3  that I would be listed as a John Doe and that
4  every reasonable effort to maintain anonymity
5  would be respected.  And that it could come
6  to the point where my name would be made
7  public, but that generally speaking, John
8  Does generally remained John Does.  And so I
9  thought that that was a reasonable level of
10  risk to accept given the importance that I
11  thought that the matter warranted.
12    Q.    Now, if this case were to go to
13  trial -- and I know that's down the road a
14  ways -- would you be hesitant to testify in
15  federal court?
16    A.    No, ma'am.
17    Q.    And why not?
18    A.    If I -- if I had been hesitant to
19  testify, I wouldn't have signed on as a
20  plaintiff.
21    Q.    And you're not hesitant to sign on
22  as a plaintiff because you don't worry about
23  people coming and harassing you?
24    A.    That concern remains, but the
25  larger issue that others shouldn't have to



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -21

October 15, 2010

45

1     A.      That was particularly what I

2  heard.

3     Q.      Okay.  So you haven't had any sort

4  of threats of reprisals against you either

5  for your involvement with Referendum 71?

6     A.      No, ma'am.

7     Q.      Nobody's ever contacted you at the

8  school where you taught --

9     A.      No, ma'am.

10    Q.      Or at home?

11    A.      No, ma'am.

12    Q.      Any of the folks you associate

13  with ever sort of shunned you or maybe pulled

14  away their friendship because of your

15  involvement with Referendum 71?

16    A.      No, ma'am.

17    Q.      Are there any other examples,

18  anything we haven't discussed this morning

19  about harassment or reprisals related to

20  Referendum 71?

21    A.      I can't think of anything.

22    Q.      And I gather that since you

23  haven't heard anything about threats or

24  harassment, that's both before and after the

25  election?



## ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -22

October 15, 2010

47

1    received harassing phone calls?

2        A.     I don't, ma'am.  I'm sorry.

3        Q.     Okay.  And do you know how many

4    she received?

5        A.     I -- other than just the fact of

6    it, that is all the information I could

7    furnish.

8        Q.     Okay.  So you don't know what was

9    said during the phone calls?

10       A.     No.  And I didn't ask at the time.

11   She didn't volunteer.

12       Q.     Okay.  Did she mention to you

13   whether she called the police about these

14   phone calls?

15       A.     I have given you as much

16   information as I have on that.

17       Q.     Okay.  And then just to make sure

18   I heard correctly, did you say that you have

19   not experienced any harassment as a result of

20   your association with Referendum 71?

21       A.     You did hear that correctly.

22       Q.     Okay.  And then one other thing I

23   wanted to make sure I heard correctly.  Am I

24   correct in understanding that you are not

25   concerned about publicly testifying in



**ESQUIRE**
Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -23

October 15, 2010

48

1    federal court?

2        A.    Well, I'm not anxious to do it,

3    but I am willing to do it.

4        Q.    Okay.  And you know of no pending

5    threats to you if you do testify publicly?

6        A.    I do not know of any pending

7    threats to me.

8            MS. EGLER:  Okay.  I have no

9    further questions.  Thank you.

10           THE WITNESS:  Yes, ma'am.

11           MS. BARNES:  And I don't have any

12   follow up.  So I think we're all done.

13           MR. BIENIEK:  I'd actually like to

14   ask a couple of follow-up questions.

15           MS. BARNES:  Sure.

16           MR. BIENIEK:  Scott Bieniek from

17   Bopp Coleson & Bostrom.

18

19   EXAMINATION BY MR. BIENIEK:

20       Q.               I want to ask -- I

21   want to go back to when you were signing the

22   petition at church.

23       A.    Yes.

24       Q.    Would you say, generally speaking,

25   that the individuals that you attend church



ESQUIRE
Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -24

October 15, 2010

53

```
 1                C E R T I F I C A T E
 2
 3    STATE OF TENNESSEE:
      COUNTY OF DAVIDSON:
 4
                I, LISE S. MATTHEWS, RMR, CRR,
 5    CCP, and Notary Public, Davidson County,
      Tennessee, CERTIFY:
 6
                The deposition was taken before
 7    me at the time and place stated in the
      foregoing styled cause with the appearances
 8    as noted.
 9              Being a Court Reporter, I then
      reported the proceedings in Stenotype, and
10    the foregoing pages contain a true and
      correct transcript of my said Stenotype notes
11    then and there taken.
12              I am not in the employ of and am
      not related to any of the parties or their
13    counsel, and I have no interest in the matter
      involved.
14
                I further certify that in order
15    for this document to be considered a true and
      correct copy, it must bear my signature seal,
16    and that any reproduction in whole or in part
      of this document is not authorized and not to
17    be considered authentic.
18              Witness my signature this the
           day of                   , 2010.
19
20
21
22              LISE S. MATTHEWS, RMR,CRR,CCP
                Notary Public at Large
23              For the State of Tennessee
24              My Commission Expires:
                May 20, 2014
25
                Tennessee License No. 353
```



ESQUIRE
'exander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Decl. of W. Stafford -25

Page 1

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

```
JOHN DOE #1, et al.,          )
                              )
              Plaintiffs,     )
                              )
         vs.                  )   NO. 09-cv-05456-BHS
                              )
SAM REED, et al.,             )
                              )
              Defendants.     )
```

DEPOSITION UPON ORAL EXAMINATION OF

September 15, 2010

Longview, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

**Exhibit B**

Decl. of W. Stafford -26

aeb113ff-d804-425d-937b-8a48a047b9ac

Page 2

```
 1    APPEARANCES:

 2            FOR THE PLAINTIFF
              PROTECT MARRIAGE
 3            WASHINGTON:              MR. STEPHEN PIDGEON
                                      ATTORNEY AT LAW
 4                                    3002 Colby Avenue
                                      Suite 306
 5                                    Everett, WA  98201

 6            FOR THE DEFENDANTS:     MS. ANNE E. EGELER
                                      DEPUTY SOLICITOR GENERAL
 7                                    P.O. Box 40100
                                      Olympia, WA  98504-0100

 8
              FOR THE INTERVENOR
 9            WASHINGTON FAMILIES
              STANDING TOGETHER:      MS. JESSICA T. HAMILTON
10                                    PERKINS COIE
                                      1120 N.W. Couch Street
11                                    Tenth Floor
                                      Portland, OR  97209
12
              FOR THE INTERVENOR
13            WASHINGTON COALITION FOR
              OPEN GOVERNMENT
14            (Via Telephone):        MR. STEVEN J. DIXSON
                                      WITHERSPOON KELLEY
15                                    422 W. Riverside Avenue
                                      Suite 1100
16                                    Spokane, WA  99201

17

18

19

20

21

22

23

24

25
```

Decl. of W. Stafford -27

Dixie Cattell & Associates  (360) 352-2506

aeb113ff-d804-425d-937b-8a48a047b9ac

EGELER (                              9/15/10)

Page 4

1           BE IT REMEMBERED that on Wednesday, September 15,

2      2010, at 1:58 p.m., at 1700 Hudson Street, Suite 300,

3      Longview, Washington, before REBECCA S. LINDAUER, Notary

4      Public in and for the State of Washington, appeared

5                    , the witness herein:

6           WHEREUPON, the following proceedings were had, to

7      wit:

8

9                                having been first duly sworn by

10                               the Notary, testified as follows:

11                       EXAMINATION

12    BY MS. EGELER:

13    Q    I would like to start by having you spell your full legal

14         name or state your full legal name, rather.

15    A    Middle name too?

16    Q    Yes.

17    A

18    Q    Are you a registered voter in Washington?

19    A    Yes.

20    Q         have you ever attended a deposition before?

21    A    No.

22    Q    I'll give you a little bit of the basic rules.  Everything

23         that we say is being taken down by the court reporter, so to

24         help her, it's very important that we let each other finish

25         our sentences, rather than talking over each other.  Okay?

Cattell & Associates (360) 352-2506

aeb113ff-d804-425d-937b-8a48a047b9ac

EGELER (                          , 9/15/10)

Page 10

| | | |
|---|---|---|
| 1 | A | Um-hmm -- yes. |
| 2 | Q | Can you tell me how you first became familiar with |
| 3 | | Referendum 71? |
| 4 | A | I guess just word of mouth through churches probably. |
| 5 | Q | So you don't remember specifically who told you about |
| 6 | | Referendum 71? |
| 7 | A | I couldn't tell you exactly who the first person that told |
| 8 | | me was. |
| 9 | Q | Do you remember around when it was that you first heard |
| 10 | | about it? |
| 11 | A | Spring of 2009 is probably the best I could say. |
| 12 | Q | Did you sign the Referendum 71 petition? |
| 13 | A | Yes. |
| 14 | Q | Do you remember where you were when you signed? |
| 15 | A | Let me think about it a second.  I couldn't tell you |
| 16 | | exactly, so all I could do is take a guess, but that's not |
| 17 | | going to be a fact, so I can't really say. |
| 18 | Q | No.  I don't need you to take a guess.  That's okay. |
| 19 | | Did you gather signatures on petitions for |
| 20 | | Referendum 71? |
| 21 | A | Yeah. |
| 22 | Q | And where did you do that? |
| 23 | A | I went to family members and friends and I gathered |
| 24 | | signatures at Creation Fest. |
| 25 | Q | What's that? |

Decl. of W. Stafford -29

Cattell & Associates (360) 352-2506

aeb113ff-d804-425d-937b-8a48a047b9ac

EGELER (                          9/15/10)

Page 11

1   A   It's a concert that's held once a year.  It was over in

2       George.

3   Q   Okay.

4   A   And I also gathered signatures at our Go Fourth Festival

5       walking around and talking to people.

6   Q   What's the Go Fourth Festival?

7   A   Every year there's a committee -- or an organization that

8       puts on the fireworks and stuff and they have vendors and do

9       things like that, so . . .

10  Q   I'm confused.

11  A   It would be for the Go Fourth -- like the 4th of July, the

12      citywide kind of celebration.  It's ran by a nonprofit

13      organization, so there's around 30,000 people there over the

14      weekend, and I just walked around for probably two hours one

15      day and talked to people.

16  Q   Where were you when you were walking around?

17  A   It's held at Lake Sacagawea.

18  Q   Do you remember, was                      with you that day?

19  A   He wasn't with me when I was doing it, no.

20  Q   Okay.

21  A   I did it alone.

22  Q   And when you were talking -- let me back up.  When you were

23      gathering signatures that weekend, were you walking around

24      with petition sheets or did you have a table you were

25      working?

EGELER (                    9/15/10)

Page 14

1   know, they don't run around thinking something is what the

2   Bible says because I told them it's what it says, so they

3   understand it's what the Bible says because they read it

4   themselves and see that, so they can have their own

5   convictions, not mine.  I would have stayed pretty close to

6   what it would have said there.

7        If I explained, it would have been if somebody had not

8   understood a word or something like that.  But, you know,

9   especially if it was somebody who was over the age of 18,

10  they would have understood, I'm sure.

11  Q   And do you recall ever making a connection during a Bible

12      study between what the Bible says about homosexuality and

13      the Referendum 71 petition campaign?

14  A   Yeah.  I'm pretty sure I could say yeah, I did.

15  Q   Yes, that you did?

16  A   (Witness nods head.)

17  Q   Did you ever go out with Referendum 71 signs and hold up a

18      sign in a public location?

19  A   Yes.

20  Q   Can you tell me about that?

21  A   We met one day -- or I went one day down to the intersection

22      down here of the Allen Street Bridge and I believe it's

23      First Avenue there and stood and held a sign for probably

24      about two or three hours.

25  Q   How many people were there with you?

EGELER (                    9/15/10)

Page 15

| | | |
|---|---|---|
| 1 | A | How many people came with me or how many people were there? |
| 2 | Q | Were there. |
| 3 | A | Probably 70. |
| 4 | Q | And by "people there," I mean people there holding signs. |
| 5 | A | Yeah. |
| 6 | Q | And is that a place that you would consider a high traffic |
| 7 | | area? |
| 8 | A | Yes. |
| 9 | Q | Was this site chosen because it's a high traffic area? |
| 10 | A | Probably, yeah. |
| 11 | Q | Did you bring people with you to this event? |
| 12 | A | No. |
| 13 | Q | Did you tell the youth group about this event? |
| 14 | A | No. |
| 15 | Q | Do you have a Facebook or a Myspace or a Web page? |
| 16 | A | Yes. |
| 17 | Q | Which of those? |
| 18 | A | I have all three. |
| 19 | Q | All three? |
| 20 | A | Yeah. |
| 21 | Q | Do you recall whether or not you announced this event or |
| 22 | | provided information about it? |
| 23 | A | I know I didn't so, no, I didn't.  I don't think I even had |
| 24 | | a Facebook then, and Myspace, I don't know if I even had a |
| 25 | | Myspace then either.  I didn't have a Web page then. |

EGELER (                    9/15/10)

Page 19

1        understood what your position was on Referendum 71?

2    A   Yeah.

3    Q   And in addition to those five, do you think some of the

4        other attendees that came occasionally understood your

5        position on Referendum 71?

6    A   Anybody that would have known very much about me and the

7        case would know what I stood for.

8    Q   So did you ever try and keep your support of Referendum 71 a

9        secret?

10   A   No.

11   Q   So do you feel comfortable telling people that you signed

12       the petition?

13   A   Yeah.

14   Q   And are you aware that as a witness in this case you may be

15       required to publicly testify in federal court?

16   A   Yeah.

17   Q   Does that concern you for any reason?

18   A   Some.

19   Q   And what concerns do you have about that?

20   A   I have a family.  I have a little girl and I know that

21       there's a lot of hostility in this and -- so I'm willing to

22       do it.  It's not like I have no concern.  I guess it's a

23       matter of standing up for what's right, so -- but it is a

24       little scary because a lot of people might -- well, a lot of

25       people put actions to their words and even words can be very

**Decl. of W. Stafford -33**

EGELER (                    9/15/10)

Page 20

1    damaging.  So I have, like I said, a family, a wife and a

2    little girl, and I don't need somebody going out hating

3    because of what I believe and attacking my family physically

4    or something like that.

5  Q  I want to go back a little.  You talked about social media,

6    like Facebook and Myspace, and said that currently you do

7    have those, correct?

8  A  Um-hmm -- yes.  I'm sorry.

9  Q  On either your Facebook page or your Myspace, do you state

10   any views about abortion?

11  A  Yes.

12  Q  And what do you state?

13  A  As far as in my own words, nothing, I believe.

14  Q  Do you have something posted that you put on there that

15   expresses an opinion about abortion?

16  A  Yes.  My wife put a couple things on there.  I never view my

17   profile because when I get on Myspace, it goes to your

18   messages and such.  It doesn't show your profile.  My wife

19   helped set up some of it.  But the one link I put was to a

20   video, showing videos, and like pictures.  It's like a slide

21   show of babies that have been aborted and that, I believe,

22   is the extent of what I put personally as far as any of my

23   own impression.

24  Q  You talked a bit about some people have hostility towards

25   political issues.

EGELER (                    9/15/10)

Page 22

1       cases as people who are proabortion becoming violent over

2       their right as much as the -- a lot of the public expression

3       of prohomosexuals.

4   Q   Let's talk about that expression, and I understand you've

5       experienced what you believed to be hostility, harassment,

6       or threats as a result of your connection to Referendum 71.

7       Is that correct?

8   A   Yes.

9   Q   Can you tell me about that, please?

10  A   I personally -- because in the big picture of all this, I'm

11      really just a nobody and my name wasn't really out there

12      very much.  The fact I'm on this is only because I signed as

13      John Doe just because I guess -- yeah.  But -- so I wasn't

14      on TV.  I wasn't in the paper.

15          You know, people that I would talk to, some people

16      would get very angry standing with the sign.  Some people

17      that I know would stop and say things to me.  My brother was

18      one person who sent me like a text message, you know, of

19      basically disgust.  Even though he doesn't -- he isn't

20      prohomosexual, I think it was more his anger that I would

21      stand out on the street corner and advocate my beliefs, so I

22      guess that's it.

23  Q   Well, let's talk about those incidents.  First, you said

24      that you were -- some people were angry when you were

25      holding a sign.  Can you tell me about that?

**Decl. of W. Stafford -35**

attell & Associates (360) 352-2506

aeb113ff-d804-425d-937b-8a48a047b9ac

EGELER (                    9/15/10)

```
1   A   Well, yeah, sure.  Some people would flip you off.  Some
2       people would cuss at you.  Some people basically public
3       indecency of dropping their pants and mooning you or
4       whatever as they drove by, so that would be the extent of
5       that.  Nobody stopped and, I guess, got out of their car and
6       came to me personally.
7   Q   So we're talking about the intersection that you were
8       standing at on the bridge, correct?
9   A   Um-hmm -- yes.
10  Q   And so let's start.  First, you said that there were people
11      who were flipping off the people holding the signs, correct?
12  A   Yes.
13  Q   You personally saw that?
14  A   Yes.
15  Q   Did any of the people that were flipping people off make
16      statements about Referendum 71 or were they driving by and
17      didn't make a statement?
18  A   Some of them made statements, but I can't remember what they
19      would have been.
20  Q   You don't remember any of the statements?
21  A   I remember people yelling things, but I don't remember what
22      they said.  Like, if you were to ask me what exactly they
23      said, I don't remember.  I do know that it was verbal
24      attacks against us, but it wasn't -- I couldn't tell you
25      exactly --
```

EGELER (                    9/15/10)

Page 25

1    know?  Yeah.  Nobody stepped out and raised their right hand

2    and solemnly swore that they were against what we were doing

3    in that sense, no.  But, you know, so in the sense -- yeah,

4    I guess.  Based upon my social ability to understand

5    people's communication, yes, people were definitely stating

6    their disagreement with this.

7  Q   And you said that there was a mooning incident.  Did you

8       personally witness this?

9  A   Yes.

10 Q   Okay.

11 A   Maybe two, but at least one.  It seems like I might remember

12     a second.

13 Q   Let's start with what you actually remember for sure and

14     what did you see, other than --

15 A   Someone's butt in the car driving by.  It was white.

16 Q   Do you remember if the individual was in the back seat or

17     the front seat?

18 A   Passenger front seat.

19 Q   Passenger front.

20        Do you remember or were you even able to tell the

21     approximate age of the individual?

22 A   No.  Probably wasn't somebody that was very old, based upon

23     the fact that they had to be able to get up and . . .

24 Q   And have you ever been mooned before in your lifetime?  Is

25     that your first experience with that?

EGELER (                        9/15/10)

1        remember.

2    A   No.

3    Q   So then to go back and catalog, while you were there holding

4        a sign, you experienced people flipping you off, an incident

5        where someone mooned you, and profane language?

6    A   Yes.

7    Q   Anything else happen while you were holding the sign?

8    A   No.

9    Q   And then when I asked you about harassment or threats, you

10       also mentioned that your brother was upset.  Can you tell me

11       about that?

12   A   Yeah.  He just sent me a text message -- I'm not sure --

13       with, you know, cuss words and, you know, he attacked the

14       Bible.  I remember that.  And he attacked me both --

15       verbally, I guess, because it was a text message with

16       swearing and that was pretty much it.

17   Q   Did you feel that that was harassment or a threat?

18   A   I would consider it harassment, yeah.  I wouldn't consider

19       it a threat only because I know my brother.  If I didn't

20       know my brother and somebody did that, then I would

21       definitely consider it a threat, yes.  But because it was my

22       brother, I know him, and I know that he's not going to come

23       over and hurt my family, so . . .

24   Q   Were you offended or did you think your brother was just

25       expressing his opinion?

**Decl. of W. Stafford -38**

Cattell & Associates (360) 352-2506

aeb113ff-d804-425d-937b-8a48a047b9ac

EGELER (                    9/15/10)

1        remember seeing it online.

2   Q    When did you see it?

3   A    During the case, probably last summer.

4   Q    Summer of 2009?

5   A    2009, yeah.

6   Q    Have you seen anything talking about violence or killing

7        people since the election's concluded?

8   A    No.

9   Q    So what's the source of your fear now?

10  A    Like I said, I haven't really looked online to see.  If,

11       say, the names are released, you know, there could be people

12       that, you know, are just waiting for that to happen.

13  Q    But your name's already out there, isn't it?

14  A    Yes.  Part of the reason that I was willing to do this as a

15       John Doe wasn't just because of my name, but because of

16       other people.  Some people may not be willing to risk what

17       I'm willing to risk, so . . .

18  Q    But to understand you, you are willing to take that risk by

19       being public about your position?

20  A    Yes.

21  Q    Have you experienced any other threats or harassments or

22       reprisals that we haven't talked about?

23  A    No.

24  Q    Did you participate at all in going to the Secretary of

25       State's office and overseeing the checking of the petition

**Decl. of W. Stafford -39**

Cattell & Associates  (360) 352-2506

aeb113ff-d804-425d-937b-8a48a047b9ac

CERTIFICATE

1   I, REBECCA S. LINDAUER, a duly authorized Notary Public in

2   and for the State of Washington, residing at Lacey, do hereby

3   certify:

4   That the foregoing deposition of                              was

5   taken before me and completed on the 18th day of September, 2010,

6   and thereafter transcribed by me by means of computer-aided

7   transcription; that the deposition is a full, true, and complete

8   transcript of the testimony of said witness;

9   That the witness, before examination, was by me duly sworn

10  to testify the truth, the whole truth, and nothing but the truth,

11  and that the witness reserved signature;

12  That I am not a relative, employee, attorney, or counsel of

13  any party to this action or relative or employee of any such

14  attorney or counsel, and I am not financially interested in the

15  said action or the outcome thereof;

16  That I am herewith securely sealing the deposition of

17                              and promptly mailing the same to MS. ANNE

18  E. EGELER.

19  IN WITNESS HEREOF, I have hereunto set my hand and affixed

20  my official seal of this 19th day of September, 2010.



Rebecca S. Lindauer, CSR#2402
Notary Public in and for the State of
Washington, residing at Lacey.

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

JOHN DOE #1, an individual; JOHN       )
DOE #2, an individual; and PROTECT     )
MARRIAGE WASHINGTON,                   )
                                       )
                  Plaintiffs,          )
                                       )
      v.                               )
                                       )   No. 09-CV-05456-BHS
SAM REED, in his official capacity     )
as Secretary of State of Washington;   )
BRENDA GALARZA, in her official        )
capacity as Public Records Officer     )
for the Secretary of State of          )
Washington,                            )
                                       )
                  Defendants.          )

Deposition Upon Oral Examination
Of

Taken by:  Tracey L. Juran, CCR
           CCR No. 2699

September 24, 2010

Everett, Washington

**Exhibit C**

Tracey Juran, Certified Court Reporter

6de9b93a-d722-4e9c-85e0-bda7be4673e4

Page 2

1                        APPEARANCES

2

3

4   For Protect Marriage Washington:

5        Stephen Pidgeon, Attorney at Law
         3002 Colby Avenue, Suite 306
6        Everett, Washington  98201-4081

7

8

    For the Defendants:
9
         Anne E. Egeler, Deputy Solicitor General
10       Attorney General of Washington
         1125 Washington Street SE
11       P.O. Box 40100
         Olympia, Washington  98504-0100
12

13

14  For Washington Families Standing Together:

15       Ben Stafford, Attorney at Law
         Perkins Coie
16       1201 Third Avenue, Suite 4800
         Seattle, Washington  98101-3099

17

18

19

20

21

22

23

24

25

Decl. of W. Stafford -42

         Tracey Juran, Certified Court Reporter

6de9b93a-d722-4e9c-85e0-bda7be4673e4

Page 5

1              Be it remembered that the deposition upon oral

2    examination of                         was taken on

3    September 24, 2010, at the hour of 8:56 a.m. at 3501

4    Colby Avenue, Suite 200, Everett, Washington, before

5    Tracey L. Juran, CCR, Notary Public in and for the State

6    of Washington residing at Edmonds, Washington.

7              Whereupon the following proceedings were had,

8    to wit:

9                          *  *  *  *  *

10                         having been first duly sworn on
                           oath by the Notary Public to tell
11                         the truth, the whole truth, and
                           nothing but the truth, was deposed
12                         and testified as follows:

13

14                         EXAMINATION

15   BY MS. EGELER:

16   Q.   Good morning,

17   A.   Morning.

18   Q.   My name is Anne Egeler and I am with the state Attorney

19        General's Office, and I represent Sam Reed and the

20        defendants in the Doe v. Reed case.

21             Before we begin, I wanted to outline a few simple

22        rules for depositions.  We're being transcribed by our

23        court reporter, Tracey, and it's important that we make

24        her life easy, and we can do that by not speaking over

25        each other.  So if we can make sure that the other

                ey Juran, Certified Court Reporter
6de9b93a-d722-4e9c-85e0-bda7be4673e4

1    Q.    And how long have you been the

2

3    A.    Eighteen and a half years.

4    Q.    Do you have any other employment?

5    A.    I do not.

6    Q.    Are you aware that you've been named as a witness to the

7          Doe v. Reed case?

8    A.    Yes, I am.

9    Q.    And, in fact, you're one of the Doe plaintiffs; correct?

10   A.    Correct.

11   Q.    Do you know what Doe number you are?

12   A.    I do not.

13   Q.    Has anybody informed you that being a witness in the

14         case may require you to publicly testify in federal

15         court?

16   A.    Yes.

17   Q.    And would you have any problems with that?

18   A.    No.

19   Q.    At any time, did you express to anyone that your name

20         needed to be kept a secret?

21   A.    I did not.

22   Q.    And does your involvement with Referendum 71 need to be

23         kept a secret for any reason?

24   A.    No, not that I'm thinking of.

25   Q.    When did you first become aware of Referendum 71?

ey Juran, Certified Court Reporter

6de9b93a-d722-4e9c-85e0-bda7be4673e4

1   A.   I was aware of its filing right from the beginning.

2   Q.   Were you aware before then of the Senate bill that was

3         the precursor -- excuse me; to the legislative bill that

4         was the precursor to Referendum 71?

5   A.   I was.

6   Q.   And did you go to Olympia to testify with respect to

7         that bill?

8   A.   I did not.

9   Q.   Did you meet with anyone about Referendum 71 before the

10        referendum was filed with the Secretary of State?

11   A.   No, not to my recollection.

12   Q.   So you first became aware of it after it was filed?

13   A.   Yes.

14   Q.   And who told you about it?

15   A.   I'm just guessing that my contact would have been with

16

17   Q.   And he attends your church; is that --

18   A.   That's --

19   Q.   -- correct?

20   A.   -- correct.

21   Q.   Did he attend in 2009 as well?

22   A.   Yes.

23   Q.   Did you sign the Referendum 71 petition?

24   A.   I did.

25   Q.   Do you remember where you were when you signed the

ey Juran, Certified Court Reporter

1      petition?

2  A.   It was likely at our church.

3  Q.   Were Referendum 71 petitions put in public locations at

4      the church for people to sign?

5  A.   Yes.

6  Q.   And when people did sign, were their names hidden from

7      other people that wanted to read the petition or sign

8      it?

9  A.   They were not.

10  Q.   Did you speak about Referendum 71 to your parishioners?

11  A.   Yes.

12  Q.   Did you speak to them during church services about

13      Referendum 71?

14  A.   Yes.

15  Q.   What did you say?

16  A.   I directly encouraged people to sign the petition

17      because of this issue dealing with a direct moral issue

18      that we feel we must be a voice for.

19  Q.   And before Referendum 71, had you been speaking publicly

20      or at church about homosexuality in any way?

21  A.   Yes.

22  Q.   Well, can you tell me in what respects other than the

23      domestic-partnership issue and Referendum 71 you

24      addressed publicly.

25  A.   Is that relevant to the R-71 specifically?

Decl. of W. Stafford -46

Page 12

1   Q.  And how long have you taken that stance?

2   A.  Throughout my public ministry.

3   Q.  And would -- did you speak with regard to homosexuality

4       generally to your parishioners?

5   A.  Yes.

6   Q.  And did you speak at any other public location with

7       regard to homosexuality generally?

8   A.  Not that I'm recalling.

9   Q.  Did you ever go out and participate in gathering

10      signatures on the Referendum 71 petitions?

11  A.  No.

12  Q.  Did you ever publicly hold up a Referendum 71 sign?

13  A.  No.

14  Q.  Did you have a Referendum 71 sign posted on the church

15      grounds?

16  A.  No.

17  Q.  Did you have a Referendum 71 bumper sticker?

18  A.  No.

19  Q.  Did you publicly endorse Referendum 71?

20  A.  Yes.

21      MS. EGELER:  Okay, mark this as Exhibit No. 2,

22    please.

23       [Exhibit 2 marked for identification]

24  Q.  (by Ms. Egeler)  And --

25      MR. PIDGEON:  No objection to this.

```
1    Q.   (by Ms. Egeler)  You have in front of you, Pastor,

2         what's been marked as Exhibit No. 2 to the deposition.

3

4

5

6

7

8

9    A.

10   Q.

11   A.

12   Q.

13

14

15   A.

16   Q.   And did you donate money to the Referendum 71 campaign

17        or to Protect Marriage Washington?

18   A.   Yes.

19   Q.   Did you know that in compliance with the law, Larry

20        Stickney was filing the names of all contributors and

21        the amount they had contributed, as well as their

22        address, with the Washington State Public Disclosure

23        Commission?

24   A.   Yes.

25             MS. EGELER:  Okay, mark this as Exhibit 3, please.
```

Decl. of W. Stafford -48

ey Juran, Certified Court Reporter

6de9b93a-d722-4e9c-85e0-bda7be4673e4

1   Q.   So you were just beginning to tell me about the

2        harassment that you feel you experienced.

3   A.   Yes.  And for my own clarity, if I could just read from

4        my Email here.  The first call was received in my office

5        July 27th, 2009, from an individual who identified

6        herself as a transgender woman who had previously been

7        in special forces.  The caller remained calm but

8        persistent in asking why I would want to limit her

9        rights.

10          After some statements back and forth, the caller

11       asked how I would like it if a number of friends were

12       brought to picket the church or to attend a morning

13       service.  I responded that the church is certainly open

14       to all who wish to come, but that we expect all to

15       conduct themselves in a way appropriate to a public

16       worship service.  I was assured that that would be the

17       case.

18   Q.   Let's stop and talk about that first instance.

19          Was this individual harassing or threatening in any

20       way, in your opinion, or did you feel that she was

21       addressing you respectfully and appropriately in

22       disagreeing with your position?

23   A.   I'd respond, as I note in my next paragraph, the caller

24        was reserved in tone; however, the spirit was certainly

25        one of challenge to the appropriateness of my stand.

y Juran, Certified Court Reporter

Page 21

1        The caller certainly also communicated that my stand

2        justified some kind of retaliatory action on his or her

3        part, so that I and others who were like-minded will pay

4        some kind of consequence for the expression of our

5        stand.

6   Q.   And you talked earlier in this description of that phone

7        call about this individual coming to your church.  Do

8        you think that that was the retaliation that she was

9        referring to?

10  A.   I understood that that could be part of the retaliation.

11  Q.   Did she state any other form of retaliation?

12  A.   She did not.

13  Q.   Did she threaten you with any physical harm?

14  A.   She did not.

15  Q.   Did she threaten any of your parishioners?

16  A.   She did not.

17  Q.   Did she threaten any sort of vandalism or damage to you

18        or the church's property?

19  A.   She did not express that.  I certainly perceived that as

20        a possibility.

21  Q.   But not because she said that.

22  A.   That's correct.

23  Q.   And did anyone come to your church after this phone

24        call?

25  A.   No one did.

Decl. of W. Stafford -50

1      message?

2  A.  I did not.

3  Q.  And have you received any calls since then?

4  A.  No.

5  Q.  And is -- that listing of the message that the secretary

6      wrote down from Krystal Mountaine as reflected on page 2

7      of Exhibit No. 8, is that complete or was anything else

8      included in the message that you haven't reported here?

9  A.  I believe this was complete.

10 Q.  So no other phone calls regarding Referendum 71 were

11     received by you or the church?

12 A.  No.

13 Q.  These two calls, did they come in on the church's phone

14     line or your personal home line?

15 A.  Church phone line.

16 Q.  And correct me if I'm wrong, but I believe you have both

17     a church phone line and a home phone line at that

18     address; correct?

19 A.  That's correct.

20 Q.  Did you receive any mail that related to Referendum 71?

21 A.  No.

22 Q.  Any other incidents occur that you felt were harassment

23     or threats of any sort?

24 A.  No.

25 Q.  Any sort of vandalism at any time of church property?

**Decl. of W. Stafford -51**

Page 28

1   A.   No.

2   Q.   And after the election on Referendum 71, have you

3        received any calls, Emails, threats, or harassment of

4        any sort?

5   A.   No.

6   Q.   Do you know how Krystal Mountaine would have known that

7        you had supported Referendum 71?

8   A.

9   Q.

10  A.

11

12  Q.   Did the caller actually state where she got your name or

13       the church's name?

14  A.   Not to the best of my recall.

15  Q.

16

17

18  A.

19  Q.   Why not?

20  A.   We -- I feel personally -- or I have strong conviction

21       regarding the issue in hand and was willing to continue

22       to do whatever I could.

23  Q.   And would it bother you if your signature on the

24       Referendum 71 petitions was publicly disclosed, given

25       your public endorsement of the measure?

ey Juran, Certified Court Reporter

6de9b93a-d722-4e9c-85e0-bda7be4673e4

1      interchange.

2  Q.  And you mentioned earlier that part of what made --

3      perhaps made you feel uncomfortable about that call was

4      the fact that this was a stranger.  Would -- is that

5      right?

6  A.  Correct.

7  Q.  And that, when you had this other experience with the

8      parishioner who disagreed regarding the birth-control

9      issue, that part of what made that unthreatening was

10     that you knew that person.

11 A.  That would be part of it.

12 Q.  Do strangers have the right to disagree with each other?

13         MR. PIDGEON:  Objection as to form.

14 Q.  (by Mr. Stafford)  In your opinion, do strangers have

15     the right to disagree with each other?

16 A.  They have the right to disagree appropriately.

17 Q.  And did you feel that she was disagreeing with your

18     position in an inappropriate fashion?

19 A.  The -- she was not inappropriate in the way she

20     expressed herself.

21 Q.  And I think you also said that, although Krystal

22     Mountaine didn't say this, you felt that perhaps there

23     was a greater tendency to be violent because of the

24     issue.  What did you mean by that?

25 A.  The fact that she both did call regarding what is

y Juran, Certified Court Reporter

6de9b93a-d722-4e9c-85e0-bda7be4673e4

Page 73

1                          CERTIFICATE

2   STATE OF WASHINGTON )
                        )
3   COUNTY OF SNOHOMISH )

4          I, the undersigned Notary Public in and for the

5   State of Washington, do hereby certify:

6          That the foregoing is a full, true, and correct

7   transcript of the testimony of the witness named herein,

8   including all objections, motions, and exceptions;

9          That the witness before examination was by me duly

10  sworn to testify truthfully and that the transcript was made

11  available to the witness for reading and signing upon

12  completion of transcription, unless indicated herein that the

13  witness waived signature;

14         That I am not a relative or employee of any party

15  to this action or of any attorney or counsel for said action

16  and that I am not financially interested in the said action

17  or the outcome thereof;

18         That I am sealing the original of this transcript

19  and promptly delivering the same to the ordering attorney.

20         IN WITNESS WHEREOF, I have hereunto set my hand and

21  seal this 7th day of October, 2010.

22

23         _____
           Notary Public in and for the State of Washington
24                  residing at Edmonds, Washington.
                       (Notary expires 3/09/13)
25                        (CCR No. 2699)

Decl. of W. Stafford -54

y Juran, Certified Court Reporter

6de9b93a-d722-4e9c-85e0-bda7be4673e4

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

```
                           )
JOHN DOE #1, et al.,       )
                           )
            Plaintiffs,    )
                           )
       vs.                 )   NO. 09-cv-05456-BHS
                           )
SAM REED, et al.,          )
                           )
            Defendants.    )
```

DEPOSITION UPON ORAL EXAMINATION OF

September 1, 2010

Tacoma, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

Decl. of W. Stafford -55

**Exhibit D**

Page 2

```
 1   APPEARANCES:

 2           FOR THE PLAINTIFFS:           MR. JOE LaRUE
                                           BOPP, COLESON & BOSTROM
 3                                         1 South Sixth Street
                                           Terre Haute, IN  47807
 4
             FOR THE DEFENDANTS:           MS. ANNE E. EGELER
 5                                         DEPUTY SOLICITOR GENERAL
                                           P.O. Box 40100
 6                                         Olympia, WA  98504-0100

 7           FOR THE INTERVENOR
             WASHINGTON COALITION FOR
 8           OPEN GOVERNMENT:              MR. STEVEN J. DIXSON
                                           WITHERSPOON KELLEY
 9                                         422 W. Riverside Avenue
                                           Suite 1100
10                                         Spokane, WA  99201

11           FOR THE INTERVENOR
             WASHINGTON FAMILIES
12           STANDING TOGETHER:           MR. KEVIN J. HAMILTON
                                           PERKINS COIE
13                                         1201 Third Avenue
                                           Suite 4800
14                                         Seattle, WA  98101

15

16

17

18

19

20

21

22

23

24

25
```

**Decl. of W. Stafford -56**

f636e1f6-7854-486c-808c-33822316b5f5

EGELER (                    9/1/10)

Page 4

1              BE IT REMEMBERED that on Wednesday, September 1,

2     2010, at 12:51 p.m., at 1250 Pacific Avenue, Suite 136,

3     Tacoma, Washington, before REBECCA S. LINDAUER, Notary

4     Public in and for the State of Washington, appeared

5                   the witness herein:

6              WHEREUPON, the following proceedings were had, to

7     wit:

8                                  (Mr. Hamilton not present.)

9

10                             having been first duly sworn by

11                             the Notary, testified as follows:

12

                              EXAMINATION

13    BY MS. EGELER:

14    Q                   my name is Anne Egeler, and I represent

15    the defendant here, Sam Reed.  I'm with the Attorney

16    General's office.

17         Can you start by spelling your last name.

18    A

19    Q    And your first name is    ?

20    A         yes, um-hmm.

21    Q    Have you ever gone by a different name?

22    A    Never.

23    Q    And can you provide your home address, please.

24    A

25    Q    And your business address?

Cattell & Associates (360) 352-2506

f636e1f6-7854-486c-808c-33822316b5f5

EGELER (                    , 9/1/10)

Page 7

1   A    Yes.  When we filed the papers with them, the declarations

2        with them, is that what you're talking about?

3   Q    How did they become aware of you?  Do you know?  How were

4        you asked to provide a declaration?  Who asked you to do

5        that?

6   A

7   Q

8        And did you bring anything with you today, any

9        documents?

10  A    My wife has documents for you.

11  Q    But you have no documents?

12  A    Not on my person.

13  Q    My understanding is that you've been a leader in the

14       movement to protect traditional marriage.  Is this an

15       accurate statement?

16  A    That's accurate.

17  Q    Can you describe in what way you've been a leader?

18  A    We just stepped into it basically.  Didn't try to open that

19       door.  It just presented itself.  We were there, so it all

20       basically started back in the -- when they were holding

21       hearings in the state legislature over 5688.

22  Q    That was the senate bill?

23  A    Yes, Senate Bill 5688.

24  Q    Okay.

25  A

EGELER (                    9/1/10)

Page 8

1

2

3

4

5      Q

6      A

7      Q

8      A

9

10

11     Q

12     A

13     Q

14     A

15

16

17

18

19     Q

20     A

21

22

23

24

25

Decl. of W. Stafford -59

Cattell & Associates (360) 352-2506

f636e1f6-7854-486c-808c-33822316b5f5

EGELER (          , 9/1/10)

Page 16

| 1  | A | Went to Wal-Marts, Fred Meyers, Targets gathering |
| 2  |   | signatures. |
| 3  | Q | And do you know approximately how many days you spent |
| 4  |   | gathering signatures? |
| 5  | A | I don't know.  It was significant though.  I don't know. |
| 6  |   | More than one or two, more than ten.  It was a number of |
| 7  |   | days.  We were fully involved. |
| 8  | Q | More than 20? |
| 9  | A | I don't know.  We didn't have that long of time to actually |
| 10 |   | get the signatures. |
| 11 | Q | Okay. |
| 12 | A | But it was a number of days. |
| 13 | Q | More than ten, but not sure if it's more than 20? |
| 14 | A | Right. |
| 15 | Q | And so you went to public locations, like in front of big |
| 16 |   | box stores:  Wal-Mart -- |
| 17 | A | Right. |
| 18 | Q | -- Target, Fred Meyer, right? |
| 19 | A | That's correct. |
| 20 | Q | Any other places you recall going to gather signatures? |
| 21 | A | Well, the -- no.  Not in that context, not where I was out |
| 22 |   | there with a clipboard getting signatures.  That's all I |
| 23 |   | recall. |
| 24 | Q | Just those three stores? |
| 25 | A | Well, no.  A lot of them, the stores in Lacey.  We went to |

EGELER (                , 9/1/10)

| | | |
|---|---|---|
| 1 | | Auburn.  We went to Shelton.  We went to Federal Way. |
| 2 | Q | Auburn, Shelton, Federal Way? |
| 3 | A | Yes.  Where else?  Tacoma. |
| 4 | Q | Tacoma. |
| 5 | A | So we went to a grocery store in Tacoma, so, you know, a lot |
| 6 | | of different locations. |
| 7 | Q | Do you remember any locations other than a Wal-Mart, a |
| 8 | | Target, a Fred Meyer, and the grocery store?  Do you |
| 9 | | remember any of the other store names? |
| 10 | A | No, uh-uh. |
| 11 | Q | Were they all public locations? |
| 12 | A | Yes, they were. |
| 13 | Q | Were you looking for -- I assume, and correct me if I'm |
| 14 | | wrong, you were looking for places where there would be a |
| 15 | | lot of people? |
| 16 | A | Yes. |
| 17 | Q | And were people receptive to signing? |
| 18 | A | Not as receptive as we would have liked. |
| 19 | Q | Did you have any incidents occur when you were gathering |
| 20 | | signatures, any incidents that you felt were -- would |
| 21 | | constitute harassment or threats or reprisals? |
| 22 | A | Yes. |
| 23 | Q | Can you describe that for me? |
| 24 | A | They're in the declaration, but at the Wal-Mart store in |
| 25 | | Lacey an elderly lady approached me.  And as she was |

EGELER (              , 9/1/10)

Page 18

1    entering the store, I spoke to her about Referendum 71, and

2    she was enthusiastic to sign it.

3         So she came over to sign the clipboard, the referendum,

4    and then two -- I'm assuming they were homosexual ladies.

5    They came out of the store.  They both stood there glaring

6    at me.  One of them -- one of them said, with a lot of

7    emotional content, "We have feelings too."

8         This shook the old lady that was going to sign the

9    referendum and she kind of hesitated.  I addressed the young

10   lady, told her basically that this has nothing to do with

11   feelings, and then she and her partner left and then the old

12   lady, she signed the referendum.

13   Q   You said that this shook the older lady?

14   A   Yes, it did.

15   Q   Did she tell you that or was that something that you thought

16       in observing her demeanor?

17   A   No.  I could see both ways.  I could see it shook her, her

18       demeanor.  She also said she did not feel comfortable with

19       them there.

20   Q   Did she ultimately sign?

21   A   She did.

22   Q   Did you have any other incidents while you were gathering

23       signatures?

24   A   Same Wal-Mart, the other door, a transgendered person came

25       out.  I don't know how far in the transgendered process this

**Decl. of W. Stafford -62**

Cattell & Associates  (360) 352-2506

f636e1f6-7854-486c-808c-33822316b5f5

EGELER (                    , 9/1/10)

1      person was.  Looked like a female initially with a masculine

2      bone structure, but still looked female initially, and was

3      dressed like a woman, you know, displaying everything, and

4      came up and asked what we were doing.

5          I said, "Well, this is Referendum 71."  Told her that

6      it's to preserve marriage between a man and a woman and to

7      protect our children.

8          And she said, "Well, why are you" -- he said, "Well,

9      why are you doing this?  Why are you getting these

10     signatures?"

11         I said, "It's because of my Biblical beliefs."

12         "Well, what does the Bible have to say?"  This is not

13     verbatim.  This is the gist --

14  Q   I understand.

15  A   -- of the discussion.  "What does the Bible have to say?"

16         I just briefly quoted what the Bible -- what God has to

17     say about it in the Bible and then the person got very, very

18     argumentative, at which point, I said, "There's no point in

19     us continuing this discussion.  You know, if we can't talk

20     peaceably around the Bible, then we don't have anything to

21     talk about."

22         Then the person left.  And as they were leaving, they

23     were threatening -- he threatened -- before that, he asked

24     me if I was a pastor because I was there on a Sunday after

25     church in my suit.  And I said, "Yes, I am."

**Decl. of W. Stafford -63**

Cattell & Associates (360) 352-2506

f636e1f6-7854-486c-808c-33822316b5f5

EGELER (                    9/1/10)

1          "Where is your church?"

2          I told him where the church was in Lacey.  As he was

3     leaving to get into his car, he says, "I'm going to bring a

4     bunch of my friends, homosexual, transgenders to your church

5     on this Sunday and we're going to pack your church."

6          And at that point I just said, "Well, God bless you.

7     You can come.  You're welcome.  If you want to come to

8     church, you come to church."

9   Q   And you told him where your church was located?

10  A   I don't recall.  I told them the name.  I might have told

11      them in a hotel, but I don't recall.

12  Q   Did he come?

13  A   No.

14  Q   Excuse me.  Did --

15  A   No, it's a he.  I don't know if it's complete.

16  Q   Well, I'll use she, since it sounds like the individual was

17      choosing that gender.  So just to be clear when I'm using

18      that pronoun who I'm referring to, did she come to the

19      church?

20  A   No.

21  Q   At any time, did any transgender individuals come to the

22      church during the Referendum 71 campaign?

23  A   No.

24  Q   And did anybody of any sort come and make a scene or protest

25      inside or outside the church?

EGELER (                    9/1/10)

Page 21

1   A   No, nothing happened.

2   Q   When she was speaking to you -- it sounds like it became

3       argumentative -- was anybody else there at the time?

4   A   No.

5   Q   And did any other incidents occur while you were gathering

6       signatures?

7   A   There's one more I have in the declaration and that was

8       outside of the Wal-Mart in Auburn.

9   Q   Okay.

10  A   A minor incident, but we documented it nonetheless.  My wife

11      and I were there together getting signatures, had a table

12      set up with two or three clipboards on the table.  And this

13      young lady got her cell phone out and started -- took a

14      picture of me first and went over and took a picture of my

15      wife.

16          And my wife says, "What are you doing?"  And the young

17      lady said that she was going to post our pictures on her

18      Facebook or whatever the social networking sites are for all

19      her homosexual and gay friends to know what we look like.

20      So we thought that was inappropriate.

21          My wife says, "I don't want you to do that.  Don't post

22      my picture."  She'll tell you that herself, but she told

23      her, please not to post the picture.  She probably did.  I'm

24      sure we're -- anyhow.

25  Q   Are you sure?

EGELER (                9/1/10)

Page 22

1   A   No, I'm not sure.  But most -- highly probable that we are

2       posted, but that's -- I don't know.  I don't visit those

3       places.

4   Q   So to be accurate, do you know if those photos were posted?

5   A   I don't know if hers were posted.

6   Q   Do you know if your photo was posted?

7   A   No, I don't.

8   Q   And was anyone else there at that time?

9   A   My wife and myself.

10  Q   Any other incidents that occurred during the gathering of

11      signatures?

12  A   No.

13  Q   With each of those three incidents -- we have the two

14      lesbian women outside a store that spoke while an elderly

15      woman was going to sign.

16  A   Right.

17  Q   And then we had a transgendered individual outside the

18      Wal-Mart Lacey and then the third was taking pictures

19      outside the Wal-Mart in Auburn?

20  A   Um-hmm.

21  Q   With any of those three incidents, did you feel the need to

22      call the police?

23  A   No.  There was a fourth.  It just came back to me and that

24      was when we were out there gathering signatures in Auburn,

25      once again, I believe.  I believe it was Auburn.  I'm not

EGELER (                    9/1/10)

Page 23

1      sure.

2              Somebody came from outside the store and basically went

3      back in and told the manager.  And the manager tried to tell

4      us to leave and so we actually -- not the manager, but

5      the -- a worker did.  So then we asked for the manager.  We

6      asked for this person to go get their manager.

7              The manager came out, and we explained to the manager

8      what just happened and that we're not harassing anybody.

9      We're being very polite, which we were, and the manager said

10     that we could stay.

11  Q  And again, there was no need to call the police with that

12     incident, since the manager took care of it?

13  A  That's correct.

14  Q  And why, with the first three incidents, did you not feel a

15     need to call the police?

16  A  I didn't -- well, the only -- I didn't perceive the threats

17     as being that -- I didn't perceive the likelihood of follow

18     through being that high with the one person that said

19     they're going to come to our church on Sunday.  I didn't

20     really feel that they would come, and if they did, we just

21     deal with it.

22  Q  And the first incident with the women who said that it was

23     hurtful to them, that Referendum 71 -- I'm not trying to

24     quote you.  I'm sure I'm off, but two women approached while

25     you were talking to an elderly woman and they said something

f636e1f6-7854-486c-808c-33822316b5f5

EGELER (                    9/1/10)

Page 25

1      with her cell phone, you mentioned that you thought that it

2      was probable that those would be posted on the Internet.

3    A  Um-hmm.

4    Q  Why did you not call the police and attempt to stop that?

5    A  I didn't know that we could.

6    Q  Okay.

7    A  I don't understand that media, what the rules are, you know.

8      I don't know.

9    Q  Okay.

10   A  We were out in a public place.  They took our picture.  I

11     don't know what the -- how that works.

12   Q  And it seems that you've made a decision as a pastor to be

13     very public about your Bible views --

14   A  Um-hmm.

15   Q  -- and your support for Referendum 71.  Is that correct?

16   A  That's correct.

17   Q  So do you tend not to object to your name being in the paper

18     or your face being shown in the paper?

19   A  Initially, we didn't want any of that.  We just wanted to be

20     involved, not because we were trying to hide or anything.

21     We just didn't want to have the headache.  But as things

22     unfolded, we got a very, very public position in the

23     referendum and it just happened.

24   Q  Do you feel secretive about your involvement now?

25   A  Not at all.

Decl. of W. Stafford -68

Cattell & Associates  (360) 352-2506

f636e1f6-7854-486c-808c-33822316b5f5

EGELER (                    9/1/10)

Page 26

1    Q    So it doesn't bother you if people know that you support

2         Referendum 71?

3    A    No, not at all.

4    Q    Or your position in this lawsuit?

5    A    That's correct.

6    Q    You said you spent more than ten days but not sure if it was

7         as many as 20 gathering signatures in very public places.

8         Do you know roughly how many signatures you and your wife

9         gathered?

10   A    We were directly and indirectly responsible for turning in

11        about 1,400.  Out of those, we personally gathered 300 or

12        400.

13   Q    Okay.

14   A    Others came from Korean churches that we contacted and they

15        collected the signatures and gave them back to us, so we

16        were involved in actually soliciting of the churches, but

17        about 1,400.

18   Q    Did you also speak to your own parishioners about signing?

19   A    Yes, we did.

20   Q    And that was done publicly during a church service?

21   A    Yes.

22   Q

23

24

25   A

EGELER (              ;  9/1/10)

Page 30

1       located in Seattle, Washington, and the Web site is again on

2       the bottom.

3

4            Do you recall this --

5    A   Yes.

6    Q   -- encounter?

7    A

8

9    Q

10

11

12           On the Web site, and this did not print out, but there

13       was a box that allowed one to play a video and you appeared

14       and were speaking.

15   A   Okay.

16   Q

17

18   A

19   Q

20

21

22           Do you see where I am?

23   A   Yes, I do.

24   Q   It goes through that line, the next line, and the following

25       line.  So the three sentences, can you review those and see

Case 3:09-cv-05456-BHS   Document 239-1   Filed 08/05/11   Page 64 of 96

EGELER (                    9/1/10)

Page 31

```
 1        if that's accurate?
 2   A    It sounds accurate.
 3   Q    Do you recall, did you say that during your television
 4        interview?
 5   A    I don't recall.  I don't recall.
 6   Q    But you do recall being on television that day?
 7   A
 8   Q
 9
10   A
11   Q
12
13
14
15   A
16   Q    Did you think that there were any problems with the way the
17        Secretary of State's office was checking signatures?
18   A    Yes.
19   Q    What problems do you think there were?
20   A    Bias, process problems.
21   Q    Like?  What sort of process?
22   A    This is a whole big topic.  The referendum -- the number of
23        signatures gathered was 138,000 and we needed 120,577, I
24        believe, to make it on the ballot, so that was very thin as
25        far as the margin, so the observing process was very
```

Decl. of W. Stafford -71

:attell & Associates  (360) 352-2506

f636e1f6-7854-486c-808c-33822316b5f5

C E R T I F I C A T E

1

2    I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3 and for the State of Washington, residing at Lacey, do hereby

4 certify:

5    That the foregoing deposition of        was taken

6 before me and completed on the 1st day of September, 2010, and

7 thereafter transcribed by me by means of computer-aided

8 transcription; that the deposition is a full, true, and complete

9 transcript of the testimony of said witness;

10    That the witness, before examination, was by me duly sworn

11 to testify the truth, the whole truth, and nothing but the truth,

12 and that the witness reserved signature;

13    That I am not a relative, employee, attorney, or counsel of

14 any party to this action or relative or employee of any such

15 attorney or counsel, and I am not financially interested in the

16 said action or the outcome thereof;

17    That I am herewith securely sealing the deposition of

18    and promptly mailing the same to MS. ANNE E. EGELER.

19    IN WITNESS HEREOF, I have hereunto set my hand and affixed

20 my official seal of this 6th day of September, 2010.

21

22

23

24                 Rebecca S. Lindauer, CSR#2402
                     Notary Public in and for the State of

25                 Washington, residing at Lacey.

**Decl. of W. Stafford -72**

Page 1

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

```
                                )
JOHN DOE #1, et al.,            )
                                )
            Plaintiffs,         )
                                )
        vs.                     )   NO. 09-cv-05456-BHS
                                )
SAM REED, et al.,               )
                                )
            Defendants.         )
```

DEPOSITION UPON ORAL EXAMINATION OF

September 1, 2010

Tacoma, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

**Exhibit E**

Page 2

1    APPEARANCES:

2            FOR THE PLAINTIFFS:            MR. JOE LaRUE
                                           BOPP, COLESON & BOSTROM
3                                          1 South Sixth Street
                                           Terre Haute, IN   47807
4
             FOR THE DEFENDANTS:           MS. ANNE E. EGELER
5                                          DEPUTY SOLICITOR GENERAL
                                           P.O. Box 40100
6                                          Olympia, WA  98504-0100

7            FOR THE INTERVENOR
             WASHINGTON COALITION FOR
8            OPEN GOVERNMENT:              MR. STEVEN J. DIXSON
                                           WITHERSPOON KELLEY
9                                          422 W. Riverside Avenue
                                           Suite 1100
10                                         Spokane, WA  99201

11           FOR THE INTERVENOR
             WASHINGTON FAMILIES
12           STANDING TOGETHER:            MR. KEVIN J. HAMILTON
                                           PERKINS COIE
13                                         1201 Third Avenue
                                           Suite 4800
14                                         Seattle, WA  98101

15

16

17

18

19

20

21

22

23

24

25

EGELER (                           9/1/10)

Page 4

```
 1              BE IT REMEMBERED that on Wednesday, September 1,

 2      2010, at 2:47 p.m., at 1250 Pacific Avenue, Suite 136,

 3      Tacoma, Washington, before REBECCA S. LINDAUER, Notary

 4      Public in and for the State of Washington, appeared

 5              the witness herein:

 6              WHEREUPON, the following proceedings were had, to

 7      wit:

 8

 9                        having been first duly sworn by

10                        the Notary, testified as follows:

11

                              EXAMINATION

12      BY MS. EGELER:

13      Q    Good afternoon,              My name is Anne Egeler.

14           We've spoken on the phone previously.  Just to remind you, I

15           am with the Attorney General's office, and I'm representing

16           Sam Reed and the defendants in the Doe v. Reed case.

17              Have you been deposed before?

18      A    Yes.

19      Q    And in what sort of an action were you deposed?

20      A    It was a lawsuit against Western State Hospital.

21      Q    And were you a party to the case?

22      A    Yes, I was.

23      Q    What was the case about?

24      A    Wrongful termination of myself.

25      Q    Can you tell me a little bit about it?
```

EGELER (                    ,  9/1/10)

Page 8

| | | |
|---|---|---|
| 1 | Q | Can you tell me what your current employment is? |
| 2 | A | I'm just -- I co-pastor with my husband.  I'm not employed |
| 3 | | outside of the home and the church. |
| 4 | Q | And is that at the |
| 5 | A | Yes. |
| 6 | Q | And the church, as we understand from your husband, is |
| 7 | | currently holding services at the |
| 8 | | Is that correct? |
| 9 | A | Yes. |
| 10 | Q | Would it be fair to say that you've been a leader with |
| 11 | | respect to the Traditional Marriage campaign and |
| 12 | | Referendum 71? |
| 13 | A | Would it be fair to say that I'm a leader? |
| 14 | Q | A leader, yes. |
| 15 | A | No. |
| 16 | Q | No.  Okay. |
| 17 | | Well, let's go through this chronologically.  Were you |
| 18 | | aware of Senate Bill 5688? |
| 19 | A | Yes. |
| 20 | Q | That is the bill that was the precursor to Referendum 71, |
| 21 | | correct? |
| 22 | A | Yes. |
| 23 | Q | |
| 24 | | |
| 25 | A | |

EGELER (                          9/1/10)

Page 9

1    Q

2    A

3

4

5

6

7

8    Q

9

10   A

11   Q

12

13

14   A

15   Q

16   A

17   Q

18   A

19   Q

20   A

21   Q

22

23   A

24   Q

25   A

EGELER (                          9/1/10)

Page 10

1

2

3

4

5    Q

6    A

7    Q

8

9    A

10

11   Q

12   A    Afterwards we were contacted by -- that's when we met

13              and

14   Q    I'm a little confused, having heard your husband's testimony

15        about that.  He mentioned that he saw            in the

16        back of the room.

17            Do you recall that?

18   A    I think he was there.  I don't remember seeing him, but

19        afterwards we saw him when it was over with.

20   Q    And did you approach him at that time?

21   A    There was -- we said hello to him and he talked to us and

22        invited us to a meeting, and so we said we would meet with

23        him.

24   Q    What sort of a meeting did he invite you to?

25   A    It was a meeting at the -- they used a room in the -- I

EGELER (                          , 9/1/10)

Page 12

| | | |
|---|---|---|
| 1 | A | I think in writing on                    Web site, but . . . |
| 2 | Q | Well, let me pass out what we'll mark as Exhibit 1 to your |
| 3 | | deposition. |
| 4 | | (Exhibit No. 1 marked.) |
| 5 | Q | Exhibit 1, which you have before you, is a page I printed |
| 6 | | from the Protect Marriage Washington Web site, and the Web |
| 7 | | address appears at the bottom of Exhibit 1. |
| 8 | | Do you see that? |
| 9 | A | Yes, I do. |
| 10 | Q | Are you familiar with that Web site? |
| 11 | A | I did not -- when we met              , I'm not wanting -- |
| 12 | | I didn't know what a blog was, so I did not know, until we |
| 13 | | were in the |
| 14 | | |
| 15 | Q | So but my question was:  Are you familiar with the Protect |
| 16 | | Marriage Washington Web site? |
| 17 | A | Yes. |
| 18 | Q | I'm trying to go through this orderly so I don't lose track |
| 19 | | of my train of thought.  Thank you. |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

EGELER                          , 9/1/10)

Page 13

1    A

2    Q

3

4

5

6    A

7    Q

8

9    A

10   Q

11

12   A

13   Q

14   A

15   Q

16   A

17   Q    Why not?

18   A    Because we endorsed.  We were there at that meeting and in

19        favor of filing the referendum.

20   Q    That's not something you feel private about?

21   A    No.

22   Q    So you feel comfortable making a public statement that you

23        support Referendum 71?

24   A    I feel comfortable?

25   Q    Yes.

EGELER (                    9/1/10)

Page 14

1   A    Yes.

2   Q    Would you feel comfortable telling someone publicly that

3        you've been involved in this lawsuit?

4   A    What lawsuit?

5   Q    The lawsuit that we're here today because of the Doe v. Reed

6        lawsuit.

7   A    That I -- yes.

8   Q

9

10

11

12

13

14

15  A

16  Q

17

18  A

19  Q    Do you know who was on the Steering Committee?

20  A    No, I don't.

21  Q    Once the petitions began to be circulated for the

22       referendum, did you or your church at any time contribute to

23       Protect Marriage Washington?

24  A    Yes.

25  Q    And did you contribute in your own name or in another name?

EGELER (                    9/1/10)

1   Q   Did you sign the Referendum 71 petition?

2   A   Yes.

3   Q   And did you collect petition signatures?

4   A   Yes.

5   Q   Do you know approximately how many days you were out

6       gathering signatures?

7   A   How many days?

8   Q   Yes.

9   A   It was off and on during the time that we had to turn in

10      signatures.

11  Q   Do you think it was more than ten days?

12  A   It was about ten to fifteen.

13  Q   And do you recall where you were when you were gathering

14      signatures?

15  A   Yes.  We went to the Wal-Mart there in the Hawk's Prairie

16      area.

17  Q   That's Lacey Hawk's Prairie?

18  A   Yes.  The Wal-Mart in Auburn.  We went to a Fred Meyer in

19      Bridgeport.  We were only there for about five minutes

20      because we found out that they have something in their

21      policies that they don't allow any -- they prohibit anyone

22      from gathering signatures, so we were asked to leave.

23  Q   Regardless of the subject matter, you're prohibited?

24  A   Right.

25  Q   Any other locations?

Decl. of W. Stafford -82

attell & Associates  (360) 352-2506

647f51fa-87e9-43d1-9daf-dd4c1863e62f

EGELER (                    9/1/10)

| | | |
|---|---|---|
| 1 | A | Target in Lakewood.  That's all I can recall. |
| 2 | Q | Do you recall going to Federal Way? |
| 3 | A | I don't think so.  We did go to Seattle once, downtown |
| 4 | | Seattle. |
| 5 | Q | Do you remember where? |
| 6 | A | No.  I don't drive into Seattle, but it was some street |
| 7 | | there. |
| 8 | Q | So looks like all of these places you've sought because |
| 9 | | there are a lot of people there.  Is that right? |
| 10 | A | Yes. |
| 11 | Q | Did you gather signatures in any other way, other than in |
| 12 | | front of stores or large public places? |
| 13 | A | No. |
| 14 | Q | Were you concerned about people seeing you there with the |
| 15 | | Referendum 71 petition? |
| 16 | A | No. |
| 17 | Q | Okay. |
| 18 | A | Well . . . |
| 19 | Q | Did you have success gathering signatures?  Did you recall |
| 20 | | how many signatures you and your husband were able to |
| 21 | | gather? |
| 22 | A | I think my husband and I, we gathered about, I think, a |
| 23 | | little over 1,000 signatures. |
| 24 | | You asked me a question before that one, that -- if I |
| 25 | | was uncomfortable being seen in public, something like that. |

EGELER (                    9/1/10)

Page 45

| | | |
|---|---|---|
| 1 | Q | Do you have regular parishioners or is your focus of your |
| 2 | | church to reach out to those who are staying at the hotel? |
| 3 | A | It's both.  We have regular attenders that just kind of come |
| 4 | | and go. |
| 5 | Q | And how many regular parishioners do you have? |
| 6 | A | At that time we had about regular -- we had about five or |
| 7 | | six. |
| 8 | Q | And during that time period, the campaign time period, is |
| 9 | | there anything else you did with regard to encouraging |
| 10 | | people to vote on Referendum 71? |
| 11 | A | We were called by a radio station in Seattle, a Christian |
| 12 | | gal who we never met before, and asked us if we wanted to |
| 13 | | inform the people on how to vote and so we did that.  It was |
| 14 | | like a 20-minute deal on the radio. |
| 15 | Q | Through a Seattle radio station? |
| 16 | A | Yes. |
| 17 | Q | Did you go and speak with any other radio stations? |
| 18 | A | Yes.  One in Kelso where _____ at -- or |
| 19 | | Longview. |
| 20 | Q | And you spoke on the radio there? |
| 21 | A | Yes. |
| 22 | Q | Did _____ speak as well on the radio? |
| 23 | A | I believe he did, but we weren't there with him.  He did |
| 24 | | something separately. |
| 25 | Q | Any other radio addresses or interviews? |

EGELER (                          , 9/1/10)

Page 46

```
 1    A    Not that I can recall.

 2    Q    Did you speak with any media during that time period?  By

 3         "media," I mean print or television.

 4    A

 5                              He called us and wanted to interview us.

 6         He was doing a piece on it before the election, and so we

 7         agreed to meet with him.

 8    Q    And were you mentioned in the article?

 9    A    Yes.

10    Q    And that was before the election?

11    A    Yes.

12    Q    So sometime in the fall of 2009?

13    A    Yes.

14    Q    During that time period from the time of the checking of

15         signatures -- actually, let me change that.  We talked about

16         harassment or threats that you perceived during the

17         signature gathering process.  At any point after the

18         signature gathering process until the election, were you

19         harassed or threatened in any way, in your opinion?

20    A    During the time from the signature process through to the

21         election, is that what you just asked?

22    Q    Correct.

23    A    Yes.

24    Q    Can you describe those incidents for me?

25    A    The first one to us that was considered a veritable threat
```

EGELER (                    ,  9/1/10)

Page 47

1     was a -- it was a Wednesday.

2

3

4

5          We came home that evening and I noticed we had gotten a

6     couple calls on the caller ID from a David Baurle, I think

7     is his last name.  They never left any messages.

8

9

10

11

12                              I returned the call to

13    this David Baurle because people call the church, so we try

14    to return the calls.

15  Q   Excuse me.  You said there were calls and that they were

16    identified on your phone as calls from David Baurle.  Was

17    there a message left?

18  A   No.

19  Q   Okay.

20  A   But he had called twice.

21  Q   So two calls?

22  A   Um-hmm.

23  Q   So it's Saturday and you decided to call?

24  A   Yes, to return the call.  I normally do that with people who

25    call the church.  So I called and said, "Hello.  We're

EGELER (                    9/1/10)

Page 48

1    looking for" -- I don't remember exactly how it went in

2    order, but, "we're looking for a David Baurle.  We're

3    returning a call to a David that called our church."

4          And he said, "There's no David here."

5          And I said, "Okay.  I'm sorry.  I guess we have the

6    wrong phone number then and thank you."

7          He stopped me and said, "Who is this?"

8          I said, "We're" -- "this is

9             and someone had called us named David."

10         He said -- after he said that there's no David there,

11   then he said, "That used to be me."  That used to be him.

12   He's no longer David.  He's now Krystal.

13         I said, "Okay."

14         And then he -- that's when he said he's the one that

15   made the calls.

16   Q    And did you continue to speak with him?

17   A    Yeah.  Then he asked what -- you know, about our church and

18        that -- I have to read the declaration because I don't

19        remember exactly how it went, but . . .

20   Q    If you can't remember, that's okay to say you can't

21        remember.  I don't want you to say anything you don't feel

22        confident of.

23   A    I just can't remember it verbatim.

24   Q    Okay.

25   A    He said that he began to explain that his name is Krystal,

EGELER (                    9/1/10)

Page 49

1   that it's not David.  It used to be David.  He's a

2   hermaphrodite, hermaphrodite.  Then he began to ask why we

3   were involved with R71.

4        At that point I asked him, "Well, how did you get our

5   phone number?"

6        And then he began to say, "

7

8

9        And at that point when he said that, I did not know

10  from this first paper that you gave me -- like I said, I

11  don't get on to blogs.

12

13

14  Q

15

16

17  A

18

19        I said, "Okay."  So he said -- I said, "Well, how did

20  you get our church phone number?"

21        He said, "Well, you've got a Web site, don't you?"

22        I said, "Yeah, okay."

23        And then he began to ask me why are we involved with

24  R71.  And -- why are we involved with R71?  Why are we doing

25  this?

Decl. of W. Stafford -88

EGELER (                    9/1/10)

Page 50

1          And I told him because we believe, you know, that
2     marriage is between a man and a woman.
3          And I remember calling him David and he got a little
4     upset. He said, "My name is Krystal. I had my name
5     changed."
6          I said, "Well, I'm sorry. The caller ID had said
7     David, so I'm going to call you David."
8          He started to get upset with me and say -- he says,
9     "Well, why do you have a problem with transgenders? I'm a
10    transgender. I was" -- "I've legally had my name changed."
11         And I said something to the effect that, you know, it
12    was confusing to children. And when I said that, he began
13    to call me stupid. He says, "You're stupid," and he said
14    some other things I can't remember, but I do remember him
15    calling me stupid.
16         And I told him at that point, I said, "David," I said,
17    "if you want to start" -- "I'll talk with you. If you want
18    to start doing this name calling, then I'm going to end the
19    conversation here with you." And then he said -- so then he
20    hung up.
21         He called back, right back again, within just a matter
22    of a couple of minutes and he called back. It was him and
23    then he -- he began to say, "We're going to go to your
24    church. I'm going to bring all of my transgender, lesbian
25    friends. I'm going to bring all of them. It sounded like

EGELER (                    9/1/10)

Page 51

1    he had a -- he indicated something to I'm going to bring all

2    of them and we're going to take up half of your -- half up

3    of your space and you better have enough room for us.

4         And at that point, I told him, I said, "Look," I says,

5    "my husband and I have no problem talking with you."  I

6    said, "My husband and I" -- "my husband would be glad to

7    talk with you," I said, "but we would" -- "if you want to

8    come to church, you're more than welcome, but if you're

9    going to come with the intent to disrupt our service, I'm

10   going to have to ask you not to do that, you know, but

11   you're more than welcome, and my husband and I, we can talk

12   to you after the service."

13        He didn't seem to listen to that.  And then he said,

14   "When we come to your church, we're going to" -- "when the

15   community finds out that you do not support the homosexual

16   community," he says, "the community is not going to want to

17   give to your church."

18   Q    Did he say anything else?

19   A    I think after that, then he called back and then I didn't

20        answer the phone.  I think that's when we started to get the

21        recorded messages with more threats on our phone.

22   Q    How did the call end?  Who ended the call?

23   A    I ended the phone call, the conversation, and then he got

24        mad once and hung up on me and then he called back and made

25        threats he's going to be at our church.

EGELER (                    9/1/10)

Page 52

1        Then my husband and I -- it's a Saturday -- we sat

2     there and talked about it because this was, unlike all the

3     other interactions I discussed earlier when we were at the

4     different stores, this was different.

5   Q  So he called once and we went through that conversation.

6     You ended the call and said you need -- something to the

7     effect of -- I'm not trying to put words in your mouth -- he

8     needs to talk respectfully and the call ended.  My

9     understanding is he called back again within a few minutes

10    and you had the second conversation.  And then I believe --

11  A  He called about three times.  I recall having three

12    conversations with him.

13  Q  Three conversations.

14  A  I remember he began to -- when I called him David, he got

15    really upset about that.  He knew that I was a female and my

16    name was                    He began to refer to me as sir

17    and I want to talk to -- he was referring to me as a man.

18  Q  Was the third call within minutes of the second call?

19  A  Yes.

20  Q  And what was said during the third call?

21  A  I think the last was where he started to do some name

22    calling with me.  I said, "You know, this conversation is

23    going to end."  And I advised him if he was going to come to

24    our church to disrupt our service, that -- not to do that.

25  Q  And you did call the police about these calls, correct?

CERTIFICATE

1

2      I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3  and for the State of Washington, residing at Lacey, do hereby

4  certify:

5      That the foregoing deposition of                was taken

6  before me and completed on the 1st day of September, 2010, and

7  thereafter transcribed by me by means of computer-aided

8  transcription; that the deposition is a full, true, and complete

9  transcript of the testimony of said witness;

10     That the witness, before examination, was by me duly sworn

11  to testify the truth, the whole truth, and nothing but the truth,

12  and that the witness reserved signature;

13     That I am not a relative, employee, attorney, or counsel of

14  any party to this action or relative or employee of any such

15  attorney or counsel, and I am not financially interested in the

16  said action or the outcome thereof;

17     That I am herewith securely sealing the deposition of

18         and promptly mailing the same to MS. ANNE E.

19  EGELER.

20     IN WITNESS HEREOF, I have hereunto set my hand and affixed

21  my official seal of this 7th day of September, 2010.

22

23                                                                    

24                              Rebecca S. Lindauer, CSR#2402
                                Notary Public in and for the State of
25                              Washington, residing at Lacey.

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA


JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,
                    Plaintiffs,

          vs.                            NO. 3:9-CV-05456-BHS

SAM REED, in his official capacity
as Secretary of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer
for the Secretary of State of
Washington,
                    Defendants.


                DEPOSITION OF

Deposition upon oral examination of                    taken

at the request of the Defendants, before Osmund D. Miller, a

Notary Public, RPR, CCR No. 2280, at the law offices of

Witherspoon-Kelley, 422 West Riverside, Spokane, Washington,

commencing at or about 9:00 a.m., on October 7, 2010 pursuant

to the Federal Rules of Civil Procedure.


                      **Exhibit F**

**Decl. of W. Stafford -93**
              COURT REPORTERS                        509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

d877f08e-530e-4fc5-b1e9-8d70d2b5a4e9

Page 2

```
 1                          APPEARANCES

 2

 3    FOR THE PLAINTIFFS:
                           STEPHEN PIDGEON ATTORNEY AT LAW, P.S.
 4                         By:  Stephen Pidgeon
                           Attorney at Law
 5                         Old Federal Building
                           3002 Colby Avenue, Suite 306
 6                         Everett, Washington 98201

 7    FOR THE DEFENDANTS WASHINGTON COALITION FOR OPEN GOVERNMENT:
                           WITHERSPOON-KELLEY
 8                         By:  Steven J. Dixson
                           Attorney at Law
 9                         1100 U.S. Bank Building
                           422 West Riverside Avenue
10                         Spokane, Washington 99201-0302

11    FOR THE DEFENDANTS SAM REED AND BRENDA GALARZA:
                           ATTORNEY GENERAL OF WASHINGTON
12                         Anne E. Egeler
                           Deputy Solicitor General
13                         P.O. Box 40100
                           Olympia, Washington 98504-0100
14
      ALSO PRESENT:
15                         Greg Senchenko, Interpreter

16

17

18

19

20

21

22

23

24

25
```

Decl. of W. Stafford -94

```
 1                    GREG SENCHENKO
              the Interpreter, having been first duly
 2            sworn according to law, did interpret from
              English to Russian and Russian to English.
 3

 4                    called as a witness at the request of
              the Defendants, having been first duly
 5            sworn according to law, did testify as
              follows herein:
 6

 7   (All answers will be given through the interpreter unless

 8   noted by the answer symbol.)

 9                         EXAMINATION

10   BY MR. DIXSON:

11   Q.   Good morning,            .  My name is Steve Dixson.   I

12   am an attorney for the Washington Coalition for Open

13   Government, one of the named defendants in the present

14   litigation.   On the phone is Attorney Anne Egeler from the

15   Washington Attorney's General office.   She may have some

16   follow-up questions when I am done this morning.

17        First off, have you ever been deposed before?

18   A.   No.

19        INTERPRETER:   I don't trust English responses.

20   Q.   Okay.   In that case, I would like to go over just some

21   basic ground rules with you this morning.   It is important

22   that we get an accurate record of what is said in this room

23   today.

24   A.   Uh-huh.

25        INTERPRETER:   Yes.
```

1   Q.   Any public participation outside of the church?

2      INTERPRETER:  So you are talking about gathering

3 signatures, right?

4   Q.   No.  It would be, in English, a public rally or a public

5 gathering in support of Referendum 71.  Like, a Town Hall or

6 a public speaking.

7      INTERPRETER:  I think there was a meeting once, in the

8 DoubleTree Hotel.

9   Q.   Okay.  Anything outside, where people used microphones,

10 or attended any type of rally?

11      INTERPRETER:  No.

12   Q.   Did you ever hold up campaign signs in support of

13 Referendum 71?

14      INTERPRETER:  Yes.

15   Q.   On how many occasions?

16      INTERPRETER:  Personally, me, you mean.  Right?

17   Q.   Correct.

18      INTERPRETER:  Maybe a couple times, I was there at the

19 intersection and holding up the sign.

20   Q.   The same intersection both times?

21      INTERPRETER:  Yes.  The same.

22   Q.   And what intersection was that?

23      INTERPRETER:  Crestline and Wellesley.

24   Q.   How did you choose that location?

25      INTERPRETER:  I don't remember.  I just walked to it.

Page 23

1   Q.   Did you have specific locations which you were instructed

2   to go to, to gather signatures?

3        INTERPRETER:   No.  Everyone did it on his own.  Wherever

4   the person lives, or --

5   Q.   So there was no overall church plan to gather signatures.

6   It was left to each member on his own?

7        INTERPRETER:   Right.  There was no specific plan where,

8   you know, I am supposed to go to south hill, or someone else

9   was supposed to go to north side.  No.  There was no such

10  form.  It was at the personal discretion.  People who wanted

11  to, they took the paperwork and --

12  Q.   Okay.  Let's talk about your personal signature

13  gathering.  How many times did you collect signatures?

14       INTERPRETER:  I don't remember exactly how many times,

15  but there was one sheet.  I think there was -- I think there

16  was, like, 30 entries on the number of sheets that I have,

17  and what I did, you know, I approached people with the

18  interpreter, and explained the issue, and if they wanted to

19  sign, they did sign.  If they didn't want to sign, you know,

20  they did not sign.  And I believe that it got filled out

21  completely.

22  Q.   So you personally were responsible for gathering

23  signatures for one full petition, correct?

24       INTERPRETER:   I took that responsibility on myself.  I

25  wanted to, and I did do that.

Decl. of W. Stafford -97

S

717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

COURT REPORTERS                    509-455-6931

d877f08e-530e-4fc5-b1e9-8d70d2b5a4e9

1    Q.    Okay.  I am just trying to establish how many petitions

2    you were personally responsible for, and I believe that that

3    is one petition, correct?

4          INTERPRETER:  One petition.

5    Q.    Where did you go to gather signatures?

6          INTERPRETER:  On a street where I live.

7    Q.    Did you go to any public places, such as grocery stores

8    or large retail stores or a mall?

9          INTERPRETER:  No.  I did not go to those.

10   Q.    So you gathered signatures in your neighborhood, correct?

11         INTERPRETER:  Yes.

12   Q.    You mentioned that you had a translator with you.  Why

13   did you bring a translator?

14         INTERPRETER:  In order -- in order to properly explain,

15   you know, the petition, we would give them the petition, and

16   I couldn't explain, but the translator could.  And after the

17   explanation, either people signed, or they declined to sign.

18   Q.    Besides yourself and the translator, was anyone else with

19   you when you gathered signatures?

20         INTERPRETER:  I don't think so.  No.

21   Q.    Are you able to read English?

22         INTERPRETER:  I do read.  I read.

23   Q.    So, were you personally aware of what the referendum

24   said, that you were asking other people to sign?

25         INTERPRETER:  Well, maybe not, like, exactly 100 percent,

1    but I did understand what it was asking for.  Yeah.  What I

2    mean is, you know, maybe by just reading, I would not get

3    exactly 100 percent, but I did understand what it was about.

4    Q.   And do you have an estimate of how many times you went

5    out in the neighborhood to gather signatures?

6         INTERPRETER:  Maybe five, maybe six times.

7    Q.   Did you have a Referendum 71 yard sign in your yard?

8         INTERPRETER:  Yes.  Up front.

9    Q.   Did you have a Referendum 71 bumper sticker on your car?

10        INTERPRETER:  No.

11   Q.   Outside of gathering signatures in the neighborhood, did

12   you personally have any other efforts to gather signatures?

13        INTERPRETER:  We had small brochures that we placed by

14   the people's doors, outside.

15   Q.   So you would leave brochures at people's doors if they

16   were not home when you went to gather signatures?

17        INTERPRETER:  Yes.  Yes.  We would walk by and just leave

18   them there.

19   Q.   Were the brochures in English or in Russian?

20        INTERPRETER:  In English.

21   Q.   Were the petitions available for signature at the church?

22        INTERPRETER:  What do you mean, petition?

23   Q.   The same petition that you took around the neighborhood

24   to gather signatures, were additional copies available at the

25   church?

Page 28

1   in general, or --

2   Q.   We will do both, but I want to start with you,

3   personally.

4        INTERPRETER:   Personally, about me.

5   Q.   Can you tell me -- and we will take time to go through

6   each incident -- but beginning where you want to begin,

7   describe any personal harassment.

8        INTERPRETER:   So, talking personally about me.   So,

9   personally, to me, there was no, you know, physical damage or

10  nothing was broken.   That did not happen.   I had that sign up

11  front, and it was still there.   The only thing that --

12  stickers with swear words were placed on my vehicle, and as

13  far as it's been connected to this, you know, I couldn't say

14  exactly.

15  Q.   When, if you remember, did you first place the yard sign

16  in your front yard?

17       INTERPRETER:   When the process started.   Probably

18  October.

19  Q.   And there was no damage done to that sign, correct?

20       INTERPRETER:   No.   It was there.

21  Q.   Turning to the stickers with the swear words, where were

22  these stickers placed?

23       INTERPRETER:   On the windshield, on two different

24  vehicles.

25  Q.   The windshield of your personal cars, correct?

1   A.   Yes.

2   Q.   Two separate cars?

3       INTERPRETER:  Yes.

4   Q.   How many stickers were placed on each car?

5       INTERPRETER:  It was two or three stickers.

6   Q.   On each car, or in total?

7       INTERPRETER:  No.  In total.

8   Q.   When did you find these stickers?

9       INTERPRETER:  Two, two and a half months ago.

10  Q.   Okay.  So, in the summer of 2010, correct?

11      INTERPRETER:  Yes.

12  Q.   And I know it may be unpleasant, but do you recall what

13  was written on the stickers?

14      INTERPRETER:  I did not understand the words, exactly,

15  but when my son looked at that, he was, like, Dad, where did

16  you get this?

17  Q.   Were the stickers written in English?

18      INTERPRETER:  Yes.

19  Q.   Approximately how big were the stickers?

20      INTERPRETER:  It was the yellow sticky note, actually.

21  It's one where you peel off and stick on.  So it was a square

22  size.

23  Q.   We would call it a Post-it note.

24      INTERPRETER:  Yes.

25      MR. PIDGEON:  Let the record reflect, he indicated the

Page 30

1    size about maybe two by two.  Two by two inches.

2         INTERPRETER:  Yes.

3    Q.   (BY MR. DIXSON)  Do you believe that those stickers were

4    related to your position with regards to Referendum 71?

5         INTERPRETER:  I couldn't say that for a hundred percent,

6    because I did not see who done it.  I don't know.  Even

7    though I resided there for four years, and I had no issues

8    with the neighbors, and --

9    Q.   Were any stickers placed on your vehicles around the time

10   of the signature gathering or the November 2009 election?

11        INTERPRETER:  No.

12   Q.   Do you recall, from what your son told you, what was

13   actually written on any of the stickers?

14        INTERPRETER:  He just told me that it was very bad

15   swearing words, and, so, I tore it up and threw them in the

16   garbage.

17   Q.   Did you think they were directed to you, personally?

18        INTERPRETER:  Yes.

19   Q.   Why do you think that?

20        INTERPRETER:  Because I did not see stickers like that at

21   my neighbors' vehicles.

22   Q.   Did your son tell you if the stickers said anything about

23   Referendum 71 or Biblical marriage?

24        INTERPRETER:  No.

25   Q.   I would like to talk about -- strike that.

STO          OURT REPORTERS                    509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

d877f08e-530e-4fc5-b1e9-8d70d2b5a4e9

Page 62

1   STATE OF WASHINGTON
                              ss:   Reporter's Certificate
2   COUNTY OF SPOKANE

3       I, Osmund D. Miller, a Certified Shorthand Reporter and

4   Notary Public in and for the State of Washington,

5       DO HEREBY CERTIFY:

6       That the foregoing is a true and correct transcription

7   of my shorthand notes as taken upon the deposition of

8           on the date and at the time and place as shown on

9   page one hereto,

10      That the witness was sworn upon his oath to tell the

11  truth, the whole truth and nothing but the truth, and did

12  thereafter make answers as appear herein,

13      That I am not related to any of the parties to this

14  litigation and have no interest in the outcome of said

15  litigation,

16      Witness my hand and seal this 28th day of October, 2010.

17

18

19                          RPR, CCR No. 2280

20  OSMUND D. MILLER
    Certified Shorthand Reporter and Notary
21  Public in and for the State of Washington,
    residing in Spokane.  My commission expires
22  on December 15, 2012.

23

24

25

**Decl. of W. Stafford -103**
ST                   COURT REPORTERS                    509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

d877f08e-530e-4fc5-b1e9-8d70d2b5a4e9