UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,<br><br>                Plaintiffs,<br><br>    v.<br><br>SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 09-CV-05456-BHS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

Deposition Upon Oral Examination
Of

---

Taken by:  Tracey L. Juran, CCR
          CCR No. 2699

September 23, 2010

Seattle, Washington

**Exhibit G**

Juran, Certified Court Reporter

Page 2

```
 1                          APPEARANCES

 2

 3

 4     For Protect Marriage Washington:

 5          Stephen Pidgeon, Attorney at Law
            3002 Colby Avenue, Suite 306
 6          Everett, Washington  98201-4081

 7

 8

 9     For the Defendants:

10          Anne E. Egeler, Deputy Solicitor General
            Attorney General of Washington
11          1125 Washington Street SE
            P.O. Box 40100
12          Olympia, Washington  98504-0100

13

14     For Washington Coalition for Open Government:

15          Steven J. Dixson, Attorney at Law (by telephone)
            Witherspoon Kelley
16          422 West Riverside Avenue, Suite 1100
            Spokane, Washington  99201-0300

17

18

19     For Washington Families Standing Together:

20          Ryan McBrayer, Attorney at Law
            Perkins Coie
21          1201 Third Avenue, Suite 4800
            Seattle, Washington  98101-3099

22

23

24

25
```

Decl. of W. Stafford -105

Tracey Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 4

1          Be it remembered that the deposition upon oral

2     examination of                              was taken on

3     September 23, 2010, at the hour of 12:36 p.m. at 800

4     Fifth Avenue, Suite 2000, Seattle, Washington, before

5     Tracey L. Juran, CCR, Notary Public in and for the State

6     of Washington residing at Edmonds, Washington.

7          Whereupon the following proceedings were had,

8     to wit:

9                         * * * * *

10                        having been first duly sworn on
                          oath by the Notary Public to
11                        tell the truth, the whole
                          truth, and nothing but the
12                        truth, was deposed and
                          testified as follows:

13

14                        EXAMINATION

15    BY MS. EGELER:

16    Q.                  as I stated to you before we went on

17    the record, my name's Anne Egeler and I represent the

18    Attorney General -- excuse me.  I'm with the Attorney

19    General's Office and I'm representing Secretary of State

20    Sam Reed --

21    A.    Mm-hm.

22    Q.    -- the defendants in the case.

23          And I wanted to start by asking, have you ever been

24    deposed before?

25    A.    No, I don't think so.  I think this first time.  I'm

Page 6

1   Q.   Well, let's get started, then.

2        Would you please state your current employment.

3   A.   Yes.  I'm

4

5   Q.   And how long have you held that position?

6   A.   I'm going on -- October'll be 26 years.

7   Q.   Wow, okay.

8        And have you been told that you were named as a

9   witness in the Doe v. Reed case?

10  A.   Yes.

11  Q.   Did you know that that may require you to publicly

12  testify in a federal court?

13  A.   That's why I agreed to do it, yes.

14  Q.   And were you asked if you had any concerns or -- about

15  publicly testifying?

16  A.   No, I don't have any.  I'm in the public's eye all the

17  time.

18  Q.   And when did you first learn that you were going to be a

19  witness in this case?

20  A.   Wow, I think back now when we (indicating) talked on the

21  phone, I think.  It's been a couple months.  Yeah, about

22  60 days or so, two months.

23  Q.   And who told you that?

24  A.   My lawyer friend here (indicating).

25  Q.   So Mr. Pidgeon in the room here.

```
1    Q.    And that bill that you were referring to being an issue,

2          do you remember what that --

3    A.    Oh, my goodness.

4    Q.    -- bill was?

5    A.    I could not say, it has been so long ago.  But it was in

6          every major newspaper all over the world, so it won't be

7          hard to find out.

8    Q.    And were you in newspapers connected with that issue?

9    A.    Everywhere.

10   Q.

11

12   A.

13

14

15

16

17

18

19

20              MR. PIDGEON:   Mm-hm.

21   A.

22

23

24   Q.    (by Ms. Egeler)

25
```

y Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

1    A.

2    Q.

3    A.

4    Q.

5

6    A.

7    Q.

8

9    A.

10

11

12

13

14

15    Q.

16

17

18    A.

19    Q.

20    A.

21

22    Q.    In addition to protecting marriage between a man and a

23          woman, did you speak about not permitting marriage

24          between two people of the same sex?

25    A.    I don't think that that really came up very much at all

y Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

1        and a woman.

2    Q.  And when you say that this is Biblically a sin, did you

3        say that to the group at --

4    A.  Say it every time I get an opportunity to speak about

5        it.

6    Q.  And specifically, that marriage that is between anyone

7        besides a man and a woman is what you're referring to as

8        the sin; correct?

9    A.  Right.

10   Q.  So in other words, same-sex marriage.

11   A.  Right.

12   Q.  And would you have made the same statement in

13       Washington, D.C.?

14   A.  Same.  It's just much bigger and more people.

15   Q.

16

17   A.

18

19

20

21

22

23

24

25   Q.

1    A.   Oh, my goodness, yes.  It was quite a bit.

2    Q.   And I'm going to just make one exhibit here of the many

3         press articles.  And I know you've brought some of those

4         with you today in actual newspaper form, but this one's

5         printed out, so it might be easier to attach to the

6         deposition.

7              MR. PIDGEON:  No objection.

8                   [Off the record - discussion]

9              [Exhibit 1 marked for identification]

10   Q.   (by Ms. Egeler)  Pastor, are you familiar with this

11        article?

12   A.   Oh, yeah.

13   Q.   And just for the record, I'll note that this is from the

14

15   A.   Mm-hm.

16   Q.   -- noted on the bottom of the document and it's dated

17

18   A.   Mm-hm.

19   Q

20

21

22

23

24

25   A.   Mm-hm.

Page 15

```
 1   Q.    -- period, end quote.  Does that quoted material come

 2         from you, do you think?

 3   A.    I don't know where that came from.  I don't -- they

 4         probably got it from some of my engagement or my

 5         speeches, but I don't remember directly making it to

 6

 7   Q.

 8

 9   A.

10

11   Q.

12

13

14   A.    Oh, my goodness.  The day of, even, was an absolutely

15         amazing time.  And what we're saying is, look, we're not

16         down here to attack homosexuals, we're not here to put

17         homosexuals down.  And you can look at -- I mean, there

18         are thousands upon thousands of articles about me and my

19         life and where I stood, but you cannot find any articles

20         at all that would be outside of the Biblical aspect of

21         what I believe.  I have never put down homosexuals, I do

22         not think they are second-class citizens, or anything

23         else.

24              But the truth is, I'm a pastor.  I believe in the

25         Bible.  I stand on the Bible regardless of whether it's
```

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

```
 1        popular or not.  And that is one of the issues that we

 2        have taken, because when those ungodly issues are pushed

 3        as normal, is pushed as one to force Christians to have

 4        to accept, then I'm a big fighter on that, regardless of

 5        what the issue is.

 6   Q.   So would it be fair to say that you've been quoted in

 7        the past or have said that homosexuality -- the act, not

 8        the individuals -- that the act is ungodly?

 9   A.   Yes.  Oh, most definitely.

10   Q.   And would it be correct to say that you have publicly

11        stated that homosexuality -- again, not the individuals,

12        but the act -- is a sin?

13   A.   Yes.

14   Q.   And have you publicly stated that it is your belief that

15        homosexual families, where two partners are parenting

16        children, is contrary to Biblical teachings?

17   A.   And common sense, okay?  Maybe I can help you understand

18        it a little bit better.  If two people walked into

19        adoption process, unmarried, a man and a woman, and

20        wanted to adopt a child, the adoption agency will say,

21        no, it's not a stable home.  That's a man and a woman

22        that's unmarried trying to adopt.  But at the same time,

23        well, couples -- two women or two men that's not married

24        will walk in and they will make exceptions for them to

25        adopt.
```

Decl. of W. Stafford -113

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

1              Now, as far as I'm concerned, where's the common

2      sense in protecting that child in a very strong home

3      that's gonna give them commitment, that's gonna give

4      them the role models of a man and a woman, and to make

5      sure that if we're gonna say no to a single -- two

6      single people trying to adopt that's not married, what

7      makes two men that's not married or two women that's not

8      married the difference?

9  Q.  Have you publicly spoken about the possibility of --

10     let's take two men who are married under one of the

11     state laws that does permit homosexual couples to marry.

12     Have you taken a public stance about that?

13  A.  Yes, because it has been very -- it has been a very

14     negative thing that happened to Christian organizations.

15     If -- I don't know if you understood or understand what

16     took place in Massachusetts.  They shut down an adoption

17     agency, Catholic adoption agency, because they would

18     not -- according to their freedom and freedom of

19     religion, would not adopt to homosexuals.

20             Now, I think that's just as discriminatory, to shut

21     down a business when they have the freedom -- in our

22     Constitution, the freedom of religion.  But they say,

23     you cannot have that right, and I would like to know

24     why.

25  Q.  Is it your position that businesses should have the

Juran, Certified Court Reporter

Page 18

1    right to adopt to two men who are married?

2    A.   No, because I don't think that that Biblically is a

3         marriage, you know.  There are certain things that we

4         have to agree on in this deposition room.  And what we

5         have to agree on in this room is, I don't have any

6         personal opinions.  When I gave my life to Christ, my

7         personal opinion took a second seat.

8              I'm not like many other hypocrites that call

9         themselves Christians and then decide what they wanna

10        believe the Bible says or don't.  I am one that's

11        totally committed to all 66 books of the Bible, every

12        chapter in the Bible -- over 1,100 chapters in the

13        Bible, and when God says something, that's where I stand

14        whether I like it or not.  God didn't ask my opinion.

15   Q.   I understand.

16             I'm just trying to get out what you've said

17        publicly so that --

18   A.   Mm-hm.

19   Q.   -- your public words can be known in the -- in our

20        transcript here --

21   A.   Oh, yeah.  I mean --

22   Q.   -- today and fairly represented.

23   A.   -- there is no reason to think that my words and my

24        actions are not known.  You go to Wikipedia.  I am

25        everywhere.  Go to Google.  I think -- I mean, I think

Page 19

1    the last time I typed my name in, there was almost

2    300,000 hits.  So it isn't -- nothing private about how

3    I feel, how I say, and where I stand.  And there is not

4    one statement that anyone can ever find in all those

5    postings where I am derogatory and attacking and feeling

6    and putting down homosexuals.

7    Q.   I understand.

8

9

10   A.

11

12

13

14

15

16

17

18   Q.   And what discriminatory and racial -- and racist

19        practices specifically?

20   A.   Specifically, if you remember some of the rallies that

21        was going on in California -- I think it's about three,

22        four years ago at the most -- there was homosexuals that

23        was attacking people with the Bible at rallies, took a

24        Bible from a little old lady, called black people stupid

25        for voting for the passage of that bill.  It may have

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 20

```
 1      been Proposition 8; I'm not sure.

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14      Q.   Did you witness anything in the state of California that

15           you've just described?

16      A.   Every day on the news.  It was hot, hot news.  And so

17           with -- the pastors that have organized Proposition 8,

18           I'm close friends with two of 'em and I knew exactly

19           what was going on.  Wasn't just hearsay in the aspect of

20           what was going on in the paper, but what was going on

21           with the pastors and the pastors who got, I mean, just

22           threats to no end that if you are gonna stand on this,

23           then you are gonna be -- I wanna say the right word --

24           you'll be profiled as a hatemonger.

25      Q.   And were you involved in an organization of a rally, for
```

Decl. of W. Stafford -117

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 21

1        lack of a better word, at                          ?

2  A.   Oh, yes.

3  Q.   Can you talk about that for me.

4  A.   I'd be more than happy to talk to you about that.  My

5        children go and attend              .  And what

6        took place was, when they -- if you wanna attack me,

7        that's fine.  I'm a big boy; I can handle it.  I can

8        back up my words and know why I do what I do.          ,

9

10

11

12

13

14            THE WITNESS:  Anything you wanna look at or say

15       before I continue?

16            MR. PIDGEON:  Yeah, one second.

17                 No objection to the exhibit.

18  A.

19              .  They was having so many problems in the

20       school racially.

21            And now, my kids was -- at that time was just

22       that -- my oldest, and there may have been three, four

23       other, really, minority kids; weren't very many.  I

24       think the Shaws was there, who had adopted a Korean --

25       two Korean kids; my kids, which was -- I'm amazed at how

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

1     is for education, not indoctrination, and they can do it

2     after school.  No big deal.  We're not saying you can't

3     do it, we're just saying, this is time for education

4     during the day.

5          Well, you can have a special day, if you want, for

6     Christians.  That is defeating why I'm here.  If I did

7     that, I'm hypocrite.  I'm saying, if we got a day of

8     respect, why not put everything on the one day?

9  Q.  So did you have a rally organized in         --

10  A.  Yes, we did.  And over half the parents kept their kids

11     out of school that day.

12  Q.  And did you bring people from the church with you?

13  A.  Church, the community, because I live in the community.

14     We had people, I mean, come from all over to come and

15     stand with us --

16  Q.  How many people --

17  A.  -- at that rally.

18  Q.  -- do you think?

19  A.  Oh, my goodness.  I don't -- please, I really don't

20     know, but probably five or six hundred.  I don't know.

21     So yeah, something like that.

22  Q.  And were there any people there that were taking the

23     opposite position and supporting --

24  A.  Did you see --

25  Q.  -- the day?

Juran, Certified Court Reporter

Page 27

1    A.    -- some of the paperwork that they put in up there?  I

2          mean, we had homosexuals and homosexual activists that

3          literally tried to start fights with me.  And I'm always

4          surrounded by people when I'm in public and people gonna

5          know I'm there, because the worst thing I could ever do

6          is to start a problem and hit someone.  And that's

7          exactly what they tried to do.

8                                              You know,

9          there's not a lotta love and a lotta tolerance in that

10         sign.

11              And we had to call the police, which was there,

12         that they were supposed to keep us separated at this

13         rally.  That was the whole issue that we were supposed

14         to do, and they didn't.  When I first walked up, I had

15         all these homosexual kids and homosexual activists come

16         to me, and here I am surrounded, with four or five guys

17         around me trying to protect me from all of them.

18   Q.    And so the police did respond when you called?

19   A.    Well, they was there.  They were standing there looking.

20         And I said, hey, don't you guys think you better move up

21         here?  Don't you think you better move -- we supposed to

22         have separate places for the crowd, those that are

23         standing against                  and those that are

24         for it, and you're not doing your job.

25   Q.    And did they --

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

1   A.   And I expect you to do your job.  And they finally did

2        move 'em back and put up a barrier, a rope.

3   Q.   Between the two groups, the rope?

4   A.   Between the two groups.

5             The things that were said, the language that was

6        used -- my wife was attacked with words, abusive, called

7        her a nigger lover, called us homophobes, hateful

8        people.  They -- I mean, I can't even say some of the

9        things that they were saying right there with the

10       television and the cameras.  But all of a sudden, none

11       of those things was on the news.

12  Q.

13

14  A.

15

16

17  Q.   Was anything thrown?

18  A.   Oh, no.  I mean, that wouldn't have happened.

19  Q.   By either group.  No -- neither group threw things.

20  A.   No, mm-mm.

21  Q.   Did either group sink to the level of physical violence?

22  A.   No.  Oh, no.  I mean, it definitely wouldn't come from

23       our side.  And everybody knows I'm not a pacifist.

24  Q.   But you didn't react with --

25  A.   No.

Page 29

1    Q.   -- violence.

2    A.   No.

3    Q.   And the other side didn't do anything violent either.

4    A.   Well, until we got 'em away from us.  I mean, coming up

5         in my face like this (indicating), what would you

6         consider that?  Would you consider getting in my space?

7    Q.   So how close were people standing to you?

8    A.   I wish we had that picture.  I know I got that picture

9         somewhere of the guys -- may look at the envelope

10        where -- I tried to bring a picture.  He's standing

11        right over -- right next to me.  I mean, he is here

12        (indicating).

13   Q.   And let the record reflect that I'm guessing that the

14        pastor's about three inches away.  Is that about right,

15        Pastor?

16   A.   He's probably about four or five inches away from me.

17             I wish I had -- it may be in that big yellow

18        folder.          said she got a picture of the guy

19        standing right next to me with the -- there it is.

20        Here's one of 'em (indicating).  This is when he's

21        walking up to me with the sign, and then he comes right

22        up right next to me on my side and was holding the sign

23        up,

24   Q.   Now, I'm looking at the picture.  And do you want to

25        take a look and tell me how far away you think he was?

1    A.    No, right there, he is not as close as he got.  Because

2          all of a sudden, the guy that's with me, the bodyguard,

3          is trying to keep him from doing that.  And that's when

4          they started really getting closer and closer to me, and

5          that's when we had to call the policeman and say, look,

6          you need to get those guys away from us or there's gonna

7          be some problems here and we're not gonna start it.

8                 MR. MCBRAYER:  Are you going to mark that, since

9          you're talking about it?

10                MS. EGELER:  Can we be off the record for a second.

11                [Off the record - discussion]

12                [Exhibit 2 marked for identification]

13   Q.    (by Ms. Egeler)  So when we went off the record, we

14         discussed how to use the newspaper that

15                            brought today.

16                                                        And we

17         agreed that this article, which is on the front of that

18         section and then continues on to the next page, that our

19         court reporter will make a copy of that, including all

20         of the pictures that show the information that the

21         pastor was referring to -- well, all of the pictures,

22         including those we haven't discussed --

23   A.    Mm-hm.

24   Q.    -- yet.

25                Pastor, I notice in the picture on the front of our

1    Q.    -- gathered?

2    A.    Mm-hm.

3    Q.    And do you remember what you told them?

4    A.    It's just a fact that we're here today to take what we

5          believe is the truth Biblically, and that is that

6          marriage is between a man and a woman.  And now that

7          GLSEN has gotten the Day of Silence in our schools, that

8          they are trying to indoctrinate and manipulate our kids

9          into saying something that we believe isn't right,

10         should be corrected, should be accepted, and should be

11         considered safe.

12   Q.    And did you have any threats or harassment made to you

13         or the church after the rally?

14   A.    All the way to the car.

15   Q.    And what were those threats or harassment?

16   A.    Yelling, screaming, calling me homophobe, hate -- you

17         know, hate filled, why don't I just accept gays as gays

18         are.  I mean, any -- you can name it, they were

19         saying -- most of the signs that they had up there, they

20         were -- and we had to get the police to come down.  I

21         mean, it got to the point where they was trying to block

22         me to get to the car so badly that we had to get

23         officers down there so I could make it to the car so we

24         could just leave.

25   Q.    And did the officers help you to the car?

y Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 33

1    A.    Oh, yeah.

2    Q.    Were you pleased with the police --

3    A.    No, I wasn't.

4    Q.    -- officers?

5          And why not?

6    A.    Because they didn't do their job.  First thing is, if

7          you look in this picture that's on the front of here

8          (indicating), they were supposed to be that far away the

9          whole day.  Now, just so -- the picture that showed you

10         the signs, where that kid was standing, if he didn't get

11         any closer to me, they didn't do their job by allowing

12         him to get that close.

13               I mean, my life -- whenever one of these things --

14         my life is in danger.  I've gotten more threats than Van

15         Camp's has pork and beans.  And I'm gonna sit there at a

16         rally and people have threatened me, say I should be

17         dead, I should be killed, I shouldn't even be last --

18         left alive for the next month or two, much less

19         anything -- and they let them get that close to me.

20         Someone could have shot me, someone could have cut me.

21         I mean, there are a lot of things that could have taken

22         place when they knew my life had been threatened.

23   Q.    Let's talk about that.

24               So this individual that's pictured with the

25                     at one point was much closer to you.

$\int$ Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 34

1   A.   Many.  Not just him.  Many was close.

2   Q.   And I understood you to say that you asked the police to

3        respond --

4   A.   I said, sir --

5   Q.   -- and separate.

6   A.   -- are you looking at what's going on here?

7   Q.   And --

8   A.   You are supposed to be keeping us separate and you're

9        not doing your job, when we come to find out later that

10       they had police officers and other members of law

11       enforcement up at the fireplace waiting for something to

12       break out.  They didn't even have all the officers there

13       on the premises where they were supposed to be.  I mean,

14       how -- if you're gonna have a rally and you gotta be

15       separated, how can you have that many people be set free

16       to come that close to me?

17   Q.   If you could just listen to the question I'm asking you

18       and focus on that question.

19           I wanted to ask you, when you felt the people were

20       too close to you and you asked the officer to take

21       action, did the officer refuse to do so?

22   A.   He said I had to wait -- he called his superior officer.

23       When the superior officer got there, then they moved the

24       people back.

25   Q.   How long before the superior officer got there?

1   A.   I don't know.   Probably about five minutes.

2   Q.   So about a five-minute response time.

3   A.   Mm-hm.

4   Q.   And when -- five minutes later, the police separated the

5        groups; is that --

6   A.   Mm-hm.

7   Q.   -- correct?

8            And how far apart did the police then keep the

9        groups?

10  A.   It look like it's about 15, 20 yards, yeah.

11  Q.   And do you think that, because they separated the

12       groups, that that prevented any sort of violence

13       occurring?

14  A.   I know it did.

15  Q.   So do you think that the police were instrumental in

16       helping to prevent violence?

17  A.   Oh, I mean, if there was no police there, it would

18       have -- I think would have broken out into some type of

19       violence.

20  Q.   That's a very strong statement, to state that the police

21       aren't doing their jobs.   So --

22  A.   Yeah, it sure is.

23  Q.   -- do you believe --

24  A.   And I --

25            MR. PIDGEON:   I object to that --

y Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 36

1          MS. EGELER:  Excuse me --

2          MR. PIDGEON:  -- statement and as to the form of

3      the question.

4  Q.   (by Ms. Egeler)  After you asked them to split up the

5      group and they did so, did you continue to feel that the

6      police were not doing their job?

7  A.   After they -- the head superior officer got there, they

8      did a great job moving everyone back.  It was -- we had

9      some 45 minutes before that separation took place.  It

10     started from the moment I got out the car and I started

11     walking towards the school.  They saw me coming and then

12     here comes the whole crowd that was representing the

13     homosexual group and activists.  They met me and walked

14     up to me long before we even got to the place.  And

15     that's how it all started.  As we moved toward, more and

16     more came and got around me and surrounded me.

17 Q.   They surrounded you and told you that they disagreed

18     with you; is that correct?

19 A.   That'd be a good statement to make, yes.

20 Q.   But they didn't surround you and physically abuse you.

21 A.   Oh, no, no.  I think, with all the guys that I have,

22     that that was not gonna take place.

23 Q.   Well, there were guys surrounding you and protecting

24     you.

25 A.   Right.

Decl. of W. Stafford -128

     y Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

1   Q.   Were they protecting the members of your church as well?

2   A.   No one was being paid attention to except me.

3        Everything was focused on me.

4   Q.   So the other members of your church were not threatened.

5   A.   Not the way I was, no.

6   Q.   Not the way you were or they weren't threatened?

7   A.   Oh, I mean, there was conversations going on the whole

8        time between the crowd and those that was against us

9        being there.

10  Q.   I understand there were conversations and, would it be

11       fair to say, angry words as well?

12  A.   Oh, yeah, mm-hm.

13  Q.   But was there physical violence occurring?

14  A.   There was no physical violence, none for -- with anyone

15       on either side.

16  Q.   And after you asked the police to separate the groups,

17       my understanding is that the police --

18  A.   Called his superior, superior arrived, and they moved

19       the crowd back.

20  Q.   And they kept things under control all the way through

21       the time that you actually got into your automobile and

22       left.

23  A.   Until we got ready to leave.

24  Q.   Until?

25  A.   When the rally was over, we turned to leave, and then it

Juran, Certified Court Reporter

Page 38

```
 1        was kinda like the police say, okay, it's through.  And

 2        then bam, here come the crowd after me as I'm walking

 3        down the street.  And that's when we had to get -- when

 4        I got to the car, again I'm surrounded and they're

 5        saying things and throwing words out, that we had to get

 6        one of the officers and call one of the officers to get

 7        down there to get these guys backed off me.

 8   Q.   And when you called one of the officers to get those

 9        guys off of you --

10   A.   He came.

11   Q.   Did he come immediately?

12   A.   Well, yeah, because he was kinda behind -- they was

13        walking because they saw what was happening with the

14        crowd when I left.  So the officer was kinda walking

15        behind the activist crowd.  So when we got to the car

16        and I had to stop, then boom, you know, here I am

17        surrounded again.  And I says, you know, Officer, we

18        need to get these guys back so we can go.  We wanna just

19        leave.  And he did.

20   Q.   And was there any vandalizing of your car or any --

21   A.   Not at that place.

22   Q.   It sounds like there's been vandalizing of your car at

23        other times; is that right?

24   A.   Well, worse than that.  I think that some of the things

25        that have happened -- and it's always during particular
```

Decl. of W. Stafford -130

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

```
 1      seasons.  If I write something, man, does the phone

 2      calls come in or does the threats go up.

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20   Q.   I understand your position, but I'm wondering if you can

21        tell me about any time that your car's been vandalized.

22   A.   Oh, you wanna go -- you want those type of things.

23        Okay, yeah.

24   Q.   I do.

25   A.   Okay, the first thing happened after the rallies.  And
```

Decl. of W. Stafford -131

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 44

1    A.   I don't know who did it.  If I did that, they wouldn't

2         be walking around free.

3    Q.   And why did they -- do -- you don't --

4    A.   I think it --

5    Q.   -- know who did it, so I assume you don't know why?

6    A.   Well, I think it's because of who I am, because of the

7         threats and the things that people have said they wanted

8         to do to me.

9    Q.   How do you know?

10   A.   I don't know.  You don't know.  But I'm not -- there's

11        eleven to twelve mailboxes on our street on the bottom.

12        There's another seven or eight on the top of the hill

13        where I live at.  Only mailbox that was stolen, anything

14        done with, no one else mailbox was touched except

15        where I live.

16   Q.   And was that in '08, then, as well?

17   A.   I think it was '08.

18   Q.   And did --

19   A.   And so we had to end up, of course, getting one of those

20        security mailboxes.

21   Q.   Did you call the police about the incident with the car

22        windows being broken?

23   A.   Yes.

24   Q.   Did they respond?

25   A.   Well, I mean, yeah, I think they -- where were we?  As

1    parents, I think we was outta town.  And I think that my

2    daughter and her friend -- I can get more details about

3    it, if need be, that -- made the call that someone had

4    busted windows and had attacked the car --

5    Q.   So you --

6    A.   -- that evening.

7    Q.   -- didn't -- you didn't actually see the --

8    A.   Right.

9    Q.   -- car, then.  Okay.

10        You heard about this from your daughter?

11   A.   Well, my daughter called, yeah, someone attacked our

12        friend's car.

13   Q.   And how about with the mail?  Did you call the police

14        about that?

15   A.   Yes, we did.

16   Q.   Did you get a response from the police about the mail?

17   A.   Well, only response they could really give us is, yep,

18        someone stole your mail and you probably need to have a

19        better security system.

20   Q.   So do you know if they had a way of finding who had --

21        who did this to your mail?

22   A.   No.

23   Q.   Were you dissatisfied with the police response either to

24        the car incident or the mail theft?

25   A.   No.  It's just if you're gonna make a stand, then that's

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

1      things that is gonna happen to you.  And that's just

2      part of what it's been like for the last five, six

3      years.

4  Q.  I understand.

5          Anything else that you've experienced?  You talked

6      about phone calls.

7  A.  Most of 'em I don't get because the front desk and

8          takes care of those.  We was getting so many so

9      frequently for a while with the          incident and

10     being down at          issue and then being in Olympia.

11     Man, oh, man, those -- that was almost an everyday -- I

12     mean, it was bad.

13         The people at work, you know, get nervous.  You get

14     people calling in and saying that, you know, your

15     pastor's not gonna make it through the week, or, he --

16     you know, he needs to be dead, or, we're gonna get him

17     if we can catch him out.  I mean, that's nothing to

18     laugh about.

19 Q.  Did you hear any of those phone calls personally?

20 A.  I try my best never to pick up those phone calls.

21 Q.  So you didn't answer those phone calls --

22 A.  No.

23 Q.  -- yourself.

24 A.  They came through the church office.

25 Q.  So          would be more knowledgeable.

        ᵣ Juran, Certified Court Reporter

1           newspaper.  I think that there's been some big

2      follow-ups from that paper about me.

3   Q.   So did you actually have anyone physically attack you at

4      any point through these years of rallies and --

5   A.   I'm too --

6   Q.   -- protests?

7   A.   I'm too careful to put myself in a position to be

8      attacked.

9   Q.   And --

10  A.   Because the -- and the reason why I am is because I'm

11     gonna be the one that's gonna end up in trouble.

12  Q.   And did you tell the police about these comments and

13     death threats?

14  A.   We have called and we have let the         Police know.

15     We have reported because we are supposed to.  And, you

16     know, at times they would say, what do we need to do?

17     We had one incident that got to the point where they

18     came to the office and there was a letter left

19     threatening.  We never could prove who wrote the letter,

20     but it was a very derogatory, very profane explanation

21     of what they thought about me and what they wanted to do

22     to me.

23  Q.   Do you have a copy of that letter?

24  A.   Oh, my goodness.  I -- if I -- no, I probably don't.

25  Q.   Did you give it to the police?

y Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 49

```
 1   A.   I think the police did get it.  I'm not sure.
 2   Q.   And how many times did you call the        Police about
 3        death threats or --
 4   A.   Whenever there was something would come in, they said,
 5        let us know.  You know, and it was -- it's kinda got to
 6        be to the point where it's kinda on a regular thing:
 7        Hey, we got some more calls; hey, we got -- just to let
 8        you know.  No one's come to the office except that one
 9        time that letter was dropped off.  And so --
10   Q.   And when you've called the        Police, have they
11        been responsive?
12   A.   Oh, yeah.
13   Q.   Are you displeased with the        Police?
14   A.   I'm not displeased with the        Police at all.  If I
15        had any, it's -- like I said, it was more protecting the
16        people up at        .
17   Q.   Have there been any attacks on the church, the structure
18        itself?
19   A.   Well, not on the church -- our church, because we rent.
20        So it's --
21   Q.   And where --
22   A.   -- you know, not ours.
23   Q.   Where do you hold services?
24   A.   We hold services at the
25             Sunday morning.
```

```
1   Q.   And you're welcoming of anyone who wants --

2   A.   You welcome --

3   Q.   -- to attend.

4   A.   -- anyone who wants to come.  And if you wanna join the

5        church, this is what it takes.

6   Q.   So now I want to talk to you a little bit about

7        Referendum 71.

8   A.   Sure.

9   Q.   Have you signed the Referendum 71 petition?

10  A.   I did.

11  Q.   And do you remember where you were?

12  A.   At the church office, I believe.

13  Q.   And were others there at the church office?

14  A.   Yeah.  I mean, we would have 'em right at the office so

15       anyone that was at the office that came through that saw

16       'em could sign 'em.  So we had petitions there right at

17       the church and at the church office.

18  Q.   And did you think that the signature was a public

19       signature or that it was secretive?

20  A.   Well, when you think about a petition, you think about

21       the right of privacy.  I think that if I wanted someone

22       to know how I was gonna vote, why don't I just announce

23       that?

24  Q.   So when you signed that petition, did you hide it?

25  A.   No.  I never would have thought that it would have been
```

y Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 57

```
 1        an issue of someone trying to get all the names off a
 2        petition to be published.
 3   Q.   After you signed, was the petition out in the public --
 4   A.   Oh, yeah.  I mean, people handled 'em the whole time.
 5        It wasn't like they just laid down on the table or, you
 6        know -- when you got -- when they got full, they would
 7        take that one and they would put it away and then they
 8        put a fresh one out.
 9   Q.   So the page that you signed, others could have seen it
10        while they were --
11   A.   While they were signing it, yeah.
12   Q.   And so were petitions made available at the church to
13        sign?
14   A.   Mm-hm.
15   Q.   Could you --
16   A.   Yes --
17   Q.   Yes.
18   A.   -- they were.
19   Q.   And did you talk about Referendum 71 or the petitions to
20        your parishioners?
21   A.   I said, we need to stand and this is one of the ways we
22        can stand against what we believe is right, is the
23        letting it be brought to a vote.
24   Q.   And did --
25   A.   And --
```

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

1    Q.    -- you say that during a sermon or from the pulpit?

2    A.    It would be more like announcements.  You know, once I

3          start the sermon, it's -- everything else is off.  This

4          is time for the word.  But in our announcements and

5          different things, we would always encourage our people

6          to be involved with our country, our state, and to be --

7          make sure they're registered voters, because if you

8          don't vote, you don't have any say-so, especially to me.

9          You're not taking your responsibility God wants us to do

10         to be involved.  So --

11   Q.    And --

12   A.    -- those are the type of things that are being said.

13   Q.    Were those announcements made during the church service?

14   A.    Yes, mm-hm, mm-hm.

15   Q.    Did you gather signatures on petitions outside the

16         church at all?

17   A.    Personally, no, I did not.  But, you know, a lot of our

18         people participated, I'm sure.

19   Q.    Did you publicly endorse Referendum 71?

20   A.    I cannot tell our people how to vote.  I never tell our

21         people how to vote.  At the most, I can say how I'm

22         gonna vote.  So if they want to hear that, they can.  I

23         mean, I'm never, ever shy of how I stand Biblically and

24         how I vote.  But I can't tell -- you can't say, well,

25         you need to vote for this person, you need to vote for

          y Juran, Certified Court Reporter

Page 59

```
 1        this proposition.

 2   Q.   So you didn't publicly endorse Referendum 71?

 3   A.   I think if you would say publicly, I said I believe in

 4        it.  So yeah, that would be a public advantage of

 5        saying, I believe in this.  What -- I never say, you

 6        have to believe in this, or I never say, you have to

 7        vote this way because I do.  That's not my job as --

 8        telling folks what they can and can't do as their

 9        pastor.

10   Q.   Did you publicly say, I endorse or I support

11        Referendum --

12   A.   Yeah, mm-hm.

13   Q.   -- 71?

14   A.   Mm-hm.

15   Q.

16

17   A.

18

19

20

21

22   Q.

23

24

25   A.
```

Page 60

1

2    Q.

3    A.

4    Q.

5

6    A.

7    Q.

8    A.

9

10

11

12   Q.

13

14

15   A.

16

17

18

19          MS. EGELER:  Let me mark this as Exhibit No. 3.

20             [Off the record - discussion]

21             [Exhibit 3 marked for identification]

22   Q.   (by Ms. Egeler)  What I've handed you is what we're

23        marking as Exhibit 3 to your deposition.

24   A.   Mm-hm.

25   Q.

 ɣ Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 61

1

2

3   A.

4   Q.

5

6   A.

7   Q.

8   A.

9   Q.

10  A.

11

12

13

14

15

16

17  Q.   So did you do a number of rallies with respect to

18        Referendum 71?

19  A.   Not very many, because I wasn't feeling well at the

20        time.  So it was limited.  I would have probably done a

21        lot more if I was as healthy as I wanted to be.

22  Q.   And you talked -- you were talking about one with a

23        women's organization.  Can you tell me about that.

24  A.   My goodness.  It's probably at -- up in the

25        area before -- had to be before the vote.  And it was

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 62

1          a -- I think it was a two-day rally, a Friday and a

2          Saturday.  And I came in and spoke that Saturday.

3     Q.   To the rally?

4     A.   To the rally, yeah.

5     Q.   Any other rallies you remember for Referendum 71?

6     A.   Man, I probably did some things on the news, radio,

7          people calling me, because I'm always called.  I mean,

8          just who I am and, you know, what -- people know where I

9          stand.  So that's probably the best that I can say,

10         that -- radio interviews, people calling me getting

11         quotes,                               rally.  So those

12         would be the ones I can remember.

13    Q.   Do you remember if you had a Referendum 71 sign in your

14         yard at your house?

15    A.   No.

16    Q.   No, okay.

17              A Referendum 71 bumper sticker?

18    A.   No.

19    Q.   Do you feel that you experienced harassment or threats

20         as a result of your public speaking regarding

21         Referendum 71?

22    A.   Absolutely.

23    Q.   Can you tell me about that.

24    A.   Well, anytime -- like I said earlier in the deposition

25         here, that anytime my name is mentioned in the paper,

                    _____y Juran, Certified Court Reporter

                                                 74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 63

1       anytime there is an issue that is concerning the

2       homosexual issue that my name is mentioned, anytime I'm

3       on TV, anytime I am interviewed and it get -- go public,

4       I am gonna get threats and I'm gonna get calls.  It's

5       automatic.  It's just gonna happen.  I'm gonna be

6       threatened.

7   Q.  Can you tell me specific incidents that occurred as a

8       result of your speaking on Referendum 71 as opposed to

9       prior to Referendum 71, the stance that you took with

10      respect to homosexuality?

11  A.  Well, I think they think I'm a nut and I think they look

12      at me as being inconsistent, because if I am for equal

13      rights for minority of blacks, they think I should

14      understand the fight that they're going through.

15  Q.  Did you have anything happen at the church as a result

16      of your speaking out regarding Referendum 71?

17  A.  They're not -- no.  I mean, that is not gonna happen at

18      the church, it's not gonna happen at the office.  But

19      the thing that's gonna happen is the calls and the

20      threats that comes through the -- you know, the bloggers

21      and all that.

22  Q.  So which blogs did you receive threats on as a result of

23      your involvement with Referendum 71?

24  A.  I think you'd have to probably just look at some of the

25      articles and the comments that come after those

Page 64

1    articles.  Like if this (indicating) came out in the

2    paper, it won't be long; I'm gonna get calls.  They're

3    gonna come in.  I mean, it is automatic.  They're gonna

4    find some way to harass me about my stand, and that's

5    automatic.  I don't have to worry.  I don't have to say,

6    you know, it's not gonna happen.

7         The only time that I can say that I haven't gotten

8    many harassment calls was after that article that was in

9              , the one I wrote.  I think that you -- did

10   you get a copy of that?  I think --

11   Q.   We might have.

12   A.   Yeah, I think you did.

13        MR. MCBRAYER:  It's right --

14        MR. PIDGEON:  That's it right there.

15        MR. MCBRAYER:  -- right there (indicating).

16   A.   Which was an absolute amazing surprise to us, that no

17   one wanna dispute the article and that the more they

18   talked about the article, the worse my case was made.

19   And so that's -- now, that's the only article in ten

20   years that was not very much response.  They were so

21   angry at that being printed by              itself, they

22   got --              got attacked for printing that

23   article.  So I was glad someone else could share.

24   Q.   (by Ms. Egeler)  So did you receive any death threats

25   specifically because of your position on Referendum 71?

*y* Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

1    A.    If it was, I wouldn't have known, because I don't

2          receive the phone calls.  The church takes care of

3          those.  And if it's something that is bad enough, they,

4          hey, says, you know, we got phones -- call today, people

5          are upset about what you said, they don't like your

6          stance on the referendum.  Or they say, hey, you know,

7          we need to take some extra caution Sunday; this came in.

8                But I try never to really listen at the calls.  I

9          mean, it don't do me any good to have that in my head.

10         And, you know, I'm trying to stay straight and not be

11         prejudiced myself towards those who's threatening me.

12   Q.    So you did not see anything threatening to kill you

13         following your endorsement of Referendum 71.

14   A.    No.  Only thing that came up was, there were some

15         comments that came through that says, you know, this guy

16         should be taken out, this guy isn't worth living.  I

17         mean, I've gotten so many of those now.

18               When I was going through the          issue and

19         when we was going through standing against -- for

20         marriage -- which is what I do.  I'd rather stand for

21         something than to stand against something, and that's

22         what I do.  And if you're gonna stand for something,

23         then they're saying you are standing against and that's

24         how it is.  And I -- at times, I was getting 400 threats

25         a year.  I mean -- and so if they know who I am and have

, Juran, Certified Court Reporter

1        the freedom to threaten, what would the average citizen

2        do if their name gets out there and feel threatened?

3   Q.   Well, let's talk about what you said.  You said that

4        there have been so many comments that they want to take

5        you out.  How many were there saying they want to take

6        you out specifically with connection to your stance on

7        Referendum --

8   A.   I don't think you can tie them in --

9   Q.   Excuse me; let me finish.

10  A.   Okay.

11  Q.   -- specifically with respect to your stance on

12       Referendum 71?

13  A.   I don't think you can separate that in my life.

14  Q.   Then how many have you received -- how many phone calls

15       or messages have you received that talk about taking you

16       out?

17  A.   Oh, my land.  You know, if it was less than 900, I would

18       probably -- that's very conservative in the last four or

19       five years.

20  Q.   And do you think that these people that make those kind

21       of remarks are cowards just using words?

22  A.   I don't take the chance that they're cowards.  Someone

23       that says that has got it in their mind.

24  Q.   Have you ever seen someone act on it?

25  A.   Well, I think the group that was up there at

y Juran, Certified Court Reporter

```
1        they -- and that's why we had police everywhere at that
2        rally.  I mean, we had state police, we had Seattle
3        Police, we had everyone there because I had gotten so
4        many threats; I mean, hundreds and hundreds of
5        threats --
6    Q.  Do you feel that --
7    A.  -- to my life.
8    Q.  -- that the police stopped violence from occurring?
9    A.  I guarantee you they did.
10   Q.  So were you pleased with the police response?
11   A.  I was, very.  The King County at the time -- boy, how
12       many years ago was that?  Because Reichert was the head
13       of the sheriff's department at that time.  And when they
14       started, they -- because we thought they may try to come
15       down on the field from the stands.  And he just -- he
16       gave a word, they went down, they stood down along the
17       walls, and that shut that down immediately.  We had
18       three or four hundred other protesters outside blocking
19       people from getting in.  And so it was not the kind of
20       thing where you feel loved.
21   Q.  So how were people able to get in if they were blocked?
22       Did the police --
23   A.  They --
24   Q.  -- help with that?
25   A.  Yes.  They just kept -- you know, people just didn't say
```

Decl. of W. Stafford -148

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

```
 1        anything.  We had said, look, don't say anything, keep

 2        focused.  You're probably gonna run into protesters, but

 3        just get to the stadium, and you've got protection there

 4        and you're gonna be okay.

 5   Q.   So do you know if any of your parishioners signed

 6        Referendum 71?

 7   A.   I'm sure they did.  I mean, yeah.

 8   Q.   And do you know of any of them being attacked or

 9        harassed or threatened?

10   A.   No.  They enjoy attacking their pastor.

11   Q.   So the --

12   A.   Most of the people, if it's gonna be an attack, it's

13        gonna be towards me.  Very seldom they gonna just come

14        at our people.  They don't know our people.  They don't

15        know where they stand.  But if this -- their names get

16        out, what's gonna keep 'em from being harassed and

17        attacked?

18   Q.   But do you know of anyone being -- in your church other

19        than you, who've been very public and are the center --

20   A.   Right.

21   Q.   -- and focal point of your church, do you know of any

22        ordinary parishioners attracting threats or harassment

23        as a result of signing the petitions?

24   A.   No.  No, I could not say that I know anyone personally.

25        But people don't know 'em.  They don't know who they
```

Page 71

1     They won't give up.

2          MR. MCBRAYER:  At some convenient point, could we

3     go off the record, take a break, five minutes?

4          MS. EGELER:  Sure.

5          MR. MCBRAYER:  Whenever you get to a convenient

6     point.

7          MS. EGELER:  Okay, we can take a break now.  That's

8     fine.

9               [Off the record - recess]

10  Q.  (by Ms. Egeler)  Pastor, we've talked about all sorts of

11     harassment.  And I want to narrow it down just to

12     harassment that you've experienced as a result of your

13     stance on Referendum 71 and ask, is there any form of

14     harassment you experienced that we didn't talk about?

15  A.  I can't think of anything that we haven't talked about.

16     I think that the difficulty in talking about

17     Referendum 71 is, you're trying to limit what -- the

18     attacks that I've had on this whole issue.

19     Referendum 71, it's just one of many of why I have been

20     attacked, called, threatened.  And so Referendum 71 just

21     give them another excuse to come after me.

22  Q.  Is it fair to say that it's hard to separate out why a

23     particular person called you, whether they're angry

24     about the           rally or other things they've seen in

25     the paper, as opposed to Referendum 71?

Juran, Certified Court Reporter

Page 73

1  Q.  Is it fair to say that you don't and haven't gone to

2      look at the Web sites or blogs yourself, you hear about

3      them from others?

4  A.  Oh, yeah.  I mean, it's -- you know, they'll send 'em to

5      me or they'll let me know.  You know, I may follow up

6      then.  But as far as just trying to go out and find, no.

7      I mean, threats are bad enough.  I don't wanna go

8      looking for 'em.

9  Q.  So you couldn't tell me the names of any specific Web

10     sites or blogs?

11 A.  No.  You wanna look at -- you know, like I say, you can

12     look at              Web site.  You can look at any of

13     the articles that was in these papers (indicating) and

14     look at the comment pages, if they still have 'em.  I

15     mean, you can see 'em for yourself.

16 Q.  And again, you've told the           Police about each of

17     these instances where there's a threat.

18 A.  We're always letting 'em know.  A lotta the time, you

19     know, they can come in four or five days and so many.

20     We just may wait and give 'em a call and say, hey, we

21     just wanna let you know that we received some calls, we

22     received some threats, and just keep you posted.

23 Q.  Do you think the           Police make any effort to go by

24     the church, drive by now and then, just to make sure

25     everything's going okay?

```
 1   A.   I think they would.  I mean, they know this crazy

 2        citizen of theirs there in        and they know what's

 3        going on.  So, you know, we're pleased with the police.

 4        I mean -- yeah.

 5   Q.   And do you think that they've helped to stop any actual

 6        violence from occurring?

 7   A.   I couldn't tell you.  They haven't allowed us to know.

 8   Q.   And as part of your appearing here today, there was a

 9        subpoena duces tecum issued to you, and it asked you to

10        bring all records stored in paper or electronic

11        format -- and I'll paraphrase -- that talk about threats

12        or harassment that you've received.  And you've brought

13        quite a stack of newspapers with you here today; thank

14        you.  Does this compromise (sic) all of the paper or

15        electronic images or discussion of harassment or threats

16        or retaliation related to Referendum 71 that you have?

17   A.   I would -- probably one that would know about all the

18        paperwork and things that come in, the threats, the

19        calls, would be more the people at the church, and I

20        think you talked to        about that.  But, you know,

21        you can get so many, you just kind of hit the delete

22        button after -- why keep 900 --

23   Q.   Do you have any --

24   A.   -- Emails?

25   Q.   Do you have any Emails?
```

Juran, Certified Court Reporter

```
 1   A.   I wouldn't.  You know, I wouldn't.  They don't even know
 2        my Email address, so that -- we try to protect that.
 3        And you can't even really call me at the church.  You
 4        can't get straight through to me at the church.  You
 5        have to go through two other avenues to get to me.
 6   Q.   Do you have any recorded messages at the church that
 7        recorded some of these phone calls?
 8   A.   Probably have to ask        and other people there.
 9   Q.   And anything written -- letters, et cetera -- that might
10        have been received, do you have any knowledge of that?
11   A.   I wouldn't.  If -- like I said, if something came in
12        they thought was worth sharing with me, they would.  If
13        we had to take any special precautions, they would let
14        me know and we would work on making sure we took those
15        precautions.
16   Q.   Did you receive any threatening letters or voice
17        messages at your home?
18   A.   Oh, no.  That's all private, so --
19   Q.   And did you receive any threatening phone calls or
20        harassing phone calls at your home?
21   A.   No.
22   Q.   Any other harassment that -- or threats that we haven't
23        talked about?
24   A.   No.  I think we've talked about the majority of 'em, you
25        know.  It's gonna -- I'm gonna get threats, I'm gonna
```

Page 76

1       get attacked, I'm gonna hear something any and every

2       time I'm in the news.

3    Q.  After Referendum 71, we had an election in November of

4       2009.

5    A.  Right.

6    Q.  So the issue, at least in terms of the election, is --

7    A.  Right.

8    Q.  -- is settled.  Have you continued to speak out on

9       issues involving homosexuality?

10   A.  Every opportunity I get, yeah, I do.

11   Q.  So you've spoken since November of 2009.

12   A.  Oh, yeah, mm-hm.

13   Q.  And have you continued to receive harassment or threats

14      as a result of that?

15   A.  There's always gonna be some kinda call, there's always

16      gonna be some kinda written response to anything I write

17      every time I do it.  Like I said, the only time it was

18      scary that I didn't get any was from the newspaper.  The

19      newspaper got attacked, but I didn't.

20          MS. EGELER:  Okay, I don't have any more questions

21      at this time.

22

23                          EXAMINATION

24   BY MR. MCBRAYER:

25   Q.  I had a couple,              , on direct.  This is Ryan

Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca

Page 124

1                              CERTIFICATE

2    STATE OF WASHINGTON )
                         )
3    COUNTY OF SNOHOMISH )

4           I, the undersigned Notary Public in and for the

5    State of Washington, do hereby certify:

6           That the foregoing is a full, true, and correct

7    transcript of the testimony of the witness named herein,

8    including all objections, motions, and exceptions;

9           That the witness before examination was by me duly

10   sworn to testify truthfully and that the transcript was made

11   available to the witness for reading and signing upon

12   completion of transcription, unless indicated herein that the

13   witness waived signature;

14          That I am not a relative or employee of any party

15   to this action or of any attorney or counsel for said action

16   and that I am not financially interested in the said action

17   or the outcome thereof;

18          That I am sealing the original of this transcript

19   and promptly delivering the same to the ordering attorney.

20          IN WITNESS WHEREOF, I have hereunto set my hand and

21   seal this 7th day of October, 2010.

22

23   _____
        Notary Public in and for the State of Washington
24            residing at Edmonds, Washington.
                  (Notary expires 3/09/13)
25                    (CCR No. 2699)

Decl. of W. Stafford -155
                          Juran, Certified Court Reporter

74ed27e5-871a-45b3-b547-81e1b7be7bca