1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

Exhibit to Pls.' Br. in Supp.
of Summ. J.
(Case No. 3:09-cv-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

# Table of Contents

Exhibit 1-1:     Dep. ███████████████, Sept. 15, 2010. . . . . . . . . . . . . . . 1

Exhibit 1-2:     Dep. █████████, Sept. 24, 2010. . . . . . . . . . . . . . . . . . . 45

Exhibit 1-3:     Dep. ██████, Sept. 24, 2010. . . . . . . . . . . . . . . . . . . . . 68

Exhibit 1-4:     Dep. ████, Sept. 27, 2010. . . . . . . . . . . . . . . . . . . . . 140

Exhibit 1-5:     Dep. ████████, Sept. 28, 2010. . . . . . . . . . . . . . . . . . 153

Exhibit 1-6:     Dep. ████, Sept. 1, 2010. . . . . . . . . . . . . . . . . . . . . 181

Exhibit 1-7:     Dep. █████, Sept. 1, 2010. . . . . . . . . . . . . . . . . . . . . 200

Exhibit 1-8:     Dep. █████, Sept. 13, 2010. . . . . . . . . . . . . . . . . . . . 229

Exhibit 1-9:     Dep. ███████, Sept. 13, 2010. . . . . . . . . . . . . . . . . . 257

Exhibit 1-10:    Dep. ████████, Sept. 15, 2010. . . . . . . . . . . . . . . . . 227

Exhibit 1-11:    Dep. ██████, Sept. 22, 2010. . . . . . . . . . . . . . . . . . . 301

Exhibit 1-12:    Dep. ██████, Sept. 22, 2010. . . . . . . . . . . . . . . . . . . 389

Exhibit 1-13:    Dep. █████, Sept. 23, 2010. . . . . . . . . . . . . . . . . . . . 412

Exhibit 1-14:    Dep. █████████, Sept. 23, 2010. . . . . . . . . . . . . . . 448

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit 1 to Pls.' Br. in Supp.**
**of Summ. J.**
**(Case No. 3:09-cv-05456-BHS)**

**BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1-1

**Exhibit to Pls.' Statement of Material Facts**
**(Case No. 3:09-cv-05456-BHS)**

Exhibit 1, Page 1

Bᴏᴘᴘ, Cᴏʟᴇsᴏɴ & Bᴏsᴛʀᴏᴍ
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

————————————————————————————————————————
                              )
JOHN DOE #1, et al.,          )
                              )
            Plaintiffs,       )
                              )
        vs.                   )   NO. 09-cv-05456-BHS
                              )
SAM REED, et al.,             )
                              )
            Defendants.       )
————————————————————————————————————————

DEPOSITION UPON ORAL EXAMINATION OF █████████████████
————————————————————————————————————————

September 15, 2010

Longview, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

EGELER (████████████████, 9/15/10)

Page 4

```
 1              BE IT REMEMBERED that on Wednesday, September 15,

 2       2010, at 8:55 a.m., at 1700 Hudson Street, Suite 300,

 3       Longview, Washington, before REBECCA S. LINDAUER, Notary

 4       Public in and for the State of Washington, appeared ████

 5       ████████████████, the witness herein:

 6              WHEREUPON, the following proceedings were had, to

 7       wit:

 8

 9    ████████████████████,   having been first duly sworn by

10                            the Notary, testified as follows:

11                        EXAMINATION

12    BY MS. EGELER:

13    Q    Pastor, my name is Anne Egeler and I'm a deputy with the

14         Attorney General's office for the state of Washington.

15              And today as we're taking your deposition, I wanted to

16         let you know the court reporter is taking down all that we

17         say, so it's important that we don't speak over each other

18         so she can get the record down correctly.  And if you could

19         also please use yes or no, rather than head nods or um-hmms,

20         it will be clear on the record as well.

21    A    Okay.

22    Q    Also, if you are confused by anything I ask you, if it's not

23         making sense, please stop and ask for clarification.  It's

24         important that we understand each other so the record will

25         be clear.  All right?
```

Exhibit 1, Page 3

EGELER (████████████████, 9/15/10)

Page 11

1   Q   Can you tell me what the situation was when you were, for

2       example, in a Wal-Mart or WinCo parking lot?  Did you have a

3       table that the petitions were on?

4   A   No.  I had it in my hands.

5   Q   And what would you do?  How would you --

6   A   I would approach people and tell them about R71.

7   Q   What would you say?

8   A   I would say if they support traditional marriage, then they

9       should sign this petition.  If they will ask additional

10      questions, I would explain.

11  Q   When you were doing this, were you careful to distinguish

12      between people that you thought had the same viewpoint that

13      you do about Referendum 71?

14  A   No.  I would approach anybody.

15  Q   Because earlier you said that you would not want people that

16      disagreed with you to know that you had signed the petition.

17              MR. PIDGEON:  Objection to the form of the

18      question.

19  Q   (By Ms. Egeler)  You can go ahead and answer.

20              MR. PIDGEON:  What was the question?

21              MS. EGELER:  Could you read it back, please?

22              THE COURT REPORTER:  Question:  "Because earlier

23      you said that you would not want people that disagreed with

24      you to know that you had signed the petition."

25  A   How would I distinguish between those who do have agenda and

EGELER (████████████████, 9/15/10)

Page 12

1      those who don't?

2   Q  (By Ms. Egeler)  Did everyone that you spoke to agree with

3      you about Referendum 71?

4   A  Not everyone did.

5   Q  Approximately what percentage of the people agreed with you?

6   A  I would say more agreed with me than disagreed.

7   Q  But certainly you encountered a large number of people that

8      disagreed with you as well?

9   A  I wouldn't say large number.

10  Q  How many people's signatures did you obtain on the petitions

11     in the total number of days that you gathered?

12  A  I can't recollect this number.  I never really thought that

13     would be important statistic for me, so I just did as much

14     as I could.

15  Q  Do you know how many completed petition sheets you turned

16     in?

17  A  I think I myself did about three or four.

18  Q  And when you gathered signatures, did you have anyone else

19     with you on any of those occasions?

20  A  My wife was with me a couple times.

21  Q  Anyone else?

22  A  No.

23  Q  On any of those days that you gathered petition

24     signatures -- let me rephrase that.

25         On each of the days that you gathered petition

Exhibit 1, Page 5

EGELER (██████████████, 9/15/10)

1       signatures, did you encounter some people who did not want

2       to sign the petition?

3  A   Yeah.  Each day there would be somebody who don't want to

4       sign petition.

5  Q   Did you gather signatures on the petitions at the church?

6  A   No.

7  Q   Did you have a Referendum 71 sign at your home in your yard?

8  A   Sign, yes.

9  Q   And was that in your yard?

10  A   It was my yard.

11  Q   Was there a Referendum 71 sign at the church?

12  A   No.

13  Q   Did you have a Referendum 71 bumper sticker on your car?

14  A   Yes.

15  Q   Did you have one on your wife's car?

16  A   We had only one car in 2009.

17  Q   In addition to signing the petitions, did you ever go out in

18       public holding a Referendum 71 sign?

19  A   Yes.

20  Q   And can you estimate on how many days you did that?

21  A   Twice.

22  Q   Do you remember where you were?

23  A   Yeah.  It was the Longview-Kelso Bridge.

24  Q   Why did you pick that location?

25  A   Pretty good exposure.

EGELER (███████████████, 9/15/10)

Page 14

1  Q   By that, do you mean that there's a lot of traffic?

2  A   Lot of traffic.

3  Q   Did you go with anyone else when you did that?

4  A   Yes.

5  Q   Who did you go with?

6  A   We had group of people on Facebook, R71 team, so . . .

7  Q   Who was on the R71 team that you just referred to?

8  A   You want me to name people?

9  Q   Let's wait a moment.  How many people were on the team?

10 A   I would say we had on the bridge, we had about 60 to 70

11     people.

12 Q   And they were from your R71 team, correct?

13 A   Well, I wouldn't say my R71 team.  It was supporters of the

14     cause.

15 Q   Were these supporters church members?

16 A   Probably some of them were, but some weren't, so there was

17     people I met for first time.

18 Q   Were you the primary organizer of these two events?

19 A   No.

20 Q   Who was?

21 A   Primary organizer was my sister.

22 Q   And her name?

23 A   Her name is ████.  She moved to ████.

24 Q   Same last name?

25 A   No.

Exhibit 1, Page 7

EGELER (███████████████, 9/15/10)

Page 15

```
 1   Q   What is her last name?
 2   A   ███████
 3   Q   You talked about Facebook.  Were these two events where
 4       signs were held at the Longview-Kelso Bridge advertised on
 5       Facebook?
 6   A   Yeah.
 7   Q   Were these on your sister's Web site?
 8   A   No.  It was Facebook, so I don't know if you call it Web
 9       site or not.  She just created this page.
10   Q   So it was a Facebook page --
11   A   Facebook page --
12   Q   -- that your sister controlled?
13   A   -- that my sister started.
14   Q   And do you know how many people had access to that Facebook
15       page?
16   A   No.
17   Q   Did the same 60 or 70 people come to each of the two sign
18       waving events?
19   A   I would say, for most part, it was same people.
20   Q   As the pastor of the church, have you taken a public
21       position on same sex marriage?
22   A   Explain yourself.
23   Q   Have you taken a position?  Have you spoken to your
24       congregation about gay marriage?
25   A   As a pastor of the church, I speak on moral issues all the
```

EGELER (█████████████████, 9/15/10)

Page 16

1       time, including homosexuality.

2    Q  Have you specifically spoken about gay marriage to your
3       congregation?

4    A  I don't know what you mean by "specific" because we don't
5       seem to allow these issues.  We speak on issues of sin and,
6       of course, I spoke on gay marriage as well.

7    Q  Did you ever speak to the congregation about the importance
8       of voting on Referendum 71?

9    A  I can't remember that.

10   Q  Do you remember if you spoke to your congregation or
11      encouraged them to sign the Referendum 71 petitions?

12   A  I spoke to people about the importance of marriage and
13      importance of defending it.

14          MR. PIDGEON:  I'm going to place an objection as
15      to the form of the question, that the question is
16      duplicative and compound in that it asks two questions,
17      whether or not ████████ spoke to members of the
18      congregation and whether or not he spoke as a pastor.  I'm
19      not sure the question is clear.

20          MS. EGELER:  I'll note for the record that the
21      objection is untimely and, therefore, inappropriate.

22          MR. PIDGEON:  It's on the record anyway, and it's
23      not untimely.

24   Q  (By Ms. Egeler)  In addition to gathering signatures and
25      holding signs up in public, did you also observe the

EGELER (█████████████████, 9/15/10)

```
 1        checking of signatures on the petitions at the Washington
 2        State Secretary of State's office?
 3   A    Yes.
 4   Q    And did someone ask you to do that?
 5   A    I pretty much was aware of the whole thing, so it was not
 6        like I didn't know.  I was very in to it, so it's not that
 7        somebody asked.  I just went there and learned about the
 8        stuff.
 9   Q    So when you say you were pretty much aware of it, do you
10        mean you were aware of the Secretary of State's office
11        checking petition signatures?
12   A    Of course.  I was following these very closely.
13   Q    And how many times did you go to observe the checking of the
14        signatures?
15   A    I believe two times.
16   Q    Do you recall seeing at the Secretary of State's office any
17        media?
18   A    I don't.
19   Q    Do you recall seeing --
20   A    I've seen lady with camera, but I don't really know who she
21        was.
22   Q    Okay.
23   A    She never introduced herself to me, but I don't recall.
24   Q    So you saw a lady with a camera.
25   A    Yeah.
```

EGELER (███████████████, 9/15/10)

Page 18

```
 1   Q   Did you see any news cameras, like television news programs?

 2   A   No.

 3   Q   Did you see people there that you knew had a contrary

 4       position with regard to Referendum 71?  And by that, I mean

 5       people who didn't want there to be enough signatures on the

 6       petitions for the issue to go to the ballot.

 7   A   Say it again.

 8   Q   When you were at the Secretary of State's office, did you

 9       see anyone there that you knew was opposed to Referendum 71

10       getting onto --

11   A   Yeah, yes.

12   Q   Let me finish my question first so we have a clear record.

13       I know you'll understand what I'm saying.

14           But anyone who was opposed to Referendum 71 getting on

15       the ballot?

16   A   Yes.

17   Q   Do you recall any of their names?

18   A   No.

19   Q   Do you recall approximately how many such people you saw?

20   A   I never bothered to count.

21   Q   But there were multiple people.  Is that correct?

22   A   Yeah.

23   Q   Do you think that they were aware that you were -- excuse

24       me.  Let me rephrase that.

25           Do you think that the people that we've just referred
```

EGELER (█████████████████, 9/15/10)

Page 19

1    to that did not want Referendum 71 to get onto the ballot,

2    do you think that any of them were aware that you did want

3    it to get onto the ballot?

4    A    I'm sure there were.

5    Q    And when you went to observe the signature counting, did

6         you -- were you asked to sign in?

7    A    Yes.

8    Q    And was that sign-in sheet used by people who wanted the

9         initiative to get -- excuse me, the referendum to get on the

10        ballot as well as those who didn't want it to get on the

11        ballot?

12   A    It was same sheet, I believe, for both parties.

13   Q    Did you ever speak publicly -- other than at the church and

14        at the two events on the Longview-Kelso Bridge, did you ever

15        speak publicly about Referendum 71?

16   A    By saying "public," you mean to large group of people or

17        just speak with other people?

18   Q    To any group of people.

19   A    No, I don't remember.  Well, I spoke to people about this,

20        but I don't know what you mean really by "speaking

21        publicly."

22   Q    Did you ever speak on the radio about Referendum 71?

23   A    No.

24   Q    Did you ever speak to a news reporter?

25   A    No, I did not.

EGELER (████████████████, 9/15/10)

Page 20

```
 1   Q   Do you have a church --

 2   A   Now --

 3   Q   Excuse me.

 4   A   I did.  When we were at the bridge, local ██████ came

 5       and spoke to some of us, so . . .

 6   Q   And by local █████████ that's a local newspaper?

 7   A   Local newspaper.

 8   Q   Do you know the name of the newspaper?

 9   A   ████████.

10   Q   I'm sorry.  I'm not from here.  I didn't know that it was

11       called ███████.

12           Did you provide your name to the reporter?

13   A   Yes.

14   Q   Do you know if a story was published in the newspaper?

15   A   It was.

16   Q   Was your name used in the story?

17   A   It was.

18   Q   Have you suffered any harassment or threats during the time

19       that you were supporting Referendum 71?

20   A   Yes.

21   Q   How many incidents?

22   A   Well, what do you call an incident?  Because it was

23       continuous thing.

24   Q   Anything that you call an incident, anything you considered

25       harassment or a threat.
```

EGELER (███████████████, 9/15/10)

Page 21

```
 1   A   Well, I would say while we stood on the bridge, it would be
 2       continuous throughout the day, you know.  When I gathered
 3       signature, I encountered twice.
 4   Q   So twice there were incidents when you were on the bridge?
 5   A   No.
 6   Q   No.
 7   A   When I was on the bridge, it would be throughout the day,
 8       throughout us standing there because cars would pass by and
 9       scream things at us and flip us and do things of this sort.
10       But when I was gathering signature on parkings, it was
11       twice.
12   Q   Let's start with the bridge.  When you were standing on the
13       bridge on both of those days, can you please tell me about
14       all incidents that you consider to be a threat or harassment
15       as a result of your connection to Referendum 71.
16   A   I can't really tell you about all because I never bothered
17       to count them.  I know people would shout profanity out of
18       the window and show fingers.  And there was one occasion
19       when somebody just pull off pants and moon us through the
20       window of the vehicle.
21   Q   That was once someone mooned?
22   A   It was once.
23   Q   They were in their vehicle when it happened?
24   A   In the vehicle.
25   Q   Anything else during the time you were on the bridge?
```

Exhibit 1, Page 14

EGELER (███████████████, 9/15/10)

Page 22

1   A   No.  That was it.

2   Q   When people were shouting, what did they say?  If it was

3       profanity, just indicating profanity is fine.  Did they say

4       anything other than profanity?

5   A   I'll just say "beep" because it was profanity.

6   Q   Did they make any statement about Referendum 71 specifically

7       or were they just swearing?

8   A   There was no dialogue.  They would pass by in the vehicle.

9       Nobody bothered to stop by.

10  Q   And the people that you said were flipping you off, was

11      there any dialogue with them?

12  A   We had no dialogue.

13  Q   And the individual that was mooning, was there any dialogue?

14  A   No.  There was no dialogue.

15  Q   When you were on the bridge, did anyone have any indication

16      either through a sign, a pin, a shirt, that they were

17      connected to your church?

18  A   No.

19  Q   Was anyone carrying a cross or any other religious symbol?

20  A   No.

21  Q   Was there any showing of connection to any other

22      organization?

23  A   No.

24  Q   The incident regarding the mooning, do you remember what the

25      vehicle looked like?

EGELER (███████████████, 9/15/10)

Page 23

1   A   I don't remember year and make.  What I remember, it was

2       underage person.  It was more of a -- it wasn't even adult,

3       yeah.

4   Q   So it was a kid that was doing that?

5   A   It was.  It was -- there was adults in the front seat and

6       kid in the back seat.

7   Q   So an adult was driving and a kid did the mooning?

8   A   Yeah.

9   Q   Did the car stop or was it continuing to move across the

10      bridge?

11  A   It continued to move.

12  Q   Did you personally see it or did you hear it from someone

13      else?

14  A   I've been told.

15  Q   Who told you?

16  A   I wouldn't feel comfortable to give out name without talking

17      to this person first, even though I have a hard time to

18      recollect right now, but I've been told there was much

19      happening on the bridge.

20  Q   But you do know who told you?

21  A   I can't remember now.

22  Q   So you don't know who told you?

23  A   I don't.  I don't remember.

24  Q   And you're stating that because you don't remember,

25      rather --

EGELER (███████████████, 9/15/10)

Page 24

| 1 | A | I don't remember who exactly told me -- |
| 2 | Q | Okay. |
| 3 | A | -- about this. |
| 4 | Q | But you did not personally see -- |
| 5 | A | I didn't personally see this. |
| 6 | Q | How about the individual that was flipping the group off? |
| 7 |   | Did you personally see that? |
| 8 | A | It was not individual.  It was many individuals and I've |
| 9 |   | seen many of this. |
| 10 | Q | And did you personally witness the individuals that drove by |
| 11 |   | shouting profanities? |
| 12 | A | Yes. |
| 13 | Q | And did these incidents happen, with the exception of the |
| 14 |   | mooning, on both days that you were on the bridge? |
| 15 | A | Yes. |
| 16 | Q | And the mooning just happened -- |
| 17 | A | Once.  I've heard about it just once. |
| 18 | Q | Did you feel the need to call the police about this behavior |
| 19 |   | that was occurring with the drivers? |
| 20 | A | I didn't. |
| 21 | Q | Did anyone in the group feel the need to call the police? |
| 22 | A | Somebody expressed concerns. |
| 23 | Q | Somebody in the group? |
| 24 | A | Somebody in the group. |
| 25 | Q | Do you remember who that was? |

Exhibit 1, Page 17

EGELER (█████████████████, 9/15/10)

Page 25

1  A    No.

2  Q    Did they, in fact, call the police?

3  A    No.

4  Q    Do you know why not?

5  A    I don't.

6  Q    Did anything else of any sort happen while you were on the

7       bridge?

8  A    I think I pretty much told you all that happened there.

9  Q    Did you tell me all that happened or pretty much all?

10 A    All I can recollect right now.

11 Q    Is there something that would help you recollect in the

12      future?

13 A    I --

14              MR. PIDGEON:  Objection; calls for speculation.

15          You can answer, if you want.

16 A    Probably talking to people, to other people who was there

17      would help me or thinking about this.  I never really

18      bothered.  We stood there.  I knew what I was expecting, so

19      I pretty much expected to happen what happened; therefore, I

20      never really bothered to pay much attention.  I was standing

21      there for my cause.

22 Q    (By Ms. Egeler)  And why did you pretty much expect that to

23      happen?

24 A    Because it's common behavior.  We've been called haters,

25      bigots, all sorts of names.  So when I went to the bridge, I

Exhibit 1, Page 18

EGELER (███████████████, 9/15/10)

Page 26

1      knew what to expect from the other side.

2  Q   Have you ever taken public action of this sort with respect

3      to any other political issue?  By "of this sort," I mean

4      standing publicly with a sign endorsing a candidate or an

5      issue.

6  A   No.

7  Q   Do you have a church Web site?

8  A   Yes.

9  Q   Did the church Web site at any point in 2009 contain any

10     information about Referendum 71?

11 A   As far as I remember, it didn't, but I'm not the one who

12     runs Web site, so . . .

13 Q   Do you have a church newsletter?

14 A   No.

15 Q   Do you have any other church communication to the people who

16     attend?

17 A   No.

18 Q   You mentioned that in addition to what happened at the

19     bridge, there were also some incidents that you would

20     consider to be harassment or threats during the signature

21     gathering.

22 A   Yeah.

23 Q   Can you tell me about those?

24 A   One happened at the WinCo parking lot when young man came

25     and start to pretty much shout profanity and he called me

EGELER (███████████, 9/15/10)

Page 27

1    Christian fascist.   He told me to get out of here.  I was

2    with my wife, by the way.  My wife was with me when this

3    happened.  He would pretty much follow us wherever we would

4    go for, I would say, about 20, 25 minutes.

5    Q    Do you remember what the young man looked like?

6    A    Yes, I do.  He was about 19, 21 years of age.  He was little

7         shorter than I am.

8    Q    You are how tall?

9    A    I'm about six feet, so -- yeah.  He appeared a little chubby

10        to me, but that's all I can remember.

11   Q    And you said that he was shouting profanity?

12   A    Yes.

13   Q    Did he shout anything other than profanity?

14   A    As I told you, he called us Christian fascists.  He said,

15        "Take your fat butts out of this place and" -- but for most

16        part, it was just words I wouldn't like to repeat.

17   Q    I understand.

18             Was there any dialogue he engaged in with respect to

19        Referendum 71?

20   A    He didn't.  We asked him to behave civilly, to which he

21        responded you taking my rights away from me and he would

22        continue on with profanity.

23   Q    Did he indicate his position with regard to Referendum 71?

24   A    There was no civil dialogue between us.

25   Q    And you said he followed you for 20 to 25 minutes?

Exhibit 1, Page 20

EGELER (███████████████, 9/15/10)

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Do you know why he left? |
| 3 | A | I don't. |
| 4 | Q | Did you ask him to leave? |
| 5 | A | I asked him multiple times. |
| 6 | Q | Did you call the police? |
| 7 | A | No, I didn't. |
| 8 | Q | Did your wife? |
| 9 | A | No, she did not. |
| 10 | Q | And why is that? |
| 11 | A | Well, I didn't feel like it. |
| 12 | Q | Did you feel that you or your wife were physically |
| 13 | | threatened by this young man? |
| 14 | A | Mostly verbally abused because I didn't really feel being |
| 15 | | threatened by this man. |
| 16 | Q | Did anything else happen in the WinCo parking lot? |
| 17 | A | No. |
| 18 | Q | And you said there was another incident that occurred? |
| 19 | A | Yes. |
| 20 | Q | Can you tell me about that? |
| 21 | A | It was on Lake Sacagewea. |
| 22 | Q | Again, that's the park in town? |
| 23 | A | Park in town during 4th of July event when there is lot of |
| 24 | | people.  It was male, about 30, 34 years of age, but this |
| 25 | | guy just screamed profanity to my face and he walked away, |

EGELER (█████████████, 9/15/10)

Page 29

| | | |
|---|---|---|
| 1 | | so . . . |
| 2 | Q | How close to you did he come? |
| 3 | A | He was screaming right into my face. |
| 4 | Q | So -- |
| 5 | A | It was very uncomfortably close. |
| 6 | Q | Within a foot of you? |
| 7 | A | I would say it was about this far. |
| 8 | Q | For the record, you were holding your hand in front of your |
| 9 | | face? |
| 10 | A | I would say about a foot of me. |
| 11 | Q | About a foot of you? |
| 12 | A | Yeah. |
| 13 | Q | So he was about one foot away and he screamed profanity? |
| 14 | A | Yes. |
| 15 | Q | Did he make a statement about Referendum 71? |
| 16 | A | There was no dialogue. |
| 17 | Q | And were you with anyone else? |
| 18 | A | I was there by myself. |
| 19 | Q | Do you recall whether you were wearing any indication of |
| 20 | | your religion? |
| 21 | A | No. |
| 22 | Q | You don't recall or you weren't wearing? |
| 23 | A | I weren't wearing. |
| 24 | Q | And when this man screamed profanity at you, do you recall |
| 25 | | whether -- I guess we can't put it in terms of sentences. |

EGELER (███████████████, 9/15/10)

Page 30

```
 1        It doesn't sound like that type of communication.  Do you
 2        recall how long he was speaking to you?
 3   A    No.  It wasn't long.  It was in few sentences and he walked
 4        away.
 5   Q    Did you respond to him?
 6   A    He didn't give me any chance really.  He said what he wanted
 7        to.  He walked away.
 8   Q    But, again, just to make sure I understood, all of what he
 9        said was profanity?
10   A    It was profanity.
11   Q    And did you feel the need to contact the police about that
12        incident?
13   A    No.
14   Q    Why is that?
15   A    I'm pretty large size guy and I don't really feel that he
16        was of -- it was very public place, lot of people was there,
17        so it wasn't pleasant experience; however, I didn't feel
18        being threatened by him.
19   Q    And would you say that you considered that to be verbal
20        harassment but not physical?
21   A    It would be verbal.
22   Q    So you did not feel physically threatened?
23   A    I did not.
24   Q    Did any other incidents of harassment or threats, in your
25        opinion, occur?
```

EGELER (██████████████████, 9/15/10)

Page 31

1   A   My name appeared on some Web site, I believe ████
2       ████████ or something like that.  Let me -- it was -- I
3       think the name of it was -- it's either ████████ or
4       Tax something. ██████████████, something like
5       this.
6   Q   You said your name appeared there?
7   A   My name appeared there.  They had -- they were on list of
8       names.  Web site pretty much called people to arms to defend
9       their rights, and my name appeared there as one of the
10      haters on that list.
11  Q   And you don't recall exactly the Web site address?
12  A   I believe I can find if I have to, but I think Web site was
13      called ████████████ -- I mean .blogspot.com, if I
14      am correct, but there could be an error.
15  Q   Do you remember who else was listed or if anyone else was
16      listed?
17  A   There was few other people from this town that stood with me
18      on the bridge and their names appeared in newspaper.  This
19      is how I think they've got ahold of our names.
20  Q   Okay.
21  A   But everyone who was in newspaper in the article was listed
22      there as a hater.
23  Q   You earlier talked about a reporter from ████████████
24      talking to you and some other people on the bridge.
25  A   Yeah.

Exhibit 1, Page 24

EGELER (███████████████, 9/15/10)

 1   Q   And that your name and those other people's names were

 2       listed in the paper.  Is this the same story that you think

 3       the people at the Web site got the names from?

 4   A   It could be.  I don't know where they got it from, but

 5       everyone who was in the article appeared on that list.

 6   Q   And you said the Web site called people to arms.  Is that

 7       exactly what it said?  We're calling you to arms?

 8   A   I have to visit this Web site again to say exactly what it

 9       said, but it was very aggressive.

10   Q   Did you contact the police about this Web site?

11   A   No, I did not.

12   Q   Why not?

13   A   I believe at this time there was awareness of this Web site

14       already.

15   Q   Awareness on the part of the police?

16   A   Yes.

17   Q   What gave you that belief?

18   A   I knew -- I think I received some news.  It's either from

19       Protect Marriage or -- I can't remember right now how I

20       received this news, but I've been told that this Web site on

21       radar already, so . . .

22   Q   On the radar of the police?

23   A   Of the police, yeah.

24   Q   You think that Protect Marriage Washington told you --

25   A   I would drop the statement because I don't -- I can't say

EGELER (█████████████, 9/15/10)

Page 33

```
 1        exactly if it was them or somebody else, but somebody else
 2        told me that this particular Web site already -- it was on
 3        the news somehow.
 4    Q   And did whoever spoke with you indicate that the police
 5        would be doing something to protect you from these people?
 6    A   No.  I have not heard anything like that.
 7    Q   But you weren't concerned about your safety?
 8    A   My personal safety, I would rather say I was concerned about
 9        safety of other people, but this Web site was, from what I
10        understood, from Bellingham somewhere and, therefore, being
11        out of the area, I would be rather concerned about people
12        who live closer to whoever runs this blog.
13    Q   I believe you stated earlier that all of the people that you
14        saw listed on this Web site were people that you stood with
15        on the bridge.  Is that correct?
16    A   Yes.
17    Q   Did they all live locally in the Longview-Kelso area?
18    A   Yes.
19    Q   So you were not concerned about them and their safety
20        because the Web site was generated in Bellingham, correct?
21    A   I believe so.  I believe Bellingham.  I cannot say for sure
22        right now, but I think it was Bellingham.
23    Q   Do you know or did you hear from any of the other
24        individuals listed that they were afraid for their safety?
25    A   I have not heard from them.
```

EGELER (█████████████████, 9/15/10)

Page 34

```
 1   Q   And you stated that you were concerned about the safety of

 2       others, but you weren't concerned enough to contact the

 3       police?

 4   A   I was concerned enough to make sure that this people know

 5       that their name is on that list.

 6   Q   But not concerned enough to contact the police about it?

 7   A   Actually it was not me, but my sister who found this blog

 8       post and she e-mailed to everybody who was listed there, so

 9       I'm sure if anyone would be concerned, they would call.

10   Q   And do you know if anyone did call the police?

11   A   No, I don't.

12   Q   Did you experience any other incidents that you considered

13       to be harassment or threats?

14   A   No.

15   Q   Did you witness anybody else experiencing what you

16       considered to be harassments or threats?

17   A   Just by standing on the bridge next to other people, that's

18       all I witnessed.

19   Q   Did you stand on the bridge on those two occasions before or

20       after Referendum 71 was placed on the ballot?

21   A   Say it again.

22   Q   When you stood on the bridge on those two occasions, was

23       that after Referendum 71 had qualified --

24   A   Yes.

25   Q   -- to be placed on the ballot?
```

Exhibit 1, Page 27

HAMILTON (███████████████, 9/15/10)

Page 35

1   A   Yes, after.

2   Q   And I assume it was before the election occurred.  Is that

3       correct?

4   A   Yes.

5   Q   Both events were before the election?

6   A   Yes.

7   Q   Have you experienced anything that you considered to be

8       threats or harassment related to Referendum 71 after the

9       election was held?

10  A   No.

11  Q   Have you witnessed anyone else experiencing what you

12      considered to be threats or harassment after the election?

13  A   I have not.

14  Q   And, again, just to be clear, are there any incidents that

15      you considered to be threats or harassment related to

16      Referendum 71 that we have not yet discussed?

17  A   I believe I told you all.

18                  MS. EGELER:  Okay.  I have no further questions.

19                          EXAMINATION

20  BY MS. HAMILTON:

21  Q   Hi, Pastor.  My name is Jessica Hamilton.  I'm an attorney

22      at the law firm of Perkins Coie in Portland, and I represent

23      Washington Families Standing Together.

24          Are you familiar with who Washington Families Standing

25      Together is?

HAMILTON (███████████████, 9/15/10)

Page 36

```
 1    A    Yes.

 2    Q    So you know that it's a coalition of civil rights groups and

 3         churches and others who supported -- who opposed

 4         Referendum 71?

 5              MR. PIDGEON:  Objection to the form of the

 6         question.

 7    Q    (By Ms. Hamilton)  Do you know that Washington Families

 8         Standing Together is a group of civil rights groups,

 9         churches, and others who opposed Referendum 71?

10    A    Yes.

11    Q    It may sound like I'm going backwards from your previous

12         examination, but I want to kind of fill in some of the gaps

13         in my mind, so bear with me, if you would.

14              You are a Washington registered voter.  You testified

15         earlier that you're a Washington registered voter.  Is that

16         correct?

17    A    Yes.

18    Q    Do you know when you first registered in the state of

19         Washington?

20    A    As soon as I moved to Washington.

21    Q    When was that?

22    A    In 2004, I believe.

23    Q    2004.

24              Did you vote in the election in 2004?

25    A    I did.
```

Exhibit 1, Page 29

HAMILTON (██████████████, 9/15/10)

Page 45

 1   Q   I know.

 2   A   I didn't keep all these details in my head.

 3   Q   Do you think it was more than 50?

 4   A   No.

 5   Q   Do you think it was more than ten?

 6   A   No.

 7   Q   So it was less than ten?

 8   A   Yeah.

 9   Q   You previously mentioned that you spoke about the issue of

10       gay marriage to your congregation.  Was that in a sermon

11       that you've spoken about gay marriage?

12   A   I spoke about homosexuality, not gay marriage.

13   Q   So specifically about homosexuality in a sermon?

14   A   As I already mentioned, I speak on moral issues all the

15       time.  It seems to me that you're trying to single out this

16       particular issue.  There was no sermon just for this issue,

17       but certainly I spoke and I do speak about homosexuality in

18       ██████████.

19   Q   Do you know if you spoke about homosexuality in the church

20       around the same time that Referendum 71 petitions were being

21       signed?

22   A   I did.

23   Q   Do you recall what you said?

24   A   Do you want me to print sermon?

25   Q   Do you have a sermon printed?

HAMILTON (█████████████, 9/15/10)

Page 37

```
 1   Q    And have you voted in every election since 2004?

 2   A    I voted in presidential election.

 3   Q    In the presidential election?

 4   A    Yeah.

 5   Q    Have you voted in state elections since 2004?

 6   A    Just last -- when was it?  Was it 2008?

 7   Q    2008?

 8   A    In 2008.

 9   Q    You said you moved to Washington in 2004.

10        Prior to your move to Washington, where did you live?

11   A    Oregon.

12   Q    Oregon.

13        When did you move to Oregon?

14   A    I moved to Oregon in 1999, I believe.

15   Q    Did you register to vote in Oregon?

16   A    Yes.

17   Q    And did you vote in the election?

18   A    Presidential elections only.

19   Q    What was your occupation when you were living in Oregon?

20   A    Pastor of the church.

21   Q    Which church?

22   A    ███████████████████.

23   Q    And where was that church?

24   A    In ██████████████.

25   Q    Did you have any other employment while you were living in
```

HAMILTON (███████████████, 9/15/10)

Page 46

1    A    No.

2    Q    Do you have a sermon in your computer that could be printed?

3    A    No.

4    Q    Do you recall what you said about -- do you recall what you

5         said about Referendum 71?

6    A    I don't recall anything about Referendum 71, but I spoke

7         about homosexuality in the church.  To repeat word for word

8         my sermon, I feel awkward because it was some time ago.

9    Q    Sure.

10   A    Yeah.  So I can give you general idea.

11   Q    Okay.

12   A    Yeah.  Well, Bible condemns homosexuality as a sin;

13        therefore, we Christians oppose it.  We do not oppose people

14        who practice such thing because they just fall into category

15        of any other sin, but we oppose the lifestyle as much as we

16        oppose adultery, idolatry, fornication, and such, so that

17        would be somewhere along these lines.

18   Q    Did you draw a connection at all to your beliefs of

19        homosexuality as a sin in accordance with the Bible and

20        Referendum 71?

21   A    I didn't draw this connection, but I was clear that there

22        are times when we need to defend marriage.

23   Q    And you were clear in the sermon that this might be one of

24        those times to defend marriage?

25   A    Yes.

HAMILTON (█████████████████, 9/15/10)

Page 47

```
 1   Q   Were petitions available at the church?

 2   A   Yes.

 3   Q   In the sanctuary or just outside of the sanctuary?

 4   A   Well, if you would be in the building where we're having a

 5       church, you wouldn't ask this question.

 6   Q   I apologize.  Were they in the area that you and the

 7       parishioners gather to worship?

 8   A   Yes.

 9   Q   Did you ever tell your congregants that petitions were

10       available, if they wanted to sign them?

11   A   Yes.

12   Q   Did anyone else at your church ever tell your congregants

13       that petitions were available, if they wanted to sign them?

14   A   I can't remember.

15   Q   Did anyone gather petitions outside of the church?

16   A   Did anyone gather petitions?

17   Q   I'm sorry.  Gather signatures for the petitions outside of

18       the church.

19   A   Right outside of the church, no.

20   Q   Skipping to this incident on the Kelso-Longview Bridge, you

21       never felt physically threatened -- did you ever feel

22       physically threatened while you were on the Kelso-Longview

23       Bridge?

24   A   I felt disgusted.  I would say I felt verbally harassed, but

25       physically threatened, personally I didn't.
```

Exhibit 1, Page 33

HAMILTON ( ███████████████ , 9/15/10)

Page 48

1  Q    Do you know if anyone else felt --

2             MS. EGELER:  If I can interject.  I don't think

3        the court reporter got last part of your answer.

4             THE COURT REPORTER:  He said I didn't.

5  Q    (By Ms. Hamilton)  Did anyone tell you they felt physically

6        threatened?

7  A    Nobody talked to me.  During collecting signatures, however,

8        several people told me that they would not sign because they

9        feel threatened.

10 Q    So people told you that they would otherwise sign, but --

11 A    They would say, "We support the issue, but at this time we

12       don't want to leave our name and address on this petition."

13 Q    In the news story that was written in ███████████ , do you

14       know if that news story identified you as being a supporter

15       of R71, Referendum 71?

16 A    Yes.

17 Q    Do you know if it also identified you as being the pastor of

18       ███████████████ ?

19 A    I can't remember.

20 Q    Getting back to one of the incidents you described where the

21       kid mooned your group on the bridge -- I should clarify.

22       The kid was in a vehicle, in the back seat of a vehicle and

23       mooned you, you previously testified that you did not

24       personally see it.  Is that correct?

25 A    I did not see it personally.

Exhibit 1, Page 34

HAMILTON (█████████████████, 9/15/10)

Page 49

1   Q   And this is just a clarification question.  You were also

2       asked if you remembered who saw it and you said --

3   A   There was much going on, on the bridge, and right now I

4       can't remember.  There was much activity happening and

5       people would talk back and forth, so . . .

6   Q   Do you know -- do you remember if you knew at the time who

7       told you about this incident?

8   A   If I knew at the time?  Do I remember if I knew at the time?

9   Q   I know it's awkwardly worded.  I'm sorry.  Do you understand

10      the question?

11  A   I probably would if I, you know . . .

12  Q   My question goes to:  Did you know the person who told you

13      about it when the person was telling you about it, but now

14      you just can't recall?

15  A   This is just awkward question.  I don't remember person

16      right now.  I can inquire within people that I know of, but

17      you know, if I don't remember now, I can't say -- I remember

18      hearing it.

19  Q   You remember hearing it?

20  A   Yeah.

21  Q   Do you think you might have heard it from someone who was

22      also repeating it from something that they heard or . . . ?

23  A   I think you're taking it too far.

24  Q   Do you know if you heard about this incident from someone

25      who witnessed it firsthand?

Exhibit 1, Page 35

HAMILTON (█████████████, 9/15/10)

Page 50

1   A   I can't tell you that.

2   Q   Because you don't remember it?  You can't tell me that

3       because you don't remember?

4   A   Well, your question is -- let's go back.  You said if they

5       witnessed it firsthand, because I don't -- how can I connect

6       this to whether I remember or not?  How would I know if

7       they're firsthand witness it or secondhand witness?

8   Q   I'm asking:  Do you recall when they were describing the

9       incident to you whether they --

10  A   I think I answered your question.  I just -- it's some sort

11      of trivia that I'm not following.

12  Q   Let me just ask it one more time and let's see if we can get

13      an answer.

14  A   Okay.

15          MR. PIDGEON:  Let's don't.  Objection; asked and

16      answered.

17  Q   (By Ms. Hamilton)  You can go ahead and answer my question.

18      When you heard about the mooning incident from this person,

19      do you remember if this person was recounting to you an

20      eyewitness account of the mooning?

21  A   I don't remember.

22  Q   In the incident at Lake Sacagewea where -- the 4th of July

23      incident where you were gathering signatures, you were by

24      yourself?

25  A   I was by myself.

PIDGEON (████████████████, 9/15/10)

Page 52

1       R71?

2   A   I have not.

3   Q   Have you heard of any other people who have?

4   A   I have not.

5               MR. HAMILTON:  I'm done.

6               MS. EGELER:  Mr. Dixson, do you have any

7       questions?

8               MR. DIXSON:  No, I do not.

9               MS. EGELER:  I have a few follow-up questions.

10              MR. PIDGEON:  I have a few follow-ups as well.

11              MS. EGELER:  Why don't you go first.

12                          EXAMINATION

13  BY MR. PIDGEON:

14  Q   Mr. ███████, you grew up in ███████?

15  A   Yes.

16  Q   And what is generally the reputation of the police in

17      ███████?

18  A   Generally by common men, it would be viewed as very bad

19      thing.

20  Q   Is it common practice in the ███████ social order for a

21      person to call the police to ask them for their assistance

22      in some kind of a function?

23  A   No.  Calling police, I guess it would be last reserve

24      option.  Usually calling police is asking for more trouble.

25  Q   So when you were asked here if you -- it was just not your

PIDGEON ( ▮▮▮▮▮▮▮▮▮▮ , 9/15/10)

Page 53

```
 1        habit to call the police in the event of some kind of a
 2        confrontation like you had at --
 3                  MS. EGELER:  Objection to the characterization of
 4        the question.
 5   A    It is not my habit to call the police.
 6   Q    (By Mr. Pidgeon)  Now, when you mentioned earlier that you
 7        did not feel threatened by the individuals who were
 8        screaming profanity in your face, did that have to do with a
 9        concept in your mind that if it came to physical violence
10        you could handle the situation yourself?
11                  MS. HAMILTON:  Objection.
12                  MS. EGELER:  Objection; leading the witness.
13   Q    (By Mr. Pidgeon)  You can answer.
14   A    I would like to -- say it again.
15   Q    If the person confronting you with the profanity had
16        physically attacked you, do you believe you could have
17        handled yourself?
18   A    I believe so.
19   Q    In both cases?
20   A    I believe I'm able to defend myself.
21   Q    Would it bother you at all if that person had your home
22        address and was able to go to your house without you being
23        there?
24   A    I wouldn't feel comfortable.  It would.
25   Q    Did you, when you signed the petition, did you put your home
```

Exhibit 1, Page 38

EGELER (████████████████, 9/15/10)

Page 54

1       address on the signature line?

2   A   I did.

3   Q   And did your wife also sign the petition?

4   A   She did.

5   Q   Did she put her home address on there as well?

6   A   She did.

7   Q   Now, in terms of Washington Families Standing Together, do

8       you know of the 165 groups that constitute Washington

9       Families Standing Together?  Do you know who they are?

10  A   No.

11  Q   Do you know whether or not one of the primary groups is

12      Acorn?

13  A   I do not know.

14  Q   Do you know whether or not any members of Acorn have been

15      arrested for election fraud in the state of Washington?

16  A   Say it again.

17  Q   Do you know whether or not any members of Acorn have been

18      arrested and convicted for election fraud in the state of

19      Washington?

20  A   I do not know.

21          MR. PIDGEON:  I have nothing further.

22                  EXAMINATION

23  BY MS. EGELER:

24  Q   Pastor, you stated that you had several people who would

25      not sign the petition.  Can you tell me about each of those

EGELER (█████████████████, 9/15/10)

Page 55

1    incidents?

2  A  It was many; therefore, I cannot tell you.  One that's

3    standing out to me, one lady come out of the white Jeep, and

4    she said, I'm with you, but this day and time, I'm not

5    signing, or I'm not putting my address on anything, and she

6    walked away.  But numerous time people would say, We support

7    the cause, but we don't want to sign it.

8  Q  That incident that you just talked about the lady came out

9    of her vehicle and made --

10 A  Yeah.

11 Q  -- that statement to you, where were you when that occurred?

12 A  I was at Marketplace parking lot, Marketplace here in town,

13    and my wife was with me.

14 Q  Marketplace is the name of a supermarket, correct?

15 A  Yeah.

16 Q  When this woman made this statement to you, did she state

17    why she would not sign?

18 A  Well, I just told you why.

19 Q  Did she state anything in addition to what you told me?

20 A  No.

21 Q  So she did not indicate any fear of signing, simply that she

22    would not sign at this time?

23 A  No.  Actually, it was fear.

24 Q  How do you know?

25 A  Well, because she said, "At this day and time, I don't want

EGELER (███████████████, 9/15/10)

Page 56

| | | |
|---|---|---|
| 1 | | to leave my address anywhere, my name and address anywhere." |
| 2 | Q | Do you know if she was willing to leave her name and address |
| 3 | | other places? |
| 4 | A | How would I know that? |
| 5 | Q | I'm asking a question.  It's a yes or no question. |
| 6 | A | Well, probably she would, if she wouldn't feel threatened, |
| 7 | | but she told me clearly, "I do support the cause, but I |
| 8 | | don't want to leave my name and address on this petition." |
| 9 | Q | Do you know if she ever signs any petitions? |
| 10 | A | I never met her before. |
| 11 | Q | Did she state to you if she ever signs any petitions? |
| 12 | A | We didn't have dialogue. |
| 13 | Q | So you don't know if she makes it her practice to never sign |
| 14 | | any petitions? |
| 15 | A | I don't know. |
| 16 | Q | Let's go through any others that you remember making |
| 17 | | statements to you that they supported your cause but would |
| 18 | | not sign. |
| 19 | A | It was numerous. |
| 20 | Q | How many? |
| 21 | A | More than once.  I would say I personally probably |
| 22 | | encountered minimum of ten, but other people that I knew of |
| 23 | | that was gathering signatures told me the same story. |
| 24 | Q | Let's talk about what you personally experienced. |
| 25 | A | Yeah. |

Exhibit 1, Page 41

EGELER (█████████████, 9/15/10)

```
 1   Q   You are confident it happened more than once, correct?

 2   A   It occurred more than once.

 3   Q   You're confident it happened at least ten times?

 4   A   Ten or less.

 5   Q   Ten or less?

 6   A   Yes.

 7   Q   So no more than ten?

 8   A   No more than ten.

 9   Q   With each of those incidents, do you recall what the

10       individual said?

11   A   No.

12   Q   Do you recall whether the individual stated whether they

13       make it a practice to never sign any petition?

14   A   I never heard about having a practice.  They just said they

15       wouldn't sign this one.

16   Q   They stated they wouldn't sign this one.  Did they also

17       state specifically -- do you recall them stating that they

18       were afraid to put down their name and address?

19   A   There was nothing about fear, but people would say, I would

20       like -- I would sign -- I would support the cause or I would

21       sign the petition, but I don't want to leave my name on it,

22       my name and address.  Nobody said because I'm terrified.

23   Q   And did they say anything to you that would allow you to

24       know with certainty whether it was simply their practice to

25       never sign a petition, even if they supported it, or whether
```

EGELER (██████████████, 9/15/10)

Page 58

1          there was something special about this petition that caused

2          them to not sign?

3    A     They knew the cause of this petition and they refused to

4          sign it, even though they supported.  This is all I can tell

5          you.  Whether it's their practice, I'm not that personally

6          attached to everybody who signed petition.

7    Q     So in answer to my question, you don't know what their

8          practice is with regard to other petitions?

9    A     I don't know what their practice is.

10   Q     And if I'm correct, you stated that you've been in the

11         United States since 1992?

12   A     Correct.

13   Q     So you've been here for approximately 18 years?

14   A     Yes.

15   Q     In that period of time, in those 18 years, have you ever had

16         a negative encounter with a United States police officer or

17         a state of Washington or a state of Oregon police officer?

18   A     No.

19   Q     Have you ever had a negative encounter with a police officer

20         from Lewis County or from the city of Longview or Kelso?

21   A     No, I did not.

22   Q     Have you ever had any encounter whatsoever with a police

23         officer in the United States, positive or negative?

24   A     I'm law abiding citizen.  I was pulled, you know, to the

25         side of the road.  I've got a couple of tickets for

Exhibit 1, Page 43

```
 1                    C E R T I F I C A T E

 2        I, REBECCA S. LINDAUER, a duly authorized Notary Public in

 3   and for the State of Washington, residing at Lacey, do hereby

 4   certify:

 5        That the foregoing deposition of ██████████████████

 6   ███████████  was taken before me and completed on the 15th day of

 7   September, 2010, and thereafter transcribed by me by means of

 8   computer-aided transcription; that the deposition is a full,

 9   true, and complete transcript of the testimony of said witness;

10        That the witness, before examination, was by me duly sworn

11   to testify the truth, the whole truth, and nothing but the truth,

12   and that the witness reserved signature;

13        That I am not a relative, employee, attorney, or counsel of

14   any party to this action or relative or employee of any such

15   attorney or counsel, and I am not financially interested in the

16   said action or the outcome thereof;

17        That I am herewith securely sealing the deposition of █████

18   █████████████████████  and promptly mailing the same to MS. ANNE

19   E. EGELER.

20        IN WITNESS HEREOF, I have hereunto set my hand and affixed

21   my official seal of this 17th day of September, 2010.

22

23

24                                 Rebecca S. Lindauer, CSR#2402
                                   Notary Public in and for the State of
25                                 Washington, residing at Lacey.
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1-2

Exhibit to Pls.' Statement of Material
Facts
(Case No. 3:09-cv-05456-BHS)

Exhibit 1, Page 45

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

JOHN DOE #1, an individual; JOHN    )
DOE #2, an individual; and PROTECT  )
MARRIAGE WASHINGTON,                )
                                    )
              Plaintiffs,           )
                                    )
     v.                             )
                                    )   No. 09-CV-05456-BHS
SAM REED, in his official capacity  )
as Secretary of State of Washington;)
BRENDA GALARZA, in her official     )
capacity as Public Records Officer  )
for the Secretary of State of       )
Washington,                         )
                                    )
              Defendants.           )
_____

Deposition Upon Oral Examination
Of
█████████████████████
_____

Taken by:  Tracey L. Juran, CCR
           CCR No. 2699


September 24, 2010

Everett, Washington

1          Be it remembered that the deposition upon oral

2     examination of ████████████████████ was taken on

3     September 24, 2010, at the hour of 8:56 a.m. at 3501

4     Colby Avenue, Suite 200, Everett, Washington, before

5     Tracey L. Juran, CCR, Notary Public in and for the State

6     of Washington residing at Edmonds, Washington.

7          Whereupon the following proceedings were had,

8     to wit:

9                         * * * * *

10  ████████████████████,     having been first duly sworn on
                                   oath by the Notary Public to tell
11                                 the truth, the whole truth, and
                                   nothing but the truth, was deposed
12                                 and testified as follows:

13

14                       EXAMINATION

15  BY MS. EGELER:

16  Q.   Good morning, ███████████

17  A.   Morning.

18  Q.   My name is Anne Egeler and I am with the state Attorney

19       General's Office, and I represent Sam Reed and the

20       defendants in the Doe v. Reed case.

21          Before we begin, I wanted to outline a few simple

22       rules for depositions.  We're being transcribed by our

23       court reporter, Tracey, and it's important that we make

24       her life easy, and we can do that by not speaking over

25       each other.  So if we can make sure that the other

1   Q.   Did you go to any meetings about Referendum 71?

2   A.   Not that I recall.

3   Q.   And were you quoted in the media, print or TV or radio,

4        as endorsing Referendum 71?

5   A.   Not that I recall apart from what we've looked at

6        already.

7   Q.   I understand you experienced what you believe to be

8        harassment or threats of reprisals as a result of your

9        support of Referendum 71; is that correct?

10  A.   Yes.

11  Q.   Let's go through and discuss each of those.  It's very

12       important that we cover every such instance.  So I'll

13       let you begin wherever you would like.

14  A.   Okay.  I do have notes from those contacts, so I'd like

15       to refer to those if I can.  The first call received at

16       the church came to my office on July 27th of 2009.

17  Q.   I'd like to stop for -- well, stop and ask you a

18       question first.

19            As part of this deposition, you were asked to bring

20       with you any electronic or paper documents you have that

21       evidence the harassment or threats you've received.  Did

22       you take a look and see if you have anything responsive?

23  A.   Yes, and I brought what I have.

24  Q.   Then I'm going to take a break.  If I could please get a

25       copy of those materials.

1    A.    Sure.

2    Q.    Did you bring a copy for me?

3    A.    I did not.

4    Q.    Then I'm going to run over to the copy machine.

5    A.    These are --

6    Q.    I'll let you --

7          MS. EGELER:  Okay, I'll be right back.

8               [Off the record - discussion]

9          [Exhibits 7 and 8 marked for identification]

10   Q.    (by Ms. Egeler)  Pastor, after that quick break to make

11         some copies, we now have two more exhibits.  Exhibit

12         No. 7 is a declaration of ██████████████ and it is

13         dated August, no day listed, 2009 and it is a three-

14         page, single-sided exhibit.  And Exhibit No. 8 is a two-

15         page exhibit that states at the -- in the top-left-hand

16         corner ██████████████" and is a series of Emails.

17         Looking at Exhibit -- what -- Exhibit No. 8 to the

18         deposition, is this what you were referring to when you

19         began to speak about harassment that you've experienced?

20   A.    Yes.

21   Q.    And is this all that you were able to find in response

22         to the subpoena duces tecum?

23   A.    Yes.

24   Q.    So there's nothing else that would be responsive?

25   A.    No.

1    Q.    So you were just beginning to tell me about the

2          harassment that you feel you experienced.

3    A.    Yes.  And for my own clarity, if I could just read from

4          my Email here.  The first call was received in my office

5          July 27th, 2009, from an individual who identified

6          herself as a transgender woman who had previously been

7          in special forces.  The caller remained calm but

8          persistent in asking why I would want to limit her

9          rights.

10          After some statements back and forth, the caller

11         asked how I would like it if a number of friends were

12         brought to picket the church or to attend a morning

13         service.  I responded that the church is certainly open

14         to all who wish to come, but that we expect all to

15         conduct themselves in a way appropriate to a public

16         worship service.  I was assured that that would be the

17         case.

18    Q.    Let's stop and talk about that first instance.

19          Was this individual harassing or threatening in any

20         way, in your opinion, or did you feel that she was

21         addressing you respectfully and appropriately in

22         disagreeing with your position?

23    A.    I'd respond, as I note in my next paragraph, the caller

24         was reserved in tone; however, the spirit was certainly

25         one of challenge to the appropriateness of my stand.

 1      The caller certainly also communicated that my stand

 2      justified some kind of retaliatory action on his or her

 3      part, so that I and others who were like-minded will pay

 4      some kind of consequence for the expression of our

 5      stand.

 6   Q. And you talked earlier in this description of that phone

 7      call about this individual coming to your church.  Do

 8      you think that that was the retaliation that she was

 9      referring to?

10   A. I understood that that could be part of the retaliation.

11   Q. Did she state any other form of retaliation?

12   A. She did not.

13   Q. Did she threaten you with any physical harm?

14   A. She did not.

15   Q. Did she threaten any of your parishioners?

16   A. She did not.

17   Q. Did she threaten any sort of vandalism or damage to you

18      or the church's property?

19   A. She did not express that.  I certainly perceived that as

20      a possibility.

21   Q. But not because she said that.

22   A. That's correct.

23   Q. And did anyone come to your church after this phone

24      call?

25   A. No one did.

```
1   Q.   And if they had come, would they have been welcome to

2        attend service?

3   A.   Yes.

4   Q.   Did this individual provide her name?

5   A.   I believe that the name was stated at that time.  I

6        didn't pick up on it.  And I do list a name in

7        conjunction with the second call.

8   Q.   Let's wait before we discuss the --

9   A.   Okay.

10  Q.   -- second call, because I have some more questions for

11       you about the first call.

12  A.   Okay.

13  Q.   At the end of that call, did you call the police?

14  A.   I did not.

15  Q.   Did you note the phone number of the individual who'd

16       called?

17  A.   I evidently did, because I matched that to the second

18       call that was received.

19  Q.   And why did you not contact the police?

20  A.   Evidently didn't think it was appropriate or necessary

21       at that point.

22  Q.   And why did you feel that it was not appropriate or

23       necessary?

24  A.   I'm not sure.

25  Q.   Did you feel that this phone call was sufficiently
```

1          threatening that you needed police protection?

2     A.   I didn't feel there was a need for immediate protection

3          or that the action would be immediate.

4     Q.   Have you ever had anyone call you and disagree with your

5          stance on anything with regard to your personal views or

6          church views in the time that you've been a pastor?

7     A.   I have had people call disagreeing.

8     Q.   And do you feel that it's appropriate for people to call

9          and disagree with you?

10    A.   The calls that I've received in the past have been

11         people that I was personally familiar with, and I

12         perceived this as being of a different nature, coming

13         from a stranger.

14    Q.   What sorts of things have you had people disagree with

15         you on in the past?

16    A.   I'm not recalling.

17    Q.   Within your church, do you ever have any disagreements

18         amongst people about church decisions?

19    A.   I imagine we do.  I'm not thinking of disagreements

20         right now.

21    Q.   Have you ever -- do you ever recall someone -- within

22         the church about a church decision or anything happening

23         at the church, someone being particularly emotional in

24         expressing their viewpoint to you?

25    A.   Yes.

1   Q.   Without revealing that individual's name, because

2        there's no need to, can you tell me about that.

3   A.   I can recall one instance from several years ago

4        about -- an individual approached me regarding a

5        differing opinion regarding children, being fruitful and

6        allowing God to give us the children that he might

7        desire to give us.  So birth control.

8   Q.   And what was this individual's viewpoint on birth

9        control?

10  A.   Is that relevant to our discussion?

11  Q.   Well, actually, I should probably give you a little

12       background.  During a deposition, I do have liberty to

13       address a variety of topics that I feel may reveal

14       relevant evidence.  So it's quite a broad scope that can

15       be explored during a deposition.

16                  [Off the record - discussion]

17  A.   I go forward?

18  Q.   (by Ms. Egeler)  Yes, please.

19  A.   The individual felt that there should be a more liberal

20       use of birth control, and my position was that it ought

21       to be more limited.

22  Q.   And by limited, do you mean limited to use by adults?

23       How do you mean limited?

24  A.   Even limited within marriage.  That there be a greater

25       openness to allow pregnancy and receive the children

1          that God might have us to have.

2    Q.    And what was this individual's position?

3    A.    That a person ought to have -- that family size should

4          be limited.

5    Q.    And was this individual emotional about his position?

6    A.    Yes, he was.

7    Q.    And how did -- in what way was he expressing that

8          passion?

9    A.    With raised voice and passion.

10   Q.    Does the individual still attend the church?

11   A.    He does not.

12   Q.    And did he stop attending after that discussion?

13   A.    No, he did not.

14   Q.    Did you feel threatened or fearful when he raised his

15         voice and disagreed with you?

16   A.    I was not comfortable, but I did not feel threatened for

17         physical harm.

18   Q.    Is that because you knew the individual?

19   A.    That's correct.

20   Q.    And do you think that might be the difference between

21         this first phone call and this individual that we're

22         talking about at the church, that this individual at the

23         church was someone you knew and the person on the phone

24         was a stranger to you?

25   A.    That would be in part the reason.

1    Q.    And what would be the rest of the reason?

2    A.    And again, this would be my perception, that there would

3          be a greater tendency to be violent because of the

4          issue.

5    Q.    Was this first phone call your first opportunity ever to

6          speak with a transgender individual?

7    A.    To my knowledge, yes.

8    Q.    And was that a bit odd to you as well?

9    A.    Yes.

10   Q.    Let's go on to the next call, the second call, which I

11         believe you state on page 2 of Exhibit No. 8.

12   A.    I note here that the second call was on August 12th,

13         2009, and was received by my secretary while I was out

14         of the office.  I note here as well the caller

15         identified herself as Krystal Mountaine and called from

16         the same number as the first phone call.  She said that

17         she would like to talk to the pastor and asked to have

18         me call, and I chose not to return the call.

19   Q.    Was anything else said by Krystal Mountaine?

20   A.    Not to my understanding.

21   Q.    And when you say what she said during the phone call,

22         are you taking that from notes that the secretary --

23         church secretary made?

24   A.    That's correct.

25   Q.    So you yourself did not hear Krystal Mountaine's

1        message?

2   A.   I did not.

3   Q.   And have you received any calls since then?

4   A.   No.

5   Q.   And is -- that listing of the message that the secretary

6        wrote down from Krystal Mountaine as reflected on page 2

7        of Exhibit No. 8, is that complete or was anything else

8        included in the message that you haven't reported here?

9   A.   I believe this was complete.

10  Q.   So no other phone calls regarding Referendum 71 were

11       received by you or the church?

12  A.   No.

13  Q.   These two calls, did they come in on the church's phone

14       line or your personal home line?

15  A.   Church phone line.

16  Q.   And correct me if I'm wrong, but I believe you have both

17       a church phone line and a home phone line at that

18       address; correct?

19  A.   That's correct.

20  Q.   Did you receive any mail that related to Referendum 71?

21  A.   No.

22  Q.   Any other incidents occur that you felt were harassment

23       or threats of any sort?

24  A.   No.

25  Q.   Any sort of vandalism at any time of church property?

 1   A.   No.

 2   Q.   And after the election on Referendum 71, have you

 3        received any calls, Emails, threats, or harassment of

 4        any sort?

 5   A.   No.

 6   Q.   Do you know how Krystal Mountaine would have known that

 7        you had supported Referendum 71?

 8   A.   I would imagine by referencing the Web site.

 9   Q.   And what Web site?

10   A.   For the Referendum 71, Protect Marriage Washington, that

11        we have an exhibit from.

12   Q.   Did the caller actually state where she got your name or

13        the church's name?

14   A.   Not to the best of my recall.

15   Q.   After that phone call, did you ask ███████████ or

16        anyone with Protect Marriage Washington to remove your

17        name from the Protect Marriage Washington Web site?

18   A.   I did not.

19   Q.   Why not?

20   A.   We -- I feel personally -- or I have strong conviction

21        regarding the issue in hand and was willing to continue

22        to do whatever I could.

23   Q.   And would it bother you if your signature on the

24        Referendum 71 petitions was publicly disclosed, given

25        your public endorsement of the measure?

1        violent about because of that.

2   A.   Correct.

3             MR. STAFFORD:  That's all I have.

4

5                         EXAMINATION

6   BY MR. PIDGEON:

7   Q.   I have a couple of follow-up --

8   A.   Okay.

9   Q.   -- questions, ██████████.

10            Have you ever seen any videos or any news reports

11       of transgendered individuals entering a church service

12       in protest?

13  A.   I have seen video of those who entered a church in the

14       state of Michigan over this issue.  Whether they were

15       transgender individuals or not I don't know

16       specifically.

17  Q.   Can you tell us what you saw on the video, what the

18       basic tenor of it was.

19  A.   The -- this group of individuals entered the church with

20       evident specific -- well, I guess I don't -- I can't say

21       what their intent was initially.  But what the video

22       showed is them being very disrespectful and disruptive

23       to the service going forward, interrupting the person

24       who was leading the service, and using that forum to be

25       able to communicate -- and I guess I'm not remembering

1    Q.   Now, when you first came to ████████, how would you

2         describe the character of the town?  I mean, was it a

3         highly rural town at that point?

4    A.   It definitely was.

5    Q.   And what would you describe its condition now?  Is it

6         still pretty much rural?

7    A.   The population has probably tripled since that time, so

8         that it is -- well, just more densely populated, not --

9         I wouldn't call it rural at all.

10   Q.   It's more semirural, maybe?

11   A.   Small town.

12   Q.   Small town, okay.

13            Now, have you spoken on positions -- you mentioned

14        that you've spoken on positions concerning birth

15        control.  Have you also spoken out on issues of abortion

16        in the church?

17   A.   Yes.

18   Q.   Have you spoken out on issues of divorce in the church?

19   A.   Yes.

20   Q.   Have you spoken out on issues of drug abuse and

21        alcoholism in the church?

22   A.   Yes.

23   Q.   Have you spoken on issues of gambling in the church?

24   A.   Yes.

25   Q.   Have you ever been threatened from anybody supporting

1       the gambling position?

2   A.   No.

3   Q.   Have you ever been threatened from anybody supporting an

4        alcoholic's right to drink?

5   A.   No.

6   Q.   Have you ever been threatened or harassed by anybody

7        supporting a drug user's right to use drugs?

8   A.   No.

9   Q.   Have you ever been approached or threatened or harassed

10       by anybody supporting a person's right to get divorced?

11  A.   No.

12  Q.   How about on the issue of abortion?  Have you ever been

13       threatened or harassed by a person giving (sic) the

14       issue of abortion?

15  A.   No.

16  Q.   So other than the one confrontation you had inside the

17       church concerning birth control, the only other

18       harassing or threatening incident that you can point to

19       is this from Krystal Mountaine?

20  A.   Yes.

21  Q.   Now, looking at Exhibit 8 again for a minute, going back

22       to this July 27th phone call, you heard this phone call;

23       correct?

24  A.   Yes.

25  Q.   Now, this woman, did she speak with a female voice or

1        was it a man's voice you were hearing?

2   A.   It was a man's voice.

3   Q.   Was it a high tenor voice or a low baritone voice?

4   A.   It was not a high voice.  It was what I would just

5        consider a normal male voice tone.

6   Q.   Normal male voice, okay.

7             Now, do you know why Krystal Mountaine referenced

8        the fact that he had been in special forces?

9   A.   I can only presume that it was to heighten the threat

10       that I should perceive.

11  Q.   Well, what does special forces mean to you?

12  A.   People who are trained in doing harm, you know, special

13       tactics to be able to carry out killing missions.

14  Q.   So would somebody in special forces, for instance, have,

15       say, a lower threshold towards the notion of killing a

16       human being, in your view?

17  A.   That would be my understanding.

18  Q.   Would it be your expectation that they had been trained

19       in how to kill in hand-to-hand combat?

20  A.   Yes.

21  Q.   Would it be your understanding that they would also have

22       weapons specialties?

23  A.   Yes.

24  Q.   Possibly sniping capability?

25  A.   Yes.

1  Q.   So if a person said they'd been in special forces, did

2       all of those things factor into your consideration of

3       who this person was on the phone?

4  A.   Yes.

5  Q.   And then the person said -- now, did the calmness of the

6       caller's voice further intimidate you or threaten you?

7       Would you have been less threatened if the caller had

8       been screaming at you?

9  A.   I would have been more intimidated if there was yelling.

10 Q.   Screaming?

11 A.   And screaming.

12 Q.   And then -- so did you perceive, then, that this man who

13      said he -- and by the way, what does it mean when this

14      man tells you that he's transgendered to you?  What does

15      that mean to you?

16 A.   My perception would be that it's somebody who has

17      undergone even a sex change.

18 Q.   A sex-change operation.

19 A.   Sex-change operation.

20 Q.   So in your opinion, this was not just a man who was

21      cross-dressing; is that correct?

22 A.   Yeah.  And that's my perception.  Maybe my definitions

23      are inappropriate.

24 Q.   Did he identify himself as transgendered?

25 A.   I'm -- I can only assume that was the case because of my

Tracey Juran, Certified Court Reporter

1    notes.  I don't recall exactly how the caller may have

2    expressed that.

3  Q.  So you don't know whether or not Krystal Mountaine has

4    actually undergone surgery for this condition.

5  A.  I do not.

6  Q.  So it is possible that Krystal Mountaine could have been

7    a muscular, well-trained special-forces operative.

8         MR. STAFFORD:  Objection; speculation.

9  A.  That's possible.

10  Q.  (by Mr. Pidgeon)  Did you consider that this person

11    might have been a -- you know, a large-scale person,

12    large-size person?

13  A.  I didn't dwell on it.

14  Q.  Now, when Krystal Mountaine was referring to a number of

15    friends, did you have any idea who these friends would

16    be?

17  A.  I could only assume that they were individuals who

18    shared the same convictions as well as a desire to

19    communicate their hostility toward others who would wish

20    to hold an opposing position.

21  Q.  And so when Krystal Mountaine said that these friends

22    would picket the church, did you envision a scene like

23    what you had seen in that video in Michigan taking place

24    in your church?

25  A.  I considered that possibility.

1                      CERTIFICATE

2    STATE OF WASHINGTON )
                         )
3    COUNTY OF SNOHOMISH )

4           I, the undersigned Notary Public in and for the

5    State of Washington, do hereby certify:

6           That the foregoing is a full, true, and correct

7    transcript of the testimony of the witness named herein,

8    including all objections, motions, and exceptions;

9           That the witness before examination was by me duly

10   sworn to testify truthfully and that the transcript was made

11   available to the witness for reading and signing upon

12   completion of transcription, unless indicated herein that the

13   witness waived signature;

14          That I am not a relative or employee of any party

15   to this action or of any attorney or counsel for said action

16   and that I am not financially interested in the said action

17   or the outcome thereof;

18          That I am sealing the original of this transcript

19   and promptly delivering the same to the ordering attorney.

20          IN WITNESS WHEREOF, I have hereunto set my hand and

21   seal this 7th day of October, 2010.

22

23   _____

          Notary Public in and for the State of Washington
24              residing at Edmonds, Washington.
                   (Notary expires 3/09/13)
25                    (CCR No. 2699)

Tracey Juran, Certified Court Reporter

Exhibit 1, Page 65

A F F I D A V I T

STATE OF WASHINGTON          )
                             )
COUNTY OF SNOHOMISH          )


            I have read my within deposition and the same is true and

accurate except for any changes and/or corrections, if any, as noted by me on the

correction sheet hereof.




            SUBSCRIBED AND SWORN to before me on this, the

26th day of October, 2010.


                              _Norma J Syrie_____
                              NOTARY PUBLIC in and for the State of
NORMA J. SYRIE                Washington residing at _Arlington_,
NOTARY PUBLIC                 Washington.
STATE OF WASHINGTON
My Commission Expires January 1, 2011   Notary expires: ____1-1-11____

LONG/SEPTEMBER 24, 2010

TO THE DEPONENT:

PLEASE READ YOUR DEPOSITION CAREFULLY.  On this correction sheet, make notes of any errors in the transcript.  Then please sign this sheet at the bottom and return it with the notarized affidavit page to Tracey Juran at 21103 80th Avenue West, Suite A, Edmonds, Washington, 98026.  If you have any questions about this process, please call me at 425-775-1243.

Page and line _____ Correction _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1-3

Exhibit to Pls.' Statement of Material
Facts
(Case No. 3:09-cv-05456-BHS)

Exhibit 1, Page 68

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,<br><br>             Plaintiffs,<br><br>   v.<br><br>SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 09-CV-05456-BHS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

Deposition Upon Oral Examination
Of
████████████████

---

Taken by:  Tracey L. Juran, CCR
        CCR No. 2699


September 24, 2010

Everett, Washington

Exhibit 1, Page 69

1           Be it remembered that the deposition upon oral

2     examination of ██████████████ was taken on

3     September 24, 2010, at the hour of 1:04 p.m. at 3501

4     Colby Avenue, Suite 200, Everett, Washington, before

5     Tracey L. Juran, CCR, Notary Public in and for the State

6     of Washington residing at Edmonds, Washington.

7           Whereupon the following proceedings were had,

8     to wit:

9                          * * * * *

10    ████████████████,        having been first duly sworn on
                               oath by the Notary Public to tell
11                             the truth, the whole truth, and
                               nothing but the truth, was deposed
12                             and testified as follows:

13

14                      EXAMINATION

15    BY MS. EGELER:

16    Q.    ████████, as I stated earlier, my name's Anne Egeler

17          and I'm a Deputy Solicitor General with the state

18          Attorney General's Office.

19             Have you ever been deposed before?

20    A.    No.

21    Q.    I'll go over some ground rules.  Everything we say is

22          being taken down by our court reporter, and it's

23          important that we let each other finish speaking before

24          the other person talks so that she's able to get

25          everything down correctly.  It's also important that we

1       indicate yes or no verbally rather than with a head nod

2       or an mm-hm sound, because only that verbal response

3       will show up on the record.  And it's also important

4       that we understand each other.  So if I ask something

5       and it's unclear or confusing, please let me know, okay?

6    A.  Okay.

7    Q.  Can you please tell me what your current employment is.

8    A.  Currently, I am a homemaker and ████████████████████

9       ███████████████████.

10   Q.  And was that the case in 2009 as well?

11   A.  Yes.

12   Q.  Any other employment in 2009?

13   A.  No.

14   Q.  And are you familiar with Referendum 71?

15   A.  Yes, I am.

16   Q.  Did you sign the petition?

17   A.  Yes, I did.

18   Q.  Do you remember where you were when you signed?

19   A.  No, I don't.  It's possible that I signed it at my

20       church.

21   Q.  And where is that church?

22   A.  ███████████████████████.

23   Q.  And when you signed, was it in a public location or was

24       it in a private office of the church?

25   A.  I'm sorry; I don't remember exactly when I signed.  So

Tracey Juran, Certified Court Reporter

1    I'm just guessing that I signed it at church because the

2    petitions were available there.

3 Q.  Did you collect signatures for the petition at all?

4 A.  I did at church at a booth.  There were several people

5    collecting signatures over the course of -- I don't

6    remember how many Sundays.  Maybe three Sundays.

7 Q.  Did you collect signatures over all those three Sundays?

8 A.  No.  I had a shift.  We were assigned shifts.  So I

9    don't think I did.  I'm sorry; I don't remember exactly

10    how many times, but at least once.

11 Q.  In the course of collecting signatures, did you indicate

12    to anyone that you supported Referendum 71?

13 A.  Yes.

14 Q.  And did you indicate that you had signed the petition

15    yourself?

16 A.  Yes, I did, both while I was collecting signatures and

17    also later, when a reporter asked me several times if I

18    had signed the R-71 petition.

19 Q.  And that reporter, was that a reporter with the ███████

20    ███████?

21 A.  Yes, it was.

22 Q.  And he asked you whether you had signed?

23 A.  He pressured me to say whether I had signed it.  It was

24    in the course of an interview about my candidacy and he

25    asked me if I had signed it and I said, no comment.  And

Tracey Juran, Certified Court Reporter

1      then later in the conversation he asked me again and I

2      said, I'd rather not say.  And he said, what, are you

3      afraid of what might happen, in a kind of teasing,

4      mocking kind of voice.

5  Q.  And did you choose to answer his question?

6  A.  And then I chose to answer.  Then I decided, if I don't

7      stand up, who will?

8  Q.  And when you answered his question, were you aware that

9      he might publish that fact in the newspaper?

10  A.  I was highly aware, because I knew I was speaking to

11      ██████████████, who's a political reporter for the

12      ██████.

13  Q.  So your expectation was that he would publish that.

14  A.  I knew it was a distinct possibility.

15  Q.  And did he, in fact, publish that?

16  A.  He did.

17  Q.  And do you remember what month that was?

18  A.  I remember it very well, because I got a death threat

19      that night.  Actually, my son took the call.

20  Q.  What month was it that the article --

21  A.  That was --

22  Q.  -- was published?

23  A.  -- August 23rd, 2009.  It was in the Sunday-morning

24      paper.  I was on the front page.

25  Q.  And did the entire article focus on the fact that you

```
 1        had signed the petition?

 2   A.   No, it did not.  Only one sentence of the article

 3        mentioned that I had signed the petition.

 4   Q.   Did the article mention anything else about your

 5        candidacy?

 6   A.   Oh, yes.  It was a nice long article --

 7   Q.   Did it --

 8   A.   -- on the -- it was one column, the left-hand column on

 9        the front page -- and it's still on-line on

10        ██████████████ if you'd like to see it -- and it was also

11        on page 4, maybe about a quarter of the page, an article

12        about places I had spoken and what I had done in the

13        campaign so far.  It was a little unusual for a

14        candidate to start so early for a ██████████████████

15        ███████ --

16   Q.   I'm not --

17   A.   -- and my kickoff was to be the next day.

18             Oh, yeah, this is the ██████████████ -- yes, this is

19        the article as it's printed out when you click on print,

20        you know what I mean?

21   Q.   Why don't you --

22   A.   But yes, this is --

23   Q.   -- keep that copy.

24   A.   -- the article.

25   Q.   We'll mark that as Exhibit No. 1 to your deposition.
```

```
 1              [Off the record - discussion]
 2              [Exhibit 1 marked for identification]
 3    Q.   (by Ms. Egeler)  So you have in front of you what we've
 4         marked as Exhibit No. 1.  And is that the article that
 5         you referred to?
 6    A.   Yes, it is.
 7    Q.   And this is the Internet version -- as you can see on
 8         the bottom, the Internet Web site is there -- but is
 9         this the same article that was published on that ███,
10         ████████████?
11    A.   It appears to be, yes.
12    Q.   Can you tell me where the sentence is that you were
13         referring to that talked about you signing the --
14    A.   Yes.  If you look at the second page --
15    Q.   Which is on the back --
16    A.   Page 2.
17    Q.   -- of the --
18    A.   Mm-hm.  In the middle of that page, paragraph discussing
19         initiatives says, "████████████████████████████
20         ██████████████████████████████████
21         ██████████████  ████████████████████
22         ████████████████████████████████████
23         ██████████████████████████████
24         ████████"
25    Q.   And two paragraphs above that, does it also refer to you
```

1       as being a staunch fiscal and social conservative who

2       belongs to the National Rifle Association?

3   A.  Yes.

4   Q.  And does it talk about your candidacy with respect to

5       any other issues other than gun rights and signing the

6       initiative?

7   A.  Could you rephrase the question.

8   Q.  Well, let me ask it a little differently.

9           Does this talk about the fact that you are a Tea

10      Party activist --

11  A.  Oh, yes.

12  Q.  And it also mentions your position on economic issues;

13      correct?

14  A.  Yes.  It does say -- well, fiscal conservative, that's

15      economic issues.

16  Q.  And the headline here mentions that you're a Tea Party

17      activist.  Was that same headline used in the newspaper?

18  A.  Yes, it was.

19  Q.  Did you make any other public statement about the fact

20      that you supported Referendum 71?

21  A.  Before the death threat?

22  Q.  We'll get to the death threat, I promise you.

23          But at --

24  A.  Mm-hm.

25  Q.  -- any time, have you made any other statements that --

1    A.    Certainly.

2    Q.    Can you tell me what those times were.

3    A.    At the -- at my kickoff the following night, on

4          August 24th, I mentioned that I had -- I think I

5          mentioned that I had signed this petition.  There was

6          also a time when I spoke to a group at -- that was

7          meeting at Edmonds Church of God.  And they asked me

8          about my stance on social issues, such as abortion and

9          marriage, and I did mention that I had signed the R-71

10         petition.

11   Q.    The first event you talked about was the August 24th

12         kickoff.  How many people were in attendance for that?

13   A.    About 120.

14   Q.    And were there any members of the media there to cover

15         it?

16   A.    Not that I'm aware of.

17   Q.    And when you spoke at the church, how many people were

18         at that event?

19   A.    I think there were around 40 at that event.

20   Q.    And any members of the media there?

21   A.    No.

22   Q.    Have you made any statement about your stance on

23         domestic partnership in any sort of campaign literature

24         or voters' guides?

25   A.    No, but I have on candidate questionnaires.

1   Q.   Would these candidate questionnaires be publicly

2       available?

3   A.   Yes, I believe so.  I believe the Family Policy

4       Institute of Washington questionnaire is available on-

5       line.

6   Q.   And that's one where you made a statement about domestic

7       partnership?

8   A.   If I recall correctly, they did ask about my stance on

9       marriage.  I can't remember how it was phrased or if it

10       was specifically about R-71, but because of the nature

11       of that group, I'm certain that the question of marriage

12       came up.

13   Q.   And did you hesitate to answer the question?

14   A.   No.

15   Q.   Why not?

16   A.   Because I had already crossed that mental hurdle.  I

17       knew the ramifications and the repercussions to myself

18       and my family.

19   Q.   Did you ever go to an R-71 rally?

20   A.   No, I don't believe I did.  I went to the R-71 -- there

21       was an election-night party.  I did go to that in

22       November.

23   Q.   And were there any members of the media there?

24   A.   There were many, many people with cameras in the hall.

25       I don't know if they were media members or not, but I

1        wouldn't be surprised.

2    Q.  When did you first --

3    A.  And they were not -- they --

4    Q.  Oh, excuse me.

5    A.  I'll say this:  They filmed -- they took film of my

6        children -- I mean, they deliberately focused on my

7        children's faces and followed us down the hall with the

8        cameras as we walked by.  And that made me nervous

9        because of the death threat.

10   Q.  And by they, who do you mean?  Who was it that --

11   A.  I mean there were at least half a dozen people, maybe

12       ten, a lot of people with big, fancy cameras in the

13       hallway outside of that party.

14   Q.  And when you saw that there were people with cameras

15       outside that party, did you think about not bringing

16       your children to the party?

17   A.  It was too late.  We had already walked in the door.

18       They were filming people as we walked in.

19   Q.  Did you put a Referendum 71 sign in your yard?

20   A.  No.

21   Q.  Did you ever hold a Referendum 71 sign in a public

22       location?

23   A.  No.

24   Q.  Let's talk about that phone call that you referred to

25       earlier that you received after the article was run in

1    the ███████████ that we've put in as Exhibit No. 1 to

2    your deposition.  Can you tell me about that.

3  A.  Certainly.  Sorry; I seem to be getting a little

4    emotional again.

5  Q.  That's okay.

6  A.  It was about 6:00 --

7  Q.  Do you want a moment?  We can take a --

8  A.  I'd like some --

9  Q.  -- break; it's okay.

10  A.  -- Kleenex available.

11           [Off the record - discussion]

12  Q.  (by Ms. Egeler)  Let's just pause for a second and talk

13    about something else for a moment before we move on to

14    that.

15      When did you first learn that you were a witness in

16    the Doe v. Reed case?

17  A.  I have a hard time placing it.  Sorry; my days are

18    pretty packed and I don't sleep very much.

19  Q.  Was it within the last few months?

20  A.  I believe so, but I can't be certain.

21  Q.  Do you know who contacted you, if you remember?

22  A.  No.  I know that I have been in contact with Larry

23    Stickney, and ███████████ has talked to me once and

24    Stephen Pidgeon at least once, because I called

25    immediately after the death threat.

 1          And after reporting to the police via 911, I then

 2      called the ADF R-71 hot-line number, which I had

 3      programmed into my phone during the time that we at

 4      church were collecting signatures, because some people

 5      at church had expressed fear about signing the petition.

 6      And we were told, I think, by ███████████████ of Family

 7      Policy Institute that we could give this 1-800 hot-line

 8      number out as we collected petitions -- or collected

 9      signatures if people expressed fear or concern about

10      their name being on the petition.

11  Q.  When --

12  A.  So when this happened, I had it ready in my phone.  And

13      I called and said, my family just got a death threat.

14      What do we do from here?

15  Q.  My questions were about when you learned that you were a

16      witness in the case and --

17  A.  Yeah, I don't remember.  Now, that was more recent, but

18      I can't place it; I'm sorry.

19  Q.  Do you recall if you were informed that, as a witness in

20      the case, you may be required to publicly testify in a

21      federal court of law?

22  A.  No.  In fact, when I agreed to do the deposition, I said

23      that because I was a candidate, I would agree to do the

24      deposition, but that I didn't really want to publicly

25      testify because it's likely to make the papers and

1       possibly change the outcome of the election.

2            I haven't been hiding anything -- I answer frankly

3       when I am asked where I stand on issues -- but I do not

4       want to be portrayed as a single-issue candidate.  And

5       my focus all along has been on jobs, education, and

6       fiscal responsibility.  My campaign is not about the

7       social issues.

8    Q.  I can tell you that the trial in this case would not

9       occur prior to the election.  In fact --

10   A.  Mm-hm.

11   Q.  -- our next time that we go just to talk to the judge

12      about when the court date will be set isn't until

13      November 15th, so it will be after the election.

14           With that understanding, would you have any

15      concerns about publicly testifying in a federal court?

16   A.  No.

17   Q.  If you're ready now, I'd like to --

18   A.  Sure.

19   Q.  -- explore that phone call that you received.

20   A.  Yes.  So let me give a little bit of background.  My

21      parents were visiting from ████████ and my sister --

22      youngest sister, also from ████████, were visiting and

23      were staying with us in order to attend the campaign

24      kickoff on the 24th.  On Sunday morning, the 23rd,

25      the -- I was on the front page of the newspaper with the

1        article that we've spoken about.

2             And at 6:00 that night, we received a phone call on

3        our unlisted home phone number.  My 13-year-old answered

4        the phone -- ███████ is his name -- and I heard him

5        say, yes, just a moment, please.  Mom, it's for you.

6        And I was in the living room, he was in the kitchen.

7        It's an open -- kind of open hallway there.  And as I

8        walked across the floor towards the phone, his face went

9        white and he said, Mom, you just got a death threat.  He

10       said, I will kill you and your family.

11            I continued walking towards the phone as he was

12       relaying this to me, and right when he finished I was at

13       the phone and picked it up, but the man had already hung

14       up.  My parents were in the room sitting on the couch

15       and my husband was in the room and my 6-year-old

16       daughter was in the room, and all of us became

17       immediately frightened and very aware of where the

18       windows are.  I was immediately angry and resolved --

19  Q.   Do you --

20  A.   -- that I would not back down from this candidacy from a

21       threat like that.

22  Q.   Do you have caller ID on your home phone number?

23  A.   We did not at that time.

24  Q.   Did you press star 69 to get the number?

25  A.   No, because we don't have caller ID.  So I thought about

1        calling star 69, but since it would just call him

2        back -- call an angry person back, I wondered, well, how

3        is that going to help anything?  Then I have an angry

4        man on the other end.  I still don't know his number.

5  Q.  So it's your understanding that star 69 dials the number

6        that just called?

7  A.  Yes.  I thought it would redial.

8  Q.  Is that still your understanding?

9  A.  I know that star 57 will trace a call.  The policeman

10       told me that.

11  Q.  And did you press star 57?

12  A.  No.  I did not know that until after the cops came.

13  Q.  And did you call the police when you received that

14       phone --

15  A.  Yes.

16  Q.  -- call?

17        And how long did it take them to respond?

18  A.  We live very near the police station in downtown ████

19       and they were there, I would say, perhaps five minutes

20       or less.  It didn't take long.

21  Q.  So it was the ████ Police Department that you called,

22       the --

23  A.  Yes.

24  Q.  -- city police?

25  A.  Well, I called 911 and I assume I was immediately

```
 1        directly routed to the  ████  Police.
 2   Q.   And do you remember the name of the officer who
 3        responded?
 4   A.   Yes.  It was Andrew Mehl, M-E-H-L.
 5   Q.   And did the officer take a report?
 6   A.   Yes.  He took two reports, one from me and one from my
 7        son.
 8   Q.   Did you make a written statement?  Is that the report
 9        that you're referring to?
10   A.   Yes, I believe I did.
11   Q.   And did the officer talk to you about the incident?
12   A.   Yes.  He tried to reassure me that death threats are
13        fairly common, which I found hard to believe.  He told
14        me that, if anything strange happened, that we should
15        call immediately.  He said, for example, if someone
16        seems to be watching the house or following you, you
17        need to report it.
18            He told us about how -- he said, put a Post-It note
19        by each one of your phones with star 57.  That will
20        redial -- or not redial, pardon me; will trace the call
21        and send the information to the police station.  So we
22        did that.  He recommended that we get phones with caller
23        ID and possibly even voice mail -- I mean, not voice
24        mail; what do you call it -- with an answering machine
25        so that we could tape messages or conversations.  We
```

Page 21

```
 1          haven't done that, but we did go out and purchase all
 2          new phones.
 3    Q.    And you said that you felt that this call was generated
 4          as a result of the article that had run in the Everett
 5          newspaper; is that correct?
 6    A.    Absolutely.  It was the same day.
 7    Q.    And did the caller say that?
 8    A.    No.
 9    Q.    Did the caller indicate that any position that you were
10          taking on any issue was what was triggering the death
11          threat?
12    A.    All that he said I've already told you.  He said, I will
13          kill you and your -- he said, is ███████████ there?
14          And -- oh, pardon me; I didn't tell you that.  But my
15          son told me and the policeman later that he had asked
16          for me by name and then had said to him, I will kill you
17          and your family, and he hung up.
18    Q.    So there was no indication of why he wanted to kill you
19          and your family.
20    A.    No.  But as you can see by reading the article, there's
21          nothing else in that article that would have elicited
22          such fury as to make a person dig to find an unlisted
23          home number and then call and then threaten a child.
24          There's nothing else in that article that could possibly
25          provoke that kind of emotional reaction.
```

Tracey Juran, Certified Court Reporter

1   Q.   Do you know if Tea Party activists have received any

2        negative publicity or response in this country?

3   A.   In this country, yes, but I'm not aware of any around

4        here who have received threats.

5   Q.   Are you aware of any angry words being said about Tea

6        Party activists in this state?

7   A.   Oh, sure.  Posts on blogs, I suppose, mm-hm.  But I had

8        already been in the paper as a Tea Party activist before

9        in the ███████ and had not received a death threat from

10       those articles.  On April 16th of 2009, I was -- there

11       was not a picture of me, but my words were on the front

12       page of the ██████████████ and my name, and they said

13       that I was considering running for office.  So at that

14       point I was not yet a candidate, but I had spoken at a

15       large Tea Party rally in ██████████ on the 15th.

16            And so frankly, I think if it were based on just

17       the phrase "Tea Party," it would be likely that

18       something might have happened earlier.

19   Q.  But this ████████ article was the first article after you

20       actually had filed for candidacy?

21   A.   There was an article in July.  I don't remember the

22       length of the article or if I was mentioned -- I can't

23       recall -- but there was a Fourth of July tea party in

24       ██████████ that received news coverage from the ████████.

25   Q.   And that was after you had announced your candidacy?

```
 1   A.   Actually announced my candidacy at that rally --

 2   Q.   And was --

 3   A.   -- on the Fourth of July.

 4   Q.   -- that a front-page article --

 5   A.   No.

 6   Q.   -- as well?

 7   A.   No, it wasn't a front-page article.

 8   Q.   And you're not sure if you were mentioned in the

 9        article?

10   A.   No, I don't recall.  I might have been mentioned briefly

11        in it, but I don't recall.

12   Q.   So is it fair to say that given this newspaper article

13        that ran on August 23rd, you suspected that the

14        individual who called was angry and expressing this

15        death threat as a result of the one sentence regarding

16        Referendum 71, but you don't know and it's a guess?

17   A.   Well, my cell-phone number was published in the article.

18        I don't know if it's in this -- no, it's not.  This

19        printed-out version does not show -- on the newspaper,

20        there was also a little square next to it that talked

21        about the kickoff the next day.  It gave the time and

22        the place of the kickoff and it gave the Web site and

23        the phone number, the campaign phone number, which is

24        also my personal cell number.  And they did not call

25        that number.  The person who did this took the time to
```

1    Q.   Were those R-71 yard signs?

2    A.   No, they were not.

3    Q.   Were those campaign signs --

4    A.   Yes.

5    Q.   -- for you?

6         And have you had any other campaign signs stolen in

7         any other location?

8    A.   Yes.  Forty percent of our signs were stolen before the

9         primary.

10   Q.   Are you familiar with the Web site Red County?

11   A.   I am.

12   Q.   And do you have an opinion regarding that Web site?

13   A.   Red County -- oh, yes.  It's a -- I haven't been on it

14        for a long time, but I know some of the people who write

15        for it.

16   Q.   And do you think they're credible individuals?

17        MR. PIDGEON:  Calls for speculation; objection.

18        MS. EGELER:  I'm asking a personal opinion.

19   Q.   (by Ms. Egeler)  Do you think the individuals that write

20        on that Web site are credible?

21        MR. PIDGEON:  Objection; lack of foundation, lack

22        of specificity, calls for a rash generalization.

23   A.   I can think of at least one person who writes for Red

24        County that I would take with a huge lump of salt.

25   Q.   (by Ms. Egeler)  And who is that?

1   A.   Oh, I don't want to say that.  How is that relevant?

2   Q.   Then let me ask it to you differently.

3             Is it --

4   A.   I don't --

5   Q.   -- Steve --

6   A.   -- want to lose --

7   Q.   Excuse me.

8             Is it Steve Boren?

9   A.   No.

10  Q.   Do you think Steve Boren is someone that --

11  A.   Beren?

12  Q.   Or Beren.

13            In your opinion -- in your personal opinion, is

14       this a credible individual?

15  A.   As far as I know, he is credible.

16            MS. EGELER:  Okay, mark this as Exhibit No. 3.

17                 [Off the record - discussion]

18            [Exhibit 3 marked for identification]

19  Q.   (by Ms. Egeler)  This is -- this Exhibit No. 3 is a

20       three-page exhibit taken from the Red County Web site,

21       and I want to direct your attention to the second page

22       of the article.  The article's entitled "Desperate Dem

23       sign thieves show disrespect/arrogance to proud Vietnam

24       vet."  And in the third paragraph on the second page it

25       states, "Sadly, it is not unusual for Democrats in this

```
 1        part of the state to tear down signs supporting GOP

 2        candidates."  Would you agree with that?

 3   A.   I would.  I have witnessed it with my own eyes.

 4   Q.   So do you think Dem -- or, excuse me; Republican

 5        candidates in general have their signs victimized quite

 6        a bit in this area of the state?

 7   A.   I have personally experienced it, yes.

 8   Q.   So were you surprised when the signs at your home were

 9        victimized?

10   A.   No, not surprised.

11   Q.   Do you know why people took signs from your property?

12   A.   Because they don't want people to know that I have a

13        chance of winning.  They don't want people to see my

14        name.  They want to stifle name recognition.

15   Q.   Have the signs been taken or have they been vandalized?

16   A.   Mangled.  Some have been stolen; some have been mangled,

17        and by mangled, I mean some of them have been sliced off

18        of their stakes with a very, very sharp implement of

19        some sort; some have been slashed repeatedly and left to

20        kind of dangle; some have been run over with vehicles.

21        One of my campaign volunteers has witnessed this

22        happening in Mukilteo.

23   Q.   And have they ever spray painted any words on the signs?

24   A.   No, not on my signs that I know of.  I'm not aware of

25        any spray-painted words.  But I have seen spray-painted
```

1          words on other Republican signs.

2    Q.    And did you have the opportunity to speak to anyone when

3          they were stealing your signs and talk to them about why

4          they're doing it?

5    A.    We captured video footage of one of the sign stealers,

6          but we have been unable to determine exactly who that

7          is.

8    Q.    And in that video footage, does the individual speak?

9    A.    No.

10   Q.    And do they wear anything that would indicate their

11         position on any particular issue?

12   A.    No.

13   Q.    Could you tell from the video footage whether the person

14         was gay or straight?

15   A.    No.

16   Q.    Any other vandalism of your property that you

17         experienced during the Referendum 71 campaign period in

18         2009?

19   A.    No.

20   Q.    And that includes vandalism of your home or automobiles?

21   A.    Our automobiles appear to have been tampered with by the

22         gas caps, but because we are not sure exactly when or

23         where that happened, we didn't report it.  And yeah, I

24         cannot say for certain that it had anything to do with

25         the R-71 --

1  Q.   And --

2  A.   -- campaign.

3  Q.   -- could you say for sure whether it even had anything

4       to do with politics, as opposed to just --

5  A.   No, it could --

6  Q.   -- criminal --

7  A.   -- could just be vandalism, because we don't know where

8       it happened.

9  Q.   Did you report the sign thefts to the police?

10 A.   No.

11 Q.   Even the one that you had videotape of?

12 A.   Even the one with the videotape.  My husband was the

13      director of IT security for a large company at the time,

14      and he said that without specific information, it would

15      be pointless to tell the police or show them the video.

16 Q.   And we're -- again, I promise you we're going to get to

17      the incident involving your son.  But did you experience

18      any other harassment or things that you would consider

19      threats during 2009?

20 A.   No, not that I can recall.

21 Q.   And before we leave the year 2009, I want to --

22 A.   Although let me go back to that.  There were a number of

23      comments posted on the -- on this article (indicating)

24      on-line.  I don't know if you looked at the comments of

25      the ████████████████████████ article.

```
 1          Did you have a chance to look for documents that would
 2          be responsive?
 3     A.   I -- responsive?
 4     Q.   Mm-hm.
 5     A.   Well, I found a couple of things related to this, yeah.
 6          I did write about it on my Facebook page, a note, after
 7          tea partiers were being accused of yelling racist words
 8          at a congressman at a large Tea Party rally in
 9          Washington, D.C.  And no footage still has surfaced of
10          that alleged incident.  The tea partiers are being
11          mischaracterized by the mainstream media, and I feel
12          that it is a direct misrepresentation of the tea
13          partiers' message, which has always been about fiscal
14          responsibility.  This --
15     Q.   As part of the subpoena, though --
16     A.   Mm-hm.
17     Q.   -- which is what I'm asking you about, you were --
18     A.   Mm-hm.
19     Q.   -- asked to produce any written or electronically stored
20          documents that --
21     A.   Yes.
22     Q.   -- would evidence --
23     A.   Let me point this out, that -- no, I was asked to --
24          according to this -- where is it -- all records,
25          regardless of whether they have been stored in paper or
```

1        electronic format, discussing or depicting images about

2        any harassment, threats, or retaliation you contend you

3        have experienced.  So I understood that to mean that if

4        I had talked about the threat any -- in any other

5        venues, that I needed to bring that in.  Did I

6        misunderstand?

7   Q.   Well, I was looking for anything about any threats or

8        harassment or reprisals you experienced.

9   A.   So this (indicating) is about the threat, but it's not a

10       threat.

11  Q.   So it's not about a threat to you; correct?

12  A.   It's about a threat to me.  This article, this piece

13       that I wrote, I said, "I would like to point out

14       rudeness and incivility from the anti-tea party crowd

15       that is not getting as much 'airtime.'  Who broke into

16       John Koster's office and stole two computers and then

17       threw a printer through a window?"  Et cetera.  "Who

18       called my family at home on our unlisted number, asked

19       for me, and then told my . . . 13-year-old son, 'I will

20       kill you and your family'?"

21  Q.   Do you have -- did you look for any documents that

22       evidenced threats or harassment that were experienced by

23       you?

24  A.   No.  There were no other threats or I --

25  Q.   And there --

1    A.    -- would have reported them to the police.

2    Q.    And there are no documents -- no other documents,

3          nothing responsive to the subpoena.

4    A.    No, I don't believe so.

5    Q.    I just wanted to cover that and make sure that there

6          wasn't something that you'd brought with you that we

7          needed to discuss.

8    A.    Mm-hm.

9    Q.    So if something else had happened, you just said you

10         would call the police?

11   A.    Absolutely.

12   Q.    What's your opinion generally of police officers in this

13         state?

14   A.    I think I respect the police officers in this state.  I

15         think they do a good job.  I do have some concerns, but

16         overall, I think they're doing their job to the best of

17         their ability.

18   Q.    And after the Referendum 71 election had concluded in

19         November of 2009, there's an incident that you were

20         referring to regarding your son.

21   A.    Mm-hm.

22   Q.    Can you tell me about that now.

23   A.    Yes.  On -- at the end of January, the final weekend in

24         January, my son and I were at a conference for

25         Republicans at Ocean Shores.  And on Sunday morning, we

1        checked out of our hotel and were walking to the car.

2        My son was following me in the lobby, but when I got to

3        the car, I realized he wasn't with me.  I began to put

4        the bags that I was carrying into the car and then

5        closed the back of the car, wondering what had happened

6        to him.

7            And then he showed up and he was covered head to

8        toe in applesauce:  On his hat, which was an ████████

9        ████  campaign hat, his coat, his blue jeans, his shoes,

10       his suitcase, and a hanging clothes bag that he had had

11       on one arm.  And I said, what happened to you?  And he

12       said, these people drove by and threw applesauce --

13       threw this all over me.  And I said, did you get the

14       license plate?  He said, no.

15           And I said, okay, well, let's get you cleaned up

16       and then go in and ask if there's a video camera,

17       security camera.  So I helped him get cleaned up and

18       then he went back in to ask.  And I've just finished --

19       I was cleaning off the bags before putting them in the

20       car.  He came back and said that the hotel did not have

21       security cameras outside.  This had happened right

22       outside the hotel in the portico.

23           And so at that point, I -- oh, and I remember I

24       also walked around the car to see if perhaps our car had

25       been vandalized.  I was concerned.  I didn't know if it

1       was a direct threat because of his hat.  I didn't know

2       if it was based on my candidacy.

3   Q.  Was your car vandalized?

4   A.  It wasn't.

5   Q.  And was your son wearing -- okay, so the hat, did it

6       just say, "███████████," on it?

7   A.  It said, "██████████████████████████," on

8       the hat with the campaign logo.

9   Q.  And did he have a shirt with the campaign logo on as

10      well?

11  A.  No, he was wearing a black suit jacket.

12  Q.  Did he say that the person in the car was male or

13      female?

14  A.  There were two people in the car.  The male was -- he --

15      my son thought that both of them were around 25.  The

16      male was driving.  The female with long black hair was

17      the passenger and she, according to him, screwed up her

18      face and made an ugly face and then threw applesauce all

19      over him.

20  Q.  So it wasn't a gay couple driving the car.

21          MR. PIDGEON:  Objection; calls for speculation.

22  Q.  (by Ms. Egeler)  You just stated it was a man and a

23      woman, so I thought that was a pretty reasonable

24      question.

25          Do you think it was a gay couple driving the car?

Page 44

1   A.   I assume not.  But I don't know that they were even a

2        couple.

3   Q.   Did the woman say anything when she threw this?

4   A.   No.

5   Q.   Was your son wearing anything to indicate a position on

6        Referendum 71?

7   A.   No, except that the gay Twitter and blogs do talk about

8        me on -- they talk about my campaign.  In fact, I just

9        had a few more mentions this week on gay tweets and

10       blogs.  And another example -- for example, the Greater

11       Seattle Business Alliance is a pro-gay business group,

12       and they have told me several times that they are

13       watching this campaign with -- they told me directly

14       because they wanted me to come debate my opponent, who

15       is gay.

16            Anyway, so I -- there -- it's a -- it's highly

17       watched, is what I'm saying.  People in other states are

18       watching this race.

19   Q.   So --

20            MR. STAFFORD:  Objection; nonresponsive answer.

21   Q.   (by Ms. Egeler)  Your son, when he --

22   A.   No, I do know that for a fact.  Is that what you mean?

23       I have proof that -- on tweets.  I can show you if you

24       like.

25   Q.   (by Ms. Egeler)  When he makes an objection --

```
 1   A.   Yes.

 2   Q.   -- you and I are still continuing our discussion, and

 3        he'll possibly be questioning you later.

 4   A.   Oh, okay.

 5   Q.   I want to back up and talk about this as it occurred to

 6        your son.

 7             Was -- you said that this happened in the portico.

 8        So was there sort of a drive-through area --

 9   A.   Yes.

10   Q.   -- that was covered --

11   A.   Yes.

12   Q.   -- attached to --

13   A.   Exactly.

14   Q.   -- the hotel?

15   A.   Yes.

16   Q.   And --

17   A.   And they sped through, he estimated, around 30 miles an

18        hour.  He said it was very fast.  And they sped through,

19        she made the face, threw it at him, and they were gone.

20   Q.   And had your son just walked out of the hotel when this

21        occurred or had he been standing outside for a while?

22   A.   He had just walked out.

23   Q.   So he hadn't been standing there waiting for anyone.

24   A.   No, no.

25   Q.   So he just walked out and a car sped up at 30 miles an
```

1          hour, and as it --

2     A.   That's his estimate, his 14-year-old estimate, mm-hm.

3     Q.   And did you think that his 14-year-old estimate as his

4          mother would be wildly inaccurate?

5     A.   Well, since he has yet to drive in city traffic himself,

6          I don't know how good of a judge he is at 30 miles an

7          hour, what that would be.

8     Q.   Do you --

9     A.   But he obvious -- he said it was very fast, so I believe

10         him on that, yeah.

11    Q.   So you believe it was very fast?

12    A.   I believe it was dangerously fast for a hotel portico,

13         yes.

14    Q.   With your sense of your son's accuracy, because I think

15         only a mother could have that, do you think that he was

16         correct within five to ten miles an hour?  Could it have

17         been as slow as 20 --

18    A.   It could have been 20, sure.

19    Q.   Could it have been less than 20?

20    A.   I doubt it.  He felt threatened by the speed of it --

21    Q.   Could it have been --

22    A.   -- I could tell.

23    Q.   Could it have been faster than 30?

24    A.   No.  I don't see how someone -- I don't under -- I can't

25         picture how someone would have been -- would have had

1      time to make a face and throw applesauce if it had been

2      faster than 30.  So --

3  Q.  How do you think an individual going 20 miles an hour

4      would be able to read that sign on his hat or the words

5      on his hat and make a decision about this individual and

6      that this is the target for the applesauce?

7  A.  Because it was a logo.  And the logo -- as you know,

8      logos can be instantly recognized.  That's the point of

9      a logo.  So for example, when you see Coca-Cola or, you

10     know, a gas-station logo, we instantly recognize it.

11 Q.  And at the time that your son had this thrown at him,

12     was he facing straight out towards the street -- or

13     towards the portico drive or was he angled in one

14     direction or the other?

15 A.  I can only assume, because I had been carrying my bags

16     ahead of him.  So frankly, I can't say with any

17     certainty.  But since he was behind me walking through

18     the hotel lobby, I assume that he was continuing on the

19     same trajectory walking behind me through the hotel

20     doors.

21 Q.  And were you wearing anything, shirt or hat, that

22     contained the same logo?

23 A.  I don't believe I was.

24 Q.  Has your face been shown on the Web pages that you were

25     referring to that have been watching your candidacy?

Tracey Juran, Certified Court Reporter

1   A.   Yes.

2   Q.   So do you think you're a recognizable individual to

3        those who are opposed to your viewpoint?

4   A.   Yes, I do.

5   Q.   And you were outside at the time that they --

6   A.   Yes.  I had walked out first.

7   Q.   You'd walked out first.

8        And can I get an idea of where your car was while

9        you were loading --

10  A.   Sure.

11  Q.   -- it.

12  A.   Okay, so let's just sketch it out here.  The portico --

13       let me get -- was immediately in front of the hotel.

14       Here's the hotel, here's the portico (indicating).

15  Q.   And we have --

16  A.   And --

17  Q.   -- to be mindful of --

18  A.   Yeah, I'm trying to --

19  Q.   -- using words.

20  A.   I'm trying to say words.

21       So there were -- there was one row of cars, two --

22       we were in the second row of cars and over to the left.

23       So there were probably about -- maybe eight to ten

24       cars -- well, make that --

25  Q.   In a parking --

Tracey Juran, Certified Court Reporter

Page 49

```
 1   A.   -- 16 cars --

 2   Q.   In a parking lot, then?

 3   A.   In a parking lot.

 4             So between myself and my son when this happened,

 5        there may have been as much space as, you know, 16 cars.

 6        Sorry; doubled, eight.  It would have been eight this

 7        way (indicating).

 8   Q.   And was this parking lot outside or was it a covered,

 9        enclosed area?

10   A.   Outside.

11   Q.   And did only hotel guests have access to that parking

12        lot or could the public have driven through the parking

13        lot?

14   A.   The public could have driven through it, but the

15        location of this hotel was at the Shilo Inn on the

16        beach, so there was nothing beyond that hotel.  In other

17        words, you would have to intentionally be going to that

18        hotel and -- or through that hotel in order to end up in

19        that parking lot.

20   Q.   Or to end up in that hotel portico; correct?

21   A.   Correct, right.

22   Q.   And did you talk to any of your fellow Republicans at

23        the convention about the incident that occurred?

24   A.   I did, including Attorney General Rob McKenna.

25   Q.   And did Rob McKenna think that this had happened because
```

1       of your position on Referendum 71?

2   A.  No, he didn't.  He said it's probably unrelated.

3   Q.  Did you talk to any other Republicans about this?

4   A.  Yes.  There were a number of Republicans there,

5       hundreds, and I did talk to several of them.

6   Q.  Did anything else happen during the conference that was

7       any sort of conflict between those at the conference and

8       members of the public?

9   A.  Yes.

10  Q.  Can you describe that for me.

11  A.  I didn't witness it myself, but I heard on Sunday that

12      on Saturday night at a karaoke bar -- and I don't know

13      if it was part of the hotel or just in the neighborhood,

14      but at a karaoke bar, there had been some nasty looks

15      from people in the bar who were upset at the choices of

16      songs that the Republicans at the bar were singing.  One

17      that comes to mind was "Sweet Caroline," that they

18      mentioned by --

19          MR. PIDGEON:  Neil Diamond.

20  A.  -- what's his name -- Neil Diamond, yes.  So they were

21      singing older songs, and apparently this irritated some

22      of the people there in the bar.  Now, when I told some

23      other Republicans that this had happened to ███████,

24      they said -- this is how I found out about it.  They

25      said, well, it's possible that someone was just angry at

```
 1        all the Republicans here for the weekend and didn't like
 2        their choice of songs in the bar last night.  In fact,
 3        it might have been Attorney General Rob McKenna who said
 4        that; I can't recall.
 5   Q.   (by Ms. Egeler)  Do you know whether the people that
 6        were in the car and that threw the applesauce were in
 7        the --
 8   A.   I have no idea.  I wasn't at the karaoke bar, so I don't
 9        know who was there.
10   Q.   Do you know the age of the people, roughly, that were at
11        the karaoke bar and disagreeing with the Republicans?
12   A.   Nope.  I did not hear anything about the age.
13   Q.   And did you talk to Attorney General McKenna about your
14        son's concerns about his personal safety?
15   A.   I did.
16   Q.   And can you tell me about that conversation.
17   A.   In fact, that's why I talked to Attorney General Rob
18        McKenna, because ████████ said, Mom, first it was in my
19        ear and now this time it was on my body, it was a
20        physical threat, and I'm afraid that next time it might
21        be sexual.  And he said, do you think they would allow
22        me to carry a gun?  And I said, no, I don't, because
23        you're so young.  And he said, well, why don't you ask
24        Rob McKenna.
25   Q.   And did you support the idea of your 13-year-old son
```

1       carrying a gun?

2   A.  If it were legal.  But it's not legal.  So yeah, I would

3       have no problem with it if it would make him feel safer.

4       I trust his judgment.  I don't think he would use it

5       wrongly.

6   Q.  And if it were legal --

7   A.  I think he would -- he would only use it in extreme

8       cause for self-defense.

9   Q.  So if it were legal, you would be supportive of his

10      carrying a gun at school if he felt the --

11  A.  He doesn't go to --

12  Q.  -- need to do so?

13  A.  -- school.  He's home schooled.

14  Q.  And any other incidents of harassment or threats --

15  A.  Yes.

16  Q.  -- that you perceived that we haven't talked about?

17  A.  Yes.  It just happened this week, actually, and I

18      brought --

19          MS. EGELER:  Let's mark this as Exhibit -- are we

20      on 4?

21          MR. PIDGEON:  Exhibit 4.

22          MS. EGELER:  Okay.

23              [Off the record - discussion]

24          [Exhibit 4 marked for identification]

25  Q.  (by Ms. Egeler)  Can you describe this for me.

1   A.   Yes.  In August there was a candidate forum, a large

2        number of candidates, at the Edmonds United Methodist

3        Church on Caspers Street.  And the state-representative

4        candidates from the 21st District were only asked one

5        question and that was our stance on gay marriage.  And

6        the first -- I was the fifth person to answer.  There

7        were six state-rep candidates, two for Position 1 and

8        four running for Position 2.

9             And the two sitting legislators support gay

10       marriage.  As incumbents, they were given the right to

11       answer first, so they did.  And again, my opponent is

12       one of the five or six gay representatives in our state

13       Legislature, which may have been why this question was

14       asked, but I don't know.  The League of Women Voters

15       selected the questions, which were submitted by the

16       audience on paper, but the League of Women Voters chose

17       which questions to ask.

18            So they asked, what is your stance on gay marriage,

19       and I was the fifth person to answer.  And because that

20       was the only chance at the mike that I had that night

21       and -- my answer did bring a round of applause and

22       people who said that they would vote for me based on

23       that answer.  They told me that as I was walking back to

24       my seat.  A lady said, you just got our vote.

25   Q.   So what would the --

1  A.  So because that was a good clip of how I can handle a

2      stressful situation and a difficult question, I posted

3      it on YouTube.  And two nights ago -- or maybe it's

4      three now -- this comment was posted where someone said,

5      "Oh my God, this woman is so" F'ing "stupid.  Someone

6      please shoot her in the head, again and again.  And

7      again."  It's someone named islander255.

8  Q.  Did you click on that name, islander255, to determine

9      who it was?

10 A.  Yes.  And the name I couldn't see, but the -- I could

11     see other videos that this person liked or talked about

12     or posted, and it does appear to be someone who is gay.

13 Q.  Does it list where the individual lives?

14 A.  No.  There was one -- it did -- somewhere on there it

15     said, I think, New Mexico, but I don't know if that is

16     the location of when they started the -- their -- what

17     do you call it -- account, their YouTube account, or --

18     you know, I don't know how that's -- how it's based.

19 Q.  Did you see a box that contained information about the

20     individual that they chose to put?

21 A.  Yes.  I believe that's where I saw New Mexico.

22 Q.  And did --

23 A.  But --

24 Q.  -- you see in that box in terms of location of residence

25     U.S. Virgin Islands?

1   A.   Oh, right, that's what it was.  Yeah, it was -- it's

2        Virgin Islands.  Yeah, New Mexico was someone else.

3            I did some more digging around on islander255 and

4        there was a guy -- I think his last name was Watkins,

5        and he's a student -- a 25-year-old student in New

6        Mexico.  So sorry; yeah, I'm confusing those two.  I

7        don't know if they're the same person, though.  But that

8        was -- I was looking on Twitter to see if there was

9        someone -- that's what it was.  I checked islander255 on

10       Twitter to see if they're -- if it's also a Twitter

11       name, and I believe that's how I found the name of -- I

12       think it was Watkins.

13  Q.   And did you see the U.S. Virgin Islands residence by

14       clicking islander255 on our Exhibit No. 4 --

15  A.   Yes.

16  Q.   -- to -- okay.

17           So that would show their account information for

18       YouTube; correct?

19  A.   Correct.  So it shows, I believe, the information that a

20       person puts in, which -- you know, you could change it,

21       you could lie, you could move and forget to update it.

22       I mean, I assume it's sort of like Facebook that way,

23       where people put down their hometown and it doesn't mean

24       that they live there.

25  Q.   But it might mean that they do.

```
 1   A.   It could, yeah.  It means they have some connection,
 2        usually, to that, at least, you know, judging by
 3        Facebook.
 4   Q.   Did you let the police know about this?
 5   A.   Yes, I did.
 6   Q.   And when did you contact the police?
 7   A.   On the 22nd.
 8   Q.   Of this month?
 9   A.   Yes.
10   Q.   Just the other day.
11             And was that the ███████ Police?
12   A.   It was.
13   Q.   Who did you speak to?
14   A.   Officer Mike Bower, B-O-W-E-R.
15   Q.   And did he take a report?
16   A.   He did.
17   Q.   And did he say he'd look into it?
18   A.   No, he didn't say he'd look into it, which is another
19        thing that bothers me, because now there are three
20        incidents.  And although I can't be certain that they're
21        related, they are -- I -- there are two death threats
22        and one physical assault to my family, and none of them
23        have been, I feel, really delved into by the police to
24        find out who is committing these crimes.
25   Q.   You know, I wanted to go back to that phone-call death
```

1    threat.  Did you ever contact the phone company and ask

2    about phone records for incoming calls?

3  A.  I did.  Yes, I did.  That night, actually, I called, and

4    they said that they couldn't do it without a police -- I

5    forget the terminology, but they -- the person on the

6    other line said -- I mean, on the end said that they

7    couldn't really do anything about it, that there needed

8    to be a court -- some kind of court procedure for them

9    to dig up the records of who had called me at that time.

10    I mean, I knew it was at 6:00, I knew the date, I knew

11    the number.  To me, it doesn't seem like it would be

12    that difficult to figure out who made that call.

13  Q.  Did they indicate that there was any legal prohibition

14    on their disclosure of that information?

15  A.  Yes, they did.  And so that's why I wish that the police

16    had walked me through whatever the legal steps are in

17    order to figure out who this criminal is.

18  Q.  Did you investigate what the law is that prohibits them

19    from giving you that information?

20  A.  No, I didn't.  I'm very busy --

21  Q.  Did you --

22  A.  -- right --

23  Q.  Did you contact an attorney to help you with that?

24  A.  No.

25  Q.  Did you ever ask the counsel for the Doe v. Reed case to

1        help you get those records?

2    A.  No.

3    Q.  Did you ever go to the courts and ask them to help you

4        have that information released?

5    A.  No.

6    Q.  With respect to the incident where the applesauce was

7        thrown, did you contact the police?

8    A.  Yes.

9    Q.  And did they respond?

10   A.  They responded, but, again, I was not happy with their

11       response.  There --

12   Q.  Can you tell me about their response.

13   A.  Sure.  There was one policeman on duty in Ocean Shores.

14       He came.  He asked my son what happened.

15   Q.  How fast before he responded?

16   A.  It was probably about 15 or 20 minutes.  Maybe 20.

17   Q.  And were you in a location you felt was safe for those

18       20 minutes?

19   A.  Yes.  We had -- the convention center was across the

20       street from the hotel.  And I did not feel safe in the

21       hotel parking lot, and so we drove over to the -- across

22       the street and parked at the convention center, where I

23       felt it was friendlier territory.  The meetings had

24       already started, and so with hundreds of Republicans

25       around, I felt safer there.  And so we stayed in the

1      lobby there until the policeman showed up.  And I'm

2      sorry; I don't have his number, but I -- or his name,

3      but I do have the case number.

4   Q.   What is that --

5   A.   Do you need that?

6   Q.   -- case number?

7   A.   That case number was 10-OS0495.

8        And this officer listened to my son's description

9      of the incident.  He wrote down a couple of notes on a

10     little spiral-bound palm-sized notebook and didn't seem

11     very concerned and then began to get into his car.  And

12     I said, wait a minute.  Don't I get a case number?  And

13     he said -- he just sighed with exasperation, rolled his

14     eyes, and reached into the car for a little card and

15     then wrote down a number, the case number, on it.

16         And then after that, we went into the meeting and,

17     as I mentioned, talked it over with Attorney General Rob

18     McKenna.  And then that meeting was over around noon.

19     The incident happened around 8:30, I believe.  So when

20     the meeting was over at 11:30 or noon and everyone began

21     to leave, my son and I were headed to Olympia for the

22     week, instead of coming home, because my son was going

23     to serve as a Senate page for Paull Shin that week.

24         So before heading on to Olympia, I drove to the

25     police station, because I had decided I had probably get

Page 60

```
 1         (sic) a copy of the report to take back with me to give

 2         to the ███████ Police, because Officer Mehl had

 3         encouraged me, if anything else happened, to file a

 4         report so that all these reports would be together.  So

 5         I drove to the police station in Ocean Shores and it was

 6         closed.  As I said, there appeared to only be one cop on

 7         duty.

 8    Q.   And what day of the week --

 9    A.   So --

10    Q.   -- was that?

11    A.   It was a Sunday.

12              So I called and left a message and told them I

13         would like a copy of the report.  On Monday, I called

14         again and told -- spoke to a person that time and told

15         them I would like a copy of the report sent up to the

16         ███████ Police Department.  And I gave them the fax

17         number of the ███████ Police Department, and they

18         assured me that they would send that.  And on Thursday,

19         I called again -- if I remember correctly, Thursday or

20         Friday -- called again to follow up and see if it had

21         been sent and they said yes.

22              And then I just put it out of my mind and let the

23         matter rest.  But today and yesterday, I have been told

24         both days by the ███████ Police Department that they

25         never received a copy of that report, although
```

1      MS. EGELER:   Okay, then that concludes my questions

2   at this point.

3

4                        EXAMINATION

5   BY MR. STAFFORD:

6   Q.   So, ███████, again, my name is Ben Stafford.

7   A.   Mm-hm.

8   Q.   I am an attorney and I represent Washington Families

9        Standing Together, which was a coalition of civic and

10       religious organizations who supported Senate Bill 5688

11       and opposed the placement of Referendum 71 on the

12       ballot.  Are you familiar with that group?

13  A.   Vaguely.

14  Q.   So wanted to start just asking a few questions about the

15       Ocean Shores --

16  A.   Mm-hm.

17  Q.   -- incident.  And --

18  A.   Mm-hm.

19  Q.   -- you indicated that you felt that the police hadn't

20       really delved into that.  So without having a license-

21       plate number, a make or model of the car, or any video

22       footage of the car, what else was it that you thought

23       the police should have done that they didn't?

24  A.   My complaint about the Ocean Shores Police is not that

25       they didn't delve into it as much.  My complaint is that

1   Q.   -- Tea Party events, Mr. --

2   A.   Mm-hm.

3   Q.   -- he has spoken at.

4   A.   Mm-hm.

5   Q.   And so when we were talking earlier about the phone call

6        that you received --

7   A.   Mm-hm.

8   Q.   -- on August 23rd --

9   A.   Mm-hm.

10  Q.   -- that came out the same day as this article in the

11       ████████████████; correct?

12  A.   Yeah.  Not this (indicating), but --

13  Q.   The --

14  A.   -- the article.

15  Q.   -- 8/23 --

16  A.   Yes.

17  Q.   -- ████████████████ article.

18  A.   Correct.

19  Q.   And that same day as the article came out, you received

20       a phone call?

21  A.   Correct.

22  Q.   And you stated earlier that you couldn't think of

23       anything in that article that would have prompted

24       somebody to place this phone call to you.

25  A.   Correct.

1   Q.   And in this Facebook posting we've just been looking

2        at --

3   A.   Mm-hm.

4   Q.   -- would you say that it appears from that article that

5        the statement of political beliefs by this other

6        individual prompted people to break into his office and

7        throw computers out the window?

8   A.   I can't guess exactly why these people attacked John

9        Koster, but I'm sure it's for his political beliefs.

10  Q.   And you can't say that -- why they would have done it

11       because it's difficult to know what might make somebody

12       angry who's not you; is that right?

13  A.   True.

14  Q.   Something that upsets you might not upset somebody else?

15  A.   Correct.

16  Q.   So is it possible that somebody might oppose Tim Eyman's

17       initiative that's going to be on the ballot?

18  A.   To the point of making a death threat to a child?  No.

19  Q.   That's not possible?

20  A.   No.

21  Q.   Nobody would do that?

22  A.   To a child?  No, I don't think so.

23  Q.   And it's --

24  A.   I mean, I would find it very difficult to believe.

25  Q.   Do you --

Page 95

1    A.    It's a huge stretch.

2    Q.    Do you know one way or the other?

3    A.    Well, how can I -- I don't know all the people on the

4          planet or what would push their button.

5    Q.    So you don't know --

6    A.    You know what I mean?

7    Q.    -- why somebody would place a phone call like that.

8          MR. PIDGEON:   Objection; asked and answered.

9    Q.    (by Mr. Stafford)   You can answer the question, if you

10         can.

11   A.    Say it again.

12   Q.    You don't know why somebody would place a phone call to

13         you if that person did not indicate why they placed the

14         phone call to you.

15   A.    Correct.   However, coupled with the post on the YouTube

16         video this week, it does solidify my belief that that

17         was the reason for the strong reaction on August 23rd,

18         2009.

19   Q.    The YouTube video was posted a year later --

20   A.    Mm-hm.

21   Q.    -- by -- you don't know if it was post -- or you don't

22         know if the person making the comment on the video was

23         the same person who placed the phone call?

24   A.    Correct.   But it shows the level of intensity on this

25         issue.

1    Q.    You mentioned that the original version of the 8/23

2          ███████████████ article --

3    A.    Mm-hm.

4    Q.    -- also included a box that had information about your

5          campaign kickoff?

6    A.    Correct.

7    Q.    And in that box, it listed your contact information?

8    A.    Correct.

9    Q.    And the contact information that was given was your

10         cell-phone number?

11   A.    Yes, mm-hm.

12   Q.    And that was your personal cell-phone number.

13   A.    Correct.

14   Q.    And no one has called that cell-phone number regarding

15         Referendum 71?  Was that your testimony?

16   A.    Correct.

17              MR. STAFFORD:  Okay, thank you.

18              MR. PIDGEON:  Okay.  All right.

19

20                        EXAMINATION

21   BY MR. PIDGEON:

22   Q.    ███████████, I have a couple of questions for you.

23   A.    Mm-hm.

24   Q.    Now, you mentioned you taught English as a second

25         language?

1   A.   Yes.

2   Q.   And you said you were in China?

3   A.   Yes.

4   Q.   How long were you in China?

5   A.   Two years, right after the Tiananmen massacre.

6   Q.   Now, were you in Beijing?

7   A.   I was in Tianjin, two hours east of Beijing.  And many

8        of my students had participated in those protests.

9   Q.   So you were aware of the Tiananmen objective.

10  A.   Highly aware.

11  Q.   Did you take part in that movement at all?

12  A.   No.  I came -- I arrived two months after the Tiananmen

13       massacre.

14  Q.   And then you also taught English in the Middle East?

15  A.   Yes.  Three years in the United Arab Emirates, from '93

16       to '96.

17  Q.   Did you learn Arabic at that time?

18  A.   Just a little bit.  The signs are in English and Arabic

19       and English is widely spoken as the language of wider

20       communication, because 70 percent of the people there

21       are not natives.  It's an odd place to be.

22  Q.   Now, you're also a member of the NRA?

23  A.   Correct.

24  Q.   How long have you been with the NRA?

25  A.   Just one year.

```
 1        left?
 2   A.   Extremely, yes.  It's used extremely often and it is
 3        used in an extremely derogative way to dismiss people
 4        who are upset about out-of-control spending.  It's used
 5        to demonize people who disagree with political
 6        decisions.
 7   Q.   So do you think it dehumanizes people who are fiscal
 8        conservatives?
 9   A.   Absolutely.  It labels, and I believe it is an attempt
10        to shut down or quiet people who disagree with the
11        current Congress's policies.
12   Q.   But isn't it also a derogatory and discriminatory term
13        towards homosexuals as well and wouldn't it --
14   A.   No.
15   Q.   -- demean --
16   A.   I --
17   Q.   -- homosexuals to be called such a name as well?
18   A.   You've got me there.  I think it comes -- I think when
19        we talk about demeaning or demoralizing, you need to
20        consider the person on the other end and how they
21        interpret the term.  If that is a term that gays use
22        among themselves or find amusing, then it wouldn't be
23        interpreted as demeaning to them.  I think it depends on
24        who is listening.  And -- but in this case, this is
25        clearly designed to intimidate and embarrass the people
```

1       calling for fiscal responsibility.

2   Q.  Do you know any other blogs besides Pam's House Blend

3       that use the phraseology "tea bagger"?

4   A.  Yes.  Richard Davis used the term.  He writes for

5       WashACE.  And interestingly, I believe he is a fiscal

6       conservative.  So in this case, I believe he picked up

7       the name from other people like on MSNBC, like Keith

8       Olbermann, who uses the term regularly.  I believe

9       Richard Davis probably learned the term from him and did

10      not realize the connotations.

11  Q.  Do you know whether or not Keith Olbermann is a tea

12      bagger in his own mind?

13  A.  I am certain that he is not in his own mind, because he

14      pokes fun of -- are you talking about tea partiers or

15      are you talking about an actual doing the act?  I don't

16      know what he does in his free time.

17  Q.  Now, you mentioned that you had an interesting

18      confrontation with a fellow in Lynnwood who was

19      screaming about mandatory redistribution of wealth.

20  A.  Yes.

21  Q.  Have you ever been threatened by anybody who's an open

22      communist or Marxist?

23  A.  Well, I suppose that was probably the closest that I've

24      come to being threatened.  As I mentioned earlier, I was

25      amused by it and just walking away --

1    Q.    But besides him, has anybody else who has identified

2          themselves as a Marxist or a communist or a socialist

3          ever threatened you, harassed you, or stalked you?

4    A.    No.

5    Q.    Were you a contributor to R-71?

6    A.    No, I don't believe I was.  No.

7    Q.    Would you say -- do you know of anybody else in the

8          state of Washington that had a higher profile as a

9          signer of the R-71 petition than you did?

10   A.    No, I'm not aware.  Let's see.  Who else was running

11         then?  It was '09, so it was local races mostly, local

12         and county races that were being discussed in the news.

13         Mine was an unusual case because I started so early.  So

14         no.

15   Q.    So you would say you -- that you were highly public as

16         an R-71 signer.

17              MR. STAFFORD:  Objection; leading.

18   Q.    (by Mr. Pidgeon)  Were you highly public as an R-71

19         signer?

20   A.    Well, after it made the papers, yes, I felt that it was

21         extremely public.

22   Q.    And since then you've received two death threats; is

23         that correct?

24   A.    Correct, and one physical assault to my son, which -- I

25         don't know if it's related, but in my mind, these three

1        events are connected.

2   Q.   Let's talk a little bit about what happened to ████.

3        You mentioned that you attended the election-night

4        party and that -- would that have been in November of

5        2009?

6   A.   Yes.

7   Q.   And at the election-night party, you also mentioned that

8        there were people taking pictures there?

9   A.   Yes, a number of people taking pictures with very

10       expensive, large cameras.

11  Q.   Were any of them making videos, to your knowledge, or

12       were they just snap photos?

13  A.   That I'm not sure.  I don't know if they were making

14       videos.

15  Q.   And did one of them or more of them go out of their way

16       to take pictures of your children?

17  A.   Yes, they did.  Several of them, as I mentioned,

18       followed the family as we walked down the hall, and I

19       know they were taking pictures of the children because

20       we were a little bit spread out as we were walking down

21       and they were focused on the children.

22  Q.   Do you think that members of the part of this community

23       that would give you a death threat would hurt your

24       children as well as you?

25  A.   I do.  After that death threat, yes.  The man said to a

1    child, I will kill you and your family.  Yes.  And he

2    had heard my son say, Mom, it's for you, so he knew that

3    he was speaking to a child.

4  Q.  Now, this incident that took place in Ocean Shores was

5    after that election party; isn't that correct?

6  A.  Correct.

7  Q.  So it's possible that someone could have had a picture

8    of ████████ from the election night; isn't that correct?

9  A.  Yes, it's quite correct.

10       I would like to point out also that my son also

11    spoke at that April 15th, 2009, tea party.  He wrote his

12    own speech and his video was posted on YouTube.  So it

13    would not be difficult to figure out what my son looks

14    like.  Also, when I introduced my speech, which was also

15    posted on YouTube, I said at the very beginning, that

16    was my son, and everybody clapped again.  So again,

17    it's -- yeah, his face is definitely out there.

18  Q.  But ████████ hasn't declared his run for any public

19    office; isn't that correct?

20  A.  Correct, although he has said that he would like to run

21    someday.

22  Q.  Does he still feel that way?

23  A.  Yes, even more so now.

24  Q.  Now, you indicate that somebody threw applesauce all

25    over him.

 1   A.   Yes.

 2   Q.   How much applesauce would you estimate was being thrown?

 3   A.   Judging by how long it took me to clean up the mess, I

 4        would guess somewhere between -- I would guess around

 5        half a cup.

 6             And actually, I did find out later, just recently,

 7        that someone from the Roanoke conference went back to

 8        the hotel after that incident and found a container, a

 9        plastic container, that looked like it could have had

10        the applesauce in it that had been thrown.  So she

11        threw, apparently, the whole thing.  I don't know if it

12        was one of those little recyclable ones, you know what I

13        mean, the little snack-pack size.  I don't know; I

14        didn't see the container.  But someone did tell me that

15        they went back and found it.

16   Q.   Then you had a discussion with Rob McKenna at this

17        convention?

18   A.   Correct.

19   Q.   Did you tell Rob at the convention about the death

20        threat that had happened earlier?

21   A.   Yes, I did.

22   Q.   And you told him the express words that had -- that were

23        given to you?

24   A.   I don't remember if I told him the express words, but I

25        did say, we received a death threat last August.  And he

1      dismissed it as being probably not connected to the

2      physical assault that had happened that morning.

3  Q.  Right.

4          But did he realize that the death threat was

5      associated with the publication of the article on R-71?

6  A.  No.  I don't know if he -- I don't recall if I had

7      mentioned that or not, that part of it.  I might have,

8      but I don't recall if I had mentioned that to him when I

9      said, we received a death threat last August.

10 Q.  Are you aware that Anne Levinson, who is the

11     representative for Washington Families Standing

12     Together, has repeatedly said in public that there is

13     absolutely no evidence of any harassment in this case?

14 A.  I have -- I've not heard her say that, but I've heard

15     Secretary of State Sam Reed say it on the radio.

16 Q.  Do you think that the death threat to you and your

17     family is no evidence of harassment in this case?

18 A.  No, I don't.  In fact, I immediately called in to that

19     radio show to tell them that there had been, and I

20     believe it was on Carlson's show, John Carlson, on KVI.

21     I immediately -- it was John.

22         I immediately called in, and they were in a

23     commercial break and they put me on afterwards.  And I

24     said, it is happening.  It happened to me.  And I

25     briefly said, you know, I was on the front page of the

1      paper and then we got a call at 6:00 that night, and he

2      hung up immediately.  And I know John Carlson knows that

3      I'm a candidate and probably didn't want to get into the

4      legal ramifications of having a candidate on his show

5      without giving the opposing candidate equal time.  So

6      that may be why he hung up quickly.

7           Yeah, I suspect that I am not the only one who has

8      filed a police report and then had no follow-up to see

9      who actually did the threat.

10  Q.   Are you aware of this fellow John Bisceglia?  Does that

11      name sound familiar to you at all?

12  A.   No.  Bisceglia?

13  Q.   Yeah.

14  A.   John Bisceglia?  Maybe -- no, it's not.  If I've seen

15      the name, I'm not placing it.

16  Q.   Now, you also mentioned that some of your signs had been

17      slashed with a sharp instrument?

18  A.   Correct.

19  Q.   Could you tell me a little bit more about that.

20  A.   Yes.  There are two kinds of slashing that we've seen.

21      One is slashing the entire sign off the stake so that

22      it's not usable again, and then the other kind is where

23      it's just mangled, slashed in many places with some kind

24      of sharp instrument, but not going all the way through

25      the sign.  So then it's just kind of hanging in shreds.

1    Q.    But the sign is essentially useless thereafter.

2    A.    Correct.

3    Q.    Now, can you describe how you think somebody could cut

4          one of your signs in multiple slices.  How would they do

5          that, in your own mind?  How would you do it if you were

6          going to make this -- you know, similar slices, do that

7          at a sign?

8    A.    I suppose you would need some kind of a machete or

9          something of similar nature, and you would have to

10         anchor the sign and -- I don't actually know.  I mean,

11         these signs are very firm material, so I can't picture

12         what kind of instrument they're using.  But it's nasty

13         looking.  It's quite frightening to come across a sign

14         like that, frankly.  It bothers me.

15   Q.    In what respect do you think that the -- do you think

16         that your opposition is deploying extremely sharp

17         weapons against your signs?

18   A.    I do.

19              MR. STAFFORD:  Objection; calls for speculation.

20   A.    It would take an extremely sharp instrument to destroy

21         the signs in such a manner.  And the fact that the sign

22         is not just merely stolen shows fury and anger.  I and

23         my husband both perceive those kind of signs as physical

24         threats to me.  It's as if they're slashing my face when

25         I see a sign like that.

Tracey Juran, Certified Court Reporter

1    Q.   (by Mr. Pidgeon)  Now, you also -- you took a position

2         in the candidate-survey response on immigration and

3         abortion.

4    A.   Mm-hm.

5    Q.   Have you ever had anybody who is pro-immigration call

6         you?

7    A.   No.

8    Q.   Have you ever had anybody who's pro-immigration blog

9         anything that you've ever seen?

10   A.   Blog anything?

11   Q.   Yeah.

12             Have you ever --

13   A.   You mean --

14   Q.   -- seen any blogs that mentioned you as a --

15   A.   No, I haven't.  No.

16   Q.   Have you ever received any threats, phone calls,

17        harassment, or stalking from somebody who is pro-

18        immigration?

19   A.   No, I haven't.

20   Q.   How about on the abortion issue?  Have you ever picketed

21        in public on abortion?

22   A.   I have.

23   Q.   Where have you picketed?

24   A.   I picketed in Illinois many years ago and I have also

25        picketed in -- let's see; where is that?  I guess it's

1      north Lynnwood, around 164th, several years ago.  And I

2      have been to pro-life rallies in Olympia, although not

3      for a couple of years.

4  Q.  Do you know whether or not Planned Parenthood was

5      created for the explicit purpose of aborting black

6      babies or African-American babies?

7          MS. EGELER:  Objection to relevance.

8  Q.  (by Mr. Pidgeon)  Just asking your -- whether or not you

9      know that.

10 A.  I do know that.  Margaret Sanger believed that eugenics

11     was a good way to eliminate the part of the population

12     that she thought was not worth living.

13 Q.  Do you know whether or not Planned Parenthood will

14     continue to accept donations right now that are

15     expressly reserved for only the abortion of African-

16     American babies?

17 A.  Yes.  I know this has been done -- exposed in several

18     cities in the last couple of years, with people calling

19     and pretending to be donors who want the money to be

20     used only to abort black babies, and the people on the

21     other end of the line at the Planned Parenthood clinics

22     agreed.  This has happened in at least three cities that

23     I've read about, different incidences.  It's very sad.

24 Q.  Now, as a result of your picketing and your notorious --

25     I mean, I take it you were in public when you were

1      picketing?

2  A.   Yes.

3  Q.   Did people see you?

4  A.   Yes.  It was on a busy street.

5  Q.   Were you ever photographed and your name in the paper

6      for doing this?

7  A.   No.

8  Q.   Did anybody threaten you, harass you, or stalk you as a

9      result of your picketing?

10  A.   No, never.

11  Q.   Has anyone who is pro-abortion in this state threatened

12      you, called you, harassed you, or blogged about you as

13      an opponent of being pro-abortion?

14  A.   Not that I'm aware of.

15  Q.   So is it your testimony here today that the only

16      difficulty you've had with your political campaign in

17      terms of threats, harassment, stalking, and so forth is

18      a result of your position on R-71?

19  A.   Yes, and my position on gay marriage in general, as

20      evidenced by the YouTube-video comment this week.

21  Q.   Now, going to that YouTube comment -- can you hand me

22      that exhibit.  I believe it's Exhibit 6.

23  A.   Let's see.  I believe I gave --

24  Q.   Exhibit 4; excuse me.

25        Now, in this exhibit, he indicates here -- do you

1      see an advocacy that you should be shot?

2  A.   I do, yeah.   I think he's saying, can't someone shoot

3      her?   I think he is making it easier for someone who

4      lives near me to say, yeah, I think she needs to be done

5      away with.

6  Q.   And this is a particular -- and this isn't shoot to

7      wound, is it?

8  A.   No.   He wants me not only dead, but mutilated beyond

9      recognition.   He wants me shot at least three times in

10     the head, judging by this comment.

11         MR. PIDGEON:   Okay, I have nothing further.

12

13                    FURTHER EXAMINATION

14  BY MS. EGELER:

15  Q.   ████████████   is there gay support for your campaign?

16  A.   There is.

17  Q.   Can you tell me about that.

18  A.   Yes.   There is a lesbian couple in my neighborhood who

19     have endorsed my campaign.   One member publicly endorsed

20     me and her name is listed on my Web site, though I did

21     not put any specifics about her.   And they -- that is

22     because they are also very concerned about the out-of-

23     control spending at the state level and they're very

24     concerned about our schools not doing a good job with

25     the money that they have.   And so they're very excited

1        about my platform.

2    Q.   And is it fair to say that your platform is not

3         predominantly -- or, rather, the predominant issue of

4         your platform is not the domestic-partnership issue?

5    A.   Correct.  In fact, the domestic-partnership issue is not

6         a part of my platform at all.  I am only answering the

7         social-issue questions when they're presented to me.

8    Q.   So --

9    A.   I don't initiate the conversation on the social issues

10        because my focus is on jobs, schools, and fiscal

11        responsibility.

12   Q.   And would you expect that those are the only gay people

13        in your district that are supporting you?

14   A.   No, I would not.  I would guess that there are other

15        gays and lesbians who are supporting me, again, because

16        they have similar concerns about the spending and the

17        higher taxes and money not being used wisely to support

18        the services that our state provides.

19   Q.   You said that you participated in some picketing

20        regarding the abortion issue.  Can --

21   A.   Several years ago.

22   Q.   Was it one incident, then?

23   A.   I can remember one incident here, yes, in Washington

24        State.

25   Q.   And that was at the State Capitol?

Tracey Juran, Certified Court Reporter

1  A.  No, that was at -- that was in Lynnwood on, I believe,

2      164th.  There's a church there where we met, and then we

3      walked down the street a few blocks, turned around, and

4      came back up the street.

5  Q.  So it wasn't picketing outside an abortion clinic.

6  A.  No.  I've never done that.

7  Q.  Was the picketing with respect to a pending legislative

8      issue regarding abortion?

9  A.  No.  It was just a general pro-life -- you know, we want

10     to respect life.  I don't remember that there was

11     anything hot on the ballot at the time or in the

12     Legislature.

13 Q.  Did you carry any signs, you being the group?

14 A.  Yes, the group did carry signs.  No pictures, you know,

15     of fetuses or anything like that.  It was just messages

16     like protect life, that type of thing.

17 Q.  And did the signs say anything negative about abortion,

18     as opposed to a positive statement about protecting

19     life?

20 A.  I don't recall.  I suppose -- I mean, it's possible it

21     might have said, abortion stops a beating heart, or some

22     kind of phrase like that, but I'm just speculating.  I

23     don't recall any specific signs.

24 Q.  And when you walked down the street, was that on a

25     residential street?

Tracey Juran, Certified Court Reporter

1                        CERTIFICATE

2    STATE OF WASHINGTON )
                          )
3    COUNTY OF SNOHOMISH )

4            I, the undersigned Notary Public in and for the

5    State of Washington, do hereby certify:

6            That the foregoing is a full, true, and correct

7    transcript of the testimony of the witness named herein,

8    including all objections, motions, and exceptions;

9            That the witness before examination was by me duly

10   sworn to testify truthfully and that the transcript was made

11   available to the witness for reading and signing upon

12   completion of transcription, unless indicated herein that the

13   witness waived signature;

14           That I am not a relative or employee of any party

15   to this action or of any attorney or counsel for said action

16   and that I am not financially interested in the said action

17   or the outcome thereof;

18           That I am sealing the original of this transcript

19   and promptly delivering the same to the ordering attorney.

20           IN WITNESS WHEREOF, I have hereunto set my hand and

21   seal this 12th day of October, 2010.

22

23       _____
         Notary Public in and for the State of Washington
24              residing at Edmonds, Washington.
                  (Notary expires 3/09/13)
25                    (CCR No. 2699)

Tracey Juran, Certified Court Reporter

Exhibit 1, Page 137

A F F I D A V I T

STATE OF WASHINGTON            )
                               )
COUNTY OF SNOHOMISH            )


          I have read my within deposition and the same is true and

accurate except for any changes and/or corrections, if any, as noted by me on the

correction sheet hereof.


          SUBSCRIBED AND SWORN to before me on this, the

_____5TH_____ day of _NOVEMBER___, 2010.

NOTARY PUBLIC in and for the State of

Washington residing at _EDMONDS_,

Washington.

Notary expires: _DEC. 8. 2012_

SCOTT/SEPTEMBER 24, 2010

TO THE DEPONENT:

PLEASE READ YOUR DEPOSITION CAREFULLY.  On this correction sheet, make notes of any errors in the transcript.  Then please sign this sheet at the bottom and return it with the notarized affidavit page to Tracey Juran at 21103 80th Avenue West, Suite A, Edmonds, Washington, 98026.  If you have any questions about this process, please call me at 425-775-1243.

Page and line                    Correction

P. 18 line 25  "No, because we didn't have caller I.D."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1-4

**Exhibit to Pls.' Statement of Material Facts**
**(Case No. 3:09-cv-05456-BHS)**

Exhibit 1, Page 140

Bᴏᴘᴘ, Cᴏʟᴇsᴏɴ & Bᴏsᴛʀᴏᴍ
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

_____

```
                            )
JOHN DOE #1, et al.,        )
                            )
            Plaintiffs,     )
                            )
        vs.                 )  NO. 09-cv-05456-BHS
                            )
SAM REED, et al.,           )
                            )
            Defendants.     )
```
_____

DEPOSITION UPON ORAL EXAMINATION OF ███████████

_____

September 27, 2010

Tacoma, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

EGELER (███████████████, 9/27/10)

Page 4

1          BE IT REMEMBERED that on Monday, September 27,

2     2010, at 10:19 a.m., at 1250 Pacific Avenue, Suite 136,

3     Tacoma, Washington, before REBECCA S. LINDAUER, Notary

4     Public in and for the State of Washington, appeared ██████

5     ██████, the witness herein:

6          WHEREUPON, the following proceedings were had, to

7     wit:

8

9     ██████████████,          having been first duly sworn by

10                             the Notary, testified as follows:

11                         EXAMINATION

12    BY MS. EGELER:

13    Q    Good morning, ███████████.  We're finally off and running.

14    We have Steven Dixson with Washington Coalition for Open

15    Government joining us on the phone, and also joining us on

16    the phone is Stephen Pidgeon with Protect Marriage

17    Washington.  If either of them has any trouble with this

18    setup hearing us, we'll just interrupt the deposition to get

19    our technology straightened out and then we'll pop back on.

20         ████████████, my name is Anne Egeler, and I'm with the

21    Washington Attorney General's office, and my first question

22    to you is:  Have you ever been deposed before?

23    A    Well, I'm 67 years old, so my history goes back quite a

24    ways, but at the moment, I can't recall a case where I was

25    deposed.

EGELER (████████████, 9/27/10)

Page 20

```
 1        signature is hardly the issue.  It would be like saying,

 2        well, would President Obama object to a public disclosure of

 3        the fact that he and Michelle voted for Obama in 2008?

 4        Obviously it's a whole different case.

 5   Q    I understand that you feel that you have suffered some

 6        threats or harassment as a result of your involvement with

 7        Referendum 71.  We would like to explore each of those

 8        instances this morning, so let's start by having you begin

 9        that narrative and let me know what --

10   A    Would this be a good time to take a quick bathroom break?

11   Q    It would be a good time.

12                                    (Recessed at 10:45 a.m.)

13                                    (Reconvened at 10:48 a.m.)

14   A    I wonder if I could add one additional point to the last

15        question.  Also, the issue of a person who is active

16        politically having their signature released raises the

17        question of risk.  Part of the problem, the concern of many

18        of the signatories, is that they took a risk to sign --

19   Q    (By Ms. Egeler)  I'm going to interrupt you and just let you

20        know during the deposition process it's sort of a question

21        and answer period and --

22   A    Well, this is in answer to your question, so I would say

23        that because I've already taken the risk by becoming a

24        spokesman for this issue, I've crossed that line already.

25   Q    Okay.
```

EGELER (███████████, 9/27/10)

Page 21

| | | |
|---|---|---|
| 1 | A | There's no additional risk worthy of mention by having the |
| 2 | | signatures released. |
| 3 | Q | So let's start discussing now any threats or harassment that |
| 4 | | you feel you suffered as a result of your involvement with |
| 5 | | Referendum 71. |
| 6 | A | Okay.  Yes, there was one particular case, which is what I |
| 7 | | signed the affidavit in regard to.  Do you want me to read |
| 8 | | this or recite it from memory? |
| 9 | Q | Recite from memory and let me know if you still remember. |
| 10 | A | Yeah.  It was a pretty vivid experience, so it's impressed |
| 11 | | upon my memory.  It was on October 11.  I was taking a ferry |
| 12 | | from Seattle after one of the debates I mentioned.  This |
| 13 | | particular debate was at -- at a church in Shoreline, sort |
| 14 | | of in the Richmond Beach area.  That was one of the |
| 15 | | non-televised debates.  Wherever I went on debates, I always |
| 16 | | took R71 brochures.  We have a nice little colorful brochure |
| 17 | | that we hand out to people in the audience and so on. |
| 18 | | On the way, I'm riding the ferry back.  You know, as a |
| 19 | | ████████ resident, I spend a good time of my -- part of my |
| 20 | | time living on the ferry.  I asked one of the attendants if |
| 21 | | it would be okay, during the hour ride, if I distributed R71 |
| 22 | | brochures to the passengers. |
| 23 | | And she wasn't willing to grant me permission on her |
| 24 | | volition, so she called the captain on the phone.  And he |
| 25 | | said, okay, as long as it doesn't become, you know, really |

Exhibit 1, Page 144

EGELER (███████████, 9/27/10)

Page 22

1    heated.  In other words, just pass them out and keep your

2    cool, which is what I did on the entire main deck without

3    any particular incidents.  A few people would ask a question

4    or two, but everything was quite civilized.

5         Then I went to the upper deck.  It's a two-deck ferry.

6    I did the west end of the ferry, the same thing.  Everything

7    was fine.  Then I went to the east end and this was the last

8    quarter of the ferry that I was going to do.  And I started,

9    as I did on that occasion, going to each table where

10   someone's sitting or chair and asking them first if they had

11   voted.  If they had already voted, I didn't feel it was

12   necessary to hand out a brochure, and so I just pass on.

13        But this gentleman said that he had not voted yet, and

14   so I handed him a brochure and moved on.  He said thank you.

15   I moved on.  I would say 20, 30 seconds passed.  I'm one or

16   two tables further along when I hear a huge shrieking

17   commotion coming from this person.  He's just screaming at

18   me, using foul language, and wadded up the brochures.  Said,

19   this is a bunch of shit, and threw it at me at about a

20   distance maybe from here to that blackboard.  And --

21 Q  How many feet would you say that is?

22 A  It's probably four yards, 12 feet.

23 Q  Okay.

24 A  And he must have been a pretty good shot because it was

25   heading straight for my head.  And I dodged it and it went

Exhibit 1, Page 145

EGELER (████████████, 9/27/10)

Page 23

1    by, and I made a mistake and sort of taunted him and said,

2    you missed, or words to that effect.

3         He became even more incensed and enraged and just was

4    carrying on about he and his male partner had just as much

5    right to get married as I did.  And shrieking and screaming

6    how dare I and da-da-da.  And it was really quite a

7    sensational experience for everyone on the aft the end of

8    the ferry.  There wasn't anybody that couldn't hear this

9    commotion going on, including a lady who was sitting there

10   with her two young children.  She pleaded with him to stop

11   carrying on like that in front of the kids, but that didn't

12   even phase him.  He continued on.

13        And then he tried to get the passengers to stand up and

14   take a vote.  He was going to do an on-the-spot politicide

15   right on there the ferry as to whether they agreed or

16   disagreed with same sex marriage.  And I realized at that

17   point I was dealing with a person who was at least

18   temporarily berserk, and so I saw no point in continuing.  I

19   briefly had an exchange or two on the issue with him.  It

20   was nonproductive.

21        So I just turned around and starting heading for the

22   other end of the ferry, but he shadowed me.  He stayed four,

23   five, six feet behind me, the width of the table, I would

24   say.  Whichever way I would go, I'm watching him sort of out

25   the back of my -- the side of my eyes as best you can when

EGELER (█████████████, 9/27/10)

1      he's directly behind you.  I could see that whichever way I

2      would go, he would go that way and muttering low tones to

3      himself or to me.  Anyway, it was unintelligible.  I was

4      more than anxious to be rid of this individual and to

5      terminate the whole experience.

6           And so I'm trying to make my escape and he's not

7      letting me get away.  Fortunately two ferry workers who were

8      in the kitchen there -- this was late in the ferry route, so

9      there weren't any customers in the line there.  They have a

10     long counter that's maybe 50 feet long or 40 and there's

11     aisles with food on either side and then a kitchen in here.

12         They came out of the kitchen and went right up to the

13     front and stood there.  And I just skirted around behind

14     them and went down that aisle, and they prevented him from

15     following me.  So they came to my assistance, allowed me to

16     make my escape.  I went as quickly possible downstairs to my

17     car and stayed in the car for the duration of the ride.

18  Q   You said that he was not letting you get away.  Did you mean

19     because he kept following you?

20  A   He stayed right with me.  Shadowing me would be the word I

21     would use.

22  Q   Continued to have that four- to six-foot distance?

23  A   Yes.

24  Q   What was he shouting?  I was little confused.  Was he

25     shouting or muttering to himself?

Exhibit 1, Page 147

EGELER (⬛⬛⬛⬛⬛⬛⬛, 9/27/10)

Page 25

1   A   Well, when he was following me, he wasn't shouting quite so

2       loud because he was -- this was sort of the second phase of

3       this confrontation with him behind me, me trying to get

4       away, him following.  What he was saying was unintelligible

5       to me.

6   Q   So that --

7   A   But he was right behind me.  He had a kind of a menacing-

8       type tone and possibly -- you know, somebody is berserk, you

9       don't know what sort of idea he might have in his mind, but

10      what was he doing shadowing me?  I was really concerned he

11      might escalate to the next level.  I didn't want to get

12      smacked in the back, you know, as I'm walking.

13          So I was more than -- I was really grateful for those

14      two ferry workers.  I didn't stay to thank them, but I

15      wished I could.

16  Q   So at the time he was following you, what he was saying was

17      unintelligible.  He was muttering?

18  A   Right.

19  Q   But earlier when you first had him -- you didn't have him,

20      but he chose to stand up and shout at you, what was he

21      shouting at that time?  I know it's not pleasant to repeat

22      swear words, but it is important that we get this down

23      accurately, even if there was foul language.

24  A   Well, the only swear word I can for sure identify from

25      memory was when he said this is a bunch of shit and then

EGELER (█████████████, 9/27/10)

Page 26

```
 1      could -- just got increasingly -- you know, he, after he
 2      threw the brochure at me, which was wadded up into a ball,
 3      and missed me and I made probably the mistake of taunting
 4      him a little bit by saying you missed, he became louder.
 5           And it wasn't so much vulgar at that point as just sort
 6      of an issue of him screaming and shrieking at me.  A couple
 7      times I made the attempt to sort of get, you know, get my
 8      point in, but he was just not going to hear of it.
 9   Q  So what was he saying at that point when he was --
10   A  He was saying, in particular, I remember he was saying that
11      he and his boyfriend had just as much right to get married
12      as I did.  How he knew I was married, I don't know.
13   Q  How did you respond to that?  You said you did --
14   A  I did say something about consent of the governed or the
15      general issue, which is so important to me, namely that the
16      people have a right to govern themselves.  Thomas Jefferson
17      said this was most valuable of all freedoms, right of the
18      people to be self-governed.  The people of this country have
19      made it perfectly clear they don't want to redefine marriage
20      to include same sex couples.  I didn't have time so say all
21      that in the course of this heated crazy shouting match on
22      his part.  I wasn't doing any shouting, but I attempted to
23      calm him down a little bit by making a point in the hopes he
24      would be become a little more rational, but I was getting
25      nowhere and then the lady started pleading for him to stop
```

EGELER (⬛⬛⬛⬛⬛⬛⬛, 9/27/10)

Page 27

| | | |
|---|---|---|
| 1 | | shouting. |
| 2 | Q | Do you think he may have been mentally ill? |
| 3 | A | It depends how you define mental illness, I guess. |
| 4 | Q | You just used the word "berserk" earlier and I wondered -- |
| 5 | A | Yeah.  I mean, whether it was temporary or some kind of |
| 6 | | chronic condition with him, I, of course, have no way of |
| 7 | | knowing. |
| 8 | Q | But you did feel that he was unwell at that moment? |
| 9 | A | He was out of control. |
| 10 | Q | I understand he threw the brochure at you.  Did he throw |
| 11 | | anything else? |
| 12 | A | No. |
| 13 | Q | Did he verbally threaten violence or was it more the |
| 14 | | intimidation of following? |
| 15 | A | Yeah, the latter. |
| 16 | Q | And do you remember how big he was, what he looked like? |
| 17 | A | Yeah.  He was shorter than me.  I would say he's maybe 5'6" |
| 18 | | to 5'8", of color. |
| 19 | Q | So African-American? |
| 20 | A | Um-hmm. |
| 21 | Q | "Yes"? |
| 22 | A | Yes. |
| 23 | Q | And his build, roughly? |
| 24 | A | I wouldn't describe him as skinny or fat, just sort of |
| 25 | | normal build. |

Exhibit 1, Page 150

EGELER (█████████████, 9/27/10)

Page 28

1   Q   And how tall are you?

2   A   Six feet.

3   Q   Did he follow you down to the area of the ferry that has the

4       parked cars or were you able to get away?

5   A   No.  Thanks to the ferry attendants, I was able to lose him

6       at that point.  I was on the upper deck.

7   Q   Were there any police officers in the vicinity at all?

8   A   If there were, if they arrived later, I don't know because I

9       got in my car and I stayed there.  I didn't see any activity

10      down on the car deck.

11  Q   Sounds like the ferry workers saw it and took care of the

12      situation?

13  A   Um-hmm.

14  Q   "Yes"?

15  A   Yes.

16  Q   Any other instances that occurred?

17  A   Do you mean other than this particular day?

18  Q   Yes.

19  A   The fellow that -- not really.  I mean, I wouldn't count the

20      sort of harassing sort of questioning that came from the

21      audience at the Seattle Public Library as threatening in the

22      sense that this was.

23  Q   Okay.

24  A   So no.

25  Q   So you just -- okay.

Exhibit 1, Page 151

1        C E R T I F I C A T E

2        I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3    and for the State of Washington, residing at Lacey, do hereby

4    certify:

5        That the foregoing deposition of ███████████ was taken

6    before me and completed on the 27th day of September, 2010, and

7    thereafter transcribed by me by means of computer-aided

8    transcription; that the deposition is a full, true, and complete

9    transcript of the testimony of said witness;

10        That the witness, before examination, was by me duly sworn

11    to testify the truth, the whole truth, and nothing but the truth,

12    and that the witness reserved signature;

13        That I am not a relative, employee, attorney, or counsel of

14    any party to this action or relative or employee of any such

15    attorney or counsel, and I am not financially interested in the

16    said action or the outcome thereof;

17        That I am herewith securely sealing the deposition of ████

18    ████████ and promptly mailing the same to MS. ANNE E. EGELER.

19        IN WITNESS HEREOF, I have hereunto set my hand and affixed

20    my official seal of this 4th day of October, 2010.

21

22    

23

24            Rebecca S. Lindauer, CSR#2402
              Notary Public in and for the State of
25            Washington, residing at Lacey.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1-5

Exhibit to Pls.' Statement of Material
Facts
(Case No. 3:09-cv-05456-BHS)

Exhibit 1, Page 153

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,<br><br>                    Plaintiffs,<br><br>        v.<br><br>SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 09-CV-05456-BHS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

Deposition Upon Oral Examination
Of
█████████████████████

_____

Taken by:  Tracey L. Juran, CCR
           CCR No. 2699


September 28, 2010

Everett, Washington

 1          Be it remembered that the deposition upon oral

 2     examination of ███████████████████ was taken on

 3     September 28, 2010, at the hour of 2:08 p.m. at 3501

 4     Colby Avenue, Suite 200, Everett, Washington, before

 5     Tracey L. Juran, CCR, Notary Public in and for the State

 6     of Washington residing at Edmonds, Washington.

 7          Whereupon the following proceedings were had,

 8     to wit:

 9                         * * * * *

10     ██████████████████,      having been first duly sworn on
                                 oath by the Notary Public to tell
11                               the truth, the whole truth, and
                                 nothing but the truth, was deposed
12                               and testified as follows:

13

14                         EXAMINATION

15     BY MS. EGELER:

16     Q.   ████████, as I stated earlier when we first met, my name

17          is Anne Egeler and --

18     A.   Mm-hm.

19     Q.   -- I'm a Deputy Solicitor General with the Attorney

20          General's Office, and I'm representing the defendants in

21          this case, Sam Reed's position.

22          Have you ever been deposed before?

23     A.   Oh, I can't remember.  I don't remember ever being

24          deposed.  I may have been.

25     Q.   Well, I will remind you of a few rules that we have.

```
 1        page --
 2   A.   Mm-hm.
 3   Q.   -- on the second and third lines -- or boxes of the back
 4        page, it lists ███████████████████ and
 5        contributions on August 13th of '09.  Is the address
 6        listed correct?
 7   A.   Yes.
 8   Q.   And we've talked before about the fact that the
 9        occupation is incorrect, is that right, on the box for
10        ████████████?
11   A.   Oh, yes, that is incorrect.  I'm a ████████████, not a
12        ████████████████.  But that's a common mistake that
13        often happens.
14             MS. EGELER:  Then one last exhibit.  We'll mark
15        this Exhibit No. 7, I think.
16             [Exhibit 7 marked for identification]
17   Q.   (by Ms. Egeler)  And what we've marked as Exhibit 7 to
18        your deposition is a page printed on ██████████████,
19        ████, from the ███████████████████████████.
20        Are you familiar with this letter that appears on this
21        exhibit?
22   A.   If I read it, I might be.  Do you want me to read it?
23   Q.   Please.
24   A.   The whole thing?
25   Q.   Until you can determine whether or not this message that
```

1       appears under the headline, "Important message from

2       ███████████████ on R-71," exclamation point, is

3       something that you actually wrote.

4   A.  Okay, what was the question again?

5   Q.  Do you recognize this letter as something that you

6       wrote?

7   A.  Yes.  Not specifically I wrote, but I endorsed.

8   Q.  And on page 2 (sic) of this Exhibit No. 7 --

9   A.  Mm-hm.

10  Q.  -- it ends with, "Sincerely," and a signature of

11      "████" --

12  A.  Mm-hm.

13  Q.  -- "███████████████████████." Is that your writing of

14      "████"?

15  A.  Yes.  Well, it's an electronic signature.  Is that what

16      you're asking me?

17  Q.  Did you authorize an electronic signature of this

18      letter?

19  A.  Yes.

20  Q.  And did you state to ████████████████████████ that

21      they could post this on their Web site?

22  A.  Yes.

23  Q.  So now I wanted to ask you about anything that you

24      perceived as harassment or threats that you suffered as

25      a result of your association and involvement with

Tracey Juran, Certified Court Reporter

```
 1        Referendum 71.

 2   A.   Well, it started with -- and I don't know what point it

 3        started.  I can't give you dates specifically.  Here

 4        (indicating) you see a date of 11/27/09.

 5             MS. EGELER:  Let's mark that as Exhibit No. 8.

 6   Q.   (by Ms. Egeler)  This is something that you produced in

 7        response to the subpoena duces tecum; correct?

 8   A.   Yes, as per your request.

 9                  [Off the record - discussion]

10             [Exhibit 8 marked for identification]

11   Q.   (by Ms. Egeler)  What we've marked as Exhibit No. 8 is

12        a -- it looks like a photocopy of a letter that you

13        produced.  And in the upper-left-hand corner there's a

14        date, 10/27/2009, Tuesday, 12, colon, 51, and a fax

15        number that appears.

16   A.   Mm-hm.

17   Q.   Can you please describe this exhibit for me.

18   A.   It's a letter that I -- that was faxed to me as per the

19        fax number that you can see.  ███████████ is the phone

20        number, the fax phone number.  And this is -- was sent

21        to me on my personal home fax machine.

22   Q.   And on the fifth line down it states, "██████████████

23        ████████," and, in parens, "bigot," and it has a fax

24        number that's a 360 number.  But this didn't come in --

25   A.   That's my fax number.
```

Page 27

1   Q.   The 360 is.

2   A.   Yes.  That's my number that they're sending it to.

3   Q.   So was this faxed to the 360 number or the 206 number

4        that appears at the top of the page?

5   A.   No, this (indicating) is their footprint of the person

6        who sent it to me.

7   Q.   So it was sent to you at the ██████████ number.

8   A.   Correct.

9   Q.   Is that the fax machine at your legislative office?

10  A.   No, no.  This is my home, personal home.

11  Q.   And do you know how someone would have obtained that fax

12       number?

13  A.   Yes, I know exactly.  In fact, that is not my fax

14       number, that is my home line.  So if you'd like, I will

15       explain this whole thing to you.  This is the result of

16       several harassing, nasty messages that were -- first of

17       all, they were to me personally.  When I would answer

18       the phone, I would hear comments of my involvement --

19       against my involvement in the referendum.

20            And after I don't remember how many of those -- but

21       this is the line that I use to take care of my

22       legislative business.  And how they got that number, I

23       don't know, but it is my husband's phone.  My husband's

24       name is in the phone book, so I presume that's how they

25       got the number.  And often it is also printed on

Tracey Juran, Certified Court Reporter

1      campaign brochures.  So that could have been another

2      means by which they got that number, to answer that

3      question as to how they got that number.

4          So I answered a number of calls not realizing that

5      they were not something that I wanted to listen to,

6      thinking it was to do with my -- either personal or my

7      legislative responsibilities.  And finally, they were

8      tying up my phone, number one, and number two, they were

9      very, very embarrassing and -- I guess if I could give a

10     physical response, they would make the hair stand up on

11     the back of my neck.  And I certainly don't want this to

12     be used in any way for anybody in this room to take this

13     as they worked, so let's keep doing it.

14  Q.  I understand.

15  A.  I want to make that very clear.  This is very, very

16      chilling experience.

17  Q.  Can you tell me how many phone calls there were?

18  A.  I would say there were -- well, finally, I stopped

19      answering the phone and they went to my answering

20      machine.  And I know the number was 15 on my answering

21      machine.  I can't tell you how many I answered

22      beforehand; I don't know.  It was a very emotional, gut-

23      wrenching experience.

24  Q.  Let's start with the ones that you did answer and talk

25      about those in detail.  I understand some of these

1     questions are unpleasant and I'm asking you possibly to

2     repeat something ugly.

3  A.  I can't repeat them.  You know what happens when you've

4     had a traumatic experience?  You blank it out.  I happen

5     to know this and this (indicating) because it's in

6     writing.  But quite honestly -- and I did not even

7     listen to all those messages.  I deleted them.

8  Q.  With respect to the phone calls, do you recall anything

9     that was said specifically?

10 A.  The word "bigot" was used a lot and "bitch."

11 Q.  And --

12 A.  Those were two that really stick out in my mind.  Beyond

13    that, be honest with you, I really blocked it out.

14                    [Cell phone ringing]

15         THE WITNESS:  Oh, excuse me.

16 Q.  (by Ms. Egeler)  Do you recall whether the caller said

17    anything about Referendum 71 or domestic partnership?

18 A.  They must have, because I knew that's what it was.  But

19    maybe it was just the language and the vitriolic

20    intimidation.

21 Q.  So are you uncertain whether they mentioned

22    Referendum 71 or same-sex marriage?

23 A.  I knew that's what it was.

24 Q.  But do you recall specifically that they mentioned it?

25         MR. PIDGEON:  Objection; asked and answered.

1    Q.    (by Ms. Egeler)  You can go ahead and answer.

2             THE WITNESS:  I'm sorry; what'd you say?

3             MR. PIDGEON:  You can answer.

4    A.    I remember the words "homosexual," but I don't remember

5          it in specific reference to this (indicating).

6    Q.    (by Ms. Egeler)  And by to this, you mean to --

7    A.    I mean --

8    Q.    -- Referendum 71?

9    A.    -- to Referendum 71, yeah; excuse me.

10            I don't recall that they actually said, because

11         you're involved in Referendum 71, we are calling you.  I

12         don't recall that.  But I -- there was no -- there was

13         not a doubt in my mind.  Just -- because I don't get

14         these kinds of phone calls.  I mean, you know, people

15         are generally very polite and intelligent sounding.

16         These were obviously people who had an agenda that I

17         fully understood.

18   Q.    And how many calls did you answer?

19   A.    I am thinking two to four before I figured out what was

20         going on.

21   Q.    Were you able to determine what number the calls that

22         you answered were --

23   A.    No.

24   Q.    -- coming from?

25   A.    No.  I don't have caller ID.

1    Q.    And did you afterward dial star 69 or any combination to

2          try and find that phone --

3    A.    You know --

4    Q.    -- number?

5    A.    -- it was such an emotional -- I did not dial star 69

6          because it was a very gut-wrenching, emotional

7          experience.  It was a kind of thing that made the hair

8          stand up on the back of my neck.

9    Q.    Did you ask the individual who they were?

10   A.    No, I didn't.  I didn't --

11   Q.    Did you contact --

12   A.    I did not --

13   Q.    Oh, excuse me.

14   A.    Excuse me.

15             I did not want to engage them in conversation.

16   Q.    Did you contact the police after these phone calls?

17   A.    I mentioned it to my office and my office then proceeded

18         to contact our security, because we do this at the

19         Legislature.

20   Q.    So your legislative office staff contacted legislative

21         security.

22   A.    I -- no.  I asked them -- my office staff what I might

23         be able to do with legislative security, because that's

24         what we usually do in these cases.  And she said,

25         because it is an initiative, we -- our office is not

```
1        allowed to be involved in this.  But -- and being it was

2        a phone call, no.

3   Q.   Was it --

4   A.   If they had threatened me with -- when you are in the

5        Legislature, for example, then we do.  We definitely

6        report it and it is investigated.

7   Q.   And the person who said that nothing could be done since

8        this was about an initiative, was that someone on your

9        staff or someone in legislative security?

10  A.   No, I did not talk to legislative security.

11  Q.   And --

12  A.   Now, let me go -- let me continue this.  So how did

13       they -- how did I get this (indicating)?  What happened

14       when I continued to get the harassing phone messages

15       was, I had two choices:  Turn my answering machine

16       office and just -- off and don't answer the phone.  And

17       I knew that they would continue to tie up my phone line,

18       so instead, I called my office and said, I am forwarding

19       my lines to my fax number.  It's a dedicated number.

20            So I forwarded to my fax number.  And then calls

21       were coming in and they would naturally get the fax

22       tone, and then eventually they quit.  Because I knew

23       that just turning my answering machine off or whatever,

24       they were going to continue to tie up my phone line.  I

25       wasn't going to have use of my phone line anyway, so I
```

1    decided I would forward it to my fax-machine line.  So

2    that's why they started sending this (indicating), was

3    because they heard the fax tone and then they could send

4    this.

5  Q.  And by this, you mean what we've marked as Exhibit

6      No. 8.

7  A.  Yes, and Exhibit No. 9.

8  Q.  Which we will definitely get to, but I want to explore a

9      little bit more with you about the phone calls.

10 A.  Okay.

11 Q.  When your office staff advised you that legislative

12     security couldn't do anything, did you call the police?

13 A.  No.

14 Q.  And why not?

15 A.  Because I went ahead and forward it to my fax line.

16 Q.  And that took care of things.

17 A.  Well, it did after two faxes came in.  I think they

18     figured it out.  And I only got two faxes.  However --

19     excuse me -- the fax did ring a few times after I

20     forwarded it without anything coming in.  I just

21     remembered that.  It didn't stop immediately.

22 Q.  And in reference to the phone calls, you've been using

23     the word "they."  Do you think it was more than one

24     person that you heard on the phone?

25 A.  They being the opponents of the initiative, I am

1    concluding.

2  Q.  Did you hear more than one voice on the telephone calls

3      that you did pick up?

4  A.  You mean did I hear a bunch of people in the background

5      yelling or something?  Is that your question?

6  Q.  Well, let's start with that.

7          Did you hear just one voice or did you hear people

8      in the background?

9  A.  You have to realize the emotional impact of this.  And

10     when you're hearing something that is foreign to the way

11     you generally communicate with people, number one, and

12     number two, that -- the disrespect and the vitriolic

13     attack, you don't much -- I could tell you they were

14     speaking English and I could tell you it was a man's

15     voice.  I didn't have any women call.  So beyond that --

16     was there more than one man's voice on the phone?  I

17     don't recall that.

18 Q.  In the two to four phone calls that you did answer, if

19     you're able to recall, was it the same man's voice, to

20     your --

21 A.  No.

22 Q.  -- recollection?

23 A.  No.  I definitely know it was more than one person

24     making different phone calls.  And I don't know -- the

25     same man might have called more than once, but of the

1       calls that I answered, it was different voices.

2    Q.  Was it always a man's voice?

3    A.  I never had a call from a woman.  If it was a woman, it

4        sounded like a man.

5    Q.  And you mentioned that there were about 15 answering-

6        machine messages; is that right?

7    A.  Yes.

8    Q.  Are you sure of that number?

9    A.  No.  You said about and that's what I said.

10   Q.  So could it have been more than 20?

11   A.  I really believe it was -- you know, the number 15

12       flashes in my mind, but I could be mistaken in that.

13   Q.  And did the answering machine record the phone number

14       that the call came from?

15   A.  No.  My machine does not do that.

16   Q.  And do you recall what was said in any of those

17       messages?

18   A.  Well, as I said, I listened to one, maybe two, and then

19       I didn't listen to the rest.  I wasn't always present in

20       the room.  Is that your question?  I wasn't always there

21       to hear them coming in.  I wasn't monitoring it per se.

22       So there were a few that I heard right after, you

23       know -- seemed like they came in within a matter of a

24       three-day period of time.  And then I just -- I would

25       listen and knew that it wasn't any voice I recognized

1    Q.   And after you concluded that it had passed, you then

2         stopped forwarding your phone to --

3    A.   Yes.

4    Q.   -- your fax line?

5              And after you stopped forwarding your phone to your

6         fax line, did you receive any other calls of that nature

7         on your home phone?

8    A.   I don't recall any.  I don't recall.  If there was, it

9         was not significant enough that I remember it.  So no.

10             MR. STAFFORD:  Okay, thanks.  That's all I have.

11             MR. PIDGEON:  Okay, I have just a few.

12

13                        EXAMINATION

14   BY MR. PIDGEON:

15   Q.   I have only a few questions, ██████████.

16             If we could, let's begin with this Exhibit 1.

17   A.   Okay.

18   Q.   I want you to take a look at that.  And just for sake of

19        clarification, now, you're not the one holding that

20        sign, right?  That's someone else holding that sign?

21   A.   Yes, that's correct.  I'm not holding it.

22   Q.   So the representation --

23   A.   I'm gesturing with my hand, whatever I'm saying.

24   Q.   So the representation that's made on that sign, which

25        reads something like, "Don't bring Sodom and Gomorrah to

1          appears on the page is just a screen shot.

2     A.   I gotcha.

3     Q.   Now, on Exhibit -- let's see if we can find this -- the

4          exhibit that's the PDC record --

5     A.   Mm-hm.

6     Q.   -- this one here (indicating) --

7     A.   Okay.

8     Q.   -- where you are mislabeled as a ████████████████ --

9     A.   Right.

10    Q.   -- it is true that a ██████████ does represent.

11    A.   That's true.

12    Q.   Right?

13             So --

14    A.   Yes.

15    Q.   So this could be true if this were, shall we say,

16         uncapitalized.  Of course, it's all in caps, right?

17    A.   Yes.

18    Q.   So it could be an accurate statement that you were a

19         person employed by the State who did represent people.

20    A.   That's correct.

21    Q.   But it's inaccurate if it's used as a proper noun.

22    A.   That's right.  But this does -- this often happens.

23    Q.   Understood.  People that didn't follow the campaign

24         closely enough.

25    A.   Either that or I was in a database as having been a

```
1            ███████████ back when and that just kind of follows.

2            And the PDC could have made that mistake, but I don't

3            think that's the case here.  I think it's probably

4            the -- what was filed.

5    Q.      Now, in terms -- let's go, if we can, to Exhibit 8 and

6            Exhibit 9 --

7    A.      Okay.

8    Q.      -- again.  I'd like to explore these just a little bit

9            more.  Now, when you had the --

10               MS. EGELER:  Just a minute, please.

11               MR. PIDGEON:  Sorry.

12   Q.      (by Mr. Pidgeon)  When you had the phone calls directed

13           to the fax machine --

14   A.      Mm-hm.

15   Q.      -- do you have your phone set up in such a way that if I

16           were to call your home phone and you weren't home, it

17           would say, okay, you've reached the campaign of

18           ███████████, or whatever, but if you -- you

19           know, leave a message, but if you wait a certain period

20           of time, you can also leave a fax?  Did you have it --

21   A.      No.

22   Q.      -- set up that way?

23   A.      No, no.  It's a dedicated line.

24   Q.      It's a dedicated line.

25   A.      This -- the fax machine is on a separate line totally.
```

Tracey Juran, Certified Court Reporter

1  Q.   So you actually switched the lines?

2  A.   I actually call forwarded my phone.  From my home

3       number, I just call forwarded it to the fax number.

4  Q.   Now, is it your experience that someone who might be

5       leaving threatening phone calls with lots of bad

6       language, if they knew it was going to be in writing,

7       they might mitigate some of that language?

8  A.   I would expect so.  But this is a -- I mean, the fact

9       that they would document this (indicating) in writing

10       tells me that the elevator doesn't go all the way to the

11       top.  I mean, I just didn't think that was a very bright

12       thing to do.  So --

13  Q.   Well, let's talk a little bit about the phone calls that

14       you did receive.  You mentioned that you may have heard

15       the word "homosexual."  Is that true?

16  A.   I said that?  Okay.  It would not have been that -- that

17       would be my interpretation.  They would say gay, as he

18       (indicating) referred to it, you know, the way they have

19       taken the word "gay" and applied it to the homosexual

20       activities.  So that's my interpretation of what was

21       said.

22  Q.   Now, these phone calls, this was during the actual

23       course of the R-71 campaign, is that right, when this

24       flurry came in?

25  A.   Yes.

1    Q.   And is it your -- is -- are you -- is it your idea that

2         it pretty much came in around this time in October; say,

3         between October 22nd and October 27th?  Is that about

4         the timing that all this happened, this flurry?

5    A.   It was with -- this -- these came in the same day.

6    Q.   The same day.

7    A.   Yeah.  So, see, these dates just don't -- I don't know

8         why they're -- but they came in the same day.  And it

9         was -- and I know that -- I remember that because it

10        wasn't long after that that they stopped calling,

11        realizing that they were getting a fax.  These two, for

12        some reason, decided that they were going to write out

13        their animosity.

14   Q.   Now, taking a look at Exhibit 8 --

15   A.   Mm-hm.

16   Q.   -- let's look up here (indicating) at this signature

17        block up here.

18   A.   Yes.

19   Q.   Do you see where it -- where Barry Brumitt appears,

20        97 -- or 910 17th Avenue East, Seattle --

21   A.   Mm-hm.

22   Q.   -- Washington, 98112; Email address, barry6@gmail.com?

23   A.   Yes.

24   Q.   Do you see how that margin lines up like that?

25   A.   I caught it.

1   Q.   So it looks like the "Dr." has been added onto that,

2        doesn't it?

3   A.   I caught that too.

4   Q.   Is that why you thought that maybe he's not really a

5        doctor and he just kind of added that to it?

6   A.   In the back of my mind, it was a thought, because more

7        than any -- I mean, you examine this and it doesn't

8        quite gel.  Why would a doctor give himself away in this

9        fashion?  And so I saw -- I mean, that's the first

10       thought:  Why would a doctor do this?  I mean, he's got

11       a professional business to run and why would he take

12       time, number one?  Number two, why would he document

13       himself in that fashion?  And then number three, you

14       look at this (indicating) -- and I did.  I saw that too,

15       yeah.

16  Q.   Interesting.

17  A.   And it looks like an add-on.  It doesn't say, M.D., it

18       doesn't say, Ph.D., he just puts "Dr." in front.  So

19       maybe it was an afterthought.  Maybe he decided, gee

20       whiz, I want her to know I'm really somebody important

21       and I think this about what she's doing.  I don't know.

22  Q.   But in this letter, he does call you misguided.

23  A.   Mm-hm.

24  Q.   Backward.

25  A.   Mm-hm.

1       children as young as 14 years of age were being

2       solicited to attend an opportunity to be introduced to

3       the lifestyle and they were solicited through the

4       school.  The school allowed the solicitation.

5            And, in fact, there are newspaper articles, if

6       anyone would care to look it up, where another

7       legislator and I -- another legislator from Snohomish

8       County and I objected to that solicitation.  And it was

9       a point of an article in the ███████████.  And I

10      refer to that because, to be honest with you, I cannot

11      recall the name of the organization that put it

12      together.  I know that there were several county

13      organizations that were sponsors.

14  Q.  Do you know whether or not curriculum has been proposed

15      for special-education students, elementary-school

16      students, or even kindergarteners to introduce them to

17      the homosexual lifestyle?

18  A.  I have not specifically seen it.  I have been told that

19      in some schools, that has been done.

20          MR. PIDGEON:  Okay.  Okay, I have nothing further.

21          MS. EGELER:  I have a few more questions.

22

23               FURTHER EXAMINATION

24  BY MS. EGELER:

25  Q.  First, I wanted to ask you --

1     will perceive you in this light:  Tragic, ignorant &

2     wrong," in that context, would this language be

3     acceptable?

4          Or let me state it differently.  In that context of

5     a bill trying to separate children of different races,

6     would you perceive it to be threatening for a

7     constituent to express that they believe that history

8     will perceive our hypothetical legislator as tragic,

9     ignorant, and wrong?

10  A.  I think that the constituent would be very entitled to

11      their opinion that history might reflect that.  I might

12      agree or I might not agree.  It depends totally on the

13      context.  It's really difficult -- you have to

14      understand, this is not a rational person who wrote

15      this.  This is not a rational statement.  So you're

16      mixing apples and oranges in this -- you know, to my way

17      of thinking, the homosexual movement is a movement.  It

18      is not a race.  It is not about discrimination regarding

19      a race.

20  Q.  And I understand.  I'm not trying --

21  A.  Okay.

22  Q.  -- to equate the two things.

23          I'm asking --

24  A.  Okay.

25  Q.  -- would this language -- what I'm trying to get at is,

```
 1          would this type of language be acceptable in any context

 2          whatsoever?  I mean, to remove it completely from

 3          categorizing people, if the bill was to euthanize all

 4          puppies in the state of Washington --

 5    A.    Careful.  I -- be careful; I have a dog.

 6    Q.    There you go.

 7               So --

 8    A.    And he's a member of the family.

 9    Q.    -- would it be threatening for a constituent to express

10          that they find support of a bill to euthanize all

11          puppies in Washington to be untenable, misguided,

12          backward, tragic, ignorant, and wrong?

13    A.    In that context, I would say it's okay for a constituent

14          to say that if they want to, yes.  In that context,

15          yeah.  It takes it out -- it gives it a different

16          connotation.  And I understand where you're going.  It's

17          just that too often, the homosexual movement tries to

18          paint themselves as a downtrodden -- as a woman, I am a

19          minority.  Homosexuals are not.  And they want to put

20          themselves in that category and I object to that.

21    Q.    I understand.

22    A.    Okay.

23    Q.    On both Exhibits 8 and 9, the letters show the fax

24          number that the letter was sent to as ▮▮▮▮▮▮▮.  And

25          I'm confused by that, because my understanding is that
```

1      you forwarded a phone line to the fax.  So I'm

2      wondering, how would they know what fax number they were

3      sending --

4    A.   They didn't.  They didn't.

5    Q.   Is that the fax number that they were sending it --

6    A.   No.

7    Q.   -- to?

8    A.   They were sending it to my phone line -- I mean, they

9         began to believe that they had received the wrong number

10        for a phone, because when they called it, they got a fax

11        tone back in their ear.  So they thought -- they

12        concluded, then, that that was my fax number, but, in

13        fact, it is not.

14   Q.   I understand.

15   A.   Does that make sense?

16   Q.   Absolutely.

17        And Mr. Pidgeon asked you if the phone calls that

18        you did pick up threatened physical harm to you, harm to

19        your physical safety or emotional safety.  And I heard

20        you answer -- please correct me if I'm wrong -- that you

21        felt that it was a threat to your emotional safety; is

22        that right?

23   A.   Yes.

24   Q.   Did you feel that there was an expression of harm to

25        your physical safety or just emotional safety?

1   A.   You know, I have tried to remember, and quite honestly,

2        I don't remember.  A threat to your physical safety

3        would be very emotional.  And what I remember is the

4        emotion.  I don't remember -- I didn't think somebody

5        was going to shoot me.  I didn't get that.  That wasn't

6        my fear.  And my fear was what it was doing to me

7        emotionally.

8   Q.   And isn't it possible that someone could say things that

9        were quite disturbing, that would upset you greatly

10       emotionally, even if physical harm wasn't threatened?

11  A.   Oh, yes, certainly.  And you have to realize, as a

12       ███████████████████, I've got pretty thick skin.

13  Q.   So have you had rude phone calls from constituents or

14       from anyone in your ██████ other than these phone

15       calls?

16  A.   Well, my office has, and certainly that's why security

17       was called.  We've had people come to my office who I

18       think we could categorize as not mentally all there, and

19       we've had some of those kinds of things.  To my home, I

20       do remember receiving calls in a prior time from

21       homosexuals, and I cannot remember if it was in regard

22       to legislation that I introduced.  I'm not certain.

23  Q.   Do you remember --

24  A.   But I do remember that I had received them before and I

25       would hang up the phone on them.  I never listened to

1           the entire harangue.

2    Q.    Do you know when that was, those --

3    A.    No --

4    Q.    -- other calls?

5    A.    -- I can't remember.  I really can't.  It didn't upset

6           me like this did, I will say that, because there were so

7           many of them and it was in a short period of time.  And

8           then when you get -- I mean, you know, for somebody to

9           document this kind of thing is very unsettling.  And

10          like I said, after this many years of being a

11          legislator, I've got pretty thick skin.

12   Q.    When your office has received calls in the past from

13          angry or rude individuals --

14   A.    Uh-huh.

15   Q.    -- do you recall any issues that generated those sorts

16          of calls?

17   A.    No.  Like I said, we've even had people walk into the

18          office that my aide has felt threatened by and would

19          call security.

20   Q.    And have you always been pleased by the response of the

21          State Patrol to those situations, those --

22   A.    Well --

23   Q.    -- calls?

24   A.    -- it isn't always State Patrol.  Sometimes it's on-

25          campus security.  But yes, I've always been -- yeah,

1                          CERTIFICATE

2    STATE OF WASHINGTON )
                         )
3    COUNTY OF SNOHOMISH )

4            I, the undersigned Notary Public in and for the

5    State of Washington, do hereby certify:

6            That the foregoing is a full, true, and correct

7    transcript of the testimony of the witness named herein,

8    including all objections, motions, and exceptions;

9            That the witness before examination was by me duly

10   sworn to testify truthfully and that the transcript was made

11   available to the witness for reading and signing upon

12   completion of transcription, unless indicated herein that the

13   witness waived signature;

14           That I am not a relative or employee of any party

15   to this action or of any attorney or counsel for said action

16   and that I am not financially interested in the said action

17   or the outcome thereof;

18           That I am sealing the original of this transcript

19   and promptly delivering the same to the ordering attorney.

20           IN WITNESS WHEREOF, I have hereunto set my hand and

21   seal this 12th day of October, 2010.

22

23        _____
          Notary Public in and for the State of Washington
24             residing at Edmonds, Washington.
                  (Notary expires 3/09/13)
25                    (CCR No. 2699)

Tracey Juran, Certified Court Reporter
Exhibit 1, Page 180

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1-6

Exhibit to Pls.' Statement of Material
Facts
(Case No. 3:09-cv-05456-BHS)
Exhibit 1, Page 181

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JOHN DOE #1, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | NO. 09-cv-05456-BHS |
| ) | |
| SAM REED, et al., ) | |
| ) | |
| Defendants. ) | |

DEPOSITION UPON ORAL EXAMINATION OF ███████

September 1, 2010

Tacoma, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

EGELER (▓▓▓▓▓▓▓▓▓, 9/1/10)

                                                            Page 4

1                    BE IT REMEMBERED that on Wednesday, September 1,

2        2010, at 12:51 p.m., at 1250 Pacific Avenue, Suite 136,

3        Tacoma, Washington, before REBECCA S. LINDAUER, Notary

4        Public in and for the State of Washington, appeared ▓▓▓

5        ▓▓▓▓▓▓, the witness herein:

6                    WHEREUPON, the following proceedings were had, to

7        wit:

8                                        (Mr. Hamilton not present.)

9

10       ▓▓▓▓▓▓▓▓▓▓,            having been first duly sworn by

11                               the Notary, testified as follows:

12                                  EXAMINATION

13       BY MS. EGELER:

14       Q    ▓▓▓▓▓▓▓▓▓▓, my name is Anne Egeler, and I represent

15            the defendant here, Sam Reed.  I'm with the Attorney

16            General's office.

17                 Can you start by spelling your last name.

18       A    ▓▓▓▓▓▓▓▓▓.

19       Q    And your first name is ▓▓▓?

20       A    ▓▓▓, yes, um-hmm.

21       Q    Have you ever gone by a different name?

22       A    Never.

23       Q    And can you provide your home address, please.

24       A    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

25       Q    And your business address?

EGELER ( ▮▮▮▮▮▮▮▮ , 9/1/10)

Page 19

```
 1        person was.  Looked like a female initially with a masculine

 2        bone structure, but still looked female initially, and was

 3        dressed like a woman, you know, displaying everything, and

 4        came up and asked what we were doing.

 5             I said, "Well, this is Referendum 71."  Told her that

 6        it's to preserve marriage between a man and a woman and to

 7        protect our children.

 8             And she said, "Well, why are you" -- he said, "Well,

 9        why are you doing this?  Why are you getting these

10        signatures?"

11             I said, "It's because of my Biblical beliefs."

12             "Well, what does the Bible have to say?"  This is not

13        verbatim.  This is the gist --

14   Q    I understand.

15   A    -- of the discussion.  "What does the Bible have to say?"

16             I just briefly quoted what the Bible -- what God has to

17        say about it in the Bible and then the person got very, very

18        argumentative, at which point, I said, "There's no point in

19        us continuing this discussion.  You know, if we can't talk

20        peaceably around the Bible, then we don't have anything to

21        talk about."

22             Then the person left.  And as they were leaving, they

23        were threatening -- he threatened -- before that, he asked

24        me if I was a pastor because I was there on a Sunday after

25        church in my suit.  And I said, "Yes, I am."
```

EGELER ( ████████████ , 9/1/10)

Page 20

```
 1            "Where is your church?"

 2            I told him where the church was in ████.  As he was

 3       leaving to get into his car, he says, "I'm going to bring a

 4       bunch of my friends, homosexual, transgenders to your church

 5       on this Sunday and we're going to pack your church."

 6            And at that point I just said, "Well, God bless you.

 7       You can come.  You're welcome.  If you want to come to

 8       church, you come to church."

 9   Q   And you told him where your church was located?

10   A   I don't recall.  I told them the name.  I might have told

11       them in a hotel, but I don't recall.

12   Q   Did he come?

13   A   No.

14   Q   Excuse me.  Did --

15   A   No, it's a he.  I don't know if it's complete.

16   Q   Well, I'll use she, since it sounds like the individual was

17       choosing that gender.  So just to be clear when I'm using

18       that pronoun who I'm referring to, did she come to the

19       church?

20   A   No.

21   Q   At any time, did any transgender individuals come to the

22       church during the Referendum 71 campaign?

23   A   No.

24   Q   And did anybody of any sort come and make a scene or protest

25       inside or outside the church?
```

EGELER ( █████████████ , 9/1/10)

Page 21

```
 1    A    No, nothing happened.

 2    Q    When she was speaking to you -- it sounds like it became

 3         argumentative -- was anybody else there at the time?

 4    A    No.

 5    Q    And did any other incidents occur while you were gathering

 6         signatures?

 7    A    There's one more I have in the declaration and that was

 8         outside of the Wal-Mart in Auburn.

 9    Q    Okay.

10    A    A minor incident, but we documented it nonetheless.  My wife

11         and I were there together getting signatures, had a table

12         set up with two or three clipboards on the table.  And this

13         young lady got her cell phone out and started -- took a

14         picture of me first and went over and took a picture of my

15         wife.

16             And my wife says, "What are you doing?"  And the young

17         lady said that she was going to post our pictures on her

18         Facebook or whatever the social networking sites are for all

19         her homosexual and gay friends to know what we look like.

20         So we thought that was inappropriate.

21             My wife says, "I don't want you to do that.  Don't post

22         my picture."  She'll tell you that herself, but she told

23         her, please not to post the picture.  She probably did.  I'm

24         sure we're -- anyhow.

25    Q    Are you sure?
```

Exhibit 1, Page 186

EGELER (⬛⬛⬛⬛⬛⬛, 9/1/10)

Page 22

```
 1   A   No, I'm not sure.  But most -- highly probable that we are
 2       posted, but that's -- I don't know.  I don't visit those
 3       places.
 4   Q   So to be accurate, do you know if those photos were posted?
 5   A   I don't know if hers were posted.
 6   Q   Do you know if your photo was posted?
 7   A   No, I don't.
 8   Q   And was anyone else there at that time?
 9   A   My wife and myself.
10   Q   Any other incidents that occurred during the gathering of
11       signatures?
12   A   No.
13   Q   With each of those three incidents -- we have the two
14       lesbian women outside a store that spoke while an elderly
15       woman was going to sign.
16   A   Right.
17   Q   And then we had a transgendered individual outside the
18       Wal-Mart Lacey and then the third was taking pictures
19       outside the Wal-Mart in Auburn?
20   A   Um-hmm.
21   Q   With any of those three incidents, did you feel the need to
22       call the police?
23   A   No.  There was a fourth.  It just came back to me and that
24       was when we were out there gathering signatures in Auburn,
25       once again, I believe.  I believe it was Auburn.  I'm not
```

EGELER ( ███████████ , 9/1/10)

1     sure.

2         Somebody came from outside the store and basically went

3     back in and told the manager.  And the manager tried to tell

4     us to leave and so we actually -- not the manager, but

5     the -- a worker did.  So then we asked for the manager.  We

6     asked for this person to go get their manager.

7         The manager came out, and we explained to the manager

8     what just happened and that we're not harassing anybody.

9     We're being very polite, which we were, and the manager said

10    that we could stay.

11  Q  And again, there was no need to call the police with that

12    incident, since the manager took care of it?

13  A  That's correct.

14  Q  And why, with the first three incidents, did you not feel a

15    need to call the police?

16  A  I didn't -- well, the only -- I didn't perceive the threats

17    as being that -- I didn't perceive the likelihood of follow

18    through being that high with the one person that said

19    they're going to come to our church on Sunday.  I didn't

20    really feel that they would come, and if they did, we just

21    deal with it.

22  Q  And the first incident with the women who said that it was

23    hurtful to them, that Referendum 71 -- I'm not trying to

24    quote you.  I'm sure I'm off, but two women approached while

25    you were talking to an elderly woman and they said something

Exhibit 1, Page 188

EGELER (⬛⬛⬛⬛⬛⬛, 9/1/10)

```
 1        e-mail address is on there.  When you get back home, could
 2        you send those to my e-mail address?
 3   A    Sure.  I can do it right now.  I have it right here.
 4   Q    We'll just keeping talking for the moment.
 5   A    Okay.  We'll do that.  But anyhow, listen to the text of
 6        those.  And the interactions we had with this David who --
 7        once again, he's a -- he's changing his sex.  He calls
 8        himself Krystal now, and he got very animated and sounded
 9        disturbed, sounded emotionally disturbed, not healthy, and
10        his comments concerned me quite a bit.
11   Q    What comments did he make that concerned you?
12   A    Made very threatening comments to our wife and my church.
13   Q    This was on speakerphone, so you could hear it?
14   A    I heard part of it on that first conversation, but then
15        there were follow-up calls because he just continued.  As
16        you listen to the phone conversations on the recording that
17        I'm going to send you, they increasingly got more animosity.
18        So the call that I heard was short and it was heated, caused
19        concern.  But then the subsequent calls got even more heated
20        where we just left them on the answering machine.  We didn't
21        pick up and answer.  There was no interaction.
22   Q    So turning to the first call first, do you remember roughly
23        when that was in terms of the date?
24   A    No.  It was right after we started at the Secretary of
25        State's office though.
```

EGELER ( ▮▮▮▮▮▮▮ , 9/1/10)

Page 39

1   Q   So it was during the time signatures were being counted?

2   A   Yeah, down at the -- in Olympia.

3   Q   Do you know how the individual on the phone got your name?

4   A   No.  I have some ideas, but I don't know.

5   Q   And did the individual state anything about why they were

6       calling you specifically?

7   A   From listening to the audios, you'll -- it's our involvement

8       in Referendum 71.

9   Q   You said with that first call that it was threatening.  In

10      what way?  What was said that was threatening?

11   A   I can't remember the text of that right now.  I would have

12      to listen to it more carefully to say something under oath.

13      I would be glad to give those to you.  The audios, they tell

14      their own story.

15   Q   And you said that the individual called back.  Is that

16      correct?

17   A   Yes.

18   Q   And did the individual speak with you or your wife or was

19      there a message left on the machine?

20   A   There were multiple messages left on our machine.

21   Q   After the first call, did either of you speak with the

22      individual again?

23   A   No.

24   Q   Okay.

25   A   Not to my recollection.

Exhibit 1, Page 190

EGELER ( ███████████ , 9/1/10)

Page 40

| 1 | Q | And the e-mail that you're going to send me will contain all |
| 2 | | of those voice mail messages? |
| 3 | A | That's correct. |
| 4 | Q | And you said that the individual was increasingly |
| 5 | | threatening.  Do you recall what about the calls made you |
| 6 | | feel that they were threatening? |
| 7 | A | The tone that he had in his voice towards my wife, hatred, |
| 8 | | and the tone that he had towards our church and just the |
| 9 | | emotional content, the vitriol that was coming forth from |
| 10 | | him, it was not healthy. |
| 11 | Q | Do you recall what the area code was?  Could you tell the |
| 12 | | area? |
| 13 | A | It was a 253 number. |
| 14 | Q | Do you recall anything specifically that was said in the |
| 15 | | phone calls or the messages? |
| 16 | A | No.  Not that I want to say because it wouldn't be accurate. |
| 17 | Q | So it was the tone that was threatening to you, not the |
| 18 | | content of the words? |
| 19 | A | No, both. |
| 20 | Q | Both? |
| 21 | A | Both.  I've got thick skin.  I'm a pastor.  But this |
| 22 | | concerned me enough that I called our local police in |
| 23 | | ███████ -- we live in ███████ -- and asked them, because at |
| 24 | | this time we're also involved with the signature |
| 25 | | verification process and that's going from 7:30 in the |

Exhibit 1, Page 191

EGELER ( █████████████ , 9/1/10)

Page 41

```
 1          morning to ten o'clock at night.  We're not getting home
 2          until 10:30 or 11:00.  We're leaving the house at 7:00.  We
 3          asked for emphasis patrols at our home, just to drive by.
 4          Told them what had gone on, drive by periodically to make
 5          sure things were all right.
 6     Q    Do you remember who you spoke to, the name of the officer
 7          with the █████ Police?
 8     A    No, no.  They'll have a report.  I don't remember the name.
 9     Q    Do you have any records with you or at home that state the
10          police report number?
11     A    No, uh-uh.
12     Q    Or the officer's name?
13     A    No, I don't think so.  You can ask my wife that.  I don't
14          have any of that.  But then we also -- there was a
15          jurisdiction problem with the police in █████ because our
16          church is in █████ , so . . .
17     Q    In █████████ ?
18     A    It's in ██████████████ .  So the █████ officer said he
19          really can't do anything about contacting this individual,
20          so he said we needed to call █████ .  Our church, actually
21          it's in █████ .  You need to call the █████ Police.  So then
22          we called the █████ Police and told them what had happened
23          and let the officer actually listen to all the messages that
24          we got.  The officer gave David or Krystal a call and asked
25          him not to further contact us, not to go to our church, that
```

Exhibit 1, Page 192

EGELER (███████████, 9/1/10)

Page 42

1       the pastor said you're not welcome at their church.

2  Q  And what happened then?

3  A  Well, the calls stopped.

4  Q  And did the individual show up at your church?

5  A  No.  Just for the record, though, I felt that that call was

6       serious enough that I also told our hotel manager that we

7       might have problems at church the next Sunday.

8  Q  By "hotel manager," the ████████████████?

9  A  The ████████████████ where we're meeting.

10  Q  Right.

11  A  Told him what's going on so he will have a heads-up.

12  Q  Who is he?

13  A  ████████.

14  Q  Can you spell Ha for me?

15  A  ████.

16  Q  Okay.

17  A  And he's very even-handed, a very professional man.  He just

18       took it in stride, just noted it.

19          We also, that day, that Sunday, called the ████ Police

20       and asked them to have a patrol car close by in case

21       anything happened, told them that we could have something

22       happen at the church.

23  Q  Did they do that?

24  A  They said -- I assumed they did, but they're just right down

25       the street from us anyhow.  But they weren't visibly

Exhibit 1, Page 193

EGELER (█████████████, 9/1/10)

Page 43

```
 1          present, but, you know, they were informed, so if we would
 2          have called, they would have been there quickly.
 3     Q    When you called the ██████ Police regarding the phone calls,
 4          were they promptly responsive?  Did they get back to you
 5          quickly?
 6     A    I believe so.  I can't recall, but I believe so.
 7     Q    So were you satisfied with the police response?
 8     A    Yes.
 9     Q    And you also talked about the police in ██████ and that you
10          had asked them to drive by the house occasionally.
11     A    Um-hmm.
12     Q    Do you know, did they agree to do that?
13     A    Yes, they did.
14     Q    Did they actually do it?
15     A    I don't know.  We weren't there.
16     Q    Were you satisfied with the ██████ Police?
17     A    Yes, yes.  Not related to any of this, but later during a
18          part of the campaign, we had signs out in our yard and they
19          were defaced.  That's not in any of the declarations.  The
20          ██████ Police came and took a look at that also.  And at
21          that point in time, I reiterated -- I asked them again to
22          just keep an emphasis patrol on our house for this period of
23          time.
24     Q    Did they tell you that they had been doing that?
25     A    No, no.  But he said he would do it though.
```

EGELER (⬛⬛⬛⬛⬛⬛⬛, 9/1/10)

Page 44

```
 1   Q   Were they prompt in responding, when you called about the
 2       signs?
 3   A   Yes.
 4   Q   Was it one sign that was defaced?
 5   A   It was ours and also the one on the corner.
 6   Q   And you say defaced.  What happened?
 7   A   It got spray painted.  It was Protect Marriage -- Preserve
 8       Marriage, Protect Children sign and it just got spray
 9       painted.
10   Q   What was spray painted, a design?
11   A   No.  The text, part of the text was, of the message.
12   Q   So it was part of the text was covered with spray paint?
13   A   Yeah.
14   Q   But no words were spray painted onto the sign.  Is that
15       accurate?
16   A   Yes.
17   Q   Wanted to make sure I was understanding.
18           Do you know who did that?
19   A   No.
20   Q   And you said that a neighbor sign was spray painted as well.
21       Was it also a Protect Marriage sign?
22   A   Yes, um-hmm.
23   Q   Do you know if anyone else in your area -- well, let me back
24       up.  Where you live, is it a neighborhood with multiple
25       homes?
```

Exhibit 1, Page 195

EGELER ( ███████████ , 9/1/10)

Page 45

```
 1   A   Yes.

 2   Q   Roughly how many homes are in your neighborhood?

 3   A   It's ██████.  It's continual.  It's a bedroom community.

 4   Q   But hundreds of homes there in ██████?

 5   A   Yes, um-hmm.

 6   Q   Do you know what other types of signs have been damaged

 7       during the election year in ██████ in 2009, that summer?

 8   A   No, I don't.

 9   Q   Do you know if any other signs were defaced or stolen?

10   A   No, I don't.

11   Q   And do you know why someone spray painted the sign, what

12       their reasoning was?

13   A   No.

14   Q   Do you know if it was potentially someone just for no

15       reason, being a vandal?

16   A   No, we don't know that.

17   Q   So we have incidents that occurred -- four incidents that

18       occurred during the signature gathering process, there were

19       phone calls from a transgendered individual, and there

20       were -- there was a defaced sign.

21           Did any other form of harassment or threats of

22       reprisals occur to you or your wife?

23   A   One more and this showed clearly that they had found our

24       home address and that's not really hard to do because, as I

25       thought about it, we're a church.  All you have to do is go
```

Exhibit 1, Page 196

EGELER (███████████, 9/1/10)

Page 46

```
 1          to the Secretary of State's Web site, the Corporations
 2          Division, find, you know, the officers of the corporation.
 3          But anyhow, they found out where we lived and we got a
 4          letter in the mail from a bogus address.  The return address
 5          was bogus in Olympia.  My wife is bringing that in.  You can
 6          look at that when you talk with her.
 7   Q      Okay.
 8   A      And this letter just said -- it was addressed to our
 9          address.  It had this bogus business address there.  Had a
10          Tacoma-Olympia postmark on it.  We opened it up and the
11          sheet of paper on the inside said, "Christian bigot," and
12          that's all it said.
13   Q      Hmm.
14   A      You'll see it.  One of the words is really big.  The other
15          is small.  It's probably Christian small and bigot big, but
16          you'll see the paper when my wife comes in.
17              So that led us to believe that they not only know who
18          we are, they know our face, but they also know where we
19          live, so that's it.
20   Q      Did it say anything about Referendum 71 in the letter or on
21          the envelope?
22   A      No.  But I've been pastoring for 15 years, more maybe, never
23          have had anything like that come in our mailbox.
24   Q      And you don't know who it was -- who sent this?
25   A      Don't know who sent it.
```

EGELER (█████████████, 9/1/10)

Page 47

1   Q   But you said you know that it came from a bogus address?

2   A   Yeah.

3   Q   How do you know that was a bogus address?

4   A   When you take a look at it, it's evident.  I don't remember

5       now whether it's a wrong zip code or even a wrong street

6       address.  It doesn't exist.

7   Q   So you never learned who sent that?

8   A   No, uh-uh.

9   Q   Or why they sent it?

10  A   Right.  Actually, the address, the return address, is in

11      Olympia, but the postmark is Tacoma-Olympia, so don't know

12      what it is.  Don't know where it came from.

13  Q   Do you know approximately when that was?

14  A   No.  It's postmarked though.  Get that off the postmark.

15  Q   So did all of the incidents that you feel are harassment or

16      threats or reprisals occur before the election in November

17      of 2009?

18  A   Yes.

19  Q   Did anything happen after the election?

20  A   Not to me, but to my wife.  You can ask her about that.

21  Q   We'll do that.  Did we cover all of the incidents that you

22      recall?

23  A   Yes.

24  Q   Just to get a little bit more information about you as an

25      individual, how long have you had the church at the █████

                    C E R T I F I C A T E

      I, REBECCA S. LINDAUER, a duly authorized Notary Public in

and for the State of Washington, residing at Lacey, do hereby

certify:

      That the foregoing deposition of ████████████ was taken

before me and completed on the 1st day of September, 2010, and

thereafter transcribed by me by means of computer-aided

transcription; that the deposition is a full, true, and complete

transcript of the testimony of said witness;

      That the witness, before examination, was by me duly sworn

to testify the truth, the whole truth, and nothing but the truth,

and that the witness reserved signature;

      That I am not a relative, employee, attorney, or counsel of

any party to this action or relative or employee of any such

attorney or counsel, and I am not financially interested in the

said action or the outcome thereof;

      That I am herewith securely sealing the deposition of ████

████████ and promptly mailing the same to MS. ANNE E. EGELER.

      IN WITNESS HEREOF, I have hereunto set my hand and affixed

my official seal of this 6th day of September, 2010.

      _____
      Rebecca S. Lindauer, CSR#2402
      Notary Public in and for the State of
      Washington, residing at Lacey.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1-7

Exhibit to Pls.' Statement of Material
Facts
(Case No. 3:09-cv-05456-BHS)

Exhibit 1, Page 200

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

Page 1

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

_____

                                    )
JOHN DOE #1, et al.,                )
                                    )
             Plaintiffs,            )
                                    )
        vs.                         )   NO. 09-cv-05456-BHS
                                    )
SAM REED, et al.,                   )
                                    )
             Defendants.            )
_____

        DEPOSITION UPON ORAL EXAMINATION OF  ██████████
_____

September 1, 2010

Tacoma, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

EGELER (███████████████, 9/1/10)

Page 4

```
 1              BE IT REMEMBERED that on Wednesday, September 1,

 2         2010, at 2:47 p.m., at 1250 Pacific Avenue, Suite 136,

 3         Tacoma, Washington, before REBECCA S. LINDAUER, Notary

 4         Public in and for the State of Washington, appeared ████

 5         ████████, the witness herein:

 6              WHEREUPON, the following proceedings were had, to

 7         wit:

 8

 9    ████████████████,            having been first duly sworn by

10                                 the Notary, testified as follows:

11                           EXAMINATION
12   BY MS. EGELER:

13   Q    Good afternoon, ██████████████.  My name is Anne Egeler.

14        We've spoken on the phone previously.  Just to remind you, I

15        am with the Attorney General's office, and I'm representing

16        Sam Reed and the defendants in the Doe v. Reed case.

17             Have you been deposed before?

18   A    Yes.

19   Q    And in what sort of an action were you deposed?

20   A    It was a lawsuit against Western State Hospital.

21   Q    And were you a party to the case?

22   A    Yes, I was.

23   Q    What was the case about?

24   A    Wrongful termination of myself.

25   Q    Can you tell me a little bit about it?
```

EGELER (█████████████, 9/1/10)

Page 26

| 1  | A | Because he said he was going to be there, but you don't know |
|----|---|--------------------------------------------------------------|

1   A   Because he said he was going to be there, but you don't know

2       if they're going to show up or not.

3   Q   So you didn't feel convinced that this is necessarily going

4       to occur?

5   A   I couldn't say that.

6   Q   And did any transgendered individuals show up at the church?

7   A   No.

8   Q   In fact, in the time that you've been worshipping at the

9       ████████████████, have any transgendered individuals

10      attended, to your knowledge?

11  A   Not that I'm aware of, no.

12  Q   Are you aware of any transgendered individuals picketing the

13      church or demonstrating in any way?

14  A   No.

15  Q   Did anything else occur with that incident?  Any other

16      exchange?

17  A   No.

18  Q   I understand that you thought that this individual was a

19      Wal-Mart employee.  Did you speak with a manager about this?

20  A   No.

21  Q   And why not?

22  A   Just didn't come to mind.

23  Q   Next incident that you recall.

24  A   We had an incident at a Wal-Mart -- no.  It was a Target, at

25      the Target store close to Southcenter, Southcenter by the

EGELER (███████████████, 9/1/10)

Page 27

1       airport.

2    Q   Near the Southcenter Mall area?

3    A   Yes.  There's a Target there.

4    Q   I understand.

5    A   I get confused between Southcenter and the South Hill, so

6        it's the one by the airport.

7    Q   And what happened?

8    A   We were out there at dusk time, my husband and I.  It was

9        relatively not too busy.  There was a person that we were

10       collecting -- we were collecting signatures.  And there was

11       a person that saw us and actually went into the store, a

12       customer it appeared to be, a customer, went into the store

13       and complained with the managers what we were doing and

14       especially with regards to this topic and wanted them to

15       remove us, have security remove us immediately.

16   Q   Did this individual speak to you before going in?

17   A   They did, but I can't remember exactly what they said.

18   Q   And did the manager remove you?

19   A   The managers came out and I think one of them was -- he came

20       with a security guard and the evening manager and he said

21       something to the effect that, you know, could you -- he said

22       that the Target corporation is coming with some of their

23       corporate people to come and see how that Target is doing

24       and the supervisors.  It's going to be uncomfortable for

25       him, especially with them coming for a review of his work,

Dixie Cattell & Associates (360) 352-2506

Exhibit 1, Page 204

EGELER (███████████, 9/1/10)

Page 28

1       and if we would please leave.

2              And we said that it's our First Amendment right, so we

3       stood there and he had no problem with that.  He agreed and

4       just left us alone.

5   Q   And any other further exchange with him then or things were

6       fine after that?

7   A   Yes.  The person came out and gave us some, you know, dirty

8       looks and looking at us and upset and walked to their car

9       and left and we stood there.

10  Q   Is the person who came out and gave you dirty looks the same

11      individual that went in and complained initially?

12  A   Yes.

13  Q   But no words were exchanged?

14  A   That first one was making some words to us, but we didn't

15      respond back.

16  Q   Do you recall what the words were?

17  A   I can't remember exactly what they were, but something to

18      the effect that, you know, we're bigots.  We're this, we're

19      that, and that was it.

20  Q   Were you concerned?  Did you feel threatened by that?

21  A   No.

22  Q   And did you alert the police to that incident?

23  A   No.

24  Q   Is that because you did not feel threatened by that?

25  A   No.

EGELER (█████████████, 9/1/10)

Page 29

1    Q    Why did you not contact the police then?

2    A    They drove off in the car and left.

3    Q    And did you get a license plate number?

4    A    No.

5    Q    Did you try?

6    A    No.

7    Q    Next incident?

8    A    We were at the Auburn Wal-Mart.

9    Q    Okay.

10   A    We had several incidents occur there.  We had -- I was

11        collecting a signature from one person and we had a table

12        there.  My husband was standing off to the side.  He had his

13        clipboard collecting signatures.  There was this one person,

14        I believe it was a female that I was collecting the

15        signature from, she was bent over on the -- leaning over on

16        the table signing her signature.  And I got done with her,

17        helping her out, had to fill out how to sign the petition.

18            And as soon as I was done and she walked off, I turned

19        around and I saw this gal the entire time had her cell phone

20        opened up.  And as soon as I looked at her, she says, "I've

21        been videotaping you."  It was antagonistic.  "I've been

22        videotaping you.  I'm going to put you on Myspace,

23        Facebook," et cetera, et cetera.  Before I could say

24        anything, she clipped her phone shut and just walked off.

25   Q    And did either of you say anything to her?

EGELER (█████████████, 9/1/10)

Page 30

| | | |
|---|---|---|
| 1 | A | My husband had been talking to her, but I was getting the |
| 2 | | signature from this other person, so I didn't hear that |
| 3 | | conversation.  And then he saw her doing this to me but I |
| 4 | | had my back to her and when she took -- soon as I turned |
| 5 | | around, she had been taking the picture the whole time.  I |
| 6 | | was unaware of it.  When I turned to look at her, she gave |
| 7 | | me that quote I just said, then she clipped the phone shut |
| 8 | | and just walked off. |
| 9 | Q | And -- |
| 10 | A | So I had no chance to speak to her. |
| 11 | Q | Did you ever go look to see if it is posted online? |
| 12 | A | No. |
| 13 | Q | Why didn't you look? |
| 14 | A | I don't normally get on -- I don't get onto Facebook, |
| 15 | | Myspace, and all that.  I don't have an account, so I |
| 16 | | wouldn't know where to look or how to look. |
| 17 | Q | Did you see where she went? |
| 18 | A | She went into the store. |
| 19 | Q | Okay. |
| 20 | A | It was really -- not that particular time.  It was really |
| 21 | | busy. |
| 22 | Q | And did you alert the police to this? |
| 23 | A | No. |
| 24 | Q | So you did not alert the police and you did not attempt to |
| 25 | | find the video online? |

Exhibit 1, Page 207

EGELER (████████████████, 9/1/10)

```
 1   A   No.

 2   Q   Do you know if the video was online?

 3   A   I don't, no.

 4   Q   You said there were several incidents in Auburn.  Do you

 5       recall any others?

 6   A   There was a gentleman that came with his wife and he got

 7       really agitated trying to argue with us about just getting

 8       the signature.  He got so agitated that he went into the

 9       store and went to the manager and asked -- demanding that we

10       be removed and -- we had authorization from the managers to

11       be there.  He was pretty agitated and fabricating some of

12       the things that he alleges that we were saying that we were

13       not.  I can't remember exactly what it was, but the manager

14       calmed him down, and I guess he went shopping.  We didn't

15       see him after that.

16   Q   What was he saying to you that you felt was agitated?

17   A   He was very vocal, demonstrative with his body language.

18       His voice was getting higher and he was -- he was talking to

19       my husband, very argumentative.  I can't remember the exact,

20       you know, words that he said verbatim.

21   Q   So you can't remember what he said, correct?

22   A   Not right now, not off the top of my head, but he was upset.

23   Q   You said that he was demonstrative.  Does that mean he was

24       waving his warms or does that mean that he was making

25       obscene gestures?  What does "demonstrative" mean?
```

Exhibit 1, Page 208

EGELER (███████████████, 9/1/10)

Page 32

```
 1   A   Seems like that's his type of personality, his personality
 2       type to be demonstrative with his hands, waving his arms
 3       when he's talking.
 4   Q   So he was not making obscene gestures?
 5   A   No.
 6   Q   Was there any physical confrontation?
 7   A   No.
 8   Q   And how did the store manager react?
 9   A   Apparently just -- I don't know.  I wasn't there.  But
10       just -- I did go to the restroom after this confrontation.
11       He was inside.  I went to the restroom.  I saw him there
12       talking with the manager and I could hear him a little bit
13       saying, "I demand that you get them removed."
14           And the manager -- I couldn't hear what was said, but
15       then they didn't do anything about it, the managers, so we
16       continued getting signatures.
17   Q   And did you call the police about this incident?
18   A   No.
19   Q   Why not?
20   A   Didn't have to.
21   Q   Because?
22   A   The manager took care of it.
23   Q   So that's two incidents in Auburn.  Did anything else occur?
24   A   I think that's all I can remember right now.
25   Q   And any others in any other location?
```

EGELER (███████████, 9/1/10)

Page 33

1   A   No.

2   Q   Were you involved in the submission of the signatures to the

3       State in any way?

4   A   The day that they needed to be turned in?

5   Q   Yes.

6   A   Yes.

7   Q   Can you describe that for me?

8   A   I believe it was on a Saturday.  We were -- we drove there

9       to the state capitol building all collecting.  There was

10      several people that gathered there and we began -- people

11      dropping off signatures -- or petitions.  We began to

12      organize so that we can count all of them and put them in

13      piles so we can make sure that we have the adequate amount

14      of signatures that needed to be turned in.

15  Q   And you were there with Larry Stickney?

16  A   I was there with my husband.  We drove up and I think Larry

17      showed up afterwards.

18  Q   And are you aware of this gathering of the petitions being

19      broadcast on the Internet?

20  A   No.

21  Q   No?

22  A   Uh-uh.

23  Q   And then once the signatures had been submitted, it's my

24      understanding that you were one of the people for Protect

25      Marriage Washington that was overseeing the Secretary of

EGELER (█████████████, 9/1/10)

Page 34

1          State's process of checking signatures.  Is that right?

2   A      Yes.

3   Q      And how did that come to be?

4   A      After we turned in and got the appropriate number of

5          signatures -- petitions to be turned in, I think it was that

6          week -- actually, we got a call that morning on that day.  I

7          think it was on a Wednesday.  Got a call from Larry

8          Stickney.  He was -- said that he just got a call from the

9          Secretary of State's office saying that the homosexual

10         community were very upset that we got the signatures.  They

11         didn't think that we would have been able to gather them.

12         Therefore, they wanted to have observers there to verify

13         that the signatures were valid.

14              He said he didn't have anyone else that he could think

15         of to call that had to time to be there to do this.

16         Actually, what Larry said was that in the call that he got

17         that the opposition had asked for observers to be there.

18         And so the person who had called him from the Secretary of

19         State's office said that, in all fairness, we had to call

20         Larry to say, Larry, you know, because they're going to be

21         there to observe the signatures, you know, he's giving them

22         the right to have signatures from R71 to be there as well.

23         So Larry asked us if we had time because we, you know, live

24         there and if we wanted to do this and so we said yes.

25   Q     And did other individuals oversee that process as well on

EGELER (██████████████, 9/1/10)

Page 45

1   Q   Do you have regular parishioners or is your focus of your

2       church to reach out to those who are staying at the hotel?

3   A   It's both.  We have regular attenders that just kind of come

4       and go.

5   Q   And how many regular parishioners do you have?

6   A   At that time we had about regular -- we had about five or

7       six.

8   Q   And during that time period, the campaign time period, is

9       there anything else you did with regard to encouraging

10      people to vote on Referendum 71?

11  A   We were called by a radio station in Seattle, a Christian

12      gal who we never met before, and asked us if we wanted to

13      inform the people on how to vote and so we did that.  It was

14      like a 20-minute deal on the radio.

15  Q   Through a Seattle radio station?

16  A   Yes.

17  Q   Did you go and speak with any other radio stations?

18  A   Yes.  One in Kelso where Pastor ████ church is at -- or

19      Longview.

20  Q   And you spoke on the radio there?

21  A   Yes.

22  Q   Did Pastor ██ speak as well on the radio?

23  A   I believe he did, but we weren't there with him.  He did

24      something separately.

25  Q   Any other radio addresses or interviews?

Dixie Cattell & Associates (360) 352-2506

EGELER (█████████████, 9/1/10)

Page 46

```
 1   A   Not that I can recall.

 2   Q   Did you speak with any media during that time period?  By

 3       "media," I mean print or television.

 4   A   Before the election?  Yes, yes.  It was with ████████████

 5       from ██████████.  He called us and wanted to interview us.

 6       He was doing a piece on it before the election, and so we

 7       agreed to meet with him.

 8   Q   And were you mentioned in the article?

 9   A   Yes.

10   Q   And that was before the election?

11   A   Yes.

12   Q   So sometime in the fall of 2009?

13   A   Yes.

14   Q   During that time period from the time of the checking of

15       signatures -- actually, let me change that.  We talked about

16       harassment or threats that you perceived during the

17       signature gathering process.  At any point after the

18       signature gathering process until the election, were you

19       harassed or threatened in any way, in your opinion?

20   A   During the time from the signature process through to the

21       election, is that what you just asked?

22   Q   Correct.

23   A   Yes.

24   Q   Can you describe those incidents for me?

25   A   The first one to us that was considered a veritable threat
```

Exhibit 1, Page 213

EGELER (███████████, 9/1/10)

Page 47

1    was a -- it was a Wednesday.  We went to the elections

2    office to be observers there when it first started.  That

3    was on a Wednesday afternoon when we started that process at

4    one in the afternoon.

5         We came home that evening and I noticed we had gotten a

6    couple calls on the caller ID from a David Baurle, I think

7    is his last name.  They never left any messages.

8         And also when we were there at the elections office, we

9    had to -- everyone had to sign in their name, you know, sign

10   in our names.

11        Then on Saturday when we were home that first weekend

12   of the observation of the signatures, I returned the call to

13   this David Baurle because people call the church, so we try

14   to return the calls.

15   Q   Excuse me.  You said there were calls and that they were

16       identified on your phone as calls from David Baurle.  Was

17       there a message left?

18   A   No.

19   Q   Okay.

20   A   But he had called twice.

21   Q   So two calls?

22   A   Um-hmm.

23   Q   So it's Saturday and you decided to call?

24   A   Yes, to return the call.  I normally do that with people who

25       call the church.  So I called and said, "Hello.  We're

EGELER (███████████████, 9/1/10)

Page 48

1    looking for" -- I don't remember exactly how it went in
2    order, but, "we're looking for a David Baurle.  We're
3    returning a call to a David that called our church."
4            And he said, "There's no David here."
5            And I said, "Okay.  I'm sorry.  I guess we have the
6    wrong phone number then and thank you."
7            He stopped me and said, "Who is this?"
8            I said, "We're" -- "this is ████████████████
9    ██████  and someone had called us named David."
10           He said -- after he said that there's no David there,
11   then he said, "That used to be me."  That used to be him.
12   He's no longer David.  He's now Krystal.
13           I said, "Okay."
14           And then he -- that's when he said he's the one that
15   made the calls.
16   Q    And did you continue to speak with him?
17   A    Yeah.  Then he asked what -- you know, about our church and
18        that -- I have to read the declaration because I don't
19        remember exactly how it went, but . . .
20   Q    If you can't remember, that's okay to say you can't
21        remember.  I don't want you to say anything you don't feel
22        confident of.
23   A    I just can't remember it verbatim.
24   Q    Okay.
25   A    He said that he began to explain that his name is Krystal,

EGELER (█████████████, 9/1/10)

Page 49

```
 1        that it's not David.  It used to be David.  He's a

 2        hermaphrodite, hermaphrodite.  Then he began to ask why we

 3        were involved with R71.

 4             At that point I asked him, "Well, how did you get our

 5        phone number?"

 6             And then he began to say, "Well, you know, you're on

 7        the Web site, aren't you?"  And he said something about

 8        we're listed with Larry Stickney, aren't you?

 9             And at that point when he said that, I did not know

10        from this first paper that you gave me -- like I said, I

11        don't get on to blogs.  Never before that time, had never

12        got on to Larry's blog.  I didn't know what a blog was.  I

13        did not know that we were on here and . . .

14   Q    I just want to interject for a moment to reflect for the

15        record that the paper you've been picking up is what we've

16        marked as Exhibit No. 1 to the deposition.

17   A    So that's when I first found out that we were on here,

18        according to David that we were on there.

19             I said, "Okay."  So he said -- I said, "Well, how did

20        you get our church phone number?"

21             He said, "Well, you've got a Web site, don't you?"

22             I said, "Yeah, okay."

23             And then he began to ask me why are we involved with

24        R71.  And -- why are we involved with R71?  Why are we doing

25        this?
```

EGELER (█████████████, 9/1/10)

1            And I told him because we believe, you know, that

2       marriage is between a man and a woman.

3            And I remember calling him David and he got a little

4       upset.  He said, "My name is Krystal.  I had my name

5       changed."

6            I said, "Well, I'm sorry.  The caller ID had said

7       David, so I'm going to call you David."

8            He started to get upset with me and say -- he says,

9       "Well, why do you have a problem with transgenders?  I'm a

10      transgender.  I was" -- "I've legally had my name changed."

11           And I said something to the effect that, you know, it

12      was confusing to children.  And when I said that, he began

13      to call me stupid.  He says, "You're stupid," and he said

14      some other things I can't remember, but I do remember him

15      calling me stupid.

16           And I told him at that point, I said, "David," I said,

17      "if you want to start" -- "I'll talk with you.  If you want

18      to start doing this name calling, then I'm going to end the

19      conversation here with you."  And then he said -- so then he

20      hung up.

21           He called back, right back again, within just a matter

22      of a couple of minutes and he called back.  It was him and

23      then he -- he began to say, "We're going to go to your

24      church.  I'm going to bring all of my transgender, lesbian

25      friends.  I'm going to bring all of them.  It sounded like

Exhibit 1, Page 217

EGELER (███████████████, 9/1/10)

Page 51

```
 1        he had a -- he indicated something to I'm going to bring all
 2        of them and we're going to take up half of your -- half up
 3        of your space and you better have enough room for us.
 4              And at that point, I told him, I said, "Look," I says,
 5        "my husband and I have no problem talking with you."  I
 6        said, "My husband and I" -- "my husband would be glad to
 7        talk with you," I said, "but we would" -- "if you want to
 8        come to church, you're more than welcome, but if you're
 9        going to come with the intent to disrupt our service, I'm
10        going to have to ask you not to do that, you know, but
11        you're more than welcome, and my husband and I, we can talk
12        to you after the service."
13              He didn't seem to listen to that.  And then he said,
14        "When we come to your church, we're going to" -- "when the
15        community finds out that you do not support the homosexual
16        community," he says, "the community is not going to want to
17        give to your church."
18   Q    Did he say anything else?
19   A    I think after that, then he called back and then I didn't
20        answer the phone.  I think that's when we started to get the
21        recorded messages with more threats on our phone.
22   Q    How did the call end?  Who ended the call?
23   A    I ended the phone call, the conversation, and then he got
24        mad once and hung up on me and then he called back and made
25        threats he's going to be at our church.
```

EGELER (███████████, 9/1/10)

Page 55

| | | |
|---|---|---|
| 1 | A | He sent us an e-mail after that. |
| 2 | Q | Before we get to that, did you have any more phone contact |
| 3 | | or messages from the individual? |
| 4 | A | No. |
| 5 | Q | Then we'll mark this as Exhibit No. 3. |
| 6 | | (Exhibit No. 3 marked.) |
| 7 | Q | So you have in front of you what we've marked as Exhibit |
| 8 | | No. 3 and today part of your subpoena asked you to bring |
| 9 | | documents, and this is one of the documents you brought, |
| 10 | | correct? |
| 11 | A | Yes. |
| 12 | Q | Can you tell me what this is? |
| 13 | A | The e-mail that we received from David Baurle now called |
| 14 | | Krystal Mountaine. |
| 15 | Q | And this Tuesday, August 4th, is this the Tuesday that |
| 16 | | follows the Saturday conversations we were just discussing? |
| 17 | A | Yes. |
| 18 | Q | After this e-mail, did you respond to it? |
| 19 | A | No. |
| 20 | Q | Did you inform the police of it? |
| 21 | A | No. |
| 22 | Q | Did you have any further contact with him of any sort? |
| 23 | A | No. |
| 24 | Q | Okay. |
| 25 | A | I want to add something to this e-mail. |

EGELER (███████████████, 9/1/10)

Page 56

1   Q   You want to add to the e-mail?

2   A   Make a comment to the e-mail we received from him.

3   Q   What would you like to say?

4   A   In my conversations with David, David/Krystal, the way he

5       talked on the phone with me does not at all sound like this

6       was his -- the way he would speak or write, so it sounded

7       like this came from somebody else.

8   Q   And other than that, do you have any knowledge of whether

9       this came from somebody else?

10  A   No.  But I can tell you that the way he talked on the phone,

11      that there's no way that he seemed to be of the skill to be

12      able to write something as -- like this.

13  Q   I understand.

14          You said you didn't contact the police after you

15      received this.  Did you feel threatened by the e-mail?

16  A   No.

17  Q   Is there some reason that you didn't inform the police of

18      this?

19  A   He said he would not be contacting us any further.  Again, I

20      have to say that this does not sound like it came from him.

21      Clearly to us, from the conversations with him, somebody

22      else had to be with him that wrote this because this was not

23      the way that he talked.

24  Q   I understand.  But my question is:  Why did you not feel the

25      need to give this to the police?

EGELER (█████████████, 9/1/10)

Page 57

```
 1   A   He did not make any threats to come to our church at that
 2       point, but I think I can understand that whoever helped him
 3       do this probably advised him not to contact us.
 4   Q   Were there any other incidents that occurred?
 5   A   During the time █████████ called us to interview us for
 6       the article for the ballot, we had put our sign out in our
 7       front yard, our front lawn, and somebody went there in the
 8       middle of the night or sometime we weren't there and defaced
 9       our sign.
10   Q   In what way?
11   A   Looks like black spray paint on both sides.
12   Q   Did they spray any words or more of marking out what was on
13       the sign?
14   A   Marking out.
15   Q   Do you know who did that?
16   A   I wish I knew.
17   Q   Do you know why they did that?
18   A   No.
19   Q   Do you know if any other signs of any sort in your
20       neighborhood were defaced?
21   A   No.
22   Q   Any incidents?
23   A   Yes.  We got a letter in our home mailbox.
24   Q   Let's mark this as Exhibit No. 4.
25                              (Exhibit No. 4 marked.)
```

Exhibit 1, Page 221

EGELER (███████████, 9/1/10)

Page 58

1   Q   And you have there what's been marked as Exhibit No. 4, but

2       I see you also have the original.  Again, this is something

3       that you brought in in response to the subpoena, correct?

4   A   Yes.

5   Q   Can you explain what this is?

6   A   This is a letter that we got in our mailbox at our home.  I

7       can't see the date on this envelope, so I don't know -- I

8       can't say exactly when it was delivered, but it was before

9       the election.

10  Q   Can you please look at the -- what we've marked as Exhibit

11      No. 4 as well and make sure that's an accurate

12      representation of the envelope and the letter that the

13      envelope contained.

14  A   Part of my copy is cut off on the envelope.

15  Q   So it is, you're right.  Can you read from the original what

16      appears in the upper left-hand corner of the envelope?

17  A   It says, "Tax Services of Washington."  I didn't notice at

18      the time that I read it, until after we opened it up, but

19      then when we opened it up, I looked to see who it was from

20      and realized that they typed Washington incorrectly.

21  Q   And how is Washington spelled?  Well, we have that on the

22      exhibit, I guess.  Can you read the second line of the

23      address?

24  A   992 Capital Avenue.

25  Q   The third line?

EGELER (█████████████, 9/1/10)

Page 59

```
 1   A    Olympia, WA 98336.

 2   Q    Is the remainder of the envelope correctly portrayed on the

 3        exhibit?

 4   A    Yes.

 5   Q    So it's difficult to read the date stamp on the envelope.

 6        Can you read that?

 7   A    What I can read?  Sure.  It's stamped from the post office

 8        and it says Tacoma/Olympia, WA 983 -- and it's not too

 9        legible on the last line here.

10   Q    I think --

11   A    Something 2009, I think.

12   Q    It looks to me --

13   A    PM.

14   Q    -- like October 2009.  Does that sound right to you?

15   A    Maybe that's 06 OCT, I think, yeah.

16   Q    Do you think it might be October 2009?

17   A    That's what it looks -- or two thousand -- mine could say

18        2009 here, but it's more than likely 2008.

19   Q    When do you --

20   A    2009, yeah.

21   Q    When do you believe you received this?

22   A    This was during the time before the election last year.

23   Q    Do you think it was October of 2009?

24   A    The election was last year?

25   Q    Yes.
```

EGELER (████████████, 9/1/10)

Page 60

```
 1   A   Yeah, 2009.

 2   Q   Okay.

 3   A   Or, yes, 2009.  Sorry.

 4   Q   The front sheet, the first page of Exhibit No. 4, is this a

 5       fair representation of what was contained in the envelope?

 6   A   Yes.

 7   Q   Do you know who sent this, other than the address on the

 8       outside?

 9   A   I sure wish I knew.

10   Q   Do you know why they sent it?

11   A   Probably in relation to R71.

12   Q   How do you know that?

13   A   We've never received this before.

14   Q   You don't know who the person is who sent it.  Is it fair to

15       say you don't know why it was sent?

16   A   It was during the time that we were involved with R71.  We

17       never received something like this before.

18   Q   I understand, but do you know for a fact why this was sent

19       to you?

20   A   I believe that it was related to R71.

21   Q   And why?  How do you know that this was related to R71?

22   A   Again, because we never received this before.

23   Q   And --

24   A   It was during the same time line that we got our sign out on

25       front lawn defaced, around that time.
```

Dixie Cattell & Associates (360) 352-2506

EGELER (⬛⬛⬛⬛⬛⬛, 9/1/10)

Page 61

| | | |
|---|---|---|
| 1 | Q | Do you know who defaced your sign? |
| 2 | A | I already answered that question.  I said no. |
| 3 | Q | And how do you know who sent this? |
| 4 | A | They -- if you look -- they didn't sign, who sent it, so we |
| 5 | | don't know. |
| 6 | Q | And did you check with Tax Services of Washington to see if |
| 7 | | that was a valid address or business? |
| 8 | A | Yes, we did. |
| 9 | Q | And is it a valid address? |
| 10 | A | No. |
| 11 | Q | Is it a business? |
| 12 | A | No.  It's interesting, though, that during the time that we |
| 13 | | were at the elections office, we would -- it was like our |
| 14 | | home there with everybody there for 15 hours a day, that I |
| 15 | | had mentioned to one of the workers there, one of the |
| 16 | | supervisors there during a break or something, that I have |
| 17 | | to file our taxes because we hadn't -- we were late on |
| 18 | | filing our taxes.  And so I thought that was interesting |
| 19 | | that whoever sent this used this Tax Services of Washington |
| 20 | | to kind of like throw us off, thinking it was some tax |
| 21 | | services. |
| 22 | Q | Who had you spoken to and told you were late filing your |
| 23 | | taxes? |
| 24 | A | To -- I can't remember her name.  She's the supervisor |
| 25 | | there.  I can't remember her name.  She worked with David |

```
1                    C E R T I F I C A T E

2         I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3    and for the State of Washington, residing at Lacey, do hereby

4    certify:

5         That the foregoing deposition of ███████████ was taken

6    before me and completed on the 1st day of September, 2010, and

7    thereafter transcribed by me by means of computer-aided

8    transcription; that the deposition is a full, true, and complete

9    transcript of the testimony of said witness;

10        That the witness, before examination, was by me duly sworn

11   to testify the truth, the whole truth, and nothing but the truth,

12   and that the witness reserved signature;

13        That I am not a relative, employee, attorney, or counsel of

14   any party to this action or relative or employee of any such

15   attorney or counsel, and I am not financially interested in the

16   said action or the outcome thereof;

17        That I am herewith securely sealing the deposition of

18   ███████████ and promptly mailing the same to MS. ANNE E.

19   EGELER.

20        IN WITNESS HEREOF, I have hereunto set my hand and affixed

21   my official seal of this 7th day of September, 2010.

22

23

24                              Rebecca S. Lindauer, CSR#2402
                                Notary Public in and for the State of
25                              Washington, residing at Lacey.
```

Exhibit ___4___ Date 6/1/10

Rebecca S. Lindauer, CCR, RPR

christian

# BIGOT

ices of Washinton
tal Ave
 WA 98335



TACOMA - OLYMPIA
WA 983



960327+8735          I|I.I.I..I..II..II..II..II.I.II.I.IIII.II..II.II.II.I

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1-8

Exhibit to Pls.' Statement of Material
Facts
(Case No. 3:09-cv-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

Exhibit 1, Page 229

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

―――――――――――――――――――――――――――――――――――――――――――

JOHN DOE #1, et al.,            )
                               )
           Plaintiffs,          )
                               )
        vs.                     )   NO. 09-cv-05456-BHS
                               )
SAM REED, et al.,               )
                               )
           Defendants.          )

―――――――――――――――――――――――――――――――――――――――――――

       DEPOSITION UPON ORAL EXAMINATION OF  ██████████████

―――――――――――――――――――――――――――――――――――――――――――

September 13, 2010

Vancouver, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

EGELER (██████████, 9/13/10)

Page 4

```
 1                BE IT REMEMBERED that on Monday, September 13,
 2        2010, at 8:46 a.m., at 1220 Main Street, Suite 510,
 3        Vancouver, Washington, before REBECCA S. LINDAUER, Notary
 4        Public in and for the State of Washington, appeared ████
 5        ████████, the witness herein:
 6                WHEREUPON, the following proceedings were had, to
 7        wit:
 8
 9        █████████████,            having been first duly sworn by
10                                  the Notary, testified as follows:
11
12                MS. EGELER:  I would like to start by noting on
13        the record that it's 8:48, and I have called my office phone
14        for messages, and there are no messages, so I'm assuming
15        that counsel for the Doe plaintiffs does not intend to
16        attend the deposition, so we'll get started.
17                               EXAMINATION
18   BY MS. EGELER:
19   Q    ██████, we're going to be recorded today by our court
20        reporter, so there are a few rules that we need to follow to
21        make sure she can get a good transcript, so we'll need to be
22        careful to not speak over each other, wait until the other
23        is finished speaking before talking.
24   A    Um-hmm.
25   Q    If you could please say yes or no, instead of um-hmms or
```

EGELER (████████████████, 9/13/10)

Page 14

```
 1   A   Yes, I have.

 2   Q   And where did you go to do that?

 3   A   Anywhere from parks, city streets, just public places.

 4   Q   And were you successful in getting signatures?

 5   A   I was.

 6   Q   Did you do anything else to support Referendum 71?

 7   A   We just hold signs on the streets, bumper stickers.

 8   Q   So there was a bumper sticker on your car?

 9   A   Yeah.

10   Q   Did you give out bumper stickers to others?

11   A   I did.

12   Q   And where did you hold up signs?

13   A   In the corner of Mill Plain and Chkalov, the street

14       crossings of Padden Parkway and Andresen, street crossings

15       of Padden Parkway and 117th, street crossings on Main

16       Street.  Don't remember the cross street on that one.  And

17       then church, across the church, street number:  ████████

18       and ████████.

19   Q   These are all major intersections, correct?

20   A   Yes.

21   Q   Did you have other people with you?

22   A   I have.

23   Q   How many people were with you?

24   A   I had my youth group involved, so anywhere from 100-plus

25       people.
```

EGELER (████████████████, 9/13/10)

Page 15

1   Q   Did you encourage the members of your youth group to sign
2       the petition?
3   A   Did I encourage them?  What do you mean by "encourage"?  Can
4       you explain that?
5   Q   Let me change the question.  Did you tell them about
6       Referendum 71?
7   A   I have told them about it.
8   Q   Did you tell them that you were supporting?
9   A   Yes.
10  Q   Did your employer, ████████████, know about your support of
11      Referendum 71?
12  A   I didn't work for them at that time.
13  Q   Did you work with other churches to promote Referendum 71?
14  A   I have.
15  Q   And just to be clear, let's state the name of your church so
16      we can distinguish it from others.
17  A   ██████████████████
18  Q   And that's located in ████████████?
19  A   ████████████████████.  Address: ██████████████████████,
20      ████████████████████████.
21  Q   And you talked about Pastor ████, and is he also involved
22      with your church?
23  A   He's our sister church in ██████████.
24  Q   And what was your involvement with Pastor ████ in promoting
25      Referendum 71?

Exhibit 1, Page 233

EGELER (███████████, 9/13/10)

Page 16

```
 1   A   We just worked together on phone calls, different plans,

 2       anything we can do to have -- get the word across to people.

 3   Q   Did you do phone calls then to encourage people to vote?

 4   A   No.

 5   Q   No.

 6           When you talked about holding up signs, what did the

 7       signs say?

 8   A   Reject R71.

 9   Q   And before there was a Referendum 71, there was a senate

10       bill regarding the same issue.  Were you familiar with the

11       issue at the time the senate bill was being promoted?

12   A   No.

13   Q   I want to talk now about any harassment or threats that you

14       received as a result of your involvement with Referendum 71.

15   A   Um-hmm.

16   Q   So we'll go through each event that occurred.

17   A   Okay.

18   Q   So let's begin wherever you would like, if you've suffered

19       any harassment or threats.

20   A   I only had like probably three stories.

21   Q   Three stories, okay.  Let's start with the first then.

22   A   First one occurred on Mill Plain and Chkalov.  It was about

23       eleven o'clock.

24   Q   A.m.?

25   A   P.m.
```

EGELER (⬛⬛⬛⬛⬛⬛⬛⬛⬛, 9/13/10)

Page 17

1   Q   P.m.

2       What you were doing at the intersection at 11:00 p.m.?

3   A   We had, that night or that evening, we had a rally there --

4       not a rally, or like a sign, whatever, sign holding.  And I

5       was just coming up cleaning everything up after that, what

6       we had, and making sure that we leave it clean.

7   Q   Was anyone else there with you?

8   A   At that moment we just had a car leave, so I was walking

9       back to my car.  I saw a sign there, one of my signs that

10      was there, so I decided to pick it up.

11  Q   Was that a Referendum 71 sign?

12  A   It was an R71 sign, yeah.

13  Q   Okay.

14  A   I picked up the sign.  I had a car pull over right across

15      from me.

16  Q   Was it across the street?

17  A   It was right across the street.  So if you look where Fred

18      Meyer's is, the car pulled into the 76 gas station.

19  Q   Were you on the same side of the street as the gas station?

20  A   We were not.

21  Q   You say "we."  Who was with you?

22  A   Well, the car that was about to leave, but the rally was

23      held on the Fred Meyer corner.  That's what I refer as "we."

24  Q   But you say the car that was about to leave, so were there

25      people in your group that were still there?

EGELER (███████████, 9/13/10)

Page 18

1   A   Yeah.

2   Q   And about how many people?

3   A   Two.

4   Q   You and who else?

5   A   It was somebody from the rally.  I don't really remember

6       their names.

7   Q   Two other people from the rally?

8   A   Yeah.

9   Q   You are under oath, ██████, so if you do remember their

10      names --

11  A   I don't.  I do not remember their names at this point.  We

12      had a lot of people there.

13  Q   Were they all associated with the church?

14  A   No.  We had different people that came out there to support.

15  Q   So across the street a car pulls into the service station,

16      correct?

17  A   Yes.

18  Q   What happened next?

19  A   For me, I didn't -- you know, I didn't notice, but all I saw

20      is young men running at me.  I had a sign in my right arm

21      and a hammer in my left arm because I was just pulling it

22      out from the ground.

23  Q   Okay.

24  A   He just launched at me.

25  Q   So a young man.  About how old, do you think?

EGELER (⬛⬛⬛⬛⬛⬛⬛, 9/13/10)

Page 19

1    A    Maybe 20's.

2    Q    Maybe 20's.

3         He ran across the street?

4    A    Right across the street where I was.

5    Q    And did he say anything?

6    A    Just a bunch of cuss words.

7    Q    Do you know why he did that?

8    A    I do not.

9    Q    And his only speech to you was cuss words?

10   A    Cuss words and he launched at me.

11   Q    Did he say anything about Referendum 71?

12   A    He did.

13   Q    What did he say about Referendum 71?

14   A    He wasn't in support on what we were doing.

15   Q    Is that what he said, "I'm not in support of what you're

16        doing"?

17   A    Do you want me to repeat what he was saying?

18   Q    Yes, please.

19   A    I'm not -- you know, I'm not going to repeat the cuss words,

20        but he was just saying what you guys are doing is wrong.

21        You guys deserve to die.  Everybody deserves the right to

22        live, some kind of -- you know, in that kind of that way,

23        so -- he was very physical, so he was getting, you

24        know . . .

25   Q    So can you describe what he looked like?

EGELER (███████████, 9/13/10)

Page 20

1  A  Young man.  This was a while back, so I can't really

2      remember, you know, specific details, but just a young man.

3      I don't know.  What else would you like to know?  White.

4  Q  Do you remember approximately how tall he was?

5  A  A little bit taller than me.

6  Q  And his weight approximately?

7  A  Skinny.  He did have long hair.

8  Q  He did?

9  A  Yeah.

10  Q  So you say he lunged at you.  Did he touch you?

11  A  Well, physically, yeah.  We had a few pushes here and there

12      and me, I was just self-defensing, like I said.  If I had

13      wanted to really put force in, I had a hammer in my left

14      hand.

15  Q  So he pushed you?

16  A  Yeah.

17  Q  What did you do when he pushed you?

18  A  It was kind of like he launched at me, so I launched at him,

19      kind of like get away, you get what I mean?

20  Q  So he pushed you and you pushed back?

21  A  Not pushed back, but just kind of like just self-defensing

22      on my side because I didn't know what he had.  It wasn't my

23      intention to just, you know, push him or anything.  I see

24      him, you know, approach on me physically, so I -- anything I

25      did was just to, you know, get myself out of his mess.

Exhibit 1, Page 238

EGELER (████████████████, 9/13/10)

Page 21

```
 1    Q    And did he stop?

 2    A    He did stop.  There was a police officer on the corner of

 3         the Starbucks, in the Starbucks, and I guess . . .

 4    Q    The corner, so the Starbucks --

 5    A    The Starbucks on Mill Plain.  Yeah, on the same --

 6    Q    Same intersection?

 7    A    -- intersection.

 8    Q    What did the officer do?

 9    A    Well, I guess the officer didn't see what happened, but when

10         he saw him, he ran back to his car, sat in the passenger

11         seat, and took off.

12    Q    When you say "he ran back to his car," do you mean the

13         officer or --

14    A    No.  The guy that approached me.

15    Q    So the guy that approached you, did he ever hit you?

16    A    No.  No, he didn't.

17    Q    And did the officer come over and speak with you?

18    A    No.

19    Q    And you think the officer didn't see anything?

20    A    I don't know.  He didn't come by, so . . .

21    Q    Did you feel the need to go and speak to the officer,

22         contact the officer?

23    A    No.

24    Q    Why not?

25    A    I just didn't think it was that important to -- you know,
```

Exhibit 1, Page 239

EGELER (⬛⬛⬛⬛⬛⬛, 9/13/10)

Page 22

| | | |
|---|---|---|
| 1 | | like I said, it didn't happen where I got hurt or anything, |
| 2 | | so I just didn't see that it was important for me to do |
| 3 | | that. |
| 4 | Q | Would it be fair to say you felt safe at that point? |
| 5 | A | I didn't feel safe, but I understood that, you know, if it |
| 6 | | comes to self-defense, I can defend myself physically.  It's |
| 7 | | a public street.  There was a lot of, you know, cars driving |
| 8 | | by at that time of the day still, you know. |
| 9 | Q | That's pretty late to have a gathering with signs that -- |
| 10 | A | No.  We're cleaning up. |
| 11 | Q | Okay. |
| 12 | A | So we were there from 7:00 to until maybe 10:00. |
| 13 | Q | 7:00 to 10:00? |
| 14 | A | 7:00 to 9:00 or something.  We were just cleaning up. |
| 15 | Q | Had you ever seen the young man that pushed you? |
| 16 | A | Did I ever see him again? |
| 17 | Q | Had you ever seen him before? |
| 18 | A | I have not. |
| 19 | Q | Did you ever see him again? |
| 20 | A | No. |
| 21 | Q | Did anything else happen at the end of that incident or |
| 22 | | anything else? |
| 23 | A | No. |
| 24 | Q | So the second incident, let's talk about that. |
| 25 | A | Second incident was on Padden Parkway. |

Dixie Cattell & Associates (360) 352-2506

Exhibit 1, Page 240

EGELER ( ▆▆▆▆▆▆▆▆▆ , 9/13/10)

Page 23

| | | |
|---|---|---|
| 1 | Q | Excuse me? |
| 2 | A | Padden Parkway and Andresen. |
| 3 | Q | Again, a large intersection? |
| 4 | A | Yes.  It was a Sunday. |
| 5 | Q | What time? |
| 6 | A | I'm guessing about three o'clock in the afternoon. |
| 7 | Q | And were you at the intersection alone? |
| 8 | A | No.  We had a gathering there again with signs. |
| 9 | Q | How many people? |
| 10 | A | About 50 people. |
| 11 | Q | What happened? |
| 12 | A | When we were there, there was a bus that pulled in. |
| 13 | Q | Where did it pull in? |
| 14 | A | Just pulled in the side of the street and -- |
| 15 | Q | Same side of the street that you were standing on? |
| 16 | A | We were standing on all four blocks. |
| 17 | Q | Okay. |
| 18 | A | And three men came out. |
| 19 | Q | Was this a city bus then? |
| 20 | A | No.  This was a construction-looking work bus. |
| 21 | Q | So three men came out. |
| 22 | A | And they were wearing very provocative clothes, was saying |
| 23 | | like almost naked. |
| 24 | Q | Can you describe what they were wearing? |
| 25 | A | Just to cover their private parts of the body.  Everything |

EGELER (████████████, 9/13/10)

Page 24

1          else was showing.

2     Q    So basically just a bathing suit then?

3     A    Basically a thong, if you want to put it that way.

4     Q    That's all they wore?

5     A    Yeah.

6     Q    Okay.

7     A    We had -- this was people from youth, so there was a lot of

8          young people there.

9     Q    Okay.

10    A    What they started to do is just walk around the crowd,

11         verbally talking to people, you know -- I don't know how to

12         explain it right, but offering their services as in like

13         sexual ways.  I'm talking about we had a lot of young girls

14         and a lot of young guys there.

15              And when they came to me, when I saw this, I approached

16         them.  There was a man with us.  You guys might know him.

17         His name is ████████████.  You can put his name down, if you

18         like, as a witness.  And me and him organized that

19         particular rally or that particular meeting.  And when we

20         were there, we approached them and we asked them to leave

21         kindly and they got very upset.

22    Q    What did they do when they got upset?

23    A    They just started throwing garbage at us from their van.

24    Q    So they got back into the --

25    A    Yeah.

EGELER (⬛⬛⬛⬛⬛⬛⬛, 9/13/10)

Page 25

```
 1   Q   Was it a bus or a van?

 2   A   It was like a van, like a work van, you know what I'm

 3       talking about?  Those big -- it was either -- an old Chevy

 4       with a slide door.

 5   Q   If I understand, you asked them to leave and then they got

 6       into their van?

 7   A   Came out, started throwing stuff at us.

 8   Q   While in the van --

 9   A   While in the van.  They were driving back and forth.  And

10       then they would get completely naked, stick their rear ends

11       out of the windows.

12   Q   Did you get a license plate number?

13   A   I didn't.

14   Q   How many times did they drive back and forth?

15   A   A few times.  It's a four-block -- I mean, a four -- you

16       know, there's nice four paved blocks.  So they would go once

17       here, once there, you know, just around the corner.

18   Q   Why didn't you get a license plate number?

19   A   I didn't think it was important enough to.  You know, things

20       happen.  I understand people are upset, so . . .

21   Q   When they were walking around the crowd, were they -- I

22       understand they were soliciting sex or making sexual

23       comments.  Were they talking about Referendum 71 as well?

24   A   They were against -- they were on the opposition of being

25       against R71.
```

Exhibit 1, Page 243

EGELER (⬛⬛⬛⬛⬛⬛⬛⬛, 9/13/10)

Page 26

1   Q   What did they say about that?

2   A   I don't remember.  I know that they were walking around and

3       the reason what they were doing is because they were

4       against.  They were just showing of their behavior, the way

5       they were acting.

6   Q   So you knew it because of their behavior as opposed to what

7       they said.  Is that right?

8   A   Well, yeah.  I mean, why would a bus stop by and three guys

9       would come out fully naked, knowing that these are church

10      folks, knowing that the morals are high, and come out and

11      they would offer their services to young men, not women.

12      I'm talking about young men, and these are not people that

13      were for.  These people were against and that's obviously

14      seen.

15  Q   So they said nothing about Referendum 71, but you could tell

16      by their behavior and being undressed?

17  A   Yes.

18  Q   I understand.

19          And how many times did they drive by?

20  A   I'm guessing around four.  There was four corners on that

21      intersection.  They made it around every corner.

22  Q   Did the garbage that they threw hit you?

23  A   No.

24  Q   Did it hit anyone in your group?

25  A   Don't remember.  It was a big crowd, about 50 people, so

EGELER (⬛⬛⬛⬛⬛⬛⬛⬛, 9/13/10)

Page 27

| | | |
|---|---|---|
| 1 | | they might have. |
| 2 | Q | Were they throwing things every time? |
| 3 | A | Cups, plastic bottles, just whatever they got under their |
| 4 | | arm, whatever they found in that van. |
| 5 | Q | Do you remember if it's a Washington plate or an Oregon |
| 6 | | plate? |
| 7 | A | I don't remember.  I was one of the organizers of the rally, |
| 8 | | and I was at a point where I didn't see everything. |
| 9 | Q | Did anyone call the police about this? |
| 10 | A | I don't know.  The police were on-site though.  I think |
| 11 | | there was one police officer standing there just to look |
| 12 | | over.  He was there.  I guess they called in just so he can |
| 13 | | stand for safety or whatever.  I don't know what he was |
| 14 | | called in for. |
| 15 | Q | So -- |
| 16 | A | There was a police officer on-site -- |
| 17 | Q | The whole time? |
| 18 | A | -- but he was just chilling in the car, you know what I |
| 19 | | mean? |
| 20 | Q | And do you remember what date this was? |
| 21 | A | I do not.  I'm guessing it was in one of the June -- May, |
| 22 | | June, July months, but I'm not quite sure which one because |
| 23 | | we did quite a few. |
| 24 | Q | Did the officer do anything at all? |
| 25 | A | He actually went by, asked around what went on, but nothing. |

Dixie Cattell & Associates (360) 352-2506

Exhibit 1, Page 245

EGELER (███████████, 9/13/10)

Page 28

1    You know, just is everything okay, is everybody fine, and

2    that's it.

3  Q  Did he do this while the individuals were walking around the

4    crowd?

5  A  No.  They were gone.

6  Q  Did you feel that the police were appropriately protecting

7    people?

8  A  No.  I felt like they weren't doing their job.

9  Q  What did you think they should do?

10  A  What they should have done?

11  Q  Yes.

12  A  I feel like they should have came out at the time when that

13    occurred.

14  Q  When what occurred?

15  A  When they pulled in and, you know, addressed some things to

16    them, maybe to us.  I feel like they were just chilling

17    there enjoying their coffee in their car rather than coming

18    out there and actually doing something.

19  Q  Did you approach the officer and ask the officer to do

20    something?

21  A  Well, I was in the middle of whatever was going on.  But

22    after everything happened, I came up to the police and I

23    told them, "Didn't you guys see what was going on?"

24  Q  What did they say?

25  A  They thought they were a part of us, which doesn't make

Exhibit 1, Page 246

EGELER (█████████████, 9/13/10)

Page 29

1       sense.

2   Q   How many officers were there?

3   A   There was one.

4   Q   Do you remember his or her name?

5   A   I'm guessing Officer Gomez or Lopez.  He was a Hispanic man.

6   Q   Do you know if the police took a report?

7   A   No, they have not.

8   Q   Was anyone physically hurt that day during that incident?

9   A   No, I don't think so.

10  Q   Going back to the first incident where -- where you were out

11      at 11:00 p.m. and the car pulled into the gas station, did

12      you get a vehicle license plate?

13  A   I did not.

14  Q   Do you remember if that was Washington or Oregon?

15  A   Do not remember.

16  Q   Do you remember the color of the car?

17  A   It was a black Civic.

18  Q   Black Civic, okay.

19  A   Black Civic or Subaru, I really don't remember.  Some

20      Japanese make.

21  Q   Anything else happen with respect to the second incident

22      with the three men that were unclothed?

23  A   No.  We talked it over with ███████████, make sure it

24      won't -- you know, trying to do everything we can next time

25      so it won't happen.

Exhibit 1, Page 247

EGELER (█████████████, 9/13/10)

Page 30

```
 1   Q   Who is ███████████?

 2   A   He is one of my good friends.

 3   Q   Is he associated with the church?

 4   A   He's not, but he worked with me for the R71.

 5   Q   You said there was one more incident.  Let's talk about

 6       that.

 7   A   The incident was at the church.

 8   Q   What happened?

 9   A   When I was outside with my table, just people were standing

10       up signing petitions.

11   Q   Was this on a Sunday?

12   A   This was a Sunday afternoon.

13   Q   Do you remember what month?

14   A   I don't.  In those three months, somewhere down in that

15       category.

16   Q   May, June, or July?

17   A   Yeah.  I just don't remember because there was so many

18       events that we did in those three months, so I don't

19       remember which one was which.

20   Q   Okay.

21   A   And it was about three of us at the table.  ███████████ was

22       there.  And we -- we were doing the -- the African-American

23       lady approached us.  She was very upset.  And she said that,

24       you know, we'll do everything to stop what you're doing.

25       You guys don't care about families.  You guys don't care
```

Exhibit 1, Page 248

1   about love or -- you know, amongst couples or whatever.

2       We tried everything to -- not to make her even more

3   upset, as in saying, you know, that's fine.  Your opinion

4   is -- you know, in support you have the right to do whatever

5   you like.

6       She did actually -- you know, you can see she was very

7   upset in the way she approached us.  After she did -- her

8   friend or her boyfriend or whoever it was that pulled in

9   afterwards, he came out of the car.  He got very upset with

10  us saying that, you're making my girl mad.  You know, I'll

11  bust your cap.  I don't know what that's supposed to mean.

12  You know, everybody deserves the right to live, you know,

13  these kind of terms, you know.  Nothing towards us

14  specifically, but just saying that one day we'll have your

15  kids.

16  Q   I don't understand.

17  A   Like I guess from the people that were in opposition of R71,

18  they were -- because a lot of -- one of the sayings that we

19  used in R71 was, you know, safe families, safe kids or

20  whatever.  Basically one of the things that she spoke

21  against is, you know, we'll have your kids, as in like, you

22  know, we get this law through and your kids will be -- you

23  will be living the life of the same sex marriage or

24  whatever.  Again, we didn't -- I understood what she meant,

25  but it's -- that's just kind of verbally threats here and

EGELER (███████████, 9/13/10)

| 1 | | there.  Nothing very physical, just very mad. |
|---|---|---|
| 2 | Q | Anything physical at all? |
| 3 | A | Nothing very physical. |
| 4 | Q | So nothing physical? |
| 5 | A | Nothing physical. |
| 6 | Q | And nothing physical from the person -- |
| 7 | A | No, just verbally.  I guess she called him and told him we |
| 8 | | were there.  He pulled in. |
| 9 | Q | He was just verbal, not physical? |
| 10 | A | Just verbal, cussing, nothing physical. |
| 11 | Q | Did you call the police? |
| 12 | A | No. |
| 13 | Q | Why not? |
| 14 | A | Because we understand people are mad and I -- honestly I |
| 15 | | didn't see a point because everybody has the right to their |
| 16 | | own opinion.  Everybody has the right to speak out whatever |
| 17 | | they think is right.  And if that's the way they understood |
| 18 | | it, that's totally fine with me, because, you know, I'm |
| 19 | | standing on what I think is right, so it gives them the |
| 20 | | right to do the same thing. |
| 21 | Q | I understand. |
| 22 | A | That's why I didn't push on calling the police because |
| 23 | | that's the opinion that I have about other people's opinion. |
| 24 | Q | And you said ████████ saw all of this incident as well? |
| 25 | A | ████████ was there. |

EGELER (                    , 9/13/10)

1   Q   Do you remember what the car looked like?

2   A   It was an SUV-type.

3   Q   What color?

4   A   Black or dark blue, something darker tone.  I don't really

5       remember at this point.

6   Q   Did you get a license plate?

7   A   I did not.

8   Q   Was that because you weren't concerned?

9   A   Like I said, I wasn't concerned about -- you know, the lady

10      pulled in and it was in kind of let's say, you know, you can

11      see she was mad.  Just because she was mad, she was saying

12      things that she didn't really -- you know, maybe she didn't

13      even mean just because of the heat or whatever she was on,

14      things came out the way they did.

15          And what I tried to do is just, you know, just told

16      her, you have the right to whatever you think and that's

17      totally fine with me.  I'm not going to start here and push

18      my thing through.  You can go across the street, put up your

19      signs, and do whatever you like.  Everyone has the right to

20      do that.

21  Q   Did you have a sign in your yard at your home?

22  A   I did.

23  Q   You said that you worked on Referendum 71 for three months:

24      May, June, and July.  Those would be the months that you

25      were encouraging people to sign petitions, correct?

EGELER (█████████████, 9/13/10)

Page 34

```
 1   A   Yes, ma'am.

 2   Q   During those months, about how many days a week do you think

 3       you had some involvement with Referendum 71?

 4   A   Probably -- it varied from two times a week, three times a

 5       week, just whenever.

 6   Q   Okay.

 7   A   I did work with ███████████.  He and I worked together on

 8       organizing stuff here in Vancouver.

 9   Q   So over the course of those three months, do you think it

10       would be fair to say maybe 40 or 50 days you might have done

11       something either --

12   A   Yeah.

13   Q   -- signs or petition encouragement?

14   A   Yeah, you can say that.

15   Q   And after the petition signatures were counted and you knew

16       that Referendum 71 had made it to the ballot, did you

17       continue to promote the campaign?

18   A   Yes, I have.

19   Q   And between the time that the signatures were counted and

20       the actual election, there were a number of months.  Would

21       you say that you worked how many more days on Referendum 71?

22   A   At least twice a week, so . . .

23   Q   Twice a week in public places?

24   A   Yeah.

25   Q   So do you think that after the signatures were counted,
```

EGELER (██████████████, 9/13/10)

Page 35

```
 1        would it be fair to say that you worked approximately 50
 2        days in some public location to promote Referendum 71?
 3   A    Yeah, I think it's fair.
 4   Q    When you talked about the second event where the people that
 5        were unclothed or wearing thongs were walking in the crowd,
 6        you said there was a police officer who was there in his
 7        car.  Do you remember if that was a Vancouver Police officer
 8        or whether it was a Clark County Sheriff officer?
 9   A    I think it was a VPD, Vancouver Police Department.
10   Q    And then the first incident where somebody stopped at the
11        gas station and got out, you said there was a police officer
12        near at that time as well?
13   A    Yeah.  There was one at Starbucks on Chkalov and Mill Plain.
14   Q    Do you remember if it was a Vancouver officer or Clark
15        County?
16   A    It was VPD.
17   Q    So Vancouver again?
18   A    Yeah.
19   Q    You thought the name of the officer who you spoke to about
20        the second incident with the men in the thongs, that that
21        officer's name was Gomez or Lopez?
22   A    Yeah.  He was a Hispanic officer, so either I think Gomez or
23        Lopez.  I don't -- something in that category.
24   Q    The first incident where the officer was near Starbucks, do
25        you remember his name?
```

Exhibit 1, Page 253

HAMILTON (████████████████, 9/13/10)

Page 36

1  A   I didn't talk to him, so I just saw him there.

2  Q   Were there any other incidents at all?

3  A   This is the only three that I personally saw.

4  Q   Have you talked to your father about testifying?

5  A   What do you mean?

6  Q   Have you talked at all to your father about the fact that he

7      will be testifying this afternoon?

8  A   Yeah, he knows.

9  Q   Do you know if he's going to talk about the same incidents

10     or whether he has additional incidents?

11 A   I don't know.

12 Q   If the signed petitions were available for people to see,

13     publicly available, would it bother you that someone could

14     see that you signed the Referendum 71 petition?

15 A   It depends the way you guys put it, put there, or the way

16     they put it up there.

17 Q   Okay.

18 A   If they just put my first and last name, I don't mind at

19     all.

20         MS. EGELER:  I have no further questions.

21                        EXAMINATION

22 BY MS. HAMILTON:

23 Q   I just have a couple of follow-up questions.  ████████, I

24     represent the Washington Coalition of -- let me make sure I

25     get my client's name right.  The Washington Coalition of

```
 1    Families that Oppose -- which is basically a broad coalition
 2    that opposed the civil rights groups and churches that
 3    opposed the effort to get Referendum 71 on the ballot.
 4         My name is Jessica Hamilton.  I'm with a law firm in
 5    Portland called Perkins Coie.  I have a few questions.
 6         I wanted to go back to ████████.  You gave a little
 7    bit of background on ████████.  How did you first meet
 8    ████████?
 9  A  The first time I met him was I think we met up in one of the
10    rallies.
11  Q  By "rally," you mean --
12  A  One of the meetings we had.
13  Q  For Referendum 71?
14  A  Yes, ma'am.
15  Q  And is he connected with another church?
16  A  He does go to church.  I don't know the church name.  I know
17    it's somewhere located in Camas, Washington.
18  Q  Is that where Mr. ████ lives, is in Camas?
19  A  He lives in Camas, yeah.
20  Q  And is he -- did he organize a lot of the rallies?
21  A  Yes, he did.  We did it together.
22  Q  Did you have -- I'm interested in how you organized the
23    rallies.  Did you have a Web site or . . . ?
24  A  Facebook.
25  Q  Facebook.
```

```
 1                        C E R T I F I C A T E
 2          I, REBECCA S. LINDAUER, a duly authorized Notary Public in
 3    and for the State of Washington, residing at Lacey, do hereby
 4    certify:
 5          That the foregoing deposition of ████████████ was taken
 6    before me and completed on the 13th day of September, 2010, and
 7    thereafter transcribed by me by means of computer-aided
 8    transcription; that the deposition is a full, true, and complete
 9    transcript of the testimony of said witness;
10          That the witness, before examination, was by me duly sworn
11    to testify the truth, the whole truth, and nothing but the truth,
12    and that the witness waived signature;
13          That I am not a relative, employee, attorney, or counsel of
14    any party to this action or relative or employee of any such
15    attorney or counsel, and I am not financially interested in the
16    said action or the outcome thereof;
17          That I am herewith securely sealing the deposition of ████
18    ████████ and promptly mailing the same to MS. ANNE E. EGELER.
19          IN WITNESS HEREOF, I have hereunto set my hand and affixed
20    my official seal of this 14th day of September, 2010.
21
22
23
24                              Rebecca S. Lindauer, CSR#2402
                                Notary Public in and for the State of
25                              Washington, residing at Lacey.
```