# Exhibit 1-9

Exhibit to Pls.' Statement of Material Facts
(Case No. 3:09-cv-05456-BHS)
Exhibit 1, Page 257

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| JOHN DOE #1, et al., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | NO. 09-cv-05456-BHS |
| SAM REED, et al., | ) | |
| Defendants. | ) | |

DEPOSITION UPON ORAL EXAMINATION OF [redacted]

September 13, 2010

Vancouver, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506 ** (800) 888-9714

BE IT REMEMBERED that on Monday, September 13, 2010, at 12:12 p.m., at 1220 Main Street, Suite 510, Vancouver, Washington, before REBECCA S. LINDAUER, Notary Public in and for the State of Washington, appeared [REDACTED] [REDACTED], the witness herein:

WHEREUPON, the following proceedings were had, to wit:

JOHN SCIGLIANO, having been first duly sworn by the Notary, translated from English to Russian and Russian to English as follows:

[REDACTED], having been first duly sworn by the Notary, testified as follows:

EXAMINATION

BY MS. EGELER:

Q [REDACTED], could you please state your entire name, please.

A In the patronymic as well, a middle name?

Q Yes, please.

A [REDACTED].

Q And are you a U.S. citizen?

A At present I am, yes.

Q And when did you become a United States citizen?

A In 2003.
Q And are you a registered voter in the state of Washington?
A Yes, I am.
Q I wanted to let you know before we get going that everything we say today is being taken down by our court reporter, and you'll have an opportunity to review that, if you want to. So that she has a good record, we'll need to say yes or no rather than nodding or saying um-hmm because those things won't show.
A Okay.
Q If anything I ask you is unclear for any reason, please ask me to clarify. It's important that we understand each other.
A Okay.
Q [redacted], could you please tell me where you're employed.
A I work presently at the [redacted].
Q Do you have any other employment?
A Nowhere else.
Q And was that the case in 2009 also?
A It was the same.
Q And that's the [redacted], correct?
A Yes.
Q How many parishioners do you have at the church?

A Parishioners, approximately 700 people.
Q Would that have been about the same in 2009?
A I think so.
Q You have been named as a witness in a lawsuit, Doe v. Reed. Were you aware of that?
A Yes, I was. I was called by telephone and told of this and so, yes, I was aware.
Q And when were you called by telephone and told of this?
A It was perhaps at the beginning of this year, maybe March.
Q And who called?
A That, I cannot say who called. I think the call was maybe from Olympia or maybe from Seattle.
Q Do you know if it was from the attorneys for the plaintiffs in the case?
A I can't say for sure. I can understand what it is about, but as far as understanding in English what this organization is, I don't know. I don't even really know now what this organization is that I'm dealing with.
Q Do you know what the lawsuit is about?
A No.
Q Being named as a witness in this case may require you to appear in federal court in Tacoma and testify publicly.
A Yes. I'm ready to go wherever.
Q Do you have any objection or concern with testifying publicly in court?

EGELER (███████████, 9/13/10)

Page 7

```
 1   A   No.  I have no concerns.

 2   Q   Are you knowledgeable about Referendum 71?

 3   A   Yes.  I was made familiar with it.

 4   Q   And when did you first become aware of it?

 5   A   I think probably in August or in July of last year.

 6   Q   And how did you become aware of it?

 7   A   I can't now say exactly, but we received information by mail

 8       that came to our home.  We received it and everything there

 9       was all clearly laid out.

10   Q   Do you know where the mail came from?  Do you remember?

11   A   I can't say the name right now, but I believe it was from

12       that same organization that was on the side of the -- what

13       was it called?  I don't know.  But it was definitely an

14       organization that sent it.

15   Q   Was it a church organization?

16   A   I don't think so.  That is for sure that it was not a church

17       organization.

18   Q   Did you sign the Referendum 71 petition?

19   A   Yes, I did sign it.

20   Q   Do you remember where you were when you signed it?

21   A   Yes, I do.  I was at home.

22   Q   Who brought the petition to you at home?

23   A   The petition was brought to me in the same way.  We received

24       it by mail.

25   Q   And did you then mail the petition to someone?
```

Exhibit 1, Page 262

EGELER (███████████, 9/13/10)

Page 8

```
 1   A   No.  I didn't send it to anyone by mail.  It arrived by mail
 2       and there were somewhere around 40 newspapers there and on
 3       each there were about 20 names, and my son was directly
 4       involved in this matter.  He gathered signatures.  He knew
 5       where to send it.
 6   Q   Did you talk to others about Referendum 71 and encourage
 7       them to sign the petition?
 8   A   Of course I spoke to many people about it, and I expressed
 9       my opinion about it, and of course, people knew my view
10       about this matter.
11   Q   Did you speak to the parishioners at your church about this?
12   A   No.
13   Q   Were petitions available inside the church for people to
14       sign?
15   A   The petitions were everywhere.
16   Q   Were they inside the church?
17   A   Both inside and outside the church and they were at bus
18       stops and at the mall as well.
19   Q   Did you at any point speak to anyone inside the church,
20       anyone who attends the church, about signing the petitions
21       that were located inside the church?
22   A   I separate political and religious affairs.  In the church,
23       we don't talk about political matters.  The petitions were
24       in the church.  People had free choice to sign them, and no
25       one forced them to do so.
```

EGELER (█████████████, 9/13/10)

1  Q   Did you speak at all in the church from a religious

2      perspective about gay marriage?

3  A   I did speak of it, of course, on the basis of the word of

4      God, what the Bible says about these things, and I separate

5      the attitudes toward people and towards sin.  We love people

6      regardless of their origin, inclinations, or sexual matters.

7  Q   But you did tell your congregation that gay marriage

8      religiously is inappropriate or wrong?

9  A   I did and I believe that is so.

10 Q   Did you have a Referendum 71 sign in your yard at your home?

11 A   Where I live on our property, we did not have any specific

12     sign like that for the reason that it's not a -- it's not a

13     through roadway.  If it were, I would have had the sign.

14 Q   Were any Referendum 71 signs put up at the church inside or

15     outside the church?

16 A   We did not put any up.

17 Q   Did you have a bumper sticker on your car saying reject

18     Referendum 71?

19 A   I did not.

20 Q   Did you go to any public places and help to gather petition

21     signatures?

22 A   I did not.

23 Q   Did you go to any public places and hold a Referendum 71

24     sign?

25 A   No.  I did not take part in these.

EGELER (█████████████, 9/13/10)

 1  Q   I understand that your son Dmitry organized many events.

 2      Did you attend any of the events concerning Referendum 71?

 3  A   I repeat, I did not take part in any of these events, and

 4      I'll add not because I did not want to, but because I did

 5      not have the opportunity to.

 6  Q   Did you observe the counting of the signatures on the

 7      petitions?

 8  A   No, I did not observe.

 9  Q   Did you have any other involvement with Referendum 71 I

10      haven't asked you about?

11  A   For example, what might that be?

12  Q   Well, actually two other things I want to ask about.  Do you

13      have a church Web site?

14  A   We do have a church Web site, but we don't have anything to

15      do with this.

16  Q   Do you have a church newsletter?

17  A   No.

18  Q   At any point, was anything about Referendum 71 or the

19      gatherings that your son was planning posted on the church

20      Internet site?

21  A   It never was, no.

22  Q   Did you attend any meetings to plan activities regarding

23      Referendum 71?

24  A   No, I was not.  If there were any such gatherings, I would

25      have known about them, of course, and I would have been

there.

Q But there were such meetings, weren't there, that your son held?

A As far as my son, I don't know of any that he held. I think that you would have to ask him.

Q Did you meet with [redacted] about Referendum 71 or discuss it with him?

A I discussed this issue with many pastors. For the most part, they were American pastors.

Q And did you express your opinion about Referendum 71?

A It was entirely by e-mail and by mail.

THE INTERPRETER: Actually, the interpreter didn't interpret the question. The interpreter did not interpret the last question --

MS. EGELER: Sorry.

THE INTERPRETER: -- Attorney General. Did you express your opinion, was that the question?

MS. EGELER: Yes.

A Well, personally my English is not such to be able to respond much, but as far as information I received from various pastors, you know, I did speak of that.

Q (By Ms. Egeler) Did you allow your name to be used as a person who was endorsing Referendum 71?

A No, of course.

Q I understand that you suffered some harassment as a result

EGELER (█████████████, 9/13/10)

Page 12

1       of signing Referendum 71.  Is that correct?

2   A   Directed at me personally, no, but in general, yes.  There

3       were several times when, by the church, we found notes that

4       had been printed from a computer which contained things

5       like:  You're worst than the fascists.  Get out of here.

6       Nothing is going to come of this for you.  Your children

7       will be just like us --

8   Q   And these --

9   A   -- that they will be homosexuals.  We'll make them -- we

10      received these several times.  They were left by the church,

11      several copies.  I was obliged to speak of this in the

12      church so that people wouldn't pay attention to this, so

13      that our people could bless these people, saying that we

14      hate sin, but we love people and that's all.  There were no

15      threats directly at me personally, but in general, there

16      were.

17  Q   So these were printed on paper and left in front of the

18      church.  Is that correct?

19  A   There were many, both by the church and left on the

20      windshields, under the windshield wipers of cars.

21  Q   Did you keep any of them?

22  A   We had no goal at that time of keeping something, especially

23      things such as these in order to prove our side or that we

24      were right.  Maybe some of the people might have kept them,

25      taking them off their windshields.  I don't know.

Everything that was found on the church property was thrown in the garbage.

Q Did anything else happen?

A Well, that's specifically what I witnessed, but also I have specifically spoken to people and heard them attest to threats.

Q Did anything else happen to the church or near the church?

A Other than that incident, no.

Q And who did you talk to that was harassed in some way?

A The thing is, it was about two years ago, when people were going out in Portland where there was also a protest against this matter. A pastor of a certain church said that eggs were tossed at them, at their cars. I know this pastor and believe him.

Q Who is this?

A [redacted].

Q Can you spell that?

A I think it's [redacted].

Q And is he a pastor in Portland?

A Yes.

Q I'm confused that there would be a rally in Portland because Referendum 71 is a Washington issue, and Oregon cannot vote on Washington issues. Could it be that he was at a rally for a similar issue on the Oregon ballot?

A I think it was not connected to this referendum, but they

EGELER (████████████, 9/13/10)

Page 14

1     had something of their own there on this issue.

2  Q  Did you --

3  A  So I think it's just not on this referendum, but on the same

4     grounds that people who were defending this position, they

5     were very aggressive.

6  Q  And did this occur, the Portland incident, two years ago?

7     Is that what you said?

8  A  Yes, two years ago.

9  Q  And you said that you heard about harassment of others. Is

10     that the incident you were thinking of or are there other

11     things you've heard of as well?

12  A  No. I know several specific testimonies of other people.

13     The first thing is that when people went out to protest, our

14     people -- or not our people, but people on this issue were

15     out standing at Mill Plain and Chkalov, and people would

16     stop, people who were supporters of the same sex marriage,

17     and some of these people stopped and tried to tear away the

18     placards from young women, girls, who were holding the

19     placards that said reject. They would stop at a traffic

20     light and open their car windows and they would lower their

21     pants and show their behinds.

22  Q  Who told you this?

23  A  I can't say now exactly who did, but my son was a witness to

24     these things. He was not alone. There were perhaps 40

25     people there.

Exhibit 1, Page 269

Q Was it your son █████ who told you about this?
A My son █████ did tell me.
Q Is there anything else you've heard about?
A Well, some things that I've heard but I simply can't name the specific people, and some people I do not want to name. I think that I can confirm those things that I've personally seen and I've told of them.
Q The signs that were left by the church, the printed things, did you call the police and report that you had received those outside the church?
A No, of course not. No. We are not planning to retaliate against anyone or present -- make any charges. It's just when a certain pressure is brought to bear on us, I need to speak of these things. I otherwise would not speak of it.
Q When you read those printed things, did you feel that you or any of your congregation were at risk of any sort of harm?
A I can only speak for myself. I do not of course feel that I'm threatened by these statements, but it's unpleasant when people are saying -- directing this at our children, that we're going to make them just like us.
Q Do you feel that people who have a different viewpoint about Referendum 71 have a right to express that opinion?
A Of course.
Q Although I understand the things that were said on the -- these printings were rude and not kindly stated, did you

EGELER (█████████████, 9/13/10)

Page 16

1    feel that it went beyond their constitutional right to
2    speak?
3  A  Definitely, I do.
4  Q  But you chose not to call the police?
5  A  Right.
6  Q  Did you think the police might be able to help you with
7    this?
8  A  No, I didn't.
9  Q  Why not?
10 A  I don't know.  Maybe it's our Russian upbringing not to run
11   for help right away.
12 Q  But if I understand you, you didn't feel that these people
13   were trying to physically harm you or your parishioners or
14   the church?
15 A  Of course I don't think so.  I didn't have that kind of
16   fear.
17 Q  Did you personally experience any other harassment that we
18   haven't talked about?
19 A  Maybe I didn't understand.
20 Q  Did you yourself experience any other -- any other
21   harassment or any threats as a result of your signing the
22   Referendum 71 petition?
23 A  No.  Everything that I've heard or that I have been a
24   witness to I've told you about.
25 Q  I just have a question about an incident that you told me

Exhibit 1, Page 271

you heard from your son [redacted]. You said you were told that people tried to pull a sign away from a young woman. Do you know if the police were contacted about that?

A No, I don't know.

MS. EGELER: I have no other questions.

EXAMINATION

BY MS. HAMILTON:

Q My name is Jessica Hamilton. I'm an attorney and I represent Washington Families Standing Together, which is a group of civil rights organizations and churches that supported the Referendum 71 -- supported -- was against getting Referendum 71 on the ballot. We opposed Referendum 71. Sorry about that.

THE INTERPRETER: Interpreter asked to repeat the name of the organization.

MS. HAMILTON: Washington Families Standing Together.

Q (By Ms. Hamilton) I just have a few questions for you.

Do you recall when the petition gathering of signatures was over, the time?

A I think it was maybe July, maybe somewhere around there. I don't even know exactly.

Q Okay.

A You see, in my life this issue is not one that I've -- that is so salient in my life that I think about it a lot.

HAMILTON (█████████████, 9/13/10)

Page 18

```
 1   Q   Since that period of time, July or August, have you felt any
 2       fear or experienced any threats because you signed the
 3       petition?
 4   A   Well, as far as fear and threats go, I've said everything I
 5       have.  I really have nothing to add.
 6   Q   So since that time, no threats?
 7   A   No threats.
 8   Q   And no --
 9   A   Personally directed at me, no.
10   Q   Have you heard of anyone else who has gotten a threat as a
11       result of signing a petition, since the signature gathering
12       has ended?
13   A   I have.
14   Q   Who?
15   A   Well, who?  Do I need to name names?
16   Q   Can you describe the incident you heard?
17   A   Well, I know a lot of incidents, things I've heard of, but I
18       was not a witness to them.
19   Q   Are these all incidents that occurred since the signature
20       gathering has ended, since the campaign has ended?
21   A   Yes.  I have heard a lot of testimony about threats about --
22       that there would be consequences for all these people who
23       signed, that, you know, it won't go -- that we will get
24       vengeance.
25   Q   Do you know who said these things?
```

EGELER (█████████████, 9/13/10)

1    A    You know, I don't -- I don't keep a record of these things

2         because it's not my area to record them.  When you asked

3         what I heard, yes, I have heard, but who said it, I can't

4         say.  If you need to find out, of course I can find out, but

5         I'm not going to get involved in this matter.

6    Q    From your perspective, the campaign for Referendum 71 is

7         done for you.  Is that correct?  Maybe not the issues, but

8         the campaign itself, the political campaign, is over?

9    A    Yes.  In general, yes.  Once it's done, I haven't returned

10        to it.

11                  MS. HAMILTON:  Can we go off the record for a

12        second?

13                                (Recessed at 1:03 p.m.)

14                                (Reconvened at 1:04 p.m.)

15                        EXAMINATION

16   BY MS. EGELER:

17   Q    I'll pick up.  You said that you heard about other people

18        who said that there would be consequences as a result of

19        signing the petition.  What other people said this?

20   A    There were various people.

21   Q    You've been named as a witness in a federal lawsuit, and I

22        understand that you may not feel comfortable naming these

23        names, but as part of the legal process, during the

24        deposition, we do have the right to ask you for those names.

25   A    And, well, I have the right not to answer you.

Exhibit 1, Page 274

Q Do you know the names of people who have said that there would be consequences?

A That there would be consequences if their names were made public, shown, is that it?

Q Yes.

A Yes. There is certain people that have experience in this and there's grounds for them saying it. Many friends in California who have suffered from this.

Q So the people in California, I don't need to know their names.

A Well, people of everywhere. If similar things have taken place, if people have been subjected to certain threats, when this issue was being decided, there's -- will guarantee that it will take place here.

Q Have individuals come to you personally and told you personally that they are at risk of harassment or threats because they signed Referendum 71?

A No. This is simply the testimony of people. Personally no one came to me.

Q And you said that you know of others who have suffered harassment other than the stories that [redacted] told you, your son. Is that correct?

A Yes, correct. I would like to ask you to specify. Are you asking me to gather, to collect the testimony of these specific people or what? What do you need?

C E R T I F I C A T E

I, REBECCA S. LINDAUER, a duly authorized Notary Public in and for the State of Washington, residing at Lacey, do hereby certify:

That the foregoing deposition of [REDACTED] was taken before me and completed on the 13th day of September, 2010, and thereafter transcribed by me by means of computer-aided transcription; that the deposition is a full, true, and complete transcript of the testimony of said witness;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved signature;

That I am not a relative, employee, attorney, or counsel of any party to this action or relative or employee of any such attorney or counsel, and I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the deposition of [REDACTED] and promptly mailing the same to MS. ANNE E. EGELER.

IN WITNESS HEREOF, I have hereunto set my hand and affixed my official seal of this 16th day of September, 2010.

Rebecca S. Lindauer, CSR#2402
Notary Public in and for the State of Washington, residing at Lacey.



# Exhibit 1-10

Exhibit to Pls.' Statement of Material Facts
(Case No. 3:09-cv-05456-BHS)

Exhibit 1, Page 277

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

JOHN DOE #1, et al.,

Plaintiffs,

vs. NO. 09-cv-05456-BHS

SAM REED, et al.,

Defendants.

DEPOSITION UPON ORAL EXAMINATION OF [redacted]

September 15, 2010

Longview, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506 ** (800) 888-9714

BE IT REMEMBERED that on Wednesday, September 15, 2010, at 1:58 p.m., at 1700 Hudson Street, Suite 300, Longview, Washington, before REBECCA S. LINDAUER, Notary Public in and for the State of Washington, appeared [REDACTED] [REDACTED], the witness herein:

WHEREUPON, the following proceedings were had, to wit:

[REDACTED], having been first duly sworn by the Notary, testified as follows:

EXAMINATION

BY MS. EGELER:

Q I would like to start by having you spell your full legal name or state your full legal name, rather.

A Middle name too?

Q Yes.

A [REDACTED].

Q Are you a registered voter in Washington?

A Yes.

Q [REDACTED], have you ever attended a deposition before?

A No.

Q I'll give you a little bit of the basic rules. Everything that we say is being taken down by the court reporter, so to help her, it's very important that we let each other finish our sentences, rather than talking over each other. Okay?

EGELER (███████████, 9/15/10)

Page 12

1  A   I walked around.

2  Q   Did you talk to people who were opposed to Referendum 71?

3  A   Yes.

4  Q   And were you able to obtain signatures?

5  A   Yes.

6  Q   Any other days that you gathered signatures that you

7      remember?

8  A   Not specifically, no, other than like what I said, you know,

9      going to family.  I couldn't tell you what days that was,

10     so . . .

11 Q   Did you gather signatures within the church?

12 A   No, I don't think I did.  No.

13 Q   Did you speak to anyone at the church or in your youth group

14     about Referendum 71?

15 A   Yes.

16 Q   And do you remember who you spoke to?

17 A   No.  Just would be whoever would have been there during the

18     time to explain to people I guess the situation and what it

19     was.

20 Q   You said that there were five -- approximately five youth

21     over the age of 18 that attended.  Do you think you would

22     have explained or, rather, do you think you did explain to

23     each of them?

24 A   What the case was?

25 Q   Or rather what Referendum 71 was.

Exhibit 1, Page 280

EGELER (███████████████, 9/15/10)

Page 13

1   A   Yeah.

2   Q   And did you share your opinion about Referendum 71 with

3       them?

4   A   I probably -- no, I can't say for sure.  All I can say is

5       probably, but no, I don't know.

6   Q   Did you encourage those who were registered voters within

7       the youth group to sign the petition?

8   A   I don't think I did.  I would say no because probably --

9       yeah, I would probably say no.

10  Q   Did you ever speak to the youth group about homosexuality?

11  A   Yes.

12  Q   And what did you say?

13  A   Anything that I would have talked about I couldn't say

14      exactly what it would have been in the Bible, but doing a

15      Bible study, so . . .

16  Q   People have different views about what's in the Bible, so if

17      you could give me a little more information about what you

18      said.

19  A   Sure.  Like Romans Chapter 1, you know, it's pretty word for

20      word, and so I usually go pretty word for word when I read

21      the Bible.  And oftentimes in a Bible study, I'll ask, even

22      if I think it spells it out, I'll ask people what it says so

23      they can get the understanding and allow people to see what

24      it says, so I'm not telling people what it means.

25          I'm telling them what it says and then -- so that, you

EGELER (█████████████████, 9/15/10)

Page 14

```
 1        know, they don't run around thinking something is what the
 2        Bible says because I told them it's what it says, so they
 3        understand it's what the Bible says because they read it
 4        themselves and see that, so they can have their own
 5        convictions, not mine.  I would have stayed pretty close to
 6        what it would have said there.
 7             If I explained, it would have been if somebody had not
 8        understood a word or something like that.  But, you know,
 9        especially if it was somebody who was over the age of 18,
10        they would have understood, I'm sure.
11   Q    And do you recall ever making a connection during a Bible
12        study between what the Bible says about homosexuality and
13        the Referendum 71 petition campaign?
14   A    Yeah.  I'm pretty sure I could say yeah, I did.
15   Q    Yes, that you did?
16   A    (Witness nods head.)
17   Q    Did you ever go out with Referendum 71 signs and hold up a
18        sign in a public location?
19   A    Yes.
20   Q    Can you tell me about that?
21   A    We met one day -- or I went one day down to the intersection
22        down here of the Allen Street Bridge and I believe it's
23        First Avenue there and stood and held a sign for probably
24        about two or three hours.
25   Q    How many people were there with you?
```

Exhibit 1, Page 282

EGELER (████████████████, 9/15/10)

Page 15

1   A   How many people came with me or how many people were there?

2   Q   Were there.

3   A   Probably 70.

4   Q   And by "people there," I mean people there holding signs.

5   A   Yeah.

6   Q   And is that a place that you would consider a high traffic
7       area?

8   A   Yes.

9   Q   Was this site chosen because it's a high traffic area?

10   A   Probably, yeah.

11   Q   Did you bring people with you to this event?

12   A   No.

13   Q   Did you tell the youth group about this event?

14   A   No.

15   Q   Do you have a Facebook or a Myspace or a Web page?

16   A   Yes.

17   Q   Which of those?

18   A   I have all three.

19   Q   All three?

20   A   Yeah.

21   Q   Do you recall whether or not you announced this event or
22       provided information about it?

23   A   I know I didn't so, no, I didn't.  I don't think I even had
24       a Facebook then, and Myspace, I don't know if I even had a
25       Myspace then either.  I didn't have a Web page then.

Exhibit 1, Page 283

Q So you had no media?
A I didn't put any of that on, any of that stuff, no.
Q Did you go to this location with signs on one occasion or multiple?
A One.
Q Do you recall speaking with any reporters while you were there?
A I did not.
Q Did you place a Referendum 71 sign in your yard?
A No.
Q Did you put a Referendum 71 bumper sticker on your car?
A No.
Q Other than speaking to your youth group -- let me back up a little. Are your youth group and Bible study group separate entities or are we talking about the same group when we talk about --
A When you're talking about like Friday night or the skate church I do?
Q Well, I'm focusing on 2009, so let me ask some clarifying questions. You talked about being a youth minister then and you worked with a youth group on Friday nights.
A Yes.
Q Then in some spots I think you also talked about a Bible study. Is that right?
A We did the Bible study. That was our youth group. We would

EGELER (███████████████, 9/15/10)

Page 21

| 1 | A | Yes. |
| 2 | Q | Do you think some people have hostility about the issue of |
| 3 | | abortion? |
| 4 | A | Yes. |
| 5 | Q | Do you worry that perhaps putting abortion messages on the |
| 6 | | Internet might cause angry words or hostility? |
| 7 | A | I'm sure that it could. |
| 8 | Q | Is this another instance where you're willing to take that |
| 9 | | risk because you want to stand up for what you believe is |
| 10 | | right? |
| 11 | A | Are you asking me that somebody's going to watch the video |
| 12 | | and get angry about abortion happening or are you asking if |
| 13 | | I'm concerned that somebody's going to see that I stand |
| 14 | | against abortion and then attack my family based upon that? |
| 15 | Q | The latter. |
| 16 | A | Okay. |
| 17 | Q | I'm asking whether you worry that some people who may be |
| 18 | | extremists in their prochoice, proabortion -- |
| 19 | A | Yes. |
| 20 | Q | -- or anti-Bible views, however you want to put it, if in |
| 21 | | that -- |
| 22 | A | In general, some people would be violent for no reason at |
| 23 | | all, but I guess it's a matter of how much on the scale of |
| 24 | | violence they're going to act.  And I think that, you know, |
| 25 | | I've never really seen or heard of near, if any, as many |

Exhibit 1, Page 285

cases as people who are proabortion becoming violent over their right as much as the -- a lot of the public expression of prohomosexuals.

Q Let's talk about that expression, and I understand you've experienced what you believed to be hostility, harassment, or threats as a result of your connection to Referendum 71. Is that correct?

A Yes.

Q Can you tell me about that, please?

A I personally -- because in the big picture of all this, I'm really just a nobody and my name wasn't really out there very much. The fact I'm on this is only because I signed as John Doe just because I guess -- yeah. But -- so I wasn't on TV. I wasn't in the paper.

You know, people that I would talk to, some people would get very angry standing with the sign. Some people that I know would stop and say things to me. My brother was one person who sent me like a text message, you know, of basically disgust. Even though he doesn't -- he isn't prohomosexual, I think it was more his anger that I would stand out on the street corner and advocate my beliefs, so I guess that's it.

Q Well, let's talk about those incidents. First, you said that you were -- some people were angry when you were holding a sign. Can you tell me about that?

EGELER (███████████████, 9/15/10)

Page 23

```
 1   A   Well, yeah, sure.  Some people would flip you off.  Some

 2       people would cuss at you.  Some people basically public

 3       indecency of dropping their pants and mooning you or

 4       whatever as they drove by, so that would be the extent of

 5       that.  Nobody stopped and, I guess, got out of their car and

 6       came to me personally.

 7   Q   So we're talking about the intersection that you were

 8       standing at on the bridge, correct?

 9   A   Um-hmm -- yes.

10   Q   And so let's start.  First, you said that there were people

11       who were flipping off the people holding the signs, correct?

12   A   Yes.

13   Q   You personally saw that?

14   A   Yes.

15   Q   Did any of the people that were flipping people off make

16       statements about Referendum 71 or were they driving by and

17       didn't make a statement?

18   A   Some of them made statements, but I can't remember what they

19       would have been.

20   Q   You don't remember any of the statements?

21   A   I remember people yelling things, but I don't remember what

22       they said.  Like, if you were to ask me what exactly they

23       said, I don't remember.  I do know that it was verbal

24       attacks against us, but it wasn't -- I couldn't tell you

25       exactly --
```

Q So --
A -- word for word is what I mean.
Q -- were the verbal statements all verbal attacks as opposed to any sort of dialogue or sharing of their viewpoint about Referendum 71?
A Yes, I would say so. If I'm standing and holding a sign that would say to reject the senate bill and somebody flipped me off and told me that I was a loser, I don't think it's because of the clothes I was wearing. I would think it would be more because of the sign I was holding and what the sign said, not because I was holding up a sign.
Q So no one specifically said, I'm angry that you're promoting Referendum 71?
A Most people weren't talking like that nicely. I think that's what they were saying, yes, but I don't think they said, hey, I just wanted you to know I don't support this kindly. Most of -- I would say most all negative response was fairly aggressive.
Q Is it fair to say that no one said -- let me rephrase that. Of those who were flipping you off or cussing, is it fair to say that none of them made a clear statement about Referendum 71? It's more a situation where you felt their opinion by their profane behavior?
A No. I believe it was very clear. I mean, you can get down for I guess -- I mean, how clear does it need to be, you

EGELER (████████████████, 9/15/10)

Page 25

1      know?  Yeah.  Nobody stepped out and raised their right hand
2      and solemnly swore that they were against what we were doing
3      in that sense, no.  But, you know, so in the sense -- yeah,
4      I guess.  Based upon my social ability to understand
5      people's communication, yes, people were definitely stating
6      their disagreement with this.
7    Q  And you said that there was a mooning incident.  Did you
8      personally witness this?
9    A  Yes.
10   Q  Okay.
11   A  Maybe two, but at least one.  It seems like I might remember
12     a second.
13   Q  Let's start with what you actually remember for sure and
14     what did you see, other than --
15   A  Someone's butt in the car driving by.  It was white.
16   Q  Do you remember if the individual was in the back seat or
17     the front seat?
18   A  Passenger front seat.
19   Q  Passenger front.
20        Do you remember or were you even able to tell the
21     approximate age of the individual?
22   A  No.  Probably wasn't somebody that was very old, based upon
23     the fact that they had to be able to get up and . . .
24   Q  And have you ever been mooned before in your lifetime?  Is
25     that your first experience with that?

MR. PIDGEON: I'm going to object as to form.
Is there a relevance to that question?
Q (By Ms. Egeler) You can go ahead and answer.
A I'm just trying to remember. Not that I can remember exactly, no.
Q [REDACTED], have you ever flipped someone off before?
A Yes.
Q And after you did it, did you physically assault them?
A I'm sure it's happened, yes.
Q Can you roughly estimate how many times in your life you flipped someone off or is that just too broad for a guess?
A It's too broad, yes.
Q Do you think you flipped someone off in the past 30 days?
A No.
Q Do you think you flipped someone off in the past year?
A No. It's probably been more like at least the last six years, six and a half years.
Q And every time you flipped someone off, have you physically accosted that person as well?
A No.
Q Have you usually not physically accosted them?
A If you can -- would you describe flipping somebody off as a verbal attack or would you express that as a physical?
Q I'm wondering --
A Do you mean physically touching and harming their body?

EGELER (███████████, 9/15/10)

Page 27

```
 1   Q   Yes.  I mean physically touching and harming their body.

 2   A   No, not every time.

 3   Q   But you have physically assaulted people before in your

 4       past?

 5   A   Yes.

 6   Q   Can you tell me about that?

 7   A   Yeah.  When I was a teenager, you know, a little kid and

 8       basically just being a jerk as a teenager.

 9   Q   Have you ever sworn at people?

10   A   Yes.

11   Q   And have you done that in the past 30 days?  Have you ever

12       said a cuss word in the past 30 days at someone?

13   A   No.

14   Q   In the past year?

15   A   No.

16   Q   Is that more teenage behavior as well?

17   A   No.  I believe it's just the fact that six and a half years

18       ago I became a Christian and that -- I mean, that's when I

19       quit, when my life changed.

20   Q   In that six and a half years that you've been a Christian,

21       you've never sworn at someone?

22   A   Probably not, no.

23   Q   So prior to that six and a half years, you had, in your

24       lifetime, sworn at people?

25   A   Yes.
```

Exhibit 1, Page 291

A Threatening.
Q -- or threats?
A No. You have to understand, though, that most of where I gathered signatures was at Creation Fest, which was a Christian event, so even though not everybody agreed, you know, most of the people weren't likely to be as physically aggressive, you know, so -- or hopefully not, none that I experienced.
Q One of the places you gathered signatures was at Lake Sacagawea Park on the 4th of July, correct?
A Yes.
Q You said there were approximately 30,000 people there that day.
A That go through during the whole weekend, so that day there was probably 10,000.
Q And of that 10,000, were they all Christians who agree with your view of the Bible?
A No.
Q Do all Christians agree with your view of the Bible with regard to homosexuality and same sex marriage?
A Yes.
Q Are you aware of people who consider themselves Christian, even if you don't consider them Christian --
A Yes.
Q -- who have a different viewpoint than you do with respect

to homosexuality?
A Yes.
Q Could any of those individuals have been at Creation Fest?
A Yes.
Q And do you know what percentage of people at Creation Fest share your view of Christianity?
A No.
Q So would it be fair to say that there could be people at Creation Fest that you spoke to that had a different viewpoint with regard to homosexuality?
A Yes.
Q And same sex marriage?
A Yes.
Q [REDACTED], is your address listed in the phone book?
A No. Actually, I don't know. Never looked. I don't have -- I guess I do have a home phone. It's not hooked up, so I don't know. You could look.
Q Do you ever disclose your home address publicly?
A Yes.
Q Where do you do that?
A It's on my Web page.
Q Who can access your Web page?
A Anybody.
Q The date that you went to the bridge and you were holding a Referendum 71 sign, did you go after that date to Lake

EGELER (█████████████, 9/15/10)

Page 34

1      Sacagawea and gather signatures?  Which came first in time?

2   A  I don't remember.  I don't remember exactly.  I think I

3      know, but I'm not positive.

4   Q  After you experienced the incidents that you believed were

5      harassing on the bridge, did you stop all public involvement

6      with Referendum 71?

7   A  No.

8   Q  Why not?

9   A  I just decided that I guess I wasn't going to be pushed

10     around by it.  So, I mean, I do have the right to believe

11     something, and at that point, it was certainly becoming very

12     aware to me how standing for something in politics is

13     extremely -- it's almost like starting a war, so I realized

14     that, but, I mean, what's the point of living if I'm not

15     going to do anything in my life?

16  Q  After experiencing the actions that you saw on the bridge,

17     the harassment, did you feel that you were putting your wife

18     or child in jeopardy by continuing public involvement with

19     Referendum 71?

20  A  Partly yes because of the bridge, mostly so because of other

21     circumstances that I was hearing about and things like from

22     the Internet or from TV and stuff like that I guess is more

23     of what it was.

24         Seeing how people reacted around us in our town, which

25     is a very small town, and not near so -- there's probably

Exhibit 1, Page 294

not as many aggressive pro-gay supporters here as there is in, say, like Seattle. And knowing that if I'm seeing as much as I was here in our town, knowing that people could be apt to see my name and information online or, you know, that type of stuff and knowing that those more aggressive people were doing more aggressive acts towards other people, then I -- that's really where more of my concern was, I guess.

Q But you didn't feel the need to protect your wife and child?

A Yes. I did feel the need to protect my wife and child, yes.

Q But your desire to remain involved with Referendum 71 was of greater importance to you?

A Yes. I believe that if -- I mean, I guess I can't say this in every circumstance, but in this circumstance especially, like I said, what's the point of me living if I have no purpose in this life and am I going -- what I'm teaching my wife or teaching my child at this point, although my child was only two years old, I believe, at this point, by just permitting the more aggressive people to push me into the place that they want me to be because they're more aggressive, then, I mean -- you know what I'm saying? It's like then who am I going to run to my whole life if I can't stand up for especially something I have every legal right to believe and to protest or gather signatures for legally, you know.

So if I can't exercise my legal rights in America, I

EGELER (█████████████, 9/15/10)

Page 36

```
 1        want to be able to show that to my wife and daughter.  And
 2        because, you know, if you'll think about it, our campaign
 3        was to protect children, you know, by doing this.  I didn't
 4        want, you know -- I believe that a child needs a mother and
 5        a father.  And if, say, my wife and I were in a car accident
 6        and my child got put up for adoption, I didn't want my child
 7        to be adopted by a homosexual family.  I don't want her also
 8        to be adopted by a normal family that's going to abuse her
 9        or anything like that, but I want my child to have a mother
10        and father, if at all possible.  And seeing especially the
11        larger picture of -- or a large picture of the homosexual --
12        what I considered a homosexual agenda, I don't want my child
13        exposed to those things.
14             I have a picture on my computer at home.  I still have
15        it, and I probably should delete it, but it's just a
16        photograph from the Seattle gay pride parade, and there's a
17        middle aged man in a leather thong exposing himself to
18        probably a six year old and an eight year old and a father
19        sitting there with his children.  And if I did that, I would
20        go to prison for years, and I don't want those things.  I
21        want it to be -- I don't want my child around any of that.
22   Q    Is it fair to say that you in Longview here did not feel
23        that you were at physical risk of harm?
24   A    No.  That's not true.
25   Q    So you felt that you were at risk of physical harm?
```

EGELER (███████████████, 9/15/10)

Page 37

```
 1   A   Some.  Not as much as probably I would have felt or I could

 2       have felt in other situations, but yes, I was aware that

 3       could reach me, certainly.

 4   Q   What made you think that?

 5   A   Seeing people's reactions and understanding that some people

 6       were, you know, becoming more violent and saying more

 7       violent and aggressive things in the media, that was making

 8       the media and things like that.

 9   Q   Did you see any violence yourself?

10   A   No.

11   Q   Are you aware of any violence surrounding Referendum 71 in

12       the Longview-Kelso area?

13   A   No.

14   Q   The election's now over and the issue has been concluded.

15       Do you still feel there's a risk to you?

16   A   Not as much.

17   Q   What risk do you think there is now?

18   A   I don't know.  I mean, especially there's -- I mean, I saw

19       things online with, you know, one -- I think one was a big

20       case of people saying that they're going to kill people if

21       anybody tries to stop their rights for basically gay

22       marriage.

23   Q   Where did you see this online?

24   A   I believe that made the paper or something, didn't it?  This

25       was one -- I remember -- I don't have the Web address, but I
```

Exhibit 1, Page 297

remember seeing it online.
Q When did you see it?
A During the case, probably last summer.
Q Summer of 2009?
A 2009, yeah.
Q Have you seen anything talking about violence or killing people since the election's concluded?
A No.
Q So what's the source of your fear now?
A Like I said, I haven't really looked online to see. If, say, the names are released, you know, there could be people that, you know, are just waiting for that to happen.
Q But your name's already out there, isn't it?
A Yes. Part of the reason that I was willing to do this as a John Doe wasn't just because of my name, but because of other people. Some people may not be willing to risk what I'm willing to risk, so . . .
Q But to understand you, you are willing to take that risk by being public about your position?
A Yes.
Q Have you experienced any other threats or harassments or reprisals that we haven't talked about?
A No.
Q Did you participate at all in going to the Secretary of State's office and overseeing the checking of the petition

signatures?
A Yes.
Q And how many times did you do that?
A Once.
Q Did you go with [redacted] to do that?
A No. I drove myself.
Q Did you sign in when you got there?
A Yeah. I think you had to, yes.
Q Were you aware that there were individuals there that had a contrary position that did not want Referendum 71 to make the ballot that were there as well?
A Yes.
Q Did you know which individuals in the room would fall into that category?
A No. Well, I guess by the end of the day, yes. When I first walked in, I couldn't -- I didn't know when I got there, but by the end of the day, it was pretty clear.
Q Approximately how many of those people were there?
A During the day while I was there, I would say around four, maybe five people.
Q Did you feel threatened by them?
A There? No. Those people, no.
Q Did you feel they might come after you later?
A No.
Q Did you think the Secretary of State's process of verifying

C E R T I F I C A T E

I, REBECCA S. LINDAUER, a duly authorized Notary Public in and for the State of Washington, residing at Lacey, do hereby certify:

That the foregoing deposition of [REDACTED] was taken before me and completed on the 18th day of September, 2010, and thereafter transcribed by me by means of computer-aided transcription; that the deposition is a full, true, and complete transcript of the testimony of said witness;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved signature;

That I am not a relative, employee, attorney, or counsel of any party to this action or relative or employee of any such attorney or counsel, and I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the deposition of [REDACTED] and promptly mailing the same to MS. ANNE E. EGELER.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal of this 19th day of September, 2010.

REBECCA S. LINDAUER
MY COMMISSION EXPIRES 02-15-2012
NOTARY PUBLIC
STATE OF WASHINGTON

Rebecca S. Lindauer, CSR#2402
Notary Public in and for the State of Washington, residing at Lacey.

# Exhibit 1-11

Exhibit to Pls.' Statement of Material Facts
(Case No. 3:09-cv-05456-BHS)

Exhibit 1, Page 301

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,

Plaintiffs,

v.

SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,

Defendants.

No. 09-CV-05456-BHS

Deposition Upon Oral Examination
Of
LAWRENCE P. STICKNEY

Taken by: Tracey L. Juran, CCR
CCR No. 2699

September 22, 2010

Everett, Washington

Be it remembered that the deposition upon oral examination of Lawrence P. Stickney was taken on September 22, 2010, at the hour of 8:59 a.m. at 3501 Colby Avenue, Suite 200, Everett, Washington, before Tracey L. Juran, CCR, Notary Public in and for the State of Washington residing at Edmonds, Washington.

Whereupon the following proceedings were had, to wit:

* * * * *

LAWRENCE P. STICKNEY, having been first duly sworn on oath by the Notary Public to tell the truth, the whole truth, and nothing but the truth, was deposed and testified as follows:

EXAMINATION

BY MS. EGELER:

Q. Good morning, Mr. --

A. Good morning.

Q. -- Stickney. Have you ever been deposed before?

A. Years ago, I had an industrial-insurance claim and I --

Q. Well, since --

A. I don't know if that was deposed or not, but it was a discussion on the record. It was --

Q. Well, since it sounds like it's been a while, I'll go over the ground rules again.

A. Okay.

Q. Obviously, I'm asking questions and you're answering and our court reporter is trying to write everything down.
A. Mm-hm.
Q. And, of course, both of us want to make sure that that is accurate.
A. Mm-hm.
Q. So to help our court reporter, it's important that we not speak over each other and that, whenever I ask a question, that you respond with yes or no instead of mm-hms or head nods, because that won't show up cleanly in the --
A. Okay.
Q. -- in the record. Okay?
A. Okay.
Q. It's also important that my questions make sense to you. So if there's anything that confuses you for any reason, please ask me to stop and to rephrase it, whatever --
A. Okay.
Q. -- whatever's necessary.
A. Sure.
Q. And then at the end, if you want to review it for accuracy, the transcript that our reporter's prepared, you'll have an opportunity to do that as well if you and counsel choose to do that. Okay?
A. Okay.

Q. Let's start by talking about your employment. What do you currently do for employment?
A. Well, currently I am the campaign manager for the John Koster for Congress campaign.
Q. And is that a full-time position?
A. Yes.
Q. So no other employment --
A. No.
Q. -- currently.
And what was your employment during 2009?
A. Well, we -- and I say we. My wife and I directed the Washington Values Alliance as well as the -- we -- I was the campaign manager for Protect Marriage Washington.
Q. And that was for all of 2009?
A. Yes.
Q. Did you have any other employment during 2009?
A. For a brief time, I -- early in John Koster's campaign for county council, yes. I was a paid consultant for the first quarter and then, with the workload of the Protect Marriage Washington and the Values Alliance, I had to give that to somebody else to do.
Q. So you worked on that campaign for the candidate during the first quarter of 2009 --
A. Right.
Q. -- but not for the remaining --

A. No.
Q. -- three quarters.
A. No, no, exactly.
Q. Let's talk about your work with Washington Values Alliance.
A. Mm-hm.
Q. Are you a director or president of that organization?
A. I am the president.
Q. The president, okay.
Did you found the organization?
A. Yes. My wife and I founded the organization.
Q. And what does the organization do?
A. Well, it's a political action -- it's not a political-action committee, but it's an organization that represents values of Washington voters. And we stand for right to life, marriage, and limited government, is our focus.
Q. Is it registered with the Public Disclosure Commission as a political committee?
A. It is not. It is not.
Q. So does it accept donations?
A. It accepts donations, yes. It's a nonprofit.
Q. So you talked about three issues that the group deals with: Right to life, marriage issues --
A. Mm-hm.

Q. -- and limited government. Are there any other issues?

A. Well, it would -- that would be our mission statement. But we would cover areas, maybe, that you would say in between those two.

Q. Such as?

A. Well, we would, you know, lobby Olympia on areas, maybe, where you would have pornography issues. We -- we're involved in taking a look at some of the magazines made available to minors and we're interested in defending minors from pornography, things like that. And so we had some involvement in a bill a couple years ago but didn't have time to address everything. So things like that.

Q. With respect to right to life --

A. Mm-hm.

Q. -- has the group been involved in any specific legislation?

A. Well, we've promoted and -- the issues of life and continue to be a public voice for right to life and have been quite vocal.

Q. And in saying that you've been quite vocal -- and by you --

A. Mm-hm.

Q. -- I mean the group --

A. Yeah.

A. Yeah.
Q. -- threats or harassment, and the first --
A. Sure.
Q. -- thing that you listed was the Emails. Are there --
A. Yeah.
Q. -- any that stand out to you?
A. Yes. Of course, the -- and mind you that a lot of -- we began to collect these, you know, in time after it started to bother us. And I blew off a lotta calls and a lot of harassment and I began a file for the more -- you know, for the harassing and the hate mail we began receiving. But right out of the blocks, we had the -- this Bisceglia character.

A Bellingham blogger had -- was posting on a number of the homosexual blogs, include -- or he had his own blog, but he had links showing up on some of the larger blogs even around the country, and it was generating a lot of Email to us. And he was actually calling for, you know, it looked like, you know, to me -- I rated as harm to my family and destruction of property, you know, and saying things like, if Larry Stickney, and by name, is going to harm my family, why shouldn't we go down to Arlington and harm his.

And so we began to feel very vulnerable and --
Q. Do you remember the name of that Web site?

A. Well, it's in the -- this -- the -- all the submittals. So --

Q. And by the submittals, you were just -- just to make sure it's --

A. Yeah.

Q. -- clear on the record, you were pointing at what you produced today in response --

A. Yes, it's in there.

Q. -- to the subpoena.

A. It's all in there, absolutely. And the name of his Web site is in there. And it was quite a -- it's on the record on -- even in newspapers, things like that, because we decided we needed to talk about that a little bit.

So it was very upsetting to us and for the first time in this thing, I began to feel there's some people out there that really don't like me and would even be putting this -- these -- this kind of chatter out on the Internet. And when you start seeing it on blogs around the country -- and I make -- that's -- some of those Web sites were clearly delineated in what we've turned in. And it put a chill on our lives right out of the block --

Q. Can I --

A. -- and kind of a cloud over our whole house. And it was

very frightening. And then within, maybe, a few weeks, then, you had The Stranger post a front-page article with my picture on it. And I was in -- with four other conservative leaders, [redacted], [redacted], myself, and [redacted]. And it -- the title of -- and all over Seattle -- and mind you, I had a daughter at Seattle University -- it said, know thy enemy. And the blogs were on fire.

Q. Can I --

A. Yeah.

Q. -- stop you for a moment --

A. Yeah.

Q. -- and let's --

A. Mm-hm.

Q. -- explore this Bellingham blog --

A. Yeah.

Q. -- a little bit.

A. Yeah, yeah.

[Off the record - discussion]

Q. (by Ms. Egeler) The Bellingham blog --

A. Mm-hm, yes.

Q. -- we had testimony in a deposition last week about a blog -- my memory is that it was Bellingham -- listing the names of Referendum 71 supporters from the Longview, Kelso area. Does that ring a bell for you at all?

Could that have been the Bellingham blog?
A. Possibly.
Q. Do you remember a blog listing anything about people supporting --
A. In Longview and Kelso?
Q. Let me finish the question.
A. Yeah.
Q. -- yes, listing names of individuals in Longview or Kelso who supported Referendum 71?
A. This thing was impossible to keep complete tabs on. If you were to go and run Referendum 71 on Google search, and you've probably all done that, there's going to be thousands of documents and numerous Web sites from A to Z across the country.
Q. So does that mean you don't remember this blog listing anybody from Longview?
A. I'm not sure. I don't recall.
Q. I understand.
A. Yeah.
Q. So I took us back to the Bellingham blog, but you were just adding that The Stranger had a headline --
A. Yeah.
Q. -- know thy enemy; is that correct?
A. Correct. So there was an atmosphere and a chill in the air. And we put together a little package of the Emails

and Web-site links and submitted them to Sheriff Lovick here in Snohomish County. And I copied my submittal to Sheriff Lovick to Kirk -- State Representative Kirk Pearson, County Councilman John Koster, State Senator Dan -- or Val Stevens, and State Representative Pearson -- or Kristiansen. So I submitted it to the legislative -- my legislators directed to Sheriff Lovick.

Q. And is -- Sheriff Lovick, he's with Snohomish County?

A. Snohomish County Sheriff.

Q. And is that L-O-V-I-C-K?

A. Correct.

Q. Did Sheriff Lovick respond?

A. He responded by referring it to Whatcom County.

Q. What county is Arlington, your home city, in?

A. Snohomish County.

Q. And would he have referred it to Whatcom because that's where Bellingham's located?

A. Yes.

Q. Why did you direct this to Sheriff Lovick instead of the sheriff's office generally?

A. Well, because he's the sheriff. Wouldn't that be the normal direction?

Q. So he's the head of the --

A. Yes.

Q. -- sheriff's office.
A. Yes, yes.
Q. That would be normal.
A. Okay.
Q. In addition to the Bellingham blog site and the headline in The Stranger, anything else?
A. Well, there were references to -- you know, at various times -- now, let's just clarify a couple things here. We had -- we -- I'm in the middle of -- prior -- okay.

We submit the referendum May -- in May. And May 5, we become overnight notorious celebrities to a lot of people in the area. We had 49 days to gather signatures. So I'm in a full-blown frenzy to get out and perhaps gather signatures faster than anyone has ever gathered that many signatures other than probably a -- there's -- that's just possible. I can't give you the historical data on that. But it was very short time, very short time.

And I'm finding myself fielding calls, media calls, harassing Emails, and coming under this kind of intensity. And you have a large number of papers that have been submitted with a large number of Emails, including some that said things like, you'd better stay off the Olympic Peninsula, Larry Stickney, or a call would come in, I wanna fight you. I wanna fight you

right now.

And mind you, I have children at home of -- young children as well as at the time I had my two boys at home and a daughter that was -- that's -- was 17 at the time. And --

[Cell phone ringing]

THE WITNESS: There's one of 'em now. See if I can get that shut off here.

A. And all of a sudden, I'm having to spend a lotta time away from home with these Emails and calls coming in. And they were coming in through every crack in the house, the calls and the Emails. They had gotten our home phone numbers and we were in the phone book. Our address was posted and my phone number was out there.

And it was sometime in May that I -- one of my young daughters came running into the house, Daddy, there's a man in our front yard taking pictures. And I had determined that was sometime after June 2nd. And I charged out into the yard after [redacted] found me and I made it outside just in time to see the car disappearing down the hill. And I hopped in my car and tried to get down there and get identification, but there's a number of side streets. The car disappeared.

Now, our fear was that -- we know it had been the tactic of some of these groups to post on-line even

photos of a home -- your home, so --
Q. (by Ms. Egeler) Can I ask --
A. Yeah.
Q. -- you a question about --
A. Yeah.
Q. -- that --
A. Mm-hm.
Q. -- man in the yard.
A. Yeah.
Q. Do you remember what he looked like?
A. Oh, I didn't see him, but my daughter did.
Q. So you did not see him.
A. No, I did not see him.
Q. How old was your daughter --
A. Eight.
Q. -- at the time?
A. Yeah, 8.
Q. And your daughter saw him taking pictures.
A. Yeah, mm-hm.
Q. When you came into the yard and chased him in his car --
A. Yeah. Yes.
Q. -- did he say anything?
A. I didn't -- when I came into my yard, he was a quarter mile heading down the hill in his car by then. I was in the back 40 when my daughter found me.

Q. Did your daughter hear him say anything?
A. No, not that I recall.
Q. And when you got into the car to follow him --
A. Yeah.
Q. -- how close were you able to get?
A. With -- the layout of my -- I live on a long, lonely country-road straightaway and it heads down a hill. And he was rounding the corner a quarter mile away. So I drove down that way to see if I could find somebody, maybe, up at the stop sign that's a couple miles out. And -- but there's a number of side streets they could have turned down, you know. I didn't find the car.
Q. Did you call the police and tell them about this?
A. I'm not sure we reported that. I don't recall. I don't recall. From the response I was getting out of the sheriff's office, I hadn't -- I was -- I -- yeah. Anyway, I --
Q. So we had this incident. And did your daughter -- how did you know this was related to Referendum 71?
A. Well, I can't make, you know, a positive lock-tight argument there, but I assumed that it likely was. There was a lot of funny things going on, and it seemed to be in character with what was being called for and some of the other things that were happening and the history of the magazine, The Stranger.

Q. But do you know --
A. Yeah.
Q. -- if this individual might have been a burglar?
A. I -- yeah, I said I don't have a lock-tight proof that this person was R-71 related. We suspected he was.
Q. So next -- let's move on to the --
A. Yeah.
Q. -- next incident.
A. Yeah.
Q. I think we've --
A. Yeah.
Q. -- exhausted --
A. Yeah.
Q. -- that.
A. Yeah. Let me just tell you that it was at this point that -- and again, I wanna go back to -- the atmosphere of fear at our home could be cut with a knife. And when you go from nice little family raising their kids out in the country to all of a sudden -- and there were some things I didn't wanna even go public with at the time and I hesitate to now.
Q. Can we --
A. Let me just --
Q. -- focus on the question, though.
A. Well, I wanna --

Q. I under --
A. I want you to understand what we were dealing with, and that is that I had to move my children into the living room.
Q. Well, let's talk about --
A. Yeah.
Q. -- that incident.
A. Yeah, okay.
Q. And that's --
A. All right.
Q. -- contained in your declaration --
A. Sure, sure, yeah.
Q. -- as well. And --
A. Yeah, mm-hm.
Q. And I believe, and --
A. Yeah.
Q. -- correct me if --
A. Mm-hm.
Q. -- I'm wrong --
A. Mm-hm.
Q. -- but you certainly felt that that was a time you experienced harassment or threats. So can you explain that to me, what occurred then.
A. Well, it was after the photo opportunity that -- and in that -- and mind you, this was a very, very busy time

for myself.
Q. How long after the photo incident?
A. We made a decision, I think, that day that we -- the kids go into the living room. And I'm -- we were beside ourselves as to what to do. And I almost packed the family up and sent them off to Colville at that point because I have some -- my in-laws there. But the kids were all in school and my wife was my right arm. The campaign would be over. We would have been heading for the hills. Instead, we carried on, but under this atmosphere of chill.

And, you know, I had my boys getting the guns loaded because of -- and I -- you know, Dad, don't worry, we'll take care of it. I'm going, yeah, okay, sure. But, I mean, that -- it was that kind of a fear. And we don't -- you know, I'm not a big gun guy, even, or -- I'm just a regular guy. But all of a sudden we're forced into these kind of -- this kind of thinking and --
Q. You said that you had an 8-year-old daughter, [redacted].
A. Yeah.
Q. What were the ages of the other children? You don't need to provide their names.
A. [redacted] is now 10 --
Q. So she was --

A. -- let's see; [redacted] was likely 7 at the time, [redacted] was likely 5, my daughter [redacted] was 17 or so. She's 19 and a half now. Let's see -- 18 -- I think she was -- no, she was of voting age, so she was over 18. [redacted] is -- just turned 21.

Q. So would have been 20 at the time?

A. Yeah, 20.

[redacted] --

[Cell phone ringing]

THE WITNESS: I thought I had that all shut off. I think I got it now. Okay, ringer volume off. Okay.

A. So there was a fear and intimidation that I've never felt before in my life, you know, yeah.

Q. (by Ms. Egeler) So just to make sure that we're clear --

A. Yeah, yeah.

Q. -- you had the kids sleeping in the living room --

A. No.

Q. -- for safety?

A. Okay. Yeah, that was the whole thing. And to this day, I hesitate to even talk about it, because I don't -- I didn't even tell the -- you know, I mentioned this in court eventually. But I developed a very deep fear of the vulnerability of my family in this campaign at that moment.

And we live on a rural-road straightaway where I've had kids go past my house at a hundred miles an hour. And it's a ways out -- it's three miles outta Arlington. It's very dark, five-acre parcels. And I hesitated to even talk to the press about my fear, but my true -- my fear was that I was gonna get a firebomb or a Molotov cocktail through the kids' window, because they were so close to the road.

Q. Did anyone tell you they were going to do that?

A. No, nobody told me that. But that became my overriding fear. And that's why I moved 'em into the -- you know, and I -- to this day, I don't like talking about that for fear of giving somebody an idea to tell them I would be vulnerable to that. And so frankly, I haven't talked about -- and I didn't talk about it then.

And there was even an opportunity to post a harassment hot line on our Web site, but I wasn't -- I was hoping to get through this part of this thing. I wasn't looking for a court case against these folks. I wanted to run a political campaign.

Q. Looking at --

A. Yeah.

Q. -- your state of mind at --

A. Yeah.

Q. -- that time, just to make sure I understand --

A. Yeah.
Q. -- at the point where you felt --
A. Yeah.
Q. -- so uncomfortable --
A. Very fearful, yeah.
Q. -- fearful --
A. Yeah, yeah.
Q. -- that you put the kids --
A. Yeah.
Q. -- into a --
A. Mm-hm.
Q. -- different area to sleep --
A. Mm-hm.
Q. -- you had experienced an individual in your yard taking pictures for unclear reasons, certainly not there at your invitation --
A. Mm-hm.
Q. -- correct?
A. Mm-hm. Correct. And --
Q. And you had experienced seeing angry words on blog Web sites and newspaper articles; correct?
A. Telephone calls.
Q. And telephone calls.
And also the Emails, some of them, that you --
A. Yeah.

Q. -- provided would have related to that time --
A. Right.
Q. -- period as --
A. Exactly, yeah.
Q. -- well; correct?
A. Correct.
Q. Was I complete in that list? Was there anything else that led to your fear at that point that you had the children move to a different area to sleep?
A. No. That was -- well, the -- that was generally the -- we were at the point there it was -- the incident with the person in the yard, I said, get the kids outta the bedroom.
Q. Right.
A. They know where we live. They may even post it. So --
Q. Do you know if your -- if a picture of your home was ever posted?
A. I never saw it, and I was glad for that.

I -- there was a Seattle Times article that came out -- I believe it was June 2nd or so, right in that time frame. I'd moved the kids in about mid-May. But there was heavy criticism all of a sudden of the -- when the Bisceglia stuff got in the paper. And there was a very good Seattle Times article and a lot of the homosexual community began to -- I -- there was some

any official condemnation of it other than there seemed to be a change in some of the banter on the blogs and -- you know, you idiot, you're giving them what they want, and things like that. And -- but I could see and you could feel the public opinion shifting towards some sympathy. And then -- but -- and it was generated by a thoughtful article in The Seattle Times that seemed to get some attention and it was a little bit sympathetic to our plight.

And so -- but mind you, this was -- everything was going a million miles an hour. I'm in a -- 49 days to get a signature drive here. And so all these things were happening: Phone calls, Emails, threats coming in. And all of a sudden, well, we'd better start a file on some of this stuff and we'd better follow up with the sheriff and do we want to file a restraining order? I mean, I don't have time to do that. I'll lose the campaign if I spend two days and cry. Just -- it was just nuts.

And then the kids. What do I do about the kids?

Q. (by Ms. Egeler) So --

A. So we took the actions that we could.

Q. Do you recall roughly --

A. Yeah.

Q. -- when this change in the banter occurred?

A. There was -- like I said, there seemed to be a little let off after that Seattle Times article, and I believe that was in early June. And it was like, you know -- but, you know, the blogs were on fire. I mean, I run a congressional campaign. You get 13 comments posted when there's an article about a congressman. There was seven or eight hundred comments following these articles every time there would be some news on the campaign. And they were absolutely on fire.

Q. Let's go back to the incident with the individual --

A. Yeah.

Q. -- in the yard. You said you don't remember whether or not you contacted the police or sheriff; is that correct?

A. I don't recall whether we contacted 'em.

And like you, I said, well, you know, they'll -- do you have positive ID? No. I mean, I've been around enough to know that, you know, you've gotta have a little evidence to do anything about anything. And all I had was an 8-year-old daughter who was terrified that came in and told me that somebody -- a man had been in our house with a camera. And that's good enough for me, but that probably won't hold up to Sheriff Lovick, who had written stuff from me and didn't do much about it except shovel it off to Whatcom County.

Q. After that incident with the individual taking pictures outside --
A. Yeah.
Q. -- your home --
A. Yeah.
Q. -- any more instances that you considered to be threats or harassment?
A. Not around the house, anyway. I didn't experience much around the house. But we didn't put a sign up in the yard to tip anybody off to our -- give 'em any help there. So --
Q. You mentioned that you had at least one --
A. Yeah.
Q. -- at least one individual say something to the effect of better not come to the Olympic Peninsula?
A. Yeah. That's an Email and it's on the record, yeah.
Q. Did you -- anywhere that you went in the state --
A. Yeah.
Q. -- not just Olympic Peninsula, but while you were working on Referendum 71, did you have any acts of violence towards you?
A. I had -- you know, I tried to avoid going into places where it might be generated. I mean, we were, you know, aware it was a controversial issue. I avoided the most hostile forums for those reasons, yeah.

Q. Did you have any instances of violence that occurred?
A. No. No, but I protected myself.
Q. Any more instances of harassment or threats during the campaign?
A. Well, when the know-thy-enemy article -- or the know-thy-enemy folks --
Q. That was with the Seattle Stranger?
A. That came in in around early -- no, that came in early June, the announcement that know thy neighbor and know -- or what was it? Not know thy enemy; excuse me. When the group announced they were going to -- I'd have to get the dates on that.
When the organizations announced they were going to get the signatures and post 'em on-line, that was another time of real anxiety for us because so many of my people were -- that were helping us just decided they couldn't be active in the campaign anymore. And so there was another time. To me, that was intimidation too. And that was, in my mind, etched in my mind as another milestone when that announcement came out.
Q. Any other incidents?
A. There would be an uptick in the -- all I can say is, my experience with this thing, it was like somebody monitoring terrorist chatter. And every time there would be an article generated and at any milestone --

and there were many of them, you know; an announcement here, a big article here -- it would just -- it was an ebb and flow of these Emails and calls. And for us, even though we'd been involved in politics for a long time, it was a new experience to be seen as, you know, somebody that a lot of people like to see dead.

Q. So in early June --

A. Yeah.

Q. -- an organization -- I think my memory's the same as yours. Know Thy Neighbor, I --

A. Yeah.

Q. -- think --

A. You know --

Q. -- is the group.

A. Know Thy Neighbor and whosigned.org. When they started making racket about releasing the names, it caused us a lot of anxiety and it --

Q. You said that you had people that could no longer work on --

A. Well, they -- I couldn't generate funding and I couldn't -- you know, when we were -- I was losing help from people or people couldn't get involved that normally would help with an effort for fear of having their name posted on the Internet.

Q. Let's explore that a little --

A. Yeah.
Q. -- bit.
A. Yeah, sure.
Q. You said that people stopped donating to Protect Marriage Washington --
A. Yeah, we had a very --
Q. -- is that right?
A. We had a very difficult time getting -- raising the money we needed to fund the campaign, correct.
Q. And that was because people feared having their name associated with Referendum 71?
A. Right. Yeah, I -- it was -- you know, I would make a fundraising pitch and it would be, say -- but I have to -- you know, and I guess that's a little off the harassment issue. But they would say, well, I can't have my name on it. I'd say, well, I have to give your -- put your name on it if you donate to us.
Q. So --
A. Yeah. And with the entire -- the high-profile nature of the campaign, people were scared to death to help us.
Q. Did you -- were you responsible for filing reports with the Public Disclosure Commission with respect to campaign donations?
A. Well, we -- as the campaign manager, I had to make sure that that was happening. But I have -- I had a

treasurer that filed them all.
Q. And you made sure that those were all filed?
A. Absolutely, yeah.
Q. And did those disclosure forms state the name and address of each person or group that donated more than $25?
A. Yes, yes.
Q. Do you know if those were listed on the Internet, on the Public Disclosure Commission's Web --
A. Yes.
Q. -- site?
A. They were, yes.
Q. And by listed, I mean the amount contributed, the name of the contributor, and their address.
A. Yes, yes.
Q. And that was occurring before June; correct?
A. You know, I don't recall the exact times and dates. But there was a -- we actually at one point tried to see if we could get an exemption on those. And I can't give you the date, but --
Q. But the entire time that Protect Marriage Washington existed and was accepting campaign contributions, it complied --
A. Yeah.
Q. -- with the law?

A. It did comply with the law, correct, yeah.
Q. In respect to disclosing that information.
A. Yes, yes. We were right on and in close contact with the PDC, so --
Q. And you mentioned that you tried to get some sort of permission to not make that --
A. Yeah.
Q. -- disclosure.
A. Yeah. There was a -- we made a petition to the PDC and asked that we get an exemption.
Q. And do you recall whether or not a hearing was held with --
A. Yes.
Q. -- regard --
A. There was a hearing, yes.
Q. If you could wait till I finish my question --
A. Okay.
Q. -- first.
A. Yeah.
Q. Starting to slip on --
A. All right.
Q. -- each other again.
There was a hearing about that issue; correct?
A. Correct.
Q. And did you testify at that hearing?

A. I was there. And I -- did I -- I don't recall that I spoke, but I likely did. I don't recall.

Q. And do you recall that that was a public hearing?

A. I believe it was a public hearing, yes, yes.

Q. And do you recall how the Public Disclosure Commission ruled?

A. Yes. They did not rule in our favor.

Q. Did you appeal that ruling?

A. Yes, we did. And again, the courtroom proceedings became an eventual blur to me, so I believe we appealed that. I'm not sure if we appealed it. We moved into -- this thing was moving very fast. I don't recall that we did. I'd have to look at the record.

Q. I'm not going to --

A. Yeah.

Q. -- keep asking about --

A. Yeah.

Q. -- something you're not sure about.

A. Yeah, yeah, yeah.

Q. Did you have any problem getting donations prior to the PDC hearing?

A. The donation effort was -- it was steady from -- the grassroots people were willing to help. But anybody who could give any substantial contribution was very fearful. And usually you're going to businessmen who --

they have a business and they --
Q. What --
A. -- they were --
Q. -- business did you talk to that was --
A. Well --
Q. -- fearful?
A. I wouldn't wanna try and recall specifics. But I talked to -- I made a lot of inquiries, lot of phone calls, and simply we'd get to the point, well, you'd have to disclose your name, and we would just give up. So it became a grassroots campaign only.
Q. What businesses expressed to you that they would be interested in contributing --
A. I didn't --
MR. PIDGEON: Okay, wait, wait, wait.
THE WITNESS: Yeah.
MR. PIDGEON: I'm going to --
THE WITNESS: Yeah, I --
MR. PIDGEON: -- interpose an objection --
THE WITNESS: Yeah.
MR. PIDGEON: -- to this. And I think we may even have to move for a protective order on this particular issue as to --
THE WITNESS: Yeah.
MR. PIDGEON: -- who these -- as to that if these

names are provided, that they be provided under seal and under seal only.

THE WITNESS: Yeah.

MS. EGELER: Well, the Court can rule on that.

Q. (by Ms. Egeler) But you can answer the question.

A. I asked no particular businesses. I asked -- I talked to -- I'm talking about businessmen, people of prominence.

Q. Can you tell me or do you know anyone who stated that they would like to contribute, but they're fearful about disclosure of their name? Do you remember the name of anyone or any business who said that?

A. Yes, I do. I had a young woman who had like a -- I don't know what she did, but she had a little shop in Seattle. And she just said, I can't give if I have to give my name. So, I mean, it's people like that that I'm talking about.

Q. Who else? Woman with a shop in Seattle.

A. I wouldn't wanna try and recall all these people.

Q. I understand that --

A. Yeah.

Q. -- you might not want to, but --

A. Yeah.

Q. -- that is why we're here today, to --

A. Yeah.

Q. -- explore this.
A. Yeah, yeah.
Q. If we have --
A. Yeah, yeah.
Q. -- a claim that --
A. Yeah.
Q. -- harassment was resulting in people not contributing and you have --
A. Yeah.
Q. -- knowledge of individuals --
A. Yeah, yeah.
Q. -- that wanted to contribute and expressed to you --
A. Yeah.
Q. -- they want to contribute but won't because of disclosure, then I do need to know --
A. Yeah.
Q. -- who these individuals --
A. I don't --
Q. -- are.
A. I don't recall the individuals.
Q. So it's not a matter of you refusing to tell me; rather, it's that you don't recall.
A. I don't recall.
Q. That's fine.

Do you recall -- I'm sure you don't recall a

specific number; maybe you do -- approximately how many people and businesses did contribute to Protect Marriage Washington?

A. Well, I don't know that any business actually contributed, because you can't take corporate checks. But how many donors did we end up with? I don't recall that. Several hundred plus, maybe. I don't know. Two, three hundred, maybe more. It's all on the public record, so --

Q. So any donors would be listed there?

A. Exactly.

Q. And again, any donor Protect Marriage Washington would have complied with the law and properly disclosed to --

A. Yes.

Q. -- the Public Disclosure Commission?

A. Absolutely, mm-hm.

Q. And you also mentioned that you -- after hearing from whosigned.org and --

A. Yeah.

Q. -- Know Thy Neighbor, if you --

A. Yeah.

Q. -- and I are remembering their names correctly --

A. Sure.

Q. -- that you had some campaign workers that were uncomfortable and no longer would work for the

campaign --
A. Well --
Q. -- is that right?
A. That generated a chill through the whole campaign.
Q. Can you tell me who the people were -- that no longer would work for the campaign were?
A. Well, I can't. I can't --
Q. Do you recall who they are?
A. I don't recall.
Q. Do you recall how many of them there were?
A. I don't recall a number.
Q. How many campaign workers were there in total?
A. You know, there may have been a time when there was, you know, many hundreds that were out gathering signatures. Many of them I didn't know. They were just out doing it, sending 'em in. So --
Q. Since the election occurred --
A. Mm-hm.
Q. -- have you experienced anything that you would consider to be harassment or threats?
A. Well, you know, as a professional person or a person that is now doing campaigns professionally, I've -- for a number of months I was -- you know, and I have a -- I write a column for Red County. It's a conservative blog. And anytime my name would appear on an article, I

would get residual harassment, I would say. But, you know, it kinda goes with the territory in politics. But still, it's residual from the R-71 campaign and --

Q. Can you be more clear for me what --

A. Oh, sure.

Q. -- sort of harassment?

A. Things like, Larry Stickney's a homophobic bigot, that is posted after I write an article. Larry Stickney was divorced in 1994, blah, blah, blah. Larry Stickney's a rat. I mean, it's just the nastiest stuff you could have. And it's those kinda things that dog me still from that era. And in much of what I do, I continue to get an occasional nasty Email, and I've brought those in too. And I -- even today, the [REDACTED] as recently as last night. So it's still there.

Q. So --

A. Yeah.

Q. -- what's continued after the election --

A. Yeah.

Q. -- to make sure I'm summing up and understanding --

A. Yeah.

Q. -- has been the angry words --

A. Yeah.

Q. -- the blog comments --

A. Yeah.

Q. -- and angry Emails.
A. Exactly. And --
MR. PIDGEON: Objection as to form.
Q. (by Ms. Egeler) Is that -- is my summary correct?
A. Say that again.
Q. That, since the election, that the harassment and threats that you've received have been in the form of angry words, angry blog comments, and angry Emails; is that correct?
A. Yeah, I -- that's --
Q. Any --
A. Yeah.
Q. Anything else?
A. There's been a -- you know, even a number of articles my names are mentioned -- my name has continued to be mentioned in by those that have a column. And so it carries on. And every time something like that happens, I seem to hear something from somebody else that has -- that's been generated. So --
Q. And again, you --
A. I call it residual, you know, harassment, yeah.
Q. Have there been any instances of harassment -- or what you believe to be harassment or threats or reprisals connected to your involvement with Referendum 71 either before or after the election that we haven't discussed?

A. Well, there was another -- one of the more outstanding incidents. And let me just tell you something: I'm a pretty rough-and-tumble guy. I mean, I'm not a guy who walked into this thing with his eyes closed. But I got rattled on a couple of occasions in this thing. And one of the standout incidents that comes to mind was a series of phone calls that I began to receive from a real odd character.

Q. And when did these phone calls happen?

A. Those started in late July and it was from a Krystal Mountaine. I used to ski up on Crystal Mountain, so I assumed it was a takeoff on that mountain or whatever. And she would call me and -- at all hours and began to -- it began to be a little bothersome.

Q. Was it at your home?

A. On my cell phone, which was -- and it was on my home phone number too.

But -- and it's just -- usually what I would get was, you know, a lot of sexual innuendo and the attacks were usually bordering on, I hate your guts, you -- I mean, you can read the stuff yourself. But this one was particularly wanting to fight me and saying, I think I'd really like that, and, you know, these kinda things. And it was very bothersome. And then this person warned me that, but I want you to know, I'm an ex-special

forces and I can -- you know, I know how to kill.

And then I kept -- I know the Emails are in the record, but they clearly mention the phone call they might have had with me. And I know this one (indicating), it says, we had a lovely conversation today on the phone call, Larry. How's it going? And it goes on and on and says, you didn't -- you know, God bless you, hope He forgives your sins. I think we're gonna become best friends, you know.

And so I continued to get these odd calls. And then I just -- I didn't -- I began to recognize the phone number and I just didn't pick it up anymore, and that person eventually gave up on me. But I know -- I did find out that my pastor was getting calls, [redacted] --

Q. Can you --

A. -- from this person.

Q. Let's stick to what --

A. Yeah.

Q. -- what you received --

A. Yeah.

Q. -- because I want to ask you --

A. Yeah.

Q. -- a few questions --

A. Yeah.

Q. -- about that.
A. Yeah.
Q. Did I hear you correctly that it was a woman, Krystal Mountaine?
A. Well, it was a man, but she was a transsexual who called herself Krystal. But she had a baritone voice and had been special forces, so was a -- I assume she had -- she told me she was a transsexual. So -- she called herself a she, so --
Q. Did you feel afraid of her or more -- was your emotion different than that? Was it fear or something else?
A. It was just a little -- it was intimidating and fear of the unknown again. And they seemed to know things and -- I know where you live. You know, I'm in the phone book, so they did know where I lived, and so there was truth in that. And they had my phone number, they had my home phone number, and they had my Email. And --
Q. Did you ever call the police and -- or the sheriff to report the calls from Krystal Mountaine?
A. I do not recall. I do not believe I did.
Q. And why not?
A. I began gathering this information and -- well, again, I'm in, you know -- this was either just right at or post -- I think -- believe that we had turned in the signatures.

And we had not received any satisfaction on the Bisceglia deal with the local sheriff. And there had been some -- I had been -- I had received a call from a detective in Whatcom County -- or the city of Bellingham. He asked me some questions, but I wasn't hearing back from these guys. I was hoping they were doing something. And I'm living on the run, running a campaign, and I was unable to follow up on some stuff that I normally would.

And yet, you know, this had become -- it was getting to be bothersome, but fairly routine just the same. I'm hearing all this harassment. And so I'm -- am I gonna let this -- these guys chase me out and chase me into the hills or am I gonna finish -- carry on this campaign? So it was intimidating, a lotta fear of the unknown. But again, I bring you back to the sense of chill and anxiety --

Q. I --

A. -- that I operated under for many months that took a toll on me and my family.

Q. I understand.

And --

A. Yeah.

Q. And I want to explore that with --

A. Yeah, yeah.

Q. -- respect to these --
A. Yeah.
Q. -- phone calls --
A. Yeah.
Q. -- in particular.
A. Yeah.
Q. Did Krystal Mountaine threaten you with physical harm?
A. Well, if threatening me with harm is saying, I want to fight you, I'd really get off on that, and then saying, but I warn you, I know how to kill, I'm an ex-special-forces person, does that rise to the level of a threat? You know, I've lived to be amazed at the things that do and don't in this campaign. So where I come from, that's a threat.
Q. So in your mind -- I didn't listen to the phone call.
A. Yeah.
Q. So in your mind, you did hear it --
A. Yes.
Q. -- and you felt it was a threat.
A. Yes, I did.
Q. So you heard this individual say that she was former special forces --
A. Mm-hm.
Q. -- and could kill you --
A. Mm-hm.

Q. -- and wanted to fight you.
A. Yeah, wanted to fight me because she'd get off on that sexually.
Q. But you weren't concerned about letting the police know about this physical threat to you?
A. I had too many things to do and I have -- I'm hearing this stuff constantly, the hate I'm absorbing at that point. And I had made a decision I'm gonna carry this thing out by then. And I guess you get somebody cornered and, you know, we were saying, well, we're gonna fight back. You're not gonna drive us out of this campaign.
Q. But this individual --
A. Yeah.
Q. -- said that she was going to --
A. Yeah, yeah.
Q. -- wanted to fight you.
A. I didn't have any -- what proof did I have other than I took a phone call?
Q. Just let me --
A. Yeah.
Q. -- finish the --
A. Yeah.
Q. -- question.
A. Yeah.

 Q. And that she, if I hear you correctly --
A. Yeah.
Q. -- knew where you lived. Were you concerned for your family?
A. Absolutely.
Q. And yet you didn't let the sheriff know about that?
A. I don't recall whether we made a call on Krystal Mountaine or not. I know I was turning all these Emails in to our file, you know. I was in communication.
Q. Were you --
A. So --
Q. You were in communication with whom?
A. With attorneys at that point. And I think I sent them to Steve and to the Alliance defense fund.
Q. And by Steve, you mean --
A. Steve Pidgeon.
Q. -- Steve Pidgeon?
A. So --
Q. And do --
A. Yeah.
Q. -- you know if Steve Pidgeon let the --
A. No, I don't know --
Q. -- Snohomish County Sheriff's --
A. -- that I ever made a -- you know, what reports I made other than I kept the Emails I got from this person.

That threat came in on a phone call, yeah.
Q. But you didn't feel concerned enough about your family's safety to call the police --
A. Oh, I absolutely --
Q. -- about that?
A. -- felt concerned enough. I didn't feel I was gonna get any response from Sheriff Lovick.
Q. Did you --
A. Yeah.
Q. Do you have a police force in the city of Arlington?
A. No. We're outside the city limits. Very vulnerable. I had no confidence in Sheriff Lovick at that point.
Q. But you didn't let Sheriff Lovick know about this threat of physical --
A. I don't --
Q. -- harm from --
A. -- recall whether we let him know or not.
Q. Who would know? Would your wife recall?
A. I doubt that.
Q. And let's explore --
A. Yeah.
Q. -- your feeling of a lack of confidence in the sheriff.
A. Yeah.
Q. Other than your contact with the sheriff to --
A. Mm-hm.

Q. -- tell the sheriff about the Bellingham blog, had you had any other contact with the sheriff's office?
A. I re-sent my complaints to Sheriff Lovick again to see if he was going to do anything.
Q. And specifically, your complaint about --
A. That was the Bisceglia --
Q. -- the --
A. -- issue.
Q. -- Bellingham --
A. Exactly.
Q. -- site?
A. Yeah.
And I had kinda felt like, well, if they don't act on this, you know, what are they gonna do with a bunch of stuff I don't have hard evidence on? That was my logic.
Q. Do you know if a police report was ever made?
A. I do not recall.
Q. Did you follow up with a phone call to the sheriff's office?
A. I don't recall and -- like I don't recall any conversation with the sheriff on the Krystal Mountaine thing.
Q. Anything else in terms of your contact with the sheriff's office at any time that would cause you to

have a lack of confidence?
A. That was enough for me, that they wouldn't -- they didn't communicate with us. They didn't even send somebody out to the house, and that upset me.
Q. They didn't send somebody out --
A. I thought --
Q. -- to the house --
A. -- they might at least send a deputy out to talk to us, yeah. But we didn't even -- we didn't get that -- even get that kind of a response out of them.
Q. And again, that would be to talk to you with respect to the Bellingham --
A. Yeah.
Q. -- blog.
A. Exactly, yeah, yeah.
Q. Do you know of any physical harm that occurred to any Referendum 1 (sic) supporters in the state of Washington?
A. I would hear rumors and this and that of stuff. I don't know of -- and I'm thinking right now, but -- I heard of some bottles being thrown and some garbage being thrown at people and --
Q. Where was that?
A. Spokane area.
Q. Who told you that?

A. I don't recall. I tried to list a lotta this stuff, but -- I think there's people that know about that. But I heard about that incident and that may have -- that may be -- might have been through some of the Russians at the Spokane churches.
Q. Did you speak to someone directly about that who --
A. I --
Q. -- was there?
A. I heard about it. I don't recall who told me. But you may get that information in this thing. I hope so.
Q. Do you --
A. It's --
Q. -- know when that happened?
A. It was in the summertime, you know.
Q. Any other instances of physical harm that you're aware of?
A. Well, maybe to myself, if that matters. I --
Q. It absolutely --
A. I ended up --
Q. -- matters.
A. I ended up -- and I've tried to describe the anxiety and the atmosphere of fright and -- as a father with small children and older kids and feeling vulnerable all of a sudden, thinking we were safe. I developed -- I was -- I took a -- some -- I became physically sick towards the

end of the campaign. It really took a toll. And I was determined we were gonna finish the campaign. And my attitude got to be, if it kills me, we're gonna finish the campaign.

And I remember somebody noticing me at a -- now, I was getting heckled at a forum in Yakima. Now, there was another forum we didn't mention. But there was a large rally -- there was a rally in Yakima. And I specifically remember getting yelled at by a woman of the cloth who earlier in the day had been a very well-mannered participant in the editorial board at the Yakima paper. And that evening, I walked past them and they were yelling obscenities at me.

But somebody noticed that I was actually dragging my right foot. So when I say I was dragging, I was literally dragging, and I was having things like my foot fall asleep. And I couldn't -- I was running so hard to all the events and trying to get through this thing that I hardly noticed myself that I was having some severe physical breakdown. And it -- I developed tremendous soreness throughout my whole body and --

Q. Were you able to --

A. -- I was tired and running a low-level fever. And I didn't -- I started to think I might have had something very severe. And -- but again, I was determined we were

gonna get through the campaign. And I didn't seek medical treatment till, maybe, after November 5th, when I nearly had to be propped up to give the speech at the -- at our election-night celebration. But -- I mean, I was still standing, but -- and then we had -- our insurance had lapsed at that point, so we were not even knowing what to do. But --

Q. Were you able to stop and get some rest during the campaign?

A. I felt through that campaign that if I could just get one good night's sleep, I'd be okay. And it was so stressful and -- but I was diagnosed after the election with a severe form of systemic arthritis that was brought on by the stress.

Q. So it sounds like you weren't able to get a --

A. It triggered --

Q. -- good night's sleep.

A. I never -- I couldn't until -- I ended up on a couple of different types of medication and they're controlling it at this point. But it's something that will likely permanently affect me.

Q. And --

A. Yeah.

Q. -- was that lack of sleep due in part to --

A. Absolutely.

Q. -- having to --
A. Sure. Stress.
Q. Let me finish the question --
A. Yeah.
Q. -- please.
A. I'm terrible.
Q. Was it due in part to -- you've talked a number of times about the very short time you had to gather these petitions. Was it due in part to running around the state trying to get information and petitions and signs distributed?
A. Well, I would say likely all those things are a factor. But to me, what I remember about last summer -- and the reason I remember it is because -- even coming back here brings it back and -- is the chill and the fear that I was operating under. And it was -- you know, it's hard to describe --
Q. Let's --
A. -- to have a cloud over you like that and to fear the unknown so deeply that it's affecting you and your confidence and your physical health.
Q. Let's talk about the woman in Yakima that yelled --
A. Yeah.
Q. -- at you.
A. Yeah.

Q. You saw her at an editorial --
A. Yes.
Q. -- board at the paper?
A. Correct, yeah.
Q. If you could just wait till I finish the question.
Do you recall her name?
A. I do not, but that would be easy to find, because she was -- if you were to -- there would be an article somewhere about the Yakima -- the editorial-board participants and --
Q. And you said she was a woman of the cloth. So did you mean by that --
A. She was --
Q. -- that she was --
A. She had a -- some type of church there. And she was my opponent in an editorial-board conversation with the Yakima Herald, so --
Q. And she would be the only opponent, so it would be clear who she is?
A. There was two of them, but she was the only female, yeah. And she's a fairly high-profile opponent of R-71, so that wouldn't be too hard to find. But --
Q. So you said after the editorial-board discussion --
A. Yeah.
Q. -- you saw her --

tonight, Larry?
A. Yeah, yeah.
Q. Did she say anything else?
A. I don't recall what it was, but there was chatter coming out of a group of them there that were there to protest the -- our involvement at the event. And I -- so -- and I can't give you any specifics of it other than it was heckling. But I specifically remember her comment, so --
Q. Are there any other instances that you believe were harassment or threats that we haven't covered, specific incidents?
A. Well, I don't have a great recollection other than, you know, I did a lot to keep myself out of public places.
Q. But do you have --
A. Yeah.
Q. -- any other instances of threats or harassment that you recall?
A. No. They're all in the record by the stacks, so --
MS. EGELER: Okay, then I have no further --
THE WITNESS: Yeah.
MS. EGELER: -- questions at this --
THE WITNESS: Okay, yeah.
MS. EGELER: -- point -- oh, actually, I do; I'm sorry.

THE WITNESS: Okay.

MS. EGELER: I want to go back on.

Q. (by Ms. Egeler) There was something that you mentioned earlier and I promised you you would get a chance to talk about it and I want to make good on that.

A. All right.

Q. You talked about damage to R-71 signs, so let's explore that. Can you tell me --

A. Oh, well, it was -- I mean, you know, I've been involved in a few campaigns, enough to know that -- you know, we had already discussed that there is a -- at least a minimal amount of sign damage to most campaigns. And -- but I have never in my life experienced anything like this one. And --

Q. And --

A. So --

Q. -- not focusing so much --

A. Yeah.

Q. -- on past --

A. Yeah.

Q. -- experiences, but rather --

A. Yeah.

Q. -- on this one --

A. Yeah.

Q. -- what can you --

A. Yeah.
Q. -- tell me about --
A. Yeah. Well, we couldn't --
Q. -- what you saw?
A. We distributed 6,000 signs around the state of Washington, of which -- they were stolen, broken, vandalized almost overnight wherever they would go, wherever we would put 'em up. And I had -- I just got to the point where I go, we're not gonna do any more signs.
Q. Every sign you put up around the state was either stolen, broken --
A. Well --
Q. -- or vandalized?
A. -- I would say near -- I would say 90 percent were -- I mean, they would go up overnight and they'd be gone the next day, torn up, slashed, or spray painted.
Q. Do you know if anybody who supports Referendum 71 took down any signs that opposed Referendum 71?
A. I did not hear one incident of complaint of that, not one.
Q. Do you know of any signs being stolen, broken, or vandalized specifically by people who opposed Referendum 71?
A. Well, I did submit some photos with swastikas and FU and

all that kinda stuff. I assume they didn't like us.
Q. So with respect to vandalism, you made that assumption because of the language that was put on the sign or, you know, symbols --
A. Well --
Q. -- that were put on?
A. They would write things on the sign. So it was pretty easy to see that they were -- this wasn't just kids walking down the street kicking your sign down. These were -- this was an organized effort.
Q. With respect to signs that were stolen or broken --
A. Mm-hm.
Q. -- what indication did you have that it was related to people that opposed Referendum 71?
A. Well, when you spray paint "bigots" or something on that, you get a pretty good idea.
Q. But just looking for now at those signs that were stolen or broken and --
A. Mm-hm.
Q. -- didn't have any message spray painted or written on them --
A. Yeah.
Q. -- did you have any indication or are you guessing that those people who did that were opposed to Referendum 71?
A. Yes, yes.

Q. Yes, you're guessing, or yes, you had specific knowledge?
A. Well, let's just say that it -- that I made an educated assumption.
Q. Did --
A. It's usually the case.
Q. So you did not have specific information about those stolen or broken signs.
A. And --
Q. Is it --
A. And --
Q. I don't think that got --
A. I mean, I --
Q. -- on the record.
A. -- I couldn't give you something that would likely stand up in a court of law today, but it seemed pretty obvious to us.
Q. Was anyone caught in the act of stealing or breaking a sign?
A. No. It was done in the evenings.
Q. Always?
A. Seemed to be. I mean, if we could have caught 'em, we would have. We were far too busy to put together our own police force.
Q. How many signs were spray painted or written on in any

way?
A. There were 6,000 signs out. Ninety percent were destroyed or vandalized.
Q. What percentage were vandalized --
A. I can't --
Q. -- with some sort of writing?
A. -- give you that. I wasn't monitoring. The ones east of the mountains did a lot better than the ones on this side. I couldn't keep signs up around here, the whole west side.
Q. Do you recall any specific locations where signs were vandalized?
A. Tacoma was especially awful. Just -- and I had a good team down there. And the minute they'd put 'em in, they'd be gone.
Q. Anything else? Any other sort of property damage, physical damage, or other forms of threats or harassment that were experienced that we --
A. Well --
Q. -- didn't cover?
A. -- there's a lot of things I assume you'll probably hear about as you carry on your --
Q. From others --
A. -- duties.
Q. -- though.

A. Yeah, yeah.
Q. Not that you personally experienced.
A. You've gotten a summary of mine and --
Q. Is it complete?
A. Well, as complete as I can give you today with the limited resources I had during that campaign to gather all this information.
MS. EGELER: Okay, okay. Well, with --
THE WITNESS: All right.
MS. EGELER: -- that, I really am done for the moment with questions.
MR. DIXSON: All right.

EXAMINATION

BY MR. DIXSON:
Q. Mr. Stickney, good morning. My name's --
A. Morning.
Q. -- Steve Dixson. I'm an attorney with the -- for the Washington Coalition for Open Government. I have a few brief follow-up questions.
A. Yeah.
Q. You mentioned that you had a radio show that you used to conduct while you were working for the Washington Values Alliance; is that correct?
A. That's correct, yeah.

Q. What station was that?
A. It was on Christian radio stations.
Q. A --
A. A number of 'em in --
Q. A network of radio stations?
A. Yeah, yeah. Eastern Washington.
Q. And since you suspended that show, has it --
A. Yeah.
Q. -- gone back on the air?
A. No. No, it has not.
Q. Turning to the content of the Protect Marriage Washington Web site and the Washington Values Alliance Web site, who controls the content of those Web sites?
A. I do.
Q. Are you the Webmaster, if there is a Webmaster --
A. Yes --
Q. -- for those Web sites?
A. -- pretty much so. I have a Web builder, but I'm -- I control the content.
Q. You have final say in what is published on that Web site.
A. Yes, yes. I have a board that's essentially dormant at this point.
Q. And how many members are on that board?
A. It's myself and two other people. But one person is

completely out of the picture due to physical illness.
Q. Who are the other board -- is this board for Washington Values Alliance --
A. Values Alliance --
Q. -- or Protect --
A. -- yeah.
Q. -- Marriage --
A. Values Alliance, yeah.
Q. And who are the other two board members --
A. [redacted].
Q. And that's the [redacted] that has been --
A. Yeah, [redacted].
Q. -- referred to? Okay.
You stated that you traveled around the state --
A. Yeah.
Q. -- distributing petitions and giving instructions to those who were going to gather signatures --
A. Yeah.
Q. -- is that correct?
A. Correct, yeah.
Q. What would you --
A. I should say that I was making that happen. My son did a lot of the driving. We all shared lots of duties and wore different hats.
Q. At any point, did you give instructions to people that

were going to gather signatures for those --
A. Yeah. We had a --
Q. -- petitions?
A. We had a sheet that went out with 'em that is -- should be submitted here somewhere. So --
Q. Assuming it is --
A. Yeah.
Q. -- and it may be, but --
A. Yeah.
Q. -- do you remember, what were the instructions that you would give to someone that was going to gather signatures?
A. They were generally the instructions that you'd get off the Secretary of State's guidelines.
Q. Did you amend those at all to make them personal to your campaign or just take --
A. Well, we personalized --
Q. -- the State's suggestions?
A. -- it, sure. And we had to have a lot of different strategy for this campaign.
Q. Can you describe some of those different strategies --
A. Well --
Q. -- for gathering signatures?
A. And you should, you know, make note of it that we -- this was not a petition that you could put down at the

corner drugstore. We would -- you know, it had to be -- get -- gotten to people that were gonna be active with it because of -- they would just be simply stolen. And I had -- was constantly getting requests for the petition from people that wanted a thousand of 'em and -- that would just take 'em down and throw 'em in a dumpster. So -- yeah.

Q. Why couldn't the -- what do you mean by it couldn't just be put at the corner drugstore?

A. Because it was such a -- there was such hostility generated that if you -- you know, if we -- and our fear was -- because we never began by putting 'em in every gas station or something. We -- you know, our strategy was to get 'em to people that would do something with 'em. So --

Q. So do you mean you wouldn't just have them passively sitting there, you wanted them in the hands of active signature --

A. Yeah.

Q. -- gatherers?

A. People that were gonna go out and do something with 'em, right. Yeah, exactly.

Q. Do you remember what your instructions would be to those people that were going to gather the signatures? Did you tell them where to go?

A. There was -- I don't know if that was on the -- the sheet just gave general things about being courteous and, you know, where you could stand legally, you know, if you're -- you know, you can stand on a sidewalk, but you can't stand on private property without permission, things like that.
Q. Did you stay in touch with your signature gatherers during the course of the campaign?
A. Yeah. We would get a lotta correspondence and, you know, phone calls and things like that and did our best to -- you know, what we -- we had a lotta people that we would mail the petitions to. So that was -- that's how we did it. Somebody --
Q. You --
A. You know, we would do a -- generally try and find out if the person was legitimate before we'd send 'em. So --
Q. Did you do any type of background checks of those people that requested petitions from you?
A. To the best of our ability. And we found a lotta people that were asking that were from -- working with other groups that were opposing us.
Q. Can you -- you mentioned that some people requested, I think you said, thousands and placed them in the dumpster. What do you -- can you elaborate --
A. I said --

Q. -- on that.

A. I said we had requests that were bogus. We were fearful that if we just made 'em -- stacks of 'em public, they'd just be tossed. I mean, I was -- you know, there was blog posts with our petition in a urinal and things like that. So obviously we weren't just gonna, you know, give 'em to anybody without trying to find out if they were somebody who was actually gonna help us.

Q. But you know that some of them went into the hands of those who opposed the referendum; is that correct?

A. You know, when you have -- I can't remember how many we ended up printing. Maybe a hundred -- I can't remember if it was -- did we distribute 75,000 or 150,000? It was a lot of 'em that were out. So, you know, where some of 'em ended up, I can't tell you. So --

Q. You stated that people placed petitions in the dumpster. Was that --

A. No, what --

Q. -- being facetious or are you aware of --

A. No, no, no. I said we avoided making them available in bulk like that for the fear of they would just end up in a dumpster. So it was more for fear than anything. So --

Q. But you're not aware of any --

A. No, no. And --

Q. -- specific petition dumping.
A. -- we avoided, like I said, the public locations for that reason.
Q. Turning to the children being moved into the living room, approximately --
A. Yeah.
Q. -- how long did you guys --
A. Well --
Q. -- stay in the living room?
A. That went on, likely, for a couple months at the height of the whole thing, when we were most fearful. And we began to feel a little more confident in time at home again. But -- and I was -- the worst part was during the signature gathering, when I was either in Olympia or in and around -- in -- you know, when I'm -- you know, I worked outta the house most of the time. So -- but I usually would -- you know, throughout most of the campaign, I had the kids sleeping in other places other than their room as the -- because of that fear.
Q. Was it every night for a couple months or --
A. Yeah.
Q. -- over a period --
A. No, every --
Q. -- of months?
A. -- night for a couple months.

Q. Regardless of whether or not you were home.
A. That's right, yeah.
Q. And all -- was it five children; is that correct? I think I heard you name --
A. Well, the --
Q. -- four girls --
A. The --
Q. -- plus [redacted]?
A. The three girls were the most vulnerable, the little girls, and they shared a room. And I had -- I have -- I had two boys, mind you, at home and a daughter. So we have so many bedrooms. And the girls have a bunk bed and another bed in that bedroom, and I moved 'em outta there. So --
Q. And your other son's name besides [redacted] is?
A. [redacted]
Q. [redacted] age last --
A. College --
Q. -- summer?
A. -- age. He was home for the summer.
Q. He's older -- is [redacted] your oldest son, then?
A. Yeah, oldest son.
Q. Since the election, has there been a time when the family's -- when the children have slept in the living room or outside of their bedrooms?

A. We've since moved back in. But, you know, we don't -- we've never felt safe there since and we're actually -- I'll just leave it at that.

MR. DIXSON: Okay, that's the extent of my questions.

MS. ENGRAV: Okay, I just have a few.

EXAMINATION

BY MS. ENGRAV:

Q. Good morning, Mr. Stickney. My name is Rebecca Engrav; I'm an attorney for Washington Families Standing Together, and I just have a few. I'll try not to cover anything that's already been covered.

A couple of clarifications. You mentioned the time when you took the signatures down to the Secretary of State's Office.

A. Yeah.

Q. And had you prepared a press release from your organization for that event as well?

A. I don't recall, but I would think so.

Q. And what would your practice have been with a press release in terms of how it would be released and to how many media outlets?

A. We -- you know, I'm trying to think about -- are you talking about the day that we turned the signatures in?

Q. You were working hard during the campaign?
A. Working hard. But I can only describe it as a -- if you've ever played in a softball tournament and played about seven games on a weekend, the next day you're just -- you can't hardly move. And that's how I operated for the last months -- the last couple months of the campaign.
Q. The pace --
A. It was getting --
Q. The pace was pretty quick to get the signatures in?
A. The pace was very quick, yeah. The pain came on a little later in the campaign.
MS. ENGRAV: That is all I have.
MR. PIDGEON: Okay, I do have some follow-up.

EXAMINATION

BY MR. PIDGEON:
Q. This is Steven Pidgeon.
Larry, how are you?
A. Good. Good to see you, Steve.
Q. I want to explore a little bit more about what you know about [REDACTED]. You mentioned earlier in your testimony that her name had appeared in a newspaper article?
A. That was one of the many articles, yeah. But there was

that you may have related to harassment associated with the R-71 petition that's been -- that the Secretary of State has asked concerning a document request? Are you aware of that?

A. Am I aware of the --

Q. Are you aware that there's a document request from you?

A. Yes.

Q. Is this (indicating) a document that you printed here?

A. Yes. Late last night I got that.

MR. PIDGEON: I'd like to mark that as an exhibit to this deposition. Unfortunately, we only have this original. We have no other copy.

[Exhibit 1 marked for identification]

Q. (by Mr. Pidgeon) Now, what do you know about this document? First of all, can you tell us what this is.

A. Well, it was -- last night I was on my own personal Email and -- or -- and I got an Email from ███████ ████. And she said, Larry, I just got this. This just came -- or just -- this just was posted on my YouTube. It's a YouTube video and it's a campaign video on YouTube.

And I don't know when the forum was, but it says, ████████████ gay marriage stance. So I assume it's somebody who's opposing her that would just post that, because I don't think that's an issue she's running on.

But she -- her own campaign would use that as a title for the -- just -- so -- and what I know of it is that it came over. And the comment -- a comment on it that came in -- it says, "Oh my God, this woman is so" F'ing "stupid. Someone please shoot her in the head, again and again. And again."

And so she was shook up last night and said, Larry, what -- you know, what do I do with this thing? I said, well -- I said, I guess save it. And she goes -- you know, I said, you know, report it to the police if you're -- you feel threatened. So that's what I know of it. And I brought it in here today and I'm turning it over here to this court -- or to this process here today.

Q. Now, let me ask you about this fellow Bisceglia.

A. Yeah, yeah.

Q. Do you know, did he ever post on any blog any reference to using firearms or getting guns?

A. Well, yes, and I believe that's -- that we've got that material. And there was a variety of postings and some more vicious than others.

Q. Did he say things like, get a gun and go shoot Stickney or -- and his family, or things of that nature?

A. Why can't we go to Arlington and harm his family? I recall that very well, yes. And then I know a link -- I

remember the link to his Web site, and there was talk of guns and a picture of a gun. And it was menacing.
Q. And do you know, was there ever a referral made to the FBI about Bisceglia's --
A. Yes.
Q. -- conduct?
A. I recall that there was, yes.
Q. And do you recall, did the FBI do anything?
A. No. I don't recall hearing back from them, no.
Q. So did a member of the FBI ever contact you about whether or not you experienced any --
A. I --
Q. -- death threats or anything from this --
A. I recall no follow-up from anybody.
Q. Did you ever have any law-enforcement officer make personal contact with you at your house to investigate all of these numerous threats --
A. Well --
Q. -- death threats, threats of harassment, threats of intimidation, and so on?
A. Well, I had Sheriff Lovick reply that he was looking at it, and I believe he -- I believe the Email that would be in the record is that he had forwarded it up to the sheriff in Whatcom County, and I don't recall his name. But I did get a phone call from a detective that

identified himself as the city of Everett. I can't tell you his name, but he said he was looking into it at the city of Bellingham. And then I never heard back from that either.

So -- and I had high hopes they would do something. But, again, we were very busy and I felt like, well, there was a lotta things that I couldn't do very well during this campaign because I was a mile wide and an inch deep and spread thin. So that was happening. I think we could probably get the sheriff in Whatcom to chase that down.

Q. Let me ask you this: Now, you mentioned that you did file the names of contributors to the campaign with the Public --

A. Yeah.

Q. -- Disclosure --

A. Exactly.

Q. -- Commission. Do you know how much money you raised totally for the R-71 campaign?

A. Well, I think that officially, it was in the range of $125,000 as far as money raised and spent for the campaign. But I -- maybe now I should say officially. That number was greater, I think, because of the in-kind donation for the legal fees from the Bopp Coleson firm, which was, you know, double that amount. So what's

officially listed on Public Disclosure Commission I'm not sure, but money raised in the campaign was right in the neighborhood of $125,000.

Q. And then do you know what the opposition raised and spent?

A. I don't have any -- I -- you know, I'm recalling that it was several million dollars. Several million, yeah.

Q. Now, to your knowledge, did -- any of the contributors who were listed on the public-records disclosure, were any of them contacted or harassed, to your knowledge?

A. Yes. I do recall that the magazine The Stranger called contributors, yes.

Q. And did they call them during normal business hours or were they --

A. They --

Q. -- after-hours or what happened?

A. As far as I know, they were calling in -- I don't know what time of day. I know my -- you know, I do know they called my dad, but I'm not sure my dad contributed to the campaign. But I know that they were called and a lot of them were elderly. But I do recall that there was actually an article in The Stranger talking about their conversation they had with R-71 donors, so it's not a secret.

Q. Now, you mentioned that you --

A. They even mentioned them by name, those people. They gave 'em names. It says, we interviewed so and so, who gave money to R-71.

Q. Would you expect that The Stranger would have contacted -- or run pieces like know thy enemy if you'd had substantial donors?

A. Oh, I saw all over the blogs, release the names so we can boycott your businesses, you know. So their aggressive tactic was to do whatever they could to, I would say, bring any type of negative force they could to those folks who might be amongst the names listed.

Q. Now, you mentioned also that you had a very short time to gather petitions.

A. Yes.

Q. Was it any shorter than any other time to gather petitions for people in the normal petition process?

A. Absolutely. You had a governor that was committed to the issue and used every legislative maneuver within the law to thwart the normal process and managed to -- you know, in a variety of legislative razzle-dazzle and manipulations, was able to cut our time down to -- instead of the normal 90 days, we ended up with maybe a maximum possible days -- I can't remember. Did we end up even having 50, 60 days? By the time the petition was printed, 49 days to gather, I think is what it was.

It's --

Q. And how many signatures were eventually gathered?

A. Hundred and thirty-eight thousand.

Q. And how many did you need for approval?

A. Hundred and twenty something.

Q. So you needed a very low rejection rate.

A. That's correct, yeah, yeah.

Q. And you did, in fact, end up with a very low rejection rate?

A. We did, yes.

Q. Now, one other question for you.

Now, you were -- you did attend the hearing at the Supreme Court?

A. Yes, Washington, D.C.

Q. Yes.

A. Yes.

Q. And do you recall passing through metal detectors at the Supreme Court?

A. Yes, I do.

Q. Did you hear any -- to your knowledge, did you hear anything whether or not security had been increased at the Supreme Court?

A. Yes. As I recall, they were asking at that very time for -- I believe it was 23 additional police or law-enforcement personnel for increased security. Now, I'm

not saying it was this issue necessarily, but they've been asking for increased security at the U.S. Supreme Court for their hearings.
Q. And did you hear Attorney General McKenna's live testimony at the court?
A. Yes, I did. Yes.
Q. Did you hear him say that members of his office were subject to daily contact by people who disagreed with them?
A. Yes, I do recall hearing that. Yes.
Q. Now, we're being -- you're being deposed at an Attorney General's office today; is that correct?
A. That's correct.
Q. Can you tell us whether or not you were able to freely enter this particular conference room for this deposition or did you enter through a locked door and through a security procedure?
A. Locked door, security procedure.
MR. PIDGEON: Okay, I have nothing further.

FURTHER EXAMINATION

BY MS. EGELER:
Q. I have a few follow-up questions, starting with this office.
Do you -- are you aware, sitting here today in the

identified himself as.
Q. Do you remember his name?
A. I do not. But I think that the county sheriff would have to know that.
Q. What did he say to you?
A. He said he was gonna take a look into the Bisceglia matter.
Q. Did he say how he would do that?
A. He just said he was a detective. He caught me on the run and I'm bombing around somewhere and he says, I just want you to know that we're gonna take a look at this thing for you. That's the last I heard of him.
Q. And did you call him back to ask --
A. No. I didn't --
Q. -- about it?
A. -- have his number.
Q. Where did you receive the call?
A. Cell phone.
Q. So your cell phone had the number.
A. Somewhere on my cell phone.
Q. And did you write that number down?
A. No, I did not.
Q. Why not?
A. Ma'am, I was -- a lot of these calls I was fielding on the run.

Q. You were asked by Mr. Pidgeon whether you received a call back from law officers regarding all of these numerous threats. But isn't it the case that you only reported to the police the blog site in Bellingham? Isn't that what you said earlier?

A. That is correct, yes.

Q. With respect to the exhibit to your deposition, Exhibit No. 1, which is the comment that was posted, that was posted on YouTube; is that correct?

A. That is correct.

Q. I wanted to ask you about Washington Values Alliance one more time. When the Alliance endorses a candidate, does the candidate approach Washington Values Alliance asking for that endorsement or do you seek candidates out?

A. We had a few ask us if we would consider it. I had some asks. And I keep tabs a little bit down there, but frankly, I just -- I -- the Values Alliance is all but dormant. And we endorsed a few of our favorite candidates this year and have not been active, really. Maybe we've endorsed a half a dozen, is all.

Q. Do you recall if [redacted] asked for that endorsement?

A. I believe she mentioned that to me, ask -- I'd like -- could I get an endorsement? Saw me at an event or something, and I said, I'll take a look. And I tried to

find out about her and do all the things I need to do to give an endorsement.

Q. Do you recall whether in 2009 there were any homes for sale within, say, a mile of your home, whether you saw any for-sale signs?

A. Sure, sure, yeah.

Q. And in what year did you buy your house?

A. Maybe like ten years ago today -- or October of ten years ago.

Q. I want to ask you about an article that was in The Stranger. I wasn't planning to bring it up, but given the individual that made a comment about which wife are you bringing --

A. Yeah.

Q. -- there was an article in The Stranger that, I would agree, was not friendly --

A. Yeah.

Q. -- and it stated that you'd had multiple marriages. Do you recall that article?

A. Yes, I do. Sure, yeah.

Q. How many marriages have you had?

A. I had --

MR. PIDGEON: I'm going to object to relevance.

THE WITNESS: Yeah.

MR. PIDGEON: Go ahead and answer.

A. Yeah, and I've been very open about that. I had two marriages that ended in divorce.
Q. (by Ms. Egeler) And then a third marriage that you're currently --
A. I'm -- I've been married -- happily married for twelve years. So -- yeah.
Q. And that article made allegations -- I'm not trying to --
A. Yeah.
Q. -- assert the truth of --
A. Sure.
Q. -- the matter --
A. Yeah.
Q. -- allegations about domestic violence --
A. Yeah.
Q. -- in one of those marriages. Do you recall that?
A. I --
MR. PIDGEON: Again, going to object as to relevance.
Go ahead and answer.
A. Yeah, I recall the article. Sure, yeah, yeah, mm-hm.
Q. (by Ms. Egeler) And was that truthful when they said that?
A. No.
Q. Can you tell me what might have caused them to say

something --

A. Well --

Q. -- like that. What in the public record might have caused them to say something like that?

MR. PIDGEON: I'm going to object again to relevance.

Go ahead.

THE WITNESS: Okay.

A. Well --

MR. PIDGEON: In fact, hold on.

THE WITNESS: Yeah.

MR. PIDGEON: This line of questioning just in general, I'm going to object to relevance. That way I don't have to do it every question. All right.

MS. EGELER: That's fine.

A. Well, I would -- I had a -- essentially a custody battle for my children many years ago and some things were said by my ex-wife in there. Many of them were not true. But you can find it in the public record, Kitsap County. Somebody sifted through that and gleaned a couple things like that. You know, I think my son may have appeared kind of rebutting some of that in the article. And I have no -- I mean, when you're accused of these kind of things, there's -- all you can say is, it isn't true, and I leave it at that.

Q. (by Ms. Egeler) But you could tell looking at the article that they could have gone to the court record and --
A. Well, they said --
Q. -- pulled out --
A. -- they did.
Q. -- accusations --
A. Sure.
Q. -- from there.
A. And I think somebody in the blog said, yeah, good work, buddy, you know. I got -- and he -- I got it out of -- I went down to Kitsap County. So they were going through -- rifling through all that stuff, sure. Yeah.

MS. EGELER: Okay, I have no further questions. Thank you for coming in today; appreciate it.

(Whereupon the deposition concluded at 12:07 p.m.)

CERTIFICATE

STATE OF WASHINGTON )
)
COUNTY OF SNOHOMISH )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the foregoing is a full, true, and correct transcript of the testimony of the witness named herein, including all objections, motions, and exceptions;

That the witness before examination was by me duly sworn to testify truthfully and that the transcript was made available to the witness for reading and signing upon completion of transcription, unless indicated herein that the witness waived signature;

That I am not a relative or employee of any party to this action or of any attorney or counsel for said action and that I am not financially interested in the said action or the outcome thereof;

That I am sealing the original of this transcript and promptly delivering the same to the ordering attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 2nd day of October, 2010.

_________________________________
Notary Public in and for the State of Washington
residing at Edmonds, Washington.
(Notary expires 3/09/13)
(CCR No. 2699)

# AFFIDAVIT

STATE OF WASHINGTON )
)
COUNTY OF SNOHOMISH )

I have read my within deposition and the same is true and accurate except for any changes and/or corrections, if any, as noted by me on the correction sheet hereof.

LAWRENCE P. STICKNEY

SUBSCRIBED AND SWORN to before me on this, the 18 day of Nov., 2010.

KIMBERLEE A. KENDALL
STATE OF WASHINGTON
NOTARY PUBLIC
MY COMMISSION EXPIRES
01-28-12

NOTARY PUBLIC in and for the State of Washington residing at Everett, Washington.

Notary expires: 1-28-2012

L. STICKNEY/SEPTEMBER 22, 2010

TO THE DEPONENT:

PLEASE READ YOUR DEPOSITION CAREFULLY. On this correction sheet, make notes of any errors in the transcript. Then please sign this sheet at the bottom and return it with the notarized affidavit page to Tracey Juran at 21103 80th Avenue West, Suite A, Edmonds, Washington, 98026. If you have any questions about this process, please call me at 425-775-1243.

| Page and line | Correction |
|---|---|
| 41/14 | "GOING" SHOULD BE "DOING" |
| 50/4 | "YINNIC" SHOULD BE "BIENIEK" |
| 66/11 | "— —" SHOULD BE "LIVING ROOM" |
| 71/16 | "— —" SHOULD BE "ASK" |
| 73/22 | "— —" SHOULD BE "INTERNET & PHONE CHATTER" |
| 132/1 | "EVERETT" SHOULD BE "BELLINGHAM" |
| 139/24 | DELETE "JUST" |

Lawrence Stickney

Deponent Signature

# Exhibit 1-12

Exhibit to Pls.' Statement of Material Facts
(Case No. 3:09-cv-05456-BHS)

Exhibit 1, Page 389

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,

Plaintiffs,

v.

SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,

Defendants.

No. 09-CV-05456-BHS

---

Deposition Upon Oral Examination

Of

[redacted]

---

Taken by: Tracey L. Juran, CCR
CCR No. 2699

September 22, 2010

Everett, Washington

Be it remembered that the deposition upon oral examination of [redacted] was taken on September 22, 2010, at the hour of 1:21 p.m. at 3501 Colby Avenue, Suite 200, Everett, Washington, before Tracey L. Juran, CCR, Notary Public in and for the State of Washington residing at Edmonds, Washington.

Whereupon the following proceedings were had, to wit:

* * * * *

[redacted], having been first duly sworn on oath by the Notary Public to tell the truth, the whole truth, and nothing but the truth, was deposed and testified as follows:

EXAMINATION

BY MS. EGELER:

Q. [redacted], we met out in the hall, but I wanted to repeat again for you, I'm Anne Egeler and I'm with Rob McKenna's office, the Attorney General's Office, for the State.

Have you ever been deposed before?

A. No.

Q. Let me give you a few ground rules that we'll both need to be careful of. One is that we need to make sure we say yes or no instead of head nodding or mm-hms, because it's difficult for the court reporter to get a good

record of what we're saying otherwise.
A. Okay.
Q. And it's also important for us to wait for each other to finish talking before we begin talking so that we don't overlap on the record.
A. Okay.
Q. And finally, it's very important that we understand each other. So if I ask you anything that doesn't make sense or you're confused, please let me know and we can make sure that we're both understanding each other. Okay?
A. Sounds good.
Q. Can you tell me about your current employment.
A. I work for the [REDACTED].
Q. Excuse me; I didn't hear you.
A. [REDACTED].
Q. Is that your full-time job?
A. Yes.
Q. And that's something that you're doing [REDACTED], I assume?
A. Well, yeah. [REDACTED].
Q. And just for the record, [REDACTED]; correct?
A. Yes.
Q. And what employment did you have in 2009?
A. I worked for Protect Marriage Washington.

Q. And were you paid for that work?
A. Yes.
Q. How much were you paid?
A. I think it was around $800 a month.
Q. What did you do when you were working for Protect Marriage Washington?
A. I did a lotta various things. I picked up literature and signs and went all across the state and distributed materials and things like that. Pretty much anything they needed me to do.
Q. Did you have a Referendum 71 bumper sticker on your car?
A. I don't even think we had any that I remember.
Q. Did you have any Referendum 71 paraphernalia, like T-shirts or hats or anything?
A. I don't think we had any of those either.
Q. Did you ever gather petition signatures?
A. Yes.
Q. Where did you do that?
A. I did it in Olympia at one point.
Q. And do you remember where you were when you did that?
A. Oh, yeah, the State Capitol. There was a rally going on.
Q. Anywhere else?
A. I didn't do a whole lotta that. We had volunteers who did that, and I was pretty much doing things in the

Q. Did you attend any public debates about Referendum 71?
A. Not that I can recall.
Q. Did you go to the Secretary of State's Office and watch the signature-checking process?
A. Yes, I did.
Q. Did you sign in there?
A. Yes.
Q. How many days did you go to watch the signature-verification process?
A. I think I was there the first day and that's it.
Q. And did you ever speak on the radio or television?
A. No.
Q. Did you ever get into any shots that were shown on the TV that you're aware of?
A. Not that I'm aware of.
Q. Do you know if your name was ever listed anywhere as being associated with --
A. Yes, it was, I remember, in a couple articles, not specifically. It was probably The Seattle Times or The Stranger or something where they talked about [redacted] [redacted] working on the campaign or [redacted] [redacted] is working on the campaign. I know it was -- they said son at one time and [redacted] another time. I don't remember specifically, but yes, my name was brought up in articles.

Q. Were you aware that when you were paid by Protect Marriage Washington, those expenditures were reported to the Public Disclosure Commission?
A. Yes.
Q. And did you know the Public Disclosure Commission reports are available on-line to the public?
A. Yes.
Q. Did you know that your name and address were listed there and the amount paid to you?
A. I'm not, you know, familiar with all the technicalities, but if -- I'm sure that is.
Q. Are you saying that because you're agreeing with my representation or you personally know that to be the case?
A. I don't personally know that to be the case, but it seems like that's probably the case.
Q. So you're here today because you've been named as a witness in the Doe v. Reed case, and I assume you're aware of that.
A. Yes.
Q. And my understanding is that you have experienced something that you considered to be threats or harassment as a result of your association with Referendum 71; is that correct?
A. Yes.

Q. Can you describe each of those incidents to me. We can walk through each one one by one in detail.

A. Okay. Personally, I was attacked on-line for the comments I made in The Stranger article. I'm sure you guys have that, since you seemed to know what I was talking about when I mentioned that. You can read what they said about me and they said about my dad.

Q. What sort of attacks? What sort of things were said, do you recall?

A. Saying that my dad's a bigot and that he should -- you know, things like he should burn in hell, he's an asshole, he -- you know, he's a -- you know, he hates, he's a hater. I don't even -- there's countless things that they said about him. I mean, pretty much any insult you could come up with under the sun they said about him.

Q. Did they say anything about you specifically?

A. They never said anything about me -- you know, they never said, you know, I am a jerk for working on the campaign or whatever. But they said -- they responded to me, telling me my, you know -- saying my dad's, you know -- a whole lot of nasty things about me and -- or about my dad and about my family. So --

Q. And that was in response to the comment that you posted --

A. Yeah.
Q. -- on The Stranger; correct?
A. Yes.
Q. Were there any other times that you were attacked on-line?
A. No, not to my knowledge.
Q. Any other instances of what you considered to be threats or harassment?
A. Towards myself?
Q. Yes.
A. Not personally towards myself, but towards my family and towards my father at all times pretty much throughout the entire campaign.
Q. And you talked about the on-line attacks that were made about your dad. Did you witness anything that would be more of a physical attack on your dad at any point?
A. Not in that article.
Q. I assume you saw on-line in many locations many comments about your dad; is that correct?
A. Yes.
Q. Did you ever see him -- as opposed to in print, did you ever see anyone in person physically attack your dad?
A. Physically attack my dad? No.
Q. Yes.
Did you ever see anyone physically attacked for

their association with Referendum 71?

A. No.

Q. Did you ever see your dad threatened in person, as opposed to the many things you say were posted on-line?

A. Yeah. How about the 20 voice mails we got every night? I mean, that's an exaggeration, but every single night we got some sort of threat over the phone.

Q. We'll talk about phone in a minute. We'll definitely --

A. Okay.

Q. -- get to that. I'll make a note of it.

But in person, person to person, did you ever hear someone make a verbal threat in person to your dad?

A. No.

Q. Did you ever witness any physical or verbal in-person attack on anyone working on Referendum 71?

A. Not that I can recall.

Q. So let's talk about the phone incidents, then. Can you tell me about that.

A. Yeah. I mean, out of the countless voice mails we got threatening my dad, threatening my family, my dad only, you know, chose to let me listen to a few of 'em because there was -- I mean, it was just so nasty, I didn't wanna hear it anyways. It was very upsetting.

Q. So you heard a few. Let's walk through those and talk about what you heard.

 A. Well, I remember one very specifically where this lady was cursing with everything she could -- or every curse under the sun about how -- you know, about my dad, you know, just -- and then went on to say that he's a closet homosexual and that he wants to -- or he probably wants to give fellatio to all of his -- all the people he -- or the guys he works with and his bosses and stuff like that. And that one was pretty -- well, I think you get the idea as to how that would make me feel.

Q. And the next one? You heard another one; is that correct?

A. I mean, it was just always pretty much the same banter, you know, like you're an asshole, you shouldn't be doing this, you -- why do you hate us, why do -- you know, specifically -- you know, specific sentences I haven't recorded in my head, you know, but it was every day.

Q. Would you say you listened to more than three of those messages?

A. Maybe two to three and I pretty much stopped listening to 'em. I didn't wanna hear 'em anymore.

Q. So it sounds like what you heard was foul language, things of a sexual -- frankly, rude nature. Anything else? Is there any category of comments that I'm missing that you remember?

A. Not that I was -- nothing that was played for me.

Q. Any other threats or harassment of any sort that you witnessed or heard?
A. Well, I mean, there was the guy that was calling, you know, death threats for my dad and my family. The FBI investigated him. You have to know about that.
Q. Can you tell me about that.
A. He was -- I don't remember exactly what he said, but he called for, you know -- he made a death threat on my dad and on my family and -- saying that, you know, he should be killed, basically, for what he's doing.
Q. Did you hear the person?
A. Well, it wasn't a recording, I don't think. It was just this guy's blog. I forget what his name was.
Q. So it wasn't a phone call.
A. No, it wasn't a phone call.
Q. Was this the blog in Bellingham?
A. Yeah.
Q. Do you know if your dad contacted the FBI?
A. I don't know what happened. I know the FBI got involved. I don't think -- I don't know if we did or did not contact the FBI.
Q. And do you know if anyone in your family or if your dad ever contacted the police about any of the threats or harassment?
A. I don't know for a fact, no.

Q. Anything else? Any other instances that you witnessed?
A. No.
Q. You said there were threats against your family. Can you tell me about those.
A. Well, I think that was the blogger guy.
Q. The Bellingham blogger --
A. Yeah.
Q. -- again? Okay.
Other than the Bellingham blogger, do you remember any other threats against your family?
A. No, but there was a guy in my front yard taking pictures of my house.
Q. Did you see him?
A. No. I was not there for that event.
Q. You didn't -- you weren't in the yard for that event --
A. I was not home.
Q. You weren't home.
Did your sister tell you about that event or did your father?
A. My parents did, yeah. I know my sister was very shook up, though.
Q. Do you know of any actions that your family took as a result of that event?
A. Yeah. I mean, we had our little -- had my little sisters sleep in the living room because the enclosed

space -- the room they lived in, we feared, you know, someone might throw a mazel tov (sic) cocktail through the window or something. We had people taking pictures of our house, clearly our address, I mean, ready to show that to other people who could have done something like that. So we kept 'em in the living room because we thought it would be a safer spot for them. I mean --

Q. You said that you had people taking pictures of your house.

A. Person. One person.

Q. And how do you know they were ready to show the pictures on the Internet?

A. Well, I mean, that's what we assumed.

Q. So do you know if this individual could have been an appraiser who was taking a photo of your house --

A. At night?

Q. What time was it?

A. I'm pretty sure it was at -- during the night.

Q. You don't know what time --

A. I don't know.

Q. -- this occurred?

Do you know if it could have been a burglar, since it was at night?

A. No. What --

Q. Excuse me?

A. Nothing.

MS. EGELER: Can you read back that last response.

[Record read back as requested]

Q. (by Ms. Egeler) Just to clarify, in case you didn't understand, do you know if this person could have had a criminal intent to break into your home and steal or --

A. No.

Q. -- do something else? Okay.

Did you ever see photos of your home posted on the Internet?

A. No.

Q. Did you look?

A. No.

Q. How long did your sisters sleep in the living room?

A. Few months. It was around two or three months.

Q. Do you know of any other instances of threats or harassment related to Referendum 71?

A. Specifically, no, I can't remember any at the time. But --

MS. EGELER: Okay, I have no further questions.

EXAMINATION

BY MR. DIXSON:

Q. [REDACTED], my name's Steve Dixson. I'm an attorney from Spokane, Washington, representing Washington Coalition

for Open Government. I have a very few questions.

Just to be clear, did you ever sleep in the living room or was it just your sisters?

A. I slept in the living room a few times, yeah.

Q. And because you felt unsafe or were you instructed to sleep there by --

A. I --

Q. -- your dad?

A. I feared for the safety of my family and so I wanted to watch over them.

Q. So you were there more to protect them than for your own safety?

A. Correct.

Q. But it was main -- but it was your sisters that slept there consistently for --

A. Yes.

Q. -- two or three months.

And did your older brother sleep in the living room as well?

A. I don't remember.

Q. And other than the -- did you ever receive any phone calls relating to Referendum 71 on your cell phone or at the house?

A. Are you talking about threats or just people calling me that worked with me?

Q. Threats.
A. No.
Q. Did you receive any --
A. No, I did not.
Q. -- threats on the home phone yourself?
A. No, I did not.
MR. DIXSON: Okay, that's all I have.

EXAMINATION

BY MS. ENGRAV:

Q. Good afternoon, [REDACTED]. My name's Rebecca Engrav; I'm an attorney for Washington Families Standing Together. Also just a very few questions.

When you were discussing the Bellingham blogger and you said that you were aware that the FBI had investigated that, how did you become aware of the FBI's involvement?
A. If I remember right, there may have been an article or two on it. Maybe just through, you know, I mean, living with my family and them informing me of what's going on.
Q. So it could be that your father told you about that?
A. Yeah.
Q. Or it could be that you read it in an article.
A. It could be either one. I mean, I don't remember specifically.

Q. At the time you were living in the house, that was your normal residence, was at the home?
A. Yes.
Q. And how many times, approximately, would you say that you slept in the living room?
A. Approximately 10 to 20.
Q. The other times you slept in your normal bedroom?
A. Yeah, which was, you know, right across from the living room. So --
MS. ENGRAV: That's all.

EXAMINATION

BY MR. PIDGEON:
Q. ████, I have just a couple of questions. Stephen Pidgeon.
Now, at the family home, the girls' bedroom is on the street side of the house; is that right?
A. Right.
Q. So how far would you say it was from their bedroom window to the curb?
A. Twenty feet, maybe.
Q. So would you say it was within throwing distance of a Molotov cocktail?
A. Absolutely.
Q. How about throwing distance of a brick?

A. Anything.
Q. Anything.
Somebody -- is it, in your mind, entirely possible that somebody could throw something out of a car window while driving by and hit the -- and hit that room?
A. It's entirely possible.
Q. And then the living room is in -- is the living room on the front side of the house or the back side of the house?
A. It's in the front side.
Q. So how close is the -- so -- but there -- are there windows in the living room --
A. Right.
Q. -- facing the front yard?
A. Yes.
Q. But it was farther back from the street than --
A. Right.
Q. -- the bedroom?
A. Yeah.
Q. Now, on the -- did your dad ever show you any of the blog sites where some of the threats were being posted?
A. Yeah.
Q. Can you describe the general tone of what those blog sites were like.
A. Very hateful, very -- you know, completely unwilling

to -- completely uncivilized. It was just --
Q. Well, how many --
A. -- threatening and, you know, just -- everything they said was just very -- the opposite of cordial, you know, like they didn't want any debate on the subject. I don't know.
Q. And how many of those blog sites did you see?
A. I think like two or three.
Q. Two or three, okay.
A. Sceglia or Bisceglia was one of 'em, the Bellingham blogger. And the other one was the pink -- I forget what it was called.
Q. There was some other blog called the pink something --
A. No --
Q. -- or --
A. Yeah, it's like -- that's what I remember. I don't remember specifically.
Q. Was there other content on the blog site besides a threat -- the threats or --
A. I don't remember.
MR. PIDGEON: All right, I have nothing further.

FURTHER EXAMINATION

BY MS. EGELER:
Q. ████, you stated that everything that was said on the

CERTIFICATE

STATE OF WASHINGTON )
)
COUNTY OF SNOHOMISH )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

That the foregoing is a full, true, and correct transcript of the testimony of the witness named herein, including all objections, motions, and exceptions;

That the witness before examination was by me duly sworn to testify truthfully and that the transcript was made available to the witness for reading and signing upon completion of transcription, unless indicated herein that the witness waived signature;

That I am not a relative or employee of any party to this action or of any attorney or counsel for said action and that I am not financially interested in the said action or the outcome thereof;

That I am sealing the original of this transcript and promptly delivering the same to the ordering attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 3rd day of October, 2010.

_________________________________
Notary Public in and for the State of Washington
residing at Edmonds, Washington.
(Notary expires 3/09/13)
(CCR No. 2699)

# AFFIDAVIT

STATE OF WASHINGTON )
)
COUNTY OF SNOHOMISH )

I have read my within deposition and the same is true and accurate except for any changes and/or corrections, if any, as noted by me on the correction sheet hereof.

SUBSCRIBED AND SWORN to before me on this, the 16 day of November, 2010.

KIMBERLEE A. KENDALL
STATE OF WASHINGTON
NOTARY PUBLIC
MY COMMISSION EXPIRES
01-28-12

NOTARY PUBLIC in and for the State of Washington residing at Everett, Washington.

Notary expires: 1-28-2012

M. STICKNEY/SEPTEMBER 22, 2010

TO THE DEPONENT:

PLEASE READ YOUR DEPOSITION CAREFULLY. On this correction sheet, make notes of any errors in the transcript. Then please sign this sheet at the bottom and return it with the notarized affidavit page to Tracey Juran at 21103 80th Avenue West, Suite A, Edmonds, Washington, 98026. If you have any questions about this process, please call me at 425-775-1243.

Page and line                    Correction

No changes

# Exhibit 1-13

**Exhibit to Pls.' Statement of Material Facts**
**(Case No. 3:09-cv-05456-BHS)**

Exhibit 1, Page 412

**BOPP, COLESON & BOSTROM**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,

Plaintiffs,

v.

SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,

Defendants.

No. 09-CV-05456-BHS

Deposition Upon Oral Examination
Of
[redacted]

Taken by: Tracey L. Juran, CCR
CCR No. 2699

September 23, 2010

Seattle, Washington

Be it remembered that the deposition upon oral examination of [redacted] was taken on September 23, 2010, at the hour of 9:23 a.m. at 800 Fifth Avenue, Suite 2000, Seattle, Washington, before Tracey L. Juran, CCR, Notary Public in and for the State of Washington residing at Edmonds, Washington.

Whereupon the following proceedings were had, to wit:

* * * * *

[redacted], having been first duly sworn on oath by the Notary Public to tell the truth, the whole truth, and nothing but the truth, was deposed and testified as follows:

EXAMINATION

BY MS. EGELER:

Q. Good morning, [redacted]. We were talking before we went on the record about the fact that you in a past life had gone to school to be a court reporter, so I assume you have the rules of depositions down, but I'm going to just refresh your recollection. When we are talking today, of course, everything's being taken down, so it will be important that we not speak over each other. And it will also be important that we indicate yes or no verbally rather than with a head nod or mm-hm, which doesn't really show up on the record. Okay?

A. Okay.
Q. And, of course, it's important that the transcript be clear and be a fair representation of your testimony, so if anything I ask is confusing or doesn't make sense, please let me know and --
A. Okay.
Q. -- I can rephrase that for you. Okay?
A. Okay.
Q. Is [REDACTED] your legal name?
A. No.
Q. What is your legal name?
A. [REDACTED].
Q. And where are you currently employed?
A. [REDACTED].
Q. What do you do there?
A. [REDACTED].
Q. What are your duties as the [REDACTED]?
A. Answering his phone calls, making appointments for him, booking speeches for him, handling all his traveling logistics, helping him write commentary. I do research on current issues so he has facts when he decides to write a commentary.
Q. And do you ever go out with him when he speaks to attend the event?
A. Occasionally.

Q. Would the church Web page have mentioned, if you recall, anything about the petitions or the initiative -- the referendum, rather?
A. I do not recall.
Q. Other than signing, did you have any -- personally have any activity that you took or engaged in to support the petition?
A. No.
Q. Did you gather signatures?
A. I did not.
Q. Did you have a Referendum 71 sign at home in your yard?
A. No.
Q. Did you tell anyone that you had signed the petition?
A. Yes.
Q. Who did you talk to about that?
A. Family, my brothers.
Q. Did you ever attend any rallies or events for Referendum 71?
A. No.
Q. Did you ever hold a Referendum 71 sign publicly?
A. No.
Q. And did you support Referendum 71 in any way we haven't discussed?
A. No.
Q. Did the church, to your knowledge, organize any events

or rallies regarding Referendum 71?
A. No.
Q. Does the church get involved in election issues?
A. Occasionally we publish a voters' pamphlet -- we don't publish a voters' pamphlet; excuse me. We acquire a voters' pamphlet and distribute it -- have it available at services.
Q. And where do you acquire the voters' pamphlet?
A. In the past, we've acquired one from Christian Coalition of Washington and one other organization, and I cannot remember the organization right now.
Q. Do you remember if that was done with respect to the November 2009 election?
A. Yes, I believe it was.
Q. And do you know where that voters' pamphlet came from for the November 2009 election?
A. It was either the Family Research Council or the Christian Coalition of Washington. But I believe it was the Christian Coalition of Washington because it -- that's a more local resource.
Q. Do you recall whether that voters' pamphlet made any recommendations with regard to Referendum 71?
A. No.
Q. No, you don't recall?
A. I don't recall that it made any recommendation on --

Q. So --
A. -- any of the issues.
Q. So it may or may not have.
A. I believe it did not make any recommendation.
Q. Have you personally experienced anything that you would consider a threat or harassment or reprisals as a result of signing Referendum 71?
A. As a result of signing it?
Q. Yes. I'm just asking --
A. No. No.
Q. So no, nothing as a result of you personally signing --
A. Correct.
Q. And do you know what you're being called upon to testify about?
A. Whether I had experienced any harassment of any sort surrounding the R-71 issue directly or indirectly.
Q. Let's now go through every incident -- every single incident, phone call, et cetera, that you found to be a threat or harassment surrounding Referendum 71.
A. Okay.
Q. So I don't know where to start because I don't know your story. So if you can just toss out the first one, we'll explore that.
A. As a result of our support of Referendum 71 --
Q. And by --

A. -- our public support --
Q. -- our -- by our, do you mean --
A. [redacted] --
Q. -- the church?
A. -- [redacted], yes.
-- we would receive phone calls.
Q. And this was phone calls at the church offices?
A. At the church office, yeah. Came through the receptionist asking for -- to talk to [redacted], and since I take all of his phone calls, I would get those calls. Every time -- almost every time he appears in print or [redacted] appears in print, the phone calls follow the next day.
Q. So for example, when he appeared at the mayday marriage -- Mayday for Marriage rally at Safeco Field, did you receive any phone calls after that?
A. Yes.
Q. And what was the tone of those phone calls?
A. He needs to shut up. Your church needs to shut up or we're going to take you down. We'll come to your church and we'll come to your church office, which is at a different location, and we will shut you down.
Q. And after receiving those phone calls following the Mayday for Marriage rally, did anyone come to the church office?

A. No.
Q. After taking a position with regard to Microsoft's employment policies with respect to homosexual employees, did the church receive any phone calls?
A. Yes.
Q. And my memory -- and please correct me if I'm wrong -- is that ██████ took a position both in the news media and appeared at a Microsoft shareholders' meeting.
A. Correct.
Q. And what sort of phone calls were received after that?
A. Same tenor, same tone.
Q. Did anyone actually come to the church offices?
A. No. However, someone did -- some -- a group of individuals did come to our Sunday service.
Q. And that was after the Microsoft --
A. Yes.
Q. A group came to the church office? No.
A. To the church building where we hold services.
Q. To --
A. They came to the service and they sat in the service.
Q. Can you tell me about that group?
A. I wasn't there, so I'm not the best person to tell you.
Q. Did you hear how many people it was?
A. No.
Q. Are members of the public welcome to come to services?

A. Absolutely.
Q. So were these people welcomed to come and listen?
A. Absolutely.
Q. And to your knowledge, did they respectfully listen?
A. I don't know.
Q. And is [redacted] the only pastor that preaches at the church?
A. No. He's the main pastor, but we do have 13 other pastors who occasionally preach.
Q. It sounds like a very large church. How many parishioners?
A. On a typical Sunday, we'll have 900 to a thousand people. However, a much larger group call it their church home.
Q. Do you know approximately how many?
A. I would say around 2,000.
Q. Do you know if [redacted] was preaching the Sunday that the group came?
A. Yes, he was.
Q. Did anything else happen following the Microsoft activities?
A. No.
Q. And there was also an event at a -- I believe it was a King County high school. Can you correct me?
A. Mount Si High School in the town of Snoqualmie.

Q. Can you explain what happened there, what that event was about.

A. [REDACTED] children go to that school. And they dedicate a day to the Day of Silence every year, which -- during the school day, some of the students and some of the teachers, I understand, vow -- take a vow of silence in support of harassment of homosexuals.

Q. Or, rather, in support of not harassing --

A. Correct.

Q. -- homosexuals?

A. Yeah, yeah, yeah.

MR. PIDGEON: Objection to the form of the question.

But go ahead and answer.

A. And [REDACTED] had met with the principal of the school inquiring as to why this event is being held during school hours and not before and after school or during lunch break and decided that we would form a rally protesting the Day of Silence in April of '08. Yes, it was April of '08. So a group of [REDACTED] people, myself included, went to the school and stood outside in protest of the Day of Silence, which was going on inside the school.

Q. (by Ms. Egeler) And do you know approximately how many people were there with the church?

A. I would say 150.
Q. And do you recall [redacted] having a bullhorn or megaphone with him?
A. Yes.
Q. And do you recall what time of day this was?
A. I believe it was 10:00 in the morning, 10:00 a.m.
Q. Were any of the students or teachers that were participating in the Day of Silence outside the school while the church was there?
A. I don't know. I would not be able to identify those people. We purposely made it later in the morning so that all the children would be already in the school and school would be underway so we wouldn't interfere with their coming and going.
Q. Was there any visible group outside the school that was in support of the Day of Silence, whether it was teachers, parents, community members, anyone?
A. Oh, yes.
Q. And what were they doing?
A. Talking, visiting.
Q. And do you remember approximately how many people there were on that side of the issue?
A. In support of the Day of Silence?
Q. Yes.
A. Oh, my goodness. I would say an equal number, a hundred

to 150.

Q. And did things remain respectful on both sides of that issue during the time that both groups were there for and against the Day of Silence?

A. I would say no.

Q. What did you hear or see?

A. Shouting. [redacted] will be bringing in a photograph this afternoon that I found of one person holding a sign up to his head that said, "Throw Rocks Here." He'll have -- it was published in [redacted] [redacted] -- I think it was [redacted] -- and he'll be bringing that with him this afternoon.

Q. Did anyone throw rocks?

A. No.

Q. Did anyone throw anything?

A. No.

Q. Do you remember what was shouted?

A. Gosh. It was unintelligible, really. I can't tell you.

Q. Was there any physical violence between the two groups?

A. No.

Q. Was anybody with the church shouting back at this group?

A. No.

Q. Was anyone from the church holding a sign?

A. I didn't see any signs from our group. I did not see any signs.

Q. Do you recall what, if anything, the pastor was saying into the bullhorn?
A. I don't recall what he said.
Q. Was he speaking into the bullhorn to the --
A. Yes.
Q. -- group?
A. Yes.
Q. Was there any chanting done by either group?
A. Not that I recall.
Q. And did the church receive any negative feedback or phone calls following that --
A. Oh, yes.
Q. -- day?
A. Yes.
Q. Can you describe that for me.
A. It's the same type of information that's conveyed to me, that if the N word doesn't shut up, we will shut him down. I don't -- I haven't told [redacted] -- I've only told [redacted] a fraction of what's been said in those phone calls, because I don't -- he doesn't need to hear what people are saying about him.
Q. And was physical violence threatened in those phone calls?
A. What does, we will shut you down, mean? I don't know what that means to them, to the people making the phone

calls.

Q. Did they do anything further to shut him down?

A. There was an incident in June -- excuse me; in April of '09 where [REDACTED] held a conference, a week -- a two-day conference, and we used [REDACTED] [REDACTED] as the location for our conference. And [REDACTED], of course, was one of the speakers at the conference.

And we monitored the blogs out there -- some of our high-school- and college-age students monitor the blogs -- and there was word out there in the blogs that they were gonna do damage to [REDACTED] because [REDACTED] was speaking there, and they did.

Q. What did they do?

A. To my knowledge, they put glue -- they poured glue in the locks. You would have to ask [REDACTED], who's the senior pastor of [REDACTED], the extent of the damage that was done to their facility.

Q. Can you tell me again that name. I didn't catch that.

A. [REDACTED].

Q. [REDACTED].

A. Yeah.

Q. And he's the pastor there at [REDACTED].

A. Correct.

Q. Anything else?

A. I think that's it.

Q. At any time throughout the pastor's events expressing an opinion on homosexuality, has there been any damage to your church?

A. No.

Q. Other than the event following the Microsoft issue when a group came to attend the church, have any other groups or individuals that are hostile to the pastor come to services?

A. No.

Q. Do you recall whether the -- or do you know if the blogs that were talking about going to the [redacted] were talking about anger with any specific event that the pastor had spoken at or --

A. It was more anger at his public position. And the reason I say that is because the blogs such as the Slog, which is The Stranger blog, and Pam's House Blend is another blog, are dedicated.

Q. Any other blogs that you can remember?

A. No.

Q. Do you recall any harassment or what you would consider to be harassment or threats with relation to the pastor's position on Referendum 71?

A. During the signature-gathering period, which was the spring and summer of '09, that -- I believe it was June,

I received a phone call from a person saying they were going to kill him. So I called the [redacted] [redacted], because we are located within the city of [redacted], and they dispatched two officers, who came out, took a report, and listened to the recorded phone message.

Q. Do you know the police-report number?

A. I don't.

Q. Did you keep a copy of the police report?

A. No.

Q. Do you remember the officers' names?

A. No, but I think I could find out fairly easily.

Q. If you could produce that when you produce the --

A. Okay.

Q. -- the Emails as evidence of threats or harassment --

A. Okay.

Q. -- that were experienced, that would be great.

Okay, so the officers came out, and it sounds like you had the call recorded.

A. Yes.

Q. So was this a call that was on the church's voice mail?

A. It was on my voice mail. The receptionist had put the call through to me and left -- this person left a message on my voice mail.

Q. And this was your voice mail at the church office.

A. Correct.
Q. Was there a telephone number that was recorded by your phone system?
A. No. I tried, you know, the star 69 function, but it doesn't work when you send a number to an extension. And the receptionist had already received numerous calls after that, was not able to capture that phone number.
Q. And the person said that they were going to --
A. Kill.
Q. Kill the pastor specifically?
A. Yes.
Q. And did they say anything about Referendum 71?
A. No.
Q. How do you know that they were talking about Referendum 71 instead of the day at Mount Si or statements that [redacted] has taken in the newspapers, et cetera?
A. Because only a day before, there had been an article in [redacted] about our support of Referendum 71.
Q. And did the caller talk about that newspaper article?
A. No.
Q. How do you know they saw it?
A. I don't know that they saw it. But I do know that it has to be surrounding our position on traditional marriage.

Q. Is it that it has to be or --
A. Most --
Q. -- you think --
A. -- likely.
Q. So you're saying you think it's a reasonable assumption, but you don't know for certain.
A. Of course not, yeah. Yeah, it's a reasonable assumption to make.
Q. So what did the [redacted] do after listening to the message?
A. They said keep them posted, let them know if we heard any more from anyone like that. One of the police officers gave me his card. I don't believe I still have that. I had no idea I would end up here today and that all of these details would be important.
Q. I understand.
And did the police say whether they would be able to find this person, given that there was no phone number?
A. They didn't offer any hope of being able to determine who it was.
Q. Did you feel they were doing their best under the circumstances?
A. Absolutely.
Q. And do you have a positive opinion generally of the

[REDACTED]?

A. Oh, yes.

Q. Did you receive any more calls?

A. Every time [REDACTED] name appears in the newspaper, I get phone calls.

Q. Was this call that we just discussed the first time anyone had called and made what you would consider to be a death threat?

A. Yes.

Q. Is it the first time anyone had made a threat of physical attack other than saying that they were going to shut the pastor down?

A. That's it.

Q. Do you know if you received any more calls from that individual?

A. I don't believe so.

Q. And with respect to the time period that Referendum 71 petitions were being signed, that spring and summer of '09 that you referred to, were there any other phone calls that were standouts to you?

A. Yes. There was one phone call shortly after the story broke that [REDACTED] has bone cancer. I got a call that said -- an individual said they hoped that the brain -- the cancer goes to his brain and eats his brain. And I never told him that, obviously.

homosexuality is a sin?
A. Correct.
Q. And has he made such statements publicly other than during church services?
A. Via the passage of Scripture in Romans, he's reiterated that.
Q. At public events?
A. Yes, yes.
Q. Outside of the church walls themselves?
A. Yes.
Q. And has he made statements about homosexuality being contrary to the Scriptures --
A. Yes.
Q. -- in newspaper articles?
A. Yes.

MS. EGELER: Okay, I have no further questions.

THE WITNESS: Okay.

MS. FIELDS: I have some questions. May I?

MS. EGELER: Absolutely.

EXAMINATION

BY MS. FIELDS:

Q. So again, my name's Penny Fields. I represent -- I'm here on behalf of Washington Families Standing Together, an intervenor in this case.

A. -- during school time.

Q. Maybe I misunderstand. I -- my understanding is, the Day of Silence is an activity protesting harassment of gay and lesbian and transgender students. Have I got that wrong?

A. You've got that right.

Q. And your rally at Mount Si was protesting the Day of Silence.

A. Correct.

Q. So isn't it fair to say that your rally was against standing up -- standing against harassment against gay and lesbian students? I mean, are you saying that your --

MR. PIDGEON: Objection as to form.

Q. (by Ms. Fields) Would you -- is it fair to say that your church thinks that harassing gay and lesbian students in school is okay?

A. Of course not. No one should be harassed. But there should not be a special day set aside to introduce children to the homosexual lifestyle during school hours, which is basically what it is under the guise of preventing harassment.

Q. So my final question is, you said that since the election, you haven't experienced any more phone calls or anything that you would consider to be harassment

related to Referendum 71 --
A. Correct.
Q. -- is that correct?
So are you today in any way fearful of being harassed personally regarding Referendum 71?
A. No, not fearful.
MS. FIELDS: I have no more questions. Thank you.
THE WITNESS: You're welcome.
MS. EGELER: Mr. Dixson, did you have any questions?
MR. DIXSON: I do, and I understand the inherent difficulty. So I think I have three, maybe four, and I'll try to make it brief.

EXAMINATION

BY MR. DIXSON:
Q. [REDACTED], my name is Steve Dixson. I'm participating via telephone from Spokane. I'm an attorney that represents the Washington Coalition for Open Government and I have just a couple of very quick questions.
The first is regarding the Microsoft stance of the church and [REDACTED]. When, approximately, did that take place?
A. I believe it was 2007 at their annual stockholders' meeting.

Q. And do you -- I could probably find that, but do you happen to recall the season or the month?
A. I believe it was January or February.
Q. Was there media coverage of [REDACTED] attendance and participation at the stockholders' meeting?
A. Yes.
Q. Was that television, newspaper, both?
A. Both.
Q. You've testified that following public appearances, you receive phone calls on the church phone line. I'm wondering in rough numbers about the volume of phone calls. Would you say it's five to ten, a dozen, or more per each appearance in the print media or public media?
A. I would say five to ten.
Q. Is that pretty consistent per incident?
A. Yes.
Q. And finally, just to be clear, the harassment that you've experienced has been via those phone calls, but none has been personally directed at you; is that correct?
A. Well, that is not correct. I was told by one caller that they would come to our church and they would come to our office and they would take us down. So I'm one of them. I guess I'm part of the us.
Q. So a particular caller stated that they would come to

the church and specifically come to the church office and take you down.
A. Correct.
Q. And that was following the Microsoft appearance; am I correct?
A. No.
Q. What incident was that related to?
A. That was related to the publicity we received for supporting Referendum 71.
Q. So that was sometime in the spring or summer of 2009, that particular phone call?
A. Correct.
MR. DIXSON: Okay, that's all I have.
MR. PIDGEON: Okay.

EXAMINATION

BY MR. PIDGEON:
Q. I have some follow-up --
A. Okay.
Q. -- questions.
How are you doing?
A. Good.
Q. Just to get a little more background on [REDACTED], you and I had discussed earlier that [REDACTED] runs a men's group called [REDACTED] --

A. Correct.
Q. -- is that correct?
And what do you know about [redacted]?
A. It's a men's Bible study.
Q. And what about [redacted] background? What did he do before he was a pastor?
A. He was a [redacted].
Q. So he [redacted] [redacted].
A. Correct.
Q. As a professional.
A. Correct.
Q. And so as a general rule, he was -- and do you know, did he [redacted]?
A. [redacted], whatever that means.
Q. That's [redacted].
A. Okay.
Q. So he was a [redacted], and so typically [redacted] are large, fast, and strong. Would that be a fair summary of [redacted]?
A. He is large, strong, and slow.
Q. He's not fast anymore.
A. No.
Q. Too many [redacted], yeah.
But suffice it to say that he does have -- does he have a reputation among the men at the church of being a

man's man?
A. Yes.
Q. And does he encourage other men in the church to be men?
A. Yes.
Q. So somebody who would -- if there was somebody making a physical threat against a church, they would not have an expectation that the men at [REDACTED] were wimpy.
A. That is correct.
Q. Would you say that that may have something to do with the fact that none of these threats have actually been carried out?
A. I don't know the reason why the threats haven't been carried out. That certainly could be a reason.
Q. But the threats that were made against [REDACTED] were carried out.
A. That is correct.
Q. Now, when you say you are not fearful but cautious, what kind of cautious steps do you take at the church office?
A. I keep the door locked when I'm there alone. I watch who follows me into the parking lot if anyone follows me into the parking lot.
Q. Do you have a security system at the church office?
A. We do not. We -- not in this particular office. Heretofore we have always had a security system.
Q. Just recently have you changed offices?

MR. PIDGEON: Okay.

MS. EGELER: Waiting for the next in the series.

MR. PIDGEON: Okay.

Q. (by Mr. Pidgeon) So when you signed the petition -- at the time you signed the petition, it's safe to say that you had no knowledge about the disclosure process of names and addresses through the Secretary of State's Office; is that true?

A. That's true.

Q. Did you know at the time you signed the petition that the Secretary of State would amass names and addresses of all the petition signers onto a single file and disclose it to whoever asked?

MS. EGELER: Objection; leading.

A. I did not know.

Q. (by Mr. Pidgeon) Would you have signed the petition if you had known that your name was going to be grouped with all the other signers and given to look, for lack of a better term, militant homosexual groups that wanted to use your name for purposes of inconvenient conversations --

MS. EGELER: Objection --

Q. (by Mr. Pidgeon) -- when you signed the petition?

MS. EGELER: Objection; assumes facts not --

A. Yes.

MS. EGELER: -- in evidence.

Q. (by Mr. Pidgeon) You would have signed?

A. I would have signed.

Q. Even if you'd known that that was going to be the case.

A. Yes.

Q. Were you aware of the organization whosigned.org at the time you signed the petition?

A. No.

Q. Were you aware of Know Thy Neighbor at the time you signed the petition?

A. No.

Q. Were you aware of the level of violence that had been perpetrated in California surrounding Proposition 8 at the time you signed the petition?

MS. EGELER: Object to the characterization.

A. I heard stories.

Q. (by Mr. Pidgeon) You've heard stories about Proposition 8?

A. Yes.

Q. Can you tell us some of the stories that you heard about Proposition 8.

A. That people had experienced violence, retaliation. I don't know specifics of the retaliation.

Q. Did you know whether or not Christians were experiencing retaliation?

A. I don't know they were specifically Christians. I don't recall that.

Q. Now, going back to this history of the phone calls, I need you to be much more specific. I know that you haven't told [redacted] these things, but I need you to be more specific and tell us the language of these phone calls, okay? You mentioned, for instance, that in many phone calls they were using the N word.

A. Correct.

Q. Can you be explicit. What do you mean by the N word?

A. Calling him a nigger.

Q. Did that happen a lot?

MS. FIELDS: Objection; form of the question.

A. Maybe three to five times.

Q. (by Mr. Pidgeon) And was it the same person that was doing this, in your opinion?

A. It's very difficult to tell. Some voices I would recognize, some I would not.

Q. So in some of these phone calls, they were repeat phone calls? I mean, you were getting -- were you getting a phone call following each event from a similar person?

A. Correct.

Q. And did their phone calls come in like clockwork? I mean, if you had something published, did they call the following day?

A. Sometimes that's how I knew something had been published, is because phone -- I would get phone calls. And then I would search the Internet for the latest story about [redacted] or our church.
Q. So tell me more about this pattern. You would get phone calls following some publication of his name and then would they die off pretty --
A. Yes.
Q. -- quickly?
A. Yes.
Q. So you wouldn't get -- so did you have somebody call you every week or was it just in a short period of time following the release of his name?
A. Within a day or two of the release of his name.
Q. So can you say it is safe to draw a correlation of proximity to the article to say that the article was published and then we got the calls? Is that --
MS. EGELER: Objection; leading the witness.
A. That is correct. Our receptionist would say, [redacted] must have been in the paper, or -- oh, it was -- it's a joke. [redacted] must have been in the paper again, because the phone calls would start the minute we opened the phone lines at 9:00 in the morning.
Q. (by Mr. Pidgeon) Now, to your knowledge, is one of the methods used to destroy a pastor in a church trying to

find a sexual scandal on the pastor?
A. Yes.
Q. Have you seen other pastors in this community go down because of sexual scandal?
A. Yes. Actually, yes, I do.
Q. And to your knowledge, has anybody ever tried to go after [redacted] to dig up a sexual scandal on him?
A. [redacted] reports that there is someone who has offered a bounty. This is what [redacted] -- I have no direct evidence myself other than what he's said. There is a bounty available to anyone who can find anything improper about his life.
Q. Do you know how big this bounty is?
A. I think it's a million dollars.
Q. Do you know who's planning on paying this million-dollar bounty?
A. I do not, but I'm certain he does.
Q. And do you know how long this bounty has been in place?
A. I don't know. At least during my three years at the church office.
Q. Now, you talked a little bit about the death threat that came in over the phone line. Was that -- was there a transcription made of that death threat?
A. No.
Q. Do you know if the police report contained the operative

terms of the death threat?

A. I didn't see it. They actually never showed me the report. But I would assume that it was -- included the verbatim message.

Q. And again, was this death threat in that same proximal period of the newspaper article being released and then the phone call came in?

A. Yes.

Q. And that proximal relationship was proximal to the story in [redacted] about [redacted] supporting R-71?

A. Yes.

Q. And did you take that -- you took that phone call; is that correct?

A. Correct.

Q. Now, did you recognize the voice?

A. I did not.

Q. So this was a new voice, then.

A. Or one that I just didn't recognize.

Q. Now, did you have a chance to look at the -- some of the blog stuff that was put up on The Stranger?

A. Yes.

Q. Did you look at the news articles on The Stranger?

A. Yes.

Q. Did they identify [redacted] or [redacted] negatively in any of those articles?

A. Oh, yes.
Q. Can you remember some of the things that were said in The Stranger?
A. Oh, my goodness. That he's a hatemonger, we're hatemongers. Basically calling us haters.
Q. Now, in your opinion, your personal opinion, is the use of the N word typical of people who are tolerant and filled with the loving kindness of God?
A. No.
Q. Yeah, I just wanted to get your opinion on that.
Now, what about Pam's House Blend? Did you get a chance to read any of the information on this site?
A. I did. I have.
Q. And did they make any reference to [redacted] or [redacted] [redacted]?
A. Yes.
Q. What kinds of things were being said?
A. That he, again, is a hatemonger; our church are shortsighted, unloving hatemongers; that his cancer -- Pam tends to focus on his cancer issue -- that he -- this is -- God's way of stopping him is taking him out of the picture by killing him with cancer and it can't happen too soon and there is justice -- there will be justice for same-sex couples once [redacted] is dead; that he's evil; that we're all evil, [redacted] is

# AFFIDAVIT

STATE OF WASHINGTON )
)
COUNTY OF KING )

I have read my within deposition and the same is true and accurate except for any changes and/or corrections, if any, as noted by me on the correction sheet hereof.

SUBSCRIBED AND SWORN to before me on this, the 27th day of October, 2010.

NOTARY PUBLIC in and for the State of Washington residing at Redmond, Washington.

Notary expires: 6/23/13

WHALEY/SEPTEMBER 23, 2010

TO THE DEPONENT:

PLEASE READ YOUR DEPOSITION CAREFULLY. On this correction sheet, make notes of any errors in the transcript. Then please sign this sheet at the bottom and return it with the notarized affidavit page to Tracey Juran at 21103 80th Avenue West, Suite A, Edmonds, Washington, 98026. If you have any questions about this process, please call me at 425-775-1243.

Page and line Correction

# Exhibit 1-14

Exhibit to Pls.' Statement of Material Facts
(Case No. 3:09-cv-05456-BHS)

Exhibit 1, Page 448

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>Defendants. | No. 09-CV-05456-BHS |

---

Deposition Upon Oral Examination
Of
[redacted]

---

Taken by: Tracey L. Juran, CCR
CCR No. 2699

September 23, 2010

Seattle, Washington

Be it remembered that the deposition upon oral examination of [redacted] was taken on September 23, 2010, at the hour of 12:36 p.m. at 800 Fifth Avenue, Suite 2000, Seattle, Washington, before Tracey L. Juran, CCR, Notary Public in and for the State of Washington residing at Edmonds, Washington.

Whereupon the following proceedings were had, to wit:

* * * * *

[redacted], having been first duly sworn on oath by the Notary Public to tell the truth, the whole truth, and nothing but the truth, was deposed and testified as follows:

EXAMINATION

BY MS. EGELER:

Q. [redacted], as I stated to you before we went on the record, my name's Anne Egeler and I represent the Attorney General -- excuse me. I'm with the Attorney General's Office and I'm representing Secretary of State Sam Reed --

A. Mm-hm.

Q. -- the defendants in the case.

And I wanted to start by asking, have you ever been deposed before?

A. No, I don't think so. I think this first time. I'm

really surprised with the life I live.
Q. Well, I'll give you a few basic rules. Everything we say is being taken down today by our court --
A. Mm-hm.
Q. -- reporter, so it's really important for us to make her life easy --
A. Yeah.
Q. -- so that we get an accurate record. And the way that we can do that is by waiting for each other to finish speaking --
A. Mm-hm.
Q. -- before the next person starts to speak. And whenever you want to indicate a yes or a no, if you could please --
A. Mm-hm.
Q. -- do that verbally, because head nods and mm-hms don't show up on the record.
A. Right.
Q. And it's also important that we understand each other. So if I ask anything that's just not clear or doesn't make sense, please stop me and ask me to rephrase that.
A. Okay, I will. I have no problem with that.
Q. And is there any reason you wouldn't be able to testify fully today?
A. No. I'm glad I could be here.

Q. Well, let's get started, then.
Would you please state your current employment.
A. Yes. I'm [redacted] at [redacted] in [redacted].
Q. And how long have you held that position?
A. I'm going on -- October'll be 26 years.
Q. Wow, okay.
And have you been told that you were named as a witness in the Doe v. Reed case?
A. Yes.
Q. Did you know that that may require you to publicly testify in a federal court?
A. That's why I agreed to do it, yes.
Q. And were you asked if you had any concerns or -- about publicly testifying?
A. No, I don't have any. I'm in the public's eye all the time.
Q. And when did you first learn that you were going to be a witness in this case?
A. Wow, I think back now when we (indicating) talked on the phone, I think. It's been a couple months. Yeah, about 60 days or so, two months.
Q. And who told you that?
A. My lawyer friend here (indicating).
Q. So Mr. Pidgeon in the room here.

I think that issue then -- it's been so many years back. The issue then was working on minority status, making the homosexual community a minority status. And so that's how I really got involved with the legislative aspect of it and down in Olympia.

And when we got there, there was a -- there was several representatives from Microsoft that was trying to get the law passed, and that's how I got involved even with the fight with Microsoft.

Q. Let's talk about that fight with Microsoft. Can you describe that for me.

A. In words? In words, probably a little bit more difficult than in emotion.

What happened was that we had so many people in our church that work for Microsoft, and I knew Microsoft policies for years towards the homosexual community. Fine with us. It was their right, it was their business, and that any way they wanted to treat their workers was their choice. Well, when we got down to Olympia, all of a sudden their decision on how they was treating the homosexuals in their business became how they wanted the State to treat homosexuals, and they was there giving testimony why this law should be passed.

And that's when I said, I think we're overstepping. Long as you wanna keep that issue inside your four

walls, it's fine with me. When you try to push your decision and your laws on me as a pastor and as a Christian, I got problems with it, especially when you step in the state. And so that's when I met with Microsoft. And we had several meetings and I got them to back off and take a neutral position in that fight that year.

Q. So do you have an opinion about whether corporations should be able to lobby the government for different laws being passed or not passed?

A. I think corporation can lobby the government for anything they want if they're willing to defend it and be challenged on it.

Q. So --

A. Because they have the right to do that. I have the right to challenge that.

Q. So you weren't objecting to Microsoft lobbying on the issue.

A. Never. I never asked them to fire their representatives, I never asked them to change their policies inside their four walls. The issue was, when you start pushing issues that's Biblically where I stand as a pastor on me, you know, pass laws that I have to submit to when the Bible says I shouldn't, then we have a problem.

Q. And that bill that you were referring to being an issue, do you remember what that --
A. Oh, my goodness.
Q. -- bill was?
A. I could not say, it has been so long ago. But it was in every major newspaper all over the world, so it won't be hard to find out.
Q. And were you in newspapers connected with that issue?
A. Everywhere.
Q. Did you form a group to address your concerns with Microsoft?
A. What we did was, we did a Mayday for Marriage in 2000 -- oh, my goodness. Man, that's tough now, been so long. We did -- in the Safeco stadium, we did a rally of just the aspect of protecting marriage. And that was my -- that was the outfit and the organization that I used, Mayday for Marriage. And that following year -- I think it was 2000 -- it was right before the 2004 election. I think that was Bush's second go-round; isn't that right?
MR. PIDGEON: Mm-hm.
A. It was right before the 2004 election, we ended up going to Washington, D.C., with that same type of rally for protecting marriage.
Q. (by Ms. Egeler) And the Mayday for Marriage, do you remember where that event was held?

A. Safeco stadium.
Q. And --
A. And the one in D.C. was on the Mall.
Q. And the Mayday for Marriage event, did you speak at that?
A. I did, mm-hm.
Q. Do you recall how many people, roughly, were in attendance?
A. Well, we had 30 days to put it together here at Safeco, and I kinda figured if we can get the stadium, we'd be able to do it. I think we had around 20, 25,000 people there. And the one in D.C., we had like three months more or so to get that done, and I think we had over 200,000 there.
Q. And when you spoke at Mayday for Marriage, do you remember what you said? And I'm sure you don't remember word for word, but --
A. All the --
Q. -- basically.
A. -- speakers had one major theme and that was protection of marriage between a man and a woman, mm-hm.
Q. In addition to protecting marriage between a man and a woman, did you speak about not permitting marriage between two people of the same sex?
A. I don't think that that really came up very much at all

because that was not the purpose of the rally. If some of the speakers said it or if it came out, it was in conjunction with saying, okay, what marriage is is what we are as believers and Christians, mm-hm.

Q. What threat to traditional marriage was the Mayday event addressing?

A. Well, we just feel that the best avenue of a family is a man, a woman and that that double representation in that marriage for children was the better way that life, we believe Biblically, was to be taught.

And that's where we stood. I mean, every one of us, from -- I invited Dr. Dobson, James Dobson, who came. The head of Family Research Council, Tony Perkins, I invited him; he came. Just about everyone that I invited came for this particular issue of not being pushed to accept which Biblically we believe is wrong and it was what we consider as a sin. And that is our main purpose we're dealing with. It would be just like anything else that we're against in the Bible.

And what most people want to say, especially towards me, is that I got this agenda towards homosexuals. No, one sin is just like another sin as far as I'm concerned. And the reason why I think that we've gotten so much publicity on this is because of our harsh stand on not compromising marriage between a man

and a woman.
Q. And when you say that this is Biblically a sin, did you say that to the group at --
A. Say it every time I get an opportunity to speak about it.
Q. And specifically, that marriage that is between anyone besides a man and a woman is what you're referring to as the sin; correct?
A. Right.
Q. So in other words, same-sex marriage.
A. Right.
Q. And would you have made the same statement in Washington, D.C.?
A. Same. It's just much bigger and more people.
Q. And then the differences with Microsoft, did it lead you to start an effort to purchase Microsoft stock?
A. Yes, I did. And the whole aspect of -- I think that most of our corporations are controlled and ran by stockholders, and I thought, you know, one of the best ways to do it is just get people involved with buying stock. Then we can influence what is going on in that corporation and in that business. It's absolutely legal to do. And that's what I started, and it was quite a ride. It was a lot of fun.
Q. And did you get a lot of press coverage of that?

A. I know that for a fact. And you can call Mount Si High School and ask for Principal Taylor. You know, he -- they can give you all the -- everything I'm saying that I tell you is the truth.

And I just had -- just finished with another meeting just to refresh last Monday about the issues of the Day of Silence. And I -- my thing was, okay, if you gonna set a time aside -- we got day of respect. That's for everybody. But then you turn around, you have a special day for homosexual kids where all the kids says, not a problem, but racism is. So you don't have -- if you gonna have a special day, why don't we deal with what the real problem is in this school, which at that time was racism.

Q. So what did you do to express your concern with the school's decision?

A. We sit down and says, okay, why are we having this day, taking a whole day out to celebrate a lifestyle?

Q. And did you bring people to the school to protest?

A. That was only after they said, we gonna go ahead and do it anyway, the next year. And so we had -- the following year I asked, are you gonna have this Day of Silence? Well, if you wanna day of -- I said, why not do it the way Christians do it? We come in early, before school, we go out the flagpole, we pray. School

is for education, not indoctrination, and they can do it after school. No big deal. We're not saying you can't do it, we're just saying, this is time for education during the day.

Well, you can have a special day, if you want, for Christians. That is defeating why I'm here. If I did that, I'm hypocrite. I'm saying, if we got a day of respect, why not put everything on the one day?

Q. So did you have a rally organized in 2008 --

A. Yes, we did. And over half the parents kept their kids out of school that day.

Q. And did you bring people from the church with you?

A. Church, the community, because I live in the community. We had people, I mean, come from all over to come and stand with us --

Q. How many people --

A. -- at that rally.

Q. -- do you think?

A. Oh, my goodness. I don't -- please, I really don't know, but probably five or six hundred. I don't know. So yeah, something like that.

Q. And were there any people there that were taking the opposite position and supporting --

A. Did you see --

Q. -- the day?

A. -- some of the paperwork that they put in up there? I mean, we had homosexuals and homosexual activists that literally tried to start fights with me. And I'm always surrounded by people when I'm in public and people gonna know I'm there, because the worst thing I could ever do is to start a problem and hit someone. And that's exactly what they tried to do. There was kids standing next to me with a sign, "Throw Rocks Here." You know, there's not a lotta love and a lotta tolerance in that sign.

And we had to call the police, which was there, that they were supposed to keep us separated at this rally. That was the whole issue that we were supposed to do, and they didn't. When I first walked up, I had all these homosexual kids and homosexual activists come to me, and here I am surrounded, with four or five guys around me trying to protect me from all of them.

Q. And so the police did respond when you called?

A. Well, they was there. They were standing there looking. And I said, hey, don't you guys think you better move up here? Don't you think you better move -- we supposed to have separate places for the crowd, those that are standing against the Day of Silence and those that are for it, and you're not doing your job.

Q. And did they --

A. And I expect you to do your job. And they finally did move 'em back and put up a barrier, a rope.
Q. Between the two groups, the rope?
A. Between the two groups.
The things that were said, the language that was used -- my wife was attacked with words, abusive, called her a nigger lover, called us homophobes, hateful people. They -- I mean, I can't even say some of the things that they were saying right there with the television and the cameras. But all of a sudden, none of those things was on the news.
Q. And were any rocks thrown? You said there was a sign about --
A. No. I mean, they -- that's what the sign was saying, and he was standing right next to me with the sign over my head, "Throw Rocks Here."
Q. Was anything thrown?
A. Oh, no. I mean, that wouldn't have happened.
Q. By either group. No -- neither group threw things.
A. No, mm-mm.
Q. Did either group sink to the level of physical violence?
A. No. Oh, no. I mean, it definitely wouldn't come from our side. And everybody knows I'm not a pacifist.
Q. But you didn't react with --
A. No.

Q. -- violence.

A. No.

Q. And the other side didn't do anything violent either.

A. Well, until we got 'em away from us. I mean, coming up in my face like this (indicating), what would you consider that? Would you consider getting in my space?

Q. So how close were people standing to you?

A. I wish we had that picture. I know I got that picture somewhere of the guys -- may look at the envelope where -- I tried to bring a picture. He's standing right over -- right next to me. I mean, he is here (indicating).

Q. And let the record reflect that I'm guessing that the pastor's about three inches away. Is that about right, Pastor?

A. He's probably about four or five inches away from me.

I wish I had -- it may be in that big yellow folder. [REDACTED] said she got a picture of the guy standing right next to me with the -- there it is. Here's one of 'em (indicating). This is when he's walking up to me with the sign, and then he comes right up right next to me on my side and was holding the sign up, "Throw Rocks Here."

Q. Now, I'm looking at the picture. And do you want to take a look and tell me how far away you think he was?

A. No, right there, he is not as close as he got. Because all of a sudden, the guy that's with me, the bodyguard, is trying to keep him from doing that. And that's when they started really getting closer and closer to me, and that's when we had to call the policeman and say, look, you need to get those guys away from us or there's gonna be some problems here and we're not gonna start it.

MR. MCBRAYER: Are you going to mark that, since you're talking about it?

MS. EGELER: Can we be off the record for a second.

[Off the record - discussion]

[Exhibit 2 marked for identification]

Q. (by Ms. Egeler) So when we went off the record, we discussed how to use the newspaper that [REDACTED] brought today. It is a copy of The [REDACTED]. And we agreed that this article, which is on the front of that section and then continues on to the next page, that our court reporter will make a copy of that, including all of the pictures that show the information that the pastor was referring to -- well, all of the pictures, including those we haven't discussed --

A. Mm-hm.

Q. -- yet.

Pastor, I notice in the picture on the front of our

Exhibit 2, so the front page of [redacted] [redacted] that day, that you have a printed T-shirt on that looks like it was a special shirt --
A. Mm-hm.
Q. -- for the rally. Can you tell me about what that shirt said.
A. Yes. It's about education, not indoctrination.
Q. And what --
A. GLSEN is trying to indoctrinate. We say that school time is for education.
Q. So what did the shirt say?
A. Let me get my glasses so I can say specifically.
Q. Part of it's hidden and --
A. Yeah.
Q. -- I just wanted to get that accurately reflected.
A. I think this one is -- says, "GLSEN Manipulation Day."
Q. And the picture shows you standing with a --
A. Microphone.
Q. -- a bullhorn --
A. Right.
Q. -- is that correct?
A. Mm-hm.
Q. And did you use that to speak to the large crowd that had --
A. Yes.

Q. -- gathered?
A. Mm-hm.
Q. And do you remember what you told them?
A. It's just a fact that we're here today to take what we believe is the truth Biblically, and that is that marriage is between a man and a woman. And now that GLSEN has gotten the Day of Silence in our schools, that they are trying to indoctrinate and manipulate our kids into saying something that we believe isn't right, should be corrected, should be accepted, and should be considered safe.
Q. And did you have any threats or harassment made to you or the church after the rally?
A. All the way to the car.
Q. And what were those threats or harassment?
A. Yelling, screaming, calling me homophobe, hate -- you know, hate filled, why don't I just accept gays as gays are. I mean, any -- you can name it, they were saying -- most of the signs that they had up there, they were -- and we had to get the police to come down. I mean, it got to the point where they was trying to block me to get to the car so badly that we had to get officers down there so I could make it to the car so we could just leave.
Q. And did the officers help you to the car?

A. Oh, yeah.
Q. Were you pleased with the police --
A. No, I wasn't.
Q. -- officers?
And why not?
A. Because they didn't do their job. First thing is, if you look in this picture that's on the front of here (indicating), they were supposed to be that far away the whole day. Now, just so -- the picture that showed you the signs, where that kid was standing, if he didn't get any closer to me, they didn't do their job by allowing him to get that close.
I mean, my life -- whenever one of these things -- my life is in danger. I've gotten more threats than Van Camp's has pork and beans. And I'm gonna sit there at a rally and people have threatened me, say I should be dead, I should be killed, I shouldn't even be last -- left alive for the next month or two, much less anything -- and they let them get that close to me. Someone could have shot me, someone could have cut me. I mean, there are a lot of things that could have taken place when they knew my life had been threatened.
Q. Let's talk about that.
So this individual that's pictured with the "Throw Rocks Here" sign at one point was much closer to you.

A. Many. Not just him. Many was close.

Q. And I understood you to say that you asked the police to respond --

A. I said, sir --

Q. -- and separate.

A. -- are you looking at what's going on here?

Q. And --

A. You are supposed to be keeping us separate and you're not doing your job, when we come to find out later that they had police officers and other members of law enforcement up at the fireplace waiting for something to break out. They didn't even have all the officers there on the premises where they were supposed to be. I mean, how -- if you're gonna have a rally and you gotta be separated, how can you have that many people be set free to come that close to me?

Q. If you could just listen to the question I'm asking you and focus on that question.

I wanted to ask you, when you felt the people were too close to you and you asked the officer to take action, did the officer refuse to do so?

A. He said I had to wait -- he called his superior officer. When the superior officer got there, then they moved the people back.

Q. How long before the superior officer got there?

A. I don't know. Probably about five minutes.
Q. So about a five-minute response time.
A. Mm-hm.
Q. And when -- five minutes later, the police separated the groups; is that --
A. Mm-hm.
Q. -- correct?
And how far apart did the police then keep the groups?
A. It look like it's about 15, 20 yards, yeah.
Q. And do you think that, because they separated the groups, that that prevented any sort of violence occurring?
A. I know it did.
Q. So do you think that the police were instrumental in helping to prevent violence?
A. Oh, I mean, if there was no police there, it would have -- I think would have broken out into some type of violence.
Q. That's a very strong statement, to state that the police aren't doing their jobs. So --
A. Yeah, it sure is.
Q. -- do you believe --
A. And I --
MR. PIDGEON: I object to that --

MS. EGELER: Excuse me --

MR. PIDGEON: -- statement and as to the form of the question.

Q. (by Ms. Egeler) After you asked them to split up the group and they did so, did you continue to feel that the police were not doing their job?

A. After they -- the head superior officer got there, they did a great job moving everyone back. It was -- we had some 45 minutes before that separation took place. It started from the moment I got out the car and I started walking towards the school. They saw me coming and then here comes the whole crowd that was representing the homosexual group and activists. They met me and walked up to me long before we even got to the place. And that's how it all started. As we moved toward, more and more came and got around me and surrounded me.

Q. They surrounded you and told you that they disagreed with you; is that correct?

A. That'd be a good statement to make, yes.

Q. But they didn't surround you and physically abuse you.

A. Oh, no, no. I think, with all the guys that I have, that that was not gonna take place.

Q. Well, there were guys surrounding you and protecting you.

A. Right.

seasons. If I write something, man, does the phone calls come in or does the threats go up.

I wrote an article from the Center of Disease Control. I said, these are not my words, this come from the health department. If we're gonna have a school and if we're concerned about the health of our children -- I mean, we're eliminating trans fats because we say it's unhealthy. We eliminated chips on lunch and pop on lunch. We would not have a day to celebrate that which the health department said is unhealthy.

And I gave all the details from the Center of Disease Control about the lifestyle of a homosexual and the danger of the lifestyle of a homosexual, bam, bam, bam, bam, bam. These not my words, these are from the health department. Now, if we're gonna get rid of that which we say is unhealthy all the way down to trans fats, sugar, and chips, why are we having a day to celebrate and protect a lifestyle that has proven to be unhealthy?

Q. I understand your position, but I'm wondering if you can tell me about any time that your car's been vandalized.

A. Oh, you wanna go -- you want those type of things. Okay, yeah.

Q. I do.

A. Okay, the first thing happened after the rallies. And

we was -- I was doing some articles because of all the publicity that was happening with us --

Q. Which rallies?

A. The one at Mount Si, because it was two years in a row that we really stood. Last year I backed off because I was going through my treatments for cancer, so I wasn't as vocal. I just did an article -- I was gonna do an article, and the school paper -- well, wasn't the school paper. It was -- the Snoqualmie Record, I think it was, refused to -- even though I bought the page and paid for the advertisement, they said they wouldn't print it. So they turned me down.

And I asked 'em, why would you turn me down? This is -- I paid for the page. I'm not asking you to do it -- donate it. It's an article from the health department. Well, sir, it's a family newspaper and we don't want this kinda news in our paper.

Q. And what year was that?

A. That was last year. That was April last year, so whatever --

Q. Is it --

A. April of 2009.

Q. Was it the same year as the Mount Si event?

A. It's the third -- it's two years after the Mount Si event. Remember, I had the big rally and then we had a

smaller rally. We decided that we wasn't gonna go to the school that year because of all the things that took place the first year, and we didn't wanna put the kids in that position again. So we didn't go to the school as a rally that day, we just did articles and talking to parents. And again, they took a large amount of the kids outta the school.

Q. So let's go back.

My question was, have you ever had your car vandalized as a result of your position --

A. Not my car, because our cars -- yeah.

Q. Please let me finish the question.

-- as a result of your stance on homosexual --

A. Right.

Q. -- behavior or same-sex marriage?

A. Right. We had an incident at the house, because basically, everyone knows -- I don't have a private residence. I mean, everyone knows where I live. Private phone numbers, yeah, because of not wanting to receive all the calls that I get at the office.

And my daughter was -- had a sleepover one night. Well, I got gates. I got security gates because of all the threats that I've gotten. And when a friend got there that evening, the gate was closed. And she didn't ring the bell, she just parked next to the gates outside

and walked up to the house. And my daughter told her it's okay to walk up because, you know, our dogs was locked up -- I have to have guard dogs -- because our dogs was locked up, so it's okay to walk on in the house.

Well, she left her car outside the gate. They never went back to put the car up. The next morning, we get up and go down there and every -- nothing was stolen outta the car. Every window was busted: Side windows, front windshield, back window. Just totally attacked her car simply because it was parked in front of our gates in front of the house. The next thing happened --

Q. Well, let me ask about that first.

A. Mm-hm.

Q. So had anything happened to the car other than the windows being broken?

A. No.

Q. Was there anything painted on the car?

A. No.

Q. Was there a note left stating why the people had done it?

A. No.

Q. Did you -- do you know for certain this wasn't an act of random vandalism?

A. Could have been. I mean, it could have been. But

that's after what happened with our mail.
Q. Let's stay with this car incident.
A. Mm-hm.
Q. What year was that?
A. It would have to be the year after the big rally, because my daughter was still in high school. So we did the rally in '8, '08. No, we did the rally a little earlier than '08. So it probably was '08 that the car was attacked, the windows.
Q. And then you wanted to go to another incident and I --
A. Mm-hm.
Q. -- paused you to talk about this. So let's --
A. Yeah.
Q. -- go to the other incident you wanted to talk about.
A. Yes, it could -- like I said, it could have been something that just happened, you know, but I don't believe that because of what had taken place before. We were sitting in our home and the neighbors came by, of course, and rung the front gate to come in. And we opened the gate and they came in and here is all of our mail. They had stolen the mail for several days, I guess, out of our mailbox and had taken it up the hill and thrown it in the ditch. So, I mean, that's -- I think that's pretty big offense.
Q. Who did this?

A. I don't know who did it. If I did that, they wouldn't be walking around free.
Q. And why did they -- do -- you don't --
A. I think it --
Q. -- know who did it, so I assume you don't know why?
A. Well, I think it's because of who I am, because of the threats and the things that people have said they wanted to do to me.
Q. How do you know?
A. I don't know. You don't know. But I'm not -- there's eleven to twelve mailboxes on our street on the bottom. There's another seven or eight on the top of the hill where I live at. Only mailbox that was stolen, anything done with, no one else mailbox was touched except ████, where I live.
Q. And was that in '08, then, as well?
A. I think it was '08.
Q. And did --
A. And so we had to end up, of course, getting one of those security mailboxes.
Q. Did you call the police about the incident with the car windows being broken?
A. Yes.
Q. Did they respond?
A. Well, I mean, yeah, I think they -- where were we? As

parents, I think we was outta town. And I think that my daughter and her friend -- I can get more details about it, if need be, that -- made the call that someone had busted windows and had attacked the car --
Q. So you --
A. -- that evening.
Q. -- didn't -- you didn't actually see the --
A. Right.
Q. -- car, then. Okay.
You heard about this from your daughter?
A. Well, my daughter called, yeah, someone attacked our friend's car.
Q. And how about with the mail? Did you call the police about that?
A. Yes, we did.
Q. Did you get a response from the police about the mail?
A. Well, only response they could really give us is, yep, someone stole your mail and you probably need to have a better security system.
Q. So do you know if they had a way of finding who had -- who did this to your mail?
A. No.
Q. Were you dissatisfied with the police response either to the car incident or the mail theft?
A. No. It's just if you're gonna make a stand, then that's

things that is gonna happen to you. And that's just part of what it's been like for the last five, six years.

Q. I understand.

Anything else that you've experienced? You talked about phone calls.

A. Most of 'em I don't get because the front desk and [REDACTED] takes care of those. We was getting so many so frequently for a while with the Mount Si incident and being down at Microsoft issue and then being in Olympia. Man, oh, man, those -- that was almost an everyday -- I mean, it was bad.

The people at work, you know, get nervous. You get people calling in and saying that, you know, your pastor's not gonna make it through the week, or, he -- you know, he needs to be dead, or, we're gonna get him if we can catch him out. I mean, that's nothing to laugh about.

Q. Did you hear any of those phone calls personally?

A. I try my best never to pick up those phone calls.

Q. So you didn't answer those phone calls --

A. No.

Q. -- yourself.

A. They came through the church office.

Q. So [REDACTED] would be more knowledgeable.

A. [redacted] and the receptionist.

Q. And by [redacted], I'm referring to [redacted], your [redacted].

A. Right.

They put it in blogs. I mean, it wasn't just the phone calls. They had it in blogs, they had it in their newspaper, they had it in many of the -- I'm trying to think of different articles. I mean, they don't like me, you know, and that's understood.

Q. And do you think that people have a First Amendment right to express that they don't like you or like your views?

A. Not in the way they did, no.

Q. And how --

A. You don't threaten me and say, I want you dead. There's no right for that.

Q. Let's talk about specific instances where people said they want you dead. When and where?

A. Most the times this comes out -- like if there's an article that I've done, there's always comments and people respond in comments to the article, whatever. You can find 'em there, you can find 'em when they would call and follow up with a call to the office, you can find it in articles that they would write. I think they -- there's been some wild ones, even, in The

Stranger newspaper. I think that there's been some big follow-ups from that paper about me.

Q. So did you actually have anyone physically attack you at any point through these years of rallies and --

A. I'm too --

Q. -- protests?

A. I'm too careful to put myself in a position to be attacked.

Q. And --

A. Because the -- and the reason why I am is because I'm gonna be the one that's gonna end up in trouble.

Q. And did you tell the police about these comments and death threats?

A. We have called and we have let the Redmond Police know. We have reported because we are supposed to. And, you know, at times they would say, what do we need to do? We had one incident that got to the point where they came to the office and there was a letter left threatening. We never could prove who wrote the letter, but it was a very derogatory, very profane explanation of what they thought about me and what they wanted to do to me.

Q. Do you have a copy of that letter?

A. Oh, my goodness. I -- if I -- no, I probably don't.

Q. Did you give it to the police?

A. I think the police did get it. I'm not sure.
Q. And how many times did you call the Redmond Police about death threats or --
A. Whenever there was something would come in, they said, let us know. You know, and it was -- it's kinda got to be to the point where it's kinda on a regular thing: Hey, we got some more calls; hey, we got -- just to let you know. No one's come to the office except that one time that letter was dropped off. And so --
Q. And when you've called the Redmond Police, have they been responsive?
A. Oh, yeah.
Q. Are you displeased with the Redmond Police?
A. I'm not displeased with the Redmond Police at all. If I had any, it's -- like I said, it was more protecting the people up at Snoqualmie.
Q. Have there been any attacks on the church, the structure itself?
A. Well, not on the church -- our church, because we rent. So it's --
Q. And where --
A. -- you know, not ours.
Q. Where do you hold services?
A. We hold services at the [redacted] school in [redacted] Sunday morning.

But what did happen was, we had a big rally at [redacted], and it was announced that we was gonna be using their church for our rally. It was a worldview conference. Had nothing to do with anything concerning this issue.

Q. And when did -- when was that rally?

A. It would be April of -- I think it was 2008, 2009.

Q. Did the rally --

A. It -- and it was concerning -- around the same time as that Day of Silence, so I was in the news. And they came to work in the morning and there was grafitti written all over the church, you know, homophobe this and hater, and they took glue and stuck it in all of the keyholes on the outside doors. And I don't think [redacted] had done anything to get those, but that's -- so it had to be because we was coming there that weekend and use the building.

Q. Did the grafitti have any words?

A. Yes. You'd have to ask the church, because they washed it off pretty quick because people was coming in for a rally that evening.

Q. Did you see the grafitti?

A. No.

Q. And that didn't have anything to do with Referendum 71, then?

A. I couldn't tell you if it did or not. But I do know if you are standing against them, you will be harassed and you will be attacked in words and threats.

Q. So the Mount Si rally that is in the newspaper article that we've put into the record and that you have there in front of you, that was in April of '08. And you said you thought that the event at [REDACTED] was around the same time?

A. Mm-hm.

Q. So by around the same time, do you mean within that spring of 2008?

A. Yes. I can get a specific date for you. But we have our worldview conference the same every year and we usually have it in April. Early May at the latest, but it's usually April.

Q. But it would be the same year, 2008 --

A. Mm-hm.

Q. -- as the rally?

A. We had a rally in -- so it's '10 now. We didn't do very much in '9, like I said, because of treatment. And '7 and '8 we had the -- '7 was the big rally, I think.

Q. You were nodding, so I'm just going to ask again to make sure we get it clearly on the record.

A. Mm-hm.

Q. You think that the [REDACTED] event would have been in

the spring of 2008.
A. Yes, I believe so. I don't think it was last year, I think it was the year before.
Q. Has there been any sort of attack or grafitti or vandalism of the church office?
A. No. No, we got all security cameras and everyone knows that the office is pretty well secure.
Q. And we talked about two things occurring at your home, the broken windows of the car --
A. Mm-hm.
Q. -- and the mail theft. Anything else at your home?
A. No. I mean, with security fences and dogs, there's not very much going on at the house.
Q. And you said your home address is public.
A. Oh, yeah, everyone knows where I live.
Q. Did you ever have anyone come to services and disrupt services?
A. Well, they've been to our service. They don't disrupt. I mean, I'm too much fun.
Q. And by they, who do you mean?
A. We've had many visitors that are homosexual. One year, right after we did -- had the Microsoft -- when that was huge news, we had a boycott. The homosexual community boycotted the church service. And so they let us know they was coming. So all of a sudden, you know, okay,

America, rally.
Q. But if I could finish my question.
A. Yeah, okay.
Q. If Protect Marriage Washington listed you as an endorser or supporter of Referendum 71 --
A. Mm-hm.
Q. -- that would be a surprise to you?
A. No, because so many people talked to me about it. They could have said, are you for it? Oh, yeah, you know. Would you support it? Yeah. It wouldn't be a surprise they put my name on it, no.
Q. And did you ever have any open statements on the Protect Marriage Washington Web site about your position on Referendum 71?
A. I could not tell you unless they was quoting me from some of the speaking engagements. Like I said, I went and spoke at several doing rallies, so they could have quoted me from those, mm-hm.
MS. EGELER: Let me mark this as Exhibit No. 3.
[Off the record - discussion]
[Exhibit 3 marked for identification]
Q. (by Ms. Egeler) What I've handed you is what we're marking as Exhibit 3 to your deposition.
A. Mm-hm.
Q. And this is -- states at the bottom of the page from the

[REDACTED]. And it states, "State Leaders Support REJECT R-71 Effort" --
A. Right.
Q. -- exclamation point. And the second statement purports to be a quotation from [REDACTED] --
A. Right.
Q. -- [REDACTED]. Do you see where I am?
A. I am. Yes, I see exactly.
Q. Is that a quotation from you?
A. I'm sure it is if they said that. But I'm saying it's probably at one of the rallies I was at, probably not at the church or something I specifically wanted them to print. So I'm sure that is something it sounds like I would say at the -- either the Concerned Women of America or one of the other rallies, other churches that pastors had got together.
Q. So did you do a number of rallies with respect to Referendum 71?
A. Not very many, because I wasn't feeling well at the time. So it was limited. I would have probably done a lot more if I was as healthy as I wanted to be.
Q. And you talked -- you were talking about one with a women's organization. Can you tell me about that.
A. My goodness. It's probably at -- up in the Alderwood area before -- had to be before the vote. And it was

a -- I think it was a two-day rally, a Friday and a Saturday. And I came in and spoke that Saturday.
Q. To the rally?
A. To the rally, yeah.
Q. Any other rallies you remember for Referendum 71?
A. Man, I probably did some things on the news, radio, people calling me, because I'm always called. I mean, just who I am and, you know, what -- people know where I stand. So that's probably the best that I can say, that -- radio interviews, people calling me getting quotes, Concerned Women of America rally. So those would be the ones I can remember.
Q. Do you remember if you had a Referendum 71 sign in your yard at your house?
A. No.
Q. No, okay.
A Referendum 71 bumper sticker?
A. No.
Q. Do you feel that you experienced harassment or threats as a result of your public speaking regarding Referendum 71?
A. Absolutely.
Q. Can you tell me about that.
A. Well, anytime -- like I said earlier in the deposition here, that anytime my name is mentioned in the paper,

anytime there is an issue that is concerning the homosexual issue that my name is mentioned, anytime I'm on TV, anytime I am interviewed and it get -- go public, I am gonna get threats and I'm gonna get calls. It's automatic. It's just gonna happen. I'm gonna be threatened.

Q. Can you tell me specific incidents that occurred as a result of your speaking on Referendum 71 as opposed to prior to Referendum 71, the stance that you took with respect to homosexuality?

A. Well, I think they think I'm a nut and I think they look at me as being inconsistent, because if I am for equal rights for minority of blacks, they think I should understand the fight that they're going through.

Q. Did you have anything happen at the church as a result of your speaking out regarding Referendum 71?

A. They're not -- no. I mean, that is not gonna happen at the church, it's not gonna happen at the office. But the thing that's gonna happen is the calls and the threats that comes through the -- you know, the bloggers and all that.

Q. So which blogs did you receive threats on as a result of your involvement with Referendum 71?

A. I think you'd have to probably just look at some of the articles and the comments that come after those

articles. Like if this (indicating) came out in the paper, it won't be long; I'm gonna get calls. They're gonna come in. I mean, it is automatic. They're gonna find some way to harass me about my stand, and that's automatic. I don't have to worry. I don't have to say, you know, it's not gonna happen.

The only time that I can say that I haven't gotten many harassment calls was after that article that was in The Stranger, the one I wrote. I think that you -- did you get a copy of that? I think --

Q. We might have.

A. Yeah, I think you did.

MR. MCBRAYER: It's right --

MR. PIDGEON: That's it right there.

MR. MCBRAYER: -- right there (indicating).

A. Which was an absolute amazing surprise to us, that no one wanna dispute the article and that the more they talked about the article, the worse my case was made. And so that's -- now, that's the only article in ten years that was not very much response. They were so angry at that being printed by The Stranger itself, they got -- The Stranger got attacked for printing that article. So I was glad someone else could share.

Q. (by Ms. Egeler) So did you receive any death threats specifically because of your position on Referendum 71?

A. If it was, I wouldn't have known, because I don't receive the phone calls. The church takes care of those. And if it's something that is bad enough, they, hey, says, you know, we got phones -- call today, people are upset about what you said, they don't like your stance on the referendum. Or they say, hey, you know, we need to take some extra caution Sunday; this came in.

But I try never to really listen at the calls. I mean, it don't do me any good to have that in my head. And, you know, I'm trying to stay straight and not be prejudiced myself towards those who's threatening me.

Q. So you did not see anything threatening to kill you following your endorsement of Referendum 71.

A. No. Only thing that came up was, there were some comments that came through that says, you know, this guy should be taken out, this guy isn't worth living. I mean, I've gotten so many of those now.

When I was going through the Microsoft issue and when we was going through standing against -- for marriage -- which is what I do. I'd rather stand for something than to stand against something, and that's what I do. And if you're gonna stand for something, then they're saying you are standing against and that's how it is. And I -- at times, I was getting 400 threats a year. I mean -- and so if they know who I am and have

the freedom to threaten, what would the average citizen do if their name gets out there and feel threatened?

Q. Well, let's talk about what you said. You said that there have been so many comments that they want to take you out. How many were there saying they want to take you out specifically with connection to your stance on Referendum --

A. I don't think you can tie them in --

Q. Excuse me; let me finish.

A. Okay.

Q. -- specifically with respect to your stance on Referendum 71?

A. I don't think you can separate that in my life.

Q. Then how many have you received -- how many phone calls or messages have you received that talk about taking you out?

A. Oh, my land. You know, if it was less than 900, I would probably -- that's very conservative in the last four or five years.

Q. And do you think that these people that make those kind of remarks are cowards just using words?

A. I don't take the chance that they're cowards. Someone that says that has got it in their mind.

Q. Have you ever seen someone act on it?

A. Well, I think the group that was up there at Mount Si

acted on it, and it would have been worse if the police wouldn't have stepped in.

Q. Any other instances where they acted on it?

A. The rallies. We was down at Safeco Field. Oh, my land, the words and the things they did. And we invited them in to come and sit, and they took a whole section. And they had sexual toys and they was screaming bad words and things at the speakers. Dr. Dobson had to stop at one time and turn and address them, that we're glad you're here. I mean, it isn't a very tolerant group.

Q. You say the things they did at that Mayday rally. What things did they do?

A. The interruption with the loudness, the section that they all sat in, having the -- like I say, the sexual toys they were showing. And, I mean, we got kids there --

Q. But did they --

A. -- at this rally.

Q. -- do something that made you think they were going to take you out, some sort of physical --

A. The amount of threats -- no. It was the amount of threats that came in before that rally. And everyone didn't think that it was gonna be that successful, because we only had 30 minutes (sic) to do it. But once they saw the success of it, boy, it exploded. I mean,

they -- and that's why we had police everywhere at that rally. I mean, we had state police, we had Seattle Police, we had everyone there because I had gotten so many threats; I mean, hundreds and hundreds of threats --

Q. Do you feel that --

A. -- to my life.

Q. -- that the police stopped violence from occurring?

A. I guarantee you they did.

Q. So were you pleased with the police response?

A. I was, very. The King County at the time -- boy, how many years ago was that? Because Reichert was the head of the sheriff's department at that time. And when they started, they -- because we thought they may try to come down on the field from the stands. And he just -- he gave a word, they went down, they stood down along the walls, and that shut that down immediately. We had three or four hundred other protesters outside blocking people from getting in. And so it was not the kind of thing where you feel loved.

Q. So how were people able to get in if they were blocked? Did the police --

A. They --

Q. -- help with that?

A. Yes. They just kept -- you know, people just didn't say

anything. We had said, look, don't say anything, keep focused. You're probably gonna run into protesters, but just get to the stadium, and you've got protection there and you're gonna be okay.

Q. So do you know if any of your parishioners signed Referendum 71?

A. I'm sure they did. I mean, yeah.

Q. And do you know of any of them being attacked or harassed or threatened?

A. No. They enjoy attacking their pastor.

Q. So the --

A. Most of the people, if it's gonna be an attack, it's gonna be towards me. Very seldom they gonna just come at our people. They don't know our people. They don't know where they stand. But if this -- their names get out, what's gonna keep 'em from being harassed and attacked?

Q. But do you know of anyone being -- in your church other than you, who've been very public and are the center --

A. Right.

Q. -- and focal point of your church, do you know of any ordinary parishioners attracting threats or harassment as a result of signing the petitions?

A. No. No, I could not say that I know anyone personally. But people don't know 'em. They don't know who they

are.

Q. Now, you've been involved in so many activities. We've talked about the Microsoft shareholder meeting and the Mount Si rally and Mayday and huge rally in Washington, D.C., and then endorsement of Referendum 71.

A. Mm-hm.

Q. And you said that the year of Referendum 71, you were ill and couldn't make as many appearances as you'd like; is --

A. Mm-hm.

Q. -- that right?

A. Mm-hm.

Q. You stated that you've averaged as many as 400 threats or harassing comments a year. Did -- since you were not as physically able to get out and publicly speak in 2009, did you experience 400 a year?

A. No, no. If I'm not very active, it's not as much. And that is why, you know, that responding to this (indicating) -- I mean, if that came out in the paper, the phone's gonna go off the hook. It's just automatic, because all of a sudden they had a -- you know, the great homophobe is speak out again. And they feel that this is a responsibility -- I don't know if they're trying to scare me. I don't know why they would even do it. It hasn't worked, you know. But they keep trying.

They won't give up.

MR. MCBRAYER: At some convenient point, could we go off the record, take a break, five minutes?

MS. EGELER: Sure.

MR. MCBRAYER: Whenever you get to a convenient point.

MS. EGELER: Okay, we can take a break now. That's fine.

[Off the record - recess]

Q. (by Ms. Egeler) Pastor, we've talked about all sorts of harassment. And I want to narrow it down just to harassment that you've experienced as a result of your stance on Referendum 71 and ask, is there any form of harassment you experienced that we didn't talk about?

A. I can't think of anything that we haven't talked about. I think that the difficulty in talking about Referendum 71 is, you're trying to limit what -- the attacks that I've had on this whole issue. Referendum 71, it's just one of many of why I have been attacked, called, threatened. And so Referendum 71 just give them another excuse to come after me.

Q. Is it fair to say that it's hard to separate out why a particular person called you, whether they're angry about the Mount Si rally or other things they've seen in the paper, as opposed to Referendum 71?

A. Well, I think it's the same issue. The issue is standing against homosexuality. Whether it was the Mount Si rally; whether it was the Mayday for Marriage at Safeco; whether it was going to Washington, D.C., to have that rally; whether it's standing up in front of a little group of women talking about what needs to be done, the issue is that if you stand against homosexuality, you will be harassed.

Q. You talked about Web sites that had threatening comments on them. Can you tell me which Web sites you're talking about?

A. Oh, my goodness. You know, you are asking me to do something I very seldom try to pay attention to. [redacted] probably would have been a better person or the people at the church, because most of the time I get these, they say, hey, look what came in, or, look what showed up on this, or, look what happened after your article. You know, and then I read 'em and -- or disregard 'em. I don't wanna read 'em.

So there is countless Web sites and bloggers that will -- some of -- the ones that probably really advertise 'em, one that surrounds the gay-sensitive newspaper here in town, The Stranger, because, you know, anything they print about me is gonna cause a lot of response.

Q. Is it fair to say that you don't and haven't gone to look at the Web sites or blogs yourself, you hear about them from others?

A. Oh, yeah. I mean, it's -- you know, they'll send 'em to me or they'll let me know. You know, I may follow up then. But as far as just trying to go out and find, no. I mean, threats are bad enough. I don't wanna go looking for 'em.

Q. So you couldn't tell me the names of any specific Web sites or blogs?

A. No. You wanna look at -- you know, like I say, you can look at The Stranger Web site. You can look at any of the articles that was in these papers (indicating) and look at the comment pages, if they still have 'em. I mean, you can see 'em for yourself.

Q. And again, you've told the Redmond Police about each of these instances where there's a threat.

A. We're always letting 'em know. A lotta the time, you know, they can come in four or five days and so many. We just may wait and give 'em a call and say, hey, we just wanna let you know that we received some calls, we received some threats, and just keep you posted.

Q. Do you think the Redmond Police make any effort to go by the church, drive by now and then, just to make sure everything's going okay?

A. I think they would. I mean, they know this crazy citizen of theirs there in Redmond and they know what's going on. So, you know, we're pleased with the police. I mean -- yeah.

Q. And do you think that they've helped to stop any actual violence from occurring?

A. I couldn't tell you. They haven't allowed us to know.

Q. And as part of your appearing here today, there was a subpoena duces tecum issued to you, and it asked you to bring all records stored in paper or electronic format -- and I'll paraphrase -- that talk about threats or harassment that you've received. And you've brought quite a stack of newspapers with you here today; thank you. Does this compromise (sic) all of the paper or electronic images or discussion of harassment or threats or retaliation related to Referendum 71 that you have?

A. I would -- probably one that would know about all the paperwork and things that come in, the threats, the calls, would be more the people at the church, and I think you talked to [redacted] about that. But, you know, you can get so many, you just kind of hit the delete button after -- why keep 900 --

Q. Do you have any --

A. -- Emails?

Q. Do you have any Emails?

get attacked, I'm gonna hear something any and every time I'm in the news.

Q. After Referendum 71, we had an election in November of 2009.

A. Right.

Q. So the issue, at least in terms of the election, is --

A. Right.

Q. -- is settled. Have you continued to speak out on issues involving homosexuality?

A. Every opportunity I get, yeah, I do.

Q. So you've spoken since November of 2009.

A. Oh, yeah, mm-hm.

Q. And have you continued to receive harassment or threats as a result of that?

A. There's always gonna be some kinda call, there's always gonna be some kinda written response to anything I write every time I do it. Like I said, the only time it was scary that I didn't get any was from the newspaper. The newspaper got attacked, but I didn't.

MS. EGELER: Okay, I don't have any more questions at this time.

EXAMINATION

BY MR. MCBRAYER:

Q. I had a couple, [REDACTED], on direct. This is Ryan

A. -- the guys got too close or whatever, yeah. I mean, they got -- the guys that were surrounding me did get, you know, body contact or people would push or say something, you know, trying to get to me. They had to get physical contact to them to get to me. And so they -- I was very proud of the guys for keeping their calm.

Q. Were there any punches thrown?

A. No. Oh, no, no.

Q. People trying to get closer to you to shout.

A. Let me know that they did not appreciate me being there and what they thought of me.

Q. Did anybody say that day that they were going to kill you?

A. No, not to us. No.

Q. Well --

A. This whole incident, if I can say, was -- and I wanna say it correctly and I wanna say it straight. This whole incident that happened at Mount Si, you gotta understand the background behind it, because most people don't. I'm classified as one of the number-one homophobes definitely in the Northwest, probably in the nation. You know that, right?

Q. I wasn't aware of that until today, but --

A. Okay.

Q. -- I understand that's your testimony.

A. Right. And you can just read it. I mean, you can just go to the Web, go to Google, you can go to Wikipedia, you can do anything you want. You can find out real quickly that I'm basically classified as the number-one homophobe.

Now, when this issue came up about the Day of Silence, my kids was in the school. They allowed it to be announced. The teachers that stood up and booed when I was there speaking for the Martin Luther King Day booed. Teachers, not just students, booed me. And it was the most important day of my daughter's life, because the second girl got me to come when she was a senior, which was four years later, okay? My daughter and I came is the first one.

So they basically wanted me to come that year so they had a way to make it a national issue. If they could beat the number-one homophobe in his own school, that would be quite a victory. They had lawyers come from California, they had lawyers come from New York, they bussed in people to the school boards. I mean, it was a major issue. So when I went there to do that rally, it was not a local issue, it was to defeat this person who is against us. And that's why it was so -- the tension was so strong.

Q. Well, let me ask you kind of a summary question, and I'd like you to disagree with me if you can.
A. Sure.
Q. Let me take that. If you're the -- in your own words, one of the most prominent alleged homophobes in the country --
A. Mm-hm.
Q. -- going to a rally where people are being bussed in --
A. No, that was at the school board.
Q. But going to a rally at a time when there was a lot of not only local but national attention on this --
A. Mm-hm.
Q. -- rally, where you arrived 30 minutes early for the rally --
A. Mm-hm.
Q. -- where the police did not separate the groups --
A. Mm-hm.
Q. -- for this initial period of --
A. Mm-hm.
Q. -- time, where the people protesting in favor of gay rights or against you were emotional and vociferous --
A. Mm-hm.
Q. -- and yet no physical violence occurred.
A. Mm-hm.
Q. Is there anything wrong about what I just said?

A. No.
Q. I mean, is there anything inaccurate?
A. No, not really. No.
Q. You spoke at one point about the [redacted] incident where you were going to speak at the worldview conference.
A. Mm-hm.
Q. Did you see any of the grafitti on the church yourself?
A. No, I did not. Remember I said, is -- they had removed it pretty quickly once they came in that morning.
Q. I just -- I wanted to make sure that that was -- they had removed all of it and you didn't see any of it.
A. I didn't see any of it.
Q. Your understanding of what was said is based on what church members told you.
A. Right, church members of [redacted].
Q. Of [redacted].
A. Mm-hm.
Q. You also spoke or testified this morning about a letter -- particular letter that someone left at your church --
A. Mm-hm.
Q. -- that was very explicit in, I think you said, the kind of things they wanted to do to you.
A. Mm-hm.

Q. Is there only -- I want to make sure I'm talking about the correct letter. Is there --
A. Right.
Q. Is there one letter that stands out in your mind in that regard as --
A. The reason --
Q. -- being explicit?
A. Yes. The reason why that letter was -- you know, had more of an impact is because they got that letter and put it inside the office. So someone had entered our office and left that letter there. And that had never happened before and it hasn't happened since. So that would catch my attention.
Q. Did the writer of the letter express their motivation for making the threats against you?
A. Yeah, I think it was quite specific about not liking me and think that I -- they should hurt me.
Q. I understand that they threatened to hurt you. My question is, was there a tie in the letter -- in the letter itself. I understand that you may -- I'll get to your belief.
A. Right.
Q. But did the letter writer say that he was writing the letter because of your stance regarding homosexuality?
A. Yes, yes.

Q. And when was that letter left?
A. We was -- that was two buildings ago, so --
Q. So it hasn't been since Referendum 71 --
A. No.
Q. -- was filed or --
A. That was before.
Q. -- been in any way connected to --
A. Right.
Q. -- that.

MR. MCBRAYER: I don't think I have any more questions. Thank you.

THE WITNESS: Thank you.

You have any questions?

MS. EGELER: Mr. Dixson, do you have any questions?

MR. DIXSON: No, I'm good. Thank you.

MR. PIDGEON: Yeah, I have a number of questions.

THE WITNESS: Super.

EXAMINATION

BY MR. PIDGEON:

Q. [redacted], if you don't mind me calling you that --
A. Please, please.

[Off the record - discussion]

Q. (by Mr. Pidgeon) Let's start with the top: Marriage. Is -- what is your understanding as to how marriage is

formed?

A. I think that the -- all the way back to the first couple, and that was Adam and Eve. And I believe that if you gonna do something, you do try to do it right the first time. And I think that God thinks that marriage between a man and a woman is the best way, because that's how he started the whole relationship process of starting families.

Q. So you see marriage as a God-ordained institution?

A. A hundred percent.

Q. And you say a hundred percent.

A. I agree that marriage is a God institution, 100 percent belief that the Bible teaches that, and that's what I stand on.

Q. What do you think about the State's position that marriage is, in fact, a state-ordained institution?

A. Well, I think that it could be a state feeling, it could be a national feeling, it could be a world feeling. Doesn't override my belief in what the Bible says.

Q. Now, you've -- you said here just a few minutes ago that you're the number one -- you've been tagged as the number-one homophobe.

A. Definitely in the Northwest --

Q. In the Northwest.

A. -- and very close to the top nationwide.

Q. It's good to be number one. All right.
Now, let me ask you, what does homophobe mean?
A. I think it's not a word. You know, just like today we've developed Islamophobe. I think it's a way to try to intimidate. I think it's a word that's used to -- saying that you are prejudiced toward a certain group of people, homosexuals; that you are fearful of homosexuals; and that you have an agenda against them. And I have none of those.
Q. So you would say that the term "homophobe," number one, is not a real word?
A. Right.
Q. And number two, does not correctly label you.
A. Absolutely not.
Q. As to your understanding of what the definition is.
A. Right.
Q. Now, have you taken positions that are opposed to abortion, for instance --
A. Yes.
Q. -- in the church?
Have you taken positions that are opposed to frivolous divorce --
A. Yes.
Q. -- in the church?
A. Any divorce.

Q. Any divorce.
A. Yes.
Q. Have you taken positions that are opposed to alcoholism and drug abuse?
A. Absolutely.
Q. Now, when you have taken those positions, have you ever been attacked or threatened by alcoholics, for instance?
A. No.
Q. Have you ever been attacked or threatened by any groups representing divorcees?
A. No.
Q. Have you ever been attacked by pro-choice -- by the pro-choice lobby?
A. No.
Q. Have you ever been sued by the pro-choice lobby?
A. No.
Q. Have you ever had protesters in front of your church from the pro-choice lobby?
A. No.
Q. Have ever received a death threat from the pro-choice lobby?
A. None.
Q. Have you ever received a death threat from the pro-divorce lobby?
A. No.

Q. How about from the pro-alcohol or drug-use lobby?
A. No.
Q. If there is such a thing.
A. Don't make news.
Q. How about Overeaters Anonymous? Did they ever --
A. None.
Q. -- they ever threaten you? Okay.
So would you say that 100 percent of the threats that you have received have come from the homosexual community?
A. Yes.
Q. And would you describe the homosexual community as having a nature of bullying?
A. I would describe them as a group that is sold out to what they believe as much as I am, and they're gonna do what it takes to make that belief known and get it passed for everyone to accept.
Q. Would you describe them as -- just generally speaking now, if you were describing their reputation --
A. Mm-hm.
Q. -- to the community, would you describe this group of homosexual activists as threatening?
A. Yes, I would.
Q. Menacing?
A. At times, yes. With the amount of threats I've gotten,

yes.
Q. Harassing?
A. Yes.
Q. Vicious?
A. At times, yes.
Q. Have you ever felt that you were being stalked by the homosexual community?
A. With the amount of calls and the amount of letters and the amount of articles, yeah, I do, very much so.
Q. Now, you indicated in your testimony that you have gates around --
A. Mm-hm.
Q. -- your property?
A. Mm-hm.
Q. When did you --
A. I do.
Q. When did you put those gates up?
A. We probably put 'em up about five years ago, almost six.
Q. And you also have dogs?
A. I do. None of 'em are Christians.
Q. As they have -- are you trying to say that your dogs have no sense of mercy?
A. They have no sense of forgiveness, yes.
Q. And the -- why did you put gates up and introduce dogs to your property?

A. I've always, you know, had dogs. I mean, that's because of just who I am, even in pro ball. I mean, you get people that -- groupies and different things that, you know, you just need protection. And then when the whole issue started with the homosexual community and my stands, and then I have -- a family and kids came about, I go, we gotta do something more about security. And that was the thing that we wanted to do, was, you know, put the security gates and things up.

Q. So would you say that the gates and the extra security measures were directly and proximately caused by the threats you were getting from the homosexual community?

MS. EGELER: Objection --

MR. MCBRAYER: Objection --

MS. EGELER: -- leading the witness.

MR. MCBRAYER: -- yeah, leading.

Q. (by Mr. Pidgeon) Let me see if I can ask that in a different way.

A. Okay.

Q. Apparently that question was over the top.

Did you place the gates around your property as a result of the threats you were receiving from the homosexual community?

A. That was the main purpose --

Q. Was that --

A. -- why we put the --
Q. -- the main reason?
A. That was the main reason we put the gates up.
Q. And since you put the gates up, they've been fairly effective to secure you?
A. Yes, they have.
Q. Now, is there such a thing as a bounty on you?
A. There was several over the years. I understand that it got up to -- oh, my goodness -- if they could find some dirt on me, I think it was -- went from up to 500,000, like a half a million then, to up over a million. And, you know, those are just the things I kept hearing from people all over the U.S.

I had one buddy call me from Alabama and says, hey, have you seen the new bounty they got on you? I go, no, I try not to even deal with this. Well, you better deal with this, you know, because they're trying to find dirt on you and, you know, anyone could come up with that kinda information have a million dollars. And that was right before the situation took place with the head of Evangelical Association, Ted Haggard.
Q. So is it your understanding that there is some kind of a motive inside the homosexual community to scandalize or to bring pastors down through scandal?
A. Oh, I -- it's been proven. We don't have to think.

That is a proven fact.

Q. And so to your knowledge, there was a bounty for somebody -- they were -- somebody inside the homosexual community -- let me see if I can ask this question more clearly.

Is it your understanding that somebody inside the homosexual community was willing to pay up to a million dollars to get information of sufficient scope to scandalize you as a pastor?

A. Yes, that's what -- the information I had received.

Q. I want to go back and talk a little bit about the Day of Silence --

A. Okay.

Q. -- at Mount Si.

Now, let me ask you, is it your understanding that -- how this Day of Silence works, that -- tell me again what you think this Day of Silence was about.

A. Okay. Compared to the first year that we had to deal with it and what they say it's for now has really changed, because we just have put so much pressure on the school about the day. Now they say it is about protecting the kids that have been bullied because they are homosexual. So I had asked the question --

Q. What was it before?

A. It was basically in support of the lifestyle.

Q. So let me see if I get this right. So the Day of Silence was that we were going to have a Day of Silence here at this public school paid for with tax dollars that is going to be anybody who is willing to say they're in support --
A. Right.
Q. -- of the gay lifestyle doesn't say anything all day long.
A. Right.
Q. Was that the agenda?
A. Right.
Q. So then can we assume that the contrary was true, that anybody who spoke during that day would be considered a homophobe?
A. Well, they were considered not in support of the homosexual lifestyle.
Q. Do you know whether or not there was castigation or otherwise a looking down upon those people who spoke during the Day of Silence in the school?
A. I think it was -- you know, the kids -- like I said, they had voted about what they thought the major issues were at the school. Homosexuality wasn't mentioned, homosexual bullying wasn't mentioned at any of the out -- you know, the results of those surveys.
And so it was kinda like whoopee do to most of the

kids. I mean, it wasn't like, okay, you know, if you don't -- if you decide to speak, boy, you know, you -- it's -- we gonna really get you, or, if you decide to stay quiet, we really gonna get you. It -- there was -- well, whatever you wanna do that day, we gonna make it through and move on. I think that was the attitude of most of the students, because there was so many teachers that was behind the support of the day.

Q. So the day was being supported and advocated by the teachers --

A. Yes.

Q. -- at the school?

A. Yes.

Q. To your knowledge, was there any student movement behind it whatsoever?

A. They said it was the GSA. And like I said, the more we got into it and looking at it, you know, how can it be the Gay-Straight Alliance when there was not even one gay student at that first year that was in the Gay-Straight Alliance? So that kinda was suspect to me, and that's why my wife and I stood as strongly as we did. And we just stood up as parents. I told 'em, I'd rather get to know you as a parent, not as a pastor, and I'd like to get this worked out between parent and teachers in school than anything else.

done.

FURTHER EXAMINATION

BY MS. EGELER:

Q. Pastor, you talked about taking positions on divorce.

A. Mm-hm.

Q. Have you spoken at rallies about divorce?

A. I've spoken about all the major issues. We even mention those when we's dealing with some of the marriage, because if you don't talk about support of marriage -- you gotta deal with every aspect of supporting marriage, and one of the destroyers of marriage is divorce. And so I've spoken about that many times.

Q. Have you spoken at any rallies about abortion?

A. Oh, yes.

Q. Can you tell me when those rallies were?

A. Oh, my goodness. I speak so many times, I wouldn't be able to tell you specifically dates and those things. But you can pretty well follow up on anything I speak on. If I'm dealing with family issues, those are gonna be some of the major issues I'm gonna deal with: Divorce, abortion, gambling. I've done a great deal on gambling. I've spoken totally against -- even down to jealousy. I mean, it's -- if it's a Biblical issue, I'm gonna speak on it.

Q. Can you tell me any rally that you spoke at about abortion where abortion was the key issue at that rally?
A. I think it was -- oh, man -- maybe two, three years ago when that -- those people were standing out in front of churches with the pictures of aborted babies and the fetuses that they were showing. And I was talking about the insensitivity toward others that may have had an abortion, that our job is not to condemn, but to help them through the situation and realize don't do it again. So I've always spoken about those major issues like that, yes.
Q. So you've spoken about a more peaceful approach to the debate about --
A. Right.
Q. -- abortion?
A. I'm -- you know, I'm just really surprised that, you know, the only attacks I really have gotten is towards when I stand up against the homosexual issue and stand strong for traditional marriage.
Q. Are you the number-one antiabortion person in the Northwest?
A. No. I'm not classified much of anything else outside of number-one homophobe.
Q. And would you say that's because your positions and appearance -- public appearances regarding same-sex

marriage and homosexuality, that's the predominant topic that you've spoken about?

A. No, it's the predominant issue that they made outta news. Okay?

Q. So --

A. The --

Q. -- would -- excuse me.

Would you --

A. Yeah.

Q. -- say that you have spoken about homosexuality and marriage more than you have spoken about the issue of abortion?

A. Over the years, probably the last four or five years, I've spoken more about the issue of marriage than I have anything else, simply because that has been the forefront, mm-hm.

Q. And how much more? Would you say you've spoken ten times more than --

A. Probably about ten times more, yeah.

Q. And --

A. But we're a lot hard -- I can say this to you straightforward: We're a lot harsher on our members in our church about divorce than we ever were on homosexuality. We've kicked folks out of our church because they've gotten divorced. Brought 'em before the

church, told the church what it was for, and told 'em to remove fellowship and you have just lost your membership in this church, bye.

Q. You said that you think that the media has run stories more about your position on --

A. Yes.

Q. -- homosexuality than about your position on other issues; is that right?

A. That's right.

Q. How much more, would you say? Ten times more, a hundred times more? What --

A. I think --

Q. -- would you say?

A. -- it's definitely 20, 30, 40 percent more than it is for homosexuality than with any other issue I stand on.

Q. Has the media run any stories about your position on abortion?

A. I haven't read one.

Q. Has the media run any stories at all about your position on drugs and alcohol?

A. No. And we have a drug-and-alcohol ministry at the church.

Q. Has the media run any stories at all about your position on isolated to divorce between a man and a woman?

A. Not really. If it's mentioned, it's so brief you

wouldn't be able to remember. And like I said, we're a lot more -- we're a lot harder on divorce than we are any issues on homosexuality.

Q. So in talking about the media, I'm talking about radio --

A. Right.

Q. -- TV --

A. Right.

Q. -- Internet --

A. Right.

Q. -- print.

A. Right.

Q. So all of those media forms are focusing on your stance with respect to homosexuality.

A. Right.

Q. You talked about bounties being placed on you, and I wanted to make sure I understood what you meant by a bounty. That was money that would be awarded to someone for finding scandalous information about --

A. Right.

Q. -- you?

A. Same thing -- I think you remember the story of Ted Haggard?

Q. I don't. Can you --

A. Okay.

Q. -- tell me.

A. Ted Haggard was the president of the Evangelical Association, one of the most powerful Christian organizations in the U.S., and they found out information about him having a homosexual relationship. And it destroyed him, the family, almost destroyed the church, because they was able to take someone who was supposed to be standing on His right side against homosexuality and marriage and was participating in the lifestyle.

And they didn't want me dead. I mean, that makes me a martyr. But if they -- they know what the Christian community's all about, and if you're hypocritical, you have just destroyed your witness.

Q. Do you know who put these bounties out?

A. No. Never even research 'em. They just -- people will call me and say, hey, bro, you better watch out who you hang out with, who you travel with. That's why I never travel alone. That's why I always have someone with me. That's why I always have -- if it's -- you know, if I can't have my wife, I'm gonna have one or two other guys or something who's gonna be with me if I'm in a public place.

Q. And these guys can attest to the fact that you aren't out with women --

# AFFIDAVIT

STATE OF WASHINGTON )
)
COUNTY OF KING )

I have read my within deposition and the same is true and accurate except for any changes and/or corrections, if any, as noted by me on the correction sheet hereof.

SUBSCRIBED AND SWORN to before me on this, the 27th day of October, 2010.

NOTARY PUBLIC in and for the State of Washington residing at Redmond, Washington.

Notary expires: 6/23/13

HUTCHERSON/SEPTEMBER 23, 2010

TO THE DEPONENT:

PLEASE READ YOUR DEPOSITION CAREFULLY.  On this correction sheet, make notes of any errors in the transcript.  Then please sign this sheet at the bottom and return it with the notarized affidavit page to Tracey Juran at 21103 80th Avenue West, Suite A, Edmonds, Washington, 98026.  If you have any questions about this process, please call me at 425-775-1243.

Page and line                    Correction