The Honorable Benjamin H. Settle
Courtesy Copy of Electronic Filing for Chambers
Case No. 3:09-cv-05456-BHS
Exhibit in Support of Plfs' Response to Def's Motion for Summ. J.

# Exhibit 7

Exhibit in Support of Pls.' Response to
Def's Motion for Summ. J.
(Case No. 3:09-cv-05456-BHS)

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434)

# Table of Contents

Ex.     7-1     Dep. ██████████, October 7, 2010................................ 1

Ex.     7-2     Dep. ██████████, October 7, 2010................................ 24
                Exhibit 3................................................121
                Exhibit 4................................................123
                Exhibit 5................................................124

Ex.     7-3     Dep. ████████, October 1, 2010................................ 126
                Exhibit 8................................................169
                Exhibit 9................................................175

Ex.     7-4     Dep. ██████████, October 15, 2010................................186

**Exhibit in Support of Pls.' Response to**
**Def's Motion for Summ. J.**
**(Case No. 3:09-cv-05456-BHS)**

**Bopp, Coleson & Bostrom**
**1 South Sixth Street**
**Terre Haute, Indiana 47807-3510**
**(812) 232-2434**

**Exhibit 7, Page 1**

# Exhibit 7-1

Exhibit in Support of Pls.' Response to
Def's Motion for Summ. J.
(Case No. 3:09-cv-05456-BHS)

Exhibit 7, Page 2

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA


JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,

         Plaintiffs,

      vs.             NO. 3:9-CV-05456-BHS

SAM REED, in his official capacity
as Secretary of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer
for the Secretary of State of
Washington,

         Defendants.


DEPOSITION OF ██████████████

Deposition upon oral examination of ██████████████, taken

at the request of the Defendants, before Osmund D. Miller, a

Notary Public, RPR, CCR No. 2280, at the law offices of

Witherspoon-Kelley, 422 West Riverside, Spokane, Washington,

commencing at or about 9:00 a.m., on October 7, 2010 pursuant

to the Federal Rules of Civil Procedure.

1                 GREG SENCHENKO
the Interpreter, having been first duly

2          sworn according to law, did interpret from
English to Russian and Russian to English.

3

4          called as a witness at the request of
the Defendants, having been first duly

5          sworn according to law, did testify as
follows herein:

6

7   (All answers will be given through the interpreter unless

8   noted by the answer symbol.)

9                    EXAMINATION

10  BY MR. DIXSON:

11  Q.   Good morning, Mr. ▇▇▇▇▇▇.  My name is Steve Dixson.  I

12  am an attorney for the Washington Coalition for Open

13  Government, one of the named defendants in the present

14  litigation.  On the phone is Attorney Anne Egeler from the

15  Washington Attorney's General office.  She may have some

16  follow-up questions when I am done this morning.

17       First off, have you ever been deposed before?

18  A.   No.

19       INTERPRETER:  I don't trust English responses.

20  Q.   Okay.  In that case, I would like to go over just some

21  basic ground rules with you this morning.  It is important

22  that we get an accurate record of what is said in this room

23  today.

24  A.   Uh-huh.

25       INTERPRETER:  Yes.

1    were asked to bring documents evidencing threats, harassment

2    or reprisals as a result of your participation with

3    Referendum 71?

4         INTERPRETER:  Yes.

5    Q.   Did you bring any documents today?

6         INTERPRETER:  I don't have specific documents.  Like,

7    pictures or documents.

8    Q.   So you do not have any responsive documents to the

9    subpoena evidencing threats, harassment or reprisals?

10        INTERPRETER:  Well, I have, like, things -- like, I have

11   stickers put on my vehicle, a couple months ago, with bad

12   words, and -- but I didn't save them, and I just took them

13   down and threw them into the garbage can.

14   Q.   Okay.  We will talk about any harassment that you allege.

15   But with regard to documents, you did not bring any of those

16   today, correct?

17        INTERPRETER:  Right.  Because I don't have them.

18   Q.   I see in front of you a folder.  Are those documents that

19   you intend to speak about today?

20        INTERPRETER:  This is just the documents that I received

21   from you, and an outline for myself.

22   Q.   Okay.  Have you spoken to anyone at your church regarding

23   the deposition today?

24        INTERPRETER:  You mean, like, about today, or when we

25   were discussing the voting?

1    we just had a short discussion and a prayer about it.

2    Q.    Okay.  I would like to talk a little bit about your

3    present employment.  Where do you currently work?

4          INTERPRETER:  Right now, I am unemployed.  The company

5    that I worked for went out of business.

6    Q.    What was that company?

7    A.    Carlisle Tire.

8          INTERPRETER:  Carlisle Tile?

9          THE WITNESS:  Tire.

10         INTERPRETER:  Carlisle Tire.

11   Q.    How long ago did Carlisle Tire stop existing?

12         INTERPRETER:  December 31, 2008 was the last year.

13   Q.    And have you worked since then?

14   A.    No.

15   Q.    Do you have any role with the ██████████████

16   ████?

17         INTERPRETER:  I am a vice pastor.

18   Q.    And how long have you had that position?

19         INTERPRETER:  For about four years now.

20   Q.    What are your responsibilities as a vice pastor?

21         INTERPRETER:  I conduct services.  I help pastor the

22   services.  I visit ill people.  Go to hospitals after

23   surgeries.  I just take care of the spiritual needs of the

24   people.

25   Q.    And did you have that position in the year 2009?

1    INTERPRETER:  Yes.

2  Q.   Approximately how many hours per week do you devote to

3  your role as the vice pastor?

4    INTERPRETER:  It's hard to say, frankly.  I never

5  counted.  I never kept track of it, how many hours.

6  Q.   Okay.

7    INTERPRETER:  I -- you know, it could be three, four,

8  five hours per day.  It really depends.

9  Q.   Okay.

10    INTERPRETER:  We have a lot of elderly members.

11  Q.   Okay.  How many parishioners or church goers are there,

12  for an average service at the church?

13    INTERPRETER:  Can I decline to respond to that, or --

14    MR. PIDGEON:  I mean, you should -- in my opinion, you

15  should answer it.

16    INTERPRETER:  Because under -- you know, we just have --

17  we never told anyone, in our practice, before, how many

18  people attend church.

19  Q.   (BY MR. DIXSON)  I am not looking for an exact number,

20  nor the identity of any member of the church.

21    INTERPRETER:  On Sunday services, between seven to 800.

22  Q.   And would that be the same as attended the church in

23  2009?

24    INTERPRETER:  Yes.

25  Q.   Does the church maintain a church newsletter or a

1   Q.   More than a hundred sheets?

2   A.   I don't know.

3        INTERPRETER:  I think there was more than a hundred.

4   Q.   More than 200?

5        INTERPRETER:  I cannot say for sure, because I don't know

6   the exact number.

7   Q.   But you are pretty sure, not knowing the exact number, it

8   was more than 100?

9        INTERPRETER:  Yes.

10  Q.   Did you or ▇▇▇▇▇▇▇▇ speak about Referendum 71

11  during church services?

12       INTERPRETER:  We don't talk about those things during

13  regular service.  You know, we pray, we sing and we preach.

14  We don't discuss any other issues, and that's our regular

15  approach.

16  Q.   I understand that you allege that you have suffered some

17  harassment as a result of your participation with Referendum

18  71?

19       MR. PIDGEON:  Objection as to form.

20  Q.   (BY MR. DIXSON)  And I would like to talk about that now.

21  A.   Uh-huh.

22  Q.   Can you tell me about any harassment, threats or

23  reprisals that you have suffered, or are aware of, regarding

24  Referendum 71?

25       INTERPRETER:  Are you talking of, just personally, me, or

1   in general, or --

2   Q.   We will do both, but I want to start with you,

3   personally.

4        INTERPRETER:  Personally, about me.

5   Q.   Can you tell me -- and we will take time to go through

6   each incident -- but beginning where you want to begin,

7   describe any personal harassment.

8        INTERPRETER:  So, talking personally about me.  So,

9   personally, to me, there was no, you know, physical damage or

10  nothing was broken.  That did not happen.  I had that sign up

11  front, and it was still there.  The only thing that --

12  stickers with swear words were placed on my vehicle, and as

13  far as it's been connected to this, you know, I couldn't say

14  exactly.

15  Q.   When, if you remember, did you first place the yard sign

16  in your front yard?

17       INTERPRETER:  When the process started.  Probably

18  October.

19  Q.   And there was no damage done to that sign, correct?

20       INTERPRETER:  No.  It was there.

21  Q.   Turning to the stickers with the swear words, where were

22  these stickers placed?

23       INTERPRETER:  On the windshield, on two different

24  vehicles.

25  Q.   The windshield of your personal cars, correct?

1   A.   Yes.

2   Q.   Two separate cars?

3        INTERPRETER:  Yes.

4   Q.   How many stickers were placed on each car?

5        INTERPRETER:  It was two or three stickers.

6   Q.   On each car, or in total?

7        INTERPRETER:  No.  In total.

8   Q.   When did you find these stickers?

9        INTERPRETER:  Two, two and a half months ago.

10  Q.   Okay.  So, in the summer of 2010, correct?

11       INTERPRETER:  Yes.

12  Q.   And I know it may be unpleasant, but do you recall what

13  was written on the stickers?

14       INTERPRETER:  I did not understand the words, exactly,

15  but when my son looked at that, he was, like, Dad, where did

16  you get this?

17  Q.   Were the stickers written in English?

18       INTERPRETER:  Yes.

19  Q.   Approximately how big were the stickers?

20       INTERPRETER:  It was the yellow sticky note, actually.

21  It's one where you peel off and stick on.  So it was a square

22  size.

23  Q.   We would call it a Post-it note.

24       INTERPRETER:  Yes.

25       MR. PIDGEON:  Let the record reflect, he indicated the

1   size about maybe two by two.  Two by two inches.

2        INTERPRETER:  Yes.

3   Q.   (BY MR. DIXSON)  Do you believe that those stickers were

4   related to your position with regards to Referendum 71?

5        INTERPRETER:  I couldn't say that for a hundred percent,

6   because I did not see who done it.  I don't know.  Even

7   though I resided there for four years, and I had no issues

8   with the neighbors, and --

9   Q.   Were any stickers placed on your vehicles around the time

10  of the signature gathering or the November 2009 election?

11       INTERPRETER:  No.

12  Q.   Do you recall, from what your son told you, what was

13  actually written on any of the stickers?

14       INTERPRETER:  He just told me that it was very bad

15  swearing words, and, so, I tore it up and threw them in the

16  garbage.

17  Q.   Did you think they were directed to you, personally?

18       INTERPRETER:  Yes.

19  Q.   Why do you think that?

20       INTERPRETER:  Because I did not see stickers like that at

21  my neighbors' vehicles.

22  Q.   Did your son tell you if the stickers said anything about

23  Referendum 71 or Biblical marriage?

24       INTERPRETER:  No.

25  Q.   I would like to talk about -- strike that.

1     Outside of the stickers, is there any personal harassment

2  that you allege you suffered, that we have not discussed here

3  today?

4     INTERPRETER:  Personally, me, no.  But, you know, when

5  our youth was out in the city with the signs, and they were

6  swore at, spat at, middle fingers were shown to them.

7  Q.   Okay.  And I want to talk about harassment that you

8  didn't suffer personally, but you are aware of.  And it is

9  important that we talk about each incident, if you can

10  separate them separately.

11     So, in whatever order you would like to tell me about

12  them, please tell me about any harassment that you are aware

13  of, but did not suffer personally.

14     INTERPRETER:  Like I said, our youth, and there is the

15  person named ███████████.  He is a nephew of ███████████

16  ███████.  He is the pastor of other ███████████.  I think

17  it was on October 24th, they were standing on Division, and

18  they saw one woman tearing down the sign, and she -- and he

19  asked her, why are you doing this?  And she took the sign and

20  hit him on the head, and he suffered cuts on his head.  He

21  actually went to emergency room, and he had stitches placed

22  in his head.

23  Q.   Was ███████████ part of a large group that was waving

24  signs?

25     INTERPRETER:  Yes.

1    Q.    Approximately how many people were in the group, if you

2    know?

3          INTERPRETER:  I don't know, exactly, the number, but it

4    was a group of people.  So, after that incident, you know, we

5    asked the youth not to be in the small groups, like of, you

6    know, like, a couple people, but more like six or eight so

7    they would feel safer.

8    Q.    Were youth from your church present with ▓▓▓▓▓▓▓ in

9    October of 2009?

10         INTERPRETER:  No.  No.  It was a group from a different

11   church, and usually, groups from the same church, you know,

12   went out.

13   Q.    What's the name of ▓▓▓▓▓▓ church?

14         INTERPRETER:  I don't know the name of the church.  I

15   know it's a church of ▓▓▓▓▓▓▓.

16   Q.    In Spokane?

17   A.    Yes.

18   Q.    Do you know the address or anything?

19         INTERPRETER:  I don't know.

20   Q.    Do you know ▓▓▓▓▓▓ personally?

21         INTERPRETER:  No.  Personally, I do not.

22   Q.    How did you learn about what happened to ▓▓▓▓▓▓?

23         INTERPRETER:  Well, I mean, it was just -- it just spread

24   among the Slavic group, and it was a little tense time, at

25   that time, so it was discussed.

1    Q.   Do you know if the woman who took the sign said anything

2  to ██████████?

3         INTERPRETER:  I don't know what was exchanged,

4  conversation-wise.  I just know that he was hit.

5    Q.   Did you see ██████████ with the stitches, following the

6  incident?

7         INTERPRETER:  No.  Personally, I did not.  Personally, I

8  did not.

9    Q.   But you have never --

10        INTERPRETER:  Because we are in different churches.

11   Q.   And you have never personally met ██████████?

12        INTERPRETER:  With his ██████████, I did.  The one

13  who is a pastor.

14   Q.   Did you talk to ██████████ about the incident?

15        INTERPRETER:  I personally did not.  There is actually a

16  letter in which he described what happened.

17   Q.   Can you tell me more about the letter?  Who wrote it?

18        INTERPRETER:  ██████████.  ██████████.  He

19  wrote this letter, and he even said he could come and

20  testify, if needed to, and to tell it in detail, how it

21  happened.

22   Q.   When was the letter written?

23        INTERPRETER:  Yesterday or day before.  He found out that

24  we had been called as witnesses to this, and he found out

25  that we needed some information, and he was ready to come and

1  testify.

2  Q.  Have you seen the letter, or ██████ just told you that

3  he wrote a letter?

4      INTERPRETER:  I saw the letter.  I personally saw the

5  letter yesterday.

6  Q.  Do you know if ████████, or anyone else in that youth

7  group, said anything to the woman, prior to her striking

8  ████████?

9      INTERPRETER:  From what I know, he asked her, why are you

10 tearing the signs down?

11 Q.  And do you know what she said to him?

12     INTERPRETER:  No.  Well, she responded with (indicating.)

13 Q.  So, to your understanding of the incident, a group of

14 youth were waving Referendum 71 signs?

15     INTERPRETER:  Yes.

16 Q.  A woman approached the group and grabbed -- and began to

17 take down the signs?

18     INTERPRETER:  From what I understand, one of them was,

19 like, sticking in the ground.

20 Q.  And she -- did she pick up a sign that was in the ground,

21 or did she take a sign from someone who was holding it?

22     INTERPRETER:  From the way I understood it, it was staked

23 into the ground.

24 Q.  And there -- and ████████ asked her, why are you

25 taking the sign out?

 1        INTERPRETER:  Yes.

 2   Q.   And then she struck him on the head with the sign?

 3        INTERPRETER:  Yes.

 4   Q.   Do you -- and ████████ went to the hospital, correct?

 5        INTERPRETER:  Yes.  And he had six stitches in his head.

 6   Q.   How do you know the number of stitches?

 7        INTERPRETER:  That is what it says in the letter.

 8   Q.   So you know that from the letter, correct?

 9        INTERPRETER:  Yes.  I saw the letter yesterday.

10   Q.   Do you know what hospital ████████ went to?

11        INTERPRETER:  I don't know what hospital.

12   Q.   Did anyone say anything to the woman after she struck

13   ████████?

14        INTERPRETER:  I don't have any knowledge what happened

15   afterwards, what actions were taken, or anything like that.

16   I don't know.

17   Q.   Do you know if ████████ filed a report with the police

18   regarding this incident?

19        INTERPRETER:  No.  He did not do that.

20   Q.   You know for a fact that he did not file a report?

21        INTERPRETER:  I heard that police was not called.

22   Q.   Did anyone tell you, or have you come to know, why the

23   police were not called?

24        INTERPRETER:  I don't know the reasons why the police was

25   not called.

1    Q.    Is there anything else about the incident with

2    ██████████  that you would like to tell me, that I haven't

3    asked you?

4          INTERPRETER:  No.  I said everything.

5    Q.    Outside of the incident with ████████, are you aware

6    of any other incidents regarding Referendum 71?

7          INTERPRETER:  The incident where -- like I stated in the

8    beginning -- where our youth was standing -- should I repeat

9    that?

10   Q.    Yes.

11         INTERPRETER:  At a number of times when our youths would

12   be standing out with the signs, they were sworn at, spat at,

13   and middle fingers were shown to them, and I did verify that

14   with the youth.

15   Q.    Okay.  Did these incidents -- are they separate

16   incidents, or was the swearing and the spitting all together?

17         INTERPRETER:  It was at different times.  Our youth went

18   out a number of times, and they would gather in groups, and

19   would be out there with signs.

20   Q.    Are these youth from your church, or youth from other

21   churches?

22         INTERPRETER:  From our church.  Yes.

23   Q.    Were you ever present when the youths were gathered and

24   waving the signs?

25         INTERPRETER:  I wasn't present, physically, but I drove

1    by locations where our youth was standing.

2    Q.   When you -- did you personally observe any spitting or

3    swearing at the youths when you drove by?

4         INTERPRETER:  No.  Personally, I did not see that.

5    That's from the words of the youth.

6    Q.   Can you estimate for me how many times the youth were

7    spit at or sworn at or had middle fingers raised?

8         INTERPRETER:  I recently talked to a person.  I don't

9    want to, you know, mention his name, because he is not an

10   adult yet.  From what he told me, it was quite frequent.

11   Q.   Can you provide any greater detail about any of these

12   particular incidents?

13        INTERPRETER:  No.  I can't provide anything more.

14   Q.   Do you know if the youths were who were spit at or sworn

15   at contacted the police regarding what had taken place?

16        INTERPRETER:  No.  They did not report that to the

17   police.

18   Q.   Do you know why they would not report that to the police?

19        INTERPRETER:  I don't know.  Maybe they got used to it

20   or --

21   Q.   Prior to the youths going out to wave signs, did you, or

22   anyone from the church, provide them instructions on where to

23   go or what to do?

24        INTERPRETER:  We had a discussions with them, you know,

25   about it, but as far as actual location, they would choose

1    themselves.  Either by the church, or on Division and

2    Wellesley.  But the sign that was by our church, on the

3    church's property, was taken down numerous times.

4    Q.  Are there any other incidents, that you are aware of,

5    with the youth and the sign waving, that you haven't told me

6    about today?

7         INTERPRETER:  No.

8    Q.  Did people report -- did the youths report these

9    incidents directly to you, or did you learn about them

10   through the members of your church and Slavic community?

11        INTERPRETER:  Well, sometimes they -- some of them told

12   it to me directly.  Sometimes they, in the group meetings,

13   you know, when the service would end, you know, would

14   communicate among each other and talk about it.

15   Q.  Informally, you learned about these incidents?

16        INTERPRETER:  You know, I did not, like, collect this

17   information, because I did not have a thought in my mind that

18   I would -- sometime later, would need that information.

19   Q.  Okay.  You mentioned that there was a Referendum 71 sign

20   on the church property that was removed.  Correct?

21        INTERPRETER:  Yes.

22   Q.  Was the sign simply taken and moved, or was it broken, or

23   damaged, or otherwise defaced?

24        INTERPRETER:  A number of times, it happened -- at

25   minimum, happened three times, and, usually, what happened,

1  the sign would be torn off, but the stake that was in the

2  ground, you know, would still be there.

3  Q.  Did you witness anybody tearing the sign off?

4       INTERPRETER:  Personally, I did not.

5  Q.  Do you know anyone from the church who saw the sign get

6  ripped off?

7       INTERPRETER:  No.  We just saw the fact that it's gone.

8  Q.  Did the -- was anything -- any notes or other messages

9  left on the stake, or anywhere else around the church

10  property?

11       INTERPRETER:  No.  It was just a broken sign.  That's it.

12  Q.  Did you, or anyone from the church, contact the police

13  regarding the broken sign?

14       INTERPRETER:  No.

15  Q.  Why not?

16       INTERPRETER:  We are not used to do those things for

17  things of that nature.  You know, if it was, like, you know,

18  some big crime, sure.  We would just put a new sign in.

19  Q.  Outside of the incident with ████████, the youths

20  holding the signs, and the sign on the church property, are

21  you aware of any other harassment related to Referendum 71,

22  that you have not told me about today?

23       INTERPRETER:  No.  That's it, pretty much.

24  Q.  Since the election in November 2009, are you -- have you,

25  or anyone you know, suffered harassment related to

1  Referendum 71?

2      INTERPRETER:  No.  I am not aware of that.  That, or any

3  threats, or anything like that.

4  Q.  Did you, at any time, feel personally unsafe based upon

5  your participation with Referendum 71?

6      INTERPRETER:  Well, there was some feeling, you know,

7  which I was going to go, but --

8  Q.  Can you explain?  I guess I am unclear as to that answer.

9      INTERPRETER:  There was some time when it was tense, but

10  there was no, like, you know, specific threats to me, or

11  anything like that.

12  Q.  What made you feel tense?

13      INTERPRETER:  I can't really explain it, but it's just a

14  feeling.

15      MR. DIXSON:  And I think I am done for now, if you have

16  any questions.

17                           EXAMINATION

18  BY MS. EGELER:

19      MS. EGELER:  Can you hear me all right?  This is Anne

20  Egeler, and I am a deputy solicitor general with the Attorney

21  General's Office, and I am representing Secretary of State

22  Sam Reed in this litigation.

23      Sir, can you tell me what your residential address is?

24      INTERPRETER:  ███████████████.

25  Q.  Okay.  And can you tell me how to spell ██████?  You

1    were referring to a ▮▮▮▮▮▮▮▮▮.  Can you spell that

2    name for me?

3    A.    ▮▮▮▮ -- I don't know -- ▮▮▮▮▮, maybe.

4         INTERPRETER:  I would guess it's ▮▮▮▮▮▮▮▮

5    Q.   And would ▮▮▮▮▮ be ▮▮▮▮▮▮▮▮▮

6         INTERPRETER:  I am sorry.  I lost you there.

7    Q.   Is Nickolay, ▮▮▮▮▮▮▮▮▮?

8         INTERPRETER:  Yes.  Yes, but sometimes he just writes it

9    down as ▮▮▮▮▮▮▮

10   Q.   And you also referred to an ▮▮▮.  Was that ▮▮▮▮▮▮

11   son?

12        INTERPRETER:  No.  It's his nephew.

13   Q.   And is his full name ▮▮▮▮▮▮?

14        INTERPRETER:  ▮▮▮▮ ▮▮▮.

15   Q.   Is his full name ▮▮▮▮▮▮?

16        INTERPRETER:  This is the interpreter speaking.

17   ▮▮▮▮▮▮ would be a patronymic.  But if it's a first name,

18   it would be ▮▮▮.

19   Q.   Okay.  During the time of -- at any time in 2009, was

20   there any vandalism or damage done to the church?

21        INTERPRETER:  No.  Except, you know, the tearing down of

22   the sign.  No.

23   Q.   Have there ever been, at any time he is aware of, any

24   other political signs that have ever been posted at the

25   church?

```
 1   STATE OF WASHINGTON
                              ss:  Reporter's Certificate
 2   COUNTY OF SPOKANE

 3        I, Osmund D. Miller, a Certified Shorthand Reporter and

 4   Notary Public in and for the State of Washington,

 5        DO HEREBY CERTIFY:

 6        That the foregoing is a true and correct transcription

 7   of my shorthand notes as taken upon the deposition of ████

 8   ████████  on the date and at the time and place as shown on

 9   page one hereto,

10        That the witness was sworn upon his oath to tell the

11   truth, the whole truth and nothing but the truth, and did

12   thereafter make answers as appear herein,

13        That I am not related to any of the parties to this

14   litigation and have no interest in the outcome of said

15   litigation,

16        Witness my hand and seal this 28th day of October, 2010.

17

18

19                              RPR, CCR No. 2280

20   OSMUND D. MILLER
     Certified Shorthand Reporter and Notary
21   Public in and for the State of Washington,
     residing in Spokane.  My commission expires
22   on December 15, 2012.

23

24

25
```

1                              EXAMINATIONS                          Page

2      EXAMINATION BY MR. DIXSON:                                      3

3      EXAMINATION BY MS. EGELER:                                     40

4      EXAMINATION BY MR. PIDGEON:                                    43

5      EXAMINATION BY MR. DIXSON:                                     50

6      EXAMINATION BY MS. EGELER:                                     52

7      EXAMINATION BY MR. PIDGEON:                                    55

8      EXAMINATION BY MR. DIXSON:                                     58

9

                                  EXHIBITS
10
       Description                                                  Page
11
       (Ex. No. 1, marked.)                                          17
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 7-2

Exhibit in Support of Pls.' Response to
Def's Motion for Summ. J.
(Case No. 3:09-cv-05456-BHS)

Exhibit 7, Page 25

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,

          Plaintiffs,

     vs.              NO. 3:9-CV-05456-BHS

SAM REED, in his official capacity
as Secretary of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer
for the Secretary of State of
Washington,

          Defendants.

DEPOSITION OF  ████████████

Deposition upon oral examination of ████████████, taken
at the request of the Defendants, before Osmund D. Miller, a
Notary Public, RPR, CCR No. 2280, at the law offices of
Witherspoon-Kelley, 422 West Riverside, Spokane, Washington,
commencing at or about 1:00 p.m., on October 7, 2010 pursuant
to the Federal Rules of Civil Procedure.

1          GREG SENCHENKO
           The Interpreter, having been first duly
2          sworn according to law, did interpret from
           English to Russian and Russian to English:
3

4          ███████████████
           called as a witness at the request of
5          the Defendants, having been first duly
           sworn according to law, did testify as
6          follows herein:

7

8

9

10     MR. DIXSON:  Anne, just so you are aware, we are going to

11  proceed in English, and if ███████████ has trouble

12  understanding the question or would like it to be spoken to

13  him in Russian, he will ask, but other than that, we will

14  proceed in English.

15     MS. EGELER:  All right.

16                      EXAMINATION

17  BY MR. DIXSON:

18  Q.   Good afternoon, ███████████.

19  A.   Hello.

20  Q.   My name is Steve Dixson.  I am an attorney for the

21  Washington Coalition for Open Government, one of the named

22  defendants in this lawsuit, and today is the time and place

23  for your deposition.

24       Did you meet with anyone, prior to your deposition today,

25  regarding the subject of your testimony?

1    But when the phone happened, the phone call happened on

2    9-16.  It was about lunchtime or so.  Yeah.  Anne called me

3    and I picked up the phone, and it said it's unavailable, you

4    know.  And I picked up the phone, and she said, kind of fast,

5    her name and organization, so I couldn't pick it up really

6    fast.  Blah, blah, blah.  And then she started talking about,

7    I need to go to the court as a witness, and they are going to

8    question me for two hours, and they are going to record

9    everything I said, and then they or going to use it in the

10   court, and all this stuff.

11   And, you know, and all my bad memories just come back to

12   me.  Oh, as this time came back from the Soviet Union.  And I

13   said to her, no.  I am sorry, but I am not going to do that.

14   And then she started saying something, like, oh, you have

15   to go there.  And we will produce a subpoena.  And, actually,

16   before -- I heard this word "subpoena," but I am not very

17   well familiar with this.  And I asked her to explain, and

18   Steve explained to me, we will serve a subpoena.  You have

19   to.  And if you don't, something really bad will happen to

20   you.  And the voice was kind of not really friendly, you

21   know.  And all my mind just started burning.  Oh, man.  This

22   is the old time.  And what are you going to do to me?

23   Something really bad, even worse than happened to me in the

24   Soviet Union.  Are you threatening me?  I said, I don't want

25   to continue this.  I don't want to talk about it, and just

1    put the phone down.

2          And, of course, I was really nervous at that moment.  And

3    about an hour later, I got another phone call from another

4    lady, and her name was Jessica Hamilton.  She said, "I am

5    calling from Washington Families Standing Together."

6          I said, "Oh, Families Standing Together.  Wonderful

7    people."

8          "No, no, no.  It's a little different."

9          Then she explained who she is, you know.  I am sincere

10   with you.  I am just telling you exactly how I felt.

11   Q.   Sure.

12   A.   And I said, "Oh, I just got a similar phone call just

13   about an hour ago.  Maybe you know who called me."  Because I

14   had no chance to write it down or anything like that.

15         She said, "Yeah, I know.  This is our people."

16         I said, "Can you spell me the name of the person who

17   called me?"

18         And she gave me their name.  Anne Egeler.  And she

19   spelled me the office where she called me from.  And then I

20   asked her, "Can you give me your name, then; who you are?

21   Can you spell me your name?"  And I put down her name and

22   phone number and the organization.  It's all here.

23         And then she started saying the same thing as Anne told

24   me.  She says, "Oh, ███, you need to go to court.  They're

25   going to hard -- they are going to ask you a bunch of

1   questions."

2       I said, "What is this all about?"

3       She said, "Oh, it's about R-71, and people who you met."

4       Just started saying a lot.  I said "Whoa, whoa, whoa.

5   Wait a second.  I don't want to discuss that."

6       Maybe for you, like, American, young -- like, she is a

7   young girl.  She doesn't know life and hardship and troubled

8   time.  Maybe for you, it's just a joke or it's nothing.  It's

9   just like this (snapping fingers), you know.  But for us, who

10  went through hell, it's very serious stuff.  You know.

11      And I said -- I said, "I don't want to continue in

12  discussions with you.  If you want this, you need to speak

13  with my lawyer."

14      "Oh, you have a lawyer?  Who's your lawyer?  Give me his

15  name.  Give me his phone number."

16      I said, "He is going to call you.  He is going to call

17  you."

18      She says, "Oh, you are from there.  Oh, I can speak to

19  you a few words in Russian."  You know Americans.  They think

20  a few words, I assume in Russian, and okay.  No problems.

21      She said, "I was in Russia once, and it wasn't that bad."

22      You know.  I said, "What year you went to Russia?"

23      She said, "Oh, 1997."

24      It was after perestroika.  And I lived there since my

25  childhood.  And I know what my parents went through, and I

1    remember my life and my family.  So it was very different.

2    So you can't even imagine what I came from.  You know?  So it

3    is very serious to us.  I can't continue.  Just my word.  We

4    will call you about it.  I said, I don't want to continue.

5         And then I got a phone call from ███, my assistant.

6    Said, oh, I just got a phone call from Jessica.  Not him, but

7    his children.  He wasn't home, and she spoke with children,

8    and she was saying to me -- it's nonsense -- because she was

9    threatening his children, saying, oh, we are already suing

10   one pastor because he didn't want to marry gay couples.

11   Something like that.

12        I said, what -- that's nonsense.  It's just crazy.  I

13   don't want to even listen to you.  And, so, at that moment, I

14   just said, no.  That's enough.  I called the lawyer and

15   explained what's going on, and said, hey.  That's way too

16   much.

17   Q.   Can I interrupt?

18   A.   Sorry.

19   Q.   Backing up a couple of steps.  Did these women -- Anne

20   and Jessica, what types of bad things did they threaten you

21   with, if you remember?

22   A.   Well, first of all, when Anne called me -- especially

23   closer to the end of the conversation -- the tone of speaking

24   was not really friendly.  You can feel it.  Like, when I

25   speak and smile with you, you can feel it, like.  You know.

1   So it wasn't really a friendly call.  And I was kind of,

2   whoa, alert.  What is this?  You know.  And then, when she

3   kind of started forcing me to go to the court, you know, and

4   then, threatening me with a subpoena.  Actually, as a matter

5   of fact, this threat of subpoena was made 14 days before

6   subpoena was produced.  I am not a lawyer, but I believe it's

7   kind of wrong, doing that.  Okay.  If you don't have a

8   subpoena, how can you threaten people with a subpoena.

9        Then, when I said, no, I am not going to do that, then

10  she said, then something really bad will happen to you.

11  Q.   She said something really bad will happen to you?

12  A.   Yes.  And then I replied, oh, you are going to do

13  something to me even worse than happened to me in Soviet

14  Union?  You are threatening me.  I said, thank you.  Goodbye.

15  I don't want to talk about it.

16  Q.   But she said to you, something really bad is going to

17  happen to you?

18  A.   Yes.  Yes, sir.

19  Q.   At that point, you ended the conversation?

20  A.   At that point, I just made a reference to Soviet time.  I

21  said, is it going to be worse than happened to me in Soviet

22  Union?  So you are threatening me?  I said, no.  I am not

23  going to continue this.  Boom.

24       I believe -- again, maybe I am not a lawyer.  I don't

25  know the law.  But I felt that it was a threat.  It was a

1  threat.  And then, when Jessica called me, she spoke with a

2  kind of good tone, manner and voice, and tried to be a

3  friend.

4  Q.   Go on.  I don't know what that is.  Go on.

5  A.   KGB.

6  Q.   Yeah.  They are on the line.

7  A.   And I am really sorry of the situation.  And I apologize

8  before Anne, because I am not a person who is -- kind of,

9  hates people, and try to fight with them, but after getting

10  this kind of phone calls, and then Jessica called me, and

11  everything the same time.  So about the same time.

12  Q.   I think we have been through Jessica's phone call.

13       What attorney did you call, following Jessica's phone

14  call?

15  A.   Okay.  I called Matt Shea.

16  Q.   Matt Shea?

17  A.   And I called Steve.  Stephen.

18  Q.   Is Matt Shea an attorney?

19  A.   Yes, he is.

20  Q.   And why did you call -- is he your personal attorney?

21  A.   I don't understand.  What does it mean, personal

22  attorney?

23  Q.   Has he represented you in any business dealings or

24  previous lawsuits?

25  A.   Well, not the lawsuits.  He helped me before with just

1    little things.  I called him asking questions, and he helped

2    me a little bit.

3    Q.    Were you able to talk to Mr. Shea about Jessica's phone

4    call?  Did you reach him in person?

5    A.    Yes, I did.

6    Q.    And did he explain to you, maybe, why she was calling?

7    A.    Actually, he said that he was shocked that these people

8    called me about a subpoena without having a subpoena.  You

9    know?  And speaking like this to me, and to, like, ███████

10   family.  And, actually, then, right away, I called Steve and

11   told him the same thing, same story.  He said, okay.  Don't

12   worry.  We will find out what's going on.  We will call those

13   people and find out what it is, because I was actually

14   shocked.  And, actually, when we started speaking with this,

15   I will just -- can I finish this?

16   Q.    Sure.

17   A.    About your question?  Because then we can go farther,

18   because I don't want to mix everything in my head.

19         So I do not use those ladies.  And they are wonderful

20   people, and I can kind of help them with any needs and serve

21   them, but after the phone calls, I started feeling really

22   bad.  My anxiety just, boom.  And as the old time memory come

23   to me, and actually, I started crying, and I was not able to

24   finish my working day, and I got sick leave.  This is a copy

25   of the whole week of my sick leave.

1  Q.   For the record, it looks like ▮▮▮▮▮▮▮ has a -- is it

2  a time card from DSHS?

3  A.   Yes.  It's my leave records.  Like, on the 16th, you see

4  when they called me, I took one.

5        MR. PIDGEON:  Before we go on, can we get this admitted

6  as an exhibit?

7        MR. DIXSON:  I am willing to take his word for it.  I

8  don't need it as an exhibit.

9        THE WITNESS:  I don't want to complain.  Like, since you

10 asked me this question.  Nobody would ask me, I would never

11 tell that.  Since you asked me, I am telling you.

12 Q.   (BY MR. DIXSON)  I understand.

13 A.   I took it seriously.  The next day, like, on Monday -- I

14 felt really bad on Sunday.  I left the church early.  I

15 wasn't able to continue.  I got high fever.  My body was

16 shaking.  High blood pressure.  Everything.  Even my organs

17 and heart.  Everything was hurting.  I couldn't recognize

18 myself, because I used to be in good shape a long time ago.

19 I used to be a boxer, actually.

20 Q.   Uh-huh.

21 A.   So, like, on Monday, I stayed home all day long in the

22 bed.  I took sick leave.  I just wasn't able to get out from

23 the bed.  On Tuesday, I came back to work, but I had symptoms

24 of heart attack, and my sup (sic) said, ▮▮▮▮▮ you better go

25 to emergency room right now, before you die."

1       So I went to Urgent Care at the Rockwood Clinic.  Three

2    hours here on the 21st.  And they checked me out, EKG, the

3    blood, x-ray.  And the doctor said, █████, you don't have a

4    heart attack yet.  It might come at any time.  But you have

5    PTSD, post-traumatic stress disorder.  He asked me what

6    happened.  I started crying.

7       I said, well, all these memories, what KGB done to my

8    family; to me, personally; to my kids; to my parents.  Just

9    every -- all those memories started coming back in.

10   Seriously, I couldn't control myself.  I just started crying.

11   I couldn't work.  And the day I come back to work, and, like,

12   three more days, I was taking sick leaves because I was,

13   like, shaking.  I can't control myself.

14       Because at the same time -- maybe it's a coincidence.  I

15   am sincere.  I am not accusing anybody.  But at the same

16   time, like, sometimes before that, after I come home from

17   work, I just came out of my home and I couldn't believe my

18   eyes.  Here is this white SUV standing across my home, and

19   the lady is making pictures of my cars, my home, my garage,

20   everything.  And I just came out and said, hey, who are you?

21   What are you doing here?

22       She said, oh, it's a project.  It's a school -- it's for

23   a school project -- project.  And she ran away.  Drove away.

24       And here I met the lady, just jump out of the bushes with

25   her camera, hiding here, you know, and she just run away the

1   same directions as the car came.  And I was, what's that?

2      And the next several days, I saw a black car come, and,

3   like, expensive, real expensive car come into my home,

4   parking right across the street in the evening time, and

5   standing there for hours.  For hours, every evening.  I

6   didn't call the police because how can I?  It's public

7   property.  Anybody can park there.  It looks really strange.

8   Without experience, I know, what can it be?

9      Or somebody come -- I look through the door at night

10  time, somebody come out of the car, and the car left, and

11  somebody was standing with something in their hand.  I don't

12  know what it was.  Maybe a camera.  I don't know what it was.

13  For hours.  For hours.  You know, and all of this.

14     And then, the same day, on the 19th, when I told you I

15  left the church, I wasn't able to continue service, and I

16  said, my brothers, I am dying.  Sorry I have to leave.  I am

17  just crawling.  I walk around -- I walked around the church,

18  jumped in my car, and started driving around the church.  And

19  that was around 9 -- maybe 8:30 or so.  It was really dark.

20  And I saw on stand, like, a couple of cameras right across

21  the street, and there was a road construction.  A couple of

22  cameras stand by.  You can see the window is on, you know,

23  just waiting for movement when people start -- it was the end

24  of the service -- starting people coming out of the church.

25  And nobody was standing next to those cameras, but a bunch of

1    cars were there, and people were hiding in the cars.

2         So it was really strange to me, because nobody actually

3    asked my permission to make pictures of people coming of the

4    church, you know.  Especially of the evening time.  But I

5    felt so bad.  I was dying.  I wasn't able to stop and find

6    out who was doing this, and call the police, or whatever.  I

7    just want home and dropped into bed.

8         My wife is a nurse, so she came from the church.  She

9    said, you have high fever.  And everything was bad.  So I

10   thought I was going to die.  I was praying to God, I am

11   ready.  Take my spirit, God.  So I am ready.

12        I am not making it up.  I am not accusing -- I don't ask

13   anybody to pay me back or whatever.  No.  You just asked me a

14   question.  I am just telling you what happened.  And why was

15   my reaction like this.  Why, today, I am here against my

16   will.  I told them, I don't want to do that, because it

17   brings all my memories and all this events that happened to

18   me.  And, like, mail started disappearing from mailbox, you

19   know, and all the strange people watching my house, and I

20   just started to remember the time KGB actually was watching

21   my house 24/7.  The car was standing, basically, just

22   watching, you know.

23        And I just -- that was too much for me.  Just too much.

24   And I -- even today, the whole church prayed for me that I

25   have strength to come, and I have weakness today.  Seriously.

1    I can't recognize myself.  I usually was strong man all the

2    time.  At this time, I don't know what's going on with me,

3    you know.  All this come to me and it's just, oh, my God.  I

4    can't really kind of control it.  It's just -- I am sorry,

5    Steve.

6    Q.   No, no.  I understand.  And I certainly appreciate you

7    being here today, understanding it's against your will.

8         Did you explain the SUV's and the cameras outside the

9    church?  Did you tell anybody about that?

10   A.   Yeah.  Yesterday, the prayer service, I actually told

11   them.  Because we have kind of experience from the Soviet

12   Union.  When you start to be persecuted, there are some tools

13   to protect yourself.  Tool No. 1 is glasnost.

14        INTERPRETER:  Openness.

15        THE WITNESS:  Openness.  Awareness of everybody else.

16   Like, when they called us to the KGB office and tried to

17   convince us to work for them.  We were telling KGB agent, you

18   know what?  Everything you are talking about now, everything

19   you asked me now, every word, as soon as I leave your office,

20   I go to church, gather all people, and I tell them everything

21   exactly you said.  And they are afraid.  They said, no, no,

22   no.  Okay.  Let's finish our conversation.  Because they

23   didn't want glasnost.  To be aware.

24        This exact tool, we are going to use now.  So when people

25   call, making threats, and all this stuff, with strange stuff

1   going on, I can't hold it myself, because I am going to

2   explode and die.  So I told everyone in the church, that's

3   what's going on.  Actually, some people started coming,

4   saying, yeah.  Actually, we saw some strange things going on,

5   some strangers coming with strange behavior.  Maybe there is

6   no connection.  I hope there is no connection.  I believe so.

7   But you understand.

8   Q.   Yes.  Did you tell your attorney, Mr. Pidgeon or Matt

9   Shea, about the cameras and the SUV's?

10  A.   Yes, I did.

11  Q.   And did they give you advice as to what to do?

12  A.   Well, yeah.  They advised me, something happen like this,

13  I have to document it and call the police.  Actually, I spoke

14  with a police officer recently, and told him about this, and

15  they said, yeah, ███   If something is happening, I advise

16  you not to be alone when it's happening.  Be with somebody

17  else all the time.  And if you see something, make pictures,

18  write down license plates, and document it, and make police

19  report right there.

20  Q.   So you spoke to a police officer, but didn't actually

21  file a report?

22  A.   No.  I didn't file any reports.  No.

23  Q.   Since -- have you seen cameras outside the church before?

24  A.   No.

25  Q.   Have you seen them since that Sunday afternoon?

1   A.   No.

2   Q.   You made some motion with your hand like the cameras were

3  on tripods or stands?

4   A.   On stands, yes.

5   Q.   Did they look like video cameras, or more like small

6  personal cameras?  If you remember.

7   A.   I'm sorry.  I interrupted you.  I'm sorry, Steve.

8   Q.   No.  You are good.  You are going to have all the time

9  you want to answer.

10   A.   I need to calm down a little bit.

11      There was a stand with a photo camera.  Not video camera,

12  but big one, like professional one, like this.  And it was on

13  stand by.  You can see the window is on.  The light is on.

14  And then, next to it, a little bit lower, I don't know if it

15  was a stand, or something like that, but there was -- it

16  looks like it was a video camera.

17   Q.   Okay.

18   A.   And it was covered with plastic because it raining a

19  little bit.  Something was covered on the top of this video

20  camera.

21   Q.   Okay.

22   A.   That's all I saw.

23   Q.   Okay.  You mentioned that there were people in cars

24  nearby?

25   A.   Right.  Nobody was standing around those cars, but this

1   street -- it's ██████████.  It was under construction,

2   you know, and there are several cars parked right on the

3   street because it was closed for through traffic, you know,

4   and I saw some people sitting in some of those cars.  Who

5   they are, I don't know.  Maybe they are just --

6   Q.   Was it at the corner of ██████████████████████

7   █████, if you remember?

8   A.   It was on ██████████████████.  Right across the

9   main doors were the steps, and it looks like they were

10  strangers because if it would be kind of people from our

11  community, they know that we don't use that door, get in and

12  out.  We mostly use the door from ████████████, which is a

13  smaller door, but that's what we mostly use, you know.

14  Q.   Would this be a side door to the church, then?

15  A.   Yeah.  In our case, it's a side door.  But when you look

16  at the church, it looks like -- if you are a stranger in

17  town, you would think that this is the main door, with steps,

18  you know.  And they put their cameras, waiting for people to

19  walk into the service, to make pictures of them.  But it

20  wasn't the main door.  So now I was thinking, whoa.  Why are

21  they standing people here?  People don't come to this door.

22  That must be strangers.  They have no idea what they do.

23  Q.   You didn't speak to anybody that was in the cars,

24  correct?

25  A.   No.  No.  I didn't stop.

1   Q.   What time of day was it?  I think you said 9:00 --

2   A.   About 8:30.

3   Q.   A.m. or p.m.?

4   A.   Evening, p.m.  It was an evening service.

5   Q.   Was it dark?

6   A.   Yeah.  It already was dark.  Yes.

7   Q.   But you could still see people in the cars, even though

8   it was dark, correct?

9   A.   Yeah.  Because there is some lights.  It's downtown.

10  It's lighted.

11  Q.   And this was on Sunday, September 19th, three days after

12  the first phone calls?

13  A.   Yes.  Absolutely.

14  Q.   And since that day, you haven't noticed anything --

15  anything like that at the church?

16  A.   No.  No.  No.

17  Q.   The SUV's that came by your house, what day did that

18  happen, if you remember?

19  A.   Unfortunately, I didn't document it.  I didn't call the

20  police.  It was a working day, because I just came back from

21  work.  It was maybe around 5, 5:30, something like that.

22  Q.   And I am referring particularly to the white SUV's, as

23  distinguished from the black luxury car.

24  A.   Uh-huh.

25  Q.   That would be -- it was sometime after you received the

1   call on September 16th?

2   A.   No.  It was before that.

3   Q.   It was before that?

4   A.   Yeah.

5   Q.   A week before?  A couple days?  A week, approximately?

6   A.   No.  I would say, maybe -- it's hard to say.  Maybe

7   about, like, three-four weeks before.  Something like that.

8   About a month before.

9   Q.   Late August, early September?

10  A.   Yeah.  I would say so.

11  Q.   And I know it brings back bad memories, but what do you

12  remember, in particular, about the white SUV?  What happened?

13  What did you see?

14  A.   I just came out of my, kind of, back -- it's not a real

15  front door of my house, but back door, but it comes to the

16  street so you can see the street.  And I just came out, and

17  the same woman -- actually, no.  When I was approaching the

18  door, the garage door, I saw this white car standing across

19  my yard.  I thought maybe somebody come to me to visit me,

20  and I opened the door and came out to the porch, and I saw

21  this lady just making pictures of my car, my wife's car, the

22  garage, and the house.  And then she saw me.

23       I said, hey, who you are?  What are you doing here?  And

24  I thought maybe I should take my cell phone and make a

25  picture, but she left really fast.  She just said a few

1   words.  Oh, yeah.  It's a school project.  And she left

2   immediately.

3   Q.   What street did you come out on?  What's the street you

4   live on?

5   A.   I live on the ███████████████████████, and she was

6   parked on the ██.

7   Q.   Was she -- if I am picturing it, one side of the street,

8   you live, and then, another side of the street?

9   A.   On the other side.

10  Q.   Was she on the other side, or was she closer to your

11  lawn?

12  A.   On the other side, because that's the way she was driving

13  down.

14  Q.   Was she heading down -- down the south hill?

15  A.   Right.

16  Q.   So she was heading north on ██?

17  A.   No.  It's not north.  It's west.

18  Q.   She was heading toward downtown on ██?

19  A.   No.  No.  From downtown.

20  Q.   She was heading away from downtown?

21  A.   Yes.

22  Q.   Up the south hill?

23  A.   I don't live on south hill.  It's down there, like, it's

24  called ███████████████████████.  People call it

25  different.  On the bottom, you know.

1  Q.   Okay.  And do you remember what you said to her, and what
2  she said back to you?
3  A.   I just said, hey, what are you doing here?  Who you are?
4  And she just was, like -- she just got really confused,
5  because she saw me.  And she said something like, oh, this is
6  a school project.  It's a project.  And started running away
7  right away.
8  Q.   Driving away?
9  A.   I am sorry.  Driving away.
10 Q.   How old would you estimate the woman was?
11 A.   Maybe 45 or so.
12 Q.   Had you ever seen her before?
13 A.   No.  Never.  Huh-uh.
14 Q.   And she mentioned it was part of a school project?
15 A.   Yeah.  She just said something like, oh, no.  It's a
16 school project.  It's a school project.
17 Q.   Have you seen her since?
18 A.   No.
19 Q.   Have you seen her car since?
20 A.   No.  Never.
21 Q.   Did you tell the police about this incident?
22 A.   No.
23 Q.   And why not?
24 A.   Well, it's another question.  Like, some people asked me
25 about this incident in ███████ church when somebody crack

1  the hat (phonetic), you know, and they didn't call the
2  police.  And I said, well, in order to understand Russian
3  people, you should live for a while back in Soviet time.
4  Calling the police, back in Soviet time, it means nothing.
5  They will not help you.  They may hurt you even more.
6  Especially if you are a Christian.  You know?  There is no
7  way to find anybody.  And somewhere in our genes, we have
8  this kind of tendency of something happening, the last thing
9  we will do is call the police.
10 Q.   Have you had interactions with the police or law
11 enforcement in the United States?
12 A.   What do you mean, interaction?
13 Q.   Have you ever had occasion to call the police in the
14 United States?
15 A.   Oh, once, we called.  Yes.  No.  Twice.  Sorry.  A long
16 time ago.  One time, about 11 years ago, during the morning
17 service, a man, stranger man, come to the church.  He walked
18 down to the pulpit, and come in front of everybody and he
19 started yelling.  He said, "I hate Russians.  I hate all of
20 these people.  I was fighting with you in Afghanistan."  No,
21 no.  In Vietnam.  In Vietnam.  "And I am going to be back now
22 with my machine gun and I'm going to kill all of you."
23      And he left.  You know, right in the middle of the
24 service.  And, of course, we called the police then.  We made
25 a report, and actually, we had two police cars come and

1    guarded the church for several days.  But it was a long time

2    ago.  11 or 12 years ago.

3    Q.    Were you satisfied with the police response?

4    A.    Yes.  Oh, yes.  No.  Actually, I have some police that I

5    know, and I like those guys, and kind of -- I even volunteer

6    for the sheriff's office.  I have a blue badge for Spokane

7    County Jail.  You know.  I can go there at any time, in any

8    room.  And I know the sheriff personally, and I know the

9    police chief, you know.

10         So, no.  I don't have anything against them.  They are

11   great people, and I have good relations with them.  Even in

12   this case, calling the police and telling them what?

13   Somebody was driving by my house with a camera, making

14   pictures?  So what?  Maybe she is crazy.  Maybe this is her

15   hobby, to make pictures.  You know.

16   Q.    Uh-huh.

17   A.    Maybe for American people, it wouldn't mean anything.

18   But in my case, I remember the time, you know.  With this, it

19   is following you.  Oh, that must be strange.  Especially the

20   second lady, jumping out.  There was kind of a little tree,

21   and she just jumped out of the tree.  Hiding.  Why she would

22   hide the camera if she is doing it legally?  You know.  She

23   was hiding the camera and just without saying anything, just

24   run down the road, you know.  And I believe she joined the

25   car and they left.

1  Q.  So the bush incident and the white SUV, those happened at
2  the same time?

3  A.  At the same time.  Yes.

4  Q.  And where was this -- was this person in your front yard
5  or side yard, or where is the --

6  A.  Well -- I can draw.  I don't know.

7  Q.  It doesn't really matter, and if you start drawing, then
8  we --

9  A.  Okay.  This is my house.  This is the front yard, the
10  front door, and this is the side door.  Okay.  This is ▮.
11  This is ▮.  Here is downtown.  So it looks like they drive
12  here, stop right across my garage with the cars, making
13  pictures, and when I came out, they just, zoom, you know,
14  down behind the corner so I couldn't see them.

15  Q.  Did you say anything to the person that was in the
16  bushes?

17  A.  No.  I had no even time to say, because she run away
18  really fast, and just grab her camera.

19  Q.  Did you see her with a camera, or did you just see her
20  putting something --

21  A.  No.  I saw the camera.  Yes.  I saw it.

22  Q.  How old would you estimate that person was?

23  A.  Maybe -- I don't know -- 30-35-40.  Not young girl, but
24  kind of adult age.

25  Q.  Younger than the person in the SUV?

1    A.    I can't say.  I don't know.  It was just, like, one

2    minute.  You can't really -- maybe about the same age.  Maybe

3    a little bit younger.

4    Q.    Man or a woman?

5    A.    A woman.  Both woman.

6    Q.    And have you seen her since?

7    A.    No.

8    Q.    Have you had anybody in the bushes taking pictures?

9    A.    No.  I never seen anything like that, after.

10   Q.    And then, lastly, before we move on; the dark colored

11   luxury vehicle, or nicer car -- I don't know how you would

12   describe it -- tell me about what happened with that.

13   A.    Yeah.  Actually, my kids told me the same story.  They

14   have seen that, kind of -- I don't know if it's the same car.

15   The night time, it's hard to tell, you know.  But I saw some

16   kind of luxury car, dark car, black car.  I believe -- when I

17   saw it, I believe it was, like, maybe a Mercedes or so, you

18   know.  And it just was -- come and stand at the same place,

19   actually, where the girls were making pictures, and standing

20   there for hours.  Like, three hours, four hours.  As much

21   as -- amazing.

22   Q.    Were you home the entire time that this car was there?

23   A.    It's the evening time.  I go to bed, and then I, like,

24   wake up, and in a couple hours, came out and check it out,

25   and it's still standing there.  It's just, wow, you know.

1 Q. When you say still standing; the car? Or was there

2 someone in the car the whole time?

3 A. It's hard to tell. Like, in a couple cases, I saw the

4 people who were in the car when it was not late night. I saw

5 around 6:00, 7:00, when it was getting dusk, you know, and I

6 saw people standing there, without walking away. You know,

7 they are just sitting there. And then car left.

8      At another time, this car was standing there for a long

9 time. I went to bed already, you know. And also, I saw

10 another truck, expensive truck, stopped there, and stayed for

11 a long time. And one time, I saw -- actually, it was dark in

12 the room. I just come to kitchen to drink some water, and I

13 saw through my glass door, a truck, a new truck, come, and

14 the person came out, and the truck left. And the person was

15 holding something in their hand. And this person was

16 standing there practically, like, over two hours.

17 Q. One person was standing --

18 A. Right.

19 Q. -- in the street for approximately two hours?

20 A. Yeah. At least two hours. Yep.

21 Q. Just holding something --

22 A. Something in their hands. Yeah. I saw some kind of

23 light, a little bit there, but I don't know what it is. You

24 can't tell.

25 Q. Did you say anything to that person?

1   A.   No.  So, what would I tell them?

2        And, actually, once -- but it was way before -- there was

3   another car parked.  It was actually parked on this side of

4   the road, next to my driveway, and I came out and just calmly

5   said, "Do you need some help?  How can I help you?"

6        They said, "No, no.  Thank you."

7   Q.   Across the street where this car was parked, is there

8   another residence across the street?

9   A.   No.  Well, yeah, but it's far away, and their entrance is

10  from ▇▇▇▇▇▇▇▇.  Not from this street.  It's back.

11  Q.   What's located directly across the street from your

12  house?  Vacant lot?  Is it --

13  A.   It's an empty spot.  They are trying to sell it.  It's an

14  empty lot.  On the next block, there is a house, an entrance

15  to ▇▇▇▇▇▇▇.

16  Q.   How many times do you think you saw either the nice black

17  sedan or the new truck?

18  A.   Me, personal, I would say, probably three-four times.

19  And, actually, when they told it to my kids, have you noticed

20  anything strange, they said, yeah.  Actually, we saw this car

21  standing there, too.  And, again, I don't know what it is.  I

22  can't really --

23  Q.   When did this happen, with respect to the white SUV?  Was

24  it before, after, about the same time?

25  A.   Before and after.

1   they saw?

2   A.   Like, from our community?

3   Q.   Yes.

4   A.   I don't think anybody from our community went there.

5   Q.   Do you have any opinion at all as to whether or not the

6   state conducted the signature checking accurately?

7   A.   I don't have an opinion, because I just don't know

8   anything about it.

9   Q.   Okay.

10  A.   I don't know how it should be done.  I believe people who

11  is doing it, they know what they do.  I just assume that

12  those people, they know how to do it.  I don't know.  As I

13  would say, I never put my nose into that business.  I just

14  take care of the spiritual part.  This is how we believe.

15  This is the sign.  We say that.  That's it.

16  Q.   Okay.  Did you have a Referendum 71 yard sign in your

17  personal yard?

18  A.   Yes, I did.  And, unfortunately, it was destroyed first,

19  on my own property, and then it was stolen.  I don't know who

20  did it, but --

21  Q.   The same sign, or did you have to put up a new sign?

22  A.   No.  The same sign that I took it from that meeting.

23  Q.   Did you replace it, once it was stolen?

24  A.   No.  I had only one sign, and I put it on the -- in the

25  front.  Like, the back of a side, like I showed you, I put it

1   right in my driveway, and I believe, in two days, it was --

2   somebody broke it at night time.  So I just screwed it back

3   and put it together, and then, I believe, the next night, or

4   within a few days, it was gone.  Stolen.

5   Q.   Did you see anybody break the sign?

6   A.   No.  I didn't see anybody.

7   Q.   Did they write anything on the sign, or did they just

8   snap the stick?

9   A.   Just snapped it.

10  Q.   Okay.  And did you see anybody take the sign?

11  A.   No, I didn't.

12  Q.   And you didn't replace it once it had been taken,

13  correct?

14  A.   No.  It actually was taken, I believe, kind of in the end

15  of this story.  Still, people had those signs, but since it

16  was stolen, and we were out of them, actually, so I just --

17  okay.  That's fine.

18  Q.   Did you have any R-71 bumper stickers on your car?

19  A.   No.  Can I tell about bumper stickers?  Last night,

20  actually, one older man come to me, and I have his witness

21  here, and he had a bumper sticker, and he come to Lincoln

22  Park with his wife, just for a walk, and they walked for,

23  like, 10 minutes.  Came back, and somebody smashed a window

24  on his car, and he believes it was because of his bumper

25  sticker.  But, again, I cannot be sure for a hundred percent,

1    but that's what he told me last night.

2    Q.   We will get to that in just a second.

3    A.   Okay.

4    Q.   So, did you go outside of the church, ever, to gather

5    signatures for the petition?

6    A.   Me, personally?

7    Q.   Yes.

8    A.   No.

9    Q.   Okay.  Did you have any public role in support of

10   Referendum 71, outside of the rallies that we have spoken

11   about?

12   A.   No.  I wouldn't say so.

13   Q.   No?

14   A.   No.  I wouldn't say so.

15   Q.   Now I think we will get, finally, to what you came here

16   to talk about, which would be any harassment that you, or

17   people that you know, have suffered.  And I want to split

18   that into two categories.

19   A.   Okay.

20   Q.   I want to talk about, first, any harassment that you

21   personally experienced.

22   A.   I've got it.

23   Q.   We will have time to go through whatever you want to tell

24   me, so, start chronologically, or whatever, you know, rings a

25   bell to you first, and then you can tell me about that.

1    A.    Okay.

2    Q.    This is you, personally.

3    A.    Okay.  Personally.

4          First of all, that's what I already told you about.  I

5    know people making pictures of my home and cars.  And mail.

6    Yeah.  Watching my house.

7    Q.    Just so you know, he is going to try to take down

8    anything you say.  So, if you are reviewing your notes, try

9    to do so silently.  It will make a better record.

10   A.    Oh.  Okay.  These are things I already mentioned.  So I

11   don't have repeat it twice.

12   Q.    So, just to be clear.  The personal harassment that you

13   suffered, you've told me about.  And that was in August and

14   September of 2010, correct?

15   A.    And --

16   Q.    And I am not trying to trap you.  I am just --

17   A.    That's right.  Yeah.  Okay.  I actually told you those

18   stories.  And I considered harassment about those two phone

19   calls that resulted in me in the emergency room, because I

20   have PTSD and anxiety, and I was not able to work.  And maybe

21   it's the wrong interpretation.  You see it differently.  I

22   don't want to argue.  But that's how it was for me and my

23   family.

24         As I said, I know people were making pictures on my home,

25   cars, and outside of church.  Somebody was watching my house.

1    And, personally, I actually didn't see much of what -- I list
2    just one event.  Okay.  Here.  Okay.  I don't remember the
3    date.  I didn't document it.  I didn't know that we would
4    need that.  But during the -- last August -- last October,
5    when people are standing with signs, we had -- I believe it
6    was a journal a board, or something like that.  I came out of
7    the church, and it was around 8, 8:30 in the evening.  I just
8    came out of the church, and I saw from the side door, from
9    the office door, and I saw our people standing on the
10   intersection of Second and Lincoln with the signs.  Okay?
11   Q.    Uh-huh.
12   A.    And right at the moment I left, I left the building, I
13   saw a young man about maybe 25 years or so.  He was walking
14   on the street, and he come to -- there was a group of people.
15   Because after this man in the ███████ church was injured,
16   we decided not to stand alone, but be in groups all the time.
17   And other violence was reported.  So there was a group of
18   people.  Maybe four or five people standing on the corner
19   with the signs.  And this young man actually approached them
20   and started screaming and yelling like crazy, and, like,
21   calling them bad names, and then he grabbed one of the signs
22   from the -- from some one of our persons, grabbed the sign,
23   and he was actually crazy, because he jumped right in the
24   middle of the intersection, Second and Lincoln.  And there
25   are lots of cars going, you know.  And he started screaming

1    at the cars crossing by, and pretending like he is trying to

2    hit those cars with this sign.  You know, just showing them

3    the sign, and trying to hit the cars.  And cars were kind of

4    avoiding him.

5          And I said, what is that?  You know.  And then he just

6    said a few bad words at our people, and he threw the sign and

7    just run away.  To me, I thought this was the man from the

8    opposite side, trying to create the opinion of the public

9    that these Slavic people are crazy.  You know, that he is one

10   of the them with the sign, hitting cars.  That was my

11   impression.  It was really bad.  And he called our people bad

12   names.  You know, just bad words.  And he run away and threw

13   away the sign.

14         That's one incident that I saw, personally, with my eyes.

15   Q.    Did he say anything other than bad words to that group

16   that was gathered there?

17   A.    Yes.  He expressed his disagreement with this action.

18   Q.    Okay.  And then he jumped in and grabbed a sign from

19   somebody?

20   A.    From the hands.  Yeah.

21   Q.    Did anybody try to stop him from doing that?

22   A.    No.  Actually, we informed all our people, we said, even

23   if there is going to be any kind of --

24         INTERPRETER:  Confrontation?

25         THE WITNESS:  Yeah.  Any kind of confrontation, just not

1   to participate.  Just stay away.  To be calm.  Not to answer

2   any of this.  You know.  And, actually, at that time, we had

3   some older people standing there.  You know, not young

4   people.  Because it was kind of getting darker, and we were

5   commanding young people not to stand in the dark time.  And

6   they were just standing without saying a word.  Saying

7   nothing.

8   Q.   (BY MR. DIXSON)  How long do you anticipate he was out in

9   the intersection?

10  A.   Not too long.  Maybe a minute or so.

11  Q.   That's a long time to be standing in traffic?

12  A.   Yeah.  Actually, he was a brave man.  I said, wow, yeah.

13  He put his life in danger.  They will hit him with the car.

14  It was like he was so enthusiastic if they decided to do so.

15  That's only one thing that I saw.

16  Q.   And did he throw the sign on the ground, or did he throw

17  it at the group that was standing there, when he left?

18  A.   He started running down the sidewalk.  I believe he just

19  crushed it over the sidewalk.

20  Q.   Threw it down?

21  A.   To the sidewalk.  He didn't hit anybody.  He just

22  expressed dirty words.

23  Q.   Okay.  Outside of the event that you just told me about,

24  and the August and September 2010 events, that's the extent

25  of your personal experience?

1  A.    Uh-huh.

2  Q.    Okay.  Let's talk about any harassment that you are aware

3  of, but did not experience personally.  And I don't know

4  where you want to start, but you can just tell me.

5  A.    And one more thing.  Maybe -- I don't know if it relates

6  to my personal or to, like, this stolen sign and broken sign

7  at my own property.

8  Q.    Yes.

9  A.    And at the church property.  Even though we have very

10 small property at our church, but we have a small piece in

11 front of the church, and we put the sign up there, and,

12 actually, every night, it was broken or stolen, you know.

13 Just -- so --

14 Q.    How many times would you estimate that happened?

15 A.    We replaced that sign too many times.  I don't know how

16 many, but many times.

17 Q.    10 or more?  Or five to 10?

18 A.    No.  Not -- maybe five or six times.  One time it was

19 broken in little pieces.  Wow, not very patient people.  Make

20 it in little small pieces.

21 Q.    Did you see anybody breaking the signs?

22 A.    No, I didn't.

23 Q.    Did they write anything on the signs?

24 A.    No.  Not -- no.

25 Q.    Did they leave any messages at the church, or near the

1   signs?

2   A.      I believe there was a sticker once, but I didn't pay

3   attention much in those days.  I believe there was a sticker

4   on the church door, when I come.  They were saying something

5   about our participation.  Something like that.

6   Q.      Do you remember when that was?

7   A.      During the rally time.

8   Q.      How big was the sticker, approximately?

9   A.      Just small office sticker.

10  Q.      So, like, two and a half inches by two and a half inches?

11  A.      Yes.  A small piece.

12  Q.      Like, a Post-It note?

13  A.      Uh-huh.

14  Q.      Do you remember what was written on the Post-It note?

15  A.      Just -- I don't remember, exactly.  I just threw it away,

16  just without -- something -- something they spread, just

17  disagreement.  If you are doing it, you have to stop doing

18  it.  Something like that.  I don't remember the wording,

19  exactly.  But some disagreement.  Why should you do this?

20  Just stop it.  Something like that.

21  Q.      So you read the Post-It note, and then threw it away?

22  A.      I just threw it away.  I didn't pay any attention.

23  Q.      Let's talk about harassment you are aware of, but didn't

24  experience personally.

25  A.      Personally?  I am done.

1  Q.  That you are aware of, but did not experience personally.

2  A.  Okay.  Actually, during this vote time, several

3  complaints were received from different members of the Slavic

4  community.  Lots of people talked about it.  And most of the

5  people were talking about some other people being rude to

6  them, calling them bad names.  And sometimes our youth had

7  a -- kind of, standing in their places, and people with

8  opposite signs, with the green signs, come, and sometimes

9  they behaved kind of violent.

10     There was different response from the public because

11  there were lots of cars driving by.  Many people encouraged

12  the youth, but some people yelled at them, saying very bad

13  words.  And this is one incident I saw it.  And lots of

14  reports of stolen and destroyed signs.  Not only on the

15  public property, but the private property.  Like, the

16  people's homes, you know.  Somebody comes, usually at night

17  time, and break them or steal them.

18     Recently I spoke with a representative from the ▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  His name is, again -- names.  I

20  hate to say names.

21  Q.  I understand.  But --

22  A.  Actually, that's his statement.  I don't think it's

23  anything bad.  Actually, ▮▮▮▮▮▮▮ spoke with me.

24  Q.  Can you say that name again?

25  A.  ▮▮▮▮▮▮▮▮.

1   Q.   █████████

2   A.   ███████.  He told me the same story from their youth.

3   Often, people called them bad names, and yelling at them with

4   all kind of threats.  They should tell at the end.  I will

5   finish with this.  Because I am afraid I will kind of mix up

6   myself and I forget.  I will just follow it.

7        When I spoke with him, he didn't tell me any, really,

8   particular stories.  He just said their youth reported the

9   same thing.  Like, making threats, and calling them bad

10  names.  And I am just making a comment about it.  Most people

11  from our churches came to America as religious refugees,

12  being persecuted by communists in the Soviet Union, seeking

13  for freedom.  Most of these people participate in our

14  official vote for the first time in their life.

15       I personally started to participate in the vote the first

16  time in my first 47 years.  But we all are very shocked by

17  the reaction and results of this, after hearing all of this

18  court actions going on, and calling us to the court.  The

19  public accusing us of discriminating and persecuting some

20  people.  I will show you what I mean.  Many people said --

21  and actually, I heard that -- that they are participating in

22  vote process for the first, and now for the last, time in

23  their lives.

24       On Internet look, we were reading malicious opinions of

25  many people against Slavic people.  Especially about their

1   participation with protecting traditional Biblical marriage.
2   Some people made open threats and expressed their hate and
3   willingness to hurt Christian people.
4       I don't represent the site, unfortunately, but those days
5   I went to Internet, really, some kind of outcomes.  People's
6   opinion about what's going on in the state.  There were some
7   positive and some negative.  Some good positive outcomes, and
8   some really bad negatives.  Actually, I was reading this.
9   Said, oh, my God.  It looks like there are some crazy people
10  in the community that can do really bad.  Because they were
11  kind of expressing the hate to Slavic people and the church
12  people and all of this.
13      Okay.  I will just say my expression.  And now, the
14  specific -- actually, I have a few, and I gave you copies.
15  Q.  Let me dive in a little bit to what you just told me, and
16  then we can go onto the specifics.
17      You said different people in the Slavic community were
18  talking about what they experienced?
19  A.  Uh-huh.
20  Q.  Did people come and tell you, ████████ , this is what
21  happened to me, or was it more generally discussed?
22  A.  Both.  Because I have heard lots of talks about it, you
23  know.  People from different churches.  Because we have good
24  communication.  Our youth, youth from other churches, and
25  parents were expressing their concerns about kids and their

1  safety, you know.  Because I will read you some of these

2  statements, and they are -- kind of sound really, really

3  scary.  Of course, parents were concerned.  Some people

4  expressed it to me personally, or I just heard their stories.

5  Q.   Were these people talking specifically about the youths

6  that had been harassed while they were out, or were they

7  talking about other incidents?

8  A.   No.  About the youth.  About during the time they were

9  standing with signs.

10 Q.   Okay.

11 A.   That's the most kind of dangerous time.

12 Q.   Did anybody tell you, or did you hear in the general

13 community, about people being harassed while trying to gather

14 signatures for the petition?

15 A.   Yeah.  Some people told me that when they went to their

16 neighbors, or, you know, it was some people, they are kind of

17 welcoming them, but some people are kind of really mad.

18 Q.   And do you think people have a right not to sign the

19 petition if they disagree?

20 A.   Oh, of course.  There is nothing wrong.  Just you can

21 express it differently.  You can say, no.  Thank you very

22 much.  I kind of have my own opinion, or decide to stay away.

23 There is nothing wrong.  Or you can do it really violently.

24 You know, like, taking a gun, or saying something really bad,

25 you know.

1  Q.   Now, are you being facetious about -- I shouldn't use the

2  word facetious -- do you know of anybody that had a gun

3  pulled on them when they asked for signatures?

4  A.   No.  I just --

5  Q.   You are just saying out loud?

6  A.   Yeah.  Saying you can do it really extremely bad.  No.  I

7  never heard anything about guns.

8  Q.   But people said they were spoken rudely to when they were

9  asked for signatures?

10 A.   Yes.

11 Q.   There was much more talk among the Slavic community about

12 the youth experienced with the sign waving.  Is that

13 accurate?

14 A.   Correct.

15 Q.   Did any particular youths speak to you about what they

16 had experienced at a particular incident?

17 A.   Yes.

18 Q.   What do you remember them telling you?

19 A.   Okay.  I had planned to go with these witnesses, and then

20 go to -- but, okay.  I will switch, since you asked me.

21      I have here the kind of list of particular people telling

22 particular stories that happened personally to them.  Not

23 that they heard from somebody.  Okay?  I just made short

24 sentences about it.  And, again, I don't know about telling

25 the names.  I can tell you the names of some, kind of, older

1  people who have nothing to lose, and they said, you can use

2  my name.  When we talk about young people, we decided not to

3  reveal their names, because they are just kids.  If something

4  happens to them, maybe not related to this, but parents will

5  think, oh, that's because ██████████ mentioned their names.

6  Now they are hurt on the streets.  You know what I mean?

7      Actually, it's protecting you and me and everybody.  So

8  you better don't mention the young people's names.  Many of

9  them are under 18, so I don't want to use kids.

10 Q.   I understand.

11 A.   The first one, I believe it's nothing.  It says, last

12 night, older man come to me.  His name is ██████████.

13 Before he entered the church last night, he said that a lady

14 come to me with a huge rock in her hand, screaming something

15 in English.  He doesn't understand English.  Just crashed

16 this rock right in front of his feet, right in front of the

17 church.  I don't know what it was all about.  I can't really

18 say that it's because of the sign.  It's probably not.  It's

19 just a reflection of some people, you know, how they looking

20 down on Slavic people.  But, okay.  Let's not talk about it.

21     But other man, ██████████, just witnessed -- oh, I

22 mentioned that.  That in October, he had a R-71 bumper

23 sticker on his car.  He came to Lincoln Park with his wife,

24 for a walk.  When they come back, someone broke a side window

25 in his car.  He come to me last night, telling me,

1    personally, I never shared that with anybody, but I want you

2    to know that's what happened.  And he believes that's because

3    of his sticker.

4    Q.   When did that happen?  When was the window broken?

5    A.   In October of last year.

6    Q.   And he was walking at Lincoln Park?

7    A.   Yes.  With his wife.

8    Q.   And came back and the car window was broken?

9    A.   Yes.

10   Q.   And he did have an R-71 bumper sticker?

11   A.   Yes.

12   Q.   He told you that he had an R-71 bumper sticker?

13   A.   Yes.  For sure.

14   Q.   At the time -- when was the first you learned of this

15   incident?  Last night?

16   A.   Last night.  He said, I e-mailed -- you know, there are

17   some people who, kind of, have -- humble --

18        INTERPRETER:  Yeah, humble.

19        THE WITNESS:  They just don't want to talk about their

20   suffering, you know.  But last night when we prayed, he told

21   me, you know, I just decided to tell.  Maybe it's nothing,

22   but you should know what happened to me.  They are not, like,

23   extra mission, pushing something.  They are really good

24   people.

25        Okay.  And the next man come.  Actually, he told me

1 before about this.  But last night, he come to me.  His name

2 is Vyacheslav Shatskiy (phonetic).  Last October, came out of

3 church building in downtown with sign of traditional marriage

4 in his hand, and it was already dark.  Car with four men

5 stopped, and those four men yelling at him, demanded to stop

6 and talk to them.  Like, confronting him.  Hey, let's have

7 some kind of -- like --

8    INTERPRETER:  Let's figure it out and we will talk about

9 it.

10    THE WITNESS:  Yeah, you know.  Without answering those

11 threats, ███████ continued walking to his car.  One man

12 came out of car and started running, trying to catch

13 ███████.  Other three men drove around, caught his way,

14 and stopped the car right in front of him.  They all started

15 cussing him, and threatening him.  Finally, he managed to

16 escape.  So they didn't hit him, but the conversation was

17 really bad, at a dark time, behind the church, you know.

18 Four huge men, you know.  He said, I got really scared.  But

19 finally, he just managed to escape from them.

20 Q. Were these people speaking Russian?

21 A. No.

22 Q. Were they speaking English?

23 A. Yeah.

24 Q. Okay.  He was carrying --

25 A. His sign.

1   Q.   In support of Referendum 71?

2   A.   Actually, he didn't rally.  He just took the sign from

3   the church to bring to his home, he actually told me.  He was

4   just entering the building, walking to his car with the sign

5   in his hand.  They saw him and stopped, and started following

6   him and trying to make confrontation, you know.

7   Q.   Did you know about this incident at the time, or did you

8   just learn about it?

9   A.   No.  Actually, I knew about this incident at the time he

10  mentioned me that.  But those days, we didn't get

11  information.  Okay.  We will just pray, and God will take

12  care of everything.  You know how --

13  Q.   Yeah.

14  A.   But last night, he come to me with his wife.  He says,

15  █████, actually, that's what happened, and I want you to know

16  about it.

17       The next person, ███████████, with her children, last

18  October, stand with marriage sign in front of the church.

19  Car with young people stopped next to them, and those people

20  showed them fingers, and even worse signs.  She said, I was

21  confused, because she was with little kids.  And actually,

22  they yelled, "All Christians shall die."  And they left.

23  Q.   So this is a family that was standing out in front of the

24  church?

25  A.   Yup.  Mom with her kids.  She is about, maybe, 49 years

1   old or so.

2   Q.   Okay.  And they were holding signs?

3   A.   Uh-huh.

4   Q.   Supporting Referendum 71?

5   A.   Marriage.  Yeah.

6   Q.   Did the car stop, or did it drive by?

7   A.   It stopped.  With young people stopped next to them,

8   because they were standing on the sidewalk, and they stopped

9   in the road, right -- just a very short distance.  And they

10  were showing fingers and some other bad signs, and, actually,

11  finally yelled, "All Christians shall die," and they left.

12  Q.   Okay.  Do you know if she -- did she follow up with that,

13  in any respect?  Did she tell you about it at the time?

14  A.   No.

15  Q.   Did she, to your knowledge, tell the police that she

16  received --

17  A.   No.

18  Q.   -- any type of threat?

19  A.   Nobody ever made any police -- except one.  Just one.

20  And I will tell you.  Just one police report.  We never call

21  the police.  We never complained.  We never followed people

22  to pay them back.  We just behaved like God's people should

23  behave.

24  Q.   So the first time you heard about this incident was when

25  this woman came to you yesterday?

1   A.   Yeah.  Actually, you know, see, maybe I heard this,

2   because at the time, in October, I have heard so many of

3   these stories, and they all mix in my head.  And a year

4   later, I can't recognize who told me and who not.  But last

5   night, she just come and say, I just want you to know what

6   happened.  And her kids were really scared, too.  First, to

7   see the signs, and then, hear they wanted us to die.  In

8   fact, it was a death threat.  That's too much.

9        All right.  The next person is ███████, was standing

10  with marriage sign last October, on Monroe and Second.

11  People from passing-by car yelled at her and throw Pepsi

12  bottle at her, right here.

13  Q.   Did the bottle hit her?

14  A.   Yeah.  A bottle with Pepsi.  Just threw in her chest.

15  Q.   Was the bottle full or empty?

16  A.   No.  It was with Pepsi.  I don't know how full, but she

17  said it was a bottle with Pepsi.

18  Q.   How do you know it was full?

19  A.   I don't know if it was full.  I am not saying that.

20  Q.   How do you know it wasn't an empty bottle?

21  A.   She told me.  I asked her, was it just an empty bottle?

22  No.  It was a bottle with Pepsi inside.  How much it was

23  there, I don't know.

24  Q.   Did they say anything to her before they threw it?

25  A.   Yeah.  They were yelling at her, like, bad words, you

1  know.

2  Q.   Did she tell you about that, at the time?

3  A.   Yeah.  Actually, I believe -- yeah.  I believe she shared

4  that.  Because when she started speaking yesterday, said, oh,

5  Pepsi bottle.  She said, yes.  Yeah.  I remember that.  But

6  she just reminded me about this.

7  Q.   And I don't -- I know you have already told me, but she

8  didn't report this to anyone?

9  A.   No.  She just told her husband, and that's it.

10  Q.   Okay.

11  A.   Then a group of people.  Actually, I have their names,

12  but I didn't do them here, because I spoke to their parents

13  and they said, you know, █████, they are just kids.  Maybe you

14  better don't mention their names, because if something

15  happens, then, you know, people can accuse us, and this has a

16  connection, you know.  We better not.  I don't want to hurt

17  kids.

18      Last October 6, young people were standing in front of

19  the church with marriage signs.  You see, we say "marriage

20  signs."  Because in our case -- like, Americans call it R-71.

21  They talk about petitions, about politicians, signing,

22  counting.  We don't have connection to that.  In our view, we

23  are talking about Biblical marriage.  Okay?

24  Q.   Okay.

25  A.   So I want the judge to understand.  It's in our

1  community, it's different.  It's not participating in

2  political movement, or something like that, you know?  Or

3  putting notes in the government.  No.  We just -- oh, this is

4  the Biblical stuff.  We believe in Biblical marriage.  It's

5  time -- because other people are expressing different

6  opinions, and it's time to say tat we believe in that, and we

7  support -- and, actually, on the signs, it was saying

8  something about -- I don't remember what it was saying.

9  Something about marriage.  Biblical marriage between man and

10 wife.  That's our idea.

11 Q.   Just to be clear.  Did you, in the Slavic community, have

12 different signs than other folks who supported Referendum 71?

13 A.   Some people, actually, young people, they made some

14 homemade signs with Bible verses, what the Bible says about

15 it.  Like, peaceful signs.  I saw them, and there is nothing

16 wrong, or not talking about political.  Even R-71, with some

17 peaceful signs.  Like, let's protect our marriages.  Family.

18 Biblical family.  Something like that.

19 Q.   But the signs that you got from the Protect Marriage

20 Washington campaign, those weren't any different than the

21 signs used in Yakima or Seattle?

22 A.   Right.

23 Q.   To the best of your knowledge.

24 A.   Right.  I never went there, but I believe that they are

25 the same.

1   of -- older people.  And I don't have any prejudice to

2   anyone, personally.  That's how I teach in the church.  We

3   can't do prejudice to any person.  We have to love all of

4   them.  When we talk about principle -- especially, Biblical

5   principle -- yes.  That's how we stand.

6   Q.   You understood that the vote in November 2009 concerned

7   Biblical marriage?

8   A.   Right.  Yes.  That's how we explained to people.  That's

9   how we understood.  That's how I believe.  Somebody would

10  tell me, oh, let's do something against those gay people, I

11  never would do anything.  Because they are just people.  Like

12  us.  There is nothing against people, and nothing against

13  hatred or intolerance.  Not at all.

14  Q.   We can continue with your --

15  A.   It's been a little bit -- because the meaning of R-71,

16  maybe, for some people, is different.  But for our community,

17  it's kind of different.  It's more like spiritual.  Because I

18  never even tried to put my nose in politics.  It's not the

19  church stock, you know.

20  Q.   Right.

21  A.   I believe the church is separated.

22       Okay.  Six young people were standing in front of the

23  church with marriage signs.  One group of people threw

24  bananas at them.  Other men threw fruit jelly on to one of

25  the girls.  Actually, it's a very pretty girl.  She come to

1  me last night.  She's about maybe 18 years old.  And she

2  said, these guys just threw jelly, fruit jelly, right into

3  her white clothes.  Very yucky.  Okay.  Threw jelly on the

4  girl.

5      The other group of people were making pictures of them.

6  Oh, yeah.  In the same group, they said they made pictures.

7  And then, after a while, they came back and made pictures

8  again of them.

9  Q.  The same group of six people?

10 A.  Right.  That's the witness from this group.  And then,

11 all older angry men came to them, speaking rude, and wished

12 them all -- wishing them all having gay children.  That

13 sounds kind of stupid.  That's exactly what everybody heard.

14 Finally, he said, I wish all of you that you all have gay

15 children.  And, actually, we know who this man is.

16 Q.  Who is that person?

17 A.  I know this person, actually.  ▮▮▮▮▮▮.  He used to

18 work for the City of Spokane.  And I had lots of interactions

19 with the mayor, so -- I told you, I was involved with the

20 community a lot.  I remember this guy.

21 Q.  What was his name again?  Did you say ▮▮▮▮▮ (sic)?

22 A.  I gave you a copy of it.  Right there.  ▮▮▮▮▮.  And,

23 actually, when I mention to you that we were shocked by

24 reaction, and saying that somebody is thinking that we were

25 discriminating them and persecuting them, we were really

1   shocked.  That's exactly what he says here, if you read the

2   article.  That was really, really unacceptable.  And that's

3   how he created that public opinion about this former

4   persecuted people.

5       That's exactly the man who approach this same group of

6   people, and he was actually rude, and he was saying some

7   inappropriate stuff, and he was there for a while, and

8   finally, he said, I hope you all -- no, no.  He wished them

9   all they have gay children.  Well, I don't know it goes to

10  anywhere, but that was the man.  And we have a newspaper.

11  Q.   How do you know that ███████ was that person?

12  A.   Because he told his name to the kids.  And when they told

13  me his name, I said, oh, I know this guy.  A few days later,

14  I open the newspaper and see ███████ under the letter

15  section.  It's a letter section.  He put his letter, and I

16  read it.  Oh, that's ridiculous.  You know.  That's -- I

17  don't know.  I know Spokesman-Review people.  They are good

18  people.  But I don't have anything against them.  I know that

19  they are good people, but I wouldn't put this letter in the

20  newspaper, because that creates the wrong public opinion

21  about a huge group of people, you know.

22      MR. DIXSON:  I will hand you that and make that an

23  exhibit, since we referred to it.

24      (Ex. No. 2, marked.)

25  Q.   (BY MR. DIXSON)  I am handing you what's been marked as

1    Exhibit 2.  Do you recognize that?

2    A.   Oh, I have the original.

3    Q.   Do you recognize Exhibit 2 as I just handed it to you?

4    A.   Yes, that's right.  That's a copy from the

5    Spokesman-Review.

6    Q.   That's a copy of an article, or letter to the editor,

7    that was published in the Spokesman-Review?

8    A.   Right.  That's right.

9    Q.   What date was that published?

10   A.   The date is ███████.

11   Q.   This is the letter from ████████ that you were just

12   referring to?

13   A.   Yes.

14   Q.   And that ███████ apparently wrote after the interaction

15   with the six youths outside the church, right?

16   A.   Yes.  It's yours, right?

17   Q.   It's going to be the court's, so we will just give it

18   over there.

19   A.   All right.  Shall we continue?

20   Q.   Please.

21   A.   Okay.  Three young men, last October, were standing with

22   signs next to Taco Bell, on Third Avenue.  A group of people

23   stopped next to them, calling bad names and yelling, "We hope

24   you all die.  You need to be destroyed."

25        I don't think we need any comment to that.  It's clear.

1  Q.   Did these people tell you what they experienced at the

2  time?

3  A.   Yeah.  They were really confused to hear that.  And, you

4  see, most of these comments were made from the cars.  They

5  just stopped next to them, made comments, and called them,

6  and leave.  You can't really get their names, and we actually

7  never had any intention of doing that.

8  Q.   But do you remember this incident, when it happened in

9  October 2009?

10 A.   Yes.  I remember young people talking about this.  And

11 they just come to me last night, after the prayers meeting,

12 and said, ███, remember we told you.  And that's what's

13 happened on the Third Avenue next to Taco Bell.

14 Q.   Okay.  Did you, as a church, do anything about that?

15 A.   No.  No.

16 Q.   Did you instruct people to avoid that intersection, going

17 forward?

18 A.   No.  We just instructed people not to be alone.  Just

19 stay in groups.

20 Q.   Okay.

21 A.   Because we didn't have lots of choices.  We only stand

22 next to our church.  Like, there are three corners that we

23 were using, next to the church.  So we didn't go through the

24 whole town.  Just right next to our church.

25 Q.   Mainly, along Second and Third Avenue downtown?

1    A.    Yes.   Second and Third.   That's right.   Lincoln, Second

2    and Third.   That's the intersections.

3    Q.    And how did you choose those intersections?   Just because

4    they were near the church?

5    A.    Yeah.   Because we were near the church.   We are home, you

6    know.   We say, this is our property.

7    Q.    Okay.   What's next?

8    A.    We didn't go to any, like, City Hall, or any public

9    places.   No.   Just next to the church.   Okay.   They just

10   said, "We hope you all die, and you need to be destroyed."

11        Then the young men, at the same time, was standing with a

12   sign on Second Avenue and Lincoln.   Unknown man tried to hit

13   him with a car.   Yeah.   Actually, I asked him how it

14   happened.   He said, yeah.   Actually, this young man in the

15   car, he just saw the sign and he started yelling something,

16   and he just was driving right toward him.   You know, even

17   though he was standing on the edge of the sidewalk.   But you

18   can easily hit a person with the nose of your car, you know.

19   The front of the car.   And he was just -- and he jumped out,

20   and he just stopped right in the edge of the sidewalk.

21   Q.    So this person felt like the person in opposition to them

22   was going to hit them with the car?

23   A.    Yeah.   That was the intention.   Just, they tried to hit

24   him.

25   Q.    Did this person tell you about it, at the time, or did

1   you learn about it just recently?

2   A.   Actually, I have heard something about it, at that time.

3   But as I said, there were so many stories, I didn't pay, kind

4   of, particular attention to any of them.  I have heard that

5   there is something that happened where somebody was trying to

6   hit somebody.  I heard it at that time.  But as I said, we

7   didn't document.  We didn't complain or pay any attention.

8        But, last night, he called and he says, ████, do you

9   remember this story?  I heard something.  That was me.  He

10   told me his name.  And, actually, his father called me and

11   said, yeah.  If you would just mention this, because they

12   tried to kill my son.  I said, okay.  I will put it down.

13   Q.   Do you think the person actually tried to kill him, or

14   did they try to scare him?

15   A.   I don't know.  How can I say that?

16   Q.   Did the car drive up on the curb, or did it stop short of

17   the curb?  If you know.

18   A.   As he explained to me, here is the road, and here is the

19   curb.  And this young man was sitting right on the edge of

20   the curb.  This man -- it's a wide street over there, and he

21   was driving with this direction, yelling at him, like, right

22   towards him.  And if this young man wouldn't have jumped, he

23   would have hit him, definitely, 100 percent.  Did he want him

24   to kill or just hurt him; just break his legs?  I don't know.

25   But, obviously, he wanted to hit him.

1  Q.   So the car made an actual attempt to run this person

2  over?

3  A.   Run him over.  Yeah.

4  Q.   That's what you have been told?

5  A.   Yes.

6  Q.   You weren't there?

7  A.   I was not there.

8  Q.   Okay.  Did you speak to the person?

9  A.   Yes.  Directly to his father.

10 Q.   To his father?

11 A.   Yes.  To his father, and to him directly.  He actually

12 called me and he told me details.

13 Q.   Okay.  Did he get a license plate number; try to follow

14 the car?

15 A.   No.

16 Q.   Contact the police, saying, hey, I almost got ran over on

17 the street corner?

18 A.   No.

19 Q.   Okay.

20 A.   Again, try to understand, Steve.  It's kind of different

21 group of people.  Church people.  People who were persecuted,

22 or their parents, and we teach our children, if you are

23 persecuted for doing wrong, then, yeah.  But if you are

24 persecuted by doing God's job, be happy about it.  Don't

25 complain.  Don't consider it something strange.  That's

1    normal.  Jesus Christ was persecuted.  He was crucified.  And

2    if you are suffering a little bit for him, be happy about

3    this.  This is the Biblical teaching.  That's how we take it.

4         Even today, I don't want to complain about it.  I want

5    the judge to know, we don't complain.  And we didn't want to

6    come here and even talk about it, but since you called us and

7    asked for this, we are just telling you some stories.  That's

8    it.

9    Q.   Sure.  And just for the record, you were identified not

10   by myself, not by Anne, not by Jessica, but by people like

11   Mr. Pidgeon.  So I am not bringing you here today.  This is

12   all Steve Pidgeon's fault.

13   A.   Is that you, Steve?

14        MR. PIDGEON:  Objection, just to the form of the

15   statement.

16        THE WITNESS:  Oh, man.  Can I ask you two questions,

17   since we are talking about it?

18        MR. DIXSON:  Sure.

19        THE WITNESS:  One thing I don't really understand.  If

20   this is Steve -- and I respect him.  He is a good man.  And I

21   respect you.  Why those ladies called me and threatened me

22   with a subpoena, instead of Steve calling me and telling me,

23   █████, we produced a subpoena, and you have to show up, and we

24   ask you, please help us?

25        MR. DIXSON:  From my point of view, it's --

1  about?

2  A.  No.

3  Q.  Okay.  So these stories -- are these all stories gathered

4  from people at your church or other Slavic churches?

5  A.  Most are from our church, and I just read you the witness

6  from, like, the Life of the Gospel Church.  They said they

7  experienced similar experience.  The same stuff.

8  Q.  Okay.

9  A.  But this I just read you, people just come to me directly

10  and said, we know that you are going to be at the court, and

11  we would like you to tell them our own stories, and that's

12  it.

13  Q.  Okay.  Okay.

14  A.  And the young people, they all come to me with parents.

15  I know their families.  They are good, decent people.  It's

16  not, like, outsiders, if you don't know them.

17  Q.  So people would drive by in the cars, yell mean and rude

18  things, and in one case, there was a Pepsi bottle thrown,

19  jelly thrown, and a banana thrown, correct?

20  A.  Yes.

21  Q.  That -- the incident with the six young people where Dean

22  Lynch eventually approached them, do you remember telling me

23  about that?

24  A.  Yes.

25  Q.  Was it ███████ that threw the banana or the jelly?

1    A.    No.  No, no.  No, he didn't.

2    Q.    But he approached that same group later?

3    A.    Right.  Later.  Yeah.

4    Q.    Okay.

5    A.    No.  He didn't touch them.  Nothing.  No, no.

6    Q.    Do you have more harassment you want to tell me about?

7    A.    Okay.  I would like to read you a statement from

8    ███████████████████████████████████████.  Here is

9    the original, with his signature and everything.  And I can

10   read it in Russian, and I have an English translation, but

11   Gregory is better.

12         "To whom it may concern" --

13         INTERPRETER:  Hold on.  Let me get the original letter.

14   It happened on Saturday, October 24 --

15         MR. DIXSON:  Let's go ahead and make this an exhibit, if

16   we are going to be reading off of it.

17         (Ex. No. 3, marked.)

18   Q.    (BY MR. DIXSON)  Now we are looking at what's been marked

19   as Exhibit No. 3, and there is a letterhead that says,

20   "██████████████████," and there is an address there.  Is

21   that correct?

22   A.    Right.

23   Q.    Okay.  Who is ██████████████████?

24   A.    He is the senior pastor of ██████████████████.  It's

25   a Pentecostal church.

1   Q.   Do you know ████████████?

2   A.   Yes, I do.

3   Q.   How do you know him?

4   A.   Well, we have lived in the same city for many years, and

5   he works as a Realtor.  He helped our families a lot.  And he

6   is a wonderful man.  Good family.  So I know him for years.

7   He used to be an owner of Kiev Market.  The Russian store.

8   Q.   Kiev Market?

9   A.   Kiev Market, uh-huh.

10   Q.   Now, referring to Exhibit No. 3, I think you begun to

11   read from that.  So you can continue to do so, and the

12   interpreter will interpret.

13        INTERPRETER:  "It happened on Saturday, October 24, 2009,

14   afternoon.  People from our church were participating in a

15   rally on the corner of Division and North River Drive, close

16   to the river.  One woman approached, then started to take

17   away signs from people.  When ████████ called out to her,

18   "Ma'am," she turned around and hit ████ over the head with

19   the sign.  With a sharp edge of the sign, she split his head

20   slightly, over his forehead.  ████ was taken to the hospital,

21   where he had six stitches placed over this wound.  Sincerely,

22   Pastor ██████████████."

23   Q.   Did you ask ████████████ to write you this letter?

24   A.   No.

25   Q.   How did he know to write you this letter?

1   A.   He called me, and, actually, he asked me if he could

2   come, personally, today here, and witness this.  And I

3   called, actually, Steve, and he said, no.  Unfortunately, he

4   can't come here because he wasn't called here.

5   Q.   Okay.  So he called you and said, I am aware of an

6   incident.  Can I tell you about it?

7   A.   Right.  Right.

8   Q.   Did you -- were you aware of this incident prior to

9   receiving the letter?

10   A.   Yes.

11   Q.   How did you know about it?  Did you know about it in

12   October of 2009?

13   A.   Yes.

14   Q.   How did you learn about it in October of 2009?

15   A.   Because they called our church and told us about this.

16   Enough of this incident.  We directed all our youth not to be

17   alone.  Not to stand in the dark time in dangerous places.

18   Just to be in front of the group with a group of people.

19   Q.   Who called you?

20   A.   Actually, I spoke with ███████████.

21   Q.   Directly?

22   A.   Yes.

23   Q.   Did he call you, or did you call him about the incident?

24   A.   I don't remember.

25   Q.   My question is:  Did he call you, specifically to tell

1   you about the incident, or did it just come up in

2   conversation?

3   A.    It's kind of hard to remember.

4   Q.    If you remember.

5   A.    I believe we were talking about this incident directly.

6   Q.    Okay.

7   A.    We took it seriously.  It is serious.

8   Q.    Do you remember; did he give you all the same facts at

9   the time, or do you remember it differently than what he has

10   reported it here?

11   A.    Pardon me?

12   Q.    Did he -- when you read this letter, is it familiar to

13   you, or are there additional facts that you didn't know at

14   the time, contained in that letter?

15   A.    No.  Yeah.  I knew about this story.  Yeah.  There was

16   nothing new and nothing additional.

17   Q.    Do you know ████████?

18   A.    Not personally.

19   Q.    Have you met ████████?

20   A.    Maybe.  But there are thousands of people, so --

21   actually, they all know me, but I don't really know all of

22   them.  I probably met this guy, but I can't have his picture

23   in front of my eyes.

24   Q.    Is it fair to say that you never spoke to ████████

25   about this incident?

1   A.   No, I didn't.

2   Q.   Okay.  Do you know anything about the woman that

3   approached him with the sign or hit him with the sign?

4   A.   No, I don't.

5   Q.   Do you know; did you visit or know anyone who visited

6   ███████ at the hospital?

7   A.   I did not visit him.  I am sure young people visited him,

8   but I never asked who, exactly, visit him, because this is a

9   different church.  I am sure they have their own people who

10   take care of this.

11   Q.   Was he admitted to the hospital; do you know?  Did he

12   spend time overnight in the hospital, as a result of this

13   incident?

14   A.   I don't know.  You better call ███████ directly and ask

15   him.  I don't know.

16   Q.   As a result of this incident, did you take any actions

17   within your own church?

18   A.   Like, police report, or anything like that?  No.

19   Q.   Did you tell your congregation about this incident, in

20   particular?

21   A.   As I said, we already -- we instruct the young people not

22   to be alone, and try to be away from, kind of, these

23   dangerous situations, and not to stand at a dark time and be

24   alone.

25   Q.   Were those instructions as a result of this incident --

1    A.    Yes.

2    Q.    -- or in general?

3    A.    No.  Actually, we start thinking about it only when it

4    happened.  Before, we just didn't even think about it, you

5    know.

6    Q.    Do you know; is Division and North River Drive, is that

7    in the vicinity of ██████████████████████?  Is it located

8    nearby?

9    A.    North River Drive?

10   Q.    I think it's by the ███████████████ there.  The

11   ██████████████████ is up on the hill.  It just on the north

12   side of the river on ███████████.

13   A.    Well, yeah.  It's not far away from their church.

14   Q.    It's █████████████.  Would be three blocks west of

15   █████████████████████?

16   A.    Yes.  Just a few blocks from there.

17   Q.    In the ████████ neighborhood, for people that know

18   Spokane?

19   A.    Yes.

20   Q.    So this is not too far from the church?

21   A.    That's right.  I don't know much.  I didn't kind of make

22   any investigation.  I just know that this happened, but

23   that's it.  I can't tell you much about it.  I just -- that's

24   actually his report.

25   Q.    Okay.  Were you done?

1    A.    Yes.  I am done.

2    Q.    Other than speaking to the congregation and the youth

3    about gathering in groups, did you follow up on this incident

4    at all?

5    A.    What do you mean by follow up?

6    Q.    Did you take any further action, based upon this

7    incident?

8    A.    No.

9    Q.    Okay.  Do you have other examples?

10   A.    Yes.  I have one more.  ████████████████████████

11   ████ .

12   Q.    If you are going to reference a specific, just tell me,

13   and we will make it an exhibit.

14   A.    I don't know if it's an exhibit.  You should determine

15   yourself.  I will just read it to you, and you determine.

16   ████████████████████████████████████ .  Pastor

17   ██████████████ , his phone number.  I spoke with their

18   administrator,███████████████ .  His phone number.  He

19   actually informed that during R-71 campaign, they received

20   threatening messages on their church telephone and on their

21   church school telephone.  They called 911.  Police came to

22   the church.  I am not sure it was police or sheriff.  I

23   believe, maybe sheriff come.  Listened to those messages and

24   report was made.

25          Also, their church custodian, personal witness, ladies

1   came in the car, right to the church property, behind the

2   fence.  Took R-71 signs.  And after custodian tried to kind

3   of chase them, they just left in the car with stolen sign.

4       Talk to them directly and they can tell you more.  So,

5   that's just their statement from their church.  That's what

6   happened right at their church property.

7   Q.   Who is ████████████████? Is he the pastor of the

8   ████████████████████?

9   A.   That's right.

10  Q.   If you know.  I spoke with their administrator.  Is

11  that -- whose administrator is that?  Did this incident

12  happen at the ████████████████████?

13  A.   Right.  Right at this address.  ████████████ is,

14  like -- we don't have an administrator in our church, but

15  administrator is kind of, like, pastor assistant, who helps

16  you with all of the stuff, you know.

17  Q.   And, so, the ██████████████████ received

18  threatening messages on their telephone and their church

19  school telephone?

20  A.   Yes.  They have ████████████████████ at

21  the same property.

22  Q.   How would somebody get that telephone number?

23  A.   The phonebook.  Anywhere.  It's not a secret.

24  Q.   When -- what was the content of these messages?

25  A.   I didn't hear those messages, so -- but it's -- you can

1   request the police report, and it's all there.  I don't want

2   to tell things that I don't know or didn't hear, you know,

3   and just the report, what happened.  If you want details, we

4   better request a police report, because it was done

5   officially.

6   Q.   Okay.  Do you know about the custodian who witnessed the

7   ladies taking the signs?

8   A.   Uh-huh.

9   Q.   Can you tell me more about that?

10   A.   Yeah.  His name is ███, and he is actually taking care

11   of the church property.  I forgot his last name.  That's

12   okay.  His name is ███, and he is taking care of the church

13   property, and he was closing all doors and everything, and

14   then he just opened the door outside, and just trying to lock

15   the door, and saw this car just came right to the church

16   property, and they had one or two signs in front of the

17   church.  And this lady jumped out of the car.  Another lady,

18   I believe, just behind the wheel, and she started grabbing

19   signs.

20       And he starts screaming, saying, hey, what are you doing?

21   And she started running.  And she grabbed the signs and

22   jumped in the car, and then, left immediately.  So he didn't

23   get their license plate.  He didn't make a police report.

24   They only made a police report about the threatening phone

25   calls.

1    A.    No, I didn't.

2    Q.    Okay.  Do you know anything about the woman that

3    approached him with the sign or hit him with the sign?

4    A.    No, I don't.

5    Q.    Do you know; did you visit or know anyone who visited

6    ███████████  at the hospital?

7    A.    I did not visit him.  I am sure young people visited him,

8    but I never asked who, exactly, visit him, because this is a

9    different church.  I am sure they have their own people who

10   take care of this.

11   Q.    Was he admitted to the hospital; do you know?  Did he

12   spend time overnight in the hospital, as a result of this

13   incident?

14   A.    I don't know.  You better call ████████ directly and ask

15   him.  I don't know.

16   Q.    As a result of this incident, did you take any actions

17   within your own church?

18   A.    Like, police report, or anything like that?  No.

19   Q.    Did you tell your congregation about this incident, in

20   particular?

21   A.    As I said, we already -- we instruct the young people not

22   to be alone, and try to be away from, kind of, these

23   dangerous situations, and not to stand at a dark time and be

24   alone.

25   Q.    Were those instructions as a result of this incident --

1    A.    Yes.

2    Q.    -- or in general?

3    A.    No.  Actually, we start thinking about it only when it

4    happened.  Before, we just didn't even think about it, you

5    know.

6    Q.    Do you know; is Division and North River Drive, is that

7    in the vicinity of ███████████████████?  Is it located

8    nearby?

9    A.    North River Drive?

10    Q.    I think it's by the ████████████████ there.  The

11    ████████████████ is up on the hill.  It just on the north

12    side of the river on ████████.

13    A.    Well, yeah.  It's not far away from their church.

14    Q.    ████████████████.  Would be three blocks west of

15    ████████████████?

16    A.    Yes.  Just a few blocks from there.

17    Q.    In the ██████ neighborhood, for people that know

18    Spokane?

19    A.    Yes.

20    Q.    So this is not too far from the church?

21    A.    That's right.  I don't know much.  I didn't kind of make

22    any investigation.  I just know that this happened, but

23    that's it.  I can't tell you much about it.  I just -- that's

24    actually his report.

25    Q.    Okay.  Were you done?

1  A.   Yes.  I am done.

2  Q.   Other than speaking to the congregation and the youth

3  about gathering in groups, did you follow up on this incident

4  at all?

5  A.   What do you mean by follow up?

6  Q.   Did you take any further action, based upon this

7  incident?

8  A.   No.

9  Q.   Okay.  Do you have other examples?

10  A.   Yes.  I have one more.  ████████████████████████

11  ████.

12  Q.   If you are going to reference a specific, just tell me,

13  and we will make it an exhibit.

14  A.   I don't know if it's an exhibit.  You should determine

15  yourself.  I will just read it to you, and you determine.

16  ████████████████████████████████████.  ████████

17  ████████████████, his phone number.  I spoke with their

18  administrator, ████████████████████.  His phone number.  He

19  actually informed that during R-71 campaign, they received

20  threatening messages on their church telephone and on their

21  church school telephone.  They called 911.  Police came to

22  the church.  I am not sure it was police or sheriff.  I

23  believe, maybe sheriff come.  Listened to those messages and

24  report was made.

25       Also, their church custodian, personal witness, ladies

1   came in the car, right to the church property, behind the

2   fence.  Took R-71 signs.  And after custodian tried to kind

3   of chase them, they just left in the car with stolen sign.

4        Talk to them directly and they can tell you more.  So,

5   that's just their statement from their church.  That's what

6   happened right at their church property.

7   Q.   Who is ███████████████████?  Is he the pastor of the

8   ███████████████████████████?

9   A.   That's right.

10  Q.   If you know.  I spoke with their administrator.  Is

11  that -- whose administrator is that?  Did this incident

12  happen at the ████████████████████████?

13  A.   Right.  Right at this address.  ███████████████████ is,

14  like -- we don't have an administrator in our church, but

15  administrator is kind of, like, pastor assistant, who helps

16  you with all of the stuff, you know.

17  Q.   And, so, the ██████████████████████████ received

18  threatening messages on their telephone and their church

19  school telephone?

20  A.   Yes.  They have █████████████████████████ at

21  the same property.

22  Q.   How would somebody get that telephone number?

23  A.   The phonebook.  Anywhere.  It's not a secret.

24  Q.   When -- what was the content of these messages?

25  A.   I didn't hear those messages, so -- but it's -- you can

1   request the police report, and it's all there.  I don't want

2   to tell things that I don't know or didn't hear, you know,

3   and just the report, what happened.  If you want details, we

4   better request a police report, because it was done

5   officially.

6   Q.   Okay.  Do you know about the custodian who witnessed the

7   ladies taking the signs?

8   A.   Uh-huh.

9   Q.   Can you tell me more about that?

10  A.   Yeah.  His name is ████, and he is actually taking care

11  of the church property.  I forgot his last name.  That's

12  okay.  His name is ████, and he is taking care of the church

13  property, and he was closing all doors and everything, and

14  then he just opened the door outside, and just trying to lock

15  the door, and saw this car just came right to the church

16  property, and they had one or two signs in front of the

17  church.  And this lady jumped out of the car.  Another lady,

18  I believe, just behind the wheel, and she started grabbing

19  signs.

20       And he starts screaming, saying, hey, what are you doing?

21  And she started running.  And she grabbed the signs and

22  jumped in the car, and then, left immediately.  So he didn't

23  get their license plate.  He didn't make a police report.

24  They only made a police report about the threatening phone

25  calls.

1   A.   Yes.

2   Q.   -- or in general?

3   A.   No.  Actually, we start thinking about it only when it

4   happened.  Before, we just didn't even think about it, you

5   know.

6   Q.   Do you know; is Division and North River Drive, is that

7   in the vicinity of ████████████████████?  Is it located

8   nearby?

9   A.   North River Drive?

10  Q.   I think it's by the ████████████ there.  The

11  ████████████████ is up on the hill.  It just on the north

12  side of the river on ████████.

13  A.   Well, yeah.  It's not far away from their church.

14  Q.   It's ████████████.  Would be three blocks west of

15  ████████████████?

16  A.   Yes.  Just a few blocks from there.

17  Q.   In the ██████ neighborhood, for people that know

18  Spokane?

19  A.   Yes.

20  Q.   So this is not too far from the church?

21  A.   That's right.  I don't know much.  I didn't kind of make

22  any investigation.  I just know that this happened, but

23  that's it.  I can't tell you much about it.  I just -- that's

24  actually his report.

25  Q.   Okay.  Were you done?

1   A.   Yes.  I am done.

2   Q.   Other than speaking to the congregation and the youth

3   about gathering in groups, did you follow up on this incident

4   at all?

5   A.   What do you mean by follow up?

6   Q.   Did you take any further action, based upon this

7   incident?

8   A.   No.

9   Q.   Okay.  Do you have other examples?

10  A.   Yes.  I have one more.  ████████████████████████████

11  ███ .

12  Q.   If you are going to reference a specific, just tell me,

13  and we will make it an exhibit.

14  A.   I don't know if it's an exhibit.  You should determine

15  yourself.  I will just read it to you, and you determine.

16  ██████████████████████████████████████████ .  Pastor

17  ████████████████ , his phone number.  I spoke with their

18  administrator, ███████████████ .  His phone number.  He

19  actually informed that during R-71 campaign, they received

20  threatening messages on their church telephone and on their

21  church school telephone.  They called 911.  Police came to

22  the church.  I am not sure it was police or sheriff.  I

23  believe, maybe sheriff come.  Listened to those messages and

24  report was made.

25       Also, their church custodian, personal witness, ladies

1   came in the car, right to the church property, behind the

2   fence.  Took R-71 signs.  And after custodian tried to kind

3   of chase them, they just left in the car with stolen sign.

4        Talk to them directly and they can tell you more.  So,

5   that's just their statement from their church.  That's what

6   happened right at their church property.

7   Q.   Who is ████████████████████?  Is he the pastor of the

8   ████████████████████████?

9   A.   That's right.

10  Q.   If you know.  I spoke with their administrator.  Is

11  that -- whose administrator is that?  Did this incident

12  happen at the ███████████████████████████?

13  A.   Right.  Right at this address.  ████████████████ is,

14  like -- we don't have an administrator in our church, but

15  administrator is kind of, like, pastor assistant, who helps

16  you with all of the stuff, you know.

17  Q.   And, so, the █████████████████████████ received

18  threatening messages on their telephone and their church

19  school telephone?

20  A.   Yes.  They have ████████████████████████████ at

21  the same property.

22  Q.   How would somebody get that telephone number?

23  A.   The phonebook.  Anywhere.  It's not a secret.

24  Q.   When -- what was the content of these messages?

25  A.   I didn't hear those messages, so -- but it's -- you can

1  request the police report, and it's all there.  I don't want

2  to tell things that I don't know or didn't hear, you know,

3  and just the report, what happened.  If you want details, we

4  better request a police report, because it was done

5  officially.

6  Q.    Okay.  Do you know about the custodian who witnessed the

7  ladies taking the signs?

8  A.    Uh-huh.

9  Q.    Can you tell me more about that?

10  A.    Yeah.  His name is ███, and he is actually taking care

11  of the church property.  I forgot his last name.  That's

12  okay.  His name is ███, and he is taking care of the church

13  property, and he was closing all doors and everything, and

14  then he just opened the door outside, and just trying to lock

15  the door, and saw this car just came right to the church

16  property, and they had one or two signs in front of the

17  church.  And this lady jumped out of the car.  Another lady,

18  I believe, just behind the wheel, and she started grabbing

19  signs.

20      And he starts screaming, saying, hey, what are you doing?

21  And she started running.  And she grabbed the signs and

22  jumped in the car, and then, left immediately.  So he didn't

23  get their license plate.  He didn't make a police report.

24  They only made a police report about the threatening phone

25  calls.

1  Q.  Did ▆▆▆ tell you the story personally?

2  A.  Story personally?

3  Q.  No.  I understand.  You seem to know the story in some

4  detail.  So I am wondering --

5  A.  Yeah.  I heard this story, definitely, from ▆▆▆▆▆▆▆

6  ▆▆▆▆▆▆, not once.  A few times.  I heard this story from

7  other people.  And I believe ▆▆▆ was -- I saw him once, and

8  he told me something like that.  But I wouldn't -- I am not a

9  hundred percent sure.

10 Q.  You don't -- as you sit here today, you can't recall a

11 particular conversation with ▆▆▆ where he told you this

12 story?

13 A.  I can't recall, particularly.  He probably told me, also,

14 because I heard it from, like, different angles.  But from

15 ▆▆▆▆▆▆▆▆▆▆▆ for sure.

16 Q.  Okay.  Do you know if they ever got the signs back?

17 A.  No.  Of course not.

18 Q.  Did they replace the signs?

19 A.  I don't know that.

20 Q.  And to your knowledge, did the person who took the signs

21 say anything when they grabbed the signs, or just grabbed the

22 signs and left?

23 A.  I don't know that.

24 Q.  Do you have anything else?

25 A.  The last one.

1    To the court, from ███████████.  "My name is

2    ████████████, and I am a legal resident of Washington.

3    One day when I was standing on the corner of Evergreen and

4    Sprague, holding up the sign that said "Reject

5    Referendum 71," I got a couple of threats towards me.  Some

6    people just disagreed, but I remembered this car that used

7    bad words, cursed me, laughed at me, and then gave me the

8    finger.  Then, after they left, they came back again and told

9    me to leave before someone gets hurt.  When I kept on

10   standing there, they kept on coming back, and each time, and

11   tell me to leave.  I am living in a free country, and the

12   First Bill of Rights says that everyone has the freedom of

13   speech.  I didn't do anything illegal.  I just gave my

14   opinion.  And I don't think it's fair for people to insult me

15   for what I believe in freedom of religion."

16       Her signature.

17   Q.   Do you know ████████████?

18   A.   Yes.  I do know her.

19   Q.   Is she a member of your church?

20   A.   Yes, she is.

21   Q.   Do you know when this event took place?

22   A.   Yes.  The same time; in October of last year.

23   Q.   Did she tell you about it at the time?

24   A.   I think so.

25   Q.   Do you remember her telling you, or do you just guess?

1 A.   There were so many stories.  No, no, no.  Yeah.  I think

2 she -- yes.  She told me that.  Uh-huh.  I tell you, there

3 are so many stories, and, so, it's so mixed.  But, yes.  She

4 told me about it, and then she decided to put it on a paper

5 and give it to me.

6 Q.   Did you ask her to write out the story for you?

7 A.   No.  No.

8 Q.   She just --

9 A.   She approached to me and said, I want to give you this

10 story.

11 Q.   Okay.  Do you remember anything that they said about

12 hurting her?  Do you remember what she told you about that?

13 A.   Not in particular.  Just saying somebody will be hurt.

14 But nothing detailed.

15 Q.   Do you know how many -- she uses the word "they."  They

16 left.  They came back.  Do you know how many people were

17 there?

18 A.   I don't know for sure.  She said there were people in the

19 car, and she didn't tell me the number.

20 Q.   Okay.  Do you know if she was by herself, or was she in a

21 group of people?

22 A.   I believe she was with her kids.  That's what she told me

23 last night.  She was with her kids.

24 Q.   And are her kids -- how old would you guess her kids are?

25 A.   Oh, small kids.  Maybe -- I don't know how old her kids

1  would be.  Maybe five years old or so.

2  Q.   Do you know if she told anybody about the threats that

3  she received?

4  A.   Yeah.  She told her story to the church, to other people.

5  Yes.  She shared that.

6  Q.   Do you mean she told her story in front of the entire

7  congregation --

8  A.   No.

9  Q.   -- or just informally?

10  A.   No.  Informally.  Nobody ever told any stories in front

11  of the church, like, formally.  No.  We don't do that.

12  Q.   It may have been discussed in the community?

13  A.   In a group of people, you know, among friends.

14  Q.   Okay.  Do you have any recollection of what she told you,

15  outside of this letter?  Do you remember anything that she

16  told you, in October 2009, that she you didn't talk about

17  today?

18  A.   More than is on the paper here.  Right?

19  Q.   Do you remember her telling you more than what's on the

20  paper?

21  A.   She just told me that she was scared.  That she was

22  scared.

23  Q.   And she was holding a Reject Referendum 71 sign?

24  A.   Yes.  Yes.

25       MR. DIXSON:  This is the first one we were talking about,

1   and this is the second one.

2         (Ex. Nos. 4 and 5, marked.)

3         MR. DIXSON:  Just for the record, Exhibit 4 is the letter

4   referencing the incident at the ████████████████████

5   ████ , on ████████████ , and Exhibit 5 is the letter from

6   ████████ regarding the incident on Evergreen and Sprague.

7   Q.  (BY MR. DIXSON)  Outside of the stories you have told me

8   and the exhibits that you have produced, are you aware of any

9   harassment -- yourself, personally, or members of the

10  church -- that you haven't told me about?

11  A.   Yeah.  I have heard many stories.  But as I said, we had

12  this intention to kind of document or collect information.

13  Remember.  As of today, I can't tell you any more kind of

14  particular stories with exact dates and what happens.  In

15  general, I spoke with many people from other churches.  We

16  communicate all the time.  And I heard similar stories from,

17  actually, every church participating.

18  Q.   Did you speak to a lot of different churches about their

19  participation?

20  A.   Well, I believe I spoke with most of our Slavic churches.

21  Q.   Okay.

22  A.   Yeah.  We communicate.  We meet.  We talk.  You know.

23  It's, like, a close community.  Everybody knows what is going

24  on.

25  Q.   And do you know what they are speaking about in their --

1    to their congregations?

2    A.    Preaching the word of God.  Because in our churches,

3    even, like, during our services, we don't mix it with other

4    stuff.  You know, we just preach and pray, you know.

5    Q.    So, how do you know what they are talking about at the

6    other churches?

7    A.    Because we communicate.  We share.

8    Q.    Amongst pastors --

9    A.    Among pastors, and among friends, and people and

10   families.  I would say, half of the community are relatives

11   within themselves.  Marry one another.  It's like one big

12   family.

13   Q.    Since the election in November of 2009, have you, or

14   anyone that you are aware of, suffered harassment based upon

15   your involvement with Referendum 71?

16   A.    Those that I already mentioned to you.

17   Q.    Okay.

18   A.    And I consider those phone calls, I consider them

19   harassment and threats.

20   Q.    Anyone -- you haven't -- are you aware of any harassment

21   to any members of the church, outside of yourself, regarding

22   Referendum 71, since the election?

23   A.    Directly, not.  Indirectly -- and, again, I can't really

24   say, for sure, that it's connected 100 percent with this.

25   But, like, my assistant, he told me that he had some notes on

1  his car.  You know, bad words and other things.  And I have

2  got those people making pictures.  I don't know.  Again, I

3  can't be a hundred percent sure that this is a connection on

4  that.  I just assume.  Because before this, before last fall,

5  we never had any incidents like this, anything suspicious,

6  any threats.  Except one time, when I mentioned, like, 12

7  years ago, this man come and threatening to kill everybody.

8  But it doesn't have a connection to this.

9        And once our website was destroyed.  Actually, when it

10  was?  Probably early this year.  Yeah.  Actually, it was

11  after the election.  We have a church website, and these guys

12  were taking care of it.  They said, hey, ███, somebody just

13  crashed it.  Actually, they crashed it twice.  Once, some

14  people -- I don't know how they did it, but they opened the

15  church site, and, sorry, there was pornography on this.

16        We said, whoa.  How could somebody do that?  Just -- you

17  know.  It was terrible.  And they were fixing it for a long

18  time before they were able to determine what happened.  And

19  they fixed that, and the next time, early this year, somebody

20  kind of crashed the whole site.  They had to -- fortunately,

21  they had everything copied, you know, and they reproduced it

22  again.

23  Q.  What do you mean, crashed the site?

24  A.  I am not a computer person.  I can't really explain it.

25  But they reported our site was no more working.  Somebody

1   destroyed it.  Just came outside.  Some hackers.  I don't

2   know how they do that.  They just destroyed everything.  They

3   erased all the information.  Just --

4   Q.   And the other time, someone posted pornography on the

5   site?

6   A.   Before that.  But it was after the election.  Again,

7   maybe there is no connection with this.  I can't tell you.

8   But that's what happened.

9   Q.   Okay.  I appreciate your patience.

10       Out of everything we talked about today, are there

11  incidents that you recall now -- personally, or amongst the

12  church -- before or after the election, that you consider

13  harassment, that you haven't told me about?

14  A.   No.  I think that's enough.

15       MR. DIXSON:  I am going to be done.  Anne may have some

16  questions.  Stephen may have some questions.  But I, for now,

17  am done.  Thank you for your time.

18       THE WITNESS:  I am almost done.  I just want to make a

19  short conclusion.  Can I do that?

20       MS. EGELER:  Actually, Pastor, this is Anne Egeler, and I

21  am going to ask you some questions now.

22                          EXAMINATION

23  BY MS. EGELER:

24  Q.   If I understand correctly, you work for the State of

25  Washington, correct?

1  A.   Yeah.  They said it was the same man.  Same voice, same
2  text, same wording.
3  Q.   Okay.  And did they tell you what the school phone
4  messages said?
5  A.   It was the same as the church messages.
6  Q.   So you don't know what, exactly, what was said on the
7  school phone messages?
8  A.   No.  I didn't hear those.  I guess I am getting tired.
9  Just my tongue is -- I was speaking all day long, and I got
10 tired.
11     MS. EGELER:  I understand.  And I don't have any more
12 questions right now.
13     THE WITNESS:  Again, Anne, once again, I apologize for
14 my -- if I was rude to you, but I explained myself.  I
15 believe you understand me why.
16     MS. EGELER:  You did.  And I accept your apology.  Thank
17 you.
18     THE WITNESS:  And I accepted your apology, also.  Thank
19 you.
20                         EXAMINATION
21 BY MR. PIDGEON:
22 Q.   I have just a couple follow-ups.
23      Now, the church has a website?
24 A.   Yes.
25 Q.   And your name appears on that website?

1   A.   Yes.

2   Q.   And does ███████████████ name appear?

3   A.   Yes.

4   Q.   Is your name in the phone book; do you know?

5   A.   A good question.  I guess so.  But, actually --

6   Q.   Let me ask you this --

7   A.   All people know my phone number because they call with me

8   all of their needs.  Anything they need, they call me.  Just

9   like a community center.

10  Q.   Do you have an unlisted phone number?  Home phone number?

11  A.   As a matter of fact, right now, I don't have a home

12  number.  We disconnected because we have cell phones, and

13  there is no need to pay for a home phone.  Just save a little

14  money.

15  Q.   Okay.  Now, when you signed the petition, the R-71

16  petition, did you know that the Secretary of State was

17  planning on disclosing the names and addresses of every

18  signer?

19  A.   No.

20       MR. DIXSON:  Object to the form of the question.

21  Q.   (BY MR. PIDGEON)  I am asking if you knew that.  Did you

22  know that?

23  A.   No.   If we would know, we wouldn't sign, because that

24  puts danger in all people.  By reading those blogs on the

25  Internet, I already know what will happen if they will do

1    that.

2    Q.    Did you read some of the blogs on the Internet?

3    A.    Yes, I did.

4    Q.    Did you see any threatening language on those blogs?

5    A.    Yes, I did.

6    Q.    Did you see any threats of violence on those blogs?

7    A.    Yeah.  I can't kind of recall exact wording, but, yes.

8    It looks like some young men, they were kind of aggressive

9    towards Russian community, saying, oh, they think they are

10   tough.  They come here.  Russians are tough.  They think they

11   are going to be tough here in America, and they are voting

12   here, and something like, let's show them -- something

13   like -- they are not -- I don't remember.  Something like

14   calling people to kind of stand against these people, and

15   kind of throw them away from the country, or, you know, call

16   them to some kind of violence.

17         I was reading it and I was shocked and said, whoa.  It

18   was kind of shocking to me.

19   Q.    Did you experience any anti-immigration bias, or

20   anti-Russian bias, when you came here in the Nineties?

21   A.    Right in the beginning of when we come?

22   Q.    Uh-huh.

23   A.    Well, I didn't understand the language.  Maybe somebody

24   said something bad.  It's the same to me.  I just was saying

25   yes, yes, yes.  Thank you.  Thank you.  (Laughter.)

1    Q.   After the fellow walked into the church and threatened to

2    machine gun the whole church --

3    A.   Okay.

4    Q.   -- did you experience any anti-Russian bias after that?

5    A.   What "bias" is?

6    Q.   Did you have anybody say, you know, Russian go home, or

7    any of this?

8    A.   Yes.  Actually, I have heard that a lot.  And kids at

9    school, even my son ██, who was born here in Spokane, and

10   he experienced that at school, and I went and spoke with his

11   principal and said, why do you tell ██ go back to Russia?

12   He was born in Spokane.  And he come home crying, saying,

13   "Hey, father, this is my motherland.  Why should I go to some

14   damn Russia I have never seen?"

15         I said, "Wait a second.  I will talk to your principal."

16         Yeah.  People will hear that a lot.

17   Q.   Has any of this incidence of anti-Russian sentiment

18   increased since the R-71 campaign?

19   A.   Um, an interesting question.  I never paid kind of

20   attention to that.  But, yeah.  I have heard this, after the

21   election, yeah, how many people are reporting that, yes.

22   Q.   You mentioned this incident of a young Russian fellow

23   being beaten up downtown?

24   A.   Uh-huh.

25   Q.   When did that happen?

1   A.   I believe it was last winter.

2   Q.   Last winter.  And do you know how many guys beat this guy

3   up?

4   A.   No.  We don't know exact number.  Because he said he had

5   no time to count them.  They beat him up, and they put him in

6   the ground and just kick him and crushed his teeth.  He come

7   home without teeth.

8   Q.   Did they give him any reason why he was being beaten up?

9   A.   No.

10  Q.   Did they ever catch the people that did it?

11  A.   No.

12      MR. PIDGEON:  All right.  I have nothing further.

13                    EXAMINATION

14  BY MR. DIXSON:

15  Q.   I just have a couple of follow-ups.  Let me finish

16  writing.

17      With regard to the blogs that you saw, were the nasty

18  things written about Christians, or were they written about

19  the Slavic people, in particular?

20  A.   Well, they were different blogs.

21  Q.   Okay.

22  A.   And some of them were particularly talking about

23  Christians, and, in particular, those people who participated

24  in the petition thing, you know.  But I believe one blog I

25  was reading, that was talking entirely about Russians, and it

1  discussion of this topic, you know.

2  Q.   Do you remember; was it a blog post or a comment?  Do you

3  understand the difference?  A main post, and then, people can

4  post comments?

5  A.   Right.  People's comments.

6  Q.   Do you remember if that was the post itself, or the

7  comments?

8  A.   Comments.

9       MR. DIXSON:  That's all that I had.

10      MS. EGELER:  I have nothing further.

11      MR. PIDGEON:  I am finished, as well.

12      THE WITNESS:  Can I make a conclusion?

13      MR. DIXSON:  We can go off the record.

14      MS. EGELER:  Are we going off the record?

15                    EXAMINATION

16  BY MR. PIDGEON:

17  Q.   Let me ask you this.  I have one last question.

18       Would you like to say some concluding remarks, ███████

19  ███?

20       MS. EGELER:  I am going to object to that.  This is a

21  deposition, and if you would like to make a statement

22  afterwards to us, that would be fine, but it's not

23  appropriate for the record.

24  Q.   (BY MR. PIDGEON)  You can answer the question.

25  A.   Actually, I want to appreciate all of you for this

1  opportunity today to meet with you wonderful people, and

2  actually speaking with Anne.  Seriously.  Because I have a

3  chance, at least, to express myself, at least, in your sight.

4  And I thought it was going to be much worse.  I thought it

5  was another KGB, but now I think we are all good people.

6  So -- and I have a good feeling, and I had a chance to kind

7  of explain myself.

8      And as a conclusion, again, I want the judge to hear

9  that, that Slavic people -- I can speak about myself, my

10  family, my friends and people who I know.  I can't speak for

11  everybody.  But people I know, and I know most of the people.

12  They are good people.  They come here as religious refugees

13  seeking for freedom.  They are hard working people.  Family

14  oriented.  And we are happy to be here.  Most of us are

15  citizens.  And, so, we have good, positive kind of influence

16  in the community, and we would like to have a good life here.

17      And one thing that I would like to say to judge, and to

18  all of you -- especially, this difficult economical

19  situation -- and I just even put here, we should stop

20  igniting hatred and hostility in our community, as we love

21  all of our people, and the Constitution protects all people.

22  And I just ask judge to not release personal information of

23  petition signers, as it will bring chaos, pain and violence

24  in our community.  But in this, our complicated time, we just

25  have to bring people together, keep them in peace, and work

1    for better future.

2         So I just want to call all people to peace, and not to

3    ignite this, you know, fights and -- because what I heard

4    here about this suit going on, I was confused.  You know.

5    Why people do that?  So I believe in good community and good

6    country.  And we had bad life in Soviet Union.  We come here

7    and would like to have good life.  And if we are bothering

8    you with our belief system or whatever, just tell us, shut

9    up, and we won't talk about this, then.  Because it does --

10   those days, we thought it's normal, it's okay, we don't do

11   anything wrong, and it's Biblical.

12        And I am reporting, we don't have any hatred towards gays

13   or any other group of people.  We have tolerance, and we love

14   all people, and we are willing to live all together.  So we

15   don't have any problem with that.

16        And me, personally, as well, professionally, and as a

17   pastor, I have lots of Americans come to our church, and

18   counsel them, and lots of homeless people.  I know what real

19   life is.  So I respect all people, and I do my best to serve

20   them.

21        And I ask and you, sir, good citizen, let's not make any

22   threats and pressures, and, you know, we want to have a good

23   life with our families here.  So I love all of you, and we

24   pray for you, and we pray for the country.  We pray for our

25   government.  We pray for local government.  We try to do our

1                          CORRECTION SHEET

2        PAGE          LINE                          CORRECTION

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19          I have read the foregoing 167 pages of my testimony and
     I declare (or certify) under penalty of perjury under the
20   laws of the State of Washington that the foregoing is true
     and correct, except for the corrections noted above.

21          Dated at_____,_____this

22   _____day of_____, 2010.

23

24                     _____
                       ██████████████████

25

```
 1   STATE OF WASHINGTON
                              ss:  Reporter's Certificate
 2   COUNTY OF SPOKANE

 3        I, Osmund D. Miller, a Certified Shorthand Reporter and

 4   Notary Public in and for the State of Washington,

 5        DO HEREBY CERTIFY:

 6        That the foregoing is a true and correct transcription

 7   of my shorthand notes as taken upon the deposition of

 8   ███████████████  on the date and at the time and place as

 9   shown on Page 1 hereto,

10        That the witness was sworn upon his oath to tell the

11   truth, the whole truth and nothing but the truth, and did

12   thereafter make answers as appear herein,

13        That I am not related to any of the parties to this

14   litigation and have no interest in the outcome of said

15   litigation,

16        Witness my hand and seal this 29th day of October, 2010.

17

18

19

20                              RPR, CCR No. 2280
          OSMUND D. MILLER
21        Certified Shorthand Reporter and Notary
          Public in and for the State of Washington,
22        residing in Spokane.  My commission expires
          December 15, 2012.
23

24

25
```



# Bethlehem Slavic Church

### 302 W Augusta Ave.
### Spokane WA 99205
*Office/fax (509) 327-1712*
*Cell  (509) 879-6377*

To Whom It May Concern:

Это было в Субботу, 24 Октября 2009г после обеда. Люди с нашей церкви проводили манифестанцию "Раллэй" на углу улицы Division и North River Drive (Близко около речки).

Одна женщина подошла и стала забирать знаки у людей. Когда Иван Гришко позвал ее "Мэм" она розвернулась и ударила Ивана Гришко знаками по голове. Острым краем знака, у Ивана была разбита голова, немного выше лба.
Ивана был отвезен в госпиталь, где ему были наложены шесть швов на повреждение.

Sincerely,



EXHIBIT
WITNESS
OSMUND D. MILLER
STOREY & MILLER

--- *"The great thing in the world is not so much where we stand as in what direction we are moving."* ---

Letter translation from Bethlehem Slavic Church:

To Whom It May Concern:

It happened on Saturday, October 24 of 2009 after noon. People from our church were participating in a Riley on a corner of Division and North River Drive (Close to river)

One lady came to them and started taking away our signs from people's hands. When ▮▮▮▮▮▮ said to her "Mam" she turned around and hit ▮▮▮▮▮▮ with the sign right in to his head. By the sharp age of the sign she cut his head right above his forehead. ▮▮▮▮ was hospitalized immediately, where doctors put six stitches on his wound.

Sincerely, (Signature)

▮▮▮▮▮▮▮▮▮

Slavic Baptist Church on a Hill

8913 N. Nettleton Ln

Spokane, WA 99208

███████████ (509) 465-8890; 747-1349; 879-1506

I spoke with their Administrator ███████████ (S09) 868-2330, He actually informed that during R-71 campaign they received threatening messages on their church telephone and on their church school telephone. They called 911, police came to the church, listened those msges and report was made. Also their church custodian personally witnessed ladies came in the car right to the church property, took R-71 signs, and after custodian tried to chase them they just left in a car with stolen sign.. Talk to them directly and they can tell you more details..



EXHIBIT 7
WITNE███
OSMUND D. MILLER
STOREY & MILLER

To: The Court

From: █████████████

My name is ███████████ and I am legal resident of Washington. One day when I was standing on the corner of Evergreen and Sprague holding up the sign that said "Reject referendum-71"; I got a couple of threats towards me. Some people just disagreed but I remember this car that used bad word, curse me, laughed at me, and then gave me the finger. Then after they left, they came back again and told me to leave before someone gets hurt. When I kept on standing there, they kept on coming back and each time and tell me to leave.

I am living in a free country and the first bill of rights says that everyone has the freedom of speech. I didn't do anything illegal, I just gave my opinion and I don't think it's fair for people to insult me for what I believe in (freedom of religion).

Sincerely,



991- 6512 cell



EXHIBIT
WITNESS
OSMUND D. MILLER
STOREY & MILLER

# Exhibit 7-3

Exhibit in Support of Pls.' Response to
Def's Motion for Summ. J.
(Case No. 3:09-cv-05456-BHS)

**Exhibit 7, Page 126**

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

_____

                            )
JOHN DOE #1, et al.,       )
                            )
        Plaintiffs,   )
                            )
        vs.            )  NO. 09-cv-05456-BHS
                            )
SAM REED, et al.,       )
                            )
        Defendants.   )

_____

DEPOSITION UPON ORAL EXAMINATION OF ███████

_____

October 1, 2010

Olympia, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

1                                    INDEX

2    EXAMINATION                                          PAGE/LINE

3    MS. EGELER                                           6     13

4    MR. HAMILTON                                         76    3

5    MR. DIXSON                                           127   23

6    MR. PIDGEON                                          132   13

7    MS. EGELER                                           147   18

8

9

10

11                                  EXHIBITS

12   EXHIBIT        DESCRIPTION                           PAGE/LINE

13   1          Blog post from Faith and Freedom          13    22
                Network; 1 pg.
14
                2          Article from Protect Marriage   19    4
15                         Washington Web site; 3 pgs.

16   3          Article in Seattle Times by               20    9
                Ms. LaCorte; 3 pgs.
17
                4          Article from Faith and Freedom Web   23    8
18                         site; 2 pgs.

19   5          Article from Faith and Freedom Network    24    5
                Web site; 3 pgs.
20
                6          Web page from Faith and Freedom  24    18
21                         Political Action Committee; 2 pgs.

22   7          Expenditure statement for Faith and       29    8
                Freedom PAC; 1 pg.
23
                8          Printout from Mr. Bisceglia's Web   43    18
24                         site; 7 pgs.

25   9          Printing from Faith Not Freedom Web       43    18

            site; 11 pgs.
            Dixie Cattell & Associates (360) 352-2506

1                            EXHIBITS

2    EXHIBIT          DESCRIPTION                        PAGE/LINE

3    10      Article in USA Today; 3 pgs.              72    11

4    11      Blog posting on Faith and Freedom        74    5
             Network; 2 pgs.
5
     12      Biography of ███████████ 1 pg.            76    12
6
     13      Faith and Freedom Network perspective    80    17
7            on candidates; 1 pg.

8    14      Vimeo web site printout; 1 pg.           82    20

9    15      Article in Seattle Times on 10/14/09;    84    17
             4 pgs.
10
     16      Article by ███████████  in the Herald    85    24
11           Net; 2 pgs.

12   17      Seattle Times article published 9/1/09;  90    8
             2 pgs.
13
     18      Article in Seattle Times published       91    23
14           7/24/09; 1 pg.

15   19      Seattle Times article published          93    1
             8/27/09; 3 pgs.
16
     20      Seattle Times article published          95    10
17           3/11/09; 2 pgs.

18   21      Seattle Times article published          96    16
             5/18/09; 2 pgs.
19
     22      Faith and Freedom Network blog; 4 pgs.   98    23
20
     23      Collection of blog postings from Faith   101   2
21           and Freedom Network blog; 51 pgs.

22   24      Blog postings on Faith and Freedom       104   11
             Network; 25 pgs.
23
     25      Political Committee Registration;        108   19
24           3 pgs.

25

1                              EXHIBITS

2    EXHIBIT           DESCRIPTION                      PAGE/LINE

3    26       Political Committee Registration form    112   24
              for Committee for Judicial Restraint;
4             5 pgs.

5    27       Registration form for Committee for      116   10
              Religious Freedom; 1 pg.
6
     28       Twitter posts; 6 pgs.                     118   13
7
     29       Civil judgment filing record; 10 pgs.    122   6
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 7, Page 130**

Page 6

1      BE IT REMEMBERED that on Friday, October 1, 2010,

2      at 8:58 a.m., at 1125 Washington Street, Suite 601, Olympia,

3      Washington, before REBECCA S. LINDAUER, Notary Public in and

4      for the State of Washington, appeared ███████, the

5      witness herein:

6      WHEREUPON, the following proceedings were had, to

7      wit:

8

9      ███████,              having been first duly sworn by

10                            the Notary, testified as follows:

11                      EXAMINATION

12  BY MS. EGELER:

13  Q    So good morning, ███████.  My name is Anne Egeler, and

14       I'm a deputy solicitor general representing the State in

15       this matter, specifically, Sam Reed and the defendants in

16       the case.

17       Before we get started, I wanted to ask:  Have you ever

18       been deposed before?

19  A    Yes.

20  Q    Can you tell me about that?

21  A    I don't really recall the details.  A number of times.  I

22       was in the music and entertainment industry.  We were just

23       talking about Nashville and we had an office there.  I

24       can't.  I don't remember.  It was just issues.  I don't even

25       know what it was.

Page 9

1          left over from my working years.

2     Q    Is that --

3     A    It isn't active today.

4     Q    Isn't active.  Was it active in 2009?

5     A    No.

6     Q    What state was that registered in?

7     A    Oregon.

8     Q    And are you associated with any nonprofit organizations?

9     A    Faith and Freedom Foundation.

10    Q    Okay.

11    A    Faith and Freedom Network.

12    Q    Are those different organizations?

13    A    Yes.

14    Q    Can you explain how they're related, if at all?

15    A    Yeah.  It's on our Web site.  It's a statement that the IRS

16         actually gave me to put on so it would clarify it the way

17         they would like to see it.  I can't quote it, but it's on

18         the Web site.  But they're separated -- they're related, but

19         separate organizations.

20    Q    So it's Faith and Freedom Network and Faith and Freedom?

21    A    Foundation.

22    Q    Foundation.

23              What is the work of those organizations?

24    A    The Foundation is education.  The Network is advocacy.

25    Q    Looking at the Network, the Faith and Freedom Network, what

**Exhibit 7, Page 132**

1     is your association with that organization?

2   A   I'm ████████.

3   Q   And is that registered as a nonprofit with the Washington

4     Secretary of State?

5   A   Yes.

6   Q   Faith and Freedom Foundation, what is your association with

7     that?

8   A   I'm ████████.

9   Q   And is that registered with Washington State?

10  A   No.  It's registered with Oregon.

11  Q   When did you learn that you were named as a witness in the

12     Doe v. Reed case?

13  A   I think when your office contacted me.

14  Q   Are you aware that being a witness in this case may require

15     you to publicly testify in federal court?

16  A   I am.

17  Q   And is that acceptable to you?

18  A   Yes.

19  Q   Did you do anything to prep for the deposition today?

20  A   In regards to?

21  Q   Anything.  Did you prep in any way?

22  A   I looked up some slanderous remarks that have been made

23     about me and copied them off the Internet.

24  Q   The subpoena you received contained a request for documents.

25     Did you have a chance to search for responsive documents?

1　A　I did.  I didn't have much time, but I had a few days, as

2　　　you know, and so I went on the Internet.  Would you like to

3　　　hear about that now?

4　Q　I don't want to hear the details of it.  I would like to see

5　　　what you have that's in response to that production request.

6　　　　　Have you brought any documents with you?

7　A　There are copies of statements I would like to share with

8　　　you.

9　Q　Okay.

10　A　(Documents passed.)

11　Q　Thank you.  We'll go through all of this during the course

12　　　of the deposition.

13　　　　　At this point, I just wanted to ask if you had a

14　　　chance --

15　A　Yeah, I did.

16　Q　-- to produce and look at this.

17　　　　　Do you feel that you had adequate time to go through

18　　　all of your records and fully respond to the subpoena?

19　A　No.  But, you know, I had some time, not adequate time.

20　Q　So you can't say then that you have fully responded to the

21　　　subpoena?

22　A　To the best of my ability in the time that I had, given my

23　　　other responsibilities.

24　Q　So are you saying that there may be responsive documents

25　　　that you have not brought with you today?

1        there, it's got in parens 44.6 percent?

2   A   Yes.

3   Q   Are we on the same page?

4   A   Yes, that's correct.

5   Q   So where on the page did you want me to look?

6   A   Right in the middle, the bold type, "Now to just try to tell

7        me that we don't have serious reasons to defend ourselves

8        and our children and maybe your children also of all sexual

9        orientations from the hate speech spewed from Christian

10       mouths."

11          This is -- on the last page of this is --

12  Q   Can we stay with this page and the piece that you just

13        identified?  Can you explain to me what your concern is with

14        this?

15  A   Well, my concern is that there's a continued advocacy or

16       violence on the part of this man.

17  Q   I see the piece that you've just read about defending

18        ourselves.  Can you show me where there's an advocacy for

19        attacking or killing someone?

20  A   On the previous page, it says, "You see," and there's a

21        check beside it --

22  Q   Right.

23  A   -- would be the back of page 1 per the copies you just made.

24        "You see, I get very angry and feel an intense need to

25       defend innocent people from harm's way when I read about the

1    family tragedies below.  Knowing that they are a direct

2    result of the ignorance, lies, misinformation, bigotry,

3    pure-evil hatred of LGBTQ people is promoted daily by many

4    Christian groups.  I feel an intense need to defend innocent

5    life from these assaults.  As a child advocate and early-

6    childhood teacher, I especially feel compelled to protect

7    children."

8    Q    Yes.  And what is your concern with that paragraph that you

9         just read in?

10   A    The list on the previous page, the first page, says, "Here

11        is a list of people whose mere existence is a serious threat

12        to our safety."  The fact that we exist is the threat.

13   Q    Okay.

14   A    The last page that I copied here and there's -- there is

15        reams.

16   Q    Let's stop.  Let's stop.  I just asked you about the

17        paragraph that appears on the back of page 1.  You read in a

18        paragraph that begins, "You see, I get very angry and feel

19        an intense need to defend innocent people," et cetera,

20        et cetera.

21             Please explain to me how you feel that that is a threat

22        or harassment.

23   A    Because he's advocating using a gun on his Web site.

24   Q    Please show me where he advocates using a --

25   A    That's what I was doing.

**Exhibit 7, Page 136**

1  Q  Okay.

2  A  The last page, there's a picture and it's very prominent on

3     his Web site, "The abuse needs to stop.  Now.  Armed gays

4     don't get bashed.  Pinkpistols.org."

5  Q  And where does it advocate using guns on people and killing

6     them as opposed to defending one's self from attack?

7  A  I'm suggesting that listing a list of names who are

8     pro-marriage, talking about the violence that these people,

9     myself included, are perpetrating upon the gay community and

10    advocating that abuse stops -- needs to stop now and the

11    picture of a gun held in the hands of an individual is

12    suggesting violence against this list, and that's exactly

13    what he's doing.

14 Q  ███████ , do you belong to the NRA?

15 A  I do not.  I resigned.

16 Q  Do you support individuals' rights to bear arms?

17 A  I do.

18 Q  Do you support the right of individuals to defend themselves

19    if attacked?

20 A  I do.

21 Q  Does that mean that you support assertively going up to

22    people that you don't agree with who have not physically

23    attacked you, and rather than defending yourself,

24    aggressively killing them?

25 A  You'll have to restate that question.

Page 50

```
 1   Q   I thought it was an easy one.
 2   A   I didn't realize I was on trial.
 3   Q   Do you believe that individuals have a right to bear arms to
 4       defend themselves --
 5   A   Yes.
 6   Q   -- or to -- do you feel that individuals, therefore, also
 7       have a right to bear arms to attack others who have not
 8       physically attacked them?
 9   A   No.
10   Q   Can you please show me in this document, Exhibit No. 8,
11       where this individual asserts that it would be appropriate
12       to assertively attack someone as opposed to defending one's
13       self?
14   A   There is a very easy, if one wants to make that
15       assumption --
16   Q   I'm not asking for assumptions.
17   A   -- easy transition --
18   Q   Sir, I'm asking you to show me the words that assert that an
19       assertive attack would be appropriate as opposed to
20       defending ones' self.
21   A   The whole Web site is hate.
22   Q   I'm asking you --
23   A   It is not on the page -- he does not advocate pulling the
24       trigger on ████████ on these pages.
25   Q   Where in this document does he advocate pulling the trigger
```

Page 51

1    on anyone who has not attacked physically innocent people?

2  A  He does not.

3  Q  Thank you.

4       Can you describe for me what Exhibit No. 9 is?

5  A  This is a Web site that was apparently set up as a mock to

6    mock faith-based or traditional value-based organizations.

7    They define themselves as Faith Not Freedom News.

8  Q  And that's the Web site that appears at the bottom left-hand

9    corner of what you've printed.  Is that correct?

10 A  Yes.

11 Q  And the date that you printed it, is that reflected in the

12   bottom right-hand corner?

13 A  Yes.

14 Q  Okay.

15 A  "Faith Not Freedom is an organization dedicated to

16   supporting the work of Washington State theocrats, most

17   notably Faith and Freedom Network," et cetera.  They --

18   page 2 -- 3.

19 Q  And because what I copied for us in the original are a bit

20   different --

21 A  Yes.

22 Q  -- and our copies are two-sided, let's identify the page

23   you're on.  Is that the one at the top that says, "Pam's

24   Blend" --

25 A  "Pam's Blend of Perversion Tries to Out Our Agenda."

1  Q   Okay.

2  A   Keep in mind that these people are speaking in a mockery

3      position, okay, as though they agree with Faith and Freedom

4      and █████████.  "It should be of no surprise that the

5      radical lesbian, Pam Spaulding tries to out my hero, ████

6      ████."  I'm not their hero.

7          They quote Pam Spaulding here as saying, "From

8      █████████ point of view, if I disagree with someone who says

9      that I should be executed because I'm gay, then somehow I'm

10     being intolerant of that person's religion.  The kind of

11     tolerance ██████ is looking for leads to violence.  Should

12     I condone my own execution?  ██████ apparently thinks so.

13     █████████ sickeningly ended his post with a plea for

14     donations to what he calls this ministry.  He is using his

15     authority as a Christian minister to broadcast to the world

16     his certainty that I and every other gay person deserve

17     death.  When we" -- "when will the press and general society

18     stop giving people like ██████ a pass because he calls

19     himself a Christian and a pastor and uses nice words like

20     'faith.'  Let's recognize his words for what they are:  a

21     condoning of lethal violence against gay people."

22          Now, there -- surely we can make a linkage because

23     these people are all reading these sites.  Surely we can

24     make a linkage between Pam Spaulding saying and being

25     requoted on this mock site that █████████ is advocating

Page 53

1    lethal violence against gay people.  That is a lie and that

2    is slander, I am certain.  I'm certain it is and we'll find

3    out about that.

4         But I will tell you that, with those kinds of words

5    being fed into the community, you have to create some kind

6    of linkage between what these people are saying and what

7    Bisceglia is saying and has said, and he did directly say

8    that Larry Stickney, ███████, any churches and

9    government buildings that are involved in supporting Senate

10   Bill 5688 should be destroyed.  He's scrubbed that from his

11   Web site, but KIRO caught it before he scrubbed it and they

12   ran a story about it.

13 Q  Wait.  He said what now?  Can you repeat that?

14 A  There should be linkage because these people are all

15   communicating with one another.  They're all aware of each

16   other.

17 Q  My question is:  What did Bisceglia say that you claim was

18   scrubbed from his Web site?

19 A  John Bisceglia put on his Web site -- I saw it.  I did not

20   copy it.  KIRO 7 saw it and reported on it.  He said that

21   ███████, Larry Stickney should be killed, and that

22   church buildings and government buildings that were involved

23   with or supportive of the R71 effort should be destroyed.

24   That's why KIRO news picked it up, KIRO 7, not the radio,

25   and reported on it.

Page 54

1    Q    Do you remember those words --

2    A    He scrubbed it.

3    Q    -- exactly or are you guessing?

4    A    Well, I'm not guessing.  I remember it because, when people

5         advocate that I get killed, that tends to stick in your

6         mind.  Is it an exact quote?  I don't know.  He scrubbed the

7         site.

8    Q    When was it posted on his Web site?

9    A    I don't know.  But KIRO, especially if there's a legal

10        action taken, we can get the information from KIRO because

11        they ran the story because they called me about it and

12        interviewed me.

13   Q    When did you see it on his Web site?

14   A    When he put it up.

15   Q    When was that?

16   A    I don't remember the date.  I don't know, Anne.

17   Q    So you don't remember when you saw it, but you're certain of

18        the words?

19   A    Absolutely.

20   Q    So you can -- you're saying under oath now that --

21   A    Back then I didn't know it would be on trial now over this

22        having to recall that.  And I'm not out to get anybody.  If

23        I was out to get someone, I would have put out in the press

24        a long time ago that Senator Murray's foster son accuses him

25        of abusing him when he was a little boy.  I would have put

**Exhibit 7, Page 142**

1        that out in the news, and I haven't done it.

2    Q   I'm asking you --

3    A   I'm not trying to hurt gays.  I've never had a problem

4        with -- as a pastor, I've reached out to gays.  I've helped

5        them over the years when I was pastor in North Hollywood,

6        when I was a pastor in Portland, and even when I was a

7        pastor here in Bellevue 40 years ago.

8    Q   I'm not asking you --

9    A   I'm not trying to hurt anyone.

10   Q   -- if you want to hurt anyone.  I'm asking you:  Do you

11       remember, and can you state under oath, that the words that

12       you told me appeared on that Web site are exactly the words?

13   A   No.  I can't say under oath they were exactly, but that was

14       the message.  KIRO got the message.  Anyone who's not blind

15       by their bias will get the message:  kill █████, kill

16       Stickney.  They got it.

17   Q   And Exhibit No. 8, which you stated came from Bisceglia's

18       Web page, do you know when this information was posted on

19       his Web page?

20   A   It was -- the list of John McCain, Tony Perkins, █████

21       █████, Stephen Pidgeon, et cetera, looks like it was

22       posted at 9:37 a.m. on a certain day.  I'm -- I don't know

23       that he'll hear of this deposition today and get it scrubbed

24       by this afternoon, but anyone can go on there and check it

25       out.

1  Q   Do you know the date this material in Exhibit No. 8 was

2       posted by him?

3  A   I don't have -- I don't have access to what he does on

4       certain days.  All I know is, you go on his Web site --

5  Q   So is the answer no?

6  A   You go on his Web site, this is what you get.

7  Q   Is your answer --

8  A   This is a recent post.

9  Q   Is your answer, no, you do not know when this information

10      was posted?

11  A   I know that it was very recent.

12  Q   How recent?

13  A   I don't know the date, but it was very recent.

14  Q   I need a range.  Approximately when?  What does "very

15      recent" mean to you?

16  A   During the month of September.  Because September 18, 2010,

17      is referenced on his -- right here on the first page.

18  Q   On the first page?

19  A   Yeah.  That list is above that, so it looks like to me it

20      was sent September 18th.

21  Q   The material in Exhibit No. 9, when was this posted?

22  A   Well, the first page is an idea of their organization.  The

23      other, I don't know when it was posted.  It looks like maybe

24      March.

25  Q   Does anything in Exhibit 9 reference Referendum 71?

Page 58

1   Q   Do you know everything they've said?

2   A   No.

3   Q   So is this abnormal, that you wouldn't know everything

4       that's said and everyone who said it?

5              MR. PIDGEON:  Objection as to form.

6   Q   (By Ms. Egeler)  You can go ahead and answer.

7   A   What's the question?

8   Q   Is this abnormal, that you wouldn't know everyone in the

9       Referendum 71 effort and what they've said?

10  A   No.

11  Q   So isn't it possible as well that, in the gay community, not

12      every gay person knows each other in the state?

13  A   I didn't say, for the record, that all gay people knew

14      everybody in the state that was gay.  I said there's a lot

15      of communication within the gay community.

16  Q   Isn't it possible that some gay people put things on the

17      Internet that other gay people in the state do not see?

18  A   Anything is possible.

19  Q   Have you ever publicly discussed the position of another

20      religion with respect to homosexuality?

21  A   A specific religion?

22  Q   Yes.

23  A   No.

24  Q   Have you ever talked about the position of Islam with

25      respect to homosexuality?

**Exhibit 7, Page 145**

Page 59

1  A    Not that I recall, I haven't.  I know what their position

2       is, but I don't recall that I've ever discussed it openly --

3       publicly.

4  Q    Do you know, looking at Exhibit No. 8, what expression you

5       may have publicly made that may have caused this response?

6            MR. PIDGEON:  Objection as to the form of the

7       question.

8  Q    (By Ms. Egeler)  You can go ahead and answer.

9  A    I believe that my beliefs are in opposition to their

10      beliefs, and if one does not support the gay agenda, one is

11      a bigot and they have labeled me as a bigot.  I am not.

12 Q    Are you aware of any discussion that took place on the

13      Internet, in which you were involved, which discussed

14      execution in some Islamic countries of homosexuals?

15 A    You better do the question again.

16 Q    Are you aware of ever publicly referring to Islamic religion

17      or any religion executing people for engaging in homosexual

18      acts?

19 A    I don't believe I've ever made that statement, although it

20      is true they do.

21 Q    Have you ever publicly discussed anyone else's reference to

22      execution of homosexuals?

23 A    Not that I recall.

24 Q    In addition to the materials in Exhibits 8 and 9, have you

25      experienced anything else that you would consider harassment

**Exhibit 7, Page 146**

```
 1        or threats as a result of your involvement with

 2        Referendum 71?

 3    A   There is a river of advocating against me personally on the

 4        Internet.

 5    Q   Do you have anything specific that you would like to

 6        discuss?

 7    A   No.

 8    Q   When did you first see -- excuse me.  Exhibit No. 8, is the

 9        exhibit you said you saw recently?

10    A   Both Exhibit 8 and Exhibit 9 were copied off the Internet on

11        September 27th.

12    Q   Was that the first date that you saw those?

13    A   No.

14    Q   What was the first date that you saw Exhibit 8?

15    A   I don't recall.

16    Q   Is that the exhibit that you said you saw extremely

17        recently?

18    A   I saw it on September 27th.  I copied it.

19    Q   Did you see it before then?

20    A   I don't recall if I did.  I don't -- I try not to spend a

21        lot of time on those Web sites.  It's a little depressing.

22    Q   On September 27th, is that the -- yeah.  September 27th, did

23        you contact the police or any other law enforcement about

24        the material in Exhibit No. 8?

25    A   No.
```

1   Q   Why not?

2   A   I wasn't thinking about my own protection. I was thinking

3       about trying to make a reasonable expression of the kind of

4       slander and violent advocacy that's made toward me on an

5       ongoing daily basis.

6   Q   And you feel Exhibit No. 8 is violent advocacy, correct?

7   A   I think it's a part of that. It's all linked, and I was

8       trying to make the linkage. And I was denied that by you,

9       but there is linkage there and violence will happen at some

10      point. I'm certain of that.

11  Q   If you do feel violence will happen at some point, are you

12      now going to contact the police about Exhibit No. 8?

13  A   I don't know. There's so much evidence of advocacy towards

14      violence on the part of some of the gay activists, not all,

15      but some, I don't know if I will contact the police or not.

16  Q   Why wouldn't you? What causes your uncertainty?

17  A   I don't know that that would be the best evidence to give

18      them. It was recent evidence. I inadvertently and naively

19      thought that this deposition today was about whether the

20      names of the people who signed Referendum 71 should be

21      released.

22  Q   And I'm asking you: For what reason would you consider not

23      contacting the police about the contents of Exhibit No. 8?

24  A   And I answered that question.

25  Q   Why would you -- why would you not contact the police? I

Page 62

1       haven't had an answer to that.

2   A   You have had an answer.  It's on the record.

3   Q   What's your answer?

4   A   My answer is that I don't know that that would be the best

5       evidence.  As a result of sitting through this, I would want

6       to go back and look at the evidence, other evidence, but

7       there is a river of evidence.

8           And whether or not this affects the release of a bunch

9       of innocent people who signed -- names of people who signed

10      Referendum 71, there is evidence and it is linked because

11      they're quoting one another from one Web site to the other.

12      It is linked.

13  Q   What causes you to think that this might not be the best

14      evidence?

15          MR. PIDGEON:  Objection as to form.

16  A   I would want to review other evidence and I would want to

17      hire a professional to review it.

18  Q   (By Ms. Egeler)  I'm asking you about Exhibit No. 8.  What

19      makes you feel that Exhibit No. 8 would not be the best

20      evidence to provide to the police?

21  A   There may be stronger evidence.  I need to look.

22  Q   What about Exhibit No. 8 do you feel isn't strong?

23  A   I have no comment on that.  I can't comment on it.  I can't

24      compare it.  I'm not a lawyer.

25  Q   I'm not asking for your legal impression.  I'm asking why

Page 63

1      you do not feel Exhibit No. 8 is sufficient to take to the

2      police.  And you stated --

3  A   I thought it was a sampling that would just be accepted as

4      what it was on face value in an honest deposition of what is

5      being said out there.  I can make a greater case before I

6      would go to the police.

7  Q   Okay.

8  A   But I believe there is a case to be made.

9  Q   Turning to Exhibit No. 9, did you first see this on

10     September 27th?

11  A  I've been aware of that Web site for some time.

12  Q  Did this material that's reflected in Exhibit No. 9 exist in

13     the past on the Web site?

14  A  Much exists on the Web site.  I don't know.

15  Q  Do you know if the material in Exhibit No. 9 existed on the

16     Web site before September 27th of 2010?

17  A  I don't know.

18  Q  Did you inform the police about the material in Exhibit

19     No. 9?

20  A  No.

21  Q  And why not?

22  A  Because I copied it for the purpose of bringing it here

23     today because I thought this was a deposition about R71

24     names, whether they should be released or not.

25  Q  Do you feel the material in Exhibit No. 9 constitutes a

**Exhibit 7, Page 150**

Page 66

| | | |
|---|---|---|
| 1 | | aware of? |
| 2 | A | Following a -- the phone call that he took, it's my |
| 3 | | understanding, I've been told that he took this call.  It |
| 4 | | was a death threat directed at his mother.  Traumatized him |
| 5 | | for sure.  They were at a campaign shortly after that. |
| 6 | | She's running for office in District -- I don't recall which |
| 7 | | district now.  Someone drove by and threw food or some |
| 8 | | substance on her son. |
| 9 | Q | And was that related to Referendum 71? |
| 10 | A | She believes it was. |
| 11 | Q | Do you -- |
| 12 | A | I don't know the details. |
| 13 | Q | Do you know where she was?  You said she was campaigning. |
| 14 | | Where was she? |
| 15 | A | She was at a meeting where Rob McKenna was in attendance. |
| 16 | Q | Where was that meeting? |
| 17 | | THE WITNESS:  Do you know where the meeting was? |
| 18 | | I don't know. |
| 19 | Q | (By Ms. Egeler)  I'm sorry.  But you can't confer with |
| 20 | | Counsel. |
| 21 | A | I don't recall. |
| 22 | Q | Do you recall if she was even in the state when it occurred? |
| 23 | A | She was in the state. |
| 24 | Q | Do you know any of the details of the incident? |
| 25 | A | I told you what I know.  I don't know further details. |

**Exhibit 7, Page 151**

Page 67

1  Q  And is it your understanding that a homosexual attacked the
2     son?
3  A  It's my understanding that she felt that was the case.
4  Q  That a homosexual attacked her son?
5  A  An activist.
6  Q  An activist, but not necessarily someone who is gay?
7  A  An activist.
8  Q  An activist on what?
9  A  On equal rights, gay rights.
10 Q  Do you know why she would feel that?
11 A  No.
12 Q  Do you know whether the event happened during the time that
13    Referendum 71 was an issue?  In other words, did it happen
14    prior to the election?
15 A  I believe it was shortly after the -- it was after the
16    election.
17 Q  Do you know if the son was in any way indicating orally or
18    visually to the person that threw food that he had a
19    position on Referendum 71?
20 A  No.
21 Q  Who told you about this event?
22 A  Several people have told me about it.  Larry Stickney told
23    me about it.  Eileen has told me about it.
24 Q  Any other physical attacks you're aware of?
25 A  No.

Page 68

1  Q  Did you receive any e-mail or phone calls that you felt were

2     threats or harassment during the time Referendum 71 was

3     pending?

4  A  No.  More slander, mostly slander.

5  Q  Mostly slander where?  Through e-mail or phone calls?

6  A  Yeah, phone calls.

7  Q  Can you tell me about each of those phone calls?

8  A  I don't recall.

9  Q  So is it fair to say you don't recall whether you received

10    any slander or any other threats or harassment via phone

11    calls?

12 A  That wouldn't be fair.

13 Q  Tell me what you do recall.

14 A  It would be fair to say that I recall getting slanderous

15    phone calls, several of them from The Stranger.  Others, I

16    don't recall.  I didn't keep a record of it.

17 Q  Slanderous in what regard?  What was said?

18 A  I don't recall.  It was slanderous.  It was offensive for

19    sure, but I felt it was slanderous.  I felt I didn't want to

20    pursue it because it wasn't about me.  It was about the

21    referendum.

22 Q  How many of these calls were there?

23 A  I don't know.

24 Q  Do you know if it was more than two?

25 A  Yes.

**Exhibit 7, Page 153**

Page 69

1   Q   Was it more than five?

2   A   It could have been.  I don't know.

3   Q   How do you know it was more than two?

4   A   Because it was.  I don't know, two to five.  I don't know

5       how many calls because I stopped taking them.

6   Q   So they didn't make enough of an impression on you that you

7       remembered when it occurred?

8   A   They made a profound impression on me.  That's why I stopped

9       taking the calls.

10  Q   So let's talk about the call from The Stranger.  What was

11      said?

12  A   It wasn't a call.  There were a number of calls.

13  Q   A number of calls from The Stranger?

14  A   Yeah.

15  Q   From a reporter at The Stranger?

16  A   Yeah.

17  Q   And what was said by the reporter?

18  A   I don't remember.  It was just adversarial.  It was a

19      fishing expedition.

20  Q   What was said that was offensive?

21  A   Just the tone and the attack of the conversation.

22  Q   Can you tell me about the attack?

23  A   Yeah.  They didn't threaten my life.

24  Q   What did they say that you found to be an attack?

25  A   I don't recall.

**Exhibit 7, Page 154**

Page 70

| | | |
|---|---|---|
| 1 | Q | Could it simply be that they disagreed with your position? |
| 2 | A | No.  It was much more than that. |
| 3 | Q | You said it had profound impact and yet you don't remember |
| 4 | | anything? |
| 5 | A | Yeah.  I don't recall the words.  I couldn't quote them. |
| 6 | Q | Do you know when it occurred? |
| 7 | A | During Referendum 71. |
| 8 | Q | Do you recall what season it was? |
| 9 | A | It was 2009 during the referendum after Governor Gregoire |
| 10 | | signed the bill and up to the election, during that period. |
| 11 | Q | So you don't even remember what season it was, but it was |
| 12 | | just sometime -- |
| 13 | A | I just told you the season.  It was two thousand -- I |
| 14 | | misunderstood the question. |
| 15 | Q | Do you recall the season:  fall, spring, summer?  Do you |
| 16 | | recall the season that it was when you were called by The |
| 17 | | Stranger? |
| 18 | A | When did Governor Gregorie sign Senate Bill 5688? |
| 19 | Q | At the time she signed, that's when you received the call? |
| 20 | A | It was after that, prior to the election. |
| 21 | Q | We went through a lot of seasons there, so you don't recall |
| 22 | | what season, correct? |
| 23 | A | I don't recall that there were a lot of seasons there |
| 24 | | because she waited until the last possible day to sign that |
| 25 | | bill, which impacted our ability to do what we had publicly |

1  A   Okay.  Got it.

2  Q   Do you see that?

3  A   Yes.

4  Q   "There are college students who, along with their families

5      are concerned that one of their gay activist professors who

6      are outspoken in the classroom will see their name on the

7      list and they will face some kind of recrimination."

8          Did I read that accurately?

9  A   Yes, you did.  Yes.

10  Q   Did you speak to any college students who told you this?

11  A   Their families spoke to me.

12  Q   Do you remember what they said?

13  A   Essentially they told me what they -- what I wrote.

14  Q   Do you remember how many families told you this?

15  A   One family told me that.

16  Q   Do you remember the college that their son or daughter was

17      attending?

18  A   University of Washington.

19  Q   Did they mention a particular professor by name?

20  A   No.

21  Q   So one family spoke to you about their fear that their son

22      or daughter would face recrimination in the classroom?

23  A   Yes.

24  Q   Do you know if it was the student's fear or the parents'

25      fear?

**Exhibit 7, Page 156**

1   A   Certainly the parents' fear, but I believe they expressed

2       that it was their -- I believe it was a son, the son's fear.

3   Q   Did you have any follow-up with that family regarding

4       whether or not the son faced any recrimination from that

5       particular professor?

6   A   No.

7   Q   And I don't know what page this is on, but the same exhibit,

8       the paragraph begins, "Some in the faith community."

9           Do you see that paragraph, approximately a paragraph

10      below where we just were?

11  A   Yes.

12  Q   Did you receive some criticism from members of the faith

13      community regarding Referendum 71?

14  A   I believe there -- I wouldn't have written that, had I not

15      heard that.  I believe there were some who said that we

16      should let it go, but there were people also that weren't

17      really involved in it and didn't support it necessarily.

18  Q   Do you remember the substance of any of those conversations

19      in particular or the origin of those conversations, any

20      particular faith-based organizations?

21  A   It wasn't -- I don't think it was an organization.  I think

22      it was individual comments.  And no, the answer is no.

23  Q   So you don't remember any of those particular conversations,

24      but they must have occurred for you to write what you wrote,

25      correct?

Page 132

1   A   I heard the comment.  I heard some comments, two or three

2       maybe.

3   Q   To you personally or how did you hear of these comments?

4   A   I don't recall.  A lot of people were saying a lot of things

5       to me at that time.  I don't know.

6   Q   I understand.

7   A   It could be either.

8               MR. DIXSON:  That's the extent of my questions for

9       now.  Thank you, sir.

10              THE WITNESS:  Thank you.

11                         EXAMINATION

12  BY MR. PIDGEON:

13  Q   ███████████, I have a few follow-ups.  If we could, I

14      would like to go back to Exhibit 8 and 9.  Let's begin with

15      Exhibit 8, if we can.

16  A   Okay.

17  Q   This is Stephen Pidgeon, on behalf of Protect Marriage

18      Washington.

19          Now, let's begin.  Now, it was your testimony earlier

20      that this was from some blog site that John Bisceglia

21      posted?

22  A   Yes.

23  Q   And this upper part here, you believe, was posted

24      September 18, 2010?

25  A   Yes, or even after that.

| | | |
|---|---|---|
| 1 | Q | So within the last 25 days? |
| 2 | A | Yes. |
| 3 | Q | And he begins with -- can you read the first sentence to me |
| 4 | | before he gives this roster of people? |
| 5 | A | "Here is a list of people whose mere existence is a serious |
| 6 | | threat to our safety." |
| 7 | Q | So in your view, does that mean to you that Bisceglia takes |
| 8 | | the fact that we're living as a threat to his safety? |
| 9 | A | Yes. |
| 10 | Q | Because my name appears on that list.  Isn't that correct? |
| 11 | A | It is.  It does. |
| 12 | Q | Your name appears on that list? |
| 13 | A | Yes. |
| 14 | Q | Let's see if there's any public figures that are on that |
| 15 | | list.  Senator John McCain is on the list? |
| 16 | A | Yes. |
| 17 | Q | Is ███████████ on that list? |
| 18 | A | Yes. |
| 19 | Q | Senator Dan Swecker? |
| 20 | A | Yes. |
| 21 | Q | Representative Matt Shea? |
| 22 | A | Yes. |
| 23 | Q | Isn't Justice Antonin Scalia from the U.S. Supreme Court on |
| 24 | | that list? |
| 25 | A | Yes. |

**Exhibit 7, Page 159**

1    Q    Former presidential candidate Mike Huckabee?

2    A    Yes.

3    Q    Senator John Cornyn?

4    A    Yes.

5    Q    Now, in your view, just asking your personal opinion, given

6        the tenor of what's in this entire exhibit, does that

7        constitute a threat of violence or even a death threat to

8        those people?

9    A    Yes.  It does in the context of what is being said.  That's

10       the point I was trying to make earlier.  In the context of

11       what is being said and advocated day after day after day on

12       this Web site and others that are interconnected, which are

13       often quoted, cross quoted, in that context, yes, it does.

14    Q    Would you take a look at -- would you look at page -- it's

15       page 4.  Page 4.

16    A    Yes.

17    Q    And if you will look, do you see where he's written in large

18       print, "But I gots me a sneakin' suspicion that things-

19       will-be-a-changin'-soon"?

20    A    Yes.

21    Q    Let's look down at the paragraph below then and let's see if

22       Mr. Bisceglia sets out any more justifications for acting --

23    A    Okay.

24    Q    -- as he's proposing at this site.

25          Can you read that whole paragraph into the record that

**Exhibit 7, Page 160**

1    begins with, "Because more and more"?

2  A  "Because more and more of us are connecting the dots between

3    those power hungry hate groups do and the results that

4    assault us.  I still maintain that if, if I were legally

5    allowed to go into your home and traumatize your children,

6    steal your nest egg, deport your wife, take your home or

7    cause severe psychological distress, I would not blame you

8    for slitting my throat with a hunting knife.  Sure, it may

9    not be legal, in quotes, and have ramifications, but just

10   how many men would sit idly by and do nothing while they

11   watched their loved ones harmed."

12  Q  Let's explore that paragraph for just a moment.  Would it be

13   reasonable to assume that he is setting forth justification

14   for why someone could slit someone else's throat with a

15   hunting knife?

16          MR. HAMILTON:  Object to the form of the question;

17   calls for speculation.

18  A  Clearly he's setting that.

19  Q  (By Mr. Pidgeon)  And is one of those justifications going

20   into your home?

21  A  Yes.

22          MR. HAMILTON:  Same objection.

23  Q  (By Mr. Pidgeon)  Is one of those justifications

24   traumatizing your children?

25  A  Yes.

Page 136

1          MR. HAMILTON:  Same objection.

2    Q    (By Mr. Pidgeon)  Is one of those justifications stealing

3         your nest egg?

4          MR. HAMILTON:  Same objection.

5    A    Yes.

6          MR. PIDGEON:  I'll go slower if you're going to

7         object on each one.

8          MR. HAMILTON:  Well, if you give me a standing

9         objection to the line of questions, I won't need to.

10         MR. PIDGEON:  Go ahead and assert your standing

11        objection.

12         MR. HAMILTON:  I object to all of these on the

13        same basis as I previously articulated.

14   Q    (By Mr. Pidgeon)  Is one of the justifications that he sets

15        forth in this paragraph for not blaming someone who would

16        slit the throat of another deporting someone's wife?

17   A    Yes.

18   Q    Is one of the justifications taking someone's home?

19   A    Yes.

20   Q    And is it also a justification for slitting someone's throat

21        with a hunting knife if another person was to cause severe

22        psychological distress?

23   A    Yes.

24   Q    Do you know of any statute in Washington that would

25        authorize the execution of another person for causing severe

1      psychological stress?

2  A   No.

3  Q   How about entering into someone's home?

4  A   No.

5  Q   Let's continue.  Can you take a look at the top of page 5,

6      the very next page?  Do you see the very first sentence

7      says -- what is the dating there?

8  A   January 31, 2009.

9  Q   Will you read the whole sentence.

10  A   The paragraph?

11  Q   No.  The sentence that you just said had the date, would you

12      read that the whole sentence?

13  A   "First posted January 31, 2009."

14  Q   Now, can you read -- so January 31, 2009, that would have

15      been before the election, correct?

16  A   Yes.

17  Q   Can you read that paragraph for us?

18  A   "The more visibility we have and the more long overdue," in

19      parentheses, "rights we are given, the more we become

20      targets of hatred and violence in America.  Perhaps when the

21      dead bodies of straight men start to pile up and gay men

22      start walking away from attempted gay bashings wiping off

23      their knives and putting away their guns,"    quote --

24      parentheses, "used for justified self-defense, future gay

25      bashers may pause and think before acting out their evil

1      hatred on us."

2  Q   Now, does, in your view, does this paragraph imply that

3      Mr. Bisceglia would seek to see dead bodies of straight men

4      starting to pile up?

5  A   Yes.

6  Q   And he also has an articulation here that -- well, let me

7      ask you this:  Does he indicate that gay men should be using

8      knives?

9  A   Yes.

10  Q   Does he also indicate they should be using guns?

11  A   Yes.

12  Q   And is the justification for self-defense here, is that

13      referring back to what he talked to back here in the

14      paragraph you read before?

15  A   Yes.

16  Q   So in other words, can you surmise, from putting these two

17      paragraphs together, that, in Mr. Bisceglia's mind, it would

18      be okay to use a knife and a gun to kill a straight man and

19      to pile up the bodies of dead people if they caused severe

20      psychological distress?

21  A   Yes.

22             MR. HAMILTON:  Object to the form of the question.

23  A   Yes.

24  Q   (By Mr. Pidgeon)  Would Mr. Bisceglia be justified,

25      according to your reading of what he's got here on the blog,

**Exhibit 7, Page 164**

1    to slit someone's throat, use a knife, or use a gun for

2    traumatizing your children?

3  A  Yes.

4         MR. HAMILTON:  Same objection.

5  Q  (By Mr. Pidgeon)  Now, this particular site below that

6    paragraph, this site, this particular page, shows a

7    particular kind of knife.  Isn't that correct?

8  A  Yes.

9  Q  Let's go to the second to the last page.

10  A  Okay.

11  Q  Do you know whether or not an FBI report was ever entered

12    concerning Mr. Bisceglia's blog posting?

13  A  I don't know.

14  Q  Do you know whether or not he made an express threat against

15    government employees?

16  A  I recall very vividly reading what has now been scrubbed

17    from his site, that he made a threat against Larry Stickney,

18    myself, and the buildings of churches and government

19    buildings that supported -- that stood against, I believe.

20    I can't remember the word he used, but that was opposed to

21    expansion of gay rights.

22  Q  Now, on the last page of this particular Web site, does

23    Mr. Bisceglia make direct references to where somebody might

24    be able to get handguns in the ad there?

25  A  I don't see a reference as to where to get them.

1  Q  Do you see this www.pinkpistols.org?

2  A  Yes.  I didn't see it.  Yes, of course.

3  Q  Have you ever gone to that Web site?

4  A  No.

5  Q  So you don't know whether or not it's possible to order a

6     handgun on that Web site?

7  A  I don't.

8  Q  Do you see what it says above the hands holding the

9     automatic weapon there?

10  A  Yes.

11  Q  What does it say?

12  A  It says three times, "Armed gays don't get bashed."

13  Q  So in your view, is that John Bisceglia recommending

14     firearms again?

15         MR. HAMILTON:  Objection to the form of the

16     question; calls for speculation.

17  A  It is because of the linkage to the whole flow of what he's

18     saying.  To take that out of context, it's an ad.  To put it

19     in the context of what he's saying here and has been for

20     months, perhaps years, of course it is.

21  Q  (By Mr. Pidgeon)  Let's take a look at Exhibit 8 for a

22     minute -- or Exhibit 9, rather.

23  A  (Witness complies.)

24  Q  I would like to look at this page here that begins with

25     "Pam's Blend of Pervision Tries to Out Our Agenda."

Page 141

```
 1   A   Yeah.

 2   Q   Now, do you see the two indented paragraphs there, the one

 3       begins with, "From ████████ point of view"?

 4   A   Yes.

 5   Q   Can you read those two paragraphs, please?

 6   A   Yes.  "From ████████ point of view, if I disagree with

 7       someone who says that I should be executed because I'm gay,

 8       then somehow I'm being intolerant of that person's religion.

 9       The kind of tolerance ████████ is looking for leads to

10       violence.  Should I condone my own execution?  ████████

11       apparently thinks so.

12            "████████ sickeningly ended his post with a plea for

13       donations to what he calls this ministry.  He is using his

14       authority as Christian minister to broadcast to the world

15       his certainty that I and every other gay person deserve

16       death.  When will the press and general society stop giving

17       people like ████████ a pass because he calls himself a

18       Christian and a pastor uses nice words like faith.  Let's

19       recognize," in bold, "Let's recognize his words for what

20       they really are, a condoning of lethal violence against gay

21       people."

22   Q   Now, ████████████, we've seen a number of exhibits, for

23       instance, looking at Exhibit 28, your Twitter messages.

24   A   28?

25   Q   Exhibit 28, your Twitter messages.
```

**Exhibit 7, Page 167**

```
 1                    C E R T I F I C A T E
 2         I, REBECCA S. LINDAUER, a duly authorized Notary Public in
 3    and for the State of Washington, residing at Lacey, do hereby
 4    certify:
 5         That the foregoing deposition of ████████████ was taken
 6    before me and completed on the 1st day of October, 2010, and
 7    thereafter transcribed by me by means of computer-aided
 8    transcription; that the deposition is a full, true, and complete
 9    transcript of the testimony of said witness;
10         That the witness, before examination, was by me duly sworn
11    to testify the truth, the whole truth, and nothing but the truth,
12    and that the witness reserved signature;
13         That I am not a relative, employee, attorney, or counsel of
14    any party to this action or relative or employee of any such
15    attorney or counsel, and I am not financially interested in the
16    said action or the outcome thereof;
17         That I am herewith securely sealing the deposition of ████
18    ████████ and promptly mailing the same to MS. ANNE E. EGELER.
19         IN WITNESS HEREOF, I have hereunto set my hand and affixed
20    my official seal of this 9th day of October, 2010.
21
22
23
24              Rebecca S. Lindauer, CSR#2402
                                     Notary Public in and for the State of
25                                   Washington, residing at Lacey.
```

# So what *are* we to do to

~

# protect *our* family?

~

Exhibit 8  Date 10/1/10

Witness ███████

Rebecca S. Lindauer, CCR, RPR

Here is a list of people whose mere existence is a serious threat to our safety:

- Senator John McCain
- Tony Perkins
- Donald E. Wildmon
- Maggie Gallagher
- Brian Brown
- Larry Stickney
- ███████████
- Stephen Pidgeon
- Bob Struble
- Senator Val Stevens
- Senator Dan Swecker
- Representative Matt Shea
- ██████████████
- Jim McCune
- Ron Boehme
- Dr. Bruce Craswell
- Cindy Honcoop
- Mike Pence
- Antonin Scalia
- Sharron Angle
- Mike Huckabee
- Rabbi Yehuda Levin
- Joseph Farah
- Senator John Cornyn
- Bryan Fischer
- (just a sample list - much more to come)

Thought by John Bisceglia roughly around 9:37 AM 0 comments 🔲 ✏️ Links to this thought
Email This BlogThis! Share to Twitter Share to Facebook Share to Google Buzz

# September 18, 2010

## Yes, This Is About Life OR Death



**The Christian Terrorists** and **Scared Little Boys & Girls**...

~

*who purport to be so traumatized by the*
*mere existence of LGBTQ people and [gasp]*
*the actual sighting of one or more of us creatures in public*

~

...are yet again playing with fire.

~

Monday, September 27, 2010 AOL: 

**Exhibit 7, Page 169**

I know this *especially well* since I feel aspects of my P.T.S.D. being re-triggered and activated every single election season since 2004 *(when I first developed P.T.S.D),* and much, much worse so every September-November since PROP 8 passed in 2008 *(when a re-triggering was severe enough to put me back on disability).*

~

You see, I get **very** angry and feel an intense need to defend innocent people from harm's way when I read about the **FAMILY TRAGEDIES** below. Knowing that they are a **direct result** of the ignorance, lies, misinformation, bigotry, and pure-evil hatred of LGBTQ people that is promoted daily by many "christian" groups....well...again...I feel an intense need to defend innocent life from these assaults. **As a child advocate and early-childhood teacher, I esp. feel compelled to protect children.**

- Indiana Teen Commits Suicide After Anti-Gay Bullying at School
- Yet Another Gay Teen Lost to Bullying Suicide — in Minnesota
- Study: 9 of 10 LGBT Students Face Harassment at School

**Here is a quick scan of the study:**

**Student Experiences, a Hostile School Climate and the Effects on Educational Outcomes and Psychological Well-Being:**

- 84.6% of LGBT students reported being verbally harassed, 40.1% reported being physically harassed and 18.8% reported being physically assaulted at school in the past year because of their sexual orientation.
- 63.7% of LGBT students reported being verbally harassed, 27.2% reported being physically harassed and 12.5% reported being physically assaulted at school in the past year because of their gender expression.
- 72.4% heard homophobic remarks, such as "faggot" or "dyke," frequently or often at school.
- Nearly two-thirds (61.1%) of students reported that they felt unsafe in school because of their sexual orientation, and more than a third (39.9%) felt unsafe because of their gender expression.
- 29.1% of LGBT students missed a class at least once and 30.0% missed at least one day of school in the past month because of safety concerns, compared to only 8.0% and 6.7%, respectively, of a national sample of secondary school students.
- The reported grade point average of students who were more frequently harassed because of their sexual orientation or gender expression was almost half a grade lower than for students who were less often harassed (2.7 vs. 3.1).
- Increased levels of victimization were related to increased levels of depression and anxiety and decreased levels of self-esteem.
- Being out in school had positive and negative repercussions for LGBT students – outness was related to higher levels of victimization, but also higher levels of psychological well-being.

**Positive Interventions and Support:**

- Having a Gay-Straight Alliance in school was related to more positive experiences for LGBT students, including: hearing fewer homophobic remarks, less victimization because of sexual orientation and gender expression, less absenteeism because of safety concerns and a greater sense of belonging to the school community.
- The presence of supportive staff contributed to a range of positive indicators including fewer reports of missing school, fewer reports of feeling unsafe, greater academic achievement, higher educational aspirations and a greater sense of school belonging.
- Students attending schools with an anti-bullying policy that included protections based on sexual orientation and/or gender identity/expression heard fewer homophobic remarks, experienced lower levels of victimization related to their sexual orientation, were more likely to report that staff intervened when hearing homophobic remarks and were more likely to report incidents of harassment and assault to school staff than students at schools with a general policy or no policy.
- Despite the positive benefits of these interventions, less than a half of LGBT students

**Exhibit 7, Page 170**

(44.6%) reported having a Gay-Straight Alliance at school, slightly more than half (53.4%) could identify six or more supportive educators and less than a fifth (18.2%) attended a school that had a comprehensive anti-bullying policy.

**School Climate Over Time: 1999-2009**

- There was a steady decline in the frequency of hearing homophobic remarks from 1999 to 2003. In recent years, between 2005 and 2009, students' reports of hearing these types of remarks have not decreased significantly.
- LGBT students' experiences of harassment and assault have remained relatively constant over time. However, there were small but significant decreases in frequencies of verbal harassment, physical harassment and physical assault from 2007 to 2009.
- There has been an increase over time in the presence of several LGBT-related resources and supports in school, specifically: Gay-Straight Alliances or other student clubs that address LGBT issues in education; school staff who were supportive of LGBT students; and LGBT-related materials in school libraries.

**Check out this book also** - **Crisis**: 40 Stories Revealing The Personal, Social and Religious Pain of Growing Up Gay In America

Now just try to tell me that we don't have serious reasons to defend ourselves and our children, *and maybe YOUR children also* [of all sexual orientations], from the hate speech spewed from "christian" mouths!

Thought by John Bisceglia roughly around 5:27 PM 0 comments ➡️ ✏️ Links to this thought
Email This BlogThis! Share to Twitter Share to Facebook Share to Google Buzz

## Deerest Queerest - Have You Had Enough Abuse YET?!

Below are groups which promote the...

- emotional,
- psychological,
- financial, and
- physical abuse

## ...of LGBTQ Americans and our children.

   

Monday, September 27, 2010 AOL: ██████

**Exaggeration?** Hmmmph.

~

We have ample empirical data of the harm these groups cause us; they have absolutely no data to support their claims of harm due to our existence.

~

**NONE.**

~

But back to my first question:

## ✓ Have You Had Enough Abuse YET?!

~

If not.....ain't you a lucky ducky.

~

Unfortunately, many **Q**'s are going about their business unaware of exactly **WHEN** and **HOW** this organized targeting of our family will directly affect themselves and their loved ones *(which may include their **young children**)*. So many have not felt "enough" abuse to be bothered "enough" by it.

~

## But I gots me a sneakin' suspicion that things-will-be-a-changin' soon.

~

Because more and more of us are connecting-the-dots between what these power-hungry hate groups do and the results that assault us. I still maintain that **IF** *(if)* **IF** I were legally allowed to go into your home and traumatize your children, steal your nest egg, deport your wife, take your home, or cause severe psychological distress, I would not BLAME you for slitting my throat with a hunting knife. Sure, it may not be (quote) "legal" (end quotes) and have ramifications, but just how many men would sit idly by and do nothing while they watch their loved ones harmed?

~

**Another question -**

~

Is there *R-E-A-L-L-Y* a difference between going into a family's home and doing these hateful acts...and spending enormous amounts of time, energy, and money to insure that these hateful acts remain *"legal"* and **continue to happen**?

~

It's also a very serious question our own government needs to ask, since it is THE GOVERNMENT which ALLOWS VOTES ON OUR FAMILY'S SAFETY.

~

Any why does THE GOVERNMENT allow these votes?

~

*I guess they ain't been suffering enough neither.*

Thought by John Bisceglia roughly around 12:31 AM 0 comments ➡️ 🖉 Links to this thought
Email This BlogThis! Share to Twitter Share to Facebook Share to Google Buzz

# September 15, 2010

## Gays, Guns, and Self-Defense

Monday, September 27, 2010 AOL: ███████

**Exhibit 7, Page 172**

First Posted on January 31, 2009

The more visibility we have and the more *(long overdue)* rights we are given, the more we become targets of hatred and violence in America. Perhaps when the **dead bodies of straight men start to pile up** and gay men start walking away from attempted gay bashings wiping off their knives and putting away their guns *(used for justified **SELF-DEFENSE**),* future gay bashers may pause and think before acting out their evil hatred on us.
~
If you are LGBT and out in the streets between **midnight and 4 a.m.** *(esp.)* WITHOUT a weapon, you are being *incredibly naive* these days. LOOK at our histories of gay-bashing; you ARE a target, so be prepared and learn about SELF-DEFENSE!
~

More proof *(August 5, 2010)*

### Police: Gay Men Targeted in Rash of Assaults

~

From **Andy Towle** over at TOWLEROAD today:
"**NOTE:** This is not the <u>first</u>, <u>second</u>, or <u>third</u> anti-gay hate crime I've had to write about TODAY. It's the <u>fourth</u>."
~

But does AMERICA ever **hear** about these?

Sure, it may sound a *tad* paranoid, but given that our country allows Hate Groups to **organize and purchase legal hate (Prop H8)**, I've gone from being "anti-gun" to "pro-gun"...or at least pro-weapon/pro-self-defense. Since January 31st I have read about FAR TOO MANY hate crimes against our Queer community, so I wanted to re-post this article and encourage you to read Ben's article on Self Defense over at "**The New Gay**" *(the 1st link below).*

~

Queers have **enough** problems in today's society. Aside from trying to navigate through American life without the same legal protections others rely on, we also try to avoid being murdered or seriously injured as the target of a hate crime.
~
So when government ITSELF *fails miserably* to offer EQUAL PROTECTION under the law, when the legal system and police *regularly* ignore hate crimes for what they are, and when the Federal Government **ALLOWS** a majority's tyranny over a minority in the voting booth.....well, **that makes an even STRONGER case for gun ownership**. Or at the very least some serious thought about self-defense and possible weapons *(knives, mace, baseball bat, lock and sock, etc.).*

~

## Here are some interesting things on Gays and Self-Defense:

~

- Article ~ The New Gay - <u>Self-Defense</u>

Monday, September 27, 2010 AOL: ██████

**Exhibit 7, Page 173**

- Article ~ **Reason Online** - **The Right Kind of Gun Rights**
- Group ~ **Cease Fear** - Cease Fear promotes self-defense education and awareness for members of minority communities

## An excerpt from "Self-Defense":

I'm also not comfortable telling you that if you choose to defend yourself, a knife is your best option for concealment, quick-strike capability, and efficient disposal of a threat in close quarters. I'm not comfortable telling you that you need a weapon with a good gripping surface, and that you should pay particular attention to how well it fits your hand so that your fingers don't slide onto the blade during a stab or thrust, or whether the knife has a finger groove for the index finger that will provide no-slip support for either your index finger during a thrusting motion, or your pinky during a stabbing motion, both of which respectively take the majority of the force of the stab during these motions.

I don't feel comfortable telling you that a good blade design will be one that is decently thick, with the tip being wide enough or strong enough to resist breaking if you were to, say, accidentally punch it into a hard surface such as a brick wall or asphalt, or that the tip of the blade should also be able to easily pierce any part of the human anatomy and be long enough to reach vital organs (3.5-4 inches), nor am I comfortable telling you that your knife should have a strong locking mechanism, because without one you run the risk of severe personal injury to yourself should the mechanism fail or collapse.

Finally, It troubles me to tell you that a fight involving a knife is most always ugly, quick, and messy, and that you should be mentally resolved to strike efficiently and that you should learn beforehand how to use your weapon tactically if you are attacked.

There are no comfortable thoughts on this subject. I can only hope that none of us ever know harm, taken or given.



## Referendum 71 Addendum

Normally I'm amused when discovering a new rhyme, but this Referendum 71 abuse is NOT amusing to our LGBTQ community. The reality is that NO ONE is protecting us here in WA State, and NO ONE seems concerned about how these campaigns fan the flames and create MORE ANTI-GAY violence.

Now I can almost hear it - the anti-gay wingnuts who wanna pounce on my use of the term "fan the flames", since I may be accused *(erroneously)* of the same.

**NOPE.**

I advocate **self-defense** and being able to **protect** one's family and children; I am "fanning the flames of self-defense". This is **Queer Empowerment** through self-defense and firearm training, since we have churches, individuals, and government itself all working TIRELESSLY against our families.

When churches are allowed by government to terrorize, which is what PROP 8 is a clear example of, we may need to use counter-terrorism as a last resort. Not "terrorism". **COUNTER - TERRORISM.**

We have EVERY RIGHT to defend ourselves from religious groups who terrorize my family and limit its DUE civil rights and protections, along with the right to defend ourselves from the

Monday, September 27, 2010 AOL: ▮▮▮▮

government that is complicit in the abuse.

**THE ABUSE NEEDS TO STOP. NOW.**



Thought by John Bisceglia roughly around 6:00 AM 0 comments ➡️ ✏️ Links to this thought
Email This BlogThis! Share to Twitter Share to Facebook Share to Google Buzz
Older Posts Home
Subscribe to: Posts (Atom)

Monday, September 27, 2010 AOL: █████████

**Exhibit 7, Page 175**

# Faith NOT Freedom News

Narrowing the scope of Judeo-Christian values in our Culture

Exhibit _____ 9 _____ Date 10|4|10
Witness
Rebecca S. Lindauer, CCR, RPR

## About Faith NOT Freedom

Faith NOT Freedom is an organization dedicated to supporting the work of Washington State theocrats, most notably **Faith and Freedom Network** (Although we think that their name is a contradiction in terms, true Christians know that the only real freedom is having faith that others need to be saved from sinning, and that America is God's chosen nation for this mission).

We believe that the Judeo-Christian heritage is justifies just about anything. Be that homophobia (our darling right now), putting women back in the home (a close second), or the establishment of a theocratic Christian state in America (thereby ending the secular-pagan fantasy of the Founding Fathers).

We currently are renouncing the racism of our forebears (but check back later).

### Leave a Reply

|                          |
| Name (required)          |
| E-mail (required)        |
| Website                  |

Submit Comment

☐ Notify me of follow-up comments via email.

☐ Notify me of new posts via email.

### · **Learn More**

- About Faith NOT Freedom

### · **Twitter Updates**

- Now that we defeat DADT repeal, shouldn't you really be writing me a check. God bless. 5 days ago
- Obama didn't say "creator" in a speech. I think I'll imply both atheism & secret Muslim status. 6 days ago
- The press is biased against conservative Christians. Giving me money is the ONLY way to stop it! 1 week ago
- O'Donnell On Witchcraft: 'How Many Of You Didn't Hang Out With Questionable Folks?' http://bit.ly/b9EpRA As long as she didn't masturbate. 1 week ago
- @joe_hill Get real pagens! All I know is that when apocalypse comes, I'm getting sucked up to heaven and leaving my shoes behind. 1 week ago
- Critics allege Elena Kagan is sympathetic to Sharia law http://bit.ly/99Cy5m Another old smear I might resurrect. 1 week ago
- Gingrich Calls For Federal Ban On Shariah Law In US | TPMDC http://bit.ly/cT46oN Except for the anti-homo parts I hope. 1 week ago

# Faith NOT Freedom News

Narrowing the scope of Judeo-Christian values in our Culture

## Archive for the spirtual warfare Category

« Older Entries

## I Always Cry At Weddings

Posted in spirtual warfare with tags hutaree on March 30, 2010 by Scary Gary

These Christians know how to show eternal devotion to each other and the Prince:



Leave A Comment »

**Exhibit 7, Page 177**

## Pam's Blend of Perversion Tries to Out Our Agenda

Posted in spirtual warfare with tags pam spaulding, ███ on March 4, 2010 by Scary Gary

It should be of no surprise that the radical lesbian (or should I just say "lesbian") **Pam Spaulding tries to out my hero** ███████. She is determined to expose conservative Christians as being bigoted, and supporting the use of violence against gays:

> From ██████ point of view, if I disagree with someone who says that I should be executed because I'm gay, then somehow I'm being intolerant of that person's religion. The kind of tolerance ████████ is looking for leads to violence. Should I condone my own execution? ████████ apparently thinks so.

> ████████ sickeningly ended his post with a plea for donations to what he calls "**this ministry**". He is using his authority as a Christian minister to broadcast to the world his certainty that I and every other gay person deserve death. When will the press and general society stop giving people like ████████ a pass because he calls himself a Christian and a pastor and uses nice words like "faith"? **Let's recognize his words for what they really are: a condoning of lethal violence against gay people.**

That is totally unfair. ████████ has never directly called for any such thing, nor would he. ████████ is way too smart to let that part of our agenda slip out into the public yet.

My fellow Biblical Christians, we have much work to do before we can openly do what needs to be done. Which is why I encourage everyone who is reading this to denounced Pam Spaulding (hmmmm, a lesbian with a sporty last name should come as no surprise) as being a radical that will use any means to advance her agenda to destroy the American family.

We must destroy her before she can destroy us before we have the chance to destroy her!

Plus her hair is way too short for woman, but we'll deal with that when it comes time to reeducate her.

Leave A Comment »

## The Tolerance of Perverts

Posted in Sodomites, spirtual warfare with tags ████ on March 2, 2010 by Scary Gary

In another of one of his inspired call to arms against a fallen culture (and a fine fund raising pitch as well), ████████ takes on the liberal idea of tolerance:

> Whether it is the NCAA or the city of Beverly Hills or a number of other public entities, there is an increasing trend to re-write or re-define biblical morality, while simultaneously seeking to silence those who believe in it.

That is the problem with this country isn't it? Non-religious institutions like cities and sports associations just aren't willing to fight for religious values. Not to mention that they even refuse to give us a public stage (and the legitimacy that comes with it) to persuade other Americans to deny the

rights of their fellow citizens.  That amounts to censorship in my book, and evidently i as well:

> It seems tolerance is a one way street and the distaste for biblical Christianity is driving it from the public square, public discourse, education and even the free expression of beliefs in the paid media.

> Ironically, intolerance of Christianity and a Christian influenced culture is most often demanded in the name of tolerance.

Christianity as we define it anyway:

> **Christianity must not be tolerated because of the need for greater tolerance. A Perverted Tolerance.**

We get what you're saying ▇▇▇ (wink).  He is talking about tolerance for perverts and tolerance for their constant assault on our morals with their homo erotic imagery. Which is why he used boldfaced type to say it.

I would hate to be on the receiving end of that.  I don't know if I could take it like that from ▇▇▇ ▇▇▇ I'm glad he's on God's side.

Leave A Comment »

## The Great Mysteries of 

Posted in patriotism, socialism, spirtual warfare with tags ?, healthcare, obama, ▇▇▇ on February 27, 2010 by Scary Gary

One of the blessings of a truly God centered life is the freedom of not having to understand everything you are told.  That ability to listen without understanding is the key to the latest post by ▇▇▇ at Faith and Freedom Network:

> "Plan B" or the abortion pill, sometimes called the morning after pill, has become a well known and controversial method of abortion.

> Walking into yesterday's health care meeting, the President assured a reporter he had a "plan B".

> Planned Parenthood's website also features "Plan B" and says it costs between $10 and $70, considerably less than the President's plan.

I have no idea what he is talking about.  But what I do know is that the abortion pill is bad, and anything to do with Kenyan president Barack Obama is bad (especially healthcare).

The mystery doesn't stop there:

> The Planned Parenthood site also feature's an "Accidents Happen" section which tells you what to do after an accident.

**Exhibit 7, Page 179**

Will the President need a "Plan B"?

President Obama ended yesterday's meeting with a threat.

"If we're unable to resolve differences over health care," he said, "we will move ahead with decisions."

One wonders if ███████ has been dipping into some of the sacramental wine (which is his right as the shepherd of Christians in Washington and possibly Oregon). One thing is for sure he is willing to ask the hard questions, even if we don't really know what he is talking about when he asks them:

The question is what will President Obama do the morning after? Will there have been a malfunction? Will there be a need for emergency measures?

It is hard to tell, especially since I'm still not entirely sure what malfunction the morning after ███ is talking about, nor do I know what emergency measures he is referring to. But that is the beauty of faith. I don't need to.

What is important is that we know that he is telling us about the evil of Obama, and the destruction (whatever it is) that that evil will cause. What is important is that we listen as if we understood, and then give, so that ███ might continue to do whatever it is he does to fight the evil (whatever it is) that is being perpetrated.

Is that clear?

Leave A Comment »

# Why 2010 Must Not Be 2006

Posted in spirtual warfare with tags santorum on February 26, 2010 by Scary Gary

This is what we are fighting against:

**Exhibit 7, Page 180**



Liberalism, it makes little girls cry and young boys look like they are in European surrealist films.

Leave A Comment »

## Abortion Superstores and Our Hero

Posted in spirtual warfare with tags Bush, Planned Parenthood on February 23, 2010 by Scary Gary

███████ of Faith and Freedom Network knows that a subtle turn of phrase can serve to restore America to Godly status:

> Planned Parenthood opens another "Super Store," this one in Oregon.
>
> . . .
>
> While Planned Parenthood expands their empire of death under the guise of "health care," there are those among us who continue to advocate for life and do all they can to preserve and protect it, while often under attack by Planned Parenthood and their allies. Think Washington State.

Wow! What a powerful manly presence ███████ exudes when he is fighting for the lives of the unborn. That is because he understands that within the womb, children have no voice of their own. It is up to him to protect them from the denizens of liberal ideology that would have us believe that women are allowed to control what goes on in their bodies, and are not the breeding machines of Our Heavenly Father.

I'm also sure that after they are born, ███ understands that services for the babies and their new parents are nothing more than the creeping socialism of Kenyan president Barack Obama, and an unsustainable expansion of our national debt.

**Exhibit 7, Page 181**

Which is why ███████ makes sure to point out that former President W. Bush was at a fund raiser for a "pregnancy clinic." Our hero was on hand to make sure that there is plenty of money and support for women when they might choose to kill they child of God within their womb.

Not so much afterwards.

Leave A Comment »

# STOP THE PRESSES! Obama Supports Killing Babies!

Posted in spirtual warfare with tags abortion, ███████ on February 22, 2010 by Scary Gary

My personal hero ███████ has done a superb piece of investigative blogging over at Faith and Freedom Network. It is a post that brings some pretty damning evidence about Kenyan president Barack **HUSSEIN** Obama:

> However, the relationship between Planned Parenthood and President Obama is stunning when you consider his words regarding abortion—and lobbyists, for that matter.
>
> . . .
>
> According to White House visitor logs, guess who is in the House on a regular basis, with almost unlimited access to the top White House staff members?
>
> Steven Ertelt with LIFENEWS has been studying the White House visitor's logs and concluded last week that Planned Parenthood has, "Unfettered access to the White House and top staffers."
>
> President Obama, Ertelt found, wasted no time in getting Planned Parenthood into the loop. Cecile Richards, president of Planned Parenthood, was invited to join a very small "special" group of friends and supporters who gathered at the White House on January 20—Inauguration Day. President Obama's first day on the job.

If there was any doubt before this moment, none can now remain. President Obama supports abortion rights for women!

This should send shock waves through this nation that will only end with Obama's impeachment and deportation back to the African nation he most likely came from (which is good for him as he will finally be able to reveal his true Islamist religion).

I applaud ███████ for having the guts to lend a hand to blowing the lid on this scandal, and for pointing out that Planned Parenthood aborts babies (while not pointing out that they provide reproductive health exams, family planning advice and education, or a variety of other anti-Christian perverted services). It is patriots like him that make it possible for our nation to not go straight to hell.

Which is why at the end of his post he makes his usual appeal for us to give him so money.

2 Comments »

**Exhibit 7, Page 182**

# Glenn Beck's Our Coach

Posted in patriotism, spirtual warfare with tags beck, cpac on February 21, 2010 by Scary Gary

He looked so masculine and virile on stage at CPAC (and he was wearing suit pants to match his suit coat, as it was a special day). He brought his A game, and made sure to tell us how he is a recovering alcoholic, and how liberalism is an addiction too. But most importantly he brought the chalkboard!



Who among us wouldn't give anything to be able to get just a whiff of the scent of all that dust mixed with his perspiration.

It doesn't matter if all the facts and figures on the board have a logical relation to the point that he is making. NO! What matters is that he is able to recall them, and tie them to America's return to the Constitution, which in my pal's world is code for a return to the Bible.

That is because Beck understands that the Constitution is a divine document from our creator (well "our creator" sort of, Beck is a Mormon after all). And when God is involved my friends we don't need those figures, illustrations, and talking points to make logical sense. They are there and that is enough for us to accept Beck as our coach in the sweat drenched locker room of Christian America, during the 1/2 time of Obama's 1st (and only) term. Every time we see him, we want to just rush out onto the field and annihilate the liberal losers and prove our manhood once and for all!

That is why I am so truly saddened by the fact that he will burn in hell for all eternity (he is a Mormon after all).

Leave A Comment »

# A Realistic Simulation of Obama's America

Posted in spirtual warfare on February 21, 2010 by Scary Gary

Usually I look at video games as a gatway into drug abuse, prostitution, abortion, moral relativity, all of which leads to decay of the soul that makes homosexual acts possible. But this video game is different:

2011 Obama's Coup Fails is part of an online Social Movement masked as a game which fuses education and entertainment to help keep America a Free nation. America is in

**Exhibit 7, Page 183**

trouble and here tens of thousands are joining and learning and spreading the word. See the links that load below and understand that some of America's darkest days are now ahead of us. The next 3 years will see America in a Great Depression brought on by the failed Progressive policies of the both Bush Administration and now enhanced many times over by the Obama Administration. Ask yourself if this is a game or is it reality? You might not like the answer but we must face it as a nation for our children and the Constitution.

Stunning realism! And I think it is safe to say that people that play will definitely ave a hard time telling the difference between reality and this important game.

But it doesn't stop there. Just check out the enemies you face in your quest to restore America to freedom:

Location: Virginia, U.S.A.
You are a militia commander and in control of 1 county.

Mission: To defeat all enemies of the United States, both foreign and domestic. Includes:

- C.O.R.N.Y. (Congress of Rejected and Neglected Youth) Shock Troops
- Obama's police force (Ameritroops)
- The Cong (Former congressional leaders)
- Nation of Malsi (Islamic fundamentalist troops)
- Black Tigers (black nationalist troops loyal to Obama)
- NHKS (National Honor Killing Society) Yet another Islamic army
- I.S.U.E. ( International Service Union Empire) Troops

- U.N. (United Nations) Peacekeepers

Those Black Tigers are just out there hiding in bush, waiting for us drop our guard. Like I said this game so real it is scary, and I hope that we take seriously. We need to not be afraid to say it like it is, even if it takes a video game to do it.

Leave A Comment »

## Save Us from the Violence of Gays

Posted in spirtual warfare with tags r-71, ███ on February 18, 2010 by Scary Gary

This Christian soldier is always on point for Bible centered Americans:

Those of us who led the R-71 effort have done everything humanly possible to protect those who signed the R-71 petitions and their right to participate in the political process without fear of retribution from homosexual activists.

And we do have reason to fear the retribution of which he speaks, given the wave of gay activist terrorism this country has undergone lately.

Leave A Comment »

**Exhibit 7, Page 184**

« Older Entries

- **Learn More**

  - About Faith NOT Freedom

- **Twitter Updates**

  - Now that we defeat DADT repeal, shouldn't you really be writing me a check. God bless. 5 days ago
  - Obama didn't say "creator" in a speech. I think I'll imply both atheism & secret Muslim status. 6 days ago
  - The press is biased against conservative Christians. Giving me money is the ONLY way to stop it! 1 week ago
  - O'Donnell On Witchcraft: 'How Many Of You Didn't Hang Out With Questionable Folks?' http://bit.ly/b9EpRA As long as she didn't masturbate. 1 week ago
  - @joe_hill Get real pagens! All I know is that when apocalypse comes, I'm getting sucked up to heaven and leaving my shoes behind. 1 week ago
  - Critics allege Elena Kagan is sympathetic to Sharia law http://bit.ly/99Cy5m Another old smear I might resurrect. 1 week ago
  - Gingrich Calls For Federal Ban On Shariah Law In US | TPMDC http://bit.ly/cT46oN Except for the anti-homo parts I hope. 1 week ago
  - Montana GOP policy: Make homosexuality illegal | ajc.com http://bit.ly/bGV5re And then there will be no homosexuals! 1 week ago
  - You might think I'm above recycling a discredited smear against an openly gay public official. You would be wrong. http://bit.ly/cOCa4E 1 week ago
  - Christine O'Donnell, why can't you live in Washington State? 1 week ago

- **Archives**

  - April 2010
  - March 2010
  - February 2010
  - January 2010
  - December 2009
  - November 2009

- **Authors**

  -  **Scary Gary**

- **Blogroll**

  - CitizenLink

**Exhibit 7, Page 185**

# Exhibit 7-4

Exhibit in Support of Pls.' Response to
Def's Motion for Summ. J.
(Case No. 3:09-cv-05456-BHS)

**Exhibit 7, Page 186**

Bopp, Coleson & Bostrom
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

IN THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN DOE #1, et al.,      )
                          )
      Plaintiffs,         )
                          )
                          )
                          )
VS.                       )      3:09-CV-5456-BHS
                          )
SAM REED, et al.,         )
                          )
      Defendants.         )
                          )
                          )

DEPOSITION OF

███████████████

Taken on behalf of the Defendants

October 15, 2010



Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 187**

1    ███████████████████████████

2    was called as a witness, and after having

3    been first duly sworn, testified as follows:

4

5    EXAMINATION BY MS. BARNES:

6        Q.    Good morning.  Can you please

7    state your name for the record?

8        A.    My name is ████████████████████████

9        Q.    And ██████ is spelled how?

10       A.    █████████████████

11       Q.    And can you tell us your home

12   address?

13       A.    ████████████████████  in Murfreesboro,

14   Tennessee.

15       Q.    And Murfreesboro is M-U-R --

16       A.    M-U-R-F-R-E-E-S-B-O-R-O.

17       Q.    And I'm not from Tennessee.  So

18   I'm not sure how it was spelled and where

19   it's from.

20           How long have you been in

21   Murfreesboro?

22       A.    We moved here in June of 2010.

23       Q.    Okay.  And prior to that you lived

24   in Washington?

25       A.    Colville, Washington, for the two



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 188**

1    years previous to that.

2        Q.    So two years previous to that

3    would be June of '08?

4        A.    That's correct.

5        Q.    To June of 2010?

6        A.    That's right.

7        Q.    Had you been in Washington prior

8    to being in Colville?

9        A.    No.

10       Q.    Where were you before then?

11       A.    We resided in Hilton Head Island,

12   South Carolina.

13       Q.    Oh, you go back and forth from

14   coast to coast.

15             And where are you currently

16   employed?

17       A.    Providence Christian Academy in

18   Murfreesboro, Tennessee.

19       Q.    And what is that?

20       A.    That's the Christian and classical

21   school.

22       Q.    And what do you do there?

23       A.    I teach upper school logic,

24   rhetoric, and humanities.

25       Q.    And have you been doing that since



Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 189**

1     Q.     That's all right.

2     A.     I'd like to back up.

3     Q.     Sure.

4     A.     There is one other way in which I

5  was involved with the campaign.  And that is

6  that by way of donation, I did donate a small

7  sum of money, $25 or somewhere abouts to the

8  campaign.

9     Q.     All right.  And we'll come back to

10  that.  But let's chat a little bit more about

11  that rally in the park.

12          Do you know approximately how many

13  people attended?

14     A.     It was not a large rally.  People

15  trickled in and out.  I would say maybe 60 to

16  70 people over the course of three to four

17  hours.

18     Q.     And were they circulating

19  petitions at that event?

20     A.     They were.

21     Q.     And I think I found that video of

22  you being interviewed.  It was on a CNN

23  website.

24     A.     Okay.

25     Q.     But it was I think -- I can't



Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

**Exhibit 7, Page 190**

1     remember because, like I say, I'm not that

2     sophisticated, but I think it was sort of a

3     citizen journalism piece?

4        A.    Yeah.  It wasn't -- it didn't --

5     it wasn't like a professional newscaster

6     coming in.  The -- I think the lady who did

7     it actually lived just up the street and saw

8     something going on and came down and had --

9     well, looked like a -- one of those Wal-Mart

10     little, you know, phone cams.  I mean, so the

11     tech level there was pretty -- pretty low.

12        Q.    So it was a small portable camera?

13        A.    Yes, ma'am.

14        Q.    And I'm doing a hand gesture which

15     obviously won't come out in the record, but

16     maybe the size of a BlackBerry?

17        A.    That would be a fair assessment.

18        Q.    Okay.  And did she introduce --

19     the reporter, did she introduce herself to

20     you?

21        A.    I'm sure she gave her name and

22     that she was doing some kind of -- I do

23     remember specifically it was some kind of

24     on-line journalism.  But I have to be frank

25     with you, I was only half paying attention



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 191**

1  because she wasn't really speaking to me at

2  the time.

3      Q.      Uh-huh.

4      A.      So that's the best I can do.

5      Q.      But you didn't have any worries

6  about giving an interview with her and being

7  on camera, did you?

8      A.      No.  I didn't think about it at

9  the time, no.

10      Q.      Have you had any other

11  interactions with the members of the media

12  regarding Referendum 71?

13      A.      No, ma'am.

14      Q.      So let's just talk briefly about

15  your donation.  You said you gave maybe $25?

16      A.      Something along those lines.

17      Q.      And that was your personal

18  account?

19      A.      Yes, ma'am.

20      Q.      Did you get a Referendum 71 bumper

21  sticker?

22      A.      I don't think I had a bumper

23  sticker.  I may have gotten a button.

24      Q.      Like a button to wear on your

25  lapel or something?



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 192**

1    A.    Yes, ma'am.

2    Q.    What about a yard sign?  Did you

3  have a Referendum 71 yard sign?

4    A.    I did not display a yard sign.

5    Q.    And I understand that some folks

6  would get Referendum 71 signs or hand-made

7  signs and stand on street corners and sort of

8  rally the cars that were driving by?

9    A.    There were people who did that.  I

10  was not one of them.

11    Q.    You did not.

12        All right.  Let me just go through

13  my notes here.

14        Were you involved in -- or had

15  discussions with a campaign manager for

16  Referendum 71?

17    A.    Yes, ma'am.

18    Q.    Larry Stickney, I think?

19    A.    Yes, ma'am.

20    Q.    Did I pronounce that correctly?

21    A.    I believe so.

22    Q.    Okay.  Do you generally recall

23  what kinds of conversation you had with

24  Mr. Stickney?

25    A.    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 193**

1  your involvement in the lawsuit.  And I don't

2  want you to tell me any confidential

3  information between you and your attorney,

4  but generally can you describe how you got

5  involved in this lawsuit?

6      A.    Yes, ma'am.  Larry Stickney called

7  and indicated that they were moving forward

8  with the lawsuit.  I had heard rumblings over

9  the previous couple of days that they might

10  be moving in that direction to forestall

11  publication of personal information from the

12  petitions.

13      Q.    And let me just ask.  When you

14  said you heard rumblings, where was that or

15  do you remember any conversations?

16      A.    I'm sure it was with his sister,

17  ███████████  She runs a store in town.  I

18  frequented the store.  It's a bookstore and

19  coffee shop.  I like both.  And so I did tend

20  to frequent there.  We often chitchatted,

21  small talk.  Was often about the progress of

22  the campaign.  I'm sure that that's where I

23  heard the rumbling.

24          So I had -- I had some sense that

25  they were going to be moving judicially in



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 194**

1    that direction.  I didn't really expect to

2    have any part of that, nor did it occur to me

3    that I would be asked to have a part of that.

4        Q.    And why is that?

5        A.    Well, I mean, I didn't play any

6    key role in the campaign.  So there was no

7    reason for me to think that the campaign

8    would have any interest in my being part of

9    such legislation or such --

10        Q.    Litigation?

11        A.    Litigation.  Thank you.  So at

12    some point -- I don't remember specifically

13    the date, but we were still in the school

14    year, so it was before June.  I don't -- I

15    just don't have -- I am sorry.  I don't have

16    a clear recollection of the dates.

17        Q.    That's okay.

18        A.    It was somewhere in the spring

19    Larry called me and indicated that they were

20    going to move forward with -- and they needed

21    to have a couple of flesh and blood

22    defendants [sic] for the lawsuit, people who

23    had, in fact, signed the petition, and had a

24    legitimate desire not to have their personal

25    information published in a public -- in that



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 195**

1 way.

2 I qualified on both of those

3 measures and I indicated to him that if he

4 felt like I was a good fit for what they were

5 trying to do, that I was happy to -- I was

6 happy to serve as a name on the -- on the

7 docket.

8 Q. To be a plaintiff?

9 A. Yes, ma'am.

10 Q. And you indicated that you fit

11 both of the criteria, one of which was that

12 you did not want your information made

13 public; is that correct?

14 A. My personal information, yes.

15 Q. And what do you mean by personal

16 information?

17 A. Specifically name, address, phone

18 number.

19 Q. And --

20 A. Can I back up? Specifically

21 address, phone number. Less -- I was less

22 concerned about the name.

23 Q. So you were more concerned about

24 the contact information?

25 A. Yes, ma'am.



Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 196**

1    Q.    And why were you concerned about

2    the contact information becoming public?

3    A.    That -- well, I have a family.  I

4    have young children.  And my professional

5    career deals with children, which means that

6    the safety of my students is a concern, as is

7    the safety of my family.  And while I was

8    happy to speak in a -- in somewhat of a

9    public way, for example, in the news article,

10   I also didn't hand her my -- my -- you know,

11   my private mailing address.

12   Q.    And by "her," you mean the

13   reporter?

14   A.    The report -- I didn't hand the

15   reporter my personal phone number.

16         So I was -- I was happy to have my

17   name associated with the campaign, but I

18   didn't -- I didn't feel that I wanted my

19   personal address, phone number, e-mail

20   address, that type of thing available to the

21   general public.

22         And I would add that in the real

23   world, I keep my number unlisted out of the

24   phonebook.  You know, you can't look up

25   Ronald Perkins and find that number in the



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Exhibit 7, Page 197

1    book.

2       Q.     Your phone number?

3       A.     My phone number.

4       Q.     Your home phone number.

5       A.     And I don't hand out my e-mail

6    address or my mailing address to the general

7    public, either. So given my reluctance to do

8    that in the general world that I run in,

9    which is pretty small, I also didn't want it

10    being available on a much wider audience.

11       Q.     Do you know if your contact

12    information, your address or phone number, is

13    made available to the students or parents in

14    the school, the Westover Academy?

15       A.     We did not publish home contact

16    information. Obviously, as an administrator

17    of the school, I had access to parent

18    information. But that was -- that's a

19    different thing. Those addresses and phone

20    numbers were not made public to other

21    families at the school.

22       Q.     Okay. And you said you were

23    concerned about your information becoming

24    public in part because you have a family.

25       A.     Uh-huh.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 198**

1 an issue that you had?

2     A.    Well, it was a -- it was a --

3 simply the absence of any thought about that

4 question.  I hadn't -- I hadn't even thought

5 far enough down the pike to consider whether

6 or not those things were made public.  It

7 was -- it just wasn't even on the radar.

8     Q.    And do you remember when you

9 became aware that your name could be made

10 public, name and contact information?

11     A.    That was probably towards the end

12 of the -- the petition campaign, the petition

13 drive and/or during the time where the

14 signatures were actually being counted and

15 tabulated.  I think that that's about the

16 time where that conversation began to

17 surface.

18     Q.    And was that the conversation with

19 Mr. Stickney or a different --

20     A.    When I say conversation, I mean

21 that in -- in the sense of public

22 conversation.  I can't even be honestly

23 certain where I heard that -- where -- even

24 where the idea came from first.  I -- I just

25 don't have a -- I don't have a clear recall.



Toll Free: 866.626.6020
Facsimile: 206.624.9995

ESQUIRE
an Alexander Gallo Company

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 199**

1    I'm sorry.

2         Q.    No.   That's okay.   We don't want

3    you to guess.

4         A.       But -- but it would have been --

5    that would have been the time frame where

6    those -- where those issues started being

7    spoken about.   I just can't be certain where

8    and when -- where and with whom those issues

9    began to be spoken with.

10        Q.       And when you became aware that

11   your name and contact information could

12   become publicly available, did you take any

13   steps to try to keep it out of the public

14   light aside from the lawsuit?

15        A.       Well, I think my reaction at the

16   time was, oh, I hadn't really even thought

17   that those names would be made public.   I

18   guess as a voter, you -- you kind of are

19   raised with the idea that the election

20   process, broadly conceived, is generally a

21   confidential process.

22            You know, you go to the ballot box

23   and no one else is looking at your ballot.   I

24   suppose I -- I just kind of had been

25   operating in that mindset.   When -- when I



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 200**

1 first heard that those names -- or that the
2 information -- not so much the names, but
3 particularly the contact information could be
4 made public, I think my reaction was mostly
5 disbelief. I was surprised that that could,
6 in fact, be made public.
7         I don't know that I took any
8 specific steps. Which isn't to say I -- I
9 wasn't really sure what you do about that
10 type of thing. There are lots of things that
11 happen in government that I really don't have
12 any control over. And, you know, I -- I'm
13 not in a -- in a personal way not in a
14 position to facilitate a wholesale change of
15 the government's policy on something.
16         So I guess I kind of just looked
17 at it like, wow, one more thing the
18 government's doing that I'm not happy with.
19     Q.    Now, were you aware either when
20 you signed or later that the Secretary of
21 State's office would have to verify your
22 signature?
23     A.    Well, I did understand that there
24 was a verification process. And the idea of
25 putting my name and address and phone number

Toll Free: 866.626.6020
Facsimile: 206.624.9995


ESQUIRE
an Alexander Gallo Company

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 201**

1 on there as a way to validate that I was a
2 real voter and really resided there and that
3 I was a real signature, I think it was
4 perfectly appropriate. I didn't object to
5 provide -- to furnishing that information so
6 that I could be verified. I just expected
7 that verification process to be handled
8 within the bureaucracy, right, and then put
9 in a white box and stuck on a shelf in the
10 basement somewhere.
11 And, you know, today, in the age
12 of the internet, you know, and where
13 everything -- you can go from being
14 completely private to having your life on a
15 screen in about five seconds, yeah, that --
16 that -- that suddenly my ears pricked up at
17 that and thought, well, that changed my
18 perspective a little bit on that.
19 Q. And were you aware that observers
20 could sort of watch the verification process
21 at the Secretary of State's office?
22 A. I was aware of that. Having --
23 having accountability is always a good thing
24 for everyone. So I didn't object to that.
25 But again, when -- I guess my mindset about

Toll Free: 866.626.6020
Facsimile: 206.624.9995


ESQUIRE
an Alexander Gallo Company

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 202**

1  that is like observers counting ballots in

2  Florida during the hanging chad debacle,

3  right?  You know, you had people watching

4  people counting the votes, but people aren't

5  sitting there reading the ballots for the

6  sake of seeing who voted.  They were --

7  they're just seeing who was voted for.

8      Q.    Sure.  Because the ballots don't

9  have your name on them?

10     A.    Correct.  I guess similarly I

11 expected that they would be counting

12 signatures for the sake of counting

13 signatures and that, you know, they would

14 stop every tenth signature to verify

15 something to be sure that the batch seemed to

16 be -- that the sample seemed to be valid,

17 that there wasn't anomalies in it, but that

18 once that verification process had ceased,

19 the personal information would just kind of

20 cease to be there, right?  It was there to

21 serve a purpose, and once that purpose had

22 been served, it kind of -- it moves off the

23 stage, as it were.  And I guess that was the

24 conception that I had of that process.

25     Q.    And so -- just to make sure I



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

Exhibit 7, Page 203

1  understand.  You think the observer part of

2  the process is an important part to

3  double-check the Secretary of State's office

4  work?

5       A.     I do.  But I don't -- I don't have

6  a vision of an observer sitting there with a

7  steno notebook taking down those names and

8  contact information and running out and

9  sending out e-mails about who it was they saw

10  in the room.

11      Q.     And do you think that happened in

12  this case?

13      A.     I don't.

14      Q.     Did you talk to any folks who were

15  going to sign the Referendum 71 petition and

16  chose not to because they were worried about

17  their name being disclosed?

18      A.     I can't say that I spoke to anyone

19  specifically about that, no.

20      Q.     Do you recall whether you spoke

21  with anybody who signed the Referendum 71

22  petition and was the subject of harassments

23  or threats or sort of annoying interactions

24  with people?

25      A.     I had heard -- I had heard some



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 204**

```
 1                C E R T I F I C A T E

 2

 3     STATE OF TENNESSEE:
       COUNTY OF DAVIDSON:

 4

            I, LISE S. MATTHEWS, RMR, CRR,
 5     CCP, and Notary Public, Davidson County,
       Tennessee, CERTIFY:

 6

            The deposition was taken before
 7     me at the time and place stated in the
       foregoing styled cause with the appearances
 8     as noted.

 9          Being a Court Reporter, I then
       reported the proceedings in Stenotype, and
10     the foregoing pages contain a true and
       correct transcript of my said Stenotype notes
11     then and there taken.

12          I am not in the employ of and am
       not related to any of the parties or their
13     counsel, and I have no interest in the matter
       involved.

14

            I further certify that in order
15     for this document to be considered a true and
       correct copy, it must bear my signature seal,
16     and that any reproduction in whole or in part
       of this document is not authorized and not to
17     be considered authentic.

18          Witness my signature this the
            day of                        , 2010.

19

20

21

22          LISE S. MATTHEWS, RMR,CRR,CCP
            Notary Public at Large
23          For the State of Tennessee

24          My Commission Expires:
            May 20, 2014

25          Tennessee License No. 353
```



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 205**

1         E R R A T A

2

3         I, ████████████████ , having
read the foregoing deposition, Pages 4

4  through 52, taken October 15, 2010, do hereby
certify said testimony is a true and accurate

5  transcript, with the following changes (if
any):

6  PAGE     LINE          SHOULD HAVE BEEN

7  _____   _____        _____

8  _____   _____        _____

9  _____   _____        _____

10 _____   _____        _____

11 _____   _____        _____

12 _____   _____        _____

13 _____   _____        _____

14 _____   _____        _____

15 _____   _____        _____

16 _____   _____        _____

17 _____   _____        _____

18 _____   _____        _____

19

20

21                   _____

22                   ████████████████████████

23

24 _____

Notary Public

25 My Commission Expires:  _____



ESQUIRE
an Alexander Gallo Company

Toll Free: 866.626.6020
Facsimile: 206.624.9995

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com

**Exhibit 7, Page 206**

1            E R R A T A

2          I, ███████████████████        having

3     read the foregoing deposition, Pages 4
      through 52, taken October 15, 2010, do hereby

4     certify said testimony is a true and accurate
      transcript, with the following changes (if

5     any):

6     PAGE      LINE       SHOULD HAVE BEEN

7     _____    _____     _____

8     _____    _____     _____

9     _____    _____     _____

10    _____    _____     _____

11    _____    _____     _____

12    _____    _____     _____

13    _____    _____     _____

14    _____    _____     _____

15    _____    _____     _____

16    _____    _____     _____

17    _____    _____     _____

18    _____    _____     _____

19

20

21

22

23

24    _____

25    Notary Public
      My Commission Expires:  6-30-14



Toll Free: 866.626.6020
Facsimile: 206.624.9995

**ESQUIRE**
an Alexander Gallo Company

Bank of America Tower, Suite 6630
701 Fifth Avenue
Seattle, WA 98104
www.esquiresolutions.com