The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON,<br><br>Plaintiffs,<br><br>v.<br><br>SAM REED, in his official capacity as Secretary of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>Defendants. | NO.  09-cv-05456-BHS<br><br>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>**NOTED ON MOTION CALENDAR:**<br><br>**JULY 22, 2011**<br><br>**ORAL ARGUMENT REQUESTED** |

## I.    MOTION

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56 and an Order of Dismissal with prejudice with respect to Count II, the remaining count of Plaintiffs' Complaint.

## II.    INTRODUCTION

Count II of Plaintiffs' Complaint alleges that, as applied to Referendum 71 (R-71), disclosure of signature petitions under Washington's Public Records Act (PRA) would

1

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   violate the First Amendment rights of persons who signed the petitions.  Plaintiffs seek to

2   bring themselves within a line of cases that carve out a narrow exemption from public

3   disclosure requirements relating to campaign contributions, and other associational activities.

4   The exception protects the identity of members of disfavored minority organizations when

5   disclosure of their names would seriously undermine their First Amendment right to

6   associate for purposes of speech.

7

8       Summary judgment dismissing Count II is appropriate because this case does not

9   concern a disfavored minority group, and the Plaintiffs' evidence fails to demonstrate the

10  probability and seriousness of harm required to invoke the exception.

11                          III.    STATEMENT OF THE CASE

12

13  A.      Referendum 71

14      In 2009, the Legislature enacted a bill expanding the rights and responsibilities of

15  same-sex and senior domestic partners.  2009 Wash. Sess. Laws page nos. 3065-3141 (E2SSB

16  5688).  Under Washington law, within 90 days after a bill is passed by the legislature, the

17  people may file a petition, with a requisite number of signatures, calling for an election on

18  whether to accept or reject the bill.  Wash. Rev. Code § 29A.72.030.  The signed petitions are

19  filed with the Secretary of State, who must determine whether the petitions contain a sufficient

20  number of valid signatures from registered voters to satisfy the constitutional requirements for

21  placing the measure on the ballot.  Anyone disagreeing with the Secretary's decision that a

22  referendum contains a sufficient number of valid voter signatures to qualify for the ballot may

23  challenge the decision in superior court.  Wash. Rev. Code § 29A.72.240 (2009).

24

25

26

In less than three months, Protect Marriage Washington (PMW), the sponsor of R-71, gathered 137,000 petition signatures for a referendum election on E2SSB 5688.  Signature gathering occurred in busy public places, such as outside Wal-Mart and Target stores.  Dkt. #53 at 2; Dkt. #54 at 2.  Each page allowed twenty signatures, with space for each person to print his or her name and address.  Wash. Rev. Code § 29A.72.130 (2009).  Although it is not required by state law, PMW also asked signers to disclose their email addresses.

In July 2009, PMW filed the R-71 petitions with the Secretary of State.  After canvassing the petitions, the Secretary concluded that the R-71 petition had enough valid Washington voter signatures to qualify the measure for the ballot.

Washington Families Standing Together (WAFST) filed a request under Washington's Public Records Act (PRA) to obtain the petitions so that it could review them to make certain the Secretary correctly concluded that the petitions contained a sufficient number of valid voter signatures to qualify for the ballot.  Dkt. #45.  The Secretary also received PRA requests from others, including the Washington Coalition for Open Government (WCOG).  Dkt. #36 at 2.

**B.    Washington's Public Records Act**

Washington's Public Records Act (PRA) was enacted by the people using the initiative process.  Wash. Rev. Code § 42.56 (2009).  The PRA requires disclosure of every record containing information relating to performance of a government function, unless it is specifically exempted from disclosure.  Wash. Rev. Code §§ 42.56.030 (2009); 42.56.010(2) (2009); 42.56.070(2) (2009).  There is no exemption for signed petitions.

**C.      The R-71 Election**

On November 3, 2009, the election was held.  Washington voters approved E2SSB 5688, expanding the rights of same sex and senior domestic partners.  In the election, 951,822 voters (53.15%) voted to approve E2SSB 5688, while 838,842 (46.85%) voted to reject it.

**D.      History of This Litigation**

On July 28, 2009, before the election, John Does Nos. 1 and 2 and PMW filed this action alleging that the PRA violates the First Amendment rights of persons who sign referendum petitions, and seeking to enjoin the release of such petitions.  Plaintiffs advanced two claims.  First, in Count I, they asserted that releasing signed petitions for any referendum would violate First Amendment rights.  Complaint at 10.  Second, in Count II, they asserted that disclosing R-71 petitions would violate the petition signers' First Amendment right of association by subjecting them to threats and harassment.  *Id.* at 10-11.

This Court granted the Plaintiffs' motion for a preliminary injunction based on Count I of the complaint.  Dkt. #63.  The Court did not rule on Count II, the claim that, as applied to R-71, the PRA violates the First Amendment.  *Id.* at 13.

This Court's preliminary injunction was reversed by the Ninth Circuit Court of Appeals.  *Doe v. Reed,* 586 F.3d 671 (2009).  The United States Supreme Court affirmed the Ninth Circuit.  *Doe v. Reed*, 130 S. Ct. 2811 (2010).  The Supreme Court did not consider Count II because it had not been considered below.  *Id.* at 2821.

**E.      Plaintiffs' Evidence of Alleged Harassment**

The testimony and documents produced by Plaintiffs and their 19 disclosed witnesses fall into four general categories:  (1) verbal or written comments that did not cause witnesses to

feel threatened or call the police; (2) concerns resolved by the police or other authorities; and (3) experiences witnesses admit arose outside the context of the R-71 campaign or may not be related to R-71. Pursuant to the Joint Scheduling Order, only witnesses disclosed by August 23, 2010, may testify in person or by declaration in this case. Dkt. #128 at 1:19-26.

Plaintiffs' evidence of harassment is limited to persons who promoted R-71 by broadcasting their names, faces, and opinions on television and radio, in newspapers, on PMW's campaign webpage, and in statements of support in public documents. Dkt. #168, 170. These persons spoke at public rallies, held R-71 signs at busy intersections, and posted R-71 signs at their homes. Dkt. #168 at 4-11. In other words, the evidence in this case concerns persons who made themselves public spokespersons against E2SSB 5688. Their actions are very different from simply signing an R-71 petition. Even as to PMW's witnesses, whose actions go far beyond signing an R-71 petition, evidence of threats and harassment is insufficient to meet the Plaintiffs' burden to show impact on First Amendment rights.

Plaintiffs offer nothing to suggest government involvement in, or support of, the isolated instances of harassment to which Plaintiffs point. In those few instances where law enforcement was contacted, its response was prompt and effective.

Nor have Plaintiffs offered evidence of R-71 related harassment which caused anyone to decline to sign a petition or engage in speech related to R-71. Rather, the evidence shows that Plaintiffs were able to gather more than 137,000 signature within a short period, and that 838,842 people, 46.85% of Washingtonians who voted in the R-71 election, supported Plaintiffs in their opposition to E2SSB 5688.

DEFENDANTS' MTN FOR SJ
NO. 09-CV-05456-BHS

5

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Finally, Plaintiffs have offered no evidence that persons providing financial support to

2    PMW, whose names and addresses have been public for two years, have been subject to

3    harassment or threats on that account.   The names and addresses of PMW's campaign

4    contributors have long been publically available on a State website.   PMW registered with

5    Washington's Public Disclosure Commission as a political committee and sought campaign

6    donations.   As required by Wash. Rev. Code § 42.17.370(10), PMW filed campaign finance

7    disclosure reports with the Commission.   Doug Ellis Decl. at 6.   From May through November

8    2009, PMW reported 857 contributions.   Each contribution was posted on the Commission's

9    website, including the contributor's name and address, the sum contributed, and the occupation

10   and employer of contributors of more than $100.   *Id.*   For over two years, the public has been able

11   to view this information on the internet.   *Id.*

12   

13   

14       In August 2009, PMW requested that the Public Disclosure Commission "seal" PMW

15   donor information that had already been made available to the public.   Ellis Decl. at 7:9-14.

16   PMW supporters, including the         REDACTED         , testified before the Commission

17   that they received uncivil, harassing, or threatening communications regarding R-71.

18   Information regarding the         REDACTED         's involvement with the R-71 campaign was

19   available from numerous public sources, including the media and PMW's campaign website.

20   *Id.* at 7-8.   Because PMW could not demonstrate any link between disclosure of names and

21   addresses on the Commission's website, and the alleged harassment, the Commission denied

22   PMW's request and continues to provide R-71 donor information to the public.   *Id.*

23   

24       In sum, even as to those persons, whose actions are qualitatively and quantitatively

25   different from signing an R-71 petition, evidence of threats and harassment is insubstantial.   It

26

falls far short of demonstrating the probability of serious harm undermining First Amendment rights of speech and association required to satisfy the narrow First Amendment exemption from public disclosure that the courts have recognized.

### 1.   Verbal exchanges and gestures that were not perceived as a threat

A number of witnesses testified that they observed individuals using rude language or gestures to express disagreement with the witness's political position.  For example, REDACTED REDACTED stated that while collecting signatures, he had a verbal exchange with a woman and her boyfriend.  Egeler Decl., Ex. 2 at 30:5 to 31:9.  Mr. REDACTED stated that he did not understand what the boyfriend's angry statements meant, but no violence or physical contact occurred.  *Id.* at 31:9-11.  Mr. REDACTED explained that he did not call the police because he understands that people sometimes get mad about politics and have a right to express their own opinions.  *Id.* at 32:11-20.  Pastor   REDACTED   described similar verbal incidents which occurred during the collection of petition signatures.  Egeler Decl., Ex. 3 at 28:18 to 30:18.  In a public park, a man shouted "a few sentences" which included profane language, then walked away.  *Id.* at 30:3-4.  Like Mr. REDACTED, Pastor REDACTED felt no need to call the police.  *Id.* at 30:11-13.  Pastor REDACTED related that "it wasn't a pleasant experience; however, I didn't feel being [sic] threatened by him." *Id.* at 30:11-18.  He felt the same way regarding a verbal exchange while gathering signatures at a grocery store.  A man shouted that Pastor REDACTED was taking his rights away, and used profanity.  Pastor REDACTED did not call the police "because I didn't really feel being threatened by this man."  *Id.* at 28:6-15.

REDACTED   also encountered verbal exchanges while gathering signatures at large businesses, such as Walmart.  Egeler Decl., Ex. 4 at 17:19 to 23:13.  On

DEFENDANTS' MTN FOR SJ   NO.  09-CV-05456-BHS

7

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

two occasions, when an unidentified person argued with the REDACTED or questioned what they were doing, a store manager intervened and the REDACTED continued their signature gathering.  On another occasion, two women "glared" at REDACTED and stated "We have feelings, too."  *Id.* at 17:19 to 18:7.  Although the REDACTED thought an older woman appeared shaken by the remark, she signed the petition.  *Id.* at 18:8-21.  The next incident involved a young woman who took a photo of the REDACTED and said she would post it on Facebook.  *Id.* at 21:5 to 21:19.  The REDACTED never looked into whether the photos were in fact posted.  *Id.* at 21:23 to 22:7.  The final incident occurred when a transgendered person approached them at Walmart, and said she would bring her homosexual friends to the REDACTED's church.  *Id.* at 18:22 to 20:5.  REDACTED told her the church location and said all were welcome.  *Id.* at 20:6-11.  She never went to the church.  *Id.* at 20:12 to 21:1.

A number of Plaintiffs' witnesses described written comments posted on the internet, regarding R-71.  For example, REDACTED, President of the REDACTED, testified regarding written remarks he saw posted on the web, expressing disagreement with the comments the REDACTED website posted generally condemning homosexuality and supporting the campaign to reject R-71.  Egeler Decl., Ex. 8. Mr. REDACTED said he saw a website that mocked the REDACTED website.  *Id.* at 51:4 to 53:12.  On another website, he saw a list of public figures, including REDACTED and Senator John McCain, listed as people whose very existence threatened gay people.  *Id.* at 44 to 51:2.  Mr. REDACTED testified that there was no express threat in the message, but nonetheless he felt threatened by it.  *Id.*

2.     **Witness concerns resolved by the police or other state authorities**

Only a few witnesses were sufficiently concerned to call the police.  When the police were contacted, they resolved the concern.   For example, both Mr. REDACTED and the REDACTED reported receiving phone calls they perceived to be hostile from a transgendered individual named Krystal Mountaine.  Egeler Decl., Ex. 4 at 46:24 to 55:4, Ex. 9 at 86:9 to 91:12.  Although Mr. REDACTED did not recall feeling the need to contact the police, the REDACTED reported the calls they received.   According to   REDACTED , the police responded within the hour, and the calls stopped.  Egeler Decl., Ex. 9 at 54:21-23 to 55:4.

Mr. REDACTED also recounted that a blogger in Bellingham posted comments on the internet that Mr. REDACTED felt were threatening.   Egeler Decl., Ex. 5 at 53:14-23. Mr. REDACTED reported the blogger to the Snohomish County Sheriff who, in turn, reported the matter to the Bellingham police for investigation.   *Id.* at 56:25 to 57:19. Bellingham Detective Allan Jensen investigated the complaint.   Jensen Decl., Ex. A.   The blogger, John Bisceglia, explained to Officer Jensen that he viewed R-71 as a threat against his family.  *Id.* at 5.   He stated "he was sorry that this had grown into a police complaint," assured Detective Jensen that "he would be careful on how he worded his blog posts," and "removed any post that might offend others."  *Id.*  Detective Jensen concluded that the blog did not merit criminal citation, but rather was "more the result of emotions" surrounding the political issue.  *Id.*  Mr. REDACTED did not report anything involving the blog after the police investigation.

REDACTED  was a 2009 candidate for the Legislature.  The day after an REDACTED, Washington, newspaper ran an article about Ms. REDACTED's campaign, entitled "REDACTED

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

REDACTED                        ," Ms. REDACTED received a threat from an anonymous
telephone caller. Egeler Decl., Ex. 7 at 17:19 to 18:18.  The lengthy article regarding her Tea
Party views contained a brief mention, near the end of the article, that REDACTED supported the
National Rifle Association and R-71.[1]  An unidentified caller told her 13-year-old son "I will
kill you and your family" and then hung up.  *Id.* at 18:9-10.  Ms. REDACTED called the police, who
responded within five minutes.  *Id.* at 19:13-20.  Responding police officer Andrew Mehl
informed Ms. REDACTED that death threats are fairly common, explained how to trace any further
calls, suggested that she get caller I.D., and encouraged her to call the police if anyone
appeared to be watching or following her.  *Id.* at 20:2-25; Mehl Decl., Ex. A at 1.  He assured
her that he would do extra patrols of the house and advise the other patrol squads.  *Id.* at
30:10-19.  Statements written and signed by Ms. REDACTED and her son the night of the incident
are included in the police report.  Mehl Decl., Ex. A at 4-5.  The statements reflect that the
caller did not state why he was making the threat, and never mentioned R-71 or any other
political issue.  *Id.*  The next day, the police made a follow-up call to check in on Ms. REDACTED.
Mehl Decl., Ex. A at 2.  No action on the threat ever materialized.

    REDACTED   testified that while he was distributing R-71 brochures on a
Washington State ferry boat, a man tossed the brochure back at him and said "this is a bunch
of shit" and that "he and his boyfriend had just as much right to get married as I did."  Egeler
Decl., Ex. 10 at 25:19 to 26:12.  Mr. REDACTED says he responded to the man by "taunting him a
little bit."  *Id.* at 26:1-4.  Although the individual did not threaten violence, when he began

---

[1]The article is available at http://www        REDACTED        2.

DEFENDANTS' MTN FOR SJ          10        ATTORNEY GENERAL OF WASHINGTON
NO.  09-CV-05456-BHS                          1125 Washington Street SE
                                            PO Box 40100
                                  Olympia, WA 98504-0100
                                    (360) 753-6200

1  following Mr. REDACTED on the boat, the ferry workers assisted Mr. REDACTED in walking away

2  from the individual. *Id.* at 27:13-15; 28: 3-13.

3

4  **3.    Experiences witnesses admit arose outside the context of the R-71 campaign, or concede may not be related to R-71**

5  A few of the witnesses shared stories that had no relationship to R-71, or which the

6  witness admitted may not have been related to R-71. For example, Pastor    REDACTED

7  provided deposition testimony regarding a number of large events he has participated in, over a

8  period of many years, relating to his staunch opposition to homosexuality. Egeler Decl., Ex. 6.

9

10 Before R-71 existed, he conducted public protests at high schools in North Bend and Issaquah

11 to object to "Days of Silence" the students held in support of gay and lesbian classmates. *Id.* at

12 24:14 to 26:21; Egeler Decl. Ex. 1 at 20:1 to 21:1. During one such event, a man was

13 photographed holding a sign by Pastor REDACTED that said "Throw Rocks Here." Egeler

14 Decl. Ex. 6 at 27:7-8. When asked whether anything actually was thrown, Pastor REDACTED

15 responded, "Oh, no.  I mean, that wouldn't have happened." *Id.* at 28:17-18.  He was

16

17 convinced that the presence of the police at the rally helped to prevent any violence. *Id.* at

18 35:11-19.  On another occasion, Pastor REDACTED encountered protests against his public

19 criticism of Microsoft for its policies of tolerance for homosexuals. *Id.* at 8:10 to 9:7.  He

20 invited the protesters to attend his church and they came and were well-behaved. *Id.* at 52:21

21 to 54:16.  Finally, in the years prior to R-71 becoming an issue, Pastor REDACTED said he

22 received "900 calls" threatening to "take him out." *Id.* at 66:3-19.  He could not connect any

23 of these calls to his stance on R-71, as opposed to his other public rallies and activities

24

25 condemning homosexuality. *Id.* Despite the years of verbal threats, he has remained a vocal

26

opponent of gay rights, and has never been physically attacked.  He credits this in part to the willingness of city, county, and state police to protect him.  *Id.* at 68:6 to 69:4.

REDACTED  testified that his eight-year-old daughter told him that a man took a picture of his house.  Egeler Decl., Ex. 5 at 59:9-23.  Mr. REDACTED testified that he ran outside and saw a car being driven away that he could not identify.  *Id.*  He was not certain the incident had anything to do with R-71.  *Id.* at 61:18-21.  Although Mr. REDACTED claims he was fearful enough to have his sons load their guns, and require his daughters to sleep in the living room, he does not recall whether he called the police.  *Id.* at 61:13-16; 64:3-14.  There were no other incidents involving his home or family.

## IV.   ARGUMENT

**A.    Summary Judgment Standards**

Summary judgment is appropriate when there is "no genuine issue as to any material fact" and the petitioners are "entitled to judgment as a matter of law."  Fed. Rule Civ. Proc. 56(c).  To survive the motion for summary judgment, Plaintiffs must establish that there is a genuine issue of material fact.  *Matsushita v. Zenith Ratio Corp.*, 475 U.S. 574, 585-586 (1986).  In this case, there are no material facts in dispute.  The defendant's motion is supported by the deposition testimony of the Plaintiffs and their witnesses.  In addition, the motion is supported by the official police reports from two of the officers who responded to the few incident reports made by the Plaintiffs and their witnesses.

Facts are viewed in the light most favorable to the nonmoving party "'only if there is a 'genuine' dispute as to those facts.'"  *Ricci v. DeStefano,* 129 S. Ct. 2658, 2677 (2009), quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007).  Once the petitioners have met their burden

under Rule 56(c), the Plaintiffs must do more than show a "metaphysical doubt." *Scott*, 550 U.S. at 380.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

**B.     The State Has An Important Interest In Preserving The Integrity Of The Electoral Process.**

The Supreme Court held that the PRA is directly related to the State's important interest in preserving the integrity of the electoral process by detecting fraud.   *Doe*, 130 S. Ct. at 2819.  As the Supreme Court held, "[t]he State's interest in preserving the integrity of the electoral process is undoubtedly important." *Id.*   The Court recognized that the disclosure required by the PRA "helps prevent certain types of petition fraud otherwise difficult to detect" and "can help cure the inadequacies of the verification and canvassing process." *Id.* at 2820.

As the Supreme Court recognized, absent access to the petitions, the public cannot verify whether the State properly determined that a referendum qualified for the ballot.  Without access to the names of signers, the public cannot confirm whether PMW gathered signatures in a fraudulent manner or from persons disqualified from voting, or confirm whether the Secretary of State properly verified and counted the signatures.  Public access to signature petitions thus provides an important check on the integrity of the referendum election process.

Washington's concern with the integrity of the electoral process, including ferreting out circumstances of illegal voting, does not end with this particular election.   Ensuring the integrity of the state's election systems is a matter of continuous concern. *E.g., Porter v. Bowen,* 496 F.3d 1009, 1013 (9th Cir. 2007) (review of legality of Secretary of State's actions after election concluded not moot, because State could act similarly in future elections).  As the

DEFENDANTS' MTN FOR SJ
NO.  09-CV-05456-BHS                           13                    ATTORNEY GENERAL OF WASHINGTON
                                                                                    1125 Washington Street SE
                                                                                         PO Box 40100
                                                                                    Olympia, WA 98504-0100
                                                                                        (360) 753-6200

Supreme Court recognized, the State has a "particularly strong" interest in eliminating fraud. *Doe*, 130 S. Ct. at 2819. Fraud "drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). There are numerous cases in which the courts across the country have found fraud or corruption in the initiative petition process. *See, e.g., Roberts v. Priest*, 975 S.W.2d 850 (Ark. 1998) (finding, in part, that initiative petition had false and forged signatures).

PMW continues to be a PAC registered in the state of Washington. Therefore, evidence of forgery or fraudulent behavior by PMW, and the State's response to such behavior, continues to be a matter of public interest. Public disclosure may be the only means of determining whether PMW engaged in "bait and switch" fraud, by misrepresenting the issue in order to persuade individuals to sign the petitions. *Doe*, 130 S. Ct. at 2820; *Montanans for Justice v. State ex rel. McGrath*, 146 P.3d 759 (2006) (upholding finding that signature gatherers used bait and switch tactics to deceptively obtain signatures). "The signer is in the best position to detect these types of fraud, and public disclosure can bring the issue to the signer's attention." *Doe*, 130 S. Ct. at 2820.

Finally, Plaintiffs' own testimony expresses concern about the Secretary of State's proper verification of signatures on future petitions. *E.g.,* Egeler Decl., Ex. 9 at 40:11 to 42:20 (explaining concern about Secretary of State's ability to check signatures accurately and without bias in the future); Egeler Decl., Ex. 4 at 34:20 to 35:18 (explaining desire to change the signature verification process). As the Supreme Court noted, the job of checking signatures "is large and difficult". *Doe*, 130 S. Ct. at 2820. The Secretary of State typically checks signatures using sampling techniques that examine just 3 to 5% of the signatures, and mistakes

DEFENDANTS' MTN FOR SJ
NO.  09-CV-05456-BHS

14

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

can occur.  *Id.*  Given the difficulty of the task, transparency and government accountability are particularly important.  Public oversight helps the State identify and "cure the inadequacies of the verification and canvassing process" and can provide the public confidence about the quality of the State's performance in upcoming elections.  *Id.*

### C.   PMW Cannot Establish A Reasonable Probability That Disclosure Will Result In Serious Threats, Harassment or Reprisals

The Supreme Court has ruled that the State's important interest in disclosure can be overcome only "where the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the Act's requirements cannot be constitutionally applied."  *Buckley v. Valeo*, 424 U.S. 1, 71 (1976).  PMW cannot meet its burden of establishing "a 'reasonable probability' that the compelled disclosures will subject those identified to 'threats, harassment, or reprisals'" of this nature.  *Brown v. Socialist Workers Party*, 459 U.S. 87, 88 (1982) (quoting *Buckley v. Valeo,* 424 U.S. at 74 (1976)).  The testimony of Plaintiffs' witnesses falls far short of meeting Plaintiffs' burden to establish "reasonable probability of serious and widespread harassment that the State is unwilling or unable to control."  *Doe*, 130 S. Ct. at 2829 (Sotomayor, J., concurring).

The Supreme Court has extended an exception to public disclosure only to established groups that demonstrated they were unpopular and would be significantly disadvantaged in exercising their First Amendment interests if disclosure were required.  These groups could demonstrate a reasonable probability that disclosure of the names of their members would result in threats, harassment, and reprisals that would seriously undermine their ability to associate for First Amendment purposes.  In each case, disclosure presented not only a direct threat of serious harm, but also a likelihood that law enforcement would be unwilling or unable to

address the harm.  The seminal case is *NAACP v. Alabama*, 357 U.S. 449, 462-63 (1958), in which the state of Alabama required the NAACP to disclose its membership information.  The NAACP was challenging Alabama's official state policy of segregation, in the 1950's.  The state alleged that disclosure of members' names would assist the state in determining whether the NAACP was conducting business in Alabama.  The Court was "unable to perceive" how disclosure of the rank and file members of the NAACP would further the state's interest in knowing whether the NAACP was doing business in the state.  *Id.* at 464-66.  In this respect, *NAACP v. Alabama* is readily distinguishable.  The Court also found that the NAACP "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* at 462.  Given both the lack of state justification for disclosure, and the overwhelming evidence of private and state harassment, the Court held that compelled disclosure would violate the First Amendment.  Plaintiffs' circumstances are a far cry from those in *NAACP v. Alabama* in this respect as well.

In *Brown v. Socialist Workers*, the Supreme Court addressed a state requirement that the Ohio Socialist Workers Party (SWP) disclose the names of its contributors and recipients of campaign expenditures.  The SWP was "a small political party with approximately sixty members" whose goal was "the abolition of capitalism and the establishment of a workers' government to achieve socialism." *Brown*, 459 U.S. at 88.  The Court illustrated the SWP's dramatic separation from the mainstream by noting that in 1980, the Party's U.S. senatorial candidate received just 1.9 % of the total vote.  *Id.* at 89.  Here, Plaintiffs easily secured the signatures necessary to put the measure on the ballot, and ultimately their position was

supported by 46.85% of the voters who participated in the R-71 election. The Party proved "specific incidents of private and government hostility" including "the burning of SWP literature, the destruction of SWP members' property, police harassment of a party candidate, and the firing of shots at an SWP office." *Id.* at 99.  In addition, "in the 12-month period before trial 22 SWP members, including four in Ohio, were fired because of their party membership." *Id.*  The evidence also established that the FBI "conducted surveillance of the Ohio SWP," interfered with its activities, and planted FBI informants in the SWP.  *Id.* at 100 and n.18. The Court noted that the evidence included "numerous instances of recent harassment" in addition to the extensive past government harassment.  *Id.* at 100-101.  In this case, Plaintiffs' evidence demonstrates none of this.

Similarly, the Second Circuit held that the Communist Party was exempt from disclosure under the Federal Election Campaign Act.  *Fed. Elec. Comm'n v. Hall-Tyner Elect. Campaign Comm.*, 678 F.2d 416 (2nd Cir. 1982).  The Court found that disclosure created a serious risk of harm, including government prosecution.  The Court noted that "[n]umerous statutes purport to subject members of the Communist Party to both civil disabilities and criminal liability." *Id.* at 422.  The Court expressed concern with state "laws which place supporters of the Committee in danger of legal sanctions or harassment if their ties with the Communist Party should be made public.  It is still illegal in many states simply to be a member of the Communist Party." *Id.*  Finally, the Court pointed to a senate report detailing "extensive governmental surveillance and harassment long directed at the Communist Party and its members." *Id.* at 423.

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

The evidence of harassment and alleged threat to First Amendment rights in the instant case pales in comparison to the circumstances the Supreme Court has determined warrant an exemption from public disclosure.  In cases on par with the instant case, the Supreme Court has ruled in favor of disclosure.  In *Buckley,* the Court upheld a challenge to federal requirements that political committees and candidates disclose the name and address of contributors of $10 or more, and the occupation and place of business of persons contributing $100 or more.  *Buckley,* 424 U.S. at 63.  The Plaintiffs established that fear of disclosure caused a few people not to contribute. .*Id.* at 72.  The Court explained that a case similar to *NAACP v. Alabama* could be brought only "where the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial" that the federal disclosure requirements "cannot be constitutionally applied." *Id.* at 71.  "But no appellant in this case has tendered record evidence of the sort proffered in *NAACP v. Alabama.*"  *Id.*  Recognizing the important interests of the state and the electorate in disclosure, the Court stated that if injury actually exists, "the type of chill and harassment identified in *NAACP v. Alabama* can be shown." *Id.* at 74.  Given the lack of significant harm, the Court found that "the substantial public interest in disclosure . . . outweighs the harm generally alleged." *Id.* at 72.  That is the case here.

**1.  Plaintiffs have failed to offer evidence showing a reasonable probability that disclosure will result in threats or harassment leading to substantial First Amendment harm**

To succeed on the merits, PMW must offer proof that disclosure of the R-71 petition signatures presents a risk of harassment and threats comparable to the *NAACP* and *Socialist*

*Workers Party* cases.  As the Supreme Court stated, "what little plaintiffs do offer" hurts rather than helps their cause.  *Doe,* 130 S. Ct. at 2821.

The only evidence offered concerns persons who were spokespersons or otherwise took extraordinarily public efforts to air their political views opposing E2SSB 5688.  These individuals are not similarly situated with persons who only signed the petition, and, accordingly, there is no reason to believe that their experience forecasts the experiences of petition signers.  The witnesses offered by PMW are sponsors and endorsers of R-71, who made every effort to expose the public to their political opinions.  Their experiences do not demonstrate a probability that "rank and file" signers of the petition would be subject to harassment.  Even if their experiences were probative, the proposed witnesses' alleged experiences fall far short of establishing the type of harassment and harm to First Amendment interests identified in the *NAACP* and *Socialist Workers Party* cases.  The testimony does not establish the level of harassment necessary to overcome the State's important interest in preserving the integrity of the electoral process.

PMW has repeatedly alleged instances of severe harassment, including death threats and destruction of property.  In addition to being allegation highly exaggerated, the deposition testimony of PMW's witnesses shows that there is no basis for connecting these incidents to the witnesses' signature on the R-71 petition.  As previously noted, for example, PMW contends that an individual threatened REDACTED in his home, and that as a result, Mr. REDACTED feared for the safety of his family.  Dkt. #3 at 5.  Mr. REDACTED's deposition testimony tells a different story.  His eight-year-old daughter saw a man take a picture of the REDACTED home.  Egeler Decl., Ex. 5 at 59:15 to 60:15.  The man did not say anything to the

child about why he was taking the picture. *Id.* at 61:1-2. Mr. <sup>REDACTED</sup> does not know whether this incident was related to R-71. *Id.* at 61:18 to 62:5. Mr. <sup>REDACTED</sup> claims he was fearful, yet he does not recall whether he even bothered to call the police. *Id.* at 61:13-17.

The testimony of REDACTED regarding a death threat made by a telephone caller similarly fails to establish a risk of harm related to R-71. Ms. <sup>REDACTED</sup> admitted to the police that the caller never mentioned R-71 or any other issue, so she cannot know what motivated the caller, or whether the call was an inappropriate prank. Egeler Decl., Ex. 7 at 21:18-25. And, in stark contrast to the situation faced by NAACP members in Alabama in the 1950's, or members of the Socialist Workers or Community Parties, Ms. <sup>REDACTED</sup> had no reason to doubt the willingness of the police to come to her assistance. The police responded within five minutes of Ms. <sup>REDACTED</sup>'s call, and followed up with her the next day. *Id.* at 19:13-20, 20:2-25; Officer Mehl Decl., Ex. A. Ms. <sup>REDACTED</sup> never experienced any actual harm.

The majority of PMW's allegations involve rude gestures or language observed while campaigning in public locations. Profane language, and even "mooning" of those holding signs on busy intersections is not unique to the R-71 campaign. James Keough Decl. It is commonly experienced by those advocating both conservative and liberal positions in an election. *Id.* This political discourse is not a "threat to the exercise of First Amendment rights so serious and the state interest furthered by disclosure so insubstantial that the Act's requirements cannot be constitutionally applied." *Buckley*, 424 U.S. at 71.

Similarly, rude or profane comments made in email messages, on the internet as comments to newspaper articles, or on blogs have become an ordinary part of the public discourse on political issues. This is experienced daily in the ordinary course of candidate

and ballot measure campaigns.  *See* Keough Decl.  As PMW's intended witness REDACTED REDACTED acknowledged, it is common to see ugly comments posted in response to internet articles regarding political issues.  Egeler Decl., Ex. 10 at 29:7 to 30:25.  The weight to be given caustic internet comments and blogs was recently addressed by the Ninth Circuit in *Doe v. Kamehameha School,* 596 F.3d 1036 (9th Cir. 2010), *reh'g denied,* No. 09-15448, 2010 WL 4400428 (9th Cir. Nov. 8, 2010).  There, the Ninth Circuit recognized that "many times people say things anonymously on the internet that they would never say in another context and have no intention of carrying out."  *Id.* at 1045.  Emotional or profane comments are unfortunate, but they fall short of demonstrating a reasonable probability of serious harm that would substantially undermine First Amendment rights.  The circumstances surrounding R-71 demonstrate the Ninth Circuit's point.  Rude language vented frustration with the R-71 campaign, but *never* escalated into physical action.

The PMW also contends that yard signs and bumper stickers were damaged during the campaign.  Yet PMW's intended witnesses had no indication that any of this was a reaction to R-71, as opposed to irritation with campaign signs or general vandalism.  As PMW's intended witness State Senator REDACTED testified, campaign signs are often stolen or demolished.  Egeler Decl., Ex. 11 at 83:15 to 84:4.   This happens without regard to the subject of the yard signs.  *See* James Keough Decl. at 3:12-21.

## 2.    Allegations regarding California's Proposition 8 are irrelevant

Under the Joint Scheduling Order entered in this case, witnesses not disclosed by August 23, 2010, "will not be permitted to testify in person, by declaration or affidavit, or otherwise."  Dkt. 128 at 1.  No California witnesses were identified, and, therefore, such

DEFENDANTS' MTN FOR SJ
NO.  09-CV-05456-BHS

21

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1   testimony cannot be admitted in this case.  However, even if such testimony could be used,

2   PMW's case is not aided by referring to California's Proposition 8, which amended

3   California's constitution to prohibit same-sex marriage.   Amici employed the same

4   arguments asserted by PMW, and sought to show a risk of harassment by relying on the

5   experience of California's Proposition 8 supporters, in *Citizens United v. Fed. Elec. Comm'n,*

6   130 S. Ct. 876 (2010).[2]  The Court refused to find harassment based on injuries allegedly

7   suffered in campaigns not at issue in *Citizens United.*  The Court stated that Citizens United

8   "offered no evidence that its members may face similar threats or reprisals.  To the contrary,

9   Citizens United has been disclosing its donors for years and has identified no instance of

10  harassment or retaliation."  *Citizens United,* 130 S. Ct. at 916.  The same is true here.

11  *Citizens United* reflects the Court's consistent rejection of similarly slim and speculative

12  evidence regarding harm from disclosure of campaign contributions and contracts for

13  electioneering communications. In *McConnell v. Federal Election Commission,* 540 U.S. 93

14  (2003), the Court concluded that such speculation "cannot outweigh the public interest in

15  ensuring full disclosure before an election actually takes place."  *Id.* at 201.  As the Court

16  recognized in response to similar arguments in *Citizens United,* evidence relating to a

17  California election is not relevant to a challenge to disclosure of donors in a different

18  election.  *Citizens United,* 130 S. Ct. at 916.  This is particularly the case as Washington's

19  actual experience with respect to the R-71 election now is known.

20      Even if evidence regarding California's Proposition 8 election were relevant, it would

21  be unpersuasive with respect to the Plaintiffs' burden in this case.  In a challenge brought to

---

[2] Briefs of Amicus Curiae in *Citizens United,* Inst. for Justice at 13 and Alliance Def. Fund at 17. http://www.scotuswiki.com/index.php?title=Citizens_United_v._Federal_Election_Commission#Amicus_Briefs (last visited on June 27, 2011).

California's statutory requirement that Proposition 8 campaign donors be disclosed, the federal district court rejected the same evidence, concluding that in "light of clearly established precedent, this Court is unable to say that the State's interest here is similarly diminished or that the Plaintiffs' potential burden is even remotely comparable [to that in *Brown v. Socialist Workers Party*]." *ProtectMarriage.com v. Bowen*, 599 F. Supp. 2d 1197, 1214 (2009). According to the court, there "is surely no evidence that the seven million individuals who voted in favor of Proposition 8 can be considered a 'fringe organization' or that their beliefs would be considered unpopular or unorthodox." *Id.* at 1215.

Similarly, in this case, the sponsors of R-71 submitted 137,000 signatures in 68 days. This is not evidence of a minority group with unorthodox beliefs. PMW is simply not in the same position as the NAACP, the Socialist Workers Party, or the Communist Party.

> **3. The conclusion of the election over a year ago makes it highly unlikely that disclosure will result in threats or harassment that undermine First Amendment rights**

The R-71 election concluded over a year ago. Those opposing PMW's position prevailed. This context makes it additionally improbable that even "uncomfortable conversations" would occur following disclosure of R-71 petitions, let alone harassment. As in *Citizens United,* the passage of time affords the court the ability to determine whether harassment is likely. As previously noted, for nearly two years, the Public Disclosure Commission has disclosed the names, addresses, contribution amount, and even some employment information, regarding over 850 donors to PMW. Unlike PMW's intended witnesses, persons who donated to PMW, without actively participating in campaign rallies, speeches, or sign-waving, are comparable to individuals who signed the R-71 petition but did

DEFENDANTS' MTN FOR SJ
NO.  09-CV-05456-BHS

23

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

not become campaign spokespersons.  Yet PMW has not named a single witness to show those who supported the R-71 campaign solely through publicly disclosed donations experienced any harassment.  This is particularly noteworthy, given **REDACTED**'s email entreaties to petition signers, asking for reports of incidents of harm or harassment.  Egeler Decl., Ex. 5 at 30:21 to 33:3.  Evidence of disclosure without negative consequences is precisely the type of information the Court took into consideration in *Citizens United*. The Court noted that although its donors had been disclosed for years, the Citizens United could not identify a single instance of harassment or retaliation.  *Citizens United*, 130 S. Ct. at 885.

Despite widespread disclosure of the names and addresses of their contributors, endorsers, and spokespersons, there is scant evidence of minor harassment prior to the election, and no credible indication of harassment after the election.  Plaintiffs have failed to come forward with a genuine issue of material fact necessary to meet their burden in establishing their First Amendment claim.

## V.   CONCLUSION

Defendants respectfully request that the Court grant the State's Motion for Summary Judgment and order dismissal with prejudice.

DATED this 29th day of June, 2011.

ROBERT M. MCKENNA
Attorney General

ANNE EGELER, WSBA #5313
*Deputy Solicitor General*
WILLIAM CLARK, WSBA #9234
*Senior Counsel*
PO Box 40100
Olympia, WA  98504-0100
360-664-3027
Annee1@atg.wa.gov

# CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed under seal the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

Scott F. Bieniek, sbieniek@bopplaw.com

James Bopp, Jr , jboppjr@aol.com

Joseph La Rue, jlarue@bopplaw.com

Stephen Pidgeon, stephen.pidgeon@comcast.net

Steven Dixson, sjd@wkdtlaw.com, collettr@wkdtlaw.com

Duane Swinton, dms@wkdtlaw.com

Leslie Weatherhead, lwlibertas@aol.com, emilyr@wkdtlaw.com, janetj@wkdtlaw.com

Anne Egeler, annee1@atg.wa.gov, sgoolyef@atg.wa.gov

William Clark, billc2@atg.wa.gov

James Pharris, jamesp@atg.wa.gov, sgoolyef@atg.wa.gov

William Stafford, wstafford@perkinscoie.com

Ryan McBrayer, rmcbrayer@perkinscoie.com, nreynolds@perkinscoie.com, docketsea@perkinscoie.com

Kevin Hamilton, khamilton@perkinscoie.com, canderson@perkinscoie.com, docketsea@perkinscoie.com

Jared M. Haynie, jhaynie@bopplaw.com, thehaynies@gmail.com

I declare under the penalty of perjury under the laws of the State of Washington that the above is true and correct.  Executed this 29th day of June, 2011.

s/ Anne Egeler
Anne Egeler

DEFENDANTS' MTN FOR SJ
NO.  09-CV-05456-BHS

25

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200