# EXHIBIT 1

Page 1

1                    UNITED STATES DISTRICT COURT
2                   WESTERN DISTRICT OF WASHINGTON
3                            AT TACOMA
4    _____
5    JOHN DOE #1, an individual; JOHN        )
     DOE #2, an individual; and PROTECT      )
6    MARRIAGE WASHINGTON,                     )
                                             )
7                        Plaintiffs,          )
                                             )
8        v.                                   )
                                             )  No. 09-CV-05456-BHS
9    SAM REED, in his official capacity       )
     as Secretary of State of Washington;    )
10   BRENDA GALARZA, in her official          )
     capacity as Public Records Officer      )
11   for the Secretary of State of           )
     Washington,                             )
12                                           )
                         Defendants.          )
13   _____
14             Deposition Upon Oral Examination
                             Of
15                         REDACTED
     _____
16
17
18
19
20
21
22   Taken by:   Tracey L. Juran, CCR
                    CCR No. 2699
23
24   September 23, 2010
25   Seattle, Washington

1   A.   I would say 150.

2   Q.   And do you recall Pastor REDACTED having a bullhorn or

3        megaphone with him?

4   A.   Yes.

5   Q.   And do you recall what time of day this was?

6   A.   I believe it was 10:00 in the morning, 10:00 a.m.

7   Q.   Were any of the students or teachers that were

8        participating in the Day of Silence outside the school

9        while the church was there?

10  A.   I don't know.  I would not be able to identify those

11       people.  We purposely made it later in the morning so

12       that all the children would be already in the school and

13       school would be underway so we wouldn't interfere with

14       their coming and going.

15  Q.   Was there any visible group outside the school that was

16       in support of the Day of Silence, whether it was

17       teachers, parents, community members, anyone?

18  A.   Oh, yes.

19  Q.   And what were they doing?

20  A.   Talking, visiting.

21  Q.   And do you remember approximately how many people there

22       were on that side of the issue?

23  A.   In support of the Day of Silence?

24  Q.   Yes.

25  A.   Oh, my goodness.  I would say an equal number, a hundred

```
 1         to 150.
 2    Q.   And did things remain respectful on both sides of that
 3         issue during the time that both groups were there for
 4         and against the Day of Silence?
 5    A.   I would say no.
 6    Q.   What did you hear or see?
 7    A.   Shouting.  Pastor  REDACTED  will be bringing in a
 8         photograph this afternoon that I found of one person
 9         holding a sign up to his head that said, "Throw Rocks
10         Here."  He'll have -- it was published in   REDACTED
11         REDACTED -- I think it was    REDACTED    -- and he'll
12         be bringing that with him this afternoon.
13    Q.   Did anyone throw rocks?
14    A.   No.
15    Q.   Did anyone throw anything?
16    A.   No.
17    Q.   Do you remember what was shouted?
18    A.   Gosh.  It was unintelligible, really.  I can't tell you.
19    Q.   Was there any physical violence between the two groups?
20    A.   No.
21    Q.   Was anybody with the church shouting back at this group?
22    A.   No.
23    Q.   Was anyone from the church holding a sign?
24    A.   I didn't see any signs from our group.  I did not see
25         any signs.
```

1          MR. PIDGEON:  Okay.

2          MS. EGELER:  Waiting for the next in the series.

3          MR. PIDGEON:  Okay.

4    Q.   (by Mr. Pidgeon)  So when you signed the petition -- at

5         the time you signed the petition, it's safe to say that

6         you had no knowledge about the disclosure process of

7         names and addresses through the Secretary of State's

8         Office; is that true?

9    A.   That's true.

10   Q.   Did you know at the time you signed the petition that

11        the Secretary of State would amass names and addresses

12        of all the petition signers onto a single file and

13        disclose it to whoever asked?

14          MS. EGELER:  Objection; leading.

15   A.   I did not know.

16   Q.   (by Mr. Pidgeon)  Would you have signed the petition if

17        you had known that your name was going to be grouped

18        with all the other signers and given to look, for lack

19        of a better term, militant homosexual groups that wanted

20        to use your name for purposes of inconvenient

21        conversations --

22          MS. EGELER:  Objection --

23   Q.   (by Mr. Pidgeon)  -- when you signed the petition?

24          MS. EGELER:  Objection; assumes facts not --

25   A.   Yes.

1          MS. EGELER:   -- in evidence.

2   Q.   (by Mr. Pidgeon)   You would have signed?

3   A.   I would have signed.

4   Q.   Even if you'd known that that was going to be the case.

5   A.   Yes.

6   Q.   Were you aware of the organization whosigned.org at the

7        time you signed the petition?

8   A.   No.

9   Q.   Were you aware of Know Thy Neighbor at the time you

10       signed the petition?

11  A.   No.

12  Q.   Were you aware of the level of violence that had been

13       perpetrated in California surrounding Proposition 8 at

14       the time you signed the petition?

15         MS. EGELER:   Object to the characterization.

16  A.   I heard stories.

17  Q.   (by Mr. Pidgeon)   You've heard stories about

18       Proposition 8?

19  A.   Yes.

20  Q.   Can you tell us some of the stories that you heard about

21       Proposition 8.

22  A.   That people had experienced violence, retaliation.   I

23       don't know specifics of the retaliation.

24  Q.   Did you know whether or not Christians were experiencing

25       retaliation?

Page 62

```
 1                          CERTIFICATE

 2   STATE OF WASHINGTON )

                         )

 3   COUNTY OF SNOHOMISH )

 4            I, the undersigned Notary Public in and for the

 5   State of Washington, do hereby certify:

 6            That the foregoing is a full, true, and correct

 7   transcript of the testimony of the witness named herein,

 8   including all objections, motions, and exceptions;

 9            That the witness before examination was by me duly

10   sworn to testify truthfully and that the transcript was made

11   available to the witness for reading and signing upon

12   completion of transcription, unless indicated herein that the

13   witness waived signature;

14            That I am not a relative or employee of any party

15   to this action or of any attorney or counsel for said action

16   and that I am not financially interested in the said action

17   or the outcome thereof;

18            That I am sealing the original of this transcript

19   and promptly delivering the same to the ordering attorney.

20            IN WITNESS WHEREOF, I have hereunto set my hand and

21   seal this 3rd day of October, 2010.

22

23            _____

             Notary Public in and for the State of Washington

24                   residing at Edmonds, Washington.

                      (Notary expires 3/09/13)

25                        (CCR No. 2699)
```

# EXHIBIT 2

Page 1

1                    UNITED STATES DISTRICT COURT
                              FOR THE
2                    WESTERN DISTRICT OF WASHINGTON

3                                    )
     JOHN DOE #1, et al.,            )
4                                    )
                    Plaintiffs,      )
5                                    )
            vs.                      )   NO. 09-cv-05456-BHS
6                                    )
     SAM REED, et al.,               )
7                                    )
                    Defendants.      )
8    _____)
9         DEPOSITION UPON ORAL EXAMINATION OF      REDACTED
     _____

10
11
12
13
14                      September 13, 2010
15                      Vancouver, Washington
16
17
18
19
20
21
22
23
24               DIXIE CATTELL & ASSOCIATES
          COURT REPORTERS & VIDEOCONFERENCING
25            (360) 352-2506   **   (800) 888-9714

EGELER ( REDACTED , 9/13/10)

Page 30

| | | |
|---|---|---|
| 1 | Q | Who is  REDACTED  ? |
| 2 | A | He is one of my good friends. |
| 3 | Q | Is he associated with the church? |
| 4 | A | He's not, but he worked with me for the R71. |
| 5 | Q | You said there was one more incident.  Let's talk about |
| 6 | | that. |
| 7 | A | The incident was at the church. |
| 8 | Q | What happened? |
| 9 | A | When I was outside with my table, just people were standing |
| 10 | | up signing petitions. |
| 11 | Q | Was this on a Sunday? |
| 12 | A | This was a Sunday afternoon. |
| 13 | Q | Do you remember what month? |
| 14 | A | I don't.  In those three months, somewhere down in that |
| 15 | | category. |
| 16 | Q | May, June, or July? |
| 17 | A | Yeah.  I just don't remember because there was so many |
| 18 | | events that we did in those three months, so I don't |
| 19 | | remember which one was which. |
| 20 | Q | Okay. |
| 21 | A | And it was about three of us at the table.  REDACTED was |
| 22 | | there.  And we -- we were doing the -- the African-American |
| 23 | | lady approached us.  She was very upset.  And she said that, |
| 24 | | you know, we'll do everything to stop what you're doing. |
| 25 | | You guys don't care about families.  You guys don't care |

EGELER (  REDACTED   9/13/10)

Page 31

```
 1          about love or -- you know, amongst couples or whatever.

 2               We tried everything to -- not to make her even more

 3          upset, as in saying, you know, that's fine.  Your opinion

 4          is -- you know, in support you have the right to do whatever

 5          you like.

 6               She did actually -- you know, you can see she was very

 7          upset in the way she approached us.  After she did -- her

 8          friend or her boyfriend or whoever it was that pulled in

 9          afterwards, he came out of the car.  He got very upset with

10          us saying that, you're making my girl mad.  You know, I'll

11          bust your cap.  I don't know what that's supposed to mean.

12          You know, everybody deserves the right to live, you know,

13          these kind of terms, you know.  Nothing towards us

14          specifically, but just saying that one day we'll have your

15          kids.

16    Q     I don't understand.

17    A     Like I guess from the people that were in opposition of R71,

18          they were -- because a lot of -- one of the sayings that we

19          used in R71 was, you know, safe families, safe kids or

20          whatever.  Basically one of the things that she spoke

21          against is, you know, we'll have your kids, as in like, you

22          know, we get this law through and your kids will be -- you

23          will be living the life of the same sex marriage or

24          whatever.  Again, we didn't -- I understood what she meant,

25          but it's -- that's just kind of verbally threats here and
```

EGELER ( REDACTED , 9/13/10)

Page 32

1      there.  Nothing very physical, just very mad.

2   Q  Anything physical at all?

3   A  Nothing very physical.

4   Q  So nothing physical?

5   A  Nothing physical.

6   Q  And nothing physical from the person --

7   A  No, just verbally.  I guess she called him and told him we

8      were there.  He pulled in.

9   Q  He was just verbal, not physical?

10  A  Just verbal, cussing, nothing physical.

11  Q  Did you call the police?

12  A  No.

13  Q  Why not?

14  A  Because we understand people are mad and I -- honestly I

15     didn't see a point because everybody has the right to their

16     own opinion.  Everybody has the right to speak out whatever

17     they think is right.  And if that's the way they understood

18     it, that's totally fine with me, because, you know, I'm

19     standing on what I think is right, so it gives them the

20     right to do the same thing.

21  Q  I understand.

22  A  That's why I didn't push on calling the police because

23     that's the opinion that I have about other people's opinion.

24  Q  And you said REDACTED saw all of this incident as well?

25  A  REDACTED was there.

```
 1              C E R T I F I C A T E

 2       I, REBECCA S. LINDAUER, a duly authorized Notary Public in

 3  and for the State of Washington, residing at Lacey, do hereby

 4  certify:

 5       That the foregoing deposition of    REDACTED    was taken

 6  before me and completed on the 13th day of September, 2010, and

 7  thereafter transcribed by me by means of computer-aided

 8  transcription; that the deposition is a full, true, and complete

 9  transcript of the testimony of said witness;

10       That the witness, before examination, was by me duly sworn

11  to testify the truth, the whole truth, and nothing but the truth,

12  and that the witness waived signature;

13       That I am not a relative, employee, attorney, or counsel of

14  any party to this action or relative or employee of any such

15  attorney or counsel, and I am not financially interested in the

16  said action or the outcome thereof;

17       That I am herewith securely sealing the deposition of REDACTED

18  REDACTED and promptly mailing the same to MS. ANNE E. EGELER.

19       IN WITNESS HEREOF, I have hereunto set my hand and affixed

20  my official seal of this 14th day of September, 2010.

21

22

23


24                        Rebecca S. Lindauer, CSR#2402

                          Notary Public in and for the State of

25                        Washington, residing at Lacey.
```

# EXHIBIT 3

Page 1

1                   UNITED STATES DISTRICT COURT
                              FOR THE
2                   WESTERN DISTRICT OF WASHINGTON

3                                    )
     JOHN DOE #1, et al.,            )
4                                    )
                       Plaintiffs,   )
5                                    )
            vs.                      )  NO. 09-cv-05456-BHS
6                                    )
     SAM REED, et al.,               )
7                                    )
                       Defendants.   )
8    _____

9    DEPOSITION UPON ORAL EXAMINATION OF          REDACTED

10
11
12
13
14                       September 15, 2010
15                       Longview, Washington
16
17
18
19
20
21
22
23
24                   DIXIE CATTELL & ASSOCIATES
               COURT REPORTERS & VIDEOCONFERENCING
25               (360) 352-2506   **   (800) 888-9714

Page 28

```
 1   A   Yes.

 2   Q   Do you know why he left?

 3   A   I don't.

 4   Q   Did you ask him to leave?

 5   A   I asked him multiple times.

 6   Q   Did you call the police?

 7   A   No, I didn't.

 8   Q   Did your wife?

 9   A   No, she did not.

10   Q   And why is that?

11   A   Well, I didn't feel like it.

12   Q   Did you feel that you or your wife were physically

13       threatened by this young man?

14   A   Mostly verbally abused because I didn't really feel being

15       threatened by this man.

16   Q   Did anything else happen in the WinCo parking lot?

17   A   No.

18   Q   And you said there was another incident that occurred?

19   A   Yes.

20   Q   Can you tell me about that?

21   A   It was on Lake Sacagewea.

22   Q   Again, that's the park in town?

23   A   Park in town during 4th of July event when there is lot of

24       people.  It was male, about 30, 34 years of age, but this

25       guy just screamed profanity to my face and he walked away,
```

EGELER (    REDACTED   , 9/15/10)

Page 29

| | | |
|---|---|---|
| 1 | | so . . . |
| 2 | Q | How close to you did he come? |
| 3 | A | He was screaming right into my face. |
| 4 | Q | So -- |
| 5 | A | It was very uncomfortably close. |
| 6 | Q | Within a foot of you? |
| 7 | A | I would say it was about this far. |
| 8 | Q | For the record, you were holding your hand in front of your |
| 9 | | face? |
| 10 | A | I would say about a foot of me. |
| 11 | Q | About a foot of you? |
| 12 | A | Yeah. |
| 13 | Q | So he was about one foot away and he screamed profanity? |
| 14 | A | Yes. |
| 15 | Q | Did he make a statement about Referendum 71? |
| 16 | A | There was no dialogue. |
| 17 | Q | And were you with anyone else? |
| 18 | A | I was there by myself. |
| 19 | Q | Do you recall whether you were wearing any indication of |
| 20 | | your religion? |
| 21 | A | No. |
| 22 | Q | You don't recall or you weren't wearing? |
| 23 | A | I weren't wearing. |
| 24 | Q | And when this man screamed profanity at you, do you recall |
| 25 | | whether -- I guess we can't put it in terms of sentences. |

Page 30

```
 1       It doesn't sound like that type of communication.  Do you
 2       recall how long he was speaking to you?
 3    A  No.  It wasn't long.  It was in few sentences and he walked
 4       away.
 5    Q  Did you respond to him?
 6    A  He didn't give me any chance really.  He said what he wanted
 7       to.  He walked away.
 8    Q  But, again, just to make sure I understood, all of what he
 9       said was profanity?
10    A  It was profanity.
11    Q  And did you feel the need to contact the police about that
12       incident?
13    A  No.
14    Q  Why is that?
15    A  I'm pretty large size guy and I don't really feel that he
16       was of -- it was very public place, lot of people was there,
17       so it wasn't pleasant experience; however, I didn't feel
18       being threatened by him.
19    Q  And would you say that you considered that to be verbal
20       harassment but not physical?
21    A  It would be verbal.
22    Q  So you did not feel physically threatened?
23    A  I did not.
24    Q  Did any other incidents of harassment or threats, in your
25       opinion, occur?
```

Page 65

```
 1                    C E R T I F I C A T E

 2        I, REBECCA S. LINDAUER, a duly authorized Notary Public in

 3   and for the State of Washington, residing at Lacey, do hereby

 4   certify:

 5        That the foregoing deposition of      REDACTED

 6   REDACTED was taken before me and completed on the 15th day of

 7   September, 2010, and thereafter transcribed by me by means of

 8   computer-aided transcription; that the deposition is a full,

 9   true, and complete transcript of the testimony of said witness;

10        That the witness, before examination, was by me duly sworn

11   to testify the truth, the whole truth, and nothing but the truth,

12   and that the witness reserved signature;

13        That I am not a relative, employee, attorney, or counsel of

14   any party to this action or relative or employee of any such

15   attorney or counsel, and I am not financially interested in the

16   said action or the outcome thereof;

17        That I am herewith securely sealing the deposition of REDACTED

18        REDACTED        and promptly mailing the same to MS. ANNE

19   E. EGELER.

20        IN WITNESS HEREOF, I have hereunto set my hand and affixed

21   my official seal of this 17th day of September, 2010.

22

23

                        _____

24                      Rebecca S. Lindauer, CSR#2402

                        Notary Public in and for the State of

25                      Washington, residing at Lacey.
```

# EXHIBIT 4

Page 1

1                    UNITED STATES DISTRICT COURT
                              FOR THE
2                  WESTERN DISTRICT OF WASHINGTON

_____

3                              )
     JOHN DOE #1, et al.,       )
4                              )
                  Plaintiffs,  )
5                              )
          vs.                  )   NO. 09-cv-05456-BHS
6                              )
     SAM REED, et al.,          )
7                              )
                  Defendants.  )
8    _____)_____
9          DEPOSITION UPON ORAL EXAMINATION OF  REDACTED
     _____
10
11
12
13
14                      September 1, 2010
15                      Tacoma, Washington
16
17
18
19
20
21
22
23
24               DIXIE CATTELL & ASSOCIATES
          COURT REPORTERS & VIDEOCONFERENCING
25           (360) 352-2506  **  (800) 888-9714

EGELER ( REDACTED , 9/1/10)

Page 17

| 1 |   | Auburn.  We went to Shelton.  We went to Federal Way. |
|---|---|---|
| 2 | Q | Auburn, Shelton, Federal Way? |
| 3 | A | Yes.  Where else?  Tacoma. |
| 4 | Q | Tacoma. |
| 5 | A | So we went to a grocery store in Tacoma, so, you know, a lot |
| 6 |   | of different locations. |
| 7 | Q | Do you remember any locations other than a Wal-Mart, a |
| 8 |   | Target, a Fred Meyer, and the grocery store?  Do you |
| 9 |   | remember any of the other store names? |
| 10 | A | No, uh-uh. |
| 11 | Q | Were they all public locations? |
| 12 | A | Yes, they were. |
| 13 | Q | Were you looking for -- I assume, and correct me if I'm |
| 14 |   | wrong, you were looking for places where there would be a |
| 15 |   | lot of people? |
| 16 | A | Yes. |
| 17 | Q | And were people receptive to signing? |
| 18 | A | Not as receptive as we would have liked. |
| 19 | Q | Did you have any incidents occur when you were gathering |
| 20 |   | signatures, any incidents that you felt were -- would |
| 21 |   | constitute harassment or threats or reprisals? |
| 22 | A | Yes. |
| 23 | Q | Can you describe that for me? |
| 24 | A | They're in the declaration, but at the Wal-Mart store in |
| 25 |   | Lacey an elderly lady approached me.  And as she was |

EGELER (REDACTED 9/1/10)

Page 18

1    entering the store, I spoke to her about Referendum 71, and

2    she was enthusiastic to sign it.

3         So she came over to sign the clipboard, the referendum,

4    and then two -- I'm assuming they were homosexual ladies.

5    They came out of the store.  They both stood there glaring

6    at me.  One of them -- one of them said, with a lot of

7    emotional content, "We have feelings too."

8         This shook the old lady that was going to sign the

9    referendum and she kind of hesitated.  I addressed the young

10   lady, told her basically that this has nothing to do with

11   feelings, and then she and her partner left and then the old

12   lady, she signed the referendum.

13   Q    You said that this shook the older lady?

14   A    Yes, it did.

15   Q    Did she tell you that or was that something that you thought

16        in observing her demeanor?

17   A    No.  I could see both ways.  I could see it shook her, her

18        demeanor.  She also said she did not feel comfortable with

19        them there.

20   Q    Did she ultimately sign?

21   A    She did.

22   Q    Did you have any other incidents while you were gathering

23        signatures?

24   A    Same Wal-Mart, the other door, a transgendered person came

25        out.  I don't know how far in the transgendered process this

EGELER (REDACTED 9/1/10)

Page 19

```
 1        person was.  Looked like a female initially with a masculine
 2        bone structure, but still looked female initially, and was
 3        dressed like a woman, you know, displaying everything, and
 4        came up and asked what we were doing.
 5             I said, "Well, this is Referendum 71."  Told her that
 6        it's to preserve marriage between a man and a woman and to
 7        protect our children.
 8             And she said, "Well, why are you" -- he said, "Well,
 9        why are you doing this?  Why are you getting these
10        signatures?"
11             I said, "It's because of my Biblical beliefs."
12             "Well, what does the Bible have to say?"  This is not
13        verbatim.  This is the gist --
14   Q    I understand.
15   A    -- of the discussion.  "What does the Bible have to say?"
16             I just briefly quoted what the Bible -- what God has to
17        say about it in the Bible and then the person got very, very
18        argumentative, at which point, I said, "There's no point in
19        us continuing this discussion.  You know, if we can't talk
20        peaceably around the Bible, then we don't have anything to
21        talk about."
22             Then the person left.  And as they were leaving, they
23        were threatening -- he threatened -- before that, he asked
24        me if I was a pastor because I was there on a Sunday after
25        church in my suit.  And I said, "Yes, I am."
```

EGELER (REDACTED, 9/1/10)

Page 20

| | | |
|---|---|---|
| 1 | | "Where is your church?" |
| 2 | | I told him where the church was in Lacey.  As he was |
| 3 | | leaving to get into his car, he says, "I'm going to bring a |
| 4 | | bunch of my friends, homosexual, transgenders to your church |
| 5 | | on this Sunday and we're going to pack your church." |
| 6 | | And at that point I just said, "Well, God bless you. |
| 7 | | You can come.  You're welcome.  If you want to come to |
| 8 | | church, you come to church." |
| 9 | Q | And you told him where your church was located? |
| 10 | A | I don't recall.  I told them the name.  I might have told |
| 11 | | them in a hotel, but I don't recall. |
| 12 | Q | Did he come? |
| 13 | A | No. |
| 14 | Q | Excuse me.  Did -- |
| 15 | A | No, it's a he.  I don't know if it's complete. |
| 16 | Q | Well, I'll use she, since it sounds like the individual was |
| 17 | | choosing that gender.  So just to be clear when I'm using |
| 18 | | that pronoun who I'm referring to, did she come to the |
| 19 | | church? |
| 20 | A | No. |
| 21 | Q | At any time, did any transgender individuals come to the |
| 22 | | church during the Referendum 71 campaign? |
| 23 | A | No. |
| 24 | Q | And did anybody of any sort come and make a scene or protest |
| 25 | | inside or outside the church? |

EGELER (REDACTED 9/1/10)

Page 21

| | | |
|---|---|---|
| 1 | A | No, nothing happened. |
| 2 | Q | When she was speaking to you -- it sounds like it became |
| 3 | | argumentative -- was anybody else there at the time? |
| 4 | A | No. |
| 5 | Q | And did any other incidents occur while you were gathering |
| 6 | | signatures? |
| 7 | A | There's one more I have in the declaration and that was |
| 8 | | outside of the Wal-Mart in Auburn. |
| 9 | Q | Okay. |
| 10 | A | A minor incident, but we documented it nonetheless.  My wife |
| 11 | | and I were there together getting signatures, had a table |
| 12 | | set up with two or three clipboards on the table.  And this |
| 13 | | young lady got her cell phone out and started -- took a |
| 14 | | picture of me first and went over and took a picture of my |
| 15 | | wife. |
| 16 | | And my wife says, "What are you doing?"  And the young |
| 17 | | lady said that she was going to post our pictures on her |
| 18 | | Facebook or whatever the social networking sites are for all |
| 19 | | her homosexual and gay friends to know what we look like. |
| 20 | | So we thought that was inappropriate. |
| 21 | | My wife says, "I don't want you to do that.  Don't post |
| 22 | | my picture."  She'll tell you that herself, but she told |
| 23 | | her, please not to post the picture.  She probably did.  I'm |
| 24 | | sure we're -- anyhow. |
| 25 | Q | Are you sure? |

EGELER ( REDACTED, 9/1/10)

Page 22

```
 1   A   No, I'm not sure.  But most -- highly probable that we are

 2       posted, but that's -- I don't know.  I don't visit those

 3       places.

 4   Q   So to be accurate, do you know if those photos were posted?

 5   A   I don't know if hers were posted.

 6   Q   Do you know if your photo was posted?

 7   A   No, I don't.

 8   Q   And was anyone else there at that time?

 9   A   My wife and myself.

10   Q   Any other incidents that occurred during the gathering of

11       signatures?

12   A   No.

13   Q   With each of those three incidents -- we have the two

14       lesbian women outside a store that spoke while an elderly

15       woman was going to sign.

16   A   Right.

17   Q   And then we had a transgendered individual outside the

18       Wal-Mart Lacey and then the third was taking pictures

19       outside the Wal-Mart in Auburn?

20   A   Um-hmm.

21   Q   With any of those three incidents, did you feel the need to

22       call the police?

23   A   No.  There was a fourth.  It just came back to me and that

24       was when we were out there gathering signatures in Auburn,

25       once again, I believe.  I believe it was Auburn.  I'm not
```

EGELER (REDACTED 9/1/10)

Page 23

```
 1        sure.
 2              Somebody came from outside the store and basically went
 3        back in and told the manager.  And the manager tried to tell
 4        us to leave and so we actually -- not the manager, but
 5        the -- a worker did.  So then we asked for the manager.  We
 6        asked for this person to go get their manager.
 7              The manager came out, and we explained to the manager
 8        what just happened and that we're not harassing anybody.
 9        We're being very polite, which we were, and the manager said
10        that we could stay.
11   Q    And again, there was no need to call the police with that
12        incident, since the manager took care of it?
13   A    That's correct.
14   Q    And why, with the first three incidents, did you not feel a
15        need to call the police?
16   A    I didn't -- well, the only -- I didn't perceive the threats
17        as being that -- I didn't perceive the likelihood of follow
18        through being that high with the one person that said
19        they're going to come to our church on Sunday.  I didn't
20        really feel that they would come, and if they did, we just
21        deal with it.
22   Q    And the first incident with the women who said that it was
23        hurtful to them, that Referendum 71 -- I'm not trying to
24        quote you.  I'm sure I'm off, but two women approached while
25        you were talking to an elderly woman and they said something
```

EGELER (REDACTED, 9/1/10)

Page 34

1    wife called REDACTED, talked to him about these names.  That's

2    just one of his relatives, a stepdaughter or something.

3    It's a close relative of his and they do have a valid

4    registration.

5         So when we were at the -- REDACTED came down to Olympia to

6    the Secretary of State's office and he, myself, my wife, and

7    Shane Hamlin sat in a room upstairs at the Secretary of

8    State's office and went over some things.  And REDACTED brought

9    up the fact that his wife -- his family member was rejected.

10        So Shane of his own volition -- I commend him for

11   this -- he researched it and he found out that indeed these

12   names should have been accepted.  He also found out that the

13   databases they were using, they take a snapshot of the VRDB,

14   voter registration database, they take a snapshot of that in

15   time, but they took that snapshot way too early.  They took

16   it sometime in July, and the signature collection process

17   went up until two or three weeks later than that.  So the

18   big push we had toward the end to get signatures, a lot of

19   these names were being discarded because they weren't in the

20   database, so this resulted in the third process.

21        They implemented a third process at the Secretary of

22   State's office to recheck all of the rejections with State

23   employees using the VRDB specifically and not a snapshot.

24                         (Mr. Hamilton now present.)

25   Q    So with the corrections that the Secretary of State's office

EGELER (REDACTED 9/1/10)

Page 35

```
 1        made, would you feel in the future that that office no

 2        longer has errors in the system and you would have full

 3        confidence in their checking of initiative signatures in the

 4        future?

 5   A    No, no.

 6   Q    You can explain.  That's okay.

 7   A    I'm going to be talking with a legislator or somebody, my

 8        wife and I will, in the future.  I saw some definite things

 9        they could do to remove bias from the process and -- but

10        right now, what happened to us in that referendum and the

11        fight that we fought during that month, that wouldn't happen

12        typically because the count wasn't so -- the race wasn't so

13        tight.  When it's tight like that, you can manage the

14        process to really make it go whichever way you want.  But

15        there are things that I have in mind that I will share with

16        the legislator to try to get laws put into place to put some

17        process controls on the entire process so it doesn't happen

18        again.

19   Q    I understand.

20            When the signatures were initially turned in, do you

21        remember if you were there when they were presented to the

22        Secretary of State's office?

23   A    I was there at the capitol that -- I forget what day it was,

24        but there was -- I was there with everybody at the capitol

25        turning them in on the capitol steps.
```

EGELER (REDACTED, 9/1/10)

```
 1   A    Yeah.  One in particular, probably the most egregious.

 2        Right after we started at the Secretary of State's office,

 3        right after that, we got a few phone calls on our church

 4        phone, which is in our home, and my wife saw the name on

 5        there, David something or other.  It's in the declaration.

 6   Q    You said a few phone calls.  Were they all from David?

 7   A    Well, there's other phone calls too, but there's ones that

 8        we didn't recognize.  There's some from David.  Didn't know

 9        who that person was.

10        So on a Saturday my wife gives this person a call.  And

11        she's talking to him upstairs but then the conversation

12        starts to get heated, so she puts him on speakerphone and

13        walks downstairs to where I can hear what's going on too.

14        And he's just -- you've got, I believe -- do you have the

15        audios of those conversations?

16   Q    No, I do not.

17   A    You don't?

18   Q    Do you have the audios?

19   A    I do.  I can give them to you.  They're on my computer.  I

20        have given them to the -- Sarah's got those.

21             MR. LaRUE:  Sarah has those, that's news to me.

22        I'll check.

23   A    I sent them to Sarah and e-mailed her the audio.  They're

24        WMV files.

25   Q    (By Ms. Egeler)  I gave you -- on my card, I believe my
```

EGELER ( REDACTED , 9/1/10)

Page 38

1     e-mail address is on there.  When you get back home, could

2     you send those to my e-mail address?

3  A  Sure.  I can do it right now.  I have it right here.

4  Q  We'll just keeping talking for the moment.

5  A  Okay.  We'll do that.  But anyhow, listen to the text of

6     those.  And the interactions we had with this David who --

7     once again, he's a -- he's changing his sex.  He calls

8     himself Krystal now, and he got very animated and sounded

9     disturbed, sounded emotionally disturbed, not healthy, and

10    his comments concerned me quite a bit.

11 Q  What comments did he make that concerned you?

12 A  Made very threatening comments to our wife and my church.

13 Q  This was on speakerphone, so you could hear it?

14 A  I heard part of it on that first conversation, but then

15    there were follow-up calls because he just continued.  As

16    you listen to the phone conversations on the recording that

17    I'm going to send you, they increasingly got more animosity.

18    So the call that I heard was short and it was heated, caused

19    concern.  But then the subsequent calls got even more heated

20    where we just left them on the answering machine.  We didn't

21    pick up and answer.  There was no interaction.

22 Q  So turning to the first call first, do you remember roughly

23    when that was in terms of the date?

24 A  No.  It was right after we started at the Secretary of

25    State's office though.

Page 41

```
 1        morning to ten o'clock at night.  We're not getting home
 2        until 10:30 or 11:00.  We're leaving the house at 7:00.  We
 3        asked for emphasis patrols at our home, just to drive by.
 4        Told them what had gone on, drive by periodically to make
 5        sure things were all right.
 6   Q    Do you remember who you spoke to, the name of the officer
 7        with the DuPont Police?
 8   A    No, no.  They'll have a report.  I don't remember the name.
 9   Q    Do you have any records with you or at home that state the
10        police report number?
11   A    No, uh-uh.
12   Q    Or the officer's name?
13   A    No, I don't think so.  You can ask my wife that.  I don't
14        have any of that.  But then we also -- there was a
15        jurisdiction problem with the police in DuPont because our
16        church is in Olympia, so . . .
17   Q    In Olympia or Lacey?
18   A    It's in Lacey, Lacey-Olympia.  So the DuPont officer said he
19        really can't do anything about contacting this individual,
20        so he said we needed to call Lacey.  Our church, actually
21        it's in Lacey.  You need to call the Lacey Police.  So then
22        we called the Lacey Police and told them what had happened
23        and let the officer actually listen to all the messages that
24        we got.  The officer gave David or Krystal a call and asked
25        him not to further contact us, not to go to our church, that
```

EGELER (Roy Hartwell, 9/1/10)

Page 42

1    the pastor said you're not welcome at their church.

2  Q  And what happened then?

3  A  Well, the calls stopped.

4  Q  And did the individual show up at your church?

5  A  No.  Just for the record, though, I felt that that call was

6     serious enough that I also told our hotel manager that we

7     might have problems at church the next Sunday.

8  Q  By "hotel manager," the        REDACTED        ?

9  A  The        REDACTED        where we're meeting.

10 Q  Right.

11 A  Told him what's going on so he will have a heads-up.

12 Q  Who is he?

13 A  REDACTED.

14 Q  Can you spell Ha for me?

15 A  REDACTED

16 Q  Okay.

17 A  And he's very even-handed, a very professional man.  He just

18    took it in stride, just noted it.

19        We also, that day, that Sunday, called the Lacey Police

20    and asked them to have a patrol car close by in case

21    anything happened, told them that we could have something

22    happen at the church.

23 Q  Did they do that?

24 A  They said -- I assumed they did, but they're just right down

25    the street from us anyhow.  But they weren't visibly

EGELER (REDACTED, 9/1/10)

Page 46

| | | |
|---|---|---|
| 1 | | to the Secretary of State's Web site, the Corporations |
| 2 | | Division, find, you know, the officers of the corporation. |
| 3 | | But anyhow, they found out where we lived and we got a |
| 4 | | letter in the mail from a bogus address.  The return address |
| 5 | | was bogus in Olympia.  My wife is bringing that in.  You can |
| 6 | | look at that when you talk with her. |
| 7 | Q | Okay. |
| 8 | A | And this letter just said -- it was addressed to our |
| 9 | | address.  It had this bogus business address there.  Had a |
| 10 | | Tacoma-Olympia postmark on it.  We opened it up and the |
| 11 | | sheet of paper on the inside said, "Christian bigot," and |
| 12 | | that's all it said. |
| 13 | Q | Hmm. |
| 14 | A | You'll see it.  One of the words is really big.  The other |
| 15 | | is small.  It's probably Christian small and bigot big, but |
| 16 | | you'll see the paper when my wife comes in. |
| 17 | | So that led us to believe that they not only know who |
| 18 | | we are, they know our face, but they also know where we |
| 19 | | live, so that's it. |
| 20 | Q | Did it say anything about Referendum 71 in the letter or on |
| 21 | | the envelope? |
| 22 | A | No.  But I've been pastoring for 15 years, more maybe, never |
| 23 | | have had anything like that come in our mailbox. |
| 24 | Q | And you don't know who it was -- who sent this? |
| 25 | A | Don't know who sent it. |

EGELER (REDACTED 9/1/10)

Page 47

1  Q  But you said you know that it came from a bogus address?

2  A  Yeah.

3  Q  How do you know that was a bogus address?

4  A  When you take a look at it, it's evident.  I don't remember

5      now whether it's a wrong zip code or even a wrong street

6      address.  It doesn't exist.

7  Q  So you never learned who sent that?

8  A  No, uh-uh.

9  Q  Or why they sent it?

10  A  Right.  Actually, the address, the return address, is in

11      Olympia, but the postmark is Tacoma-Olympia, so don't know

12      what it is.  Don't know where it came from.

13  Q  Do you know approximately when that was?

14  A  No.  It's postmarked though.  Get that off the postmark.

15  Q  So did all of the incidents that you feel are harassment or

16      threats or reprisals occur before the election in November

17      of 2009?

18  A  Yes.

19  Q  Did anything happen after the election?

20  A  Not to me, but to my wife.  You can ask her about that.

21  Q  We'll do that.  Did we cover all of the incidents that you

22      recall?

23  A  Yes.

24  Q  Just to get a little bit more information about you as an

25      individual, how long have you had the church at the REDACTED

EGELER (REDACTED 9/1/10)

Page 48

```
 1                    REDACTED        ?

 2    A    We've been there about two years at that location.

 3    Q    Okay.

 4    A    About two years.

 5    Q    Where were you before then?

 6    A    We were in another hotel for about six months to a year.

 7         That's the      REDACTED      .

 8    Q    And prior to that?

 9    A    We were at the      REDACTED       for at least two

10         years, maybe two, two and a half years.

11    Q    And was that in Lacey in well?

12    A    That's in              REDACTED           .

13    Q    And clearly you're a pastor, but you mentioned also that you

14         have background as an engineer.  Is that correct?

15    A    That's correct.

16    Q    What is your educational background?

17    A    BSEE from University of Washington.

18    Q    And in addition to the leadership role you took with respect

19         to traditional marriage and Referendum 71, have you taken a

20         public stance on any other political issues?

21    A    No.  Well, let me see.

22    Q    For example, abortion perhaps?

23    A    No, no.  Years ago -- along the same issue, there was a -- I

24         want to be accurate.  It's not a no, but I typically -- let

25         me say this.  I typically don't get involved in these types
```

EGELER (REDACTED 9/1/10)

Page 49.

```
1       of things.  The involvement that my wife and I got involved

2       with on R71 was the deepest we've ever gone into something

3       like this, and I had been prepared for that really.

4              But a couple years before that, there was a -- what was

5       it called?  A rights bill, 2662 or something.  I went and

6       spoke at that bill also, but it's also related to homosexual

7       rights, sort of like a nondiscrimination kind of bill.

8    Q  Any other bills that you've spoken out on?

9    A  No.

10   Q  You said a few moments ago when you got deeply involved in

11      this, you said that you were prepared for it.  What did you

12      mean by that?

13   A  I'm talking about a Christian principle right now.  The Lord

14      had prepared me personally for this issue.  Even before this

15      became an issue in our state, I saw what was happening in

16      our society.  I saw what was happening to a number of

17      churches.  A lot of the -- a number of mainline

18      denominational churches have -- are accepting homosexual

19      clergy now.

20             I saw this in light of God's word.  The Lord stirred

21      me, and I started to really study his word and to get the

22      Bible clearly defined in my heart to where I can articulate

23      clearly what I believe and to others also.  So when this

24      came to be an issue in our state, we just got involved.  But

25      the way we got thrust into the forefront of this was just
```

EGELER (REDACTED, 9/1/10)

Page 50

```
 1        the way it happened.  It was not by design.

 2   Q    Jumping back for a moment, with respect to your contact with

 3        the DuPont Police and the Lacey Police, do you recall the

 4        names of any of the officers you spoke to?

 5   A    No.

 6   Q    And no police reports for either?

 7   A    I don't know.  They might have filled something out.  I

 8        don't know though.  We never got a copy of something.  I

 9        don't know that we did or not.  We might have signed

10        something, but don't recall.

11   Q    And also turning back again to the hotel manager, Mr. [REDACTED] --

12   A    Um-hmm.

13   Q    -- did he tell you that you would not be able to meet in the

14        church or did meetings continue just as before?  Was there

15        any interruptions?

16   A    No interruptions.

17   Q    Were there ever any picketing of any sort?  You said that no

18        one came and attended the church that made threats.  Did

19        anyone come and picket?

20   A    No.

21   Q    Any other contact with the church by individuals that were

22        threatening?

23   A    One person.  My wife will bring a letter in.  There's a

24        Charlene Strong.  She was the one that was on all the

25        commercials during this time.  You probably know her.  One
```

EGELER (Roy Hartwell, 9/1/10)

Page 51

```
 1        of you lawyers here probably do.  Charlene Strong, she was

 2        the homosexual woman.  Her partner had -- I think she died

 3        in hospital care, so she is a big supporter of domestic

 4        rights for same sex partners.  She did a number of

 5        television commercials and she contacted our church asking

 6        to come and to speak to our congregation.

 7    Q   And did she ask politely or was she hostile?

 8    A   No, no.  It was -- I don't know if polite is the right word,

 9        but it wasn't hostile.

10    Q   And how did you respond?

11    A   I didn't.  We weren't going to do that.

12    Q   Or more accurately, was it your wife who responded?

13    A   No.  I can't recall.  We got it in the church e-mail, so

14        whether I responded or my wife -- I don't believe we did

15        respond.  I talked to my wife about it and said that we're

16        definitely not going to have her come to our church and --

17        but I would be glad to go and talk with her.

18    Q   Anything else that we haven't discussed that happened?

19    A   That's all I can recollect.

20    Q   Just give me a second to glance through my list of questions

21        and we'll see if I missed anything.

22            We went through and marked as exhibits four newspaper

23        articles and one King 5 interview.  Do you know if there

24        were other quotations of you in newspapers during the time

25        that Referendum 71 was an issue on the ballot?
```

EGELER (REDACTED, 9/1/10)

Page 52

```
 1   A    I know there's others.  You have to Google Pastor REDACTED

 2        REDACTED and look.  They quoted me on something in The

 3        REDACTED for the senate's, you know -- for that hearing I

 4        was in.

 5   Q    And did you appear on any other television shows or TVW,

 6        et cetera, live audio-visual presentations?

 7   A    We did TCTV, Thurston County Television.  We did a

 8        30-minute -- I think it's 30-minute bill with the gal for

 9        that.

10   Q    By "we," who do you mean?

11   A    My wife and I were interviewed by I forget the gal's name.

12        I think it's Lori, Lori Lee and -- Lori something.  We did a

13        half-hour spot talking about the referendum and the issue.

14   Q    That was on television?

15   A    That was on cable television.

16   Q    Do you recall what month that might have been?

17   A    No, I don't.

18   Q    Was that before or after signatures were turned in?

19   A    I believe -- I'm not sure.  I believe that was during the

20        process.  After the Secretary of State's, the signatures

21        were already turned in.

22   Q    Okay.

23   A    We're in the Secretary of State's office.  It couldn't have

24        been during that time because we were too wrapped up.  But

25        probably -- I don't know.  I could bracket it for you, but
```

EGELER (REDACTED 9/1/10)

Page 53

```
 1        it -- to answer your question directly, yes, we were on that

 2        show.

 3   Q    And can you bracket the time period for me then?

 4   A    Most likely after the Secretary of State's office and before

 5        the election.

 6   Q    I understand.

 7            Any other television appearances?  We've covered

 8        newsprint media.  You think there are more online.  I think

 9        earlier you stated that you were on the radio after the

10        testimony at the senate hearing, correct?

11   A    Well, they just took a clip out of the senate hearing and

12        put it on the radio, National Public Radio.

13   Q    Okay.

14   A    We also did radio down in the south Kelso area.  There's a

15        radio station down there, a Christian radio station, down

16        there that we did a spot on it also.

17   Q    So you were live on the air then with that radio station?

18   A    I'm not sure if it was live or we then taped it, replayed

19        it.  I don't know.

20   Q    But someone listening to that radio station would have heard

21        your voice, you speaking?

22   A    Yes, absolutely.

23   Q    For how long were you speaking?  Do you recall?

24   A    Half hour to an hour.

25            MS. EGELER:  That's all the questions.  Thank you
```

DIXSON (REDACTED, 9/1/10)

Page 54

1          so much for coming in.

2                    MR. DIXSON:   I have a couple of follow-up

3          questions.  Keith may as well.

4                              EXAMINATION

5     BY MR. DIXSON:

6     Q    Turning back to the threats made by this transgendered

7          person at the Wal-Mart, is it your testimony that he or she

8          said, "I'm going to bring all of my homosexual friends with

9          me to church"?  What do you remember that person saying to

10         you in particular, if you recall?

11    A    It's in the declaration, which is at the time it was very

12         fresh, but even my recollection right now is, "I'm going to

13         bring all my homosexual, transgender, gay" -- they say gay.

14         I don't like to say that word.  "I'm going to bring all of

15         my gay friends.  I'm going to bring all of my transgendered

16         friends to your church service, and we're going to have a

17         good time," something like that.

18    Q    And the person who took the cell phone video, again, did

19         they -- what do you remember them saying to you in

20         particular, if you recall?

21                   MS. EGELER:  I'm going to object to the question.

22         I believe the testimony was it cell phone pictures, not

23         video.

24    Q    (By Mr. Dixson)  Excuse me.  The cell phone pictures, do you

25         remember in particular what that person said after she took

DIXSON (REDACTED 9/1/10)

Page 55

```
1       the photo?
2   A   I can't remember exactly.  My wife can tell you.  She was
3       talking to my wife directly at that time.  I was there, but
4       she said she was going to post them on Facebook or Myspace.
5       Whatever the social media was, she's going to post the
6       pictures for all of her gay friends to look at.
7   Q   The recordings, turning to the recordings that you made of
8       these calls, how were they recorded?
9   A   On our answering machine.
10  Q.  And then from the answering machine to the computer?
11  A   No.  I have a digital recorder that has a USB interface on
12      it.
13  Q   Okay.
14  A   So I just copied them onto the digital recorder and took
15      them from that into the computer.
16  Q   And was that first telephone call that took place first with
17      your wife and then over the speakerphone, is that call
18      recorded or no?
19  A   Yes.  They're all there.
20  Q   And how was that phone call recorded then?
21  A   Answering machine -- no, it wasn't.  That wasn't.  That's
22      not recorded.  You're right.  That one is not recorded.
23  Q   So the only recorded calls are those that were played on the
24      answering machine.  Is that correct?
25  A   That's correct, yes.
```

DIXSON (REDACTED 9/1/10)

Page 56

| | | |
|---|---|---|
| 1 | Q | You testified that you know that the Lacey Police Department |
| 2 | | called this David or Krystal.  Is that correct? |
| 3 | A | Actually, yes.  The Lacey Police did. |
| 4 | Q | Were you there -- how do you know that the Lacey Police |
| 5 | | Department contacted David or Krystal? |
| 6 | A | I believe they gave us a call to let us know that they did. |
| 7 | | We were not going to let that slip or slide.  The officer |
| 8 | | gave us a call back to confirm that he had made contact. |
| 9 | Q | At that point, the officer informed you as to the substance |
| 10 | | of his conversation with that person? |
| 11 | A | Yeah.  It's very short.  You know, police officers are very |
| 12 | | short and direct. |
| 13 | Q | The threats to the church, were they directed toward a |
| 14 | | particular Sunday service or were there repeated threats to |
| 15 | | different church services? |
| 16 | A | It was not defined.  The way I took that was that it was for |
| 17 | | the immediate Sunday, and if they didn't do it then, they |
| 18 | | never would.  That's how I took it.  They didn't really |
| 19 | | define when they were going to come. |
| 20 | Q | And so those repeated phone messages, what's the timespan |
| 21 | | from the initial call until the police report? |
| 22 | A | Ask my wife that question.  I don't recall, but she's got a |
| 23 | | very good memory. |
| 24 | Q | Is it a matter of days or weeks or -- |
| 25 | A | It's less than weeks and greater than days.  It's -- I don't |

HAMILTON (REDACTED, 9/1/10)

Page 57

```
 1      know.  A short period of time.  In that short period of
 2      time, he got increasingly agitated.  I can give you a
 3      probably, if that was -- but I don't want to do that.
 4   Q  We can listen to the recordings to get the actual dates.
 5   A  Okay.
 6              MR. DIXSON:  Those were the follow-up questions
 7      that I had.
 8                         EXAMINATION
 9   BY MR. HAMILTON:
10   Q  Good afternoon, Mr. REDACTED.  My name is Kevin Hamilton.
11      I represent Washington Families Standing Together, the
12      coalition of civil rights and church groups that opposed
13      Referendum 71 during the election.  We were a party of the
14      action.  I just have a few follow-up questions for you.
15              You mentioned a few moments ago that you had received
16      some phone calls on a church phone, I think you described
17      it, but it's in your home.
18   A  That's correct.
19   Q  You maintain a separate phone line or is this your home
20      phone line?
21   A  It's the same line, but it's a different number.  Our church
22      is in Olympia, so we have a 360 number that goes over to our
23      home phone.
24   Q  So two different telephone numbers that ring on the same
25      phone?
```

```
 1                    C E R T I F I C A T E
 2        I, REBECCA S. LINDAUER, a duly authorized Notary Public in
 3   and for the State of Washington, residing at Lacey, do hereby
 4   certify:
 5        That the foregoing deposition of REDACTED, was taken
 6   before me and completed on the 1st day of September, 2010, and
 7   thereafter transcribed by me by means of computer-aided
 8   transcription; that the deposition is a full, true, and complete
 9   transcript of the testimony of said witness;
10        That the witness, before examination, was by me duly sworn
11   to testify the truth, the whole truth, and nothing but the truth,
12   and that the witness reserved signature;
13        That I am not a relative, employee, attorney, or counsel of
14   any party to this action or relative or employee of any such
15   attorney or counsel, and I am not financially interested in the
16   said action or the outcome thereof;
17        That I am herewith securely sealing the deposition of REDACTED
18   REDACTED and promptly mailing the same to MS. ANNE E. EGELER.
19        IN WITNESS HEREOF, I have hereunto set my hand and affixed
20   my official seal of this 6th day of September, 2010.
21
22
23
24                         _____
25                         Rebecca S. Lindauer, CSR#2402
                           Notary Public in and for the State of
                           Washington, residing at Lacey.
```

