# EXHIBIT 5

Page 1

1                UNITED STATES DISTRICT COURT
2               WESTERN DISTRICT OF WASHINGTON
3                       AT TACOMA
4    _____
5    JOHN DOE #1, an individual; JOHN      )
     DOE #2, an individual; and PROTECT    )
6    MARRIAGE WASHINGTON,                  )
                                           )
7                       Plaintiffs,        )
                                           )
8        v.                                )
                                           )    No. 09-CV-05456-BHS
9    SAM REED, in his official capacity    )
     as Secretary of State of Washington; )
10   BRENDA GALARZA, in her official       )
     capacity as Public Records Officer    )
11   for the Secretary of State of         )
     Washington,                           )
12                                         )
                        Defendants.        )
13   _____
14             Deposition Upon Oral Examination
                           Of
15                      **REDACTED**
     _____
16
17
18
19
20
21
22   Taken by:   Tracey L. Juran, CCR
                 CCR No. 2699
23
24   September 22, 2010
25   Everett, Washington

1      Washington disclose that to the Public Disclosure

2      Commission?

3  A.  Every time there was a required report, the information

4      was submitted in a timely manner.

5  Q.  So we could go to the Public --

6  A.  Absolutely.

7  Q.  Just let me finish, please.  I know it's --

8  A.  Yeah.

9  Q.  -- it's difficult.

10      But if we went to the Public Disclosure

11      Commission's Web site, we could look at those reports

12      and see what the exact amount was; correct?

13  A.  That is correct.

14      MR. PIDGEON:  Okay, can we go off the record for

15      just one second.

16            [Off the record - discussion]

17      MS. EGELER:  Back on the record.

18  Q.  (by Ms. Egeler)  What did you do for Protect Marriage

19      Washington during 2009?

20  A.  Well, I filed the referendum and I ran the campaign.

21  Q.  Before filing the referendum, were you involved in any

22      way in the legislative bill that was the precursor to

23      Referendum 71?

24  A.  Yes.

25  Q.  And can you describe that.

```
 1   A.   Well, I worked and lobbied some in Olympia.  I -- and
 2        when I say that, I took a trip down there once in a
 3        while and met with a few state representatives and --
 4   Q.   Anything else?
 5   A.   -- organized some efforts outside of the Legislature to
 6        oppose the bill.
 7   Q.   Anything else with respect to that bill?
 8   A.   No.
 9   Q.   So you didn't testify --
10   A.   I did.  I did testify, yes.
11   Q.   Did you testify against the bill?
12   A.   Against.
13   Q.   And was that a public hearing that you --
14   A.   Yes.
15   Q.   Do you recall whether there were other members of the
16        public present?
17   A.   Yes.
18   Q.   Roughly how many people do you think there were, very
19        roughly?
20   A.   As many as 300.
21   Q.   When you testified, were you required to sign in before
22        testifying?
23   A.   Yes.
24   Q.   And did you do so?
25   A.   Yes.
```

1   Q.   Do you recall whether you were asked to provide both

2        your name and your address?

3   A.   Yes.

4   Q.   And did you provide your address?

5   A.   Yes.

6   Q.   You said that you organized efforts to oppose the bill

7        with others.  Who were those others?

8   A.   Well, key contacts.

9   Q.   Such as?

10  A.   People that might contact us that were of like mind.

11  Q.   And how did you organize them?

12  A.   Loosely.

13  Q.   Did you organize people to come to the hearing and

14       testify?

15  A.   We asked in an Email message, yes.

16  Q.   And who was that Email sent to?

17  A.   A list of people that we began to gather as -- over

18       time.

19  Q.   Was that Email sent from your personal Email account?

20  A.   No.

21  Q.   What Email address was that sent from?

22  A.   Washington Values Alliance.

23  Q.   So at the time that you were working to oppose the

24       legislative bill, that work was done through Washington

25       Values Alliance; correct?

```
 1        very few.
 2   Q.   You mentioned that you used the names and addresses and
 3        the Email addresses to keep people informed of what's
 4        going on.  Did you mean this lawsuit?
 5   A.   We've posted a few of the press releases that have come
 6        out from the lawsuit.  That's about all we've done.
 7   Q.   Have you sent any Emails out asking people to share
 8        their experiences, any sort of harassment they might
 9        have experienced?
10   A.   I do believe there was an Email that mentioned that at
11        one time, but I'm not even sure of that, whether we did
12        that.  We have not -- there was, I think, one Email
13        quite a while back, and I'm not even -- I'm not sure if
14        it was specific to that issue that day.
15   Q.   After the United States Supreme Court --
16   A.   Yeah.
17   Q.   -- ruled on --
18   A.   Yeah.
19   Q.   -- part of the case --
20   A.   Yeah.
21   Q.   -- do you know if an Email was sent out asking people to
22        share their experiences of harassment?
23   A.   I do believe we sent an Email out that asked that at one
24        time.
25   Q.   And that would have gone to the few thousand Email --
```

Page 33

```
 1   A.   Yeah.
 2   Q.   -- addresses?
 3   A.   That's right, yeah.
 4   Q.   Would anything have been mailed to the written addresses
 5        that you had?
 6   A.   We did not write to people, no.
 7   Q.   When you asked people to share their experiences of
 8        harassment -- and I'm looking at the time period --
 9   A.   Mm-hm.
10   Q.   -- after the United States Supreme Court ruled -- did
11        you have any responses to that request?
12   A.   There was a -- you know, and again, I'm not recalling
13        the specific Email, so -- it wasn't something we made a
14        big -- went into real hot pursuit on.
15   Q.   I understand.
16   A.   Yeah.
17   Q.   I'm just wondering --
18   A.   Yeah.
19   Q.   -- did anyone respond with anything?
20   A.   If they did, I've submitted it.
21   Q.   Submitted it to whom?
22   A.   Oh, that's -- it's in the records that have been brought
23        in.
24   Q.   Do you recall how many people might have responded?
25   A.   No.  No.
```

1    Q.   So any response that you did receive in response to the

2         Email asking about harassment would be included in

3         the --

4    A.   Yes.

5    Q.   -- materials --

6    A.   Yes.

7    Q.   -- would be included in the materials that you've

8         provided in response to the subpoena duces tecum.

9    A.   Yes.

10   Q.   And there's nothing that you failed to respond -- excuse

11        me; failed to produce.

12   A.   No.

13             MR. PIDGEON:   I'm going to object that --

14             THE WITNESS:   Yeah.

15             MR. PIDGEON:   -- just for point of clarification,

16        having looked through the documents -- the responsive

17        documents that were replied -- that were placed -- that

18        were put in -- that have been, I believe, filed in terms

19        of responses to requests for production, that it is an

20        ongoing discovery request and that we have reserved the

21        right to continue to respond to the discovery request in

22        terms of any new information that's still coming in,

23        just for clarification.

24   Q.   (by Ms. Egeler)   Mr. REDACTED, do you remember

25        approximately when that Email would have been sent, even

1           in terms of what month it would have been sent?

2    A.    No.

3    Q.    But it was after the United States Supreme Court ruled?

4    A.    It was during -- I mean, here's (indicating) some of the

5           listing of some of the courtroom activities, and at some

6           point we asked.  And I -- this thing has become awfully

7           convoluted and difficult for me to -- as -- to remember

8           exact times and dates.  It's been very complicated.

9    Q.    I understand.

10          In addition to speaking to reporters and filing

11          petitions, et cetera, did you do little things, like

12          have a bumper sticker about Referendum 71 on your car?

13   A.    Yes.

14   Q.    And did you personally have a yard sign about

15          Referendum 71?

16   A.    I don't recall that I did for certain reasons.

17   Q.    So at no point during the campaign did you have a yard

18          sign?

19   A.    I do not believe so, no.

20   Q.    Did you appear on television or radio to promote

21          Referendum 71?

22   A.    Yes.

23   Q.    Let's break that up and address, first, radio.  Can you

24          tell me about any radio appearances you had.

25   A.    Numerous.

1  A.  Yeah.

2  Q.  -- threats or harassment, and the first --

3  A.  Sure.

4  Q.  -- thing that you listed was the Emails.  Are there --

5  A.  Yeah.

6  Q.  -- any that stand out to you?

7  A.  Yes.  Of course, the -- and mind you that a lot of -- we

8     began to collect these, you know, in time after it

9     started to bother us.  And I blew off a lotta calls and

10    a lot of harassment and I began a file for the more --

11    you know, for the harassing and the hate mail we began

12    receiving.  But right out of the blocks, we had the --

13    this Bisceglia character.

14         A Bellingham blogger had -- was posting on a number

15    of the homosexual blogs, include -- or he had his own

16    blog, but he had links showing up on some of the larger

17    blogs even around the country, and it was generating a

18    lot of Email to us.  And he was actually calling for,

19    you know, it looked like, you know, to me -- I rated as

20    harm to my family and destruction of property, you know,

21    and saying things like, if    REDACTED   , and by name,

22    is going to harm my family, why shouldn't we go down to

23    Arlington and harm his.

24         And so we began to feel very vulnerable and --

25  Q.  Do you remember the name of that Web site?

1        Could that have been the Bellingham blog?

2   A.   Possibly.

3   Q.   Do you remember a blog listing anything about people

4        supporting --

5   A.   In Longview and Kelso?

6   Q.   Let me finish the question.

7   A.   Yeah.

8   Q.   -- yes, listing names of individuals in Longview or

9        Kelso who supported Referendum 71?

10  A.   This thing was impossible to keep complete tabs on.  If

11       you were to go and run Referendum 71 on Google search,

12       and you've probably all done that, there's going to be

13       thousands of documents and numerous Web sites from A to

14       Z across the country.

15  Q.   So does that mean you don't remember this blog listing

16       anybody from Longview?

17  A.   I'm not sure.  I don't recall.

18  Q.   I understand.

19  A.   Yeah.

20  Q.   So I took us back to the Bellingham blog, but you were

21       just adding that The Stranger had a headline --

22  A.   Yeah.

23  Q.   -- know thy enemy; is that correct?

24  A.   Correct.  So there was an atmosphere and a chill in the

25       air.  And we put together a little package of the Emails

```
 1        and Web-site links and submitted them to Sheriff Lovick
 2        here in Snohomish County.  And I copied my submittal to
 3        Sheriff Lovick to Kirk -- State Representative Kirk
 4        Pearson, County Councilman John Koster, State
 5        Senator Dan -- or Val Stevens, and State
 6        Representative Pearson -- or Kristiansen.  So I
 7        submitted it to the legislative -- my legislators
 8        directed to Sheriff Lovick.
 9   Q.   And is -- Sheriff Lovick, he's with Snohomish County?
10   A.   Snohomish County Sheriff.
11   Q.   And is that L-O-V-I-C-K?
12   A.   Correct.
13   Q.   Did Sheriff Lovick respond?
14   A.   He responded by referring it to Whatcom County.
15   Q.   What county is Arlington, your home city, in?
16   A.   Snohomish County.
17   Q.   And would he have referred it to Whatcom because that's
18        where Bellingham's located?
19   A.   Yes.
20   Q.   Why did you direct this to Sheriff Lovick instead of the
21        sheriff's office generally?
22   A.   Well, because he's the sheriff.  Wouldn't that be the
23        normal direction?
24   Q.   So he's the head of the --
25   A.   Yes.
```

1      right now.

2            And mind you, I have children at home of -- young

3      children as well as at the time I had my two boys at

4      home and a daughter that was -- that's -- was 17 at the

5      time.  And --

6                       [Cell phone ringing]

7            THE WITNESS:  There's one of 'em now.  See if I can

8      get that shut off here.

9   A.  And all of a sudden, I'm having to spend a lotta time

10     away from home with these Emails and calls coming in.

11     And they were coming in through every crack in the

12     house, the calls and the Emails.  They had gotten our

13     home phone numbers and we were in the phone book.  Our

14     address was posted and my phone number was out there.

15           And it was sometime in May that I -- one of my

16     young daughters came running into the house, Daddy,

17     there's a man in our front yard taking pictures.  And I

18     had determined that was sometime after June 2nd.  And I

19     charged out into the yard after REDACTED found me and I

20     made it outside just in time to see the car disappearing

21     down the hill.  And I hopped in my car and tried to get

22     down there and get identification, but there's a number

23     of side streets.  The car disappeared.

24           Now, our fear was that -- we know it had been the

25     tactic of some of these groups to post on-line even

```
 1        photos of a home -- your home, so --

 2   Q.   (by Ms. Egeler)  Can I ask --

 3   A.   Yeah.

 4   Q.   -- you a question about --

 5   A.   Yeah.

 6   Q.   -- that --

 7   A.   Mm-hm.

 8   Q.   -- man in the yard.

 9   A.   Yeah.

10   Q.   Do you remember what he looked like?

11   A.   Oh, I didn't see him, but my daughter did.

12   Q.   So you did not see him.

13   A.   No, I did not see him.

14   Q.   How old was your daughter --

15   A.   Eight.

16   Q.   -- at the time?

17   A.   Yeah, 8.

18   Q.   And your daughter saw him taking pictures.

19   A.   Yeah, mm-hm.

20   Q.   When you came into the yard and chased him in his car --

21   A.   Yeah.  Yes.

22   Q.   -- did he say anything?

23   A.   I didn't -- when I came into my yard, he was a quarter

24        mile heading down the hill in his car by then.  I was in

25        the back 40 when my daughter found me.
```

1   Q.   Did your daughter hear him say anything?

2   A.   No, not that I recall.

3   Q.   And when you got into the car to follow him --

4   A.   Yeah.

5   Q.   -- how close were you able to get?

6   A.   With -- the layout of my -- I live on a long, lonely

7        country-road straightaway and it heads down a hill.  And

8        he was rounding the corner a quarter mile away.  So I

9        drove down that way to see if I could find somebody,

10       maybe, up at the stop sign that's a couple miles out.

11       And -- but there's a number of side streets they could

12       have turned down, you know.  I didn't find the car.

13  Q.   Did you call the police and tell them about this?

14  A.   I'm not sure we reported that.  I don't recall.  I don't

15       recall.  From the response I was getting out of the

16       sheriff's office, I hadn't -- I was -- I -- yeah.

17       Anyway, I --

18  Q.   So we had this incident.  And did your daughter -- how

19       did you know this was related to Referendum 71?

20  A.   Well, I can't make, you know, a positive lock-tight

21       argument there, but I assumed that it likely was.  There

22       was a lot of funny things going on, and it seemed to be

23       in character with what was being called for and some of

24       the other things that were happening and the history of

25       the magazine, The Stranger.

1    Q.    But do you know --

2    A.    Yeah.

3    Q.    -- if this individual might have been a burglar?

4    A.    I -- yeah, I said I don't have a lock-tight proof that

5          this person was R-71 related.  We suspected he was.

6    Q.    So next -- let's move on to the --

7    A.    Yeah.

8    Q.    -- next incident.

9    A.    Yeah.

10   Q.    I think we've --

11   A.    Yeah.

12   Q.    -- exhausted --

13   A.    Yeah.

14   Q.    -- that.

15   A.    Yeah.  Let me just tell you that it was at this point

16         that -- and again, I wanna go back to -- the atmosphere

17         of fear at our home could be cut with a knife.  And when

18         you go from nice little family raising their kids out in

19         the country to all of a sudden -- and there were some

20         things I didn't wanna even go public with at the time

21         and I hesitate to now.

22   Q.    Can we --

23   A.    Let me just --

24   Q.    -- focus on the question, though.

25   A.    Well, I wanna --

1    Q.   I under --

2    A.   I want you to understand what we were dealing with, and

3         that is that I had to move my children into the living

4         room.

5    Q.   Well, let's talk about --

6    A.   Yeah.

7    Q.   -- that incident.

8    A.   Yeah, okay.

9    Q.   And that's --

10   A.   All right.

11   Q.   -- contained in your declaration --

12   A.   Sure, sure, yeah.

13   Q.   -- as well.  And --

14   A.   Yeah, mm-hm.

15   Q.   And I believe, and --

16   A.   Yeah.

17   Q.   -- correct me if --

18   A.   Mm-hm.

19   Q.   -- I'm wrong --

20   A.   Mm-hm.

21   Q.   -- but you certainly felt that that was a time you

22        experienced harassment or threats.  So can you explain

23        that to me, what occurred then.

24   A.   Well, it was after the photo opportunity that -- and in

25        that -- and mind you, this was a very, very busy time

```
 1        for myself.

 2   Q.   How long after the photo incident?

 3   A.   We made a decision, I think, that day that we -- the

 4        kids go into the living room.  And I'm -- we were beside

 5        ourselves as to what to do.  And I almost packed the

 6        family up and sent them off to Colville at that point

 7        because I have some -- my in-laws there.  But the kids

 8        were all in school and my wife was my right arm.  The

 9        campaign would be over.  We would have been heading for

10        the hills.  Instead, we carried on, but under this

11        atmosphere of chill.

12             And, you know, I had my boys getting the guns

13        loaded because of -- and I -- you know, Dad, don't

14        worry, we'll take care of it.  I'm going, yeah, okay,

15        sure.  But, I mean, that -- it was that kind of a fear.

16        And we don't -- you know, I'm not a big gun guy, even,

17        or -- I'm just a regular guy.  But all of a sudden we're

18        forced into these kind of -- this kind of thinking

19        and --

20   Q.   You said that you had an 8-year-old daughter, REDACTED.

21   A.   Yeah.

22   Q.   What were the ages of the other children?  You don't

23        need to provide their names.

24   A.        REDACTED      --

25   Q.   So she was --
```

Page 80

```
 1           names are provided, that they be provided under seal and
 2           under seal only.
 3                THE WITNESS:  Yeah.
 4                MS. EGELER:  Well, the Court can rule on that.
 5    Q.   (by Ms. Egeler)  But you can answer the question.
 6    A.   I asked no particular businesses.  I asked -- I talked
 7         to -- I'm talking about businessmen, people of
 8         prominence.
 9    Q.   Can you tell me or do you know anyone who stated that
10         they would like to contribute, but they're fearful about
11         disclosure of their name?  Do you remember the name of
12         anyone or any business who said that?
13    A.   Yes, I do.  I had a young woman who had like a -- I
14         don't know what she did, but she had a little shop in
15         Seattle.  And she just said, I can't give if I have to
16         give my name.  So, I mean, it's people like that that
17         I'm talking about.
18    Q.   Who else?  Woman with a shop in Seattle.
19    A.   I wouldn't wanna try and recall all these people.
20    Q.   I understand that --
21    A.   Yeah.
22    Q.   -- you might not want to, but --
23    A.   Yeah.
24    Q.   -- that is why we're here today, to --
25    A.   Yeah.
```

1   Q.   -- explore this.

2   A.   Yeah, yeah.

3   Q.   If we have --

4   A.   Yeah, yeah.

5   Q.   -- a claim that --

6   A.   Yeah.

7   Q.   -- harassment was resulting in people not contributing

8        and you have --

9   A.   Yeah.

10  Q.   -- knowledge of individuals --

11  A.   Yeah, yeah.

12  Q.   -- that wanted to contribute and expressed to you --

13  A.   Yeah.

14  Q.   -- they want to contribute but won't because of

15       disclosure, then I do need to know --

16  A.   Yeah.

17  Q.   -- who these individuals --

18  A.   I don't --

19  Q.   -- are.

20  A.   I don't recall the individuals.

21  Q.   So it's not a matter of you refusing to tell me; rather,

22       it's that you don't recall.

23  A.   I don't recall.

24  Q.   That's fine.

25            Do you recall -- I'm sure you don't recall a

1       specific number; maybe you do -- approximately how many

2       people and businesses did contribute to Protect Marriage

3       Washington?

4  A.  Well, I don't know that any business actually

5       contributed, because you can't take corporate checks.

6       But how many donors did we end up with?  I don't recall

7       that.  Several hundred plus, maybe.  I don't know.  Two,

8       three hundred, maybe more.  It's all on the public

9       record, so --

10  Q.  So any donors would be listed there?

11  A.  Exactly.

12  Q.  And again, any donor Protect Marriage Washington would

13      have complied with the law and properly disclosed to --

14  A.  Yes.

15  Q.  -- the Public Disclosure Commission?

16  A.  Absolutely, mm-hm.

17  Q.  And you also mentioned that you -- after hearing from

18      whosigned.org and --

19  A.  Yeah.

20  Q.  -- Know Thy Neighbor, if you --

21  A.  Yeah.

22  Q.  -- and I are remembering their names correctly --

23  A.  Sure.

24  Q.  -- that you had some campaign workers that were

25      uncomfortable and no longer would work for the

```
 1        campaign --
 2   A.   Well --
 3   Q.   -- is that right?
 4   A.   That generated a chill through the whole campaign.
 5   Q.   Can you tell me who the people were -- that no longer
 6        would work for the campaign were?
 7   A.   Well, I can't.  I can't --
 8   Q.   Do you recall who they are?
 9   A.   I don't recall.
10   Q.   Do you recall how many of them there were?
11   A.   I don't recall a number.
12   Q.   How many campaign workers were there in total?
13   A.   You know, there may have been a time when there was, you
14        know, many hundreds that were out gathering signatures.
15        Many of them I didn't know.  They were just out doing
16        it, sending 'em in.  So --
17   Q.   Since the election occurred --
18   A.   Mm-hm.
19   Q.   -- have you experienced anything that you would consider
20        to be harassment or threats?
21   A.   Well, you know, as a professional person or a person
22        that is now doing campaigns professionally, I've -- for
23        a number of months I was -- you know, and I have a -- I
24        write a column for Red County.  It's a conservative
25        blog.  And anytime my name would appear on an article, I
```

1   A.   Well, there was another -- one of the more outstanding
2        incidents.  And let me just tell you something:  I'm a
3        pretty rough-and-tumble guy.  I mean, I'm not a guy who
4        walked into this thing with his eyes closed.  But I got
5        rattled on a couple of occasions in this thing.  And one
6        of the standout incidents that comes to mind was a
7        series of phone calls that I began to receive from a
8        real odd character.
9   Q.   And when did these phone calls happen?
10  A.   Those started in late July and it was from a Krystal
11       Mountaine.  I used to ski up on Crystal Mountain, so I
12       assumed it was a takeoff on that mountain or whatever.
13       And she would call me and -- at all hours and began
14       to -- it began to be a little bothersome.
15  Q.   Was it at your home?
16  A.   On my cell phone, which was -- and it was on my home
17       phone number too.
18            But -- and it's just -- usually what I would get
19       was, you know, a lot of sexual innuendo and the attacks
20       were usually bordering on, I hate your guts, you -- I
21       mean, you can read the stuff yourself.  But this one was
22       particularly wanting to fight me and saying, I think I'd
23       really like that, and, you know, these kinda things.
24       And it was very bothersome.  And then this person warned
25       me that, but I want you to know, I'm an ex-special

1  Q.  -- and wanted to fight you.

2  A.  Yeah, wanted to fight me because she'd get off on that

3      sexually.

4  Q.  But you weren't concerned about letting the police know

5      about this physical threat to you?

6  A.  I had too many things to do and I have -- I'm hearing

7      this stuff constantly, the hate I'm absorbing at that

8      point.  And I had made a decision I'm gonna carry this

9      thing out by then.  And I guess you get somebody

10      cornered and, you know, we were saying, well, we're

11      gonna fight back.  You're not gonna drive us out of this

12      campaign.

13  Q.  But this individual --

14  A.  Yeah.

15  Q.  -- said that she was going to --

16  A.  Yeah, yeah.

17  Q.  -- wanted to fight you.

18  A.  I didn't have any -- what proof did I have other than I

19      took a phone call?

20  Q.  Just let me --

21  A.  Yeah.

22  Q.  -- finish the --

23  A.  Yeah.

24  Q.  -- question.

25  A.  Yeah.

1   Q.   And that she, if I hear you correctly --

2   A.   Yeah.

3   Q.   -- knew where you lived.  Were you concerned for your

4        family?

5   A.   Absolutely.

6   Q.   And yet you didn't let the sheriff know about that?

7   A.   I don't recall whether we made a call on Krystal

8        Mountaine or not.  I know I was turning all these Emails

9        in to our file, you know.  I was in communication.

10  Q.   Were you --

11  A.   So --

12  Q.   You were in communication with whom?

13  A.   With attorneys at that point.  And I think I sent them

14       to Steve and to the Alliance defense fund.

15  Q.   And by Steve, you mean --

16  A.   Steve Pidgeon.

17  Q.   -- Steve Pidgeon?

18  A.   So --

19  Q.   And do --

20  A.   Yeah.

21  Q.   -- you know if Steve Pidgeon let the --

22  A.   No, I don't know --

23  Q.   -- Snohomish County Sheriff's --

24  A.   -- that I ever made a -- you know, what reports I made

25       other than I kept the Emails I got from this person.

1      That threat came in on a phone call, yeah.

2  Q.  But you didn't feel concerned enough about your family's

3      safety to call the police --

4  A.  Oh, I absolutely --

5  Q.  -- about that?

6  A.  -- felt concerned enough.  I didn't feel I was gonna get

7      any response from Sheriff Lovick.

8  Q.  Did you --

9  A.  Yeah.

10  Q.  Do you have a police force in the city of Arlington?

11  A.  No.  We're outside the city limits.  Very vulnerable.  I

12      had no confidence in Sheriff Lovick at that point.

13  Q.  But you didn't let Sheriff Lovick know about this threat

14      of physical --

15  A.  I don't --

16  Q.  -- harm from --

17  A.  -- recall whether we let him know or not.

18  Q.  Who would know?  Would your wife recall?

19  A.  I doubt that.

20  Q.  And let's explore --

21  A.  Yeah.

22  Q.  -- your feeling of a lack of confidence in the sheriff.

23  A.  Yeah.

24  Q.  Other than your contact with the sheriff to --

25  A.  Mm-hm.

1        identified himself as.

2   Q.   Do you remember his name?

3   A.   I do not.  But I think that the county sheriff would

4        have to know that.

5   Q.   What did he say to you?

6   A.   He said he was gonna take a look into the Bisceglia

7        matter.

8   Q.   Did he say how he would do that?

9   A.   He just said he was a detective.  He caught me on the

10       run and I'm bombing around somewhere and he says, I just

11       want you to know that we're gonna take a look at this

12       thing for you.  That's the last I heard of him.

13  Q.   And did you call him back to ask --

14  A.   No.  I didn't --

15  Q.   -- about it?

16  A.   -- have his number.

17  Q.   Where did you receive the call?

18  A.   Cell phone.

19  Q.   So your cell phone had the number.

20  A.   Somewhere on my cell phone.

21  Q.   And did you write that number down?

22  A.   No, I did not.

23  Q.   Why not?

24  A.   Ma'am, I was -- a lot of these calls I was fielding on

25       the run.

# EXHIBIT 6

Page 1

1                    UNITED STATES DISTRICT COURT
2                   WESTERN DISTRICT OF WASHINGTON
3                            AT TACOMA
4    _____
5    JOHN DOE #1, an individual; JOHN        )
     DOE #2, an individual; and PROTECT      )
6    MARRIAGE WASHINGTON,                     )
                                             )
7                         Plaintiffs,        )
                                             )
8         v.                                  )
                                             )   No. 09-CV-05456-BHS
9    SAM REED, in his official capacity      )
     as Secretary of State of Washington;   )
10   BRENDA GALARZA, in her official         )
     capacity as Public Records Officer     )
11   for the Secretary of State of          )
     Washington,                             )
12                                           )
                         Defendants.         )
13   _____
14              Deposition Upon Oral Examination
                              Of
15            PASTOR      REDACTED
     _____
16
17
18
19
20
21
22   Taken by:  Tracey L. Juran, CCR
                CCR No. 2699
23
24   September 23, 2010
25   Seattle, Washington

1      I think that issue then -- it's been so many years back.

2      The issue then was working on minority status, making

3      the homosexual community a minority status.  And so

4      that's how I really got involved with the legislative

5      aspect of it and down in Olympia.

6          And when we got there, there was a -- there was

7      several representatives from Microsoft that was trying

8      to get the law passed, and that's how I got involved

9      even with the fight with Microsoft.

10  Q.  Let's talk about that fight with Microsoft.  Can you

11      describe that for me.

12  A.  In words?  In words, probably a little bit more

13      difficult than in emotion.

14          What happened was that we had so many people in our

15      church that work for Microsoft, and I knew Microsoft

16      policies for years towards the homosexual community.

17      Fine with us.  It was their right, it was their

18      business, and that any way they wanted to treat their

19      workers was their choice.  Well, when we got down to

20      Olympia, all of a sudden their decision on how they was

21      treating the homosexuals in their business became how

22      they wanted the State to treat homosexuals, and they was

23      there giving testimony why this law should be passed.

24          And that's when I said, I think we're overstepping.

25      Long as you wanna keep that issue inside your four

Page 9

```
 1        walls, it's fine with me.  When you try to push your
 2        decision and your laws on me as a pastor and as a
 3        Christian, I got problems with it, especially when you
 4        step in the state.  And so that's when I met with
 5        Microsoft.  And we had several meetings and I got them
 6        to back off and take a neutral position in that fight
 7        that year.
 8   Q.   So do you have an opinion about whether corporations
 9        should be able to lobby the government for different
10        laws being passed or not passed?
11   A.   I think corporation can lobby the government for
12        anything they want if they're willing to defend it and
13        be challenged on it.
14   Q.   So --
15   A.   Because they have the right to do that.  I have the
16        right to challenge that.
17   Q.   So you weren't objecting to Microsoft lobbying on the
18        issue.
19   A.   Never.  I never asked them to fire their
20        representatives, I never asked them to change their
21        policies inside their four walls.  The issue was, when
22        you start pushing issues that's Biblically where I stand
23        as a pastor on me, you know, pass laws that I have to
24        submit to when the Bible says I shouldn't, then we have
25        a problem.
```

1      the last time I typed my name in, there was almost

2      300,000 hits.  So it isn't -- nothing private about how

3      I feel, how I say, and where I stand.  And there is not

4      one statement that anyone can ever find in all those

5      postings where I am derogatory and attacking and feeling

6      and putting down homosexuals.

7  Q.  I understand.

8      So looking again at Microsoft, was the effort to

9      buy the stock of the company, then?

10  A.  Yeah.  It's just like -- just go in and buy stock and

11     influence what is going on in that business.  One of the

12     reasons why we did that was because -- I think it was

13     when -- there was something going on in California.  I

14     don't think it was Proposition 8, I think it was another

15     issue that was hitting.  And I came to the stockholders'

16     meeting at Microsoft to ask them why were they

17     supporting discriminatory and racial practices.

18  Q.  And what discriminatory and racial -- and racist

19     practices specifically?

20  A.  Specifically, if you remember some of the rallies that

21     was going on in California -- I think it's about three,

22     four years ago at the most -- there was homosexuals that

23     was attacking people with the Bible at rallies, took a

24     Bible from a little old lady, called black people stupid

25     for voting for the passage of that bill.  It may have

1     been Proposition 8; I'm not sure.

2         And I asked Microsoft as a company and as a

3     stockholder, if it was -- anyone else had done such

4     blatant discriminatory and racist comments and

5     movements, would this company support 'em? And I said,

6     absolutely not. But you are. You continue to support

7     the homosexual lifestyle and ways even though you know

8     where they stand.

9         And that you call me intolerant, but you never

10    heard me call homosexuals names. But you've heard them

11    call me names. You've heard them call other black

12    people names and how ignorant black people are because

13    of voting for Proposition 8.

14  Q.  Did you witness anything in the state of California that

15     you've just described?

16  A.  Every day on the news. It was hot, hot news. And so

17     with -- the pastors that have organized Proposition 8,

18     I'm close friends with two of 'em and I knew exactly

19     what was going on. Wasn't just hearsay in the aspect of

20     what was going on in the paper, but what was going on

21     with the pastors and the pastors who got, I mean, just

22     threats to no end that if you are gonna stand on this,

23     then you are gonna be -- I wanna say the right word --

24     you'll be profiled as a hatemonger.

25  Q.  And were you involved in an organization of a rally, for

1    the board, we will talk about this later.

2         And she came home and says, do you know what's

3    going on up at the school?  I go, no.  She says, I went

4    up to talk to the teacher and they was honoring the Day

5    of Silence.  Teachers wouldn't teach.  They were -- if

6    they committed to honor the Day of Silence, they

7    wouldn't teach.  Students didn't have to talk in the

8    classroom.  They were having students come in at the

9    front of the school to say, okay, are you for this and

10   you supported this or not?  They was handing out arm

11   bands.

12        So all of a sudden I'm thinking, what is gonna --

13   this isn't gonna happen.

14   Q.   (by Ms. Egeler)  And what was the Day of Silence about?

15   A.   It was honoring those students who they say had been

16   bullied as a homosexual student.  Now, that -- okay,

17   great, let's deal with bullying.  But outta all those

18   issues that the kids voted on, homosexual bullying or

19   homosexual problems wasn't even mentioned.  And the GSA

20   that put on the Day of Silence didn't have one

21   homosexual student in their whole program.  There was no

22   gay students in the committee.  It was heterosexual kids

23   pushed by teachers, which is not right when it's

24   supposed to be student sponsored.

25   Q.   Do you actually know that --

1   A.   I know that for a fact.  And you can call Mount Si High

2        School and ask for Principal Taylor.  You know, he --

3        they can give you all the -- everything I'm saying that

4        I tell you is the truth.

5             And I just had -- just finished with another

6        meeting just to refresh last Monday about the issues of

7        the Day of Silence.  And I -- my thing was, okay, if you

8        gonna set a time aside -- we got day of respect.  That's

9        for everybody.  But then you turn around, you have a

10       special day for homosexual kids where all the kids says,

11       not a problem, but racism is.  So you don't have -- if

12       you gonna have a special day, why don't we deal with

13       what the real problem is in this school, which at that

14       time was racism.

15  Q.   So what did you do to express your concern with the

16       school's decision?

17  A.   We sit down and says, okay, why are we having this day,

18       taking a whole day out to celebrate a lifestyle?

19  Q.   And did you bring people to the school to protest?

20  A.   That was only after they said, we gonna go ahead and do

21       it anyway, the next year.  And so we had -- the

22       following year I asked, are you gonna have this Day of

23       Silence?  Well, if you wanna day of -- I said, why not

24       do it the way Christians do it?  We come in early,

25       before school, we go out the flagpole, we pray.  School

```
 1          is for education, not indoctrination, and they can do it

 2          after school.  No big deal.  We're not saying you can't

 3          do it, we're just saying, this is time for education

 4          during the day.

 5               Well, you can have a special day, if you want, for

 6          Christians.  That is defeating why I'm here.  If I did

 7          that, I'm hypocrite.  I'm saying, if we got a day of

 8          respect, why not put everything on the one day?

 9  Q.      So did you have a rally organized in 2008 --

10  A.      Yes, we did.  And over half the parents kept their kids

11          out of school that day.

12  Q.      And did you bring people from the church with you?

13  A.      Church, the community, because I live in the community.

14          We had people, I mean, come from all over to come and

15          stand with us --

16  Q.      How many people --

17  A.      -- at that rally.

18  Q.      -- do you think?

19  A.      Oh, my goodness.  I don't -- please, I really don't

20          know, but probably five or six hundred.  I don't know.

21          So yeah, something like that.

22  Q.      And were there any people there that were taking the

23          opposite position and supporting --

24  A.      Did you see --

25  Q.      -- the day?
```

Page 27

1   A.   -- some of the paperwork that they put in up there?  I

2        mean, we had homosexuals and homosexual activists that

3        literally tried to start fights with me.  And I'm always

4        surrounded by people when I'm in public and people gonna

5        know I'm there, because the worst thing I could ever do

6        is to start a problem and hit someone.  And that's

7        exactly what they tried to do.  There was kids standing

8        next to me with a sign, "Throw Rocks Here."  You know,

9        there's not a lotta love and a lotta tolerance in that

10       sign.

11            And we had to call the police, which was there,

12       that they were supposed to keep us separated at this

13       rally.  That was the whole issue that we were supposed

14       to do, and they didn't.  When I first walked up, I had

15       all these homosexual kids and homosexual activists come

16       to me, and here I am surrounded, with four or five guys

17       around me trying to protect me from all of them.

18   Q.   And so the police did respond when you called?

19   A.   Well, they was there.  They were standing there looking.

20       And I said, hey, don't you guys think you better move up

21       here?  Don't you think you better move -- we supposed to

22       have separate places for the crowd, those that are

23       standing against the Day of Silence and those that are

24       for it, and you're not doing your job.

25   Q.   And did they --

Page 28

1   A.   And I expect you to do your job.  And they finally did

2        move 'em back and put up a barrier, a rope.

3   Q.   Between the two groups, the rope?

4   A.   Between the two groups.

5             The things that were said, the language that was

6        used -- my wife was attacked with words, abusive, called

7        her a nigger lover, called us homophobes, hateful

8        people.  They -- I mean, I can't even say some of the

9        things that they were saying right there with the

10       television and the cameras.  But all of a sudden, none

11       of those things was on the news.

12  Q.   And were any rocks thrown?  You said there was a sign

13       about --

14  A.   No.  I mean, they -- that's what the sign was saying,

15       and he was standing right next to me with the sign over

16       my head, "Throw Rocks Here."

17  Q.   Was anything thrown?

18  A.   Oh, no.  I mean, that wouldn't have happened.

19  Q.   By either group.  No -- neither group threw things.

20  A.   No, mm-mm.

21  Q.   Did either group sink to the level of physical violence?

22  A.   No.  Oh, no.  I mean, it definitely wouldn't come from

23       our side.  And everybody knows I'm not a pacifist.

24  Q.   But you didn't react with --

25  A.   No.

| | | |
|---|---|---|
| 1 | A. | I don't know.  Probably about five minutes. |
| 2 | Q. | So about a five-minute response time. |
| 3 | A. | Mm-hm. |
| 4 | Q. | And when -- five minutes later, the police separated the |
| 5 | | groups; is that -- |
| 6 | A. | Mm-hm. |
| 7 | Q. | -- correct? |
| 8 | | And how far apart did the police then keep the |
| 9 | | groups? |
| 10 | A. | It look like it's about 15, 20 yards, yeah. |
| 11 | Q. | And do you think that, because they separated the |
| 12 | | groups, that that prevented any sort of violence |
| 13 | | occurring? |
| 14 | A. | I know it did. . |
| 15 | Q. | So do you think that the police were instrumental in |
| 16 | | helping to prevent violence? |
| 17 | A. | Oh, I mean, if there was no police there, it would |
| 18 | | have -- I think would have broken out into some type of |
| 19 | | violence. |
| 20 | Q. | That's a very strong statement, to state that the police |
| 21 | | aren't doing their jobs.  So -- |
| 22 | A. | Yeah, it sure is. |
| 23 | Q. | -- do you believe -- |
| 24 | A. | And I -- |
| 25 | | MR. PIDGEON:  I object to that -- |

1              MS. EGELER:  Excuse me --

2              MR. PIDGEON:  -- statement and as to the form of

3         the question.

4    Q.   (by Ms. Egeler)  After you asked them to split up the

5         group and they did so, did you continue to feel that the

6         police were not doing their job?

7    A.   After they -- the head superior officer got there, they

8         did a great job moving everyone back.  It was -- we had

9         some 45 minutes before that separation took place.  It

10        started from the moment I got out the car and I started

11        walking towards the school.  They saw me coming and then

12        here comes the whole crowd that was representing the

13        homosexual group and activists.  They met me and walked

14        up to me long before we even got to the place.  And

15        that's how it all started.  As we moved toward, more and

16        more came and got around me and surrounded me.

17   Q.   They surrounded you and told you that they disagreed

18        with you; is that correct?

19   A.   That'd be a good statement to make, yes.

20   Q.   But they didn't surround you and physically abuse you.

21   A.   Oh, no, no.  I think, with all the guys that I have,

22        that that was not gonna take place.

23   Q.   Well, there were guys surrounding you and protecting

24        you.

25   A.   Right.

```
 1                But what did happen was, we had a big rally at
 2       Crossroads Baptist Church, and it was announced that we
 3       was gonna be using their church for our rally.  It was a
 4       worldview conference.  Had nothing to do with anything
 5       concerning this issue.
 6    Q. And when did -- when was that rally?
 7    A. It would be April of -- I think it was 2008, 2009.
 8    Q. Did the rally --
 9    A. It -- and it was concerning -- around the same time as
10       that Day of Silence, so I was in the news.  And they
11       came to work in the morning and there was grafitti
12       written all over the church, you know, homophobe this
13       and hater, and they took glue and stuck it in all of the
14       keyholes on the outside doors.  And I don't think
15       Crossroads had done anything to get those, but that's --
16       so it had to be because we was coming there that weekend
17       and use the building.
18    Q. Did the grafitti have any words?
19    A. Yes.  You'd have to ask the church, because they washed
20       it off pretty quick because people was coming in for a
21       rally that evening.
22    Q. Did you see the grafitti?
23    A. No.
24    Q. And that didn't have anything to do with Referendum 71,
25       then?
```

```
 1   A.   I couldn't tell you if it did or not.  But I do know if
 2        you are standing against them, you will be harassed and
 3        you will be attacked in words and threats.
 4   Q.   So the Mount Si rally that is in the newspaper article
 5        that we've put into the record and that you have there
 6        in front of you, that was in April of '08.  And you said
 7        you thought that the event at Crossroads was around the
 8        same time?
 9   A.   Mm-hm.
10   Q.   So by around the same time, do you mean within that
11        spring of 2008?
12   A.   Yes.  I can get a specific date for you.  But we have
13        our worldview conference the same every year and we
14        usually have it in April.  Early May at the latest, but
15        it's usually April.
16   Q.   But it would be the same year, 2008 --
17   A.   Mm-hm.
18   Q.   -- as the rally?
19   A.   We had a rally in -- so it's '10 now.  We didn't do very
20        much in '9, like I said, because of treatment.  And '7
21        and '8 we had the -- '7 was the big rally, I think.
22   Q.   You were nodding, so I'm just going to ask again to make
23        sure we get it clearly on the record.
24   A.   Mm-hm.
25   Q.   You think that the Crossroads event would have been in
```

1       the spring of 2008.

2   A.  Yes, I believe so.  I don't think it was last year, I

3       think it was the year before.

4   Q.  Has there been any sort of attack or grafitti or

5       vandalism of the church office?

6   A.  No.  No, we got all security cameras and everyone knows

7       that the office is pretty well secure.

8   Q.  And we talked about two things occurring at your home,

9       the broken windows of the car --

10  A.  Mm-hm.

11  Q.  -- and the mail theft.  Anything else at your home?

12  A.  No.  I mean, with security fences and dogs, there's not

13      very much going on at the house.

14  Q.  And you said your home address is public.

15  A.  Oh, yeah, everyone knows where I live.

16  Q.  Did you ever have anyone come to services and disrupt

17      services?

18  A.  Well, they've been to our service.  They don't disrupt.

19      I mean, I'm too much fun.

20  Q.  And by they, who do you mean?

21  A.  We've had many visitors that are homosexual.  One year,

22      right after we did -- had the Microsoft -- when that was

23      huge news, we had a boycott.  The homosexual community

24      boycotted the church service.  And so they let us know

25      they was coming.  So all of a sudden, you know, okay,

1    what is gonna be the issue if we have them show up at

2    our church and what is gonna take place and how do we

3    wanna make sure that they're safe and we're safe?

4        So right before the service, we had taken -- it was

5    gonna be a hot day.  It was in the summer -- I think it

6    was August -- and I'm -- it's been four or five years

7    now.  And we said, hey, let's get some water out there,

8    let's get some refreshments for 'em and let 'em know,

9    hey, you're more than welcome to come in.  We're welcome

10   to come in?

11       Said, yeah, you're more than welcome to come in.

12   You can't come in as a protester, but you can come in as

13   wanna see what goes on in our church.  Because they were

14   saying, you know, I'm preaching against homosexuals

15   every Sunday -- I mean, that's my number-one message --

16   which is, you know, not true.  And so they couldn't

17   believe we invited 'em in.  So they did.  They all

18   walked in, they all sit down.  I said, you know, be

19   great if you guys just split up and enjoy yourselves

20   like anyone else that's coming into the church.

21       I stood up in front of the church and says, ladies

22   and gentlemen, we wanna let you know that the protesters

23   outside is no longer protesting.  They're inside the

24   church here with us and they come to share with what

25   we're gonna do.  The church applauded, told 'em, thanks

Page 54

```
1        for coming.  We had a great sermon, great singing.  And

2        when they got through, they stayed around after that

3        service almost 45 minutes to an hour just talking and

4        beginning to get a good understanding about where I

5        stood.

6             And they -- two girls come up to me and said, it's

7        not about hatred, is it, of homosexuals?  Go, no, it's

8        not.  She says, you don't like anything the Bible don't

9        like.  Yeah, that's where I stand.  They says, okay, we

10       can understand it.  If we wanna be a part of your

11       church, could we?  I said, absolutely, as long as you do

12       what the Bible say and repent of any wrong you're doing

13       like anybody else.

14   Q.  And so it sounds like they were well behaved and --

15   A.  Well behaved and well accepted and had a great time,

16       because we're a lotta fun.

17   Q.  And you said a lot of other people have come.

18   A.  We have visitors there all the time because, I mean,

19       things come out in the paper that I've said, whatever,

20       you know.  You know that someone's there listening.

21   Q.  Just listening or have you ever had anyone be

22       disruptive?

23   A.  Oh, no, no.  We got -- you know, our church is really

24       organized and we really want folks to enjoy, but we

25       really -- everyone knows that you come in, you come in,
```

1       the freedom to threaten, what would the average citizen

2       do if their name gets out there and feel threatened?

3    Q. Well, let's talk about what you said.  You said that

4       there have been so many comments that they want to take

5       you out.  How many were there saying they want to take

6       you out specifically with connection to your stance on

7       Referendum --

8    A. I don't think you can tie them in --

9    Q. Excuse me; let me finish.

10   A. Okay.

11   Q. -- specifically with respect to your stance on

12      Referendum 71?

13   A. I don't think you can separate that in my life.

14   Q. Then how many have you received -- how many phone calls

15      or messages have you received that talk about taking you

16      out?

17   A. Oh, my land.  You know, if it was less than 900, I would

18      probably -- that's very conservative in the last four or

19      five years.

20   Q. And do you think that these people that make those kind

21      of remarks are cowards just using words?

22   A. I don't take the chance that they're cowards.  Someone

23      that says that has got it in their mind.

24   Q. Have you ever seen someone act on it?

25   A. Well, I think the group that was up there at Mount Si

1    they -- and that's why we had police everywhere at that

2    rally.  I mean, we had state police, we had Seattle

3    Police, we had everyone there because I had gotten so

4    many threats; I mean, hundreds and hundreds of

5    threats --

6  Q.  Do you feel that --

7  A.  -- to my life.

8  Q.  -- that the police stopped violence from occurring?

9  A.  I guarantee you they did.

10 Q.  So were you pleased with the police response?

11 A.  I was, very.  The King County at the time -- boy, how

12     many years ago was that?  Because Reichert was the head

13     of the sheriff's department at that time.  And when they

14     started, they -- because we thought they may try to come

15     down on the field from the stands.  And he just -- he

16     gave a word, they went down, they stood down along the

17     walls, and that shut that down immediately.  We had

18     three or four hundred other protesters outside blocking

19     people from getting in.  And so it was not the kind of

20     thing where you feel loved.

21 Q.  So how were people able to get in if they were blocked?

22     Did the police --

23 A.  They --

24 Q.  -- help with that?

25 A.  Yes.  They just kept -- you know, people just didn't say

```
 1        anything.  We had said, look, don't say anything, keep
 2        focused.  You're probably gonna run into protesters, but
 3        just get to the stadium, and you've got protection there
 4        and you're gonna be okay.
 5   Q.   So do you know if any of your parishioners signed
 6        Referendum 71?
 7   A.   I'm sure they did.  I mean, yeah.
 8   Q.   And do you know of any of them being attacked or
 9        harassed or threatened?
10   A.   No.  They enjoy attacking their pastor.
11   Q.   So the --
12   A.   Most of the people, if it's gonna be an attack, it's
13        gonna be towards me.  Very seldom they gonna just come
14        at our people.  They don't know our people.  They don't
15        know where they stand.  But if this -- their names get
16        out, what's gonna keep 'em from being harassed and
17        attacked?
18   Q.   But do you know of anyone being -- in your church other
19        than you, who've been very public and are the center --
20   A.   Right.
21   Q.   -- and focal point of your church, do you know of any
22        ordinary parishioners attracting threats or harassment
23        as a result of signing the petitions?
24   A.   No.  No, I could not say that I know anyone personally.
25        But people don't know 'em.  They don't know who they
```

1                             CERTIFICATE

2     STATE OF WASHINGTON )

                          )

3     COUNTY OF SNOHOMISH )

4              I, the undersigned Notary Public in and for the

5     State of Washington, do hereby certify:

6              That the foregoing is a full, true, and correct

7     transcript of the testimony of the witness named herein,

8     including all objections, motions, and exceptions;

9              That the witness before examination was by me duly

10    sworn to testify truthfully and that the transcript was made

11    available to the witness for reading and signing upon

12    completion of transcription, unless indicated herein that the

13    witness waived signature;

14             That I am not a relative or employee of any party

15    to this action or of any attorney or counsel for said action

16    and that I am not financially interested in the said action

17    or the outcome thereof;

18             That I am sealing the original of this transcript

19    and promptly delivering the same to the ordering attorney.

20             IN WITNESS WHEREOF, I have hereunto set my hand and

21    seal this 7th day of October, 2010.

22

23         _____

           Notary Public in and for the State of Washington

24                residing at Edmonds, Washington.

                  (Notary expires 3/09/13)

25                     (CCR No. 2699)