# EXHIBIT 7

```
 1                    UNITED STATES DISTRICT COURT
 2                   WESTERN DISTRICT OF WASHINGTON
 3                            AT TACOMA
 4        _____
 5   JOHN DOE #1, an individual; JOHN      )
     DOE #2, an individual; and PROTECT    )
 6   MARRIAGE WASHINGTON,                  )
                                           )
 7                         Plaintiffs,     )
                                           )
 8        v.                               )
                                           )  No. 09-CV-05456-BHS
 9   SAM REED, in his official capacity    )
     as Secretary of State of Washington;  )
10   BRENDA GALARZA, in her official       )
     capacity as Public Records Officer    )
11   for the Secretary of State of         )
     Washington,                           )
12                                         )
                          Defendants.      )
13        _____
14                Deposition Upon Oral Examination
                                 Of
15                            REDACTED
          _____
16
17
18
19
20
21
22   Taken by:  Tracey L. Juran, CCR
                CCR No. 2699
23
24   September 24, 2010
25   Everett, Washington
```

1    possibly change the outcome of the election.

2        I haven't been hiding anything -- I answer frankly

3    when I am asked where I stand on issues -- but I do not

4    want to be portrayed as a single-issue candidate.  And

5    my focus all along has been on jobs, education, and

6    fiscal responsibility.  My campaign is not about the

7    social issues.

8  Q.  I can tell you that the trial in this case would not

9      occur prior to the election.  In fact --

10 A.  Mm-hm.

11 Q.  -- our next time that we go just to talk to the judge

12     about when the court date will be set isn't until

13     November 15th, so it will be after the election.

14        With that understanding, would you have any

15     concerns about publicly testifying in a federal court?

16 A.  No.

17 Q.  If you're ready now, I'd like to --

18 A.  Sure.

19 Q.  -- explore that phone call that you received.

20 A.  Yes.  So let me give a little bit of background.  My

21     parents were visiting from Illinois and my sister --

22     youngest sister, also from Illinois, were visiting and

23     were staying with us in order to attend the campaign

24     kickoff on the 24th.  On Sunday morning, the 23rd,

25     the -- I was on the front page of the newspaper with the

1    article that we've spoken about.

2         And at 6:00 that night, we received a phone call on

3    our unlisted home phone number.  My 13-year-old answered

4    the phone -- REDACTED is his name -- and I heard him

5    say, yes, just a moment, please.  Mom, it's for you.

6    And I was in the living room, he was in the kitchen.

7    It's an open -- kind of open hallway there.  And as I

8    walked across the floor towards the phone, his face went

9    white and he said, Mom, you just got a death threat.  He

10   said, I will kill you and your family.

11        I continued walking towards the phone as he was

12   relaying this to me, and right when he finished I was at

13   the phone and picked it up, but the man had already hung

14   up.  My parents were in the room sitting on the couch

15   and my husband was in the room and my 6-year-old

16   daughter was in the room, and all of us became

17   immediately frightened and very aware of where the

18   windows are.  I was immediately angry and resolved --

19   Q.  Do you --

20   A.  -- that I would not back down from this candidacy from a

21   threat like that.

22   Q.  Do you have caller ID on your home phone number?

23   A.  We did not at that time.

24   Q.  Did you press star 69 to get the number?

25   A.  No, because we don't have caller ID.  So I thought about

```
1           calling star 69, but since it would just call him
2           back -- call an angry person back, I wondered, well, how
3           is that going to help anything?  Then I have an angry
4           man on the other end.  I still don't know his number.
5    Q.     So it's your understanding that star 69 dials the number
6           that just called?
7    A.     Yes.  I thought it would redial.
8    Q.     Is that still your understanding?
9    A.     I know that star 57 will trace a call.  The policeman
10          told me that.
11   Q.     And did you press star 57?
12   A.     No.  I did not know that until after the cops came.
13   Q.     And did you call the police when you received that
14          phone --
15   A.     Yes.
16   Q.     -- call?
17              And how long did it take them to respond?
18   A.     We live very near the police station in downtown Edmonds
19          and they were there, I would say, perhaps five minutes
20          or less.  It didn't take long.
21   Q.     So it was the Edmonds Police Department that you called,
22          the --
23   A.     Yes.
24   Q.     -- city police?
25   A.     Well, I called 911 and I assume I was immediately
```

```
 1           directly routed to the Edmonds Police.
 2    Q.     And do you remember the name of the officer who
 3           responded?
 4    A.     Yes.  It was Andrew Mehl, M-E-H-L.
 5    Q.     And did the officer take a report?
 6    A.     Yes.  He took two reports, one from me and one from my
 7           son.
 8    Q.     Did you make a written statement?  Is that the report
 9           that you're referring to?
10    A.     Yes, I believe I did.
11    Q.     And did the officer talk to you about the incident?
12    A.     Yes.  He tried to reassure me that death threats are
13           fairly common, which I found hard to believe.  He told
14           me that, if anything strange happened, that we should
15           call immediately.  He said, for example, if someone
16           seems to be watching the house or following you, you
17           need to report it.
18                He told us about how -- he said, put a Post-It note
19           by each one of your phones with star 57.  That will
20           redial -- or not redial, pardon me; will trace the call
21           and send the information to the police station.  So we
22           did that.  He recommended that we get phones with caller
23           ID and possibly even voice mail -- I mean, not voice
24           mail; what do you call it -- with an answering machine
25           so that we could tape messages or conversations.  We
```

Page 21

```
 1        haven't done that, but we did go out and purchase all
 2        new phones.
 3   Q.   And you said that you felt that this call was generated
 4        as a result of the article that had run in the REDACTED
 5        newspaper; is that correct?
 6   A.   Absolutely.  It was the same day.
 7   Q.   And did the caller say that?
 8   A.   No.
 9   Q.   Did the caller indicate that any position that you were
10        taking on any issue was what was triggering the death
11        threat?
12   A.   All that he said I've already told you.  He said, I will
13        kill you and your -- he said, is     REDACTED     there?
14        And -- oh, pardon me; I didn't tell you that.  But my
15        son told me and the policeman later that he had asked
16        for me by name and then had said to him, I will kill you
17        and your family, and he hung up.
18   Q.   So there was no indication of why he wanted to kill you
19        and your family.
20   A.   No.  But as you can see by reading the article, there's
21        nothing else in that article that would have elicited
22        such fury as to make a person dig to find an unlisted
23        home number and then call and then threaten a child.
24        There's nothing else in that article that could possibly
25        provoke that kind of emotional reaction.
```

1   Q.  Do you know if Tea Party activists have received any

2       negative publicity or response in this country?

3   A.  In this country, yes, but I'm not aware of any around

4       here who have received threats.

5   Q.  Are you aware of any angry words being said about Tea

6       Party activists in this state?

7   A.  Oh, sure.  Posts on blogs, I suppose, mm-hm.  But I had

8       already been in the paper as a Tea Party activist before

9       in the REDACTED and had not received a death threat from

10      those articles.  On     REDACTED    , I was -- there

11      was not a picture of me, but my words were on the front

12      page of the REDACTED and my name, and they said

13      that I was considering running for office.  So at that

14      point I was not yet a candidate, but I had spoken at a

15      large Tea Party rally in Everett on the 15th.

16          And so frankly, I think if it were based on just

17      the phrase "Tea Party," it would be likely that

18      something might have happened earlier.

19   Q.  But this REDACTED article was the first article after you

20      actually had filed for candidacy?

21   A.  There was an article in July.  I don't remember the

22      length of the article or if I was mentioned -- I can't

23      recall -- but there was a Fourth of July tea party in

24      Everett that received news coverage from the REDACTED.

25   Q.  And that was after you had announced your candidacy?

1   A.   Actually announced my candidacy at that rally --

2   Q.   And was --

3   A.   -- on the Fourth of July.

4   Q.   -- that a front-page article --

5   A.   No.

6   Q.   -- as well?

7   A.   No, it wasn't a front-page article.

8   Q.   And you're not sure if you were mentioned in the

9        article?

10  A.   No, I don't recall.  I might have been mentioned briefly

11       in it, but I don't recall.

12  Q.   So is it fair to say that given this newspaper article

13       that ran on   REDACTED , you suspected that the

14       individual who called was angry and expressing this

15       death threat as a result of the one sentence regarding

16       Referendum 71, but you don't know and it's a guess?

17  A.   Well, my cell-phone number was published in the article.

18       I don't know if it's in this -- no, it's not.  This

19       printed-out version does not show -- on the newspaper,

20       there was also a little square next to it that talked

21       about the kickoff the next day.  It gave the time and

22       the place of the kickoff and it gave the Web site and

23       the phone number, the campaign phone number, which is

24       also my personal cell number.  And they did not call

25       that number.  The person who did this took the time to

1      dig and find the unlisted home phone number.

2  Q.  But my question is, it's -- it is -- I understand the

3      circumstances surrounding it and why you have your

4      belief, but it is just a belief and a guess and not

5      fact, correct --

6          MR. PIDGEON:  I'm going to object --

7  Q.  (by Ms. Egeler)  -- with respect to your --

8          MR. PIDGEON:  -- as to form of the question.

9          MS. EGELER:  Excuse me; I'm still asking the

10     question.

11  Q.  (by Ms. Egeler)  -- with respect to your assumption that

12     this individual was responding to the sentence in the

13     newspaper article that talked about Referendum 71?

14         MR. PIDGEON:  Objection to the form; calls for a

15     legal conclusion.

16          Go ahead and answer.

17  A.  Frankly, as I said before, I see no other possible

18     sentence in this article that could cause that kind of

19     emotional reaction.

20  Q.  (by Ms. Egeler)  Let me ask it differently.

21         Do you know if the individual who called was

22     mentally ill?

23  A.  How could I possibly know that when I don't know who it

24     is?

25  Q.  Is the answer no, then?

Page 30

```
 1   A.   -- but they didn't.
 2   Q.   Did the police officer explain to you that there's a way
 3        for you to do that?
 4   A.   No.
 5   Q.   Do you -- did you ever see the police incident report?
 6   A.   No.
 7        MS. EGELER:  Okay, let's mark this as Exhibit
 8        No. 2.
 9             [Exhibit 2 marked for identification]
10   Q.   (by Ms. Egeler)  We have marked as Exhibit No. 2 to your
11        deposition a police report dated August 23rd, 2009, and
12        this purports to be a report regarding an incident at
13        your home.
14   A.   Mm-hm.
15   Q.   The report states in the last paragraph --
16   A.   Mm-hm.
17   Q.   -- the third sentence, that the officer advised you that
18        he would do extra patrols of your house and advise the
19        other patrol squads.
20   A.   Mm-hm.
21   Q.   Do you know if the officers did that?
22   A.   No, I don't know.
23   Q.   Do you have any reason to believe that the police had --
24        that he promised you something that he didn't deliver?
25   A.   No.
```

1   Q.   And then on the next page, it's dated August 24th and it

2       states that there was a follow-up call to you.  Do you

3       recall receiving a follow-up call the next day from the

4       officer?

5   A.   Yes.

6   Q.   And I'll just read the first paragraph.  "I called

7       V-1/REDACTED to inquire as to whether or not anyone had

8       tried to do call tracing on the incoming call yesterday.

9       V-1/REDACTED said that they had not as they were not

10      familiar with the service.  I provided her with

11      instructions for doing so should she get" any "more

12      suspicious/threatening calls."

13  A.   Yes.

14  Q.   Did he at that time explain to you how to call the phone

15      company and get incoming-call records?

16  A.   That is when he told me about star 57.  And this is, as

17      you noticed, the next day.

18  Q.   I'm confused, because earlier you said that when he came

19      to your house on the 23rd, he instructed you to put

20      those stickies near all of your phones.

21  A.   Well, I must be misremembering.  He must have told us

22      that the next morning.  It was over a year ago.

23  Q.   And were you pleased that he called and followed up?

24  A.   Yes, I believe so.

25  Q.   And that day at your kickoff, did you see any suspicious

1   A.   -- would have reported them to the police.

2   Q.   And there are no documents -- no other documents,

3        nothing responsive to the subpoena.

4   A.   No, I don't believe so.

5   Q.   I just wanted to cover that and make sure that there

6        wasn't something that you'd brought with you that we

7        needed to discuss.

8   A.   Mm-hm.

9   Q.   So if something else had happened, you just said you

10       would call the police?

11  A.   Absolutely.

12  Q.   What's your opinion generally of police officers in this

13       state?

14  A.   I think I respect the police officers in this state.  I

15       think they do a good job.  I do have some concerns, but

16       overall, I think they're doing their job to the best of

17       their ability.

18  Q.   And after the Referendum 71 election had concluded in

19       November of 2009, there's an incident that you were

20       referring to regarding your son.

21  A.   Mm-hm.

22  Q.   Can you tell me about that now.

23  A.   Yes.  On -- at the end of January, the final weekend in

24       January, my son and I were at a conference for

25       Republicans at Ocean Shores.  And on Sunday morning, we

1    checked out of our hotel and were walking to the car.

2    My son was following me in the lobby, but when I got to

3    the car, I realized he wasn't with me.  I began to put

4    the bags that I was carrying into the car and then

5    closed the back of the car, wondering what had happened

6    to him.

7         And then he showed up and he was covered head to

8    toe in applesauce:  On his hat, which was an REDACTED

9    REDACTED campaign hat, his coat, his blue jeans, his shoes,

10   his suitcase, and a hanging clothes bag that he had had

11   on one arm.  And I said, what happened to you?  And he

12   said, these people drove by and threw applesauce --

13   threw this all over me.  And I said, did you get the

14   license plate?  He said, no.

15        And I said, okay, well, let's get you cleaned up

16   and then go in and ask if there's a video camera,

17   security camera.  So I helped him get cleaned up and

18   then he went back in to ask.  And I've just finished --

19   I was cleaning off the bags before putting them in the

20   car.  He came back and said that the hotel did not have

21   security cameras outside.  This had happened right

22   outside the hotel in the portico.

23        And so at that point, I -- oh, and I remember I

24   also walked around the car to see if perhaps our car had

25   been vandalized.  I was concerned.  I didn't know if it

Page 123

1                              CERTIFICATE

2     STATE OF WASHINGTON )
                          )
3     COUNTY OF SNOHOMISH )

4              I, the undersigned Notary Public in and for the

5     State of Washington, do hereby certify:

6              That the foregoing is a full, true, and correct

7     transcript of the testimony of the witness named herein,

8     including all objections, motions, and exceptions;

9              That the witness before examination was by me duly

10    sworn to testify truthfully and that the transcript was made

11    available to the witness for reading and signing upon

12    completion of transcription, unless indicated herein that the

13    witness waived signature;

14             That I am not a relative or employee of any party

15    to this action or of any attorney or counsel for said action

16    and that I am not financially interested in the said action

17    or the outcome thereof;

18             That I am sealing the original of this transcript

19    and promptly delivering the same to the ordering attorney.

20             IN WITNESS WHEREOF, I have hereunto set my hand and

21    seal this 12th day of October, 2010.

22

23        _____

          Notary Public in and for the State of Washington
24                    residing at Edmonds, Washington.
                        (Notary expires 3/09/13)
25                         (CCR No. 2699)

Tracey Juran, Certified Court Reporter

# EXHIBIT  8

Page 1

1                   UNITED STATES DISTRICT COURT

                            FOR THE

2                 WESTERN DISTRICT OF WASHINGTON

3    _____

     JOHN DOE #1, et al.,                )

4                                         )

                    Plaintiffs,           )

5                                         )

            vs.                           )   NO. 09-cv-05456-BHS

6                                         )

     SAM REED, et al.,                    )

7                                         )

                    Defendants.           )

8    _____

9          DEPOSITION UPON ORAL EXAMINATION OF     REDACTED

     _____

10

11

12

13

14                      October 1, 2010

15                     Olympia, Washington

16

17

18

19

20

21

22

23

24              DIXIE CATTELL & ASSOCIATES

          COURT REPORTERS & VIDEOCONFERENCING

25          (360) 352-2506   **   (800) 888-9714

EGELER (REDACTED, 10/1/10)

Page 44

| | | |
|---|---|---|
| 1 | A | 9. |
| 2 | Q | What it might be helpful to do, before we discuss the |
| 3 | | details of them, is to have you describe what each of these |
| 4 | | exhibits are.  If you want to start with Exhibit No. 8, if |
| 5 | | you could tell me what that is. |
| 6 | A | Okay.  Are we on now? |
| 7 | Q | We are on. |
| 8 | A | Exhibit 8 is one of two examples that I took from the |
| 9 | | Internet just, I believe, yesterday, the date that I pulled |
| 10 | | these.  Actually it was Monday, I guess, the 27th.  There's |
| 11 | | two examples of pages of Google or Bing about me, about |
| 12 | | Faith and Freedom, and that are attack. |
| 13 | Q | I don't understand what Exhibit No. 8 is.  I don't see a Web |
| 14 | | site listed on this.  Is this a printing from a Web site? |
| 15 | A | It is a printing from a Web site. |
| 16 | Q | It was printed when? |
| 17 | A | It was printed Monday, the 27 -- September 27th. |
| 18 | Q | What is the Web site? |
| 19 | A | It's John Bisceglia and his name is on the first page of the |
| 20 | | 8. |
| 21 | Q | But what's the Web site? |
| 22 | | THE WITNESS:  What's the name of his Web site?  I |
| 23 | | don't know. |
| 24 | Q | (By Ms. Egeler)  You don't know what Web site this came |
| 25 | | from? |

EGELER ( REDACTED , 10/1/10)

Page 45

| 1 | A | I don't know the name of it.  I didn't realize that I should |
| 2 | | have brought the whole Web site.  I brought his most recent |
| 3 | | advocating for death. |
| 4 | Q | Did you copy things from a Web site and put them -- |
| 5 | A | Yes. |
| 6 | Q | -- in another document and then print? |
| 7 | A | No.  I just printed them off his Web site. |
| 8 | Q | Okay.  I'm -- |
| 9 | A | Directly to the printer. |
| 10 | Q | Because there's no Web site listed at the bottom of the |
| 11 | | page, but you're representing that John Bisceglia has a Web |
| 12 | | page? |
| 13 | A | Yes. |
| 14 | Q | And you did not alter in any way what appears there by |
| 15 | | deleting some of it, including other parts? |
| 16 | A | I did not, no. |
| 17 | Q | So you just pressed print and this is what came out? |
| 18 | A | Yeah, that's correct.  I apologize for not getting -- I was |
| 19 | | trying to save a little paper. |
| 20 | | 8, No. 8, is -- there's a list of people there: |
| 21 | | Senator John McCain, Tony Perkins.  These are national |
| 22 | | people.  REDACTED , REDACTED , Stephen Pidgeon, Bob |
| 23 | | Struble, Senator Val Stevens, Senator Dan Swecker, |
| 24 | | Representative Matt Shea. |
| 25 | Q | It's okay.  You don't need to read them off.  This will be |

EGELER (Gary Randall, 10/1/10)

Page 46

| | | |
|---|---|---|
| 1 | | in the record, so all of these names will be there. |
| 2 | | What is your concern? |
| 3 | A | Okay.  The title of -- well, he's advocating that someone |
| 4 | | kill us. |
| 5 | Q | Where is that stated? |
| 6 | A | On the next page and throughout the Web site, he states that |
| 7 | | we are trying to hurt him and his children and other |
| 8 | | people's children of -- that are gay. |
| 9 | | And he said on page 2 -- and this is just recent.  You |
| 10 | | can go back years on this -- "Now just try to tell me that |
| 11 | | we don't have serious reasons to defend ourselves and our |
| 12 | | children and maybe your children also of all sexual |
| 13 | | orientations from the hate speech spewed from Christian |
| 14 | | mouths." |
| 15 | | So how does he suggest that they protect themselves? |
| 16 | Q | Can you show me where you're reading that?  I'm not tracking |
| 17 | | you. |
| 18 | A | Page 2. |
| 19 | Q | So is that the back of the first page?  Correct? |
| 20 | A | No.  I'm sorry.  It's the -- it would be page 3 -- |
| 21 | Q | So -- |
| 22 | A | -- the way this is copied. |
| 23 | Q | So at the -- |
| 24 | A | No, the middle, middle of page 3. |
| 25 | Q | But just to identify what page we're on, at the very top |

EGELER (Gary Randall, 10/1/10)

Page 47

| | | |
|---|---|---|
| 1 | | there, it's got in parens 44.6 percent? |
| 2 | A | Yes. |
| 3 | Q | Are we on the same page? |
| 4 | A | Yes, that's correct. |
| 5 | Q | So where on the page did you want me to look? |
| 6 | A | Right in the middle, the bold type, "Now to just try to tell |
| 7 | | me that we don't have serious reasons to defend ourselves |
| 8 | | and our children and maybe your children also of all sexual |
| 9 | | orientations from the hate speech spewed from Christian |
| 10 | | mouths." |
| 11 | | This is -- on the last page of this is -- |
| 12 | Q | Can we stay with this page and the piece that you just |
| 13 | | identified?  Can you explain to me what your concern is with |
| 14 | | this? |
| 15 | A | Well, my concern is that there's a continued advocacy or |
| 16 | | violence on the part of this man. |
| 17 | Q | I see the piece that you've just read about defending |
| 18 | | ourselves.  Can you show me where there's an advocacy for |
| 19 | | attacking or killing someone? |
| 20 | A | On the previous page, it says, "You see," and there's a |
| 21 | | check beside it -- |
| 22 | Q | Right. |
| 23 | A | -- would be the back of page 1 per the copies you just made. |
| 24 | | "You see, I get very angry and feel an intense need to |
| 25 | | defend innocent people from harm's way when I read about the |

EGELER ( REDACTED  10/1/10)

Page 48

| | | |
|---|---|---|
| 1 | | family tragedies below.  Knowing that they are a direct |
| 2 | | result of the ignorance, lies, misinformation, bigotry, |
| 3 | | pure-evil hatred of LGBTQ people is promoted daily by many |
| 4 | | Christian groups.  I feel an intense need to defend innocent |
| 5 | | life from these assaults.  As a child advocate and early- |
| 6 | | childhood teacher, I especially feel compelled to protect |
| 7 | | children." |
| 8 | Q | Yes.  And what is your concern with that paragraph that you |
| 9 | | just read in? |
| 10 | A | The list on the previous page, the first page, says, "Here |
| 11 | | is a list of people whose mere existence is a serious threat |
| 12 | | to our safety."  The fact that we exist is the threat. |
| 13 | Q | Okay. |
| 14 | A | The last page that I copied here and there's -- there is |
| 15 | | reams. |
| 16 | Q | Let's stop.  Let's stop.  I just asked you about the |
| 17 | | paragraph that appears on the back of page 1.  You read in a |
| 18 | | paragraph that begins, "You see, I get very angry and feel |
| 19 | | an intense need to defend innocent people," et cetera, |
| 20 | | et cetera. |
| 21 | | Please explain to me how you feel that that is a threat |
| 22 | | or harassment. |
| 23 | A | Because he's advocating using a gun on his Web site. |
| 24 | Q | Please show me where he advocates using a -- |
| 25 | A | That's what I was doing. |

EGELER ( REDACTED, 10/1/10)

Page 49

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | The last page, there's a picture and it's very prominent on |
| 3 | | his Web site, "The abuse needs to stop.  Now.  Armed gays |
| 4 | | don't get bashed.  Pinkpistols.org." |
| 5 | Q | And where does it advocate using guns on people and killing |
| 6 | | them as opposed to defending one's self from attack? |
| 7 | A | I'm suggesting that listing a list of names who are |
| 8 | | pro-marriage, talking about the violence that these people, |
| 9 | | myself included, are perpetrating upon the gay community and |
| 10 | | advocating that abuse stops -- needs to stop now and the |
| 11 | | picture of a gun held in the hands of an individual is |
| 12 | | suggesting violence against this list, and that's exactly |
| 13 | | what he's doing. |
| 14 | Q | Mr. REDACTED, do you belong to the NRA? |
| 15 | A | I do not.  I resigned. |
| 16 | Q | Do you support individuals' rights to bear arms? |
| 17 | A | I do. |
| 18 | Q | Do you support the right of individuals to defend themselves |
| 19 | | if attacked? |
| 20 | A | I do. |
| 21 | Q | Does that mean that you support assertively going up to |
| 22 | | people that you don't agree with who have not physically |
| 23 | | attacked you, and rather than defending yourself, |
| 24 | | aggressively killing them? |
| 25 | A | You'll have to restate that question. |

EGELER (REDACTED, 10/1/10)

Page 50

| | | |
|---|---|---|
| 1 | Q | I thought it was an easy one. |
| 2 | A | I didn't realize I was on trial. |
| 3 | Q | Do you believe that individuals have a right to bear arms to |
| 4 | | defend themselves -- |
| 5 | A | Yes. |
| 6 | Q | -- or to -- do you feel that individuals, therefore, also |
| 7 | | have a right to bear arms to attack others who have not |
| 8 | | physically attacked them? |
| 9 | A | No. |
| 10 | Q | Can you please show me in this document, Exhibit No. 8, |
| 11 | | where this individual asserts that it would be appropriate |
| 12 | | to assertively attack someone as opposed to defending one's |
| 13 | | self? |
| 14 | A | There is a very easy, if one wants to make that |
| 15 | | assumption -- |
| 16 | Q | I'm not asking for assumptions. |
| 17 | A | -- easy transition -- |
| 18 | Q | Sir, I'm asking you to show me the words that assert that an |
| 19 | | assertive attack would be appropriate as opposed to |
| 20 | | defending ones' self. |
| 21 | A | The whole Web site is hate. |
| 22 | Q | I'm asking you -- |
| 23 | A | It is not on the page -- he does not advocate pulling the |
| 24 | | trigger on REDACTED on these pages. |
| 25 | Q | Where in this document does he advocate pulling the trigger |

EGELER ( REDACTED , 10/1/10)

Page 51

| 1 | | on anyone who has not attacked physically innocent people? |
|---|---|---|
| 2 | A | He does not. |
| 3 | Q | Thank you. |
| 4 | | Can you describe for me what Exhibit No. 9 is? |
| 5 | A | This is a Web site that was apparently set up as a mock to |
| 6 | | mock faith-based or traditional value-based organizations. |
| 7 | | They define themselves as Faith Not Freedom News. |
| 8 | Q | And that's the Web site that appears at the bottom left-hand |
| 9 | | corner of what you've printed.  Is that correct? |
| 10 | A | Yes. |
| 11 | Q | And the date that you printed it, is that reflected in the |
| 12 | | bottom right-hand corner? |
| 13 | A | Yes. |
| 14 | Q | Okay. |
| 15 | A | "Faith Not Freedom is an organization dedicated to |
| 16 | | supporting the work of Washington State theocrats, most |
| 17 | | notably Faith and Freedom Network," et cetera.  They -- |
| 18 | | page 2 -- 3. |
| 19 | Q | And because what I copied for us in the original are a bit |
| 20 | | different -- |
| 21 | A | Yes. |
| 22 | Q | -- and our copies are two-sided, let's identify the page |
| 23 | | you're on.  Is that the one at the top that says, "Pam's |
| 24 | | Blend" -- |
| 25 | A | "Pam's Blend of Perversion Tries to Out Our Agenda." |

EGELER (REDACTED, 10/1/10)

Page 52

1   Q   Okay.

2   A   Keep in mind that these people are speaking in a mockery

3       position, okay, as though they agree with Faith and Freedom

4       and REDACTED . "It should be of no surprise that the

5       radical lesbian, Pam Spaulding tries to out my hero, REDACTED

6       REDACTED ." I'm not their hero.

7           They quote Pam Spaulding here as saying, "From

8       REDACTED's point of view, if I disagree with someone who says

9       that I should be executed because I'm gay, then somehow I'm

10      being intolerant of that person's religion. The kind of

11      tolerance REDACTED is looking for leads to violence. Should

12      I condone my own execution? REDACTED apparently thinks so.

13      REDACTED's sickeningly ended his post with a plea for

14      donations to what he calls this ministry. He is using his

15      authority as a Christian minister to broadcast to the world

16      his certainty that I and every other gay person deserve

17      death. When we" -- "when will the press and general society

18      stop giving people like REDACTED a pass because he calls

19      himself a Christian and a pastor and uses nice words like

20      'faith.' Let's recognize his words for what they are: a

21      condoning of lethal violence against gay people."

22          Now, there -- surely we can make a linkage because

23      these people are all reading these sites. Surely we can

24      make a linkage between Pam Spaulding saying and being

25      requoted on this mock site that REDACTED is advocating

EGELER (REDACTED, 10/1/10)

Page 53

1   lethal violence against gay people.  That is a lie and that

2   is slander, I am certain.  I'm certain it is and we'll find

3   out about that.

4         But I will tell you that, with those kinds of words

5   being fed into the community, you have to create some kind

6   of linkage between what these people are saying and what

7   Bisceglia is saying and has said, and he did directly say

8   that   REDACTED  ,   REDACTED  , any churches and

9   government buildings that are involved in supporting Senate

10  Bill 5688 should be destroyed.  He's scrubbed that from his

11  Web site, but KIRO caught it before he scrubbed it and they

12  ran a story about it.

13  Q   Wait.  He said what now?  Can you repeat that?

14  A   There should be linkage because these people are all

15  communicating with one another.  They're all aware of each

16  other.

17  Q   My question is:  What did Bisceglia say that you claim was

18  scrubbed from his Web site?

19  A   John Bisceglia put on his Web site -- I saw it.  I did not

20  copy it.  KIRO 7 saw it and reported on it.  He said that

21  REDACTED  ,   REDACTED   should be killed, and that

22  church buildings and government buildings that were involved

23  with or supportive of the R71 effort should be destroyed.

24  That's why KIRO news picked it up, KIRO 7, not the radio,

25  and reported on it.

EGELER (REDACTED 10/1/10)

Page 54

1    Q    Do you remember those words --

2    A    He scrubbed it.

3    Q    -- exactly or are you guessing?

4    A    Well, I'm not guessing.  I remember it because, when people

5         advocate that I get killed, that tends to stick in your

6         mind.  Is it an exact quote?  I don't know.  He scrubbed the

7         site.

8    Q    When was it posted on his Web site?

9    A    I don't know.  But KIRO, especially if there's a legal

10        action taken, we can get the information from KIRO because

11        they ran the story because they called me about it and

12        interviewed me.

13   Q    When did you see it on his Web site?

14   A    When he put it up.

15   Q    When was that?

16   A    I don't remember the date.  I don't know, Anne.

17   Q    So you don't remember when you saw it, but you're certain of

18        the words?

19   A    Absolutely.

20   Q    So you can -- you're saying under oath now that --

21   A    Back then I didn't know it would be on trial now over this

22        having to recall that.  And I'm not out to get anybody.  If

23        I was out to get someone, I would have put out in the press

24        a long time ago that Senator Murray's foster son accuses him

25        of abusing him when he was a little boy.  I would have put

Page 156

1                    · C E R T I F I C A T E

2          I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3     and for the State of Washington, residing at Lacey, do hereby

4     certify:

5          That the foregoing deposition of   REDACTED   was taken

6     before me and completed on the 1st day of October, 2010, and

7     thereafter transcribed by me by means of computer-aided

8     transcription; that the deposition is a full, true, and complete

9     transcript of the testimony of said witness;

10         That the witness, before examination, was by me duly sworn

11    to testify the truth, the whole truth, and nothing but the truth,

12    and that the witness reserved signature;

13         That I am not a relative, employee, attorney, or counsel of

14    any party to this action or relative or employee of any such

15    attorney or counsel, and I am not financially interested in the

16    said action or the outcome thereof;

17         That I am herewith securely sealing the deposition of REDACTED

18    REDACTED and promptly mailing the same to MS. ANNE E. EGELER.

19         IN WITNESS HEREOF, I have hereunto set my hand and affixed

20    my official seal of this 9th day of October, 2010.

21

22

23

                              _____

24                            Rebecca S. Lindauer, CSR#2402

                              Notary Public in and for the State of

25                            Washington, residing at Lacey.