# EXHIBIT 9

1                    UNITED STATES DISTRICT COURT
                            FOR THE
2                  WESTERN DISTRICT OF WASHINGTON

3    ────────────────────────────────
                                    )
     JOHN DOE #1, et al.,           )
4                                   )
                 Plaintiffs,        )
5                                   )
           vs.                      )  NO: 09-cv-05456-BHS
6                                   )
     SAM REED, et al.,              )
7                                   )
                 Defendants.        )
8    ────────────────────────────────

9       DEPOSITION UPON ORAL EXAMINATION OF    REDACTED

10   ────────────────────────────────

11

12

13

14                      September 1, 2010
15                      Tacoma, Washington
16

17

18

19

20

21

22

23

24              DIXIE CATTELL & ASSOCIATES
          COURT REPORTERS & VIDEOCONFERENCING
25          (360) 352-2506  **  (800) 888-9714

EGELER ( REDACTED , 9/1/10)

Page 40

1        using a current, accurate registered voter's database?

2   A    Yes, they were initially.  Then we had to go to a third

3        count and they weren't initially, until we had to meet with

4        the directors.

5   Q    And when you did meet with the directors, was the problem

6        solved?

7   A    Yes.

8   Q    Do you feel that all of the signatures that were rejected

9        were rejected properly?

10  A    No.

11  Q    If you were to be involved in an initiative campaign again,

12       would you have confidence in the Secretary of State's work?

13  A    No.

14  Q    And why not?

15  A    I saw bias.  We saw, while we were there for that entire

16       month for 15 hours a day, we saw some of the staff -- we saw

17       some of the observers from Washington Families Standing

18       Together -- it's a long name.  I'll say WFST, if that's

19       okay.  Some of the observers there, the lead observers there

20       for WFST, talking with the supervisors there.  They were --

21       I, in particular, saw three of them, one of which I believe

22       was an attorney for Washington Families Standing Together,

23       go into the offices of one of the lead checkers that works

24       there full-time.  He's not -- he wasn't a part-time, just,

25       you know, being hired part-time to -- for this process.

EGELER ( REDACTED , 9/1/10)

| 1 | | He's actually a full-time member there.  And they, without |
|---|---|---|
| 2 | | this person being in his office, all three of them were in |
| 3 | | there looking around like they had been in there before and |
| 4 | | just took the liberty to be in his private office, which |
| 5 | | none of us had ever done. |
| 6 | Q | Would you have any -- other than the bias, would you have |
| 7 | | any problems with the process used? |
| 8 | A | Yes. |
| 9 | Q | In what regard? |
| 10 | A | In regards to the Russian names, we didn't -- there was a -- |
| 11 | | one of the directors there was Katie Williams.  She was the |
| 12 | | assistant director with Shane Hamlin.  When it came to going |
| 13 | | through the third check of the signatures, she had wrote out |
| 14 | | the policy for the checkers that were there on how to -- not |
| 15 | | how to, but what to do and what not to do when checking |
| 16 | | these signatures, in particular the Russian signatures. |
| 17 | | There was thousands of them that were Russian names.  She |
| 18 | | had specifically wrote down, when checking the names, to not |
| 19 | | check the last name -- I can't quote the wording exactly, |
| 20 | | but to not check the last name of the Russian signatures as |
| 21 | | the first name on the computer database. |
| 22 | | And we found out, from talking to the Russian observers |
| 23 | | that there were with us, that is not their culture.  That |
| 24 | | the culture in the Russian community is that when they sign |
| 25 | | their names, unlike Americans who sign their first name and |

EGELER ( REDACTED , 9/1/10)

Page 42

1          then their last name, the Russian community people sign

2          their last name first.

3               And it is our -- my opinion that Katie Blinn did this

4          deliberately knowing this about the Russian culture.  Had we

5          not caught it, my husband and I caught that that day, that

6          morning before we were going to start this third check on

7          this new database, had we not caught it -- and REDACTED

8          REDACTED was actually on his way up from Mount Vernon where

9          he lives to come to the offices.  He had a Russian fellow

10         coming with him who we found out was actually an attorney,

11         and we showed this policy to him.  So we went and had a

12         meeting -- fortunately for that, for him being up there, we

13         had a meeting with Katie Blinn and Shane Hamlin, myself, and

14         my husband,   REDACTED  , and this Russian attorney.

15              And REDACTED confronted Shane Hamlin about this

16         discrepancy and asked him what he was going to do about it.

17         Had we not been there to catch that, I firmly believe that

18         the Russian signatures would have been undermined and

19         rejected, and we wouldn't have got the appropriate

20         signatures.

21    Q    Can you tell me who were the Russians that were with you

22         checking signatures?

23    A    I can't remember their names.  Igor.  They came from

24         different churches.  We had one pastor that we finally got

25         ahold of to help us in particular during this time when I

EGELER ( REDACTED , 9/1/10)

1      was a -- it was a Wednesday.  We went to the elections

2      office to be observers there when it first started.  That

3      was on a Wednesday afternoon when we started that process at

4      one in the afternoon.

5           We came home that evening and I noticed we had gotten a

6      couple calls on the caller ID from a David Baurle, I think

7      is his last name.  They never left any messages.

8           And also when we were there at the elections office, we

9      had to -- everyone had to sign in their name, you know, sign

10     in our names.

11          Then on Saturday when we were home that first weekend

12     of the observation of the signatures, I returned the call to

13     this David Baurle because people call the church, so we try

14     to return the calls.

15  Q  Excuse me.  You said there were calls and that they were

16     identified on your phone as calls from David Baurle.  Was

17     there a message left?

18  A  No.

19  Q  Okay.

20  A  But he had called twice.

21  Q  So two calls?

22  A  Um-hmm.

23  Q  So it's Saturday and you decided to call?

24  A  Yes, to return the call.  I normally do that with people who

25     call the church.  So I called and said, "Hello.  We're

Page 48

```
 1        looking for" -- I don't remember exactly how it went in
 2        order, but, "we're looking for a David Baurle.  We're
 3        returning a call to a David that called our church."
 4              And he said, "There's no David here."
 5              And I said, "Okay.  I'm sorry.  I guess we have the
 6        wrong phone number then and thank you."
 7              He stopped me and said, "Who is this?"
 8              I said, "We're" -- "this is     REDACTED    Christian
 9        Church and someone had called us named David."
10              He said -- after he said that there's no David there,
11        then he said, "That used to be me."  That used to be him.
12        He's no longer David.  He's now Krystal.
13              I said, "Okay."
14              And then he -- that's when he said he's the one that
15        made the calls.
16   Q    And did you continue to speak with him?
17   A    Yeah.  Then he asked what -- you know, about our church and
18        that -- I have to read the declaration because I don't
19        remember exactly how it went, but . . .
20   Q    If you can't remember, that's okay to say you can't
21        remember.  I don't want you to say anything you don't feel
22        confident of.
23   A    I just can't remember it verbatim.
24   Q    Okay.
25   A    He said that he began to explain that his name is Krystal,
```

EGELER (  REDACTED  , 9/1/10)

Page 54

| | | |
|---|---|---|
| 1 | | also called the police.  The police officer returned the |
| 2 | | call to us.  We explained to him what happened.  He asked to |
| 3 | | listen to the recordings we had on the answering machine. |
| 4 | | We got on the cell phone and he listened to all of them and |
| 5 | | asked for the phone number and said he would call Mr. Baurle |
| 6 | | and tell him because of these threats not to show up at the |
| 7 | | church the next day. |
| 8 | Q | Was this a DuPont Police officer? |
| 9 | A | Lacey.  I can't remember.  I thought -- I think it was Lacey |
| 10 | | because our church is in Lacey. |
| 11 | Q | Okay. |
| 12 | A | Yeah. |
| 13 | Q | Do you recall the name of the officer you spoke to? |
| 14 | A | No, I don't. |
| 15 | Q | And did the officer call you back to let you know if he or |
| 16 | | she had actually called the individual? |
| 17 | A | I believe so.  Yeah, he did.  I can't remember if we called |
| 18 | | him or he called us, but yes, he let us know he talked to |
| 19 | | him, and I can't remember if he talked to him personally or |
| 20 | | if he left a message.  I don't know. |
| 21 | Q | Was it taken care of promptly or were the police slow to do |
| 22 | | anything? |
| 23 | A | It was within that hour. |
| 24 | Q | Did you hear again from the individual who had been calling |
| 25 | | you? |

EGELER (Valerie Hartwell, 9/1/10)

Page 55

| | | |
|---|---|---|
| 1 | A | He sent us an e-mail after that. |
| 2 | Q | Before we get to that, did you have any more phone contact |
| 3 | | or messages from the individual? |
| 4 | A | No. |

5    Q    Then we'll mark this as Exhibit No. 3.

6                          (Exhibit No. 3 marked.)

7    Q    So you have in front of you what we've marked as Exhibit

8         No. 3 and today part of your subpoena asked you to bring

9         documents, and this is one of the documents you brought,

10        correct?

11   A    Yes.

12   Q    Can you tell me what this is?

13   A    The e-mail that we received from David Baurle now called

14        Krystal Mountaine.

15   Q    And this Tuesday, August 4th, is this the Tuesday that

16        follows the Saturday conversations we were just discussing?

17   A    Yes.

18   Q    After this e-mail, did you respond to it?

19   A    No.

20   Q    Did you inform the police of it?

21   A    No.

22   Q    Did you have any further contact with him of any sort?

23   A    No.

24   Q    Okay.

25   A    I want to add something to this e-mail.

EGELER (Valerie Hartwell, 9/1/10)

Page 56

1    Q    You want to add to the e-mail?

2    A    Make a comment to the e-mail we received from him.

3    Q    What would you like to say?

4    A    In my conversations with David, David/Krystal, the way he

5         talked on the phone with me does not at all sound like this

6         was his -- the way he would speak or write, so it sounded

7         like this came from somebody else.

8    Q    And other than that, do you have any knowledge of whether

9         this came from somebody else?

10   A    No.  But I can tell you that the way he talked on the phone,

11        that there's no way that he seemed to be of the skill to be

12        able to write something as -- like this.

13   Q    I understand.

14            You said you didn't contact the police after you

15        received this.  Did you feel threatened by the e-mail?

16   A    No.

17   Q    Is there some reason that you didn't inform the police of

18        this?

19   A    He said he would not be contacting us any further.  Again, I

20        have to say that this does not sound like it came from him.

21        Clearly to us, from the conversations with him, somebody

22        else had to be with him that wrote this because this was not

23        the way that he talked.

24   Q    I understand.  But my question is:  Why did you not feel the

25        need to give this to the police?

HAMILTON ( REDACTED , 9/1/10)

Page 86

| | | |
|---|---|---|
| 1 | A | He was yelling at the customer service desk inside the store |
| 2 | | after he had had this discourse with my husband outside the |
| 3 | | store while customers are going in and out. |
| 4 | Q | Your concern was he was speaking too loudly and yelling in |
| 5 | | making the request that you be removed from the front of the |
| 6 | | store? |
| 7 | A | Absolutely. |
| 8 | Q | You agree with me that he has the right to ask that you be |
| 9 | | removed, so long as he it does it politely? |
| 10 | A | Anybody has the right to do that, but the way he did it was |
| 11 | | bordering on disrupting the peace. |
| 12 | Q | Thank you. |
| 13 | | Let me turn your attention to this call from the |
| 14 | | David -- we'll call him David/Krystal.  You understand who |
| 15 | | I'm referring to there? |
| 16 | A | Yes. |
| 17 | Q | Now, we know that that individual got your phone number from |
| 18 | | the Protect Marriage Washington Web site.  Isn't that true? |
| 19 | | That's what he told you? |
| 20 | A | I don't believe that our phone number is on the Protect |
| 21 | | Marriage Web site.  Our name is. |
| 22 | Q | Your name? |
| 23 | A | I found out now, but I don't believe that our phone number |
| 24 | | is there. |
| 25 | Q | But we know he got your name from the Web site because |

HAMILTON ( REDACTED , 9/1/10)

Page 87

```
 1        that's what he told you?
 2   A    Well, he said he got it from  REDACTED .  First he
 3        mentioned I got it -- I got it from  REDACTED 's Web
 4        site.  And then he says -- when I asked him how he got our
 5        phone number, then he said, "Well, you have a church Web
 6        site too, don't you?"
 7   Q    So that suggests he got your phone number from your Web site
 8        and your name from the Protect Marriage Washington Web site?
 9   A    Yes.  He mentioned  REDACTED  first.
10   Q    You'll agree with me the one thing we know for certain,
11        absolutely certain, is he did not get your name from the
12        Referendum 71 petition sheet.  You know that because those
13        have always been kept private, even until today?
14   A    I cannot say.  You'll have to ask David/Krystal where he got
15        it from exactly, but I find it more than coincidental when
16        we were there at the elections office and within a day
17        afterwards, when we had to sign in our name and Washington
18        Families Standing Together was there signing their name and
19        who they were with, that we starting getting these calls
20        from David/Krystal.
21   Q    Well, putting aside these the coincidences you identified,
22        what we know is that David/Krystal told you that he got your
23        name from the Protect Marriage Washington Web site?
24   A    That's what he said.
25   Q    And the --
```

Page 88

| 1 | A | He mentioned REDACTED 's name. |
| 2 | Q | And the phone number from your church Web site? |
| 3 | A | Yes. |
| 4 | Q | Your phone number is not a secret.  It's easy to find, isn't |
| 5 | | it? |
| 6 | A | It's easy, yes.  You have to get on the Web site. |
| 7 | Q | I would like to direct your attention to the e-mail from |
| 8 | | Krystal Mountaine, the same individual in Exhibit No. 3. |
| 9 | | Do you have that there in front of you? |
| 10 | A | Yes. |
| 11 | Q | This is the e-mail you received -- |
| 12 | A | Yes. |
| 13 | Q | -- on August 4th the church e-mail address? |
| 14 | A | It looks like it. |
| 15 | Q | The e-mail address is not a secret either.  That's on the |
| 16 | | Web site, true? |
| 17 | A | Yes. |
| 18 | Q | In fact, you want to make it easy to contact the church, and |
| 19 | | so that's the reason you have a Web site? |
| 20 | A | Anybody does, yes. |
| 21 | Q | You testified a moment ago that you thought that somebody |
| 22 | | else wrote this for Krystal Mountaine.  That's a guess, |
| 23 | | true? |
| 24 | A | I believe it's more than a guess because Krystal Mountaine |
| 25 | | did not talk like this at all. |

HAMILTON ( REDACTED  9/1/10)

Page 89

1   Q   But the only thing you know is that you received this e-mail

2       as signed by him?

3   A   Well, it's not signed by him, but it's from his e-mail

4       address.

5   Q   No one's told you they wrote it for him?

6   A   No.  My testimony is that we never talked to him afterwards,

7       but to receive this e-mail from him, clearly from the

8       conversation with him and listening to the tape recordings,

9       that is not his voice.

10  Q   My question is:  He never told you that someone else wrote

11      this for him?

12  A   We never talked with him.

13  Q   And no one else has ever come to you and said, gee, I wrote

14      that e-mail for Krystal Mountaine?

15  A   If they did, I don't think they would tell us that.

16  Q   So the answer is no, no one ever told you that?

17  A   No.

18  Q   Let's turn to Exhibit 6, if you would.  This is the e-mail

19      you received from Charlene Strong.  You'll agree with me

20      this e-mail is a polite e-mail, won't you?

21  A   Yes, it is.

22  Q   In fact, it's respectful.  Even the way she signed it,

23      "Respectfully"?

24  A   Yes.

25  Q   It was a request to come speak about an issue that you both

Page 90

```
 1        felt pretty strongly about?
 2   A    Yes.
 3   Q    You didn't want your parishioners to hear from Ms. Strong
 4        and her point of view on the issue?
 5   A    Well, that's obvious.
 6   Q    With all due respect, it's not obvious to me why you
 7        wouldn't want your parishioners to hear an opposing
 8        viewpoint, so that's why I'm asking.  You didn't want your
 9        parishioners to hear from Ms. Strong?
10   A    No.
11   Q    The mere request to come speak with you, you consider this
12        to be harassment?
13   A    She's asking to come and speak to our church, to our church
14        congregation, our church people.  Do I consider that
15        harassment?  It's a form of, for lack of a better word,
16        taunting, knowing that we wouldn't do this.
17   Q    You thought she was taunting you in this e-mail?
18   A    She knew where our position was at from being at the
19        elections office and the news being there, my husband being
20        on the news, she knew where we were at.  To ask us, that was
21        kind of like taunting.
22   Q    But one of the things you were doing in front of these
23        stores was trying to talk people into signing the petition,
24        even if they might have initially disagreed with you, right?
25   A    Yes.
```

HAMILTON ( REDACTED , 9/1/10)

Page 91

| 1 | Q | But you're not taunting the citizens as they come out the |
| 2 | | door and you try to convince them they ought to sign the |
| 3 | | petition, are you? |
| 4 | A | We're getting petitions outside department stores, not going |
| 5 | | into a church. |
| 6 | Q | You were involved on the day that all the signed petitions |
| 7 | | were delivered to the Secretary of State's office.  Is that |
| 8 | | true? |
| 9 | A | Yes. |
| 10 | Q | So you spent the day out there, you know, opening up the |
| 11 | | boxes and organizing the petitions and all of that? |
| 12 | A | Yes. |
| 13 | Q | Do you recall the issue arising that on the back side of |
| 14 | | some of the petitions there was a little form affidavit that |
| 15 | | was supposed to have been signed by the signature gatherers, |
| 16 | | but in many case were not signed.  Do you remember that? |
| 17 | A | Vaguely. |
| 18 | Q | Do you recall seeing  REDACTED  using a stamp to stamp |
| 19 | | some signature on all those pages? |
| 20 | A | I think so. |
| 21 | Q | Did either you or Mr. REDACTED or anybody else that was |
| 22 | | helping you sign any of those signature gatherer affidavits |
| 23 | | yourself? |
| 24 | A | I think I signed a couple of them and my husband did. |
| 25 | Q | And who asked you to do that? |

Page 101

```
 1                    C E R T I F I C A T E
 2        I, REBECCA S. LINDAUER, a duly authorized Notary Public in
 3   and for the State of Washington, residing at Lacey, do hereby
 4   certify:
 5        That the foregoing deposition of    REDACTED    was taken
 6   before me and completed on the 1st day of September, 2010, and
 7   thereafter transcribed by me by means of computer-aided
 8   transcription; that the deposition is a full, true, and complete
 9   transcript of the testimony of said witness;
10        That the witness, before examination, was by me duly sworn
11   to testify the truth, the whole truth, and nothing but the truth,
12   and that the witness reserved signature;
13        That I am not a relative, employee, attorney, or counsel of
14   any party to this action or relative or employee of any such
15   attorney or counsel, and I am not financially interested in the
16   said action or the outcome thereof;
17        That I am herewith securely sealing the deposition of
18      REDACTED    and promptly mailing the same to MS. ANNE E.
19   EGELER.
20        IN WITNESS HEREOF, I have hereunto set my hand and affixed
21   my official seal of this 7th day of September, 2010.
22
23
                          _____
24                        Rebecca S. Lindauer, CSR#2402
                          Notary Public in and for the State of
25                        Washington, residing at Lacey.
```

# EXHIBIT 10

Page 1

1                    UNITED STATES DISTRICT COURT

                           FOR THE

2                WESTERN DISTRICT OF WASHINGTON

3                                  )

    JOHN DOE #1, et al.,           )

4                                  )

                 Plaintiffs,       )

5                                  )

          vs.                      )   NO. 09-cv-05456-BHS

6                                  )

    SAM REED, et al.,              )

7                                  )

                 Defendants.       )

8

9        DEPOSITION UPON ORAL EXAMINATION OF    REDACTED

10

11

12

13

14                    September 27, 2010

15                    Tacoma, Washington

16

17

18

19

20

21

22

23

24              DIXIE CATTELL & ASSOCIATES

         COURT REPORTERS & VIDEOCONFERENCING

25           (360) 352-2506  **  (800) 888-9714

EGELER ( REDACTED , 9/27/10)

Page 21

1   A   There's no additional risk worthy of mention by having the

2       signatures released.

3   Q   So let's start discussing now any threats or harassment that

4       you feel you suffered as a result of your involvement with

5       Referendum 71.

6   A   Okay.  Yes, there was one particular case, which is what I

7       signed the affidavit in regard to.  Do you want me to read

8       this or recite it from memory?

9   Q   Recite from memory and let me know if you still remember.

10  A   Yeah.  It was a pretty vivid experience, so it's impressed

11      upon my memory.  It was on October 11.  I was taking a ferry

12      from Seattle after one of the debates I mentioned.  This

13      particular debate was at -- at a church in Shoreline, sort

14      of in the Richmond Beach area.  That was one of the

15      non-televised debates.  Wherever I went on debates, I always

16      took R71 brochures.  We have a nice little colorful brochure

17      that we hand out to people in the audience and so on.

18          On the way, I'm riding the ferry back.  You know, as a

19      Bremerton resident, I spend a good time of my -- part of my

20      time living on the ferry.  I asked one of the attendants if

21      it would be okay, during the hour ride, if I distributed R71

22      brochures to the passengers.

23          And she wasn't willing to grant me permission on her

24      volition, so she called the captain on the phone.  And he

25      said, okay, as long as it doesn't become, you know, really

EGELER ( REDACTED , 9/27/10)

Page 22

```
 1     heated.  In other words, just pass them out and keep your
 2     cool, which is what I did on the entire main deck without
 3     any particular incidents.  A few people would ask a question
 4     or two, but everything was quite civilized.
 5          Then I went to the upper deck.  It's a two-deck ferry.
 6     I did the west end of the ferry, the same thing.  Everything
 7     was fine.  Then I went to the east end and this was the last
 8     quarter of the ferry that I was going to do.  And I started,
 9     as I did on that occasion, going to each table where
10     someone's sitting or chair and asking them first if they had
11     voted.  If they had already voted, I didn't feel it was
12     necessary to hand out a brochure, and so I just pass on.
13          But this gentleman said that he had not voted yet, and
14     so I handed him a brochure and moved on.  He said thank you.
15     I moved on.  I would say 20, 30 seconds passed.  I'm one or
16     two tables further along when I hear a huge shrieking
17     commotion coming from this person.  He's just screaming at
18     me, using foul language, and wadded up the brochures.  Said,
19     this is a bunch of shit, and threw it at me at about a
20     distance maybe from here to that blackboard.  And --
21  Q  How many feet would you say that is?
22  A  It's probably four yards, 12 feet.
23  Q  Okay.
24  A  And he must have been a pretty good shot because it was
25     heading straight for my head.  And I dodged it and it went
```

EGELER ( REDACTED , 9/27/10)

Page 25

| | | |
|---|---|---|
| 1 | A | Well, when he was following me, he wasn't shouting quite so |
| 2 | | loud because he was -- this was sort of the second phase of |
| 3 | | this confrontation with him behind me, me trying to get |
| 4 | | away, him following.  What he was saying was unintelligible |
| 5 | | to me. |
| 6 | Q | So that -- |
| 7 | A | But he was right behind me.  He had a kind of a menacing- |
| 8 | | type tone and possibly -- you know, somebody is berserk, you |
| 9 | | don't know what sort of idea he might have in his mind, but |
| 10 | | what was he doing shadowing me?  I was really concerned he |
| 11 | | might escalate to the next level.  I didn't want to get |
| 12 | | smacked in the back, you know, as I'm walking. |
| 13 | | So I was more than -- I was really grateful for those |
| 14 | | two ferry workers.  I didn't stay to thank them, but I |
| 15 | | wished I could. |
| 16 | Q | So at the time he was following you, what he was saying was |
| 17 | | unintelligible.  He was muttering? |
| 18 | A | Right. |
| 19 | Q | But earlier when you first had him -- you didn't have him, |
| 20 | | but he chose to stand up and shout at you, what was he |
| 21 | | shouting at that time?  I know it's not pleasant to repeat |
| 22 | | swear words, but it is important that we get this down |
| 23 | | accurately, even if there was foul language. |
| 24 | A | Well, the only swear word I can for sure identify from |
| 25 | | memory was when he said this is a bunch of shit and then |

Page 26

```
 1        could -- just got increasingly -- you know, he, after he
 2        threw the brochure at me, which was wadded up into a ball,
 3        and missed me and I made probably the mistake of taunting
 4        him a little bit by saying you missed, he became louder.
 5             And it wasn't so much vulgar at that point as just sort
 6        of an issue of him screaming and shrieking at me.  A couple
 7        times I made the attempt to sort of get, you know, get my
 8        point in, but he was just not going to hear of it.
 9    Q   So what was he saying at that point when he was --
10    A   He was saying, in particular, I remember he was saying that
11        he and his boyfriend had just as much right to get married
12        as I did.  How he knew I was married, I don't know.
13    Q   How did you respond to that?  You said you did --
14    A   I did say something about consent of the governed or the
15        general issue, which is so important to me, namely that the
16        people have a right to govern themselves.  Thomas Jefferson
17        said this was most valuable of all freedoms, right of the
18        people to be self-governed.  The people of this country have
19        made it perfectly clear they don't want to redefine marriage
20        to include same sex couples.  I didn't have time so say all
21        that in the course of this heated crazy shouting match on
22        his part.  I wasn't doing any shouting, but I attempted to
23        calm him down a little bit by making a point in the hopes he
24        would be become a little more rational, but I was getting
25        nowhere and then the lady started pleading for him to stop
```

EGELER ( REDACTED , 9/27/10)

Page 27

| 1 | | shouting. |
|---|---|---|
| 2 | Q | Do you think he may have been mentally ill? |
| 3 | A | It depends how you define mental illness, I guess. |
| 4 | Q | You just used the word "berserk" earlier and I wondered -- |
| 5 | A | Yeah.  I mean, whether it was temporary or some kind of |
| 6 | | chronic condition with him, I, of course, have no way of |
| 7 | | knowing. |
| 8 | Q | But you did feel that he was unwell at that moment? |
| 9 | A | He was out of control. |
| 10 | Q | I understand he threw the brochure at you.  Did he throw |
| 11 | | anything else? |
| 12 | A | No. |
| 13 | Q | Did he verbally threaten violence or was it more the |
| 14 | | intimidation of following? |
| 15 | A | Yeah, the latter. |
| 16 | Q | And do you remember how big he was, what he looked like? |
| 17 | A | Yeah.  He was shorter than me.  I would say he's maybe 5'6" |
| 18 | | to 5'8", of color. |
| 19 | Q | So African-American? |
| 20 | A | Um-hmm. |
| 21 | Q | "Yes"? |
| 22 | A | Yes. |
| 23 | Q | And his build, roughly? |
| 24 | A | I wouldn't describe him as skinny or fat, just sort of |
| 25 | | normal build. |

EGELER (REDACTED 9/27/10)

Page 28

| | | |
|---|---|---|
| 1 | Q | And how tall are you? |
| 2 | A | Six feet. |
| 3 | Q | Did he follow you down to the area of the ferry that has the |
| 4 | | parked cars or were you able to get away? |
| 5 | A | No.  Thanks to the ferry attendants, I was able to lose him |
| 6 | | at that point.  I was on the upper deck. |
| 7 | Q | Were there any police officers in the vicinity at all? |
| 8 | A | If there were, if they arrived later, I don't know because I |
| 9 | | got in my car and I stayed there.  I didn't see any activity |
| 10 | | down on the car deck. |
| 11 | Q | Sounds like the ferry workers saw it and took care of the |
| 12 | | situation? |
| 13 | A | Um-hmm. |
| 14 | Q | "Yes"? |
| 15 | A | Yes. |
| 16 | Q | Any other instances that occurred? |
| 17 | A | Do you mean other than this particular day? |
| 18 | Q | Yes. |
| 19 | A | The fellow that -- not really.  I mean, I wouldn't count the |
| 20 | | sort of harassing sort of questioning that came from the |
| 21 | | audience at the Seattle Public Library as threatening in the |
| 22 | | sense that this was. |
| 23 | Q | Okay. |
| 24 | A | So no. |
| 25 | Q | So you just -- okay. |

EGELER ( REDACTED , 9/27/10)

Page 29

```
 1            So no other instances then of harassment or threats

 2       that you felt had been encountered?

 3    A  No, nothing that was threatening to me personally.

 4    Q  After the election, you noted that you published an article

 5       comparing Washington and at least one other state?

 6    A  Maine.

 7    Q  Did you have any threats or harassment following the

 8       publication of that article?

 9    A  Well, you know, some -- like if it had been published in the

10       Kitsap Sun --

11    Q  Was it published in the Kitsap Sun?

12    A  That article wasn't.  I had an article published prior to

13       that on behalf of the Knights of Columbus.  There was all

14       kinds of ugly comments.  Kitsap Sun is a much -- is not

15       monitored the way that Catholic Exchange is.  You get

16       abusive, they don't post your comments in Catholic Exchange.

17       It's quite civilized, quite -- there's a lot decorum,

18       whereas this is not the case with the Kitsap Sun.  I don't

19       mean to bad mouth the local newspaper, but I've gotten to

20       the point I hardly ever read the comment section because

21       it's so kind of demeaning and --

22    Q  I think I know what you mean.  We have our Olympian in

23       Olympia.  The online comments, in my opinion, often are --

24    A  Yeah.

25    Q  -- out of control and nasty on virtually any issue.  Would
```

EGELER ( REDACTED , 9/27/10)

Page 30

```
 1         you find that to be the case with Kitsap as well?

 2    A    I don't know if it was any issue.  I mean, some

 3         noncontroversial issues not so, but . . .

 4    Q    Anything political tends to get --

 5    A    Yes, absolutely, yes.  Polarizing politically, it will get

 6         really ugly.  In fact, the article that I did publish in the

 7         Kitsap Sun evidently got so ugly that one of my friends read

 8         it and he said, don't read it.  You don't want to read it,

 9         you know, or be demoralized.  I just didn't.

10    Q    Right.  And that would be in keeping with some of the other

11         controversial issues where you've seen people get out of

12         control with online comments?  These are issues that are not

13         related to Referendum 71, but where people might have

14         opposing views?

15    A    Yeah.  A lot of -- have you ever seen the Yahoo news Web

16         sites?  Sometimes they will get 2,000, 3,000, 4,000

17         comments.  Who could ever read all of those anyway, the

18         sheer quantity?  They're the same thing.  There are some

19         that are high level and there are others that are really low

20         level.  And I think there's sort of an aggression law

21         operating there that tends to depreciate the quality of the

22         commentaries because people see themselves associated with

23         such demeaning comments and so they don't comment anymore.

24         It kind of gradually deflates the intellectual currency, if

25         you will.
```

DIXSON ( REDACTED , 9/27/10)

1                              EXAMINATION

2     BY MR. DIXSON:

3     Q    Mr. REDACTED, good morning.  My name is Steven Dixson.  I'm

4          on the phone here in Spokane, Washington.  We represent the

5          Washington Coalition for Open Government.

6     A    Sure, Steve.

7     Q    I recognize the inherent difficulties doing this over the

8          phone, so I will try to be brief and direct.  In the ten or

9          so debates you had both televised and non-televised, did you

10         experience any heckling or harassment during those debates?

11    A    Yes, the one at the Seattle Public Library in particular.

12    Q    Can you tell me what happened there?

13    A    Yeah.  The one guy said, I want to direct my question

14         specifically to Mr. REDACTED.  And he said, why don't you

15         just get out of my way?  And I started to -- I presumed that

16         he meant, you know, stand aside and let the same sex

17         marriage agenda proceed.  And I -- so I started to respond,

18         but he wouldn't allow me to finish my first sentence.  He

19         said, no, no.  Why don't you get out of our way, you know.

20         And I finally -- the moderator finally came to my defense,

21         allowed me to answer the question, so that would be about it

22         in terms of harassment from the audience.

23    Q    What was your -- the speech there was regarding the PLU

24         documentary regarding marriage.  Is that correct?

25    A    Yeah.  They had a panel discussion.  They showed the film

Page 40

1                C E R T I F I C A T E

2        I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3   and for the State of Washington, residing at Lacey, do hereby

4   certify:

5        That the foregoing deposition of    REDACTED    was taken

6   before me and completed on the 27th day of September, 2010, and

7   thereafter transcribed by me by means of computer-aided

8   transcription; that the deposition is a full, true, and complete

9   transcript of the testimony of said witness;

10        That the witness, before examination, was by me duly sworn

11   to testify the truth, the whole truth, and nothing but the truth,

12   and that the witness reserved signature;

13        That I am not a relative, employee, attorney, or counsel of

14   any party to this action or relative or employee of any such

15   attorney or counsel, and I am not financially interested in the

16   said action or the outcome thereof;

17        That I am herewith securely sealing the deposition of REDACTED

18   REDACTED and promptly mailing the same to MS. ANNE E. EGELER.

19        IN WITNESS HEREOF, I have hereunto set my hand and affixed

20   my official seal of this 4th day of October, 2010.

21

22

23

24                         Rebecca S. Lindauer, CSR#2402

                           Notary Public in and for the State of

25                         Washington, residing at Lacey.

# EXHIBIT 11

Page 1

1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF WASHINGTON

3                            AT TACOMA

4

5    JOHN DOE #1, an individual; JOHN       )
     DOE #2, an individual; and PROTECT     )
6    MARRIAGE WASHINGTON,                    )
                                             )
7                        Plaintiffs,         )
                                             )
8        v.                                   )
                                             )    No. 09-CV-05456-BHS
9    SAM REED, in his official capacity      )
     as Secretary of State of Washington;   )
10   BRENDA GALARZA, in her official         )
     capacity as Public Records Officer     )
11   for the Secretary of State of          )
     Washington,                             )
12                                           )
                         Defendants.         )
13

14              Deposition Upon Oral Examination
                              Of
15                  SENATOR    REDACTED

16

17

18

19

20

21

22   Taken by:   Tracey L. Juran, CCR
                 CCR No. 2699

23

24   September 28, 2010

25   Everett, Washington

1   Q.   And in stating that, my understanding is that you don't

2        mean to be making a general statement about all letters

3        written to state agencies or all letters written to

4        people from state agencies; correct?

5   A.   Correct.

6   Q.   When is the last time that you campaigned for

7        reelection? What year was that?

8   A.   Two years ago.

9   Q.   So in 2008?

10  A.   Mm-hm.  Well, 2007.  I was elected -- I campaigned in

11       2007, was elected, and serve -- started serving in 2008

12       the last time.

13  Q.   And what district are you in?

14  A.   REDACTED.

15  Q.   Do you recall if any of your campaign signs were stolen?

16  A.   Oh, yes.

17  Q.   Were there quite a few of those?

18  A.   Uh-huh.

19  Q.   Is that a yes?

20  A.   Yes.  That is a yes.

21            And --

22  Q.   Did you --

23  A.   -- some -- and one was burned --

24  Q.   Oh, my goodness.

25  A.   -- several times.

Page 84

1   Q.   Has that been your experience in all of your elections,
2        that --
3   A.   I've never had one burned.  That was a first.  But yes,
4        often they are stolen, they are demolished.
5   Q.   Have you ever had a campaign sign slashed with a knife?
6   A.   Yes.
7   Q.   And has that happened --
8   A.   I mean, I don't know how they slashed it -- an ax, a
9        knife, I don't know -- but yes.
10  Q.   And have you ever seen a sign for a Democrat that was
11       vandalized, slashed, or burned, destroyed in some way?
12  A.   Never burned.  I've never seen anybody else's sign
13       burned, especially as many times as mine was, the same
14       one.  But -- same location.  We replaced it and it would
15       be burned again.  But, you know, I think I just saw one
16       the other day, and I'm trying to remember if it was -- I
17       don't know whose sign it was.  Let's just say it was --
18       I don't know whose sign it was, if it was a Democrat or
19       a Republican.  I don't know.  But I did see one the
20       other day on I-5.
21  Q.   Do you have any idea why someone would have burned your
22       sign?
23  A.   None.  Fire department would like to know too.  Fact,
24       they called my office and wanted to know why I kept
25       putting the sign back up, because they had to go out and

Page 107

1                          CERTIFICATE

2   STATE OF WASHINGTON )

                         )

3   COUNTY OF SNOHOMISH )

4              I, the undersigned Notary Public in and for the

5   State of Washington, do hereby certify:

6              That the foregoing is a full, true, and correct

7   transcript of the testimony of the witness named herein,

8   including all objections, motions, and exceptions;

9              That the witness before examination was by me duly

10  sworn to testify truthfully and that the transcript was made

11  available to the witness for reading and signing upon

12  completion of transcription, unless indicated herein that the

13  witness waived signature;

14             That I am not a relative or employee of any party

15  to this action or of any attorney or counsel for said action

16  and that I am not financially interested in the said action

17  or the outcome thereof;

18             That I am sealing the original of this transcript

19  and promptly delivering the same to the ordering attorney.

20             IN WITNESS WHEREOF, I have hereunto set my hand and

21  seal this 12th day of October, 2010.

22

23          _____

          Notary Public in and for the State of Washington

24                 residing at Edmonds, Washington.

                   (Notary expires 3/09/13)

25                      (CCR No. 2699)