1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,

                    Plaintiffs,

      v.

SAM REED, in his official capacity as
Secretary of State of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer for the
Secretary of State of Washington,

                Defendants.

NO. 09-cv-05465-BHS

DESIGNATED DEPOSITION
TESTIMONY OF

      Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

Washington Families Standing Together and the Washington Coalition for Open Government

and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

"Parties") hereby submit combined designated deposition testimony for

         .

      Defendants and Intervenors object to the admission of any deposition testimony taken

of any witnesses who could be called to testify at trial.   Therefore, the designations of

DESIGNATED DEPOSITION
TESTIMONY OF

- No. 09-cv-05465-BHS

1

1    Defendants and Intervenors are being submitted in the event that the Court decides to admit

2    deposition testimony.

3            For the Court's convenience Defendants' designations have been highlighted in blue,

4    Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5    been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6    filing the redacted versions of these documents.

7            DATED this 6th day of September, 2011.

8    ROBERT M. MCKENNA
     Attorney General
9

10    s/ William Clark_____
      WILLIAM CLARK, WSBA #9234
11    Senior Counsel
      800 Fifth Ave, Ste 2000
12    Seattle, WA 98104
      206-464-7352
13    BillC2@atg.wa.gov
      ANNE EGELER, WSBA #20258
14    Deputy Solicitor General
      PO Box 40100
15    Olympia, WA  98504-0100
      360-664-3027
16    Annee1@atg.wa.gov
      _____
17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

—————————————————————————————————————————————————
                            )
JOHN DOE #1, et al.,        )
                            )
            Plaintiffs,     )
                            )
        vs.                 )   NO. 09-cv-05456-BHS
                            )
SAM REED, et al.,           )
                            )
            Defendants.     )
—————————————————————————————————————————————————

   DEPOSITION UPON ORAL EXAMINATION OF
—————————————————————————————————————————————————




                  September 15, 2010

                  Longview, Washington










                DIXIE CATTELL & ASSOCIATES
          COURT REPORTERS & VIDEOCONFERENCING
           (360) 352-2506  **  (800) 888-9714

```
 1   APPEARANCES:

 2           FOR THE PLAINTIFF
             PROTECT MARRIAGE
 3           WASHINGTON:                  MR. STEPHEN PIDGEON
                                          ATTORNEY AT LAW
 4                                        3002 Colby Avenue
                                          Suite 306
 5                                        Everett, WA  98201

 6           FOR THE DEFENDANTS:          MS. ANNE E. EGELER
                                          DEPUTY SOLICITOR GENERAL
 7                                        P.O. Box 40100
                                          Olympia, WA  98504-0100
 8
             FOR THE INTERVENOR
 9           WASHINGTON FAMILIES
             STANDING TOGETHER:           MS. JESSICA T. HAMILTON
10                                        PERKINS COIE
                                          1120 N.W. Couch Street
11                                        Tenth Floor
                                          Portland, OR  97209
12
             FOR THE INTERVENOR
13           WASHINGTON COALITION FOR
             OPEN GOVERNMENT
14           (Via Telephone):            MR. STEVEN J. DIXSON
                                          WITHERSPOON KELLEY
15                                        422 W. Riverside Avenue
                                          Suite 1100
16                                        Spokane, WA  99201

17

18

19

20

21

22

23

24

25
```

Page 3

1                              INDEX

2    EXAMINATION                                      PAGE/LINE

3    MS. EGELER                                       4    13

4    MS. HAMILTON                                     46   23

5    MR. PIDGEON                                      53   4

6    MS. HAMILTON                                     56   6

7    MS. EGELER                                       56   22

8

9                             EXHIBITS

10   EXHIBIT          DESCRIPTION                     PAGE/LINE

11                        (No Exhibits.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EGELER (                              , 9/15/10)

                                                         Page 4

 1              BE IT REMEMBERED that on Wednesday, September 15,

 2        2010, at 1:58 p.m., at 1700 Hudson Street, Suite 300,

 3        Longview, Washington, before REBECCA S. LINDAUER, Notary

 4        Public in and for the State of Washington, appeared

 5                   , the witness herein:

 6              WHEREUPON, the following proceedings were had, to

 7        wit:

 8

 9                        ,       having been first duly sworn by

10                        the Notary, testified as follows:

11                        EXAMINATION

12  BY MS. EGELER:

13  Q    I would like to start by having you spell your full legal

14        name or state your full legal name, rather.

15  A    Middle name too?

16  Q    Yes.

17  A                      .

18  Q    Are you a registered voter in Washington?

19  A    Yes.

20  Q    Redac, have you ever attended a deposition before?

21  A    No.

22  Q    I'll give you a little bit of the basic rules.  Everything

23        that we say is being taken down by the court reporter, so to

24        help her, it's very important that we let each other finish

25        our sentences, rather than talking over each other.  Okay?

EGELER (                          , 9/15/10)

Page 5

1   A   Um-hmm.

2   Q   And it's also important that we say yes or no, rather than

3       um-hmm or head nods, because it won't show up on the record.

4   A   Okay.

5   Q   If you at any point are confused, if I'm asking something in

6       a way that just doesn't make sense, and that might happen,

7       just stop me and let me know and we can rephrase in a way

8       that does make sense.

9   A   Sure.

10  Q   So,      , can you tell me, where you are employed?

11  A   It's called

12  Q   And what type of a business is that?

13  A   It's industrial supply.

14  Q   What do you do there?

15  A   I do stock and prepare orders.

16  Q   How long have you been working there?

17  A   I think about two and a half months.

18  Q   And before that, where were you employed?

19  A   I did basically just part-time work with my dad.  He owns a

20      construction company.  And then before that, if you want to

21      know how far back, I worked at                          and

22          , so . . .

23  Q   What is your educational background?

24  A   I have a high school diploma.  I'm currently enrolled in

25      college right now.

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/15/10)

Page 6

```
 1   Q   And where are you attended college?
 2   A   It's called                    .  I do online school.  It's
 3       out of Oakland, California.
 4   Q   What are you studying?
 5   A   It's a bachelor's in church leadership.
 6   Q   And speaking of church leadership, do you have a leadership
 7       role at the                               ?
 8   A   No.
 9   Q   Or         ?
10   A   No.
11   Q   No.
12           Do you have church involvement currently?
13   A   In that church?
14   Q   In any church.
15   A   Yeah, I go to church.
16   Q   What church is that?
17   A   I go to The             .  It's a church that meets down
18       in the      here, the                    .
19   Q   And was that the same -- did you attend that same church in
20       2009?
21   A   No.
22   Q   In 2009, where did you attend church?
23   A                                   .
24   Q   Would that be true throughout 2009?
25   A   Um-hmm.  I mean, yes.
```

EGELER (                                    , 9/15/10)

Page 7

1    Q    Thank you.

2            Did you have a role in the church, other than just

3         attending?

4    A    Yeah.  At that time, I was the youth pastor.

5    Q    And what did you do as the youth pastor?

6    A    Mostly just involved Friday nights we would do youth

7         meetings, just do Bible studies and stuff, and we would do

8         some worship services and just hang out with the kids and

9         kind of play games and stuff.

10   Q    How old were the kids that you worked with?

11   A    It was anywhere from eight years old to 26 even, so it was a

12        pretty big age difference.

13   Q    The Friday night gatherings, did you have that age spread?

14   A    Yeah.

15   Q    And how many youth would you say you worked with?

16   A    I don't know if you're asking me for each -- how many would

17        come on average or how many over a period of time that I

18        would see because sometimes a kid would come once.

19        Sometimes they would come once every month or something --

20   Q    Okay.

21   A    -- so if you can be more specific.

22   Q    You know, I'm most interested in youth that were 18 years of

23        age and older, so let's focus on those.  If you could tell

24        me the -- well, let me ask:  Would you even be able to tell

25        me the number of every kid 18 or older who came and attended

EGELER (                        , 9/15/10)

Page 8

1        once?

2    A   Sure.  I could take a random guess in the year of 2009, 18

3        and over, I would probably say around maybe 40.

4    Q   Around 40 would attend regularly?

5    A   No.

6    Q   No.

7    A   Regularly I would probably say five.

8    Q   And on each Friday night, would you estimate that you had

9        about five people over the age of 18?

10   A   That's what I meant by that, yeah.

11   Q   I understand.

12            And I understand that you have some sort of skateboard

13       ministry that you do?

14   A   Yeah.  I run a skate church but it's really -- I shouldn't

15       put it that way.  It's more of just an outreach ministry

16       that I do.  It's not affiliated with any church.  I call it

17       a skate church, but it's not really a church as far as any

18       type of documentation or anything like that.  We don't even

19       take offerings.  We don't do any of that.  They don't call

20       me a pastor.  I just lead a Bible study and hang out with

21       the kids.

22   Q   How often do you lead the Bible study?

23   A   We meet once a week.

24   Q   Was that true in 2009?

25   A   No.  Well, let's see.  What's the date?  I probably started

EGELER (                              , 9/15/10)

Page 9

```
 1          doing the Bible studies nine months ago, so I would say no,
 2          I don't think we ever met in 2009.
 3    Q     With respect to your current church,                    , do
 4          you have a leadership role there?
 5    A     Uh-uh.
 6    Q     No?
 7    A     No.
 8    Q     When you were the youth pastor at the                    , did
 9          you have any contact with                    ?
10    A     I don't know who that is.
11    Q     Did you have any contact with anyone at the
12          in Vancouver, Washington?
13    A     Not really, no.  They're a Russian-speaking church and some
14          of them speak English, but most of them I don't even know.
15          And like if that guy     , I may even have seen his face
16          before, but I wouldn't even know his name.  I don't -- you
17          know, so I know very slightly the pastor and the youth
18          pastor there, but the pastor, I don't think, even speaks
19          English, so obviously never even had a conversation with
20          him.  Then the youth pastor, I've spoken to him maybe a few
21          times, so . . .
22    Q     Do you speak Russian?
23    A     No.
24    Q     No.  Okay.
25                I assume you're familiar with Referendum 71?
```

EGELER (                              , 9/15/10)

Page 10

```
 1   A   Um-hmm -- yes.

 2   Q   Can you tell me how you first became familiar with

 3       Referendum 71?

 4   A   I guess just word of mouth through churches probably.

 5   Q   So you don't remember specifically who told you about

 6       Referendum 71?

 7   A   I couldn't tell you exactly who the first person that told

 8       me was.

 9   Q   Do you remember around when it was that you first heard

10       about it?

11   A   Spring of 2009 is probably the best I could say.

12   Q   Did you sign the Referendum 71 petition?

13   A   Yes.

14   Q   Do you remember where you were when you signed?

15   A   Let me think about it a second.  I couldn't tell you

16       exactly, so all I could do is take a guess, but that's not

17       going to be a fact, so I can't really say.

18   Q   No.  I don't need you to take a guess.  That's okay.

19           Did you gather signatures on petitions for

20       Referendum 71?

21   A   Yeah.

22   Q   And where did you do that?

23   A   I went to family members and friends and I gathered

24       signatures at Creation Fest.

25   Q   What's that?
```

EGELER (                              , 9/15/10)

Page 11

1    A    It's a concert that's held once a year.  It was over in

2         George.

3    Q    Okay.

4    A    And I also gathered signatures at our Go Fourth Festival

5         walking around and talking to people.

6    Q    What's the Go Fourth Festival?

7    A    Every year there's a committee -- or an organization that

8         puts on the fireworks and stuff and they have vendors and do

9         things like that, so . . .

10   Q    I'm confused.

11   A    It would be for the Go Fourth -- like the 4th of July, the

12        citywide kind of celebration.  It's ran by a nonprofit

13        organization, so there's around 30,000 people there over the

14        weekend, and I just walked around for probably two hours one

15        day and talked to people.

16   Q    Where were you when you were walking around?

17   A    It's held at Lake Sacagawea.

18   Q    Do you remember, was                        with you that day?

19   A    He wasn't with me when I was doing it, no.

20   Q    Okay.

21   A    I did it alone.

22   Q    And when you were talking -- let me back up.  When you were

23        gathering signatures that weekend, were you walking around

24        with petition sheets or did you have a table you were

25        working?

EGELER (                              , 9/15/10)

Page 12

1   A   I walked around.

2   Q   Did you talk to people who were opposed to Referendum 71?

3   A   Yes.

4   Q   And were you able to obtain signatures?

5   A   Yes.

6   Q   Any other days that you gathered signatures that you

7       remember?

8   A   Not specifically, no, other than like what I said, you know,

9       going to family.  I couldn't tell you what days that was,

10      so . . .

11  Q   Did you gather signatures within the church?

12  A   No, I don't think I did.  No.

13  Q   Did you speak to anyone at the church or in your youth group

14      about Referendum 71?

15  A   Yes.

16  Q   And do you remember who you spoke to?

17  A   No.  Just would be whoever would have been there during the

18      time to explain to people I guess the situation and what it

19      was.

20  Q   You said that there were five -- approximately five youth

21      over the age of 18 that attended.  Do you think you would

22      have explained or, rather, do you think you did explain to

23      each of them?

24  A   What the case was?

25  Q   Or rather what Referendum 71 was.

EGELER (                          , 9/15/10)

Page 13

1    A    Yeah.

2    Q    And did you share your opinion about Referendum 71 with

3         them?

4    A    I probably -- no, I can't say for sure.  All I can say is

5         probably, but no, I don't know.

6    Q    Did you encourage those who were registered voters within

7         the youth group to sign the petition?

8    A    I don't think I did.  I would say no because probably --

9         yeah, I would probably say no.

10   Q    Did you ever speak to the youth group about homosexuality?

11   A    Yes.

12   Q    And what did you say?

13   A    Anything that I would have talked about I couldn't say

14        exactly what it would have been in the Bible, but doing a

15        Bible study, so . . .

16   Q    People have different views about what's in the Bible, so if

17        you could give me a little more information about what you

18        said.

19   A    Sure.  Like Romans Chapter 1, you know, it's pretty word for

20        word, and so I usually go pretty word for word when I read

21        the Bible.  And oftentimes in a Bible study, I'll ask, even

22        if I think it spells it out, I'll ask people what it says so

23        they can get the understanding and allow people to see what

24        it says, so I'm not telling people what it means.

25             I'm telling them what it says and then -- so that, you

EGELER (                                      , 9/15/10)

1    know, they don't run around thinking something is what the

2    Bible says because I told them it's what it says, so they

3    understand it's what the Bible says because they read it

4    themselves and see that, so they can have their own

5    convictions, not mine.  I would have stayed pretty close to

6    what it would have said there.

7         If I explained, it would have been if somebody had not

8    understood a word or something like that.  But, you know,

9    especially if it was somebody who was over the age of 18,

10    they would have understood, I'm sure.

11  Q   And do you recall ever making a connection during a Bible

12    study between what the Bible says about homosexuality and

13    the Referendum 71 petition campaign?

14  A   Yeah.  I'm pretty sure I could say yeah, I did.

15  Q   Yes, that you did?

16  A   (Witness nods head.)

17  Q   Did you ever go out with Referendum 71 signs and hold up a

18    sign in a public location?

19  A   Yes.

20  Q   Can you tell me about that?

21  A   We met one day -- or I went one day down to the intersection

22    down here of the Allen Street Bridge and I believe it's

23    First Avenue there and stood and held a sign for probably

24    about two or three hours.

25  Q   How many people were there with you?

EGELER (                          , 9/15/10)

Page 15

1   A   How many people came with me or how many people were there?

2   Q   Were there.

3   A   Probably 70.

4   Q   And by "people there," I mean people there holding signs.

5   A   Yeah.

6   Q   And is that a place that you would consider a high traffic

7       area?

8   A   Yes.

9   Q   Was this site chosen because it's a high traffic area?

10  A   Probably, yeah.

11  Q   Did you bring people with you to this event?

12  A   No.

13  Q   Did you tell the youth group about this event?

14  A   No.

15  Q   Do you have a Facebook or a Myspace or a Web page?

16  A   Yes.

17  Q   Which of those?

18  A   I have all three.

19  Q   All three?

20  A   Yeah.

21  Q   Do you recall whether or not you announced this event or

22      provided information about it?

23  A   I know I didn't so, no, I didn't.  I don't think I even had

24      a Facebook then, and Myspace, I don't know if I even had a

25      Myspace then either.  I didn't have a Web page then.

EGELER (                              , 9/15/10)

Page 16

 1   Q   So you had no media?

 2   A   I didn't put any of that on, any of that stuff, no.

 3   Q   Did you go to this location with signs on one occasion or

 4       multiple?

 5   A   One.

 6   Q   Do you recall speaking with any reporters while you were

 7       there?

 8   A   I did not.

 9   Q   Did you place a Referendum 71 sign in your yard?

10   A   No.

11   Q   Did you put a Referendum 71 bumper sticker on your car?

12   A   No.

13   Q   Other than speaking to your youth group -- let me back up a

14       little.  Are your youth group and Bible study group

15       separate entities or are we talking about the same group

16       when we talk about --

17   A   When you're talking about like Friday night or the skate

18       church I do?

19   Q   Well, I'm focusing on 2009, so let me ask some clarifying

20       questions.  You talked about being a youth minister then and

21       you worked with a youth group on Friday nights.

22   A   Yes.

23   Q   Then in some spots I think you also talked about a Bible

24       study.  Is that right?

25   A   We did the Bible study.  That was our youth group.  We would

EGELER (                            , 9/15/10)

Page 17

1        do a Bible study there, so there was only one occasion when

2        I was actually involved like that.

3    Q   So the Friday nights, that was the Bible study?

4    A   Yes.

5    Q   And the Friday nights, do you think that would have met

6        every Friday throughout 2009?

7    A   Not every Friday.

8    Q   How often in a month would it have met?

9    A   Usually it was every Friday.  But I guess by that I mean, if

10       there was other events at another church we might attend or

11       if holidays and things like that, so it was scheduled to

12       meet basically once every week.

13   Q   So sometimes you met with other church youth groups?

14   A   Not -- well, yes.  Yes.  I can say, yes, we did.

15   Q   When you met with other church youth groups, was there ever

16       a Bible study with that or a sermon?

17   A   Not probably in the year of 2009.  Often sometimes when we

18       would meet would be after a Bible study and we would go and

19       play like basketball or dodge ball or something at the gym.

20       That's usually when we would have our contact with other

21       youth groups.

22   Q   Did you have any opportunity to speak with other people with

23       other youth groups about Referendum 71?

24   A   No.

25   Q   Okay.

EGELER (                              , 9/15/10)

Page 18

1    A    I wanted to clarify something, I think, when you -- because

2         I didn't really get to insert this.  When you asked if I

3         spoke to my youth group and linked the Bible with Referendum

4         71, what I would say that I linked wasn't about -- as much

5         about homosexuality and Referendum 71, but about the Bible

6         and our role as voters.

7    Q    Okay.

8    A    And encouraging people not to vote according to

9         homosexuality, but to vote according to the fact that they

10        should be voting in general.  So the encouragement that I

11        would have given based upon the Bible wasn't telling people

12        how they should view Referendum 71 as much based upon the

13        Bible but how they should view politics based upon the

14        Bible.

15             One of the -- I know this isn't why we're here, but the

16        reason I would have done that is because one of the biggest

17        struggles is that people say there should be no connection

18        between the Bible and politics.  But once again, if you read

19        the Bible, that's pretty clear in there that that's

20        something we should be doing.  That's a lot more of what I

21        was probably encouraging people to do, was to understand

22        that politics is part of, you know, their responsibility and

23        they should be voting, if they were of the age of 18,

24        so . . .

25   Q    Do you think that each of the five regular attendees

EGELER (                           , 9/15/10)

Page 19

1       understood what your position was on Referendum 71?

2   A   Yeah.

3   Q   And in addition to those five, do you think some of the

4       other attendees that came occasionally understood your

5       position on Referendum 71?

6   A   Anybody that would have known very much about me and the

7       case would know what I stood for.

8   Q   So did you ever try and keep your support of Referendum 71 a

9       secret?

10  A   No.

11  Q   So do you feel comfortable telling people that you signed

12      the petition?

13  A   Yeah.

14  Q   And are you aware that as a witness in this case you may be

15      required to publicly testify in federal court?

16  A   Yeah.

17  Q   Does that concern you for any reason?

18  A   Some.

19  Q   And what concerns do you have about that?

20  A   I have a family.  I have a little girl and I know that

21      there's a lot of hostility in this and -- so I'm willing to

22      do it.  It's not like I have no concern.  I guess it's a

23      matter of standing up for what's right, so -- but it is a

24      little scary because a lot of people might -- well, a lot of

25      people put actions to their words and even words can be very

EGELER (                                    , 9/15/10)

Page 20

```
1          damaging.  So I have, like I said, a family, a wife and a
2          little girl, and I don't need somebody going out hating
3          because of what I believe and attacking my family physically
4          or something like that.
5     Q    I want to go back a little.  You talked about social media,
6          like Facebook and Myspace, and said that currently you do
7          have those, correct?
8     A    Um-hmm -- yes.  I'm sorry.
9     Q    On either your Facebook page or your Myspace, do you state
10         any views about abortion?
11    A    Yes.
12    Q    And what do you state?
13    A    As far as in my own words, nothing, I believe.
14    Q    Do you have something posted that you put on there that
15         expresses an opinion about abortion?
16    A    Yes.  My wife put a couple things on there.  I never view my
17         profile because when I get on Myspace, it goes to your
18         messages and such.  It doesn't show your profile.  My wife
19         helped set up some of it.  But the one link I put was to a
20         video, showing videos, and like pictures.  It's like a slide
21         show of babies that have been aborted and that, I believe,
22         is the extent of what I put personally as far as any of my
23         own impression.
24    Q    You talked a bit about some people have hostility towards
25         political issues.
```

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/15/10)

Page 21

1    A    Yes.

2    Q    Do you think some people have hostility about the issue of

3         abortion?

4    A    Yes.

5    Q    Do you worry that perhaps putting abortion messages on the

6         Internet might cause angry words or hostility?

7    A    I'm sure that it could.

8    Q    Is this another instance where you're willing to take that

9         risk because you want to stand up for what you believe is

10        right?

11   A    Are you asking me that somebody's going to watch the video

12        and get angry about abortion happening or are you asking if

13        I'm concerned that somebody's going to see that I stand

14        against abortion and then attack my family based upon that?

15   Q    The latter.

16   A    Okay.

17   Q    I'm asking whether you worry that some people who may be

18        extremists in their prochoice, proabortion --

19   A    Yes.

20   Q    -- or anti-Bible views, however you want to put it, if in

21        that --

22   A    In general, some people would be violent for no reason at

23        all, but I guess it's a matter of how much on the scale of

24        violence they're going to act.  And I think that, you know,

25        I've never really seen or heard of near, if any, as many

EGELER (                              , 9/15/10)

Page 22

1    cases as people who are proabortion becoming violent over

2    their right as much as the -- a lot of the public expression

3    of prohomosexuals.

4  Q  Let's talk about that expression, and I understand you've

5    experienced what you believed to be hostility, harassment,

6    or threats as a result of your connection to Referendum 71.

7    Is that correct?

8  A  Yes.

9  Q  Can you tell me about that, please?

10 A  I personally -- because in the big picture of all this, I'm

11   really just a nobody and my name wasn't really out there

12   very much.  The fact I'm on this is only because I signed as

13   John Doe just because I guess -- yeah.  But -- so I wasn't

14   on TV.  I wasn't in the paper.

15        You know, people that I would talk to, some people

16   would get very angry standing with the sign.  Some people

17   that I know would stop and say things to me.  My brother was

18   one person who sent me like a text message, you know, of

19   basically disgust.  Even though he doesn't -- he isn't

20   prohomosexual, I think it was more his anger that I would

21   stand out on the street corner and advocate my beliefs, so I

22   guess that's it.

23 Q  Well, let's talk about those incidents.  First, you said

24   that you were -- some people were angry when you were

25   holding a sign.  Can you tell me about that?

EGELER (                                    , 9/15/10)

Page 23

 1   A   Well, yeah, sure.  Some people would flip you off.  Some

 2       people would cuss at you.  Some people basically public

 3       indecency of dropping their pants and mooning you or

 4       whatever as they drove by, so that would be the extent of

 5       that.  Nobody stopped and, I guess, got out of their car and

 6       came to me personally.

 7   Q   So we're talking about the intersection that you were

 8       standing at on the bridge, correct?

 9   A   Um-hmm -- yes.

10   Q   And so let's start.  First, you said that there were people

11       who were flipping off the people holding the signs, correct?

12   A   Yes.

13   Q   You personally saw that?

14   A   Yes.

15   Q   Did any of the people that were flipping people off make

16       statements about Referendum 71 or were they driving by and

17       didn't make a statement?

18   A   Some of them made statements, but I can't remember what they

19       would have been.

20   Q   You don't remember any of the statements?

21   A   I remember people yelling things, but I don't remember what

22       they said.  Like, if you were to ask me what exactly they

23       said, I don't remember.  I do know that it was verbal

24       attacks against us, but it wasn't -- I couldn't tell you

25       exactly --

EGELER (                              , 9/15/10)

Page 24

```
 1   Q    So --

 2   A    -- word for word is what I mean.

 3   Q    -- were the verbal statements all verbal attacks as opposed

 4        to any sort of dialogue or sharing of their viewpoint about

 5        Referendum 71?

 6   A    Yes, I would say so.  If I'm standing and holding a sign

 7        that would say to reject the senate bill and somebody

 8        flipped me off and told me that I was a loser, I don't think

 9        it's because of the clothes I was wearing.  I would think it

10        would be more because of the sign I was holding and what the

11        sign said, not because I was holding up a sign.

12   Q    So no one specifically said, I'm angry that you're promoting

13        Referendum 71?

14   A    Most people weren't talking like that nicely.  I think

15        that's what they were saying, yes, but I don't think they

16        said, hey, I just wanted you to know I don't support this

17        kindly.  Most of -- I would say most all negative response

18        was fairly aggressive.

19   Q    Is it fair to say that no one said -- let me rephrase that.

20        Of those who were flipping you off or cussing, is it fair to

21        say that none of them made a clear statement about

22        Referendum 71?  It's more a situation where you felt their

23        opinion by their profane behavior?

24   A    No.  I believe it was very clear.  I mean, you can get down

25        for I guess -- I mean, how clear does it need to be, you
```

EGELER (                                    , 9/15/10)

Page 25

```
 1      know?  Yeah.  Nobody stepped out and raised their right hand
 2      and solemnly swore that they were against what we were doing
 3      in that sense, no.  But, you know, so in the sense -- yeah,
 4      I guess.  Based upon my social ability to understand
 5      people's communication, yes, people were definitely stating
 6      their disagreement with this.
 7   Q  And you said that there was a mooning incident.  Did you
 8      personally witness this?
 9   A  Yes.
10   Q  Okay.
11   A  Maybe two, but at least one.  It seems like I might remember
12      a second.
13   Q  Let's start with what you actually remember for sure and
14      what did you see, other than --
15   A  Someone's butt in the car driving by.  It was white.
16   Q  Do you remember if the individual was in the back seat or
17      the front seat?
18   A  Passenger front seat.
19   Q  Passenger front.
20          Do you remember or were you even able to tell the
21      approximate age of the individual?
22   A  No.  Probably wasn't somebody that was very old, based upon
23      the fact that they had to be able to get up and . . .
24   Q  And have you ever been mooned before in your lifetime?  Is
25      that your first experience with that?
```

EGELER (                              , 9/15/10)

Page 26

```
 1              MR. PIDGEON:  I'm going to object as to form.

 2        Is there a relevance to that question?

 3   Q    (By Ms. Egeler)  You can go ahead and answer.

 4   A    I'm just trying to remember.  Not that I can remember

 5        exactly, no.

 6   Q       , have you ever flipped someone off before?

 7   A    Yes.

 8   Q    And after you did it, did you physically assault them?

 9   A    I'm sure it's happened, yes.

10   Q    Can you roughly estimate how many times in your life you

11        flipped someone off or is that just too broad for a guess?

12   A    It's too broad, yes.

13   Q    Do you think you flipped someone off in the past 30 days?

14   A    No.

15   Q    Do you think you flipped someone off in the past year?

16   A    No.  It's probably been more like at least the last six

17        years, six and a half years.

18   Q    And every time you flipped someone off, have you physically

19        accosted that person as well?

20   A    No.

21   Q    Have you usually not physically accosted them?

22   A    If you can -- would you describe flipping somebody off as a

23        verbal attack or would you express that as a physical?

24   Q    I'm wondering --

25   A    Do you mean physically touching and harming their body?
```

EGELER (                                    , 9/15/10)

Page 27

```
 1   Q   Yes.  I mean physically touching and harming their body.
 2   A   No, not every time.
 3   Q   But you have physically assaulted people before in your
 4       past?
 5   A   Yes.
 6   Q   Can you tell me about that?
 7   A   Yeah.  When I was a teenager, you know, a little kid and
 8       basically just being a jerk as a teenager.
 9   Q   Have you ever sworn at people?
10   A   Yes.
11   Q   And have you done that in the past 30 days?  Have you ever
12       said a cuss word in the past 30 days at someone?
13   A   No.
14   Q   In the past year?
15   A   No.
16   Q   Is that more teenage behavior as well?
17   A   No.  I believe it's just the fact that six and a half years
18       ago I became a Christian and that -- I mean, that's when I
19       quit, when my life changed.
20   Q   In that six and a half years that you've been a Christian,
21       you've never sworn at someone?
22   A   Probably not, no.
23   Q   So prior to that six and a half years, you had, in your
24       lifetime, sworn at people?
25   A   Yes.
```

EGELER (                              , 9/15/10)

Page 28

1   Q   Did you always physically accost them after swearing at
2       them?
3   A   Not every time.
4   Q   But sometimes?
5   A   Sometimes.
6   Q   Did you ever get in any trouble with the law during these
7       fights?
8   A   No.
9   Q   Any problems with the schools?
10  A   A little.
11  Q   Can you tell me about that?
12  A   As far as how much they would actually -- I did get
13      suspended once in high school for fighting.
14  Q   When you were on the bridge, the intersection where you were
15      holding the sign, do you know what the speed limit is there?
16  A   Yeah, 25.  I mistook that once.
17  Q   So in addition to people flipping you off -- well, actually,
18      let's go back and cover the second mooning incident that you
19      might remember.  Do you remember with certainty a second
20      mooning incident?
21  A   Not exactly.
22  Q   Not exactly?
23  A   I couldn't -- because I'm not even positive that it really
24      happened, I wouldn't say it did, for the record.
25  Q   I'm not going to ask you to guess about something you don't

EGELER (                              , 9/15/10)

Page 29

1    remember.

2  A    No.

3  Q    So then to go back and catalog, while you were there holding

4       a sign, you experienced people flipping you off, an incident

5       where someone mooned you, and profane language?

6  A    Yes.

7  Q    Anything else happen while you were holding the sign?

8  A    No.

9  Q    And then when I asked you about harassment or threats, you

10      also mentioned that your brother was upset.  Can you tell me

11      about that?

12  A   Yeah.  He just sent me a text message -- I'm not sure --

13      with, you know, cuss words and, you know, he attacked the

14      Bible.  I remember that.  And he attacked me both --

15      verbally, I guess, because it was a text message with

16      swearing and that was pretty much it.

17  Q   Did you feel that that was harassment or a threat?

18  A   I would consider it harassment, yeah.  I wouldn't consider

19      it a threat only because I know my brother.  If I didn't

20      know my brother and somebody did that, then I would

21      definitely consider it a threat, yes.  But because it was my

22      brother, I know him, and I know that he's not going to come

23      over and hurt my family, so . . .

24  Q   Were you offended or did you think your brother was just

25      expressing his opinion?

EGELER (                           , 9/15/10)

1  A  It was offensive, yeah.

2  Q  Did you tell him it was offensive?

3  A  I don't know that I -- I remember talking to him about it.

4  Q  Okay.

5  A  So I would say I probably expressed that.  I think he meant

6     it to be offensive, you know.

7  Q  When you talked to him, did he, after that, stop doing

8     things that you felt were harassment?

9  A  It's kind of a tricky question because I would say his

10    attitude would be no, but as far as actions, yes.

11 Q  What actions did he take that you thought were harassing?

12 A  What I meant was his actions is he did stop, but I don't

13    believe his attitude towards the situation changed, so . . .

14 Q  But he was no longer sending you offensive messages?

15 A  No.  I don't think he felt sorry for doing it the first

16    time, but I don't -- he didn't send any more.

17 Q  The people that were driving by and harassing, in your

18    opinion, when you were on the bridge, did you feel the need

19    to call the police?

20 A  At that point, no, or I would have.

21 Q  And why did you not feel the need to call the police?

22 A  Well, none of what happened there -- well, let me see.  I

23    guess what I could say is, if I had -- I don't know.  If I

24    felt there was more physical violence, at that point I would

25    have, even though I think that public indecency is against

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/15/10)

Page 31

1   the law, you know, then, you know, I'm sure that if the

2   person that did that did it to the wrong person, they could

3   have -- I mean, could have filed a sexual harassment charges

4   or something I'm sure.  Exposing private parts to children

5   is against the law, as far as I'm concerned, especially if

6   you're over the age of 18, and I'm sure the person was over

7   the age of a teenager.  There was children near us, so . . .

8   Q   But I'm understanding that you did not feel physically

9       threatened at that time.  Is that correct?

10  A   No, I did not.

11  Q   So we have the incident that occurred on the bridge and your

12      brother's message.  Did you experience anything else that

13      you considered harassment or a threat as a result of your

14      involvement with Referendum 71?

15  A   Only by people when I was gathering signatures.

16  Q   Can you tell me about that?

17  A   Yeah.  Just people's responses.  Most of it was indirect.

18      People would, you know, look -- like if you would offer

19      something to somebody, then, you know, instead of being

20      like, you know, saying, no, I don't support that, but, you

21      know, just more like, you know, leave me alone, get out of

22      here.  Nothing I would consider any type of, you know,

23      serious offense.

24  Q   So while gathering signatures, you did not experience

25      anything you would consider harassment --

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/15/10)

Page 32

1  A  Threatening.

2  Q  -- or threats?

3  A  No.  You have to understand, though, that most of where I

4     gathered signatures was at Creation Fest, which was a

5     Christian event, so even though not everybody agreed, you

6     know, most of the people weren't likely to be as physically

7     aggressive, you know, so -- or hopefully not, none that I

8     experienced.

9  Q  One of the places you gathered signatures was at Lake

10     Sacagawea Park on the 4th of July, correct?

11  A  Yes.

12  Q  You said there were approximately 30,000 people there that

13     day.

14  A  That go through during the whole weekend, so that day there

15     was probably 10,000.

16  Q  And of that 10,000, were they all Christians who agree with

17     your view of the Bible?

18  A  No.

19  Q  Do all Christians agree with your view of the Bible with

20     regard to homosexuality and same sex marriage?

21  A  Yes.

22  Q  Are you aware of people who consider themselves Christian,

23     even if you don't consider them Christian --

24  A  Yes.

25  Q  -- who have a different viewpoint than you do with respect

EGELER (                              , 9/15/10)

Page 33

1          to homosexuality?

2     A    Yes.

3     Q    Could any of those individuals have been at Creation Fest?

4     A    Yes.

5     Q    And do you know what percentage of people at Creation Fest

6          share your view of Christianity?

7     A    No.

8     Q    So would it be fair to say that there could be people at

9          Creation Fest that you spoke to that had a different

10         viewpoint with regard to homosexuality?

11    A    Yes.

12    Q    And same sex marriage?

13    A    Yes.

14    Q         , is your address listed in the phone book?

15    A    No.  Actually, I don't know.  Never looked.  I don't have --

16         I guess I do have a home phone.  It's not hooked up, so I

17         don't know.  You could look.

18    Q    Do you ever disclose your home address publicly?

19    A    Yes.

20    Q    Where do you do that?

21    A    It's on my Web page.

22    Q    Who can access your Web page?

23    A    Anybody.

24    Q    The date that you went to the bridge and you were holding a

25         Referendum 71 sign, did you go after that date to Lake

EGELER (                           , 9/15/10)

Page 34

1          Sacagawea and gather signatures?  Which came first in time?

2    A     I don't remember.  I don't remember exactly.  I think I

3          know, but I'm not positive.

4    Q     After you experienced the incidents that you believed were

5          harassing on the bridge, did you stop all public involvement

6          with Referendum 71?

7    A     No.

8    Q     Why not?

9    A     I just decided that I guess I wasn't going to be pushed

10         around by it.  So, I mean, I do have the right to believe

11         something, and at that point, it was certainly becoming very

12         aware to me how standing for something in politics is

13         extremely -- it's almost like starting a war, so I realized

14         that, but, I mean, what's the point of living if I'm not

15         going to do anything in my life?

16   Q     After experiencing the actions that you saw on the bridge,

17         the harassment, did you feel that you were putting your wife

18         or child in jeopardy by continuing public involvement with

19         Referendum 71?

20   A     Partly yes because of the bridge, mostly so because of other

21         circumstances that I was hearing about and things like from

22         the Internet or from TV and stuff like that I guess is more

23         of what it was.

24             Seeing how people reacted around us in our town, which

25         is a very small town, and not near so -- there's probably

State Objects: Lack of Foundation; Hearsay; Irrelevant.

Dixie Cattell & Associates (360) 352-2506

EGELER (                          , 9/15/10)

1    not as many aggressive pro-gay supporters here as there is

2    in, say, like Seattle.  And knowing that if I'm seeing as

3    much as I was here in our town, knowing that people could be

4    apt to see my name and information online or, you know, that

5    type of stuff and knowing that those more aggressive people

6    were doing more aggressive acts towards other people, then

7    I -- that's really where more of my concern was, I guess.

8  Q  But you didn't feel the need to protect your wife and child?

9  A  Yes.  I did feel the need to protect my wife and child, yes.

10 Q  But your desire to remain involved with Referendum 71 was of

11   greater importance to you?

12 A  Yes.  I believe that if -- I mean, I guess I can't say this

13   in every circumstance, but in this circumstance especially,

14   like I said, what's the point of me living if I have no

15   purpose in this life and am I going -- what I'm teaching my

16   wife or teaching my child at this point, although my child

17   was only two years old, I believe, at this point, by just

18   permitting the more aggressive people to push me into the

19   place that they want me to be because they're more

20   aggressive, then, I mean -- you know what I'm saying?  It's

21   like then who am I going to run to my whole life if I can't

22   stand up for especially something I have every legal right

23   to believe and to protest or gather signatures for legally,

24   you know.

25         So if I can't exercise my legal rights in America, I

State Objects: Lack of Foundation; Hearsay; Irrelevant.

Dixie Cattell & Associates (360) 352-2506

EGELER (                          , 9/15/10)

Page 36

1    want to be able to show that to my wife and daughter.  And

2    because, you know, if you'll think about it, our campaign

3    was to protect children, you know, by doing this.  I didn't

4    want, you know -- I believe that a child needs a mother and

5    a father.  And if, say, my wife and I were in a car accident

6    and my child got put up for adoption, I didn't want my child

7    to be adopted by a homosexual family.  I don't want her also

8    to be adopted by a normal family that's going to abuse her

9    or anything like that, but I want my child to have a mother

10   and father, if at all possible.  And seeing especially the

11   larger picture of -- or a large picture of the homosexual --

12   what I considered a homosexual agenda, I don't want my child

13   exposed to those things.

14       I have a picture on my computer at home.  I still have

15   it, and I probably should delete it, but it's just a

16   photograph from the Seattle gay pride parade, and there's a

17   middle aged man in a leather thong exposing himself to

18   probably a six year old and an eight year old and a father

19   sitting there with his children.  And if I did that, I would

20   go to prison for years, and I don't want those things.  I

21   want it to be -- I don't want my child around any of that.

22   Q   Is it fair to say that you in Longview here did not feel

23       that you were at physical risk of harm?

24   A   No.  That's not true.

25   Q   So you felt that you were at risk of physical harm?

State Objects: Impermissible lay witness testimony under ER 701; the witnesses testimony is also irrelevant.

State Objects: Lack of Foundation; Hearsay; Irrelevant.

Dixie Cattell & Associates (360) 352-2506

EGELER (                                    , 9/15/10)

Page 37

1    A    Some.  Not as much as probably I would have felt or I could

2         have felt in other situations, but yes, I was aware that

3         could reach me, certainly.

4    Q    What made you think that?

5    A    Seeing people's reactions and understanding that some people

6         were, you know, becoming more violent and saying more

7         violent and aggressive things in the media, that was making

8         the media and things like that.

9    Q    Did you see any violence yourself?

10   A    No.

11   Q    Are you aware of any violence surrounding Referendum 71 in

12        the Longview-Kelso area?

13   A    No.

14   Q    The election's now over and the issue has been concluded.

15        Do you still feel there's a risk to you?

16   A    Not as much.

17   Q    What risk do you think there is now?

18   A    I don't know.  I mean, especially there's -- I mean, I saw

19        things online with, you know, one -- I think one was a big

20        case of people saying that they're going to kill people if

21        anybody tries to stop their rights for basically gay

22        marriage.

23   Q    Where did you see this online?

24   A    I believe that made the paper or something, didn't it?  This

25        was one -- I remember -- I don't have the Web address, but I

State Objects: Lack of Foundation; Hearsay; Irrelevant.

State Objects: Lack of Foundation; Hearsay; Irrelevant.

EGELER (                              , 9/15/10)

State Objects: Lack of Foundation; Hearsay; Irrelevant

Page 38

1        remember seeing it online.

2    Q   When did you see it?

3    A   During the case, probably last summer.

4    Q   Summer of 2009?

5    A   2009, yeah.

6    Q   Have you seen anything talking about violence or killing

7        people since the election's concluded?

8    A   No.

9    Q   So what's the source of your fear now?

10   A   Like I said, I haven't really looked online to see.  If,

11       say, the names are released, you know, there could be people

12       that, you know, are just waiting for that to happen.

13   Q   But your name's already out there, isn't it?

14   A   Yes.  Part of the reason that I was willing to do this as a

15       John Doe wasn't just because of my name, but because of

16       other people.  Some people may not be willing to risk what

17       I'm willing to risk, so . . .

18   Q   But to understand you, you are willing to take that risk by

19       being public about your position?

20   A   Yes.

21   Q   Have you experienced any other threats or harassments or

22       reprisals that we haven't talked about?

23   A   No.

24   Q   Did you participate at all in going to the Secretary of

25       State's office and overseeing the checking of the petition

EGELER (                                          , 9/15/10)

Page 39

1         signatures?

2    A    Yes.

3    Q    And how many times did you do that?

4    A    Once.

5    Q    Did you go with                        to do that?

6    A    No.  I drove myself.

7    Q    Did you sign in when you got there?

8    A    Yeah.  I think you had to, yes.

9    Q    Were you aware that there were individuals there that had a

10        contrary position that did not want Referendum 71 to make

11        the ballot that were there as well?

12   A    Yes.

13   Q    Did you know which individuals in the room would fall into

14        that category?

15   A    No.  Well, I guess by the end of the day, yes.  When I first

16        walked in, I couldn't -- I didn't know when I got there, but

17        by the end of the day, it was pretty clear.

18   Q    Approximately how many of those people were there?

19   A    During the day while I was there, I would say around four,

20        maybe five people.

21   Q    Did you feel threatened by them?

22   A    There?  No.  Those people, no.

23   Q    Did you feel they might come after you later?

24   A    No.

25   Q    Did you think the Secretary of State's process of verifying

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/15/10)

Page 40

1        names was accurate?

2    A    Yeah.

3    Q    When you were there, did you see any cameras in the room?

4    A    Yes.

5    Q    Did you see any television cameras?

6    A    That was the camera that I saw.

7    Q    Do you remember which television station the camera was

8         from?

9    A    No.

10   Q    Were you concerned that the television camera might show you

11        in that room?

12   A    Some.  I guess, see, it's not that I don't have -- the fear

13        is that I don't -- is not because I'm concerned.  It's

14        because I'm willing to do it.  I do understand that there's

15        a risk to that, if I was put on TV or such things, but I'm

16        just willing to do it, I guess, so, yes, I do have concern.

17        I guess it's a matter of whether, you know, I was willing to

18        do it or not.

19   Q    Do you know if you were shown in that room on television?

20   A    I do not believe that I was.

21   Q    Do you know if your picture was shown on any Web sites?

22   A    No, I don't know.

23   Q    As part of your deposition notice, you were asked to bring

24        with you any records in electronic or paper format that

25        would depict any images or harassment or threats that you

EGELER (                              , 9/15/10)

Page 41

1       received.

2    A   Here?

3    Q   Yes.

4    A   Yes, I did read that.

5    Q   Did you have anything responsive to that?

6    A   No.  I didn't bring anything.

7    Q   Do you have anything that would be responsive that you

8        didn't bring?

9    A   I would have had to take some time to research to find some

10       of the things that I had seen before, and so -- I didn't

11       have the time to do that.  Even making this, my wife's work

12       schedule got changed, so, I mean, I have to come here

13       straight from work and go to work early just to make it here

14       today.  And so -- I do school, so I've been very busy.  I

15       wasn't even sure if I would find things, so I didn't look.

16   Q   If you had looked, would you be looking strictly for Web

17       sites or did you receive any information that was sent to

18       you?

19   A   It would have been from Web sites.

20   Q   And do you have any photographs of the day at the bridge or

21       any of your signature gathering days?

22   A   I do not personally, no.

23   Q   Does your employer have any awareness of where you are

24       today?

25   A   Right now?

EGELER (                              , 9/15/10)

Page 42

```
 1   Q   Yes.

 2   A   No.

 3   Q   Does your employer know that you're a party to the lawsuit?

 4   A   No.

 5   Q   Does anybody know that you're a party to the lawsuit, other

 6       than counsel?

 7   A   My wife knows.                knows.  One of my coworkers

 8       knows.  He's a friend of mine.

 9   Q   Does your brother know?

10   A   No.

11   Q   No one else in your family knows?

12   A   I believe that my dad and my stepmom know, yes.  They don't

13       know that I'm here today, but I believe if you were to

14       mention it to them, I think that my dad could recollect

15       something from me telling him in the past.

16   Q   Did you tell your youth group about your involvement in the

17       case?

18   A   No.

19   Q   Have you told anyone else that you're standing up for your

20       values in this case?

21   A   No.

22   Q   Are you concerned that people will find out?

23   A   No.  Well, I guess that -- like I said is, that just goes

24       to, you know, I understand that it could be -- lead to

25       consequences that I don't want to see or to be a part of,
```

EGELER (                                        , 9/15/10)

Page 43

1          but I'm willing to risk it, so . . .

2    Q    Are you worried about your friends or people that you go to

3          church with finding out that you're taking part in this

4          lawsuit?

5    A    Not friends, no.

6    Q    You said during 2009 you did not have any social media Web

7          sites of any sort.

8               Did your wife have any?

9    A    As far as this case is concerned or any at all?

10   Q    Any at all.

11   A    She probably -- I'm sure she had a Myspace thing.

12   Q    Did she ever participate with you in signature gathering?

13   A    I can't say yes, so I would have to say no.  There may have

14         been one time, but I don't know for sure.  I know somebody

15         was with me at one time, but I don't remember who it was.

16         It may have been her, but I can't say for sure, so I would

17         have to say no.

18   Q    Did she go to the bridge and hold up a sign with you?

19   A    No.  She worked.

20   Q    Do you know if she stated anything on her Myspace page about

21         your involvement with Referendum 71?

22   A    I don't know.

23   Q    Do you know if she put anything on her Web page talking

24         about Referendum 71 at all?

25   A    I have no idea.

EGELER (                              , 9/15/10)

Page 44

```
 1   Q   If you ever did have a situation where there was physical
 2       violence directly threatened to you or your family, would
 3       you feel comfortable calling your local or state police?
 4   A   Yes, I think so.  I guess I do.  It depended if it was the
 5       police threatening me.  I don't know.  It would depend.  I
 6       don't think they would, but I'm just saying I don't know.
 7       I'm not in -- never been put in that situation for anything
 8       like this before, but I would assume that's the first thing
 9       I would do.
10   Q   Do you think that your local or state police would threaten
11       you?
12   A   No.  It was mostly a joke.  I'm sorry.  But you didn't
13       describe a more precise situation, so I was just saying.
14   Q   So you feel comfortable calling your state or local police
15       then?
16   A   Yes.
17   Q   Before Referendum 71 came about, there was a Senate
18       Bill 5688.  Were you aware of that bill?
19   A   Yes.
20   Q   There was a public hearing regarding that bill.  Did you
21       participate in any way in that public hearing?
22   A   No, no.  I did not.  I believe it was -- I might have heard
23       about one in Olympia.  Is that it?
24   Q   Yes.
25   A   No, I was not there.
```

EGELER (                              , 9/15/10)

Page 45

1   Q   Did you ever meet with anyone else to plan Referendum 71

2       related events or signature gathering?

3   A            and I think that's it.

4   Q   Did you ever meet with Larry Stickney?

5   A   I've met him.  I guess I did talk to him, even on the phone,

6       about things that, you know, we could do, but nothing had

7       ever happened, so yes, I did talk to Larry Stickney.

8   Q   What did you speak about?

9   A   I would just have to say, because I can't remember exactly,

10      just things in general about the case, even a lot of stuff

11      that had nothing to do with Referendum 71 or any of this,

12      just I guess personal off topic things.  And so -- but as

13      far as the case or Referendum 71 was concerned, it would

14      just be what were possible ideas or options to try to let

15      more people know about what was going on and stuff.

16  Q   Did you talk to Larry Stickney about this case?

17  A   Yes.

18  Q   Did you talk to him before being deposed?

19  A   What do you mean, "being deposed"?

20  Q   Did you talk to him about this deposition today?

21  A   No.  I haven't talked to him recently.

22  Q   And other than Larry Stickney and          , who else did

23      you talk to about Referendum 71 in terms of organizing or

24      getting the word out?

25  A   I don't think there was anybody else offhand, but, I mean, I

HAMILTION (                              , 9/15/10)

Page 46

1        guess to show memory is -- until you just said his name, I

2        forgot he even existed for a second, so -- but nobody that I

3        can think of.

4    Q   Do you remember speaking with              ?

5    A   And              is?

6    Q   Just yes or no.

7    A   I think, but is this -- is    the pastor out of -- that

8        was out of Olympia?

9    Q   I'm not aware of him being a pastor.  I'm wondering if you

10       might be thinking of            .  He's a pastor in

11       Olympia.

12   A   That's who I'm thinking of, yes.  As far as              , I

13       would have to say no, because I can't remember who that is.

14   Q   When did you speak with              ?

15   A   He had come and -- well, I seen him up at the signature

16       gathering.  He was up there when I was up there and I met

17       him there, but I don't -- I didn't speak with him about any

18       ways to, I guess, propagate or do any of that type of stuff,

19       so . . .

20               MS. EGELER:  I have no further questions.

21                         EXAMINATION

22   BY MS. HAMILTON:

23   Q   My name is Jessica Hamilton.  I'm an attorney at Perkins

24       Coie in Portland.  I represent Washington Families Standing

25       Together.  Are you aware of what Washington Families

HAMILTION (                              , 9/15/10)

Page 47

1          Standing Together is?

2    A    Not precisely.  You can go ahead and describe it, just to

3         make sure.

4    Q    It's a coalition of civil rights groups, churches, and

5         others who oppose the efforts to get Referendum 71 on the

6         ballot.  And so I was with you for most of your deposition,

7         but I've got a few clarification questions.

8    A    Sure.

9    Q    You were just talking about            and how you spoke

10        to him at a signature gathering.

11   A    It wasn't the signature gathering.  It was in Olympia when

12        we did the signature watching of the Secretary of State's --

13        of verifying signatures.  I spoke to him there.

14   Q    You meant to say signature verification?

15   A    Yeah.  If I said differently, that's what I meant.

16   Q    That's one source of confusion.  Is that the first time you

17        ever met            ?

18   A    I believe so, yes.

19   Q    How long have you been a registered voter in Washington?

20   A    I don't remember.  I can take a guess for you.

21   Q    Have you only voted in Washington?

22   A    Yes.

23   Q    Have you ever lived in any other state?

24   A    No.

25   Q    When did you turn 18?

HAMILTION (                              , 9/15/10)

Page 48

1    A    I'm 26 now, so July 10th six years ago.  I guess 2002.

2    Q    I made you do math off the spot, and I think it might have

3         been eight years ago, but --

4    A    Did I say six?  Oops.

5    Q    -- if you're 26 now.  Sorry.  You're --

6    A    I'm really not that bad at math.  I just . . .

7    Q    I know.  It's hard.

8    A    I'm older than I thought.  I'm realizing that every day.

9    Q    Do you think you might have registered right around your

10        18th birthday?

11   A    No.

12   Q    Do you think you might have registered right around the time

13        you became a Christian?

14   A    I know it was after.

15   Q    Do you recall how many times you voted in the past?

16   A    I can only think of two times.

17   Q    Did you vote in this most recent election?

18   A    Of?

19   Q    In 2008.

20   A    Like --

21   Q    November.

22   A    Yes, I think.  Which election?  Are you talking about --

23   Q    Any election.  The presidential election.

24   A    Yeah, that was the first time.

25   Q    I don't want to know who you voted for.

HAMILTION (                           , 9/15/10)

Page 49

1   A    No.  It's fine.  The first time I did vote was the
2        presidential election.
3   Q    In 2008?
4   A    Yes.  I know I was registered before, but I know that's the
5        first time I did vote.
6   Q    You also mentioned that back in 2009 that you were attending
7        the                                  .  Why did you leave?
8   A    Just because I really feel like there's just different
9        things going on in my life and my wife's life.  Not any
10       disagreement with the church or any offense or anything like
11       that.  It's just, I guess, in wanting growth spiritually and
12       stuff like that and exposure to new people and different
13       situations.  And so going to a church and being around a
14       pastor that was -- had, you know, more teaching and stuff I
15       hadn't heard before and being exposed to more people in new
16       situations, so . . .
17  Q    I'm going to go back to the gathering, the protest that was
18       on the bridge.  And you were talking earlier about your
19       first experience with the mooning there, and do you know if
20       the individual who mooned you was mooning you because of
21       your viewpoint on Referendum 71?
22  A    I could only guess, but I couldn't say for sure.
23  Q    The individual who mooned you didn't say anything about
24       Referendum 71 or --
25  A    They may have, but I don't know how you would have heard it

HAMILTION (                              , 9/15/10)

Page 50

1           because they were looking in the other direction, so . . .

2      Q    Have you ever mooned anyone?

3      A    Not that I can remember.

4      Q    Do you know people who have mooned people?

5      A    Probably.

6      Q    Have you ever been in the car with anyone who's mooned

7           someone?

8      A    I don't think so.

9      Q    The people who you know who have mooned others, are they

10          friends of yours?

11     A    Not anymore.  I can only say that I've seen it done before.

12          I couldn't even tell you who.

13     Q    Were they friends of yours, do you think, at the time?

14     A    Probably more like acquaintances.  I tried not to be friends

15          with most of those type of people that, you know, pull their

16          pants down in public, but, you know, I don't know.

17     Q    Even when you're in high school, you weren't -- you tried to

18          not be friends with those type of people?

19     A    Not if they were guys, yeah.

20     Q    Do you think of mooning the same way that you might think of

21          toilet papering someone's house?

22     A    Depends on the person.

23     Q    The people who, in your past experience, you might remember

24          mooning people, would you think of them as threatening

25          people?

HAMILTION (                              , 9/15/10)

Page 51

1  A   In the circumstances that I can think of, no.

2  Q   Earlier you talked about -- earlier you were asked whether

3      you had a Referendum 71 bumper sticker and you said no.  Is

4      that correct?

5  A   Yes.

6  Q   Do you have a car?

7  A   Yes.

8  Q   Do you know if any of your friends had stickers?

9  A   None that I can remember.

10 Q   We also talked about where your address may be publicly and

11     you said it might be in the phone book and it's also on your

12     Web site?

13             MR. PIDGEON:  Objection.  I don't believe that was

14     his answer.

15        Go ahead.

16 Q   (By Ms. Hamilton)  Did you say that it might be in the phone

17     book?

18 A   Now it may be.

19 Q   Did you also say that it was on your Web site?

20 A   It is now, yes.

21 Q   Yes.

22 A   I didn't have this Web site then.

23 Q   Right, right.  I apologize.  That's an appropriate

24     clarification.

25             Are there any other situations that you may have given

HAMILTION (                              , 9/15/10)

Page 52

1        your home address in a public setting?

2    A   Relating to any of Referendum 71?

3    Q   Just generally.

4    A   Not that I can remember exactly.  I wouldn't have been

5        against it.

6    Q   Have you ever testified in front of city council?

7    A   Yes.

8    Q   And do you recall if you gave your public -- if you gave --

9    A   Yes, you're required to.

10   Q   And do you know if those -- if they keep minutes of the city

11       council meetings?

12   A   I'm sure they do.

13   Q   Do you know if those minutes are available to the general

14       public?

15   A   I don't know.  I would assume that they are, yes, because

16       it's a city council meeting, but I don't know.  I would

17       assume that in that situation they wouldn't be allowed to

18       give our address, but perhaps they are.

19   Q   But you don't know?

20   A   I don't know.  Never thought about it.

21                MS. HAMILTON:  That's all I've got.

22                MS. EGELER:  Mr. Dixson, do you have any

23       questions?  Are you still there?

24                THE WITNESS:  I think I heard him hang up around

25       five minutes in.

Dixie Cattell & Associates (360) 352-2506

PIDGEON (                                     , 9/15/10)

Page 53

1           MS. EGELER:  Do you have any questions?

2                      EXAMINATION

3   BY MR. PIDGEON:

4   Q   I have a couple questions on this name issue.  Now, was

5       your name ever put in the newspaper as being an R71

6       supporter?

7   A   Not that I can remember, no.

8   Q   So are you aware of the group whosigned.org?

9   A   Yes.

10  Q   So do you know if they know that you are one of the John

11      Does in this case, to your knowledge?

12  A   No.

13  Q   Do you know who among that group would have your name and

14      address or how anybody would be able to link you to R71?

15          MS. EGELER:  Objection; compound question.

16  Q   (By Mr. Pidgeon)  Do you know how anybody would be able to

17      link you to R71?  How would they do it?

18  A   Through my signature being on the petition would probably be

19      the first way, if they were released, and probably the most

20      accessible to the largest amount of people, and I would say

21      even more specifically the people that were more likely to

22      not have the mind to control themselves.

23          I don't believe that the coalition that you represent

24      is out to destroy my family as far as physical violence,

25      which is why the people at the Secretary of State's office I

PIDGEON (                              , 9/15/10)

Page 54

1    wasn't afraid of because generally most people that are

2    going to be upright people, even if they disagree with me,

3    aren't violent.

4         But it's the people that are standing in small

5    organizations on the side or certain individuals that I

6    don't want especially to have that information that are

7    going to be more likely to act upon it.  But also, to finish

8    the question, because I was at the Secretary of State's

9    office and because I was gathering signatures would be the

10   way.  Sorry for drawing that out so much.

11   Q   No, no.  That's basically it.  I just wanted to try to

12       discover, you know, how much publicity you had at that

13       point.

14   A   I was available, but in reality, I didn't receive very much.

15       I could have very -- I saw on one Web site I think a

16       16-year-old girl's name who hadn't even signed, but just

17       was, I think, at the rally on somebody's Web page as -- that

18       was the one Web site I would have looked for to bring in

19       here, if it was still there, because I know this girl was a

20       minor.  And they had posted her under these people are bad

21       people and so -- I mean, that's one thing that's really

22       concerning too.  This is a minor, not even a voter, so . . .

23   Q   Let me ask you another question.  In your take on the

24       Christian faith, what do you believe is the -- what do you

25       think qualifies somebody as obtaining salvation, in your

PIDGEON (                          , 9/15/10)

Page 55

```
 1        understanding of the Christian faith?

 2   A    Somebody who has faith in not only God's existence but in

 3        the work he did through Jesus Christ and has faith in his

 4        word because the Bible says that Jesus is the word, which

 5        is -- the Bible is the word.  And so if -- and also somebody

 6        that acts according to that.  I'll say ultimately it's

 7        somebody that loves God.  And the Bible says that, if you

 8        love me, keep my commandments.  That's what Jesus said, so

 9        somebody that loves God and acts like they love God.

10   Q    So do you think it's possible for a practicing homosexual to

11        have salvation?

12   A    In a very -- in a very short extent, yes, because I know

13        that the grace of God is very strong and I believe that God

14        can save a person and you don't have to change your life to

15        get saved.  I don't think God's there to change your life.

16        I know that a person can be born a sinner and have their

17        sinful temptations or whatever it is their whole life and

18        that's where they get saved at.

19             As a matter of fact, I would have to say, you can't get

20        saved unless you're a sinner, so yes, absolutely.  But I

21        believe that if they are really saved, that God's going to

22        do that work in them over a matter of time.  And I believe

23        that based upon especially Romans 1, homosexuality is a

24        very, very big thing with God and I believe it -- a sexual

25        sin in general is one of the first places that God's going
```

HAMILTON/EGELER (                              , 9/15/10)

Page 56

1        to begin to speak to people, if they really get saved.

2                    MR. PIDGEON:  Okay.  I don't have anything

3        further.

4                              EXAMINATION

5    BY MS. HAMILTON:

6    Q    I actually have one more question.  Have you ever gone on

7         the Web site Google and entered your name?

8    A    Yes, I have.

9    Q    And did you get some hits on your name?

10   A    At that time, no, because it was my name but it was some guy

11        that lived in the eastern United States, and that's why I

12        wanted to see if there was somebody out there with my same

13        name randomly.  It was a couple years ago.  I haven't done

14        it recently.

15   Q    Do you believe that sometimes when you enter in a name to a

16        search engine like Google, it either turns up information

17        that's not true or information that's not about you?

18   A    It is possible, yeah.

19                    MS. HAMILTON:  That's all I've got.

20                              EXAMINATION

21   BY MS. EGELER:

22   Q    Okay.  Now,      , I wanted to ask you about the 16 year old

23        that you mentioned when you were being questioned by

24        Mr. Pidgeon.

25   A    I have to verify that.  I'm not positive the girl was 16.

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/15/10)

Page 57

1          I'm positive she was a minor.  I think about 16.

2    Q    By "minor," do you mean under 18?

3    A    Under the age of 18, yes.

4    Q    Are you positive she was under the age of 18?

5    A    Yes.  Because that's one of the things I remembered is being

6          like, oh my gosh, I know that girl is not 18 yet, and they

7          have her posted on this Web site.  There's a good chance

8          that -- well, actually the reason is because that girl, as I

9          think about it, that girl was in the paper and they got it

10         out of the paper, which is why my name wasn't on the Web

11         site, is because my name wasn't in the paper.  That was

12         based upon the gathering that we did at the bridge.

13   Q    So a newspaper reporter was at the bridge?

14   A    Yes.

15   Q    And was that for Longview?

16   A    Daily News.

17   Q    Daily News.

18              And that reporter obtained the name of the minor?

19   A    Um-hmm.

20   Q    "Yes"?

21   A    Yes, yes.

22   Q    And her name was printed in the newspaper?

23   A    Yes.

24   Q    Can you tell me her name?

25   A    Yeah, if I -- her name is                    .

EGELER (                              , 9/15/10)

Page 58

1    Q    And then her name was listed on a Web site?

2    A    Yes.

3    Q    And when was it listed on this Web site?

4    A    Before we voted.

5    Q    Before the election then?

6    A    Yes, before the election.

7    Q    And do you know what that Web site's name was or the

8         address?

9    A    No, no.  That's the information I would have looked up, like

10        I said, if I had taken the time to do so.

11   Q    Do you know where the people who posted that information are

12        located?

13   A    No.

14   Q    Do you know if they're in the Longview area?

15   A    I don't know where they're located.

16   Q    Have you heard that they're located in Bellingham?

17   A    I don't know.

18   Q    Do you know of any physical harm that has come to this young

19        woman?

20   A    No.

21   Q    Is she someone that you know?

22   A    Yes, I know her.  I don't talk to her.  I haven't talked to

23        her in while, but I do know her.

24              MS. EGELER:  I have no further questions.

25                               (Concluded at 3:21 p.m.)

Page 59

1                              (Signature reserved.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2        I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3   and for the State of Washington, residing at Lacey, do hereby

4   certify:

5        That the foregoing deposition of                      was

6   taken before me and completed on the 18th day of September, 2010,

7   and thereafter transcribed by me by means of computer-aided

8   transcription; that the deposition is a full, true, and complete

9   transcript of the testimony of said witness;

10       That the witness, before examination, was by me duly sworn

11  to testify the truth, the whole truth, and nothing but the truth,

12  and that the witness reserved signature;

13       That I am not a relative, employee, attorney, or counsel of

14  any party to this action or relative or employee of any such

15  attorney or counsel, and I am not financially interested in the

16  said action or the outcome thereof;

17       That I am herewith securely sealing the deposition of

18                         and promptly mailing the same to MS. ANNE

19  E. EGELER.

20       IN WITNESS HEREOF, I have hereunto set my hand and affixed

21  my official seal of this 19th day of September, 2010.

22

23

24                         _____
                           Rebecca S. Lindauer, CSR#2402
                           Notary Public in and for the State of
25                         Washington, residing at Lacey.

Dixie Cattell & Associates (360) 352-2506