1

2

3

4

5

6

7

8

9

10

The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON, | NO. 09-cv-05465-BHS |
| Plaintiffs, | DESIGNATED DEPOSITION TESTIMONY OF |
| v. | |
| SAM REED, in his official capacity as Secretary of State of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, | |
| Defendants. | |

11

12

13

14

15

16

17

18

19    Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

20   Washington Families Standing Together and the Washington Coalition for Open Government

21   and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

22   "Parties") hereby submit combined designated deposition testimony for

23

24    Defendants and Intervenors object to the admission of any deposition testimony taken

25   of any witnesses who could be called to testify at trial.   Therefore, the designations of

26

DESIGNATED DEPOSITION
TESTIMONY OF
- No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

1   Defendants and Intervenors are being submitted in the event that the Court decides to admit

2   deposition testimony.

3          For the Court's convenience Defendants' designations have been highlighted in blue,

4   Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5   been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6   filing the redacted versions of these documents.

7          DATED this 6th day of September, 2011.

8   ROBERT M. MCKENNA
    Attorney General
9

10    s/ William Clark
    WILLIAM CLARK, WSBA #9234
11   Senior Counsel
    800 Fifth Ave, Ste 2000
12   Seattle, WA 98104
    206-464-7352
13   BillC2@atg.wa.gov
    ANNE EGELER, WSBA #20258
14   Deputy Solicitor General
    PO Box 40100
15   Olympia, WA  98504-0100
    360-664-3027
16   Annee1@atg.wa.gov

17

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION
TESTIMONY OF
- No. 09-cv-05465-BHS

2

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

_____

```
                              )
JOHN DOE #1, et al.,          )
                              )
             Plaintiffs,      )
                              )
        vs.                   )   NO. 09-cv-05456-BHS
                              )
SAM REED, et al.,             )
                              )
             Defendants.      )
```
_____

DEPOSITION UPON ORAL EXAMINATION OF

_____

September 13, 2010

Vancouver, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

```
 1   APPEARANCES:

 2        FOR THE DEFENDANTS:          MS. ANNE E. EGELER
                                       DEPUTY SOLICITOR GENERAL
 3                                     P.O. Box 40100
                                       Olympia, WA  98504-0100
 4
          FOR THE INTERVENOR
 5        WASHINGTON FAMILIES
          STANDING TOGETHER:           MS. JESSICA T. HAMILTON
 6                                     PERKINS COIE
                                       1120 N.W. Couch Street
 7                                     Tenth Floor
                                       Portland, OR  97209
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2    EXAMINATION                                  PAGE/LINE

3    MS. EGELER                                    4    19

4    MS. HAMILTON                                 36    23

5

6

7

8

9

10                           EXHIBITS

11   EXHIBIT          DESCRIPTION                 PAGE/LINE

12                          (No Exhibits.)

13

14

15

16

17

18

19

20

21

22

23

24

25

EGELER (                                   , 9/13/10)

Page 4

1                 BE IT REMEMBERED that on Monday, September 13,

2        2010, at 8:46 a.m., at 1220 Main Street, Suite 510,

3        Vancouver, Washington, before REBECCA S. LINDAUER, Notary

4        Public in and for the State of Washington, appeared

5                   , the witness herein:

6                 WHEREUPON, the following proceedings were had, to

7        wit:

8

9                            having been first duly sworn by

10                           the Notary, testified as follows:

11

12                MS. EGELER:  I would like to start by noting on

13       the record that it's 8:48, and I have called my office phone

14       for messages, and there are no messages, so I'm assuming

15       that counsel for the Doe plaintiffs does not intend to

16       attend the deposition, so we'll get started.

17                              EXAMINATION

18  BY MS. EGELER:

19  Q            , we're going to be recorded today by our court

20       reporter, so there are a few rules that we need to follow to

21       make sure she can get a good transcript, so we'll need to be

22       careful to not speak over each other, wait until the other

23       is finished speaking before talking.

24  A    Um-hmm.

25  Q    If you could please say yes or no, instead of um-hmms or

EGELER (                              , 9/13/10)

Page 5

| | | |
|---|---|---|
| 1 | | head nods, then she will be able to take that down |
| 2 | | correctly.  Okay? |
| 3 | A | Okay. |
| 4 | Q | If you feel confused or don't understand anything I've asked |
| 5 | | you for any reason, please let me know and I can rephrase |
| 6 | | the question and make it clear.  Is that okay? |
| 7 | A | That's okay. |
| 8 | Q | Have you ever been deposed before? |
| 9 | A | Been what? |
| 10 | Q | Deposed, done what we're doing here today. |
| 11 | A | No. |
| 12 | Q | Have you ever testified in court before? |
| 13 | A | I have. |
| 14 | Q | In what sort of a situation? |
| 15 | A | Witness. |
| 16 | Q | To what? |
| 17 | A | A car accident. |
| 18 | Q | Was that in Washington? |
| 19 | A | Oregon. |
| 20 | Q | And how long ago was that? |
| 21 | A | A while back.  A long time, maybe four or five years. |
| 22 | Q | Four or five years, okay. |
| 23 | | Can I ask:  What year were you born? |
| 24 | A | 1988. |
| 25 | Q | And were you born in the United States? |

EGELER (                        , 9/13/10)

Page 6

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Where were you born? |
| 3 | A | I was born in Georgia, country of Georgia, city of Butime. |
| 4 | Q | Can you spell that, please? |
| 5 | A | B-u-t-i-m-e. |
| 6 | Q | And when did you come to the United States? |
| 7 | A | Came to the United States I think it was in April 1990. |
| 8 | Q | 1990? |
| 9 | A | 1990. |
| 10 | Q | So you were quite young then? |
| 11 | A | Yes. |
| 12 | Q | And did you come to the state of Washington? |
| 13 | A | Came to Oregon. |
| 14 | Q | And do you currently reside in Oregon? |
| 15 | A | No.  I live here in Washington. |
| 16 | Q | Do you have a Washington driver's license? |
| 17 | A | I do. |
| 18 | Q | And your car would have Washington driver's -- excuse me, a |
| 19 | | Washington plate? |
| 20 | A | My car would. |
| 21 | Q | Did you drive in your car today? |
| 22 | A | No. |
| 23 | Q | No, okay. |
| 24 | | And are you registered to vote in Washington? |
| 25 | A | Yes. |

EGELER (                              , 9/13/10)

Page 7

1  Q  Are you currently employed?

2  A  Yes.

3  Q  By whom?

4  A  I work for a car company.  I do sales for them, but it's

5     something I do on the side.

6  Q  And what car company?

7  A           .

8  Q  Is that in Washington?

9  A  It's in Oregon.

10  Q  In Portland?

11  A  Yes.

12  Q  How many hours a week do you work there?

13  A  I have a really broad schedule, so I basically work when I

14     want.

15  Q  And you said that's something you do on the side.  Is there

16     something else that you do?

17  A  It's based on commission and then I do a lot of volunteer

18     work, like I'm flying to California.

19  Q  What sort of volunteer work do you do?

20  A  The ministry I'm going to, they're called              .

21     They feed the hungry, cloth the naked.  They work with women

22     that don't have husbands that have kids.  They have a

23     hospital on-site, that kind of work.

24  Q  So it's volunteer work through your church?

25  A  No, just personally my own decision.

EGELER (                        , 9/13/10)

Page 8

1  Q   And I understand that your father is a pastor at a church

2      here in Vancouver.  Is that correct?

3  A   That's correct.

4  Q   And do you have any involvement in that church?

5  A   I do.  I work with the youth ministry.

6  Q   So would it be fair to say you're the youth minister?

7  A   No.

8  Q   No.

9  A   I'm one of the leaders there in the group that work with the

10     youth.

11 Q   How old are the youth that you work with?

12 A   They start from 17 and go up to 25.

13 Q   17 to 25.

14         What sort of things do you do as the youth minister?

15 A   One of the things that I'm involved in, I do -- we do school

16     prayers in our county.  I work with the kids that go to

17     school and we plan things out and they just meet and have

18     clubs to open up in our schools.

19 Q   Do you meet regularly with the youth group?

20 A   Well, the youth group meets every Sunday night and then we

21     meet -- the leader board meets every Monday night and then

22     my kids would meet every Wednesday night.

23 Q   And do you know that you've been named as witness in a

24     lawsuit?

25 A   Of course.

EGELER (                            , 9/13/10)

Page 9

1   Q   And I'm talking about the Doe v. Reed case.  Can you tell me

2       what you know about the case?

3   A   I actually don't know much.  Don't know what the case is all

4       about.

5   Q   Okay.

6   A   You know, all I know is that, you know, I got a phone call

7       from you and when I talked to Mr. Patrick, he said it was

8       okay, so . . .

9   Q   Before you received a phone call from me, did you know you

10      had been named as a witness?

11  A   No, I have not.

12  Q   So no one asked you?

13  A   No.

14  Q   Do you know that you may be called on to testify in federal

15      court?

16  A   I didn't know that, no.

17  Q   Would that frighten you?

18  A   No.

19  Q   Would it concern you to testify in a public courtroom?

20  A   I don't see why not.

21  Q   So it would not concern you?  No?

22  A   It wouldn't concern me.

23  Q   Thank you.

24          And you said something about speaking to a Mr. Patrick.

25      Is that right?

Dixie Cattell & Associates (360) 352-2506

EGELER (                          , 9/13/10)

```
                                                        Page 10

 1   A    Yeah.

 2   Q    And who is Mr. Patrick?

 3   A    He is a -- he's one of the guys that, I guess, works for the

 4        attorney.  I'm not sure.

 5   Q    Could it be Mr. Pidgeon?

 6   A    Mr. Pidgeon, there you go.  My bad.

 7   Q    When did you speak with Mr. Pidgeon?

 8   A    Two weeks ago.

 9   Q    After you spoke with me then?

10   A    Yeah.

11   Q    Did he call you?

12   A    I talked to            .  He lives in Longview, Washington.

13        He called me and spoke with him and he said all right.

14   Q    And what did Mr. Pidgeon tell you?

15   A    I just asked him if it was all right to go and do what we

16        were asked to do.  He said it's totally good.

17   Q    Anything else?

18   A    That's it.

19   Q    So are you familiar with Referendum 71?

20   A    I am.

21   Q    That's why you're here, so you're familiar?

22   A    Yeah.

23   Q    When did you first become aware of Referendum 71?

24   A    I'm guessing last year in the springtime.

25   Q    And who told you about Referendum 71, if you remember?
```

EGELER (                          , 9/13/10)

Page 11

1    A    Probably              from Longview.

2    Q    And you referred to            a couple times.  Do you know

3         his last name?

4    A              .

5    Q    Can you spell that?

6    A    Not off the top of my head.                    .

7    Q    And speaking of spelling,      , I want to go backwards a

8         bit and ask you to spell your full name.  You've spelled

9         your first name for the court reporter.  And your last name

10        is       .  Is that correct?

11   A    That's correct.

12   Q    Do you have any more names?  I know sometimes Russian names

13        are --

14   A    No.

15   Q    -- quite long.

16   A    I have a middle name, which is an S.

17   Q    Just an S?

18   A    Yes.

19   Q    There's no name.  Just an initial?

20   A    Just an initial.

21   Q    So you always go by                    ?

22   A    Yes.

23   Q    So back to Referendum 71, did you sign the petition for

24        Referendum 71?

25   A    I did.

EGELER (                              , 9/13/10)

Page 12

1   Q   And do you recall where you were when you signed?

2   A   Probably at my church.

3   Q   Probably at your church?

4   A   Yes.

5   Q   Are you certain it was at your church?

6   A   Pretty sure.

7   Q   Was the petition circulated at your church?

8   A   Yep.

9   Q   And your father's the pastor, correct?

10  A   That's correct.

11  Q   Do you recall whether he spoke from -- spoke to the church

12      and asked people to sign or talked about Referendum 71?

13  A   No.

14  Q   Was the petition put in a public area of the church?

15  A   Just outside the church.

16  Q   So outside the building?

17  A   Yeah.

18  Q   And was this done just one day?

19  A   They were there -- people were there off and on, so during

20      the week maybe a couple times a week.

21  Q   And on Sundays were they there?

22  A   Of course.

23  Q   Did you help to gather signatures outside --

24  A   I have.

25  Q   -- the church?

Dixie Cattell & Associates (360) 352-2506

EGELER (                          , 9/13/10)

Page 13

1      Just wait until I finish because we're going to make it

2      difficult for our court reporter, and we definitely want to

3      make things easier for her.

4           So you were saying, yes, you have gathered signatures

5      for Referendum 71?

6    A  Yes, I did.

7    Q  That was outside the church?

8    A  That was outside the church.

9    Q  Do you remember how many days you did that?

10   A  For a few months.

11   Q  For a few months?

12   A  Yes, ma'am.

13   Q  Did you gather signatures at any place other than outside

14      the church?

15   A  Parks then --

16           MS. EGELER:        , I'm going to stop for a

17      second and take this phone call.  I'm concerned it's

18      Mr. Pidgeon and he's lost, so I want to make sure he has an

19      opportunity.  If we can go off the record for a moment, I'll

20      be right back.

21                              (Recessed at 8:57 a.m.)

22                              (Reconvened at 8:59 a.m.)

23   Q  (By Ms. Egeler)  And I think I was just asking you,        ,

24      whether or not you gathered signatures at places other than

25      outside the church.

EGELER (                        , 9/13/10)

Page 14

1    A    Yes, I have.

2    Q    And where did you go to do that?

3    A    Anywhere from parks, city streets, just public places.

4    Q    And were you successful in getting signatures?

5    A    I was.

6    Q    Did you do anything else to support Referendum 71?

7    A    We just hold signs on the streets, bumper stickers.

8    Q    So there was a bumper sticker on your car?

9    A    Yeah.

10   Q    Did you give out bumper stickers to others?

11   A    I did.

12   Q    And where did you hold up signs?

13   A    In the corner of Mill Plain and Chkalov, the street

14        crossings of Padden Parkway and Andresen, street crossings

15        of Padden Parkway and 117th, street crossings on Main

16        Street.  Don't remember the cross street on that one.  And

17        then church, across the church, street number:

18

19   Q    These are all major intersections, correct?

20   A    Yes.

21   Q    Did you have other people with you?

22   A    I have.

23   Q    How many people were with you?

24   A    I had my youth group involved, so anywhere from 100-plus

25        people.

Dixie Cattell & Associates (360) 352-2506

EGELER (                        , 9/13/10)

Page 15

1  Q  Did you encourage the members of your youth group to sign

2     the petition?

3  A  Did I encourage them?  What do you mean by "encourage"?  Can

4     you explain that?

5  Q  Let me change the question.  Did you tell them about

6     Referendum 71?

7  A  I have told them about it.

8  Q  Did you tell them that you were supporting?

9  A  Yes.

10  Q  Did your employer,            , know about your support of

11     Referendum 71?

12  A  I didn't work for them at that time.

13  Q  Did you work with other churches to promote Referendum 71?

14  A  I have.

15  Q  And just to be clear, let's state the name of your church so

16     we can distinguish it from others.

17  A                        .

18  Q  And that's located in Vancouver?

19  A  Vancouver, Washington.  Address:                        ,

20     .

21  Q  And you talked about        , and is he also involved

22     with your church?

23  A  He's our sister church in Longview.

24  Q  And what was your involvement with            in promoting

25     Referendum 71?

EGELER (                              , 9/13/10)

Page 16

| 1 | A | We just worked together on phone calls, different plans, |

1   A   We just worked together on phone calls, different plans,

2        anything we can do to have -- get the word across to people.

3   Q   Did you do phone calls then to encourage people to vote?

4   A   No.

5   Q   No.

6        When you talked about holding up signs, what did the

7        signs say?

8   A   Reject R71.

9   Q   And before there was a Referendum 71, there was a senate

10      bill regarding the same issue.  Were you familiar with the

11      issue at the time the senate bill was being promoted?

12  A   No.

13  Q   I want to talk now about any harassment or threats that you

14      received as a result of your involvement with Referendum 71.

15  A   Um-hmm.

16  Q   So we'll go through each event that occurred.

17  A   Okay.

18  Q   So let's begin wherever you would like, if you've suffered

19      any harassment or threats.

20  A   I only had like probably three stories.

21  Q   Three stories, okay.  Let's start with the first then.

22  A   First one occurred on Mill Plain and Chkalov.  It was about

23      eleven o'clock.

24  Q   A.m.?

25  A   P.m.

EGELER (                                  , 9/13/10)

Page 17

1   Q   P.m.

2           What you were doing at the intersection at 11:00 p.m.?

3   A   We had, that night or that evening, we had a rally there --

4       not a rally, or like a sign, whatever, sign holding.  And I

5       was just coming up cleaning everything up after that, what

6       we had, and making sure that we leave it clean.

7   Q   Was anyone else there with you?

8   A   At that moment we just had a car leave, so I was walking

9       back to my car.  I saw a sign there, one of my signs that

10      was there, so I decided to pick it up.

11  Q   Was that a Referendum 71 sign?

12  A   It was an R71 sign, yeah.

13  Q   Okay.

14  A   I picked up the sign.  I had a car pull over right across

15      from me.

16  Q   Was it across the street?

17  A   It was right across the street.  So if you look where Fred

18      Meyer's is, the car pulled into the 76 gas station.

19  Q   Were you on the same side of the street as the gas station?

20  A   We were not.

21  Q   You say "we."  Who was with you?

22  A   Well, the car that was about to leave, but the rally was

23      held on the Fred Meyer corner.  That's what I refer as "we."

24  Q   But you say the car that was about to leave, so were there

25      people in your group that were still there?

EGELER (                              , 9/13/10)

Page 18

1    A    Yeah.

2    Q    And about how many people?

3    A    Two.

4    Q    You and who else?

5    A    It was somebody from the rally.  I don't really remember

6         their names.

7    Q    Two other people from the rally?

8    A    Yeah.

9    Q    You are under oath,       , so if you do remember their

10        names --

11   A    I don't.  I do not remember their names at this point.  We

12        had a lot of people there.

13   Q    Were they all associated with the church?

14   A    No.  We had different people that came out there to support.

15   Q    So across the street a car pulls into the service station,

16        correct?

17   A    Yes.

18   Q    What happened next?

19   A    For me, I didn't -- you know, I didn't notice, but all I saw

20        is young men running at me.  I had a sign in my right arm

21        and a hammer in my left arm because I was just pulling it

22        out from the ground.

23   Q    Okay.

24   A    He just launched at me.

25   Q    So a young man.  About how old, do you think?

EGELER (                         , 9/13/10)

Page 19

| | | |
|---|---|---|
| 1 | A | Maybe 20's. |
| 2 | Q | Maybe 20's. |
| 3 | | He ran across the street? |
| 4 | A | Right across the street where I was. |
| 5 | Q | And did he say anything? |
| 6 | A | Just a bunch of cuss words. |
| 7 | Q | Do you know why he did that? |
| 8 | A | I do not. |
| 9 | Q | And his only speech to you was cuss words? |
| 10 | A | Cuss words and he launched at me. |
| 11 | Q | Did he say anything about Referendum 71? |
| 12 | A | He did. |
| 13 | Q | What did he say about Referendum 71? |
| 14 | A | He wasn't in support on what we were doing. |
| 15 | Q | Is that what he said, "I'm not in support of what you're |
| 16 | | doing"? |
| 17 | A | Do you want me to repeat what he was saying? |
| 18 | Q | Yes, please. |
| 19 | A | I'm not -- you know, I'm not going to repeat the cuss words, |
| 20 | | but he was just saying what you guys are doing is wrong. |
| 21 | | You guys deserve to die.  Everybody deserves the right to |
| 22 | | live, some kind of -- you know, in that kind of that way, |
| 23 | | so -- he was very physical, so he was getting, you |
| 24 | | know . . . |
| 25 | Q | So can you describe what he looked like? |

State Objects: Hearsay

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/13/10)

Page 20

1   A   Young man.  This was a while back, so I can't really

2       remember, you know, specific details, but just a young man.

3       I don't know.  What else would you like to know?  White.

4   Q   Do you remember approximately how tall he was?

5   A   A little bit taller than me.

6   Q   And his weight approximately?

7   A   Skinny.  He did have long hair.

8   Q   He did?

9   A   Yeah.

10  Q   So you say he lunged at you.  Did he touch you?

11  A   Well, physically, yeah.  We had a few pushes here and there

12      and me, I was just self-defensing, like I said.  If I had

13      wanted to really put force in, I had a hammer in my left

14      hand.

15  Q   So he pushed you?

16  A   Yeah.

17  Q   What did you do when he pushed you?

18  A   It was kind of like he launched at me, so I launched at him,

19      kind of like get away, you get what I mean?

20  Q   So he pushed you and you pushed back?

21  A   Not pushed back, but just kind of like just self-defensing

22      on my side because I didn't know what he had.  It wasn't my

23      intention to just, you know, push him or anything.  I see

24      him, you know, approach on me physically, so I -- anything I

25      did was just to, you know, get myself out of his mess.

EGELER (                                    , 9/13/10)

Page 21

1  Q   And did he stop?

2  A   He did stop.  There was a police officer on the corner of

3      the Starbucks, in the Starbucks, and I guess . . .

4  Q   The corner, so the Starbucks --

5  A   The Starbucks on Mill Plain.  Yeah, on the same --

6  Q   Same intersection?

7  A   -- intersection.

8  Q   What did the officer do?

9  A   Well, I guess the officer didn't see what happened, but when

10     he saw him, he ran back to his car, sat in the passenger

11     seat, and took off.

12 Q   When you say "he ran back to his car," do you mean the

13     officer or --

14 A   No.  The guy that approached me.

15 Q   So the guy that approached you, did he ever hit you?

16 A   No.  No, he didn't.

17 Q   And did the officer come over and speak with you?

18 A   No.

19 Q   And you think the officer didn't see anything?

20 A   I don't know.  He didn't come by, so . . .

21 Q   Did you feel the need to go and speak to the officer,

22     contact the officer?

23 A   No.

24 Q   Why not?

25 A   I just didn't think it was that important to -- you know,

EGELER (                              , 9/13/10)

Page 22

1   like I said, it didn't happen where I got hurt or anything,

2   so I just didn't see that it was important for me to do

3   that.

4   Q   Would it be fair to say you felt safe at that point?

5   A   I didn't feel safe, but I understood that, you know, if it

6       comes to self-defense, I can defend myself physically.  It's

7       a public street.  There was a lot of, you know, cars driving

8       by at that time of the day still, you know.

9   Q   That's pretty late to have a gathering with signs that --

10  A   No.  We're cleaning up.

11  Q   Okay.

12  A   So we were there from 7:00 to until maybe 10:00.

13  Q   7:00 to 10:00?

14  A   7:00 to 9:00 or something.  We were just cleaning up.

15  Q   Had you ever seen the young man that pushed you?

16  A   Did I ever see him again?

17  Q   Had you ever seen him before?

18  A   I have not.

19  Q   Did you ever see him again?

20  A   No.

21  Q   Did anything else happen at the end of that incident or

22      anything else?

23  A   No.

24  Q   So the second incident, let's talk about that.

25  A   Second incident was on Padden Parkway.

EGELER (                              , 9/13/10)

Page 23

| 1 | Q | Excuse me? |
| 2 | A | Padden Parkway and Andresen. |
| 3 | Q | Again, a large intersection? |
| 4 | A | Yes.  It was a Sunday. |
| 5 | Q | What time? |
| 6 | A | I'm guessing about three o'clock in the afternoon. |
| 7 | Q | And were you at the intersection alone? |
| 8 | A | No.  We had a gathering there again with signs. |
| 9 | Q | How many people? |
| 10 | A | About 50 people. |
| 11 | Q | What happened? |
| 12 | A | When we were there, there was a bus that pulled in. |
| 13 | Q | Where did it pull in? |
| 14 | A | Just pulled in the side of the street and -- |
| 15 | Q | Same side of the street that you were standing on? |
| 16 | A | We were standing on all four blocks. |
| 17 | Q | Okay. |
| 18 | A | And three men came out. |
| 19 | Q | Was this a city bus then? |
| 20 | A | No.  This was a construction-looking work bus. |
| 21 | Q | So three men came out. |
| 22 | A | And they were wearing very provocative clothes, was saying |
| 23 |   | like almost naked. |
| 24 | Q | Can you describe what they were wearing? |
| 25 | A | Just to cover their private parts of the body.  Everything |

EGELER (                          , 9/13/10)

Page 24

1        else was showing.

2    Q   So basically just a bathing suit then?

3    A   Basically a thong, if you want to put it that way.

4    Q   That's all they wore?

5    A   Yeah.

6    Q   Okay.

7    A   We had -- this was people from youth, so there was a lot of

8        young people there.

9    Q   Okay.

10   A   What they started to do is just walk around the crowd,

11       verbally talking to people, you know -- I don't know how to

12       explain it right, but offering their services as in like

13       sexual ways.  I'm talking about we had a lot of young girls

14       and a lot of young guys there.

15           And when they came to me, when I saw this, I approached

16       them.  There was a man with us.  You guys might know him.

17       His name is            .  You can put his name down, if you

18       like, as a witness.  And me and him organized that

19       particular rally or that particular meeting.  And when we

20       were there, we approached them and we asked them to leave

21       kindly and they got very upset.

22   Q   What did they do when they got upset?

23   A   They just started throwing garbage at us from their van.

24   Q   So they got back into the --

25   A   Yeah.

_State Objects: Hearsay_

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/13/10)

Page 25

```
 1   Q   Was it a bus or a van?

 2   A   It was like a van, like a work van, you know what I'm

 3       talking about?  Those big -- it was either -- an old Chevy

 4       with a slide door.

 5   Q   If I understand, you asked them to leave and then they got

 6       into their van?

 7   A   Came out, started throwing stuff at us.

 8   Q   While in the van --

 9   A   While in the van.  They were driving back and forth.  And

10       then they would get completely naked, stick their rear ends

11       out of the windows.

12   Q   Did you get a license plate number?

13   A   I didn't.

14   Q   How many times did they drive back and forth?

15   A   A few times.  It's a four-block -- I mean, a four -- you

16       know, there's nice four paved blocks.  So they would go once

17       here, once there, you know, just around the corner.

18   Q   Why didn't you get a license plate number?

19   A   I didn't think it was important enough to.  You know, things

20       happen.  I understand people are upset, so . . .

21   Q   When they were walking around the crowd, were they -- I

22       understand they were soliciting sex or making sexual

23       comments.  Were they talking about Referendum 71 as well?

24   A   They were against -- they were on the opposition of being

25       against R71.
```

EGELER (                          , 9/13/10)

Page 26

1  Q   What did they say about that?

2  A   I don't remember.  I know that they were walking around and

3      the reason what they were doing is because they were

4      against.  They were just showing of their behavior, the way

5      they were acting.

6  Q   So you knew it because of their behavior as opposed to what

7      they said.  Is that right?

8  A   Well, yeah.  I mean, why would a bus stop by and three guys

9      would come out fully naked, knowing that these are church

10     folks, knowing that the morals are high, and come out and

11     they would offer their services to young men, not women.

12     I'm talking about young men, and these are not people that

13     were for.  These people were against and that's obviously

14     seen.

15 Q   So they said nothing about Referendum 71, but you could tell

16     by their behavior and being undressed?

17 A   Yes.

18 Q   I understand.

19     And how many times did they drive by?

20 A   I'm guessing around four.  There was four corners on that

21     intersection.  They made it around every corner.

22 Q   Did the garbage that they threw hit you?

23 A   No.

24 Q   Did it hit anyone in your group?

25 A   Don't remember.  It was a big crowd, about 50 people, so

*State Objects: Witness lacks foundation for the testimony; hearsay.*

EGELER (                              , 9/13/10)

Page 27

1    they might have.

2  Q  Were they throwing things every time?

3  A  Cups, plastic bottles, just whatever they got under their

4     arm, whatever they found in that van.

5  Q  Do you remember if it's a Washington plate or an Oregon

6     plate?

7  A  I don't remember.  I was one of the organizers of the rally,

8     and I was at a point where I didn't see everything.

9  Q  Did anyone call the police about this?

10 A  I don't know.  The police were on-site though.  I think

11    there was one police officer standing there just to look

12    over.  He was there.  I guess they called in just so he can

13    stand for safety or whatever.  I don't know what he was

14    called in for.

15 Q  So --

16 A  There was a police officer on-site --

17 Q  The whole time?

18 A  -- but he was just chilling in the car, you know what I

19    mean?

20 Q  And do you remember what date this was?

21 A  I do not.  I'm guessing it was in one of the June -- May,

22    June, July months, but I'm not quite sure which one because

23    we did quite a few.

24 Q  Did the officer do anything at all?

25 A  He actually went by, asked around what went on, but nothing.

EGELER (                          , 9/13/10)

Page 28

1   You know, just is everything okay, is everybody fine, and

2   that's it.

3   Q   Did he do this while the individuals were walking around the

4   crowd?

5   A   No.  They were gone.

6   Q   Did you feel that the police were appropriately protecting

7   people?

8   A   No.  I felt like they weren't doing their job.

9   Q   What did you think they should do?

10  A   What they should have done?

11  Q   Yes.

12  A   I feel like they should have came out at the time when that

13  occurred.

14  Q   When what occurred?

15  A   When they pulled in and, you know, addressed some things to

16  them, maybe to us.  I feel like they were just chilling

17  there enjoying their coffee in their car rather than coming

18  out there and actually doing something.

19  Q   Did you approach the officer and ask the officer to do

20  something?

21  A   Well, I was in the middle of whatever was going on.  But

22  after everything happened, I came up to the police and I

23  told them, "Didn't you guys see what was going on?"

24  Q   What did they say?

25  A   They thought they were a part of us, which doesn't make

EGELER (                              , 9/13/10)

Page 29

1        sense.

2    Q   How many officers were there?

3    A   There was one.

4    Q   Do you remember his or her name?

5    A   I'm guessing Officer Gomez or Lopez.  He was a Hispanic man.

6    Q   Do you know if the police took a report?

7    A   No, they have not.

8    Q   Was anyone physically hurt that day during that incident?

9    A   No, I don't think so.

10   Q   Going back to the first incident where -- where you were out

11       at 11:00 p.m. and the car pulled into the gas station, did

12       you get a vehicle license plate?

13   A   I did not.

14   Q   Do you remember if that was Washington or Oregon?

15   A   Do not remember.

16   Q   Do you remember the color of the car?

17   A   It was a black Civic.

18   Q   Black Civic, okay.

19   A   Black Civic or Subaru, I really don't remember.  Some

20       Japanese make.

21   Q   Anything else happen with respect to the second incident

22       with the three men that were unclothed?

23   A   No.  We talked it over with              , make sure it

24       won't -- you know, trying to do everything we can next time

25       so it won't happen.

EGELER (                      , 9/13/10)

Page 30

```
 1   Q     Who is              ?

 2   A     He is one of my good friends.

 3   Q     Is he associated with the church?

 4   A     He's not, but he worked with me for the R71.

 5   Q     You said there was one more incident.  Let's talk about

 6         that.

 7   A     The incident was at the church.

 8   Q     What happened?

 9   A     When I was outside with my table, just people were standing

10         up signing petitions.

11   Q     Was this on a Sunday?

12   A     This was a Sunday afternoon.

13   Q     Do you remember what month?

14   A     I don't.  In those three months, somewhere down in that

15         category.

16   Q     May, June, or July?

17   A     Yeah.  I just don't remember because there was so many

18         events that we did in those three months, so I don't

19         remember which one was which.

20   Q     Okay.

21   A     And it was about three of us at the table.            was

22         there.  And we -- we were doing the -- the African-American

23         lady approached us.  She was very upset.  And she said that,

24         you know, we'll do everything to stop what you're doing.

25         You guys don't care about families.  You guys don't care
```

State Objects: Hearsay

Dixie Cattell & Associates (360) 352-2506

EGELER (                                    , 9/13/10)

Page 31

1      about love or -- you know, amongst couples or whatever.

2          We tried everything to -- not to make her even more

3      upset, as in saying, you know, that's fine.  Your opinion

4      is -- you know, in support you have the right to do whatever

5      you like.

6          She did actually -- you know, you can see she was very

7      upset in the way she approached us.  After she did -- her

8      friend or her boyfriend or whoever it was that pulled in

9      afterwards, he came out of the car.  He got very upset with

10     us saying that, you're making my girl mad.  You know, I'll

11     bust your cap.  I don't know what that's supposed to mean.

12     You know, everybody deserves the right to live, you know,

13     these kind of terms, you know.  Nothing towards us

14     specifically, but just saying that one day we'll have your

15     kids.

16   Q  I don't understand.

17   A  Like I guess from the people that were in opposition of R71,

18     they were -- because a lot of -- one of the sayings that we

19     used in R71 was, you know, safe families, safe kids or

20     whatever.  Basically one of the things that she spoke

21     against is, you know, we'll have your kids, as in like, you

22     know, we get this law through and your kids will be -- you

23     will be living the life of the same sex marriage or

24     whatever.  Again, we didn't -- I understood what she meant,

25     but it's -- that's just kind of verbally threats here and

State Objects: Hearsay

EGELER (                          , 9/13/10)

Page 32

State Objects: Hearsay

```
 1        there.  Nothing very physical, just very mad.

 2   Q    Anything physical at all?

 3   A    Nothing very physical.

 4   Q    So nothing physical?

 5   A    Nothing physical.

 6   Q    And nothing physical from the person --

 7   A    No, just verbally.  I guess she called him and told him we

 8        were there.  He pulled in.

 9   Q    He was just verbal, not physical?

10   A    Just verbal, cussing, nothing physical.

11   Q    Did you call the police?

12   A    No.

13   Q    Why not?

14   A    Because we understand people are mad and I -- honestly I

15        didn't see a point because everybody has the right to their

16        own opinion.  Everybody has the right to speak out whatever

17        they think is right.  And if that's the way they understood

18        it, that's totally fine with me, because, you know, I'm

19        standing on what I think is right, so it gives them the

20        right to do the same thing.

21   Q    I understand.

22   A    That's why I didn't push on calling the police because

23        that's the opinion that I have about other people's opinion.

24   Q    And you said              saw all of this incident as well?

25   A              was there.
```

EGELER (                              , 9/13/10)

Page 33

1 Q    Do you remember what the car looked like?

2 A    It was an SUV-type.

3 Q    What color?

4 A    Black or dark blue, something darker tone.  I don't really

5      remember at this point.

6 Q    Did you get a license plate?

7 A    I did not.

8 Q    Was that because you weren't concerned?

9 A    Like I said, I wasn't concerned about -- you know, the lady

10     pulled in and it was in kind of let's say, you know, you can

11     see she was mad.  Just because she was mad, she was saying

12     things that she didn't really -- you know, maybe she didn't

13     even mean just because of the heat or whatever she was on,

14     things came out the way they did.

15         And what I tried to do is just, you know, just told

16     her, you have the right to whatever you think and that's

17     totally fine with me.  I'm not going to start here and push

18     my thing through.  You can go across the street, put up your

19     signs, and do whatever you like.  Everyone has the right to

20     do that.

21 Q    Did you have a sign in your yard at your home?

22 A    I did.

23 Q    You said that you worked on Referendum 71 for three months:

24     May, June, and July.  Those would be the months that you

25     were encouraging people to sign petitions, correct?

Dixie Cattell & Associates (360) 352-2506

EGELER (                           , 9/13/10)

Page 34

1   A   Yes, ma'am.

2   Q   During those months, about how many days a week do you think

3       you had some involvement with Referendum 71?

4   A   Probably -- it varied from two times a week, three times a

5       week, just whenever.

6   Q   Okay.

7   A   I did work with                 .  He and I worked together on

8       organizing stuff here in Vancouver.

9   Q   So over the course of those three months, do you think it

10      would be fair to say maybe 40 or 50 days you might have done

11      something either --

12  A   Yeah.

13  Q   -- signs or petition encouragement?

14  A   Yeah, you can say that.

15  Q   And after the petition signatures were counted and you knew

16      that Referendum 71 had made it to the ballot, did you

17      continue to promote the campaign?

18  A   Yes, I have.

19  Q   And between the time that the signatures were counted and

20      the actual election, there were a number of months.  Would

21      you say that you worked how many more days on Referendum 71?

22  A   At least twice a week, so . . .

23  Q   Twice a week in public places?

24  A   Yeah.

25  Q   So do you think that after the signatures were counted,

EGELER (                              , 9/13/10)

Page 35

1    would it be fair to say that you worked approximately 50

2    days in some public location to promote Referendum 71?

3  A  Yeah, I think it's fair.

4  Q  When you talked about the second event where the people that

5     were unclothed or wearing thongs were walking in the crowd,

6     you said there was a police officer who was there in his

7     car.  Do you remember if that was a Vancouver Police officer

8     or whether it was a Clark County Sheriff officer?

9  A  I think it was a VPD, Vancouver Police Department.

10 Q  And then the first incident where somebody stopped at the

11    gas station and got out, you said there was a police officer

12    near at that time as well?

13 A  Yeah.  There was one at Starbucks on Chkalov and Mill Plain.

14 Q  Do you remember if it was a Vancouver officer or Clark

15    County?

16 A  It was VPD.

17 Q  So Vancouver again?

18 A  Yeah.

19 Q  You thought the name of the officer who you spoke to about

20    the second incident with the men in the thongs, that that

21    officer's name was Gomez or Lopez?

22 A  Yeah.  He was a Hispanic officer, so either I think Gomez or

23    Lopez.  I don't -- something in that category.

24 Q  The first incident where the officer was near Starbucks, do

25    you remember his name?

HAMILTON (                              , 9/13/10)

Page 36

1   A   I didn't talk to him, so I just saw him there.

2   Q   Were there any other incidents at all?

3   A   This is the only three that I personally saw.

4   Q   Have you talked to your father about testifying?

5   A   What do you mean?

6   Q   Have you talked at all to your father about the fact that he

7       will be testifying this afternoon?

8   A   Yeah, he knows.

9   Q   Do you know if he's going to talk about the same incidents

10      or whether he has additional incidents?

11  A   I don't know.

12  Q   If the signed petitions were available for people to see,

13      publicly available, would it bother you that someone could

14      see that you signed the Referendum 71 petition?

15  A   It depends the way you guys put it, put there, or the way

16      they put it up there.

17  Q   Okay.

18  A   If they just put my first and last name, I don't mind at

19      all.

20              MS. EGELER:  I have no further questions.

21                          EXAMINATION

22  BY MS. HAMILTON:

23  Q   I just have a couple of follow-up questions.          , I

24      represent the Washington Coalition of -- let me make sure I

25      get my client's name right.  The Washington Coalition of

Dixie Cattell & Associates (360) 352-2506

HAMILTON (                          , 9/13/10)

Page 37

 1     Families that Oppose -- which is basically a broad coalition

 2     that opposed the civil rights groups and churches that

 3     opposed the effort to get Referendum 71 on the ballot.

 4         My name is Jessica Hamilton.  I'm with a law firm in

 5     Portland called Perkins Coie.  I have a few questions.

 6         I wanted to go back to              .  You gave a little

 7     bit of background on              .  How did you first meet

 8                    ?

 9  A  The first time I met him was I think we met up in one of the

10     rallies.

11  Q  By "rally," you mean --

12  A  One of the meetings we had.

13  Q  For Referendum 71?

14  A  Yes, ma'am.

15  Q  And is he connected with another church?

16  A  He does go to church.  I don't know the church name.  I know

17     it's somewhere located in Camas, Washington.

18  Q  Is that where              lives, is in Camas?

19  A  He lives in Camas, yeah.

20  Q  And is he -- did he organize a lot of the rallies?

21  A  Yes, he did.  We did it together.

22  Q  Did you have -- I'm interested in how you organized the

23     rallies.  Did you have a Web site or . . . ?

24  A  Facebook.

25  Q  Facebook.

HAMILTON (                          , 9/13/10)

Page 38

```
 1   A   Network sites.  And then we did -- when we were signing, we
 2       would invite people that would sign.
 3   Q   Did you organize the Facebook page and the network sites?
 4   A   I just did an event through my Facebook account, so there
 5       was an event category that you can do through your personal
 6       account.
 7   Q   You'll have to forgive me.  I'm probably one of the few
 8       people in this world who actually is not all familiar with
 9       Facebook.
10   A   That's fine.
11   Q   I don't have an account.
12   A   That's fine.
13   Q   Is there a way to restrict your account to public or private
14       to publicize the events?
15   A   Yeah.  The thing is, Facebook, you won't -- it's just for
16       friends and people that I know and they can send to their
17       friends.  It's not like you can come to facebook.com, find
18       my name, and see what I have going on.  It won't allow you
19       to do that because, you know, there's no add-on by friends.
20           But, yeah, you know, let's say, for instance, I have
21       300 friends and they all would get this thing in their
22       event.  And if they like, they can resend them to other
23       friends.  It works as a chain reaction.
24   Q   Okay.
25   A   That's how the word got around.
```

HAMILTON (                              , 9/13/10)

Page 39

```
 1   Q   So people you didn't know were getting notices about your

 2       events that you were holding?

 3   A   Um-hmm.

 4            MS. EGELER:  Excuse me.  Could you please --

 5            THE WITNESS:  Yes.

 6            MS. EGELER:  Thank you.

 7   Q   (By Ms. Hamilton)  How many people do you think were getting

 8       information about your events?

 9   A   Probably -- personally for me, probably 300 people through

10       Facebook, not including inviting people that would sign the

11       petition, so maybe, I don't know, from one event, we

12       probably advertise 300-plus people.

13   Q   When people would sign the petition, did you ask them also

14       for an e-mail address to provide them with another means of

15       communication so you could provide them --

16   A   I think that was part of the petition lines, e-mail address,

17       but we didn't use them for advertising.

18   Q   When your Facebook page event would go out to people --

19       friends of friends on your Facebook account, would that show

20       up as being from you originally with you as the organizer?

21   A   It would.

22   Q   Do you have any idea of how many people might have seen

23       that?

24   A   Facebook is crazy.  I don't know.  It can go on from, you

25       know, hundreds to thousands.  It's a huge network site.
```

HAMILTON (                        , 9/13/10)

Page 40

```
 1       Personally me, I have 300 people at the time that were my

 2       friends, people I knew, people that I stayed in touch with,

 3       and they all got in.  Whoever they sent it to that -- you

 4       know, they understood I was the organizer of the event.  You

 5       know, anybody could have clicked on the event page and saw I

 6       was the guy promoting it, but I don't know how far it went.

 7       I can't tell you numbers because, let's say, you know, even

 8       if all those 300 people sent one invitation, that makes it

 9       600 people already.  So if they all sent two, that's, you

10       know, 900 people.  It just keeps on adding on.

11    Q  Did people following these events then try and friend you as

12       a result of having seen your original event posting?

13    A  Like invited me to be their friend?

14    Q  Yes.

15    A  I get invited a lot.  I don't know if it's from the event or

16       I don't.  You know, I clicked in through Facebook with

17       people in Seattle that were doing the same thing, people in

18       different counties, so we got -- you know, we talked through

19       Facebook a lot with, you know, supporting each other on what

20       we did.

21    Q  How many events would you say that you organized through

22       Facebook in this manner that you've just described?

23    A  Every event I put up an invitation.

24    Q  How many events do you think you organized?

25    A  We probably did once a week one of the meetings we did at
```

Dixie Cattell & Associates (360) 352-2506

HAMILTON (                          , 9/13/10)

Page 41

```
 1        the intersections and then we go sign petitions once a week
 2        too, so you know, roughly saying, maybe, I don't know, once
 3        a week, three months, what is that?  I don't know.  Fifteen
 4        times.
 5   Q    Each of these events would show up as you being one of the
 6        organizers?
 7   A    Yeah.
 8   Q    Did you organize in any other -- did you use any other
 9        electronic means to organize, either e-mail or a Twitter
10        account or a Web site?
11   A    No, not that I remember.
12   Q    Do you have a Twitter account?
13   A    I did.
14   Q    Do you know how many followers you had?
15   A    Not a lot.
16   Q    Did your father's church, the                  , ever post
17        anything on its Web site?
18   A    They have not.
19   Q    Does it have a Web site?
20   A    It does have a Web site.
21   Q                   , does                have a Web site?
22   A    I don't think so.
23   Q    Do you know how he sort of carried on his half of the
24        organizing?
25   A    He would just -- every Sunday he would come out with a big
```

HAMILTON (                          , 9/13/10)

Page 42

1     board in front of the church.  People would come up and

2     that's his way of advertising.

3  Q  In front of your church -- your father's church?

4  A  Different churches.

5  Q  Different churches?

6  A  Yeah.  He wouldn't be on the church property.  It would be

7     on the corner of a sidewalk.  People in support would stop

8     by and he would tell them about the meeting.

9  Q  Do you know how old                    is?

10 A  He's an older man.  He's about 65, 70, maybe a little bit

11    older.  I'm not sure.

12 Q  I want to go back to just a couple things you said.

13        When your father -- early on in your testimony, we

14    talked about signature gathering at the church, and you said

15    that the petition was circulated at the church and you were

16    asked whether you recall whether your father spoke to the

17    congregation about R71.

18 A  Um-hmm.

19 Q  You said no.  And I just wanted to clarify, were you saying

20    no because you don't recall whether he did or not?

21 A  I was saying no because I know that we were there at the

22    church.  It wasn't in the sanctuary.  Most of the time it

23    was outside.  And he didn't recall on -- what do you mean by

24    recall?  Can you explain like --

25 Q  Do you --

HAMILTON (                           , 9/13/10)

Page 43

| | | |
|---|---|---|
| 1 | A | Are you asking me the question as he spoke to people about |
| 2 | | R71? |
| 3 | Q | Yes. |
| 4 | A | He did. |
| 5 | Q | He did? |
| 6 | A | But to the point of the way that the question was to me if |
| 7 | | he recommend to vote yes or no, he did not, so he just gave |
| 8 | | people an option of what's going on. |
| 9 | Q | Do you recall what he said about Referendum 71? |
| 10 | A | Like what he said out of the pulpit?  Is that what you're |
| 11 | | asking? |
| 12 | Q | Yes. |
| 13 | A | He didn't say anything in direct.  He said that there's |
| 14 | | people out there outside of church that are collecting |
| 15 | | signatures and he just, you know, made an announcement that |
| 16 | | there's -- maybe it wasn't even him.  It was one of the |
| 17 | | announcers at the church, but it was announced that we were |
| 18 | | there so people knew that we were there. |
| 19 | Q | Was it suggested that people could go outside and sign the |
| 20 | | petition, if they wanted to? |
| 21 | A | No. |
| 22 | Q | Other than doing these rallies and setting up tables and |
| 23 | | spots for gathering signatures, you mentioned that you did |
| 24 | | not make any phone calls.  Is that correct? |
| 25 | A | That's correct. |

HAMILTON (                        , 9/13/10)

Page 44

1   Q   Did you or any of your group ever go door to door?

2   A   I have went door to door.

3   Q   How many times would you say you went door to door?

4   A   Twice.

5   Q   Twice?

6   A   It wasn't successful, so . . .

7   Q   How many homes do you think that you stopped at?

8   A   We did neighborhoods, so we did a lot.

9   Q   Did you provide information?

10  A   Yeah.  We had brochures we gave out to people.  We didn't

11      need them to sign at the point.  You know, we understand

12      that this matter was -- doesn't come up with a 30-second

13      decision.  People had to re-think and then whenever they're

14      ready, we just told them where we're at.

15  Q   Did you give them contact information about how they could

16      contact you if they were interested in signing?

17  A   E-mail.

18  Q   E-mail.  Whose e-mail did they get?

19  A   Mine.

20  Q   Your e-mail?

21  A   Yes.

22  Q   Did you get any e-mails from people?

23  A   I did not.

24  Q   Is that why it wasn't successful?

25  A   Yeah.  It was just -- most of the door to door thing was

HAMILTON (                              , 9/13/10)

Page 45

1       just we were giving flowers -- fliers to people.  Flowers

2       would have been nice, huh?  And that's it.  We weren't there

3       with a petition because we understand that these things --

4       you know, when you tell a person, these things don't come up

5       with a decision in 30 seconds.  So, you know, if I had

6       somebody knock on my door and ask me to sign something, I

7       wouldn't sign it because I don't know if I'm signing away my

8       life, you know what I mean?  It was something that we would

9       give out an information booklet to people.

10  Q   Did you give the opportunity to sign, if people wanted to

11      sign?

12  A   We did.  But it wasn't -- it wasn't as big as -- you know,

13      maybe a few people signed.

14  Q   In your second incident that you described, the one that

15      occurred at Padden Parkway and Andresen at about three

16      o'clock on a Sunday afternoon, I guess the thong incident,

17      you mentioned that the people who were in your group were

18      youth and that there were a lot of young people there.

19          Can you describe to me what you mean by youth?  How

20      old?

21  A   From 17 to 25.

22  Q   So your group?

23  A   Yeah.  There were older people there from other churches or

24      other -- you know, people that just stopped by in support,

25      but it was mostly our people there from youth group.

HAMILTON (                              , 9/13/10)

Page 46

```
 1   Q   Would you say that in terms of the Referendum 71 campaign

 2       that you were one of the leaders of the campaign in this

 3       area, in the Vancouver area?

 4   A   No.  I wouldn't say that.

 5   Q   Who would you say would be?

 6   A   Probably            .

 7   Q   When you were working on the campaign and doing your

 8       organization of these rallies, were you working at the time?

 9   A   I was working at the time.

10   Q   Where were you working?

11   A   It was a delivery company in Portland.

12   Q   Delivery.  What was the name of it?

13   A

14   Q   Can you spell that?

15   A

16   Q   What were you doing there?

17   A   Just delivering packages, on-demand delivery.

18   Q   How many hours a week were you doing that?

19   A   I work whenever I wanted to.  It was commission-based, so I

20       would push eight hours, but it wasn't paid per hour.  It was

21       paid how much packages I delivered.

22   Q   Eight hours a week?

23   A   Eight hours a day.

24   Q   Eight hours a day.

25           And when did you leave that job?
```

HAMILTON (                            , 9/13/10)

Page 47

```
 1   A   Probably in the fall.

 2   Q   Fall of?

 3   A   Last year.

 4   Q   Last year.  So fall of 2009?

 5   A   Yeah.

 6   Q   Why did you leave that job?

 7   A   It just wasn't working out, the hours I worked and the money

 8       I made, so I decided to leave.

 9   Q   Is that when you got the job with the -- is it              ?

10   A   Yeah.              , I just -- I work there as commission, so

11       I don't -- I get a 1099 form at the end.  Basically it's on

12       my own.  Whenever I feel like making an extra buck, I go

13       work there.  Basically I'm just sales.

14   Q   So for       , when you left -- or during the time of your

15       employment, was your employer,          , aware of your

16       activities --

17   A   He was not.

18   Q   -- up here in Vancouver?

19           So your leaving       had nothing to do with --

20   A   It had nothing to do with.

21   Q   Have you ever felt like in the community here in Vancouver

22       that people have rejected you because of your activities

23       involving R71?

24   A   No.

25   Q   Have you ever felt uncomfortable after -- other than these
```

Dixie Cattell & Associates (360) 352-2506

HAMILTON (                          , 9/13/10)

Page 48

1       three incidents which occurred during the campaign,

2       post-campaign have you ever felt uncomfortable because of

3       your involvement with R71?

4   A   I have not.  I think that -- I looked at it from a position

5       of not my personal rights, but as in doing something for our

6       community, and every person has his own opinion.  That's why

7       I, you know, I didn't care if people flipped me off.  I

8       didn't care if people mocked at me because they have the

9       right to, if they wanted to do that.  If they don't

10      understand something that I'm doing, it's totally fine.  So

11      that's why I didn't look at the position where I'm, you

12      know, I'll get offended; I'll get hurt.  It's just not the

13      way I am.

14          So even if those things occurred at the intersections,

15      I'll forget in 30 seconds and I'll just move on with my own,

16      you know, thing I'm doing for what I'm standing up for.  So

17      if, you know, people, if they wanted to, have the right to

18      do the same at the intersection or the same intersection

19      across the street or with the street, with us.  It doesn't

20      matter.

21          Everybody has the right to stand on what they believe

22      in, so that's where I come in.  I didn't -- you know, of

23      course, you know, I wasn't like, thanks for the finger.

24      Yeah, I appreciate it.  No.  But it was, you know, all

25      right, you know.  Have a good day, you know.  I'm here with

HAMILTON (                          , 9/13/10)

Page 49

1      the sign.  I'm still going to continue whatever I'm doing,

2      so . . .

3  Q   Would you say that your opinions were public?

4  A   What do you mean by "public"?

5  Q   In that you weren't hiding your opinions?

6  A   I was not hiding my opinion.

7  Q   In fact, you were talking about your opinions --

8  A   I was.

9  Q   -- as much as really you could, right?

10 A   Yeah.  I was pushing it through everything that I could.

11 Q   And I think I never got an answer to this, but since the

12     campaign ended, have you felt threatened or harassed by

13     anyone as a result of your political views?

14 A   No, never have.

15 Q   You feel perfectly safe?

16 A   I'm not satisfied with -- I'm not in support of what

17     happened, you know, when the votes came in, but like I said,

18     you know, the votes came in and that's the way they came

19     out, so you just move on with your life and live to your

20     best knowledge of understanding the way it's supposed to be,

21     you know.  And if that's the way it came in, that's the way

22     people voted on it.  Everybody had a choice to do whatever

23     they wanted to do.  So, I mean, I'm not hurt.  You know, I'm

24     moving on with my life.  I'm living my life, so that's where

25     I'm at.

HAMILTON (                        , 9/13/10)

Page 50

1  Q   No one since the campaign has come up to you in a public
2      place or called you or sent you a harassing e-mail --
3  A   No.
4  Q   -- or a threatening e-mail?
5  A   No.
6  Q   Do you have any fears because you signed the petition?
7  A   The only thing I have is, if my name gets publicized on Web
8      sites or wherever, you know, I'm not worried about my name
9      as much as my address and my personal information, e-mail
10     and phone, you know.  I'm not against my name being up
11     there.  It's, you know, public records is totally fine with
12     me, but if it's to the point of my personal stuff -- my
13     address, my phone number, and my e-mail -- then, of course,
14     I would -- it would be a fear of, you know, something could
15     happen or somebody could stop by or somebody can send you
16     something.  That's where I'm at on that.
17 Q   Do you know if your information is listed in the phone book?
18 A   It's not.
19 Q   Do you know, is there -- have you used a search engine like
20     Google or any other search engine to see what information
21     about yourself is available?
22 A   I did use Google one time, a few years back though.  It
23     wasn't recently, so there's, you know, nothing really that I
24     noticed that came out to be, you know, scary or something
25     about me in there, so . . .

HAMILTON (                          , 9/13/10)

Page 51

1    Q    No old high school photos?

2    A    No.

3              MS. HAMILTON:  All right.  That's all I have.

4              MS. EGELER:  That's it.

5                             (Concluded at 9:53 a.m.)

6                             (Signature waived.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 52

1                       C E R T I F I C A T E

2       I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3  and for the State of Washington, residing at Lacey, do hereby

4  certify:

5       That the foregoing deposition of                    was taken

6  before me and completed on the 13th day of September, 2010, and

7  thereafter transcribed by me by means of computer-aided

8  transcription; that the deposition is a full, true, and complete

9  transcript of the testimony of said witness;

10      That the witness, before examination, was by me duly sworn

11 to testify the truth, the whole truth, and nothing but the truth,

12 and that the witness waived signature;

13      That I am not a relative, employee, attorney, or counsel of

14 any party to this action or relative or employee of any such

15 attorney or counsel, and I am not financially interested in the

16 said action or the outcome thereof;

17      That I am herewith securely sealing the deposition of

18           and promptly mailing the same to MS. ANNE E. EGELER.

19      IN WITNESS HEREOF, I have hereunto set my hand and affixed

20 my official seal of this 14th day of September, 2010.

21

22

23

                              _____
24                            Rebecca S. Lindauer, CSR#2402
                              Notary Public in and for the State of
25                            Washington, residing at Lacey.