1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> SAM REED, in his official capacity as Secretary of State of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, <br><br> Defendants. | NO. 09-cv-05465-BHS <br><br> DESIGNATED DEPOSITION TESTIMONY OF |

Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors Washington Families Standing Together and the Washington Coalition for Open Government and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the "Parties") hereby submit combined designated deposition testimony for

Defendants and Intervenors object to the admission of any deposition testimony taken of any witnesses who could be called to testify at trial.  Therefore, the designations of

DESIGNATED DEPOSITION
TESTIMONY OF

- No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

1   Defendants and Intervenors are being submitted in the event that the Court decides to admit

2   deposition testimony.

3        For the Court's convenience Defendants' designations have been highlighted in blue,

4   Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5   been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6   filing the redacted versions of these documents.

7        DATED this <u>6th</u> day of September, 2011.

8   ROBERT M. MCKENNA
    Attorney General

9

10     s/ William Clark                
    WILLIAM CLARK, WSBA #9234

11   Senior Counsel
    800 Fifth Ave, Ste 2000

12   Seattle, WA 98104
    206-464-7352

13   BillC2@atg.wa.gov
    ANNE EGELER, WSBA #20258

14   Deputy Solicitor General
    PO Box 40100

15   Olympia, WA  98504-0100
    360-664-3027

16   Annee1@atg.wa.gov
    _____

17

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION
TESTIMONY OF

- No. 09-cv-05465-BHS

                     2

Page 1

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

_____

```
                                )
JOHN DOE #1, et al.,            )
                                )
            Plaintiffs,         )
                                )
         vs.                    )   NO. 09-cv-05456-BHS
                                )
SAM REED, et al.,               )
                                )
            Defendants.         )
```

_____

DEPOSITION UPON ORAL EXAMINATION OF

_____

September 13, 2010

Vancouver, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

```
 1   APPEARANCES:

 2        FOR THE DEFENDANTS:          MS. ANNE E. EGELER
                                       DEPUTY SOLICITOR GENERAL
 3                                     P.O. Box 40100
                                       Olympia, WA  98504-0100
 4
          FOR THE INTERVENOR
 5        WASHINGTON FAMILIES
          STANDING TOGETHER:          MS. JESSICA T. HAMILTON
 6                                     PERKINS COIE
                                       1120 N.W. Couch Street
 7                                     Tenth Floor
                                       Portland, OR  97209
 8
          FOR THE INTERVENOR
 9        WASHINGTON COALITION FOR
          OPEN GOVERNMENT
10        (Via Telephone):            MR. STEVEN J. DIXSON
                                       WITHERSPOON KELLEY
11                                     422 W. Riverside Avenue
                                       Suite 1100
12                                     Spokane, WA  99201

13        INTERPRETER:                JOHN SCIGLIANO

14

15

16

17

18

19

20

21

22

23

24

25
```

Dixie Cattell & Associates (360) 352-2506

Page 3

1                                    INDEX

2    EXAMINATION                                          PAGE/LINE

3    MS. EGELER                                        4     18

4    MS. HAMILTON                                      17     8

5    MS. EGELER                                        19    17

6

7

8

9

10                                 EXHIBITS

11   EXHIBIT          DESCRIPTION                         PAGE/LINE

12                             (No Exhibits.)

13

14

15

16

17

18

19

20

21

22

23

24

25

EGELER (                    , 9/13/10)

```
 1                    BE IT REMEMBERED that on Monday, September 13,

 2          2010, at 12:12 p.m., at 1220 Main Street, Suite 510,

 3          Vancouver, Washington, before REBECCA S. LINDAUER, Notary

 4          Public in and for the State of Washington, appeared

 5                           , the witness herein:

 6                    WHEREUPON, the following proceedings were had, to

 7          wit:

 8

 9   JOHN SCIGLIANO,              having been first duly sworn by the

10                               Notary, translated from English to

11                               Russian and Russian to English as

12                               follows:

13

14                       ,    having been first duly sworn by

15                            the Notary, testified as follows:

16                           EXAMINATION

17   BY MS. EGELER:

18   Q    Mr.        , could you please state your entire name,

19        please.

20   A    In the patronymic as well, a middle name?

21   Q    Yes, please.

22   A                              .

23   Q    And are you a U.S. citizen?

24   A    At present I am, yes.

25   Q    And when did you become a United States citizen?
```

Dixie Cattell & Associates (360) 352-2506

EGELER (                        , 9/13/10)

Page 5

 1   A   In 2003.

 2   Q   And are you a registered voter in the state of Washington?

 3   A   Yes, I am.

 4   Q   I wanted to let you know before we get going that everything

 5       we say today is being taken down by our court reporter, and

 6       you'll have an opportunity to review that, if you want to.

 7       So that she has a good record, we'll need to say yes or no

 8       rather than nodding or saying um-hmm because those things

 9       won't show.

10   A   Okay.

11   Q   If anything I ask you is unclear for any reason, please ask

12       me to clarify.  It's important that we understand each

13       other.

14   A   Okay.

15   Q                   , could you please tell me where you're

16       employed.

17   A   I work presently at the                     .

18   Q   Do you have any other employment?

19   A   Nowhere else.

20   Q   And was that the case in 2009 also?

21   A   It was the same.

22   Q   And that's the                                        ,

23       correct?

24   A   Yes.

25   Q   How many parishioners do you have at the church?

Dixie Cattell & Associates (360) 352-2506

EGELER (                        , 9/13/10)

Page 6

1   A   Parishioners, approximately 700 people.

2   Q   Would that have been about the same in 2009?

3   A   I think so.

4   Q   You have been named as a witness in a lawsuit, Doe v. Reed.

5       Were you aware of that?

6   A   Yes, I was.  I was called by telephone and told of this and

7       so, yes, I was aware.

8   Q   And when were you called by telephone and told of this?

9   A   It was perhaps at the beginning of this year, maybe March.

10  Q   And who called?

11  A   That, I cannot say who called.  I think the call was maybe

12      from Olympia or maybe from Seattle.

13  Q   Do you know if it was from the attorneys for the plaintiffs

14      in the case?

15  A   I can't say for sure.  I can understand what it is about,

16      but as far as understanding in English what this

17      organization is, I don't know.  I don't even really know now

18      what this organization is that I'm dealing with.

19  Q   Do you know what the lawsuit is about?

20  A   No.

21  Q   Being named as a witness in this case may require you to

22      appear in federal court in Tacoma and testify publicly.

23  A   Yes.  I'm ready to go wherever.

24  Q   Do you have any objection or concern with testifying

25      publicly in court?

EGELER (                    , 9/13/10)

Page 7

1    A    No.  I have no concerns.

2    Q    Are you knowledgeable about Referendum 71?

3    A    Yes.  I was made familiar with it.

4    Q    And when did you first become aware of it?

5    A    I think probably in August or in July of last year.

6    Q    And how did you become aware of it?

7    A    I can't now say exactly, but we received information by mail

8         that came to our home.  We received it and everything there

9         was all clearly laid out.

10   Q    Do you know where the mail came from?  Do you remember?

11   A    I can't say the name right now, but I believe it was from

12        that same organization that was on the side of the -- what

13        was it called?  I don't know.  But it was definitely an

14        organization that sent it.

15   Q    Was it a church organization?

16   A    I don't think so.  That is for sure that it was not a church

17        organization.

18   Q    Did you sign the Referendum 71 petition?

19   A    Yes, I did sign it.

20   Q    Do you remember where you were when you signed it?

21   A    Yes, I do.  I was at home.

22   Q    Who brought the petition to you at home?

23   A    The petition was brought to me in the same way.  We received

24        it by mail.

25   Q    And did you then mail the petition to someone?

Dixie Cattell & Associates (360) 352-2506

EGELER (                    , 9/13/10)

Page 8

```
 1    A    No.  I didn't send it to anyone by mail.  It arrived by mail

 2         and there were somewhere around 40 newspapers there and on

 3         each there were about 20 names, and my son was directly

 4         involved in this matter.  He gathered signatures.  He knew

 5         where to send it.

 6    Q    Did you talk to others about Referendum 71 and encourage

 7         them to sign the petition?

 8    A    Of course I spoke to many people about it, and I expressed

 9         my opinion about it, and of course, people knew my view

10         about this matter.

11    Q    Did you speak to the parishioners at your church about this?

12    A    No.

13    Q    Were petitions available inside the church for people to

14         sign?

15    A    The petitions were everywhere.

16    Q    Were they inside the church?

17    A    Both inside and outside the church and they were at bus

18         stops and at the mall as well.

19    Q    Did you at any point speak to anyone inside the church,

20         anyone who attends the church, about signing the petitions

21         that were located inside the church?

22    A    I separate political and religious affairs.  In the church,

23         we don't talk about political matters.  The petitions were

24         in the church.  People had free choice to sign them, and no

25         one forced them to do so.
```

Dixie Cattell & Associates (360) 352-2506

EGELER (                                          , 9/13/10)

Page 9

1   Q   Did you speak at all in the church from a religious

2       perspective about gay marriage?

3   A   I did speak of it, of course, on the basis of the word of

4       God, what the Bible says about these things, and I separate

5       the attitudes toward people and towards sin.  We love people

6       regardless of their origin, inclinations, or sexual matters.

7   Q   But you did tell your congregation that gay marriage

8       religiously is inappropriate or wrong?

9   A   I did and I believe that is so.

10  Q   Did you have a Referendum 71 sign in your yard at your home?

11  A   Where I live on our property, we did not have any specific

12      sign like that for the reason that it's not a -- it's not a

13      through roadway.  If it were, I would have had the sign.

14  Q   Were any Referendum 71 signs put up at the church inside or

15      outside the church?

16  A   We did not put any up.

17  Q   Did you have a bumper sticker on your car saying reject

18      Referendum 71?

19  A   I did not.

20  Q   Did you go to any public places and help to gather petition

21      signatures?

22  A   I did not.

23  Q   Did you go to any public places and hold a Referendum 71

24      sign?

25  A   No.  I did not take part in these.

EGELER (                          , 9/13/10)

Page 10

```
 1   Q   I understand that your son       organized many events.
 2       Did you attend any of the events concerning Referendum 71?
 3   A   I repeat, I did not take part in any of these events, and
 4       I'll add not because I did not want to, but because I did
 5       not have the opportunity to.
 6   Q   Did you observe the counting of the signatures on the
 7       petitions?
 8   A   No, I did not observe.
 9   Q   Did you have any other involvement with Referendum 71 I
10       haven't asked you about?
11   A   For example, what might that be?
12   Q   Well, actually two other things I want to ask about.  Do you
13       have a church Web site?
14   A   We do have a church Web site, but we don't have anything to
15       do with this.
16   Q   Do you have a church newsletter?
17   A   No.
18   Q   At any point, was anything about Referendum 71 or the
19       gatherings that your son was planning posted on the church
20       Internet site?
21   A   It never was, no.
22   Q   Did you attend any meetings to plan activities regarding
23       Referendum 71?
24   A   No, I was not.  If there were any such gatherings, I would
25       have known about them, of course, and I would have been
```

EGELER (                          , 9/13/10)

Page 11

```
 1        there.

 2   Q    But there were such meetings, weren't there, that your son

 3        held?

 4   A    As far as my son, I don't know of any that he held.  I think

 5        that you would have to ask him.

 6   Q    Did you meet with                          about Referendum 71 or

 7        discuss it with him?

 8   A    I discussed this issue with many pastors.  For the most

 9        part, they were American pastors.

10   Q    And did you express your opinion about Referendum 71?

11   A    It was entirely by e-mail and by mail.

12              THE INTERPRETER:  Actually, the interpreter didn't

13        interpret the question.  The interpreter did not interpret

14        the last question --

15              MS. EGELER:  Sorry.

16              THE INTERPRETER:  -- Attorney General.  Did you

17        express your opinion, was that the question?

18              MS. EGELER:  Yes.

19   A    Well, personally my English is not such to be able to

20        respond much, but as far as information I received from

21        various pastors, you know, I did speak of that.

22   Q    (By Ms. Egeler)  Did you allow your name to be used as a

23        person who was endorsing Referendum 71?

24   A    No, of course.

25   Q    I understand that you suffered some harassment as a result
```

Dixie Cattell & Associates (360) 352-2506

EGELER (                          9/13/10)

Page 12

1       of signing Referendum 71.  Is that correct?

2    A  Directed at me personally, no, but in general, yes.  There

3       were several times when, by the church, we found notes that

4       had been printed from a computer which contained things

5       like:  You're worst than the fascists.  Get out of here.

6       Nothing is going to come of this for you.  Your children

7       will be just like us --

8    Q  And these --

9    A  -- that they will be homosexuals.  We'll make them -- we

10      received these several times.  They were left by the church,

11      several copies.  I was obliged to speak of this in the

12      church so that people wouldn't pay attention to this, so

13      that our people could bless these people, saying that we

14      hate sin, but we love people and that's all.  There were no

15      threats directly at me personally, but in general, there

16      were.

17   Q  So these were printed on paper and left in front of the

18      church.  Is that correct?

19   A  There were many, both by the church and left on the

20      windshields, under the windshield wipers of cars.

21   Q  Did you keep any of them?

22   A  We had no goal at that time of keeping something, especially

23      things such as these in order to prove our side or that we

24      were right.  Maybe some of the people might have kept them,

25      taking them off their windshields.  I don't know.

State Objects: Witness lacks foundation for the testimony; hearsay.

Dixie Cattell & Associates (360) 352-2506

EGELER (                          , 9/13/10)

Page 13

1     Everything that was found on the church property was thrown

2     in the garbage.

3   Q   Did anything else happen?

4   A   Well, that's specifically what I witnessed, but also I have

5       specifically spoken to people and heard them attest to

6       threats.

7   Q   Did anything else happen to the church or near the church?

8   A   Other than that incident, no.

9   Q   And who did you talk to that was harassed in some way?

10  A   The thing is, it was about two years ago, when people were

11      going out in Portland where there was also a protest against

12      this matter.  A pastor of a certain church said that eggs

13      were tossed at them, at their cars.  I know this pastor and

14      believe him.

15  Q   Who is this?

16  A

17  Q   Can you spell that?

18  A   I think it's

19  Q   And is he a pastor in Portland?

20  A   Yes.

21  Q   I'm confused that there would be a rally in Portland because

22      Referendum 71 is a Washington issue, and Oregon cannot vote

23      on Washington issues.  Could it be that he was at a rally

24      for a similar issue on the Oregon ballot?

25  A   I think it was not connected to this referendum, but they

Dixie Cattell & Associates (360) 352-2506

EGELER (                        , 9/13/10)

Page 14

1           had something of their own there on this issue.

2      Q    Did you --

3      A    So I think it's just not on this referendum, but on the same

4           grounds that people who were defending this position, they

5           were very aggressive.

6      Q    And did this occur, the Portland incident, two years ago?

7           Is that what you said?

8      A    Yes, two years ago.

9      Q    And you said that you heard about harassment of others.  Is

10          that the incident you were thinking of or are there other

11          things you've heard of as well?

12     A    No.  I know several specific testimonies of other people.

13          The first thing is that when people went out to protest, our

14          people -- or not our people, but people on this issue were

15          out standing at Mill Plain and Chkalov, and people would

16          stop, people who were supporters of the same sex marriage,

17          and some of these people stopped and tried to tear away the

18          placards from young women, girls, who were holding the

19          placards that said reject.  They would stop at a traffic

20          light and open their car windows and they would lower their

21          pants and show their behinds.

22     Q    Who told you this?

23     A    I can't say now exactly who did, but my son was a witness to

24          these things.  He was not alone.  There were perhaps 40

25          people there.

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

EGELER (                       , 9/13/10)

Page 15

1   Q   Was it your son        who told you about this?

2   A   My son        did tell me.

3   Q   Is there anything else you've heard about?

4   A   Well, some things that I've heard but I simply can't name

5       the specific people, and some people I do not want to name.

6       I think that I can confirm those things that I've personally

7       seen and I've told of them.

8   Q   The signs that were left by the church, the printed things,

9       did you call the police and report that you had received

10      those outside the church?

11  A   No, of course not.  No.  We are not planning to retaliate

12      against anyone or present -- make any charges.  It's just

13      when a certain pressure is brought to bear on us, I need to

14      speak of these things.  I otherwise would not speak of it.

15  Q   When you read those printed things, did you feel that you or

16      any of your congregation were at risk of any sort of harm?

17  A   I can only speak for myself.  I do not of course feel that

18      I'm threatened by these statements, but it's unpleasant when

19      people are saying -- directing this at our children, that

20      we're going to make them just like us.

21  Q   Do you feel that people who have a different viewpoint about

22      Referendum 71 have a right to express that opinion?

23  A   Of course.

24  Q   Although I understand the things that were said on the --

25      these printings were rude and not kindly stated, did you

Dixie Cattell & Associates (360) 352-2506

EGELER                          , 9/13/10)

Page 16

1      feel that it went beyond their constitutional right to
2      speak?
3   A   Definitely, I do.
4   Q   But you chose not to call the police?
5   A   Right.
6   Q   Did you think the police might be able to help you with
7      this?
8   A   No, I didn't.
9   Q   Why not?
10  A   I don't know.  Maybe it's our Russian upbringing not to run
11     for help right away.
12  Q   But if I understand you, you didn't feel that these people
13     were trying to physically harm you or your parishioners or
14     the church?
15  A   Of course I don't think so.  I didn't have that kind of
16     fear.
17  Q   Did you personally experience any other harassment that we
18     haven't talked about?
19  A   Maybe I didn't understand.
20  Q   Did you yourself experience any other -- any other
21     harassment or any threats as a result of your signing the
22     Referendum 71 petition?
23  A   No.  Everything that I've heard or that I have been a
24     witness to I've told you about.
25  Q   I just have a question about an incident that you told me

Page 17

```
1      you heard from your son      You said you were told that
2      people tried to pull a sign away from a young woman.  Do you
3      know if the police were contacted about that?
4   A  No, I don't know.
5              MS. EGELER:  I have no other questions.
6                             EXAMINATION
7   BY MS. HAMILTON:
8   Q  My name is Jessica Hamilton.  I'm an attorney and I
9      represent Washington Families Standing Together, which is a
10     group of civil rights organizations and churches that
11     supported the Referendum 71 -- supported -- was against
12     getting Referendum 71 on the ballot.  We opposed
13     Referendum 71.  Sorry about that.
14             THE INTERPRETER:  Interpreter asked to repeat the
15     name of the organization.
16             MS. HAMILTON:  Washington Families Standing
17     Together.
18  Q  (By Ms. Hamilton)  I just have a few questions for you.
19         Do you recall when the petition gathering of signatures
20     was over, the time?
21  A  I think it was maybe July, maybe somewhere around there.  I
22     don't even know exactly.
23  Q  Okay.
24  A  You see, in my life this issue is not one that I've -- that
25     is so salient in my life that I think about it a lot.
```

HAMILTON (                        , 9/13/10)

Page 18

| | | |
|---|---|---|
| 1 | Q | Since that period of time, July or August, have you felt any |
| 2 | | fear or experienced any threats because you signed the |
| 3 | | petition? |
| 4 | A | Well, as far as fear and threats go, I've said everything I |
| 5 | | have.  I really have nothing to add. |
| 6 | Q | So since that time, no threats? |
| 7 | A | No threats. |
| 8 | Q | And no -- |
| 9 | A | Personally directed at me, no. |
| 10 | Q | Have you heard of anyone else who has gotten a threat as a |
| 11 | | result of signing a petition, since the signature gathering |
| 12 | | has ended? |
| 13 | A | I have. |
| 14 | Q | Who? |
| 15 | A | Well, who?  Do I need to name names? |
| 16 | Q | Can you describe the incident you heard? |
| 17 | A | Well, I know a lot of incidents, things I've heard of, but I |
| 18 | | was not a witness to them. |
| 19 | Q | Are these all incidents that occurred since the signature |
| 20 | | gathering has ended, since the campaign has ended? |
| 21 | A | Yes.  I have heard a lot of testimony about threats about -- |
| 22 | | that there would be consequences for all these people who |
| 23 | | signed, that, you know, it won't go -- that we will get |
| 24 | | vengeance. |
| 25 | Q | Do you know who said these things? |

State Objects: Witness lacks foundation for the testimony; hearsay.

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/13/10)

Page 19

1   A   You know, I don't -- I don't keep a record of these things

2       because it's not my area to record them.  When you asked

3       what I heard, yes, I have heard, but who said it, I can't

4       say.  If you need to find out, of course I can find out, but

5       I'm not going to get involved in this matter.

6   Q   From your perspective, the campaign for Referendum 71 is

7       done for you.  Is that correct?  Maybe not the issues, but

8       the campaign itself, the political campaign, is over?

9   A   Yes.  In general, yes.  Once it's done, I haven't returned

10      to it.

11             MS. HAMILTON:  Can we go off the record for a

12      second?

13                          (Recessed at 1:03 p.m.)

14                          (Reconvened at 1:04 p.m.)

15                       EXAMINATION

16  BY MS. EGELER:

17  Q   I'll pick up.  You said that you heard about other people

18      who said that there would be consequences as a result of

19      signing the petition.  What other people said this?

20  A   There were various people.

21  Q   You've been named as a witness in a federal lawsuit, and I

22      understand that you may not feel comfortable naming these

23      names, but as part of the legal process, during the

24      deposition, we do have the right to ask you for those names.

25  A   And, well, I have the right not to answer you.

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/13/10)

Page 20

1   Q   Do you know the names of people who have said that there

2       would be consequences?

3   A   That there would be consequences if their names were made

4       public, shown, is that it?

5   Q   Yes.

6   A   Yes.  There is certain people that have experience in this

7       and there's grounds for them saying it.  Many friends in

8       California who have suffered from this.

9   Q   So the people in California, I don't need to know their

10      names.

11  A   Well, people of everywhere.  If similar things have taken

12      place, if people have been subjected to certain threats,

13      when this issue was being decided, there's -- will guarantee

14      that it will take place here.

15  Q   Have individuals come to you personally and told you

16      personally that they are at risk of harassment or threats

17      because they signed Referendum 71?

18  A   No.  This is simply the testimony of people.  Personally no

19      one came to me.

20  Q   And you said that you know of others who have suffered

21      harassment other than the stories that          told you, your

22      son.  Is that correct?

23  A   Yes, correct.  I would like to ask you to specify.  Are you

24      asking me to gather, to collect the testimony of these

25      specific people or what?  What do you need?

State Objects: Witness lacks foundation for the testimony; hearsay.

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/13/10)

Page 21

1   Q   Did people come to you personally and tell you personally

2       about harassment that they suffered?

3   A   I've already answered that question.

4   Q   Yes or no?

5   A   No.

6   Q   So I want to make sure that we understand each other.  The

7       only incidents of harassment that you've heard about from

8       someone else directly told to you were told to you by

9       Dmitry.  Is that correct?

10  A   Yes.

11          MS. EGELER:  I understand.  Thank you.

12      On the telephone we have Steven Dixson, and he is

13  counsel for the Washington Coalition for Open Government.

14      Steve, do you have any questions?

15          MR. DIXSON:  Thank you for the opportunity, and I

16  do not have any questions at this point.

17          MS. EGELER:  Ms. Hamilton, do you have any further

18  questions?

19          MS. HAMILTON:  I do not.  Thanks.

20          MS. EGELER:  We're done.  Thank you.

21                          (Concluded at 1:10 p.m.)

22                          (Signature reserved.)

23

24

25

Page 22

1                      C E R T I F I C A T E

2          I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3     and for the State of Washington, residing at Lacey, do hereby

4     certify:

5          That the foregoing deposition of                         was

6     taken before me and completed on the 13th day of September, 2010,

7     and thereafter transcribed by me by means of computer-aided

8     transcription; that the deposition is a full, true, and complete

9     transcript of the testimony of said witness;

10         That the witness, before examination, was by me duly sworn

11    to testify the truth, the whole truth, and nothing but the truth,

12    and that the witness reserved signature;

13         That I am not a relative, employee, attorney, or counsel of

14    any party to this action or relative or employee of any such

15    attorney or counsel, and I am not financially interested in the

16    said action or the outcome thereof;

17         That I am herewith securely sealing the deposition of

18                      and promptly mailing the same to MS. ANNE E.

19    EGELER.

20         IN WITNESS HEREOF, I have hereunto set my hand and affixed

21    my official seal of this 16th day of September, 2010.

22

23

24                         _____
                           Rebecca S. Lindauer, CSR#2402
                           Notary Public in and for the State of
25                         Washington, residing at Lacey.

Dixie Cattell & Associates (360) 352-2506