1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,

                       Plaintiffs,

     v.

SAM REED, in his official capacity as
Secretary of State of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer for the
Secretary of State of Washington,

                    Defendants.

NO. 09-cv-05465-BHS

DESIGNATED DEPOSITION
TESTIMONY OF Redacted
Redacted

Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

Washington Families Standing Together and the Washington Coalition for Open Government

and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

"Parties") hereby submit combined designated deposition testimony for Redacted

Redacted

Defendants and Intervenors object to the admission of any deposition testimony taken

of any witnesses who could be called to testify at trial.   Therefore, the designations of

DESIGNATED DEPOSITION
TESTIMONY OF Redacted
Redacted
- No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

1  Defendants and Intervenors are being submitted in the event that the Court decides to admit

2  deposition testimony.

3        For the Court's convenience Defendants' designations have been highlighted in blue,

4  Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5  been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6  filing the redacted versions of these documents.

7        DATED this 6th day of September, 2011.

8  ROBERT M. MCKENNA
   Attorney General

9

10   s/ William Clark
   _____
11  WILLIAM CLARK, WSBA #9234
   Senior Counsel
12  800 Fifth Ave, Ste 2000
   Seattle, WA 98104
13  206-464-7352
   BillC2@atg.wa.gov
14  ANNE EGELER, WSBA #20258
   Deputy Solicitor General
15  PO Box 40100
   Olympia, WA  98504-0100
16  360-664-3027
   Annee1@atg.wa.gov
17  _____

18

19

20

21

22

23

24

25

26

Redacted

1

IN THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN DOE #1, et al.,  )
                       )
   Plaintiffs,    )
                       )
                       )
                       )
VS.                )    3:09-CV-5456-BHS
                       )
SAM REED, et al.,    )
                       )
   Defendants.    )
                       )
                       )

DEPOSITION OF

Redacted

Taken on behalf of the Defendants

October 15, 2010

1    A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:

4    Mr. Scott Bieniek
     Bopp Coleson & Bostrom
5    1 S 6th St
     Terre Haute, IN 47460
6    sbieniek@bopplaw.com
     812-232-2434

7

8    FOR THE DEFENDANTS:

9    Ms. Rhonda L. Barnes
     Perkins, Coie, Brown & Bain
10   2901 N. Central Avenue, Suite 2000
     Phoenix, AZ 85012
11   rbarnes@perkinscoie.com
     602-351-8305

12

     AND
13

     Ms. Anne E. Egler (Via telephone)
14   Deputy Solictor General
     P.O. Box 40100
15   Olympia, WA 98504
     anne1@atg.wa.gov

16

17

           E X A M I N A T I O N

18

19                                    PAGE
     Examination by Ms. Barnes...............   4
20   Examination by Ms. Egler...............  46
     Examination by Mr. Bieniek.............  48
21   Examination by Ms. Egler...............  50

22

23

24

25

Redacted                                          October 15, 2010

3

1           The deposition of Redacted

2     Redacted       taken on behalf of the

3     Defendants, on October 15, 2010, at the

4     offices of Alpha Court Reporting, 3200 West

5     End Avenue, Suite 500, Nashville, Tennessee,

6     for all purposes under the Federal Rules of

7     Civil Procedure.

8           The formalities as to caption,

9     certificate, et cetera, are waived.  All

10    objections, except as to the form of the

11    questions, are reserved to the hearing.

12          It is agreed that Lise S.

13    Matthews, being a Notary Public and Certified

14    Court Reporter for the State of Tennessee,

15    may swear the witness, and that the reading

16    and signing of the completed deposition by

17    the witness is not waived.

18

19

20                    *   *   *

21

22

23

24

25

Redacted                                          October 15, 2010

4

1                   Redacted

2       was called as a witness, and after having

3       been first duly sworn, testified as follows:

4

5       EXAMINATION BY MS. BARNES:

6           Q.      Good morning.  Can you please

7       state your name for the record?

8           A.      My name is Redacted

9           Q.      And Redacted is spelled how?

10          A.      Redacted

11          Q.      And can you tell us your home

12      address?

13          A.      Redacted

14      Redacted

15          Q.      And Redacted is Redacted

16          A.      Redacted

17          Q.      And I'm not from Redacted So

18      I'm not sure how it was spelled and where

19      it's from.

20                  How long have you been in

21      Redacted

22          A.      We moved here in June of 2010.

23          Q.      Okay.  And prior to that you lived

24      in Redacted

25          A.      Redacted , for the two

5

1    years previous to that.

2        Q.      So two years previous to that

3    would be June of '08?

4        A.       That's correct.

5        Q.      To June of 2010?

6        A.       That's right.

7        Q.      Had you been in Redacted prior

8    to being in Redacted

9        A.       No.

10       Q.      Where were you before then?

11       A.       We resided in Redacted,

12   Redacted.

13       Q.      Oh, you go back and forth from

14   coast to coast.

15               And where are you currently

16   employed?

17       A.       Redacted in

18   Redacted.

19       Q.      And what is that?

20       A.       That's the Christian and classical

21   school.

22       Q.      And what do you do there?

23       A.       I teach upper school logic,

24   rhetoric, and humanities.

25       Q.      And have you been doing that since

6

1    June of 2010?

2         A.      Yes, ma'am.

3         Q.      And what were you employed as --

4    or where were you employed while you were in

5    Redacted

6         A.      I was employed at Redacted

7    where I was both the secondary humanities

8    instructor and associate head master.

9         Q.      And were you at Redacted

10   the whole two years you were in Redacted

11        A.      Yes, ma'am.

12        Q.      And have you ever been deposed

13   before?

14        A.      No, ma'am.

15        Q.      All right.  I should probably

16   start with a couple ground rules now that we

17   have gotten to know each other a little bit.

18             As you can tell, everything we're

19   saying is being taken down by the court

20   reporter.  So as much as you can, and I will

21   try to do the same, not talk over each other.

22   It will make her pull her hair out, and we

23   don't need her to do that.

24             And likewise, when I'm asking a

25   question, if you could give a verbal

7

1   response, a yes or a no, so she can take it

2   down, that would be appreciated.

3       A.      Yes, ma'am.

4       Q.      And finally, if you need to take a

5   break or if you have any questions, please

6   let me know.  We're more than happy to

7   rephrase something or address any questions

8   you have.  My only request is if you want to

9   take a break, please don't do it while a

10  question is pending and do it before or after

11  you answer.

12      A.      Yes, ma'am.

13      Q.      Okay.  Great.  Let's talk a little

14  bit about Referendum 71.  You're familiar

15  with that?

16      A.      Yes, ma'am.

17      Q.      And if I call it Referendum 71,

18  what does that mean to you?

19      A.      That was the petition drive that

20  we engaged in in an effort to forestall a law

21  that the Washington State legislature was

22  attempting to enact which would have had

23  ramifications in favor of the advancement of

24  homosexual marriage in Washington over the

25  long-term.

8

1    Q.      And how did you become familiar

2  with Referendum 71?

3    A.      Hmm.  Probably most directly

4  through my social network, which involved

5  individuals who were intimately involved in

6  the petition drive and the formulation of

7  that petition drive.

8    Q.      So were you part of the

9  organization that -- that initiated the

10  petition drive?

11    A.      I was not.

12    Q.      You came in afterwards?

13    A.      Yes, ma'am.

14    Q.      Now let's talk about the petitions

15  themselves, then.  Did you sign the

16  Referendum 71 petition?

17    A.      I did.

18    Q.      Do you remember where or when that

19  was, approximately?

20    A.      Where I physically signed the

21  petition?

22    Q.      Uh-huh.

23    A.      I'm pretty sure that I signed it

24  after a church service sometime during April

25  or May.  I don't know specifically when, but

9

1    it was somewhere in the middle of the drive.

2    We had brought petitions in to church.  After

3    the service, we had them in the foyer area in

4    the back.  I signed it on one of those

5    occasions.

6        Q.    And you said "we" had brought the

7    petitions in to church.  Is that what you

8    said?

9        A.    Well, "we" in the sense that one

10   of the other people who was affiliated with

11   the petition drive also attended our church.

12   She brought them and I signed them.

13       Q.    Okay.  I see.  So when you were

14   saying "we," it wasn't you included in that?

15       A.    Correct.

16       Q.    Okay.  I just wanted to be clear.

17            And so was there -- the woman who

18   brought them who was involved, was she there

19   with a clipboard?  Is that how you were

20   handed the petition?  Do you remember?

21       A.    As I recall, it was simply set on

22   the table in the back of the room.  A brief

23   announcement was made that anyone who was

24   interested in signing the petition, that one

25   would be available in the back of the room.

10

1    And I don't recall it being circulated.  Just

2    sitting there and after the service, if you

3    wanted to, you could sign on your way out.

4         Q.    So there was a table in the back

5    with sort of stacks of petitions, blank

6    petitions?

7         A.    I don't even recall there were

8    stacks.  There may have been one or two.

9         Q.    Okay.  So just a couple?

10        A.    (Witness moves head up and down.)

11   Sorry.  Yes, ma'am.

12        Q.    Thank you.

13             And were other individuals

14   standing around at that table when you were

15   signing?  Do you remember?

16        A.    That table -- that table's like a

17   multipurpose table.  I mean, that's also

18   where the usher sets the bulletins and things

19   like that.  So I don't know that anyone was

20   sitting at the table.  It's more like an

21   informational kind of a display table for

22   literature and such going in to the church.

23        Q.    So there were other brochures and

24   sort of papers on the table in addition to

25   the petitions?

11

1      A.      That's my recollection, yes.

2      Q.      And when you signed the petition,

3   were there other folks there either before

4   you signing it or behind you waiting to sign?

5      A.      I don't remember a line.  I

6   remember talking about the petition with a

7   couple of other individuals.

8      Q.      And you were -- let me just

9   clarify.  You were talking with individuals

10  sort of at that table or --

11     A.      No.  No.  I'll paint a better

12  picture.  After the service, during the

13  typical mull around and talk with people

14  time --

15     Q.      Uh-huh.

16     A.      -- since the petition had been

17  mentioned, we knew it was there.  A few of us

18  were speaking about it.  At that point, I

19  think I noticed that no one else was back

20  there, so I took that opportunity to sign the

21  petition.

22     Q.      And you said you took that

23  opportunity to sign because then you weren't

24  going to have to wait in line?

25     A.      Correct.

1      Q.      And so that was easier for you,

2   just to go straight up there and sign?

3      A.      Yes, ma'am.

4      Q.      And other -- you could see other

5   signatures on the form; is that correct?

6      A.      There were a couple.

7      Q.      And anybody who signed after you

8   could have seen your signature; correct?

9      A.      Yes, ma'am.

10      Q.      And you said you were talking to

11   other folks at that mulling around time?

12      A.      Uh-huh.

13      Q.      About the referendum?

14      A.      Yes, ma'am.

15      Q.      And did you tell them that you had

16   signed?

17      A.      You know, I don't really remember

18   specifically saying I did sign or I didn't.

19   I think it was within -- within my immediate

20   circle of -- of acquaintances, I think it was

21   general knowledge that all of us intended to

22   sign.

23      Q.      And do you know why that was

24   general knowledge?  Was it just something

25   that had came up in conversation?

1      A.      Well, I think that our general

2  world views were shared and there -- we had

3  enough dinnertime conversations at one

4  another's homes to know that we were all

5  in -- in -- we were like-minded about that

6  particular political issue and we had all

7  spoken about the need to sign it.  Therefore,

8  I think it was presumed that each person in

9  that group would have signed it.

10      Q.      Okay.

11      A.      So just need to clarify, I don't

12  think anyone ever said, I have now signed it.

13      Q.      There was no declaratory statement

14  like that?

15      A.      Correct.

16      Q.      Okay.  Were you aware when you

17  signed the petition that it could be made

18  publicly available?

19      A.      To be honest with you, I didn't

20  really have -- I didn't really think about it

21  one way or the other.  I'd never given much

22  thought to whether petitions were public or

23  not public in any respect probably until

24  after the petition drive was either nearly

25  concluded or shortly after.

14

1    Q.      And if you had been aware at the
2  time you signed that it could be publicly
3  available, would that have changed your
4  decision on whether to sign?
5    A.      Probably not.
6    Q.      And why is that?
7    A.      Well, I felt very strongly about
8  the issue at the time.  I don't think that it
9  would -- I don't think that would have
10 changed my actions on that occasion given
11 what I knew at the time.
12   Q.      And it sounds like you signed the
13 petition early enough in the process that
14 there probably wasn't discussions of
15 litigation surrounding the petitions; is that
16 right?
17   A.      No.  That -- those -- even the
18 mere mention of litigation didn't come until
19 a number of months beyond that.
20   Q.      Okay.  And did you circulate
21 petitions yourself?
22   A.      I did not.
23   Q.      Were you otherwise involved in the
24 Referendum 71 campaign?
25   A.      Only on one occasion.  In

15

1    [Redacted]    the organizers of the petition

2    drive locally had put together a little rally

3    in the park.  I did attend that rally for a

4    couple of hours as a way of showing, you

5    know, my support.  And because the organizers

6    were ladies, I was there to kind of help move

7    tables and things of that nature.

8         Q.     You were there to be the force?

9         A.     Yes, ma'am.  On that particular

10   occasion, a reporter -- and I don't really

11   remember where she was from -- she was doing

12   some kind of -- I think she was an on-line

13   freelance journalist of some kind, did stop

14   by.  They did a short little, hey, there's a

15   rally going on.  It's [Redacted]   Not a whole

16   lot happens, so any group of people in

17   [Redacted]  gets an article, I think.  And I was

18   briefly interviewed just for, hey, what's

19   the -- what is this all -- what's happening

20   here today kind of thing.  And so if you want

21   to call that involved, that's -- that would

22   be the extent of it.

23        Q.     And at that rally in the park in

24   [Redacted]

25        A.     I'm sorry to interrupt.

Redacted                                          October 15, 2010

16

1    Q.      That's all right.

2    A.      I'd like to back up.

3    Q.      Sure.

4    A.      There is one other way in which I

5    was involved with the campaign.  And that is

6    that by way of donation, I did donate a small

7    sum of money, $25 or somewhere abouts to the

8    campaign.

9    Q.      All right.  And we'll come back to

10   that.  But let's chat a little bit more about

11   that rally in the park.

12           Do you know approximately how many

13   people attended?

14   A.      It was not a large rally.  People

15   trickled in and out.  I would say maybe 60 to

16   70 people over the course of three to four

17   hours.

18   Q.      And were they circulating

19   petitions at that event?

20   A.      They were.

21   Q.      And I think I found that video of

22   you being interviewed.  It was on a Redacted

23   website.

24   A.      Okay.

25   Q.      But it was I think -- I can't

17

1   remember because, like I say, I'm not that

2   sophisticated, but I think it was sort of a

3   citizen journalism piece?

4        A.      Yeah.  It wasn't -- it didn't --

5   it wasn't like a professional newscaster

6   coming in.  The -- I think the lady who did

7   it actually lived just up the street and saw

8   something going on and came down and had --

9   well, looked like a -- one of those Wal-Mart

10  little, you know, phone cams.  I mean, so the

11  tech level there was pretty -- pretty low.

12       Q.      So it was a small portable camera?

13       A.      Yes, ma'am.

14       Q.      And I'm doing a hand gesture which

15  obviously won't come out in the record, but

16  maybe the size of a BlackBerry?

17       A.      That would be a fair assessment.

18       Q.      Okay.  And did she introduce --

19  the reporter, did she introduce herself to

20  you?

21       A.      I'm sure she gave her name and

22  that she was doing some kind of -- I do

23  remember specifically it was some kind of

24  on-line journalism.  But I have to be frank

25  with you, I was only half paying attention

18

1   because she wasn't really speaking to me at
2   the time.
3        Q.      Uh-huh.
4        A.      So that's the best I can do.
5        Q.      But you didn't have any worries
6   about giving an interview with her and being
7   on camera, did you?
8        A.      No.   I didn't think about it at
9   the time, no.
10       Q.      Have you had any other
11  interactions with the members of the media
12  regarding Referendum 71?
13       A.      No, ma'am.
14       Q.      So let's just talk briefly about
15  your donation.  You said you gave maybe $25?
16       A.      Something along those lines.
17       Q.      And that was your personal
18  account?
19       A.      Yes, ma'am.
20       Q.      Did you get a Referendum 71 bumper
21  sticker?
22       A.      I don't think I had a bumper
23  sticker.  I may have gotten a button.
24       Q.      Like a button to wear on your
25  lapel or something?

19

1     A.     Yes, ma'am.

2     Q.     What about a yard sign?  Did you

3   have a Referendum 71 yard sign?

4     A.     I did not display a yard sign.

5     Q.     And I understand that some folks

6   would get Referendum 71 signs or hand-made

7   signs and stand on street corners and sort of

8   rally the cars that were driving by?

9     A.     There were people who did that.  I

10  was not one of them.

11    Q.     You did not.

12           All right.  Let me just go through

13  my notes here.

14           Were you involved in -- or had

15  discussions with a campaign manager for

16  Referendum 71?

17    A.     Yes, ma'am.

18    Q.     Larry Stickney, I think?

19    A.     Yes, ma'am.

20    Q.     Did I pronounce that correctly?

21    A.     I believe so.

22    Q.     Okay.  Do you generally recall

23  what kinds of conversation you had with

24  Mr. Stickney?

25    A.     Yes.

1      Q.      And can you just generally

2  describe what those conversations involved?

3      A.      Well, I was acquaintances,

4  friends, with Larry's sister who attended our

5  church, which is the only reason I came to

6  know Larry at all.  Most of our conversations

7  were just of a friendly, personal nature

8  around the dinner table.  Every six or eight

9  weeks he would come to visit family and we'd

10 see each other, you know.  We'd be invited

11 over to the Shinn's home for dinner.

12          Are you asking specifically about

13 conversations related to R-71?

14     Q.      Yes.  That's correct.

15     A.      Okay.  We talked about the

16 importance of the changes in the legislation,

17 what the implications of those changes might

18 be, what options the political process

19 afforded us to prevent that legislation from

20 becoming law.

21          In a broader sense, we spoke about

22 our concerns about an activist legislature

23 centered in a geographically isolated area

24 legislating for a much larger area and the

25 comparison that presented to, say, the

1   founding period of America where the South,

2   very large, but not populated, was competing

3   for representation with the more concentrated

4   but smaller North and that there were

5   similarities in the concerns that we were

6   expressing and these had been seen before in

7   history.  So we -- I suppose we spoke about

8   those issues in a somewhat philosophical

9   sense.

10      Q.    And it sounds like from what

11  you're describing is that you might have

12  talked to Mr. Stickney prior to the

13  referendum petitions being -- the campaign

14  starting?

15      A.    I was acquainted with Larry before

16  the campaign began.

17      Q.    So you discussed with him prior to

18  the campaign sort of what the possibilities

19  were for pulling the referendum?

20      A.    No.  I wouldn't characterize it as

21  that.  I'm -- I'm not a -- I'm not a

22  political strategist.  That's not my area of

23  expertise.  And so I can't say that we ever

24  spoke real specifically about the campaign in

25  any depth until the campaign was already

22

1   formulated and he was ready to bounce ideas

2   off people about how to proceed.

3            In those early days leading up to

4   the campaign, we spoke about those issues

5   really more in a conceptual way, what are the

6   implications of this kind of legislation,

7   what's the implication of changing the

8   language of legislation, the historical

9   understandings of gender, for example, and

10  what would that mean for other laws, right,

11  that were on the books; what's the role of

12  the constitution or a state constitution in

13  either advancing or -- advancing the cause of

14  a legislature as opposed to advancing the

15  cause of the general population.

16           I mean, we spoke about those kinds

17  of questions in the sense of political

18  theory, not in the sense of strategy.

19      Q.    Okay.  And what you were saying

20  made me think of something back to that

21  reporter in the park.

22      A.    Yes, ma'am.

23      Q.    Did she tell you she was going to

24  post the story on-line?

25      A.    I think she indicated that she

23

1    would submit it.  Sometimes they aired it --
2    sometimes they would edit it down; sometimes
3    they would air it.
4        Q.    Okay.  And did you ever find it
5    on-line?  Did you ever go look for it?
6        A.    I think someone sent me a link to
7    it a week or so afterwards.  I couldn't even
8    tell you who sent me the link.  It was on
9    somebody's blog.
10       Q.    Uh-huh.
11       A.    I -- I couldn't even tell you
12   whose blog it was.  I remember thinking that
13   I wore a good shirt for the interview, had
14   vertical stripes.
15       Q.    All right.
16       A.    Slimming effect.
17       Q.    So you actually watched the video,
18   then?
19       A.    I did.
20       Q.    Okay.  I'll have to remember that,
21   vertical stripes.
22             All right.  So let's talk a little
23   bit more about that campaign.  You wrote a
24   check.  Did you ask anybody else to write a
25   check for the campaign?

24

1    A.      I did not solicit any money for

2    the campaign.

3    Q.      Did you write any letters to the

4    editors?

5    A.      I did not.

6    Q.      And you only attended the one

7    rally at the park?

8    A.      Yes, ma'am.

9    Q.      And I can't remember if I asked

10   you this, but when was that, the rally,

11   approximately?

12   A.      It was still cold.  So it -- to be

13   honest with you, I don't -- I don't remember

14   the specific date.  I remember having to wear

15   a coat.

16   Q.      Okay.  And for those of us who

17   live in Phoenix and don't know when it's cold

18   in Redacted

19   A.      It was definitely before say

20   mid-May.

21   Q.      Okay.  Okay.  Were you involved in

22   the signature verification process at the

23   Secretary of State's office?

24   A.      No, ma'am.

25   Q.      And let's talk a little bit about

25

1    your involvement in the lawsuit.  And I don't

2    want you to tell me any confidential

3    information between you and your attorney,

4    but generally can you describe how you got

5    involved in this lawsuit?

6        A.    Yes, ma'am.  Larry Stickney called

7    and indicated that they were moving forward

8    with the lawsuit.  I had heard rumblings over

9    the previous couple of days that they might

10   be moving in that direction to forestall

11   publication of personal information from the

12   petitions.

13       Q.    And let me just ask.  When you

14   said you heard rumblings, where was that or

15   do you remember any conversations?

16       A.    I'm sure it was with his sister,

17   Redacted     She runs a store in town.  I

18   frequented the store.  It's a bookstore and

19   coffee shop.  I like both.  And so I did tend

20   to frequent there.  We often chitchatted,

21   small talk.  Was often about the progress of

22   the campaign.  I'm sure that that's where I

23   heard the rumbling.

24            So I had -- I had some sense that

25   they were going to be moving judicially in

1    that direction.  I didn't really expect to

2    have any part of that, nor did it occur to me

3    that I would be asked to have a part of that.

4         Q.      And why is that?

5         A.      Well, I mean, I didn't play any

6    key role in the campaign.  So there was no

7    reason for me to think that the campaign

8    would have any interest in my being part of

9    such legislation or such --

10        Q.      Litigation?

11        A.      Litigation.  Thank you.  So at

12   some point -- I don't remember specifically

13   the date, but we were still in the school

14   year, so it was before June.  I don't -- I

15   just don't have -- I am sorry.  I don't have

16   a clear recollection of the dates.

17        Q.      That's okay.

18        A.      It was somewhere in the spring

19   Larry called me and indicated that they were

20   going to move forward with -- and they needed

21   to have a couple of flesh and blood

22   defendants [sic] for the lawsuit, people who

23   had, in fact, signed the petition, and had a

24   legitimate desire not to have their personal

25   information published in a public -- in that

27

1  way.

2        I qualified on both of those

3  measures and I indicated to him that if he

4  felt like I was a good fit for what they were

5  trying to do, that I was happy to -- I was

6  happy to serve as a name on the -- on the

7  docket.

8      Q.    To be a plaintiff?

9      A.    Yes, ma'am.

10     Q.    And you indicated that you fit

11  both of the criteria, one of which was that

12  you did not want your information made

13  public; is that correct?

14     A.    My personal information, yes.

15     Q.    And what do you mean by personal

16  information?

17     A.    Specifically name, address, phone

18  number.

19     Q.    And --

20     A.    Can I back up?  Specifically

21  address, phone number.  Less -- I was less

22  concerned about the name.

23     Q.    So you were more concerned about

24  the contact information?

25     A.    Yes, ma'am.

1    Q.    And why were you concerned about

2    the contact information becoming public?

3    A.    That -- well, I have a family.  I

4    have young children.  And my professional

5    career deals with children, which means that

6    the safety of my students is a concern, as is

7    the safety of my family.  And while I was

8    happy to speak in a -- in somewhat of a

9    public way, for example, in the news article,

10   I also didn't hand her my -- my -- you know,

11   my private mailing address.

12   Q.    And by "her," you mean the

13   reporter?

14   A.    The report -- I didn't hand the

15   reporter my personal phone number.

16         So I was -- I was happy to have my

17   name associated with the campaign, but I

18   didn't -- I didn't feel that I wanted my

19   personal address, phone number, e-mail

20   address, that type of thing available to the

21   general public.

22         And I would add that in the real

23   world, I keep my number unlisted out of the

24   phonebook.  You know, you can't look up

25   Redacted        and find that number in the

29

1    book.

2       Q.    Your phone number?

3       A.    My phone number.

4       Q.    Your home phone number.

5       A.    And I don't hand out my e-mail

6    address or my mailing address to the general

7    public, either.  So given my reluctance to do

8    that in the general world that I run in,

9    which is pretty small, I also didn't want it

10   being available on a much wider audience.

11      Q.    Do you know if your contact

12   information, your address or phone number, is

13   made available to the students or parents in

14   the school, Redacted ?

15      A.    We did not publish home contact

16   information.  Obviously, as an administrator

17   of the school, I had access to parent

18   information.  But that was -- that's a

19   different thing.  Those addresses and phone

20   numbers were not made public to other

21   families at the school.

22      Q.    Okay.  And you said you were

23   concerned about your information becoming

24   public in part because you have a family.

25      A.    Uh-huh.

30

1       Q.      Is that correct?

2       A.      Yes, ma'am.

3       Q.      Were there any other concerns you

4   had?

5       A.      No.  Those -- frankly, those were

6   my two primary concerns.

7       Q.      And had you ever had an instance

8   related to your name being made public or

9   your address being made public where somebody

10  contacted you, harassing or threatening or

11  annoying?

12      A.      I did not.

13      Q.      And any -- and not just limited to

14  the Referendum 71.  I'm want to make sure I'm

15  clear.  That more broadly you haven't had

16  that harassment either?

17      A.      I've never had a case of phone

18  harassment, no.

19      Q.      What about mail?  Have you ever

20  gotten sort of unpleasant letters in the

21  mail?

22      A.      Well, I mean, I receive the

23  occasional mailing from the Democratic party,

24  but nothing specific.

25      Q.      Nothing directed to you

31

1    personally?

2        A.      No, ma'am.

3        Q.      And in regards to the Referendum

4    71, I know you weren't involved, but the --

5    your limited involvement in that campaign,

6    did anybody ever speak to you about it

7    directly in a sort of harassing or annoying

8    way?

9        A.      You mean from -- from the public

10   speaking to me?

11       Q.      Correct.

12       A.      No, ma'am.

13       Q.      No.  So the only conversations you

14   had with folks about Referendum 71, if I

15   understand your testimony correctly, were

16   those who were of a similar mind as you?

17       A.      Yes, ma'am.

18       Q.      Okay.  And when you became

19   involved in this lawsuit, were you told that

20   you would have to testify publicly?

21       A.      I was advised that it was a

22   possibility.

23       Q.      And did that concern you?

24       A.      It did not.

25       Q.      And why not?

1     A.     Well, because I -- in describing

2  the way that this -- this case would work,

3  that I would be listed as a John Doe and that

4  every reasonable effort to maintain anonymity

5  would be respected.  And that it could come

6  to the point where my name would be made

7  public, but that generally speaking, John

8  Does generally remained John Does.  And so I

9  thought that that was a reasonable level of

10  risk to accept given the importance that I

11  thought that the matter warranted.

12     Q.     Now, if this case were to go to

13  trial -- and I know that's down the road a

14  ways -- would you be hesitant to testify in

15  federal court?

16     A.     No, ma'am.

17     Q.     And why not?

18     A.     If I -- if I had been hesitant to

19  testify, I wouldn't have signed on as a

20  plaintiff.

21     Q.     And you're not hesitant to sign on

22  as a plaintiff because you don't worry about

23  people coming and harassing you?

24     A.     That concern remains, but the

25  larger issue that others shouldn't have to

33

1     worry about it I think outweighs my private

2     concern.

3         Q.      And --

4         A.      To -- just to clarify.  I would

5     like the next Redacted to be able to not have to

6     sweat whether or not his personal information

7     is going to be made public to others, and if

8     I can contribute in this way to preventing

9     that from happening in the future, then I'm

10    willing to undertake that.

11            And after speaking with my wife

12    about it at the time, she was of a similar

13    mind that that was a reasonable level of risk

14    to take on for our family.

15        Q.      All right.  Let's talk just a

16    little bit about sort of domestic partnership

17    same sex marriage issues sort of generally.

18        A.      Yes, ma'am.

19        Q.      Have you taken public positions on

20    same sex marriage, for example?

21        A.      Can you clarify what you mean by

22    public position?

23        Q.      Sure.  Speaking in front of a

24    public group, whether it's a church or some

25    other sort of organization or posting

34

1    anything on-line, that sort of thing where

2    it's sort of outside your immediate family?

3        A.    As a teacher in a Christian

4    school, we sometimes speak about those

5    issues.

6        Q.    And "we" includes you?

7        A.    We, in the sense of a teacher,

8    students in the classroom.  I teach logic

9    classes.  Logic classes often deal with

10   debate-like issues.  And so we often -- I

11   won't say often, we sometimes encounter those

12   kinds of questions.  And so I suppose that I

13   have spoken on those issues in that forum.

14   But I have not -- I have not publicized my

15   positions in the sense of a blog or letters

16   to the editor or speaking at rallies or

17   churches or something like that.

18       Q.    So the only instances in which

19   you've spoken about issues of same sex

20   marriage have been in the classroom?

21       A.    Yes, ma'am.

22       Q.    And I gather, then, that you also

23   have --

24       A.    And -- I'm sorry.  Can I back up

25   just to clarify your statement?

35

1     Q.      Of course.

2     A.      In the classroom in the context of

3     teaching about debating issues and how to

4     approach those issues and how to use sources

5     and authorities in a Christian school, the

6     Bible would be one of those, but there are

7     others, and how -- and for students how to

8     use those authority sources to construct

9     arguments either for or against those

10    positions.

11            So I just want to clarify that

12    that's in a particular context of teaching

13    and not Redacted  pulpit in the class room.

14    Q.      Wasn't sort of a non sequitur one

15    day that you were talking about?

16    A.      Thank you.

17    Q.      I understand.

18            And then have you been involved in

19    political parties?

20    A.      Yes.

21    Q.      And which parties?

22    A.      When I was in college, I

23    participated briefly with the Mountain Party,

24    which was a third party in the state of West

25    Virginia.

36

1      Q.      Okay.

2      A.      Which is largely concerned with

3   environmental issues.  Outside of that, I

4   have not had any real activity with political

5   parties.

6      Q.      Would you say you're a regular

7   voter?

8      A.      I would say I'm a regular voter.

9      Q.      So let's talk a little bit about

10  other sort of public debates.  Have you been

11  involved in anything not related to same sex

12  marriage and domestic partnerships, involved

13  in a public capacity regarding political

14  issues, any topic?  I mean, you mentioned the

15  Mountain Party and the environment.  Any

16  others?

17     A.      No, ma'am.

18     Q.      So you're pretty much church,

19  family, home, straight kind of guy?

20     A.      I'm pretty much a home body.

21     Q.      Okay.  That's fine.

22          When we talked about signing the

23  petition, the Referendum 71 petition, you

24  said at the time you weren't aware of whether

25  or not that would become public.  It wasn't

37

1    an issue that you had?

2        A.    Well, it was a -- it was a --

3    simply the absence of any thought about that

4    question.  I hadn't -- I hadn't even thought

5    far enough down the pike to consider whether

6    or not those things were made public.  It

7    was -- it just wasn't even on the radar.

8        Q.    And do you remember when you

9    became aware that your name could be made

10   public, name and contact information?

11       A.    That was probably towards the end

12   of the -- the petition campaign, the petition

13   drive and/or during the time where the

14   signatures were actually being counted and

15   tabulated.  I think that that's about the

16   time where that conversation began to

17   surface.

18       Q.    And was that the conversation with

19   Mr. Stickney or a different --

20       A.    When I say conversation, I mean

21   that in -- in the sense of public

22   conversation.  I can't even be honestly

23   certain where I heard that -- where -- even

24   where the idea came from first.  I -- I just

25   don't have a -- I don't have a clear recall.

1   I'm sorry.

2        Q.       No.   That's okay.   We don't want

3   you to guess.

4        A.       But -- but it would have been --

5   that would have been the time frame where

6   those -- where those issues started being

7   spoken about.   I just can't be certain where

8   and when -- where and with whom those issues

9   began to be spoken with.

10       Q.       And when you became aware that

11  your name and contact information could

12  become publicly available, did you take any

13  steps to try to keep it out of the public

14  light aside from the lawsuit?

15       A.       Well, I think my reaction at the

16  time was, oh, I hadn't really even thought

17  that those names would be made public.   I

18  guess as a voter, you -- you kind of are

19  raised with the idea that the election

20  process, broadly conceived, is generally a

21  confidential process.

22              You know, you go to the ballot box

23  and no one else is looking at your ballot.   I

24  suppose I -- I just kind of had been

25  operating in that mindset.   When -- when I

1   first heard that those names -- or that the

2   information -- not so much the names, but

3   particularly the contact information could be

4   made public, I think my reaction was mostly

5   disbelief.  I was surprised that that could,

6   in fact, be made public.

7         I don't know that I took any

8   specific steps.  Which isn't to say I -- I

9   wasn't really sure what you do about that

10  type of thing.  There are lots of things that

11  happen in government that I really don't have

12  any control over.  And, you know, I -- I'm

13  not in a -- in a personal way not in a

14  position to facilitate a wholesale change of

15  the government's policy on something.

16        So I guess I kind of just looked

17  at it like, wow, one more thing the

18  government's doing that I'm not happy with.

19     Q.     Now, were you aware either when

20  you signed or later that the Secretary of

21  State's office would have to verify your

22  signature?

23     A.     Well, I did understand that there

24  was a verification process.  And the idea of

25  putting my name and address and phone number

October 15, 2010

40

1    on there as a way to validate that I was a
2    real voter and really resided there and that
3    I was a real signature, I think it was
4    perfectly appropriate.  I didn't object to
5    provide -- to furnishing that information so
6    that I could be verified.  I just expected
7    that verification process to be handled
8    within the bureaucracy, right, and then put
9    in a white box and stuck on a shelf in the
10   basement somewhere.
11            And, you know, today, in the age
12   of the internet, you know, and where
13   everything -- you can go from being
14   completely private to having your life on a
15   screen in about five seconds, yeah, that --
16   that -- that suddenly my ears pricked up at
17   that and thought, well, that changed my
18   perspective a little bit on that.
19      Q.     And were you aware that observers
20   could sort of watch the verification process
21   at the Secretary of State's office?
22      A.     I was aware of that.  Having --
23   having accountability is always a good thing
24   for everyone.  So I didn't object to that.
25   But again, when -- I guess my mindset about

October 15, 2010

41

1   that is like observers counting ballots in

2   Florida during the hanging chad debacle,

3   right?  You know, you had people watching

4   people counting the votes, but people aren't

5   sitting there reading the ballots for the

6   sake of seeing who voted.  They were --

7   they're just seeing who was voted for.

8        Q.     Sure.  Because the ballots don't

9   have your name on them?

10        A.     Correct.  I guess similarly I

11   expected that they would be counting

12   signatures for the sake of counting

13   signatures and that, you know, they would

14   stop every tenth signature to verify

15   something to be sure that the batch seemed to

16   be -- that the sample seemed to be valid,

17   that there wasn't anomalies in it, but that

18   once that verification process had ceased,

19   the personal information would just kind of

20   cease to be there, right?  It was there to

21   serve a purpose, and once that purpose had

22   been served, it kind of -- it moves off the

23   stage, as it were.  And I guess that was the

24   conception that I had of that process.

25        Q.     And so -- just to make sure I

42

understand.  You think the observer part of
the process is an important part to
double-check the Secretary of State's office
work?

A.    I do.  But I don't -- I don't have
a vision of an observer sitting there with a
steno notebook taking down those names and
contact information and running out and
sending out e-mails about who it was they saw
in the room.

Q.    And do you think that happened in
this case?

A.    I don't.

Q.    Did you talk to any folks who were
going to sign the Referendum 71 petition and
chose not to because they were worried about
their name being disclosed?

A.    I can't say that I spoke to anyone
specifically about that, no.

Q.    Do you recall whether you spoke
with anybody who signed the Referendum 71
petition and was the subject of harassments
or threats or sort of annoying interactions
with people?

A.    I had heard -- I had heard some

43

1    stories from -- some calls and some threats

2    that had been made against the organizers or

3    those who were actually directly or

4    officially part of the campaign, but outside

5    of that, no.

6        Q.     And -- and the organizers of the

7    campaign that you had heard about, is that

8    including Mr. Stickney?

9        A.     It does.

10       Q.     Any others?

11       A.     Well, his sister was subject to a

12   couple of harassing kinds of calls.  I don't

13   think there was any physical presence

14   involved in that.

15       Q.     And that's Redacted; is that

16   right?

17       A.     Redacted

18       Q.     Redacted

19       A.     Well, her name then was Redacted  My

20   understanding is she has since remarried.  So

21   I'm not sure what her name is currently.

22       Q.     Is that Redacted

23       A.     Redacted

24       Q.     Okay.  Did you speak with anybody

25   else about sort of their experience with

44

1    signing Referendum 71?

2        A.      I did not.

3        Q.      Okay.  Had you heard other

4    stories?  Maybe you didn't talk to somebody

5    directly.  But you had heard information

6    about people's experience?

7        A.      I had indirectly heard of some

8    other, I guess things that you would kind of

9    throw in the harassment basket.  But they

10   weren't -- they weren't things that were

11   directly known to me.  And they weren't

12   things that had happened geographically in

13   the region where I lived.  So I couldn't

14   attest to the veracity of those statements.

15       Q.      So not anywhere near Redacted

16       A.      Redacted .

17       Q.      Just generally, and recognizing

18   that you can't verify whether or not they

19   were true, what were the sorts of stories you

20   heard?

21       A.      Well, particularly, just -- just

22   kind of harassing calls, increased number of

23   kind of hang-ups, kind of prank call types of

24   things.

25       Q.      Uh-huh.

45

1        A.        That was particularly what I

2    heard.

3        Q.        Okay.   So you haven't had any sort

4    of threats of reprisals against you either

5    for your involvement with Referendum 71?

6        A.        No, ma'am.

7        Q.        Nobody's ever contacted you at the

8    school where you taught --

9        A.        No, ma'am.

10        Q.        Or at home?

11        A.        No, ma'am.

12        Q.        Any of the folks you associate

13    with ever sort of shunned you or maybe pulled

14    away their friendship because of your

15    involvement with Referendum 71?

16        A.        No, ma'am.

17        Q.        Are there any other examples,

18    anything we haven't discussed this morning

19    about harassment or reprisals related to

20    Referendum 71?

21        A.        I can't think of anything.

22        Q.        And I gather that since you

23    haven't heard anything about threats or

24    harassment, that's both before and after the

25    election?

Redacted                                    October 15, 2010

46

1          A.      Correct.  Yes.

2          MS. BARNES:  Okay.  I think that's

3     all I have.

4          Anne, do you have more?  Are you

5     there?  Anne, are you still there?

6          MS. EGLER:  Oh, I'm sorry.  I am

7     here.  I do have a few questions.  Can you

8     hear me?

9          THE WITNESS:  Yes, ma'am.

10

11    EXAMINATION BY MS. EGLER:

12     Q.     My name is Anne Egler, and I'm

13    with the Washington State Attorney General's

14    office.  And I'm representing the defendants

15    in this case, specifically Secretary of State

16    Reed.  And I just have a couple of questions

17    for you to follow up and make sure I heard

18    things correctly.

19          One thing you mentioned was that

20    Redacted      experienced some harassing phone

21    calls?

22     A.     That was my -- that was my

23    recollection.  But, of course, that comes

24    from her, not me directly.

25     Q.     Okay.  Do you know when she

47

1    received harassing phone calls?

2        A.      I don't, ma'am.  I'm sorry.

3        Q.      Okay.  And do you know how many

4    she received?

5        A.      I -- other than just the fact of

6    it, that is all the information I could

7    furnish.

8        Q.      Okay.  So you don't know what was

9    said during the phone calls?

10       A.      No.  And I didn't ask at the time.

11   She didn't volunteer.

12       Q.      Okay.  Did she mention to you

13   whether she called the police about these

14   phone calls?

15       A.      I have given you as much

16   information as I have on that.

17       Q.      Okay.  And then just to make sure

18   I heard correctly, did you say that you have

19   not experienced any harassment as a result of

20   your association with Referendum 71?

21       A.      You did hear that correctly.

22       Q.      Okay.  And then one other thing I

23   wanted to make sure I heard correctly.  Am I

24   correct in understanding that you are not

25   concerned about publicly testifying in

48

1   federal court?

2       A.      Well, I'm not anxious to do it,

3   but I am willing to do it.

4       Q.      Okay.  And you know of no pending

5   threats to you if you do testify publicly?

6       A.      I do not know of any pending

7   threats to me.

8               MS. EGLER:  Okay.  I have no

9   further questions.  Thank you.

10              THE WITNESS:  Yes, ma'am.

11              MS. BARNES:  And I don't have any

12  follow up.  So I think we're all done.

13              MR. BIENIEK:  I'd actually like to

14  ask a couple of follow-up questions.

15              MS. BARNES:  Sure.

16              MR. BIENIEK:  Scott Bieniek from

17  Bopp Coleson & Bostrom.

18

19  EXAMINATION BY MR. BIENIEK:

20      Q.      Redacted        , I want to ask -- I

21  want to go back to when you were signing the

22  petition at church.

23      A.      Yes.

24      Q.      Would you say, generally speaking,

25  that the individuals that you attend church

49

1    with would be sort of friendly or sort of

2    believe and approach this issue in the same

3    fashion as you?

4        A.      Yes, sir.

5        Q.      Would you say that individuals in

6    your church would be likely to sort of

7    challenge you politically on this issue?

8        A.      No.

9        Q.      Let's go back to the question

10   about the personal information and -- and she

11   had asked you about, you know, your concerns

12   about it becoming public.  You said that you

13   are concerned about your address and phone

14   number becoming public?

15       A.      Yes, sir.

16       Q.      Are you worried -- let me think --

17   let's go back.

18               Are there other places you are

19   aware of where individuals could come up with

20   your name, address, and/or phone number on

21   the internet.

22       A.      I mean, I don't know anywhere

23   specifically.

24       Q.      Have you ever searched for that?

25       A.      I actually have occasionally

50

1    searched for myself.  One or two times I've

2    actually removed personal information from

3    a -- like a 411 kind of website.  But

4    that's -- that's the extent of that.

5        Q.    So if I'm understanding you

6    correctly, you're generally a private person?

7        A.    I would describe myself as so,

8    yes.

9             MR. BIENIEK:  Okay.  I think

10   that's all I have.

11            MS. BARNES:  Anne, do you have any

12   follow-up?

13            MS. EGLER:  Yes, I do.  Just a

14   couple.

15

16   EXAMINATION BY MS. EGLER:

17       Q.    Redacted        , when you were at the

18   park, you mentioned that there were people

19   gathering petition signatures; is that

20   correct?

21       A.    Could you repeat the question?

22       Q.    When you were at the rally at the

23   park in Redacted   that you spoke about -- do

24   you recall that?

25       A.    Yes, ma'am.

51

1      Q.      And if I heard correctly, you said
2    that there were petition signatures being
3    gathered at the park that day; is that
4    correct?
5      A.      Yes, ma'am.
6      Q.      Can you tell me, was the park
7    closed to the public that day?
8      A.      No, ma'am.
9      Q.      So is it possible that there were
10   people in the park who did not agree with
11   your position on Referendum 71?
12     A.      I'm sure that that's a
13   possibility.
14     Q.      Okay.  Also, one thing I forgot to
15   ask you about.  Miss Barnes asked you about a
16   website video that contained the interview
17   that you gave to the woman in the park that
18   day.
19     A.      Yes, ma'am.
20     Q.      Have you seen that video posted on
21   the internet?
22     A.      I did at the time, yes.
23     Q.      Okay.  And did you ask the website
24   to take that video off?
25     A.      I did not.

October 15, 2010

52

1     Q.      Okay.  And are you still at the --

2     or do you still own the property that you

3     lived at in Redacted

4     A.      No.  We -- we moved in June 2010

5     here to Tennessee.

6     Q.      Okay.  And do you currently have

7     an unlisted telephone number?

8     A.      I believe so.

9     Q.      Okay.  And if individuals were to

10    obtain the address that you used to live in

11    in Washington State, how would they then be

12    able to connect it to your current address in

13    Redacted

14    A.      The short answer is I can't answer

15    that question.  However, if I had still lived

16    in Washington, the concern would be the same.

17            MS. EGLER:  Okay.  Okay.  I have

18    no further questions.  Thank you.

19            MS. BARNES:  Anything else to ask?

20            MR. BIENIEK:  No.

21            MS. BARNES:  All right.  Thank

22    you.

23

24

25

1                    C E R T I F I C A T E

2

3       STATE OF TENNESSEE:
        COUNTY OF DAVIDSON:

4

5              I, LISE S. MATTHEWS, RMR, CRR,
        CCP, and Notary Public, Davidson County,
        Tennessee, CERTIFY:

6

7              The deposition was taken before
        me at the time and place stated in the
        foregoing styled cause with the appearances

8       as noted.

9              Being a Court Reporter, I then
        reported the proceedings in Stenotype, and

10      the foregoing pages contain a true and
        correct transcript of my said Stenotype notes

11      then and there taken.

12             I am not in the employ of and am
        not related to any of the parties or their

13      counsel, and I have no interest in the matter
        involved.

14

15             I further certify that in order
        for this document to be considered a true and
        correct copy, it must bear my signature seal,

16      and that any reproduction in whole or in part
        of this document is not authorized and not to

17      be considered authentic.

18             Witness my signature this the
        day of                        , 2010.

19

20

21

22             LISE S. MATTHEWS, RMR,CRR,CCP
               Notary Public at Large

23             For the State of Tennessee

24             My Commission Expires:
               May 20, 2014

25
               Tennessee License No. 353

Redacted                                     October 15, 2010

54

1                          E R R A T A

2
                I, Redacted                          having
3        read the foregoing deposition, Pages 4
         through 52, taken October 15, 2010, do hereby
4        certify said testimony is a true and accurate
         transcript, with the following changes (if
5        any):

6        PAGE      LINE          SHOULD HAVE BEEN

7        _____     _____         _____

8        _____     _____         _____

9        _____     _____         _____

10       _____     _____         _____

11       _____     _____         _____

12       _____     _____         _____

13       _____     _____         _____

14       _____     _____         _____

15       _____     _____         _____

16       _____     _____         _____

17       _____     _____         _____

18       _____     _____         _____

19

20
                                 _____
21
                          Redacted
22

23

24       _____
         Notary Public
25       My Commission Expires:    _____

Redacted



Redacted



Redacted



Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

