The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON,

Plaintiffs,

v.

SAM REED, in his official capacity as Secretary of State of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,

Defendants.

NO. 09-cv-05465-BHS

DESIGNATED DEPOSITION TESTIMONY OF ███████ ███████

Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors Washington Families Standing Together and the Washington Coalition for Open Government and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the "Parties") hereby submit combined designated deposition testimony for ███████ ███████.

Defendants and Intervenors object to the admission of any deposition testimony taken of any witnesses who could be called to testify at trial. Therefore, the designations of

DESIGNATED DEPOSITION TESTIMONY OF ██████ ██████ - No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

1  Defendants and Intervenors are being submitted in the event that the Court decides to admit

2  deposition testimony.

3       For the Court's convenience Defendants' designations have been highlighted in blue,

4  Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5  been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6  filing the redacted versions of these documents.

7       DATED this 6th day of September, 2011.

8  ROBERT M. MCKENNA
   Attorney General

9

10   s/ William Clark
   WILLIAM CLARK, WSBA #9234

11  Senior Counsel
   800 Fifth Ave, Ste 2000

12  Seattle, WA 98104
   206-464-7352

13  BillC2@atg.wa.gov
   ANNE EGELER, WSBA #20258

14  Deputy Solicitor General
   PO Box 40100

15  Olympia, WA 98504-0100
   360-664-3027

16  Annee1@atg.wa.gov

17

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION
TESTIMONY OF ▮Redacted▮
▮ed▮
- No. 09-cv-05465-BHS

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

_____

```
                            )
JOHN DOE #1, et al.,        )
                            )
              Plaintiffs,   )
                            )
         vs.                )   NO. 09-cv-05456-BHS
                            )
SAM REED, et al.,           )
                            )
              Defendants.   )
```
_____

DEPOSITION UPON ORAL EXAMINATION OF Redacted

_____

September 15, 2010

Longview, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

```
 1   APPEARANCES:

 2        FOR THE PLAINTIFF
          PROTECT MARRIAGE
 3        WASHINGTON:              MR. STEPHEN PIDGEON
                                   ATTORNEY AT LAW
 4                                 3002 Colby Avenue
                                   Suite 306
 5                                 Everett, WA  98201

 6        FOR THE DEFENDANTS:      MS. ANNE E. EGELER
                                   DEPUTY SOLICITOR GENERAL
 7                                 P.O. Box 40100
                                   Olympia, WA  98504-0100
 8
          FOR THE INTERVENOR
 9        WASHINGTON FAMILIES
          STANDING TOGETHER:       MS. JESSICA T. HAMILTON
10                                 PERKINS COIE
                                   1120 N.W. Couch Street
11                                 Tenth Floor
                                   Portland, OR  97209
12
          FOR THE INTERVENOR
13        WASHINGTON COALITION FOR
          OPEN GOVERNMENT
14        (Via Telephone):        MR. STEVEN J. DIXSON
                                   WITHERSPOON KELLEY
15                                 422 W. Riverside Avenue
                                   Suite 1100
16                                 Spokane, WA  99201

17

18

19

20

21

22

23

24

25
```

Page 3

1                              INDEX

2   EXAMINATION                                         PAGE/LINE

3   MS. EGELER                                       4     13

4   MS. HAMILTON                                    35     21

5   MR. PIDGEON                                     52     14

6   MS. EGELER                                      54     24

7   MS. HAMILTON                                    62     6

8   MR. PIDGEON                                     63     8

9

10

11

12

13                            EXHIBITS

14   EXHIBIT          DESCRIPTION                    PAGE/LINE

15                        (No Exhibits.)

16

17

18

19

20

21

22

23

24

25

EGELER (Redacted                      , 9/15/10)

                                                            Page 4

1                   BE IT REMEMBERED that on Wednesday, September 15,

2          2010, at 8:55 a.m., at 1700 Hudson Street, Suite 300,

3          Longview, Washington, before REBECCA S. LINDAUER, Notary

4          Public in and for the State of Washington, appeared Redacted

5          Redacted                      , the witness herein:

6                   WHEREUPON, the following proceedings were had, to

7          wit:

8

9   Redacted                           ,  having been first duly sworn by

10                                        the Notary, testified as follows:

11                              EXAMINATION

12  BY MS. EGELER:

13  Q    Pastor, my name is Anne Egeler and I'm a deputy with the

14       Attorney General's office for the state of Washington.

15            And today as we're taking your deposition, I wanted to

16       let you know the court reporter is taking down all that we

17       say, so it's important that we don't speak over each other

18       so she can get the record down correctly.  And if you could

19       also please use yes or no, rather than head nods or um-hmms,

20       it will be clear on the record as well.

21  A    Okay.

22  Q    Also, if you are confused by anything I ask you, if it's not

23       making sense, please stop and ask for clarification.  It's

24       important that we understand each other so the record will

25       be clear.  All right?

EGELER (▮Redacted▮, 9/15/10)

Page 5

```
 1   A    All right.

 2   Q    Could you please begin by stating your full name.

 3   A    My name is ▮Redacted▮

 4   Q    That's your complete name?

 5   A    Yeah.

 6   Q    And are you a Washington registered voter?

 7   A    Yes, I am.

 8   Q    Can you tell me what your current employment is?

 9   A    I'm a pastor of the church and I also self-employed.  I do

10        have small business.

11   Q    Let's start with the church.  Were you the pastor in 2009?

12   A    Yes.

13   Q    And is that the ▮Redacted▮

14   A    Yes.

15   Q    Is that a church here in Longview?

16   A    Yeah.

17   Q    And is it associated with the ▮Redacted▮?

18   A    We're friends.  That's the only association there is.

19   Q    And can you tell me about your self-employment?

20   A    I do have ▮Redacted▮.

21   Q    And was that the case in 2009 as well?

22   A    Yeah.

23   Q    How big is your church here in Longview?  How many people do

24        you have attending the church?

25   A    What does it have to do with us?  I was thinking I'll be
```

Dixie Cattell & Associates (360) 352-2506

EGELER (Redacted, 9/15/10)

1      questioned concerning R71, so what's the size of my church

2      have to do with this matter?

3   Q  Well, perhaps I should back up.  You've been named as a

4      witness --

5   A  Okay.

6   Q  -- in a federal lawsuit.  Okay?

7   A  Yeah.

8   Q  And as part of the federal court rules, I am authorized to

9      question you about the case and that includes matters that

10     may not appear to be relevant to the case to you, but still

11     we do have the right to ask those questions.

12  A  Okay.

13  Q  So how many people attend your church?

14  A  I would say somewhere around 150 to 200 people.

15  Q  Would that have been about the same number in 2009?

16  A  Yeah.

17  Q  Did you do anything to prepare for your deposition today?

18  A  Not really.

19  Q  Did you know, before I contacted you, that you had been

20     named as a witness in the case?

21  A  Yes.

22  Q  When did you learn that?

23  A  I think in 2009.

24  Q  And who contacted you and told you that?

25  A  I can't really remember right now.  I know there was talk

EGELER ( Redacted , 9/15/10)

```
 1        over the phone and I -- yeah.  So I can't really remember
 2        that.
 3    Q   And you don't remember who you spoke to?
 4    A   Yeah, I don't.
 5    Q   Did you speak with Mr. Pidgeon about your deposition?
 6    A   Yeah, we spoke.
 7    Q   When did you talk to Mr. Pidgeon?
 8    A   When did we walk?  He give me call actually after I received
 9        call from you.  I called him.  This is when we talked, yeah.
10    Q   What did he tell you?
11    A   He said that he'll try to be here.
12    Q   Did he tell you anything about what you should do during the
13        deposition?
14    A   No.
15    Q   I assume you're aware of Referendum 71.  Is that correct?
16    A   Yeah, I am.
17    Q   When did you become aware of Referendum?
18    A   When I learned that our governor signed Senate Bill 5688, I
19        believe.  It was in May.
20    Q   Who told you about that?
21    A   It was by the word of mouth.  I think one of the pastors in
22        town told me about this.
23    Q   In Longview?
24    A   In Longview.
25    Q   Did you sign the Referendum 71 petition?
```

EGELER ( Redacted , 9/15/10)

Page 8

| | | |
|---|---|---|
| 1 | A | Yes, I did. |
| 2 | Q | Would it trouble you to have others know that you signed |
| 3 | | that petition? |
| 4 | A | Say it again. |
| 5 | Q | Would you be troubled or bothered if other people knew that |
| 6 | | you signed that petition? |
| 7 | A | That other people knew?  Personally me, it probably |
| 8 | | wouldn't. |
| 9 | Q | It wouldn't bother you? |
| 10 | A | If people would know if I signed the petition? |
| 11 | Q | Yes. |
| 12 | A | Maybe to extent. |
| 13 | Q | To what extent? |
| 14 | A | Well, I wouldn't mind for people to know that I signed |
| 15 | | petition, but if people with agenda would know, I would |
| 16 | | rather them not to know. |
| 17 | Q | So it would be okay if some people knew, but not other |
| 18 | | people? |
| 19 | A | I suppose. |
| 20 | Q | So did you -- you supported the petition.  Did you do so |
| 21 | | publicly or did you keep that a secret? |
| 22 | A | No.  I did it publicly. |
| 23 | Q | Do you remember where you were when you signed the petition? |
| 24 | A | No, I don't, but I know I signed it. |
| 25 | Q | Did you gather petition signatures? |

EGELER (Redacted                    , 9/15/10)

Page 9

1   A   I did.

2   Q   Where did you do that?

3   A   All over town.

4   Q   In public locations?

5   A   Yes.

6   Q   So you stood up publicly with a petition sheet and asked

7       people to sign?

8   A   Yes.

9               MR. PIDGEON:  I object to the form of the

10      question.

11  Q   (By Ms. Egeler)  We're okay.

12          Can you tell me some of the locations where you had

13      people signing petitions?

14  A   Sure.  It was WinCo parking lot.

15  Q   That's a local supermarket?

16  A   Local supermarket.  Actually, there's whole plaza of

17      different businesses and I used that parking lot.  Also Lake

18      Sacagawea, that's a pretty good gathering place.

19  Q   That's a large park in Longview?

20  A   Yeah, large park in Longview.  And some other places.

21  Q   Do you remember any of those other places?

22  A   Wal-Mart parking lot.

23  Q   Any others?

24  A   No, I don't remember any others.  This is pretty much where

25      I stood at.

EGELER (Redacted, 9/15/10)

Page 10

```
 1   Q   Do you remember how many days, approximately, you spent
 2       gathering signatures?
 3   A   I can't give you exact amount of days, but it was more than
 4       one day.
 5   Q   Was it more than ten?
 6   A   I can't tell you time spent.  I know I went out more than
 7       once to gather signatures, but I didn't calculate.
 8   Q   Do you know if it was more than five?
 9   A   Probably more than five times.  I don't know if it would be
10       dates.
11   Q   On more than two days?
12   A   More than two days.
13   Q   More than three days?
14   A   I didn't do it every day, so I would do it one day and then
15       I would do maybe two days later or three days later, so it
16       could be within two weeks period of time, but it doesn't
17       mean I was there every day of the week.
18   Q   I understand.  But even if the days weren't consecutive, do
19       you think that you went out to gather signatures on three or
20       more days?
21   A   Probably more than three.
22   Q   Do you think that it was more than five days?
23   A   I would stop at five.
24   Q   So would it be fair to say approximately five days?
25   A   Approximately five days.
```

EGELER (Redacted, 9/15/10)

Page 11

```
 1   Q   Can you tell me what the situation was when you were, for
 2       example, in a Wal-Mart or WinCo parking lot?  Did you have a
 3       table that the petitions were on?
 4   A   No.  I had it in my hands.
 5   Q   And what would you do?  How would you --
 6   A   I would approach people and tell them about R71.
 7   Q   What would you say?
 8   A   I would say if they support traditional marriage, then they
 9       should sign this petition.  If they will ask additional
10       questions, I would explain.
11   Q   When you were doing this, were you careful to distinguish
12       between people that you thought had the same viewpoint that
13       you do about Referendum 71?
14   A   No.  I would approach anybody.
15   Q   Because earlier you said that you would not want people that
16       disagreed with you to know that you had signed the petition.
17               MR. PIDGEON:  Objection to the form of the
18       question.
19   Q   (By Ms. Egeler)  You can go ahead and answer.
20               MR. PIDGEON:  What was the question?
21               MS. EGELER:  Could you read it back, please?
22               THE COURT REPORTER:  Question:  "Because earlier
23       you said that you would not want people that disagreed with
24       you to know that you had signed the petition."
25   A   How would I distinguish between those who do have agenda and
```

EGELER ( Redacted                    , 9/15/10)

Page 12

1        those who don't?

2   Q    (By Ms. Egeler)  Did everyone that you spoke to agree with

3        you about Referendum 71?

4   A    Not everyone did.

5   Q    Approximately what percentage of the people agreed with you?

6   A    I would say more agreed with me than disagreed.

7   Q    But certainly you encountered a large number of people that

8        disagreed with you as well?

9   A    I wouldn't say large number.

10  Q    How many people's signatures did you obtain on the petitions

11       in the total number of days that you gathered?

12  A    I can't recollect this number.  I never really thought that

13       would be important statistic for me, so I just did as much

14       as I could.

15  Q    Do you know how many completed petition sheets you turned

16       in?

17  A    I think I myself did about three or four.

18  Q    And when you gathered signatures, did you have anyone else

19       with you on any of those occasions?

20  A    My wife was with me a couple times.

21  Q    Anyone else?

22  A    No.

23  Q    On any of those days that you gathered petition

24       signatures -- let me rephrase that.

25            On each of the days that you gathered petition

EGELER  (Redacted                    , 9/15/10)

Page 13

1   signatures, did you encounter some people who did not want

2   to sign the petition?

3   A   Yeah.  Each day there would be somebody who don't want to

4   sign petition.

5   Q   Did you gather signatures on the petitions at the church?

6   A   No.

7   Q   Did you have a Referendum 71 sign at your home in your yard?

8   A   Sign, yes.

9   Q   And was that in your yard?

10  A   It was my yard.

11  Q   Was there a Referendum 71 sign at the church?

12  A   No.

13  Q   Did you have a Referendum 71 bumper sticker on your car?

14  A   Yes.

15  Q   Did you have one on your wife's car?

16  A   We had only one car in 2009.

17  Q   In addition to signing the petitions, did you ever go out in

18      public holding a Referendum 71 sign?

19  A   Yes.

20  Q   And can you estimate on how many days you did that?

21  A   Twice.

22  Q   Do you remember where you were?

23  A   Yeah.  It was the Longview-Kelso Bridge.

24  Q   Why did you pick that location?

25  A   Pretty good exposure.

EGELER (Redacted, 9/15/10)

Page 14

1  Q    By that, do you mean that there's a lot of traffic?

2  A    Lot of traffic.

3  Q    Did you go with anyone else when you did that?

4  A    Yes.

5  Q    Who did you go with?

6  A    We had group of people on Facebook, R71 team, so . . .

7  Q    Who was on the R71 team that you just referred to?

8  A    You want me to name people?

9  Q    Let's wait a moment.  How many people were on the team?

10 A    I would say we had on the bridge, we had about 60 to 70

11       people.

12 Q    And they were from your R71 team, correct?

13 A    Well, I wouldn't say my R71 team.  It was supporters of the

14       cause.

15 Q    Were these supporters church members?

16 A    Probably some of them were, but some weren't, so there was

17       people I met for first time.

18 Q    Were you the primary organizer of these two events?

19 A    No.

20 Q    Who was?

21 A    Primary organizer was my sister.

22 Q    And her name?

23 A    Her name is Redacte.  She moved to Ohio.

24 Q    Same last name?

25 A    No.

EGELER (Redacted                    , 9/15/10)

Page 15

1   Q   What is her last name?

2   A   Redacted

3   Q   You talked about Facebook.  Were these two events where

4       signs were held at the Longview-Kelso Bridge advertised on

5       Facebook?

6   A   Yeah.

7   Q   Were these on your sister's Web site?

8   A   No.  It was Facebook, so I don't know if you call it Web

9       site or not.  She just created this page.

10  Q   So it was a Facebook page --

11  A   Facebook page --

12  Q   -- that your sister controlled?

13  A   -- that my sister started.

14  Q   And do you know how many people had access to that Facebook

15      page?

16  A   No.

17  Q   Did the same 60 or 70 people come to each of the two sign

18      waving events?

19  A   I would say, for most part, it was same people.

20  Q   As the pastor of the church, have you taken a public

21      position on same sex marriage?

22  A   Explain yourself.

23  Q   Have you taken a position?  Have you spoken to your

24      congregation about gay marriage?

25  A   As a pastor of the church, I speak on moral issues all the

EGELER (█Redacted█████████████████, 9/15/10)

Page 16

1        time, including homosexuality.

2    Q   Have you specifically spoken about gay marriage to your

3        congregation?

4    A   I don't know what you mean by "specific" because we don't

5        seem to allow these issues.  We speak on issues of sin and,

6        of course, I spoke on gay marriage as well.

7    Q   Did you ever speak to the congregation about the importance

8        of voting on Referendum 71?

9    A   I can't remember that.

10   Q   Do you remember if you spoke to your congregation or

11       encouraged them to sign the Referendum 71 petitions?

12   A   I spoke to people about the importance of marriage and

13       importance of defending it.

14            MR. PIDGEON:  I'm going to place an objection as

15       to the form of the question, that the question is

16       duplicative and compound in that it asks two questions,

17       whether or not █Redacted███████ spoke to members of the

18       congregation and whether or not he spoke as a pastor.  I'm

19       not sure the question is clear.

20            MS. EGELER:  I'll note for the record that the

21       objection is untimely and, therefore, inappropriate.

22            MR. PIDGEON:  It's on the record anyway, and it's

23       not untimely.

24   Q   (By Ms. Egeler)  In addition to gathering signatures and

25       holding signs up in public, did you also observe the

EGELER (Redacted, 9/15/10)

Page 17

1    checking of signatures on the petitions at the Washington
2    State Secretary of State's office?
3  A  Yes.
4  Q  And did someone ask you to do that?
5  A  I pretty much was aware of the whole thing, so it was not
6    like I didn't know.  I was very in to it, so it's not that
7    somebody asked.  I just went there and learned about the
8    stuff.
9  Q  So when you say you were pretty much aware of it, do you
10    mean you were aware of the Secretary of State's office
11    checking petition signatures?
12  A  Of course.  I was following these very closely.
13  Q  And how many times did you go to observe the checking of the
14    signatures?
15  A  I believe two times.
16  Q  Do you recall seeing at the Secretary of State's office any
17    media?
18  A  I don't.
19  Q  Do you recall seeing --
20  A  I've seen lady with camera, but I don't really know who she
21    was.
22  Q  Okay.
23  A  She never introduced herself to me, but I don't recall.
24  Q  So you saw a lady with a camera.
25  A  Yeah.

EGELER (Redacted              , 9/15/10)

Page 18

1    Q   Did you see any news cameras, like television news programs?

2    A   No.

3    Q   Did you see people there that you knew had a contrary

4        position with regard to Referendum 71?  And by that, I mean

5        people who didn't want there to be enough signatures on the

6        petitions for the issue to go to the ballot.

7    A   Say it again.

8    Q   When you were at the Secretary of State's office, did you

9        see anyone there that you knew was opposed to Referendum 71

10       getting onto --

11   A   Yeah, yes.

12   Q   Let me finish my question first so we have a clear record.

13       I know you'll understand what I'm saying.

14           But anyone who was opposed to Referendum 71 getting on

15       the ballot?

16   A   Yes.

17   Q   Do you recall any of their names?

18   A   No.

19   Q   Do you recall approximately how many such people you saw?

20   A   I never bothered to count.

21   Q   But there were multiple people.  Is that correct?

22   A   Yeah.

23   Q   Do you think that they were aware that you were -- excuse

24       me.  Let me rephrase that.

25           Do you think that the people that we've just referred

EGELER (Redacted, 9/15/10)

Page 19

```
 1        to that did not want Referendum 71 to get onto the ballot,
 2        do you think that any of them were aware that you did want
 3        it to get onto the ballot?
 4    A   I'm sure there were.
 5    Q   And when you went to observe the signature counting, did
 6        you -- were you asked to sign in?
 7    A   Yes.
 8    Q   And was that sign-in sheet used by people who wanted the
 9        initiative to get -- excuse me, the referendum to get on the
10        ballot as well as those who didn't want it to get on the
11        ballot?
12    A   It was same sheet, I believe, for both parties.
13    Q   Did you ever speak publicly -- other than at the church and
14        at the two events on the Longview-Kelso Bridge, did you ever
15        speak publicly about Referendum 71?
16    A   By saying "public," you mean to large group of people or
17        just speak with other people?
18    Q   To any group of people.
19    A   No, I don't remember.  Well, I spoke to people about this,
20        but I don't know what you mean really by "speaking
21        publicly."
22    Q   Did you ever speak on the radio about Referendum 71?
23    A   No.
24    Q   Did you ever speak to a news reporter?
25    A   No, I did not.
```

EGELER (Redacted                          , 9/15/10)

Page 20

```
 1   Q    Do you have a church --

 2   A    Now --

 3   Q    Excuse me.

 4   A    I did.  When we were at the bridge, local Redacted came

 5        and spoke to some of us, so . . .

 6   Q    And by local Redacted , that's a local newspaper?

 7   A    Local newspaper.

 8   Q    Do you know the name of the newspaper?

 9   A    Redacted

10   Q    I'm sorry.  I'm not from here.  I didn't know that it was

11        called Redacted

12             Did you provide your name to the reporter?

13   A    Yes.

14   Q    Do you know if a story was published in the newspaper?

15   A    It was.

16   Q    Was your name used in the story?

17   A    It was.

18   Q    Have you suffered any harassment or threats during the time

19        that you were supporting Referendum 71?

20   A    Yes.

21   Q    How many incidents?

22   A    Well, what do you call an incident?  Because it was

23        continuous thing.

24   Q    Anything that you call an incident, anything you considered

25        harassment or a threat.
```

EGELER (Redacted, 9/15/10)

Page 21

1   A   Well, I would say while we stood on the bridge, it would be

2       continuous throughout the day, you know.  When I gathered

3       signature, I encountered twice.

4   Q   So twice there were incidents when you were on the bridge?

5   A   No.

6   Q   No.

7   A   When I was on the bridge, it would be throughout the day,

8       throughout us standing there because cars would pass by and

9       scream things at us and flip us and do things of this sort.

10      But when I was gathering signature on parkings, it was

11      twice.

12  Q   Let's start with the bridge.  When you were standing on the

13      bridge on both of those days, can you please tell me about

14      all incidents that you consider to be a threat or harassment

15      as a result of your connection to Referendum 71.

16  A   I can't really tell you about all because I never bothered

17      to count them.  I know people would shout profanity out of

18      the window and show fingers.  And there was one occasion

19      when somebody just pull off pants and moon us through the

20      window of the vehicle.

21  Q   That was once someone mooned?

22  A   It was once.

23  Q   They were in their vehicle when it happened?

24  A   In the vehicle.

25  Q   Anything else during the time you were on the bridge?

State Objects: Hearsay

Dixie Cattell & Associates (360) 352-2506

EGELER  (Redacted                    , 9/15/10)

Page 22

| | | |
|---|---|---|
| 1 | A | No.  That was it. |
| 2 | Q | When people were shouting, what did they say?  If it was |
| 3 | | profanity, just indicating profanity is fine.  Did they say |
| 4 | | anything other than profanity? |
| 5 | A | I'll just say "beep" because it was profanity. |
| 6 | Q | Did they make any statement about Referendum 71 specifically |
| 7 | | or were they just swearing? |
| 8 | A | There was no dialogue.  They would pass by in the vehicle. |
| 9 | | Nobody bothered to stop by. |
| 10 | Q | And the people that you said were flipping you off, was |
| 11 | | there any dialogue with them? |
| 12 | A | We had no dialogue. |
| 13 | Q | And the individual that was mooning, was there any dialogue? |
| 14 | A | No.  There was no dialogue. |
| 15 | Q | When you were on the bridge, did anyone have any indication |
| 16 | | either through a sign, a pin, a shirt, that they were |
| 17 | | connected to your church? |
| 18 | A | No. |
| 19 | Q | Was anyone carrying a cross or any other religious symbol? |
| 20 | A | No. |
| 21 | Q | Was there any showing of connection to any other |
| 22 | | organization? |
| 23 | A | No. |
| 24 | Q | The incident regarding the mooning, do you remember what the |
| 25 | | vehicle looked like? |

EGELER (Redacted, 9/15/10)

Page 23

1   A   I don't remember year and make.  What I remember, it was

2      underage person.  It was more of a -- it wasn't even adult,

3      yeah.

4   Q   So it was a kid that was doing that?

5   A   It was.  It was -- there was adults in the front seat and

6      kid in the back seat.

7   Q   So an adult was driving and a kid did the mooning?

8   A   Yeah.

9   Q   Did the car stop or was it continuing to move across the

10     bridge?

11   A   It continued to move.

12   Q   Did you personally see it or did you hear it from someone

13     else?

14   A   I've been told.

15   Q   Who told you?

16   A   I wouldn't feel comfortable to give out name without talking

17     to this person first, even though I have a hard time to

18     recollect right now, but I've been told there was much

19     happening on the bridge.

20   Q   But you do know who told you?

21   A   I can't remember now.

22   Q   So you don't know who told you?

23   A   I don't.  I don't remember.

24   Q   And you're stating that because you don't remember,

25     rather --

EGELER ( Redacted ███████████, 9/15/10)

Page 24

1   A   I don't remember who exactly told me --

2   Q   Okay.

3   A   -- about this.

4   Q   But you did not personally see --

5   A   I didn't personally see this.

6   Q   How about the individual that was flipping the group off?

7       Did you personally see that?

8   A   It was not individual.  It was many individuals and I've

9       seen many of this.

10  Q   And did you personally witness the individuals that drove by

11      shouting profanities?

12  A   Yes.

13  Q   And did these incidents happen, with the exception of the

14      mooning, on both days that you were on the bridge?

15  A   Yes.

16  Q   And the mooning just happened --

17  A   Once.  I've heard about it just once.

18  Q   Did you feel the need to call the police about this behavior

19      that was occurring with the drivers?

20  A   I didn't.

21  Q   Did anyone in the group feel the need to call the police?

22  A   Somebody expressed concerns.

23  Q   Somebody in the group?

24  A   Somebody in the group.

25  Q   Do you remember who that was?

EGELER (Redacted, 9/15/10)

Page 25

1    A    No.

2    Q    Did they, in fact, call the police?

3    A    No.

4    Q    Do you know why not?

5    A    I don't.

6    Q    Did anything else of any sort happen while you were on the

7         bridge?

8    A    I think I pretty much told you all that happened there.

9    Q    Did you tell me all that happened or pretty much all?

10   A    All I can recollect right now.

11   Q    Is there something that would help you recollect in the

12        future?

13   A    I --

14                  MR. PIDGEON:  Objection; calls for speculation.

15            You can answer, if you want.

16   A    Probably talking to people, to other people who was there

17        would help me or thinking about this.  I never really

18        bothered.  We stood there.  I knew what I was expecting, so

19        I pretty much expected to happen what happened; therefore, I

20        never really bothered to pay much attention.  I was standing

21        there for my cause.

22   Q    (By Ms. Egeler)  And why did you pretty much expect that to

23        happen?

24   A    Because it's common behavior.  We've been called haters,

25        bigots, all sorts of names.  So when I went to the bridge, I

EGELER (Redacted                    , 9/15/10)

Page 26

```
 1        knew what to expect from the other side.

 2   Q    Have you ever taken public action of this sort with respect

 3        to any other political issue?  By "of this sort," I mean

 4        standing publicly with a sign endorsing a candidate or an

 5        issue.

 6   A    No.

 7   Q    Do you have a church Web site?

 8   A    Yes.

 9   Q    Did the church Web site at any point in 2009 contain any

10        information about Referendum 71?

11   A    As far as I remember, it didn't, but I'm not the one who

12        runs Web site, so . . .

13   Q    Do you have a church newsletter?

14   A    No.

15   Q    Do you have any other church communication to the people who

16        attend?

17   A    No.

18   Q    You mentioned that in addition to what happened at the

19        bridge, there were also some incidents that you would

20        consider to be harassment or threats during the signature

21        gathering.

22   A    Yeah.

23   Q    Can you tell me about those?

24   A    One happened at the WinCo parking lot when young man came

25        and start to pretty much shout profanity and he called me
```

State Objects: Hearsay

EGELER (Redacted, 9/15/10)

Page 27

1    Christian fascist.  He told me to get out of here.  I was

2    with my wife, by the way.  My wife was with me when this

3    happened.  He would pretty much follow us wherever we would

4    go for, I would say, about 20, 25 minutes.

5  Q  Do you remember what the young man looked like?

6  A  Yes, I do.  He was about 19, 21 years of age.  He was little

7    shorter than I am.

8  Q  You are how tall?

9  A  I'm about six feet, so -- yeah.  He appeared a little chubby

10   to me, but that's all I can remember.

11  Q  And you said that he was shouting profanity?

12  A  Yes.

13  Q  Did he shout anything other than profanity?

14  A  As I told you, he called us Christian fascists.  He said,

15    "Take your fat butts out of this place and" -- but for most

16    part, it was just words I wouldn't like to repeat.

17  Q  I understand.

18      Was there any dialogue he engaged in with respect to

19    Referendum 71?

20  A  He didn't.  We asked him to behave civilly, to which he

21    responded you taking my rights away from me and he would

22    continue on with profanity.

23  Q  Did he indicate his position with regard to Referendum 71?

24  A  There was no civil dialogue between us.

25  Q  And you said he followed you for 20 to 25 minutes?

State Objects: Hearsay

State Objects: Hearsay

EGELER ( Redacted                        , 9/15/10)

Page 28

1    A    Yes.

2    Q    Do you know why he left?

3    A    I don't.

4    Q    Did you ask him to leave?

5    A    I asked him multiple times.

6    Q    Did you call the police?

7    A    No, I didn't.

8    Q    Did your wife?

9    A    No, she did not.

10    Q    And why is that?

11    A    Well, I didn't feel like it.

12    Q    Did you feel that you or your wife were physically

13        threatened by this young man?

14    A    Mostly verbally abused because I didn't really feel being

15        threatened by this man.

16    Q    Did anything else happen in the WinCo parking lot?

17    A    No.

18    Q    And you said there was another incident that occurred?

19    A    Yes.

20    Q    Can you tell me about that?

21    A    It was on Lake Sacagewea.

22    Q    Again, that's the park in town?

23    A    Park in town during 4th of July event when there is lot of

24        people.  It was male, about 30, 34 years of age, but this

25        guy just screamed profanity to my face and he walked away,

State Objects: Hearsay

EGELER (Redacted , 9/15/10)

Page 29

1        so . . .

2    Q    How close to you did he come?

3    A    He was screaming right into my face.

4    Q    So --

5    A    It was very uncomfortably close.

6    Q    Within a foot of you?

7    A    I would say it was about this far.

8    Q    For the record, you were holding your hand in front of your

9         face?

10   A    I would say about a foot of me.

11   Q    About a foot of you?

12   A    Yeah.

13   Q    So he was about one foot away and he screamed profanity?

14   A    Yes.

15   Q    Did he make a statement about Referendum 71?

16   A    There was no dialogue.

17   Q    And were you with anyone else?

18   A    I was there by myself.

19   Q    Do you recall whether you were wearing any indication of

20        your religion?

21   A    No.

22   Q    You don't recall or you weren't wearing?

23   A    I weren't wearing.

24   Q    And when this man screamed profanity at you, do you recall

25        whether -- I guess we can't put it in terms of sentences.

State Objects: Hearsay

EGELER (Redacted, 9/15/10)

Page 30

1    It doesn't sound like that type of communication.  Do you
2    recall how long he was speaking to you?
3  A  No.  It wasn't long.  It was in few sentences and he walked
4    away.
5  Q  Did you respond to him?
6  A  He didn't give me any chance really.  He said what he wanted
7    to.  He walked away.
8  Q  But, again, just to make sure I understood, all of what he
9    said was profanity?
10 A  It was profanity.
11 Q  And did you feel the need to contact the police about that
12    incident?
13 A  No.
14 Q  Why is that?
15 A  I'm pretty large size guy and I don't really feel that he
16    was of -- it was very public place, lot of people was there,
17    so it wasn't pleasant experience; however, I didn't feel
18    being threatened by him.
19 Q  And would you say that you considered that to be verbal
20    harassment but not physical?
21 A  It would be verbal.
22 Q  So you did not feel physically threatened?
23 A  I did not.
24 Q  Did any other incidents of harassment or threats, in your
25    opinion, occur?

Dixie Cattell & Associates (360) 352-2506

EGELER (█Redacted█, 9/15/10)

```
                                                              Page 31

 1    A    My name appeared on some Web site, I believe █Redacte█

 2         █Redacted█   or something like that.  Let me -- it was -- I

 3         think the name of it was -- it's either █Redacted█   or

 4         █Red█ something.  █Redacted█, something like

 5         this.

 6    Q    You said your name appeared there?

 7    A    My name appeared there.  They had -- they were on list of

 8         names.  Web site pretty much called people to arms to defend

 9         their rights, and my name appeared there as one of the

10         haters on that list.

11    Q    And you don't recall exactly the Web site address?

12    A    I believe I can find if I have to, but I think Web site was

13         called █Redacted█   -- I mean .blogspot.com, if I

14         am correct, but there could be an error.

15    Q    Do you remember who else was listed or if anyone else was

16         listed?

17    A    There was few other people from this town that stood with me

18         on the bridge and their names appeared in newspaper.  This

19         is how I think they've got ahold of our names.

20    Q    Okay.

21    A    But everyone who was in newspaper in the article was listed

22         there as a hater.

23    Q    You earlier talked about a reporter from █Redacted█

24         talking to you and some other people on the bridge.

25    A    Yeah.
```

EGELER ▓Redacted▓, 9/15/10)

1   Q   And that your name and those other people's names were

2       listed in the paper.  Is this the same story that you think

3       the people at the Web site got the names from?

4   A   It could be.  I don't know where they got it from, but

5       everyone who was in the article appeared on that list.

6   Q   And you said the Web site called people to arms.  Is that

7       exactly what it said?  We're calling you to arms?

8   A   I have to visit this Web site again to say exactly what it

9       said, but it was very aggressive.

10  Q   Did you contact the police about this Web site?

11  A   No, I did not.

12  Q   Why not?

13  A   I believe at this time there was awareness of this Web site

14      already.

15  Q   Awareness on the part of the police?

16  A   Yes.

17  Q   What gave you that belief?

18  A   I knew -- I think I received some news.  It's either from

19      Protect Marriage or -- I can't remember right now how I

20      received this news, but I've been told that this Web site on

21      radar already, so . . .

22  Q   On the radar of the police?

23  A   Of the police, yeah.

24  Q   You think that Protect Marriage Washington told you --

25  A   I would drop the statement because I don't -- I can't say

EGELER (Redacted                        , 9/15/10)

1       exactly if it was them or somebody else, but somebody else

2       told me that this particular Web site already -- it was on

3       the news somehow.

4    Q  And did whoever spoke with you indicate that the police

5       would be doing something to protect you from these people?

6    A  No.  I have not heard anything like that.

7    Q  But you weren't concerned about your safety?

8    A  My personal safety, I would rather say I was concerned about

9       safety of other people, but this Web site was, from what I

10      understood, from Bellingham somewhere and, therefore, being

11      out of the area, I would be rather concerned about people

12      who live closer to whoever runs this blog.

13   Q  I believe you stated earlier that all of the people that you

14      saw listed on this Web site were people that you stood with

15      on the bridge.  Is that correct?

16   A  Yes.

17   Q  Did they all live locally in the Longview-Kelso area?

18   A  Yes.

19   Q  So you were not concerned about them and their safety

20      because the Web site was generated in Bellingham, correct?

21   A  I believe so.  I believe Bellingham.  I cannot say for sure

22      right now, but I think it was Bellingham.

23   Q  Do you know or did you hear from any of the other

24      individuals listed that they were afraid for their safety?

25   A  I have not heard from them.

EGELER (Redacted, 9/15/10)

Page 34

1  Q  And you stated that you were concerned about the safety of
2     others, but you weren't concerned enough to contact the
3     police?
4  A  I was concerned enough to make sure that this people know
5     that their name is on that list.
6  Q  But not concerned enough to contact the police about it?
7  A  Actually it was not me, but my sister who found this blog
8     post and she e-mailed to everybody who was listed there, so
9     I'm sure if anyone would be concerned, they would call.
10 Q  And do you know if anyone did call the police?
11 A  No, I don't.
12 Q  Did you experience any other incidents that you considered
13    to be harassment or threats?
14 A  No.
15 Q  Did you witness anybody else experiencing what you
16    considered to be harassments or threats?
17 A  Just by standing on the bridge next to other people, that's
18    all I witnessed.
19 Q  Did you stand on the bridge on those two occasions before or
20    after Referendum 71 was placed on the ballot?
21 A  Say it again.
22 Q  When you stood on the bridge on those two occasions, was
23    that after Referendum 71 had qualified --
24 A  Yes.
25 Q  -- to be placed on the ballot?

HAMILTON (Redacted                    , 9/15/10)

Page 35

1    A    Yes, after.

2    Q    And I assume it was before the election occurred.  Is that

3         correct?

4    A    Yes.

5    Q    Both events were before the election?

6    A    Yes.

7    Q    Have you experienced anything that you considered to be

8         threats or harassment related to Referendum 71 after the

9         election was held?

10   A    No.

11   Q    Have you witnessed anyone else experiencing what you

12        considered to be threats or harassment after the election?

13   A    I have not.

14   Q    And, again, just to be clear, are there any incidents that

15        you considered to be threats or harassment related to

16        Referendum 71 that we have not yet discussed?

17   A    I believe I told you all.

18                  MS. EGELER:  Okay.  I have no further questions.

19                             EXAMINATION

20   BY MS. HAMILTON:

21   Q    Hi, Pastor.  My name is Jessica Hamilton.  I'm an attorney

22        at the law firm of Perkins Coie in Portland, and I represent

23        Washington Families Standing Together.

24             Are you familiar with who Washington Families Standing

25        Together is?

HAMILTON (Redacted                    , 9/15/10)

Page 36

```
 1   A    Yes.

 2   Q    So you know that it's a coalition of civil rights groups and

 3        churches and others who supported -- who opposed

 4        Referendum 71?

 5                 MR. PIDGEON:  Objection to the form of the

 6        question.

 7   Q    (By Ms. Hamilton)  Do you know that Washington Families

 8        Standing Together is a group of civil rights groups,

 9        churches, and others who opposed Referendum 71?

10   A    Yes.

11   Q    It may sound like I'm going backwards from your previous

12        examination, but I want to kind of fill in some of the gaps

13        in my mind, so bear with me, if you would.

14            You are a Washington registered voter.  You testified

15        earlier that you're a Washington registered voter.  Is that

16        correct?

17   A    Yes.

18   Q    Do you know when you first registered in the state of

19        Washington?

20   A    As soon as I moved to Washington.

21   Q    When was that?

22   A    In 2004, I believe.

23   Q    2004.

24            Did you vote in the election in 2004?

25   A    I did.
```

HAMILTON (Redacted                        , 9/15/10)

Page 37

```
 1   Q   And have you voted in every election since 2004?

 2   A   I voted in presidential election.

 3   Q   In the presidential election?

 4   A   Yeah.

 5   Q   Have you voted in state elections since 2004?

 6   A   Just last -- when was it?  Was it 2008?

 7   Q   2008?

 8   A   In 2008.

 9   Q   You said you moved to Washington in 2004.

10           Prior to your move to Washington, where did you live?

11   A   Oregon.

12   Q   Oregon.

13           When did you move to Oregon?

14   A   I moved to Oregon in 1999, I believe.

15   Q   Did you register to vote in Oregon?

16   A   Yes.

17   Q   And did you vote in the election?

18   A   Presidential elections only.

19   Q   What was your occupation when you were living in Oregon?

20   A   Pastor of the church.

21   Q   Which church?

22   A   Redacted

23   Q   And where was that church?

24   A   In Rainier, Oregon.

25   Q   Did you have any other employment while you were living in
```

Dixie Cattell & Associates (360) 352-2506

HAMILTON (█Redacted█, 9/15/10)

```
                                                       Page 38

 1        Oregon?

 2   A    I was doing █Redacted█

 3   Q    Was that also in Rainier?

 4   A    No.  It was in Longview.

 5   Q    In Longview.

 6            Prior to your move to Oregon in 1999, where were you

 7        living?

 8   A    In Longview.

 9   Q    In Longview.

10            And how long did you live in Longview?

11   A    I lived in Longview --

12   Q    The first time, I should say.

13   A    I moved to Longview in 1992.

14   Q    In 1992.

15            Did you register to vote in 1992?

16   A    No.  I was not citizen of the United States of America.

17   Q    When did you become a citizen?

18   A    I believe five years later, which would be I think it's 1998

19        when I became citizen of United States of America.

20   Q    Prior to becoming a citizen of the United States, where were

21        you a citizen?

22   A    I was alien resident in United States of America.

23   Q    In what country did you come from?

24   A    I came from Kyrgyzstan.

25   Q    Did you come from Kyrgyzstan in 1992?
```

HAMILTON (Redacted                         , 9/15/10)

Page 39

```
 1    A    Correct.

 2    Q    And you previously talked about your wife, but I'm not sure

 3         that we got her name.  Can you please tell me what her name

 4         is?

 5    A    Redacted

 6    Q    And what's her last name?

 7    A    Same as mine, Redacted

 8    Q    Does she have a middle name?

 9    A    She does.  Well, middle initial.  Over in Russia, middle

10         name is father's name.

11    Q    Yes.

12    A    So she will be Redacted

13    Q    Redacted

14              Do you have a middle name too?

15    A    Yes.

16    Q    What is that?

17    A    Redacted

18    Q    Does that mean your father's name is Redacted

19    A    Correct.

20    Q    Previously you were told that you had been named as a

21         witness in this federal lawsuit.   Did you understand that?

22    A    Understand what?

23    Q    That you've been named as a witness in this federal lawsuit.

24    A    Yes.

25    Q    Do you understand that being named as a witness in this
```

HAMILTON (Redacted                    , 9/15/10)

Page 40

1       lawsuit may require you to testify in federal court?

2   A   Yes.

3   Q   Do you have any concerns about testifying in federal court?

4   A   I don't.

5   Q   In doing your preparation for this deposition, can -- well,

6       let me back up.

7           Do you know Redacted

8   A   Yes.

9   Q   Do you know Redacted

10  A   I do.

11  Q   Have you spoken to them recently?

12  A   I spoke to Redacted          I speak to him on weekly basis.

13  Q   When was the last time you spoke to him?

14  A   I believe on Monday.

15  Q   Do you know what time on Monday?

16  A   It was right before his deposition.

17  Q   Before.

18          And have you spoken to him since his deposition?

19  A   I called him last night.

20  Q   So when you called him last night, did you speak with him?

21  A   I spoke to him.  Actually, it wasn't night.  It was

22      afternoon.

23  Q   You spoke to him yesterday, Tuesday the 14th, in the

24      afternoon?

25  A   Yeah.

HAMILTON (Redacted          , 9/15/10)

                                                        Page 41

1    Q    And what did you talk about?

2    A    We talk about deposition.

3    Q    Have you spoken to Redacted

4    A    No.

5    Q    Did Redacted      tell you the questions he was asked in his

6         deposition?

7    A    Some.

8    Q    Previously you told us about your wife Redacted and your

9         sister Redacted

10            Do you have any other family members that are involved

11        with the church?

12   A    Yes.

13   Q    What are their names?

14   A    I don't see how it's relevant.

15   Q    Let me ask you this:  Did any other family members help you

16        in your support of R71?

17   A    I have family members who signed petition.

18   Q    Did any other of your congregants, your parishioners, help

19        you in the support of R71?

20   A    Yes.

21   Q    How many, would you guess?

22   A    I never counted.

23   Q    Is it more than ten?

24            MR. PIDGEON:  Objection; asked and answered.

25   Q    (By Ms. Hamilton)  You can go ahead and answer, if you know.

HAMILTON (Redacted                      , 9/15/10)

                                                        Page 42

 1    A    I can't give you exact number.

 2    Q    Was it fewer than 50?

 3              MR. PIDGEON:  Objection; asked and answered.

 4    A    I never counted.

 5    Q    (By Ms. Hamilton)  Previously you testified that at the time

 6         you had a Referendum -- at the time, meaning the summer of

 7         2009, you had a Referendum 71 sticker on your car.  Is that

 8         correct?

 9    A    Correct.

10    Q    Is that sticker still on your car?

11    A    No, it's not.

12    Q    Do you still have the car that the sticker was on?

13    A    Yes.

14    Q    When did you take that off?

15    A    Recently.

16    Q    How recently?

17    A    I would say about three, four months ago, but it was

18         recently.

19    Q    So sometime in the beginning of the summer --

20              MR. PIDGEON:  Objection; asked and answered.

21    Q    (By Ms. Hamilton)  -- or --

22              MR. PIDGEON:  You can go ahead and answer.

23    A    I know that half of it was peeled off and it was kind of

24         awkward to have the rest of it, and I removed it about

25         three, four months ago, I would say.

HAMILTON (█Redacted███████████, 9/15/10)

Page 43

1    Q    (By Ms. Hamilton)   Okay.

2    A    But I can't really give you exact date.

3    Q    No.   That's okay.   Thank you.

4         Your sister, █Redacted███████, created a Facebook page.

5         Do you know if that Facebook page had a public profile?

6    A    I'm not so familiar with all these terms, public profile.

7         What does it mean?

8    Q    It means could people who were not her friends, and by

9         friends I mean friends as in the word is used on Facebook,

10        could anyone access her site or did you have to have a

11        certain connection?

12   A    Well, I'm not that Facebook friendly.   I do have an account

13        on the Facebook, but I don't know much about.

14   Q    I'm only smiling because if you have an account on Facebook,

15        you're more Facebook friendly than I am.

16   A    Yeah.   I just go there to add friends when they send request

17        and that's about the extent of my knowledge of Facebook.

18        I've been told I need an account.   I think it was mistake.

19   Q    Did you ever visit your sister's Facebook page on the

20        Referendum 71?

21   A    I visited.   I visited this page.

22   Q    Do you know how many friends this Facebook page had?

23   A    I don't.

24   Q    And were there any other methods that you used to organize

25        people for these protests or rallies on the Kelso-Longview

HAMILTON (Redacted                          , 9/15/10)

                                                              Page 44

 1        Bridge?

 2                  MR. PIDGEON:  Objection as to form.

 3    Q   (By Ms. Hamilton)  Did you use any methods to reach out to

 4        people to advertise the events, other than Facebook?

 5    A   Phone.

 6    Q   Phone.

 7              And did you personally call people?

 8    A   I called people.

 9    Q   Who did you call?  I'm not asking -- how did you get the

10        names of who to call?

11    A   Well, I knew them.  I know those people.

12    Q   How did you know them?

13    A   I guess they've been around for quite some time, and I know

14        this people.

15    Q   Were they connected to your church?

16    A   Some of them.

17    Q   Some of them.

18              The people who you called who were not connected to

19        your church, how did you know them?

20    A   I didn't call somebody who is not connected -- I just --

21        other people -- other people.  It was by word of mouth.

22    Q   How many people do you think you called?

23    A   You know, I can't really tell.  If I would know I would be

24        questioned on this, I would keep record, but it's awkward,

25        you know.

HAMILTON Redacted                    , 9/15/10)

Page 45

1   Q   I know.

2   A   I didn't keep all these details in my head.

3   Q   Do you think it was more than 50?

4   A   No.

5   Q   Do you think it was more than ten?

6   A   No.

7   Q   So it was less than ten?

8   A   Yeah.

9   Q   You previously mentioned that you spoke about the issue of

10      gay marriage to your congregation.  Was that in a sermon

11      that you've spoken about gay marriage?

12  A   I spoke about homosexuality, not gay marriage.

13  Q   So specifically about homosexuality in a sermon?

14  A   As I already mentioned, I speak on moral issues all the

15      time.  It seems to me that you're trying to single out this

16      particular issue.  There was no sermon just for this issue,

17      but certainly I spoke and I do speak about homosexuality in

18      Redacted

19  Q   Do you know if you spoke about homosexuality in the church

20      around the same time that Referendum 71 petitions were being

21      signed?

22  A   I did.

23  Q   Do you recall what you said?

24  A   Do you want me to print sermon?

25  Q   Do you have a sermon printed?

HAMILTON (Redacted                           , 9/15/10)

Page 46

1  A   No.

2  Q   Do you have a sermon in your computer that could be printed?

3  A   No.

4  Q   Do you recall what you said about -- do you recall what you

5      said about Referendum 71?

6  A   I don't recall anything about Referendum 71, but I spoke

7      about homosexuality in the church.  To repeat word for word

8      my sermon, I feel awkward because it was some time ago.

9  Q   Sure.

10  A   Yeah.  So I can give you general idea.

11  Q   Okay.

12  A   Yeah.  Well, Bible condemns homosexuality as a sin;

13      therefore, we Christians oppose it.  We do not oppose people

14      who practice such thing because they just fall into category

15      of any other sin, but we oppose the lifestyle as much as we

16      oppose adultery, idolatry, fornication, and such, so that

17      would be somewhere along these lines.

18  Q   Did you draw a connection at all to your beliefs of

19      homosexuality as a sin in accordance with the Bible and

20      Referendum 71?

21  A   I didn't draw this connection, but I was clear that there

22      are times when we need to defend marriage.

23  Q   And you were clear in the sermon that this might be one of

24      those times to defend marriage?

25  A   Yes.

HAMILTON (Redacted                    , 9/15/10)

Page 47

1   Q   Were petitions available at the church?

2   A   Yes.

3   Q   In the sanctuary or just outside of the sanctuary?

4   A   Well, if you would be in the building where we're having a
5       church, you wouldn't ask this question.

6   Q   I apologize.  Were they in the area that you and the
7       parishioners gather to worship?

8   A   Yes.

9   Q   Did you ever tell your congregants that petitions were
10      available, if they wanted to sign them?

11  A   Yes.

12  Q   Did anyone else at your church ever tell your congregants
13      that petitions were available, if they wanted to sign them?

14  A   I can't remember.

15  Q   Did anyone gather petitions outside of the church?

16  A   Did anyone gather petitions?

17  Q   I'm sorry.  Gather signatures for the petitions outside of
18      the church.

19  A   Right outside of the church, no.

20  Q   Skipping to this incident on the Kelso-Longview Bridge, you
21      never felt physically threatened -- did you ever feel
22      physically threatened while you were on the Kelso-Longview
23      Bridge?

24  A   I felt disgusted.  I would say I felt verbally harassed, but
25      physically threatened, personally I didn't.

HAMILTON Redacted                          , 9/15/10

Page 48

1   Q   Do you know if anyone else felt --

2           MS. EGELER:  If I can interject.  I don't think

3       the court reporter got last part of your answer.

4           THE COURT REPORTER:  He said I didn't.

5   Q   (By Ms. Hamilton)  Did anyone tell you they felt physically

6       threatened?

7   A   Nobody talked to me.  During collecting signatures, however,

8       several people told me that they would not sign because they

9       feel threatened.

10  Q   So people told you that they would otherwise sign, but --

11  A   They would say, "We support the issue, but at this time we

12      don't want to leave our name and address on this petition."

13  Q   In the news story that was written in Redacted      , do you

14      know if that news story identified you as being a supporter

15      of R71, Referendum 71?

16  A   Yes.

17  Q   Do you know if it also identified you as being the pastor of

18      the Redacted

19  A   I can't remember.

20  Q   Getting back to one of the incidents you described where the

21      kid mooned your group on the bridge -- I should clarify.

22      The kid was in a vehicle, in the back seat of a vehicle and

23      mooned you, you previously testified that you did not

24      personally see it.  Is that correct?

25  A   I did not see it personally.

*State Objects: Witness lacks foundation for testimony; hearsay*

Dixie Cattell & Associates (360) 352-2506

HAMILTON (Redacted , 9/15/10)

Page 49

1  Q  And this is just a clarification question.  You were also

2     asked if you remembered who saw it and you said --

3  A  There was much going on, on the bridge, and right now I

4     can't remember.  There was much activity happening and

5     people would talk back and forth, so . . .

6  Q  Do you know -- do you remember if you knew at the time who

7     told you about this incident?

8  A  If I knew at the time?  Do I remember if I knew at the time?

9  Q  I know it's awkwardly worded.  I'm sorry.  Do you understand

10     the question?

11  A  I probably would if I, you know . . .

12  Q  My question goes to:  Did you know the person who told you

13     about it when the person was telling you about it, but now

14     you just can't recall?

15  A  This is just awkward question.  I don't remember person

16     right now.  I can inquire within people that I know of, but

17     you know, if I don't remember now, I can't say -- I remember

18     hearing it.

19  Q  You remember hearing it?

20  A  Yeah.

21  Q  Do you think you might have heard it from someone who was

22     also repeating it from something that they heard or . . . ?

23  A  I think you're taking it too far.

24  Q  Do you know if you heard about this incident from someone

25     who witnessed it firsthand?

HAMILTON (Redacted, 9/15/10)

Page 50

1   A   I can't tell you that.

2   Q   Because you don't remember it?  You can't tell me that

3       because you don't remember?

4   A   Well, your question is -- let's go back.  You said if they

5       witnessed it firsthand, because I don't -- how can I connect

6       this to whether I remember or not?  How would I know if

7       they're firsthand witness it or secondhand witness?

8   Q   I'm asking:  Do you recall when they were describing the

9       incident to you whether they --

10  A   I think I answered your question.  I just -- it's some sort

11      of trivia that I'm not following.

12  Q   Let me just ask it one more time and let's see if we can get

13      an answer.

14  A   Okay.

15          MR. PIDGEON:  Let's don't.  Objection; asked and

16      answered.

17  Q   (By Ms. Hamilton)  You can go ahead and answer my question.

18      When you heard about the mooning incident from this person,

19      do you remember if this person was recounting to you an

20      eyewitness account of the mooning?

21  A   I don't remember.

22  Q   In the incident at Lake Sacagewea where -- the 4th of July

23      incident where you were gathering signatures, you were by

24      yourself?

25  A   I was by myself.

HAMILTON (Redacted                    , 9/15/10)

Page 51

1   Q   And the male of 30 to 34 years shouted some profanity at

2       you, how did he know that you were in support of

3       Referendum 71?

4   A   I assumed because I held petition in my hands.

5   Q   Were you just holding --

6   A   What was it called?  Well, that thing with the signatures,

7       yes.

8   Q   A petition?

9   A   A petition.

10  Q   Were you wearing any buttons supporting R71?

11  A   No.

12  Q   Did you have a sign supporting R71?

13  A   No.

14  Q   Were you just standing there with a petition?

15  A   Yes.

16  Q   Had you approached him to ask him for his signature?

17  A   No.  He approached me.

18  Q   The Web site that you previously mentioned that you said

19      your name appeared on, did you happen to print out a copy of

20      that at the time you saw it?

21  A   No, I did not.

22  Q   I want to talk a little bit about what has happened since

23      Referendum 71 has been over, since the election has been

24      over.  Have you experienced any, you personally, experienced

25      any threats or harassment as a result of your support of

PIDGEON (Redacted , 9/15/10)

Page 52

1       R71?

2   A   I have not.

3   Q   Have you heard of any other people who have?

4   A   I have not.

5               MR. HAMILTON:  I'm done.

6               MS. EGELER:  Mr. Dixson, do you have any

7       questions?

8               MR. DIXSON:  No, I do not.

9               MS. EGELER:  I have a few follow-up questions.

10              MR. PIDGEON:  I have a few follow-ups as well.

11              MS. EGELER:  Why don't you go first.

12                          EXAMINATION

13  BY MR. PIDGEON:

14  Q   Redacted , you grew up in Kyrgyzstan?

15  A   Yes.

16  Q   And what is generally the reputation of the police in

17      Kyrgyzstan?

18  A   Generally by common men, it would be viewed as very bad

19      thing.

20  Q   Is it common practice in the Kyrgyzstan social order for a

21      person to call the police to ask them for their assistance

22      in some kind of a function?

23  A   No.  Calling police, I guess it would be last reserve

24      option.  Usually calling police is asking for more trouble.

25  Q   So when you were asked here if you -- it was just not your

PIDGEON (█Redacted█████████████, 9/15/10)

Page 53

```
 1        habit to call the police in the event of some kind of a

 2        confrontation like you had at --

 3                  MS. EGELER:  Objection to the characterization of

 4        the question.

 5   A    It is not my habit to call the police.

 6   Q    (By Mr. Pidgeon)  Now, when you mentioned earlier that you

 7        did not feel threatened by the individuals who were

 8        screaming profanity in your face, did that have to do with a

 9        concept in your mind that if it came to physical violence

10        you could handle the situation yourself?

11                  MS. HAMILTON:  Objection.

12                  MS. EGELER:  Objection; leading the witness.

13   Q    (By Mr. Pidgeon)  You can answer.

14   A    I would like to -- say it again.

15   Q    If the person confronting you with the profanity had

16        physically attacked you, do you believe you could have

17        handled yourself?

18   A    I believe so.

19   Q    In both cases?

20   A    I believe I'm able to defend myself.

21   Q    Would it bother you at all if that person had your home

22        address and was able to go to your house without you being

23        there?

24   A    I wouldn't feel comfortable.  It would.

25   Q    Did you, when you signed the petition, did you put your home
```

EGELER (Redacted , 9/15/10)

Page 54

1    address on the signature line?

2 A  I did.

3 Q  And did your wife also sign the petition?

4 A  She did.

5 Q  Did she put her home address on there as well?

6 A  She did.

7 Q  Now, in terms of Washington Families Standing Together, do

8    you know of the 165 groups that constitute Washington

9    Families Standing Together?  Do you know who they are?

10 A  No.

11 Q  Do you know whether or not one of the primary groups is

12    Acorn?

13 A  I do not know.

14 Q  Do you know whether or not any members of Acorn have been

15    arrested for election fraud in the state of Washington?

16 A  Say it again.

17 Q  Do you know whether or not any members of Acorn have been

18    arrested and convicted for election fraud in the state of

19    Washington?

20 A  I do not know.

21          MR. PIDGEON:  I have nothing further.

22                    EXAMINATION

23 BY MS. EGELER:

24 Q  Pastor, you stated that you had several people who would

25    not sign the petition.  Can you tell me about each of those

EGELER (Redacted                    , 9/15/10)

Page 55

1       incidents?

2    A  It was many; therefore, I cannot tell you.  One that's

3       standing out to me, one lady come out of the white Jeep, and

4       she said, I'm with you, but this day and time, I'm not

5       signing, or I'm not putting my address on anything, and she

6       walked away.  But numerous time people would say, We support

7       the cause, but we don't want to sign it.

8    Q  That incident that you just talked about the lady came out

9       of her vehicle and made --

10   A  Yeah.

11   Q  -- that statement to you, where were you when that occurred?

12   A  I was at Marketplace parking lot, Marketplace here in town,

13      and my wife was with me.

14   Q  Marketplace is the name of a supermarket, correct?

15   A  Yeah.

16   Q  When this woman made this statement to you, did she state

17      why she would not sign?

18   A  Well, I just told you why.

19   Q  Did she state anything in addition to what you told me?

20   A  No.

21   Q  So she did not indicate any fear of signing, simply that she

22      would not sign at this time?

23   A  No.  Actually, it was fear.

24   Q  How do you know?

25   A  Well, because she said, "At this day and time, I don't want

State Objects: Witness lacks
foundation for testimony; hearsay

EGELER ████████████████, 9/15/10)

Page 56

1    to leave my address anywhere, my name and address anywhere."

2  Q  Do you know if she was willing to leave her name and address

3    other places?

4  A  How would I know that?

5  Q  I'm asking a question.   It's a yes or no question.

6  A  Well, probably she would, if she wouldn't feel threatened,

7    but she told me clearly, "I do support the cause, but I

8    don't want to leave my name and address on this petition."

9  Q  Do you know if she ever signs any petitions?

10 A  I never met her before.

11 Q  Did she state to you if she ever signs any petitions?

12 A  We didn't have dialogue.

13 Q  So you don't know if she makes it her practice to never sign

14   any petitions?

15 A  I don't know.

16 Q  Let's go through any others that you remember making

17   statements to you that they supported your cause but would

18   not sign.

19 A  It was numerous.

20 Q  How many?

21 A  More than once.   I would say I personally probably

22   encountered minimum of ten, but other people that I knew of

23   that was gathering signatures told me the same story.

24 Q  Let's talk about what you personally experienced.

25 A  Yeah.

State Objects: Witness lacks
foundation for testimony; hearsay

EGELER (Redacted, 9/15/10)

Page 57

1  Q  You are confident it happened more than once, correct?

2  A  It occurred more than once.

3  Q  You're confident it happened at least ten times?

4  A  Ten or less.

5  Q  Ten or less?

6  A  Yes.

7  Q  So no more than ten?

8  A  No more than ten.

9  Q  With each of those incidents, do you recall what the

10     individual said?

11  A  No.

12  Q  Do you recall whether the individual stated whether they

13     make it a practice to never sign any petition?

14  A  I never heard about having a practice.  They just said they

15     wouldn't sign this one.

16  Q  They stated they wouldn't sign this one.  Did they also

17     state specifically -- do you recall them stating that they

18     were afraid to put down their name and address?

19  A  There was nothing about fear, but people would say, I would

20     like -- I would sign -- I would support the cause or I would

21     sign the petition, but I don't want to leave my name on it,

22     my name and address.  Nobody said because I'm terrified.

23  Q  And did they say anything to you that would allow you to

24     know with certainty whether it was simply their practice to

25     never sign a petition, even if they supported it, or whether

EGELER ( Redacted                    , 9/15/10)

Page 58

1   there was something special about this petition that caused

2   them to not sign?

3   A   They knew the cause of this petition and they refused to

4   sign it, even though they supported.  This is all I can tell

5   you.  Whether it's their practice, I'm not that personally

6   attached to everybody who signed petition.

7   Q   So in answer to my question, you don't know what their

8   practice is with regard to other petitions?

9   A   I don't know what their practice is.

10  Q   And if I'm correct, you stated that you've been in the

11      United States since 1992?

12  A   Correct.

13  Q   So you've been here for approximately 18 years?

14  A   Yes.

15  Q   In that period of time, in those 18 years, have you ever had

16      a negative encounter with a United States police officer or

17      a state of Washington or a state of Oregon police officer?

18  A   No.

19  Q   Have you ever had a negative encounter with a police officer

20      from Lewis County or from the city of Longview or Kelso?

21  A   No, I did not.

22  Q   Have you ever had any encounter whatsoever with a police

23      officer in the United States, positive or negative?

24  A   I'm law abiding citizen.  I was pulled, you know, to the

25      side of the road.  I've got a couple of tickets for

EGELER Redacted                     , 9/15/10)

Page 59

```
 1        speeding, but that was the extent of it, so . . .

 2   Q    When you were pulled to the side of the road you said a

 3        couple of times, so that's happened at least twice?

 4   A    At least twice.

 5   Q    Where were you?  What state?

 6   A    Here in Washington.

 7   Q    Were you pulled over by a Washington State Trooper?

 8   A    Probably.

 9   Q    When you were pulled over, did the police officer act

10        inappropriately, in your opinion, in any respect?

11   A    No.

12   Q    Were you frightened by the police officer?

13   A    I was not.

14   Q    Were you speeding?

15   A    Yes.

16   Q    Did you feel the police officer was honest?

17   A    I felt that.

18   Q    Did the police officer ask you for money or a bribe?

19   A    No.

20   Q    Did the police officer threaten you in any way?

21   A    No.

22   Q    Did the police officer intimidate you?

23   A    No.

24   Q    Do you think that United States or local police officers are

25        frightening or intimidating for any reason for law abiding
```

                                                    Page 60

1          citizens?

2    A     Not for me.

3    Q     If you had a problem, a legal problem or someone was harming

4          you or your family, would you feel comfortable calling the

5          local or state police?

6    A     I probably would.

7    Q     Do you feel that they would honestly protect your safety?

8    A     I believe so.

9    Q     Do you feel that the police officers in this state or

10         locally pose any threat to you or your family?

11   A     Police officers?

12   Q     Yes.

13   A     No.

14   Q     Have you ever encountered local police officers in the

15         schools in a positive setting?

16   A     No.

17   Q     Do you have children?

18   A     I do.

19   Q     Do you know if your children have ever encountered the

20         police officers visiting the schools or local children's

21         events?

22   A     I don't know.

23   Q     Do you know if your children are afraid of the police or

24         whether they feel that it's a positive force in the

25         community?

EGELER (Redacted                          , 9/15/10)

Page 61

1   A   I don't think they're afraid of the police.

2   Q   Is your wife afraid of the police?

3   A   No, she's not.

4   Q   So your opinions about police officers outside this country

5       do not influence your opinion about police officers within

6       this country?

7   A   Say it again.

8   Q   Do your opinions about police officers outside this

9       country --

10  A   Um-hmm.

11  Q   -- influence your view of the honesty of the police officers

12      inside this country?

13  A   I just don't think about it.

14  Q   Do you have any reason to have a negative view of police

15      officers in this country?

16  A   No.

17  Q   Is your home address listed in the phone book?

18  A   I don't know.

19  Q   You don't know whether it's in the phone book?

20  A   I think it's in the phone book.

21  Q   And you stated earlier that you're registered to vote in the

22      state of Washington.  Did you know that your voter

23      registration is public record?

24  A   Yes.

25  Q   So you're aware that anyone can access your name and address

HAMILTON (Redacted , 9/15/10)

Page 62

```
 1        through the voter registration database?

 2    A   I don't know these details.  I do not know.

 3               MS. EGELER:  I have no further questions.

 4                          EXAMINATION

 5    BY MS. HAMILTON:

 6    Q   I have one follow-up.

 7            Do you know whose address is Redacted    in

 8        Longview?

 9    A   Yes.

10    Q   Who is that?

11    A   This is Redacted    .

12    Q   And is she related to Redacted    ?

13    A   Yes.

14    Q   Who are Redacted    ?

15    A   Mother and daughter.

16    Q   Are they affiliated with your church?

17    A   Yes.

18    Q   In what capacity?

19    A   They're members of my church.

20    Q   And is Redacted    the registered agent with the

21        Secretary of State's office?

22    A   Registered agent?

23    Q   For the corporate records for the church.  For the nonprofit

24        records, you had to fill out an application with the state.

25        You had to fill out some forms with the state.
```

PIDGEON (Redacted                    , 9/15/10)

Page 63

1    A    I believe so, yes.

2    Q    Do you know if Redacted           signed the petition for

3         Referendum 71?

4    A    I believe she did.

5              MS. HAMILTON:  That's all I have.

6                          EXAMINATION

7    BY MR. PIDGEON:

8    Q    I have just one quick follow-up.

9              Were you aware -- did Larry Stickney ever make you

10        aware that he felt threatened?

11   A    I received e-mail from -- I believe so.  I believe so.

12   Q    Do you know whether or not this blogspot Web site that you

13        referenced that you said was very aggressive, did the police

14        take any steps at all to prosecute the fellow who put that

15        stuff on the blog?

16   A    I do not know.

17   Q    You don't know if there was any arrest made or an

18        investigation?

19   A    I don't know.

20             MS. EGELER:  Asked and answered.

21   Q    (By Mr. Pidgeon)  Do you know if the FBI had made any

22        investigation?

23   A    I do not know.

24             MR. PIDGEON:  Nothing further.

25             MS. EGELER:  Nothing further.

Page 64

1                               (Concluded at 10:21 a.m.)

2                               (Signature reserved.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 65

```
 1              C E R T I F I C A T E

 2       I, REBECCA S. LINDAUER, a duly authorized Notary Public in

 3  and for the State of Washington, residing at Lacey, do hereby

 4  certify:

 5       That the foregoing deposition of ▇Redacted▇▇▇▇▇▇

 6  ▇Redacted▇ was taken before me and completed on the 15th day of

 7  September, 2010, and thereafter transcribed by me by means of

 8  computer-aided transcription; that the deposition is a full,

 9  true, and complete transcript of the testimony of said witness;

10       That the witness, before examination, was by me duly sworn

11  to testify the truth, the whole truth, and nothing but the truth,

12  and that the witness reserved signature;

13       That I am not a relative, employee, attorney, or counsel of

14  any party to this action or relative or employee of any such

15  attorney or counsel, and I am not financially interested in the

16  said action or the outcome thereof;

17       That I am herewith securely sealing the deposition of ▇Redacted▇

18  ▇Redacted▇▇▇▇▇ and promptly mailing the same to MS. ANNE

19  E. EGELER.

20       IN WITNESS HEREOF, I have hereunto set my hand and affixed

21  my official seal of this 17th day of September, 2010.

22

23
                         _____
24                       Rebecca S. Lindauer, CSR#2402
                         Notary Public in and for the State of
25                       Washington, residing at Lacey.
```