1

2

3

4

5

6

7

8

9

10

The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON, | NO. 09-cv-05465-BHS |
| Plaintiffs, | DESIGNATED DEPOSITION TESTIMONY OF |
| v. | |
| SAM REED, in his official capacity as Secretary of State of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, | |
| Defendants. | |

11

12

13

14

15

16

17

18

19   Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

20   Washington Families Standing Together and the Washington Coalition for Open Government

21   and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

22   "Parties") hereby submit combined designated deposition testimony for

23

24   Defendants and Intervenors object to the admission of any deposition testimony taken

25   of any witnesses who could be called to testify at trial.   Therefore, the designations of

26

DESIGNATED DEPOSITION
TESTIMONY OF

- No. 09-cv-05465-BHS

1

1    Defendants and Intervenors are being submitted in the event that the Court decides to admit

2    deposition testimony.

3           For the Court's convenience Defendants' designations have been highlighted in blue,

4    Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5    been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6    filing the redacted versions of these documents.

7           DATED this 6th day of September, 2011.

8    ROBERT M. MCKENNA
     Attorney General
9

10    s/ William Clark
     _____
11   WILLIAM CLARK, WSBA #9234
     Senior Counsel
     800 Fifth Ave, Ste 2000
12   Seattle, WA 98104
     206-464-7352
13   BillC2@atg.wa.gov
     ANNE EGELER, WSBA #20258
14   Deputy Solicitor General
     PO Box 40100
15   Olympia, WA  98504-0100
     360-664-3027
16   Annee1@atg.wa.gov
     _____
17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON, <br><br>               Plaintiffs, <br><br>    v. <br><br> SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, <br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 09-CV-05456-BHS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

Deposition Upon Oral Examination
Of

---

Taken by:  Tracey L. Juran, CCR
           CCR No. 2699


September 22, 2010

Everett, Washington

```
 1                          APPEARANCES

 2

 3

 4   For Protect Marriage Washington:

 5        Stephen Pidgeon, Attorney at Law
          3002 Colby Avenue, Suite 306
 6        Everett, Washington  98201-4081

 7

 8
     For the Defendants:
 9
          Anne E. Egeler, Deputy Solicitor General
10        Attorney General of Washington
          1125 Washington Street SE
11        P.O. Box 40100
          Olympia, Washington  98504-0100
12

13

14   For Washington Coalition for Open Government:

15        Steven J. Dixson, Attorney at Law
          Witherspoon Kelley
16        422 West Riverside Avenue, Suite 1100
          Spokane, Washington  99201-0300
17

18

19   For Washington Families Standing Together:

20        Rebecca S. Engrav, Attorney at Law
          Perkins Coie
21        1201 Third Avenue, Suite 4800
          Seattle, Washington  98101-3099
22

23

24

25
```

Tracey Juran, Certified Court Reporter

Page 3

```
 1                              INDEX

 2

 3

 4

 5                                              Page No.

 6   EXAMINATION

 7        By Ms. Egeler                              4
          By Mr. Dixson                             20
 8        By Ms. Engrav                             22
          By Mr. Pidgeon                            23
 9        By Ms. Egeler                             25
          By Mr. Dixson                             29
10        By Ms. Engrav                             29
          By Mr. Pidgeon                            32
11

12

13

14   EXHIBITS MARKED

15        None

16

17

18

19

20

21

22

23

24

25
```

1          Be it remembered that the deposition upon oral

2     examination of                      was taken on

3     September 22, 2010, at the hour of 1:21 p.m. at 3501

4     Colby Avenue, Suite 200, Everett, Washington, before

5     Tracey L. Juran, CCR, Notary Public in and for the State

6     of Washington residing at Edmonds, Washington.

7          Whereupon the following proceedings were had,

8     to wit:

9                              * * * * *

10                    ,         having been first duly sworn on
                               oath by the Notary Public to tell
11                             the truth, the whole truth, and
                               nothing but the truth, was deposed
12                             and testified as follows:

13

14                         EXAMINATION

15  BY MS. EGELER:

16  Q.       , we met out in the hall, but I wanted to repeat

17     again for you, I'm Anne Egeler and I'm with Rob

18     McKenna's office, the Attorney General's Office, for the

19     State.

20          Have you ever been deposed before?

21  A.   No.

22  Q.   Let me give you a few ground rules that we'll both need

23     to be careful of.  One is that we need to make sure we

24     say yes or no instead of head nodding or mm-hms, because

25     it's difficult for the court reporter to get a good

```
1          record of what we're saying otherwise.

2    A.    Okay.

3    Q.    And it's also important for us to wait for each other to

4          finish talking before we begin talking so that we don't

5          overlap on the record.

6    A.    Okay.

7    Q.    And finally, it's very important that we understand each

8          other.  So if I ask you anything that doesn't make sense

9          or you're confused, please let me know and we can make

10         sure that we're both understanding each other.  Okay?

11   A.    Sounds good.

12   Q.    Can you tell me about your current employment.

13   A.    I work for the                              .

14   Q.    Excuse me; I didn't hear you.

15   A.

16   Q.    Is that your full-time job?

17   A.    Yes.

18   Q.    And that's something that you're doing with your dad, I

19         assume?

20   A.    Well, yeah.  He's the

21   Q.    And just for the record, your father's

22         correct?

23   A.    Yes.

24   Q.    And what employment did you have in 2009?

25   A.    I worked for                              .
```

Tracey Juran, Certified Court Reporter

1   Q.   And were you paid for that work?

2   A.   Yes.

3   Q.   How much were you paid?

4   A.   I think it was around $800 a month.

5   Q.   What did you do when you were working for

6                              ?

7   A.   I did a lotta various things.  I picked up literature

8        and signs and went all across the state and distributed

9        materials and things like that.  Pretty much anything

10       they needed me to do.

11  Q.   Did you have a Referendum 71 bumper sticker on your car?

12  A.   I don't even think we had any that I remember.

13  Q.   Did you have any Referendum 71 paraphernalia, like

14       T-shirts or hats or anything?

15  A.   I don't think we had any of those either.

16  Q.   Did you ever gather petition signatures?

17  A.   Yes.

18  Q.   Where did you do that?

19  A.   I did it in Olympia at one point.

20  Q.   And do you remember where you were when you did that?

21  A.   Oh, yeah, the State Capitol.  There was a rally going

22       on.

23  Q.   Anywhere else?

24  A.   I didn't do a whole lotta that.  We had volunteers who

25       did that, and I was pretty much doing things in the

1        campaign that were more, you know, distributing them.

2        So I wasn't doing that very much, gathering signatures.

3   Q.   So you only gathered signatures on one day at the State

4        Capitol?

5   A.   I don't remember if it was more than one day.  I may

6        have done it a couple other times, but I don't remember.

7   Q.   Do you remember when that rally was, roughly?

8   A.   No.

9   Q.   Did you ever hold up Referendum 71 signs at any events?

10  A.   I think maybe once or twice at some sign wavings.

11  Q.   Do you remember where you were?

12  A.   I traveled all over the state that year.  It's tough to

13       remember specifically where I was at -- you know.  No, I

14       don't remember where I was.

15  Q.   You don't remember what town you were in?

16  A.   Right.

17  Q.   Do you remember what the location was like, whether you

18       were holding signs in a private location, on private

19       property?

20  A.   It -- I assume it would be on public property if -- we

21       were, I mean, probably at an intersection or some

22       highly, you know, trafficked area.

23  Q.   I assume you wanted to be seen by as --

24  A.   Correct.

25  Q.   -- many people as you could.  Okay.

1          Did you ever get asked questions by any reporters

2     about Referendum 71?

3  A.  No.

4  Q.  Did you ever, other than holding signs and asking for

5     petition signatures, publicly identify yourself with

6     Protect Marriage Washington?

7  A.  I made a comment on an article where I had many nasty

8     responses towards me and my father.

9  Q.  Was that an article on-line by            ?

10 A.  Yes.

11 Q.  And you responded to the on-line article with a comment

12    posting?

13 A.  Yes.

14 Q.  Did you make any comments on any other Web sites?

15 A.  No.

16 Q.  Did you ever work to get volunteers to help with

17    Referendum 71?

18 A.  In some form or another, yes.  I mean, everything that

19    we did was to recruit volunteers as well as, you know,

20    get the -- get it out there, you know, in people's minds

21    and --

22 Q.  What did you --

23 A.  -- stuff like that.

24 Q.  -- personally do to recruit volunteers?

25 A.  I guess it would be indirectly, things I did indirectly.

1      So it was never like I was calling people up and asking

2      them to work for the campaign.  I never did anything

3      like that.

4   Q.  What did you do?

5   A.  Well, like I said, I built signs and I picked up

6      literature and I distributed literature and I worked

7      with other people on the campaign team, delivered signs.

8      I just did anything the campaign, you know, needed help

9      with.  So, I mean, it was always indirect, sort of, you

10     know.

11  Q.  Before there was a Referendum 71, there was a bill in

12     the Legislature.  Do you recall that?

13  A.  No.

14  Q.  And did you testify at any legislative hearings?

15  A.  Oh, you mean the bill -- can you repeat the question.

16  Q.  There was a bill that was the precursor to

17     Referendum 71.

18  A.  Oh, okay, yeah.

19  Q.  So you're --

20  A.  I know what you're talking about.

21  Q.  -- familiar with that.

22  A.  Yeah.  I was --

23  Q.  There were some --

24  A.  -- a little confused.

25  Q.  There was a public hearing with regard to that bill.

Tracey Juran, Certified Court Reporter

```
 1         Did you attend that hearing?

 2    A.   No.

 3    Q.   Did you attend any rallies or gatherings?

 4    A.   Yes.

 5    Q.   Can you tell me about those.

 6    A.   We had a couple at the State Capitol.  I think the

 7         one -- what you were just referring to about the hearing

 8         on the bill I did not attend.  I think that was the

 9         first one.  But there's several others after that all

10         around the state.  I remember, I think, one in Olympia.

11         That's on the Capitol steps, I think.  To be honest, I

12         don't remember specifically where they were, the rest of

13         them.

14    Q.   But you remember attending several?

15    A.   Sure, yes.

16    Q.   And when you were at these rallies, did you do anything

17         to promote Referendum 71?

18    A.   Besides waving a sign?

19    Q.   So you waved a sign at the --

20    A.   Yeah --

21    Q.   -- rallies.

22    A.   -- things like that.  I was never a public speaker or

23         anything.

24    Q.   But you held the sign?

25    A.   Right.
```

```
 1   Q.   Did you attend any public debates about Referendum 71?
 2   A.   Not that I can recall.
 3   Q.   Did you go to the Secretary of State's Office and watch
 4        the signature-checking process?
 5   A.   Yes, I did.
 6   Q.   Did you sign in there?
 7   A.   Yes.
 8   Q.   How many days did you go to watch the signature-
 9        verification process?
10   A.   I think I was there the first day and that's it.
11   Q.   And did you ever speak on the radio or television?
12   A.   No.
13   Q.   Did you ever get into any shots that were shown on the
14        TV that you're aware of?
15   A.   Not that I'm aware of.
16   Q.   Do you know if your name was ever listed anywhere as
17        being associated with --
18   A.   Yes, it was, I remember, in a couple articles, not
19        specifically.  It was probably                        or
20              or something where they talked about
21                      working on the campaign or
22                        is working on the campaign.  I know
23        it was -- they said son at one time and
24        another time.  I don't remember specifically, but yes,
25        my name was brought up in articles.
```

Tracey Juran, Certified Court Reporter

1   Q.   Were you aware that when you were paid by

2                          those expenditures were reported to

3        the Public Disclosure Commission?

4   A.   Yes.

5   Q.   And did you know the Public Disclosure Commission

6        reports are available on-line to the public?

7   A.   Yes.

8   Q.   Did you know that your name and address were listed

9        there and the amount paid to you?

10  A.   I'm not, you know, familiar with all the technicalities,

11       but if -- I'm sure that is.

12  Q.   Are you saying that because you're agreeing with my

13       representation or you personally know that to be the

14       case?

15  A.   I don't personally know that to be the case, but it

16       seems like that's probably the case.

17  Q.   So you're here today because you've been named as a

18       witness in the Doe v. Reed case, and I assume you're

19       aware of that.

20  A.   Yes.

21  Q.   And my understanding is that you have experienced

22       something that you considered to be threats or

23       harassment as a result of your association with

24       Referendum 71; is that correct?

25  A.   Yes.

Tracey Juran, Certified Court Reporter

Page 13

```
 1   Q.   Can you describe each of those incidents to me.  We can
 2        walk through each one one by one in detail.
 3   A.   Okay.  Personally, I was attacked on-line for the
 4        comments I made in             article.  I'm sure you
 5        guys have that, since you seemed to know what I was
 6        talking about when I mentioned that.  You can read what
 7        they said about me and they said about my dad.
 8   Q.   What sort of attacks?  What sort of things were said, do
 9        you recall?
10   A.   Saying that my dad's a bigot and that he should -- you
11        know, things like he should burn in hell, he's an
12        asshole, he -- you know, he's a -- you know, he hates,
13        he's a hater.  I don't even -- there's countless things
14        that they said about him.  I mean, pretty much any
15        insult you could come up with under the sun they said
16        about him.
17   Q.   Did they say anything about you specifically?
18   A.   They never said anything about me -- you know, they
19        never said, you know, I am a jerk for working on the
20        campaign or whatever.  But they said -- they responded
21        to me, telling me my, you know -- saying my dad's, you
22        know -- a whole lot of nasty things about me and -- or
23        about my dad and about my family.  So --
24   Q.   And that was in response to the comment that you
25        posted --
```

State Objects: Hearsay

Tracey Juran, Certified Court Reporter

Page 14

1    A.    Yeah.

2    Q.    -- on                ; correct?

3    A.    Yes.

4    Q.    Were there any other times that you were attacked on-

5          line?

6    A.    No, not to my knowledge.

7    Q.    Any other instances of what you considered to be threats

8          or harassment?

9    A.    Towards myself?

10   Q.    Yes.

11   A.    Not personally towards myself, but towards my family and

12         towards my father at all times pretty much throughout

13         the entire campaign.

14   Q.    And you talked about the on-line attacks that were made

15         about your dad.  Did you witness anything that would be

16         more of a physical attack on your dad at any point?

17   A.    Not in that article.

18   Q.    I assume you saw on-line in many locations many comments

19         about your dad; is that correct?

20   A.    Yes.

21   Q.    Did you ever see him -- as opposed to in print, did you

22         ever see anyone in person physically attack your dad?

23   A.    Physically attack my dad?  No.

24   Q.    Yes.

25         Did you ever see anyone physically attacked for

Page 15

1      their association with Referendum 71?

2   A.  No.

3   Q.  Did you ever see your dad threatened in person, as

4      opposed to the many things you say were posted on-line?

5   A.  Yeah.  How about the 20 voice mails we got every night?

6      I mean, that's an exaggeration, but every single night

7      we got some sort of threat over the phone.

8   Q.  We'll talk about phone in a minute.  We'll definitely --

9   A.  Okay.

10  Q.  -- get to that.  I'll make a note of it.

11         But in person, person to person, did you ever hear

12      someone make a verbal threat in person to your dad?

13  A.  No.

14  Q.  Did you ever witness any physical or verbal in-person

15      attack on anyone working on Referendum 71?

16  A.  Not that I can recall.

17  Q.  So let's talk about the phone incidents, then.  Can you

18      tell me about that.

19  A.  Yeah.  I mean, out of the countless voice mails we got

20      threatening my dad, threatening my family, my dad only,

21      you know, chose to let me listen to a few of 'em because

22      there was -- I mean, it was just so nasty, I didn't

23      wanna hear it anyways.  It was very upsetting.

24  Q.  So you heard a few.  Let's walk through those and talk

25      about what you heard.

1   A.   Well, I remember one very specifically where this lady
2        was cursing with everything she could -- or every curse
3        under the sun about how -- you know, about my dad, you
4        know, just -- and then went on to say that he's a closet
5        homosexual and that he wants to -- or he probably wants
6        to give fellatio to all of his -- all the people he --
7        or the guys he works with and his bosses and stuff like
8        that.  And that one was pretty -- well, I think you get
9        the idea as to how that would make me feel.
10  Q.   And the next one?  You heard another one; is that
11       correct?
12  A.   I mean, it was just always pretty much the same banter,
13       you know, like you're an asshole, you shouldn't be doing
14       this, you -- why do you hate us, why do -- you know,
15       specifically -- you know, specific sentences I haven't
16       recorded in my head, you know, but it was every day.
17  Q.   Would you say you listened to more than three of those
18       messages?
19  A.   Maybe two to three and I pretty much stopped listening
20       to 'em.  I didn't wanna hear 'em anymore.
21  Q.   So it sounds like what you heard was foul language,
22       things of a sexual -- frankly, rude nature.  Anything
23       else?  Is there any category of comments that I'm
24       missing that you remember?
25  A.   Not that I was -- nothing that was played for me.

State Objects: Hearsay

Tracey Juran, Certified Court Reporter

Page 17

1    Q.    Any other threats or harassment of any sort that you

2         witnessed or heard?

3    A.    Well, I mean, there was the guy that was calling, you

4         know, death threats for my dad and my family.  The FBI

5         investigated him.  You have to know about that.

6    Q.    Can you tell me about that.

7    A.    He was -- I don't remember exactly what he said, but he

8         called for, you know -- he made a death threat on my dad

9         and on my family and -- saying that, you know, he should

10        be killed, basically, for what he's doing.

11    Q.    Did you hear the person?

12    A.    Well, it wasn't a recording, I don't think.  It was just

13        this guy's blog.  I forget what his name was.

14    Q.    So it wasn't a phone call.

15    A.    No, it wasn't a phone call.

16    Q.    Was this the blog in Bellingham?

17    A.    Yeah.

18    Q.    Do you know if your dad contacted the FBI?

19    A.    I don't know what happened.  I know the FBI got

20        involved.  I don't think -- I don't know if we did or

21        did not contact the FBI.

22    Q.    And do you know if anyone in your family or if your dad

23        ever contacted the police about any of the threats or

24        harassment?

25    A.    I don't know for a fact, no.

Tracey Juran, Certified Court Reporter

Page 18

1   Q.   Anything else?  Any other instances that you witnessed?

2   A.   No.

3   Q.   You said there were threats against your family.  Can

4        you tell me about those.

5   A.   Well, I think that was the blogger guy.

6   Q.   The Bellingham blogger --

7   A.   Yeah.

8   Q.   -- again?  Okay.

9            Other than the Bellingham blogger, do you remember

10       any other threats against your family?

11  A.   No, but there was a guy in my front yard taking pictures

12       of my house.

13  Q.   Did you see him?

14  A.   No.  I was not there for that event.

15  Q.   You didn't -- you weren't in the yard for that event --

16  A.   I was not home.

17  Q.   You weren't home.

18           Did your sister tell you about that event or did

19       your father?

20  A.   My parents did, yeah.  I know my sister was very shook

21       up, though.

22  Q.   Do you know of any actions that your family took as a

23       result of that event?

24  A.   Yeah.  I mean, we had our little -- had my little

25       sisters sleep in the living room because the enclosed

Page 19

1    space -- the room they lived in, we feared, you know,

2    someone might throw a mazel tov (sic) cocktail through

3    the window or something.  We had people taking pictures

4    of our house, clearly our address, I mean, ready to show

5    that to other people who could have done something like

6    that.  So we kept 'em in the living room because we

7    thought it would be a safer spot for them.  I mean --

8  Q.  You said that you had people taking pictures of your

9      house.

10 A.  Person.  One person.

11 Q.  And how do you know they were ready to show the pictures

12     on the Internet?

13 A.  Well, I mean, that's what we assumed.

14 Q.  So do you know if this individual could have been an

15     appraiser who was taking a photo of your house --

16 A.  At night?

17 Q.  What time was it?

18 A.  I'm pretty sure it was at -- during the night.

19 Q.  You don't know what time --

20 A.  I don't know.

21 Q.  -- this occurred?

22        Do you know if it could have been a burglar, since

23     it was at night?

24 A.  No.  What --

25 Q.  Excuse me?

Tracey Juran, Certified Court Reporter

Page  20

1    A.    Nothing.

2              MS. EGELER:   Can you read back that last response.

3                   [Record read back as requested]

4    Q.    (by Ms. Egeler)  Just to clarify, in case you didn't

5          understand, do you know if this person could have had a

6          criminal intent to break into your home and steal or --

7    A.    No.

8    Q.    -- do something else?   Okay.

9              Did you ever see photos of your home posted on the

10         Internet?

11   A.    No.

12   Q.    Did you look?

13   A.    No.

14   Q.    How long did your sisters sleep in the living room?

15   A.    Few months.   It was around two or three months.

16   Q.    Do you know of any other instances of threats or

17         harassment related to Referendum 71?

18   A.    Specifically, no, I can't remember any at the time.

19         But --

20             MS. EGELER:   Okay, I have no further questions.

21

22                         EXAMINATION

23   BY MR. DIXSON:

24   Q.             , my name's Steve Dixson.  I'm an attorney from

25         Spokane, Washington, representing Washington Coalition

Tracey Juran, Certified Court Reporter

```
 1          for Open Government.  I have a very few questions.
 2                  Just to be clear, did you ever sleep in the living
 3          room or was it just your sisters?
 4     A.   I slept in the living room a few times, yeah.
 5     Q.   And because you felt unsafe or were you instructed to
 6          sleep there by --
 7     A.   I --
 8     Q.   -- your dad?
 9     A.   I feared for the safety of my family and so I wanted to
10          watch over them.
11     Q.   So you were there more to protect them than for your own
12          safety?
13     A.   Correct.
14     Q.   But it was main -- but it was your sisters that slept
15          there consistently for --
16     A.   Yes.
17     Q.   -- two or three months.
18          And did your older brother sleep in the living room
19          as well?
20     A.   I don't remember.
21     Q.   And other than the -- did you ever receive any phone
22          calls relating to Referendum 71 on your cell phone or at
23          the house?
24     A.   Are you talking about threats or just people calling me
25          that worked with me?
```

Page 22

1    Q.    Threats.

2    A.    No.

3    Q.    Did you receive any --

4    A.    No, I did not.

5    Q.    -- threats on the home phone yourself?

6    A.    No, I did not.

7          MR. DIXSON:  Okay, that's all I have.

8

9                         EXAMINATION

10   BY MS. ENGRAV:

11   Q.    Good afternoon,            .  My name's Rebecca Engrav;

12         I'm an attorney for Washington Families Standing

13         Together.  Also just a very few questions.

14              When you were discussing the Bellingham blogger and

15         you said that you were aware that the FBI had

16         investigated that, how did you become aware of the FBI's

17         involvement?

18   A.    If I remember right, there may have been an article or

19         two on it.  Maybe just through, you know, I mean, living

20         with my family and them informing me of what's going on.

21   Q.    So it could be that your father told you about that?

22   A.    Yeah.

23   Q.    Or it could be that you read it in an article.

24   A.    It could be either one.  I mean, I don't remember

25         specifically.

Page 23

```
 1   Q.   At the time you were living in the house, that was your
 2        normal residence, was at the home?
 3   A.   Yes.
 4   Q.   And how many times, approximately, would you say that
 5        you slept in the living room?
 6   A.   Approximately 10 to 20.
 7   Q.   The other times you slept in your normal bedroom?
 8   A.   Yeah, which was, you know, right across from the living
 9        room.  So --
10             MS. ENGRAV:  That's all.
11
12                      EXAMINATION
13   BY MR. PIDGEON:
14   Q.       , I have just a couple of questions.  Stephen
15        Pidgeon.
16             Now, at the family home, the girls' bedroom is on
17        the street side of the house; is that right?
18   A.   Right.
19   Q.   So how far would you say it was from their bedroom
20        window to the curb?
21   A.   Twenty feet, maybe.
22   Q.   So would you say it was within throwing distance of a
23        Molotov cocktail?
24   A.   Absolutely.
25   Q.   How about throwing distance of a brick?
```

Tracey Juran, Certified Court Reporter

Page 24

1   A.   Anything.

2   Q.   Anything.

3            Somebody -- is it, in your mind, entirely possible

4        that somebody could throw something out of a car window

5        while driving by and hit the -- and hit that room?

6   A.   It's entirely possible.

7   Q.   And then the living room is in -- is the living room on

8        the front side of the house or the back side of the

9        house?

10  A.   It's in the front side.

11  Q.   So how close is the -- so -- but there -- are there

12       windows in the living room --

13  A.   Right.

14  Q.   -- facing the front yard?

15  A.   Yes.

16  Q.   But it was farther back from the street than --

17  A.   Right.

18  Q.   -- the bedroom?

19  A.   Yeah.

20  Q.   Now, on the -- did your dad ever show you any of the

21       blog sites where some of the threats were being posted?

22  A.   Yeah.

23  Q.   Can you describe the general tone of what those blog

24       sites were like.

25  A.   Very hateful, very -- you know, completely unwilling

```
 1        to -- completely uncivilized.  It was just --
 2   Q.   Well, how many --
 3   A.   -- threatening and, you know, just -- everything they
 4        said was just very -- the opposite of cordial, you know,
 5        like they didn't want any debate on the subject.  I
 6        don't know.
 7   Q.   And how many of those blog sites did you see?
 8   A.   I think like two or three.
 9   Q.   Two or three, okay.
10   A.   Sceglia or Bisceglia was one of 'em, the Bellingham
11        blogger.  And the other one was the pink -- I forget
12        what it was called.
13   Q.   There was some other blog called the pink something --
14   A.   No --
15   Q.   -- or --
16   A.   Yeah, it's like -- that's what I remember.  I don't
17        remember specifically.
18   Q.   Was there other content on the blog site besides a
19        threat -- the threats or --
20   A.   I don't remember.
21             MR. PIDGEON:  All right, I have nothing further.
22
23                      FURTHER EXAMINATION
24   BY MS. EGELER:
25   Q.        , you stated that everything that was said on the
```

Tracey Juran, Certified Court Reporter

Page 26

1          blog sites was the opposite of cordial.  Did you read
2          quite a few comments on the blog sites?
3     A.   Yeah.
4     Q.   Did you ever see any comments where people were arguing
5          that homosexual families are families too and that they
6          want to be respected as families?
7     A.   Yes.
8     Q.   Would you consider that the opposite of cordial or would
9          you consider that an attempt to have a respectful
10         debate?
11    A.   I'd say it was an attempt to, you know, stifle anybody
12         else's opinions about what they think.
13    Q.   You would consider someone saying that they're a
14         homosexual family and they want to be respected as a
15         family to be trying to stifle --
16    A.   Well, I never saw --
17    Q.   -- someone else's opinion?
18    A.   -- anybody say that specifically.
19    Q.   Did you see anything that was not cuss words, not a
20         threat of any sort of violence, but rather a statement
21         of opinion about Referendum 71?
22    A.   Yeah.
23    Q.   And do you think other people have a right to express a
24         contrary opinion?
25    A.   Absolutely.

1   Q.   Did you see --

2   A.   That's what this country's about.  But the whole point

3        is that we were not allowed to.  Anything we said was

4        just you're a bigot, you're hateful, like your opinion

5        does not matter.  We're right, you're wrong.  You don't

6        even have a right to say that.  That's what I saw

7        throughout the entire campaign, is that if you disagree

8        with us, if you're against us, then you're pretty much

9        the worst person on the planet, you know.

10  Q.   And by the same token, though, you think that people --

11       or do you think people are awful if they comment that

12       they think that same-sex partnership is appropriate?

13  A.   Absolutely not.

14  Q.   And did you see comments to that effect?

15  A.   Not on those blogging sites that I remember.  But, I

16       mean, that was pretty much the argument of the other

17       side.

18  Q.   And did you ever see anyone posting that they have a

19       different belief regarding how God views equality among

20       all people?

21  A.   I don't remember seeing that specifically, no.

22  Q.   So all you ever saw was what you considered extremist

23       remarks?

24  A.   Yeah.

25  Q.   Were you ever -- did you ever see or hear a threat to

Page 28

1    throw a Molotov cocktail or brick through your family

2    home's window?

3    A.   No.

4    Q.   And was anything ever thrown from a car at your home?

5    A.   No.

6    Q.   Anything ever thrown by a passerby?

7    A.   No, thankfully.

8    Q.   Were you responsible as part of your work with

9                       for distributing signs around the

10   state?

11   A.   Yes.

12   Q.   Are you aware of any signs being stolen or --

13   A.   Just about --

14   Q.   -- broken?

15   A.   -- every single one of 'em.

16   Q.   You think just about every single sign was stolen?

17   A.   Yes.

18   Q.   What percentage of the signs do you think were stolen?

19   A.   Stolen, destroyed, knocked down, however you wanna put

20        it, about 90 -- 80, 90 percent.

21   Q.   Did you ever hear from anybody that was stealing or

22        breaking signs?

23   A.   Did I ever hear from anybody that was doing that?

24   Q.   Yes.

25   A.   No.

1   Q.   Do you know -- or did you meet, did you see anyone doing

2        that?

3   A.   No.

4           MS. EGELER:  Okay.  Okay, that's all I have.

5

6                    FURTHER EXAMINATION

7   BY MR. DIXSON:

8   Q.   I just had one more question, and I'm sorry; I don't

9        mean to drag this on.

10          But other than the comment that you posted on The

11       Stranger Web site, did you, on the blog sites

12       Mr. Pidgeon mentioned, enter any comments yourself or

13       did you just view the comments that were made?

14  A.   I just viewed them.  I pretty much stayed out of it.

15  Q.   And other than the one comment that you posted on

16          Web site, did you post any comments anywhere to

17       try to engage in this dialogue?

18  A.   No.

19          MR. DIXSON:  Okay, thank you.

20

21                   FURTHER EXAMINATION

22  BY MS. ENGRAV:

23  Q.   Just one question.

24          You were discussing with the attorney for the State

25       about the extremist comments that you saw.  Are you

Tracey Juran, Certified Court Reporter

1       aware of any similar comments but made directed in the

2       other direction, somebody who supported Referendum 71

3       using foul language or inappropriate remarks about

4       somebody opposed to it?

5  A.   Could you repeat that.

6  Q.   Sure.  It was probably a bit long, wasn't it?

7       You were discussing extremist comments that you saw

8       on blog postings made by people who did not support

9       Referendum 71 and used foul language, made crude sexual

10      comments.  Are you aware of any comments of the same

11      nature being made by people in the other direction,

12      pointed at gay or lesbian people, people who did not

13      support the referendum?

14 A.   I was not aware, no.  But when -- and when you say

15      extremists, you're making it seem like it's a very small

16      percentage of these -- the people who were against us

17      were doing these sort of things.  It was most of them.

18 Q.   I thought I was just using your own language to describe

19      the type of remarks.  So not trying to categorize a

20      percentage, just the nature of the remarks and language

21      used.

22      So my question was, are you aware that those

23      comments may have been made in the other direction by

24      people who supported your referendum and were speaking

25      against people who did not support it?

1  A.   I was not aware of any.

2  Q.   Would it surprise you to know they'd been made?

3  A.   It would not surprise me because there's extremists on

4       both sides.  But the vast majority of the foul language

5       and the threatening language was on the other side, not

6       ours.

7  Q.   And I believe you testified that you looked at a few

8       blogs that were directed against the referendum and

9       that's the extent of the on-line commentary you looked

10      at.

11 A.   It's not the extent of it.  There was plenty of articles

12      against what we were doing.

13 Q.   Did you try to go out and find out blogosphere comments

14      that were in blogs not against you, but aimed at the

15      other direction?

16 A.   Not against me, but aimed at the other direction?

17 Q.   Did you try to go out and find the blogs that may

18      contain comments of people who supported Referendum 71,

19      may be opposed to gay and lesbian people?

20 A.   Yeah.  I mean, of course I saw, you know, people --

21      there was people who supported what we were doing,

22      making -- who had blogs and who wrote articles, sure.

23 Q.   So I guess I'm a little confused, because at first you

24      said you only looked at a few blogs, and now it sounds

25      like you're saying you --

Page 32

1   A.   I thought --

2   Q.   -- went out and looked at a lot.

3   A.   I thought you were talking about -- okay.  Throughout

4        the campaign I read many articles, I read many blogs.  I

5        thought you were specifically asking before about

6        opposition blogs, you know, blogs opposing what we were

7        doing.  I mean, I read articles and blogs the entire

8        campaign, pro and against.

9   Q.   And so reading those blog posts pro and against, you saw

10       or you didn't see comments using foul language, making

11       sexual remarks directed against gay or --

12            MR. PIDGEON:  Objection --

13  Q.   (by Ms. Engrav)  -- lesbian people?

14            MR. PIDGEON:  -- this assumes facts not in evidence

15       and I'm also objecting on the basis of relevance.

16                 But go ahead and answer.

17  A.   I don't remember any.

18            MS. ENGRAV:  Thank you.

19

20                 FURTHER EXAMINATION

21  BY MR. PIDGEON:

22  Q.   I've got -- I have just a couple of follow-up questions.

23            Were there any bumper stickers involved in the

24       campaign?

25  A.   You know, after I said that I don't remember, I seem to

Tracey Juran, Certified Court Reporter

1    remember now that we may have, just because of their

2    poor quality.  And I think I remember them, you know --

3    I'm -- I can't say for a fact, but I seem to remember,

4    you know, we may have had some bumper stickers.

5  Q.  Did any -- to your knowledge, did anybody deploy a

6    bumper sticker, put it on their car?

7  A.  If we had them, yeah, I'm sure they did.

8  Q.  Do you know if anybody's car was vandalized that had a

9    bumper sticker on it?

10  A.  I don't remember, no.

11  Q.  And then just to clarify some of this language here, you

12    were asked earlier about negative blog sites, if I

13    recall.  So is -- was it your testimony that you didn't

14    want your dad to show you any more of these horrendous

15    blog sites?

16  A.  I didn't wanna listen to any more of the horrendous

17    voice mails.  I kept up pretty well on, you know,

18    reading what was going on on the Internet.

19  Q.  So your -- is -- was your general review of what was

20    happening on the Internet just more or less, say, a view

21    of the articles that were going on, the news coverage

22    about the --

23  A.  Yes.

24  Q.  -- the case?  Okay.

25      So you weren't necessarily seeking blog commentary,

```
 1        but rather --

 2   A.   Right.

 3   Q.   -- news and regular comments there too.

 4   A.   Right.

 5             MR. PIDGEON:  Okay.  Okay, that's it.

 6             MS. EGELER:  Okay, I think we're done,

 7             THE WITNESS:  Okay.

 8             MS. EGELER:  Thank you.

 9

10                            (Whereupon the deposition
                               concluded at 1:57 p.m.)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 35

1                        CERTIFICATE

2   STATE OF WASHINGTON )
                        )
3   COUNTY OF SNOHOMISH )

4           I, the undersigned Notary Public in and for the

5   State of Washington, do hereby certify:

6           That the foregoing is a full, true, and correct

7   transcript of the testimony of the witness named herein,

8   including all objections, motions, and exceptions;

9           That the witness before examination was by me duly

10  sworn to testify truthfully and that the transcript was made

11  available to the witness for reading and signing upon

12  completion of transcription, unless indicated herein that the

13  witness waived signature;

14          That I am not a relative or employee of any party

15  to this action or of any attorney or counsel for said action

16  and that I am not financially interested in the said action

17  or the outcome thereof;

18          That I am sealing the original of this transcript

19  and promptly delivering the same to the ordering attorney.

20          IN WITNESS WHEREOF, I have hereunto set my hand and

21  seal this 3rd day of October, 2010.

22

23          _____
            Notary Public in and for the State of Washington
24                residing at Edmonds, Washington.
                     (Notary expires 3/09/13)
25                       (CCR No. 2699)

Tracey Juran, Certified Court Reporter