The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> SAM REED, in his official capacity as Secretary of State of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, <br><br> Defendants. | NO. 09-cv-05465-BHS <br><br> DESIGNATED DEPOSITION TESTIMONY OF |

Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

Washington Families Standing Together and the Washington Coalition for Open Government

and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

"Parties") hereby submit combined designated deposition testimony for

Defendants and Intervenors object to the admission of any deposition testimony taken

of any witnesses who could be called to testify at trial.  Therefore, the designations of

DESIGNATED DEPOSITION
TESTIMONY OF
- No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

1   Defendants and Intervenors are being submitted in the event that the Court decides to admit

2   deposition testimony.

3         For the Court's convenience Defendants' designations have been highlighted in blue,

4   Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5   been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6   filing the redacted versions of these documents.

7         DATED this 6th day of September, 2011.

8   ROBERT M. MCKENNA
    Attorney General

9

10    s/ William Clark
    WILLIAM CLARK, WSBA #9234

11  Senior Counsel
    800 Fifth Ave, Ste 2000

12  Seattle, WA 98104
    206-464-7352

13  BillC2@atg.wa.gov
    ANNE EGELER, WSBA #20258

14  Deputy Solicitor General
    PO Box 40100

15  Olympia, WA  98504-0100
    360-664-3027

16  Annee1@atg.wa.gov

17

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION
TESTIMONY OF
- No. 09-cv-05465-BHS

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

_____

JOHN DOE #1, et al.,      )
                         )
         Plaintiffs,   )
                         )
       vs.         )  NO. 09-cv-05456-BHS
                         )
SAM REED, et al.,        )
                         )
        Defendants.   )

_____

DEPOSITION UPON ORAL EXAMINATION OF

_____

September 27, 2010

Tacoma, Washington

DIXIE CATTELL & ASSOCIATES
COURT REPORTERS & VIDEOCONFERENCING
(360) 352-2506  **  (800) 888-9714

```
 1    APPEARANCES:

 2          FOR THE PLAINTIFF
            PROTECT MARRIAGE
 3          WASHINGTON
            (Via Telephone):            MR. STEPHEN PIDGEON
 4                                       ATTORNEY AT LAW
                                         3002 Colby Avenue
 5                                       Suite 306
                                         Everett, WA  98201
 6
            FOR THE DEFENDANTS:          MS. ANNE E. EGELER
 7                                       DEPUTY SOLICITOR GENERAL
                                         P.O. Box 40100
 8                                       Olympia, WA  98504-0100

 9          FOR THE INTERVENOR
            WASHINGTON COALITION FOR
10          OPEN GOVERNMENT
            (Via Telephone):            MR. STEVEN J. DIXSON
11                                       WITHERSPOON KELLEY
                                         422 W. Riverside Avenue
12                                       Suite 1100
                                         Spokane, WA  99201
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                                INDEX

2     EXAMINATION                                    PAGE/LINE

3     MS. EGELER                                     4    13

4     MR. DIXSON                                     32   3

5     MR. PIDGEON                                    37   11

6

7

8

9                              EXHIBITS

10    EXHIBIT          DESCRIPTION                   PAGE/LINE

11                        (No Exhibits.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EGELER (                    , 9/27/10)

Page 4

```
 1                    BE IT REMEMBERED that on Monday, September 27,

 2        2010, at 10:19 a.m., at 1250 Pacific Avenue, Suite 136,

 3        Tacoma, Washington, before REBECCA S. LINDAUER, Notary

 4        Public in and for the State of Washington, appeared

 5               , the witness herein:

 6                    WHEREUPON, the following proceedings were had, to

 7        wit:

 8

 9               ,                having been first duly sworn by

10                               the Notary, testified as follows:

11                         EXAMINATION

12   BY MS. EGELER:

13   Q    Good morning,         .  We're finally off and running.

14        We have Steven Dixson with Washington Coalition for Open

15        Government joining us on the phone, and also joining us on

16        the phone is Stephen Pidgeon with Protect Marriage

17        Washington.  If either of them has any trouble with this

18        setup hearing us, we'll just interrupt the deposition to get

19        our technology straightened out and then we'll pop back on.

20                    , my name is Anne Egeler, and I'm with the

21        Washington Attorney General's office, and my first question

22        to you is:  Have you ever been deposed before?

23   A    Well, I'm 67 years old, so my history goes back quite a

24        ways, but at the moment, I can't recall a case where I was

25        deposed.
```

Dixie Cattell & Associates (360) 352-2506

EGELER (                              , 9/27/10)

Page 5

1  Q   Well, I'm going to go over a few ground rules as we get

2      started to explain to you how this works.  Everything we say

3      is being taken down by our court reporter.  It's really

4      important that we make her job as easy as possible so that

5      she can create an accurate record for us.

6          As we talk today, to help get a clear record, if we

7      wait for each other to finish speaking before the next

8      person speaks, it's easier for our court reporter to take it

9      down.  If we talk over each other, we tend to get a garbled

10     record.

11         Also, as we're talking, it's important that we say yes

12     or no rather than using head nods or um-hmms because that

13     doesn't show up on the record.

14 A   Okay.

15 Q   And finally, I wanted to let you know, if you are confused

16     by anything or I'm not making sense, please just stop and

17     ask me and I'll restate it.  It's important that we can

18     understand each other.  Okay?

19 A   I'm a firm believer in communication.

20 Q   Let's start by talking about your current employment.  Where

21     are you currently employed?

22 A   Well, I'm a retired schoolteacher.  I've been retired since

23     2007, June, but I do a lot of other things that are sort of

24     in the way of volunteer work.

25             For example, I'm a

Dixie Cattell & Associates (360) 352-2506

EGELER (                      , 9/27/10)

Page 6

```
 1        in          , active in the church.  I write for
 2                    I'm a writer.  I have a nonprofit corporation in
 3        the state of Washington,                           .
 4   Q    What does                      , do?
 5   A    It's an educational nonprofit foundation whose purpose is to
 6        promote a book.
 7   Q    What book?
 8   A    It's a free online book entitled                         ,
 9        and it has to do with the
10                                     .
11   Q    And you said you write for              .  Are you in
12        some way associated with the Catholic church?
13   A    I am --
14   Q    Okay.
15   A    -- a parishioner and long-time practicing Catholic.
16   Q    So --
17   A    For the record, two of my aunts were nuns.
18   Q    Is the                      a publication that the Catholic
19        church puts forth?
20   A    It's not officially, you know, under the hierarchy of the
21        church, no, but it's a lay Catholic online magazine, slash,
22        newspaper.  It changes every day.  I have lots of articles
23        on a wide variety of topics:  political, economic, cultural.
24   Q    Are you the head of the publication?
25   A    No, far from it.                         is the editor.
```

EGELER (                              9/27/10)

Page 7

```
 1        She edits my articles and decides to accept them for

 2        publication or not.

 3    Q   When you were a teacher, what did you teach?

 4    A   History mainly.

 5    Q   In the public schools or private?

 6    A   Both public and private and in Europe.  I taught at a

 7        private prep school in Europe.

 8    Q   Do you have any background in radio broadcasting?

 9    A   No, not really.  My father was a pioneer in television back

10        in the early '50s in Spokane.  That's Spokane and KXLY was

11        his station.  Occasionally he had me come down as a boy and

12        do ads on television and radio.  But other than that, no.

13    Q   What is your educational background?

14    A   I have a BA in history from San Diego State and a BA in

15        education from Eastern Washington University.

16    Q   When did you first learn that you were named as a witness in

17        the Doe v. Reed case?

18    A   I can't remember exactly.  It was -- I got a call from Larry

19        Stickney who was the head -- was the head of the R71

20        campaign --

21    Q   Okay.

22    A   -- asking me if I would be willing, and I said I would.

23    Q   And did Mr. Stickney explain that being a witness may

24        require you to testify publicly in federal court?

25    A   I can't remember him explaining that, but I would be
```

Dixie Cattell & Associates (360) 352-2506

EGELER (                        , 9/27/10)

  1        willing.

  2   Q    You don't have any concerns about that?

  3   A    Concerns about testifying or about the federal courts?

  4   Q    About publicly --

  5   A    I'm a writer, yes.

  6   Q    -- testifying.

  7   A    No.  No concerns about testifying.

  8   Q    Have you talked to counsel for Protect Marriage Washington

  9        in preparation for this deposition?

 10   A    Not so much verbally as by e-mail with Stephen Pidgeon.

 11   Q    What did you discuss?

 12   A    We discussed the nature of the affidavit that I wrote -- I

 13        would sign this -- is that the word for this?  Affidavit or

 14        certified statement, declaration.

 15   Q    Can I take a look at that?

 16   A    (Document passed.)

 17   Q    Is this a declaration that you signed quite a while ago or

 18        is this one that you're looking to sign in the future?

 19   A    On July 2010.

 20   Q    Okay.

 21   A    I signed it already.

 22   Q    Did you talk about this deposition and what you should say

 23        during the deposition?

 24   A    With Steve, no, I really didn't talk much about what would

 25        occur today, you know, in the Attorney General's office.  It

EGELER (                      , 9/27/10)

Page 9

```
 1        was mainly to make sure my statement was accurate.

 2   Q    Did you sign the Referendum 71 petition?

 3   A    Yes, I did.

 4   Q    Do you remember where you were when you signed?

 5   A    Yes.  I was at our                           church in

 6                   We had a table in the vestibule where

 7        parishioners would sign.  We had a lot of signatures.  I was

 8        one.

 9   Q    Was that an open area where people could walk up and --

10   A    Right.

11   Q    Were the signatures on the petition open to people as they

12        came up to read the petition and add their name to the list?

13   A    Yes.  Although we filled lots of petitions, so, you know, as

14        they filled up, we put them in the stack.  If you were at

15        the bottom of the stack, probably not so visible.

16   Q    Did you help to gather signatures yourself?

17   A    In the church there, yes.  I manned the table, helped -- we

18        had lots of volunteers.

19   Q    Were you successful in gathering signatures?

20   A    Yes, we were.  We got I think 150, 200, something like that,

21        from the parish.

22   Q    Did you gather signatures in any other location?

23   A    No.

24   Q    Did you go to any events and hold a referendum sign near the

25        road, for example, to encourage people to vote?
```

EGELER (                        , 9/27/10)

Page 10

 1   A   Yes.  To encourage them to vote?

 2   Q   Either to vote or to sign the petitions.

 3   A   Yeah.  I remember holding Referendum 71 signs, yeah, in a

 4       number of places.

 5   Q   How many times do you think you did that?

 6   A   I would say three or four.

 7   Q   And do you remember where you were?

 8   A   I remember Gig Harbor was one case.  Let's see.  I would

 9       have to -- is it important?  I would have to reflect on what

10       exactly the locations were.

11   Q   If you don't remember the exact locations, do you remember

12       if they were all heavy traffic areas where a lot of cars

13       would drive by and see the signs?

14   A   Well, I would have to remember where they were to remember,

15       but I would guess that, you know, it being strategically

16       advantageous to choose high traffic areas, that's what we

17       chose.

18   Q   Did you have a Referendum 71 sign in your own yard?

19   A   Yeah, I believe so.  We own both sides of the street, so I

20       think I had one by the barn across the street.

21   Q   So you had one by your barn across the street from your

22       home?

23   A   Right, on our property.

24   Q   Was that throughout the time of the signature gathering and

25       through until after the election?

EGELER (                              , 9/27/10)

Page 11

1   A   Well, until the election, yeah.

2   Q   Okay.

3   A   And the start date, I couldn't give you an exact date.

4   Q   Did you participate in any public events discussing

5       Referendum 71?

6   A   Yes, I did.

7   Q   Can you tell me about those?

8   A   I attend debates around the state.  I was one of the

9       spokesmen for the Protect Marriage Washington campaign.

10  Q   Did you debate against the same person each time?

11  A   No.  Quite a number of opponents, maybe more than half of

12      them were televised.

13  Q   The ones that weren't televised, were they broadcast on the

14      radio?

15  A   There was -- yes.  There was -- KIRO broadcasted a debate on

16      the radio.  I believe they were the only solely radio.  The

17      rest were television.

18  Q   So were each of them either televised or broadcast on the

19      radio?

20  A   No.  There were some that weren't, had no media.

21  Q   Were those debates all open to the public to come and watch?

22  A   Yes, absolutely.

23  Q   So members of the public were welcome?

24  A   Right.

25  Q   Do you remember on average roughly how many people attended

EGELER (                              , 9/27/10)

Page 12

1        those debates?

2    A   It varied from -- well, like the debate in Olympia with Anne

3        Levinson, it was just the television moderator and the two

4        debaters.

5    Q   Was that --

6    A   Yeah.  It was on the government station down there,

7        Washington -- I forget what it's called.  Channel 12, I

8        think it is, in Olympia.

9    Q   Is that TVW?

10   A   TVW, right.

11   Q   You said Olympia was one of the locations.

12           Do you remember any of the others?

13   A   The televised ones or what?

14   Q   Televised.

15   A   Yeah.  Televised would include Spokane.  League of Women

16       Voters had some kind of government channel.  They televised

17       it.  The one in Auburn, slash, Kent, in that Kent Valley

18       there, was televised.  We had one on the University of

19       Washington Channel 9 that was televised.  That was Anne

20       Levinson again, so I debated her twice.  And then let's see.

21       The one in Silverdale was televised and the one in

22       Coupeville was televised.

23   Q   And then where were the non-publicized events?

24   A   There was one in Shoreline that was publicized.  It was a

25       good crowd, but it wasn't --

EGELER (                        , 9/27/10)

Page 13

1    Q    Thank you for correcting me.  What I meant to ask you was

2         those that were not televised.

3    A    Right.  Shoreline was one.  Port Angeles was another one.  I

4         would have to -- I have some notes somewhere, but I don't

5         think I brought them with me.

6    Q    That's okay.

7              Do you know if those events were covered at all in the

8         print media?

9    A    Yes, they were.  That reminds me.  There was another one at

10        south -- in Pierce College down in -- south of here.

11   Q    Was that televised?

12   A    No.

13   Q    And those that weren't televised were attended by the

14        public?

15   A    Yes, yeah.  There weren't any cases where it was no public,

16        if it wasn't televised.

17   Q    Do you remember having any debates on the radio?

18   A    Yes, KIRO radio with Frank Shires and his show.

19   Q    Did you have any other interviews on the radio?

20   A    Radio and television, yeah.  I had -- let's see.  Channel 13

21        interviewed me and televised it.

22   Q    How about OPB, Oregon Public Broadcasting?  Did that radio

23        station interview you?

24   A    Not that I know of.

25   Q    Okay.

EGELER (                    , 9/27/10)

Page 14

1  A    I remember the election night there was a number of

2       reporters, a bank of microphones.  I'm not exactly sure who

3       all was involved in that.

4  Q    Before there was a Referendum 71, did you testify at the

5       legislature about the domestic partnership issue?

6  A    Let's see.  Yes.  I went down in -- let's see.  It would

7       have been before they got enough signatures, so it's

8       probably February maybe of '09 and they had a hearing in the

9       legislature.  I believe it was at the house, house one that

10      I actually testified.

11 Q    Was this a public hearing?

12 A    It was.

13 Q    Well attended?

14 A    Well attended, yeah.

15 Q    Would you say there were hundreds of people there for that

16      hearing?

17 A    It was packed and they had an overflow room.

18 Q    Did you sign in to that hearing?

19 A    I'm sure I did.

20 Q    Do you recall whether the sign-in sheets were a list that

21      you could view and then add your name to?

22 A    I've testified before in Olympia, so I'm not exactly sure

23      how this one was -- how it differed from the others.  I know

24      in the past I remember seeing such, but whether this

25      particular one was in that format or not, I'm not sure.

Dixie Cattell & Associates (360) 352-2506

EGELER (                    , 9/27/10)

Page 15

1   Q   Did you publicly promote Referendum 71 in any other respect

2       that we haven't talked about?

3   A   Yeah.  On, you know, just informally by e-mail and that sort

4       of thing with friends.

5   Q   Was the fact --

6   A   Well, also at                    , I'm a writer for

7                 .  I have some articles that -- one in particular

8       was actually a post mortem, came just after the election,

9       and contrasted the result in Maine, which was favorable to

10      traditional marriage, with the one in Washington and that

11      they -- they were very similar demographically, so it was

12      interesting to compare and contrast.

13  Q   That was an article you did after the election?

14  A   Right.

15  Q   Do you remember what month that was?

16  A   It was probably in mid to late November, I'm guessing.  All

17      my articles are archived on                    , if you want

18      to . . .

19  Q   Do you remember the individuals that you debated personally

20      from the other side of the issue?  Did you find them to be

21      appropriate in discussing the political issue or did you

22      find that they were inappropriate in any way, in your

23      opinion?

24  A   Well, sometimes the audience got involved, which reminds me

25      that I neglected to mention that the Seattle Public Library

EGELER (                          , 9/27/10)

1        hosted the Pacific Lutheran University's debut of the

2        documentary that was done by grad students there.  I was

3        interviewed for that up in the Bremerton Knights of Columbus

4        and televised and then I was a significant part of the

5        documentary when it actually came out.  It was a pretty good

6        size group at the amphitheater there at the library.  And I

7        remember one fellow just kept interrupting me from the

8        audience.  Now the panelists were okay, but --

9   Q   Let's focus on the panelists first.  Did you find they were

10       respectful and appropriate in tone in debating the issue?

11   A   In tone, yes.

12   Q   I'm not asking if you agreed with them, of course.

13   A   I have a little problem in terms of honesty on the other

14       side, but that's another story.

15   Q   What was the documentary that you were talking about

16       specifically with Pacific Lutheran University?

17   A   The title was something to do with marriage or changing

18       times.  They have a program.  They've done a number of

19       documentaries on various issues.  This was one they spent a

20       lot of time on.  They have a faculty advisor who supervised

21       the whole thing.  In fact, he was there moderating the

22       panel.

23   Q   And was the documentary balanced in that it was presenting

24       both sides?

25   A   Yes.  Yes, it was.

EGELER (                    , 9/27/10)

Page 17

1   Q   So it wasn't reaching a conclusion or trying to sell

2       anyone --

3   A   No.  Well, you know, there's -- there are ways to sell

4       people.  I think maybe that the overall effect of the

5       documentary might have been possibly more influential in the

6       opposite direction that I held.

7   Q   Okay.

8   A   But they did give my -- allow me to make my point.  I also

9       had Pastor          included in the documentary and he was

10      one of the panelists.

11  Q   Can you spell

12  A                I'm guessing.          He's at

13

14  Q   I'm going to remind you that I think you and I are starting

15      to speak over each other occasionally.

16              THE WITNESS:  Steve, are you still there?

17              MR. PIDGEON:  Yes, I am.

18              THE WITNESS:  Can you hear me okay?

19              MR. PIDGEON:  I can hear you better now.  Thank

20      you.

21              THE WITNESS:  All right.

22  Q   (By Ms. Egeler)  Any other public participation in promoting

23      or debating Referendum 71 that we haven't discussed?

24  A   I can't think of anything offhand.  It may come to me.

25  Q   Did you write any letters to the editors of any newspaper?

Dixie Cattell & Associates (360) 352-2506

EGELER (                    , 9/27/10)

Page 18

1   A   Yes, I did.                had a letter of mine not long

2       before the election on behalf of the Knights of Columbus.

3   Q   What did you state in your letter?

4   A   I made the argument that it was contrary to some of the

5       basic principles of our republic, including the consent of

6       the governed, to have same sex marriage foisted upon the

7       people when all polls and surveys and all the actual

8       elections in 31 states made it very clear that the governed

9       were not giving their consent to a redefinition of marriage.

10          And we argued all along that, even though R71 was not

11      directly and explicitly a concern with same sex marriage, it

12      did change the law in such a way that it would be a cakewalk

13      for the Court to follow the precedents established in five

14      or six other states, namely to mandate same sex marriage

15      without the consent of the people.

16  Q   Given the fact that you were so outspoken, would you call

17      yourself the spokesman for Referendum 71 during the

18      campaign?

19  A   A spokesman.

20  Q   A spokesman.

21          And given that you were a spokesman for Referendum 71,

22      do you think that it was pretty clear to the public that you

23      did sign the petition?

24  A   I don't know if the public made a connection between being a

25      signatory and being a spokesman.

EGELER (                    , 9/27/10)

Page 19

1    Q    Just with respect to yourself and not other signatories,

2         given your broad public involvement, would it trouble you if

3         your signature on the petitions were released?

4    A    Yes.

5    Q    You --

6    A    And mainly -- I mean, although, of course, I'm a lot more

7         prominently involved than the mere presence of a signature.

8         My signature is not nearly as prominent as my public stand

9         in this and my media appearances.  So, therefore, if I'm

10        willing to make a media appearance, the least of my problems

11        is my particular signature, but I still am opposed on

12        principle to everybody seeing my signature because we have a

13        secret ballot in this country.  It's the idea one can cast

14        his ballot and participate in a democratic process with

15        confidentiality.  It's just not me.  I mean, if they release

16        my signature, then all these other tens of thousands of

17        people also will have theirs released.  I know there are

18        people who are concerned about that.

19   Q    Yes.  But I was just asking about your name, given your very

20        public involvement, would it bother you to have people know

21        that you signed the Referendum 71 petitions?

22   A    I have no problem volunteering that information --

23   Q    Okay.

24   A    -- I mean, because it's so minuscule compared to the fact

25        that I'm a public spokesman, so it's not really -- my

EGELER (                    , 9/27/10)

Page 20

1    signature is hardly the issue.  It would be like saying,

2    well, would President Obama object to a public disclosure of

3    the fact that he and Michelle voted for Obama in 2008?

4    Obviously it's a whole different case.

5  Q   I understand that you feel that you have suffered some

6      threats or harassment as a result of your involvement with

7      Referendum 71.  We would like to explore each of those

8      instances this morning, so let's start by having you begin

9      that narrative and let me know what --

10 A   Would this be a good time to take a quick bathroom break?

11 Q   It would be a good time.

12                                  (Recessed at 10:45 a.m.)

13                                  (Reconvened at 10:48 a.m.)

14 A   I wonder if I could add one additional point to the last

15     question.  Also, the issue of a person who is active

16     politically having their signature released raises the

17     question of risk.  Part of the problem, the concern of many

18     of the signatories, is that they took a risk to sign --

19 Q   (By Ms. Egeler)  I'm going to interrupt you and just let you

20     know during the deposition process it's sort of a question

21     and answer period and --

22 A   Well, this is in answer to your question, so I would say

23     that because I've already taken the risk by becoming a

24     spokesman for this issue, I've crossed that line already.

25 Q   Okay.

EGELER (                         , 9/27/10)

Page 21

1    A    There's no additional risk worthy of mention by having the

2         signatures released.

3    Q    So let's start discussing now any threats or harassment that

4         you feel you suffered as a result of your involvement with

5         Referendum 71.

6    A    Okay.  Yes, there was one particular case, which is what I

7         signed the affidavit in regard to.  Do you want me to read

8         this or recite it from memory?

9    Q    Recite from memory and let me know if you still remember.

10   A    Yeah.  It was a pretty vivid experience, so it's impressed

11        upon my memory.  It was on October 11.  I was taking a ferry

12        from Seattle after one of the debates I mentioned.  This

13        particular debate was at -- at a church in Shoreline, sort

14        of in the Richmond Beach area.  That was one of the

15        non-televised debates.  Wherever I went on debates, I always

16        took R71 brochures.  We have a nice little colorful brochure

17        that we hand out to people in the audience and so on.

18             On the way, I'm riding the ferry back.  You know, as a

19        Bremerton resident, I spend a good time of my -- part of my

20        time living on the ferry.  I asked one of the attendants if

21        it would be okay, during the hour ride, if I distributed R71

22        brochures to the passengers.

23             And she wasn't willing to grant me permission on her

24        volition, so she called the captain on the phone.  And he

25        said, okay, as long as it doesn't become, you know, really

EGELER (                    , 9/27/10)

Page 22

1    heated.  In other words, just pass them out and keep your

2    cool, which is what I did on the entire main deck without

3    any particular incidents.  A few people would ask a question

4    or two, but everything was quite civilized.

5         Then I went to the upper deck.  It's a two-deck ferry.

6    I did the west end of the ferry, the same thing.  Everything

7    was fine.  Then I went to the east end and this was the last

8    quarter of the ferry that I was going to do.  And I started,

9    as I did on that occasion, going to each table where

10   someone's sitting or chair and asking them first if they had

11   voted.  If they had already voted, I didn't feel it was

12   necessary to hand out a brochure, and so I just pass on.

13        But this gentleman said that he had not voted yet, and

14   so I handed him a brochure and moved on.  He said thank you.

15   I moved on.  I would say 20, 30 seconds passed.  I'm one or

16   two tables further along when I hear a huge shrieking

17   commotion coming from this person.  He's just screaming at

18   me, using foul language, and wadded up the brochures.  Said,

19   this is a bunch of shit, and threw it at me at about a

20   distance maybe from here to that blackboard.  And --

21   Q   How many feet would you say that is?

22   A   It's probably four yards, 12 feet.

23   Q   Okay.

24   A   And he must have been a pretty good shot because it was

25   heading straight for my head.  And I dodged it and it went

EGELER (                            , 9/27/10)

Page 23

1    by, and I made a mistake and sort of taunted him and said,

2    you missed, or words to that effect.

3        He became even more incensed and enraged and just was

4    carrying on about he and his male partner had just as much

5    right to get married as I did.  And shrieking and screaming

6    how dare I and da-da-da.  And it was really quite a

7    sensational experience for everyone on the aft the end of

8    the ferry.  There wasn't anybody that couldn't hear this

9    commotion going on, including a lady who was sitting there

10   with her two young children.  She pleaded with him to stop

11   carrying on like that in front of the kids, but that didn't

12   even phase him.  He continued on.

13       And then he tried to get the passengers to stand up and

14   take a vote.  He was going to do an on-the-spot politicide

15   right on there the ferry as to whether they agreed or

16   disagreed with same sex marriage.  And I realized at that

17   point I was dealing with a person who was at least

18   temporarily berserk, and so I saw no point in continuing.  I

19   briefly had an exchange or two on the issue with him.  It

20   was nonproductive.

21       So I just turned around and starting heading for the

22   other end of the ferry, but he shadowed me.  He stayed four,

23   five, six feet behind me, the width of the table, I would

24   say.  Whichever way I would go, I'm watching him sort of out

25   the back of my -- the side of my eyes as best you can when

Page 24

1    he's directly behind you.  I could see that whichever way I
2    would go, he would go that way and muttering low tones to
3    himself or to me.  Anyway, it was unintelligible.  I was
4    more than anxious to be rid of this individual and to
5    terminate the whole experience.
6          And so I'm trying to make my escape and he's not
7    letting me get away.  Fortunately two ferry workers who were
8    in the kitchen there -- this was late in the ferry route, so
9    there weren't any customers in the line there.  They have a
10   long counter that's maybe 50 feet long or 40 and there's
11   aisles with food on either side and then a kitchen in here.
12         They came out of the kitchen and went right up to the
13   front and stood there.  And I just skirted around behind
14   them and went down that aisle, and they prevented him from
15   following me.  So they came to my assistance, allowed me to
16   make my escape.  I went as quickly possible downstairs to my
17   car and stayed in the car for the duration of the ride.
18  Q  You said that he was not letting you get away.  Did you mean
19      because he kept following you?
20  A  He stayed right with me.  Shadowing me would be the word I
21      would use.
22  Q  Continued to have that four- to six-foot distance?
23  A  Yes.
24  Q  What was he shouting?  I was little confused.  Was he
25      shouting or muttering to himself?

Dixie Cattell & Associates (360) 352-2506

EGELER (                    , 9/27/10)

Page 25

1    A    Well, when he was following me, he wasn't shouting quite so

2         loud because he was -- this was sort of the second phase of

3         this confrontation with him behind me, me trying to get

4         away, him following.  What he was saying was unintelligible

5         to me.

6    Q    So that --

7    A    But he was right behind me.  He had a kind of a menacing-

8         type tone and possibly -- you know, somebody is berserk, you

9         don't know what sort of idea he might have in his mind, but

10        what was he doing shadowing me?  I was really concerned he

11        might escalate to the next level.  I didn't want to get

12        smacked in the back, you know, as I'm walking.

13             So I was more than -- I was really grateful for those

14        two ferry workers.  I didn't stay to thank them, but I

15        wished I could.

16   Q    So at the time he was following you, what he was saying was

17        unintelligible.  He was muttering?

18   A    Right.

19   Q    But earlier when you first had him -- you didn't have him,

20        but he chose to stand up and shout at you, what was he

21        shouting at that time?  I know it's not pleasant to repeat

22        swear words, but it is important that we get this down

23        accurately, even if there was foul language.

24   A    Well, the only swear word I can for sure identify from

25        memory was when he said this is a bunch of shit and then

Dixie Cattell & Associates (360) 352-2506

EGELER (                         , 9/27/10)

Page 26

1    could -- just got increasingly -- you know, he, after he

2    threw the brochure at me, which was wadded up into a ball,

3    and missed me and I made probably the mistake of taunting

4    him a little bit by saying you missed, he became louder.

5         And it wasn't so much vulgar at that point as just sort

6    of an issue of him screaming and shrieking at me.  A couple

7    times I made the attempt to sort of get, you know, get my

8    point in, but he was just not going to hear of it.

9  Q   So what was he saying at that point when he was --

10 A   He was saying, in particular, I remember he was saying that

11     he and his boyfriend had just as much right to get married

12     as I did.  How he knew I was married, I don't know.

13 Q   How did you respond to that?  You said you did --

14 A   I did say something about consent of the governed or the

15     general issue, which is so important to me, namely that the

16     people have a right to govern themselves.  Thomas Jefferson

17     said this was most valuable of all freedoms, right of the

18     people to be self-governed.  The people of this country have

19     made it perfectly clear they don't want to redefine marriage

20     to include same sex couples.  I didn't have time so say all

21     that in the course of this heated crazy shouting match on

22     his part.  I wasn't doing any shouting, but I attempted to

23     calm him down a little bit by making a point in the hopes he

24     would be become a little more rational, but I was getting

25     nowhere and then the lady started pleading for him to stop

Dixie Cattell & Associates (360) 352-2506

EGELER (                    , 9/27/10)

Page 27

1          shouting.

2     Q    Do you think he may have been mentally ill?

3     A    It depends how you define mental illness, I guess.

4     Q    You just used the word "berserk" earlier and I wondered --

5     A    Yeah.  I mean, whether it was temporary or some kind of

6          chronic condition with him, I, of course, have no way of

7          knowing.

8     Q    But you did feel that he was unwell at that moment?

9     A    He was out of control.

10    Q    I understand he threw the brochure at you.  Did he throw

11         anything else?

12    A    No.

13    Q    Did he verbally threaten violence or was it more the

14         intimidation of following?

15    A    Yeah, the latter.

16    Q    And do you remember how big he was, what he looked like?

17    A    Yeah.  He was shorter than me.  I would say he's maybe 5'6"

18         to 5'8", of color.

19    Q    So African-American?

20    A    Um-hmm.

21    Q    "Yes"?

22    A    Yes.

23    Q    And his build, roughly?

24    A    I wouldn't describe him as skinny or fat, just sort of

25         normal build.

EGELER (                    , 9/27/10)

Page 28

1   Q   And how tall are you?

2   A   Six feet.

3   Q   Did he follow you down to the area of the ferry that has the

4       parked cars or were you able to get away?

5   A   No.  Thanks to the ferry attendants, I was able to lose him

6       at that point.  I was on the upper deck.

7   Q   Were there any police officers in the vicinity at all?

8   A   If there were, if they arrived later, I don't know because I

9       got in my car and I stayed there.  I didn't see any activity

10      down on the car deck.

11  Q   Sounds like the ferry workers saw it and took care of the

12      situation?

13  A   Um-hmm.

14  Q   "Yes"?

15  A   Yes.

16  Q   Any other instances that occurred?

17  A   Do you mean other than this particular day?

18  Q   Yes.

19  A   The fellow that -- not really.  I mean, I wouldn't count the

20      sort of harassing sort of questioning that came from the

21      audience at the Seattle Public Library as threatening in the

22      sense that this was.

23  Q   Okay.

24  A   So no.

25  Q   So you just -- okay.

EGELER (                          , 9/27/10)

Page 29

```
 1            So no other instances then of harassment or threats

 2       that you felt had been encountered?

 3    A  No, nothing that was threatening to me personally.

 4    Q  After the election, you noted that you published an article

 5       comparing Washington and at least one other state?

 6    A  Maine.

 7    Q  Did you have any threats or harassment following the

 8       publication of that article?

 9    A  Well, you know, some -- like if it had been published in the

10       Kitsap Sun --

11    Q  Was it published in the Kitsap Sun?

12    A  That article wasn't.  I had an article published prior to

13       that on behalf of the Knights of Columbus.  There was all

14       kinds of ugly comments.  Kitsap Sun is a much -- is not

15       monitored the way that                     is.  You get

16       abusive, they don't post your comments in                   .

17       It's quite civilized, quite -- there's a lot decorum,

18       whereas this is not the case with the Kitsap Sun.  I don't

19       mean to bad mouth the local newspaper, but I've gotten to

20       the point I hardly ever read the comment section because

21       it's so kind of demeaning and --

22    Q  I think I know what you mean.  We have our Olympian in

23       Olympia.  The online comments, in my opinion, often are --

24    A  Yeah.

25    Q  -- out of control and nasty on virtually any issue.  Would
```

EGELER (                          , 9/27/10)

Page 30

1       you find that to be the case with Kitsap as well?

2   A   I don't know if it was any issue.  I mean, some

3       noncontroversial issues not so, but . . .

4   Q   Anything political tends to get --

5   A   Yes, absolutely, yes.  Polarizing politically, it will get

6       really ugly.  In fact, the article that I did publish in the

7       Kitsap Sun evidently got so ugly that one of my friends read

8       it and he said, don't read it.  You don't want to read it,

9       you know, or be demoralized.  I just didn't.

10  Q   Right.  And that would be in keeping with some of the other

11      controversial issues where you've seen people get out of

12      control with online comments?  These are issues that are not

13      related to Referendum 71, but where people might have

14      opposing views?

15  A   Yeah.  A lot of -- have you ever seen the Yahoo news Web

16      sites?  Sometimes they will get 2,000, 3,000, 4,000

17      comments.  Who could ever read all of those anyway, the

18      sheer quantity?  They're the same thing.  There are some

19      that are high level and there are others that are really low

20      level.  And I think there's sort of an aggression law

21      operating there that tends to depreciate the quality of the

22      commentaries because people see themselves associated with

23      such demeaning comments and so they don't comment anymore.

24      It kind of gradually deflates the intellectual currency, if

25      you will.

EGELER (                              , 9/27/10)

Page 31

1   Q   Yeah, okay.  But nothing like that happened when you posted

2       the article?

3   A   On                        , no.

4   Q   Anything else after the election that you experienced or has

5       the issue pretty much . . . ?

6   A   We've had a few go-rounds within the ranks of my extended

7       family.

8   Q   But nothing with the public?

9   A   No, uh-uh.  Nothing threatening.

10  Q   Any details about the ferry incident that we didn't discuss

11      that we've left out here?

12  A   I think I did mention, didn't I, that three-quarters of the

13      ferry was without incident.  There was one woman who wanted

14      to debate me for a while, but she was very civil and, you

15      know, made her points in a logical way.  But for the most

16      part, I was kind of under orders from the captain not to,

17      you know, get involved in a big debate, so I would terminate

18      these few conversations pretty quickly and move on to the

19      next to get my brochures distributed.  That was my point.

20          It was very civil.  Most of the ferry passengers were

21      just fine with it.  I saw a lot of them reading the

22      brochure, but this was the one exception to the rule.

23          MS. EGELER:  Steve Dixson, do you have any

24      questions?

25          MR. DIXSON:  Yes.  I have just a couple.

Dixie Cattell & Associates (360) 352-2506

DIXSON (                          , 9/27/10)

                                                              Page 32

1                          EXAMINATION

2    BY MR. DIXSON:

3    Q                 , good morning.  My name is Steven Dixson.  I'm

4          on the phone here in Spokane, Washington.  We represent the

5          Washington Coalition for Open Government.

6    A    Sure, Steve.

7    Q    I recognize the inherent difficulties doing this over the

8          phone, so I will try to be brief and direct.  In the ten or

9          so debates you had both televised and non-televised, did you

10         experience any heckling or harassment during those debates?

11   A    Yes, the one at the Seattle Public Library in particular.

12   Q    Can you tell me what happened there?

13   A    Yeah.  The one guy said, I want to direct my question

14         specifically to             .  And he said, why don't you

15         just get out of my way?  And I started to -- I presumed that

16         he meant, you know, stand aside and let the same sex

17         marriage agenda proceed.  And I -- so I started to respond,

18         but he wouldn't allow me to finish my first sentence.  He

19         said, no, no.  Why don't you get out of our way, you know.

20         And I finally -- the moderator finally came to my defense,

21         allowed me to answer the question, so that would be about it

22         in terms of harassment from the audience.

23   Q    What was your -- the speech there was regarding the PLU

24         documentary regarding marriage.  Is that correct?

25   A    Yeah.  They had a panel discussion.  They showed the film

DIXSON (                        , 9/27/10)

Page 33

```
 1        first and then they had a panel discussion.  And people in

 2        the audience asked the panelists questions.  There were two

 3        panelists who favored same sex marriage and there was two,

 4        myself and             , who opposed it.

 5   Q    So the questions were related mainly to the documentary and

 6        same sex marriage overall.  It was not a Referendum 71 rally

 7        or event.  Is that correct?

 8   A    No.  In fact, this -- I think this came out after the

 9        election.  I believe the Seattle Public Library event was

10        after the election.

11   Q    The documentary and the event we're talking about were after

12        the election?

13   A    Yeah, I believe so.

14   Q    So it was not related to Referendum 71?

15   A    Well, of course it was.  I mean, because that had just

16        transpired and it was on everyone's mind.  That was what

17        prompted the documentary in the first place.  This

18        caused the students, the two students in particular from

19        PLU, to see this as a news story worthy of attention, so

20        they took that ball and ran with it.

21   Q    So was the documentary focused on Referendum 71 or the issue

22        of traditional marriage versus expansion of marriage rights?

23   A    I would say both, but especially the latter.

24   Q    Other than the gentleman at that Seattle Public Library

25        event, did you experience other hecklers or harassment
```

DIXSON (                    , 9/27/10)

Page 34

```
 1       during the debate circuit?

 2   A   No.

 3   Q   I want to talk a little bit about your online

 4

 5          Are you familiar with that?

 6   A   I wrote it.

 7   Q   And is that something that you did on behalf of         ?

 8   A                        , yes.

 9          THE WITNESS:  But, Steve, is this something we

10       want to discuss here?

11          MR. PIDGEON:  They have the right to seek relevant

12       evidence, so I would encourage you to answer.

13          THE WITNESS:  Okay.

14   Q   (By Mr. Dixson)  Can you tell me what             is

15       briefly?

16   A   It's a nonprofit corporation under the laws of the state of

17       Washington.  It's not a 5013c at the federal level and its

18       sole purpose is educational to promote the book,

19                        , which is free online.

20          So, for example, we've had some donations and we've

21       used them for advertising to advertise the location of the

22       Web site where the book is located.

23   Q   Is             does it make political contributions or is it

24       solely focused on publication of the

25
```

DIXSON (                           , 9/27/10)

Page 35

```
 1   A   The latter.  No political contributions in the way of office

 2       holders or anything of the kind, although it does advocate a

 3       constitutional convention, but there, so far, has been no

 4       election of delegates to such a convention.

 5   Q   And are you the sole member or founder of

 6   A   Founder, but there are other members.

 7   Q   Are you responsible for the content on that Web page?

 8   A   I wrote it.

 9   Q   How often do you update the content on that Web page?

10   A   Annually at least.

11   Q   The                                  , does that contain any

12       chapters regarding homosexuality or traditional marriage?

13   A   Yes.

14   Q   Would that be Chapter 10?

15   A   And Chapter 3.

16   Q   Is there a way for people to contact you via e-mail or

17       telephone or written mail to

18   A   Yes, there is.

19   Q   Do you receive comments via e-mail or written mail based

20       upon the content of that                                ?

21   A   Occasionally.

22   Q   Have you received any commentary directly related to either

23       Chapter 10 or Chapter 3 of the treatise?

24   A   I do -- I believe that I've gotten some adverse comment and

25       it may have touched on that issue.  I would have to go back
```

Dixie Cattell & Associates (360) 352-2506

DIXSON (                           , 9/27/10)

Page 36

```
 1        and check the records of my e-mail to be sure --
 2   Q    Okay.
 3   A    -- how specific it was to same sex marriage exactly.
 4   Q    Do you remember any of that negative commentary coming last
 5        year around the time of Referendum 71?
 6   A    I didn't see any correlation between comments I received as
 7        the spokesman for Tell and the spokesman for R71.  I didn't
 8        see that there was any parallel at all.
 9   Q    And, finally, do you have a way of tracking Web hits or do
10        you know how many people visit the          page or the
11                                  ?
12   A    Yes.
13   Q    Can you tell me either annually or so far in the history of
14        the page's existence approximately how many people have
15        visited?
16   A    Right now it's running about a quarter million hits per
17        year.
18   Q    How long has that site been around?
19   A    Since 2005.
20   Q    So there could be upwards of a million page views of either
21        the treatise or
22   A    Yes.
23   Q    Do you have a way of parsing out visits to either page or
24        are the numbers about the same for both?
25   A    Well, there's a number of chapters, so I can break it down
```

PIDGEON (                    , 9/27/10)

Page 37

1       by particular chapters.

2  Q    Round numbers is about 250,000 per year?

3  A    I said a quarter of a million, didn't I?  No.  It's running

4       about 125,000 a year right now.  One time it was 250,000.

5  Q    And by "right now," would that be 2009, 2010?

6  A    Right.

7                  MR. DIXSON:  That's all I had.

8                  MS. EGELER:  Mr. Pidgeon?

9                          EXAMINATION

10  BY MR. PIDGEON:

11  Q    I have just a couple questions, if that's all right.

12                    , now have you ever had any acts of violence

13       perpetrated against you in public prior to this?

14  A    Yes.  I used to play football for the University of

15       Washington.

16  Q    Well, besides the voluntary actions in a football game, has

17       anyone else ever approached you in public?

18  A    My college days I was involved in an altercation or two,

19       yes.  But you know the old saying, old men are always jolly

20       because they can't fight and they can't run.

21  Q    Have you been approached on your political views before?

22  A    By "approached," what do you mean?

23  Q    Have you ever been threatened physically because of your

24       political views in public?

25  A    Well, I've gotten threatening e-mail, but nothing face-to-

Dixie Cattell & Associates (360) 352-2506

PIDGEON                    , 9/27/10)

Page 38

```
 1        face, other than the one I just described that I can

 2        remember right now.  It's --

 3   Q    So -- all right.

 4   A    I was involved in the campus life in the 1960's too at San

 5        Diego State.  There was a lot of physical confrontation.  We

 6        had an action that -- a strike, campus strike, that lasted a

 7        few days.  There was a lot of stuff, you know, going on.

 8        There was tear gas and so on, but that's all the way back in

 9        my youth, Steve.

10   Q    What year was that?

11   A    In the 1960's.

12   Q    Which campus?

13   A    San Diego State.  I remember there was something during the

14        off year up in Seattle here.  This was during the Vietnam

15        war and that involved tear gas.

16   Q    Sounds exciting.

17   A    Yeah.  I discovered that -- actually, I was once out on a

18        double date with my girlfriend and another couple.  And we

19        parked in the parking lot at the University Bookstore right

20        between 15th and University Way.  There was something else

21        going on unrelated to our going out and seeing a movie.  A

22        police car came up 15th Avenue with a machine that

23        absolutely engulfed the entire street and this huge

24        billowing cloud of tear gas and then another one came down

25        University Way going the other direction, so we were caught
```

PIDGEON (                    , 9/27/10)

Page 39

1     in between these two wondering what we were going to do when

2     somebody lobbed a tear gas canister, lit right at my feet,

3     came up in our face, so I got a firsthand experience of how

4     unpleasant tear gas is right then.

5              MR. PIDGEON:  Well, I think that's all the

6     questions I have.

7              MS. EGELER:  I have nothing further, so I think we

8     are done.

9                      , thank you so much for coming in this

10    morning.

11                              (Concluded at 11:15 a.m.)

12                              (Signature reserved.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 40

1                        C E R T I F I C A T E

2          I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3    and for the State of Washington, residing at Lacey, do hereby

4    certify:

5          That the foregoing deposition of                    was taken

6    before me and completed on the 27th day of September, 2010, and

7    thereafter transcribed by me by means of computer-aided

8    transcription; that the deposition is a full, true, and complete

9    transcript of the testimony of said witness;

10         That the witness, before examination, was by me duly sworn

11   to testify the truth, the whole truth, and nothing but the truth,

12   and that the witness reserved signature;

13         That I am not a relative, employee, attorney, or counsel of

14   any party to this action or relative or employee of any such

15   attorney or counsel, and I am not financially interested in the

16   said action or the outcome thereof;

17         That I am herewith securely sealing the deposition of

18            and promptly mailing the same to MS. ANNE E. EGELER.

19         IN WITNESS HEREOF, I have hereunto set my hand and affixed

20   my official seal of this 4th day of October, 2010.

21

22

23

24                         _____
                           Rebecca S. Lindauer, CSR#2402
                           Notary Public in and for the State of
25                         Washington, residing at Lacey.

Dixie Cattell & Associates (360) 352-2506