1

2

3

4

5

6

7

8                                                    The Honorable Benjamin H. Settle

9                    **UNITED STATES DISTRICT COURT**
                     **WESTERN DISTRICT OF WASHINGTON**
                            **AT TACOMA**

10

11   JOHN DOE #1, an individual, JOHN          NO. 09-cv-05465-BHS
     DOE #2, an individual, and PROTECT
12   MARRIAGE WASHINGTON,                       DESIGNATED DEPOSITION
                                                TESTIMONY OF ▮Redacted▮
                          Plaintiffs,           ▮Redacted▮
13

14              v.

15   SAM REED, in his official capacity as
     Secretary of State of State of Washington,
16   BRENDA GALARZA, in her official
     capacity as Public Records Officer for the
17   Secretary of State of Washington,

                          Defendants.
18

19           Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

20   Washington Families Standing Together and the Washington Coalition for Open Government

21   and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

22   "Parties") hereby submit combined designated deposition testimony for ▮Redacted▮

23   ▮Redacted▮

24           Defendants and Intervenors object to the admission of any deposition testimony taken

25   of any witnesses who could be called to testify at trial.   Therefore, the designations of

26

1   Defendants and Intervenors are being submitted in the event that the Court decides to admit

2   deposition testimony.

3          For the Court's convenience Defendants' designations have been highlighted in blue,

4   Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5   been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6   filing the redacted versions of these documents.

7          DATED this 6th day of September, 2011.

8   ROBERT M. MCKENNA
    Attorney General
9

10   s/ William Clark_____
    WILLIAM CLARK, WSBA #9234
11   Senior Counsel
    800 Fifth Ave, Ste 2000
12   Seattle, WA 98104
    206-464-7352
13   BillC2@atg.wa.gov
    ANNE EGELER, WSBA #20258
14   Deputy Solicitor General
    PO Box 40100
15   Olympia, WA  98504-0100
    360-664-3027
16   Annee1@atg.wa.gov
    _____
17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,<br><br>               Plaintiffs,<br><br>    v.<br><br>SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 09-CV-05456-BHS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

Deposition Upon Oral Examination
Of

Redacted

_____

Taken by:  Tracey L. Juran, CCR
           CCR No. 2699


September 23, 2010

Seattle, Washington

```
 1                          APPEARANCES

 2

 3

 4   For Protect Marriage Washington:

 5        Stephen Pidgeon, Attorney at Law
          3002 Colby Avenue, Suite 306
 6        Everett, Washington  98201-4081

 7

 8
     For the Defendants:
 9
          Anne E. Egeler, Deputy Solicitor General
10        Attorney General of Washington
          1125 Washington Street SE
11        P.O. Box 40100
          Olympia, Washington  98504-0100
12

13

14   For Washington Coalition for Open Government:

15        Steven J. Dixson, Attorney at Law (by telephone)
          Witherspoon Kelley
16        422 West Riverside Avenue, Suite 1100
          Spokane, Washington  99201-0300
17

18

19   For Washington Families Standing Together:

20        Penny Fields, Attorney at Law
          Perkins Coie
21        1201 Third Avenue, Suite 4800
          Seattle, Washington  98101-3099
22

23

24

25
```

Tracey Juran, Certified Court Reporter

1                                INDEX

2

3

4

5                                                    Page No.

6    EXAMINATION

7         By Ms. Egeler                                  4
          By Ms. Fields                                 33
8         By Mr. Dixson                                 39
          By Mr. Pidgeon                                41
9         By Ms. Egeler                                 57
          By Ms. Fields                                 59
10

11

12

13   EXHIBITS MARKED

14        None

15

16

17

18

19

20

21

22

23

24

25

1        Be it remembered that the deposition upon oral

2    examination of ███████████████████ was taken on

3    September 23, 2010, at the hour of 9:23 a.m. at 800

4    Fifth Avenue, Suite 2000, Seattle, Washington, before

5    Tracey L. Juran, CCR, Notary Public in and for the State

6    of Washington residing at Edmonds, Washington.

7        Whereupon the following proceedings were had,

8    to wit:

9                            *  *  *  *  *

10   ████████████████████████, having been first duly sworn on
                               oath by the Notary Public to tell
11                             the truth, the whole truth, and
                               nothing but the truth, was
12                             deposed and testified as follows:

13

14                          EXAMINATION

15   BY MS. EGELER:

16   Q.   Good morning, ███████  We were talking before we went on

17        the record about the fact that you in a past life had

18        gone to school to be a court reporter, so I assume you

19        have the rules of depositions down, but I'm going to

20        just refresh your recollection.  When we are talking

21        today, of course, everything's being taken down, so it

22        will be important that we not speak over each other.

23        And it will also be important that we indicate yes or no

24        verbally rather than with a head nod or mm-hm, which

25        doesn't really show up on the record.  Okay?

```
 1   A.   Okay.

 2   Q.   And, of course, it's important that the transcript be

 3        clear and be a fair representation of your testimony, so

 4        if anything I ask is confusing or doesn't make sense,

 5        please let me know and --

 6   A.   Okay.

 7   Q.   -- I can rephrase that for you.  Okay?

 8   A.   Okay.

 9   Q.   Is [Redacted]      your legal name?

10   A.   No.

11   Q.   What is your legal name?

12   A.   [Redacted]

13   Q.   And where are you currently employed?

14   A.   [Redacted]

15   Q.   What do you do there?

16   A.   Assistant to the senior pastor.

17   Q.   What are your duties as the assistant?

18   A.   Answering his phone calls, making appointments for him,

19        booking speeches for him, handling all his traveling

20        logistics, helping him write commentary.  I do research

21        on current issues so he has facts when he decides to

22        write a commentary.

23   Q.   And do you ever go out with him when he speaks to attend

24        the event?

25   A.   Occasionally.
```

1   Q.   And in 2009, were you in the same employment situation?

2   A.   Yes.

3   Q.   And the same job with the church at that time?

4   A.   Yes.

5   Q.   Same duties?

6   A.   Yes.

7   Q.   Did you know that you had been named as a witness in the

8        Doe v. Reed case?

9   A.   Yes.

10  Q.   When did you find that out?

11  A.   When Steve called me.

12  Q.   And by Steve, do you mean Steve --

13  A.   Steve --

14  Q.   -- Pidgeon?

15  A.   -- Pidgeon, yes.

16  Q.   And do you recall when that was, roughly?

17  A.   Month or two.

18  Q.   Month or two?   Okay.

19           And were you told that as part of being a witness,

20       you may be required to publicly testify in federal

21       court?

22  A.   Yes.

23  Q.   And are you okay with that?

24  A.   Yes.

25  Q.   So did you express to Mr. Pidgeon any need for your name

1       to remain confidential or secret?

2    A.   No.

3    Q.   And did you have an opportunity to talk to Mr. Pidgeon

4         before this deposition?

5    A.   Yes.

6    Q.   And what did you talk about?

7    A.   He asked me if I had any experiences related to R-71

8         signature-gathering time frame that would have been

9         negative and would I be willing to share those with

10        someone.

11   Q.   And did he talk to you at all about what you should say

12        or do during the deposition?

13   A.   He did not.

14   Q.   Did you do anything to prepare for the deposition today?

15   A.   Recollected.  Searched for Emails that I know I received

16        during that time frame, and I must have deleted them,

17        because I don't have them anymore.  I have lots and lots

18        of Emails surrounding that subject, but -- hundreds of

19        Emails, to be frank, but I couldn't really take the time

20        to look through all of them.  And some of the very --

21        some of the more appalling Emails I had deleted at the

22        time because I didn't want them on my computer.

23   Q.   Well, let's talk about that.

24        You are here today in response to a subpoena duces

25        tecum.

```
 1   A.   Mm-hm.
 2   Q.   And that subpoena duces tecum asked you to bring with
 3        you all records, regardless of whether they have been
 4        stored in paper or electronic format, discussing or
 5        depicting images about any harassment, threats, or
 6        retaliation you contend you have experienced related
 7        directly or indirectly to Referendum 71.  This includes,
 8        but is not limited to, photographs, recorded voice
 9        messages, letters, newspaper articles, and electronic
10        postings, articles, comments, and blogs.  So do you have
11        anything that is responsive back at the office?
12   A.   Emails.
13   Q.   And why did you not bring responsive Emails with you?
14   A.   They were supportive from -- supporting of our position
15        on R-71.
16   Q.   So do you have any Emails back at the office that are
17        not supportive?
18   A.   I'm sure I do.  It's gonna take a significant amount of
19        research, but we can do that.
20             MS. EGELER:  Okay.  Well, let's be off the record
21        for a minute.
22                  [Off the record - discussion]
23             MS. EGELER:  Let's be back on the record, then.
24              While we were off the record, we had a
25        discussion about the fact that Redacted has not yet gone
```

1    through Email in response to the subpoena duces tecum.

2    And we discussed whether to stop the deposition now and

3    hold it at a later date or whether we should go forward

4    and get Redacted testimony now and then leave the

5    deposition open and provide an opportunity for us to

6    come back with that discovery information and talk to

7    Redacted about that discovery information at a later date.

8            And we also talked about an agreement that we

9    will all agree to slide the discovery time lines as

10   needed to accommodate Redacted schedule and

11   Redacted , who there's also some difficulty in

12   contacting.

13            Is everybody in agreement?

14            MR. PIDGEON:  Yes, I'm in agreement on behalf --

15            MS. EGELER:  Steve?

16            MR. PIDGEON:  -- of Protect Marriage Washington.

17            MR. DIXSON:  Yes, and I'm in agreement.

18            MS. EGELER:  Okay.

19            MS. FIELDS:  Yes on behalf of Washington Families

20   Standing Together.

21            MS. EGELER:  Okay.

22   Q.  (by Ms. Egeler) So let's keep going, then, Redacted

23            I do want to ask you not to repeat the detail of

24   the Email at this time, but you said that you have a lot

25   of Email surrounding this issue.  Did you mean the issue

1        of homosexuality generally or just Referendum 71 related

2        Email?

3   A.   Both.

4   Q.   So there's a broader category.

5   A.   There is a broader category, and that is the public

6        stand that our pastor and ████████ Redacted ████████ has taken

7        in support of traditional marriage.

8   Q.   And just so that we're clear about that, in saying that

9        a broader stance has been taken, would that include, for

10       example, the pastor's position with respect to

11       Microsoft's policies on homosexual employees?

12  A.   Yes.

13  Q.   And would it also include his involvement in school

14       rallies, for example, regarding homosexual students?

15  A.   Yes.

16  Q.   Any other things I've missed?  Any other events that

17       he's taken part in to express his and the church's

18       position with respect to traditional marriage or, more

19       broadly, the issue of homosexuality?

20  A.   There was a Mayday for Marriage rally that took place at

21       Safeco Field.

22  Q.   And what year was that?

23  A.   It was in May of 2006, I believe.

24  Q.   And any other events that you can recall?

25  A.   Subsequently, he held a rally on the Mall in Washington,

1         D.C., in support of traditional marriage, and I believe

2         that was the following September.

3    Q.   So that would be September of 2006?

4    A.   Correct.

5    Q.   Any others?

6    A.   Those are the only ones that come to mind right now.

7    Q.   Are you -- well, I assume you're aware of Referendum 71.

8    A.   Yes.

9    Q.   And did you sign the Referendum 71 petition?

10   A.   Yes.

11   Q.   Do you remember where you were when you signed?

12   A.   At my church.

13   Q.   And where -- do you remember where in the church you

14        were?

15   A.   At my church office.  At the front desk of my church

16        office.

17   Q.   Did anyone else see you sign?

18   A.   Possibly our receptionist.

19   Q.   Do people walk by that front desk?

20   A.   Yes, yes.

21   Q.   A lot of people?

22   A.   Staff, mostly.

23   Q.   Mostly staff?

24        Do any -- can the general parishioners come through

25        that way?

Page 12

1   A.   Absolutely.

2   Q.   And the petition that you signed, that specific petition

3        sheet, was it left out, then, at the front desk for

4        others to sign?

5   A.   Yes, yes.

6   Q.   So is it possible that others saw your signature --

7   A.   Oh, yes.

8   Q.   -- there?

9             Was that okay with you, that --

10  A.   Yes.

11  Q.   -- people could see?

12  A.   Yes.

13  Q.   We're going to have to not talk over each other or --

14  A.   Oh, got it.

15  Q.   And was there any other petition gathering done at the

16       church other than at the front desk?

17  A.   The petitions were made available at Sunday services.

18  Q.   Was anything said to the congregation about the

19       petitions?

20  A.   I believe Pastor [Redacted] announced from the pulpit

21       that the petitions were available.

22  Q.   Do you have a church newsletter?

23  A.   No.

24  Q.   Is there a church Web page?

25  A.   Yes.

1   Q.   Would the church Web page have mentioned, if you recall,

2        anything about the petitions or the initiative -- the

3        referendum, rather?

4   A.   I do not recall.

5   Q.   Other than signing, did you have any -- personally have

6        any activity that you took or engaged in to support the

7        petition?

8   A.   No.

9   Q.   Did you gather signatures?

10  A.   I did not.

11  Q.   Did you have a Referendum 71 sign at home in your yard?

12  A.   No.

13  Q.   Did you tell anyone that you had signed the petition?

14  A.   Yes.

15  Q.   Who did you talk to about that?

16  A.   Family, my brothers.

17  Q.   Did you ever attend any rallies or events for

18       Referendum 71?

19  A.   No.

20  Q.   Did you ever hold a Referendum 71 sign publicly?

21  A.   No.

22  Q.   And did you support Referendum 71 in any way we haven't

23       discussed?

24  A.   No.

25  Q.   Did the church, to your knowledge, organize any events

1        or rallies regarding Referendum 71?

2   A.   No.

3   Q.   Does the church get involved in election issues?

4   A.   Occasionally we publish a voters' pamphlet -- we don't

5        publish a voters' pamphlet; excuse me.  We acquire a

6        voters' pamphlet and distribute it -- have it available

7        at services.

8   Q.   And where do you acquire the voters' pamphlet?

9   A.   In the past, we've acquired one from Christian Coalition

10        of Washington and one other organization, and I cannot

11        remember the organization right now.

12   Q.   Do you remember if that was done with respect to the

13        November 2009 election?

14   A.   Yes, I believe it was.

15   Q.   And do you know where that voters' pamphlet came from

16        for the November 2009 election?

17   A.   It was either the Family Research Council or the

18        Christian Coalition of Washington.  But I believe it was

19        the Christian Coalition of Washington because it --

20        that's a more local resource.

21   Q.   Do you recall whether that voters' pamphlet made any

22        recommendations with regard to Referendum 71?

23   A.   No.

24   Q.   No, you don't recall?

25   A.   I don't recall that it made any recommendation on --

Page 15

1    Q.    So --

2    A.    -- any of the issues.

3    Q.    So it may or may not have.

4    A.    I believe it did not make any recommendation.

5    Q.    Have you personally experienced anything that you would

6          consider a threat or harassment or reprisals as a result

7          of signing Referendum 71?

8    A.    As a result of signing it?

9    Q.    Yes.  I'm just asking --

10   A.    No.  No.

11   Q.    So no, nothing as a result of you personally signing --

12   A.    Correct.

13   Q.    And do you know what you're being called upon to testify

14         about?

15   A.    Whether I had experienced any harassment of any sort

16         surrounding the R-71 issue directly or indirectly.

17   Q.    Let's now go through every incident -- every single

18         incident, phone call, et cetera, that you found to be a

19         threat or harassment surrounding Referendum 71.

20   A.    Okay.

21   Q.    So I don't know where to start because I don't know your

22         story.  So if you can just toss out the first one, we'll

23         explore that.

24   A.    As a result of our support of Referendum 71 --

25   Q.    And by --

Page 16

1    A.    -- our public support --

2    Q.    -- our -- by our, do you mean --

3    A.    Redacted  --

4    Q.    -- the church?

5    A.    -- Redacted , yes.

6          -- we would receive phone calls.

7    Q.    And this was phone calls at the church offices?

8    A.    At the church office, yeah.  Came through the

9          receptionist asking for -- to talk to Redacte, and since I

10         take all of his phone calls, I would get those calls.

11         Every time -- almost every time he appears in print or

12         Redacted     appears in print, the phone calls

13         follow the next day.

14   Q.    So for example, when he appeared at the mayday

15         marriage -- Mayday for Marriage rally at Safeco Field,

16         did you receive any phone calls after that?

17   A.    Yes.

18   Q.    And what was the tone of those phone calls?

19   A.    He needs to shut up.  Your church needs to shut up or

20         we're going to take you down.  We'll come to your church

21         and we'll come to your church office, which is at a

22         different location, and we will shut you down.

23   Q.    And after receiving those phone calls following the

24         Mayday for Marriage rally, did anyone come to the church

25         office?

Tracey Juran, Certified Court Reporter

State Objects: Hearsay; the witness's testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

1    A.    No.

2    Q.    After taking a position with regard to Microsoft's

3          employment policies with respect to homosexual

4          employees, did the church receive any phone calls?

5    A.    Yes.

6    Q.    And my memory -- and please correct me if I'm wrong --

7          is that Redacte took a position both in the news media and

8          appeared at a Microsoft shareholders' meeting.

9    A.    Correct.

10   Q.    And what sort of phone calls were received after that?

11   A.    Same tenor, same tone.

12   Q.    Did anyone actually come to the church offices?

13   A.    No.  However, someone did -- some -- a group of

14         individuals did come to our Sunday service.

15   Q.    And that was after the Microsoft --

16   A.    Yes.

17   Q.    A group came to the church office?  No.

18   A.    To the church building where we hold services.

19   Q.    To --

20   A.    They came to the service and they sat in the service.

21   Q.    Can you tell me about that group?

22   A.    I wasn't there, so I'm not the best person to tell you.

23   Q.    Did you hear how many people it was?

24   A.    No.

25   Q.    Are members of the public welcome to come to services?

State Objects: Hearsay; the witness's testimony is irrelevant even if not offered for the truth, UR R71.

Tracey Juran, Certified Court Reporter

Page 18

```
 1   A.   Absolutely.

 2   Q.   So were these people welcomed to come and listen?

 3   A.   Absolutely.

 4   Q.   And to your knowledge, did they respectfully listen?

 5   A.   I don't know.

 6   Q.   And is ███████████████ the only pastor that preaches

 7        at the church?

 8   A.   No.  He's the main pastor, but we do have 13 other

 9        pastors who occasionally preach.

10   Q.   It sounds like a very large church.  How many

11        parishioners?

12   A.   On a typical Sunday, we'll have 900 to a thousand

13        people.  However, a much larger group call it their

14        church home.

15   Q.   Do you know approximately how many?

16   A.   I would say around 2,000.

17   Q.   Do you know if ███████ was preaching the Sunday that the

18        group came?

19   A.   Yes, he was.

20   Q.   Did anything else happen following the Microsoft

21        activities?

22   A.   No.

23   Q.   And there was also an event at a -- I believe it was a

24        King County high school.  Can you correct me?

25   A.   ████████████████████  in the town of ██████████
```

State Objects: Irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

```
 1   Q.   Can you explain what happened there, what that event was
 2        about.
 3   A.   [Redacted] children go to that school.  And they dedicate a
 4        day to the Day of Silence every year, which -- during
 5        the school day, some of the students and some of the
 6        teachers, I understand, vow -- take a vow of silence in
 7        support of harassment of homosexuals.
 8   Q.   Or, rather, in support of not harassing --
 9   A.   Correct.
10   Q.   -- homosexuals?
11   A.   Yeah, yeah, yeah.
12             MR. PIDGEON:  Objection to the form of the
13        question.
14                  But go ahead and answer.
15   A.   And [Redacted] had met with the principal of the
16        school inquiring as to why this event is being held
17        during school hours and not before and after school or
18        during lunch break and decided that we would form a
19        rally protesting the Day of Silence in April of '08.
20        Yes, it was April of '08.  So a group of [Redacted] people,
21        myself included, went to the school and stood outside in
22        protest of the Day of Silence, which was going on inside
23        the school.
24   Q.   (by Ms. Egeler)  And do you know approximately how many
25        people were there with the church?
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 20

1   A.   I would say 150.

2   Q.   And do you recall [Redacted] having a bullhorn or

3        megaphone with him?

4   A.   Yes.

5   Q.   And do you recall what time of day this was?

6   A.   I believe it was 10:00 in the morning, 10:00 a.m.

7   Q.   Were any of the students or teachers that were

8        participating in the Day of Silence outside the school

9        while the church was there?

10  A.   I don't know.  I would not be able to identify those

11       people.  We purposely made it later in the morning so

12       that all the children would be already in the school and

13       school would be underway so we wouldn't interfere with

14       their coming and going.

15  Q.   Was there any visible group outside the school that was

16       in support of the Day of Silence, whether it was

17       teachers, parents, community members, anyone?

18  A.   Oh, yes.

19  Q.   And what were they doing?

20  A.   Talking, visiting.

21  Q.   And do you remember approximately how many people there

22       were on that side of the issue?

23  A.   In support of the Day of Silence?

24  Q.   Yes.

25  A.   Oh, my goodness.   I would say an equal number, a hundred

Tracey Juran, Certified Court Reporter

State Objects: Irrelevant,UR R-71.

State Objects: Irrelevant, unrelated to R-71.

```
 1              to 150.

 2    Q.    And did things remain respectful on both sides of that

 3          issue during the time that both groups were there for

 4          and against the Day of Silence?

 5    A.    I would say no.

 6    Q.    What did you hear or see?

 7    A.    Shouting.  [Redacted] will be bringing in a

 8          photograph this afternoon that I found of one person

 9          holding a sign up to his head that said, "Throw Rocks

10          Here."  He'll have -- it was published in The [Redacted]

11          [Redacte] -- I think it was The [Redacted] -- and he'll

12          be bringing that with him this afternoon.

13    Q.    Did anyone throw rocks?

14    A.    No.

15    Q.    Did anyone throw anything?

16    A.    No.

17    Q.    Do you remember what was shouted?

18    A.    Gosh.  It was unintelligible, really.  I can't tell you.

19    Q.    Was there any physical violence between the two groups?

20    A.    No.

21    Q.    Was anybody with the church shouting back at this group?

22    A.    No.

23    Q.    Was anyone from the church holding a sign?

24    A.    I didn't see any signs from our group.  I did not see

25          any signs.
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

State Counter designates this testimony only if relevance objection is overruled.

Tracey Juran, Certified Court Reporter

Page 22

```
 1   Q.   Do you recall what, if anything, the pastor was saying
 2        into the bullhorn?
 3   A.   I don't recall what he said.
 4   Q.   Was he speaking into the bullhorn to the --
 5   A.   Yes.
 6   Q.   -- group?
 7   A.   Yes.
 8   Q.   Was there any chanting done by either group?
 9   A.   Not that I recall.
10   Q.   And did the church receive any negative feedback or
11        phone calls following that --
12   A.   Oh, yes.
13   Q.   -- day?
14   A.   Yes.
15   Q.   Can you describe that for me.
16   A.   It's the same type of information that's conveyed to me,
17        that if the N word doesn't shut up, we will shut him
18        down.  I don't -- I haven't told ▉Redacte▉ -- I've only told
19        ▉Redacte▉ a fraction of what's been said in those phone
20        calls, because I don't -- he doesn't need to hear what
21        people are saying about him.
22   Q.   And was physical violence threatened in those phone
23        calls?
24   A.   What does, we will shut you down, mean?  I don't know
25        what that means to them, to the people making the phone
```

State Objects: Hearsay; the witness's testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Page 23

```
 1              calls.

 2    Q.    Did they do anything further to shut him down?

 3    A.    There was an incident in June -- excuse me; in April of

 4          '09 where █████████ held a conference, a

 5          week -- a two-day conference, and we used Crossroads

 6          Bible Church in Bellevue as the location for our

 7          conference.  And ███████, of course, was one of the

 8          speakers at the conference.

 9              And we monitored the blogs out there -- some of our

10          high-school- and college-age students monitor the

11          blogs -- and there was word out there in the blogs that

12          they were gonna do damage to Crossroads Bible Church

13          because ███████ was speaking there, and they did.

14    Q.    What did they do?

15    A.    To my knowledge, they put glue -- they poured glue in

16          the locks.  You would have to ask Jerry Mitchell, who's

17          the senior pastor of Crossroads Bible Church, the extent

18          of the damage that was done to their facility.

19    Q.    Can you tell me again that name.  I didn't catch that.

20    A.    Jerry Mitchell.

21    Q.    Jerry Mitchell.

22    A.    Yeah.

23    Q.    And he's the pastor there at Crossroads.

24    A.    Correct.

25    Q.    Anything else?
```

State Objects: Hearsay; the witness's testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 24

1    A.    I think that's it.

2    Q.    At any time throughout the pastor's events expressing an

3          opinion on homosexuality, has there been any damage to

4          your church?

5    A.    No.

6    Q.    Other than the event following the Microsoft issue when

7          a group came to attend the church, have any other groups

8          or individuals that are hostile to the pastor come to

9          services?

10   A.    No.

11   Q.    Do you recall whether the -- or do you know if the blogs

12         that were talking about going to the Crossroads Church

13         were talking about anger with any specific event that

14         the pastor had spoken at or --

15   A.    It was more anger at his public position.  And the

16         reason I say that is because the blogs such as the Slog,

17         which is The Stranger blog, and Pam's House Blend is

18         another blog, are dedicated.

19   Q.    Any other blogs that you can remember?

20   A.    No.

21   Q.    Do you recall any harassment or what you would consider

22         to be harassment or threats with relation to the

23         pastor's position on Referendum 71?

24   A.    During the signature-gathering period, which was the

25         spring and summer of '09, that -- I believe it was June,

Page 25

```
 1            I received a phone call from a person saying they were
 2       going to kill him.  So I called the [Redacted]
 3       Department, because we are located within the city of
 4       [Redacted], and they dispatched two officers, who came out,
 5       took a report, and listened to the recorded phone
 6       message.
 7  Q.   Do you know the police-report number?
 8  A.   I don't.
 9  Q.   Did you keep a copy of the police report?
10  A.   No.
11  Q.   Do you remember the officers' names?
12  A.   No, but I think I could find out fairly easily.
13  Q.   If you could produce that when you produce the --
14  A.   Okay.
15  Q.   -- the Emails as evidence of threats or harassment --
16  A.   Okay.
17  Q.   -- that were experienced, that would be great.
18            Okay, so the officers came out, and it sounds like
19       you had the call recorded.
20  A.   Yes.
21  Q.   So was this a call that was on the church's voice mail?
22  A.   It was on my voice mail.  The receptionist had put the
23       call through to me and left -- this person left a
24       message on my voice mail.
25  Q.   And this was your voice mail at the church office.
```

Tracey Juran, Certified Court Reporter

Page 26

1    A.   Correct.

2    Q.   Was there a telephone number that was recorded by your

3         phone system?

4    A.   No.  I tried, you know, the star 69 function, but it

5         doesn't work when you send a number to an extension.

6         And the receptionist had already received numerous calls

7         after that, was not able to capture that phone number.

8    Q.   And the person said that they were going to --

9    A.   Kill.

10   Q.   Kill the pastor specifically?

11   A.   Yes.

12   Q.   And did they say anything about Referendum 71?

13   A.   No.

14   Q.   How do you know that they were talking about

15        Referendum 71 instead of the day at [Redacted] or

16        statements that [Redacted] has taken in the newspapers, et

17        cetera?

18   A.   Because only a day before, there had been an article in

19        [Redacted] about our support of Referendum 71.

20   Q.   And did the caller talk about that newspaper article?

21   A.   No.

22   Q.   How do you know they saw it?

23   A.   I don't know that they saw it.  But I do know that it

24        has to be surrounding our position on traditional

25        marriage.

Tracey Juran, Certified Court Reporter

Page 27

1   Q.   Is it that it has to be or --

2   A.   Most --

3   Q.   -- you think --

4   A.   -- likely.

5   Q.   So you're saying you think it's a reasonable assumption,

6        but you don't know for certain.

7   A.   Of course not, yeah.  Yeah, it's a reasonable assumption

8        to make.

9   Q.   So what did the [Redacted] do after listening to the

10       message?

11  A.   They said keep them posted, let them know if we heard

12       any more from anyone like that.  One of the police

13       officers gave me his card.  I don't believe I still have

14       that.  I had no idea I would end up here today and that

15       all of these details would be important.

16  Q.   I understand.

17            And did the police say whether they would be able

18       to find this person, given that there was no phone

19       number?

20  A.   They didn't offer any hope of being able to determine

21       who it was.

22  Q.   Did you feel they were doing their best under the

23       circumstances?

24  A.   Absolutely.

25  Q.   And do you have a positive opinion generally of the

1      ███████████   Department?

2   A.   Oh, yes.

3   Q.   Did you receive any more calls?

4   A.   Every time ████████ name appears in the newspaper, I get

5        phone calls.

6   Q.   Was this call that we just discussed the first time

7        anyone had called and made what you would consider to be

8        a death threat?

9   A.   Yes.

10  Q.   Is it the first time anyone had made a threat of

11       physical attack other than saying that they were going

12       to shut the pastor down?

13  A.   That's it.

14  Q.   Do you know if you received any more calls from that

15       individual?

16  A.   I don't believe so.

17  Q.   And with respect to the time period that Referendum 71

18       petitions were being signed, that spring and summer of

19       '09 that you referred to, were there any other phone

20       calls that were standouts to you?

21  A.   Yes.  There was one phone call shortly after the story

22       broke that ████████████ has bone cancer.  I got a call

23       that said -- an individual said they hoped that the

24       brain -- the cancer goes to his brain and eats his

25       brain.  And I never told him that, obviously.

Page 29

1  Q.   And did you call the police --

2  A.   No.

3  Q.   -- to let them know?

4  A.   No.

5  Q.   And why was that?

6  A.   They can -- it was just a wish.  It was someone's wish.

7       I mean, there was no threat there.  It was stating a

8       rather unpleasant wish, but I didn't see it as any kind

9       of a threat.

10  Q.   Going back just for a moment to the recorded message

11       that was the person saying that they were going to kill

12       the pastor, do you still have that recording?

13  A.   No.  No.

14  Q.   Do you have any other recordings of voice messages left?

15  A.   No.

16  Q.   Any other phone calls from that time period that really

17       stand out for you?

18  A.   No.  No.

19  Q.   Did anything else happen in that time period that

20       petitions were being gathered or up until the election

21       in November where any incidents occurred that you would

22       consider to be harassment or threats as a result of

23       involvement with Referendum 71?

24  A.   No.

25  Q.   How about after the election in November?  Have the

1   phone calls continued?

2   A.   They have not.

3   Q.   Have any of the phone calls talked about anger with the

4        pastor signing the petition?

5   A.   Not specifically.

6   Q.   Were they directed instead to things that have been

7        covered in the newspapers or public appearances?

8   A.   They were directed at his support of the referendum.

9        They -- I mean, they didn't say, because he signed it.

10       I'm assuming they know that he signed it if he's

11       publicly in support of the referendum.

12  Q.   But they didn't specifically mention anger with him

13       specifically for -- just for signing the referendum.

14  A.   No.

15  Q.   When you received the phone call threatening to do

16       damage to Crossroads Church --

17  A.   It wasn't a phone call.  That was a blog.  Someone found

18       this information on a blog.

19  Q.   And do you know whether the -- anyone at the church

20       contacted the police --

21  A.   Oh, yes.

22  Q.   -- about that?  Okay.

23            And which police office would have been --

24  A.   Would have been --

25  Q.   -- contacted?

State Objects: Hearsay; irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 31

```
 1   A.    -- the Bellevue Police Department.

 2   Q.    And did you personally have any contact with the

 3         Bellevue Police about that?

 4   A.    No, I did not.

 5   Q.    Do you know who did?

 6   A.    Probably our administrative pastor.

 7   Q.    And who's that?

 8   A.    [Redacted]

 9   Q.    And that would have been in April of 2009?

10   A.    Correct.

11   Q.    It sounds like the pastor's received what you call

12         threatening or harassing phone calls for years over the

13         stance he's taken on various issues pertaining to

14         homosexuality.

15   A.    Yes.

16   Q.    Have they, the callers or bloggers, ever frightened him

17         into not appearing publicly anymore or no longer taking

18         a public position?

19   A.    No.

20   Q.    And why do you think that is?

21   A.    Because he's not afraid.

22   Q.    Are you afraid working in the church office?

23   A.    No.  Cautious would be appropriate.

24   Q.    I understand.

25               Is there any other threat or harassment that we
```

Tracey Juran, Certified Court Reporter

1      haven't discussed?

2   A.   No.

3   Q.   I guess the one event I didn't ask you about is the

4      Washington, D.C., rally.  Were any phone calls or

5      harassment of any sort showing up after that event?

6   A.   Phone calls.  Always phone calls when we appear in

7      print.  Our position is support of traditional marriage.

8      Our position is not antihomosexual.  All we ever do is

9      support traditional marriage.  And that's really the

10     only public stand that we take on anything, is

11     supporting traditional marriage between a man and a

12     woman.  So every time we appear in print, we get

13     harassing -- excuse me; we get negative phone calls.

14  Q.   Has [Redacted] ever said that homosexual acts are

15     a sin or inappropriate?

16  A.   He's quoted Scripture to that effect.

17  Q.   So he's not just opposed to same-sex partnership or

18     marriage, he's also opposed to homosexuality.

19         MR. PIDGEON:  Objection as to the form of the

20     question.

21  Q.   (by Ms. Egeler)  You can answer.

22  A.   He reiterates the Biblical stand against homosexuality.

23     It's not his personal opinion, it's what God's word

24     says.

25  Q.   Is it his opinion that God's word says that

```
 1        homosexuality is a sin?

 2   A.   Correct.

 3   Q.   And has he made such statements publicly other than

 4        during church services?

 5   A.   Via the passage of Scripture in Romans, he's reiterated

 6        that.

 7   Q.   At public events?

 8   A.   Yes, yes.

 9   Q.   Outside of the church walls themselves?

10   A.   Yes.

11   Q.   And has he made statements about homosexuality being

12        contrary to the Scriptures --

13   A.   Yes.

14   Q.   -- in newspaper articles?

15   A.   Yes.

16             MS. EGELER:  Okay, I have no further questions.

17             THE WITNESS:  Okay.

18             MS. FIELDS:  I have some questions.  May I?

19             MS. EGELER:  Absolutely.

20

21                      EXAMINATION

22   BY MS. FIELDS:

23   Q.   So again, my name's Penny Fields.  I represent -- I'm

24        here on behalf of Washington Families Standing Together,

25        an intervenor in this case.
```

Page 34

1              I'd like to go back.  Just a couple quick questions

2         about your signing of the referendum --

3    A.   Yes.

4    Q.   -- in your church office.  At the time you signed, were

5         you aware that Washington's Public Disclosure Act makes

6         petitions public on request when they're signed?

7    A.   Yes.

8    Q.   And did you take any steps at that point to keep your

9         signing of the referendum secret or private?

10   A.   No.

11   Q.   Were you aware of this litigation at the time you

12        signed?

13   A.   No.

14   Q.   Other than your involvement in the Referendum 71

15        campaign, have you been involved in any other -- in any

16        way in any other political debates or political issues;

17        for example, the death penalty, religious rights,

18        property rights, civil rights of any other kind?  Any

19        other political debates?

20   A.   In my life?

21   Q.   Yes.

22   A.   Oh, yes.

23   Q.   Could you give me a couple of examples.

24   A.   You brought up property rights.  I'm also a real-estate

25        agent, so I've contributed to political-action

Page 35

1         committees that support property rights.

2   Q.   I'm sorry; you mean contributed money or contributed

3         in --

4   A.   Money, mm-hm.

5              I also -- let's see; what else?  Do people's minds

6         go blank?  Okay, I've contributed money to Second

7         Amendment Right Foundation in the state of Washington,

8         I've attended rallies.

9   Q.   For?

10  A.   For traditional marriage, like the Mayday for Marriage

11        rally that we held at Safeco Field in --

12  Q.   So just -- but other than your support for traditional

13        marriage or surrounding gay rights or anything related

14        to -- that we've discussed here already today, I'm

15        thinking of other political campaigns or rallies you've

16        been involved in.  So you mentioned -- sorry.

17  A.   Second Amendment.

18  Q.   Right.

19             You've attended rallies?

20  A.   No, I've contributed money.

21             And property rights via political-action committee.

22  Q.   So is it fair to say that your involvement in other

23        kinds of political campaigns or issues has been limited

24        to financial contributions?

25  A.   Yes, for the most part.

1   Q.   Thank you.

2        Have you ever yourself elected not to shop at a

3        particular store or buy a particular product because of

4        your political or your religious beliefs?

5   A.   No.

6   Q.   Have you ever avoided associating with people or

7        associating with an organization because of your

8        political or moral beliefs?

9   A.   No.

10  Q.   Have you ever been in a situation where you have avoided

11       making your views on a subject known because you were

12       afraid of -- because you were afraid?

13  A.   Because I was afraid?  No, not because I was afraid.

14  Q.   Have you been in situations where you've avoided because

15       of -- for another reason?

16  A.   Only because I didn't want a discussion to take place.

17       I didn't want a confrontation to take place.

18  Q.   Can you give me an example?

19  A.   A couple of my friends are die-hard supporters of

20       President Obama and I'm not.  And we just avoid those

21       kind of conversations when we're in social settings.

22  Q.   Have you been in a situation where you avoided

23       expressing your views on what might be a contentious

24       topic in a public setting as opposed to, say, a private

25       social setting?

1    A.    I've not had the opportunity to express my views in a

2          public setting other than to be present at, say, a

3          rally.

4    Q.    Are you aware of anyone who refused to sign the

5          Referendum 71 petition because they were afraid?

6    A.    No.

7    Q.    And I just have one more -- one or two more questions.

8          You were talking a little bit earlier about the

9          fact that the basic stance of your church is the support

10         of traditional marriage and, basically, the political

11         activities in support of traditional marriage.  And I'm

12         wondering how the protest at Redacted is in support of

13         traditional marriage.

14   A.    We were making a statement about a cultural norm, and

15         traditional marriage is a cultural norm.

16   Q.    Right.

17         But I'm not -- how does the Day of Silence relate

18         to traditional marriage?

19   A.    We believe the homosexual lifestyle is being propagated

20         in grade schools through GLSEN -- and I can't tell you

21         exactly what that stands for -- G-L-E-S-N (sic), gay,

22         lesbian -- G-L-E-S-N (sic).  They're -- they sponsor the

23         Day of Silence at high schools.  And we believe that is

24         propagating the homosexual lifestyle in the schools --

25   Q.    Isn't --

Tracey Juran, Certified Court Reporter

```
 1  A.   -- during school time.

 2  Q.   Maybe I misunderstand.  I -- my understanding is, the

 3       Day of Silence is an activity protesting harassment of

 4       gay and lesbian and transgender students.  Have I got

 5       that wrong?

 6  A.   You've got that right.

 7  Q.   And your rally at ▓Redacted▓ was protesting the Day of

 8       Silence.

 9  A.   Correct.

10  Q.   So isn't it fair to say that your rally was against

11       standing up -- standing against harassment against gay

12       and lesbian students?  I mean, are you saying that

13       your --

14            MR. PIDGEON:  Objection as to form.

15  Q.   (by Ms. Fields)  Would you -- is it fair to say that

16       your church thinks that harassing gay and lesbian

17       students in school is okay?

18  A.   Of course not.  No one should be harassed.  But there

19       should not be a special day set aside to introduce

20       children to the homosexual lifestyle during school

21       hours, which is basically what it is under the guise of

22       preventing harassment.

23  Q.   So my final question is, you said that since the

24       election, you haven't experienced any more phone calls

25       or anything that you would consider to be harassment
```

Page 39

1        related to Referendum 71 --
2  A.    Correct.
3  Q.    -- is that correct?
4        So are you today in any way fearful of being
5        harassed personally regarding Referendum 71?
6  A.    No, not fearful.
7              MS. FIELDS:  I have no more questions.  Thank you.
8              THE WITNESS:  You're welcome.
9              MS. EGELER:  Mr. Dixson, did you have any
10       questions?
11             MR. DIXSON:  I do, and I understand the inherent
12       difficulty.  So I think I have three, maybe four, and
13       I'll try to make it brief.
14
15                        EXAMINATION
16  BY MR. DIXSON:
17  Q.    Redacted      , my name is Steve Dixson.  I'm participating
18       via telephone from Spokane.  I'm an attorney that
19       represents the Washington Coalition for Open Government
20       and I have just a couple of very quick questions.
21             The first is regarding the Microsoft stance of the
22       church and Redacted    .  When, approximately, did that
23       take place?
24  A.    I believe it was 2007 at their annual stockholders'
25       meeting.

Tracey Juran, Certified Court Reporter

Page 40

1    Q.   And do you -- I could probably find that, but do you

2         happen to recall the season or the month?

3    A.   I believe it was January or February.

4    Q.   Was there media coverage of █Redacted█████████ attendance

5         and participation at the stockholders' meeting?

6    A.   Yes.

7    Q.   Was that television, newspaper, both?

8    A.   Both.

9    Q.   You've testified that following public appearances, you

10        receive phone calls on the church phone line.  I'm

11        wondering in rough numbers about the volume of phone

12        calls.  Would you say it's five to ten, a dozen, or more

13        per each appearance in the print media or public media?

14   A.   I would say five to ten.

15   Q.   Is that pretty consistent per incident?

16   A.   Yes.

17   Q.   And finally, just to be clear, the harassment that

18        you've experienced has been via those phone calls, but

19        none has been personally directed at you; is that

20        correct?

21   A.   Well, that is not correct.  I was told by one caller

22        that they would come to our church and they would come

23        to our office and they would take us down.  So I'm one

24        of them.  I guess I'm part of the us.

25   Q.   So a particular caller stated that they would come to

State Objects: Hearsay

Tracey Juran, Certified Court Reporter

Page 41

State Objects: Hearsay

1    the church and specifically come to the church office

2    and take you down.

3  A.  Correct.

4  Q.  And that was following the Microsoft appearance; am I

5    correct?

6  A.  No.

7  Q.  What incident was that related to?

8  A.  That was related to the publicity we received for

9    supporting Referendum 71.

10  Q.  So that was sometime in the spring or summer of 2009,

11    that particular phone call?

12  A.  Correct.

13         MR. DIXSON:  Okay, that's all I have.

14         MR. PIDGEON:  Okay.

15

16              EXAMINATION

17  BY MR. PIDGEON:

18  Q.  I have some follow-up --

19  A.  Okay.

20  Q.  -- questions.

21         How are you doing?

22  A.  Good.

23  Q.  Just to get a little more background on Redacted, you and

24    I had discussed earlier that Redacted runs a men's group

25    called Redacted

Tracey Juran, Certified Court Reporter

Page 42

```
 1   A.   Correct.

 2   Q.   -- is that correct?

 3             And what do you know about [Redacted]

 4   A.   It's a men's Bible study.

 5   Q.   And what about [Redacted] background?  What did he do

 6        before he was a pastor?

 7   A.   He was a [Redacted] in -- for the [Redacted]

 8   Q.   So he played [Redacted]

 9   A.   Correct.

10   Q.   As a professional.

11   A.   Correct.

12   Q.   And so as a general rule, he was -- and do you know, did

13        he [Redacted]

14   A.   He [Redacted] -- he was a [Redacted] whatever that means.

15   Q.   That's [Redacted]

16   A.   Okay.

17   Q.   So he was a [Redacted] and so typically [Redacted] are

18        large, fast, and strong.  Would that be a fair summary

19        of [Redacted]

20   A.   He is large, strong, and slow.

21   Q.   He's not fast anymore.

22   A.   No.

23   Q.   Too many [Redacted], yeah.

24             But suffice it to say that he does have -- does he

25        have a reputation among the men at the church of being a
```

Page 43

1    man's man?

2  A.   Yes.

3  Q.   And does he encourage other men in the church to be men?

4  A.   Yes.

5  Q.   So somebody who would -- if there was somebody making a

6       physical threat against a church, they would not have an

7       expection that the men at ▮Redacted▮ were wimpy.

8  A.   That is correct.

9  Q.   Would you say that that may have something to do with

10      the fact that none of these threats have actually been

11      carried out?

12 A.   I don't know the reason why the threats haven't been

13      carried out.  That certainly could be a reason.

14 Q.   But the threats that were made against Crossroads Church

15      were carried out.

16 A.   That is correct.

17 Q.   Now, when you say you are not fearful but cautious, what

18      kind of cautious steps do you take at the church office?

19 A.   I keep the door locked when I'm there alone.  I watch

20      who follows me into the parking lot if anyone follows me

21      into the parking lot.

22 Q.   Do you have a security system at the church office?

23 A.   We do not.  We -- not in this particular office.

24      Heretofore we have always had a security system.

25 Q.   Just recently have you changed offices?

Page 44

1   A.   A year ago.

2   Q.   And you haven't yet installed security.

3   A.   That's correct.

4   Q.   And then how about you personally?  Do you have -- what

5        do you do to secure your environment at home?

6   A.   Keep the doors locked when I'm in the house, all the

7        normal things that people do.

8   Q.   Have you ever had anybody come by your house?

9   A.   No.

10  Q.   Did you put an R-71 sign up at your house?

11  A.   I did not.

12  Q.   Why not?

13  A.   I'm not allowed to have signage in my neighborhood.

14  Q.   Now, let's talk about your knowledge a little bit of the

15       referendum process in the state and the public

16       disclosure -- Public Records Act.  You're aware that the

17       referendum process has been going on for over a hundred

18       years in Washington?  Are you aware of that?

19            MS. EGELER:  Objection --

20            MS. FIELDS:  Objection.

21            MS. EGELER:  -- leading.

22  Q.   (by Mr. Pidgeon)   Are you aware that the referendum

23       process has gone on for over a hundred years in

24       Washington?

25            MS. EGELER:   Objection; leading.

Tracey Juran, Certified Court Reporter

Page 45

1   Q.   (by Mr. Pidgeon)  Do you know how long the referendum

2        process has gone on in the state of Washington?

3   A.   At least as long as I've been able to vote.

4   Q.   How long has that been, if you don't mind my asking?

5   A.   Oh, my goodness.  I'm 55 and I started voting at 18,

6        so --

7   Q.   Now, do you recall whether or not any referendum

8        signatures or initiative signatures were released to the

9        public prior to the year 2006?

10  A.   Could you rephrase the question or repeat the question.

11  Q.   Do you know whether or not any names and addresses of

12       petition signers for initiatives or referendums in the

13       state of Washington have been released to the public

14       before 2006?

15  A.   I don't know.  I would assume they were.  Isn't it

16       public disclosure?  I --

17  Q.   You --

18  A.   -- don't know the process.

19  Q.   Do you know whether or not the Attorney General in 1993

20       issued an opinion that said the Public Records Act --

21            MS. EGELER:  Objection --

22  Q.   (by Mr. Pidgeon)  -- did not --

23            MS. EGELER:  -- leading.

24            MR. PIDGEON:  I'm asking if she knows this.

25            MS. EGELER:  Objection --

Page 46

1    Q.    (by Mr. Pidgeon)   Do you know --

2          MS. EGELER:   -- stands.

3    Q.    (by Mr. Pidgeon)   Do you know whether or not the

4          Attorney General issued an opinion letter saying that

5          the Public Records Act required that names not be

6          disclosed in 1993?

7          MS. EGELER:   Objection; leading.

8    Q.    (by Mr. Pidgeon)   You can go ahead and answer.

9    A.    I do not know that.

10   Q.    Do you know whether or not Sam Reed is the first

11         Secretary of State in the history of Washington to

12         release public names --

13         MS. EGELER:   Objection; leading.

14   Q.    (by Mr. Pidgeon)   -- and addresses?

15   A.    I did not know that.

16   Q.    Did you know the history of the name-release process

17         when you signed the petition?

18   A.    No.

19         MS. EGELER:   Objection.

20         MR. PIDGEON:   What's objectionable about that?

21         MS. EGELER:   Nothing.

22         MR. PIDGEON:   I'm asking --

23         MS. EGELER:   Withdraw that.

24         MR. PIDGEON:   -- just asking --

25         MS. EGELER:   Withdraw that one.

1          MR. PIDGEON:  Okay.

2          MS. EGELER:  Waiting for the next in the series.

3          MR. PIDGEON:  Okay.

4    Q.   (by Mr. Pidgeon)  So when you signed the petition -- at

5         the time you signed the petition, it's safe to say that

6         you had no knowledge about the disclosure process of

7         names and addresses through the Secretary of State's

8         Office; is that true?

9    A.   That's true.

10   Q.   Did you know at the time you signed the petition that

11        the Secretary of State would amass names and addresses

12        of all the petition signers onto a single file and

13        disclose it to whoever asked?

14         MS. EGELER:  Objection; leading.

15   A.   I did not know.

16   Q.   (by Mr. Pidgeon)  Would you have signed the petition if

17        you had known that your name was going to be grouped

18        with all the other signers and given to look, for lack

19        of a better term, militant homosexual groups that wanted

20        to use your name for purposes of inconvenient

21        conversations --

22         MS. EGELER:  Objection --

23   Q.   (by Mr. Pidgeon)  -- when you signed the petition?

24         MS. EGELER:  Objection; assumes facts not --

25   A.   Yes.

Tracey Juran, Certified Court Reporter

Page 48

1          MS. EGELER:   -- in evidence.

2    Q.   (by Mr. Pidgeon)   You would have signed?

3    A.   I would have signed.

4    Q.   Even if you'd known that that was going to be the case.

5    A.   Yes.

6    Q.   Were you aware of the organization whosigned.org at the

7         time you signed the petition?

8    A.   No.

9    Q.   Were you aware of Know Thy Neighbor at the time you

10        signed the petition?

11   A.   No.

12   Q.   Were you aware of the level of violence that had been

13        perpetrated in California surrounding Proposition 8 at

14        the time you signed the petition?

15          MS. EGELER:   Object to the characterization.

16   A.   I heard stories.

17   Q.   (by Mr. Pidgeon)   You've heard stories about

18        Proposition 8?

19   A.   Yes.

20   Q.   Can you tell us some of the stories that you heard about

21        Proposition 8.

22   A.   That people had experienced violence, retaliation.   I

23        don't know specifics of the retaliation.

24   Q.   Did you know whether or not Christians were experiencing

25        retaliation?

State Objects: Lack foundation; hearsay; irrelevant even if not offered for the truth, unrelated to R-71

Tracey Juran, Certified Court Reporter

Page 49

1    A.   I don't know they were specifically Christians.  I don't

2         recall that.

3    Q.   Now, going back to this history of the phone calls, I

4         need you to be much more specific.  I know that you

5         haven't told Redacted these things, but I need you

6         to be more specific and tell us the language of these

7         phone calls, okay?  You mentioned, for instance, that in

8         many phone calls they were using the N word.

9    A.   Correct.

10   Q.   Can you be explicit.  What do you mean by the N word?

11   A.   Calling him a nigger.

12   Q.   Did that happen a lot?

13             MS. FIELDS:  Objection; form of the question.

14   A.   Maybe three to five times.

15   Q.   (by Mr. Pidgeon)  And was it the same person that was

16        doing this, in your opinion?

17   A.   It's very difficult to tell.  Some voices I would

18        recognize, some I would not.

19   Q.   So in some of these phone calls, they were repeat phone

20        calls?  I mean, you were getting -- were you getting a

21        phone call following each event from a similar person?

22   A.   Correct.

23   Q.   And did their phone calls come in like clockwork?  I

24        mean, if you had something published, did they call the

25        following day?

State Objects: Hearsay; the witness's testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 50

```
 1   A.   Sometimes that's how I knew something had been
 2        published, is because phone -- I would get phone calls.
 3        And then I would search the Internet for the latest
 4        story about  Redacte  or our church.
 5   Q.   So tell me more about this pattern.  You would get phone
 6        calls following some publication of his name and then
 7        would they die off pretty --
 8   A.   Yes.
 9   Q.   -- quickly?
10   A.   Yes.
11   Q.   So you wouldn't get -- so did you have somebody call you
12        every week or was it just in a short period of time
13        following the release of his name?
14   A.   Within a day or two of the release of his name.
15   Q.   So can you say it is safe to draw a correlation of
16        proximity to the article to say that the article was
17        published and then we got the calls?  Is that --
18             MS. EGELER:  Objection; leading the witness.
19   A.   That is correct.  Our receptionist would say,  Redacte  must
20        have been in the paper, or -- oh, it was -- it's a joke.
21         Redacte  must have been in the paper again, because the
22        phone calls would start the minute we opened the phone
23        lines at 9:00 in the morning.
24   Q.   (by Mr. Pidgeon)  Now, to your knowledge, is one of the
25        methods used to destroy a pastor in a church trying to
```

State Objects: Hearsay; the witness's testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Page 51

1   find a sexual scandal on the pastor?

2   A.   Yes.

3   Q.   Have you seen other pastors in this community go down

4   because of sexual scandal?

5   A.   Yes.  Actually, yes, I do.

6   Q.   And to your knowledge, has anybody ever tried to go

7   after [Redacted] to dig up a sexual scandal on him?

8   A.   [Redacted] reports that there is someone who has offered a

9   bounty.  This is what [Redacted] -- I have no direct evidence

10  myself other than what he's said.  There is a bounty

11  available to anyone who can find anything improper about

12  his life.

13  Q.   Do you know how big this bounty is?

14  A.   I think it's a million dollars.

15  Q.   Do you know who's planning on paying this million-dollar

16  bounty?

17  A.   I do not, but I'm certain he does.

18  Q.   And do you know how long this bounty has been in place?

19  A.   I don't know.  At least during my three years at the

20  church office.

21  Q.   Now, you talked a little bit about the death threat that

22  came in over the phone line.  Was that -- was there a

23  transcription made of that death threat?

24  A.   No.

25  Q.   Do you know if the police report contained the operative

State Objects: Hearsay; the witness's testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 52

```
 1          terms of the death threat?
 2    A.    I didn't see it.  They actually never showed me the
 3          report.  But I would assume that it was -- included the
 4          verbatim message.
 5    Q.    And again, was this death threat in that same proximal
 6          period of the newspaper article being released and then
 7          the phone call came in?
 8    A.    Yes.
 9    Q.    And that proximal relationship was proximal to the story
10          in [Redacted]            about [Redacte] supporting R-71?
11    A.    Yes.
12    Q.    And did you take that -- you took that phone call; is
13          that correct?
14    A.    Correct.
15    Q.    Now, did you recognize the voice?
16    A.    I did not.
17    Q.    So this was a new voice, then.
18    A.    Or one that I just didn't recognize.
19    Q.    Now, did you have a chance to look at the -- some of the
20          blog stuff that was put up on The Stranger?
21    A.    Yes.
22    Q.    Did you look at the news articles on The Stranger?
23    A.    Yes.
24    Q.    Did they identify [Redacted]              negatively in
25          any of those articles?
```

Page 53

1   A.   Oh, yes.

2   Q.   Can you remember some of the things that were said in

3        The Stranger?

4   A.   Oh, my goodness.  That he's a hatemonger, we're

5        hatemongers.  Basically calling us haters.

6   Q.   Now, in your opinion, your personal opinion, is the use

7        of the N word typical of people who are tolerant and

8        filled with the loving kindness of God?

9   A.   No.

10  Q.   Yeah, I just wanted to get your opinion on that.

11            Now, what about Pam's House Blend?  Did you get a

12       chance to read any of the information on this site?

13  A.   I did.  I have.

14  Q.   And did they make any reference to ███████████

15       ███████

16  A.   Yes.

17  Q.   What kinds of things were being said?

18  A.   That he, again, is a hatemonger; our church are

19       shortsighted, unloving hatemongers; that his cancer --

20       Pam tends to focus on his cancer issue -- that he --

21       this is -- God's way of stopping him is taking him out

22       of the picture by killing him with cancer and it can't

23       happen too soon and there is justice -- there will be

24       justice for same-sex couples once ██████ is dead; that

25       he's evil; that we're all evil, ██████████████ is

Page 54

1    evil.

2  Q.   Do you feel that The Stranger was dehumanizing [Redacted]

3       you, and [Redacted]

4          MS. EGELER:   Objection; leading.

5  A.   Dehumanizing us?

6  Q.   (by Mr. Pidgeon)  Were they trying to make you something

7       less than human, do you believe, in the eyes of the

8       community?

9  A.   I wouldn't say less than human.  No, not less than

10      human, but certainly not nice.  We're not very nice

11      people.

12 Q.   Do you believe that The Stranger and Pam's House Blend

13      were trying to force you to walk away from your support

14      of R-71?

15 A.   More walk away in support of our stand on traditional

16      marriage, R-71 being one part of that, and that is

17      trying to maintain the standard of marriage between one

18      man and one woman.  It's all about that.  Whether it's

19      R-71 or a rally or Day of Silence, it's trying -- it's

20      not wanting homosexual behavior to be normalized.

21 Q.   So do you feel -- I'm going to ask this question again.

22      Do you feel The Stranger -- do -- let me ask them

23      separately.

24          Do you feel The Stranger was attempting to pressure

25      you, [Redacted], and the members of the congregation

Tracey Juran, Certified Court Reporter

```
1        at [Redacted] to abandon their position in favor of
2        traditional marriage?
3              MS. EGELER:  Objection; asked and answered.
4    A.  Yes.
5    Q.  (by Mr. Pidgeon)  Go ahead -- okay.
6              And do you feel that Pam's House Blend was
7        attempting to pressure you, [Redacted] and the
8        members of the congregation of the church to abandon
9        their position in favor of traditional marriage?
10   A.  Yes.
11   Q.  And do you believe that those people who had called the
12       church after every article were making explicit
13       expressions that you should abandon your position in
14       favor of traditional marriage?
15   A.  Yes.
16   Q.  And that [Redacte] should abandon his position in favor of
17       traditional marriage?
18   A.  Yes.
19   Q.  And that [Redacted] should abandon its position in favor of
20       traditional marriage?
21   A.  Yes.
22   Q.  And that the members of the congregation should abandon
23       their position in favor of traditional marriage?
24   A.  Yes.
25   Q.  Do you believe at any point that all of the pressure
```

1   that was brought by The Stranger, Pam's House Blend, and

2   the phone calls that came in to the church did, in fact,

3   cause some people to not sign the petition or to

4   otherwise be silent about the issue in public?

5 A. Do I know that for sure?  No.  Would I suspect that

6   there was fear among the congregation?  Yes.

7 Q. Do you have any evidence of this fear among the

8   congregation?

9 A. No.

10 Q. Did anyone ever tell you, I'd like to sign, but I'm not

11   going to?

12 A. No.

13 Q. Did anybody tell you, I'm -- I don't dare put up a sign

14   in my yard?

15 A. No.

16 Q. Did anybody tell you -- has anyone ever had their car

17   vandalized for taking a position in favor of traditional

18   marriage at Redacted

19 A. Not to my knowledge.

20 Q. And to your knowledge, has anyone ever been personally

21   attacked for taking a position in favor of traditional

22   knowledge -- traditional marriage; pardon me?

23 A. Not to my knowledge.

24    MR. PIDGEON:  Okay, I think that's all I have.

25    THE WITNESS:  Okay.

Page 57

1                    FURTHER EXAMINATION

2    BY MS. EGELER:

3    Q.    I have just a few more.

4          Did you ask to see a copy of the police report?

5    A.    I did not.

6    Q.    If you had asked, did you have a feeling that you would

7          be refused by the police?

8    A.    No.

9    Q.    There was some discussion regarding the Pam's House

10         Blend Web site.   Did you go to that Web site and read it

11         yourself?

12   A.    Yes.

13   Q.    Did you ever see anything on Pam's House Blend promoting

14         killing or physically attacking the pastor?

15   A.    Not what I read.

16   Q.    You talked about the word "nigger" being used in three

17         to five calls.   Do you recall when those three to five

18         calls came in?

19   A.    Not specifically.

20   Q.    Could you say that all of those three to five calls were

21         related to the time period when Referendum 71 was being

22         promoted?

23   A.    I can't say that for sure.

24   Q.    Could it be that those calls were associated with other

25         activities that the pastor undertook with respect to

1        traditional marriage and the issue of homosexuality?

2  A.   They always result from his stand on that issue.  Those

3       are the only calls we get like that.

4  Q.   So they could have come in as a result of his appearance

5       at a rally or an event prior to Referendum 71?

6  A.   Yes.

7  Q.   How long have you worked for the church?

8  A.   Two years, ten months.

9  Q.   How long have you been in the habit of locking the doors

10      at your home?

11  A.   I would say in the last ten years.

12  Q.   Why did you start locking the doors in your home?

13  A.   I don't know the particular -- there wasn't a particular

14      catalyst.

15  Q.   Do you lock the doors in your home because of concerns

16      about burglary?

17  A.   Sure.

18  Q.   And are you in the same habit with respect to your car

19      doors?  Do you lock those?  Not necessarily at home, but

20      when you go to the city, for example, would you, if you

21      walked away from your car, lock the doors?

22  A.   Always.

23  Q.   And why do you do that?

24  A.   Theft.

25  Q.   Has the church taken a stance on any other political

Page 59

1        issues, such as a woman's right to choose an abortion or

2        the death penalty or any other issue?

3   A.   I can't tell you any specifics, but I'm sure ▇Redacted▇ has

4        been asked, for instance, about abortion or the death

5        penalty.

6   Q.   Do you recall any phone calls generated by anger

7        regarding other issues?

8   A.   Never.

9   Q.   You've said that the calls would come in and that you

10       and the receptionist would kind of laugh about, well,

11       there must be another newspaper article.  Is that -- my

12       memory of your testimony correct?

13  A.   Yes.

14  Q.   Did you always check to confirm that there had been --

15  A.   Yes.

16            MS. EGELER:  Okay.  Okay, no further questions.

17            MS. FIELDS:  May I ask a couple of follow-ups?

18            MS. EGELER:  Sure.

19

20                  FURTHER EXAMINATION

21  BY MS. FIELDS:

22  Q.   ▇Redacted▇ you talked a little bit about all the

23       different things that appear on Pam's House Blend and in

24       The Stranger, on the blogs.  Do you believe that they

25       have a First Amendment right to express their opinion

1        about ▮Redacted▮

2   A.   Absolutely.

3   Q.   And then just a couple quick questions to follow up on.

4        Your church -- I think you mentioned earlier you

5        have 900 to a thousand members, maybe more --

6   A.   Mm-hm.

7   Q.   -- who call it their church home.  Do you have some idea

8        of what the male-female ratio is in your church,

9        percentage of men versus women?

10  A.   Adults, probably 50/50.

11  Q.   And of the 50 percentish of adult men, what percentage

12       of them would you call men's men, in your opinion?

13  A.   I would say 60 percent.

14  Q.   And have you ever attended -- other than the conference

15       that you had at Crossroads Church, I think, in Bellevue,

16       have you attended that church?

17  A.   Crossroads?

18  Q.   Yeah.  I mean, are you familiar --

19  A.   Yes.

20  Q.   How familiar are you with that church?

21  A.   Very familiar.

22  Q.   What would you say the percentage between men and women

23       adults are in that church?

24  A.   50/50.

25  Q.   What percentage of the men in that church would you say

1       are men's men, to your knowledge?

2   A.   I don't know.

3   Q.   And you said the pastor of that church is Jerry

4       Mitchell?

5   A.   Correct.

6   Q.   Would you describe Pastor Mitchell as wimpy?

7   A.   No.

8           MS. FIELDS:  No further questions.

9           MS. EGELER:  Mr. Dixson?

10          MR. DIXSON:  I'm good.

11          MS. EGELER:  Anything further, Mr. Pidgeon?

12          MR. PIDGEON:  No, I'm fine.  Thank you.

13          MS. EGELER:  Well, thank you for coming in --

14          THE WITNESS:  Okay.

15          MS. EGELER:  -- this morning.

16          THE WITNESS:  You're welcome.

17          MS. EGELER:  And as we stated earlier, we'll leave

18      this deposition open and revisit the Emails and other

19      production materials that you're going to go back and

20      look for, okay?

21          THE WITNESS:  Yes, yes.

22

23                              (Whereupon the deposition
                                adjourned at 10:46 a.m.)
24

25

Page 62

1                              CERTIFICATE

2    STATE OF WASHINGTON )
                         )
3    COUNTY OF SNOHOMISH )

4              I, the undersigned Notary Public in and for the

5    State of Washington, do hereby certify:

6              That the foregoing is a full, true, and correct

7    transcript of the testimony of the witness named herein,

8    including all objections, motions, and exceptions;

9              That the witness before examination was by me duly

10   sworn to testify truthfully and that the transcript was made

11   available to the witness for reading and signing upon

12   completion of transcription, unless indicated herein that the

13   witness waived signature;

14             That I am not a relative or employee of any party

15   to this action or of any attorney or counsel for said action

16   and that I am not financially interested in the said action

17   or the outcome thereof;

18             That I am sealing the original of this transcript

19   and promptly delivering the same to the ordering attorney.

20             IN WITNESS WHEREOF, I have hereunto set my hand and

21   seal this 3rd day of October, 2010.

22

23             _____
               Notary Public in and for the State of Washington
24                    residing at Edmonds, Washington.
                       (Notary expires 3/09/13)
25                        (CCR No. 2699)

Tracey Juran, Certified Court Reporter