**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> SAM REED, in his official capacity as Secretary of State of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, <br><br> Defendants. | NO. 09-cv-05465-BHS <br><br> DESIGNATED DEPOSITION TESTIMONY OF |

Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors Washington Families Standing Together and the Washington Coalition for Open Government and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the "Parties") hereby submit combined designated deposition testimony for

Defendants and Intervenors object to the admission of any deposition testimony taken of any witnesses who could be called to testify at trial. Therefore, the designations of

1

1    Defendants and Intervenors are being submitted in the event that the Court decides to admit

2    deposition testimony.

3        For the Court's convenience Defendants' designations have been highlighted in blue,

4    Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5    been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6    filing the redacted versions of these documents.

7        DATED this 6th day of September, 2011.

8    ROBERT M. MCKENNA
     Attorney General
9

10    s/ William Clark
     WILLIAM CLARK, WSBA #9234
11   Senior Counsel
     800 Fifth Ave, Ste 2000
12   Seattle, WA 98104
     206-464-7352
13   BillC2@atg.wa.gov
     ANNE EGELER, WSBA #20258
14   Deputy Solicitor General
     PO Box 40100
15   Olympia, WA  98504-0100
     360-664-3027
16   Annee1@atg.wa.gov

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,

                Plaintiffs,

        vs.                   NO. 3:9-CV-05456-BHS

SAM REED, in his official capacity
as Secretary of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer
for the Secretary of State of
Washington,

                Defendants.

DEPOSITION OF

Deposition upon oral examination of          , taken

at the request of the Defendants, before Osmund D. Miller, a

Notary Public, RPR, CCR No. 2280, at the law offices of

Witherspoon-Kelley, 422 West Riverside, Spokane, Washington,

commencing at or about 9:00 a.m., on October 7, 2010 pursuant

to the Federal Rules of Civil Procedure.

```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFFS:
                         STEPHEN PIDGEON ATTORNEY AT LAW, P.S.
 4                       By:  Stephen Pidgeon
                         Attorney at Law
 5                       Old Federal Building
                         3002 Colby Avenue, Suite 306
 6                       Everett, Washington 98201

 7   FOR THE DEFENDANTS WASHINGTON COALITION FOR OPEN GOVERNMENT:
                         WITHERSPOON-KELLEY
 8                       By:  Steven J. Dixson
                         Attorney at Law
 9                       1100 U.S. Bank Building
                         422 West Riverside Avenue
10                       Spokane, Washington 99201-0302

11   FOR THE DEFENDANTS SAM REED AND BRENDA GALARZA:
                         ATTORNEY GENERAL OF WASHINGTON
12                       Anne E. Egeler
                         Deputy Solicitor General
13                       P.O. Box 40100
                         Olympia, Washington 98504-0100
14
     ALSO PRESENT:
15                       Greg Senchenko, Interpreter

16

17

18

19

20

21

22

23

24

25
```

1            GREG SENCHENKO
            the Interpreter, having been first duly
2           sworn according to law, did interpret from
            English to Russian and Russian to English.
3

4           called as a witness at the request of
            the Defendants, having been first duly
5           sworn according to law, did testify as
            follows herein:
6

7  (All answers will be given through the interpreter unless

8  noted by the answer symbol.)

9                        EXAMINATION

10 BY MR. DIXSON:

11 Q.   Good morning,              .  My name is Steve Dixson.  I

12 am an attorney for the Washington Coalition for Open

13 Government, one of the named defendants in the present

14 litigation.  On the phone is Attorney Anne Egeler from the

15 Washington Attorney's General office.  She may have some

16 follow-up questions when I am done this morning.

17      First off, have you ever been deposed before?

18 A.   No.

19      INTERPRETER:  I don't trust English responses.

20 Q.   Okay.  In that case, I would like to go over just some

21 basic ground rules with you this morning.  It is important

22 that we get an accurate record of what is said in this room

23 today.

24 A.   Uh-huh.

25      INTERPRETER:  Yes.

1  Q.   And, so, we have a court reporter who will be taking down

2  each of the questions, and your answers to those questions.

3  A.   Uh-huh.

4  Q.   As a result, it's important that you answer each question

5  with a "yes" or "no," or some type of spoken answer, and not

6  a nod of the head.  Do you understand?

7  A.   Yes.

8  Q.   In addition -- and I don't think it will be a problem,

9  because we are using a translator -- we need to let each

10  other finish our sentences before asking the next question.

11  Do you understand that?

12  A.   Yes.

13  Q.   And if, today, I ask you a question that does not make

14  sense, or is somehow confusing, please ask me to restate the

15  question, and don't guess at what I am trying to ask you.  Do

16  you understand that?

17  A.   Yes.

18  Q.   Did you meet with anyone prior to your deposition this

19  morning?

20  A.   No.

21  Q.   No.  Okay.  Have you spoken to anyone else who has been

22  deposed previously in this lawsuit?

23  A.   No.

24  Q.   Do you understand that as part of this lawsuit, and in

25  conjunction with the subpoena that was served upon you, you

1  were asked to bring documents evidencing threats, harassment

2  or reprisals as a result of your participation with

3  Referendum 71?

4      INTERPRETER:  Yes.

5  Q.  Did you bring any documents today?

6      INTERPRETER:  I don't have specific documents.  Like,

7  pictures or documents.

8  Q.  So you do not have any responsive documents to the

9  subpoena evidencing threats, harassment or reprisals?

10     INTERPRETER:  Well, I have, like, things -- like, I have

11  stickers put on my vehicle, a couple months ago, with bad

12  words, and -- but I didn't save them, and I just took them

13  down and threw them into the garbage can.

14  Q.  Okay.  We will talk about any harassment that you allege.

15  But with regard to documents, you did not bring any of those

16  today, correct?

17     INTERPRETER:  Right.  Because I don't have them.

18  Q.  I see in front of you a folder.  Are those documents that

19  you intend to speak about today?

20     INTERPRETER:  This is just the documents that I received

21  from you, and an outline for myself.

22  Q.  Okay.  Have you spoken to anyone at your church regarding

23  the deposition today?

24     INTERPRETER:  You mean, like, about today, or when we

25  were discussing the voting?

1    Q.    Particularly, about the deposition today.

2         INTERPRETER:  Yes.  We had a church meeting, and we just

3    informed the church members that me and brother     will be

4    attending this deposition.

5    Q.    Did that happen -- did that meeting occur with the entire

6    congregation, or just a smaller group?

7         INTERPRETER:  Yesterday, we had the members -- church

8    members meeting.  This would be about half the size of the

9    church, and we did discuss some of this yesterday.

10   Q.    How many people, approximately, were at the members

11   meeting?

12        INTERPRETER:  Should I say this or not?

13   Q.    Just -- yes.

14        INTERPRETER:  About 200.

15   Q.    Were other topics discussed at the meeting, or just the

16   subject of the deposition?

17        INTERPRETER:  We had a regularly scheduled members

18   meeting.  It was a career meeting, and at the end, we just

19   provided information to the members about this.

20   Q.    Was                  present at the meeting?

21   A.    Yes.

22   Q.    Was any discussion regarding your specific testimony

23   mentioned at the meeting?

24        INTERPRETER:  I -- you know, we really didn't -- don't

25   have a clear picture, you know, what would be discussed, so

1    we just had a short discussion and a prayer about it.

2    Q.   Okay.  I would like to talk a little bit about your

3    present employment.  Where do you currently work?

4          INTERPRETER:  Right now, I am unemployed.  The company

5    that I worked for went out of business.

6    Q.   What was that company?

7    A.

8          INTERPRETER:

9          THE WITNESS:

10        INTERPRETER:

11   Q.   How long ago did             stop existing?

12       INTERPRETER:  December 31, 2008 was the last year.

13   Q.   And have you worked since then?

14   A.   No.

15   Q.   Do you have any role with the

16

17       INTERPRETER:  I am a vice pastor.

18   Q.   And how long have you had that position?

19       INTERPRETER:  For about four years now.

20   Q.   What are your responsibilities as a vice pastor?

21       INTERPRETER:  I conduct services.  I help pastor the

22    services.  I visit ill people.  Go to hospitals after

23    surgeries.  I just take care of the spiritual needs of the

24    people.

25   Q.   And did you have that position in the year 2009?

1    INTERPRETER:  Yes.

2  Q.   Approximately how many hours per week do you devote to

3  your role as the vice pastor?

4    INTERPRETER:  It's hard to say, frankly.  I never

5  counted.  I never kept track of it, how many hours.

6  Q.   Okay.

7    INTERPRETER:  I -- you know, it could be three, four,

8  five hours per day.  It really depends.

9  Q.   Okay.

10    INTERPRETER:  We have a lot of elderly members.

11  Q.   Okay.  How many parishioners or church goers are there,

12  for an average service at the church?

13    INTERPRETER:  Can I decline to respond to that, or --

14    MR. PIDGEON:  I mean, you should -- in my opinion, you

15  should answer it.

16    INTERPRETER:  Because under -- you know, we just have --

17  we never told anyone, in our practice, before, how many

18  people attend church.

19  Q.   (BY MR. DIXSON)  I am not looking for an exact number,

20  nor the identity of any member of the church.

21    INTERPRETER:  On Sunday services, between seven to 800.

22  Q.   And would that be the same as attended the church in

23  2009?

24    INTERPRETER:  Yes.

25  Q.   Does the church maintain a church newsletter or a

1 website?

2 INTERPRETER:  There is no newsletter, but there is a

3 website.

4 Q.  Who is responsible for the content posted on the church

5 website?

6 INTERPRETER:  Now people change.  There was a person who

7 was responsible.  He went to a different church.

8 Q.  Okay.  Is either yourself or                  responsible

9 for the content on the church website?

10 INTERPRETER:                        is responsible.

11 Q.  Does                   post the content himself, or does

12 he use someone to post his messages?

13 INTERPRETER:  There is -- the way it usually happens,

14 there is a meeting.  There is a number of people involved.

15 People responsible for the video.  People responsible for

16 other content.  And they discuss what goes on, and, at times,

17 he consults us; you know, what we should put and what we

18 should not put.

19 Q.  Prior to working for                , did you have another

20 occupation in the United States?

21 INTERPRETER:  I worked for six months.  It was a seasonal

22 work, and it was in a hot house.  And I worked there until

23 December 31st, and as of January 5th, I started working at

24                   .  And I worked there for five years.

25 Q.  What year did you come to the United States?

1      INTERPRETER:  2003.

2   Q.   Did you come straight to Spokane?

3   A.   Yes.

4   Q.   And have you become a United States citizen since living

5   here?

6      INTERPRETER:  Yes.

7   Q.   And what year was that?

8      INTERPRETER:  A year and a half ago.  I believe it was in

9   '09.

10  Q.   And are you a registered Washington voter?

11     INTERPRETER:  Yes.

12  Q.   Do you remember when you first became a registered

13  Washington voter?

14     INTERPRETER:  My first time was when we voted on the 71.

15  Q.   Okay.  So you had not voted in a Washington election

16  prior to November 2009, correct?

17     INTERPRETER:  No.

18  Q.   No; that's incorrect?  Or, no, you had not?

19     MR. PIDGEON:  I knew I should have objected to the form

20  of that question.

21     INTERPRETER:  No, I did not vote.  I did not have a right

22  to do that before that.

23  Q.   (BY MR. DIXSON)  Okay.  Do you remember a particular

24  month, in the year 2009, when you became a registered voter?

25     INTERPRETER:  There was discussion before that, but, you

1  know, the vote was in November, so, probably, shortly before

2  November, or right in November.

3  Q.   So the fall season of 2009?

4       INTERPRETER:  The fall.  Yes.

5  Q.   When did you first learn that you had been named as a

6  witness in the Referendum 71 lawsuit?

7       INTERPRETER:  Do you mean, about today's meeting?

8  Q.   No.  There was a witness list prepared by the plaintiffs

9  in late August or early September 2010.  When did you first

10 learn that you were named as a witness on that list?

11      INTERPRETER:  Jessica called on September 16th.

12      THE WITNESS:  16th.

13 Q.   Prior to your conversation with Jessica Hamilton, were

14 you aware that you had been named as a witness in this

15 lawsuit?

16      INTERPRETER:  No.

17 Q.   Prior to speaking with Ms. Hamilton in September 2010,

18 had you spoken to any attorneys regarding the Referendum 71

19 lawsuit?

20      INTERPRETER:  No.

21 Q.   Were you surprised to find out that you had been named as

22 a witness in this lawsuit?

23      INTERPRETER:  Yes.

24 Q.   Do you understand that as a named witness in a federal

25 trial, you may be required to testify in federal court

1  regarding your experiences?  Do you have any concerns about

2  testifying in public regarding Referendum 71?

3       INTERPRETER:  What do you mean, specifically?  Like, for

4  me appearing in court, or, I mean, what?

5  Q.   Yes.  If you were required to be in court, would that --

6  would you have any concerns about appearing in court as a

7  witness?

8       INTERPRETER:  Well, I am sure it's not the most pleasant

9  procedure.

10 Q.   Do you have any concerns about your physical or mental

11 health regarding testifying in federal court?

12      INTERPRETER:  Hard to say.

13 Q.   Okay.  When did you first learn about Referendum 71?

14      INTERPRETER:  It was the beginning of the fall in '09.

15 Q.   And I should back up.  Do you understand what I mean when

16 I say Referendum 71?

17      INTERPRETER:  You are talking about the votes on this

18 issue, right?

19 Q.   I am, right now, talking, in particular, about the actual

20 petition for Referendum 71, and not the actual November vote.

21      INTERPRETER:  You talking about the times when they are

22 gathering signatures, right?

23 Q.   Yes.

24      INTERPRETER:  So, what is your question?  Dates and

25 times, or if I knew what I was doing?  What's the --

1  Q.  In general, when did you first become involved with

2  Referendum 71?  If that means gathering signatures, yes; when

3  did that first occur?

4     INTERPRETER:  So, in November, there is a voting.  So I

5  would say, the summer.

6  Q.  How -- who first told you about Referendum 71, or how did

7  you first learn about Referendum 71?

8     INTERPRETER:  We had meetings.  We had meetings.

9  Q.  Meetings at the church?

10     INTERPRETER:  We had unscheduled meeting in our church.

11  It was not a regularly schedule meeting.

12  Q.  Do you remember when that was?

13     INTERPRETER:  It was sometime in the summer.  I don't

14  know the specific date.

15  Q.  Who was at that meeting?

16     INTERPRETER:         , and I don't remember who else.

17  Q.  Was         at that meeting?

18     INTERPRETER:  Yes.

19  Q.  How many people, approximately, were at that meeting?

20     INTERPRETER:  It wasn't just people from our church.  It

21  was Slavic people in the area.  Maybe 80 to a hundred people.

22  Q.  Who organized the meeting?

23     INTERPRETER:  I think, probably,         .

24  Q.  Did you help to organize the meeting?

25     INTERPRETER:  I did not help to set up the meeting, but

1  gathering signatures, sure.

2  Q.   Do you know how people were invited to attend that

3  meeting?

4       INTERPRETER:  Can you repeat that?  I have a problem

5  translating.

6  Q.   Yes.  Do you know how people were invited to attend that

7  meeting?

8       INTERPRETER:  People were called -- people who knew the

9  neighbors, and those who -- and those who wanted to attend.

10  It was a voluntary meeting, and those who wanted to attend,

11  did.

12  Q.   Where did the meeting take place?

13       INTERPRETER:  In our church.

14  Q.   Who spoke at the meeting?

15       INTERPRETER:            .  I don't remember the names.

16  Some other people.  It was just purely informational.

17  Q.   What did          tell those people at the meeting?

18       INTERPRETER:  That meeting was, the issue of gathering

19  signature was discussed, so there will be voting on this

20  issue.

21  Q.   Do you remember anything else from that initial meeting

22  with        ?

23  A.   No.

24  Q.   Approximately how long did that meeting last?

25       INTERPRETER:  Maybe a couple hours.

1  Q.  Had you had any interaction with          prior to that

2  meeting?

3       INTERPRETER:  Personally, I didn't, because I have a

4  language barrier.

5  Q.  Did you know who          was, prior to this meeting?

6  A.  No.

7  Q.  Did you have any participation with Senate Bill 5688 in

8  the Washington State legislature?

9       INTERPRETER:  What is that?

10  Q.  It was a bill that expanded same sex rights to domestic

11  partnerships, and led to Referendum 71.

12       INTERPRETER:  As far as I understood, that's why the

13  signatures were gathered.  Right?

14  Q.  Yes.

15       INTERPRETER:  You know, the information we got, you know,

16  how this law was going into effect.

17  Q.  And that was at the meeting with          in the summer

18  of 2009?

19       INTERPRETER:  Yes.

20  Q.  Okay.  We will talk about the signature gathering in just

21  a second.

22       In support of Referendum 71, did you attend any public

23  rallies or gatherings?

24       INTERPRETER:  Well, we had separate meetings in the

25  church, and we had meetings where we discussed that.  Yes.

1    Q.    Any public participation outside of the church?

2        INTERPRETER:  So you are talking about gathering

3  signatures, right?

4    Q.    No.  It would be, in English, a public rally or a public

5  gathering in support of Referendum 71.  Like, a Town Hall or

6  a public speaking.

7        INTERPRETER:  I think there was a meeting once, in the

8  DoubleTree Hotel.

9    Q.    Okay.  Anything outside, where people used microphones,

10  or attended any type of rally?

11        INTERPRETER:  No.

12    Q.    Did you ever hold up campaign signs in support of

13  Referendum 71?

14        INTERPRETER:  Yes.

15    Q.    On how many occasions?

16        INTERPRETER:  Personally, me, you mean.  Right?

17    Q.    Correct.

18        INTERPRETER:  Maybe a couple times, I was there at the

19  intersection and holding up the sign.

20    Q.    The same intersection both times?

21        INTERPRETER:  Yes.  The same.

22    Q.    And what intersection was that?

23        INTERPRETER:  Crestline and Wellesley.

24    Q.    How did you choose that location?

25        INTERPRETER:  I don't remember.  I just walked to it.

1  Q.   Were you by yourself or with a group of people?

2       INTERPRETER:  It was my family with me.

3  Q.   And was this your idea to do so, or did someone instruct

4  you to be at that intersection?

5       MR. PIDGEON:  Objection, as to the form of the question.

6       MR. DIXSON:  You can answer.

7       INTERPRETER:  It was my idea.  Nobody made me do it or

8  talked me into it.  And it was a desire of my family.  I did

9  not ask or make anyone to do it.

10 Q.   (BY MR. DIXSON)  I am not asking about any particular

11 family members or their identities, but how many of you were

12 out on the intersection?

13      INTERPRETER:  Four people.

14 Q.   Did everyone have signs?

15      INTERPRETER:  We had two signs, and they were nearby me.

16 Q.   Did you donate to any political action committees in

17 support of Referendum 71?

18      INTERPRETER:  I think -- and I don't remember the

19 amount -- but I think the church did some support.

20 Q.   Did you personally donate to any political action

21 committees?

22      INTERPRETER:  No.

23      MR. DIXSON:  Ozzie, this is going to be Exhibit 1.

24      (Ex. No. 1, marked.)

25 Q.   (BY MR. DIXSON)  I am handing you what has been marked as

1    Exhibit 1 to your deposition.  This is a document from the

2    Washington State Public Disclosure Commission.  If you can

3    turn to the page labeled Page No. 5, in the upper right-hand

4    corner.  In looking at the bottom line on that page, there is

5    an entry for the                                    .  Is that your

6    church?

7    A.    Yes.

8    Q.    And there is an entry for $1,000.  Is that correct?

9         INTERPRETER:  It could be true.  I don't remember the

10   specific amount.  It's quite possible.

11   Q.    Okay.  Did you assist the church in collecting money for

12   the contribution to the political action committee?

13        INTERPRETER:  No.  This was just given from the church.

14   Q.    Was there a special collection for this, or did it come

15   from the general donations from the parishioners?

16        INTERPRETER:  No.  It was --

17        MR. PIDGEON:  Objection to relevance.

18        INTERPRETER:  It was just from the general.  And then,

19   also, people could have -- also were allowed to just give,

20   themselves.

21        MR. PIDGEON:  One note for the record.  Just for the sake

22   of the flowing of the conversation, I would like, if I have

23   an objection to the question, I would like to be able to

24   enter the objection after he answers.  In other words, I

25   don't want to lose my objection, but I don't want to

1   interrupt his answer, either.

2        MR. DIXSON:  That's fine with me.

3        MR. PIDGEON:  Okay.

4   Q.  (BY MR. DIXSON)  Did you participate in any radio or

5   television interviews regarding Referendum 71?

6        INTERPRETER:  No.

7   Q.  Did you appear, to your knowledge, in any newspaper or

8   Internet websites regarding Referendum 71?

9        INTERPRETER:  No.

10  Q.  And to your knowledge, is your name publicly associated

11  with Referendum 71, in any form?

12       INTERPRETER:  I really don't think that, you know, my

13  name is that loud, and is really involved.

14  Q.  Okay.  So the answer would be "no"?

15       INTERPRETER:  No.

16       MR. PIDGEON:  Objection as to form.

17  Q.  (BY MR. DIXSON)  Are you aware that after the petitions

18  were circulated and submitted to the Secretary of State's

19  office, the Secretary of State had to conduct a counting and

20  verification process in Olympia?

21       INTERPRETER:  Yes.  I know that votes should have been

22  counted.  Yes.

23  Q.  Not the votes, but the actual number of people who signed

24  the petition?

25       INTERPRETER:  Yes.  I mean, I know it should be counted.

1    Q.    Okay.

2         INTERPRETER:  Yeah.  There is known that we needed a

3    certain amount of people to sign off.

4    Q.    Did you participate in observing the signature counting

5    in the Secretary of State's office?

6         INTERPRETER:  No.

7    Q.    Do you know anyone who did?

8         INTERPRETER:  I don't know, for sure, but maybe Matt

9    Shea.

10   Q.    To your knowledge, did anyone from your church

11   participate in the signature verification process?

12        INTERPRETER:  What do you mean, specifically?

13   Q.    Did anyone from your church, to your knowledge, travel to

14   Olympia to oversee the signature verification process?

15        INTERPRETER:  No.

16   Q.    Have you heard anything about the signature verification

17   process?

18        INTERPRETER:  I -- well, we heard about the process going

19   on.  We had people raising different concerns about it.  I

20   mean, just in general, we just tried to follow it.

21   Q.    Did anyone tell you about particular concerns with the

22   process?

23        INTERPRETER:  Well, I mean, I was concerned myself, which

24   way it was going to go.

25   Q.    Regarding whether or not you had, in fact, gathered

1    enough signatures to put the measure on the ballot?

2         INTERPRETER:  Yes.

3    Q.   Did you have any particular concerns that the Secretary

4    of State's office was making errors in the counting process?

5         INTERPRETER:  Hard to say.  I don't know those people.

6    Q.   But you were not aware of any particular concerns

7    regarding the verification process?

8         INTERPRETER:  What do you mean?

9    Q.   Did anyone tell you that they had concerns regarding

10   errors being made by the Secretary of State during the

11   verification process?

12        INTERPRETER:  No.  Nobody told me anything like that;

13   specifically that, you know, there was something like that

14   going on.

15   Q.   Other than your participation in gathering signatures and

16   holding signs, did you have any other involvement with

17   Referendum 71?

18        INTERPRETER:  No.

19   Q.   I want to talk about the signature gathering process.

20   Did you help gather signatures for Referendum 71?

21        INTERPRETER:  Yes.

22   Q.   Did you, in fact, sign the Referendum 71 petition?

23        INTERPRETER:  Yes.

24   Q.   Where were you when you signed the petition?

25        INTERPRETER:  At home.

1    Q.    Okay.  Who asked you to help gather signatures?

2          INTERPRETER:  It was my own desire.

3    Q.    Was this -- was the signature gathering effort something

4    you discussed with the members of the church?

5          INTERPRETER:  Yes.  We had a special meeting.  Those

6    people who wanted to attend it, and people who wanted to sign

7    the petition, they did.  There is no, you know, talking

8    people into, or, you know, making them do that, or anything

9    like that.

10   Q.    So people signed the petition at this special meeting,

11   correct?

12         INTERPRETER:  No.  People would take them with them.

13   Yes.

14   Q.    Okay.  What was the church's plan to gather signatures?

15         INTERPRETER:  Well, we wanted for a Biblical family to be

16   preserved.

17   Q.    What do you mean by Biblical family?

18         INTERPRETER:  God created man and a woman, and he blessed

19   them, and we believe in Biblical marriage as of today.

20   Q.    Do you define Biblical marriage to be marriage between

21   one man and one woman?

22   A.    Yes.

23         INTERPRETER:  Yes.

24   Q.    Okay.  How did the church plan to gather signatures?

25         INTERPRETER:  What do you mean, how we planned?

1    Q.   Did you have specific locations which you were instructed

2    to go to, to gather signatures?

3         INTERPRETER:  No.  Everyone did it on his own.  Wherever

4    the person lives, or --

5    Q.   So there was no overall church plan to gather signatures.

6    It was left to each member on his own?

7         INTERPRETER:  Right.  There was no specific plan where,

8    you know, I am supposed to go to south hill, or someone else

9    was supposed to go to north side.  No.  There was no such

10   form.  It was at the personal discretion.  People who wanted

11   to, they took the paperwork and --

12   Q.   Okay.  Let's talk about your personal signature

13   gathering.  How many times did you collect signatures?

14        INTERPRETER:  I don't remember exactly how many times,

15   but there was one sheet.  I think there was -- I think there

16   was, like, 30 entries on the number of sheets that I have,

17   and what I did, you know, I approached people with the

18   interpreter, and explained the issue, and if they wanted to

19   sign, they did sign.  If they didn't want to sign, you know,

20   they did not sign.  And I believe that it got filled out

21   completely.

22   Q.   So you personally were responsible for gathering

23   signatures for one full petition, correct?

24        INTERPRETER:  I took that responsibility on myself.  I

25   wanted to, and I did do that.

1  Q.   Okay.  I am just trying to establish how many petitions

2  you were personally responsible for, and I believe that that

3  is one petition, correct?

4      INTERPRETER:  One petition.

5  Q.   Where did you go to gather signatures?

6      INTERPRETER:  On a street where I live.

7  Q.   Did you go to any public places, such as grocery stores

8  or large retail stores or a mall?

9      INTERPRETER:  No.  I did not go to those.

10  Q.   So you gathered signatures in your neighborhood, correct?

11      INTERPRETER:  Yes.

12  Q.   You mentioned that you had a translator with you.  Why

13  did you bring a translator?

14      INTERPRETER:  In order -- in order to properly explain,

15  you know, the petition, we would give them the petition, and

16  I couldn't explain, but the translator could.  And after the

17  explanation, either people signed, or they declined to sign.

18  Q.   Besides yourself and the translator, was anyone else with

19  you when you gathered signatures?

20      INTERPRETER:  I don't think so.  No.

21  Q.   Are you able to read English?

22      INTERPRETER:  I do read.  I read.

23  Q.   So, were you personally aware of what the referendum

24  said, that you were asking other people to sign?

25      INTERPRETER:  Well, maybe not, like, exactly 100 percent,

1   but I did understand what it was asking for.  Yeah.  What I

2   mean is, you know, maybe by just reading, I would not get

3   exactly 100 percent, but I did understand what it was about.

4   Q.   And do you have an estimate of how many times you went

5   out in the neighborhood to gather signatures?

6        INTERPRETER:  Maybe five, maybe six times.

7   Q.   Did you have a Referendum 71 yard sign in your yard?

8        INTERPRETER:  Yes.  Up front.

9   Q.   Did you have a Referendum 71 bumper sticker on your car?

10       INTERPRETER:  No.

11   Q.   Outside of gathering signatures in the neighborhood, did

12   you personally have any other efforts to gather signatures?

13       INTERPRETER:  We had small brochures that we placed by

14   the people's doors, outside.

15   Q.   So you would leave brochures at people's doors if they

16   were not home when you went to gather signatures?

17       INTERPRETER:  Yes.  Yes.  We would walk by and just leave

18   them there.

19   Q.   Were the brochures in English or in Russian?

20       INTERPRETER:  In English.

21   Q.   Were the petitions available for signature at the church?

22       INTERPRETER:  What do you mean, petition?

23   Q.   The same petition that you took around the neighborhood

24   to gather signatures, were additional copies available at the

25   church?

1     INTERPRETER:  Maybe it was available.  Some did fill it

2  out there, or put his name there.

3  Q.  Did you see people sign the petitions at the church?

4     INTERPRETER:  I could have happened.  I mean, like, I was

5  responsible for 30 signatures, and people could have come up

6  and see if I could put the name in.

7  Q.  Okay.  But there was no organized signature gathering at

8  the church?

9     INTERPRETER:  There was no concrete time or place set at

10  the church, you know, for signatures.  Mostly, what happened,

11  people took the petitions and, you know, went out and signed

12  it at their time and place.

13  Q.  Did one person gather all of the signed petitions to send

14  them to the Secretary of State's office once they had been

15  compiled?

16     INTERPRETER:  Yes.  Someone was responsible for gathering

17  all of the petitions and turning them in.

18  Q.  Do you remember who that was?

19  A.  No.

20  Q.  Do you know how many petitions that members of the

21  church, in total, gathered and sent to the Secretary of

22  State?

23     INTERPRETER:  I don't know the exact number.

24  Q.  Do you think it was more than 20 sheets?

25     INTERPRETER:  I think there was more.

1  Q.  More than a hundred sheets?

2  A.  I don't know.

3     INTERPRETER:  I think there was more than a hundred.

4  Q.  More than 200?

5     INTERPRETER:  I cannot say for sure, because I don't know

6  the exact number.

7  Q.  But you are pretty sure, not knowing the exact number, it

8  was more than 100?

9     INTERPRETER:  Yes.

10  Q.  Did you or            speak about Referendum 71

11  during church services?

12     INTERPRETER:  We don't talk about those things during

13  regular service.  You know, we pray, we sing and we preach.

14  We don't discuss any other issues, and that's our regular

15  approach.

16  Q.  I understand that you allege that you have suffered some

17  harassment as a result of your participation with Referendum

18  71?

19     MR. PIDGEON:  Objection as to form.

20  Q.  (BY MR. DIXSON)  And I would like to talk about that now.

21  A.  Uh-huh.

22  Q.  Can you tell me about any harassment, threats or

23  reprisals that you have suffered, or are aware of, regarding

24  Referendum 71?

25     INTERPRETER:  Are you talking of, just personally, me, or

1  in general, or --

2  Q.   We will do both, but I want to start with you,

3  personally.

4       INTERPRETER:  Personally, about me.

5  Q.   Can you tell me -- and we will take time to go through

6  each incident -- but beginning where you want to begin,

7  describe any personal harassment.

8       INTERPRETER:  So, talking personally about me.  So,

9  personally, to me, there was no, you know, physical damage or

10 nothing was broken.  That did not happen.  I had that sign up

11 front, and it was still there.  The only thing that --

12 stickers with swear words were placed on my vehicle, and as

13 far as it's been connected to this, you know, I couldn't say

14 exactly.

15 Q.   When, if you remember, did you first place the yard sign

16 in your front yard?

17      INTERPRETER:  When the process started.  Probably

18 October.

19 Q.   And there was no damage done to that sign, correct?

20      INTERPRETER:  No.  It was there.

21 Q.   Turning to the stickers with the swear words, where were

22 these stickers placed?

23      INTERPRETER:  On the windshield, on two different

24 vehicles.

25 Q.   The windshield of your personal cars, correct?

1  A.    Yes.

2  Q.    Two separate cars?

3        INTERPRETER:  Yes.

4  Q.    How many stickers were placed on each car?

5        INTERPRETER:  It was two or three stickers.

6  Q.    On each car, or in total?

7        INTERPRETER:  No.  In total.

8  Q.    When did you find these stickers?

9        INTERPRETER:  Two, two and a half months ago.

10 Q.    Okay.  So, in the summer of 2010, correct?

11       INTERPRETER:  Yes.

12 Q.    And I know it may be unpleasant, but do you recall what

13 was written on the stickers?

14       INTERPRETER:  I did not understand the words, exactly,

15 but when my son looked at that, he was, like, Dad, where did

16 you get this?

17 Q.    Were the stickers written in English?

18       INTERPRETER:  Yes.

19 Q.    Approximately how big were the stickers?

20       INTERPRETER:  It was the yellow sticky note, actually.

21 It's one where you peel off and stick on.  So it was a square

22 size.

23 Q.    We would call it a Post-it note.

24       INTERPRETER:  Yes.

25       MR. PIDGEON:  Let the record reflect, he indicated the

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

1   size about maybe two by two.  Two by two inches.

2        INTERPRETER:  Yes.

3   Q.   (BY MR. DIXSON)  Do you believe that those stickers were

4   related to your position with regards to Referendum 71?

5        INTERPRETER:  I couldn't say that for a hundred percent,

6   because I did not see who done it.  I don't know.  Even

7   though I resided there for four years, and I had no issues

8   with the neighbors, and --

9   Q.   Were any stickers placed on your vehicles around the time

10  of the signature gathering or the November 2009 election?

11       INTERPRETER:  No.

12  Q.   Do you recall, from what your son told you, what was

13  actually written on any of the stickers?

14       INTERPRETER:  He just told me that it was very bad

15  swearing words, and, so, I tore it up and threw them in the

16  garbage.

17  Q.   Did you think they were directed to you, personally?

18       INTERPRETER:  Yes.

19  Q.   Why do you think that?

20       INTERPRETER:  Because I did not see stickers like that at

21  my neighbors' vehicles.

22  Q.   Did your son tell you if the stickers said anything about

23  Referendum 71 or Biblical marriage?

24       INTERPRETER:  No.

25  Q.   I would like to talk about -- strike that.

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

1      Outside of the stickers, is there any personal harassment
2  that you allege you suffered, that we have not discussed here
3  today?
4      INTERPRETER:  Personally, me, no.  But, you know, when
5  our youth was out in the city with the signs, and they were
6  swore at, spat at, middle fingers were shown to them.
7  Q.  Okay.  And I want to talk about harassment that you
8  didn't suffer personally, but you are aware of.  And it is
9  important that we talk about each incident, if you can
10  separate them separately.
11      So, in whatever order you would like to tell me about
12  them, please tell me about any harassment that you are aware
13  of, but did not suffer personally.
14      INTERPRETER:  Like I said, our youth, and there is the
15  person named          .  He is a nephew of
16          He is the pastor of other Slavic Church.  I think
17  it was on October 24th, they were standing on Division, and
18  they saw one woman tearing down the sign, and she -- and he
19  asked her, why are you doing this?  And she took the sign and
20  hit him on the head, and he suffered cuts on his head.  He
21  actually went to emergency room, and he had stitches placed
22  in his head.
23  Q.  Was          part of a large group that was waving
24  signs?
25      INTERPRETER:  Yes.

STOREY & MILLER COURT REPORTERS                    509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

1  Q.   Approximately how many people were in the group, if you

2  know?

3       INTERPRETER:   I don't know, exactly, the number, but it

4  was a group of people.   So, after that incident, you know, we

5  asked the youth not to be in the small groups, like of, you

6  know, like, a couple people, but more like six or eight so

7  they would feel safer.

8  Q.   Were youth from your church present with          in

9  October of 2009?

10      INTERPRETER:  No.  No.  It was a group from a different

11 church, and usually, groups from the same church, you know,

12 went out.

13 Q.   What's the name of          church?

14      INTERPRETER:  I don't know the name of the church.  I

15 know it's a church of          .

16 Q.   In Spokane?

17 A.   Yes.

18 Q.   Do you know the address or anything?

19      INTERPRETER:  I don't know.

20 Q.   Do you know          personally?

21      INTERPRETER:  No.  Personally, I do not.

22 Q.   How did you learn about what happened to          ?

23      INTERPRETER:  Well, I mean, it was just -- it just spread

24 among the Slavic group, and it was a little tense time, at

25 that time, so it was discussed.

State Objects: Witness lacks foundation; hearsay; and irrelevant.

1  Q.   Do you know if the woman who took the sign said anything

2  to            ?

3       INTERPRETER:  I don't know what was exchanged,

4  conversation-wise.  I just know that he was hit.

5  Q.   Did you see            with the stitches, following the

6  incident?

7       INTERPRETER:  No.  Personally, I did not.  Personally, I

8  did not.

9  Q.   But you have never --

10      INTERPRETER:  Because we are in different churches.

11 Q.   And you have never personally met            ?

12      INTERPRETER:  With his            , I did.  The one

13 who is a pastor.

14 Q.   Did you talk to                about the incident?

15      INTERPRETER:  I personally did not.  There is actually a

16 letter in which he described what happened.

17 Q.   Can you tell me more about the letter?  Who wrote it?

18      INTERPRETER:                    .                    .  He

19 wrote this letter, and he even said he could come and

20 testify, if needed to, and to tell it in detail, how it

21 happened.

22 Q.   When was the letter written?

23      INTERPRETER:  Yesterday or day before.  He found out that

24 we had been called as witnesses to this, and he found out

25 that we needed some information, and he was ready to come and

1  testify.

2  Q.   Have you seen the letter, or          just told you that

3  he wrote a letter?

4       INTERPRETER:  I saw the letter.  I personally saw the

5  letter yesterday.

6  Q.   Do you know if          , or anyone else in that youth

7  group, said anything to the woman, prior to her striking

8          ?

9       INTERPRETER:  From what I know, he asked her, why are you

10 tearing the signs down?

11 Q.   And do you know what she said to him?

12      INTERPRETER:  No.  Well, she responded with (indicating.)

13 Q.   So, to your understanding of the incident, a group of

14 youth were waving Referendum 71 signs?

15      INTERPRETER:  Yes.

16 Q.   A woman approached the group and grabbed -- and began to

17 take down the signs?

18      INTERPRETER:  From what I understand, one of them was,

19 like, sticking in the ground.

20 Q.   And she -- did she pick up a sign that was in the ground,

21 or did she take a sign from someone who was holding it?

22      INTERPRETER:  From the way I understood it, it was staked

23 into the ground.

24 Q.   And there -- and          asked her, why are you

25 taking the sign out?

 1          INTERPRETER:  Yes.

 2    Q.    And then she struck him on the head with the sign?

 3          INTERPRETER:  Yes.

 4    Q.    Do you -- and            went to the hospital, correct?

 5          INTERPRETER:  Yes.  And he had six stitches in his head.

 6    Q.    How do you know the number of stitches?

 7          INTERPRETER:  That is what it says in the letter.

 8    Q.    So you know that from the letter, correct?

 9          INTERPRETER:  Yes.  I saw the letter yesterday.

10    Q.    Do you know what hospital            went to?

11          INTERPRETER:  I don't know what hospital.

12    Q.    Did anyone say anything to the woman after she struck

13                ?

14          INTERPRETER:  I don't have any knowledge what happened

15    afterwards, what actions were taken, or anything like that.

16    I don't know.

17    Q.    Do you know if            filed a report with the police

18    regarding this incident?

19          INTERPRETER:  No.  He did not do that.

20    Q.    You know for a fact that he did not file a report?

21          INTERPRETER:  I heard that police was not called.

22    Q.    Did anyone tell you, or have you come to know, why the

23    police were not called?

24          INTERPRETER:  I don't know the reasons why the police was

25    not called.

1  Q.   Is there anything else about the incident with

2         that you would like to tell me, that I haven't

3  asked you?

4      INTERPRETER:  No.  I said everything.

5  Q.   Outside of the incident with        , are you aware

6  of any other incidents regarding Referendum 71?

7      INTERPRETER:  The incident where -- like I stated in the

8  beginning -- where our youth was standing -- should I repeat

9  that?

10 Q.   Yes.

11     INTERPRETER:  At a number of times when our youths would

12 be standing out with the signs, they were sworn at, spat at,

13 and middle fingers were shown to them, and I did verify that

14 with the youth.

15 Q.   Okay.  Did these incidents -- are they separate

16 incidents, or was the swearing and the spitting all together?

17     INTERPRETER:  It was at different times.  Our youth went

18 out a number of times, and they would gather in groups, and

19 would be out there with signs.

20 Q.   Are these youth from your church, or youth from other

21 churches?

22     INTERPRETER:  From our church.  Yes.

23 Q.   Were you ever present when the youths were gathered and

24 waving the signs?

25     INTERPRETER:  I wasn't present, physically, but I drove

1  by locations where our youth was standing.

2  Q.  When you -- did you personally observe any spitting or

3  swearing at the youths when you drove by?

4      INTERPRETER:  No.  Personally, I did not see that.

5  That's from the words of the youth.

6  Q.  Can you estimate for me how many times the youth were

7  spit at or sworn at or had middle fingers raised?

8      INTERPRETER:  I recently talked to a person.  I don't

9  want to, you know, mention his name, because he is not an

10  adult yet.  From what he told me, it was quite frequent.

11  Q.  Can you provide any greater detail about any of these

12  particular incidents?

13      INTERPRETER:  No.  I can't provide anything more.

14  Q.  Do you know if the youths were who were spit at or sworn

15  at contacted the police regarding what had taken place?

16      INTERPRETER:  No.  They did not report that to the

17  police.

18  Q.  Do you know why they would not report that to the police?

19      INTERPRETER:  I don't know.  Maybe they got used to it

20  or --

21  Q.  Prior to the youths going out to wave signs, did you, or

22  anyone from the church, provide them instructions on where to

23  go or what to do?

24      INTERPRETER:  We had a discussions with them, you know,

25  about it, but as far as actual location, they would choose

1  themselves.  Either by the church, or on Division and

2  Wellesley.  But the sign that was by our church, on the

3  church's property, was taken down numerous times.

4  Q.  Are there any other incidents, that you are aware of,

5  with the youth and the sign waving, that you haven't told me

6  about today?

7       INTERPRETER:  No.

8  Q.  Did people report -- did the youths report these

9  incidents directly to you, or did you learn about them

10 through the members of your church and Slavic community?

11      INTERPRETER:  Well, sometimes they -- some of them told

12 it to me directly.  Sometimes they, in the group meetings,

13 you know, when the service would end, you know, would

14 communicate among each other and talk about it.

15 Q.  Informally, you learned about these incidents?

16      INTERPRETER:  You know, I did not, like, collect this

17 information, because I did not have a thought in my mind that

18 I would -- sometime later, would need that information.

19 Q.  Okay.  You mentioned that there was a Referendum 71 sign

20 on the church property that was removed.  Correct?

21      INTERPRETER:  Yes.

22 Q.  Was the sign simply taken and moved, or was it broken, or

23 damaged, or otherwise defaced?

24      INTERPRETER:  A number of times, it happened -- at

25 minimum, happened three times, and, usually, what happened,

1    the sign would be torn off, but the stake that was in the

2    ground, you know, would still be there.

3    Q.    Did you witness anybody tearing the sign off?

4          INTERPRETER:  Personally, I did not.

5    Q.    Do you know anyone from the church who saw the sign get

6    ripped off?

7          INTERPRETER:  No.  We just saw the fact that it's gone.

8    Q.    Did the -- was anything -- any notes or other messages

9    left on the stake, or anywhere else around the church

10   property?

11         INTERPRETER:  No.  It was just a broken sign.  That's it.

12   Q.    Did you, or anyone from the church, contact the police

13   regarding the broken sign?

14         INTERPRETER:  No.

15   Q.    Why not?

16         INTERPRETER:  We are not used to do those things for

17   things of that nature.  You know, if it was, like, you know,

18   some big crime, sure.  We would just put a new sign in.

19   Q.    Outside of the incident with          , the youths

20   holding the signs, and the sign on the church property, are

21   you aware of any other harassment related to Referendum 71,

22   that you have not told me about today?

23         INTERPRETER:  No.  That's it, pretty much.

24   Q.    Since the election in November 2009, are you -- have you,

25   or anyone you know, suffered harassment related to

1  Referendum 71?

2        INTERPRETER:  No.  I am not aware of that.  That, or any

3  threats, or anything like that.

4  Q.   Did you, at any time, feel personally unsafe based upon

5  your participation with Referendum 71?

6        INTERPRETER:  Well, there was some feeling, you know,

7  which I was going to go, but --

8  Q.   Can you explain?  I guess I am unclear as to that answer.

9        INTERPRETER:  There was some time when it was tense, but

10  there was no, like, you know, specific threats to me, or

11  anything like that.

12  Q.   What made you feel tense?

13        INTERPRETER:  I can't really explain it, but it's just a

14  feeling.

15        MR. DIXSON:  And I think I am done for now, if you have

16  any questions.

17                            EXAMINATION

18  BY MS. EGELER:

19        MS. EGELER:  Can you hear me all right?  This is Anne

20  Egeler, and I am a deputy solicitor general with the Attorney

21  General's Office, and I am representing Secretary of State

22  Sam Reed in this litigation.

23        Sir, can you tell me what your residential address is?

24        INTERPRETER:                    .

25  Q.   Okay.  And can you tell me how to spell        ?  You

1   were referring to a                    .  Can you spell that

2   name for me?

3   A.                                      , maybe.

4        INTERPRETER:  I would guess it's                   .

5   Q.   And would          be                   ?

6        INTERPRETER:  I am sorry.  I lost you there.

7   Q.   Is

8        INTERPRETER:  Yes.  Yes, but sometimes he just writes it

9   down as

10  Q.   And you also referred to an     .  Was that

11  son?

12       INTERPRETER:  No.  It's his nephew.

13  Q.   And is his full name           ?

14       INTERPRETER:

15  Q.   Is his full name

16       INTERPRETER:  This is the interpreter speaking.

17            would be a patronymic.  But if it's a first name,

18  it would be    .

19  Q.   Okay.  During the time of -- at any time in 2009, was

20  there any vandalism or damage done to the church?

21       INTERPRETER:  No.  Except, you know, the tearing down of

22  the sign.  No.

23  Q.   Have there ever been, at any time he is aware of, any

24  other political signs that have ever been posted at the

25  church?

1        INTERPRETER:  I don't think so.

2    Q.    Okay.  Do you have an address for                ?

3        INTERPRETER:  No.

4    Q.    Do you know whether he lives in Spokane?

5        INTERPRETER:  Yes.  He lives in Spokane.

6    Q.    So he does not live in Cheney?

7        INTERPRETER:  Well, I mean, I don't know if he lives in

8    Cheney or not, but, I mean, he is in Spokane.

9    Q.    Okay.  And I missed part of it, I think.  Is

10          associated with another church?

11        INTERPRETER:  Yes.  He is a pastor of a different church.

12    Q.    And what is the name of that church?

13        INTERPRETER:  I don't know.

14    Q.    Where is that church?

15        INTERPRETER:  It's in Spokane.  I have never been to the

16    church.

17    Q.    Do you know what type of church it is?

18        INTERPRETER:  It's a                  .

19    Q.    Okay.  Have you ever met                  ?

20        INTERPRETER:  Yes.

21    Q.    When?

22        INTERPRETER:  He called me a few days ago, not related to

23    this case.  He works as a Realtor, so he called me on a

24    different subject.

25    Q.    And how did you learn that he had an incident related to

1   Referendum 71?

2        INTERPRETER:  I saw that letter yesterday, that he wrote

3   up.

4   Q.   Who was the letter addressed to?

5        INTERPRETER:  To                    .

6   Q.   Do you know if it was mailed to the church?

7        INTERPRETER:  No.  I believe it was transferred via

8   e-mail to him.

9   Q.   And you were asked to bring any documents that evidenced

10  any harassment or threats that you were aware of.  Why did

11  you choose not to bring this e-mail?

12       INTERPRETER:  Well, it's not addressed to me.

13       MR. PIDGEON:  Objection, as to the form of the question.

14       MS. EGELER:  I have no further questions.

15       MR. PIDGEON:  I have a few follow-ups.

16       You still need to translate everything he says.

17       INTERPRETER:  Peace to you.  Our Lord.

18       MR. PIDGEON:  Okay.  A couple questions.

19       THE WITNESS:  Okay.

20                         EXAMINATION

21  BY MR. PIDGEON:

22  Q.   Now, on the website of the church, are you listed on that

23  website?

24       INTERPRETER:  Yes.  Yes, sir.

25  Q.   Are you identified as a pastor of the church?

1    INTERPRETER:  Yes.  Like, as a vice pastor.  Maybe you

2  find my preachings there, too.

3  Q.    And is              also identified on this website?

4    INTERPRETER:  Yes.

5  Q.    Okay.  And is your name also in the phone book?

6    INTERPRETER:  Yes.

7  Q.    And is your address in the phone book, as well?

8    INTERPRETER:  Yes.

9  Q.    So it would be possible for someone to see your name on

10  the website, and then, find your address?

11    INTERPRETER:  If someone needs that.

12  Q.    Now, as vice pastor to the church, do you have authority

13  over the youth?

14    INTERPRETER:  Well, it's not, like, authority.  We try to

15  be, like, a father figure, you know, in a sense.  So

16  sometimes -- you know, sometimes they invite us to the youth

17  meetings, and we talk with them.  We communicate with them

18  and discuss things with them.

19  Q.    Is there a dedicated youth pastor at the church?

20    INTERPRETER:  A specific one, no.  It's actually in the

21  works, at this point.

22  Q.    Okay.  Okay.  So this incident that happened with

23        , first, is it possible that his name may be

24

25    INTERPRETER:  It's possible.  I just know his first name

1  is Ivan.  And that's what it's referred to in the letter.  It

2  does not say                    .  It just says

3  Q.   Now, was this incident widely discussed among the youth,

4  that he had been hit in the head?

5       INTERPRETER:  It was discussed.  After that incident, we

6  discussed with the youth that, probably, two to three people

7  is not enough; that they should have larger groups when they

8  go out, so they would feel safer.

9  Q.   But was this widely discussed among the Slavic community?

10      INTERPRETER:  It was known to everyone.

11  Q.   It was known to everyone.  So most of the Slavic churches

12  in this area knew about this incident?

13      INTERPRETER:  They did know about it.

14  Q.   And, so, did you advise the youth as to being in bigger

15  groups during this time?

16      INTERPRETER:  Yes.

17  Q.   Okay.  Okay.

18      Let me ask you something, too, before.  Do you know

19                  (phonetic)?

20      INTERPRETER:         ?

21  Q.          .

22      INTERPRETER:  In Spokane?

23  Q.   No?

24      INTERPRETER:  No.  It's not familiar to me.

25  Q.   Do you know a                        (phonetic)?

1     INTERPRETER:  Personally, I do not know him.

2  Q.  Okay.  All right.  Now, from which country did you

3  emigrate?

4     INTERPRETER:  Ukraine.

5  Q.  Were you a Pentecostal in Ukraine?

6     INTERPRETER:  No.  Baptist church.

7  Q.  And was your church a registered church?

8     INTERPRETER:  We organized a new church, and it was in

9  the process -- and I think, at this time, they decided not to

10  register.

11  Q.  Did you ever suffer any persecution in Ukraine for being

12  Baptist?

13     INTERPRETER:  Yes.  When I was in school, I was called

14  out and was shamed in front of everyone, and, like, in the

15  middle of a class, I would get called into the

16  vice-principal's office, and he would spend time with me,

17  talking to me like I am a criminal.

18  Q.  Uh-huh.  And do you know; is -- was the Pentecostal

19  church treated similarly in Ukraine?

20     MR. DIXSON:  Object to the form of the question.

21  Q.  (BY MR. PIDGEON)  Do you know; was the Pentecostal church

22  in Ukraine also subjected to similar prosecution?

23     MR. DIXSON:  Same objection.

24     INTERPRETER:  It's on the same level.  There was no

25  difference.

1        MR. PIDGEON:  Let me rephrase the question to try to

2   answer the objection.

3   Q.   (BY MR. PIDGEON)  Were members of the Pentecostal Union

4   also called out and shamed because of their religious

5   affiliation in the Ukraine?

6        INTERPRETER:  Yes.

7        MR. DIXSON:  My objection is to the relevance of the line

8   of questioning.  Not to the particular form of that question.

9        MR. PIDGEON:  All right.  It does go -- just to make a

10  statement to its relevancy, it does go to the question of why

11  the police were called or weren't called.

12  Q.   (BY MR. PIDGEON)  Do you know, also, in the history of

13  the Ukraine, were there incidents that you know of, where

14  members of either the Baptist Union or the Pentecostal Union

15  were incarcerated or killed because of their religious

16  affiliation?

17       INTERPRETER:  It happened.  My grandma's brother, he was

18  taken and never came back.  My father's generation, many of

19  them were in prison.  My parents were called to school and

20  were told not to take us to church with them.  And teachers

21  would show up at the church services and would check upon us

22  if we were in church or not.

23  Q.   Now, was this election concerning R-71, was that the

24  first time you voted in America?

25       INTERPRETER:  Yes.  It was the first time.

1  Q.   And was this the first time you participated in the

2  political process in America?

3       INTERPRETER:  First time.

4  Q.   Do you intend to participate in the political process

5  again in the America?

6  A.   I don't know.

7  Q.   If you could do R-71 again, would you do it again?

8       INTERPRETER:  I would.

9  Q.   Okay.

10      INTERPRETER:  I wanted for Biblical marriage to stay

11 together.

12 Q.   Let me ask you this, too.  Did you meet with me and

13              yesterday?

14      INTERPRETER:  Yes.

15 Q.   And did I give you an idea of what would happen at this

16 deposition?

17      INTERPRETER:  Yes.  Roughly, yes.

18 Q.   And I explained to you that you couldn't bring other

19 church members into the deposition?

20      INTERPRETER:  Yes, you did.

21 Q.   And I also explained to you that you wouldn't be arrested

22 during this deposition?  And I did explain to you that you

23 would not be arrested as a result of this deposition?

24      INTERPRETER:  Yes.

25 Q.   Now, do you know if you have been identified on any

1  blogs, or anywhere else on the website, as a significant

2  party associated with R-71?

3      INTERPRETER:  Really, I don't know.  I don't know how it

4  would actually occur.  You know, really, it's a question in

5  my mind, why my name popped up.

6  Q.  Okay.  I want to go back to these stickers on the car.

7  Now, where were your cars parked?

8      INTERPRETER:  Right in front of the house.

9  Q.  Okay.  Is that where you traditionally park?

10      INTERPRETER:  Yes.

11  Q.  Okay.  And do your neighbors ever occasionally park in

12  those places?

13      INTERPRETER:  Practically, no.  They have their own

14  places.

15  Q.  Okay.  And do you think this occurred around August

16  of 2010?

17      INTERPRETER:  Yes.

18  Q.  Do you know whether or not it was after you were named as

19  a witness in this case?

20      INTERPRETER:  Well, I don't even know exactly when I was

21  named as a witness.

22  Q.  Uh-huh.

23      INTERPRETER:  I found out about that on September 16th,

24  when I got a call from Jessica.

25  Q.  So you never had -- there was never another incident that

1    occurred at your house?

2         INTERPRETER:  No.  Nothing was broken, or anything like

3    that.

4    Q.   Okay.  But this did occur after the election in 2009?

5         INTERPRETER: Well, yes.  After that.  Prior to that, you

6    know, I had no issues.  I mean, I can't say 100 percent, for

7    sure, that it's connected to this, but --

8    Q.   Okay.  Now, you received a phone call from Jessica on

9    September 16th.  Did you receive a phone call from Jessica

10   Hamilton on September 16th?

11        INTERPRETER:  Yes.  But I wasn't the actual person

12   talking to her.  I was not home at that time.  My son talked

13   to her.  He called me afterwards and told me that some woman

14   called, saying that I am going to be a witness.  Something to

15   that effect.

16   Q.   And did she speak to you about a subpoena, or any of

17   these things?

18        INTERPRETER:  It was a short conversation.  He did not

19   talk to her for long, and I don't believe there was actual

20   discussion that there will be a subpoena coming.

21   Q.   Okay.

22        MR. PIDGEON:  I don't have anything further.

23        MR. DIXSON:  Just a couple follow-ups.

24                          EXAMINATION

25   BY MR. DIXSON:

1   Q.   Were you aware of the              incident at the time

2   it happened, or when you read              letter a couple of

3   days ago?

4        INTERPRETER:  I found out right after it happened.  The

5   youth talked about it.  But the letter I saw, personally,

6   yesterday.

7   Q.   Okay.  Have you had an opportunity, outside of

8   Referendum 71, to call law enforcement in the United States?

9        INTERPRETER:  No.

10  Q.   And do you have any reason to believe, if you did call

11  the police, that they would not respond to your request?

12       INTERPRETER:  In my experience, when I lived in Ukraine,

13  and neighbors stopped by, and she asked me to call the police

14  because someone was trying to kill her, and I dialed the

15  number, and they told us, we will come tomorrow.

16  Q.   Okay.

17       INTERPRETER:  So, that was the situation.  So I am not

18  saying, you know, the police would act here as the same way,

19  but where I was raised and I grew up, that's the experience I

20  had.  So we didn't call, usually.

21  Q.   And in the United States, do you have any reason to

22  believe the police would act here, as they did in the

23  Ukraine?

24       INTERPRETER:  No.  I have no reasons.  I did not have

25  need, you know, or issues to call the police about.  Maybe in

1    the future, if I have the need.

2         MR. DIXSON:  That's all I have.

3         INTERPRETER:  As far as I know, here, police arrive very

4    soon right after you call.

5         MR. DIXSON:  Anne?

6         MS. EGELER:  Just a few follow-ups.

7                        EXAMINATION

8    BY MS. EGELER:

9    Q.   So, is it your belief that the police here in the United

10   States are honest and helpful?

11        INTERPRETER:  Yes.

12   Q.   And I am wondering; can you tell me all of the Slavic

13   churches in the Spokane area?

14        INTERPRETER:  No.  I couldn't do that.  I don't know

15   their addresses.  I visit a few churches.  I know where they

16   are located, but as far has the address goes, no.

17   Q.   Do you know the names of all of the Slavic churches in

18   the Spokane area?

19        INTERPRETER:  No.

20   Q.   Do you know the names of all of the Slavic pastors in the

21   Spokane area?

22        INTERPRETER:  No.  I don't know that.

23   Q.   So, is it fair to say that you don't know what they are

24   talking about in all of the Slavic churches in the Spokane

25   area?

1      MR. PIDGEON:  Objection, as to form.

2      INTERPRETER:  Each church is individual.  And what is
3  discussed in each church is none of my business.  It's that
4  church issue.

5  Q.  (BY MS. EGELER)  Earlier, you testified that all of the
6  Slavic churches in the area were discussing and were aware of
7  the incident with            -- excuse me -- with            .
8  How did you know that they were all talking about the
9  incident with            ?  Did you go and ask people in
10 those churches?

11     INTERPRETER:  What do you mean, specifically?

12 Q.  Are you guessing that there was discussion in other
13 churches, or do you actually know whether there was
14 discussion about the incident with            ?

15     INTERPRETER:  I don't know about the other churches.  I
16 know it was discussed in our church, and I believe it was
17 discussed in other churches.

18 Q.  So, what makes you believe?  Do you know that it was
19 discussed in other churches, or are you guessing that it was
20 discussed in other churches?

21     MR. PIDGEON:  Objection, as to form.

22     INTERPRETER:  Can you repeat the question?  I lost it for
23 a second.

24 Q.  (BY MS. EGELER)  Are you guessing that it was discussed
25 in other churches?

1      INTERPRETER:  Well, I don't know if it was, like,

2   formally discussed at the high level, or something like that,

3   but I am sure the information was shared.

4   Q.   How are you sure?

5      INTERPRETER:  Well, because, especially youth in Spokane

6   from different churches, they communicate with each other.

7   They go to each other churches.  They exchange texts, and,

8   you know, they stay in touch.  So, that's how would I know.

9   Q.   So you think that youth might have discussed it, but you,

10  yourself, did not discuss it with anyone from another Slavic

11  church?

12     INTERPRETER:  There was no meetings, say, at the pastors'

13  level, between churches, to discuss that.  That's right.

14  Q.   Did you discuss the incident with anyone, at any level,

15  from another Slavic church?

16     INTERPRETER:  What do you mean, at any level?

17  Q.   I mean, not just discussion between pastors, but did you

18  have a discussion with any member of another Slavic church

19  who told you that their church was discussing the incident

20  with                ?

21     INTERPRETER:  I couldn't say that I talked to him, in

22  particular.

23  Q.   And did any youth in your church tell you that they had

24  spoken to anyone at another church about the incident with

25                  ?

1    INTERPRETER:  No.  There was no such conversation where I

2  would ask someone if they have talked to someone about it.

3    MS. EGELER:  Okay.  I have no further questions.

4    MR. PIDGEON:  Just a little follow-up.

5                              EXAMINATION

6  BY MR. PIDGEON:

7  Q.   I need to use a word that is probably not going to

8  translate well.  The Slavic community in Spokane is a

9  homogeneous community?

10    INTERPRETER:  Yes.  There is communication going on.

11  Sometimes we have youth gatherings from different churches.

12  We have, you know, single gathering.  At times, we have,

13  like, a choir visiting our church, from a different church.

14  So we have those interactions.

15  Q.   Do you also have pastor gatherings where the pastors come

16  together to meet?

17    INTERPRETER:  Sometimes that happens, too.

18  Q.   And do the youth ever share missions or camps or Bible

19  schools or any of that?

20    INTERPRETER:  Yes.  The summertime, we have camps for

21  youth, for younger youth, and any youth from other churches

22  join.

23  Q.   So, would it be common, if a significant event happened

24  in one of the churches, that the reputation of that event

25  would go throughout the Slavic community?

1      MR. DIXSON:  I object to the form of the question.

2      INTERPRETER:  Yeah.  That could happen.  You know,

3  something of that level, sure.

4  Q.  (BY MR. PIDGEON)  For instance, if there was a fire in

5  one of the churches.

6      INTERPRETER:  Of course.

7  Q.  That would be known throughout the Slavic community?

8      INTERPRETER:  Yes.

9  Q.  When you talk speak about the Slavic community, you are

10  speaking about the Slavic community of believers, correct?

11      INTERPRETER:  Yes.

12  Q.  So you are not speaking about members of the Slavic

13  community who may be non-believers?

14      INTERPRETER:  And also, to help explain, some of them are

15  non-believers, but they still come to church.  To give an

16  example.  Say there is a big family.  You know, 10 different

17  families come to Spokane.  Some will attend this church.

18  Some will attend the other church.  But they still

19  communicate among each other.

20  Q.  Now, the church that Pastor      pastors, where you are a

21  vice pastor, are your services in the Russian language?

22      INTERPRETER:  Yes.

23  Q.  And to your knowledge, are most of the Slavic churches in

24  the community Russian speaking churches?

25      INTERPRETER:  Yes.  Mostly, yes.

1   Q.    Are some English speaking churches?

2         INTERPRETER:  Mostly, Russian speaking, but even we now

3   are introducing English, at some level.  Sometimes in the

4   evening service, or during youth meetings, we do have

5   teachings in English.

6   Q.    So, would you say that the Russian language is a

7   connector that connects this community?

8         INTERPRETER:  Quite possibly.

9   Q.    Okay.  All right.  Now, also, the youth in your community

10  are mostly bilingual; is that correct?

11        INTERPRETER:  Yes.

12  Q.    Uh-huh.  And would you -- how would you characterize

13  their ability to text message and send e-mails and so on?

14        INTERPRETER:  They do it constantly.

15  Q.    Would you say that most of the youth have cell phones and

16  texting capability?

17        INTERPRETER:  I would say that most of them do have that.

18  Q.    Uh-huh.  And, so, would you say that in your position as

19  a vice pastor, you would have knowledge about the general

20  news within the community?

21        INTERPRETER:  What do you mean?

22  Q.    For instance -- well, let's see.  How can I ask this

23  question?  The significant news that goes among the youth by

24  text messages and e-mails, would you expect that you would

25  know of this?

1    INTERPRETER:  Yes.  Well, say, for example, someone died.

2  You know, like, if someone died in a different church, we

3  would announce that in our church -- perhaps they have

4  relatives in our church -- so that they could attend the

5  funeral, too.

6  Q.   And, so, was this event with             of that kind of

7  importance?

8    INTERPRETER:  We found out about it.  We found out about

9  it right away.  We talked about it.  That's why we made

10  safety decisions for the groups to be bigger.

11    MR. PIDGEON:  No further questions.

12                              EXAMINATION

13  BY MR. DIXSON:

14  Q.   And I don't want to open a new can of worms.  Did you or

15         speak to your congregation, as a whole, about the

16           incident?

17    INTERPRETER:  No.  I would just like to point out, again,

18  that during regular services, we don't discuss any issues

19  like that.  We just have a service.

20    MR. DIXSON:  That's all for me.

21    Anne?

22    MS. EGELER:  Nothing further.

23    MR. DIXSON:  Do you want to explain to him about the

24  transcript and his options at this point?

25    MR. PIDGEON:  Sure.

1      Once the transcript is completed, you can either waive

2  your signature without review, or he will provide you with a

3  copy that you can review.  And in which case, you can go

4  through and see if what was interpreted was what you meant to

5  say.  And then, so, if there are changes where you really see

6  something distinct, that's not what was being said, then you

7  can make the changes that you need to make, before you sign

8  it.  But it is your election.  It's one you are going to have

9  to make here this morning.

10      INTERPRETER:  Well, if it contains what I responded to,

11  my correct responses, then I am ready to sign.

12      MR. PIDGEON:  I think you should review it.  That's my

13  opinion.

14      MR. DIXSON:  There will be a transcript of this

15  deposition that's been recorded today.  Would you like to

16  review that transcript, prior to signing it, or are you

17  comfortable with the transcript as it has been taken down by

18  our court reporter this morning?

19      INTERPRETER:  No.  I would like to review it, perhaps

20  with the interpreter, so that the interpreter could read it

21  to me and translate it to me.

22      MR. DIXSON:  Okay.  And you understand that the review

23  process is to correct any errors, if you said "yes" and meant

24  "no," but it is not a second run through the deposition?

25      INTERPRETER:  Yes.

1          (Signature not waived.)

2          (Off the record at 11:14 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CORRECTION SHEET

2    PAGE          LINE                        CORRECTION

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19         I have read the foregoing 60 pages of my testimony and
     I declare (or certify) under penalty of perjury under the
20   laws of the State of Washington that the foregoing is true
     and correct, except for the corrections noted above.

21         Dated at _____, _____this

22   _____day of_____, 2010.

23

24         _____
                         Redacted

25

1  STATE OF WASHINGTON
                            ss:  Reporter's Certificate
2  COUNTY OF SPOKANE

3      I, Osmund D. Miller, a Certified Shorthand Reporter and

4  Notary Public in and for the State of Washington,

5      DO HEREBY CERTIFY:

6      That the foregoing is a true and correct transcription

7  of my shorthand notes as taken upon the deposition of

8      on the date and at the time and place as shown on

9  page one hereto,

10     That the witness was sworn upon his oath to tell the

11  truth, the whole truth and nothing but the truth, and did

12  thereafter make answers as appear herein,

13     That I am not related to any of the parties to this

14  litigation and have no interest in the outcome of said

15  litigation,

16     Witness my hand and seal this 28th day of October, 2010.

17

18

19                     RPR, CCR No. 2280

20  OSMUND D. MILLER
     Certified Shorthand Reporter and Notary
21  Public in and for the State of Washington,
     residing in Spokane.  My commission expires
22  on December 15, 2012.

23

24

25

1                         EXAMINATIONS                    Page

2        EXAMINATION BY MR. DIXSON:                        3

3        EXAMINATION BY MS. EGELER:                       40

4        EXAMINATION BY MR. PIDGEON:                      43

5        EXAMINATION BY MR. DIXSON:                       50

6        EXAMINATION BY MS. EGELER:                       52

7        EXAMINATION BY MR. PIDGEON:                      55

8        EXAMINATION BY MR. DIXSON:                       58

9

                           EXHIBITS
10
         Description                                     Page
11
         (Ex. No. 1, marked.)                             17
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit One

PUBLIC DISCLOSURE COMMISSION
711 CAPITOL WAY RM 206
PO BOX 40908
OLYMPIA WA 98504-0908
(360) 753-1111
TOLL FREE 1-877-601-2828



## CASH RECEIPTS MONETARY CONTRIBUTIONS

**C3**

(1/02)

THIS SPACE FOR OFFICE USE

100329360

10-14-2009

Candidate or Committee Name (Do not abbreviate. Use full name.)

Protect Marriage Washington

Mailing Address

PO Box 501

| City | Zip + 4 | Office Sought (candidates) | Election Date |
|---|---|---|---|
| Arlington, WA | 98223 | | 2009 |

### 1. MONETARY CONTRIBUTIONS DEPOSITED IN ACCOUNT

| Date Received | | Amount | Total |
|---|---|---|---|
| | a. Anonymous ................................................................ | | |
| | b. Candidate's personal funds deposited in the bank (include candidate loans in 1c)........ | | |
| | c. Loans, notes, security agreements. Attach Schedule L .................... | | |
| | d. Miscellaneous receipts (interest, refunds, auctions, other). Attach explanation ......... | | |
| Various | e. Small contributions $25.00 or less not itemized and number of persons giving 25 (persons) | | 649.98 |

### 2. CONTRIBUTIONS OVER $25.00

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | PRI | GEN | Amount | Aggregate* Total |
|---|---|---|---|---|---|---|
| 10/05/09 | STEPHEN FUHRMAN 710 E HWY 395 NORTH KETTLE FALLS, WA 99141 Occupation | | | | 100.00 | 100.00 |
| 10/05/09 | THERESA FUHRMAN 710 E HWY 395 NORTH KETTLE FALLS, WA 99141 Occupation | | | | 100.00 | 100.00 |
| 10/05/09 | BRENDA GRASSEL PO BOX 141483 SPOKANE, WA 99214 Occupation OWNERS | Precision Cutting Spokane Valley, WA | | | 125.00 | 125.00 |
| 10/05/09 | CLINT GRASSEL PO BOX 141483 SPOKANE, WA 99214 Occupation OWNER | Precision Cutting Spokane Valley, WA | | | 125.00 | 125.00 |
| 10/05/09 | DAVID MILLER PO BOX 9292 SPOKANE, WA 99209 Occupation | | | | 50.00 | 50.00 |

| | | | |
|---|---|---|---|
| ☒ Check here if additional pages are attached | Sub-total | 1,149.98 | |
| | Amount from attached pages | 7,706.00 | **\*See reverse for details.** |

### 3. TOTAL FUNDS RECEIVED AND DEPOSITED OR CREDITED TO ACCOUNT
Sum of parts 1 and 2 above. Enter this amount in line 1, Schedule A to C4.

8,855.98

### 4. Date of Deposit

10/09/09

I certify that this report is true and complete to the best of my knowledge

| Treasurer's Signature | Date |
|---|---|
| | 10-14-2009 |

Treasurer's Daytime Telephone No.:

EXHIBIT #1

WITNES

OSMUND D. MILLER

STOREY & MILLER

| Candidate or Committee Name (Do not abbreviate. Use full name.) | Deposit Date |
|---|---|
| Protect Marriage Washington | 10/09/09 |

## 2. CONTRIBUTIONS OVER $25.00

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | P R I | G E N | Amount | Aggregate Total* |
|---|---|---|---|---|---|---|
| 10/05/09 | SYLVIA MILLER<br>PO BOX 9292<br>SPOKANE, WA 99209<br>Occupation | | | | 50.00 | 50.00 |
| 10/05/09 | CYNTHIA ZAPOTOCKY<br>PO BOX 8672<br>SPOKANE, WA 99203<br>Occupation HOUSEWIFE | , | | | 500.00 | 1,500.00 |
| 10/05/09 | MARBLE COMMUNITY FELLOWSHIP<br>3383 State Highway 25<br>Northport, WA 99157<br>Occupation | | | | 500.00 | 500.00 |
| 10/05/09 | SHARON HUNTER<br>602 Kirkland Ave<br>Kirkland, WA 98033<br>Occupation RETIRED | , | | | 200.00 | 300.00 |
| 10/05/09 | SHARON HUNTER<br>602 Kirkland Ave<br>Kirkland, WA 98033<br>Occupation RETIRED | , | | | 100.00 | 300.00 |
| 10/05/09 | SARAH RIGBY<br>10301 45TH AVE NE<br>SEATTLE, WA 98125<br>Occupation UNEMPLOYED | , | | | 500.00 | 500.00 |
| 10/05/09 | MYRTLE PARKER<br>2082 HERITAGE WAY<br>ADDY, WA 99101<br>Occupation RETIRED | , | | | 100.00 | 200.00 |
| 10/05/09 | JACKIE PARKER<br>2082 HERITAGE WAY<br>ADDY, WA 99101<br>Occupation RETIRED | , | | | 100.00 | 200.00 |
| 10/05/09 | KAREN KOOY<br>205 EAST WISER LK RD<br>LYNDEN, WA 98264<br>Occupation BOOKKEEPER | Self-Employed<br>Lynden, WA | | | 50.00 | 200.00 |
| 10/05/09 | MICHAEL WITMER<br>P.O. BOX 3063<br>WENATCHEE, WA 98807<br>Occupation | | | | 75.00 | 75.00 |
| 10/05/09 | SAMUEL THORNTON<br>1767 ROAD F.5 NE<br>MOSES LAKE, WA 98837<br>Occupation RETIRED | , | | | 50.00 | 150.00 |

Page Total 2,225.00

# RECEIPTS CONTINUATION SHEET (Attachment to C-3 Form)

| Candidate or Committee Name (Do not abbreviate. Use full name.) | Deposit Date |
|---|---|
| Protect Marriage Washington | 10/09/09 |

## 2. CONTRIBUTIONS OVER $25.00

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | PRI | GEN | Amount | Aggregate Total* |
|---|---|---|---|---|---|---|
| 10/05/09 | LORNE BLACKMAN<br>4176 STATELINE ROAD<br>WALLA WALLA, WA 99362 | Self-Employed<br>Walla Walla, WA<br>Occupation NURSERYMAN | | | 250.00 | 250.00 |
| 10/05/09 | LAURA BELVIN<br>30143 - 12TH AVE SW<br>FEDERAL WAY, WA 98023 | Self-Employed<br>Federal Way, WA<br>Occupation ENGINEER | | | 200.00 | 249.50 |
| 10/05/09 | ARLEIGH KERR<br>30026 FIRST PLACE SOUTH<br>FEDERAL WAY, WA 98003 | Boeing<br>Seattle, WA<br>Occupation COMPUTER PROGRAMMING | | | 250.00 | 250.00 |
| 10/05/09 | LYNDA KRESTINSKI<br>1560 SW CAMANO DR<br>CAMANO ISLAND, WA 98282 | Occupation | | | 50.00 | 75.00 |
| 10/05/09 | VICKI PEEBLES<br>625 GOLF COURSE PLACE<br>CHELAN, WA 98816 | Culinary Apple<br>Chelan, WA<br>Occupation CLERK | | | 100.00 | 221.00 |
| 10/06/09 | STEVEN HARDEBECK<br>27403 SE 306TH ST<br>BLACK DIAMOND, WA 98010 | Occupation | | | 100.00 | 100.00 |
| 10/06/09 | GRIGORIY GURMEZA<br>1520 99TH ST. S.<br>TACOMA, WA 98444 | Occupation | | | 50.00 | 50.00 |
| 10/06/09 | SERGEY GURMEZA<br>1520 99TH ST. S.<br>TACOMA, WA 98444 | Occupation | | | 100.00 | 100.00 |
| 10/06/09 | CASSIE NICHOLS<br>5570 WOODARD AVE.<br>FREELAND, WA 98249 | Occupation | | | 50.00 | 75.00 |
| 10/06/09 | DENNIS MCKAY<br>22509 72ND PLACE W<br>EDMONDS, WA 98026 | Occupation | | | 50.00 | 100.00 |
| 10/06/09 | ALEKSANDR NAUMCHIK<br>8103 72ND PL NE<br>MARYSVILLE, WA 98270 | Occupation | | | 100.00 | 100.00 |

Page Total    1,300.00

# RECEIPTS CONTINUATION SHEET (Attachment to C-3 Form)

| Candidate or Committee Name (Do not abbreviate. Use full name.) | Deposit Date |
|---|---|
| Protect Marriage Washington | 10/09/09 |

## 2. CONTRIBUTIONS OVER $25.00

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | P R I | G E N | Amount | Aggregate Total* |
|---|---|---|---|---|---|---|
| 10/06/09 | ROLF AMUNDSON<br>28911 81H AVE S<br>FEDERAL WAY, WA 98003<br>Occupation RETIRED | , | | | 100.00 | 300.00 |
| 10/06/09 | MARY SORENSEN<br>12128 N. DIVISION ST. PMB 171<br>SPOKANE, WA 99218<br>Occupation ADMINISTRATOR | Horizon Credit Union<br>Spokane, WA | | | 250.00 | 300.00 |
| 10/08/09 | RICHARD LONG<br>6905 172ND ST. NE<br>ARLINGTON, WA 98223<br>Occupation | | | | 100.00 | 100.00 |
| 10/08/09 | REBECCA OCONNOR<br>4010 TACOMA AVE S<br>TACOMA, WA 98418<br>Occupation HOMEMAKER | , | | | 375.00 | 375.00 |
| 10/08/09 | KARIN SEWELL<br>7709 97TH AVE SW<br>LAKEWOOD, WA 98498<br>Occupation | | | | 70.00 | 70.00 |
| 10/08/09 | STEVEN THOMAS<br>19322 141 AVE SE<br>RENTON, WA 98058<br>Occupation COMPUTER SECURITY | Dept of Army<br>Fort Lewis, WA | | | 101.00 | 101.00 |
| 10/08/09 | MIKE CARROLL<br>7595 CABRINI DRIVE SE<br>PORT ORCHARD, WA 98367<br>Occupation RETIRED | , | | | 100.00 | 125.00 |
| 10/09/09 | CHERYL ANDERSON<br>PO BOX 7125<br>KENT, WA 98042<br>Occupation CONSULTANT | Monavie<br>S. Jordan, UT | | | 500.00 | 500.00 |
| 10/09/09 | SANDY WIXSON<br>3332 EDMONDS AVE NE<br>RENTON, WA 98056<br>Occupation | | | | 100.00 | 100.00 |
| 10/09/09 | NATALYA BORUSHKO<br>3516 NE IONE ST<br>CAMAS, WA 98607<br>Occupation SUPERVISOR | Hudson Group<br>Portland, WA | | | 200.00 | 200.00 |
| 10/09/09 | HANS BUTSCHUN<br>110 MICHIGAN HILL RD<br>CENTRALIA, WA 98531<br>Occupation RETIRED | , | | | 100.00 | 250.00 |

Page Total    1,996.00

# RECEIPTS CONTINUATION SHEET (Attachment to C-3 Form)

| Candidate or Committee Name (Do not abbreviate. Use full name.) | Deposit Date |
|---|---|
| Protect Marriage Washington | 10/09/09 |

## 2. CONTRIBUTIONS OVER $25.00

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | P R I | G E N | Amount | Aggregate Total* |
|---|---|---|---|---|---|---|
| 10/09/09 | SUZANNE BUTSCHUN 110 MICHIGAN HILL RD CENTRALIA, WA 98531 | Farmers Centralia, WA Occupation SELF-EMPLOYED | | | 100.00 | 250.00 |
| 10/09/09 | MARSHALL ROBERTS 1924 MAIDEN LANE WENATCHEE, WA 98801 | Occupation | | | 50.00 | 50.00 |
| 10/09/09 | JOYCE ROBERTS 1924 MAIDEN LANE WENATCHEE, WA 98801 | Occupation | | | 50.00 | 50.00 |
| 10/09/09 | TAI OH 13304 2ND PLACE SE BURIEN, WA 98146 | , Occupation RETIRED | | | 70.00 | 235.00 |
| 10/09/09 | RAYMOND BRENSIKE 14117 SE 177TH ST #H204 RENTON, WA 98058 | Occupation | | | 50.00 | 50.00 |
| 10/09/09 | JACK RICHARDSON 11723 194TH AVE NE REDMOND, WA 98053 | , Occupation RETIRED | | | 40.00 | 211.00 |
| 10/09/09 | ASHLEY PERRY 9730 YELM HIGHWAY OLYMPIA, WA 98513 | , Occupation RETIRED | | | 25.00 | 163.00 |
| 10/09/09 | VIVIAN ROBINSON 10809 176TH CIR NE REDMOND, WA 98052 | Occupation | | | 25.00 | 96.00 |
| 10/09/09 | WILLIAM BACKLUND 23736 NE 116th Place Redmond, WA 98053 | Occupation | | | 12.50 | 37.50 |
| 10/09/09 | PATRICIA BACKLUND 23736 NE 116th Place Redmond, WA 98053 | Occupation | | | 12.50 | 37.50 |
| | | Occupation | | | 1,000.00 | 1,000.00 |

Page Total  1,435.00

# RECEIPTS CONTINUATION SHEET (Attachment to C-3 Form)

| Candidate or Committee Name (Do not abbreviate. Use full name.) | Deposit Date |
|---|---|
| Protect Marriage Washington | 10/09/09 |

2. CONTRIBUTIONS OVER $25.00

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | P R I | G E N | Amount | Aggregate Total* |
|---|---|---|---|---|---|---|
| 10/09/09 | JAMES LUNABURG P.O. BOX 7898 MARIETTA, GA 30065 | Self-Employed Marietta, GA Occupation CONSULTANT | | | 500.00 | 500.00 |
| 10/09/09 | CHRIS GORCHELS 3180 WILLOW POINTE DR RICHLAND, WA 99354 | Self Employed Richland, WA Occupation SELF EMPLOYED | | | 250.00 | 250.00 |
| | | Occupation | | | | |
| | | Occupation | | | | |
| | | Occupation | | | | |
| | | Occupation | | | | |
| | | Occupation | | | | |
| | | Occupation | | | | |
| | | Occupation | | | | |
| | | Occupation | | | | |

Page Total    750.00