The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> SAM REED, in his official capacity as Secretary of State of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, <br><br> Defendants. | NO. 09-cv-05465-BHS <br><br> DESIGNATED DEPOSITION TESTIMONY OF PASTOR <br> ██████ Redacted ██████ |

Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors Washington Families Standing Together and the Washington Coalition for Open Government and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the "Parties") hereby submit combined designated deposition testimony for PASTOR ██████ Redacted ██████.

Defendants and Intervenors object to the admission of any deposition testimony taken of any witnesses who could be called to testify at trial.   Therefore, the designations of

1

1  Defendants and Intervenors are being submitted in the event that the Court decides to admit

2  deposition testimony.

3        For the Court's convenience Defendants' designations have been highlighted in blue,

4  Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5  been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6  filing the redacted versions of these documents.

7        DATED this 6th day of September, 2011.

8  ROBERT M. MCKENNA
  Attorney General

9

10   s/ William Clark
  _____

11  WILLIAM CLARK, WSBA #9234
  Senior Counsel
  800 Fifth Ave, Ste 2000

12  Seattle, WA 98104
  206-464-7352

13  BillC2@atg.wa.gov
  ANNE EGELER, WSBA #20258

14  Deputy Solicitor General
  PO Box 40100

15  Olympia, WA  98504-0100
  360-664-3027

16  Annee1@atg.wa.gov

17  _____

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION
TESTIMONY OF PASTOR ▮Redacted▮
- No. 09-cv-05465-BHS

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,<br><br>               Plaintiffs,<br><br>   v.<br><br>SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>             Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. 09-CV-05456-BHS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

Deposition Upon Oral Examination
Of
PASTOR ████████ Redacted ████████

---

Taken by:  Tracey L. Juran, CCR
           CCR No. 2699

September 23, 2010

Seattle, Washington

Page 2

```
 1                          APPEARANCES

 2


 3


 4    For Protect Marriage Washington:

 5         Stephen Pidgeon, Attorney at Law
           3002 Colby Avenue, Suite 306
 6         Everett, Washington  98201-4081


 7


 8
      For the Defendants:
 9
           Anne E. Egeler, Deputy Solicitor General
10         Attorney General of Washington
           1125 Washington Street SE
11         P.O. Box 40100
           Olympia, Washington  98504-0100
12


13


14    For Washington Coalition for Open Government:

15         Steven J. Dixson, Attorney at Law (by telephone)
           Witherspoon Kelley
16         422 West Riverside Avenue, Suite 1100
           Spokane, Washington  99201-0300
17


18


19    For Washington Families Standing Together:

20         Ryan McBrayer, Attorney at Law
           Perkins Coie
21         1201 Third Avenue, Suite 4800
           Seattle, Washington  98101-3099
22


23


24


25
```

Page 3

```
 1                        INDEX

 2

 3

 4

 5                                          Page No.

 6   EXAMINATION

 7      By Ms. Egeler                           4
        By Mr. McBrayer                        76
 8      By Mr. Pidgeon                         91
        By Ms. Egeler                         113
 9

10

11

12   EXHIBITS MARKED

13      No. 1 (3-page printout of an article    14
           from the ███████Redacted████████
██         ██████████████████████████████
██         ████████████████████████
16

        No. 2 (4-page photocopy of an          30
17         article from ███████Redacted██████
██         ██████████████████████████████
           █████████████)
19

        No. 3 (3-page printout from the        60
20         Protect Marriage Washington Web
           site labeled ██████Redacted█████
██         ████████████████████████)

22

23

24

25
```

Page 4

1          Be it remembered that the deposition upon oral

2     examination of Pastor [Redacted] was taken on

3     September 23, 2010, at the hour of 12:36 p.m. at 800

4     Fifth Avenue, Suite 2000, Seattle, Washington, before

5     Tracey L. Juran, CCR, Notary Public in and for the State

6     of Washington residing at Edmonds, Washington.

7          Whereupon the following proceedings were had,

8     to wit:

9                          * * * * *

10    PASTOR [Redacted], having been first duly sworn on
                                     oath by the Notary Public to
11                                   tell the truth, the whole
                                     truth, and nothing but the
12                                   truth, was deposed and
                                     testified as follows:

13

14                       EXAMINATION

15    BY MS. EGELER:

16    Q.   Pastor [Redacted], as I stated to you before we went on

17         the record, my name's Anne Egeler and I represent the

18         Attorney General -- excuse me.  I'm with the Attorney

19         General's Office and I'm representing Secretary of State

20         Sam Reed --

21    A.   Mm-hm.

22    Q.   -- the defendants in the case.

23          And I wanted to start by asking, have you ever been

24         deposed before?

25    A.   No, I don't think so.  I think this first time.  I'm

```
1         really surprised with the life I live.
2    Q.   Well, I'll give you a few basic rules.  Everything we
3         say is being taken down today by our court --
4    A.   Mm-hm.
5    Q.   -- reporter, so it's really important for us to make her
6         life easy --
7    A.   Yeah.
8    Q.   -- so that we get an accurate record.  And the way that
9         we can do that is by waiting for each other to finish
10        speaking --
11   A.   Mm-hm.
12   Q.   -- before the next person starts to speak.  And whenever
13        you want to indicate a yes or a no, if you could
14        please --
15   A.   Mm-hm.
16   Q.   -- do that verbally, because head nods and mm-hms don't
17        show up on the record.
18   A.   Right.
19   Q.   And it's also important that we understand each other.
20        So if I ask anything that's just not clear or doesn't
21        make sense, please stop me and ask me to rephrase that.
22   A.   Okay, I will.  I have no problem with that.
23   Q.   And is there any reason you wouldn't be able to testify
24        fully today?
25   A.   No.  I'm glad I could be here.
```

1   Q.   Well, let's get started, then.

2        Would you please state your current employment.

3   A.   Yes.  I'm senior pastor at [Redacted]  in

4   [Redacted], Washington.

5   Q.   And how long have you held that position?

6   A.   I'm going on -- October'll be 26 years.

7   Q.   Wow, okay.

8        And have you been told that you were named as a

9   witness in the Doe v. Reed case?

10  A.   Yes.

11  Q.   Did you know that that may require you to publicly

12  testify in a federal court?

13  A.   That's why I agreed to do it, yes.

14  Q.   And were you asked if you had any concerns or -- about

15  publicly testifying?

16  A.   No, I don't have any.  I'm in the public's eye all the

17  time.

18  Q.   And when did you first learn that you were going to be a

19  witness in this case?

20  A.   Wow, I think back now when we (indicating) talked on the

21  phone, I think.  It's been a couple months.  Yeah, about

22  60 days or so, two months.

23  Q.   And who told you that?

24  A.   My lawyer friend here (indicating).

25  Q.   So Mr. Pidgeon in the room here.

```
 1   A.    Mr. Pidgeon, yes.

 2   Q.    Did you talk to Mr. Pidgeon about your deposition today?

 3   A.    Well, we really didn't talk about the deposition.  We

 4         just talked about would I be willing to come down as a

 5         witness about what has taken place in my life with the

 6         whole situation with the homosexual community.

 7   Q.    Let's talk about that.

 8             My understanding is that the issue of the

 9         homosexual lifestyle is a bigger issue for you than just

10         Referendum 71; is that right?

11   A.    Absolutely.

12   Q.    Can you explain sort of over time your involvement in

13         that issue.

14   A.    I look back now probably some 20 years of dealing with

15         the whole issue, not only just with the homosexuality

16         issue, but with any aspect of lifestyle that isn't

17         healthy Biblically.  Homosexuality is one issue.  And it

18         magnified when we started having a great deal of

19         problems in Olympia, and I was called to get involved

20         because they knew who I was and because of the stands I

21         have taken against other issues of sin that the Bible

22         was against.

23             And I had heard -- got a call from one of the

24         pastors in the area and said, did you hear that there's

25         some representatives that is going down to Olympia?  And
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 8

```
 1     I think that issue then -- it's been so many years back.
 2     The issue then was working on minority status, making
 3     the homosexual community a minority status.  And so
 4     that's how I really got involved with the legislative
 5     aspect of it and down in Olympia.
 6          And when we got there, there was a -- there was
 7     several representatives from [Redacted] that was trying
 8     to get the law passed, and that's how I got involved
 9     even with the fight with [Redacted].
10  Q. Let's talk about that fight with [Redacted].  Can you
11     describe that for me.
12  A. In words?  In words, probably a little bit more
13     difficult than in emotion.
14          What happened was that we had so many people in our
15     church that work for [Redacted], and I knew [Redacted]
16     policies for years towards the homosexual community.
17     Fine with us.  It was their right, it was their
18     business, and that any way they wanted to treat their
19     workers was their choice.  Well, when we got down to
20     Olympia, all of a sudden their decision on how they was
21     treating the homosexuals in their business became how
22     they wanted the State to treat homosexuals, and they was
23     there giving testimony why this law should be passed.
24          And that's when I said, I think we're overstepping.
25     Long as you wanna keep that issue inside your four
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

```
1     walls, it's fine with me.  When you try to push your

2     decision and your laws on me as a pastor and as a

3     Christian, I got problems with it, especially when you

4     step in the state.  And so that's when I met with

5     [Redacted] .  And we had several meetings and I got them

6     to back off and take a neutral position in that fight

7     that year.

8  Q.  So do you have an opinion about whether corporations

9     should be able to lobby the government for different

10     laws being passed or not passed?

11  A.  I think corporation can lobby the government for

12     anything they want if they're willing to defend it and

13     be challenged on it.

14  Q.  So --

15  A.  Because they have the right to do that.  I have the

16     right to challenge that.

17  Q.  So you weren't objecting to [Redacted] lobbying on the

18     issue.

19  A.  Never.  I never asked them to fire their

20     representatives, I never asked them to change their

21     policies inside their four walls.  The issue was, when

22     you start pushing issues that's Biblically where I stand

23     as a pastor on me, you know, pass laws that I have to

24     submit to when the Bible says I shouldn't, then we have

25     a problem.
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

```
 1  Q.  And that bill that you were referring to being an issue,

 2      do you remember what that --

 3  A.  Oh, my goodness.

 4  Q.  -- bill was?

 5  A.  I could not say, it has been so long ago.  But it was in

 6      every major newspaper all over the world, so it won't be

 7      hard to find out.

 8  Q.  And were you in newspapers connected with that issue?

 9  A.  Everywhere.

10  Q.  Did you form a group to address your concerns with

11      Microsoft?

12  A.  What we did was, we did a [Redacted] in 2000 --

13      oh, my goodness.  Man, that's tough now, been so long.

14      We did -- in the [Redacted], we did a rally of just

15      the aspect of protecting marriage.  And that was my --

16      that was the outfit and the organization that I used,

17      [Redacted].  And that following year -- I think

18      it was 2000 -- it was right before the 2004 election.  I

19      think that was Bush's second go-round; isn't that right?

20          MR. PIDGEON:  Mm-hm.

21  A.  It was right before the 2004 election, we ended up going

22      to Washington, D.C., with that same type of rally for

23      protecting marriage.

24  Q.  (by Ms. Egeler)  And the [Redacted], do you

25      remember where that event was held?
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

State Obj:
Irrelevant

```
 1   A.   ████ Redacted ████ .

 2   Q.   And --

 3   A.   And the one in D.C. was on the Mall.

 4   Q.   And the ████ Redacted ████ event, did you speak at

 5        that?

 6   A.   I did, mm-hm.

 7   Q.   Do you recall how many people, roughly, were in

 8        attendance?

 9   A.   Well, we had 30 days to put it together here at Safeco,

10        and I kinda figured if we can get the stadium, we'd be

11        able to do it.  I think we had around 20, 25,000 people

12        there.  And the one in D.C., we had like three months

13        more or so to get that done, and I think we had over

14        200,000 there.

15   Q.   And when you spoke at ████ Redacted ████, do you

16        remember what you said?  And I'm sure you don't remember

17        word for word, but --

18   A.   All the --

19   Q.   -- basically.

20   A.   -- speakers had one major theme and that was protection

21        of marriage between a man and a woman, mm-hm.

22   Q.   In addition to protecting marriage between a man and a

23        woman, did you speak about not permitting marriage

24        between two people of the same sex?

25   A.   I don't think that that really came up very much at all
```

1      because that was not the purpose of the rally.  If some

2      of the speakers said it or if it came out, it was in

3      conjunction with saying, okay, what marriage is is what

4      we are as believers and Christians, mm-hm.

5  Q.   What threat to traditional marriage was the [Redacted] event

6      addressing?

7  A.   Well, we just feel that the best avenue of a family is a

8      man, a woman and that that double representation in that

9      marriage for children was the better way that life, we

10     believe Biblically, was to be taught.

11         And that's where we stood.  I mean, every one of

12     us, from -- I invited Dr. Dobson, James Dobson, who

13     came.  The head of Family Research Council, Tony

14     Perkins, I invited him; he came.  Just about everyone

15     that I invited came for this particular issue of not

16     being pushed to accept which Biblically we believe is

17     wrong and it was what we consider as a sin.  And that is

18     our main purpose we're dealing with.  It would be just

19     like anything else that we're against in the Bible.

20         And what most people want to say, especially

21     towards me, is that I got this agenda towards

22     homosexuals.  No, one sin is just like another sin as

23     far as I'm concerned.  And the reason why I think that

24     we've gotten so much publicity on this is because of our

25     harsh stand on not compromising marriage between a man

Page 13

```
 1        and a woman.
 2   Q.   And when you say that this is Biblically a sin, did you
 3        say that to the group at --
 4   A.   Say it every time I get an opportunity to speak about
 5        it.
 6   Q.   And specifically, that marriage that is between anyone
 7        besides a man and a woman is what you're referring to as
 8        the sin; correct?
 9   A.   Right.
10   Q.   So in other words, same-sex marriage.
11   A.   Right.
12   Q.   And would you have made the same statement in
13        Washington, D.C.?
14   A.   Same.  It's just much bigger and more people.
15   Q.   And then the differences with  [Redacted] , did it lead you
16        to start an effort to purchase  [Redacted]  stock?
17   A.   Yes, I did.  And the whole aspect of -- I think that
18        most of our corporations are controlled and ran by
19        stockholders, and I thought, you know, one of the best
20        ways to do it is just get people involved with buying
21        stock.  Then we can influence what is going on in that
22        corporation and in that business.  It's absolutely legal
23        to do.  And that's what I started, and it was quite a
24        ride.  It was a lot of fun.
25   Q.   And did you get a lot of press coverage of that?
```

Page 14

1   A.   Oh, my goodness, yes.  It was quite a bit.

2   Q.   And I'm going to just make one exhibit here of the many

3        press articles.  And I know you've brought some of those

4        with you today in actual newspaper form, but this one's

5        printed out, so it might be easier to attach to the

6        deposition.

7             MR. PIDGEON:  No objection.

8                  [Off the record - discussion]

9                  [Exhibit 1 marked for identification]

10  Q.   (by Ms. Egeler)  Pastor, are you familiar with this

11       article?

12  A.   Oh, yeah.

13  Q.   And just for the record, I'll note that this is from the

14       ▮▮Redacted▮▮ Web site --

15  A.   Mm-hm.

16  Q.   -- noted on the bottom of the document and it's dated

17       Tuesday, January 8, 2008.

18  A.   Mm-hm.

19  Q.   The first paragraph, Pastor, states that, "R

     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

     ▮▮▮▮▮▮▮" --

25  A.   Mm-hm.

1   Q.   -- period, end quote.  Does that quoted material come

2        from you, do you think?

3   A.   I don't know where that came from.  I don't -- they

4        probably got it from some of my engagement or my

5        speeches, but I don't remember directly making it to

6        Redacted .

7   Q.   Would you agree that Redacted was financing ungodly

8        ventures?

9   A.   Yes.  That's what -- the whole fight that we started

10       from in the aspect down in Olympia.

11  Q.   And starting -- let's back up and start with the Redacted

    Redacted .  Did you get any negative reaction from

13       people?

14  A.   Oh, my goodness.  The day of, even, was an absolutely

15       amazing time.  And what we're saying is, look, we're not

16       down here to attack homosexuals, we're not here to put

17       homosexuals down.  And you can look at -- I mean, there

18       are thousands upon thousands of articles about me and my

19       life and where I stood, but you cannot find any articles

20       at all that would be outside of the Biblical aspect of

21       what I believe.  I have never put down homosexuals, I do

22       not think they are second-class citizens, or anything

23       else.

24            But the truth is, I'm a pastor.  I believe in the

25       Bible.  I stand on the Bible regardless of whether it's

1      popular or not.  And that is one of the issues that we

2      have taken, because when those ungodly issues are pushed

3      as normal, is pushed as one to force Christians to have

4      to accept, then I'm a big fighter on that, regardless of

5      what the issue is.

6  Q.  So would it be fair to say that you've been quoted in

7      the past or have said that homosexuality -- the act, not

8      the individuals -- that the act is ungodly?

9  A.  Yes.  Oh, most definitely.

10 Q.  And would it be correct to say that you have publicly

11     stated that homosexuality -- again, not the individuals,

12     but the act -- is a sin?

13 A.  Yes.

14 Q.  And have you publicly stated that it is your belief that

15     homosexual families, where two partners are parenting

16     children, is contrary to Biblical teachings?

17 A.  And common sense, okay?  Maybe I can help you understand

18     it a little bit better.  If two people walked into

19     adoption process, unmarried, a man and a woman, and

20     wanted to adopt a child, the adoption agency will say,

21     no, it's not a stable home.  That's a man and a woman

22     that's unmarried trying to adopt.  But at the same time,

23     well, couples -- two women or two men that's not married

24     will walk in and they will make exceptions for them to

25     adopt.

```
 1              Now, as far as I'm concerned, where's the common

 2         sense in protecting that child in a very strong home

 3         that's gonna give them commitment, that's gonna give

 4         them the role models of a man and a woman, and to make

 5         sure that if we're gonna say no to a single -- two

 6         single people trying to adopt that's not married, what

 7         makes two men that's not married or two women that's not

 8         married the difference?

 9    Q.   Have you publicly spoken about the possibility of --

10         let's take two men who are married under one of the

11         state laws that does permit homosexual couples to marry.

12         Have you taken a public stance about that?

13    A.   Yes, because it has been very -- it has been a very

14         negative thing that happened to Christian organizations.

15         If -- I don't know if you understood or understand what

16         took place in Massachusetts.  They shut down an adoption

17         agency, Catholic adoption agency, because they would

18         not -- according to their freedom and freedom of

19         religion, would not adopt to homosexuals.

20              Now, I think that's just as discriminatory, to shut

21         down a business when they have the freedom -- in our

22         Constitution, the freedom of religion.  But they say,

23         you cannot have that right, and I would like to know

24         why.

25    Q.   Is it your position that businesses should have the
```

1       right to adopt to two men who are married?

2   A.  No, because I don't think that that Biblically is a

3       marriage, you know.  There are certain things that we

4       have to agree on in this deposition room.  And what we

5       have to agree on in this room is, I don't have any

6       personal opinions.  When I gave my life to Christ, my

7       personal opinion took a second seat.

8           I'm not like many other hypocrites that call

9       themselves Christians and then decide what they wanna

10      believe the Bible says or don't.  I am one that's

11      totally committed to all 66 books of the Bible, every

12      chapter in the Bible -- over 1,100 chapters in the

13      Bible, and when God says something, that's where I stand

14      whether I like it or not.  God didn't ask my opinion.

15  Q.  I understand.

16          I'm just trying to get out what you've said

17      publicly so that --

18  A.  Mm-hm.

19  Q.  -- your public words can be known in the -- in our

20      transcript here --

21  A.  Oh, yeah.  I mean --

22  Q.  -- today and fairly represented.

23  A.  -- there is no reason to think that my words and my

24      actions are not known.  You go to Wikipedia.  I am

25      everywhere.  Go to Google.  I think -- I mean, I think

1       the last time I typed my name in, there was almost

2       300,000 hits.  So it isn't -- nothing private about how

3       I feel, how I say, and where I stand.  And there is not

4       one statement that anyone can ever find in all those

5       postings where I am derogatory and attacking and feeling

6       and putting down homosexuals.

7  Q.   I understand.

8       So looking again at [Redacted], was the effort to

9       buy the stock of the company, then?

10  A.   Yeah.  It's just like -- just go in and buy stock and

11      influence what is going on in that business.  One of the

12      reasons why we did that was because -- I think it was

13      when -- there was something going on in California.  I

14      don't think it was Proposition 8, I think it was another

15      issue that was hitting.  And I came to the stockholders'

16      meeting at [Redacted] to ask them why were they

17      supporting discriminatory and racial practices.

18  Q.   And what discriminatory and racial -- and racist

19      practices specifically?

20  A.   Specifically, if you remember some of the rallies that

21      was going on in California -- I think it's about three,

22      four years ago at the most -- there was homosexuals that

23      was attacking people with the Bible at rallies, took a

24      Bible from a little old lady, called black people stupid

25      for voting for the passage of that bill.  It may have

1        been Proposition 8; I'm not sure.

2           And I asked [Redacted] as a company and as a

3        stockholder, if it was -- anyone else had done such

4        blatant discriminatory and racist comments and

5        movements, would this company support 'em?  And I said,

6        absolutely not.  But you are.  You continue to support

7        the homosexual lifestyle and ways even though you know

8        where they stand.

9           And that you call me intolerant, but you never

10       heard me call homosexuals names.  But you've heard them

11       call me names.  You've heard them call other black

12       people names and how ignorant black people are because

13       of voting for Proposition 8.

14  Q.   Did you witness anything in the state of California that

15       you've just described?

16  A.   Every day on the news.  It was hot, hot news.  And so

17       with -- the pastors that have organized Proposition 8,

18       I'm close friends with two of 'em and I knew exactly

19       what was going on.  Wasn't just hearsay in the aspect of

20       what was going on in the paper, but what was going on

21       with the pastors and the pastors who got, I mean, just

22       threats to no end that if you are gonna stand on this,

23       then you are gonna be -- I wanna say the right word --

24       you'll be profiled as a hatemonger.

25  Q.   And were you involved in an organization of a rally, for

Page 21

1      lack of a better word, at [Redacted] High School?

2  A.   Oh, yes.

3  Q.   Can you talk about that for me.

4  A.   I'd be more than happy to talk to you about that.  My

5       children go and attend [Redacted] High School.  And what

6       took place was, when they -- if you wanna attack me,

7       that's fine.  I'm a big boy; I can handle it.  I can

8       back up my words and know why I do what I do.  Well,

9       when my oldest daughter, which is now a senior in

10      college at WSU, was a freshman, they asked me to come

11      and speak at the Martin Luther King Day.  They was

12      having tremendous problems up there at the school --

13      thank you very much.

14          THE WITNESS:  Anything you wanna look at or say

15      before I continue?

16          MR. PIDGEON:  Yeah, one second.

17             No objection to the exhibit.

18  A.   So they asked me to come and speak at the Martin Luther

19      King Day.  They was having so many problems in the

20      school racially.

21          And now, my kids was -- at that time was just [Redacted]

22      that -- my oldest, and there may have been three, four

23      other, really, minority kids; weren't very many.  I

24      think the [Redacted] was there, who had adopted a Korean --

25      two Korean kids; my kids, which was -- I'm amazed at how

1    school does it and education does it.  I mean, I'm the

2    blackest man you gonna see and my wife is the whitest

3    woman you could see, yet still our kids are classified

4    as black in the public schools.  And probably was about

5    four others in the whole school.

6         And so I wanted to come up and I agreed to speak

7    because of the things that was going on in the school.

8    Racial epithets were being written on the walls, the

9    bathroom.  It was just -- it was to the point where it

10   wasn't safe for many of the black kids to be around.

11        So they had that whole school vote on what are the

12   major problems at  Redacted , and then they did a

13   statewide survey of the students.  The number-one

14   problem, they said, was racism in the school, number

15   one.  And they was thinking about eliminating the Martin

16   Luther King celebration because most of it ended up just

17   being another way of being political, to push an agenda,

18   that wasn't supposed to be an assembly.

19        So when -- Redacte come home and said, Dad, they

20   would love for you to come and speak at the school.

21   Would you come?  Said, we got a lotta problems.  And I

22   go, absolutely.  She said, we did this vote, and it came

23   out that there was three main issues and most schools

24   were four.  Racism was number one at just about all the

25   schools, and there was nothing mentioned about

Tracey Juran, Certified Court Reporter

1      homosexuality.  So that was a good thing for me because

2      I -- you know, I don't wanna spend my life talking about

3      one issue.

4           So I go, I'd be more than happy.  So I went up and

5      spoke.  Man, it was fabulous.  It went off extremely

6      well.  They liked it, they got a -- I got a standing

7      ovation from the students, the teachers thanked me.  So

8      I thought, oh, man, okay, we making some great progress

9      to get things turned around.

10          Now, outta all those things, they started the Day

11     of Silence the same year, which we didn't know -- what's

12     the Day of Silence?  And we didn't know what the Day of

13     Silence was until later on in that year when my wife

14     happened to have an appointment with a teacher after

15     school to talk about my daughter's math issues.  Honor-

16     roll student, just doing well, but man, she was just

17     really struggling with this math teacher.  So we wanted

18     to go and have a family parent-teacher conference.

19          My wife arrives after school.  She comes in with

20     the teacher and starts talking to the teacher.  The

21     teacher won't talk back.  The teacher is writing answers

22     on the board.  My wife asked, what are you doing?  We

23     got an appointment here to talk about my daughter.  She

24     said, it's the Day of Silence and I am holding to that,

25     so I can't talk to you.  So my wife walked up, wrote on

Page 24

1          the board, we will talk about this later.

2                And she came home and says, do you know what's

3          going on up at the school?  I go, no.  She says, I went

4          up to talk to the teacher and they was honoring the Day

5          of Silence.  Teachers wouldn't teach.  They were -- if

6          they committed to honor the Day of Silence, they

7          wouldn't teach.  Students didn't have to talk in the

8          classroom.  They were having students come in at the

9          front of the school to say, okay, are you for this and

10         you supported this or not?  They was handing out arm

11         bands.

12               So all of a sudden I'm thinking, what is gonna --

13         this isn't gonna happen.

14    Q.   (by Ms. Egeler)  And what was the Day of Silence about?

15    A.   It was honoring those students who they say had been

16         bullied as a homosexual student.  Now, that -- okay,

17         great, let's deal with bullying.  But outta all those

18         issues that the kids voted on, homosexual bullying or

19         homosexual problems wasn't even mentioned.  And the GSA

20         that put on the Day of Silence didn't have one

21         homosexual student in their whole program.  There was no

22         gay students in the committee.  It was heterosexual kids

23         pushed by teachers, which is not right when it's

24         supposed to be student sponsored.

25    Q.   Do you actually know that --

1  A.  I know that for a fact.  And you can call ▓Redacted▓ High

2      School and ask for Principal Taylor.  You know, he --

3      they can give you all the -- everything I'm saying that

4      I tell you is the truth.

5          And I just had -- just finished with another

6      meeting just to refresh last Monday about the issues of

7      the Day of Silence.  And I -- my thing was, okay, if you

8      gonna set a time aside -- we got day of respect.  That's

9      for everybody.  But then you turn around, you have a

10     special day for homosexual kids where all the kids says,

11     not a problem, but racism is.  So you don't have -- if

12     you gonna have a special day, why don't we deal with

13     what the real problem is in this school, which at that

14     time was racism.

15 Q.  So what did you do to express your concern with the

16     school's decision?

17 A.  We sit down and says, okay, why are we having this day,

18     taking a whole day out to celebrate a lifestyle?

19 Q.  And did you bring people to the school to protest?

20 A.  That was only after they said, we gonna go ahead and do

21     it anyway, the next year.  And so we had -- the

22     following year I asked, are you gonna have this Day of

23     Silence?  Well, if you wanna day of -- I said, why not

24     do it the way Christians do it?  We come in early,

25     before school, we go out the flagpole, we pray.  School

Tracey Juran, Certified Court Reporter

1           is for education, not indoctrination, and they can do it

2           after school.  No big deal.  We're not saying you can't

3           do it, we're just saying, this is time for education

4           during the day.

5                 Well, you can have a special day, if you want, for

6           Christians.  That is defeating why I'm here.  If I did

7           that, I'm hypocrite.  I'm saying, if we got a day of

8           respect, why not put everything on the one day?

9     Q.    So did you have a rally organized in 2008 --

10    A.    Yes, we did.  And over half the parents kept their kids

11          out of school that day.

12    Q.    And did you bring people from the church with you?

13    A.    Church, the community, because I live in the community.

14          We had people, I mean, come from all over to come and

15          stand with us --

16    Q.    How many people --

17    A.    -- at that rally.

18    Q.    -- do you think?

19    A.    Oh, my goodness.  I don't -- please, I really don't

20          know, but probably five or six hundred.  I don't know.

21          So yeah, something like that.

22    Q.    And were there any people there that were taking the

23          opposite position and supporting --

24    A.    Did you see --

25    Q.    -- the day?

State Objects:
Irrelevant, unrel to R-71.

1    A.    -- some of the paperwork that they put in up there?  I
2          mean, we had homosexuals and homosexual activists that
3          literally tried to start fights with me.  And I'm always
4          surrounded by people when I'm in public and people gonna
5          know I'm there, because the worst thing I could ever do
6          is to start a problem and hit someone.  And that's
7          exactly what they tried to do.  There was kids standing
8          next to me with a sign, "Throw Rocks Here."  You know,
9          there's not a lotta love and a lotta tolerance in that
10         sign.
11             And we had to call the police, which was there,
12         that they were supposed to keep us separated at this
13         rally.  That was the whole issue that we were supposed
14         to do, and they didn't.  When I first walked up, I had
15         all these homosexual kids and homosexual activists come
16         to me, and here I am surrounded, with four or five guys
17         around me trying to protect me from all of them.
18   Q.    And so the police did respond when you called?
19   A.    Well, they was there.  They were standing there looking.
20         And I said, hey, don't you guys think you better move up
21         here?  Don't you think you better move -- we supposed to
22         have separate places for the crowd, those that are
23         standing against the Day of Silence and those that are
24         for it, and you're not doing your job.
25   Q.    And did they --

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

1    A.    And I expect you to do your job.  And they finally did

2          move 'em back and put up a barrier, a rope.

3    Q.    Between the two groups, the rope?

4    A.    Between the two groups.

5          The things that were said, the language that was

6          used -- my wife was attacked with words, abusive, called

7          her a nigger lover, called us homophobes, hateful

8          people.  They -- I mean, I can't even say some of the

9          things that they were saying right there with the

10         television and the cameras.  But all of a sudden, none

11         of those things was on the news.

12   Q.    And were any rocks thrown?  You said there was a sign

13         about --

14   A.    No.  I mean, they -- that's what the sign was saying,

15         and he was standing right next to me with the sign over

16         my head, "Throw Rocks Here."

17   Q.    Was anything thrown?

18   A.    Oh, no.  I mean, that wouldn't have happened.

19   Q.    By either group.  No -- neither group threw things.

20   A.    No, mm-mm.

21   Q.    Did either group sink to the level of physical violence?

22   A.    No.  Oh, no.  I mean, it definitely wouldn't come from

23         our side.  And everybody knows I'm not a pacifist.

24   Q.    But you didn't react with --

25   A.    No.

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 29

1   Q.   -- violence.

2   A.   No.

3   Q.   And the other side didn't do anything violent either.

4   A.   Well, until we got 'em away from us.  I mean, coming up

5        in my face like this (indicating), what would you

6        consider that?  Would you consider getting in my space?

7   Q.   So how close were people standing to you?

8   A.   I wish we had that picture.  I know I got that picture

9        somewhere of the guys -- may look at the envelope

10       where -- I tried to bring a picture.  He's standing

11       right over -- right next to me.  I mean, he is here

12       (indicating).

13  Q.   And let the record reflect that I'm guessing that the

14       pastor's about three inches away.  Is that about right,

15       Pastor?

16  A.   He's probably about four or five inches away from me.

17            I wish I had -- it may be in that big yellow

18       folder.  Rachel said she got a picture of the guy

19       standing right next to me with the -- there it is.

20       Here's one of 'em (indicating).  This is when he's

21       walking up to me with the sign, and then he comes right

22       up right next to me on my side and was holding the sign

23       up, "Throw Rocks Here."

24  Q.   Now, I'm looking at the picture.  And do you want to

25       take a look and tell me how far away you think he was?

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

1   A.   No, right there, he is not as close as he got.  Because

2        all of a sudden, the guy that's with me, the bodyguard,

3        is trying to keep him from doing that.  And that's when

4        they started really getting closer and closer to me, and

5        that's when we had to call the policeman and say, look,

6        you need to get those guys away from us or there's gonna

7        be some problems here and we're not gonna start it.

8             MR. MCBRAYER:  Are you going to mark that, since

9        you're talking about it?

10            MS. EGELER:  Can we be off the record for a second.

11                 [Off the record - discussion]

12                 [Exhibit 2 marked for identification]

13   Q.  (by Ms. Egeler)  So when we went off the record, we

14       discussed how to use the newspaper that

15       Pastor ███Redacted███ brought today.  It is a copy of The

16       ██Redacted██, section R, from ████Redacted████.  And we

17       agreed that this article, which is on the front of that

18       section and then continues on to the next page, that our

19       court reporter will make a copy of that, including all

20       of the pictures that show the information that the

21       pastor was referring to -- well, all of the pictures,

22       including those we haven't discussed --

23   A.  Mm-hm.

24   Q.  -- yet.

25            Pastor, I notice in the picture on the front of our

State Objects: Irrelevant, unrelated to R-71.

State Objects to Dep. Ex. 2; Plaintiffs' Trial Exhibit 51; hearsay; irrelevant, unrel to R-71.

1        Exhibit 2, so the front page of ▓▓▓▓▓Redacted▓▓▓▓▓

▓        ▓▓▓▓▓  that day, that you have a printed T-shirt on that

3        looks like it was a special shirt --

4    A.  Mm-hm.

5    Q.  -- for the rally.  Can you tell me about what that shirt

6        said.

7    A.  Yes.  It's about education, not indoctrination.

8    Q.  And what --

9    A.  GLSEN is trying to indoctrinate.  We say that school

10       time is for education.

11   Q.  So what did the shirt say?

12   A.  Let me get my glasses so I can say specifically.

13   Q.  Part of it's hidden and --

14   A.  Yeah.

15   Q.  -- I just wanted to get that accurately reflected.

16   A.  I think this one is -- says, "GLSEN Manipulation Day."

17   Q.  And the picture shows you standing with a --

18   A.  Microphone.

19   Q.  -- a bullhorn --

20   A.  Right.

21   Q.  -- is that correct?

22   A.  Mm-hm.

23   Q.  And did you use that to speak to the large crowd that

24       had --

25   A.  Yes.

1  Q.    -- gathered?

2  A.    Mm-hm.

3  Q.    And do you remember what you told them?

4  A.    It's just a fact that we're here today to take what we

5        believe is the truth Biblically, and that is that

6        marriage is between a man and a woman.  And now that

7        GLSEN has gotten the Day of Silence in our schools, that

8        they are trying to indoctrinate and manipulate our kids

9        into saying something that we believe isn't right,

10       should be corrected, should be accepted, and should be

11       considered safe.

12 Q.    And did you have any threats or harassment made to you

13       or the church after the rally?

14 A.    All the way to the car.

15 Q.    And what were those threats or harassment?

16 A.    Yelling, screaming, calling me homophobe, hate -- you

17       know, hate filled, why don't I just accept gays as gays

18       are.  I mean, any -- you can name it, they were

19       saying -- most of the signs that they had up there, they

20       were -- and we had to get the police to come down.  I

21       mean, it got to the point where they was trying to block

22       me to get to the car so badly that we had to get

23       officers down there so I could make it to the car so we

24       could just leave.

25 Q.    And did the officers help you to the car?

State Objects: Hearsay; and the testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Tracey Juran, Certified Court Reporter

1   A.   Oh, yeah.

2   Q.   Were you pleased with the police --

3   A.   No, I wasn't.

4   Q.   -- officers?

5        And why not?

6   A.   Because they didn't do their job.  First thing is, if

7        you look in this picture that's on the front of here

8        (indicating), they were supposed to be that far away the

9        whole day.  Now, just so -- the picture that showed you

10       the signs, where that kid was standing, if he didn't get

11       any closer to me, they didn't do their job by allowing

12       him to get that close.

13            I mean, my life -- whenever one of these things --

14       my life is in danger.  I've gotten more threats than Van

15       Camp's has pork and beans.  And I'm gonna sit there at a

16       rally and people have threatened me, say I should be

17       dead, I should be killed, I shouldn't even be last --

18       left alive for the next month or two, much less

19       anything -- and they let them get that close to me.

20       Someone could have shot me, someone could have cut me.

21       I mean, there are a lot of things that could have taken

22       place when they knew my life had been threatened.

23   Q.   Let's talk about that.

24            So this individual that's pictured with the "Throw

25       Rocks Here" sign at one point was much closer to you.

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page  34

1    A.    Many.   Not just him.   Many was close.

2    Q.    And I understood you to say that you asked the police to

3          respond --

4    A.    I said, sir --

5    Q.    -- and separate.

6    A.    -- are you looking at what's going on here?

7    Q.    And --

8    A.    You are supposed to be keeping us separate and you're

9          not doing your job, when we come to find out later that

10         they had police officers and other members of law

11         enforcement up at the fireplace waiting for something to

12         break out.   They didn't even have all the officers there

13         on the premises where they were supposed to be.   I mean,

14         how -- if you're gonna have a rally and you gotta be

15         separated, how can you have that many people be set free

16         to come that close to me?

17   Q.    If you could just listen to the question I'm asking you

18         and focus on that question.

19             I wanted to ask you, when you felt the people were

20         too close to you and you asked the officer to take

21         action, did the officer refuse to do so?

22   A.    He said I had to wait -- he called his superior officer.

23         When the superior officer got there, then they moved the

24         people back.

25   Q.    How long before the superior officer got there?

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

1   A.   I don't know.  Probably about five minutes.

2   Q.   So about a five-minute response time.

3   A.   Mm-hm.

4   Q.   And when -- five minutes later, the police separated the

5        groups; is that --

6   A.   Mm-hm.

7   Q.   -- correct?

8            And how far apart did the police then keep the

9        groups?

10  A.   It look like it's about 15, 20 yards, yeah.

11  Q.   And do you think that, because they separated the

12       groups, that that prevented any sort of violence

13       occurring?

14  A.   I know it did.

15  Q.   So do you think that the police were instrumental in

16       helping to prevent violence?

17  A.   Oh, I mean, if there was no police there, it would

18       have -- I think would have broken out into some type of

19       violence.

20  Q.   That's a very strong statement, to state that the police

21       aren't doing their jobs.  So --

22  A.   Yeah, it sure is.

23  Q.   -- do you believe --

24  A.   And I --

25            MR. PIDGEON:  I object to that --

```
 1              MS. EGELER:  Excuse me --
 2              MR. PIDGEON:   -- statement and as to the form of
 3         the question.
 4    Q.   (by Ms. Egeler)  After you asked them to split up the
 5         group and they did so, did you continue to feel that the
 6         police were not doing their job?
 7    A.   After they -- the head superior officer got there, they
 8         did a great job moving everyone back.  It was -- we had
 9         some 45 minutes before that separation took place.  It
10         started from the moment I got out the car and I started
11         walking towards the school.  They saw me coming and then
12         here comes the whole crowd that was representing the
13         homosexual group and activists.  They met me and walked
14         up to me long before we even got to the place.  And
15         that's how it all started.  As we moved toward, more and
16         more came and got around me and surrounded me.
17    Q.   They surrounded you and told you that they disagreed
18         with you; is that correct?
19    A.   That'd be a good statement to make, yes.
20    Q.   But they didn't surround you and physically abuse you.
21    A.   Oh, no, no.  I think, with all the guys that I have,
22         that that was not gonna take place.
23    Q.   Well, there were guys surrounding you and protecting
24         you.
25    A.   Right.
```

1   Q.   Were they protecting the members of your church as well?

2   A.   No one was being paid attention to except me.

3        Everything was focused on me.

4   Q.   So the other members of your church were not threatened.

5   A.   Not the way I was, no.

6   Q.   Not the way you were or they weren't threatened?

7   A.   Oh, I mean, there was conversations going on the whole

8        time between the crowd and those that was against us

9        being there.

10  Q.   I understand there were conversations and, would it be

11       fair to say, angry words as well?

12  A.   Oh, yeah, mm-hm.

13  Q.   But was there physical violence occurring?

14  A.   There was no physical violence, none for -- with anyone

15       on either side.

16  Q.   And after you asked the police to separate the groups,

17       my understanding is that the police --

18  A.   Called his superior, superior arrived, and they moved

19       the crowd back.

20  Q.   And they kept things under control all the way through

21       the time that you actually got into your automobile and

22       left.

23  A.   Until we got ready to leave.

24  Q.   Until?

25  A.   When the rally was over, we turned to leave, and then it

1        was kinda like the police say, okay, it's through.  And

2        then bam, here come the crowd after me as I'm walking

3        down the street.  And that's when we had to get -- when

4        I got to the car, again I'm surrounded and they're

5        saying things and throwing words out, that we had to get

6        one of the officers and call one of the officers to get

7        down there to get these guys backed off me.

8   Q.   And when you called one of the officers to get those

9        guys off of you --

10  A.   He came.

11  Q.   Did he come immediately?

12  A.   Well, yeah, because he was kinda behind -- they was

13       walking because they saw what was happening with the

14       crowd when I left.  So the officer was kinda walking

15       behind the activist crowd.  So when we got to the car

16       and I had to stop, then boom, you know, here I am

17       surrounded again.  And I says, you know, Officer, we

18       need to get these guys back so we can go.  We wanna just

19       leave.  And he did.

20  Q.   And was there any vandalizing of your car or any --

21  A.   Not at that place.

22  Q.   It sounds like there's been vandalizing of your car at

23       other times; is that right?

24  A.   Well, worse than that.  I think that some of the things

25       that have happened -- and it's always during particular

```
 1        seasons.  If I write something, man, does the phone
 2        calls come in or does the threats go up.
 3             I wrote an article from the Center of Disease
 4        Control.  I said, these are not my words, this come from
 5        the health department.  If we're gonna have a school and
 6        if we're concerned about the health of our children -- I
 7        mean, we're eliminating trans fats because we say it's
 8        unhealthy.  We eliminated chips on lunch and pop on
 9        lunch.  We would not have a day to celebrate that which
10        the health department said is unhealthy.
11             And I gave all the details from the Center of
12        Disease Control about the lifestyle of a homosexual and
13        the danger of the lifestyle of a homosexual, bam, bam,
14        bam, bam, bam.  These not my words, these are from the
15        health department.  Now, if we're gonna get rid of that
16        which we say is unhealthy all the way down to trans
17        fats, sugar, and chips, why are we having a day to
18        celebrate and protect a lifestyle that has proven to be
19        unhealthy?
20   Q.   I understand your position, but I'm wondering if you can
21        tell me about any time that your car's been vandalized.
22   A.   Oh, you wanna go -- you want those type of things.
23        Okay, yeah.
24   Q.   I do.
25   A.   Okay, the first thing happened after the rallies.  And
```

```
 1        we was -- I was doing some articles because of all the
 2        publicity that was happening with us --
 3   Q.   Which rallies?
 4   A.   The one at  Redacted , because it was two years in a row
 5        that we really stood.  Last year I backed off because I
 6        was going through my treatments for cancer, so I wasn't
 7        as vocal.  I just did an article -- I was gonna do an
 8        article, and the school paper -- well, wasn't the school
 9        paper.  It was -- the      Redacted     , I think it was,
10        refused to -- even though I bought the page and paid for
11        the advertisement, they said they wouldn't print it.  So
12        they turned me down.
13             And I asked 'em, why would you turn me down?  This
14        is -- I paid for the page.  I'm not asking you to do
15        it -- donate it.  It's an article from the health
16        department.  Well, sir, it's a family newspaper and we
17        don't want this kinda news in our paper.
18   Q.   And what year was that?
19   A.   That was last year.  That was April last year, so
20        whatever --
21   Q.   Is it --
22   A.   April of 2009.
23   Q.   Was it the same year as the  Redacted  event?
24   A.   It's the third -- it's two years after the  Redacted
25        event.  Remember, I had the big rally and then we had a
```

Page 41

1          smaller rally.  We decided that we wasn't gonna go to

2          the school that year because of all the things that took

3          place the first year, and we didn't wanna put the kids

4          in that position again.  So we didn't go to the school

5          as a rally that day, we just did articles and talking to

6          parents.  And again, they took a large amount of the

7          kids outta the school.

8     Q.   So let's go back.

9               My question was, have you ever had your car

10         vandalized as a result of your position --

11    A.   Not my car, because our cars -- yeah.

12    Q.   Please let me finish the question.

13              -- as a result of your stance on homosexual --

14    A.   Right.

15    Q.   -- behavior or same-sex marriage?

16    A.   Right.  We had an incident at the house, because

17         basically, everyone knows -- I don't have a private

18         residence.  I mean, everyone knows where I live.

19         Private phone numbers, yeah, because of not wanting to

20         receive all the calls that I get at the office.

21              And my daughter was -- had a sleepover one night.

22         Well, I got gates.  I got security gates because of all

23         the threats that I've gotten.  And when a friend got

24         there that evening, the gate was closed.  And she didn't

25         ring the bell, she just parked next to the gates outside

State Objects: Witness lacks foundation for the testimony; hearsay; and  the testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 42

1  and walked up to the house.  And my daughter told her

2  it's okay to walk up because, you know, our dogs was

3  locked up -- I have to have guard dogs -- because our

4  dogs was locked up, so it's okay to walk on in the

5  house.

6       Well, she left her car outside the gate.  They

7  never went back to put the car up.  The next morning, we

8  get up and go down there and every -- nothing was stolen

9  outta the car.  Every window was busted:  Side windows,

10 front windshield, back window.  Just totally attacked

11 her car simply because it was parked in front of our

12 gates in front of the house.  The next thing happened --

13 Q.  Well, let me ask about that first.

14 A.  Mm-hm.

15 Q.  So had anything happened to the car other than the

16 windows being broken?

17 A.  No.

18 Q.  Was there anything painted on the car?

19 A.  No.

20 Q.  Was there a note left stating why the people had done

21 it?

22 A.  No.

23 Q.  Did you -- do you know for certain this wasn't an act of

24 random vandalism?

25 A.  Could have been.  I mean, it could have been.  But

State Objects: Lack of foundation; hearsay; and the witness's testimony is irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 43

1        that's after what happened with our mail.

2    Q.   Let's stay with this car incident.

3    A.   Mm-hm.

4    Q.   What year was that?

5    A.   It would have to be the year after the big rally,

6         because my daughter was still in high school.  So we did

7         the rally in '8, '08.  No, we did the rally a little

8         earlier than '08.  So it probably was '08 that the car

9         was attacked, the windows.

10   Q.   And then you wanted to go to another incident and I --

11   A.   Mm-hm.

12   Q.   -- paused you to talk about this.  So let's --

13   A.   Yeah.

14   Q.   -- go to the other incident you wanted to talk about.

15   A.   Yes, it could -- like I said, it could have been

16        something that just happened, you know, but I don't

17        believe that because of what had taken place before.  We

18        were sitting in our home and the neighbors came by, of

19        course, and rung the front gate to come in.  And we

20        opened the gate and they came in and here is all of our

21        mail.  They had stolen the mail for several days, I

22        guess, out of our mailbox and had taken it up the hill

23        and thrown it in the ditch.  So, I mean, that's -- I

24        think that's pretty big offense.

25   Q.   Who did this?

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

```
 1   A.   I don't know who did it.  If I did that, they wouldn't
 2        be walking around free.
 3   Q.   And why did they -- do -- you don't --
 4   A.   I think it --
 5   Q.   -- know who did it, so I assume you don't know why?
 6   A.   Well, I think it's because of who I am, because of the
 7        threats and the things that people have said they wanted
 8        to do to me.
 9   Q.   How do you know?
10   A.   I don't know.  You don't know.  But I'm not -- there's
11        eleven to twelve mailboxes on our street on the bottom.
12        There's another seven or eight on the top of the hill
13        where I live at.  Only mailbox that was stolen, anything
14        done with, no one else mailbox was touched except Redac,
15        where I live.
16   Q.   And was that in '08, then, as well?
17   A.   I think it was '08.
18   Q.   And did --
19   A.   And so we had to end up, of course, getting one of those
20        security mailboxes.
21   Q.   Did you call the police about the incident with the car
22        windows being broken?
23   A.   Yes.
24   Q.   Did they respond?
25   A.   Well, I mean, yeah, I think they -- where were we?  As
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

1        parents, I think we was outta town.  And I think that my

2        daughter and her friend -- I can get more details about

3        it, if need be, that -- made the call that someone had

4        busted windows and had attacked the car --

5    Q.  So you --

6    A.  -- that evening.

7    Q.  -- didn't -- you didn't actually see the --

8    A.  Right.

9    Q.  -- car, then.  Okay.

10            You heard about this from your daughter?

11   A.  Well, my daughter called, yeah, someone attacked our

12       friend's car.

13   Q.  And how about with the mail?  Did you call the police

14       about that?

15   A.  Yes, we did.

16   Q.  Did you get a response from the police about the mail?

17   A.  Well, only response they could really give us is, yep,

18       someone stole your mail and you probably need to have a

19       better security system.

20   Q.  So do you know if they had a way of finding who had --

21       who did this to your mail?

22   A.  No.

23   Q.  Were you dissatisfied with the police response either to

24       the car incident or the mail theft?

25   A.  No.  It's just if you're gonna make a stand, then that's

1      things that is gonna happen to you.  And that's just

2      part of what it's been like for the last five, six

3      years.

4   Q.  I understand.

5          Anything else that you've experienced?  You talked

6      about phone calls.

7   A.  Most of 'em I don't get because the front desk and

8      Rachel takes care of those.  We was getting so many so

9      frequently for a while with the [Redacted] incident and

10     being down at [Redacted] issue and then being in Olympia.

11     Man, oh, man, those -- that was almost an everyday -- I

12     mean, it was bad.

13         The people at work, you know, get nervous.  You get

14     people calling in and saying that, you know, your

15     pastor's not gonna make it through the week, or, he --

16     you know, he needs to be dead, or, we're gonna get him

17     if we can catch him out.  I mean, that's nothing to

18     laugh about.

19  Q.  Did you hear any of those phone calls personally?

20  A.  I try my best never to pick up those phone calls.

21  Q.  So you didn't answer those phone calls --

22  A.  No.

23  Q.  -- yourself.

24  A.  They came through the church office.

25  Q.  So [Redacted] would be more knowledgeable.

1   A.   Redacted and the receptionist.

2   Q.   And by Redacted, I'm referring to Redacted, your

3        executive assistant.

4   A.   Right.

5            They put it in blogs.  I mean, it wasn't just the

6        phone calls.  They had it in blogs, they had it in their

7        newspaper, they had it in many of the -- I'm trying to

8        think of different articles.  I mean, they don't like

9        me, you know, and that's understood.

10  Q.   And do you think that people have a First Amendment

11       right to express that they don't like you or like your

12       views?

13  A.   Not in the way they did, no.

14  Q.   And how --

15  A.   You don't threaten me and say, I want you dead.  There's

16       no right for that.

17  Q.   Let's talk about specific instances where people said

18       they want you dead.  When and where?

19  A.   Most the times this comes out -- like if there's an

20       article that I've done, there's always comments and

21       people respond in comments to the article, whatever.

22       You can find 'em there, you can find 'em when they would

23       call and follow up with a call to the office, you can

24       find it in articles that they would write.  I think

25       they -- there's been some wild ones, even, in The

 1          Stranger newspaper.  I think that there's been some big

 2          follow-ups from that paper about me.

 3    Q.    So did you actually have anyone physically attack you at

 4          any point through these years of rallies and --

 5    A.    I'm too --

 6    Q.    -- protests?

 7    A.    I'm too careful to put myself in a position to be

 8          attacked.

 9    Q.    And --

10    A.    Because the -- and the reason why I am is because I'm

11          gonna be the one that's gonna end up in trouble.

12    Q.    And did you tell the police about these comments and

13          death threats?

14    A.    We have called and we have let the ▮Redacted▮ Police know.

15          We have reported because we are supposed to.  And, you

16          know, at times they would say, what do we need to do?

17          We had one incident that got to the point where they

18          came to the office and there was a letter left

19          threatening.  We never could prove who wrote the letter,

20          but it was a very derogatory, very profane explanation

21          of what they thought about me and what they wanted to do

22          to me.

23    Q.    Do you have a copy of that letter?

24    A.    Oh, my goodness.  I -- if I -- no, I probably don't.

25    Q.    Did you give it to the police?

State Objects: Hearsay; the witness's testimony is irrelevant even if not offered for the truth, unrel R-71.

Tracey Juran, Certified Court Reporter

1   A.  I think the police did get it.  I'm not sure.

2   Q.  And how many times did you call the [Redacted] Police about

3       death threats or --

4   A.  Whenever there was something would come in, they said,

5       let us know.  You know, and it was -- it's kinda got to

6       be to the point where it's kinda on a regular thing:

7       Hey, we got some more calls; hey, we got -- just to let

8       you know.  No one's come to the office except that one

9       time that letter was dropped off.  And so --

10  Q.  And when you've called the Redmond Police, have they

11      been responsive?

12  A.  Oh, yeah.

13  Q.  Are you displeased with the [Redacted] Police?

14  A.  I'm not displeased with the [Redacted] Police at all.  If I

15      had any, it's -- like I said, it was more protecting the

16      people up at [Redacted].

17  Q.  Have there been any attacks on the church, the structure

18      itself?

19  A.  Well, not on the church -- our church, because we rent.

20      So it's --

21  Q.  And where --

22  A.  -- you know, not ours.

23  Q.  Where do you hold services?

24  A.  We hold services at the [Redacted] in

25      [Redacted] Sunday morning.

1        But what did happen was, we had a big rally at

2     [Redacted] Church, and it was announced that we

3     was gonna be using their church for our rally.  It was a

4     worldview conference.  Had nothing to do with anything

5     concerning this issue.

6  Q.  And when did -- when was that rally?

7  A.  It would be April of -- I think it was 2008, 2009.

8  Q.  Did the rally --

9  A.  It -- and it was concerning -- around the same time as

10    that Day of Silence, so I was in the news.  And they

11    came to work in the morning and there was grafitti

12    written all over the church, you know, homophobe this

13    and hater, and they took glue and stuck it in all of the

14    keyholes on the outside doors.  And I don't think

15    [Redacted] had done anything to get those, but that's --

16    so it had to be because we was coming there that weekend

17    and use the building.

18  Q.  Did the grafitti have any words?

19  A.  Yes.  You'd have to ask the church, because they washed

20    it off pretty quick because people was coming in for a

21    rally that evening.

22  Q.  Did you see the grafitti?

23  A.  No.

24  Q.  And that didn't have anything to do with Referendum 71,

25    then?

State Objects: Lack of Foundation; hearsay; testimony is irrelevant even if not offered for the truth, unrel to R-71.

Tracey Juran, Certified Court Reporter

Page 51

```
 1   A.   I couldn't tell you if it did or not.  But I do know if

 2        you are standing against them, you will be harassed and

 3        you will be attacked in words and threats.

 4   Q.   So the [Redacted] rally that is in the newspaper article

 5        that we've put into the record and that you have there

 6        in front of you, that was in April of '08.  And you said

 7        you thought that the event at [Redacted] was around the

 8        same time?

 9   A.   Mm-hm.

10   Q.   So by around the same time, do you mean within that

11        spring of 2008?

12   A.   Yes.  I can get a specific date for you.  But we have

13        our worldview conference the same every year and we

14        usually have it in April.  Early May at the latest, but

15        it's usually April.

16   Q.   But it would be the same year, 2008 --

17   A.   Mm-hm.

18   Q.   -- as the rally?

19   A.   We had a rally in -- so it's '10 now.  We didn't do very

20        much in '9, like I said, because of treatment.  And '7

21        and '8 we had the -- '7 was the big rally, I think.

22   Q.   You were nodding, so I'm just going to ask again to make

23        sure we get it clearly on the record.

24   A.   Mm-hm.

25   Q.   You think that the [Redacted] event would have been in
```

1      the spring of 2008.

2   A.  Yes, I believe so.  I don't think it was last year, I

3       think it was the year before.

4   Q.  Has there been any sort of attack or grafitti or

5       vandalism of the church office?

6   A.  No.  No, we got all security cameras and everyone knows

7       that the office is pretty well secure.

8   Q.  And we talked about two things occurring at your home,

9       the broken windows of the car --

10  A.  Mm-hm.

11  Q.  -- and the mail theft.  Anything else at your home?

12  A.  No.  I mean, with security fences and dogs, there's not

13      very much going on at the house.

14  Q.  And you said your home address is public.

15  A.  Oh, yeah, everyone knows where I live.

16  Q.  Did you ever have anyone come to services and disrupt

17      services?

18  A.  Well, they've been to our service.  They don't disrupt.

19      I mean, I'm too much fun.

20  Q.  And by they, who do you mean?

21  A.  We've had many visitors that are homosexual.  One year,

22      right after we did -- had the Microsoft -- when that was

23      huge news, we had a boycott.  The homosexual community

24      boycotted the church service.  And so they let us know

25      they was coming.  So all of a sudden, you know, okay,

1    what is gonna be the issue if we have them show up at
2    our church and what is gonna take place and how do we
3    wanna make sure that they're safe and we're safe?
4         So right before the service, we had taken -- it was
5    gonna be a hot day.  It was in the summer -- I think it
6    was August -- and I'm -- it's been four or five years
7    now.  And we said, hey, let's get some water out there,
8    let's get some refreshments for 'em and let 'em know,
9    hey, you're more than welcome to come in.  We're welcome
10   to come in?
11        Said, yeah, you're more than welcome to come in.
12   You can't come in as a protester, but you can come in as
13   wanna see what goes on in our church.  Because they were
14   saying, you know, I'm preaching against homosexuals
15   every Sunday -- I mean, that's my number-one message --
16   which is, you know, not true.  And so they couldn't
17   believe we invited 'em in.  So they did.  They all
18   walked in, they all sit down.  I said, you know, be
19   great if you guys just split up and enjoy yourselves
20   like anyone else that's coming into the church.
21        I stood up in front of the church and says, ladies
22   and gentlemen, we wanna let you know that the protesters
23   outside is no longer protesting.  They're inside the
24   church here with us and they come to share with what
25   we're gonna do.  The church applauded, told 'em, thanks

1    for coming.  We had a great sermon, great singing.  And
2    when they got through, they stayed around after that
3    service almost 45 minutes to an hour just talking and
4    beginning to get a good understanding about where I
5    stood.
6         And they -- two girls come up to me and said, it's
7    not about hatred, is it, of homosexuals?  Go, no, it's
8    not.  She says, you don't like anything the Bible don't
9    like.  Yeah, that's where I stand.  They says, okay, we
10   can understand it.  If we wanna be a part of your
11   church, could we?  I said, absolutely, as long as you do
12   what the Bible say and repent of any wrong you're doing
13   like anybody else.
14  Q.  And so it sounds like they were well behaved and --
15  A.  Well behaved and well accepted and had a great time,
16   because we're a lotta fun.
17  Q.  And you said a lot of other people have come.
18  A.  We have visitors there all the time because, I mean,
19   things come out in the paper that I've said, whatever,
20   you know.  You know that someone's there listening.
21  Q.  Just listening or have you ever had anyone be
22   disruptive?
23  A.  Oh, no, no.  We got -- you know, our church is really
24   organized and we really want folks to enjoy, but we
25   really -- everyone knows that you come in, you come in,

1      and we just don't put up with disruptions.

2   Q. It sounds like people are enjoying listening to you and

3      the service.

4   A. There was an article written about three years ago -- I

5      wish I could remember what it was -- and the guy had

6      come to the church because he had, you know, heard all

7      of the derogatory things about me and my stands and my

8      hatred for homosexuals.

9          And he came, he sit down, he was there for the

10     whole service, and he wrote a tremendous article

11     afterwards and basically said, you know, if he hadn't

12     heard about this guy and figured out, that he could have

13     been persuaded I was a pretty nice guy.  But he didn't

14     think I was all the things that he had heard in the

15     papers and on the news.  And so it is my lot in life to

16     take what people think and to still live what I believe

17     Biblically.

18  Q. But to get back to people who've attended the church

19     that disagree with you about homosexuality --

20  A. Mm-hm.

21  Q. -- none of them have disrupted services or misbehaved.

22  A. Nope.  And we make that clear, you know, from very

23     beginning:  When we're here, it's not a political time.

24  Q. And --

25  A. Nothing to do with politics.

 1  Q.  And you're welcoming of anyone who wants --

 2  A.  You welcome --

 3  Q.  -- to attend.

 4  A.  -- anyone who wants to come.  And if you wanna join the

 5      church, this is what it takes.

 6  Q.  So now I want to talk to you a little bit about

 7      Referendum 71.

 8  A.  Sure.

 9  Q.  Have you signed the Referendum 71 petition?

10  A.  I did.

11  Q.  And do you remember where you were?

12  A.  At the church office, I believe.

13  Q.  And were others there at the church office?

14  A.  Yeah.  I mean, we would have 'em right at the office so

15      anyone that was at the office that came through that saw

16      'em could sign 'em.  So we had petitions there right at

17      the church and at the church office.

18  Q.  And did you think that the signature was a public

19      signature or that it was secretive?

20  A.  Well, when you think about a petition, you think about

21      the right of privacy.  I think that if I wanted someone

22      to know how I was gonna vote, why don't I just announce

23      that?

24  Q.  So when you signed that petition, did you hide it?

25  A.  No.  I never would have thought that it would have been

Tracey Juran, Certified Court Reporter

Page 57

1        an issue of someone trying to get all the names off a
2        petition to be published.
3   Q.   After you signed, was the petition out in the public --
4   A.   Oh, yeah.  I mean, people handled 'em the whole time.
5        It wasn't like they just laid down on the table or, you
6        know -- when you got -- when they got full, they would
7        take that one and they would put it away and then they
8        put a fresh one out.
9   Q.   So the page that you signed, others could have seen it
10       while they were --
11  A.   While they were signing it, yeah.
12  Q.   And so were petitions made available at the church to
13       sign?
14  A.   Mm-hm.
15  Q.   Could you --
16  A.   Yes --
17  Q.   Yes.
18  A.   -- they were.
19  Q.   And did you talk about Referendum 71 or the petitions to
20       your parishioners?
21  A.   I said, we need to stand and this is one of the ways we
22       can stand against what we believe is right, is the
23       letting it be brought to a vote.
24  Q.   And did --
25  A.   And --

Page 58

1   Q.   -- you say that during a sermon or from the pulpit?

2   A.   It would be more like announcements.  You know, once I

3        start the sermon, it's -- everything else is off.  This

4        is time for the word.  But in our announcements and

5        different things, we would always encourage our people

6        to be involved with our country, our state, and to be --

7        make sure they're registered voters, because if you

8        don't vote, you don't have any say-so, especially to me.

9        You're not taking your responsibility God wants us to do

10       to be involved.  So --

11  Q.   And --

12  A.   -- those are the type of things that are being said.

13  Q.   Were those announcements made during the church service?

14  A.   Yes, mm-hm, mm-hm.

15  Q.   Did you gather signatures on petitions outside the

16       church at all?

17  A.   Personally, no, I did not.  But, you know, a lot of our

18       people participated, I'm sure.

19  Q.   Did you publicly endorse Referendum 71?

20  A.   I cannot tell our people how to vote.  I never tell our

21       people how to vote.  At the most, I can say how I'm

22       gonna vote.  So if they want to hear that, they can.  I

23       mean, I'm never, ever shy of how I stand Biblically and

24       how I vote.  But I can't tell -- you can't say, well,

25       you need to vote for this person, you need to vote for

1        this proposition.

2   Q.   So you didn't publicly endorse Referendum 71?

3   A.   I think if you would say publicly, I said I believe in

4        it.  So yeah, that would be a public advantage of

5        saying, I believe in this.  What -- I never say, you

6        have to believe in this, or I never say, you have to

7        vote this way because I do.  That's not my job as --

8        telling folks what they can and can't do as their

9        pastor.

10  Q.   Did you publicly say, I endorse or I support

11       Referendum --

12  A.   Yeah, mm-hm.

13  Q.   -- 71?

14  A.   Mm-hm.

15  Q.   And do you know whether your support or endorsement was

16       stated on the Protect Marriage Washington Web site?

17  A.   No, I don't think -- I think the one that -- the -- was

18       more of a Joe Fuiten type of endorsement.  I'm not -- it

19       wasn't something like I was -- my name was big on it or

20       whatever, no.

21            MS. EGELER:  Okay, just a sec.

22  Q.   (by Ms. Egeler)  If Protect Marriage Washington had put

23       you down and listed you as an endorser of

24       Referendum 71 --

25  A.   I think I went and spoke at a CWA, Concerned Women of

1        America, rally.

2   Q.   But if I could finish my question.

3   A.   Yeah, okay.

4   Q.   If Protect Marriage Washington listed you as an endorser

5        or supporter of Referendum 71 --

6   A.   Mm-hm.

7   Q.   -- that would be a surprise to you?

8   A.   No, because so many people talked to me about it.  They

9        could have said, are you for it?  Oh, yeah, you know.

10       Would you support it?  Yeah.  It wouldn't be a surprise

11       they put my name on it, no.

12  Q.   And did you ever have any open statements on the Protect

13       Marriage Washington Web site about your position on

14       Referendum 71?

15  A.   I could not tell you unless they was quoting me from

16       some of the speaking engagements.  Like I said, I went

17       and spoke at several doing rallies, so they could have

18       quoted me from those, mm-hm.

19            MS. EGELER:  Let me mark this as Exhibit No. 3.

20                 [Off the record - discussion]

21             [Exhibit 3 marked for identification]

22  Q.   (by Ms. Egeler)  What I've handed you is what we're

23       marking as Exhibit 3 to your deposition.

24  A.   Mm-hm.

25  Q.   And this is -- states at the bottom of the page from the

```
 1        protectmarriagewashington.com Web site.  And it states,

 2        "State Leaders Support REJECT R-71 Effort" --

 3   A.   Right.

 4   Q.   -- exclamation point.  [Redacted]

          [Redacted]                                     --

 6   A.   Right.

 7   Q.   -- [Redacted]      .  Do you see where I am?

 8   A.   I am.  Yes, I see exactly.

 9   Q.   Is that a quotation from you?

10   A.   I'm sure it is if they said that.  But I'm saying it's

11        probably at one of the rallies I was at, probably not at

12        the church or something I specifically wanted them to

13        print.  So I'm sure that is something it sounds like I

14        would say at the -- either the Concerned Women of

15        America or one of the other rallies, other churches that

16        pastors had got together.

17   Q.   So did you do a number of rallies with respect to

18        Referendum 71?

19   A.   Not very many, because I wasn't feeling well at the

20        time.  So it was limited.  I would have probably done a

21        lot more if I was as healthy as I wanted to be.

22   Q.   And you talked -- you were talking about one with a

23        women's organization.  Can you tell me about that.

24   A.   My goodness.  It's probably at -- up in the [Redacted]

25        area before -- had to be before the vote.  And it was
```

```
 1          a -- I think it was a two-day rally, a Friday and a

 2          Saturday.  And I came in and spoke that Saturday.

 3   Q.     To the rally?

 4   A.     To the rally, yeah.

 5   Q.     Any other rallies you remember for Referendum 71?

 6   A.     Man, I probably did some things on the news, radio,

 7          people calling me, because I'm always called.  I mean,

 8          just who I am and, you know, what -- people know where I

 9          stand.  So that's probably the best that I can say,

10          that -- radio interviews, people calling me getting

11          quotes, Concerned Women of America rally.  So those

12          would be the ones I can remember.

13   Q.     Do you remember if you had a Referendum 71 sign in your

14          yard at your house?

15   A.     No.

16   Q.     No, okay.

17                A Referendum 71 bumper sticker?

18   A.     No.

19   Q.     Do you feel that you experienced harassment or threats

20          as a result of your public speaking regarding

21          Referendum 71?

22   A.     Absolutely.

23   Q.     Can you tell me about that.

24   A.     Well, anytime -- like I said earlier in the deposition

25          here, that anytime my name is mentioned in the paper,
```

1       anytime there is an issue that is concerning the

2       homosexual issue that my name is mentioned, anytime I'm

3       on TV, anytime I am interviewed and it get -- go public,

4       I am gonna get threats and I'm gonna get calls.  It's

5       automatic.  It's just gonna happen.  I'm gonna be

6       threatened.

7   Q.  Can you tell me specific incidents that occurred as a

8       result of your speaking on Referendum 71 as opposed to

9       prior to Referendum 71, the stance that you took with

10      respect to homosexuality?

11  A.  Well, I think they think I'm a nut and I think they look

12      at me as being inconsistent, because if I am for equal

13      rights for minority of blacks, they think I should

14      understand the fight that they're going through.

15  Q.  Did you have anything happen at the church as a result

16      of your speaking out regarding Referendum 71?

17  A.  They're not -- no.  I mean, that is not gonna happen at

18      the church, it's not gonna happen at the office.  But

19      the thing that's gonna happen is the calls and the

20      threats that comes through the -- you know, the bloggers

21      and all that.

22  Q.  So which blogs did you receive threats on as a result of

23      your involvement with Referendum 71?

24  A.  I think you'd have to probably just look at some of the

25      articles and the comments that come after those

1     articles.  Like if this (indicating) came out in the

2     paper, it won't be long; I'm gonna get calls.  They're

3     gonna come in.  I mean, it is automatic.  They're gonna

4     find some way to harass me about my stand, and that's

5     automatic.  I don't have to worry.  I don't have to say,

6     you know, it's not gonna happen.

7         The only time that I can say that I haven't gotten

8     many harassment calls was after that article that was in

9     The Stranger, the one I wrote.  I think that you -- did

10    you get a copy of that?  I think --

11  Q.  We might have.

12  A.  Yeah, I think you did.

13       MR. MCBRAYER:  It's right --

14       MR. PIDGEON:  That's it right there.

15       MR. MCBRAYER:  -- right there (indicating).

16  A.  Which was an absolute amazing surprise to us, that no

17    one wanna dispute the article and that the more they

18    talked about the article, the worse my case was made.

19    And so that's -- now, that's the only article in ten

20    years that was not very much response.  They were so

21    angry at that being printed by [Redacted] itself, they

22    got -- [Redacted] got attacked for printing that

23    article.  So I was glad someone else could share.

24  Q.  (by Ms. Egeler)  So did you receive any death threats

25    specifically because of your position on Referendum 71?

1   A.   If it was, I wouldn't have known, because I don't

2        receive the phone calls.  The church takes care of

3        those.  And if it's something that is bad enough, they,

4        hey, says, you know, we got phones -- call today, people

5        are upset about what you said, they don't like your

6        stance on the referendum.  Or they say, hey, you know,

7        we need to take some extra caution Sunday; this came in.

8             But I try never to really listen at the calls.  I

9        mean, it don't do me any good to have that in my head.

10       And, you know, I'm trying to stay straight and not be

11       prejudiced myself towards those who's threatening me.

12   Q.   So you did not see anything threatening to kill you

13        following your endorsement of Referendum 71.

14   A.   No.  Only thing that came up was, there were some

15        comments that came through that says, you know, this guy

16        should be taken out, this guy isn't worth living.  I

17        mean, I've gotten so many of those now.

18            When I was going through the ▮Redacted▮ issue and

19       when we was going through standing against -- for

20       marriage -- which is what I do.  I'd rather stand for

21       something than to stand against something, and that's

22       what I do.  And if you're gonna stand for something,

23       then they're saying you are standing against and that's

24       how it is.  And I -- at times, I was getting 400 threats

25       a year.  I mean -- and so if they know who I am and have

*State Objects: hearsay; irrelevant, unrelated to R-71.*

Page 66

1        the freedom to threaten, what would the average citizen

2        do if their name gets out there and feel threatened?

3   Q.   Well, let's talk about what you said.  You said that

4        there have been so many comments that they want to take

5        you out.  How many were there saying they want to take

6        you out specifically with connection to your stance on

7        Referendum --

8   A.   I don't think you can tie them in --

9   Q.   Excuse me; let me finish.

10  A.   Okay.

11  Q.   -- specifically with respect to your stance on

12       Referendum 71?

13  A.   I don't think you can separate that in my life.

14  Q.   Then how many have you received -- how many phone calls

15       or messages have you received that talk about taking you

16       out?

17  A.   Oh, my land.  You know, if it was less than 900, I would

18       probably -- that's very conservative in the last four or

19       five years.

20  Q.   And do you think that these people that make those kind

21       of remarks are cowards just using words?

22  A.   I don't take the chance that they're cowards.  Someone

23       that says that has got it in their mind.

24  Q.   Have you ever seen someone act on it?

25  A.   Well, I think the group that was up there at [Redacted]

Tracey Juran, Certified Court Reporter

```
1          acted on it, and it would have been worse if the police

2          wouldn't have stepped in.

3   Q.     Any other instances where they acted on it?

4   A.     The rallies.  We was down at [Redacted].  Oh, my land,

5          the words and the things they did.  And we invited them

6          in to come and sit, and they took a whole section.  And

7          they had sexual toys and they was screaming bad words

8          and things at the speakers.  Dr. Dobson had to stop at

9          one time and turn and address them, that we're glad

10         you're here.  I mean, it isn't a very tolerant group.

11  Q.     You say the things they did at that [Redacted] rally.  What

12         things did they do?

13  A.     The interruption with the loudness, the section that

14         they all sat in, having the -- like I say, the sexual

15         toys they were showing.  And, I mean, we got kids

16         there --

17  Q.     But did they --

18  A.     -- at this rally.

19  Q.     -- do something that made you think they were going to

20         take you out, some sort of physical --

21  A.     The amount of threats -- no.  It was the amount of

22         threats that came in before that rally.  And everyone

23         didn't think that it was gonna be that successful,

24         because we only had 30 minutes (sic) to do it.  But once

25         they saw the success of it, boy, it exploded.  I mean,
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 68

1      they -- and that's why we had police everywhere at that

2      rally.  I mean, we had state police, we had Seattle

3      Police, we had everyone there because I had gotten so

4      many threats; I mean, hundreds and hundreds of

5      threats --

6   Q.  Do you feel that --

7   A.  -- to my life.

8   Q.  -- that the police stopped violence from occurring?

9   A.  I guarantee you they did.

10  Q.  So were you pleased with the police response?

11  A.  I was, very.  The King County at the time -- boy, how

12      many years ago was that?  Because Reichert was the head

13      of the sheriff's department at that time.  And when they

14      started, they -- because we thought they may try to come

15      down on the field from the stands.  And he just -- he

16      gave a word, they went down, they stood down along the

17      walls, and that shut that down immediately.  We had

18      three or four hundred other protesters outside blocking

19      people from getting in.  And so it was not the kind of

20      thing where you feel loved.

21  Q.  So how were people able to get in if they were blocked?

22      Did the police --

23  A.  They --

24  Q.  -- help with that?

25  A.  Yes.  They just kept -- you know, people just didn't say

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

1       anything.  We had said, look, don't say anything, keep

2       focused.  You're probably gonna run into protesters, but

3       just get to the stadium, and you've got protection there

4       and you're gonna be okay.

5    Q.  So do you know if any of your parishioners signed

6       Referendum 71?

7    A.  I'm sure they did.  I mean, yeah.

8    Q.  And do you know of any of them being attacked or

9       harassed or threatened?

10   A.  No.  They enjoy attacking their pastor.

11   Q.  So the --

12   A.  Most of the people, if it's gonna be an attack, it's

13      gonna be towards me.  Very seldom they gonna just come

14      at our people.  They don't know our people.  They don't

15      know where they stand.  But if this -- their names get

16      out, what's gonna keep 'em from being harassed and

17      attacked?

18   Q.  But do you know of anyone being -- in your church other

19      than you, who've been very public and are the center --

20   A.  Right.

21   Q.  -- and focal point of your church, do you know of any

22      ordinary parishioners attracting threats or harassment

23      as a result of signing the petitions?

24   A.  No.  No, I could not say that I know anyone personally.

25      But people don't know 'em.  They don't know who they

```
 1        are.

 2   Q.   Now, you've been involved in so many activities.  We've

 3        talked about the [Redacted] shareholder meeting and the

 4        [Redacted] rally and [Redacted] and huge rally in Washington,

 5        D.C., and then endorsement of Referendum 71.

 6   A.   Mm-hm.

 7   Q.   And you said that the year of Referendum 71, you were

 8        ill and couldn't make as many appearances as you'd like;

 9        is --

10   A.   Mm-hm.

11   Q.   -- that right?

12   A.   Mm-hm.

13   Q.   You stated that you've averaged as many as 400 threats

14        or harassing comments a year.  Did -- since you were not

15        as physically able to get out and publicly speak in

16        2009, did you experience 400 a year?

17   A.   No, no.  If I'm not very active, it's not as much.  And

18        that is why, you know, that responding to this

19        (indicating) -- I mean, if that came out in the paper,

20        the phone's gonna go off the hook.  It's just automatic,

21        because all of a sudden they had a -- you know, the

22        great homophobe is speak out again.  And they feel that

23        this is a responsibility -- I don't know if they're

24        trying to scare me.  I don't know why they would even do

25        it.  It hasn't worked, you know.  But they keep trying.
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

Page 71

1        They won't give up.

2                MR. MCBRAYER:  At some convenient point, could we

3        go off the record, take a break, five minutes?

4                MS. EGELER:  Sure.

5                MR. MCBRAYER:  Whenever you get to a convenient

6        point.

7                MS. EGELER:  Okay, we can take a break now.  That's

8        fine.

9                        [Off the record - recess]

10   Q.   (by Ms. Egeler)  Pastor, we've talked about all sorts of

11        harassment.  And I want to narrow it down just to

12        harassment that you've experienced as a result of your

13        stance on Referendum 71 and ask, is there any form of

14        harassment you experienced that we didn't talk about?

15   A.   I can't think of anything that we haven't talked about.

16        I think that the difficulty in talking about

17        Referendum 71 is, you're trying to limit what -- the

18        attacks that I've had on this whole issue.

19        Referendum 71, it's just one of many of why I have been

20        attacked, called, threatened.  And so Referendum 71 just

21        give them another excuse to come after me.

22   Q.   Is it fair to say that it's hard to separate out why a

23        particular person called you, whether they're angry

24        about the Redacted rally or other things they've seen in

25        the paper, as opposed to Referendum 71?

1    A.    Well, I think it's the same issue.  The issue is

2          standing against homosexuality.  Whether it was the

3          [Redacted] rally; whether it was the [Redacted]

4          at [Redacted]; whether it was going to Washington, D.C., to

5          have that rally; whether it's standing up in front of a

6          little group of women talking about what needs to be

7          done, the issue is that if you stand against

8          homosexuality, you will be harassed.

9    Q.    You talked about Web sites that had threatening comments

10         on them.  Can you tell me which Web sites you're talking

11         about?

12   A.    Oh, my goodness.  You know, you are asking me to do

13         something I very seldom try to pay attention to.  [Redacted]

14         probably would have been a better person or the people

15         at the church, because most of the time I get these,

16         they say, hey, look what came in, or, look what showed

17         up on this, or, look what happened after your article.

18         You know, and then I read 'em and -- or disregard 'em.

19         I don't wanna read 'em.

20              So there is countless Web sites and bloggers that

21         will -- some of -- the ones that probably really

22         advertise 'em, one that surrounds the gay-sensitive

23         newspaper here in town, The Stranger, because, you know,

24         anything they print about me is gonna cause a lot of

25         response.

1   Q.   Is it fair to say that you don't and haven't gone to

2        look at the Web sites or blogs yourself, you hear about

3        them from others?

4   A.   Oh, yeah.  I mean, it's -- you know, they'll send 'em to

5        me or they'll let me know.  You know, I may follow up

6        then.  But as far as just trying to go out and find, no.

7        I mean, threats are bad enough.  I don't wanna go

8        looking for 'em.

9   Q.   So you couldn't tell me the names of any specific Web

10       sites or blogs?

11  A.   No.  You wanna look at -- you know, like I say, you can

12       look at ▆Redacted▆ Web site.  You can look at any of

13       the articles that was in these papers (indicating) and

14       look at the comment pages, if they still have 'em.  I

15       mean, you can see 'em for yourself.

16  Q.   And again, you've told the ▆Redacted▆ Police about each of

17       these instances where there's a threat.

18  A.   We're always letting 'em know.  A lotta the time, you

19       know, they can come in four or five days and so many.

20       We just may wait and give 'em a call and say, hey, we

21       just wanna let you know that we received some calls, we

22       received some threats, and just keep you posted.

23  Q.   Do you think the ▆Redacted▆ Police make any effort to go by

24       the church, drive by now and then, just to make sure

25       everything's going okay?

```
 1  A.   I think they would.  I mean, they know this crazy

 2       citizen of theirs there in [Redacted] and they know what's

 3       going on.  So, you know, we're pleased with the police.

 4       I mean -- yeah.

 5  Q.   And do you think that they've helped to stop any actual

 6       violence from occurring?

 7  A.   I couldn't tell you.  They haven't allowed us to know.

 8  Q.   And as part of your appearing here today, there was a

 9       subpoena duces tecum issued to you, and it asked you to

10       bring all records stored in paper or electronic

11       format -- and I'll paraphrase -- that talk about threats

12       or harassment that you've received.  And you've brought

13       quite a stack of newspapers with you here today; thank

14       you.  Does this compromise (sic) all of the paper or

15       electronic images or discussion of harassment or threats

16       or retaliation related to Referendum 71 that you have?

17  A.   I would -- probably one that would know about all the

18       paperwork and things that come in, the threats, the

19       calls, would be more the people at the church, and I

20       think you talked to [Redacted] about that.  But, you know,

21       you can get so many, you just kind of hit the delete

22       button after -- why keep 900 --

23  Q.   Do you have any --

24  A.   -- Emails?

25  Q.   Do you have any Emails?
```

1   A.   I wouldn't.  You know, I wouldn't.  They don't even know

2        my Email address, so that -- we try to protect that.

3        And you can't even really call me at the church.  You

4        can't get straight through to me at the church.  You

5        have to go through two other avenues to get to me.

6   Q.   Do you have any recorded messages at the church that

7        recorded some of these phone calls?

8   A.   Probably have to ask Redacted and other people there.

9   Q.   And anything written -- letters, et cetera -- that might

10       have been received, do you have any knowledge of that?

11  A.   I wouldn't.  If -- like I said, if something came in

12       they thought was worth sharing with me, they would.  If

13       we had to take any special precautions, they would let

14       me know and we would work on making sure we took those

15       precautions.

16  Q.   Did you receive any threatening letters or voice

17       messages at your home?

18  A.   Oh, no.  That's all private, so --

19  Q.   And did you receive any threatening phone calls or

20       harassing phone calls at your home?

21  A.   No.

22  Q.   Any other harassment that -- or threats that we haven't

23       talked about?

24  A.   No.  I think we've talked about the majority of 'em, you

25       know.  It's gonna -- I'm gonna get threats, I'm gonna

Tracey Juran, Certified Court Reporter

1        get attacked, I'm gonna hear something any and every

2        time I'm in the news.

3   Q.   After Referendum 71, we had an election in November of

4        2009.

5   A.   Right.

6   Q.   So the issue, at least in terms of the election, is --

7   A.   Right.

8   Q.   -- is settled.  Have you continued to speak out on

9        issues involving homosexuality?

10  A.   Every opportunity I get, yeah, I do.

11  Q.   So you've spoken since November of 2009.

12  A.   Oh, yeah, mm-hm.

13  Q.   And have you continued to receive harassment or threats

14       as a result of that?

15  A.   There's always gonna be some kinda call, there's always

16       gonna be some kinda written response to anything I write

17       every time I do it.  Like I said, the only time it was

18       scary that I didn't get any was from the newspaper.  The

19       newspaper got attacked, but I didn't.

20           MS. EGELER:  Okay, I don't have any more questions

21       at this time.

22

23                         EXAMINATION

24  BY MR. MCBRAYER:

25  Q.   I had a couple, Mr. ███Redacted███, on direct.  This is Ryan

```
 1        McBrayer representing Washington Families Standing

 2        Together.

 3             At the  [Redacted]  rally --

 4   A.   Mm-hm.

 5   Q.   -- your testimony earlier was that when you arrived,

 6        people accosted you --

 7   A.   Mm-hm.

 8   Q.   -- right away.  But between that point and the point at

 9        which the police separated the two groups was a 45-

10        minute period.

11   A.   It's almost 45 minutes, yeah.

12   Q.   You testified at another point that it was only five

13        minutes before the point of separation -- you actually

14        asked the officer and he made the -- you actually -- you

15        asked the officer --

16   A.   Right.

17   Q.   -- to separate the groups and he made the call.

18   A.   Right.

19   Q.   Is that time line accurate?

20   A.   It's pretty -- as far as my remembering the whole

21        situation and the day, very close.  Because I was really

22        surprised that they didn't move in earlier to separate

23        us.

24   Q.   Well, it's the earlier that I'll ask you about, because

25        that leaves about 40 minutes --
```

```
 1   A.   Yeah.

 2   Q.   -- in between where --

 3   A.   Because we got there before the crowd got there.

 4        They -- myself, my wife, some of the bodyguards, and

 5        some of the people that was coming with me to make sure

 6        they were gonna keep everything safe.

 7   Q.   When you first arrived, how many of the -- if I might,

 8        can I call them counterprotesters or what -- the

 9        people -- the group of people that greeted you --

10   A.   Right.

11   Q.   -- for lack of a better --

12   A.   Right.

13   Q.   I'm not trying to put words in your mouth.

14   A.   I know you're not.

15   Q.   How big was that group?

16   A.   Well, it was much larger than the people that was gonna

17        be coming within the next 30 to 40 minutes, because we

18        got there early for the rally.  And so they had already

19        gotten there, because many of 'em had came at the very

20        beginning of the school and they were standing there

21        when the schoolkids arrived.  And our plan was not to

22        get there until after all school had started, the kids

23        was inside.  And we didn't want them participating and a

24        part of the rally.

25            So when I got there, it was before all the other
```

```
 1        people there.  And that group that was already there

 2        from the very beginning of that morning, when they saw

 3        me coming, I mean, they -- here they come.  I think it's

 4        about 30, 40.

 5   Q.   How long between that point and when the rally -- your

 6        rally started?  How long elapsed?

 7   A.   It was probably about 40, 45 minutes by the time the

 8        rally started.  And it was right before the rally

 9        started that I asked the policeman, because there was

10        more and more people arriving and coming and I thought

11        that we couldn't control everyone.  The group that came

12        with me, we had very good control.  We had already

13        talked about what we would and would not do, what we

14        would and would not say.  So that group was more

15        contained and controlled by me.

16   Q.   How big was --

17   A.   But --

18   Q.   -- your group?

19   A.   Probably about 10 to 15 people plus the wives.

20   Q.   What happened during the 40 minutes?

21   A.   They just -- you know, they just wanted to make sure

22        that they knew that -- how dumb I was and how hateful I

23        was, how much of a hatemonger I was and -- you know, to

24        stand up against that which they believe was natural,

25        and to let me know how less of a person I was.
```

1  Q.  Well, I want to -- let me ask you a series of questions.

2      And I'm going to -- I want to hear --

3  A.  Sure.

4  Q.  -- the positions, you know, the beliefs --

5  A.  Mm-hm.

6  Q.  -- but I want to get a few of just the basic mechanics

7      down, you know.

8          First of all, how far away from the building did

9      you park?

10 A.  I was probably about -- from the parking lot of the

11     school, we probably parked a good 40 yards, 50 at the

12     most, on the same main street.

13 Q.  And did you -- right away when you got out of your car,

14     where did you walk to?

15 A.  I was on the west side of the parking lot of the school.

16     I parked on the north side of the street that was west

17     of the parking lot for the students.  And when I started

18     walking -- we got out of the car and crossed the street

19     right after I left the car.  So we was probably about --

20     we didn't even make 10 or 15 yards before they looked

21     up, saw me, and here they came.

22 Q.  And then for the remaining -- when they met you, were

23     you standing on the sidewalk?

24 A.  I never stopped walking.  As they came toward me, I kept

25     going, because the place where I thought they was gonna

1       separate us would be a safer place to be than just

2       stopping on the sidewalk and talking.

3    Q.  And you -- when you say you never stopped, at some point

4       did you -- during the 40 minutes did you stop walking or

5       were you walking --

6    A.  Oh, yeah.  Oh, yeah --

7    Q.  -- for 40 minutes?

8    A.  -- we got over right in front of the -- used to be the

9       tennis courts; they removed 'em now.  But the first

10      thing you would hit when you went into the students'

11      parking lot was the tennis courts.  And we were standing

12      right north of the tennis courts on the south side of

13      the main street.

14   Q.  So the -- this was -- the area where you were standing

15      was bounded by -- was this -- it was a sidewalk or a

16      concrete -- larger concrete area?

17   A.  Sidewalk and probably about an eight-foot valley fence

18      that surrounded the tennis courts.

19   Q.  And was there a larger concrete area there or was it

20      just a sidewalk?

21   A.  Just a sidewalk.

22   Q.  And you got there.  You stood there, I take it, for some

23      significant period of time before the rally started?

24   A.  By the time we got there for where we just stopped and

25      stood, it was probably about 30 minutes before the rally

1    actually was gonna take place.  So the time of arriving,

2    time of parking the car, time of getting out, have them

3    come and approach me, walk through them -- because we

4    wanted to make sure that we was very careful not to bump

5    into anyone and try to even be aggressive in any way --

6    until I got to where we was gonna be standing for the

7    rally.  And by that time, you know, we had about 30

8    minutes left or so for the rally to start.

9  Q.  And what happened during the 30 minutes?  Were you

10    standing there the whole time?

11 A.  I was standing there with the rest of the guys that

12    whole time.

13 Q.  And what were the counterprotesters doing?

14 A.  They was making sure that they could get as close as

15    they could to me and let me know how disapproving they

16    were of what I was doing.

17 Q.  Were they shouting at you?

18 A.  Oh, yeah.  Not only me, but like I said -- you know, you

19    can attack me.  I mean, I'm a big boy; I can take it.

20    But when they start talking to my wife and start calling

21    her names and talk about my family and kids, that's

22    another story.

23        And I knew that eventually, you know, the police

24    are gonna come up here.  I mean, we supposed to be

25    separated.  But it just kept going, kept going.  And

1    they -- and it seemed as though they got a little bolder

2    as the time went on.  And by the time the other people

3    started coming is when I -- you know, to -- got to, hey,

4    we need to get some separation here, man, because --

5  Q.  But I --

6  A.  -- I don't know how other people are gonna act.

7  Q.  I guess it's during that 30-minute period people are

8    shouting at you.

9  A.  Yeah.

10 Q.  Were they emotional?

11 A.  Oh, yeah.  Oh, yeah.

12 Q.  Did you say anything back?

13 A.  I try my best not to say anything except, you know,

14   please, don't get this close to me.  And the guys were

15   saying the same thing:  It's best you not get this

16   close.

17 Q.  When you had -- you mentioned you had 15 guys and their

18   wives.  I take it you -- were these --

19 A.  Fifteen altogether with guys and their wives.

20 Q.  Were you in the middle of this group of people

21   associated with your party --

22 A.  Yeah.

23 Q.  -- such that the people, the 15 guys, were --

24 A.  Yeah, we tried --

25 Q.  -- protesters away from you?

```
 1   A.   We -- yeah, we were try --
 2            THE REPORTER:  I'm sorry, I'm sorry; I need one at
 3        a time.
 4            THE WITNESS:  Okay.
 5            THE REPORTER:  I can't do two.
 6            MR. MCBRAYER:  Yes.
 7            THE REPORTER:  Can you do that again, please,
 8        because I couldn't get both of the --
 9            THE WITNESS:  I'm sorry.
10   Q.   (by Mr. McBrayer)  And let's -- let me start that over
11        just so she can --
12            THE REPORTER:  Thank you.
13   Q.   (by Mr. McBrayer)  -- report us, try and be polite to
14        her.
15            Do you -- so you get your group of 15 people.  Was
16        it true that they were surrounding you to prevent the
17        protesters from approaching you --
18   A.   As --
19   Q.   -- closely?
20   A.   As much as they could without touching.  That was the
21        most difficult thing, is to be able to keep them away
22        from me without getting physical.
23   Q.   Right.
24   A.   And that's how the -- you know, the guy and some of the
25        others got that close to me, because here they are, is
```

```
 1          trying to, you know, put a perimeter around me, yet
 2          still it took so long that that perimeter broke down
 3          some.
 4  Q.      Did any of the protesters physically assault any of the
 5          15 gentlemen who were with you?  I want to set aside the
 6          words --
 7  A.      Right.
 8  Q.      -- and the shouts.  Were there any physical altercations
 9          with the 15 people who accompanied you?
10  A.      No, it was none, because we had talked so much about how
11          it was gonna be and, guys, even if they try anything,
12          our responsibility is to stay calm.
13  Q.      I want to use the word "physical altercation" more
14          broadly.  I understand you had instructed the 15 men in
15          your group not to react in any way.
16  A.      Right.
17  Q.      Did you personally observe any of the protesters and
18          people who were protesting against you physically
19          assault any of the 15 gentlemen in your party?
20          Regardless of whether the 15 gentlemen reacted
21          themselves --
22  A.      Right.
23  Q.      -- did you observe any one-way assaults?
24  A.      No.  They was -- if you talk about physical touching --
25  Q.      Right.
```

1   A.   -- the guys got too close or whatever, yeah.  I mean,

2        they got -- the guys that were surrounding me did get,

3        you know, body contact or people would push or say

4        something, you know, trying to get to me.  They had to

5        get physical contact to them to get to me.  And so

6        they -- I was very proud of the guys for keeping their

7        calm.

8   Q.   Were there any punches thrown?

9   A.   No.  Oh, no, no.

10  Q.   People trying to get closer to you to shout.

11  A.   Let me know that they did not appreciate me being there

12       and what they thought of me.

13  Q.   Did anybody say that day that they were going to kill

14       you?

15  A.   No, not to us.  No.

16  Q.   Well --

17  A.   This whole incident, if I can say, was -- and I wanna

18       say it correctly and I wanna say it straight.  This

19       whole incident that happened at █Redacted█, you gotta

20       understand the background behind it, because most people

21       don't.  I'm classified as one of the number-one

22       homophobes definitely in the Northwest, probably in the

23       nation.  You know that, right?

24  Q.   I wasn't aware of that until today, but --

25  A.   Okay.

```
1   Q.    -- I understand that's your testimony.
2   A.    Right.  And you can just read it.  I mean, you can just
3         go to the Web, go to Google, you can go to Wikipedia,
4         you can do anything you want.  You can find out real
5         quickly that I'm basically classified as the number-one
6         homophobe.
7               Now, when this issue came up about the Day of
8         Silence, my kids was in the school.  They allowed it to
9         be announced.  The teachers that stood up and booed when
10        I was there speaking for the Martin Luther King Day
11        booed.  Teachers, not just students, booed me.  And it
12        was the most important day of my daughter's life,
13        because the second girl got me to come when she was a
14        senior, which was four years later, okay?  My daughter
15        and I came is the first one.
16              So they basically wanted me to come that year so
17        they had a way to make it a national issue.  If they
18        could beat the number-one homophobe in his own school,
19        that would be quite a victory.  They had lawyers come
20        from California, they had lawyers come from New York,
21        they bussed in people to the school boards.  I mean, it
22        was a major issue.  So when I went there to do that
23        rally, it was not a local issue, it was to defeat this
24        person who is against us.  And that's why it was so --
25        the tension was so strong.
```

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

1   Q.   Well, let me ask you kind of a summary question, and I'd

2       like you to disagree with me if you can.

3   A.   Sure.

4   Q.   Let me take that.  If you're the -- in your own words,

5       one of the most prominent alleged homophobes in the

6       country --

7   A.   Mm-hm.

8   Q.   -- going to a rally where people are being bussed in --

9   A.   No, that was at the school board.

10  Q.   But going to a rally at a time when there was a lot of

11      not only local but national attention on this --

12  A.   Mm-hm.

13  Q.   -- rally, where you arrived 30 minutes early for the

14      rally --

15  A.   Mm-hm.

16  Q.   -- where the police did not separate the groups --

17  A.   Mm-hm.

18  Q.   -- for this initial period of --

19  A.   Mm-hm.

20  Q.   -- time, where the people protesting in favor of gay

21      rights or against you were emotional and vociferous --

22  A.   Mm-hm.

23  Q.   -- and yet no physical violence occurred.

24  A.   Mm-hm.

25  Q.   Is there anything wrong about what I just said?

1    A.    No.

2    Q.    I mean, is there anything inaccurate?

3    A.    No, not really.  No.

4    Q.    You spoke at one point about the [Redacted] Church

5          incident where you were going to speak at the worldview

6          conference.

7    A.    Mm-hm.

8    Q.    Did you see any of the grafitti on the church yourself?

9    A.    No, I did not.  Remember I said, is -- they had removed

10         it pretty quickly once they came in that morning.

11   Q.    I just -- I wanted to make sure that that was -- they

12         had removed all of it and you didn't see any of it.

13   A.    I didn't see any of it.

14   Q.    Your understanding of what was said is based on what

15         church members told you.

16   A.    Right, church members of [Redacted].

17   Q.    Of [Redacted] Church.

18   A.    Mm-hm.

19   Q.    You also spoke or testified this morning about a

20         letter -- particular letter that someone left at your

21         church --

22   A.    Mm-hm.

23   Q.    -- that was very explicit in, I think you said, the kind

24         of things they wanted to do to you.

25   A.    Mm-hm.

State Objects: Hearsay;irrelevant, unrelated to R-71.

Page 90

1   Q.   Is there only -- I want to make sure I'm talking about
2        the correct letter.  Is there --
3   A.   Right.
4   Q.   Is there one letter that stands out in your mind in that
5        regard as --
6   A.   The reason --
7   Q.   -- being explicit?
8   A.   Yes.  The reason why that letter was -- you know, had
9        more of an impact is because they got that letter and
10       put it inside the office.  So someone had entered our
11       office and left that letter there.  And that had never
12       happened before and it hasn't happened since.  So that
13       would catch my attention.
14  Q.   Did the writer of the letter express their motivation
15       for making the threats against you?
16  A.   Yeah, I think it was quite specific about not liking me
17       and think that I -- they should hurt me.
18  Q.   I understand that they threatened to hurt you.  My
19       question is, was there a tie in the letter -- in the
20       letter itself.  I understand that you may -- I'll get to
21       your belief.
22  A.   Right.
23  Q.   But did the letter writer say that he was writing the
24       letter because of your stance regarding homosexuality?
25  A.   Yes, yes.

State Objects: Hearsay; testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 91

1   Q.   And when was that letter left?

2   A.   We was -- that was two buildings ago, so --

3   Q.   So it hasn't been since Referendum 71 --

4   A.   No.

5   Q.   -- was filed or --

6   A.   That was before.

7   Q.   -- been in any way connected to --

8   A.   Right.

9   Q.   -- that.

10       MR. MCBRAYER:  I don't think I have any more

11   questions.  Thank you.

12       THE WITNESS:  Thank you.

13        You have any questions?

14       MS. EGELER:  Mr. Dixson, do you have any questions?

15       MR. DIXSON:  No, I'm good.  Thank you.

16       MR. PIDGEON:  Yeah, I have a number of questions.

17       THE WITNESS:  Super.

18

19               EXAMINATION

20   BY MR. PIDGEON:

21   Q.   [Redacted], if you don't mind me calling you that --

22   A.   Please, please.

23        [Off the record - discussion]

24   Q.   (by Mr. Pidgeon)  Let's start with the top:  Marriage.

25       Is -- what is your understanding as to how marriage is

Page 92

```
 1        formed?
 2   A.   I think that the -- all the way back to the first
 3        couple, and that was Adam and Eve.  And I believe that
 4        if you gonna do something, you do try to do it right the
 5        first time.  And I think that God thinks that marriage
 6        between a man and a woman is the best way, because
 7        that's how he started the whole relationship process of
 8        starting families.
 9   Q.   So you see marriage as a God-ordained institution?
10   A.   A hundred percent.
11   Q.   And you say a hundred percent.
12   A.   I agree that marriage is a God institution, 100 percent
13        belief that the Bible teaches that, and that's what I
14        stand on.
15   Q.   What do you think about the State's position that
16        marriage is, in fact, a state-ordained institution?
17   A.   Well, I think that it could be a state feeling, it could
18        be a national feeling, it could be a world feeling.
19        Doesn't override my belief in what the Bible says.
20   Q.   Now, you've -- you said here just a few minutes ago that
21        you're the number one -- you've been tagged as the
22        number-one homophobe.
23   A.   Definitely in the Northwest --
24   Q.   In the Northwest.
25   A.   -- and very close to the top nationwide.
```

```
 1   Q.   It's good to be number one.  All right.

 2             Now, let me ask you, what does homophobe mean?

 3   A.   I think it's not a word.  You know, just like today

 4        we've developed Islamophobe.  I think it's a way to try

 5        to intimidate.  I think it's a word that's used to --

 6        saying that you are prejudiced toward a certain group of

 7        people, homosexuals; that you are fearful of

 8        homosexuals; and that you have an agenda against them.

 9        And I have none of those.

10   Q.   So you would say that the term "homophobe," number one,

11        is not a real word?

12   A.   Right.

13   Q.   And number two, does not correctly label you.

14   A.   Absolutely not.

15   Q.   As to your understanding of what the definition is.

16   A.   Right.

17   Q.   Now, have you taken positions that are opposed to

18        abortion, for instance --

19   A.   Yes.

20   Q.   -- in the church?

21             Have you taken positions that are opposed to

22        frivolous divorce --

23   A.   Yes.

24   Q.   -- in the church?

25   A.   Any divorce.
```

State Objects: irrelevant, unrelated to R-71.

Tracey Juran, Certified Court Reporter

Page 94

1    Q.    Any divorce.

2    A.    Yes.

3    Q.    Have you taken positions that are opposed to alcoholism

4          and drug abuse?

5    A.    Absolutely.

6    Q.    Now, when you have taken those positions, have you ever

7          been attacked or threatened by alcoholics, for instance?

8    A.    No.

9    Q.    Have you ever been attacked or threatened by any groups

10         representing divorcees?

11   A.    No.

12   Q.    Have you ever been attacked by pro-choice -- by the pro-

13         choice lobby?

14   A.    No.

15   Q.    Have you ever been sued by the pro-choice lobby?

16   A.    No.

17   Q.    Have you ever had protesters in front of your church

18         from the pro-choice lobby?

19   A.    No.

20   Q.    Have ever received a death threat from the pro-choice

21         lobby?

22   A.    None.

23   Q.    Have you ever received a death threat from the pro-

24         divorce lobby?

25   A.    No.

State Objects: The witness's testimony is irrelevant, unrelated to R-71.

1   Q.   How about from the pro-alcohol or drug-use lobby?

2   A.   No.

3   Q.   If there is such a thing.

4   A.   Don't make news.

5   Q.   How about Overeaters Anonymous?  Did they ever --

6   A.   None.

7   Q.   -- they ever threaten you?  Okay.

8        So would you say that 100 percent of the threats

9        that you have received have come from the homosexual

10       community?

11  A.   Yes.

12  Q.   And would you describe the homosexual community as

13       having a nature of bullying?

14  A.   I would describe them as a group that is sold out to

15       what they believe as much as I am, and they're gonna do

16       what it takes to make that belief known and get it

17       passed for everyone to accept.

18  Q.   Would you describe them as -- just generally speaking

19       now, if you were describing their reputation --

20  A.   Mm-hm.

21  Q.   -- to the community, would you describe this group of

22       homosexual activists as threatening?

23  A.   Yes, I would.

24  Q.   Menacing?

25  A.   At times, yes.  With the amount of threats I've gotten,

State Objects: Irrelevant

State Objects: Foundation;
Hearsay; Irrelevant;unrel R71

Tracey Juran, Certified Court Reporter

Page 96

```
 1          yes.

 2    Q.    Harassing?

 3    A.    Yes.

 4    Q.    Vicious?

 5    A.    At times, yes.

 6    Q.    Have you ever felt that you were being stalked by the

 7          homosexual community?

 8    A.    With the amount of calls and the amount of letters and

 9          the amount of articles, yeah, I do, very much so.

10    Q.    Now, you indicated in your testimony that you have gates

11          around --

12    A.    Mm-hm.

13    Q.    -- your property?

14    A.    Mm-hm.

15    Q.    When did you --

16    A.    I do.

17    Q.    When did you put those gates up?

18    A.    We probably put 'em up about five years ago, almost six.

19    Q.    And you also have dogs?

20    A.    I do.  None of 'em are Christians.

21    Q.    As they have -- are you trying to say that your dogs

22          have no sense of mercy?

23    A.    They have no sense of forgiveness, yes.

24    Q.    And the -- why did you put gates up and introduce dogs

25          to your property?
```

State Obj; Foundation . Hearsay; Irrelevant; UR R71

State Obj; Foundation . Hearsay; Irrelevant; UR R71

Tracey Juran, Certified Court Reporter

1   A.   I've always, you know, had dogs.  I mean, that's because

2        of just who I am, even in pro ball.  I mean, you get

3        people that -- groupies and different things that, you

4        know, you just need protection.  And then when the whole

5        issue started with the homosexual community and my

6        stands, and then I have -- a family and kids came about,

7        I go, we gotta do something more about security.  And

8        that was the thing that we wanted to do, was, you know,

9        put the security gates and things up.

10  Q.   So would you say that the gates and the extra security

11       measures were directly and proximately caused by the

12       threats you were getting from the homosexual community?

13            MS. EGELER:  Objection --

14            MR. MCBRAYER:  Objection --

15            MS. EGELER:  -- leading the witness.

16            MR. MCBRAYER:  -- yeah, leading.

17  Q.   (by Mr. Pidgeon)  Let me see if I can ask that in a

18       different way.

19  A.   Okay.

20  Q.   Apparently that question was over the top.

21            Did you place the gates around your property as a

22       result of the threats you were receiving from the

23       homosexual community?

24  A.   That was the main purpose --

25  Q.   Was that --

*State Objects: Foundation . Hearsay; Irrelevant, unrelated to R-71.*

*State Obj: Foundation, Hearsay; Irrelevant, UR R71*

Tracey Juran, Certified Court Reporter

Page  98

```
 1    A.    -- why we put the --

 2    Q.    -- the main reason?

 3    A.    That was the main reason we put the gates up.

 4    Q.    And since you put the gates up, they've been fairly

 5          effective to secure you?

 6    A.    Yes, they have.

 7    Q.    Now, is there such a thing as a bounty on you?

 8    A.    There was several over the years.  I understand that it

 9          got up to -- oh, my goodness -- if they could find some

10          dirt on me, I think it was -- went from up to 500,000,

11          like a half a million then, to up over a million.  And,

12          you know, those are just the things I kept hearing from

13          people all over the U.S.

14                I had one buddy call me from Alabama and says, hey,

15          have you seen the new bounty they got on you?  I go, no,

16          I try not to even deal with this.  Well, you better deal

17          with this, you know, because they're trying to find dirt

18          on you and, you know, anyone could come up with that

19          kinda information have a million dollars.  And that was

20          right before the situation took place with the head of

21          Evangelical Association, Ted Haggard.

22    Q.    So is it your understanding that there is some kind of a

23          motive inside the homosexual community to scandalize or

24          to bring pastors down through scandal?

25    A.    Oh, I -- it's been proven.  We don't have to think.
```

State Obj: Lack of foundation; hearsay; irrelevant even if not offered for the truth of the matter, unrelated to R-1.

Page 99

1      That is a proven fact.

2   Q.   And so to your knowledge, there was a bounty for

3        somebody -- they were -- somebody inside the homosexual

4        community -- let me see if I can ask this question more

5        clearly.

6           Is it your understanding that somebody inside the

7        homosexual community was willing to pay up to a million

8        dollars to get information of sufficient scope to

9        scandalize you as a pastor?

10  A.   Yes, that's what -- the information I had received.

11  Q.   I want to go back and talk a little bit about the Day of

12       Silence --

13  A.   Okay.

14  Q.   -- at [Redacted].

15          Now, let me ask you, is it your understanding

16       that -- how this Day of Silence works, that -- tell me

17       again what you think this Day of Silence was about.

18  A.   Okay.  Compared to the first year that we had to deal

19       with it and what they say it's for now has really

20       changed, because we just have put so much pressure on

21       the school about the day.  Now they say it is about

22       protecting the kids that have been bullied because they

23       are homosexual.  So I had asked the question --

24  Q.   What was it before?

25  A.   It was basically in support of the lifestyle.

State Obj: Foundation . Hearsay; Irrelevant; UR R71

Tracey Juran, Certified Court Reporter

1    Q.    So let me see if I get this right.  So the Day of

2          Silence was that we were going to have a Day of Silence

3          here at this public school paid for with tax dollars

4          that is going to be anybody who is willing to say

5          they're in support --

6    A.    Right.

7    Q.    -- of the gay lifestyle doesn't say anything all day

8          long.

9    A.    Right.

10   Q.    Was that the agenda?

11   A.    Right.

12   Q.    So then can we assume that the contrary was true, that

13         anybody who spoke during that day would be considered a

14         homophobe?

15   A.    Well, they were considered not in support of the

16         homosexual lifestyle.

17   Q.    Do you know whether or not there was castigation or

18         otherwise a looking down upon those people who spoke

19         during the Day of Silence in the school?

20   A.    I think it was -- you know, the kids -- like I said,

21         they had voted about what they thought the major issues

22         were at the school.  Homosexuality wasn't mentioned,

23         homosexual bullying wasn't mentioned at any of the

24         out -- you know, the results of those surveys.

25              And so it was kinda like whoopee do to most of the

1      kids.  I mean, it wasn't like, okay, you know, if you

2      don't -- if you decide to speak, boy, you know, you --

3      it's -- we gonna really get you, or, if you decide to

4      stay quiet, we really gonna get you.  It -- there was --

5      well, whatever you wanna do that day, we gonna make it

6      through and move on.  I think that was the attitude of

7      most of the students, because there was so many teachers

8      that was behind the support of the.

9   Q.  So the day was being supported and advocated by the

10      teachers --

11  A.  Yes.

12  Q.  -- at the school?

13  A.  Yes.

14  Q.  To your knowledge, was there any student movement behind

15      it whatsoever?

16  A.  They said it was the GSA.  And like I said, the more we

17      got into it and looking at it, you know, how can it be

18      the Gay-Straight Alliance when there was not even one

19      gay student at that first year that was in the Gay-

20      Straight Alliance?  So that kinda was suspect to me, and

21      that's why my wife and I stood as strongly as we did.

22      And we just stood up as parents.  I told 'em, I'd rather

23      get to know you as a parent, not as a pastor, and I'd

24      like to get this worked out between parent and teachers

25      in school than anything else.

1   Q.   Now, did your daughters ever experience any form of

2        racism in this school?

3   A.   My kids was great athletes, you know.  [Redacted] and -- my

4        oldest, was, you know -- I mean, she's just -- she was

5        just a class act in volleyball.  So that eliminated a

6        lotta those regular harassment.  Some of the other

7        students got more harassed than she was simply because

8        of who she was.

9             [Redacted], my daughter, probably felt the most, the

10       second girl.  It was a rough, rough year for her when

11       that teacher stood up, which was her favorite teacher.

12       She was in advanced placement for English literature,

13       and that advanced teacher was her teacher that stood up

14       and booed me.  And then she had to go to school after

15       that and they was talking about me in the classroom.

16            So we ended up having to pull her out of school for

17       a week because she was so emotionally drained about what

18       was going on at the school and what was said at that

19       assembly.  And she ended up taking that class from off

20       campus.

21   Q.   So now, were you booed for your remarks about Martin

22        Luther King?

23   A.   I was booed because I was a hypocrite, they said.  How

24        can I be saying that I believe in equal rights when I

25        didn't want homosexual to have equal rights, which -- I

Tracey Juran, Certified Court Reporter

1    don't know where that came from.

2  Q.  So you were booed by your daughter's teacher because of

3      your stance about homosexuality.

4  A.  And we had agreed, when my daughter -- it was four years

5      after I'd spoken the first time, right?  I'd spoken when

6      my first daughter was a freshman.  She graduated.  My

7      daughter ended up being a freshman -- a senior that

8      fourth year and she asked us to come back.  Some of --

9      many of the students says, hey, we haven't had an

10     assembly like that since your dad was here.  Could he

11     please come back to speak.

12         And I go -- you know, at that time, man, there was

13     really a great deal going on with the whole homosexual

14     issue, because we had dealt with Redacted and

15     everything else.  And I said, are you sure they want me

16     to come and speak?  And she said, yeah, we agreed.  We

17     met with the GSA, we met with the teacher that was --

18     which was her advanced-placement teacher, and there was

19     nothing gonna be said or done about homosexuality.  The

20     issue was gonna be Martin Luther King and what I went

21     through as a young man growing up in Alabama.

22         And the minute I stood up, I was booed.

23  Q.  By the teacher.

24  A.  By the teachers.

25  Q.  So it's your testimony here today that your daughter's

1       AP English-literature teacher, a teacher at the public

2       school, at [Redacted] High School, targeted your daughter

3       in class because of your stand on homosexuality.

4  A.   I don't think she -- I could say that she just targeted

5       my daughter.  But having my daughter there and talking

6       about it, yeah, I think that was insensitive.

7  Q.   Now, there's something in one of the newspaper articles

8       here that hasn't been brought up, which was one of the

9       events, I think, you participated in, which was a debate

10      with [Redacted].

11  A.   Oh, the clash of the titans?

12  Q.   Yeah, the clash of the titans.

13  A.   Yep.

14  Q.   Now, do you remember, how many pastors in the community

15      joined you during that debate?

16  A.   It was just [Red] and I, was the only one that was onstage

17      that evening.  The place was packed.  There was standing

18      room only at the Center, I think it -- Seattle Center

19      there somewhere.  What was the name of that?  I wish I

20      could name the place it was held at.

21         And there was many pastors that was in the audience

22      and there was many supporters of [Red] and the homosexual

23      community that was there, and it was a fireball.  We had

24      a lot -- we had to bring in a lot of protection in order

25      to do that, had a lot of security guards that was with

```
 1        me, and so forth, so on.
 2   Q.   So since you began to be known for your stance in
 3        support of traditional marriage --
 4   A.   Mm-hm.
 5   Q.   -- you have seen what we have described the homosexual
 6        community do, including the placing of bounties.  Now,
 7        again, looking to the general reputation of that
 8        community, your understanding of that community, do you
 9        think they had become less bullying or less threatening
10        over the last year or two years?
11             MR. MCBRAYER:  Objection; foundation.  Asking for
12        an expert opinion.
13             MR. PIDGEON:  I'm asking for a lay opinion and I'm
14        asking for reputation opinion.
15             MR. MCBRAYER:  Objection to lack of foundation.
16             MR. PIDGEON:  Okay, let's establish -- get some
17        foundation here.
18   Q.   (by Mr. Pidgeon)  Are you a member of this community?
19   A.   I am.
20   Q.   Do you have some idea of the reputation of the
21        homosexual community in the Christian world?
22   A.   I do.
23   Q.   Can you reflect on that reputation to tell us whether or
24        not, in your opinion, that -- the activism of the
25        homosexual community, has it waned, has it relaxed over
```

```
 1        the last two years?

 2   A.   No.

 3   Q.   The tactics of the homosexual community to use threats

 4        and some of the other things you've described earlier,

 5        has that waned over the last two years?

 6   A.   No.

 7   Q.   Is it your expectation that if you were to publish an

 8        article today on the issue of traditional marriage,

 9        would you receive threats and phone calls?  Is that your

10        expectation?

11   A.   It --

12             MR. MCBRAYER:  Objection; foundation.

13   Q.   (by Mr. Pidgeon)  Go ahead and answer the question.

14   A.   Yes.

15   Q.   You would --

16   A.   I would.

17   Q.   You would expect it -- to --

18   A.   Yeah.

19   Q.   -- receive threats?

20   A.   We'll find out here real soon too if you want me to

21        prove it.

22   Q.   So you haven't -- so it's your testimony you haven't

23        seen any shift towards, shall we say, niceness in the

24        homosexual community.

25   A.   Not towards those activists that really are upset at
```

1       anyone that can say anything negative about the

2       homosexual lifestyle.

3   Q.  Now, I want to go back to your petition signing.  Do you

4       remember what number you were on the petition when you

5       signed?

6   A.  I do not.

7   Q.  Do you remember that the petition -- how many signatures

8       the petition would allow on the face of the petition?

9   A.  No.  I think it was about 50 a sheet.  I'm not sure.

10  Q.  So if you signed in the middle of that petition, is it

11      your expectation the people that signed before you would

12      have knowledge that you signed it?

13  A.  No.

14  Q.  So it's only going to be those people who signed after

15      you --

16  A.  If they wanted to look, yeah.

17  Q.  And only if they wanted to look.

18  A.  Yeah.  I don't -- I couldn't tell you the person that

19      was right in front of me.

20  Q.  Did you look at any of the other names on --

21  A.  No.

22  Q.  -- the petition?  Okay.

23          Did you know at the time that you signed the

24      petition that somebody in a group called whosigned.org

25      was going to ask the Secretary of State to give him a

```
 1         computer file of all the names and addresses of

 2         everybody who signed this petition?

 3    A.   Didn't even cross my mind.  I didn't even think it was

 4         legal.

 5    Q.   Did you know -- do you know how long the referendum and

 6         initiative process has been going on in the state of

 7         Washington?

 8    A.   Quite a while, yes.

 9    Q.   Do you know whether or not any Secretary of State prior

10         to Sam Reed has released the names and addresses of

11         petition signers for referendums and initiatives?

12    A.   I have not heard of a one.  That's why I was so

13         surprised when they was talking about releasing the

14         names of this one.

15    Q.   Do you know whether or not any Attorney Generals in this

16         state have issued opinions on the Public Records Act

17         instructing the Secretary of State to not release the

18         names on petitions?

19    A.   No.  I mean, I'm very much in touch with all the states

20         with all the things I do, with all the Christian

21         leaders.  I know every major leader that's a Christian

22         leader in the United States.  All of 'em knows me.  And

23         when things are happening legislatively that we need to

24         understand and need to let our people know, I'm one of

25         the first and the few that they will allow -- say, hey,
```

Tracey Juran, Certified Court Reporter

```
1         you need to be cognitive to this.  And so no.  I mean,

2         I'm -- this is brand-new to me.

3    Q.   Now, in terms of the petitions, would you have -- if you

4         had had knowledge that anybody who signed the petition

5         for R-71 was going to be exposed to the exact same

6         experiences that you've had for your taking a position

7         on traditional marriage, would you recommend that they

8         sign the R-71 petition?

9    A.   I would give them a warning that this is the possibility

10        of what can happen.  You gonna have to make up your

11        mind.  Me, because I've been in it for so long and have

12        had so many threats, I would have signed it anyway

13        simply because that is my responsibility as a voting

14        member of society.

15   Q.   Do you know whether or not -- are you still holding your

16        [Redacted] stock?

17   A.   No, I sold it.

18   Q.   When did you sell it?

19   A.   It's been about two years.

20   Q.   Two years.

21   A.   About two years now.

22   Q.   And you --

23   A.   At the last -- after the last stockholders' meeting when

24        I challenged them on their support after Proposition 8

25        passed, it was -- I think that was three years in a row
```

1      I had brought that up.  And there was no more recourse

2      to deal with them as a stockholder because they had

3      voted it down every time to continue.  And they would

4      not answer me on if it was anyone else that was making

5      those derogatory and racist statements, would [Redacted]

6      stand behind them.  And [Redacted] and -- who's the

7      president now?

8  Q.  [Redacted]?

9  A.  -- [Redacted] and the CFO, fellow from -- I believe,

10     I was able to challenge all of them at that meeting, and

11     they said that your recommendation was voted down.  So

12     after that, you know, there was no need in trying to

13     continue to, you know, beat a dead horse.  When the

14     horse is dead, the only thing that's left is to unsaddle

15     it.

16 Q.  Did you make any money on the stock?

17 A.  I got out at a good time, yeah.

18         MR. MCBRAYER:  Amen.

19 Q.  (by Mr. Pidgeon)  Now, let me -- I got one last thing I

20     wanted to ask you about, the --

21 A.  Sure.

22 Q.  -- your knowledge on Proposition 8 in California.

23 A.  Right.

24 Q.  So tell me about -- do you know of -- do you have any

25     personal knowledge of incidents of violence, threats,

1     harassment, and so on in California?

2  A.  Yes.  One of the guys that is really close to me that

3     was really on the front line with Proposition 8 was

4     Redacted.  He is -- was one of the old San Diego

5     Charger football players, and so we had known each other

6     for quite a while.  And I had tried to get him -- tried

7     to hire him years ago to come up and work for me at the

8     church.  But he wanted to be his own boss, so he started

9     his own church in San Diego.

10        And I remember one day when all this was going on

11     and I find out that's Miles involved with Proposition 8.

12     I better give him a call.  So I called him to let him

13     know what to expect and this is gonna come and, if his

14     name gets out, these are the things you have to expect

15     as far as calls, as far as threats, and to understand

16     what you're getting into.  And that was very helpful to

17     him because it kinda caught him on surprise down there,

18     the threats and the calls and the things that people

19     were saying to him.

20  Q.  And do you know what kinds of threats he received?

21  A.  Just some of the basic ones I got:  You know, how can

22     you be against -- being black, how can you be against

23     the equal rights of homosexuals and, you know, you are a

24     homophobe, you're a hater, you don't respect the

25     homosexual lifestyle, and, you know, you better --

1    basically, he had to get bodyguards.  So I guess they

2    was, you know, solid enough that he thought he'd better

3    get some bodyguards meeting at his church.

4  Q.  Do you know of any other incidents that happened down

5    there?

6  A.  Just what we heard from the guys who was telling what

7    was going on at rallies, the things that I saw and heard

8    on the radio and the television news.  It got to be

9    pretty vicious, that fight.  And the -- like I said, the

10   racial slurs and statements that was made from the black

11   community all the way from -- what's the actress's name?

12   Rosie O'Donnell?  I mean, there was some harsh

13   statements made to the black community about supporting

14   Proposition 8.

15 Q.  Did you have -- are you surprised with R-71 that we

16   didn't have as much violence in Washington as they had

17   in California?

18        MS. EGELER:  Objection to the characterization.

19        MR. PIDGEON:  I'll withdraw the question.  Okay.

20         All right, I'm going to -- I'm finished with

21   that line of examination.

22        THE WITNESS:  Thank you.

23        MR. PIDGEON:  Thanks, Redacted.

24        THE WITNESS:  Mm-hm.

25        MS. EGELER:  I have a few more questions if you're

1      done.

2

3                    FURTHER EXAMINATION

4  BY MS. EGELER:

5  Q.   Pastor, you talked about taking positions on divorce.

6  A.   Mm-hm.

7  Q.   Have you spoken at rallies about divorce?

8  A.   I've spoken about all the major issues.  We even mention

9       those when we's dealing with some of the marriage,

10      because if you don't talk about support of marriage --

11      you gotta deal with every aspect of supporting marriage,

12      and one of the destroyers of marriage is divorce.  And

13      so I've spoken about that many times.

14 Q.   Have you spoken at any rallies about abortion?

15 A.   Oh, yes.

16 Q.   Can you tell me when those rallies were?

17 A.   Oh, my goodness.  I speak so many times, I wouldn't be

18      able to tell you specifically dates and those things.

19      But you can pretty well follow up on anything I speak

20      on.  If I'm dealing with family issues, those are gonna

21      be some of the major issues I'm gonna deal with:

22      Divorce, abortion, gambling.  I've done a great deal on

23      gambling.  I've spoken totally against -- even down to

24      jealousy.  I mean, it's -- if it's a Biblical issue, I'm

25      gonna speak on it.

1   Q.   Can you tell me any rally that you spoke at about

2        abortion where abortion was the key issue at that rally?

3   A.   I think it was -- oh, man -- maybe two, three years ago

4        when that -- those people were standing out in front of

5        churches with the pictures of aborted babies and the

6        fetuses that they were showing.  And I was talking about

7        the insensitivity toward others that may have had an

8        abortion, that our job is not to condemn, but to help

9        them through the situation and realize don't do it

10       again.  So I've always spoken about those major issues

11       like that, yes.

12  Q.   So you've spoken about a more peaceful approach to the

13       debate about --

14  A.   Right.

15  Q.   -- abortion?

16  A.   I'm -- you know, I'm just really surprised that, you

17       know, the only attacks I really have gotten is towards

18       when I stand up against the homosexual issue and stand

19       strong for traditional marriage.

20  Q.   Are you the number-one antiabortion person in the

21       Northwest?

22  A.   No.  I'm not classified much of anything else outside of

23       number-one homophobe.

24  Q.   And would you say that's because your positions and

25       appearance -- public appearances regarding same-sex

1       marriage and homosexuality, that's the predominant topic
2       that you've spoken about?
3   A.  No, it's the predominant issue that they made outta
4       news.  Okay?
5   Q.  So --
6   A.  The --
7   Q.  -- would -- excuse me.
8           Would you --
9   A.  Yeah.
10  Q.  -- say that you have spoken about homosexuality and
11      marriage more than you have spoken about the issue of
12      abortion?
13  A.  Over the years, probably the last four or five years,
14      I've spoken more about the issue of marriage than I have
15      anything else, simply because that has been the
16      forefront, mm-hm.
17  Q.  And how much more?  Would you say you've spoken ten
18      times more than --
19  A.  Probably about ten times more, yeah.
20  Q.  And --
21  A.  But we're a lot hard -- I can say this to you
22      straightforward:  We're a lot harsher on our members in
23      our church about divorce than we ever were on
24      homosexuality.  We've kicked folks out of our church
25      because they've gotten divorced.  Brought 'em before the

Page 116

```
 1        church, told the church what it was for, and told 'em to
 2        remove fellowship and you have just lost your membership
 3        in this church, bye.
 4   Q.   You said that you think that the media has run stories
 5        more about your position on --
 6   A.   Yes.
 7   Q.   -- homosexuality than about your position on other
 8        issues; is that right?
 9   A.   That's right.
10   Q.   How much more, would you say?  Ten times more, a hundred
11        times more?  What --
12   A.   I think --
13   Q.   -- would you say?
14   A.   -- it's definitely 20, 30, 40 percent more than it is
15        for homosexuality than with any other issue I stand on.
16   Q.   Has the media run any stories about your position on
17        abortion?
18   A.   I haven't read one.
19   Q.   Has the media run any stories at all about your position
20        on drugs and alcohol?
21   A.   No.  And we have a drug-and-alcohol ministry at the
22        church.
23   Q.   Has the media run any stories at all about your position
24        on isolated to divorce between a man and a woman?
25   A.   Not really.  If it's mentioned, it's so brief you
```

1      wouldn't be able to remember.  And like I said, we're a

2      lot more -- we're a lot harder on divorce than we are

3      any issues on homosexuality.

4  Q.  So in talking about the media, I'm talking about

5      radio --

6  A.  Right.

7  Q.  -- TV --

8  A.  Right.

9  Q.  -- Internet --

10  A.  Right.

11  Q.  -- print.

12  A.  Right.

13  Q.  So all of those media forms are focusing on your stance

14      with respect to homosexuality.

15  A.  Right.

16  Q.  You talked about bounties being placed on you, and I

17      wanted to make sure I understood what you meant by a

18      bounty.  That was money that would be awarded to someone

19      for finding scandalous information about --

20  A.  Right.

21  Q.  -- you?

22  A.  Same thing -- I think you remember the story of Ted

23      Haggard?

24  Q.  I don't.  Can you --

25  A.  Okay.

1   Q.   -- tell me.

2   A.   Ted Haggard was the president of the Evangelical

3        Association, one of the most powerful Christian

4        organizations in the U.S., and they found out

5        information about him having a homosexual relationship.

6        And it destroyed him, the family, almost destroyed the

7        church, because they was able to take someone who was

8        supposed to be standing on His right side against

9        homosexuality and marriage and was participating in the

10       lifestyle.

11            And they didn't want me dead.  I mean, that makes

12       me a martyr.  But if they -- they know what the

13       Christian community's all about, and if you're

14       hypocritical, you have just destroyed your witness.

15  Q.   Do you know who put these bounties out?

16  A.   No.  Never even research 'em.  They just -- people will

17       call me and say, hey, bro, you better watch out who you

18       hang out with, who you travel with.  That's why I never

19       travel alone.  That's why I always have someone with me.

20       That's why I always have -- if it's -- you know, if I

21       can't have my wife, I'm gonna have one or two other guys

22       or something who's gonna be with me if I'm in a public

23       place.

24  Q.   And these guys can attest to the fact that you aren't

25       out with women --

 1   A.   That's right.

 2   Q.   -- and behaving inappropriately or with men behaving

 3        inappropriately.

 4   A.   Correct.

 5   Q.   And do you know, how long have these bounties been in

 6        effect?

 7   A.   I don't know.  It's been probably three, four years when

 8        they first started.  That's when -- all the issues with

 9        the [Redacted], all the issues with [Redacted], those was big

10        things happening then, because it was national and

11        international news.

12   Q.   You talked about a debate with [Redacted].  Was that a

13        debate about Referendum 71?

14   A.   No, that was a debate about the homosexual lifestyle.

15   Q.   Do you know what year that happened?

16   A.   When was that clash of the titans?  It was probably

17        right before we went to D.C.  Is it in -- do you got

18        that article in the paper there, bro?

19   Q.   And I think you talked about D.C. being maybe 2004; is

20        that right?

21   A.   It was -- that was -- I wish -- they videotaped that and

22        it played for like two, three months afterwards on

23        public TV.

24   Q.   So I'm looking at a newspaper, a Seattle Post-

25        Intelligencer, that you produced today and it's dated

1    March 3rd, 2006.  And there's an, on the front page,

2    article entitled "███████████ Redacted ███████████

3    ██    ██████ ."

4   A.   Mm-hm.

5   Q.   Does that refresh your recollection about --

6   A.   Yes, mm-hm.

7   Q.   -- when it would have happened?

8   A.   Well, it had to be 2006, mm-hm.  Like I said, this

9        happened three, four years ago, before, I know, he went

10       to D.C., so --

11  Q.   You talked about security guards being there.

12  A.   Oh, yeah.

13  Q.   Were the police there as well?

14  A.   If uniformed policemen was there, I didn't see 'em

15       because they kept me in a backroom most of the time

16       until they brought me out onstage, which was right

17       behind the stage where they kept us.  It was all -- I

18       know I had all our security guards there and guys was

19       throughout the audience and right next to the stage.  We

20       had 'em standing up in front of the stage.

21  Q.   Was there any violence that day or evening?

22  A.   No.  No, it was -- we're really peaceful people.

23  Q.   You've stated that you're very much in touch with

24       government events.  Have you ever been notified before

25       an Attorney General opinion is issued?

Tracey Juran, Certified Court Reporter

1   A.   Attorney General?  No, I don't think that that is a

2        major issue.  Most of the time I'm contacted, something

3        is going to Congress, something that is gonna be voted

4        on legislatively.  They will inform me that we need to

5        crank up some abilities that let people know what's

6        going on and if we need to contact our congressmen or

7        our senators.  So that's part of the network that I'm a

8        part of.

9   Q.   Have you ever personally read any Attorney General

10        opinion?

11   A.   No, not -- I don't think so.  I think the only one is

12        this -- is the whole issue with health care with

13        McKenna.

14   Q.   With Mr. Pidgeon you discussed the Christian community

15        and reaction to the homosexual community.  Is the

16        Christian community all in the same position that you

17        are with respect to their stance --

18   A.   No.  I mean --

19   Q.   -- on homosexuality?

20   A.   No.  I -- you probably will find a lotta differences in

21        many of the churches, pastors, denominations.  I mean,

22        that's why we have denominations.  We don't all agree.

23        But mostly evangelicals; we pretty well stand strong

24        together.

25   Q.   And do you know any nonevangelical pastors, priests, or

1      rabbis who are supportive of homosexuals and same-sex

2      marriage?

3  A.  Do I know of any that is?

4  Q.  Yes.

5  A.  Probably -- I don't -- you know, probably a large

6      percentage is.  I know -- I would know more that was

7      against it than I would that was for it because of the

8      circle that I would spend my time.

9  Q.  But you're aware that many Christian and Jewish leaders

10     are --

11 A.  Oh, yeah.

12 Q.  -- supportive of --

13 A.  Oh, yeah.  Yes, I am aware they're supportive of the

14     homosexual lifestyle.

15 Q.  And I was just remembering one rally that I don't think

16     we talked about, but just wanted to get that on the

17     record.  Did you speak at a rally about Referendum 71 at

18     the State Capitol?

19 A.  Was that the one that we did on a Sunday afternoon?

20 Q.  I don't know.

21 A.  I think it was.  I think it was -- I know we had a big

22     get-together down on the State Capitol.  I was invited

23     to come down and speak.

24         I think the pastor that put that on was from the

25     Federal Way area Life Center.  Oh, my goodness, why

Page 123

```
 1      can't I think of his name?  You know who I'm talking
 2      about, the big church down in Federal Way?  I can't
 3      believe I can't think of his name.  If he knew I forgot
 4      his name, he'd shoot me.  [Redacted].  [Redacted]  and
 5      his wife, they wanted to make sure we stood -- have --
 6      get together and make people stand.  And I went down to
 7      the Capitol and we met out there on the front steps.
 8              MS. EGELER:  Okay, that's it for my questions.
 9              THE WITNESS:  Okay.
10              MS. EGELER:  Thank you.
11              THE WITNESS:  Mm-hm.
12              MR. MCBRAYER:  Nothing for me.
13              MS. EGELER:  Steve Dixson, anything further?
14              MR. DIXSON:  No, ma'am.
15
16                               (Whereupon the deposition
                                 concluded at 3:12 p.m.)
17
18
19
20
21
22
23
24
25
```

Tracey Juran, Certified Court Reporter

Page 124

1                          CERTIFICATE

2  STATE OF WASHINGTON )
                       )
3  COUNTY OF SNOHOMISH )

4          I, the undersigned Notary Public in and for the

5  State of Washington, do hereby certify:

6          That the foregoing is a full, true, and correct

7  transcript of the testimony of the witness named herein,

8  including all objections, motions, and exceptions;

9          That the witness before examination was by me duly

10 sworn to testify truthfully and that the transcript was made

11 available to the witness for reading and signing upon

12 completion of transcription, unless indicated herein that the

13 witness waived signature;

14         That I am not a relative or employee of any party

15 to this action or of any attorney or counsel for said action

16 and that I am not financially interested in the said action

17 or the outcome thereof;

18         That I am sealing the original of this transcript

19 and promptly delivering the same to the ordering attorney.

20         IN WITNESS WHEREOF, I have hereunto set my hand and

21 seal this 7th day of October, 2010.

22

23        _____
          Notary Public in and for the State of Washington
24                residing at Edmonds, Washington.
                    (Notary expires 3/09/13)
25                     (CCR No. 2699)

Tracey Juran, Certified Court Reporter

Exhibit One

Redacted

Exhibit Two

Redacted

Redacted

# Exhibit Three

Redacted

Redacted