The Honorable Benjamin H. Settle

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,

               Plaintiffs,

     v.

SAM REED, in his official capacity as
Secretary of State of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer for the
Secretary of State of Washington,

               Defendants.

NO. 09-cv-05465-BHS

DESIGNATED DEPOSITION
TESTIMONY OF Redacted
Redacted

Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

Washington Families Standing Together and the Washington Coalition for Open Government

and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

"Parties") hereby submit combined designated deposition testimony for Redacted

Redacted

Defendants and Intervenors object to the admission of any deposition testimony taken

of any witnesses who could be called to testify at trial. Therefore, the designations of

DESIGNATED DEPOSITION
TESTIMONY OF Redacted
Redacted
- No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

1  Defendants and Intervenors are being submitted in the event that the Court decides to admit

2  deposition testimony.

3         For the Court's convenience Defendants' designations have been highlighted in blue,

4  Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5  been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6  filing the redacted versions of these documents.

7         DATED this 6th day of September, 2011.

8  ROBERT M. MCKENNA
   Attorney General

9

10   s/ William Clark_____
     WILLIAM CLARK, WSBA #9234

11   Senior Counsel
     800 Fifth Ave, Ste 2000

12   Seattle, WA 98104
     206-464-7352

13   BillC2@atg.wa.gov
     ANNE EGELER, WSBA #20258

14   Deputy Solicitor General
     PO Box 40100

15   Olympia, WA  98504-0100
     360-664-3027

16   Annee1@atg.wa.gov
     _____

17

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION
TESTIMONY OF Redacted
Redacted
- No. 09-cv-05465-BHS

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,

          Plaintiffs,

       vs.               NO. 3:9-CV-05456-BHS

SAM REED, in his official capacity
as Secretary of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer
for the Secretary of State of
Washington,

          Defendants.

DEPOSITION OF [Redacted]

Deposition upon oral examination of [Redacted], taken at the request of the Defendants, before Osmund D. Miller, a Notary Public, RPR, CCR No. 2280, at the law offices of Witherspoon-Kelley, 422 West Riverside, Spokane, Washington, commencing at or about 1:00 p.m., on October 7, 2010 pursuant to the Federal Rules of Civil Procedure.

```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFFS:
                         STEPHEN PIDGEON ATTORNEY AT LAW, P.S.
 4                       By:  Stephen Pidgeon
                         Attorney at Law
 5                       Old Federal Building
                         3002 Colby Avenue, Suite 306
 6                       Everett, Washington 98201

 7   FOR THE DEFENDANTS WASHINGTON COALITION FOR OPEN GOVERNMENT:
                         WITHERSPOON-KELLEY
 8                       By:  Steven J. Dixson
                         Attorney at Law
 9                       1100 U.S. Bank Building
                         422 West Riverside Avenue
10                       Spokane, Washington 99201-0302

11   FOR THE DEFENDANTS SAM REED AND BRENDA GALARZA:
                         ATTORNEY GENERAL OF WASHINGTON
12                       Anne E. Egeler
                         Deputy Solicitor General
13                       P.O. Box 40100
                         Olympia, Washington 98504-0100
14
     ALSO PRESENT:
15                       Greg Senchenko, Interpreter

16

17

18

19

20

21

22

23

24

25
```

1          GREG SENCHENKO
         The Interpreter, having been first duly
2        sworn according to law, did interpret from
         English to Russian and Russian to English:
3

4                    Redacted
         called as a witness at the request of
5        the Defendants, having been first duly
         sworn according to law, did testify as
6        follows herein:

7

8

9

10    MR. DIXSON:  Anne, just so you are aware, we are going to

11  proceed in English, and if Mr. Redacted has trouble

12  understanding the question or would like it to be spoken to

13  him in Russian, he will ask, but other than that, we will

14  proceed in English.

15    MS. EGELER:  All right.

16                    EXAMINATION

17  BY MR. DIXSON:

18  Q.   Good afternoon, Mr. Redacted

19  A.   Hello.

20  Q.   My name is Steve Dixson.  I am an attorney for the

21  Washington Coalition for Open Government, one of the named

22  defendants in this lawsuit, and today is the time and place

23  for your deposition.

24      Did you meet with anyone, prior to your deposition today,

25  regarding the subject of your testimony?

1   A.   Not today.

2   Q.   Prior to today, have you met with anybody in preparation

3   for your deposition?

4   A.   Yes.  We met with Steve yesterday, for an hour.  An hour

5   or so, just --

6   Q.   And I don't want to know anything that's attorney/client

7   privilege, but, in general, what did you guys discuss?

8   A.   I just asked him -- actually, we met together, Redacted and

9   I, and Steve, and we just asked him what it is, and how it

10   works.  You know, just technical details, because we are not

11   familiar with this.

12   Q.   Okay.  Have you been deposed before?

13   A.   No.

14   Q.   And I understand Mr. Pidgeon might have given you some

15   instructions, as well, but I will go over those again today.

16   All right?

17   A.   Sure.

18   Q.   We have a court reporter who is sitting here, taking down

19   everything that we say.  So it is important that you allow me

20   to finish my questions and I allow you to finish your

21   answers.  Do you understand that?

22   A.   Of course.

23   Q.   When you answer a question "yes" or "no," it's important

24   that you speak your answer, and not shrug your head or roll

25   your shoulders, because it's very difficult for him to take

1  that down.  Do you understand?

2  A.  Yes.  I already was informed of that.  Definitely.

3  Q.  If I ask you a question that you don't understand, please

4  ask me to restate the question, because I am not here to

5  trick you or trap you.  So, if you don't understand, please

6  ask me to rephrase the question.

7  A.  Actually, I would ask people not to trick me, because I

8  have experience, from the Soviet Union, speaking with KGB,

9  and I remember how they speak.  You know, turn it around.  My

10  English is not very good.  If you would ask me kind of simple

11  questions so I can comprehend, and I will do the same thing.

12  Q.  I will absolutely do my best.  It's not my intention

13  today to run you around in circles.

14  A.  Okay.

15  Q.  So, if I am, stop me, and I will rephrase the question.

16  And your attorney here is to protect all of your rights and

17  the rights of your fellow plaintiffs.  So you are well

18  represented at the counsel table today.

19  A.  Okay.

20  Q.  Outside of Mr. Pidgeon and Mr. Redacted , who was deposed

21  this morning --

22  A.  Right.

23  Q.  -- did you speak with anyone else about your deposition

24  today?

25  A.  Well, the whole community knows about it.

1   Q.    How does the community know about it?

2   A.    Because yesterday we had a day of fasting and praying,

3  and the whole church, and, actually, all the Slavic churches

4  in America, lots of American churches, are praying for us

5  today.  So everybody knows.

6   Q.   And was this a special service with regard to the

7  deposition, or did this prayer occur at a regularly

8  scheduled --

9   A.   Yesterday --

10  Q.   Just so I can finish my question so we have a clear

11  record.

12      Was it a special service yesterday, or did this prayer

13  occur at a normal service, and you mentioned the deposition?

14  A.   Okay.  On Wednesday, we usually have regular prayer

15  service.  Okay.  And we had the regular prayer service, but

16  the main need for the placing the prayer was about all this.

17  Because we are not sure what is really going on.  For people

18  who came from the Soviet Union, that means a lot, since we

19  don't know exactly what's going on.  You know?  People have

20  sensed, like, oh, there is something wrong.  We have to pray

21  to God really hard.

22      So, yesterday, we had a day of fasting and prayer with

23  the entire church, but it was a regular prayer service.  It

24  was not a special kind of meeting.

25  Q.   Are you saying fasting or feasting?

1   A.   Fasting

2   Q.   Not eating --

3   A.   Like, we -- you know, Biblical fasting.  We don't eat;

4   just pray the whole day, you know.

5   Q.   Does that occur every Wednesday?

6   A.   We try to do it.  Yeah.  We actually announce, before we

7   have a prayers meeting, and people who can be fasting at that

8   day, so, please.  But with this need, I know that most people

9   are fasting and praying.  Yeah.

10  Q.   Did you speak at this service?

11  A.   Yeah.  Because -- especially, it was another regular -- I

12  mean, it was a regular Wednesday service, but once a month,

13  on Wednesday, we have a members meeting.  So we had members

14  only.  And, of course, I spoke as a pastor.

15  Q.   Do you remember what you told the congregation about your

16  deposition?

17  A.   Yes.  I said that tomorrow we have appointments.  Redacted

18  at 9:00, and I have 1:00, and we are not sure exactly what

19  question is going to be asked and talked, but, we said,

20  that's something about our vote.  We voted for the family

21  Biblical marriage, and people signed petitions.  And we said,

22  we don't know, but let's pray, and God will take care of it.

23  Nothing specific, because we really don't know.

24  Q.   Can you tell me the difference between a regular

25  congregation member and a member?  What's the difference?

1  A.    Okay.  The regular meeting, when everybody comes,

2  including children, or non-members of the church.  And once a

3  month, we have -- America, it's called a business meeting.

4  Like, members meeting.  And once a month, we have this kind

5  of members meeting, when we kind of talk about faith.  Like,

6  yesterday, we pretty much --

7       INTERPRETER:  To accept someone as a member.

8       THE WITNESS:  Yeah.  New members.  You know.  There was a

9  young man who wanted to join the church.  We don't do it,

10  like, at the regular Sunday morning service.  It's once a

11  month for a regular business meeting.  And we talked about

12  the upcoming baptizing service that we plan next month, so 12

13  people going to be baptized, and we discussed how we are

14  going to do it.  It's time to discuss the technical things.

15  Plus, it's a prayers meeting.  So we discuss a little bit,

16  and then we read the Bible, and the whole church is praying.

17  Q.    How does someone become a member of the church?

18  A.    How people become members?

19  Q.    Yes.

20  A.    In order to become members of all Baptist churches,

21  people have to be born again.  Like, repented.  And they have

22  to be baptized.  And after they are baptized, they become

23  members of the church.

24  Q.    And how many -- are you the senior pastor for the Redacted

25  Redacted

1  A.    So far.  I am tired.  I am planning to resign, by the

2  way.

3  Q.    How long have you had that position?

4  A.    Since I started.  It was -- I started in January of 1994.

5  Q.    And since January 1994, have you been the senior pastor

6  the entire time?

7  A.    Yes.

8  Q.    How many parishioners did you have, in 1994, and how many

9  would you estimate you have today?

10  A.    Well, I started with 48 people.  I remember that.  I

11  still have that prodigal.  48 people in January of 1994, and

12  today -- you know, it's really hard to say the exact number.

13  Like, on Sundays, we have maybe around 700 or 800 people.

14  Actually, you know, I kind of am not really comfortable

15  speaking about it, because -- I know, in America, it's not a

16  secret.  I don't see any dangerous here, you know.  But

17  living back in Soviet Union, actually, this information I

18  have given you, that was top secret information.  That's

19  exactly what KGB was trying to pull from people, and people

20  went to prison to hold on.  And I am kind of telling you

21  this, I am kind of feel inside myself, kind of -- you know

22  what I mean?

23  Q.    I can't possibly relate to what you have been through,

24  but if I am asking you a question that you feel uncomfortable

25  about, please tell me, and your attorney and I can discuss

1   whether or not we think there needs to be an answer.  But I

2   don't mean to make you uncomfortable at any point today.

3   A.   Okay.

4   Q.   Do you -- and were you the senior pastor for your church

5   in the year 2009?

6   A.   Right.

7   Q.   I understand you brought with you a copy of the subpoena

8   that you were served with, to appear today?

9   A.   Yes.  It's right here.

10  Q.   Do you understand that as a part of that subpoena, you

11  were requested to bring any documents that you believe

12  evidence threats, harassment or reprisals that you have

13  suffered as a result of your participation with

14  Referendum 71?

15  A.   Yeah.  I read it here on the second page.

16  Q.   Okay.  Did you bring any documents with you today

17  responsive to that subpoena?

18  A.   Well, I don't know what you would consider documents.  We

19  were not able to prepare very well.  Actually, at that time,

20  we never told that there would be need of that, so we didn't

21  document anything.  But, yes.  I do have some kind of

22  documents.  Like, a newspaper.  I have some statements,

23  like -- yes and no.  I don't know what you mean by documents.

24  Q.   But you brought documents --

25  A.   Some materials.

1    Q.    -- in response to the subpoena, whether or not --

2    A.    Yes.

3    Q.    Can I see what you brought with you today?

4    A.    Yes.  I will give you copies of everything.

5    Q.    Did you make additional copies, or do you just have one

6    copy of everything?

7    A.    Actually, for the most important documents, I have

8    additional copies.  This is mine, and one for you, and one

9    for you.  And we can discuss it, then.

10   Q.    And I may not go through them at all.  I just want to

11   make clear on the record that you have brought some documents

12   with you.  So --

13   A.    So this statement.  Okay.  I will give you this.  That's

14   a copy from the original newspaper, from the

15   Redacted

16   Q.    Okay.

17   A.    And I have my notes.  Just my notes.

18   Q.    Did someone ask you to prepare those notes, or are those

19   for your own benefit?

20   A.    No.  I just have little experience in life.  Yeah.

21   Because when I read the subpoena, it looked like they were

22   going to ask me those questions.  I had no time to prepare

23   myself well, but I just made some notes to myself to remind

24   me, so we can talk about it.

25   Q.    Okay.  And understanding the time constraints, to the

1  best of your knowledge, are the documents that you brought

2  with you today the whole extent of the documents that

3  would -- you would consider to be threats, harassment and

4  reprisals, or supporting threats, harassment and reprisals?

5  A.   Yes.  And it was really to talk only about this subject.

6  I didn't know that we were going to discuss church issues and

7  membership, and that.  That's all new to me.  From the

8  subpoena, what it said, it was talking about the stress and

9  harassment, and I just -- people just shared with me some

10  information.  I brought it here.

11  Q.   Okay.  Yes.

12  A.   It's only about this.  Nothing else.

13  Q.   I understand.  And I will allow you to tell me all about

14  the threats and harassment.  Before we get there, I am going

15  to ask some questions about your background, and some of the

16  participation leading up to the harassment.  So I promise,

17  you will get to tell me all about the harassment.

18  A.   All right.

19  Q.   As the senior pastor of the church, what are your job

20  responsibilities?

21  A.   Well, mostly, to overlook services, and since we don't

22  have anybody on staff, like, people working in the church --

23  because we believe that serving God is a service.  It's not a

24  job, you know.  And we just spread responsibilities through

25  many people in the church.  So everybody knows what to do.

1  You know, like, ants.  They know what to do.  So, that's how

2  we operate.  It's a little different than maybe, like, a

3  regular American church with a pastor and staff, you know,

4  and their jobs.  It's different.  We just spread

5  responsibilities, and everybody is doing their own

6  departments and their job.

7       And I just was -- in the beginning, I was organizing all

8  this, and then I just overlook this.  They kind of report to

9  me how it works, and that's it.

10 Q.   So the different departments -- if you will allow me to

11 use that term -- would report to you, as the senior pastor?

12 A.   Yes.  Not to me, personally, only.  Like, once a month,

13 we have a board meeting.  The whole board come together.  And

14 they reported, like, what happened during the month, what

15 they have done, you know, to the whole board.  I just kind of

16 run the meeting.

17 Q.   Okay.  In 1994, did you start the church, or did you come

18 to a church that was looking -- an existing church looking

19 for a senior pastor?

20 A.   No.  Actually, I started from the scratch.

21 Q.   You started from scratch?

22 A.   Uh-huh.

23 Q.   Do you draw a salary from the church?

24 A.   No.

25 Q.   Have you ever drawn a salary from the church?

1    A.    No.  No.

2    Q.    Do any your pastors draw a salary from the church?

3    A.    No.

4    Q.    Outside of the church, are you otherwise employed?

5    A.    Yes, I am.

6    Q.    And what do you do?

7    A.    I am a [Redacted]

8    Q.    For?

9    A.    For [Redacted]

10   Q.    Do you know what [Redacted] stands for?

11   A.    [Redacted]

12   Q.    Okay.

13   A.    [Redacted]          [Redacted]          Everybody knows what [Redacted]

14   is.

15   Q.    And what's your title?

16   A.    [Redacted]

17   Q.    Do you have a degree in [Redacted]

18   A.    No, I don't.

19   Q.    How long have you worked for [Redacted]

20   A.    Since March 1st, 1993.

21   Q.    And has your position changed since you have been at

22   [Redacted]

23   A.    Yes.  A little bit.  Like, for the first, I would say,

24   17 years or so, 16 or 17 years, I only was working as a

25   [Redacted]          I was serving all kind of [Redacted]

1    coming to Spokane.  And then, last year, in the beginning of

2    last year, they started changing my work duties, mixing

3    with -- cutting the [Redacted] a little bit, because of

4    the budget cuts.  The whole program started cutting.  And

5    give me more doing a program named [Redacted]

6    Now they've changed the name to [Redacted]

7    [Redacted] sorry -- and I am helping [Redacted] to

8    get an assistance.

9        And I serve, mostly, kind of, the general population.

10   It's not the [Redacted] And I still do -- maybe, like, five

11   percent of my time, I still do [Redacted] ; [Redacted]

12   [Redacted] , and

13   all that stuff.

14   Q.   Okay.  When did you first come to the United States?

15   A.   Well, we left the Ukraine in October -- oh, this is

16   October -- October 28th of 1989.  By the way, October 28th,

17   we are going to celebrate our 30th anniversary.  My wife.

18   Q.   Oh, congratulations.

19   A.   Yes, thank you.  It was one day.  We went through

20   Czechoslovakia, Austria, Italy.  We spent about three months

21   in Italy.  Finally, we got -- October, November and

22   December -- we got into Fresno, California in 1990.  I

23   believe that was January.  Yes.  January of 1990.  That's

24   when we first come to Fresno.

25   Q.   Okay.  Why Fresno?

1  A.  Well, actually, I had no relatives here.  Nobody but --

2  there was a little Slavic church, old immigrants church, you

3  know, and they actually called me when I was in the Ukraine.

4  They already found my name from some friends.  They called me

5  to tell us, would you come to Fresno?  We have this little

6  church.  Because it's dying.  Only old people.  You know.

7  And they helped me with the paperwork, you know.  They

8  helped -- they kind of invited me to come to their church.

9  Q.  How long were you in Fresno?

10  A.  For about maybe two, two and a half years.

11  Q.  Okay.  And where did you go next?

12  A.  And then I had visitors in my home in Fresno, from

13  Spokane.  About five brothers who already lived here.  And

14  there are people from my hometown in Ukraine, from Mariupol.

15  And they said, hey, Redacte what are you doing here in

16  California?  Why don't you come to Spokane, Washington?  We

17  just moved there.  It's a nice city.  Lots of white people.

18  I am sorry.  Yeah.  That's what it was.  It was a new

19  experience for us, in America, coming from Ukraine.  You can

20  imagine.  So, you know, and the housing is good.  It's cheap

21  and better.  Easier to find a job, and we need you in the

22  church.  We just started a new church.

23  And they called me, and I come to Spokane with my wife

24  once, to visit, and we went around and said, wow, this is

25  like Ukraine.  Four seasons.  And then you drive Spokane

1    roads, like, oh, oh, oh, oh (laughter.)  It's a joke.  It's

2    true.  We like it.  It reminds us of Ukraine so much.

3         And then we come back once again.  We found a little

4    house on Redacted   It was only $48,000 at that time.  And we

5    made a loan through FHA.  I don't know if it's still

6    existing.  In those days, we were able to gain a loan, and we

7    bought this house, old house, and we moved with my whole

8    family here.

9    Q.   Was that approximately --

10   A.   Maybe 1993.

11   Q.   Did you --

12   A.   Maybe the end of 1992.  I am sorry.  I don't remember the

13   exact date.

14   Q.   That's okay.  Did you have any employment prior to

15   working for Redacted ?

16   A.   Yes.  When I come to Spokane -- actually, my first

17   American employment started here in Spokane.  I didn't work

18   in Fresno.  I went to Redacted for two years.

19        Yeah.  I started as a -- maybe it sounds kind of -- as

20   the president of Redacted

21   Q.   Okay.

22   A.   And I worked only part-time.  And this organization is

23   still existing.  It's very small.  That's where I started.

24   And I worked part-time.  And then there was a position

25   open -- and I just worked across the street from the east

1  office, and I have friend there.  And actually, my boss come

2  to me one day and said, "█Redac█, there is a position open for

3  █Redacted█.  Why don't you apply?"

4          I said, "Ha, ha, ha."

5          He said, "No.  Just try."

6          I said, "No.  My English is not very good.  I am not the

7  best person."

8          He said, "No.  Just go ahead and apply."

9          And I just made one application.  We prayed with the

10  family.  Said, if it's my place, and God is willing to use me

11  to help these poor people coming here.  Here I am.  I went

12  for interview.  And I am sure there are people better than

13  me, but, for some reason, they choose me.  Yeah.  They said,

14  that is exactly who we need.  They hired me, and I still work

15  there.

16          INTERPRETER:  Lots of awards.

17          THE WITNESS:  Lots of awards, recognition.  So I was

18  doing my really best, serving people.

19  Q.  (BY MR. DIXSON)  Okay.  And the church, you started in

20  1994, correct?

21  A.  Yes.

22  Q.  Have you, at any time since you have been in the United

23  States, become a United States citizen?

24  A.  Oh, yes.  The whole family are citizens.

25  Q.  Do you remember when that was?  You, personally.  Not the

1   rest of the family.

2   A.   Me?  It was a long time ago.  Can you asking me something

3   more simple?  Oh, maybe -- okay, let's see.  Maybe in, I

4   believe, '95.  Because you can become a citizen after five

5   years of presence in the country.  I remember, we applied

6   right away, and we passed the test.

7   Q.   Are you registered to vote in the State of Washington?

8   A.   Yeah.  Unfortunately.

9   Q.   Unfortunately?

10  A.   Yeah.

11  Q.   Do you know when you first registered to vote?

12  A.   Just before this vote they had last year.

13  Q.   So sometime in 2009?

14  A.   Yeah.  Probably.  I don't remember the date.  Actually,

15  living in the Soviet Union, I never -- and actually,

16  Christians, we never took part in vote.  I believe that it's

17  a worthy thing, and we never touched that.  We stayed kind of

18  isolated.  And when we come to United States, we still have

19  that, maybe, stereotype.  Maybe you were right.  I don't

20  know.  But we stayed away for all those years.  And most of

21  our people, they stayed away from any kind of political

22  participation.  And this is -- was actually my first time in

23  my life I participated in a vote.

24  Q.   Why did you register to vote in 2009?

25  A.   Why?  Because I spoke with lots of my American friends.

1   I have lots of pastors.  You know, we kind of have some

2   communication.  And they told me, it's wrong, you know, to be

3   in America for 20 years and don't participate in the

4   community.  Even though I was really actually involved in

5   local community life.  I go as the board of directors of

6   ███████   I worked the committee of ███████

7   █████.  And I graduated from ███████        in

8   2002.  So, actually, I was, really, involved in many local

9   events.

10      But in vote, you know, we had this kind of -- maybe it's

11  difficult for you to understand, but living back in the

12  Soviet time and being a Christian, it's very different.  You

13  know.  And we didn't believe in the system that was

14  persecuting us all the time.  So we just -- and here,

15  probably, somewhere back in my mind, I probably had -- even

16  to understand, I am in a new country.  It's a free country.

17  We are happy.  But I believe it's not a Christian thing.

18  Q.   Yeah.

19  A.   But then, speaking with many pastors, they told me, █████,

20  it's wrong.  Christians are citizens.  They have a right to

21  participate in community life.  It's the right time to

22  participate.  And actually, they convinced me.

23  Q.   Do you wish they wouldn't have convinced you now?

24  A.   I think so.

25  Q.   Did they convince you with regard to a particular issue

1   that was important to you or them, or just convince you to

2   vote, overall?

3   A.   First of all, vote overall.   Because some friends tried

4   to kind of make me shame.   Like, we are not taking part in

5   the community.   I said, no.   I do everything I can, you know,

6   but not in this.   And understanding that, kind of -- it's

7   difficult to explain.

8        INTERPRETER:   Direction of society that resides depends

9   on each person.   It's not only us who live here, but also,

10  our children and grandchildren.   And how we act today, the

11  future of our children and grandchildren will depend on that.

12       THE WITNESS:   That was actually most, kind of, important

13  thing that decided me.   Yeah.   Actually, what kind of life

14  and community will we leave the next generation.   It's up to

15  us, you know.   And especially when people start talking about

16  marriage, and we believe that this is the institute that was

17  established by God himself.   And we said, yeah.   It's time to

18  say how we believe and that we support this.   We just say,

19  you know.

20  Q.   Are you familiar with the term Biblical marriage?

21  A.   Right.

22  Q.   How would you define Biblical marriage?

23  A.   Well, the book of Genesis says that.   God created man and

24  woman, and put them together and said, okay, produce

25  children.   That is the way God created.   There is no other

1    interpretation of this, actually.

2    Q.    So Biblical marriage, to you, means marriage between one

3    man and one woman?

4    A.    Yeah.  Yeah.

5    Q.    Okay.  When did you first learn that you were named as a

6    witness in this Referendum 71 lawsuit?

7    A.    Okay.  Recently.  Actually, I can tell you the date.

8    That's strange.

9    Q.    Even better.

10   A.    Yeah.  I can tell you the date.  That was September 16th.

11   Q.    And how did you learn that you had been named as a

12   witness?

13   A.    Well, two ladies called me, and they said this name.

14   Q.    When I say Referendum 71, do you know what I am speaking

15   about?

16   A.    Right.  The petition that people signed.

17   Q.    Yes.  Just so we are clear.

18   A.    Yup.

19   Q.    Were you surprised that you had been named as a witness?

20   A.    Yes.

21   Q.    Why were you surprised?

22   A.    Because the word "witness," back in Soviet Union, meant

23   really bad word.

24   Q.    Okay.

25   A.    That's the worst thing you can call people; to be a

1   witness.  Unless you are -- unless you are a witness of Jesus

2   Christ.  But if you go to prison, they will soon find out

3   that you are a witness, you are a dead body, actually.

4   Q.   And have you had any experience to be a witness in the

5   United States before this time?

6   A.   I believe so.  I don't know if it was called witness.  I

7   went to court, I believe, twice, and the one case was a

8   marriage -- do you remember when Nickolay -- Vladimir

9   Nikenchu (phonetic) was divorcing?  Actually, he just passed

10  away recently.  So they called me, I believe, as a witness.

11  So they asked me some questions.  But it wasn't like this.

12  It was in the court.  They just asked me a few questions, and

13  I believe Gregory was interpreting.

14      And the second time -- oh, yeah.  A member of our church

15  divorced.  There was something, yeah.  I don't remember what,

16  exactly, but they called me to witness about how do I know

17  him.  I said, yeah, he is a great man, blah, blah, blah.

18  That's it.

19  Q.   Have you testified in a courtroom before, as a witness,

20  in the United States?

21  A.   Right.  If I consider that a witness.  Yes.  But it's

22  different than this.

23  Q.   And do you understand that being named as a witness in

24  this case, you may be called to testify in a federal court

25  regarding your participation in Referendum 71?

1  A.    Yes.  That's actually what I asked Steve yesterday.  I

2  said, do we have to go, actually, to the court?  He said,

3  well, maybe.  But it's possible.

4  Q.    Would you be concerned about testifying as a witness in

5  this case?

6  A.    Of course.

7  Q.    And why would that be?

8  A.    Even today, I am here against my will.

9  Q.    Okay.  Are you afraid to be a witness?

10  A.    Yes.

11  Q.    And is that based upon something that's happened to you

12  in the United States, or based upon what you remember about

13  being a witness in the Ukraine?

14  A.    Probably mostly Ukraine.  Yeah.  Yeah.

15  Q.    Would you be afraid to be a witness in any case, or is

16  there something in particular about this case that makes you

17  afraid?

18  A.    Actually, it's kind of -- it's difficult to answer.  I

19  would say that I hate to be a witness in any case.  Even

20  those two cases, I didn't want to go there, but since they

21  are, like, members of the church, and I believe there was a

22  subpoena, also.  I don't -- I am sorry.  I don't remember.

23  There was a subpoena, probably.  Yeah.  I think so.  I had to

24  go and just say a few words.  Actually, I helped in that

25  situation.  The lawyer said, oh, you are good people.  You

1   came here.  But still, I kind of felt not really good.

2       And in this situation, when I -- especially the phone

3   calls that I had from Gregory -- I will talk about this

4   later.  I will explain to you why.

5   Q.   Okay.  If we can -- talking about the phone calls that

6   you got, to be a witness in this case, can you describe for

7   me those phone calls and how you felt?

8   A.   Right now?

9   Q.   Please.

10  A.   I thought it's most important to talk in the end.

11      Well, to be honest, the affect of the calls was really

12  bad.

13  Q.   Okay?

14  A.   Anne, are you there?

15      MS. EGELER:  Yes.  I am here.

16      THE WITNESS:  Hi, Anne.  This is Redacte  So, first of all,

17  Anne, I would like to apologize that when you called me, and

18  in the end, I put my phone down, I really didn't know who you

19  are.  Because on the phone it said "unavailable," and, you

20  know, there are lots of people calling me from different

21  places, with different crazy ideas.  So -- and I really

22  apologize.  I don't know you, and I wish I could meet you

23  today, so, you know, to talk in person.  So it doesn't mean

24  that I don't like you, or, you know, there is nothing

25  personal.  You are probably a great person.

1     But when the phone happened, the phone call happened on

2  9-16.  It was about lunchtime or so.  Yeah.  Anne called me

3  and I picked up the phone, and it said it's unavailable, you

4  know.  And I picked up the phone, and she said, kind of fast,

5  her name and organization, so I couldn't pick it up really

6  fast.  Blah, blah, blah.  And then she started talking about,

7  I need to go to the court as a witness, and they are going to

8  question me for two hours, and they are going to record

9  everything I said, and then they or going to use it in the

10 court, and all this stuff.

11     And, you know, and all my bad memories just come back to

12 me.  Oh, as this time came back from the Soviet Union.  And I

13 said to her, no.  I am sorry, but I am not going to do that.

14     And then she started saying something, like, oh, you have

15 to go there.  And we will produce a subpoena.  And, actually,

16 before -- I heard this word "subpoena," but I am not very

17 well familiar with this.  And I asked her to explain, and

18 Steve explained to me, we will serve a subpoena.  You have

19 to.  And if you don't, something really bad will happen to

20 you.  And the voice was kind of not really friendly, you

21 know.  And all my mind just started burning.  Oh, man.  This

22 is the old time.  And what are you going to do to me?

23 Something really bad, even worse than happened to me in the

24 Soviet Union.  Are you threatening me?  I said, I don't want

25 to continue this.  I don't want to talk about it, and just

1   put the phone down.

2        And, of course, I was really nervous at that moment.  And

3   about an hour later, I got another phone call from another

4   lady, and her name was Jessica Hamilton.  She said, "I am

5   calling from Washington Families Standing Together."

6        I said, "Oh, Families Standing Together.  Wonderful

7   people."

8        "No, no, no.  It's a little different."

9        Then she explained who she is, you know.  I am sincere

10  with you.  I am just telling you exactly how I felt.

11  Q.   Sure.

12  A.   And I said, "Oh, I just got a similar phone call just

13  about an hour ago.  Maybe you know who called me."  Because I

14  had no chance to write it down or anything like that.

15       She said, "Yeah, I know.  This is our people."

16       I said, "Can you spell me the name of the person who

17  called me?"

18       And she gave me their name.  Anne Egeler.  And she

19  spelled me the office where she called me from.  And then I

20  asked her, "Can you give me your name, then; who you are?

21  Can you spell me your name?"  And I put down her name and

22  phone number and the organization.  It's all here.

23       And then she started saying the same thing as Anne told

24  me.  She says, "Oh, Redac, you need to go to court.  They're

25  going to hard -- they are going to ask you a bunch of

1  questions."

2      I said, "What is this all about?"

3      She said, "Oh, it's about R-71, and people who you met."

4      Just started saying a lot.  I said "Whoa, whoa, whoa.

5  Wait a second.  I don't want to discuss that."

6      Maybe for you, like, American, young -- like, she is a

7  young girl.  She doesn't know life and hardship and troubled

8  time.  Maybe for you, it's just a joke or it's nothing.  It's

9  just like this (snapping fingers), you know.  But for us, who

10  went through hell, it's very serious stuff.  You know.

11      And I said -- I said, "I don't want to continue in

12  discussions with you.  If you want this, you need to speak

13  with my lawyer."

14      "Oh, you have a lawyer?  Who's your lawyer?  Give me his

15  name.  Give me his phone number."

16      I said, "He is going to call you.  He is going to call

17  you."

18      She says, "Oh, you are from there.  Oh, I can speak to

19  you a few words in Russian."  You know Americans.  They think

20  a few words, I assume in Russian, and okay.  No problems.

21      She said, "I was in Russia once, and it wasn't that bad."

22      You know.  I said, "What year you went to Russia?"

23      She said, "Oh, 1997."

24      It was after perestroika.  And I lived there since my

25  childhood.  And I know what my parents went through, and I

1  remember my life and my family.  So it was very different.

2  So you can't even imagine what I came from.  You know?  So it

3  is very serious to us.  I can't continue.  Just my word.  We

4  will call you about it.  I said, I don't want to continue.

5      And then I got a phone call from Redacted my assistant.

6  Said, oh, I just got a phone call from Jessica.  Not him, but

7  his children.  He wasn't home, and she spoke with children,

8  and she was saying to me -- it's nonsense -- because she was

9  threatening his children, saying, oh, we are already suing

10  one pastor because he didn't want to marry gay couples.

11  Something like that.

12      I said, what -- that's nonsense.  It's just crazy.  I

13  don't want to even listen to you.  And, so, at that moment, I

14  just said, no.  That's enough.  I called the lawyer and

15  explained what's going on, and said, hey.  That's way too

16  much.

17  Q.   Can I interrupt?

18  A.   Sorry.

19  Q.   Backing up a couple of steps.  Did these women -- Anne

20  and Jessica, what types of bad things did they threaten you

21  with, if you remember?

22  A.   Well, first of all, when Anne called me -- especially

23  closer to the end of the conversation -- the tone of speaking

24  was not really friendly.  You can feel it.  Like, when I

25  speak and smile with you, you can feel it, like.  You know.

1   So it wasn't really a friendly call.  And I was kind of,

2   whoa, alert.  What is this?  You know.  And then, when she

3   kind of started forcing me to go to the court, you know, and

4   then, threatening me with a subpoena.  Actually, as a matter

5   of fact, this threat of subpoena was made 14 days before

6   subpoena was produced.  I am not a lawyer, but I believe it's

7   kind of wrong, doing that.  Okay.  If you don't have a

8   subpoena, how can you threaten people with a subpoena.

9       Then, when I said, no, I am not going to do that, then

10  she said, then something really bad will happen to you.

11  Q.    She said something really bad will happen to you?

12  A.    Yes.  And then I replied, oh, you are going to do

13  something to me even worse than happened to me in Soviet

14  Union?  You are threatening me.  I said, thank you.  Goodbye.

15  I don't want to talk about it.

16  Q.    But she said to you, something really bad is going to

17  happen to you?

18  A.    Yes.  Yes, sir.

19  Q.    At that point, you ended the conversation?

20  A.    At that point, I just made a reference to Soviet time.  I

21  said, is it going to be worse than happened to me in Soviet

22  Union?  So you are threatening me?  I said, no.  I am not

23  going to continue this.  Boom.

24      I believe -- again, maybe I am not a lawyer.  I don't

25  know the law.  But I felt that it was a threat.  It was a

1    threat. And then, when Jessica called me, she spoke with a

2    kind of good tone, manner and voice, and tried to be a

3    friend.

4    Q. Go on. I don't know what that is. Go on.

5    A. KGB.

6    Q. Yeah. They are on the line.

7    A. And I am really sorry of the situation. And I apologize

8    before Anne, because I am not a person who is -- kind of,

9    hates people, and try to fight with them, but after getting

10    this kind of phone calls, and then Jessica called me, and

11    everything the same time. So about the same time.

12    Q. I think we have been through Jessica's phone call.

13    What attorney did you call, following Jessica's phone

14    call?

15    A. Okay. I called Matt Shea.

16    Q. Matt Shea?

17    A. And I called Steve. Stephen.

18    Q. Is Matt Shea an attorney?

19    A. Yes, he is.

20    Q. And why did you call -- is he your personal attorney?

21    A. I don't understand. What does it mean, personal

22    attorney?

23    Q. Has he represented you in any business dealings or

24    previous lawsuits?

25    A. Well, not the lawsuits. He helped me before with just

1  little things.  I called him asking questions, and he helped

2  me a little bit.

3  Q.    Were you able to talk to Mr. Shea about Jessica's phone

4  call?  Did you reach him in person?

5  A.    Yes, I did.

6  Q.    And did he explain to you, maybe, why she was calling?

7  A.    Actually, he said that he was shocked that these people

8  called me about a subpoena without having a subpoena.  You

9  know?  And speaking like this to me, and to, like, Redacted

10  family.  And, actually, then, right away, I called Steve and

11  told him the same thing, same story.  He said, okay.  Don't

12  worry.  We will find out what's going on.  We will call those

13  people and find out what it is, because I was actually

14  shocked.  And, actually, when we started speaking with this,

15  I will just -- can I finish this?

16  Q.    Sure.

17  A.    About your question?  Because then we can go farther,

18  because I don't want to mix everything in my head.

19        So I do not use those ladies.  And they are wonderful

20  people, and I can kind of help them with any needs and serve

21  them, but after the phone calls, I started feeling really

22  bad.  My anxiety just, boom.  And as the old time memory come

23  to me, and actually, I started crying, and I was not able to

24  finish my working day, and I got sick leave.  This is a copy

25  of the whole week of my sick leave.

1    Q.    For the record, it looks like Mr. █Redacted█ has a -- is it

2    a time card from █Redacte█

3    A.    Yes.   It's my leave records.  Like, on the 16th, you see

4    when they called me, I took one.

5         MR. PIDGEON:  Before we go on, can we get this admitted

6    as an exhibit?

7         MR. DIXSON:  I am willing to take his word for it.  I

8    don't need it as an exhibit.

9         THE WITNESS:  I don't want to complain.  Like, since you

10   asked me this question.  Nobody would ask me, I would never

11   tell that.  Since you asked me, I am telling you.

12   Q.    (BY MR. DIXSON)  I understand.

13   A.    I took it seriously.  The next day, like, on Monday -- I

14   felt really bad on Sunday.  I left the church early.  I

15   wasn't able to continue.  I got high fever.  My body was

16   shaking.  High blood pressure.  Everything.  Even my organs

17   and heart.  Everything was hurting.  I couldn't recognize

18   myself, because I used to be in good shape a long time ago.

19   I used to be a boxer, actually.

20   Q.    Uh-huh.

21   A.    So, like, on Monday, I stayed home all day long in the

22   bed.  I took sick leave.  I just wasn't able to get out from

23   the bed.  On Tuesday, I came back to work, but I had symptoms

24   of heart attack, and my sup (sic) said, "█Redac█, you better go

25   to emergency room right now, before you die."

1    So I went to Urgent Care at the Rockwood Clinic.  Three

2  hours here on the 21st.  And they checked me out, EKG, the

3  blood, x-ray.  And the doctor said, Redacte you don't have a

4  heart attack yet.  It might come at any time.  But you have

5  PTSD, post-traumatic stress disorder.  He asked me what

6  happened.  I started crying.

7    I said, well, all these memories, what KGB done to my

8  family; to me, personally; to my kids; to my parents.  Just

9  every -- all those memories started coming back in.

10  Seriously, I couldn't control myself.  I just started crying.

11  I couldn't work.  And the day I come back to work, and, like,

12  three more days, I was taking sick leaves because I was,

13  like, shaking.  I can't control myself.

14    Because at the same time -- maybe it's a coincidence.  I

15  am sincere.  I am not accusing anybody.  But at the same

16  time, like, sometimes before that, after I come home from

17  work, I just came out of my home and I couldn't believe my

18  eyes.  Here is this white SUV standing across my home, and

19  the lady is making pictures of my cars, my home, my garage,

20  everything.  And I just came out and said, hey, who are you?

21  What are you doing here?

22    She said, oh, it's a project.  It's a school -- it's for

23  a school project -- project.  And she ran away.  Drove away.

24    And here I met the lady, just jump out of the bushes with

25  her camera, hiding here, you know, and she just run away the

1    same directions as the car came.  And I was, what's that?

2         And the next several days, I saw a black car come, and,

3    like, expensive, real expensive car come into my home,

4    parking right across the street in the evening time, and

5    standing there for hours.  For hours, every evening.  I

6    didn't call the police because how can I?  It's public

7    property.  Anybody can park there.  It looks really strange.

8    Without experience, I know, what can it be?

9         Or somebody come -- I look through the door at night

10   time, somebody come out of the car, and the car left, and

11   somebody was standing with something in their hand.  I don't

12   know what it was.  Maybe a camera.  I don't know what it was.

13   For hours.  For hours.  You know, and all of this.

14        And then, the same day, on the 19th, when I told you I

15   left the church, I wasn't able to continue service, and I

16   said, my brothers, I am dying.  Sorry I have to leave.  I am

17   just crawling.  I walk around -- I walked around the church,

18   jumped in my car, and started driving around the church.  And

19   that was around 9 -- maybe 8:30 or so.  It was really dark.

20   And I saw on stand, like, a couple of cameras right across

21   the street, and there was a road construction.  A couple of

22   cameras stand by.  You can see the window is on, you know,

23   just waiting for movement when people start -- it was the end

24   of the service -- starting people coming out of the church.

25   And nobody was standing next to those cameras, but a bunch of

1   cars were there, and people were hiding in the cars.

2       So it was really strange to me, because nobody actually

3   asked my permission to make pictures of people coming of the

4   church, you know.  Especially of the evening time.  But I

5   felt so bad.  I was dying.  I wasn't able to stop and find

6   out who was doing this, and call the police, or whatever.  I

7   just want home and dropped into bed.

8       My wife is a nurse, so she came from the church.  She

9   said, you have high fever.  And everything was bad.  So I

10  thought I was going to die.  I was praying to God, I am

11  ready.  Take my spirit, God.  So I am ready.

12      I am not making it up.  I am not accusing -- I don't ask

13  anybody to pay me back or whatever.  No.  You just asked me a

14  question.  I am just telling you what happened.  And why was

15  my reaction like this.  Why, today, I am here against my

16  will.  I told them, I don't want to do that, because it

17  brings all my memories and all this events that happened to

18  me.  And, like, mail started disappearing from mailbox, you

19  know, and all the strange people watching my house, and I

20  just started to remember the time KGB actually was watching

21  my house 24/7.  The car was standing, basically, just

22  watching, you know.

23      And I just -- that was too much for me.  Just too much.

24  And I -- even today, the whole church prayed for me that I

25  have strength to come, and I have weakness today.  Seriously.

1    I can't recognize myself.  I usually was strong man all the

2    time.  At this time, I don't know what's going on with me,

3    you know.  All this come to me and it's just, oh, my God.  I

4    can't really kind of control it.  It's just -- I am sorry,

5    Steve.

6    Q.    No, no.  I understand.  And I certainly appreciate you

7    being here today, understanding it's against your will.

8          Did you explain the SUV's and the cameras outside the

9    church?  Did you tell anybody about that?

10   A.    Yeah.  Yesterday, the prayer service, I actually told

11   them.  Because we have kind of experience from the Soviet

12   Union.  When you start to be persecuted, there are some tools

13   to protect yourself.  Tool No. 1 is glasnost.

14         INTERPRETER:  Openness.

15         THE WITNESS:  Openness.  Awareness of everybody else.

16   Like, when they called us to the KGB office and tried to

17   convince us to work for them.  We were telling KGB agent, you

18   know what?  Everything you are talking about now, everything

19   you asked me now, every word, as soon as I leave your office,

20   I go to church, gather all people, and I tell them everything

21   exactly you said.  And they are afraid.  They said, no, no,

22   no.  Okay.  Let's finish our conversation.  Because they

23   didn't want glasnost.  To be aware.

24         This exact tool, we are going to use now.  So when people

25   call, making threats, and all this stuff, with strange stuff

1   going on, I can't hold it myself, because I am going to
2   explode and die.  So I told everyone in the church, that's
3   what's going on.  Actually, some people started coming,
4   saying, yeah.  Actually, we saw some strange things going on,
5   some strangers coming with strange behavior.  Maybe there is
6   no connection.  I hope there is no connection.  I believe so.
7   But you understand.
8   Q.   Yes.  Did you tell your attorney, Mr. Pidgeon or Matt
9   Shea, about the cameras and the SUV's?
10  A.   Yes, I did.
11  Q.   And did they give you advice as to what to do?
12  A.   Well, yeah.  They advised me, something happen like this,
13  I have to document it and call the police.  Actually, I spoke
14  with a police officer recently, and told him about this, and
15  they said, yeah, Redacte  If something is happening, I advise
16  you not to be alone when it's happening.  Be with somebody
17  else all the time.  And if you see something, make pictures,
18  write down license plates, and document it, and make police
19  report right there.
20  Q.   So you spoke to a police officer, but didn't actually
21  file a report?
22  A.   No.  I didn't file any reports.  No.
23  Q.   Since -- have you seen cameras outside the church before?
24  A.   No.
25  Q.   Have you seen them since that Sunday afternoon?

1    A.    No.

2    Q.    You made some motion with your hand like the cameras were

3    on tripods or stands?

4    A.    On stands, yes.

5    Q.    Did they look like video cameras, or more like small

6    personal cameras?  If you remember.

7    A.    I'm sorry.  I interrupted you.  I'm sorry, Steve.

8    Q.    No.  You are good.  You are going to have all the time

9    you want to answer.

10   A.    I need to calm down a little bit.

11         There was a stand with a photo camera.  Not video camera,

12   but big one, like professional one, like this.  And it was on

13   stand by.  You can see the window is on.  The light is on.

14   And then, next to it, a little bit lower, I don't know if it

15   was a stand, or something like that, but there was -- it

16   looks like it was a video camera.

17   Q.    Okay.

18   A.    And it was covered with plastic because it raining a

19   little bit.  Something was covered on the top of this video

20   camera.

21   Q.    Okay.

22   A.    That's all I saw.

23   Q.    Okay.  You mentioned that there were people in cars

24   nearby?

25   A.    Right.  Nobody was standing around those cars, but this

1  street -- it's Lincoln Street.  It was under construction,

2  you know, and there are several cars parked right on the

3  street because it was closed for through traffic, you know,

4  and I saw some people sitting in some of those cars.  Who

5  they are, I don't know.  Maybe they are just --

6  Q.   Was it at the corner of Lincoln and Second or Lincoln and

7  Third, if you remember?

8  A.   It was on Lincoln closer to Second.  Right across the

9  main doors were the steps, and it looks like they were

10  strangers because if it would be kind of people from our

11  community, they know that we don't use that door, get in and

12  out.  We mostly use the door from Second Avenue, which is a

13  smaller door, but that's what we mostly use, you know.

14  Q.   Would this be a side door to the church, then?

15  A.   Yeah.  In our case, it's a side door.  But when you look

16  at the church, it looks like -- if you are a stranger in

17  town, you would think that this is the main door, with steps,

18  you know.  And they put their cameras, waiting for people to

19  walk into the service, to make pictures of them.  But it

20  wasn't the main door.  So now I was thinking, whoa.  Why are

21  they standing people here?  People don't come to this door.

22  That must be strangers.  They have no idea what they do.

23  Q.   You didn't speak to anybody that was in the cars,

24  correct?

25  A.   No.  No.  I didn't stop.

1   Q.   What time of day was it?  I think you said 9:00 --

2   A.   About 8:30.

3   Q.   A.m. or p.m.?

4   A.   Evening, p.m.  It was an evening service.

5   Q.   Was it dark?

6   A.   Yeah.  It already was dark.  Yes.

7   Q.   But you could still see people in the cars, even though

8   it was dark, correct?

9   A.   Yeah.  Because there is some lights.  It's downtown.

10  It's lighted.

11  Q.   And this was on Sunday, September 19th, three days after

12  the first phone calls?

13  A.   Yes.  Absolutely.

14  Q.   And since that day, you haven't noticed anything --

15  anything like that at the church?

16  A.   No.  No.  No.

17  Q.   The SUV's that came by your house, what day did that

18  happen, if you remember?

19  A.   Unfortunately, I didn't document it.  I didn't call the

20  police.  It was a working day, because I just came back from

21  work.  It was maybe around 5, 5:30, something like that.

22  Q.   And I am referring particularly to the white SUV's, as

23  distinguished from the black luxury car.

24  A.   Uh-huh.

25  Q.   That would be -- it was sometime after you received the

1    call on September 16th?

2    A.    No.  It was before that.

3    Q.    It was before that?

4    A.    Yeah.

5    Q.    A week before?  A couple days?  A week, approximately?

6    A.    No.  I would say, maybe -- it's hard to say.  Maybe

7    about, like, three-four weeks before.  Something like that.

8    About a month before.

9    Q.    Late August, early September?

10   A.    Yeah.  I would say so.

11   Q.    And I know it brings back bad memories, but what do you

12   remember, in particular, about the white SUV?  What happened?

13   What did you see?

14   A.    I just came out of my, kind of, back -- it's not a real

15   front door of my house, but back door, but it comes to the

16   street so you can see the street.  And I just came out, and

17   the same woman -- actually, no.  When I was approaching the

18   door, the garage door, I saw this white car standing across

19   my yard.  I thought maybe somebody come to me to visit me,

20   and I opened the door and came out to the porch, and I saw

21   this lady just making pictures of my car, my wife's car, the

22   garage, and the house.  And then she saw me.

23        I said, hey, who you are?  What are you doing here?  And

24   I thought maybe I should take my cell phone and make a

25   picture, but she left really fast.  She just said a few

1  words.  Oh, yeah.  It's a school project.  And she left
2  immediately.

3  Q.   What street did you come out on?  What's the street you

4  live on?

5  A.   I live on the intersection of Redacted , and she was

6  parked on the Redac

7  Q.   Was she -- if I am picturing it, one side of the street,

8  you live, and then, another side of the street?

9  A.   On the other side.

10  Q.   Was she on the other side, or was she closer to your

11  lawn?

12  A.   On the other side, because that's the way she was driving

13  down.

14  Q.   Was she heading down -- down the south hill?

15  A.   Right.

16  Q.   So she was heading north on Red ?

17  A.   No.  It's not north.  It's west.

18  Q.   She was heading toward downtown on Red ?

19  A.   No.  No.  From downtown.

20  Q.   She was heading away from downtown?

21  A.   Yes.

22  Q.   Up the south hill?

23  A.   I don't live on south hill.  It's down there, like, it's

24  called Redacted .  People call it

25  different.  On the bottom, you know.

1  Q.  Okay.  And do you remember what you said to her, and what

2  she said back to you?

3  A.  I just said, hey, what are you doing here?  Who you are?

4  And she just was, like -- she just got really confused,

5  because she saw me.  And she said something like, oh, this is

6  a school project.  It's a project.  And started running away

7  right away.

8  Q.  Driving away?

9  A.  I am sorry.  Driving away.

10  Q.  How old would you estimate the woman was?

11  A.  Maybe 45 or so.

12  Q.  Had you ever seen her before?

13  A.  No.  Never.  Huh-uh.

14  Q.  And she mentioned it was part of a school project?

15  A.  Yeah.  She just said something like, oh, no.  It's a

16  school project.  It's a school project.

17  Q.  Have you seen her since?

18  A.  No.

19  Q.  Have you seen her car since?

20  A.  No.  Never.

21  Q.  Did you tell the police about this incident?

22  A.  No.

23  Q.  And why not?

24  A.  Well, it's another question.  Like, some people asked me

25  about this incident in Grishko's church when somebody crack

1  the hat (phonetic), you know, and they didn't call the
2  police.  And I said, well, in order to understand Russian
3  people, you should live for a while back in Soviet time.
4  Calling the police, back in Soviet time, it means nothing.
5  They will not help you.  They may hurt you even more.
6  Especially if you are a Christian.  You know?  There is no
7  way to find anybody.  And somewhere in our genes, we have
8  this kind of tendency of something happening, the last thing
9  we will do is call the police.
10  Q.   Have you had interactions with the police or law
11  enforcement in the United States?
12  A.   What do you mean, interaction?
13  Q.   Have you ever had occasion to call the police in the
14  United States?
15  A.   Oh, once, we called.  Yes.  No.  Twice.  Sorry.  A long
16  time ago.  One time, about 11 years ago, during the morning
17  service, a man, stranger man, come to the church.  He walked
18  down to the pulpit, and come in front of everybody and he
19  started yelling.  He said, "I hate Russians.  I hate all of
20  these people.  I was fighting with you in Afghanistan."  No,
21  no.  In Vietnam.  In Vietnam.  "And I am going to be back now
22  with my machine gun and I'm going to kill all of you."
23       And he left.  You know, right in the middle of the
24  service.  And, of course, we called the police then.  We made
25  a report, and actually, we had two police cars come and

1  guarded the church for several days.  But it was a long time

2  ago.  11 or 12 years ago.

3  Q.   Were you satisfied with the police response?

4  A.   Yes.  Oh, yes.  No.  Actually, I have some police that I

5  know, and I like those guys, and kind of -- I even volunteer

6  for the sheriff's office.  I have a blue badge for Spokane

7  County Jail.  You know.  I can go there at any time, in any

8  room.  And I know the sheriff personally, and I know the

9  police chief, you know.

10      So, no.  I don't have anything against them.  They are

11  great people, and I have good relations with them.  Even in

12  this case, calling the police and telling them what?

13  Somebody was driving by my house with a camera, making

14  pictures?  So what?  Maybe she is crazy.  Maybe this is her

15  hobby, to make pictures.  You know.

16  Q.   Uh-huh.

17  A.   Maybe for American people, it wouldn't mean anything.

18  But in my case, I remember the time, you know.  With this, it

19  is following you.  Oh, that must be strange.  Especially the

20  second lady, jumping out.  There was kind of a little tree,

21  and she just jumped out of the tree.  Hiding.  Why she would

22  hide the camera if she is doing it legally?  You know.  She

23  was hiding the camera and just without saying anything, just

24  run down the road, you know.  And I believe she joined the

25  car and they left.

1  Q.    So the bush incident and the white SUV, those happened at
2  the same time?
3  A.    At the same time.  Yes.
4  Q.    And where was this -- was this person in your front yard
5  or side yard, or where is the --
6  A.    Well -- I can draw.  I don't know.
7  Q.    It doesn't really matter, and if you start drawing, then
8  we --
9  A.    Okay.  This is my house.  This is the front yard, the
10  front door, and this is the side door.  Okay.  This is Oak.
11  This is 27th.  Here is downtown.  So it looks like they drive
12  here, stop right across my garage with the cars, making
13  pictures, and when I came out, they just, zoom, you know,
14  down behind the corner so I couldn't see them.
15  Q.    Did you say anything to the person that was in the
16  bushes?
17  A.    No.  I had no even time to say, because she run away
18  really fast, and just grab her camera.
19  Q.    Did you see her with a camera, or did you just see her
20  putting something --
21  A.    No.  I saw the camera.  Yes.  I saw it.
22  Q.    How old would you estimate that person was?
23  A.    Maybe -- I don't know -- 30-35-40.  Not young girl, but
24  kind of adult age.
25  Q.    Younger than the person in the SUV?

1   A.   I can't say.  I don't know.  It was just, like, one

2   minute.  You can't really -- maybe about the same age.  Maybe

3   a little bit younger.

4   Q.   Man or a woman?

5   A.   A woman.  Both woman.

6   Q.   And have you seen her since?

7   A.   No.

8   Q.   Have you had anybody in the bushes taking pictures?

9   A.   No.  I never seen anything like that, after.

10  Q.   And then, lastly, before we move on; the dark colored

11  luxury vehicle, or nicer car -- I don't know how you would

12  describe it -- tell me about what happened with that.

13  A.   Yeah.  Actually, my kids told me the same story.  They

14  have seen that, kind of -- I don't know if it's the same car.

15  The night time, it's hard to tell, you know.  But I saw some

16  kind of luxury car, dark car, black car.  I believe -- when I

17  saw it, I believe it was, like, maybe a Mercedes or so, you

18  know.  And it just was -- come and stand at the same place,

19  actually, where the girls were making pictures, and standing

20  there for hours.  Like, three hours, four hours.  As much

21  as -- amazing.

22  Q.   Were you home the entire time that this car was there?

23  A.   It's the evening time.  I go to bed, and then I, like,

24  wake up, and in a couple hours, came out and check it out,

25  and it's still standing there.  It's just, wow, you know.

1  Q.   When you say still standing; the car?  Or was there

2  someone in the car the whole time?

3  A.   It's hard to tell.  Like, in a couple cases, I saw the

4  people who were in the car when it was not late night.  I saw

5  around 6:00, 7:00, when it was getting dusk, you know, and I

6  saw people standing there, without walking away.  You know,

7  they are just sitting there.  And then car left.

8       At another time, this car was standing there for a long

9  time.  I went to bed already, you know.  And also, I saw

10  another truck, expensive truck, stopped there, and stayed for

11  a long time.  And one time, I saw -- actually, it was dark in

12  the room.  I just come to kitchen to drink some water, and I

13  saw through my glass door, a truck, a new truck, come, and

14  the person came out, and the truck left.  And the person was

15  holding something in their hand.  And this person was

16  standing there practically, like, over two hours.

17  Q.   One person was standing --

18  A.   Right.

19  Q.    -- in the street for approximately two hours?

20  A.   Yeah.  At least two hours.  Yep.

21  Q.   Just holding something --

22  A.   Something in their hands.  Yeah.  I saw some kind of

23  light, a little bit there, but I don't know what it is.  You

24  can't tell.

25  Q.   Did you say anything to that person?

1   A.   No.  So, what would I tell them?

2        And, actually, once -- but it was way before -- there was

3   another car parked.  It was actually parked on this side of

4   the road, next to my driveway, and I came out and just calmly

5   said, "Do you need some help?  How can I help you?"

6        They said, "No, no.  Thank you."

7   Q.   Across the street where this car was parked, is there

8   another residence across the street?

9   A.   No.  Well, yeah, but it's far away, and their entrance is

10  from Inland Empire Way.  Not from this street.  It's back.

11  Q.   What's located directly across the street from your

12  house?  Vacant lot?  Is it --

13  A.   It's an empty spot.  They are trying to sell it.  It's an

14  empty lot.  On the next block, there is a house, an entrance

15  to Redacted

16  Q.   How many times do you think you saw either the nice black

17  sedan or the new truck?

18  A.   Me, personal, I would say, probably three-four times.

19  And, actually, when they told it to my kids, have you noticed

20  anything strange, they said, yeah.  Actually, we saw this car

21  standing there, too.  And, again, I don't know what it is.  I

22  can't really --

23  Q.   When did this happen, with respect to the white SUV?  Was

24  it before, after, about the same time?

25  A.   Before and after.

1  Q.  Okay.  When is the -- so this would, again, be August and
2  September of 2010?
3  A.  Yeah.  This year.  About so.  Yeah.  The end of summer.
4  Q.  When is the last time you saw the car or truck across the
5  street?
6  A.  Maybe about a month ago.
7  Q.  Did you ever say anything to that -- to anybody that was
8  in the car?
9  A.  No.
10  Q.  Did anybody ever say anything to you, from the car?
11  A.  No.
12  Q.  Anybody say anything to your family, from the car?
13  A.  No.
14  Q.  You ended up here as a witness today, correct?
15  A.  Yes.
16  Q.  Were you able to talk to an attorney, who explained to
17  you what would happen today?
18  A.  Yeah.  We met with Steve yesterday, for about an hour.
19  Just we spoke a little bit.
20  Q.  Prior to that meeting, had you spoken with Mr. Pidgeon
21  over the phone?
22  A.  Over the phone, yeah.  When I called him and reported all
23  the incidents, yeah.  We spoke over the phone.  He tried to
24  calm me down.  Find out what's going on.
25  Q.  Did he explain to you the subpoena process, and what may

1   be required?

2   A.   Yes.  I asked him what subpoena really means, because

3   it's kind of new terminology to me.  He explains, if subpoena

4   is produced -- or how you call it -- made, so then, yes, I

5   have to show up in the court.

6   Q.   Okay.  Turning now toward Referendum 71.  So, going back

7   in time.

8        MR. PIDGEON:  Before we do that, can we take a break just

9   for a few minutes?

10       MR. DIXSON:  Sure.  Yes.

11       (Recess taken from 2:11 p.m. to 2:18 p.m.)

12       MR. DIXSON:  Back on the record.

13  Q.   (BY MR. DIXSON)  Now, to tie up what we were talking

14  about, with the phone calls and the photographs at the church

15  and at your home, is there anything else, from that

16  September -- August and September 2010 time frame, that you

17  experienced, that you haven't told me about, or have we been

18  through that stage pretty well?

19  A.   Well, I noticed a couple of times, I believe, that my

20  mail was stolen from the mailbox.  Maybe there is no

21  connection to this.  Probably no connection.  Yeah.  I

22  noticed that.

23  Q.   How did you know mail had been stolen?

24  A.   Because all the neighbors got mails, and I usually get

25  lots of mails, and I asked my kids, anybody saw anything?

1    No.  Just --

2    Q.    Okay.

3    A.    Maybe it's nothing.

4    Q.    Turning to Referendum 71.  How did you first learn about

5    Referendum 71?

6    A.    Well, I had known about it from American friends.  And we

7    watched it on TV, and I spoke with our other pastors.  And,

8    like, we have still kind of town coalition for pastors, and

9    we come for prayer, like, once a month, you know.  And lots

10   of meetings in the town, you know, pastors meetings, and I am

11   good friend with some pastors.  So they just share, you know.

12   You can hear it everywhere.

13   Q.   Is this a downtown coalition of, mainly, Slavic Russian

14   pastors?

15   A.    No.  No.  No, no, no.  Regular churches.  And from Slavic

16   churches, only I join them very often.  Not lately, though.

17   I am so busy.  No.  It's not about Slavic churches.

18   Q.   Do you think you first heard about Referendum 71 through

19   that downtown coalition?

20   A.    I think that's impossible to recall, exactly, really, the

21   first time they heard from.  But that's from my American

22   friends and pastors.

23   Q.   What did you decide to do about it, when you heard about

24   Referendum 71?

25   A.    So I would say, first, I probably didn't decide anything,

1  since I knew that we kind of stay away from everything, you

2  know.  But then I started learning more about it, what it's

3  all about, you know, and I believe my conscious just told me,

4  it's time to kind of support your brothers.  They are

5  participating in this, and it's important, not only for you,

6  but your kids and grand kids, you know, to their healthy

7  society.

8  Q.  Do you know who Larry Stickney is?

9  A.  Yes, I do.

10  Q.  How do you know Larry Stickney?

11  A.  He is a wonderful man.

12  Q.  How do you know him?

13  A.  How --

14  Q.  How did you meet Mr. Stickney?

15  A.  How did I meet him the first time?  I -- I don't remember

16  when I met.  But, definitely, I met him somewhere before the

17  referendum.  Maybe -- the referendum was, I believe, in

18  October, right?  Yeah.  Of last year.  So I met him probably

19  September or so.  August.

20  Q.  And we might, in English, use different words.  The

21  election was in November, but the referendum process had been

22  going on before that.

23  A.  Right.  Yeah.

24  Q.  So, do you think you probably met him in the fall of

25  2009?  Mr. Stickney.

1  A.    Right.  Yeah.

2  Q.    Had you communicated via e-mail or telephone prior to

3  that point?

4  A.    With him?

5  Q.    Yes.

6  A.    I spoke with him over the phone maybe a couple times.  He

7  told me that he is going to be in Spokane this day, so I

8  said, well, yeah.  Let's meet.

9  Q.    Did you, as the pastor of the church, speak to the

10  congregation about Referendum 71?

11  A.    Well, we had a special meeting.  Not like the regular

12  services.  No.  We don't mix, like, serving God and, you

13  know, community stuff.  We would try not to make any kind of

14  technical announcements during the spiritual service, you

15  know, so it just stays there.

16       But we had a meeting in the church, somewhere in

17  September, and we just called people who is interested to

18  hear about this, to know what it is.  So it was a kind of

19  assigned special day and time.  It wasn't about the regular

20  service.  That's when Larry come and kind of answered our

21  questions, because most people, we had no idea what's going

22  on.  What it's all about.

23  Q.    Did Larry ask you to plan this meeting in Spokane?

24  A.    Well, he -- no.  Probably, he didn't ask.  He just told

25  me that he is coming to Spokane these dates.  I said that

1  would be nice to meet.  And I said, would you mind if I kind

2  invite other people to kind of just -- we just -- let's meet

3  on this date and time, and we announced in the community,

4  whoever is interested, to meet with some people who knows

5  about it, and hear.  That's fair.

6  Q.   You think this was probably September 2009?

7  A.   Yeah.  I don't know the date, exactly.  But, yeah.  About

8  September.

9  Q.   And you announced that meeting to the congregation?

10 A.   Yes.

11 Q.   And where did the meeting take place?

12 A.   Right in the church.

13 Q.   How many people, would you guess, were there?

14 A.   I don't -- I never counted.  I don't know.  Maybe 50-60.

15 Maybe 70.  About 60 people or so.

16 Q.   Did you speak at that meeting?

17 A.   Yeah.  At the beginning, as -- because it was announced

18 in our building, so I kind of -- I opened the meeting.  I

19 read the Bible, a story from the Bible, and we prayed

20 together, and then, gave it to our guest.

21 Q.   Do you remember who else spoke at the meeting?

22 A.   Actually, everybody spoke.

23 Q.   All 50 or 60 people?

24 A.   Yeah.  Because everybody had lots of questions, you know.

25 Q.   By speak, I mean, not, like, asked a question from the

1  audience.  But were there actual speakers at either the

2  pulpit, or some type of stand at the front of the church?

3  A.   Again, everybody who come and our guests, everybody spoke

4  a little bit.  We didn't have, like, a main speaker we were

5  going to listen.  Just everybody shared what they know.

6  Q.   Okay.  And Larry Stickney was at that meeting?

7  A.   Uh-huh.

8  Q.   And Matt Shea was at that meeting?

9  A.   Yeah.

10 Q.   Do you remember -- I am not asking you to name all the

11 names.  Do you remember other particular people at the

12 meeting?

13 A.   Yes.

14 Q.   Can you tell me some of the more prominent people that

15 were there?

16 A.   Yes, I can.  But Stephen.  Oh, you should be Russian to

17 understand your question.

18 Q.   I understand that there is a deep-seated fear, and if you

19 don't feel comfortable outing these people, but it is

20 important that we get an understanding of who was present and

21 what their role was.  If it were just people that came up and

22 said a little something, I don't need to know that, but if

23 there were speakers more prominent than another, I would like

24 to know those.

25 A.   It sounds like an easy question, and I know there is

1  nothing really terrible to name the other people who were

2  there.  But in our situation, in our culture, it's -- sounds

3  like betraying.  And my name is not Judas.  I am ▉Redacte▉  Even

4  though -- seriously.  I'm sorry, Stephen.  I know --

5  Q.    I understand.

6  A.    -- there is nothing that -- like, with Larry and --

7  Q.    Matt Shea?

8  A.    Matt Shea.  You already mentioned their names, and I just

9  said, yeah.  I spoke with them.  You know what I mean?

10  Q.    I do.

11  A.    But naming the names, it's just, like, you better shoot

12  me.  Even though I know it's not a secret, there is nothing

13  against it, but it's not in our culture for good people, you

14  know.  It's not a good manner.

15  Q.    Were other pastors of other churches there?

16  A.    Yes.

17  Q.    Do you know -- I won't go into the congregations.  But if

18  there were other pastors, can you identify the pastors and

19  their churches?

20  A.    Well, he is a pastor, but I don't believe he is pastor of

21  a church at this time.

22  Q.    Okay.  And who is that?

23  A.    Just another friend of ours.

24  Q.    Okay.  I would like the name.

25  A.    I don't know, Steve.  It's not a secret, at all, but I

1   just don't feel comfortable saying it, because it's not a

2   good -- it's, like, when I go back, because the whole

3   community will ask me, so, how did it went?  I said, well, I

4   named all our friends there.  Oh, then we have to kill you.

5   No.  You know what I mean?

6   Q.   I do know what you mean, but we are in kind of a unique

7   situation where people who participated in this process are

8   important for the community to know, and I am trying to be as

9   culture sensitive as I can, and limit my scope, but if there

10  were other pastors there --

11  A.   Yes.  Yeah.  There were.

12  Q.   -- I would like to know those people's names and their

13  churches.  I don't want to get you killed, and I don't want

14  to out you to the community.  So I am trying to think on the

15  fly, there, is a way we can get these names without tracing

16  it back to you, or making it public.

17  A.   Are you asking about American pastors who kind of come as

18  guests, or are you asking about our, kind of, local Slavic

19  pastors?

20  Q.   I am more interested in the local Slavic pastors.

21  A.   Well, that's even worse.  If -- to be honest, some of

22  those people, I don't know the names.  Thank God.

23  Q.   Can you tell me the churches that they are affiliated

24  with, without giving me the names of the pastors?  And maybe

25  I can be the bad guy.

1   A.   Okay.   Sure.   That's much easier.   All Baptist churches,

2   Pentecostal churches, and two Adventists, Seventh-Day.

3   Q.   Do you know the names of the churches?

4   A.   Some.   Some.

5   Q.   Can you tell me the names you do know?

6   A.   Oh, there was some charismatic churches.   I don't know

7   the names for their church.   Okay.   I know people from our

8   church, people from Redacted

9   Q.   Redacted ?

10  A.   Yes.   People from Church -- we call it, Redacted

11  Q.   Redacted

12  A.   On the Redacted

13  right? Redacted   And then, people from -- I don't

14  know the official name of the church, but people from the

15  church that kind of represent people who come from the

16  underground church in the Soviet Union.   Even though I come

17  from underground church, too, it was kind of mixed

18  membership.   But there is a group of people who only people

19  who were at the underground Baptist church in the Soviet

20  Union.   So they kind of stayed a little bit separate.   I

21  don't know their official name of the church.   But -- so

22  there is some representatives from this church.   And then,

23  from the Pentecostal church.

24  Q.   Do you know the name of the Pentecostal church?

25  A.   No.   You see, in Slavic community, we have name of

1  church; is how we register.  But the whole community doesn't

2  go by name of churches.  Most of the people go just pastor's

3  name.  I believe it's wrong, completely wrong.  ██Redacted██

4  church.  Steve's church, Stephen's church.  I said, no.  The

5  church is Jesus Christ's church.

6      But people do call.  And even though they have some names

7  and some papers, in most cases, I don't know how they

8  register.  Seriously, I don't know official names.

9  Q.  So, how would you refer to the Pentecostal churches that

10 were there?

11 A.  There are a few.  There are actually several Pentecostal

12 churches.  And I don't know their names.  I know they are

13 Pentecostal churches and different pastors.  Sometimes they

14 change pastors, and I can't really follow all of them, keep

15 track of them.  There are some divisions between churches.

16 New groups.  I am too busy to know.  But there are people

17 from other churches, Pentecostal, and we have two Adventist

18 Seventh-Day churches.  Their pastors were there.  And there

19 is a little charismatical (sic) church in the Valley.  I

20 don't think they have a name.  They come also.

21     And people from community, members of the church.  And it

22 was mixed.  All kinds.  Just anybody who was willing, some

23 brothers and sisters come, because it was announced, whoever

24 is interested to hear about it, please come.

25 Q.  So, do you remember what was said at the meeting?  Was it

1    informational?  Was anything --

2    A.   Yes.  It was informational about R-71, what it's all

3    about.  And people started asking questions and expressing

4    their opinions.  What the Bible says, you know.  Just kind of

5    discussion.  It's not, like, an official speaker and agenda.

6    It was more, like, friends come together and discuss, so,

7    what are we going to do?  Are we going to participate in

8    this?  How?  You know, just all this.

9    Q.   Were there any decisions made about how you were going to

10   participate?

11   A.   Not really, because every church is kind of independent,

12   and it's up to them to, kind of, decide how they are going to

13   participate, and to what extent, you know.  Most people just

14   express their view and they say, yeah.  We should support

15   this, at this time, because it's Biblical.  We stand for

16   Biblical principles, and there is nothing wrong.  It's not

17   illegal.  And we do nothing wrong.  That was the main kind of

18   opinion, you know.

19   Q.   Did you decide how your church would participate,

20   following the meeting?

21   A.   No.  Not at that meeting, because it wasn't the church

22   business meeting.  But then, after that, they spoke in our

23   church.  We just got information at there.  Like, brochures,

24   you know, everything.  The material.  And then said, now,

25   when we go to -- everybody goes to their churches, we need to

1    speak with our congregations.

2    Q.   And you said Larry Stickney was in town for a couple of

3    days; is that correct?

4    A.   I don't know for how many days he stayed, but I believe

5    so he was here for a couple of days.

6    Q.   Did you attend any other meetings that Mr. Stickney was

7    at, in Spokane?

8    A.   Yeah.  There was a meeting at the -- when there was a

9    rally --

10        INTERPRETER:  The American church at the rally.

11        THE WITNESS:  What church?

12        INTERPRETER:  A lot of freshmen go there, up north.

13        THE WITNESS:  On the north.  Life Center.  Not Life

14   Center.  Calvary Chapel.  At the Calvary Chapel.  There was

15   is a rally, and the information was in the newspapers and, I

16   believe, on radio, everywhere, about this rally, and people

17   walking with signs, you know, and in the end of the rally,

18   there was a meeting for the entire city, for everybody.

19   Q.   (BY MR. DIXSON)  Do you remember when that was?

20   A.   What date?  No.  I didn't document it.

21   Q.   Do you know the month?

22   A.   It probably was September -- no.  Probably October.  In

23   October.  There was a rally, and it was announced everywhere.

24   All churches knew about it, because the whole town.  And in

25   the end, there was a, kind of, prayer meeting for everybody.

1  Q.   And you think this took place at the Calvary Chapel?

2  A.   Yes.

3  Q.   How many people would you guess attended the rally?

4  A.   I can't tell, because I don't know.  We had our own

5  rally.  While the rally for the whole city was that area,

6  actually, the Slavic youth decided to have their own rally in

7  downtown, on Division.  And the end of it, many people come

8  to the Calvary Chapel.

9  Q.   Did you attend the Calvary Chapel rally or the Slavic

10 youth rally?

11 A.   Unfortunately, none of them.  I just said, no chance.

12 Q.   Were you around, and chose not to participate?

13 A.   No.  I just had no chance.  I was really busy.  I was not

14 able to come to either of those.  But I went to that meeting,

15 because brothers called and said, Redacte at least come to the

16 meeting and pray together, you know.  So I went there.  I

17 don't believe I spoke there.  I just prayed with everybody.

18 Q.   So you didn't attend the Calvary Chapel rally or Slavic

19 youth rally?

20 A.   No.

21 Q.   Other than that, you did have any interaction with

22 Mr. Stickney in Spokane?

23 A.   No.  Only those two meetings that I saw him.

24 Q.   So you did see him at a second meeting?  I am sorry.  I

25 am not following.

1  A.   Yes.  You asked me that, and I told you where I saw him.

2  The second time, at the Calvary Chapel.

3  Q.   I thought you said you didn't attend the Calvary Chapel?

4  A.   No, no, no.  I didn't attend the rally.  Like, marching

5  with the signs.

6  Q.   Okay.

7  A.   But I come at the end of it, to the meeting, for prayers

8  meeting.

9  Q.   Okay.  And how many people were at the prayer meeting,

10  would you guess?

11  A.   Oh, not too many.  Most people went home.  I don't --

12  it's difficult to estimate.  It's a huge building.  I can't

13  estimate.  Maybe 70.  I don't know.

14  Q.   And that was held inside the Calvary Chapel?

15  A.   Right.  Right.  In the building.

16  Q.   Okay.  Did you become involved in gathering signatures

17  for this referendum?

18  A.   What do you mean by signatures?

19  Q.   You understand that there were petitions that were

20  circulated?

21  A.   Right.

22  Q.   And that you had -- the petitions had names on them,

23  and --

24  A.   Right.

25  Q.   -- if the group in support of the referendum gathered

1  significant signatures, it would be placed on the ballot?

2  A.   Right.   Yes.

3  Q.   Did you assist in gathering signatures for those

4  petitions?

5  A.   Not personally.   I am just too busy to do it personally.

6  In the church, we didn't force anybody to do that.   We have

7  some other people who kind of were responsible for this.

8  Especially young people.   The youth.   They put a table, you

9  know, in the end, and we just announced, whoever is willing

10  to participate in this, there is some paperwork you can come

11  over and sign.   And there was some young people sitting

12  there, kind of directing.

13  Q.   There was a --

14  A.   Personally, I didn't do that.

15  Q.   There was table at the back of the church?

16  A.   Right.   In the church.   They put a table at the end of

17  the service, with paperwork, and whoever wants to come and

18  sign, people come and sign.   And, yeah.   People were

19  assisting them, showing them where to sign.

20  Q.   Was that -- did that happen once, or did that happen more

21  than once; the signing at the table?

22  A.   No.   It wasn't once.   It was, like, maybe a few services.

23  I don't remember the deadline to turn it in.   It was like,

24  morning service, evening service, and I believe, during the

25  week, a few services were there.

1   Q.   But all of those took place within one week, probably?

2   A.   Maybe a week or two.

3   Q.   Okay.

4   A.   But it wasn't a long time, because we were kind of late,

5   you know, with this.

6   Q.   Whose idea was it to set up that table at the back of the

7   church?

8   A.   The youth.  They were taking care of it.  Because, first,

9   when we offered people to sign, especially older people, they

10   had no idea.  They don't know English.  They start doing it

11   wrong, you know.  The place where it's city, they put the

12   state, or their home address, just put it backward.  And

13   young people said, hey, we understand English.  We can help

14   you.  So they were taking care of this.

15   Q.   And did you, or any of the other pastors, encourage

16   people to sign the petition during the regular church

17   service?

18   A.   Not during the regular service, but during the

19   announcements, yes.  We said there is a petition, and if you

20   feel you want to participate in this.  Again, it depends what

21   you mean by encourage.  because you can encourage, like, "I

22   am encouraging you," with a fist.  No.  We just give

23   information and said, if you feel like you want to

24   participate, there was no force at all.  And we said, there

25   is no force.  No obligation.  Nothing.  If your consciousness

1  says you have to participate, go ahead.  This is your

2  personal decision.

3  Q.  And the announcements are made to the entire

4  congregation; not just to the members, or in some special

5  meeting?

6  A.  Yeah.  Right.

7  Q.  And did you, personally, sign the petition?

8  A.  Yes, I did.

9  Q.  And where were you when you signed the petition?

10  A.  In the church.

11  Q.  In your church?

12  A.  Uh-huh.

13  Q.  Did you appear in any public rallies in support of

14  Referendum 71?

15  A.  No.  Not personally.

16  Q.  Did you attend any public rallies in support of

17  Referendum 71?

18  A.  No.

19  Q.  Did you, to the best of your knowledge, do any radio or

20  television appearances in support of Referendum 71?

21  A.  No.

22  Q.  Did you agree to any interviews with any newspapers

23  regarding Referendum 71?

24  A.  No.  I don't think so.  Somebody called me over the

25  phone, but after the election.

1  Q.   Okay.

2  A.   And I don't know.  Maybe that was Jessica, or somebody

3  else.  Some lady called me, asking some questions about it.

4  Q.   Do you think it might have been as recently as the middle

5  of September?

6  A.   I know it was after even we vote.

7  Q.   Uh-huh.

8  A.   Some young lady called me and she started asking me

9  questions.  How were you involved?  How did we know.  Like,

10  similar questions you are asking me today.

11  Q.   Uh-huh.

12  A.   I believe that probably was Jessica.

13  Q.   Is there any chance this person was from Indiana?  If you

14  know.

15  A.   No.  I don't think so.  That was local.

16  Q.   It was local?

17  A.   Yeah.

18  Q.   Did they identify themselves as a reporter?

19  A.   No.

20  Q.   Did they identify themselves as an attorney?

21  A.   No.

22  Q.   Do you know if any of -- did you agree to do an

23  interview?

24  A.   Well, it wasn't, like, an interview.  She just started

25  asking me questions, and I started answering them, while they

1   were simple questions, and then she started to get in -- and

2   said, you know what?  I am not comfortable to speaking about

3   it over the phone with a person I don't know.  I am sorry.

4   Q.   That conversation ended?

5   A.   Yeah.  It just ended.

6   Q.   Did you ever find out who that person was?

7   A.   She told me the name, at that time, but, seriously, I

8   didn't took it seriously.  Because I was so busy.  Phone

9   calls, somebody said the name.  Said, what about this?  I

10  just had no idea.  Yeah.  We participated, and, yeah, we

11  believe that.  And then she started asking me about names,

12  and I said, no, no, no.  I am sorry.

13  Q.   To the best you can, can you give me a season or a month

14  that this conversation took place?

15  A.   I can't say, exactly.  But it was after election.

16  Q.   Do you think it was the winter of 2009, or the spring of

17  2010?

18  A.   Probably the winter.  Yeah.  I believe so.

19  Q.   To the best of your knowledge, did you appear on any

20  websites or anything that supported Referendum 71?

21  A.   Can you repeat the question?

22  Q.   Yes.  To the best of your knowledge, did you appear on

23  any websites that supported Referendum 71?

24  A.   Me?  No.

25  Q.   Did you make any donations to any political action

1  committees in support of Referendum 71?

2  A.   We were talking about collecting some money, but I don't

3  remember if we did.  Oh, my gosh.

4  Q.   As an individual, did you make any contributions that you

5  remember?

6  A.   No.  No.  I remember there was some conversations.  Some

7  people talking about, oh, maybe we should help raising some

8  money.  Seriously, I don't remember if we made any.

9  Definitely, we didn't collect money in the church.

10  Definitely, we didn't make any collections like we do during

11  the service.  No.  We never do that.

12       (Ex. No. 1, marked.)

13  Q.   (BY MR. DIXSON)  I am handing you a document that I will

14  represent to you is a printing from the Washington State

15  Public Disclosure Commission.  Do you see that, in the upper

16  left-hand corner of the first page?  Upper left.

17  A.   Okay.

18  Q.   And can you turn to Page 5 for me?

19  A.   Okay.

20  Q.   Looking at the last entry there, it says -- there is a

21  line entry for ▉Redacted▉▉▉▉▉▉▉▉  Is that the church

22  you are senior pastor at?

23  A.   Yes.

24  Q.   Do you see there, that there is, in the amount column,

25  the number 1,000?

1    A.    Yes, absolutely.

2    Q.    And that -- the date of October 9th, 2009?

3    A.    Okay.  Yes.  This is the question?

4    Q.    Yes.  Do you remember, now, making --

5    A.    Yes.

6    Q.     -- a donation to the political action committee?

7    A.    Yes.  I can explain, easily, that.  I believe this is the

8    date when we held that meeting.

9    Q.    Which meeting?

10   A.    When we were talking about when everybody come from

11   different churches, different people.  Everybody who wanted.

12   And I believe, yeah, there was a talk at this service, people

13   saying, oh, maybe we should support somehow.  And we didn't

14   make -- as I said, we didn't make any collections in the

15   local church, like, as a church.  Not the regular services.

16        But I believe, at the end of this meeting, people from

17   different churches, individually, they made some donations

18   put together, and since it was kind of in our building, we

19   had our treasurer, and said, okay.  We can't give anybody the

20   cash that people brought.  And they just made a check from,

21   like, everybody who donated.  Yes.  That's right.

22        But it wasn't, like, from our church donation.  Even

23   though it looks like.  But it was in the end of the, kind of,

24   meeting for, like, everybody.  Not -- that meeting that I

25   explained to you.  Okay?  And people -- different people just

1  donated from their own.  Like, kind of, private based.  They

2  collected money.  But we can't give any cash to anybody.  So

3  we just put them together and made a check payable to there.

4      Yes.  Now I remember that.  Yes.  That was at the end of

5  that meeting.

6  Q.  Okay.

7  A.  But there was no collection, like, regular collection.

8  People just come and they decided to donate some money there,

9  to make some brochures and signs.  That's why.  Yes.

10  Q.  And did you authorize that check to be made in the

11  church's name?

12  A.  No.  What do you mean by authorize?  Signing a check?

13  No.  I don't touch financial side at all.

14  Q.  Do you have -- as a senior pastor, do you have control

15  over how the church spends its money?

16  A.  Not personal.  The church board is controlling this.

17  Q.  So, did the church board authorize the check to be made

18  in the church's name?

19  A.  Yes.  The Brothers Baptist, we were there together and

20  collected money.  We said, let's authorize the check towards

21  this project.  Yes.  But not me, personally, because I don't

22  have control over money.  I don't touch this area at all.

23  Q.  To the best of your knowledge, has the church donated any

24  other money to any other political cause?

25  A.  I don't think so.  What do you mean, political cause?

1    Q.    Has the church made any similar donations to another

2    political action committee or on any other political issue?

3    A.    I don't know, but usually, we don't participate in

4    political action.  And we don't call this political action,

5    because this was kind of faith based church project.  It

6    wasn't political.  We never participate in any political

7    movements, or anything like that.

8    Q.    Okay.  Are you aware that once the petitions were signed

9    and presented to the Secretary of State, that the Secretary

10   of State's office had to verify signatures and count those,

11   over in Olympia?

12   A.    Yeah.  I heard that.

13   Q.    Did you travel -- are you aware that members from both

14   parties, supporting the measure and opposing it, were there

15   to verify that process?

16   A.    I am not sure.  I have heard something, like, people

17   counting it in Olympia.  Seriously, I am so busy, I have not

18   time to, kind of, get into those details.  It was just done

19   with our side.  We have done everything possible.  And then,

20   I kind of didn't -- I don't know.  I have heard that there is

21   some counting going on in Olympia, but I don't know much

22   about it.

23   Q.    So you didn't personally travel to Olympia to view that?

24   A.    No, no.  Not at all.

25   Q.    Did you hear from anybody who did travel to Olympia, what

1   they saw?

2   A.   Like, from our community?

3   Q.   Yes.

4   A.   I don't think anybody from our community went there.

5   Q.   Do you have any opinion at all as to whether or not the

6   state conducted the signature checking accurately?

7   A.   I don't have an opinion, because I just don't know

8   anything about it.

9   Q.   Okay.

10   A.   I don't know how it should be done.  I believe people who

11   is doing it, they know what they do.  I just assume that

12   those people, they know how to do it.  I don't know.  As I

13   would say, I never put my nose into that business.  I just

14   take care of the spiritual part.  This is how we believe.

15   This is the sign.  We say that.  That's it.

16   Q.   Okay.  Did you have a Referendum 71 yard sign in your

17   personal yard?

18   A.   Yes, I did.  And, unfortunately, it was destroyed first,

19   on my own property, and then it was stolen.  I don't know who

20   did it, but --

21   Q.   The same sign, or did you have to put up a new sign?

22   A.   No.  The same sign that I took it from that meeting.

23   Q.   Did you replace it, once it was stolen?

24   A.   No.  I had only one sign, and I put it on the -- in the

25   front.  Like, the back of a side, like I showed you, I put it

1  right in my driveway, and I believe, in two days, it was --

2  somebody broke it at night time.  So I just screwed it back

3  and put it together, and then, I believe, the next night, or

4  within a few days, it was gone.  Stolen.

5  Q.   Did you see anybody break the sign?

6  A.   No.  I didn't see anybody.

7  Q.   Did they write anything on the sign, or did they just

8  snap the stick?

9  A.   Just snapped it.

10  Q.   Okay.  And did you see anybody take the sign?

11  A.   No, I didn't.

12  Q.   And you didn't replace it once it had been taken,

13  correct?

14  A.   No.  It actually was taken, I believe, kind of in the end

15  of this story.  Still, people had those signs, but since it

16  was stolen, and we were out of them, actually, so I just --

17  okay.  That's fine.

18  Q.   Did you have any R-71 bumper stickers on your car?

19  A.   No.  Can I tell about bumper stickers?  Last night,

20  actually, one older man come to me, and I have his witness

21  here, and he had a bumper sticker, and he come to Lincoln

22  Park with his wife, just for a walk, and they walked for,

23  like, 10 minutes.  Came back, and somebody smashed a window

24  on his car, and he believes it was because of his bumper

25  sticker.  But, again, I cannot be sure for a hundred percent,

State Objects: Lack of Foundation; hearsay; relevance

1    but that's what he told me last night.

2    Q.    We will get to that in just a second.

3    A.    Okay.

4    Q.    So, did you go outside of the church, ever, to gather

5    signatures for the petition?

6    A.    Me, personally?

7    Q.    Yes.

8    A.    No.

9    Q.    Okay.  Did you have any public role in support of

10   Referendum 71, outside of the rallies that we have spoken

11   about?

12   A.    No.  I wouldn't say so.

13   Q.    No?

14   A.    No.  I wouldn't say so.

15   Q.    Now I think we will get, finally, to what you came here

16   to talk about, which would be any harassment that you, or

17   people that you know, have suffered.  And I want to split

18   that into two categories.

19   A.    Okay.

20   Q.    I want to talk about, first, any harassment that you

21   personally experienced.

22   A.    I've got it.

23   Q.    We will have time to go through whatever you want to tell

24   me, so, start chronologically, or whatever, you know, rings a

25   bell to you first, and then you can tell me about that.

State Obj: Foundation; hearsay; relevance

1    A.    Okay.

2    Q.    This is you, personally.

3    A.    Okay.  Personally.

4          First of all, that's what I already told you about.  I

5    know people making pictures of my home and cars.  And mail.

6    Yeah.  Watching my house.

7    Q.    Just so you know, he is going to try to take down

8    anything you say.  So, if you are reviewing your notes, try

9    to do so silently.  It will make a better record.

10   A.    Oh.  Okay.  These are things I already mentioned.  So I

11   don't have repeat it twice.

12   Q.    So, just to be clear.  The personal harassment that you

13   suffered, you've told me about.  And that was in August and

14   September of 2010, correct?

15   A.    And --

16   Q.    And I am not trying to trap you.  I am just --

17   A.    That's right.  Yeah.  Okay.  I actually told you those

18   stories.  And I considered harassment about those two phone

19   calls that resulted in me in the emergency room, because I

20   have PTSD and anxiety, and I was not able to work.  And maybe

21   it's the wrong interpretation.  You see it differently.  I

22   don't want to argue.  But that's how it was for me and my

23   family.

24         As I said, I know people were making pictures on my home,

25   cars, and outside of church.  Somebody was watching my house.

1  And, personally, I actually didn't see much of what -- I list

2  just one event.  Okay.  Here.  Okay.  I don't remember the

3  date.  I didn't document it.  I didn't know that we would

4  need that.  But during the -- last August -- last October,

5  when people are standing with signs, we had -- I believe it

6  was a journal a board, or something like that.  I came out of

7  the church, and it was around 8, 8:30 in the evening.  I just

8  came out of the church, and I saw from the side door, from

9  the office door, and I saw our people standing on the

10  intersection of Second and Lincoln with the signs.  Okay?

11  Q.    Uh-huh.

12  A.    And right at the moment I left, I left the building, I

13  saw a young man about maybe 25 years or so.  He was walking

14  on the street, and he come to -- there was a group of people.

15  Because after this man in the Grishko's church was injured,

16  we decided not to stand alone, but be in groups all the time.

17  And other violence was reported.  So there was a group of

18  people.  Maybe four or five people standing on the corner

19  with the signs.  And this young man actually approached them

20  and started screaming and yelling like crazy, and, like,

21  calling them bad names, and then he grabbed one of the signs

22  from the -- from some one of our persons, grabbed the sign,

23  and he was actually crazy, because he jumped right in the

24  middle of the intersection, Second and Lincoln.  And there

25  are lots of cars going, you know.  And he started screaming

State Obj: hearsay; irrelevant even if offered for truth

STOREY & MILLER COURT REPORTERS          509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

1   at the cars crossing by, and pretending like he is trying to

2   hit those cars with this sign.  You know, just showing them

3   the sign, and trying to hit the cars.  And cars were kind of

4   avoiding him.

5        And I said, what is that?  You know.  And then he just

6   said a few bad words at our people, and he threw the sign and

7   just run away.  To me, I thought this was the man from the

8   opposite side, trying to create the opinion of the public

9   that these Slavic people are crazy.  You know, that he is one

10  of the them with the sign, hitting cars.  That was my

11  impression.  It was really bad.  And he called our people bad

12  names.  You know, just bad words.  And he run away and threw

13  away the sign.

14       That's one incident that I saw, personally, with my eyes.

15  Q.  Did he say anything other than bad words to that group

16  that was gathered there?

17  A.  Yes.  He expressed his disagreement with this action.

18  Q.  Okay.  And then he jumped in and grabbed a sign from

19  somebody?

20  A.  From the hands.  Yeah.

21  Q.  Did anybody try to stop him from doing that?

22  A.  No.  Actually, we informed all our people, we said, even

23  if there is going to be any kind of --

24       INTERPRETER:  Confrontation?

25       THE WITNESS:  Yeah.  Any kind of confrontation, just not

State Objects: Witness lacks foundation for testimony

State objects: Hearsay

STOREY & MILLER COURT REPORTERS                    509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

1    to participate.  Just stay away.  To be calm.  Not to answer

2    any of this.  You know.  And, actually, at that time, we had

3    some older people standing there.  You know, not young

4    people.  Because it was kind of getting darker, and we were

5    commanding young people not to stand in the dark time.  And

6    they were just standing without saying a word.  Saying

7    nothing.

8    Q.  (BY MR. DIXSON)  How long do you anticipate he was out in

9    the intersection?

10    A.  Not too long.  Maybe a minute or so.

11    Q.  That's a long time to be standing in traffic?

12    A.  Yeah.  Actually, he was a brave man.  I said, wow, yeah.

13    He put his life in danger.  They will hit him with the car.

14    It was like he was so enthusiastic if they decided to do so.

15    That's only one thing that I saw.

16    Q.  And did he throw the sign on the ground, or did he throw

17    it at the group that was standing there, when he left?

18    A.  He started running down the sidewalk.  I believe he just

19    crushed it over the sidewalk.

20    Q.  Threw it down?

21    A.  To the sidewalk.  He didn't hit anybody.  He just

22    expressed dirty words.

23    Q.  Okay.  Outside of the event that you just told me about,

24    and the August and September 2010 events, that's the extent

25    of your personal experience?

1    A.    Uh-huh.

2    Q.    Okay.    Let's talk about any harassment that you are aware

3    of, but did not experience personally.    And I don't know

4    where you want to start, but you can just tell me.

5    A.    And one more thing.    Maybe -- I don't know if it relates

6    to my personal or to, like, this stolen sign and broken sign

7    at my own property.

8    Q.    Yes.

9    A.    And at the church property.    Even though we have very

10   small property at our church, but we have a small piece in

11   front of the church, and we put the sign up there, and,

12   actually, every night, it was broken or stolen, you know.

13   Just -- so --

14   Q.    How many times would you estimate that happened?

15   A.    We replaced that sign too many times.    I don't know how

16   many, but many times.

17   Q.    10 or more?    Or five to 10?

18   A.    No.    Not -- maybe five or six times.    One time it was

19   broken in little pieces.    Wow, not very patient people.    Make

20   it in little small pieces.

21   Q.    Did you see anybody breaking the signs?

22   A.    No, I didn't.

23   Q.    Did they write anything on the signs?

24   A.    No.    Not -- no.

25   Q.    Did they leave any messages at the church, or near the

1  signs?

2  A.   I believe there was a sticker once, but I didn't pay

3  attention much in those days.  I believe there was a sticker

4  on the church door, when I come.  They were saying something

5  about our participation.  Something like that.

6  Q.   Do you remember when that was?

7  A.   During the rally time.

8  Q.   How big was the sticker, approximately?

9  A.   Just small office sticker.

10  Q.   So, like, two and a half inches by two and a half inches?

11  A.   Yes.  A small piece.

12  Q.   Like, a Post-It note?

13  A.   Uh-huh.

14  Q.   Do you remember what was written on the Post-It note?

15  A.   Just -- I don't remember, exactly.  I just threw it away,

16  just without -- something -- something they spread, just

17  disagreement.  If you are doing it, you have to stop doing

18  it.  Something like that.  I don't remember the wording,

19  exactly.  But some disagreement.  Why should you do this?

20  Just stop it.  Something like that.

21  Q.   So you read the Post-It note, and then threw it away?

22  A.   I just threw it away.  I didn't pay any attention.

23  Q.   Let's talk about harassment you are aware of, but didn't

24  experience personally.

25  A.   Personally?  I am done.

1   Q.   That you are aware of, but did not experience personally.

2   A.   Okay.  Actually, during this vote time, several

3   complaints were received from different members of the Slavic

4   community.  Lots of people talked about it.  And most of the

5   people were talking about some other people being rude to

6   them, calling them bad names.  And sometimes our youth had

7   a -- kind of, standing in their places, and people with

8   opposite signs, with the green signs, come, and sometimes

9   they behaved kind of violent.

10          There was different response from the public because

11  there were lots of cars driving by.  Many people encouraged

12  the youth, but some people yelled at them, saying very bad

13  words.  And this is one incident I saw it.  And lots of

14  reports of stolen and destroyed signs.  Not only on the

15  public property, but the private property.  Like, the

16  people's homes, you know.  Somebody comes, usually at night

17  time, and break them or steal them.

18          Recently I spoke with a representative from the Redacted

19  Redacted His name is, again -- names.  I

20  hate to say names.

21  Q.   I understand.  But --

22  A.   Actually, that's his statement.  I don't think it's

23  anything bad.  Actually, Redacted spoke with me.

24  Q.   Can you say that name again?

25  A.   Redacted .

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

1  Q.     █Redacted█

2  A.     █Redacted█   He told me the same story from their youth.

3  Often, people called them bad names, and yelling at them with

4  all kind of threats.  They should tell at the end.  I will

5  finish with this.  Because I am afraid I will kind of mix up

6  myself and I forget.  I will just follow it.

7       When I spoke with him, he didn't tell me any, really,

8  particular stories.  He just said their youth reported the

9  same thing.  Like, making threats, and calling them bad

10  names.  And I am just making a comment about it.  Most people

11  from our churches came to America as religious refugees,

12  being persecuted by communists in the Soviet Union, seeking

13  for freedom.  Most of these people participate in our

14  official vote for the first time in their life.

15       I personally started to participate in the vote the first

16  time in my first 47 years.  But we all are very shocked by

17  the reaction and results of this, after hearing all of this

18  court actions going on, and calling us to the court.  The

19  public accusing us of discriminating and persecuting some

20  people.  I will show you what I mean.  Many people said --

21  and actually, I heard that -- that they are participating in

22  vote process for the first, and now for the last, time in

23  their lives.

24       On Internet look, we were reading malicious opinions of

25  many people against Slavic people.  Especially about their

State Obj: Foundation; Hearsay; Irrelevant.

1    participation with protecting traditional Biblical marriage.

2    Some people made open threats and expressed their hate and

3    willingness to hurt Christian people.

4          I don't represent the site, unfortunately, but those days

5    I went to Internet, really, some kind of outcomes.  People's

6    opinion about what's going on in the state.  There were some

7    positive and some negative.  Some good positive outcomes, and

8    some really bad negatives.  Actually, I was reading this.

9    Said, oh, my God.  It looks like there are some crazy people

10   in the community that can do really bad.  Because they were

11   kind of expressing the hate to Slavic people and the church

12   people and all of this.

13         Okay.  I will just say my expression.  And now, the

14   specific -- actually, I have a few, and I gave you copies.

15   Q.   Let me dive in a little bit to what you just told me, and

16   then we can go onto the specifics.

17         You said different people in the Slavic community were

18   talking about what they experienced?

19   A.   Uh-huh.

20   Q.   Did people come and tell you, ▮Redacted▮, this is what

21   happened to me, or was it more generally discussed?

22   A.   Both.  Because I have heard lots of talks about it, you

23   know.  People from different churches.  Because we have good

24   communication.  Our youth, youth from other churches, and

25   parents were expressing their concerns about kids and their

State Obj: Foundation; Hearsay; Irrelevant.

1  safety, you know.  Because I will read you some of these

2  statements, and they are -- kind of sound really, really

3  scary.  Of course, parents were concerned.  Some people

4  expressed it to me personally, or I just heard their stories.

5  Q.   Were these people talking specifically about the youths

6  that had been harassed while they were out, or were they

7  talking about other incidents?

8  A.   No.  About the youth.  About during the time they were

9  standing with signs.

10  Q.   Okay.

11  A.   That's the most kind of dangerous time.

12  Q.   Did anybody tell you, or did you hear in the general

13  community, about people being harassed while trying to gather

14  signatures for the petition?

15  A.   Yeah.  Some people told me that when they went to their

16  neighbors, or, you know, it was some people, they are kind of

17  welcoming them, but some people are kind of really mad.

18  Q.   And do you think people have a right not to sign the

19  petition if they disagree?

20  A.   Oh, of course.  There is nothing wrong.  Just you can

21  express it differently.  You can say, no.  Thank you very

22  much.  I kind of have my own opinion, or decide to stay away.

23  There is nothing wrong.  Or you can do it really violently.

24  You know, like, taking a gun, or saying something really bad,

25  you know.

1 Q. Now, are you being facetious about -- I shouldn't use the

2 word facetious -- do you know of anybody that had a gun

3 pulled on them when they asked for signatures?

4 A. No. I just --

5 Q. You are just saying out loud?

6 A. Yeah. Saying you can do it really extremely bad. No. I

7 never heard anything about guns.

8 Q. But people said they were spoken rudely to when they were

9 asked for signatures?

10 A. Yes.

11 Q. There was much more talk among the Slavic community about

12 the youth experienced with the sign waving. Is that

13 accurate?

14 A. Correct.

15 Q. Did any particular youths speak to you about what they

16 had experienced at a particular incident?

17 A. Yes.

18 Q. What do you remember them telling you?

19 A. Okay. I had planned to go with these witnesses, and then

20 go to -- but, okay. I will switch, since you asked me.

21    I have here the kind of list of particular people telling

22 particular stories that happened personally to them. Not

23 that they heard from somebody. Okay? I just made short

24 sentences about it. And, again, I don't know about telling

25 the names. I can tell you the names of some, kind of, older

1    people who have nothing to lose, and they said, you can use

2    my name.  When we talk about young people, we decided not to

3    reveal their names, because they are just kids.  If something

4    happens to them, maybe not related to this, but parents will

5    think, oh, that's because [Redacted] mentioned their names.

6    Now they are hurt on the streets.  You know what I mean?

7         Actually, it's protecting you and me and everybody.  So

8    you better don't mention the young people's names.  Many of

9    them are under 18, so I don't want to use kids.

10   Q.   I understand.

11   A.   The first one, I believe it's nothing.  It says, last

12   night, older man come to me.  His name is [Redacted]

13   Before he entered the church last night, he said that a lady

14   come to me with a huge rock in her hand, screaming something

15   in English.  He doesn't understand English.  Just crashed

16   this rock right in front of his feet, right in front of the

17   church.  I don't know what it was all about.  I can't really

18   say that it's because of the sign.  It's probably not.  It's

19   just a reflection of some people, you know, how they looking

20   down on Slavic people.  But, okay.  Let's not talk about it.

21        But other man, [Redacted], just witnessed -- oh, I

22   mentioned that.  That in October, he had a R-71 bumper

23   sticker on his car.  He came to Lincoln Park with his wife,

24   for a walk.  When they come back, someone broke a side window

25   in his car.  He come to me last night, telling me,

1   personally, I never shared that with anybody, but I want you

2   to know that's what happened.  And he believes that's because

3   of his sticker.

4   Q.   When did that happen?  When was the window broken?

5   A.   In October of last year.

6   Q.   And he was walking at Lincoln Park?

7   A.   Yes.  With his wife.

8   Q.   And came back and the car window was broken?

9   A.   Yes.

10  Q.   And he did have an R-71 bumper sticker?

11  A.   Yes.

12  Q.   He told you that he had an R-71 bumper sticker?

13  A.   Yes.  For sure.

14  Q.   At the time -- when was the first you learned of this

15  incident?  Last night?

16  A.   Last night.  He said, I e-mailed -- you know, there are

17  some people who, kind of, have -- humble --

18       INTERPRETER:  Yeah, humble.

19       THE WITNESS:  They just don't want to talk about their

20  suffering, you know.  But last night when we prayed, he told

21  me, you know, I just decided to tell.  Maybe it's nothing,

22  but you should know what happened to me.  They are not, like,

23  extra mission, pushing something.  They are really good

24  people.

25       Okay.  And the next man come.  Actually, he told me

State Obj: Foundation; Hearsay; Irrelevant.

1    before about this.  But last night, he come to me.  His name

2    is [Redacted] (phonetic).  Last October, came out of

3    church building in downtown with sign of traditional marriage

4    in his hand, and it was already dark.  Car with four men

5    stopped, and those four men yelling at him, demanded to stop

6    and talk to them.  Like, confronting him.  Hey, let's have

7    some kind of -- like --

8          INTERPRETER:  Let's figure it out and we will talk about

9    it.

10         THE WITNESS:  Yeah, you know.  Without answering those

11   threats, [Redacted] continued walking to his car.  One man

12   came out of car and started running, trying to catch

13   [Redacted]  Other three men drove around, caught his way,

14   and stopped the car right in front of him.  They all started

15   cussing him, and threatening him.  Finally, he managed to

16   escape.  So they didn't hit him, but the conversation was

17   really bad, at a dark time, behind the church, you know.

18   Four huge men, you know.  He said, I got really scared.  But

19   finally, he just managed to escape from them.

20   Q.    Were these people speaking Russian?

21   A.    No.

22   Q.    Were they speaking English?

23   A.    Yeah.

24   Q.    Okay.  He was carrying --

25   A.    His sign.

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

1  Q.    In support of Referendum 71?

2  A.    Actually, he didn't rally.  He just took the sign from

3  the church to bring to his home, he actually told me.  He was

4  just entering the building, walking to his car with the sign

5  in his hand.  They saw him and stopped, and started following

6  him and trying to make confrontation, you know.

7  Q.    Did you know about this incident at the time, or did you

8  just learn about it?

9  A.    No.  Actually, I knew about this incident at the time he

10  mentioned me that.  But those days, we didn't get

11  information.  Okay.  We will just pray, and God will take

12  care of everything.  You know how --

13  Q.    Yeah.

14  A.    But last night, he come to me with his wife.  He says,

15  Redac, actually, that's what happened, and I want you to know

16  about it.

17        The next person, Redacted, with her children, last

18  October, stand with marriage sign in front of the church.

19  Car with young people stopped next to them, and those people

20  showed them fingers, and even worse signs.  She said, I was

21  confused, because she was with little kids.  And actually,

22  they yelled, "All Christians shall die."  And they left.

23  Q.    So this is a family that was standing out in front of the

24  church?

25  A.    Yup.  Mom with her kids.  She is about, maybe, 49 years

State Objects: Lack of Foundation; Hearsay; Irrelevant.

STOREY & MILLER COURT REPORTERS                    509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

1   old or so.

2   Q.    Okay.   And they were holding signs?

3   A.    Uh-huh.

4   Q.    Supporting Referendum 71?

5   A.    Marriage.   Yeah.

6   Q.    Did the car stop, or did it drive by?

7   A.    It stopped.   With young people stopped next to them,

8   because they were standing on the sidewalk, and they stopped

9   in the road, right -- just a very short distance.   And they

10  were showing fingers and some other bad signs, and, actually,

11  finally yelled, "All Christians shall die," and they left.

12  Q.   Okay.   Do you know if she -- did she follow up with that,

13  in any respect?   Did she tell you about it at the time?

14  A.   No.

15  Q.   Did she, to your knowledge, tell the police that she

16  received --

17  A.   No.

18  Q.   -- any type of threat?

19  A.   Nobody ever made any police -- except one.   Just one.

20  And I will tell you.   Just one police report.   We never call

21  the police.   We never complained.   We never followed people

22  to pay them back.   We just behaved like God's people should

23  behave.

24  Q.   So the first time you heard about this incident was when

25  this woman came to you yesterday?

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

STOREY & MILLER COURT REPORTERS                    509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

1    A.    Yeah.   Actually, you know, see, maybe I heard this,

2    because at the time, in October, I have heard so many of

3    these stories, and they all mix in my head.   And a year

4    later, I can't recognize who told me and who not.   But last

5    night, she just come and say, I just want you to know what

6    happened.   And her kids were really scared, too.   First, to

7    see the signs, and then, hear they wanted us to die.   In

8    fact, it was a death threat.   That's too much.

9         All right.   The next person is [Redacted] was standing

10   with marriage sign last October, on Monroe and Second.

11   People from passing-by car yelled at her and throw Pepsi

12   bottle at her, right here.

13   Q.    Did the bottle hit her?

14   A.    Yeah.   A bottle with Pepsi.   Just threw in her chest.

15   Q.    Was the bottle full or empty?

16   A.    No.   It was with Pepsi.   I don't know how full, but she

17   said it was a bottle with Pepsi.

18   Q.    How do you know it was full?

19   A.    I don't know if it was full.   I am not saying that.

20   Q.    How do you know it wasn't an empty bottle?

21   A.    She told me.   I asked her, was it just an empty bottle?

22   No.   It was a bottle with Pepsi inside.   How much it was

23   there, I don't know.

24   Q.    Did they say anything to her before they threw it?

25   A.    Yeah.   They were yelling at her, like, bad words, you

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

 1    know.

 2    Q.    Did she tell you about that, at the time?

 3    A.    Yeah.  Actually, I believe -- yeah.  I believe she shared

 4    that.  Because when she started speaking yesterday, said, oh,

 5    Pepsi bottle.  She said, yes.  Yeah.  I remember that.  But

 6    she just reminded me about this.

 7    Q.    And I don't -- I know you have already told me, but she

 8    didn't report this to anyone?

 9    A.    No.  She just told her husband, and that's it.

10    Q.    Okay.

11    A.    Then a group of people.  Actually, I have their names,

12    but I didn't do them here, because I spoke to their parents

13    and they said, you know, Redacted they are just kids.  Maybe you

14    better don't mention their names, because if something

15    happens, then, you know, people can accuse us, and this has a

16    connection, you know.  We better not.  I don't want to hurt

17    kids.

18          Last October 6, young people were standing in front of

19    the church with marriage signs.  You see, we say "marriage

20    signs."  Because in our case -- like, Americans call it R-71.

21    They talk about petitions, about politicians, signing,

22    counting.  We don't have connection to that.  In our view, we

23    are talking about Biblical marriage.  Okay?

24    Q.    Okay.

25    A.    So I want the judge to understand.  It's in our

1    community, it's different.  It's not participating in

2    political movement, or something like that, you know?  Or

3    putting notes in the government.  No.  We just -- oh, this is

4    the Biblical stuff.  We believe in Biblical marriage.  It's

5    time -- because other people are expressing different

6    opinions, and it's time to say tat we believe in that, and we

7    support -- and, actually, on the signs, it was saying

8    something about -- I don't remember what it was saying.

9    Something about marriage.  Biblical marriage between man and

10   wife.  That's our idea.

11   Q.    Just to be clear.  Did you, in the Slavic community, have

12   different signs than other folks who supported Referendum 71?

13   A.    Some people, actually, young people, they made some

14   homemade signs with Bible verses, what the Bible says about

15   it.  Like, peaceful signs.  I saw them, and there is nothing

16   wrong, or not talking about political.  Even R-71, with some

17   peaceful signs.  Like, let's protect our marriages.  Family.

18   Biblical family.  Something like that.

19   Q.    But the signs that you got from the Protect Marriage

20   Washington campaign, those weren't any different than the

21   signs used in Yakima or Seattle?

22   A.    Right.

23   Q.    To the best of your knowledge.

24   A.    Right.  I never went there, but I believe that they are

25   the same.

1   Q.   And did you understand Referendum 71 to encompass

2   Biblical marriage?

3   A.   Right.  Yeah, right.  Yeah.

4   Q.   And you understood --

5   A.   Yeah.  That's right.  Because for our people, we kind of

6   say R-71, because that's kind of a cold name.  We believe we

7   are talking about Biblical marriage.

8   Q.   And the R-71 had to do with Biblical marriage?

9   A.   Right.  Yeah.

10   Q.   Did you understand that the vote -- the election in

11   November 2009, did you understand that to be a vote that

12   would allow same sex marriage to be recognized by the State

13   of Washington?

14   A.   That's kind of a long question.

15   Q.   Yeah.

16   A.   What, exactly, you mean?  We understand, by voting in

17   November, we protect Biblical marriage as we believe.  Not

18   against -- sorry.

19   Q.   It was your impression that when you voted in

20   November 2009, you were voting against allowing same sex

21   marriage?  You were voting in favor of traditional marriage?

22   A.   Right.  In favor.  Yeah.  To protect Biblical traditional

23   marriage.  And I want to emphasize that we didn't vote

24   against somebody.  And, personally, I work with gay people a

25   lot.  With homeless people.  With handicapped.  All kind

1    of -- older people.  And I don't have any prejudice to

2    anyone, personally.  That's how I teach in the church.  We

3    can't do prejudice to any person.  We have to love all of

4    them.  When we talk about principle -- especially, Biblical

5    principle -- yes.  That's how we stand.

6    Q.   You understood that the vote in November 2009 concerned

7    Biblical marriage?

8    A.   Right.  Yes.  That's how we explained to people.  That's

9    how we understood.  That's how I believe.  Somebody would

10   tell me, oh, let's do something against those gay people, I

11   never would do anything.  Because they are just people.  Like

12   us.  There is nothing against people, and nothing against

13   hatred or intolerance.  Not at all.

14   Q.   We can continue with your --

15   A.   It's been a little bit -- because the meaning of R-71,

16   maybe, for some people, is different.  But for our community,

17   it's kind of different.  It's more like spiritual.  Because I

18   never even tried to put my nose in politics.  It's not the

19   church stock, you know.

20   Q.   Right.

21   A.   I believe the church is separated.

22        Okay.  Six young people were standing in front of the

23   church with marriage signs.  One group of people threw

24   bananas at them.  Other men threw fruit jelly on to one of

25   the girls.  Actually, it's a very pretty girl.  She come to

State Objects: Lack of Foundation; Hearsay; Irrelevant.

1    me last night.  She's about maybe 18 years old.  And she

2    said, these guys just threw jelly, fruit jelly, right into

3    her white clothes.  Very yucky.  Okay.  Threw jelly on the

4    girl.

5        The other group of people were making pictures of them.

6    Oh, yeah.  In the same group, they said they made pictures.

7    And then, after a while, they came back and made pictures

8    again of them.

9    Q.   The same group of six people?

10   A.   Right.  That's the witness from this group.  And then,

11   all older angry men came to them, speaking rude, and wished

12   them all -- wishing them all having gay children.  That

13   sounds kind of stupid.  That's exactly what everybody heard.

14   Finally, he said, I wish all of you that you all have gay

15   children.  And, actually, we know who this man is.

16   Q.   Who is that person?

17   A.   I know this person, actually.  ████████  He used to

18   work for the City of Spokane.  And I had lots of interactions

19   with the mayor, so -- I told you, I was involved with the

20   community a lot.  I remember this guy.

21   Q.   What was his name again?  Did you say ████████ (sic)?

22   A.   I gave you a copy of it.  Right there.  ████████  And,

23   actually, when I mention to you that we were shocked by

24   reaction, and saying that somebody is thinking that we were

25   discriminating them and persecuting them, we were really

STOREY & MILLER COURT REPORTERS                    509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

*[Right margin, vertical text: State Objects: Lack of Foundation; Hearsay; Irrelevant.]*

1    shocked.  That's exactly what he says here, if you read the

2    article.  That was really, really unacceptable.  And that's

3    how he created that public opinion about this former

4    persecuted people.

5        That's exactly the man who approach this same group of

6    people, and he was actually rude, and he was saying some

7    inappropriate stuff, and he was there for a while, and

8    finally, he said, I hope you all -- no, no.  He wished them

9    all they have gay children.  Well, I don't know it goes to

10   anywhere, but that was the man.  And we have a newspaper.

11   Q.   How do you know that [Redacted] was that person?

12   A.   Because he told his name to the kids.  And when they told

13   me his name, I said, oh, I know this guy.  A few days later,

14   I open the newspaper and see [Redacted] under the letter

15   section.  It's a letter section.  He put his letter, and I

16   read it.  Oh, that's ridiculous.  You know.  That's -- I

17   don't know.  I know [Redacted] people.  They are good

18   people.  But I don't have anything against them.  I know that

19   they are good people, but I wouldn't put this letter in the

20   newspaper, because that creates the wrong public opinion

21   about a huge group of people, you know.

22       MR. DIXSON:  I will hand you that and make that an

23   exhibit, since we referred to it.

24       (Ex. No. 2, marked.)

25   Q.   (BY MR. DIXSON)  I am handing you what's been marked as

1   Exhibit 2.  Do you recognize that?

2   A.    Oh, I have the original.

3   Q.    Do you recognize Exhibit 2 as I just handed it to you?

4   A.    Yes, that's right.  That's a copy from the

5   Redacted

6   Q.    That's a copy of an article, or letter to the editor,

7   that was published in the Redacted

8   A.    Right.  That's right.

9   Q.    What date was that published?

10  A.    The date is Redacted

11  Q.    This is the letter from Redacted that you were just

12  referring to?

13  A.    Yes.

14  Q.    And that Mr. Redacte apparently wrote after the interaction

15  with the six youths outside the church, right?

16  A.    Yes.  It's yours, right?

17  Q.    It's going to be the court's, so we will just give it

18  over there.

19  A.    All right.  Shall we continue?

20  Q.    Please.

21  A.    Okay.  Three young men, last October, were standing with

22  signs next to Taco Bell, on Third Avenue.  A group of people

23  stopped next to them, calling bad names and yelling, "We hope

24  you all die.  You need to be destroyed."

25        I don't think we need any comment to that.  It's clear.

1  Q.   Did these people tell you what they experienced at the

2  time?

3  A.   Yeah.  They were really confused to hear that.  And, you

4  see, most of these comments were made from the cars.  They

5  just stopped next to them, made comments, and called them,

6  and leave.  You can't really get their names, and we actually

7  never had any intention of doing that.

8  Q.   But do you remember this incident, when it happened in

9  October 2009?

10 A.   Yes.  I remember young people talking about this.  And

11 they just come to me last night, after the prayers meeting,

12 and said, Redac, remember we told you.  And that's what's

13 happened on the Third Avenue next to Taco Bell.

14 Q.   Okay.  Did you, as a church, do anything about that?

15 A.   No.  No.

16 Q.   Did you instruct people to avoid that intersection, going

17 forward?

18 A.   No.  We just instructed people not to be alone.  Just

19 stay in groups.

20 Q.   Okay.

21 A.   Because we didn't have lots of choices.  We only stand

22 next to our church.  Like, there are three corners that we

23 were using, next to the church.  So we didn't go through the

24 whole town.  Just right next to our church.

25 Q.   Mainly, along Redacted ?

1   A.   Yes.   [Redacted].   That's right.   [Redacted]

2   and [Redacted].   That's the intersections.

3   Q.   And how did you choose those intersections?   Just because

4   they were near the church?

5   A.   Yeah.   Because we were near the church.   We are home, you

6   know.   We say, this is our property.

7   Q.   Okay.   What's next?

8   A.   We didn't go to any, like, City Hall, or any public

9   places.   No.   Just next to the church.   Okay.   They just

10  said, "We hope you all die, and you need to be destroyed."

11      Then the young men, at the same time, was standing with a

12  sign on [Redacted].   Unknown man tried to hit

13  him with a car.   Yeah.   Actually, I asked him how it

14  happened.   He said, yeah.   Actually, this young man in the

15  car, he just saw the sign and he started yelling something,

16  and he just was driving right toward him.   You know, even

17  though he was standing on the edge of the sidewalk.   But you

18  can easily hit a person with the nose of your car, you know.

19  The front of the car.   And he was just -- and he jumped out,

20  and he just stopped right in the edge of the sidewalk.

21  Q.   So this person felt like the person in opposition to them

22  was going to hit them with the car?

23  A.   Yeah.   That was the intention.   Just, they tried to hit

24  him.

25  Q.   Did this person tell you about it, at the time, or did

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

1   you learn about it just recently?

2   A.   Actually, I have heard something about it, at that time.

3   But as I said, there were so many stories, I didn't pay, kind

4   of, particular attention to any of them.   I have heard that

5   there is something that happened where somebody was trying to

6   hit somebody.   I heard it at that time.   But as I said, we

7   didn't document.   We didn't complain or pay any attention.

8       But, last night, he called and he says, Redac, do you

9   remember this story?   I heard something.   That was me.   He

10  told me his name.   And, actually, his father called me and

11  said, yeah.   If you would just mention this, because they

12  tried to kill my son.   I said, okay.   I will put it down.

13  Q.   Do you think the person actually tried to kill him, or

14  did they try to scare him?

15  A.   I don't know.   How can I say that?

16  Q.   Did the car drive up on the curb, or did it stop short of

17  the curb?   If you know.

18  A.   As he explained to me, here is the road, and here is the

19  curb.   And this young man was sitting right on the edge of

20  the curb.   This man -- it's a wide street over there, and he

21  was driving with this direction, yelling at him, like, right

22  towards him.   And if this young man wouldn't have jumped, he

23  would have hit him, definitely, 100 percent.   Did he want him

24  to kill or just hurt him; just break his legs?   I don't know.

25  But, obviously, he wanted to hit him.

State Objects: Witness lacks foundation for the testimony; hearsay; and the testimony is irrelevant even if not offered for the truth of the matter.

State Obj: Foundation; hearsay: irrelevant

1  Q.   So the car made an actual attempt to run this person

2  over?

3  A.   Run him over.  Yeah.

4  Q.   That's what you have been told?

5  A.   Yes.

6  Q.   You weren't there?

7  A.   I was not there.

8  Q.   Okay.  Did you speak to the person?

9  A.   Yes.  Directly to his father.

10  Q.   To his father?

11  A.   Yes.  To his father, and to him directly.  He actually

12  called me and he told me details.

13  Q.   Okay.  Did he get a license plate number; try to follow

14  the car?

15  A.   No.

16  Q.   Contact the police, saying, hey, I almost got ran over on

17  the street corner?

18  A.   No.

19  Q.   Okay.

20  A.   Again, try to understand, Steve.  It's kind of different

21  group of people.  Church people.  People who were persecuted,

22  or their parents, and we teach our children, if you are

23  persecuted for doing wrong, then, yeah.  But if you are

24  persecuted by doing God's job, be happy about it.  Don't

25  complain.  Don't consider it something strange.  That's

1   normal.  Jesus Christ was persecuted.  He was crucified.  And

2   if you are suffering a little bit for him, be happy about

3   this.  This is the Biblical teaching.  That's how we take it.

4        Even today, I don't want to complain about it.  I want

5   the judge to know, we don't complain.  And we didn't want to

6   come here and even talk about it, but since you called us and

7   asked for this, we are just telling you some stories.  That's

8   it.

9   Q.   Sure.  And just for the record, you were identified not

10  by myself, not by Anne, not by Jessica, but by people like

11  Mr. Pidgeon.  So I am not bringing you here today.  This is

12  all Steve Pidgeon's fault.

13  A.   Is that you, Steve?

14       MR. PIDGEON:  Objection, just to the form of the

15  statement.

16       THE WITNESS:  Oh, man.  Can I ask you two questions,

17  since we are talking about it?

18       MR. DIXSON:  Sure.

19       THE WITNESS:  One thing I don't really understand.  If

20  this is Steve -- and I respect him.  He is a good man.  And I

21  respect you.  Why those ladies called me and threatened me

22  with a subpoena, instead of Steve calling me and telling me,

23  Redac, we produced a subpoena, and you have to show up, and we

24  ask you, please help us?

25       MR. DIXSON:  From my point of view, it's --

1       THE WITNESS:  I don't understand.

2       MR. DIXSON:  It's an inadequate answer, but that's the

3  way the system works.  Because you have been identified by

4  the plaintiffs in this nature, in this action, it would not

5  be incumbent upon them to call you as a witness.  The

6  defense -- the defense --

7       THE WITNESS:  I don't understand.  Sorry.  I don't

8  understand.

9       (Interpreter speaks in Russian to the witness.)

10      THE WITNESS:  That's a strange law.  Okay.  I accept

11  that, but that's a strange law.

12      MR. DIXSON:  And because the State of Washington, in its

13  official capacity, or the Secretary of State, is represented

14  in this matter by the Attorney General's Office, and either

15  who you spoke with works for the Attorney General's Office,

16  there has been some discussion between Anne and Mr. Pidgeon,

17  and some lawyers back in Indiana, about how we are going to

18  identify witnesses and take their depositions.

19      And, so, the lawyers have agreed, amongst themselves,

20  about how this process would take place.  And, so, Anne made

21  the first contact with you, and then, I believe, Jessica did,

22  based upon her Russian proficiency.

23      THE WITNESS:  So, let me understand.  So Jessica Hamilton

24  was kind of commanded by judge to call me, and, I would say,

25  threaten me with subpoena that was not even produced yet.  Is

1    that correct?

2        MR. DIXSON:  No.  No judge has told Jessica Hamilton to

3    call you.

4        THE WITNESS:  Okay.  Then, who told her to call me?

5        MR. DIXSON:  I mean --

6        THE WITNESS:  I am lost.  I don't know the law.  Who is

7    Jessica Hamilton to call me?

8        MR. DIXSON:  Because we had trouble finding where you

9    were in Spokane, and you didn't agree to just show up, that's

10   why we had to issue a subpoena, to make sure you would be

11   here today.  Had you said, Anne, I agree; I will come to the

12   deposition and I will bring all the records with me, there

13   would have been no subpoena.  But because there was some

14   initial resistance, we issued the subpoena.

15       I can tell you why there was a delay in issuing the

16   subpoena, but it's really not relevant.  Mr. Pidgeon and I

17   and Anne have discussions over 10 days or more about serving

18   the subpoena, and how that was going to happen.  I can

19   represent to you that Anne and Jessica could have had a

20   subpoena ready that day.  They didn't threaten it, and then,

21   serve it later, as an attempt to surprise you.  We tried to

22   work with your attorney to have you prepared to receive the

23   subpoena, rather than someone showing up on your front door,

24   unannounced, due to your health concerns and your concerns

25   about the whole nature.

1    THE WITNESS:  All right.  That's okay.  But, Steve, even

2  with your explanation, it's still not clear for me, because

3  why my lawyer didn't call me.  I called him to inform him

4  about this.

5    MR. DIXSON:  That is between you --

6    THE WITNESS:  But some girl from -- I don't know what

7  organization, but tomorrow, somebody else who called,

8  somebody else, shouldn't, at least, all of them -- I don't

9  know.  Okay.  That's fine.  But it was not clear to me.

10    MR. DIXSON:  We did not create the initial witness list,

11  and I am, quite frankly, surprised you weren't aware that you

12  were a witness, prior to someone speaking with you.  But I

13  don't know about that, and I don't know how it happened.

14    THE WITNESS:  Okay.  Fine.  Enough problems.  Let's go.

15  Because if Steve would have called me, then I wouldn't end up

16  in the emergency room.  Say, okay.  That's understandable.

17  If I need to help somebody, okay.  I will do it.  No problem.

18  But when you do it this way, I almost died.

19    MR. DIXSON:  I understand.

20    THE WITNESS:  You know?

21    MR. DIXSON:  And our hand was forced, quite frankly, sir.

22  Our hand was forced.  We had --

23    THE WITNESS:  I just asked you, Steve.  I don't have

24  anything against you or those people.  No.  I'm fine.  Okay.

25    Other group of young people, all born in USA, at the same

1    time, heard unknown people yell at them, "We hate you.  Go

2    back to Russia."  And calling Slavic people bad words.

3         They come to me and say, ▓Redac▓, how can we go back to

4    Russia?  We never were there.  This is my native country.  I

5    was born here.  Why should I go to Russia?  Because this our

6    kids.  And it's confusing.  I actually have heard this

7    expression several times from the community.  "All Russians

8    go back to Russia."

9         Like my kids.  They are grown here.  And, actually, we

10   never were in Russia in our lives.  You know, we have no idea

11   what Russia is.  So I was just --

12   Q.   (BY MR. DIXSON)  How do you think somebody knew these

13   people were Slavic?

14   A.   Standing next to the Slavic church.  They assume they are

15   Slavic people.

16   Q.   Did they say anything about Referendum 71, or just, "Go

17   back to Russia"?

18   A.   I don't know that, for sure, they mentioned R-71, but

19   they were standing with signs.  I believe there is a

20   connection with this.

21   Q.   So these people were standing with signs at the time?

22   A.   At the same time, same place, yeah.  Same group of young

23   people.

24   Q.   And they said, "Go back to Russia"?

25   A.   Uh-huh.

1  Q.   Okay.

2  A.   I think we are done with this, and I have just a couple

3  more.  Yeah.  It's the same thing.

4  Q.   Other pages --

5  A.   It's just copies.

6  Q.   Copies.  Three copies?  We don't have four single-spaced

7  bullet points?

8  A.   No, no.  And you are okay.

9  Q.   I thought we had four single-spaced pages.

10  A.   We are almost done.  Just three little statements.

11  Q.   That's the best news I have heard throughout today.

12  A.   You know, Steve, I had no time to prepare.

13  Q.   No, no.  I saw you flipping through the pages, and I saw

14  four pages behind the paper clip.  I thought we had four

15  pages worth of incidents.

16  A.   No.

17  Q.   Have you described to me the incidents involving the

18  youths and the signs, as far as you know them to be true?

19  A.   Yes.  And I know those kids.  I spoke with them directly.

20  I know their parents.  They are all wonderful people.  And I

21  don't think they made up these stories, because I know it

22  happened.

23  Q.   Were your children present at any of these incidents?

24  A.   No.

25  Q.   Did your children suffer harassment that they told you

1   about?

2   A.    No.

3   Q.    Okay.  So these stories -- are these all stories gathered

4   from people at your church or other Slavic churches?

5   A.    Most are from our church, and I just read you the witness

6   from, like, the ▓Redacted▓.  They said they

7   experienced similar experience.  The same stuff.

8   Q.    Okay.

9   A.    But this I just read you, people just come to me directly

10  and said, we know that you are going to be at the court, and

11  we would like you to tell them our own stories, and that's

12  it.

13  Q.    Okay.  Okay.

14  A.    And the young people, they all come to me with parents.

15  I know their families.  They are good, decent people.  It's

16  not, like, outsiders, if you don't know them.

17  Q.    So people would drive by in the cars, yell mean and rude

18  things, and in one case, there was a Pepsi bottle thrown,

19  jelly thrown, and a banana thrown, correct?

20  A.    Yes.

21  Q.    That -- the incident with the six young people where ▓Redac▓

22  ▓Redacte▓ eventually approached them, do you remember telling me

23  about that?

24  A.    Yes.

25  Q.    Was it ▓Redacted▓ that threw the banana or the jelly?

STOREY & MILLER COURT REPORTERS                      509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

1    A.    No.  No, no.  No, he didn't.

2    Q.    But he approached that same group later?

3    A.    Right.  Later.  Yeah.

4    Q.    Okay.

5    A.    No.  He didn't touch them.  Nothing.  No, no.

6    Q.    Do you have more harassment you want to tell me about?

7    A.    Okay.  I would like to read you a statement from

8    ████████████████, ████████████████.  Here is

9    the original, with his signature and everything.  And I can

10   read it in Russian, and I have an English translation, but

11   Gregory is better.

12         "To whom it may concern" --

13         INTERPRETER:  Hold on.  Let me get the original letter.

14   It happened on Saturday, October 24 --

15         MR. DIXSON:  Let's go ahead and make this an exhibit, if

16   we are going to be reading off of it.

17         (Ex. No. 3, marked.)

18   Q.    (BY MR. DIXSON)  Now we are looking at what's been marked

19   as Exhibit No. 3, and there is a letterhead that says,

20   ████████████████," and there is an address there.  Is

21   that correct?

22   A.    Right.

23   Q.    Okay.  Who is ████████████████?

24   A.    He is the senior pastor of ████████████████.  It's

25   a Pentecostal church.

State Objects to Ex. 3; Plaintiffs' trial Ex. 233; authenticity; foundation; hearsay; relevance

1    Q.    Do you know Redacted?

2    A.    Yes, I do.

3    Q.    How do you know him?

4    A.    Well, we have lived in the same city for many years, and

5    he works as a Realtor.  He helped our families a lot.  And he

6    is a wonderful man.  Good family.  So I know him for years.

7    He used to be an owner of Kiev Market.  The Russian store.

8    Q.    Kiev Market?

9    A.    Kiev Market, uh-huh.

10   Q.    Now, referring to Exhibit No. 3, I think you begun to

11   read from that.  So you can continue to do so, and the

12   interpreter will interpret.

13         INTERPRETER:  "It happened on Saturday, October 24, 2009,

14   afternoon.  People from our church were participating in a

15   rally on the corner of Division and North River Drive, close

16   to the river.  One woman approached, then started to take

17   away signs from people.  When Redacted called out to her,

18   "Ma'am," she turned around and hit Redac over the head with

19   the sign.  With a sharp edge of the sign, she split his head

20   slightly, over his forehead.  Redac was taken to the hospital,

21   where he had six stitches placed over this wound.  Sincerely,

22   Redacted."

23   Q.    Did you ask Redacted to write you this letter?

24   A.    No.

25   Q.    How did he know to write you this letter?

1  A.   He called me, and, actually, he asked me if he could

2  come, personally, today here, and witness this.  And I

3  called, actually, Steve, and he said, no.  Unfortunately, he

4  can't come here because he wasn't called here.

5  Q.   Okay.  So he called you and said, I am aware of an

6  incident.  Can I tell you about it?

7  A.   Right.  Right.

8  Q.   Did you -- were you aware of this incident prior to

9  receiving the letter?

10 A.   Yes.

11 Q.   How did you know about it?  Did you know about it in

12 October of 2009?

13 A.   Yes.

14 Q.   How did you learn about it in October of 2009?

15 A.   Because they called our church and told us about this.

16 Enough of this incident.  We directed all our youth not to be

17 alone.  Not to stand in the dark time in dangerous places.

18 Just to be in front of the group with a group of people.

19 Q.   Who called you?

20 A.   Actually, I spoke with Pastor Redacted

21 Q.   Directly?

22 A.   Yes.

23 Q.   Did he call you, or did you call him about the incident?

24 A.   I don't remember.

25 Q.   My question is:  Did he call you, specifically to tell

1   you about the incident, or did it just come up in

2   conversation?

3   A.   It's kind of hard to remember.

4   Q.   If you remember.

5   A.   I believe we were talking about this incident directly.

6   Q.   Okay.

7   A.   We took it seriously.  It is serious.

8   Q.   Do you remember; did he give you all the same facts at

9   the time, or do you remember it differently than what he has

10  reported it here?

11  A.   Pardon me?

12  Q.   Did he -- when you read this letter, is it familiar to

13  you, or are there additional facts that you didn't know at

14  the time, contained in that letter?

15  A.   No.  Yeah.  I knew about this story.  Yeah.  There was

16  nothing new and nothing additional.

17  Q.   Do you know Redacted ?

18  A.   Not personally.

19  Q.   Have you met Redacted ?

20  A.   Maybe.  But there are thousands of people, so --

21  actually, they all know me, but I don't really know all of

22  them.  I probably met this guy, but I can't have his picture

23  in front of my eyes.

24  Q.   Is it fair to say that you never spoke to Redacted

25  about this incident?

1    A.    No, I didn't.

2    Q.    Okay.  Do you know anything about the woman that

3    approached him with the sign or hit him with the sign?

4    A.    No, I don't.

5    Q.    Do you know; did you visit or know anyone who visited

6    Mr. ▮Redacted▮ at the hospital?

7    A.    I did not visit him.  I am sure young people visited him,

8    but I never asked who, exactly, visit him, because this is a

9    different church.  I am sure they have their own people who

10   take care of this.

11   Q.    Was he admitted to the hospital; do you know?  Did he

12   spend time overnight in the hospital, as a result of this

13   incident?

14   A.    I don't know.  You better call ▮Redacted▮ directly and ask

15   him.  I don't know.

16   Q.    As a result of this incident, did you take any actions

17   within your own church?

18   A.    Like, police report, or anything like that?  No.

19   Q.    Did you tell your congregation about this incident, in

20   particular?

21   A.    As I said, we already -- we instruct the young people not

22   to be alone, and try to be away from, kind of, these

23   dangerous situations, and not to stand at a dark time and be

24   alone.

25   Q.    Were those instructions as a result of this incident --

1  A.   Yes.

2  Q.   -- or in general?

3  A.   No.  Actually, we start thinking about it only when it

4  happened.  Before, we just didn't even think about it, you

5  know.

6  Q.   Do you know; is Division and North River Drive, is that

7  in the vicinity of ████████████████████?  Is it located

8  nearby?

9  A.   North River Drive?

10  Q.   I think it's by the ████████████ there.  The

11  ████████████ is up on the hill.  It just on the north

12  side of the river on ██████████.

13  A.   Well, yeah.  It's not far away from their church.

14  Q.   It's ████████████.  Would be three blocks west of

15  ████████  on Augusta?

16  A.   Yes.  Just a few blocks from there.

17  Q.   In the ██████████ neighborhood, for people that know

18  Spokane?

19  A.   Yes.

20  Q.   So this is not too far from the church?

21  A.   That's right.  I don't know much.  I didn't kind of make

22  any investigation.  I just know that this happened, but

23  that's it.  I can't tell you much about it.  I just -- that's

24  actually his report.

25  Q.   Okay.  Were you done?

1    A.    Yes.  I am done.

2    Q.    Other than speaking to the congregation and the youth

3    about gathering in groups, did you follow up on this incident

4    at all?

5    A.    What do you mean by follow up?

6    Q.    Did you take any further action, based upon this

7    incident?

8    A.    No.

9    Q.    Okay.  Do you have other examples?

10   A.    Yes.  I have one more.  ████████████████  on the

11   Hill.

12   Q.    If you are going to reference a specific, just tell me,

13   and we will make it an exhibit.

14   A.    I don't know if it's an exhibit.  You should determine

15   yourself.  I will just read it to you, and you determine.

16   ████████████████, Spokane, Washington.  Pastor

17   ████████████, his phone number.  I spoke with their

18   administrator, ████████████.  His phone number.  He

19   actually informed that during R-71 campaign, they received

20   threatening messages on their church telephone and on their

21   church school telephone.  They called 911.  Police came to

22   the church.  I am not sure it was police or sheriff.  I

23   believe, maybe sheriff come.  Listened to those messages and

24   report was made.

25         Also, their church custodian, personal witness, ladies

1   came in the car, right to the church property, behind the

2   fence.  Took R-71 signs.  And after custodian tried to kind

3   of chase them, they just left in the car with stolen sign.

4        Talk to them directly and they can tell you more.  So,

5   that's just their statement from their church.  That's what

6   happened right at their church property.

7   Q.   Who is ▮▮▮▮▮? Is he the pastor of the

8   ▮▮▮▮▮?

9   A.   That's right.

10   Q.   If you know.  I spoke with their administrator.  Is

11   that -- whose administrator is that?  Did this incident

12   happen at the ▮▮▮▮▮?

13   A.   Right.  Right at this address.  ▮▮▮▮▮ is,

14   like -- we don't have an administrator in our church, but

15   administrator is kind of, like, pastor assistant, who helps

16   you with all of the stuff, you know.

17   Q.   And, so, the ▮▮▮▮▮ received

18   threatening messages on their telephone and their church

19   school telephone?

20   A.   Yes.  They have ▮▮▮▮▮ at

21   the same property.

22   Q.   How would somebody get that telephone number?

23   A.   The phonebook.  Anywhere.  It's not a secret.

24   Q.   When -- what was the content of these messages?

25   A.   I didn't hear those messages, so -- but it's -- you can

1   request the police report, and it's all there.  I don't want

2   to tell things that I don't know or didn't hear, you know,

3   and just the report, what happened.  If you want details, we

4   better request a police report, because it was done

5   officially.

6   Q.   Okay.  Do you know about the custodian who witnessed the

7   ladies taking the signs?

8   A.   Uh-huh.

9   Q.   Can you tell me more about that?

10  A.   Yeah.  His name is Redacte and he is actually taking care

11  of the church property.  I forgot his last name.  That's

12  okay.  His name is Redac, and he is taking care of the church

13  property, and he was closing all doors and everything, and

14  then he just opened the door outside, and just trying to lock

15  the door, and saw this car just came right to the church

16  property, and they had one or two signs in front of the

17  church.  And this lady jumped out of the car.  Another lady,

18  I believe, just behind the wheel, and she started grabbing

19  signs.

20       And he starts screaming, saying, hey, what are you doing?

21  And she started running.  And she grabbed the signs and

22  jumped in the car, and then, left immediately.  So he didn't

23  get their license plate.  He didn't make a police report.

24  They only made a police report about the threatening phone

25  calls.

1  Q.    Did [Redac] tell you the story personally?

2  A.    Story personally?

3  Q.    No.  I understand.  You seem to know the story in some

4  detail.  So I am wondering --

5  A.    Yeah.  I heard this story, definitely, from [Redacted]

6  [Redacted] , not once.  A few times.  I heard this story from

7  other people.  And I believe [Redac] was -- I saw him once, and

8  he told me something like that.  But I wouldn't -- I am not a

9  hundred percent sure.

10  Q.    You don't -- as you sit here today, you can't recall a

11  particular conversation with [Redac] where he told you this

12  story?

13  A.    I can't recall, particularly.  He probably told me, also,

14  because I heard it from, like, different angles.  But from

15  [Redacted]  for sure.

16  Q.    Okay.  Do you know if they ever got the signs back?

17  A.    No.  Of course not.

18  Q.    Did they replace the signs?

19  A.    I don't know that.

20  Q.    And to your knowledge, did the person who took the signs

21  say anything when they grabbed the signs, or just grabbed the

22  signs and left?

23  A.    I don't know that.

24  Q.    Do you have anything else?

25  A.    The last one.

1      To the court, from Redacted.  "My name is

2 Redacted, and I am a legal resident of Washington.

3 One day when I was standing on the corner of Evergreen and

4 Sprague, holding up the sign that said "Reject

5 Referendum 71," I got a couple of threats towards me.  Some

6 people just disagreed, but I remembered this car that used

7 bad words, cursed me, laughed at me, and then gave me the

8 finger.  Then, after they left, they came back again and told

9 me to leave before someone gets hurt.  When I kept on

10 standing there, they kept on coming back, and each time, and

11 tell me to leave.  I am living in a free country, and the

12 First Bill of Rights says that everyone has the freedom of

13 speech.  I didn't do anything illegal.  I just gave my

14 opinion.  And I don't think it's fair for people to insult me

15 for what I believe in freedom of religion."

16      Her signature.

17 Q.   Do you know Redacted?

18 A.   Yes.  I do know her.

19 Q.   Is she a member of your church?

20 A.   Yes, she is.

21 Q.   Do you know when this event took place?

22 A.   Yes.  The same time; in October of last year.

23 Q.   Did she tell you about it at the time?

24 A.   I think so.

25 Q.   Do you remember her telling you, or do you just guess?

1  A.    There were so many stories.  No, no, no.  Yeah.  I think

2  she -- yes.  She told me that.  Uh-huh.  I tell you, there

3  are so many stories, and, so, it's so mixed.  But, yes.  She

4  told me about it, and then she decided to put it on a paper

5  and give it to me.

6  Q.    Did you ask her to write out the story for you?

7  A.    No.  No.

8  Q.    She just --

9  A.    She approached to me and said, I want to give you this

10 story.

11 Q.    Okay.  Do you remember anything that they said about

12 hurting her?  Do you remember what she told you about that?

13 A.    Not in particular.  Just saying somebody will be hurt.

14 But nothing detailed.

15 Q.    Do you know how many -- she uses the word "they."  They

16 left.  They came back.  Do you know how many people were

17 there?

18 A.    I don't know for sure.  She said there were people in the

19 car, and she didn't tell me the number.

20 Q.    Okay.  Do you know if she was by herself, or was she in a

21 group of people?

22 A.    I believe she was with her kids.  That's what she told me

23 last night.  She was with her kids.

24 Q.    And are her kids -- how old would you guess her kids are?

25 A.    Oh, small kids.  Maybe -- I don't know how old her kids

1   would be.  Maybe five years old or so.

2   Q.   Do you know if she told anybody about the threats that

3   she received?

4   A.   Yeah.  She told her story to the church, to other people.

5   Yes.  She shared that.

6   Q.   Do you mean she told her story in front of the entire

7   congregation --

8   A.   No.

9   Q.   -- or just informally?

10   A.   No.  Informally.  Nobody ever told any stories in front

11   of the church, like, formally.  No.  We don't do that.

12   Q.   It may have been discussed in the community?

13   A.   In a group of people, you know, among friends.

14   Q.   Okay.  Do you have any recollection of what she told you,

15   outside of this letter?  Do you remember anything that she

16   told you, in October 2009, that she you didn't talk about

17   today?

18   A.   More than is on the paper here.  Right?

19   Q.   Do you remember her telling you more than what's on the

20   paper?

21   A.   She just told me that she was scared.  That she was

22   scared.

23   Q.   And she was holding a Reject Referendum 71 sign?

24   A.   Yes.  Yes.

25      MR. DIXSON:  This is the first one we were talking about,

1    and this is the second one.

2          (Ex. Nos. 4 and 5, marked.)

3          MR. DIXSON:  Just for the record, Exhibit 4 is the letter

4    referencing the incident at the ██████████ on the

5    ████, on ██████████, and Exhibit 5 is the letter from

6    ████████ regarding the incident on Evergreen and Sprague.

7    Q.   (BY MR. DIXSON)  Outside of the stories you have told me

8    and the exhibits that you have produced, are you aware of any

9    harassment -- yourself, personally, or members of the

10   church -- that you haven't told me about?

11   A.   Yeah.  I have heard many stories.  But as I said, we had

12   this intention to kind of document or collect information.

13   Remember.  As of today, I can't tell you any more kind of

14   particular stories with exact dates and what happens.  In

15   general, I spoke with many people from other churches.  We

16   communicate all the time.  And I heard similar stories from,

17   actually, every church participating.

18   Q.   Did you speak to a lot of different churches about their

19   participation?

20   A.   Well, I believe I spoke with most of our Slavic churches.

21   Q.   Okay.

22   A.   Yeah.  We communicate.  We meet.  We talk.  You know.

23   It's, like, a close community.  Everybody knows what is going

24   on.

25   Q.   And do you know what they are speaking about in their --

State Objects to Exs. 4 and 5; Pltf's Tr. Ex. 234 and 235; authenticity; foundation; hearsay; relevance.

1  to their congregations?

2  A.   Preaching the word of God.  Because in our churches,

3  even, like, during our services, we don't mix it with other

4  stuff.  You know, we just preach and pray, you know.

5  Q.   So, how do you know what they are talking about at the

6  other churches?

7  A.   Because we communicate.  We share.

8  Q.   Amongst pastors --

9  A.   Among pastors, and among friends, and people and

10  families.  I would say, half of the community are relatives

11  within themselves.  Marry one another.  It's like one big

12  family.

13  Q.   Since the election in November of 2009, have you, or

14  anyone that you are aware of, suffered harassment based upon

15  your involvement with Referendum 71?

16  A.   Those that I already mentioned to you.

17  Q.   Okay.

18  A.   And I consider those phone calls, I consider them

19  harassment and threats.

20  Q.   Anyone -- you haven't -- are you aware of any harassment

21  to any members of the church, outside of yourself, regarding

22  Referendum 71, since the election?

23  A.   Directly, not.  Indirectly -- and, again, I can't really

24  say, for sure, that it's connected 100 percent with this.

25  But, like, my assistant, he told me that he had some notes on

1    his car.  You know, bad words and other things.  And I have

2    got those people making pictures.  I don't know.  Again, I

3    can't be a hundred percent sure that this is a connection on

4    that.  I just assume.  Because before this, before last fall,

5    we never had any incidents like this, anything suspicious,

6    any threats.  Except one time, when I mentioned, like, 12

7    years ago, this man come and threatening to kill everybody.

8    But it doesn't have a connection to this.

9         And once our website was destroyed.  Actually, when it

10   was?  Probably early this year.  Yeah.  Actually, it was

11   after the election.  We have a church website, and these guys

12   were taking care of it.  They said, hey, Redac, somebody just

13   crashed it.  Actually, they crashed it twice.  Once, some

14   people -- I don't know how they did it, but they opened the

15   church site, and, sorry, there was pornography on this.

16        We said, whoa.  How could somebody do that?  Just -- you

17   know.  It was terrible.  And they were fixing it for a long

18   time before they were able to determine what happened.  And

19   they fixed that, and the next time, early this year, somebody

20   kind of crashed the whole site.  They had to -- fortunately,

21   they had everything copied, you know, and they reproduced it

22   again.

23   Q.   What do you mean, crashed the site?

24   A.   I am not a computer person.  I can't really explain it.

25   But they reported our site was no more working.  Somebody

1  destroyed it.  Just came outside.  Some hackers.  I don't

2  know how they do that.  They just destroyed everything.  They

3  erased all the information.  Just --

4  Q.   And the other time, someone posted pornography on the

5  site?

6  A.   Before that.  But it was after the election.  Again,

7  maybe there is no connection with this.  I can't tell you.

8  But that's what happened.

9  Q.   Okay.  I appreciate your patience.

10      Out of everything we talked about today, are there

11  incidents that you recall now -- personally, or amongst the

12  church -- before or after the election, that you consider

13  harassment, that you haven't told me about?

14  A.   No.  I think that's enough.

15      MR. DIXSON:  I am going to be done.  Anne may have some

16  questions.  Stephen may have some questions.  But I, for now,

17  am done.  Thank you for your time.

18      THE WITNESS:  I am almost done.  I just want to make a

19  short conclusion.  Can I do that?

20      MS. EGELER:  Actually, Pastor, this is Anne Egeler, and I

21  am going to ask you some questions now.

22                          EXAMINATION

23  BY MS. EGELER:

24  Q.   If I understand correctly, you work for the Redacted

25  Redacted , correct?

1   A.   Yes.  I work for Redacte   Yes.

2   Q.   As part of your work, do you have people who have newly

3   arrived to this country understand how things work in this

4   country?

5   A.   I am sorry.  I don't understand the question.

6   Q.   Let me be more specific.  As part of your work for Redacte

7   have you ever explained to people from a former Soviet Union

8   country that the American police force is trustworthy, and is

9   not like the police in the former Soviet Union?

10  A.   Well, I don't really recall talking with the people about

11  this.  As I said, the last couple years -- and, actually,

12  Russian immigration ended.  We don't have any newly arrived

13  refugees for about, probably -- the last year and a half, or

14  two years, I don't recall anybody coming here.  In the

15  previous years, I served all kind of refugees.  Not only

16  Russian-speaking, but from different countries.

17       If somebody asked me, what police to call, something like

18  that, I would tell them.  But nothing in particular.  No.

19  It's not on my agenda to talk about police.

20  Q.   But would you tell them it's safe to call the police in

21  the United States?

22  A.   It's hard to hear her.

23  Q.   Do you tell people that it's safe to call the police in

24  the United States?

25  A.   Yeah.  Actually, when people -- when something happened

1    in somebody's family, they, like, called me, and I said,

2    yeah.  This -- I think they probably should be involved, and

3    you can call, and it is safe.

4    Q.    Okay.  And do you feel safe publicly expressing your

5    religious viewpoints in the United States?

6    A.    That's kind of a tricky question.

7    Q.    Do you feel that you could be persecuted for expressing

8    your religious beliefs in the United States?

9    A.    You know, to be honest, Anne, I am a sincere man, and if

10   you ask me the question, I would answer you sincerely.

11   Actually, I feel that I already prosecuted.

12   Q.    Okay.  Well, for example, have you ever offered a prayer

13   or spiritual words before a Spokane City Council meeting?

14   A.    Yeah.  I believe -- I don't know what year, but I

15   remember, many years ago, they called me to pray with the

16   council meeting once.

17   Q.    And did it worry you to stand in front of a city council

18   meeting and express the fact that you are a Christian?

19   A.    No.  Nobody asked me to explain to people that I am a

20   Christian.  They just called me to read the verse from the

21   Bible, and make a short prayer, and leave, and they start the

22   council meeting.  I was not, like, preaching.  Just reading a

23   short verse from the Bible, pray, and then, leave.

24   Q.    Right.  So, do you think, when you read from the Bible,

25   people might have inferred from that, or assumed, that you

1  were a Christian?

2  A.    Of course.

3  Q.    Were you worried about people at the city council meeting

4  knowing that you were a Christian?

5  A.    No.  Not at all.  Actually, and to this point -- Steve

6  asked me this question -- you asked me.  To this point, to

7  these events, I actually never had any fear of anything, and

8  when older people were trying to tell me, like, oh, we have

9  to be careful, you know, because they are in prison in Soviet

10  Union for years, I told them, oh, it's okay.  It's America.

11  It's a free country.  Everything is legal.  No problem.

12       And nobody ever called me to any offices.  Nobody

13  threatened me.  You know, I was feeling very good.  But until

14  the last few events.  Now I am not really sure.  Seriously, I

15  don't know what to tell.

16  Q.    You mentioned that after Jessica Hamilton and I spoke

17  with you, that someone showed up and was -- a woman showed up

18  and was taking pictures of your home.  Do you remember what

19  that woman looked like?

20  A.    No.  First of all, it was before you called me, and I

21  said it was before.

22  Q.    I misunderstood.  Okay.

23  A.    Right.  And, no.  I don't remember how she looks like,

24  because I saw her just maybe 30 seconds or so.

25  Q.    Okay.  And you said there was another woman behind a

1  tree.  Was that before we called you, too?

2  A.  Right.

3  Q.  And the people taking video pictures at your church, was

4  that before we called?

5  A.  No.  That was right after you called.

6  Q.  Okay.  And do you remember if that was a man or a woman?

7  A.  There was nobody standing next to the camera.  People

8  were sitting in cars.  So I don't know who was there.

9  Q.  Okay.  And do you think that was me or Jessica that was

10 doing that?

11 A.  Again, I am sorry, but that's a silly question.  How can

12 I say that?  How can I know?  No.  Personally, I don't think

13 so.  I believe -- I am a positive person.  I believe that

14 even people, some bad people, I believe that they have good

15 inside.  They are good people.  And I don't think you or

16 Jessica are bad people.  No.  Not at all.  I believe you are

17 good people, and I respect you, and I apologized, and I

18 apologize again that I ended the conversation with you, but I

19 explained why.

20 Q.  I understand.

21 A.  And I am sorry.  I am sorry.

22 Q.  Have you, during your time working for the state, had a

23 chance to work with anybody in the Attorney General's Office?

24 A.  No.  I don't think so.

25 Q.  Okay.

1  A.   No.  I never can talk to them.

2  Q.   Okay.

3  A.   Anne, seriously, I even didn't know what it is --

4  Q.   I understand.

5  A.   -- before you called.  After you called me, and then, I

6  asked Jessica who called me, and I spelled the name of your

7  office, then I called my lawyer and asked him, what is this?

8  Before, I never even heard about it.

9  Q.   Right.

10       And you said that you have PTSD.  Is that right?

11  A.   Yeah.  When it all happened, yeah.  I went to the Urgent

12  Care, and they checked my heart because they thought I have a

13  heart attack, because the symptoms are very similar.  And the

14  doctor said, Redac, no.  You just kind of -- he asked me, do

15  you know what PTSD is?

16       I said, of course I know.  Because probably half of my

17  clients have PTSD.  People who went through, like, war and

18  concentration camps, and those terrible stuff.  So it looks

19  like that's what you got.  He asked me, what happened in your

20  life?  Because I was crying.  And he said, what happened?

21       And I just told him that I got in some hardship in the

22  war, and all my bad memories come back from the Soviet time.

23  Actually, you didn't ask me today about my background.  But

24  if I would tell you my story, my family story, you probably

25  would cry, too.  Seriously.  All those bad memories just come

1   back.

2        And I am not accusing you, Anne, but it just ignited

3   that, you know?  The first time in my 21 years in America, I

4   felt -- I had this feeling, and it just was terrible.  I am

5   sorry.

6   Q.   I am apologizing that you felt that way.  That certainly

7   wasn't my intent.  I was just hoping to work out a time for

8   the deposition.

9        But do you understand now who is calling you as a witness

10  in the case?

11  A.   You called me.

12  Q.   So -- but do you know who is requiring you to be a

13  witness in this case?

14  A.   Well, seriously, I am still confused about this.  It's

15  not clear.  I asked this question, but, actually, Steve

16  Pidgeon, he never called me about it.

17  Q.   Okay.

18  A.   That's the thing.  And I don't know.  I don't know the

19  system, this system, very well.  I am sorry.  Maybe I am

20  confused, and I am sorry if I am saying something not

21  correctly.  I am seriously confused.  I don't know how it

22  works.  Maybe it's the right way.  So, again, I apologize.

23  Maybe it should work that way.  I don't know.

24  Q.   You stated that after the election, that your assistant

25  had notes on his car.  Did I hear that right?

 1    A.    Yeah.  He had some notes on his car.

 2    Q.    Are you talking about Mr. <span>Redacted</span>?

 3    A.    Yes.

 4    Q.    Okay.  We talked to him about that, so I will not bother

 5    you further about that.

 6    A.    Okay.

 7    Q.    But I do want to ask you about some of these events that

 8    you told me about, just to get an idea of how much you know

 9    about it.  You talked about a sticker on the church door.  Do

10    you know what that sticker said?

11    A.    Again, it was a year ago, and I just didn't pay any

12    attention.  It was, like, little sticker.  I just threw it

13    away.  But it said something about the referendum.  Like, I

14    don't recall the exact wording, but it just said something,

15    like, why are you doing this.  Just stop it.  Something like

16    that.  I am sorry.  Seriously, I don't remember the exact

17    wording.

18    Q.    But, you know, I just want to ask you what you do

19    remember, so, if you don't remember something, please, just

20    tell me.  That's fine.

21    A.    All right.

22    Q.    You said that there was a -- and I apologize, because I

23    probably didn't hear everything you said perfectly -- but

24    there was something about a man.  I think he was holding a

25    sign.  And there was a woman with a rock, screaming at him.

1  Do you recall that?

2  A.   Oh, in the beginning.  No.  He was not with a sign.  I

3  just said that -- maybe I didn't have to mention that.  It's

4  just, an older man just told me -- his name is Redacted

5  Redacted        -- that this screaming lady approached him with a

6  huge rock in her hand and crashed it in front of his feet,

7  just at the church door.  He doesn't understand English.  He

8  doesn't know what she was screaming about.  Maybe she is just

9  crazy.  I don't know.

10  Q.   Okay.

11  A.   I am not referring that to this story.  I don't know.  It

12  probably doesn't have a connection.  Maybe it does.  I don't

13  know.

14  Q.   So, for that story, you are not sure if that is related

15  to Referendum 71?

16  A.   Right.

17  Q.   Okay.  And then you said there was another situation

18  where a person had a petition in their hand, and a car with

19  four men in it stopped and confronted him and accosted him.

20  Is that right?

21  A.   Yes.

22  Q.   And who was that, that happened to?

23  A.   Okay.  His name is Redacted            (phonetic).

24  Q.   I am sure the reporter will ask you for spellings, so I

25  won't put you through that.

1      When did he tell you about this?

2  A.   He told me about this at the time of incident, back in

3  October of last year, and also, he remind me just yesterday.

4  Q.   And on what date did this occur?

5  A.   He doesn't recall the date.  But it was -- no.  Let me --

6  no.  He didn't mention a date.

7  Q.   Do you know where he was when this happened?

8  A.   Yes.  It was behind the church.

9  Q.   And was it with anyone else?

10  A.   No.  He was alone.

11  Q.   Are you certain?

12  A.   Yes.

13  Q.   And on what date did he tell you about it?

14  A.   Back then, I don't know.  But now, just yesterday.

15  Q.   Just yesterday, he told you again?

16  A.   Yeah.  Right.

17  Q.   And how old is he?

18  A.   Redacted, he is about -- I am not sure.

19  Q.   Roughly?

20  A.   I am just guessing, maybe, 49, 48 or so.

21  Q.   Okay.  And do you know if he got a license plate number?

22  A.   No.  He didn't get anything.

23  Q.   Do you recall seeing him -- at that time that it

24  occurred, seeing any bruises on him?

25  A.   No.  They didn't beat him up.

1   Q.   What do you mean by accosted him?

2   A.   Well --

3   Q.   Did they touch him?

4   A.   No.  They didn't touch him.  They just were using dirty

5   words, and kind of accusing him -- they were confronting him

6   about his understanding of, kind of, Biblical marriage, and

7   they opposed that, you know, and just called his best name --

8   as he told me -- they were trying to start, kind of,

9   confronting, like, leading to the fight, and he saw that it

10  was leading to the fight, and he just managed to escape that

11  situation and he just ran away.

12  Q.   So he walked away, and the people didn't follow him?

13  A.   Right.

14  Q.   And you talked about -- I am not sure I wrote this down

15  right, either -- Redacted .  Is that right?  With her

16  children?

17  A.   Redacted , yeah.  With her children.

18  Q.   She was with her children.  Do you know if she was with

19  anyone else?

20  A.   I am not sure.  Maybe some other people were standing

21  there.  I am not sure.  She says, in front of the church.

22  There must be other people maybe on the other corner, because

23  we had people on three corners, usually.

24  Q.   But you don't know if there were people with her that

25  day?

1   A.   I am not 100 percent positive.  She just said she was

2   there with children.

3   Q.   Do you know if she was with her own children, as opposed

4   to, maybe, some youth from the church?

5   A.   I believe that was her children.

6   Q.   Are you sure?

7   A.   Yeah.

8   Q.   And what date was that?

9   A.   She doesn't know the exact date.  She didn't document,

10  but it was back in October of 2009.

11  Q.   And when did she tell you about this?

12  A.   Last night, for sure, and back last year.  You see, I

13  have heard so many stories, and I have to recall who

14  mentioned that.  I don't really remember.  She probably did,

15  because last year, I heard these stories about people

16  expressing some really bad statements, like, about, like, you

17  shall die, and you should be destroyed.  You should be

18  killed.  I remember these stories from last year.  That must

19  be her that told me the story.

20  Q.   Is it hard for you to remember who told you which words

21  were said?

22       MR. PIDGEON:  I am going to object to the form of the

23  question.

24  Q.   (BY MS. EGELER)  You can go ahead and answer.

25  A.   Can you repeat the question?

1  Q.   Is it hard for you to match the person to exactly the

2  words that were said?  In other words, is it hard to keep

3  track of all of these events?

4  A.   No.  Actually, I am not crazy.  Even though I feel really

5  kind of tired now.  But I have good memory.  And it's just

6  difficult because there are so many stories, and some of

7  those stories were kind of outstanding, and they kind of

8  pictured in my mind.  But some stories, when they start

9  talking about it, I have to kind of recall and remember the

10 situation.  And when people remind me about the place and the

11 situation they told me, then, of course, I kind of remember

12 better.

13 Q.   So, with Redacte, what, exactly, did the people say to her?

14 A.   Okay.  I can read it to you.

15     MR. PIDGEON:  Objection.  Asked and answered.

16 Q.   (BY MS. EGELER)  You can go ahead.

17 A.   Shall I?

18     MR. PIDGEON:  Yes.

19     THE WITNESS:  They just showed her fingers, and she said

20 she showed even more.  I believe I can show it to you.  Some

21 bad signs.  And they were yelling, "All Christians shall

22 die."

23 Q.   (BY MS. EGELER)  Okay.  And I can't see you right now, so

24 I am not sure what you are looking at.  Are you looking at

25 something that you wrote down, or that Redacte wrote down?

1   A.   Well, actually, last night, I was writing these notes

2   from the words of people, they come to me, stating, in a

3   line, telling me their stories, and I just was writing down

4   as they were speaking.  So it's not like it was done

5   overnight or the next day; right at the moment they were

6   witnessing.  So --

7   Q.   Okay.  So you took notes as they were talking?

8   A.   Yes.  It's really accurate.

9   Q.   And did you ask [Redacted] if she was absolutely sure that

10  those exact words were said a year ago?

11  A.   Yeah.  I asked them if they were really sure, because I

12  didn't want to put anybody in kind of wrong understanding, or

13  lie to someone.

14  Q.   The next story, you said, was about a young woman in a

15  car, yelling at the woman, and that a Pepsi bottle was thrown

16  and hit her.  Did I get that right?

17  A.   Yes.

18  Q.   Who was that person?

19  A.   [Redacted].

20  Q.   Okay.  And how old was this person?

21  A.   [Redac]?  She is -- I believe she is --

22       INTERPRETER:  About 50.

23       THE WITNESS:  Yeah, about 50.

24  Q.   (BY MS. EGELER)  About 15?

25  A.   No.  50.

1    Q.    50, okay.  Five zero.

2          Was she alone when this happened?

3    A.    Actually, at that time, yes.  She was alone.

4    Q.    Okay.  Do your notes say that she was alone?

5    A.    Yes.

6    Q.    Okay.  And what date did that occur?

7    A.    Well, again, it was last October 2009, on the

8    intersection of Monroe and Second Avenue.  But we don't know

9    the exact date.

10   Q.    Okay.  Was she holding a Referendum 71 sign?

11   A.    Yes.

12   Q.    Do you know how long she had been there?

13   A.    I don't know, for sure, for how long she stayed.  But,

14   usually, these people, they come there after work, and stay

15   there for, like, a couple hours, and then, go home.

16   Q.    Okay.  And do you know if she was with anyone else --

17   excuse me.  I already asked that.  You said that she was

18   alone.

19          Then the next story was about six young people in front

20   of the church, with signs.  And who were those six young

21   people?

22          MR. PIDGEON:  Objection.

23          THE WITNESS:  Young people from our church, and I know

24   those families, and I know their parents.  You know.

25   Q.    (BY MS. EGELER)  I understand, but you are offering them

1  as evidence of what happened, and, so, I am wondering who

2  these individuals are.

3      MR. PIDGEON:  I am going to object to the question.

4  Q.  (BY MS. EGELER)  Let's start differently.  I am going to

5  ask you; do you know how old these young people were?

6  A.  I can tell you.  Yeah.  This group of people were in the

7  age of, like, 16, 17, 18 years old people.

8  Q.  And are you certain that all six of them were under the

9  age of 18?

10  A.  I think most of them, or all of them are under 18.

11  Q.  Do you know which?  Is it most, or is it all?

12  A.  Well, it's kind of -- I don't know.  That's impossible to

13  answer this question.  I would have to call them and ask for

14  their date of birth, you know, and you are just confusing me.

15  How can I answer this?

16  Q.  If you don't know, that's okay.  That's a perfectly fair

17  answer.  I know it's a big church.  And if "I don't know" is

18  the answer, and if that's the truthful answer, then that's

19  the right answer.

20  A.  Yeah.

21  Q.  So, is the answer that you are not sure; that they were

22  somewhere between 16 and 18?

23  A.  Yeah.  They are this age.  Right.

24  Q.  Okay.  Okay.  And when did this event happen?

25  A.  The same time.  October of last year.

1  Q.  But, again, you don't know what day?

2  A.  No.  You see, we had no intention to document it, so we

3  just --

4  Q.  And do you know how many other people they were with?

5  A.  At that time, at that corner, there were six people.

6  Q.  Just six people.  Okay.

7  A.  Right.

8  Q.  And they were holding up Referendum 71 signs?

9  A.  Yes.

10  Q.  How long were they there, doing that?

11  A.  Well, I didn't ask them this question.  Usually, people

12  stay for, like, one, two or three hours at most.

13  Q.  But, again, you are not sure?

14  A.  No.  I would assume, just, maybe, a couple of hours.  But

15  not, like, 10 minutes.  People come there, like, to dedicate

16  that evening, you know.

17  Q.  Okay.  And then you talked about ▓Redacted▓ saying, "We

18  wish you all have gay children"?

19  A.  Yes.

20  Q.  Where was this said?

21  A.  That was said to this group of people on the intersection

22  right at the church.  On the corner of the church.

23  Q.  And was that said to adults?

24  A.  Pardon me?

25  Q.  Was that said to a group of adults?

1   A.   No.  He said it to these young people.

2   Q.   To these six young people?

3   A.   Yes.

4   Q.   And is that the same ███████ who is a former Spokane

5   City Councilman?

6   A.   I think so.

7   Q.   And did the children say that they are certain that those

8   are the exact words that were said, one full year ago?

9   A.   Yes.

10  Q.   Have you, as a father of nine, ever experienced children

11  not quite remembering things right; particularly, a year

12  later?

13  A.   Well, how many kids do you have, Anne?

14  Q.   I have two, and while they don't they are lying -- I am

15  not saying they are lying -- sometimes their memories, a year

16  later, just like my own, aren't quite perfect.

17       Have you ever experienced that with kids?

18  A.   Let's do some mathematics.  If you have two kids, you

19  have two chances of lying.  Right?  Minus two chances that

20  one of them would lie.  If you have four kids, then you have

21  less chances that all four will lie.  If you 10 kids, you

22  have 10 percent less chances that they would lie.

23  Q.   Also, just to stop you there, I am not saying that they

24  are lying.  I am saying that it can be difficult to remember

25  exactly what was said, a full year later.  Would you agree

1  with that?

2       MR. PIDGEON:  Objection.  Calls for speculation.

3       Go ahead and answer.

4       THE WITNESS:  Okay.  I would say, not in this particular

5  kids, because the thing that was said to these young people,

6  most of them girls, women to get married and have children,

7  if somebody wished them to have children gay, I don't think

8  they will forget about it.  They will never forget about

9  this.

10 Q.  (BY MS. EGELER)  Did you speak to all six of the young

11 children?

12 A.  Yes.  They come to me, all of them, last night.

13 Q.  How many were girls and how many boys?

14 A.  I believe, four girls and two boys.  Yes.  There is

15 another paper, I had their names, but today, I didn't take

16 their names with me, because I discussed with their parents,

17 and they are not comfortable to giving out in public their

18 names.  They are just kids.

19 Q.  Okay.  And then, the next one you talked about, three

20 men, with signs, near a Taco Bell.  Do you remember that?

21 A.  Yes.

22 Q.  Who were those three men?

23 A.  Young men from our church.

24 Q.  And are they over the age of 18?

25 A.  I -- to be honest, I don't know, exactly, their date of

1   birth, but they are in the age of, like, 17, 18 years old.

2   Q.   Okay.  And who are they?

3   A.   What do you mean, who are they?

4   Q.   What are their names?

5        MR. PIDGEON:  Objection.

6        THE WITNESS:  I am not going to tell names.  Actually, I

7   don't have their names here.  I knew that somebody might ask

8   me this question, so I didn't take their names with me.  That

9   I was lying or saying the truth.  I don't know their names.

10  I have it somewhere else, but not with me.  And these notes,

11  I don't have their names, because I promised not to reveal

12  their names.

13  Q.   And you don't know their names?

14  A.   Actually, it's in my papers somewhere, and I spoke with

15  them last night.  They are particular kind of live people.  I

16  know them, and I know their families and their parents.  So

17  it's not, like, people from the moon, you know.

18  Q.   So these are three young men that you personally know?

19  A.   Yes.

20  Q.   So you know what their names are.  Right?

21  A.   Yeah.  Actually, yeah.  We do know.

22  Q.   But you are unwilling to disclose that?

23  A.   I just promised them that I would not.

24  Q.   Okay.  And if you were asked to disclose that on the

25  witness stand in federal court, would you disclose the names?

1  A.   No.

2  Q.   Okay.  And do you recall what date they had -- these

3  three men were near the Taco Bell with their signs?

4  A.   No.  We don't have exact date.

5  Q.   Do you know how long they were near the Taco Bell with

6  these signs?

7  A.   Again, they all standing for about two hours.

8  Q.   They told you that; that they were there for two hours?

9  A.   They didn't tell me, exactly, they said, exactly for two

10  hours, but that's the approximate number.

11  Q.   Okay.  Do you know who else they were with?

12  A.   At that corner, at that time, there were only two-three

13  men.

14  Q.   And what time of day was that?

15  A.   It was after work time.

16  Q.   Okay.  And you said that there was another incident where

17  there was a man who tried to hit someone with his car?

18  A.   Yes.

19  Q.   When they were holding a sign?

20  A.   Yup.

21  Q.   And who was that, that was holding the sign?

22  A.   Well, for young men, we kind of have an agreement not to

23  reveal their names, because they are kids.

24  Q.   And, again, if you were in federal court, you would

25  refuse to testify to their names?

1  A.   Yeah.  I wouldn't tell them.  If I promised them, then,

2  you better shoot me.

3  Q.   Okay.  All of the names that you have told me you don't

4  feel comfortable saying, is that true for all of them; that

5  none of those people would you be willing to reveal while

6  testifying in federal court?

7  A.   I just discussed it with their parents.

8  Q.   Let me be more specific.  We have the girl who had a

9  Pepsi bottle thrown at her, and -- excuse me -- that's the

10  woman aged 50, and you gave that name.  So we have the six

11  young people, and if in you were in Federal Court, you would

12  not testify to their names?

13  A.   No.

14  Q.   Okay.  And the three young men, you would not testify to

15  their names?

16  A.   No.

17  Q.   Okay.  There was an incident where there was a bumper

18  sticker on a car?

19  A.   Yup.

20  Q.   And a rock was thrown in the window of the car.  Can you

21  tell me the name of the individuals that were involved with

22  that?

23  A.   Yes, I can.  His name is Redacted            .

24  Q.   What did the bumper sticker say?

25  A.   It's a standard R-71 bumper sticker.

1  Q.  And when did that occur?

2  A.  In October of last year, 2009.

3  Q.  Did you see the broken car window?

4  A.  No, I didn't.

5  Q.  And was that reported to the police?

6  A.  No, they didn't.  He was there with his wife.  His wife

7  can witness that.

8  Q.  Okay.  Do you know why they didn't call the police?

9  A.  No.  I don't know why.  I assumed that older people, they

10  have a tendency not to call the police.

11  Q.  Do you know who broke the window?

12  A.  No.  Of course not.

13  Q.  Do they know?

14  A.  No.

15  Q.  Do you know whether it was just a random act of violence?

16  A.  How --

17  Q.  It could have had nothing to do with Referendum 71.

18  Right?

19  A.  Well, it's got a 50/50.  You can be right.  You can be

20  wrong.

21  Q.  Okay.  Let me see.  The incident involving Redacted;

22  do you know how -- do you know whether Redac called the

23  police?

24  A.  No.  They didn't call the police.

25  Q.  Okay.  And how do you know that?

1  A.    Because they told me.

2  Q.    Who told you?

3  A.    Nickolay.

4  Q.    But I thought you just knew from the letter?

5        MR. PIDGEON:  Objection.

6  Q.   (BY MS. EGELER)  Is that right?  Is all the information

7  that you have, about what happened to ▮Redac▮, information from

8  the letter?

9  A.    No.

10       MR. PIDGEON:  Objection.  Asked and answered.

11       THE WITNESS:  No.  Actually, I spoke with him before, and

12  I heard about this story last year, so I knew about it.

13  Everybody knows this story very well.

14  Q.   (BY MS. EGELER)  Okay.  Do you know how many people were

15  standing with ▮Redac▮ with when this happened?

16  A.    No.  I wasn't there.  I don't know how many people.

17  There was a group of people.  We can ask ▮Redacted▮ and he can

18  tell us, exactly, the number.  I don't know.

19  Q.    Do you know for certain that there were other people with

20  him?

21  A.    Yes.  That's what he told me.  There was a group of

22  people.

23  Q.    And do you know how long he had been standing out with

24  the sign?

25  A.    I don't know that.

1  Q.   Do you know where they were, physically?  What

2  intersection?

3  A.   Yes.  It's intersection of Division and North River

4  Drive.

5  Q.   Do you know if the woman who did this could have been

6  mentally ill?

7  A.   I am sure she is, to some extent, but I don't know her.

8  How can I tell that?

9  Q.   Do you know if that's an area where homeless people are

10 often found?

11 A.   No.  I don't think so.  No.

12 Q.   You have never seen anyone homeless, wandering that area?

13 A.   No.  Homeless people usually wander in the downtown area.

14 Q.   Okay.

15 A.   And it's kind of a little farther away from downtown.

16 Q.   Okay.  And you talked about a woman named Redacted who was

17 carrying a sign, and threats were made to her?

18 A.   Yes.

19 Q.   Do you know exactly what was said to her?

20 A.   Okay.  Yeah.  They just -- as she said.  It's from her

21 words, because I wasn't there.  They used bad words, like,

22 dirty words.  Cursing.  And laughed at her, and then showed

23 her fingers.  And then they came back and they said that you

24 have to leave before someone get hurts.

25 Q.   Do you know if she got the license plate from the car?

1  A.   No, she didn't.

2  Q.   Okay.  And that's in your notes, so you know it because

3  it's in your notes?

4  A.   I have her statement in front of me.

5  Q.   And -- but in her statement, it talks about not getting

6  the license plate?

7  A.   No.  It doesn't say that.

8  Q.   Okay.  So, how do you know that --

9  A.   From her words.

10 Q.   Excuse me?

11 A.   From her words.

12 Q.   Okay.  And do you know who she was with?

13 A.   She was with her kids.

14 Q.   Okay.  When you talked about a woman being with her kids,

15 being harassed, earlier, is this the same woman with her

16 kids?

17 A.   Yes.

18 Q.   Okay.  You also talked about the [Redacted]

19 [Redacted]

20 A.   Wait a second.  I don't know exactly who you mean.  Today

21 we spoke about two women with kids.  [Redacted] and

22 [Redacted].  Who are you referring to, this question?

23 Q.   Let's go through this [Redacted], because that shows up

24 later in my notes.  When she had these words spoken at her,

25 do you know what day that occurred?

1    A.    No.  We don't know exact date.  But it was back in

2    October of 2009.

3    Q.    And do you know how long she had been holding the sign

4    publicly?

5    A.    I don't know the exact time, but she was there for

6    just -- not for very long, because she was with small kids.

7    I would assume, maybe an hour or so.

8    Q.    So all of the events that you have talked about involved

9    people that were either holding a Referendum 71 petition in

10   public, or were holding a sign in public.  Do you know of

11   anyone who didn't have any public involvement with

12   Referendum 71, who was harassed or threatened?

13   A.    I am sorry.  Can you clarify the question?  People who

14   were not offended, or who were?  I didn't get this.

15   Q.    All of the people that we have been talking about, that

16   you heard their story --

17   A.    Okay.

18   Q.     -- and took notes about, my understanding is that they

19   were in a public place --

20   A.    Right.

21   Q.     -- and they had something that identified them as

22   supporting Referendum 71?

23   A.    Absolutely.  Correct.

24   Q.    Either a sign or a poster -- I mean, excuse me -- a sign

25   or a petition or a bumper sticker, right?

1   A.   Correct.

2   Q.   Have you heard about anyone being threatened or harassed

3   who wasn't publicly displaying a connection to Referendum 71?

4   A.   Oh, I got this.  Well, I have heard a story that there

5   was a young Russian man was beaten in downtown, a few months

6   ago, but it doesn't have a connection to this.

7   Q.   Okay.

8   A.   So there was just a bunch of young men.  As soon as they

9   heard he was Russian, actually, just jumped on him and beat

10  him up severely.

11  Q.   But that doesn't have anything do about Referendum 71?

12  A.   Yeah.  Because he had no sign in his hand.

13  Q.   And it was after the election, right?

14  A.   Right.

15  Q.   You also talked about the ███████████

16  ████, and you said that they got threatening messages on

17  their church phone?

18  A.   Yes.

19  Q.   How many messages did they get?

20  A.   Actually, they said they did get several messages.

21  Q.   How many is "several"?

22  A.   I can't tell you the exact number, so you can request a

23  police report and have exact information.

24  Q.   Do you know what was said on those messages?

25  A.   Well, I didn't hear them myself, so I don't want to make

1    up the story.

2    Q.    Do you know what date they were left?

3    A.    Does it talk about a date here?  I am sure it's all in

4    the police report.  And if you call ~~Redacted~~ , he

5    can tell you exact dates and everything.  I probably -- no.

6    It doesn't say here, the date.  I am sorry.  I can't tell

7    you.

8    Q.    And the same -- would you have the same answers with

9    respect to the school phone, and messages left on the school

10   phone?

11   A.    Yes.

12   Q.    You don't know when those were left?

13   A.    No.  Because it was at the same time.  Same man was

14   leaving same messages to church phone and church school

15   phone.

16   Q.    How do you know it was the same man?

17   A.    That's what they told me.

18   Q.    How do they know it was the same man?

19        MR. PIDGEON:  Objection.  Calls for speculation.

20        THE WITNESS:  Ask them, how can -- just the voice tone

21   and the message, the text of what they said, I believe it's

22   very easy.  So I can recognize your questions and say it was

23   asked by the same woman.  Right?

24   Q.    (BY MS. EGELER)  So did they tell you they knew it was

25   the same man because his voice sounded the same?

1  A.    Yeah.  They said it was the same man.  Same voice, same

2  text, same wording.

3  Q.    Okay.  And did they tell you what the school phone

4  messages said?

5  A.    It was the same as the church messages.

6  Q.    So you don't know what, exactly, what was said on the

7  school phone messages?

8  A.    No.  I didn't hear those.  I guess I am getting tired.

9  Just my tongue is -- I was speaking all day long, and I got

10  tired.

11     MS. EGELER:  I understand.  And I don't have any more

12  questions right now.

13     THE WITNESS:  Again, Anne, once again, I apologize for

14  my -- if I was rude to you, but I explained myself.  I

15  believe you understand me why.

16     MS. EGELER:  You did.  And I accept your apology.  Thank

17  you.

18     THE WITNESS:  And I accepted your apology, also.  Thank

19  you.

20                          EXAMINATION

21  BY MR. PIDGEON:

22  Q.    I have just a couple follow-ups.

23        Now, the church has a website?

24  A.    Yes.

25  Q.    And your name appears on that website?

1   A.   Yes.

2   Q.   And does <span style="background-color:black;color:white">Redacted</span> name appear?

3   A.   Yes.

4   Q.   Is your name in the phone book; do you know?

5   A.   A good question.  I guess so.  But, actually --

6   Q.   Let me ask you this --

7   A.   All people know my phone number because they call with me

8   all of their needs.  Anything they need, they call me.  Just

9   like a community center.

10  Q.   Do you have an unlisted phone number?  Home phone number?

11  A.   As a matter of fact, right now, I don't have a home

12  number.  We disconnected because we have cell phones, and

13  there is no need to pay for a home phone.  Just save a little

14  money.

15  Q.   Okay.  Now, when you signed the petition, the R-71

16  petition, did you know that the Secretary of State was

17  planning on disclosing the names and addresses of every

18  signer?

19  A.   No.

20      MR. DIXSON:  Object to the form of the question.

21  Q.   (BY MR. PIDGEON)  I am asking if you knew that.  Did you

22  know that?

23  A.   No.  If we would know, we wouldn't sign, because that

24  puts danger in all people.  By reading those blogs on the

25  Internet, I already know what will happen if they will do

STOREY & MILLER COURT REPORTERS                          509-455-6931
717 W. Sprague Ave., Suite 1520, Spokane, WA  99201

1    that.

2    Q.    Did you read some of the blogs on the Internet?

3    A.    Yes, I did.

4    Q.    Did you see any threatening language on those blogs?

5    A.    Yes, I did.

6    Q.    Did you see any threats of violence on those blogs?

7    A.    Yeah.  I can't kind of recall exact wording, but, yes.

8    It looks like some young men, they were kind of aggressive

9    towards Russian community, saying, oh, they think they are

10   tough.  They come here.  Russians are tough.  They think they

11   are going to be tough here in America, and they are voting

12   here, and something like, let's show them -- something

13   like -- they are not -- I don't remember.  Something like

14   calling people to kind of stand against these people, and

15   kind of throw them away from the country, or, you know, call

16   them to some kind of violence.

17        I was reading it and I was shocked and said, whoa.  It

18   was kind of shocking to me.

19   Q.    Did you experience any anti-immigration bias, or

20   anti-Russian bias, when you came here in the Nineties?

21   A.    Right in the beginning of when we come?

22   Q.    Uh-huh.

23   A.    Well, I didn't understand the language.  Maybe somebody

24   said something bad.  It's the same to me.  I just was saying

25   yes, yes, yes.  Thank you.  Thank you.  (Laughter.)

1  Q.   After the fellow walked into the church and threatened to

2  machine gun the whole church --

3  A.   Okay.

4  Q.   -- did you experience any anti-Russian bias after that?

5  A.   What "bias" is?

6  Q.   Did you have anybody say, you know, Russian go home, or

7  any of this?

8  A.   Yes.  Actually, I have heard that a lot.  And kids at

9  school, even my son ▇Redac▇, who was born here in Spokane, and

10 he experienced that at school, and I went and spoke with his

11 principal and said, why do you tell ▇Redac▇ go back to Russia?

12 He was born in Spokane.  And he come home crying, saying,

13 "Hey, father, this is my motherland.  Why should I go to some

14 damn Russia I have never seen?"

15      I said, "Wait a second.  I will talk to your principal."

16      Yeah.  People will hear that a lot.

17 Q.   Has any of this incidence of anti-Russian sentiment

18 increased since the R-71 campaign?

19 A.   Um, an interesting question.  I never paid kind of

20 attention to that.  But, yeah.  I have heard this, after the

21 election, yeah, how many people are reporting that, yes.

22 Q.   You mentioned this incident of a young Russian fellow

23 being beaten up downtown?

24 A.   Uh-huh.

25 Q.   When did that happen?

1  A.    I believe it was last winter.

2  Q.    Last winter.  And do you know how many guys beat this guy

3  up?

4  A.    No.  We don't know exact number.  Because he said he had

5  no time to count them.  They beat him up, and they put him in

6  the ground and just kick him and crushed his teeth.  He come

7  home without teeth.

8  Q.    Did they give him any reason why he was being beaten up?

9  A.    No.

10  Q.    Did they ever catch the people that did it?

11  A.    No.

12      MR. PIDGEON:  All right.  I have nothing further.

13                        EXAMINATION

14  BY MR. DIXSON:

15  Q.    I just have a couple of follow-ups.  Let me finish

16  writing.

17      With regard to the blogs that you saw, were the nasty

18  things written about Christians, or were they written about

19  the Slavic people, in particular?

20  A.    Well, they were different blogs.

21  Q.    Okay.

22  A.    And some of them were particularly talking about

23  Christians, and, in particular, those people who participated

24  in the petition thing, you know.  But I believe one blog I

25  was reading, that was talking entirely about Russians, and it

1  said, oh, they are tough people.  They are tough fighters.

2  They always fight back, blah, blah, blah.  But, let's show

3  them, kind of, we are stronger than them.  Let's put them

4  down.  Like, in general.  Not about Christians.

5       But most of those opinions of people -- because that was

6  a blog -- I don't remember the site, but I went there to see

7  people's opinion about R-71, because there are a few sites

8  about this, people were talking about it.  I don't remember

9  which of them, but it was just sitting there, reading what

10 people say about this.  Like, Seattle area, and other areas,

11 and Spokane area.

12      And, actually, I believe it was the Seattle area was

13 more, kind of, aggressive.  Spokane is not bad because, so

14 far, we have a good reputation in Spokane.  We have --

15 what -- I don't know how many -- 25,000-29,000 Russian people

16 in Spokane.  So far, we have good reputation.  Of course,

17 there are some bad kids.  But it's not nothing serious.  Most

18 of us are good families.  Hard working people.

19 Q.   You remember several different blogs, some more negative

20 toward Christians, and one, in particular, that was negative

21 toward Russians?

22 A.   Right.

23 Q.   Did the Russian one mention Referendum 71, or was it just

24 anti-Russian, in general?

25 A.   I believe he didn't mention R-71, but it was under the

1    discussion of this topic, you know.

2    Q.    Do you remember; was it a blog post or a comment?  Do you

3    understand the difference?  A main post, and then, people can

4    post comments?

5    A.    Right.  People's comments.

6    Q.    Do you remember if that was the post itself, or the

7    comments?

8    A.    Comments.

9          MR. DIXSON:  That's all that I had.

10         MS. EGELER:  I have nothing further.

11         MR. PIDGEON:  I am finished, as well.

12         THE WITNESS:  Can I make a conclusion?

13         MR. DIXSON:  We can go off the record.

14         MS. EGELER:  Are we going off the record?

15                       EXAMINATION

16   BY MR. PIDGEON:

17   Q.    Let me ask you this.  I have one last question.

18         Would you like to say some concluding remarks, Pastor

19   ▮Redac▮?

20         MS. EGELER:  I am going to object to that.  This is a

21   deposition, and if you would like to make a statement

22   afterwards to us, that would be fine, but it's not

23   appropriate for the record.

24   Q.    (BY MR. PIDGEON)  You can answer the question.

25   A.    Actually, I want to appreciate all of you for this

1    opportunity today to meet with you wonderful people, and

2    actually speaking with Anne.  Seriously.  Because I have a

3    chance, at least, to express myself, at least, in your sight.

4    And I thought it was going to be much worse.  I thought it

5    was another KGB, but now I think we are all good people.

6    So -- and I have a good feeling, and I had a chance to kind

7    of explain myself.

8        And as a conclusion, again, I want the judge to hear

9    that, that Slavic people -- I can speak about myself, my

10   family, my friends and people who I know.  I can't speak for

11   everybody.  But people I know, and I know most of the people.

12   They are good people.  They come here as religious refugees

13   seeking for freedom.  They are hard working people.  Family

14   oriented.  And we are happy to be here.  Most of us are

15   citizens.  And, so, we have good, positive kind of influence

16   in the community, and we would like to have a good life here.

17       And one thing that I would like to say to judge, and to

18   all of you -- especially, this difficult economical

19   situation -- and I just even put here, we should stop

20   igniting hatred and hostility in our community, as we love

21   all of our people, and the Constitution protects all people.

22   And I just ask judge to not release personal information of

23   petition signers, as it will bring chaos, pain and violence

24   in our community.  But in this, our complicated time, we just

25   have to bring people together, keep them in peace, and work

State Objects: Lack of foundation and the witness's testimony is irrelevant.

1    for better future.

2         So I just want to call all people to peace, and not to

3    ignite this, you know, fights and -- because what I heard

4    here about this suit going on, I was confused.  You know.

5    Why people do that?  So I believe in good community and good

6    country.  And we had bad life in Soviet Union.  We come here

7    and would like to have good life.  And if we are bothering

8    you with our belief system or whatever, just tell us, shut

9    up, and we won't talk about this, then.  Because it does --

10   those days, we thought it's normal, it's okay, we don't do

11   anything wrong, and it's Biblical.

12        And I am reporting, we don't have any hatred towards gays

13   or any other group of people.  We have tolerance, and we love

14   all people, and we are willing to live all together.  So we

15   don't have any problem with that.

16        And me, personally, as well, professionally, and as a

17   pastor, I have lots of Americans come to our church, and

18   counsel them, and lots of homeless people.  I know what real

19   life is.  So I respect all people, and I do my best to serve

20   them.

21        And I ask and you, sir, good citizen, let's not make any

22   threats and pressures, and, you know, we want to have a good

23   life with our families here.  So I love all of you, and we

24   pray for you, and we pray for the country.  We pray for our

25   government.  We pray for local government.  We try to do our

1  very best.  If we do something wrong, just correct us, or

2  tell us about it.  We don't know all these details.  And I

3  believe in working together.

4      So, God bless you.

5      MR. DIXSON:  Nothing further, I don't think.  We will

6  probably do some spelling, here.  You are welcome to stick

7  around for that.

8      (Signature not waived.)

9      (Off the record at 5:02 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CORRECTION SHEET

2      PAGE         LINE                        CORRECTION

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19        I have read the foregoing 167 pages of my testimony and
    I declare (or certify) under penalty of perjury under the

20  laws of the State of Washington that the foregoing is true
    and correct, except for the corrections noted above.

21

        Dated at_____,_____this

22

    _____day of_____, 2010.

23

                        _____

24                        Redacted

25

1    STATE OF WASHINGTON
                              ss:   Reporter's Certificate
2    COUNTY OF SPOKANE

3         I, Osmund D. Miller, a Certified Shorthand Reporter and

4    Notary Public in and for the State of Washington,

5         DO HEREBY CERTIFY:

6         That the foregoing is a true and correct transcription

7    of my shorthand notes as taken upon the deposition of

8    ▉Redacted▉          on the date and at the time and place as

9    shown on Page 1 hereto,

10        That the witness was sworn upon his oath to tell the

11   truth, the whole truth and nothing but the truth, and did

12   thereafter make answers as appear herein,

13        That I am not related to any of the parties to this

14   litigation and have no interest in the outcome of said

15   litigation,

16        Witness my hand and seal this 29th day of October, 2010.

17

18

19

20                             RPR, CCR No. 2280
                   OSMUND D. MILLER
21                 Certified Shorthand Reporter and Notary
                   Public in and for the State of Washington,
22                 residing in Spokane.  My commission expires
                   December 15, 2012.
23

24

25

1                          EXAMINATIONS                    Page

2      EXAMINATION BY MR. DIXSON:                            3

3      EXAMINATION BY MS. EGELER:                          129

4      EXAMINATION BY MR. PIDGEON:                         158

5      EXAMINATION BY MR. DIXSON:                          162

6      EXAMINATION BY MR. PIDGEON:                         164

7                            EXHIBITS

8
       Description                                         Page
9
       (Ex. No. 1, marked.)                                 71
10
11     (Ex. No. 2, marked.)                                100

12
       (Ex. No. 3, marked.)                                113
13
14     (Ex. Nos. 4 and 5, marked.)                         126

15

16

17

18

19

20

21

22

23

24

25

# Exhibit One













# Exhibit Two


Redacted

# Exhibit Three

Redacted



Redacted

--- "The great thing in the world is not so much where we stand as in what direction we are moving." ---

Redacted

Exhibit Four

Redacted

Redacted

# Exhibit Five

10-6-10

Redacted

Redacted