1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,

                            Plaintiffs,

       v.

SAM REED, in his official capacity as
Secretary of State of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer for the
Secretary of State of Washington,

                        Defendants.

NO. 09-cv-05465-BHS

DESIGNATED DEPOSITION
TESTIMONY OF PASTOR
Redacted

19
20
21
22
23

      Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

Washington Families Standing Together and the Washington Coalition for Open Government

and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

"Parties") hereby submit combined designated deposition testimony for PASTOR Redacted

Redact.

24
25

      Defendants and Intervenors object to the admission of any deposition testimony taken

of any witnesses who could be called to testify at trial.   Therefore, the designations of

26

DESIGNATED DEPOSITION
TESTIMONY OF PASTOR Redacted
Reda
- No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

1   Defendants and Intervenors are being submitted in the event that the Court decides to admit

2   deposition testimony.

3          For the Court's convenience Defendants' designations have been highlighted in blue,

4   Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5   been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6   filing the redacted versions of these documents.

7          DATED this 6th day of September, 2011.

8   ROBERT M. MCKENNA
    Attorney General
9

10   s/ William Clark
    WILLIAM CLARK, WSBA #9234
11   Senior Counsel
    800 Fifth Ave, Ste 2000
12   Seattle, WA 98104
    206-464-7352
13   BillC2@atg.wa.gov
    ANNE EGELER, WSBA #20258
14   Deputy Solicitor General
    PO Box 40100
15   Olympia, WA  98504-0100
    360-664-3027
16   Annee1@atg.wa.gov

17

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION                    2          ATTORNEY GENERAL OF WASHINGTON
TESTIMONY OF PASTOR Redacted                              Complex Litigation Section
Reda                                                     800 Fifth Avenue, Suite 2000
- No. 09-cv-05465-BHS                                    Seattle, WA  98104-3188
                                                         (206) 464-7352

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON, ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | No. 09-CV-05456-BHS |
| SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, ) ) ) ) ) ) | |
| Defendants. ) | |

---

Deposition Upon Oral Examination
Of
PASTOR █████Redacted█████

---

Taken by:  Tracey L. Juran, CCR
           CCR No. 2699


September 24, 2010

Everett, Washington

```
 1                          APPEARANCES

 2


 3


 4   For Protect Marriage Washington:

 5        Stephen Pidgeon, Attorney at Law
          3002 Colby Avenue, Suite 306
 6        Everett, Washington  98201-4081

 7


 8
     For the Defendants:
 9
          Anne E. Egeler, Deputy Solicitor General
10        Attorney General of Washington
          1125 Washington Street SE
11        P.O. Box 40100
          Olympia, Washington  98504-0100
12

13

14   For Washington Families Standing Together:

15        Ben Stafford, Attorney at Law
          Perkins Coie
16        1201 Third Avenue, Suite 4800
          Seattle, Washington  98101-3099
17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2

 3

 4                                                   Page No.

 5    EXAMINATION

 6         By Ms. Egeler                                5
           By Mr. Stafford                            29
 7         By Mr. Pidgeon                             39
           By Ms. Egeler                              50
 8         By Mr. Stafford                            60
           By Mr. Pidgeon                             63
 9         By Ms. Egeler                              67

10

11

12    EXHIBITS MARKED

13         No. 1 (1-page double-sided printout         6
                from the Washington Secretary of
14              State's Web site  Redacted
           ██████████████████████████████
    ██          █████████ )
16         No. 2 (1-page double-sided printout        12
                from the Protect Marriage
17              Washington Web site  Redacted
           ████████████████████████████
    ██      ████████████████ )
19         No. 3 (1-page printout from the            14
20              Public Disclosure Commission's Web
                site labeled "Advanced Search
21              Detailed Contributions" showing
           ████████████ Redacted ██████████
    ██
23         No. 4 (2-page double-sided Public          14
                Disclosure Commission Cash
24              Receipts Monetary Contributions
                form ████████ Redacted ███████
    ██      ██████████████████
```

Tracey Juran, Certified Court Reporter

Page 4

1                    INDEX, continued

2

3

4                                              Page No.

5   EXHIBITS MARKED, continued

6       No. 5 (1-page printout from the              16
        Public Disclosure Commission's Web
7       site labeled "Advanced Search
        Detailed Contributions" showing
8       ████████████ Redacted ████████████
█       ██████████████████ )

10      No. 6 (1-page Public Disclosure             17
        Commission Cash Receipts Monetary
11      Contributions form ████ Redacted ████
                           ██████ )

12
        No. 7 ████████ Redacted ████████         ██
█       █████████████████████████████████
        █████████████████████████████████
█       ██████████████

15      No. 8 (2-page printout of an Email          19
        exchange between ███ Redacted ███ and
16      Sarah Troupis dated August 19,
        2009)

17

18

19

20

21

22

23

24

25

1          Be it remembered that the deposition upon oral

2     examination of Pastor Redacted was taken on

3     September 24, 2010, at the hour of 8:56 a.m. at 3501

4     Colby Avenue, Suite 200, Everett, Washington, before

5     Tracey L. Juran, CCR, Notary Public in and for the State

6     of Washington residing at Edmonds, Washington.

7          Whereupon the following proceedings were had,

8     to wit:

9                         * * * * *

10   PASTOR Redacted ,          having been first duly sworn on
                                    oath by the Notary Public to tell
11                                  the truth, the whole truth, and
                                    nothing but the truth, was deposed
12                                  and testified as follows:

13

14                        EXAMINATION

15   BY MS. EGELER:

16   Q.   Good morning, Pastor Redac .

17   A.   Morning.

18   Q.   My name is Anne Egeler and I am with the state Attorney

19        General's Office, and I represent Sam Reed and the

20        defendants in the Doe v. Reed case.

21          Before we begin, I wanted to outline a few simple

22        rules for depositions.  We're being transcribed by our

23        court reporter, Tracey, and it's important that we make

24        her life easy, and we can do that by not speaking over

25        each other.  So if we can make sure that the other

```
 1        person finishes what they're saying before the next

 2        person speaks, that will help her to get an accurate

 3        transcript.

 4             Also, when we're talking, it's important to use yes

 5        or no rather than a head shake or an mm-hm sound,

 6        because those things don't show up on our transcript

 7        either, okay?

 8   A.   Okay.

 9   Q.   And then finally, it's important that we understand each

10        other, of course.  So if at any point what I'm saying

11        isn't making sense to you or is confusing for any

12        reason, please stop me and ask me to clarify.  All

13        right?

14   A.   Very good.

15   Q.   Pastor, can you tell me what your current employment is.

16   A.   I serve as pastor for ████████████ Redacted ████████████

17   ██   ████████████████████.

18             MS. EGELER:  Okay, and I have an exhibit here which

19        our court reporter will mark as Exhibit 1 to the

20        deposition.

21                  [Off the record - discussion]

22             [Exhibit 1 marked for identification]

23             MS. EGELER:  I believe while we were off the

24        record, Mr. Pidgeon noted that he has no objection.

25   Q.   (by Ms. Egeler)  Do you have a copy of Exhibit No. 1 in
```

1        front of you?

2   A.   I do.

3   Q.   This is a page -- according to the bottom of this sheet,

4        printed page from the Secretary of State's Web site and

5        it has information regarding ████████ Redacted ████████

6        ██  ███████.  Is the church, to your knowledge, Pastor, a

         registered nonprofit with the State of Washington?

8   A.   It is.

9   Q.   And can you look at this registration information and

10       see if that agrees with your understanding.

11  A.   That is what I understand.

12  Q.   And, in fact, would you have been the person who filed

13       this information with the Secretary of State?

14  A.   Most likely.  It has been done by a secretary at times,

15       but I believe that generally I file.

16  Q.   And this lists, does it not, that you are the registered

17       agent for the church?

18  A.   It does.

19  Q.   And the address contained there under your name, is that

20       your residential address?

21  A.   We share an address with the church.  So both the

22       residential address and the church address are

23       identical.

24  Q.   And that is the address reflected on Exhibit No. 1?

25  A.   That's correct.

1    Q.    And how long have you been the pastor of ███ Redacted ███
      ███        ████████?

3    A.    Eighteen and a half years.

4    Q.    Do you have any other employment?

5    A.    I do not.

6    Q.    Are you aware that you've been named as a witness to the

7          Doe v. Reed case?

8    A.    Yes, I am.

9    Q.    And, in fact, you're one of the Doe plaintiffs; correct?

10   A.    Correct.

11   Q.    Do you know what Doe number you are?

12   A.    I do not.

13   Q.    Has anybody informed you that being a witness in the

14         case may require you to publicly testify in federal

15         court?

16   A.    Yes.

17   Q.    And would you have any problems with that?

18   A.    No.

19   Q.    At any time, did you express to anyone that your name

20         needed to be kept a secret?

21   A.    I did not.

22   Q.    And does your involvement with Referendum 71 need to be

23         kept a secret for any reason?

24   A.    No, not that I'm thinking of.

25   Q.    When did you first become aware of Referendum 71?

```
 1   A.   I was aware of its filing right from the beginning.

 2   Q.   Were you aware before then of the Senate bill that was

 3        the precursor -- excuse me; to the legislative bill that

 4        was the precursor to Referendum 71?

 5   A.   I was.

 6   Q.   And did you go to Olympia to testify with respect to

 7        that bill?

 8   A.   I did not.

 9   Q.   Did you meet with anyone about Referendum 71 before the

10        referendum was filed with the Secretary of State?

11   A.   No, not to my recollection.

12   Q.   So you first became aware of it after it was filed?

13   A.   Yes.

14   Q.   And who told you about it?

15   A.   I'm just guessing that my contact would have been with

16        [Redacted].

17   Q.   And he attends your church; is that --

18   A.   That's --

19   Q.   -- correct?

20   A.   -- correct.

21   Q.   Did he attend in 2009 as well?

22   A.   Yes.

23   Q.   Did you sign the Referendum 71 petition?

24   A.   I did.

25   Q.   Do you remember where you were when you signed the
```

Page 10

1      petition?

2   A.   It was likely at our church.

3   Q.   Were Referendum 71 petitions put in public locations at

4        the church for people to sign?

5   A.   Yes.

6   Q.   And when people did sign, were their names hidden from

7        other people that wanted to read the petition or sign

8        it?

9   A.   They were not.

10  Q.   Did you speak about Referendum 71 to your parishioners?

11  A.   Yes.

12  Q.   Did you speak to them during church services about

13       Referendum 71?

14  A.   Yes.

15  Q.   What did you say?

16  A.   I directly encouraged people to sign the petition

17       because of this issue dealing with a direct moral issue

18       that we feel we must be a voice for.

19  Q.   And before Referendum 71, had you been speaking publicly

20       or at church about homosexuality in any way?

21  A.   Yes.

22  Q.   Well, can you tell me in what respects other than the

23       domestic-partnership issue and Referendum 71 you

24       addressed publicly.

25  A.   Is that relevant to the R-71 specifically?

```
 1              MR. PIDGEON:  I'll make the objection on the basis
 2        of relevance.
 3                   But go ahead and answer the question.
 4   A.   Could you restate the question.
 5              MS. EGELER:  Okay, can you read the question back,
 6        please.
 7                   [Record read back as requested]
 8   Q.   (by Ms. Egeler)  And by that I mean in what respects did
 9        you address homosexuality publicly or publicly at
10        church?
11   A.   We have been concerned about the advance of the
12        homosexual agenda broadly.
13   Q.   And what is the homosexual agenda?
14   A.   To legitimize homosexual relationships in a legal sense.
15   Q.   So have you been concerned with respect to the issue of
16        homosexuality only with legalizing domestic partnerships
17        between same-sex partners?
18   A.   I've been concerned for homosexual relationships
19        generally as being something that we recognize as being
20        inappropriate according to God's design and the
21        revelation of Scripture.
22   Q.   So to make sure I'm understanding, you've spoken
23        publicly against homosexual relations or activity even
24        outside a legally recognized partnership.
25   A.   That's correct.
```

```
 1   Q.   And how long have you taken that stance?

 2   A.   Throughout my public ministry.

 3   Q.   And would -- did you speak with regard to homosexuality

 4        generally to your parishioners?

 5   A.   Yes.

 6   Q.   And did you speak at any other public location with

 7        regard to homosexuality generally?

 8   A.   Not that I'm recalling.

 9   Q.   Did you ever go out and participate in gathering

10        signatures on the Referendum 71 petitions?

11   A.   No.

12   Q.   Did you ever publicly hold up a Referendum 71 sign?

13   A.   No.

14   Q.   Did you have a Referendum 71 sign posted on the church

15        grounds?

16   A.   No.

17   Q.   Did you have a Referendum 71 bumper sticker?

18   A.   No.

19   Q.   Did you publicly endorse Referendum 71?

20   A.   Yes.

21        MS. EGELER:  Okay, mark this as Exhibit No. 2,

22        please.

23             [Exhibit 2 marked for identification]

24   Q.   (by Ms. Egeler)  And --

25        MR. PIDGEON:  No objection to this.
```

1   Q.   (by Ms. Egeler)   You have in front of you, Pastor,

2        what's been marked as Exhibit No. 2 to the deposition.

3        And this, as is reflected at the bottom of the page, is

4        a page from the Protect Marriage Washington Web site,

5        and there's a list of names and businesses here that

6        endorsed Referendum -- the Reject Referendum 71

7        campaign.   And looking down to the third name from the

8        bottom of that list, do you see your name there?

9   A.   Yes.

10  Q.   And that's your church as well with your name?

11  A.   Yes.

12  Q.   Did you authorize Protect Marriage Washington or Larry

13       Stickney to include your name on a list of those

14       endorsing Referendum 71?

15  A.   Yes.

16  Q.   And did you donate money to the Referendum 71 campaign

17       or to Protect Marriage Washington?

18  A.   Yes.

19  Q.   Did you know that in compliance with the law, Larry

20       Stickney was filing the names of all contributors and

21       the amount they had contributed, as well as their

22       address, with the Washington State Public Disclosure

23       Commission?

24  A.   Yes.

25            MS. EGELER:   Okay, mark this as Exhibit 3, please.

Tracey Juran, Certified Court Reporter

1          [Off the record - discussion]

2          [Exhibit 3 marked for identification]

3          MR. PIDGEON:  I have no objection to this exhibit.

4    Q.   (by Ms. Egeler)  So, Pastor, you have in front of you

5          what's been marked as Exhibit 3 to your deposition, and

6          as the Web citation states at the bottom of the page,

7          this is taken from the Washington State Public

8          Disclosure Commission's publicly available Web site.

9          And it states on three lines the names of three

10         contributors with the name -- last name Redac.  Do you

11         see that?

12   A.   I do.

13   Q.   And do you see your own name?

14   A.   Yes.

15   Q.   Do you recognize that date and amount as a contribution

16         you made?

17   A.   I wouldn't have remembered it, but I would believe that

18         to be accurate.

19   Q.   And do you see on the far-left side on that line where

20         your name appears the word "Report"?

21   A.   Yes.

22   Q.   I'm going to pass out what we'll mark as Exhibit 4 to

23         your deposition.

24         [Exhibit 4 marked for identification]

25   Q.   (by Ms. Egeler)  And Exhibit 4 is a two-page document,

1       again, printed from the Public Disclosure Commission's

2       Web site.  It has printing on both sides of each page.

3       And this is the report that's -- that can be viewed if

4       you click the word "Report" as shown on Exhibit 3 to the

5       left of your name.

6            MR. PIDGEON:  Okay, I'm going to object to this

7       exhibit on the basis of relevance.

8   Q.  (by Ms. Egeler)  Pastor, if you could please flip to the

9       back of the exhibit, what would be the fourth page of

10      the form.  Do you see your name on this?

11  A.  Yes.

12           MR. PIDGEON:  Okay, excuse me; objection withdrawn.

13      I didn't see his name; I'm sorry.  I'll admit the

14      exhibit as Exhibit 4.

15           MS. EGELER:  Okay.

16  Q.  (by Ms. Egeler)  And is that your address, the address

17      where you reside, and the address of the church?

18  A.  Correct.

19  Q.  And in addition to making a personal contribution to

20      Protect Marriage Washington, was a contribution made in

21      the church's name?

22  A.  Yes.

23  Q.  And were you responsible for submitting that

24      contribution?

25  A.  No.  The contribution was approved by the church council

Page 16

1          and submitted by the treasurer of the congregation.

2    Q.    And did you approve of this or --

3    A.    Yes, I did.

4          MS. EGELER:  Okay, let's make this Exhibit No. 5 to

5          the deposition.

6          [Exhibit 5 marked for identification]

7    Q.    (by Ms. Egeler)  And you have before you a copy of

8          what's been marked as Exhibit 5 to your deposition and,

9          again, this is taken from the Washington State Public

10         Disclosure Commission's Web site, which is publicly

11         available.  Do you see a contribution from ██Redacted██

           ███████████████████████ listed on the exhibit?

13   A.    Yes.

14   Q.    And what is the amount of that?

15   A.    $█Redacte█.

16   Q.    And does that comport with your knowledge of the amount

17         the church donated?

18   A.    The church made a donation of $█Red█ that was matched by a

19         business on the peninsula for $█Red█.  So, I believe,

20         because of -- those two $█Red█ amounts being put together

21         reflects the $█Redacte█ here.

22   Q.    Did the business provide the $█Red█ to the church and then

23         the church combined the funds and made a donation of

24         █Redacte█?

25   A.    Not to the best of my knowledge.

Page 17

```
 1   Q.   So the church, to your knowledge, donated $Red, not

 2        Redacte.

 3   A.   That is what I understood.

 4   Q.   And we'll mark as Exhibit No. 6 to your deposition.

 5             [Exhibit 6 marked for identification]

 6             MR. PIDGEON:  No objection.

 7   Q.   (by Ms. Egeler)  And still looking for a moment at

 8        Exhibit No. 5, on the line that notes the contribution

 9        from            Redacted           , do you see on the

10        far left the word "Report"?

11   A.   Yes.

12   Q.   Well, I clicked that and Exhibit 6 is the report that

13        comes up to show that contribution.  Again, this is a

14        page printed from the publicly available Web site of the

15        Public Disclosure Commission.  And do you see on

16        Exhibit 6            Redacted           's contribution?

17   A.   Yes.

18   Q.   And again, do you see the address listed?

19   A.   I do.

20   Q.   In addition to the financial contribution that you made

21        to Protect Marriage Washington and speaking from the

22        pulpit to your parishioners about Referendum 71, did you

23        take any other action to publicly endorse or be involved

24        in the Referendum 71 campaign?

25   A.   No.
```

Tracey Juran, Certified Court Reporter

Page 18

1    Q.    Did you go to any meetings about Referendum 71?

2    A.    Not that I recall.

3    Q.    And were you quoted in the media, print or TV or radio,

4          as endorsing Referendum 71?

5    A.    Not that I recall apart from what we've looked at

6          already.

7    Q.    I understand you experienced what you believe to be

8          harassment or threats of reprisals as a result of your

9          support of Referendum 71; is that correct?

10   A.    Yes.

11   Q.    Let's go through and discuss each of those.  It's very

12         important that we cover every such instance.  So I'll

13         let you begin wherever you would like.

14   A.    Okay.  I do have notes from those contacts, so I'd like

15         to refer to those if I can.  The first call received at

16         the church came to my office on July 27th of 2009.

17   Q.    I'd like to stop for -- well, stop and ask you a

18         question first.

19               As part of this deposition, you were asked to bring

20         with you any electronic or paper documents you have that

21         evidence the harassment or threats you've received.  Did

22         you take a look and see if you have anything responsive?

23   A.    Yes, and I brought what I have.

24   Q.    Then I'm going to take a break.  If I could please get a

25         copy of those materials.

Page 19

1   A.   Sure.

2   Q.   Did you bring a copy for me?

3   A.   I did not.

4   Q.   Then I'm going to run over to the copy machine.

5   A.   These are --

6   Q.   I'll let you --

7            MS. EGELER:  Okay, I'll be right back.

8                 [Off the record - discussion]

9            [Exhibits 7 and 8 marked for identification]

10  Q.   (by Ms. Egeler)  Pastor, after that quick break to make

11       some copies, we now have two more exhibits.  Exhibit

12       No. 7 is a ███████████ Redacted ███████████ and it is

13       dated August, no day listed, 2009 and it is a three-

14       page, single-sided exhibit.  And Exhibit No. 8 is a two-

15       page exhibit that states at the -- in the top-left-hand

16       corner "Pastor ███ Redacted ███" and is a series of Emails.

17       Looking at Exhibit -- what -- Exhibit No. 8 to the

18       deposition, is this what you were referring to when you

19       began to speak about harassment that you've experienced?

20  A.   Yes.

21  Q.   And is this all that you were able to find in response

22       to the subpoena duces tecum?

23  A.   Yes.

24  Q.   So there's nothing else that would be responsive?

25  A.   No.

Page 20

1   Q.   So you were just beginning to tell me about the
2        harassment that you feel you experienced.
3   A.   Yes.  And for my own clarity, if I could just read from
4        my Email here.  The first call was received in my office
5        July 27th, 2009, from an individual who identified
6        herself as a transgender woman who had previously been
7        in special forces.  The caller remained calm but
8        persistent in asking why I would want to limit her
9        rights.
10              After some statements back and forth, the caller
11       asked how I would like it if a number of friends were
12       brought to picket the church or to attend a morning
13       service.  I responded that the church is certainly open
14       to all who wish to come, but that we expect all to
15       conduct themselves in a way appropriate to a public
16       worship service.  I was assured that that would be the
17       case.
18   Q.   Let's stop and talk about that first instance.
19              Was this individual harassing or threatening in any
20       way, in your opinion, or did you feel that she was
21       addressing you respectfully and appropriately in
22       disagreeing with your position?
23   A.   I'd respond, as I note in my next paragraph, the caller
24       was reserved in tone; however, the spirit was certainly
25       one of challenge to the appropriateness of my stand.

State Objects: Hearsay.  State also objects to EX. 8.

Tracey Juran, Certified Court Reporter

Page 21

State Objects: Hearsay

1   The caller certainly also communicated that my stand
2   justified some kind of retaliatory action on his or her
3   part, so that I and others who were like-minded will pay
4   some kind of consequence for the expression of our
5   stand.

6   Q.  And you talked earlier in this description of that phone
7       call about this individual coming to your church.  Do
8       you think that that was the retaliation that she was
9       referring to?

10  A.  I understood that that could be part of the retaliation.

11  Q.  Did she state any other form of retaliation?

12  A.  She did not.

13  Q.  Did she threaten you with any physical harm?

14  A.  She did not.

15  Q.  Did she threaten any of your parishioners?

16  A.  She did not.

17  Q.  Did she threaten any sort of vandalism or damage to you
18      or the church's property?

19  A.  She did not express that.  I certainly perceived that as
20      a possibility.

21  Q.  But not because she said that.

22  A.  That's correct.

23  Q.  And did anyone come to your church after this phone
24      call?

25  A.  No one did.

1    Q.   And if they had come, would they have been welcome to

2         attend service?

3    A.   Yes.

4    Q.   Did this individual provide her name?

5    A.   I believe that the name was stated at that time.  I

6         didn't pick up on it.  And I do list a name in

7         conjunction with the second call.

8    Q.   Let's wait before we discuss the --

9    A.   Okay.

10   Q.   -- second call, because I have some more questions for

11        you about the first call.

12   A.   Okay.

13   Q.   At the end of that call, did you call the police?

14   A.   I did not.

15   Q.   Did you note the phone number of the individual who'd

16        called?

17   A.   I evidently did, because I matched that to the second

18        call that was received.

19   Q.   And why did you not contact the police?

20   A.   Evidently didn't think it was appropriate or necessary

21        at that point.

22   Q.   And why did you feel that it was not appropriate or

23        necessary?

24   A.   I'm not sure.

25   Q.   Did you feel that this phone call was sufficiently

1      threatening that you needed police protection?

2   A.  I didn't feel there was a need for immediate protection

3      or that the action would be immediate.

4   Q.  Have you ever had anyone call you and disagree with your

5      stance on anything with regard to your personal views or

6      church views in the time that you've been a pastor?

7   A.  I have had people call disagreeing.

8   Q.  And do you feel that it's appropriate for people to call

9      and disagree with you?

10  A.  The calls that I've received in the past have been

11     people that I was personally familiar with, and I

12     perceived this as being of a different nature, coming

13     from a stranger.

14  Q.  What sorts of things have you had people disagree with

15     you on in the past?

16  A.  I'm not recalling.

17  Q.  Within your church, do you ever have any disagreements

18     amongst people about church decisions?

19  A.  I imagine we do.  I'm not thinking of disagreements

20     right now.

21  Q.  Have you ever -- do you ever recall someone -- within

22     the church about a church decision or anything happening

23     at the church, someone being particularly emotional in

24     expressing their viewpoint to you?

25  A.  Yes.

 1   Q.   Without revealing that individual's name, because

 2        there's no need to, can you tell me about that.

 3   A.   I can recall one instance from several years ago

 4        about -- an individual approached me regarding a

 5        differing opinion regarding children, being fruitful and

 6        allowing God to give us the children that he might

 7        desire to give us.  So birth control.

 8   Q.   And what was this individual's viewpoint on birth

 9        control?

10   A.   Is that relevant to our discussion?

11   Q.   Well, actually, I should probably give you a little

12        background.  During a deposition, I do have liberty to

13        address a variety of topics that I feel may reveal

14        relevant evidence.  So it's quite a broad scope that can

15        be explored during a deposition.

16                  [Off the record - discussion]

17   A.   I go forward?

18   Q.   (by Ms. Egeler)  Yes, please.

19   A.   The individual felt that there should be a more liberal

20        use of birth control, and my position was that it ought

21        to be more limited.

22   Q.   And by limited, do you mean limited to use by adults?

23        How do you mean limited?

24   A.   Even limited within marriage.  That there be a greater

25        openness to allow pregnancy and receive the children

1    that God might have us to have.

2  Q.  And what was this individual's position?

3  A.  That a person ought to have -- that family size should

4    be limited.

5  Q.  And was this individual emotional about his position?

6  A.  Yes, he was.

7  Q.  And how did -- in what way was he expressing that

8    passion?

9  A.  With raised voice and passion.

10 Q.  Does the individual still attend the church?

11 A.  He does not.

12 Q.  And did he stop attending after that discussion?

13 A.  No, he did not.

14 Q.  Did you feel threatened or fearful when he raised his

15    voice and disagreed with you?

16 A.  I was not comfortable, but I did not feel threatened for

17    physical harm.

18 Q.  Is that because you knew the individual?

19 A.  That's correct.

20 Q.  And do you think that might be the difference between

21    this first phone call and this individual that we're

22    talking about at the church, that this individual at the

23    church was someone you knew and the person on the phone

24    was a stranger to you?

25 A.  That would be in part the reason.

```
 1   Q.   And what would be the rest of the reason?

 2   A.   And again, this would be my perception, that there would

 3        be a greater tendency to be violent because of the

 4        issue.

 5   Q.   Was this first phone call your first opportunity ever to

 6        speak with a transgender individual?

 7   A.   To my knowledge, yes.

 8   Q.   And was that a bit odd to you as well?

 9   A.   Yes.

10   Q.   Let's go on to the next call, the second call, which I

11        believe you state on page 2 of Exhibit No. 8.

12   A.   I note here that the second call was on August 12th,

13        2009, and was received by my secretary while I was out

14        of the office.  I note here as well the caller

15        identified herself as Krystal Mountaine and called from

16        the same number as the first phone call.  She said that

17        she would like to talk to the pastor and asked to have

18        me call, and I chose not to return the call.

19   Q.   Was anything else said by Krystal Mountaine?

20   A.   Not to my understanding.

21   Q.   And when you say what she said during the phone call,

22        are you taking that from notes that the secretary --

23        church secretary made?

24   A.   That's correct.

25   Q.   So you yourself did not hear Krystal Mountaine's
```

1     message?

2   A.   I did not.

3   Q.   And have you received any calls since then?

4   A.   No.

5   Q.   And is -- that listing of the message that the secretary

6     wrote down from Krystal Mountaine as reflected on page 2

7     of Exhibit No. 8, is that complete or was anything else

8     included in the message that you haven't reported here?

9   A.   I believe this was complete.

10  Q.   So no other phone calls regarding Referendum 71 were

11     received by you or the church?

12  A.   No.

13  Q.   These two calls, did they come in on the church's phone

14     line or your personal home line?

15  A.   Church phone line.

16  Q.   And correct me if I'm wrong, but I believe you have both

17     a church phone line and a home phone line at that

18     address; correct?

19  A.   That's correct.

20  Q.   Did you receive any mail that related to Referendum 71?

21  A.   No.

22  Q.   Any other incidents occur that you felt were harassment

23     or threats of any sort?

24  A.   No.

25  Q.   Any sort of vandalism at any time of church property?

Page 28

1   A.   No.

2   Q.   And after the election on Referendum 71, have you

3        received any calls, Emails, threats, or harassment of

4        any sort?

5   A.   No.

6   Q.   Do you know how Krystal Mountaine would have known that

7        you had supported Referendum 71?

8   A.   I would imagine by referencing the Web site.

9   Q.   And what Web site?

10  A.   For the Referendum 71, Protect Marriage Washington, that

11       we have an exhibit from.

12  Q.   Did the caller actually state where she got your name or

13       the church's name?

14  A.   Not to the best of my recall.

15  Q.   After that phone call, did you ask Larry Stickney or

16       anyone with Protect Marriage Washington to remove your

17       name from the Protect Marriage Washington Web site?

18  A.   I did not.

19  Q.   Why not?

20  A.   We -- I feel personally -- or I have strong conviction

21       regarding the issue in hand and was willing to continue

22       to do whatever I could.

23  Q.   And would it bother you if your signature on the

24       Referendum 71 petitions was publicly disclosed, given

25       your public endorsement of the measure?

Page  29

1   A.   That's --

2            MR. PIDGEON:   I'm going to object as to the form of

3        the question.

4                 But go ahead and answer.

5   A.   I feel like there are two different issues.   I have

6        chosen to publicly identify myself with --

7   Q.   (by Ms. Egeler)   And I'm just asking about disclosure of

8        your signature on the petition sheets, you personally.

9   A.   I would not object.

10            MS. EGELER:   Okay, I have no further questions.

11            Anything?

12            MR. STAFFORD:   Yeah.

13

14                      EXAMINATION

15   BY MR. STAFFORD:

16   Q.   So, Pastor Redac, again, my name is Ben Stafford.   I work

17        at Perkins Coie and I represent Washington Families

18        Standing Together, which is a coalition of church and

19        civic organizations dedicated to supporting Senate

20        Bill 5688 and opposing the placement of Referendum 71 on

21        the ballot.   Are you familiar with that group?

22   A.   No, I'm not.

23   Q.   So just a few follow-ups.

24            Does your church maintain a Web site?

25   A.   Yes.

1  Q.  And do you know if your name appears on that Web site?

2  A.  I believe it does.

3  Q.  And how about an Email address?  Would that appear on

4      the Web site for you?

5  A.  There would be a means of Emailing me.  I'm not sure if

6      the physical -- if a visible Email address is there.

7  Q.  And would that Web site also list the address of the

8      church?

9  A.  Certainly.

10 Q.  And how about the church's phone number?

11 A.  Yes.

12 Q.  So we talked a little bit about some of the

13     contributions that you made to Protect Marriage

14     Washington personally and also ones that your church

15     made as well.  Do you recall that?

16 A.  Yes.

17 Q.  And so with respect to the church's contribution, you

18     said that you understood that $⬛Red had been identified

19     by the church for a contribution.  And what was the

20     source of that $⬛Red?  Where does the church get its

21     money?

22 A.  It would be from the contributions of the members.

23 Q.  And do you pass a collection plate on Sunday?  Is that

24     how you get contributions from members?

25 A.  Yes, we do.

1    Q.   And contributions from any other sources besides a

2         collection plate?

3    A.   No.

4    Q.   And do you recall if the church raised money

5         specifically for that contribution?

6              MR. PIDGEON:   I'm going to object as to the

7         relevance of this question.

8                   But go ahead and answer.

9    A.   No.

10   Q.   (by Mr. Stafford)  So you don't recall one way or

11        another whether the church raised money specifically for

12        the contribution?

13   A.   I do not believe that the church did raise money

14        specifically.

15   Q.   Understood.   Thank you.

16             And you mentioned that a business matched that $Red

17        contribution.

18   A.   Yes.

19   Q.   And how did it come about that that business was

20        identified to do so?  Who spoke with that business?

21   A.   I believe I was made aware of that business through

22        Larry Stickney.

23   Q.   And what was the business?  What was the name of the

24        business?

25   A.   I don't recall.

Tracey Juran, Certified Court Reporter

 1   Q.   And do you know if the business gave $Red to the church

 2        which the church then gave to Protect Marriage

 3        Washington?

 4             THE WITNESS:   And I apologize, Anne, regarding this

 5        too.

 6   A.   I'm just trying to think.  It may have -- I'm not

 7        recalling exactly.  We would have to check something

 8        else to see just what the route of the contribution was,

 9        if it came back to the church so that, in fact, the

10        church wrote a thousand-dollar check --

11   Q.   (by Mr. Stafford)  Thank you.

12   A.   -- so that it came out that way.  I'm not sure.

13   Q.   Do you recall attending the Stand Up For Marriage rally?

14   A.   Which one?

15   Q.   Was there a March 19th rally, 2009, or a rally in

16        Olympia?

17   A.   I did attend a rally in Olympia.

18   Q.   And do you recall about when that rally was?

19   A.   I have very poor recall apart from notes, so --

20   Q.   Would it have been early in the year, middle part of the

21        year?

22   A.   I would imagine it's the rally you're referring to, but

23        that's as much as I can --

24   Q.   And did you speak at that rally?

25   A.   I remember praying for a rally.  It must have been the

1      one that we're speaking of.  You're going to find out

2      how feeble my brain is.

3   Q.  My recollection beyond a year is quite frightening as

4      well.

5          So you recall praying that a rally would occur?

6   A.  Yes.

7   Q.  And do you recall whether you attended such a rally?

8   A.  Yes.

9   Q.  And do you recall whether or not you spoke at the rally?

10  A.  I'm imagining that the rally that I'm thinking that I

11      had an opening prayer for is the rally in question.

12  Q.  And do you remember about how many people attended the

13      rally, ballpark estimate?

14  A.  Thousands.

15  Q.  Thousands?

16          Tens of thousands, single number of thousands?

17  A.  Single.

18  Q.  And what was the subject of that rally?

19  A.  You know, and I'd feel a little bit -- because of my

20      cloudiness about the whole incident, I'm feeling a

21      little bit like I'm maybe speaking beyond my memory.

22  Q.  Certainly, and we want to just make sure that you limit

23      yourself to what you recall.

24          Do you recall the basic area?  Maybe not word for

25      word what it was about, but the basic subject matter of

```
 1        the rally?

 2   A.   Yeah, it's only because of the fact that you mentioned

 3        the rally and the title of it that I am remembering that

 4        I did attend a rally.  And just as I'm reflecting back,

 5        the focus of that rally would have been to -- regarding

 6        the whole issue of marriage and upholding the sanctity

 7        of marriage.

 8   Q.   And part of the issue of marriage or the -- upholding

 9        the sanctity of marriage would be the Senate Bill 568

10        (sic) or the issue of same-sex marriage?

11   A.   Yes.

12   Q.   And did you express the view, as we've discussed here

13        today, that marriage should not be extended to same-sex

14        couples at that rally?

15   A.   I didn't address the gathering except for having a

16        prayer asking for God's blessing on our nation and for

17        us to uphold righteousness.  I don't -- it was not a

18        written prayer and I don't recall the more specific

19        content of the prayer beyond that.

20   Q.   So your comments at the rally were an opening prayer or

21        a prayer during the course of the rally.

22   A.   That's correct.

23   Q.   Thank you.  Okay.

24            And we spoke about the call that you received from

25        Krystal Mountaine and -- referring back to the July 27th
```

1    call.   And if you could look at Exhibit No. 8 here.

2  A.  Mm-hm.

3  Q.  So you mentioned here that there were some statements

4      back and forth.  Do you recall what those statements

5      were?

6  A.  They would have been regarding my stand and what the

7      basis of that was.

8  Q.  And so could you break that down for me further.  Did

9      she ask you a question and then you responded?  Do you

10     recall the words that were used during the call?

11  A.  I don't recall the words that were used, but it would

12     have been to the effect of why I felt that it was

13     appropriate for me to take a stand on something that she

14     saw as limiting hers and other people's freedom or right

15     to do what --

16  Q.  And you -- when --

17  A.  -- she would choose to.

18  Q.  Apologies.

19         And when she asked that, you would describe her

20     tone as calm?

21  A.  And I described it as reserved.  I wouldn't say calm, I

22     would say certainly -- maybe intense is too strong of a

23     word to use to -- serious, maybe, is a good word, a

24     good --

25  Q.  And so in your notes of the call that we're looking at

Page 36

1      here on Exhibit 8, you say the caller remained calm.

2      Was that an accurate statement?

3   A.  Where did I use that phrase?

4   Q.  I'm looking after number 3 at --

5   A.  Okay.

6   Q.  -- the second line --

7   A.  Okay.

8   Q.  -- of your response.

9   A.  I do see, yes.

10  Q.  So in those notes, you do say the caller remained calm?

11  A.  Okay.  Yes, I do.

12  Q.  And when she asked why you felt that you could limit

13      what she saw as her rights, what did you respond?

14  A.  Said that my conviction was that God ordained marriage.

15      That God ordained marriage between a man and a woman is

16      not only Scriptural from my standpoint and personal

17      conviction, but also what has been demonstrated through

18      the epic of human history as what's healthy for every

19      society.

20  Q.  And how did you -- how did she respond, rather, after

21      you expressed that opinion?

22  A.  Just disagreement and that my stand and those that would

23      hold such a position would limit the freedoms of others.

24  Q.  And after she said that, how did you respond?

25  A.  And that was about as much as we had by way of

Tracey Juran, Certified Court Reporter

Page 37

1    interchange.

2    Q.   And you mentioned earlier that part of what made --

3         perhaps made you feel uncomfortable about that call was

4         the fact that this was a stranger.   Would -- is that

5         right?

6    A.   Correct.

7    Q.   And that, when you had this other experience with the

8         parishioner who disagreed regarding the birth-control

9         issue, that part of what made that unthreatening was

10        that you knew that person.

11   A.   That would be part of it.

12   Q.   Do strangers have the right to disagree with each other?

13             MR. PIDGEON:   Objection as to form.

14   Q.   (by Mr. Stafford)   In your opinion, do strangers have

15        the right to disagree with each other?

16   A.   They have the right to disagree appropriately.

17   Q.   And did you feel that she was disagreeing with your

18        position in an inappropriate fashion?

19   A.   The -- she was not inappropriate in the way she

20        expressed herself.

21   Q.   And I think you also said that, although Krystal

22        Mountaine didn't say this, you felt that perhaps there

23        was a greater tendency to be violent because of the

24        issue.   What did you mean by that?

25   A.   The fact that she both did call regarding what is

```
 1          recognized as being a volatile issue and then in closing
 2          comments also did suggest the possibility of action that
 3          I can see was only mentioned for the sake of
 4          intimidation.
 5     Q.   And that action that you refer to was attending your
 6          church to picket or to attend morning services?
 7     A.   Yes.
 8     Q.   And you told her that she was welcome to attend morning
 9          services so long as she acted in a manner appropriate to
10          a public worship service?
11     A.   I felt like that was an appropriate response on my part.
12     Q.   And was that an accurate response?
13     A.   Everyone is welcome to attend public worship services.
14     Q.   And this is -- this issue, same-sex marriage or the
15          sanctity of marriage, is an issue that you feel strongly
16          about.
17     A.   It is.
18     Q.   Do you have a greater tendency to be violent because of
19          the issue?
20     A.   No.
21     Q.   It's an issue that you care about.
22     A.   Yes.
23     Q.   And you're willing to express your views about.
24     A.   Yes.
25     Q.   But not necessarily one that you're going to be more
```

Page 39

```
 1          violent about because of that.
 2   A.     Correct.
 3               MR. STAFFORD:  That's all I have.
 4
 5                          EXAMINATION
 6   BY MR. PIDGEON:
 7   Q.     I have a couple of follow-up --
 8   A.     Okay.
 9   Q.     -- questions, Pastor Redac.
10          Have you ever seen any videos or any news reports
11          of transgendered individuals entering a church service
12          in protest?
13   A.     I have seen video of those who entered a church in the
14          state of Michigan over this issue.  Whether they were
15          transgender individuals or not I don't know
16          specifically.
17   Q.     Can you tell us what you saw on the video, what the
18          basic tenor of it was.
19   A.     The -- this group of individuals entered the church with
20          evident specific -- well, I guess I don't -- I can't say
21          what their intent was initially.  But what the video
22          showed is them being very disrespectful and disruptive
23          to the service going forward, interrupting the person
24          who was leading the service, and using that forum to be
25          able to communicate -- and I guess I'm not remembering
```

Tracey Juran, Certified Court Reporter

1        the exact content, but certainly it was to bolster

2        their -- to speak against the church's public position

3        regarding the homosexual issue.

4  Q.  Do you know whether these persons were men dressed up as

5        women during the course of this?

6  A.  I'm not recalling.

7  Q.  Did you ever see a video of men dressed up as nuns

8        demanding Communion in a Catholic church?

9  A.  No.

10  Q.  Were you familiar with any of the events that took place

11        in California concerning Proposition 8?

12  A.  I'm aware of the issue there and aware in a broad -- in

13        a general way of news reports, but I did not watch any

14        video footage.

15  Q.  Were you aware of any acts of violence that had taken

16        place in California concerning that proposition?

17  A.  Not specifically.

18  Q.  Do you know of any pastors in California that were

19        involved in that?

20  A.  I'm not personally familiar with any.  I do realize that

21        pastors in a very broad range -- many pastors were

22        involved in opposing that legislation.

23  Q.  Now, you mentioned that you've been in Arlington for 18

24        years; is that correct?

25  A.  Yes.

1  Q.   Now, when you first came to ▮Redacted▮, how would you

2       describe the character of the town?  I mean, was it a

3       highly rural town at that point?

4  A.   It definitely was.

5  Q.   And what would you describe its condition now?  Is it

6       still pretty much rural?

7  A.   The population has probably tripled since that time, so

8       that it is -- well, just more densely populated, not --

9       I wouldn't call it rural at all.

10  Q.   It's more semirural, maybe?

11  A.   Small town.

12  Q.   Small town, okay.

13       Now, have you spoken on positions -- you mentioned

14       that you've spoken on positions concerning birth

15       control.  Have you also spoken out on issues of abortion

16       in the church?

17  A.   Yes.

18  Q.   Have you spoken out on issues of divorce in the church?

19  A.   Yes.

20  Q.   Have you spoken out on issues of drug abuse and

21       alcoholism in the church?

22  A.   Yes.

23  Q.   Have you spoken on issues of gambling in the church?

24  A.   Yes.

25  Q.   Have you ever been threatened from anybody supporting

Page 42

1      the gambling position?

2  A.   No.

3  Q.   Have you ever been threatened from anybody supporting an

4      alcoholic's right to drink?

5  A.   No.

6  Q.   Have you ever been threatened or harassed by anybody

7      supporting a drug user's right to use drugs?

8  A.   No.

9  Q.   Have you ever been approached or threatened or harassed

10      by anybody supporting a person's right to get divorced?

11  A.   No.

12  Q.   How about on the issue of abortion?  Have you ever been

13      threatened or harassed by a person giving (sic) the

14      issue of abortion?

15  A.   No.

16  Q.   So other than the one confrontation you had inside the

17      church concerning birth control, the only other

18      harassing or threatening incident that you can point to

19      is this from Krystal Mountaine?

20  A.   Yes.

21  Q.   Now, looking at Exhibit 8 again for a minute, going back

22      to this July 27th phone call, you heard this phone call;

23      correct?

24  A.   Yes.

25  Q.   Now, this woman, did she speak with a female voice or

Page 43

1   was it a man's voice you were hearing?

2   A.   It was a man's voice.

3   Q.   Was it a high tenor voice or a low baritone voice?

4   A.   It was not a high voice.   It was what I would just

5        consider a normal male voice tone.

6   Q.   Normal male voice, okay.

7             Now, do you know why Krystal Mountaine referenced

8        the fact that he had been in special forces?

9   A.   I can only presume that it was to heighten the threat

10       that I should perceive.

11  Q.   Well, what does special forces mean to you?

12  A.   People who are trained in doing harm, you know, special

13       tactics to be able to carry out killing missions.

14  Q.   So would somebody in special forces, for instance, have,

15       say, a lower threshold towards the notion of killing a

16       human being, in your view?

17  A.   That would be my understanding.

18  Q.   Would it be your expectation that they had been trained

19       in how to kill in hand-to-hand combat?

20  A.   Yes.

21  Q.   Would it be your understanding that they would also have

22       weapons specialties?

23  A.   Yes.

24  Q.   Possibly sniping capability?

25  A.   Yes.

State Objects: Witness lacks foundation for the testimony; hearsay.

Tracey Juran, Certified Court Reporter

1   Q.   So if a person said they'd been in special forces, did

2        all of those things factor into your consideration of

3        who this person was on the phone?

4   A.   Yes.

5   Q.   And then the person said -- now, did the calmness of the

6        caller's voice further intimidate you or threaten you?

7        Would you have been less threatened if the caller had

8        been screaming at you?

9   A.   I would have been more intimidated if there was yelling.

10  Q.   Screaming?

11  A.   And screaming.

12  Q.   And then -- so did you perceive, then, that this man who

13       said he -- and by the way, what does it mean when this

14       man tells you that he's transgendered to you?  What does

15       that mean to you?

16  A.   My perception would be that it's somebody who has

17       undergone even a sex change.

18  Q.   A sex-change operation.

19  A.   Sex-change operation.

20  Q.   So in your opinion, this was not just a man who was

21       cross-dressing; is that correct?

22  A.   Yeah.  And that's my perception.  Maybe my definitions

23       are inappropriate.

24  Q.   Did he identify himself as transgendered?

25  A.   I'm -- I can only assume that was the case because of my

1    notes.  I don't recall exactly how the caller may have
2    expressed that.
3  Q.  So you don't know whether or not Krystal Mountaine has
4    actually undergone surgery for this condition.
5  A.  I do not.
6  Q.  So it is possible that Krystal Mountaine could have been
7    a muscular, well-trained special-forces operative.
8        MR. STAFFORD:  Objection; speculation.
9  A.  That's possible.
10 Q.  (by Mr. Pidgeon)  Did you consider that this person
11   might have been a -- you know, a large-scale person,
12   large-size person?
13 A.  I didn't dwell on it.
14 Q.  Now, when Krystal Mountaine was referring to a number of
15   friends, did you have any idea who these friends would
16   be?
17 A.  I could only assume that they were individuals who
18   shared the same convictions as well as a desire to
19   communicate their hostility toward others who would wish
20   to hold an opposing position.
21 Q.  And so when Krystal Mountaine said that these friends
22   would picket the church, did you envision a scene like
23   what you had seen in that video in Michigan taking place
24   in your church?
25 A.  I considered that possibility.

1    Q.    And so when you invited Krystal Mountaine to attend a

2          morning service, you did put a cautionary note to that

3          invitation, did you not?

4    A.    Yes.

5                MS. EGELER:  Objection; leading.

6                MR. PIDGEON:  Let me ask the question again.

7    Q.    (by Mr. Pidgeon)  Did you put a cautionary note to your

8          invitation to Krystal Mountaine?

9    A.    Yes.  And I believe that I've expressed that when I said

10         that it was important that any who come conduct

11         themselves in a way that's appropriate to public worship

12         services.  And I expressed that specifically because of

13         my concern that their presence -- that -- might deport

14         themselves differently than that.

15   Q.    So your concern here at this point -- and let me see if

16         I can get to your general -- was it your general

17         understanding at the time that what was being conveyed

18         to you by Krystal Mountaine was a threat of disruption

19         at the church?

20   A.    I thought that at the very least, it would be for the

21         purpose of intimidation, to influence people away from

22         being involved in signing the R-71 petition, if not

23         disruption itself.  Considered that disruption was also

24         a possibility, but at the least intimidation.

25   Q.    What's the average age of your congregation there in

Page 47

1    [Redacted]?

2    A.   Oh, probably 40.  But we have a broad range, from the

3         youngest to the oldest.

4    Q.   You do.

5              So you have a full range of families and so forth?

6    A.   Yes.

7    Q.   So you wouldn't say it's a skewed demographic to any

8         particular age group.

9    A.   No.

10   Q.   But it is a small-town church; is that correct?

11   A.   It is.

12   Q.   What's the size of the membership there?

13   A.   We have a Sunday attendance of about 250.

14   Q.   Now, let me ask you this:   This is a [Redacted] church; is

15        that correct?

16   A.   Correct.

17   Q.   And are you familiar with the ordainment of open

18        homosexual pastors in certain groups of the [Redacted]

19        church?

20   A.   Yes.

21   Q.   What is your position on that?

22   A.   We oppose ordaining of homosexual pastors and are

23        distinct from the church body that has approved that.

24   Q.   So you're part of this [Redacted]?

25   A.   We are part of the [Redacted]

1      [Redacted] .

2   Q.   And that is distinct from the operation out of

3        [Redacted] ; is that correct?

4   A.   Yes, an entirely separate church body.

5   Q.   Is that issue creating a schism within the church?

6   A.   Within our church body?

7   Q.   Right.

8   A.   No.  We have a stated position opposing practice of

9        homosexuality and ordaining of homosexual pastors.

10  Q.   Now, there's just a couple more questions I just want to

11       ask before we wrap this up.

12            But the -- at the rally in Olympia where you said

13       you opened with prayer --

14  A.   Yes.

15  Q.   -- do you recall the Scripture passage, if my people who

16       are called by my name?  Do you recall that passage?

17  A.   Yes, I do.

18  Q.   Do you know what passage that is?

19  A.   2 Chronicles 7:14.

20  Q.   And what is the actual Scriptural cite, do you remember?

21  A.   The wording?

22  Q.   Yeah.

23  A.   If my people who are called by my name will humble

24       themselves and pray and turn from their wicked ways -- I

25       think I missed a phrase -- then will I hear from heaven,

1       will forgive their sins and heal their land.

2   Q.  Now, that phrase in your mind applies to which group of

3       people?

4   A.  It applies to those who are in God's family, who trust

5       in Jesus as their savior, have become Christian, and God

6       is calling upon them that verse for a life change as the

7       means, then, by which He is able to be freed to do the

8       work that He desires to do in our culture and through

9       the world.

10  Q.  And then what do you find is the Scriptural basis that

11      does not provide for homosexual marriages?

12  A.  I would think of -- Romans 1 speaks in opposition to

13      homosexuality, 1 Corinthians Chapter 6 is another place,

14      and also even from the book of Genesis, where God

15      ordained marriage.  He said there was -- they're one man

16      and one woman.  The man should leave his father and

17      mother and cleave to his wife and the two will become

18      one flesh.  And Jesus cited that institution of marriage

19      also in Matthew 19.

20  Q.  So you're opposed, then, to polygamy, would that be the

21      case?

22  A.  Yes.

23  Q.  Even though there's plenty of Scriptural references to

24      polygamous marriages, right?

25  A.  Yes.

1    Q.    With, for instance, Jacob and -- Jacob Israel or David

2          or Solomon and his thousand wives?

3    A.    Correct.

4                MS. EGELER:  I'm going to object to this line of

5          questioning; it is not relevant, nor is it responsive to

6          what was asked earlier.

7    Q.    (by Mr. Pidgeon)  And I just wanted to explore the

8          Scriptural basis.

9                Let me ask you one other thing.  Do you know of

10         pastors anywhere in the United States or around the

11         world that have been prosecuted for relying (sic) or

12         otherwise stating Romans 1 in public?

13   A.    I have read news reports of those who have been arrested

14         in Canada as well as European countries.

15               MR. PIDGEON:  Okay, I don't have anything further.

16

17                          FURTHER EXAMINATION

18   BY MS. EGELER:

19   Q.    Pastor, is it your understanding that transgender

20         individuals are homosexual?

21   A.    Yes.

22   Q.    And what's your understanding of the U.S. Government's

23         position on gays in the military?

24   A.    There has been a don't ask, don't tell position since

25         the time of President Clinton, I understand, in which

1      there was not to be an acting out of homosexuality in

2      the military.

3   Q.   Do you think a man who had undergone an operation to

4      become a woman or was dressing as a woman and was

5      homosexual would be welcome in the United States

6      military?

7   A.   It would be my perception that he would not be.

8   Q.   Pastor, how tall are you?

9   A.   Six one.

10  Q.   And would it be fair to say that you're a very soft-

11     spoken man?

12  A.   Yes.

13  Q.   And have you ever met a short person with a deep voice?

14  A.   I'm sure that I have.  I'm not recalling a specific

15     individual right now.

16  Q.   So is it fair to say that one cannot determine someone's

17     height by listening to the sound of their voice on the

18     telephone?

19  A.   Correct.

20  Q.   So you didn't know how tall Krystal Mountaine might be?

21  A.   No.

22  Q.   Did the name Krystal Mountaine strike you as silly or

23     goofy for any reason?

24  A.   Yes, because of the male voice associated with the

25     female name.

1  Q.   And did it strike you that Krystal Mountaine sounded a

2       bit like Crystal Mountain?

3  A.   No.

4  Q.   When you told Krystal Mountaine that, if she brought

5       people to the church, that they would be welcome but

6       would need to conduct themselves in an appropriate way,

7       what was her response?

8  A.   As I note, I was assured that that would be the case.

9  Q.   Have you ever publicly endorsed any sort of political

10      campaign regarding the issue of divorce between a man

11      and a woman?

12 A.   No.

13 Q.   Have you ever contributed to a campaign regarding

14      divorce between men and women?

15 A.   No.

16 Q.   Have you ever prayed at or attended a rally regarding

17      the issue of divorce between a man and a woman?

18 A.   No.

19 Q.   How about with respect to birth control?  Have you ever

20      endorsed publicly a position regarding birth control

21      with respect to a political issue?

22 A.   No.

23 Q.   Have you ever publicly contributed to any group that was

24      espousing your position with respect to birth control?

25 A.   No.

1    Q.   Have you ever prayed or attended a rally concerning
2         birth control?
3    A.   No.
4    Q.   Have you ever endorsed publicly a political issue
5         regarding gambling?
6    A.   No.
7    Q.   Have you ever prayed or attended a rally regarding
8         gambling?
9    A.   No.
10   Q.   Have you ever contributed to any cause regarding
11        gambling?
12   A.   No.
13   Q.   Same questions with respect to alcohol and drugs:  Have
14        you ever endorsed a political issue regarding alcohol or
15        drugs?
16   A.   No.
17   Q.   Ever contributed money to any group that espouses a
18        position with respect to alcohol or drugs?
19   A.   No.
20   Q.   You ever prayed or attended a rally regarding issues
21        surrounding alcohol and drugs?
22   A.   No.
23   Q.   With respect to abortion, have you ever publicly
24        endorsed a political position regarding the issue of
25        abortion?

Tracey Juran, Certified Court Reporter

1  A.    Yes.

2  Q.    Can you tell me about that.

3  A.    We -- I publicly opposed the recently adopted health-

4        care legislation because of provisions that would allow

5        for public funding of abortion.

6  Q.    Was that a federal issue?

7  A.    Yes.

8  Q.    And what year was that?

9  A.    Just in this last year.

10 Q.    Was your name listed on any Web sites or blogs as

11       supporting this cause --

12 A.    No.

13 Q.    -- with respect -- okay.

14        Did you contribute any money to the issue?

15 A.    I have contributed regularly over the years to pro-life

16       organizations.  I do not believe that I contributed

17       anything specifically to -- that would relate to the

18       health care -- opposing the health-care legislation.

19 Q.    And when you contributed to pro-life organizations, were

20       they federal organizations?

21 A.    Both state and national.

22 Q.    Can you tell me the names of those organizations.

23 A.    Human Life of Washington, National Right to Life,

24       Lutherans for Life.

25 Q.    And which of those are state organizations?

Page 55

1    A.    Human Life of Washington.

2    Q.    And what state issue did Human Life of Washington become

3          engaged in?

4    A.    They, I believe, are more of an educational

5          organization, so they would not have put their name to

6          any specific piece of legislation.

7    Q.    And National Right to Life, I assume, is a national

8          organization?

9    A.    Yes.

10   Q.    Do you recall how much you've contributed?

11   A.    I do not.

12   Q.    Do you know how much you've contributed to Human Life of

13         Washington?

14   A.    I don't know.

15   Q.    Do you know if it was $25 or more?

16   A.    I'm imagine -- over the course of time, it was likely

17         $25 or more.

18   Q.    Can you state with certainty that each of your

19         contributions was $25 or more?

20   A.    I can't.

21   Q.    So they may have been less than 25.

22   A.    They may have been.

23   Q.    And National Right to Life, do you know the amount of

24         your individual contributions?

25   A.    I don't.  In fact, I think it's been some time since

1        I've contributed to them.

2   Q.   Do you know whether you would have contributed in a

3        single contribution at any point more than $25?

4   A.   I don't know.

5   Q.   How about Lutherans for Life?  Is that a national

6        organization?

7   A.   It is.

8   Q.   And individual contributions to Lutherans for Life, do

9        you know if you've made any contribution of $25 or more?

10  A.   I don't recall.

11  Q.   So do you know if any of your contributions are

12       something that someone could learn of through public

13       documents?

14  A.   I don't know.

15  Q.   Did you know that the Public Disclosure Commission does

16       not publicly report contributions of under $25?

17  A.   I didn't know that.

18  Q.   Have you endorsed any of those three groups or any other

19       group regarding abortion through any means that would

20       allow people to publicly access Web sites or other

21       databases to determine your support?

22  A.   I have publicly made people aware of Lutherans for Life

23       in particular, if that's what you're asking.

24  Q.   And where did you publicly do that?

25  A.   In the context of our congregation and its worship.

1   Q.   Did you ever do so outside the church?

2   A.   I don't think I've had occasion to.

3   Q.   Did you ever attend any rallies or public events

4        regarding the issue of abortion?

5   A.   I've attended Walk for Life at Olympia --

6   Q.   And when was --

7   A.   -- at least on one occasion.

8   Q.   When was that?

9   A.   Taxing my memory again and my nonexistent -- I believe I

10       went to the life rally in Olympia two years ago.

11  Q.   And was there some legislative issue that was pending

12       that this rally concerned?

13  A.   No.  There's a rally that takes place in Olympia every

14       January to commemorate the Roe v. Wade decision of the

15       Supreme Court, 1973.

16  Q.   So it's not to advocate any pending piece of

17       legislation?

18  A.   Not specifically.

19  Q.   And have you spoken publicly anywhere else with regard

20       to abortion?

21  A.   Not that I'm recalling.

22  Q.   Have you been quoted in the media with respect to your

23       position on abortion?

24  A.   I don't believe so.

25  Q.   So how would someone outside your church become aware of

Page 58

```
 1        your position on abortion?
 2   A.   Possibly through conversations with members of our
 3        congregation.
 4   Q.   Is that the only way?
 5   A.   Our national church body also has a position statement
 6        regarding abortion, so a person could surmise my
 7        position because I am a member pastor of that national
 8        church body.
 9   Q.   And again, the national church body you're talking about
10        is not the -- for lack of a better word, the --
11   A.   It's not the Redac.
12   Q.   Thank you.
13            And that's -- can you say what the Redac is.
14   A.   Redac?  The             Redacted             is a
15        church body that has approved of abortion and
16        homosexuality.
17   Q.   And it's not that group.
18   A.   It is not that church body.
19   Q.   People get confused about those church bodies?
20   A.   To a person who simply sees the title Redacted, yes.
21   Q.   It's confusing whether it's the evangelical or the --
22   A.   Or a church -- or a Redacted n church body that does not
23        hold the same stand on those issues.
24   Q.   Is that a common question that you get from people?
25   A.   Yes.
```

1   Q.   You said that you saw some -- a video from the state of

2        Michigan.  Do you remember what year that video was

3        made?

4   A.   I viewed it, to the best of my recollection, sometime

5        during 2009.

6   Q.   Who showed you that video?

7   A.   I watched it on my own computer.

8   Q.   And who told you how to access that video?

9   A.   I imagine that I received some type of an Email alert

10       that made reference to it.

11  Q.   Who would have sent you that Email alert?

12  A.   I don't recall.

13  Q.   Could it have been Larry Stickney?

14  A.   Likely not.  It was probably another organization.

15       Could have been the American Family Association, AFA.

16  Q.   Do you know when the video was taken?

17  A.   I believe that I saw it soon after it was taken.  Again,

18       with my just guessing, that it would have been an event

19       that took place sometime in early 2009.

20  Q.   Do you know what the issue was in the Michigan church

21       other than homosexuality generally?

22  A.   No.

23  Q.   So you don't know whether it was related to domestic

24       partnership?

25  A.   No.

1  Q.   You stated that you're aware of pastors in the state of

2       California that opposed permitting same-sex partners to

3       enter a domestic partnership; is that right?

4  A.   Yes.

5  Q.   Are you aware that there are pastors in the state of

6       California that took the opposite position and favored

7       permitting same-sex partnerships?

8  A.   Yes.

9  Q.   Are you aware of any Christian clergy or Jewish or

10      Muslim leaders in the state of Washington who were in

11      favor of domestic partnership?

12 A.   I'm aware that there are.  I don't know of those

13      individuals personally.

14          MS. EGELER:  Okay.  Okay, I have no further

15      questions.

16          MR. PIDGEON:  I have just a couple of follow-ups --

17      go ahead.

18          MR. STAFFORD:  Just a couple for me as well.

19

20                    FURTHER EXAMINATION

21 BY MR. STAFFORD:

22 Q.   We talked about Romans 1 a little bit and you hearing of

23      church leaders in Canada and Europe who had been

24      prosecuted for discussing Romans 1 in public.  Do you

25      know of any such church leaders in the United States who

Page 61

1       have been prosecuted --

2   A.  I do not.

3   Q.  -- for that?

4           And would that be because of the First Amendment in

5       the United States?

6   A.  Yes.

7   Q.  And people having a right to speak their views and

8       express their opinions?

9   A.  Yes.

10  Q.  And is one of the things that one can do under the First

11      Amendment picket another organization?

12  A.  Yes.

13  Q.  Have you ever picketed a group because of disagreement

14      over its views?

15  A.  Yes.

16  Q.  And could you tell us about that.  When was that?

17  A.  I have picketed abortion clinics.

18  Q.  And more than one abortion clinic?

19  A.  Two.

20  Q.  And when was that that you picketed?

21  A.  Peoria, Illinois, sometime in the span of 1988 to '92.

22      Not continuously during that time, but that's the time

23      that I lived in Illinois.

24  Q.  And about how many times did you attend a picket at the

25      clinic?

1   A.   Half dozen, six times.

2   Q.   And how about the other clinic?

3   A.   Marysville, Washington.

4   Q.   And when was that?

5   A.   September -- I have to think about dates -- 10th,

6        2000 --

7   Q.   September 10th?

8   A.   Yes, 2010.

9   Q.   And was that the only time you had picketed that

10       particular clinic?

11  A.   Yes.

12  Q.   And was it, in your mind or in your view, a threat to

13       the people in the clinic that you were picketing?

14  A.   I didn't make any personal approach to individuals, so

15       I -- my perception would be that they would not have

16       thought of it as a threat.

17  Q.   And you also mentioned what the phrase "special forces"

18       meant to you.  Do -- any of your parishioners, have they

19       served in the armed forces, to your knowledge?

20  A.   Yes.

21  Q.   And have you spoken with any of them about their service

22       in the armed forces?

23  A.   Yes.

24  Q.   Would you assume that any of those people had been

25       trained in the use of firearms?

1   A.   Yes.

2   Q.   And did you perceive during that conversation that them

3        mentioning they'd been in the armed forces was a threat

4        to you?

5   A.   No.

6             MR. STAFFORD:   Thanks.   That's all I have.

7             MR. PIDGEON:   Okay, I have a little bit of follow-

8        up.

9

10                       FURTHER EXAMINATION

11  BY MR. PIDGEON:

12  Q.   What is your knowledge of the First Amendment of the

13       Constitution?

14  A.   That we have freedom of speech and of religious

15       practice.

16  Q.   Are you aware of the current status of the ongoing

17       jurisprudence concerning the free-practice clause in the

18       First Amendment?

19  A.   Yes.

20  Q.   Are you aware of the establishment clause of the First

21       Amendment?

22  A.   Yes.

23  Q.   Are you aware that the phrase "separation of church and

24       state" does not appear anywhere in the Constitution?

25  A.   Yes, I am aware.

1   Q.   Do you know of the 14 individuals that were arrested in

2         Philadelphia for holding up the Bible at a gay-rights

3         parade?

4   A.   Yes.  Now that you mention it, I am familiar with that.

5   Q.   What do you know about that particular incident?

6   A.   That the people were arrested and yet later, I believe,

7         were cleared of the charges.

8   Q.   Do you know what they had done?

9   A.   I'm sorry; I'm not recalling.

10  Q.   So you don't know whether or not they were standing on

11        the sidewalk with picket signs?

12       MS. EGELER:  Objection; witness has already

13        indicated that he does not recall.

14  Q.   (by Mr. Pidgeon)  You can answer if you want.

15       MS. EGELER:  And also objecting with respect to the

16        leading nature of the question.

17  Q.   (by Mr. Pidgeon)  Do you know whether or not the

18        Philadelphia group was picketing the gay-rights parade?

19       MS. EGELER:  Objection; leading.

20       MR. PIDGEON:  It's not leading.

21  A.   Yeah, and I'm sorry; I don't recall the nature of their

22        activity.

23  Q.   (by Mr. Pidgeon)  Now, Washington Families Standing

24        Together, have you had the opportunity to look at the

25        165 organizations that consist of that group?

Page 65

```
 1   A.   I haven't looked.
 2   Q.   Do you know whether or not ACORN is a significant factor
 3        in that group?
 4   A.   I don't know.
 5   Q.   Do you know if -- which churches are involved in
 6        Washington Families Standing Together?
 7   A.   I haven't noted that.
 8   Q.   As to the pastors that are in favor -- oh, let me ask --
 9        let me get a little clarity on this.
10             You indicated -- there was kind of a joint question
11        the AG asked you here concerning whether or not there
12        were pastors, imams, and rabbis, I think, people of the
13        Jewish and Islamic faith, that supported this.  Do you
14        know of pastors locally that are supporting domestic
15        partnerships?
16   A.   I don't know for certain specific individuals.
17   Q.   And how about rabbis?  Do you know of anybody in the
18        Jewish faith that is supporting the domestic
19        partnerships?
20   A.   I'm not personally aware of those individuals.
21   Q.   So you don't -- you wouldn't be able to distinguish, for
22        instance, Reform Jews or Orthodox Jews on the position?
23   A.   No.
24   Q.   And as to imams or any other Islamic religious leader,
25        do you know of any Islamic religious leader that has
```

```
 1          taken a position in favor of homosexuality?

 2    A.    No one that I'm personally acquainted with.

 3    Q.    Do you know of anyone, even, that's outside of your

 4          personal acquaintance inside the Islamic religion that

 5          has taken a position in favor of homosexuality?

 6    A.    No.

 7    Q.    Do you know whether or not under sharia law

 8          homosexuality is punishable by the death penalty?

 9    A.    I am aware of that.

10    Q.    Do you know whether or not Saudi Arabia and Iran use the

11          death penalty against homosexuals?

12    A.    My understanding is that they do.

13    Q.    Now, you also mentioned that you took a position -- a

14          public position that was opposed to the national health-

15          care plan, the abortion practices in the national

16          health-care plan; is that correct?

17    A.    Yes.

18    Q.    Is it your understanding that abortion is paid for with

19          tax dollars under that health-care plan?

20    A.    That's my understanding.

21    Q.    Is it your understanding that that's also an issue that

22          will affect Washington State?

23    A.    Yes.

24    Q.    Do you know whether or not the Attorney General in the

25          state of Washington has brought a lawsuit to stop the
```

1        application of that health-care plan in the state of

2        Washington?

3   A.   I understand that there has been opposition in

4        Washington, and I wasn't aware that that was from the

5        Attorney General's Office if that's the case.

6   Q.   But you do believe that the national health-care plan

7        would have a Washington application?

8   A.   Yes.

9   Q.   Have you received any threats from anybody or any

10       harassment of any sort from anybody concerning your

11       position in opposition to the national health-care plan?

12  A.   No.

13            MR. PIDGEON:  Okay.  All right, I have nothing

14       further.

15            MS. EGELER:  I have a few more.

16

17                    FURTHER EXAMINATION

18  BY MS. EGELER:

19  Q.   Pastor, do you have a mainstream [Redacted] church in your

20       area, a [Redacted] church that's not of your denomination?

21  A.   Yes.

22  Q.   And what is the position of that [Redacted] church with

23       respect to homosexuality?

24  A.   I haven't spoken directly to the pastor about it, but

25       the fact that they comfortably remained within that

1        church body after the decisions of August 2009 leads me

2        to conclude that they do support homosexual rights and

3        domestic partnerships.

4  Q.   Do you have an Episcopalian church in your area?

5  A.   No.

6  Q.   Unitarian?

7  A.   No.

8  Q.   United Church of Christ?

9  A.   No.

10  Q.   Quaker meeting?

11  A.   No.

12  Q.   Any other churches in your area that, to your knowledge,

13        that a church group would support homosexuality at a

14        national level?

15  A.   Not that I'm aware of.

16  Q.   Again, with respect to your opposition to the national

17        health-care bill, other than hearing that from you in

18        your church, where might I find evidence of that

19        publicly available?

20  A.   Of my opposition?

21  Q.   Yes.

22  A.   I'm not -- I don't know.

23  Q.   Would it be fair to say that I would need to hear that

24        from you at your church and that there is no other

25        public opportunity to obtain that knowledge?

1   A.   I'm trying to recall if there was any kind of petition.

2        I believe that that would be the case.

3   Q.   When you were picketing outside abortion -- an abortion

4        clinic in Illinois, do you recall roughly how many

5        people were with you?

6   A.   One to two.

7   Q.   Did you carry signs?

8   A.   Yes.

9   Q.   As women were entering the abortion clinic, did you

10       attempt to engage them in conversation?

11  A.   No.

12  Q.   What was on the signs?

13  A.   It may have said, abortion kills babies.

14  Q.   Do you think you may have had signs depicting any

15       images?

16  A.   No.

17  Q.   Do you think that women who saw those signs and were

18       entering the clinic to obtain an abortion may have

19       thought from that sign that your position was that they

20       were going into the building to kill their baby?

21  A.   Yes.

22  Q.   And in Marysville, how many people were with you?

23  A.   Four.

24  Q.   Again, did you carry signs?

25  A.   Yes.

1   Q.   And what did those signs say?

2   A.   You think I'd be able to remember.  I'm not recalling

3        right now.

4   Q.   Do you think they might have said something like,

5        abortion kills babies?

6   A.   No.  It was something like, choose life, but it was not

7        that.

8   Q.   Do you know if any of the signs depicted images?

9   A.   The sign that I had had a little baby on it.

10  Q.   An aborted baby?

11  A.   No.

12  Q.   A baby that had been born?

13  A.   That's correct.

14  Q.   And at each location -- well, let's start with

15       Marysville.  How close would a woman who was going into

16       the building have come to you physically as she walked

17       into the building?

18  A.   Must be -- we were off the property on roadside.  The

19       distance must be -- at a guess, I'm going to say 80

20       feet.

21  Q.   Did the people with you in Marysville or yourself say

22       anything to the women as they went into the clinic?

23  A.   Yes.

24  Q.   What did you say?

25  A.   I did not speak, but others engaged people in

1       conversation, encouraged them to keep their baby.

2   Q.  And did they make any negative statements about this

3       being wrong or murder?

4   A.  No.

5   Q.  And when they engaged people in conversation, how close

6       were they to the individual?

7   A.  Within close speaking distance, five feet.

8   Q.  Are you aware or have you ever heard of doctors who

9       perform abortions being shot and killed by those who

10      oppose abortion?

11  A.  Yes.

12  Q.  And are you aware or have you ever heard of those who

13      oppose abortion burning down abortion clinics?

14  A.  Yes.

15  Q.  Do you think a woman who is walking into an abortion

16      clinic that you were picketing in Illinois or Marysville

17      may have felt threatened or harassed?

18  A.  It's possible.

19  Q.  And do you think that it was inappropriate for you to be

20      there picketing, holding signs, or engaging people in

21      conversation because they felt threatened or harassed?

22  A.  No.

23  Q.  And would that be because you have a First Amendment

24      right to express your opinion?

25  A.  And because of a moral conviction that I have regarding

1        the issue of abortion.

2                MS. EGELER:  Okay, no further questions.

3                MR. STAFFORD:  Nothing from me.

4                MS. EGELER:  Okay.  Thank you for coming in this

5        morning.  Appreciate it.

6                THE WITNESS:  You're welcome.

7

8                                    (Whereupon the deposition
                                     concluded at 10:39 a.m.)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 73

```
 1                          CERTIFICATE

 2   STATE OF WASHINGTON )
                         )
 3   COUNTY OF SNOHOMISH )

 4            I, the undersigned Notary Public in and for the

 5   State of Washington, do hereby certify:

 6            That the foregoing is a full, true, and correct

 7   transcript of the testimony of the witness named herein,

 8   including all objections, motions, and exceptions;

 9            That the witness before examination was by me duly

10   sworn to testify truthfully and that the transcript was made

11   available to the witness for reading and signing upon

12   completion of transcription, unless indicated herein that the

13   witness waived signature;

14            That I am not a relative or employee of any party

15   to this action or of any attorney or counsel for said action

16   and that I am not financially interested in the said action

17   or the outcome thereof;

18            That I am sealing the original of this transcript

19   and promptly delivering the same to the ordering attorney.

20            IN WITNESS WHEREOF, I have hereunto set my hand and

21   seal this 7th day of October, 2010.

22

23            _____
              Notary Public in and for the State of Washington
24                    residing at Edmonds, Washington.
                       (Notary expires 3/09/13)
25                        (CCR No. 2699)
```

Tracey Juran, Certified Court Reporter

# Exhibit One



| | Enter Keywords | Search |

## Corporations Division

Home    Search    Apostilles    Domestic Partnerships    Awards Program    Public Notices



Redacted

**NEW! - SEARCH APPS ON MOBILE DEVICES**

 

**ALL CORPORATIONS DATA DOWNLOAD**

Download the whole Corporations search database in XML format. Average file size is 70 Mb compressed, 750 Mb uncompressed.

Neither the State of Washington nor any agency, officer, or employee of the State of Washington warrants the accuracy, reliability, or timeliness of any information in the Public Access System and shall not be liable for any losses caused by such reliance on the accuracy, reliability, or timeliness of such information. While every effort is made to ensure the accuracy of this information, portions may be incorrect or not current. Any person or entity who relies on information obtained from the System does so at his or her own risk.

| | | |
|---|---|---|
| Address Confidentiality | Domestic Partnerships | Medals of Merit & Valor |
| Apostilles | Elections & Voting | Newsroom |
| Archives | Heritage Center | Productivity Board |
| Charities | International Trade | State Flag |
| Corporations | Legacy Project | State Seal |
| Digital Signatures | Library | Washington History |

Available RSS Feeds: News | Blog | More...

Phone Numbers | Privacy Policy | Accessibility

Washington Secretary of State

Ex. ____    Date 9/24/10

Witness

Redacted

Tracey L. Juran, CCR

Exhibit Two

Organization & Community Endorsements

UPCOMING EVENTS    TALKING POINTS    DONATE NOW

Home    Event Schedule    Latest News    Talking Points    Donate Now    Info for Churches    Video    Endorsements    Contact Us

## Preserving Marriage, Protecting Families

**DONATE NOW**

### Organization & Community Endorsements

The following organizations and community leaders endorse the campaign to REJECT R-71/SB 5688

Redacted

Join the growing Protect Marriage Washington coalition by contacting us on this page.

Next >

## Upcoming Events

### PDF Downloads

**R-71 Doorbell Flier**
PAGE 1 - PAGE 2

**R-71 Window Sign**

## Latest News

Same-Sex Marriage and the Threat to Religious Liberty

Stop the Trojan Horse!

Referendum (71) Sunday and other campaign news!

Governor OKs domestic partner rights law

## Press Release

Court Prohibits Release of Referendum Petitions

U.S. Supreme Court Returns Petition Signing Case to District Court

Update on R-71 Supreme Court case

Same-Sex Marriage Takes Center Stage at the Supreme Court

## Endorsements

State Leaders Support REJECT R-71 Effort!

Organization & Community Endorsements

## Like it? Share it!



## Mission

The mission of the new PAC is to organize the effort to gather the **120,577 required signatures** for Referendum 71 by **July 25, 2009** to bring the controversial Senate Bill 5688 before the voters of Washington State in November. SB 5688 is a 110 page document which includes the phrase **"marriage shall apply equally to state registered domestic partnerships"** 180 times.

SB 5688 was packaged and presented to the legislature as a Domestic Partnerships expansion of benefits. **In truth, it will demolish the state's historical understanding and definition of marriage** as that of uniting a man and a woman for life as Washington State will immediately become subject to litigation by same-sex partners demanding that the courts overturn the Defense of Marriage Act and impose **"same-sex marriage"** (as happened recently in California prior to Proposition 8).

Ex. 2            Date 9/24/10

Witness   Redacted

Tracey L. Juran, CCR

Redacted

9/17/2010

# Exhibit Three

Building Confidence in the Political Process
**pdc** **Public Disclosure Commission**

| HOME | PUBLIC RESOURCES | FILER RESOURCES | SEARCH THE DATABASE | VIEW ACTUAL REPORTS | ONLINE FILING |

| CANDIDATES | COMMITTEES | INDEPENDENT SPENDING | ADVANCED SEARCH |

## ADVANCED SEARCH DETAILED CONTRIBUTIONS

| CONTRIBUTIONS | EXPENDITURES |

NOTE: Click on a column header to sort by that column, or click on the ▼ icon to filter your results

Drag a column header and drop it here to group by that column

| Report | Name | Contributor | Date | Amount | P/G | Employer | Occupation | Description |
|--------|------|-------------|------|--------|-----|----------|------------|-------------|
| Report | PROTECT MARRIAGE WA | Redacted | Redacted | Redacted | N | | | |
| Report | PROTECT MARRIAGE WA | | | | N | | | |
| Report | PROTECT MARRIAGE WA | | | | N | | | |

Displaying items 1 - 3 of 3

| 1 |

HOME / PRIVACY NOTICE / EMPLOYMENT / SITE MAP
PUBLIC DISCLOSURE COMMISSION / 711 CAPITOL WAY #206 / PO BOX 40908 / OLYMPIA, WA 98504-0908
TOLL FREE - 1-877-601-2828 / PHONE 360-753-1111 / FAX (360)753-1112 / EMAIL pdc@pdc.wa.gov
OFFICE HOURS: 8:00AM - 5:00PM Monday - Friday  Closed Weekends & State Holidays.

Access Washington™

Ex. _3_____ Date 9/24/10

Witness [Redacted]

Tracey L. Juran, CCR

# Exhibit Four

PUBLIC DISCLOSURE COMMISSION
711 CAPITOL WAY RM 206
PO BOX 40908
OLYMPIA WA 98504-0908
(360) 753-1111
TOLL FREE 1-877-601-2828

**pdc**

# CASH RECEIPTS
# MONETARY
# CONTRIBUTIONS

(1/02)

**C3**

THIS SPACE FOR OFFICE USE

100329360

10-14-2009

Candidate or Committee Name (Do not abbreviate. Use full name.)
Protect Marriage Washington

Mailing Address
PO Box 501

| City | Zip + 4 | Office Sought (candidates) | Election Date |
|------|---------|---------------------------|---------------|
| Arlinton, WA | 98223 | | 2009 |

1. MONETARY CONTRIBUTIONS DEPOSITED IN ACCOUNT   Ex. 4   Date 9/24/10

Witness   [Redacted]   Tracey L. Juran, CCR

| Date Received | | Amount | Total |
|---------------|---|--------|-------|
| | a. Anonymous ................................................................ | | |
| | b. Candidate's personal funds deposited in the bank (include candidate loans in 1c) ............... | | |
| | c. Loans, notes, security agreements. Attach Schedule L .................... | | |
| | d. Miscellaneous receipts (interest, refunds, auctions, other). Attach explanation ............. | | |
| Various | e. Small contributions $25.00 or less not itemized and number of persons giving 35 (persons) | 649.98 | |

2. CONTRIBUTIONS OVER $25.00

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | P R I | G E N | Amount | Aggregate* Total |
|---------------|-----------------------------------------------|------------------------------------------------------------------|-------|-------|--------|------------------|
| Redacted | | | | | | |

| | | | |
|---|---|---|---|
| ☒ Check here if additional pages are attached | Sub-total | 1,149.98 | |
| | Amount from attached pages | 7,706.00 | *See reverse for details. |
| TOTAL FUNDS RECEIVED AND DEPOSITED OR CREDITED TO ACCOUNT Sum of parts 1 and 2 above. Enter this amount in line 1, Schedule A to C4. | | 8,855.98 | |

| 4. Date of Deposit | I certify that this report is true and complete to the best of my knowledge | |
|--------------------|------------------------------------------------------------------------------|---|
| 10/09/09 | Treasurer's Signature | Date |
| | | 10-14-2009 |
| Treasurer's Daytime Telephone No.: | | |

# RECEIPTS CONTINUATION SHEET (Attachment to C-3 Form)

Page 2

| Candidate or Committee Name (Do not abbreviate. Use full name.) | Deposit Date |
|---|---|
| Protect Marriage Washington | 10/09/09 |

**2. CONTRIBUTIONS OVER $25.00**

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | P R I | G E N | Amount | Aggregate Total* |
|---|---|---|---|---|---|---|
| Redacted | | | | | | |

Page Total    2,225.00

# RECEIPTS CONTINUATION SHEET (Attachment to C-3 Form)

Page 3___

| Candidate or Committee Name (Do not abbreviate.  Use full name.) | Deposit Date |
|---|---|
| Protect Marriage Washington | 10/09/09 |

2. CONTRIBUTIONS OVER $25.00

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:*<br>Employer's Name, City and State | P R I | G E N | Amount | Aggregate Total* |
|---|---|---|---|---|---|---|
| | Redacted | | | | | |

Page Total   1,300.00

# RECEIPTS CONTINUATION SHEET (Attachment to C-3 Form)

Page 4

| Candidate or Committee Name (Do not abbreviate. Use full name.) | Deposit Date |
|---|---|
| Protect Marriage Washington | 10/09/09 |

| 2. CONTRIBUTIONS OVER $25.00 | | | | | | |
|---|---|---|---|---|---|---|
| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | P R I | G E N | Amount | Aggregate Total* |
| | | Redacted | | | | |

Page Total    1,996.00

Exhibit Five

**pdc** Building Confidence in the Political Process
**Public Disclosure Commission**

| HOME | PUBLIC RESOURCES | FILER RESOURCES | SEARCH THE DATABASE | VIEW ACTUAL REPORTS | ONLINE FILING |
|---|---|---|---|---|---|

| CANDIDATES | COMMITTEES | INDEPENDENT SPENDING | ADVANCED SEARCH |
|---|---|---|---|

### ADVANCED SEARCH DETAILED CONTRIBUTIONS

| CONTRIBUTIONS | EXPENDITURES |
|---|---|

NOTE: Click on a column header to sort by that column, or click on the 🔽 icon to filter your results

Drag a column header and drop it here to group by that column

| Report | Name | Contributor | Date | Amount | P/G | Employer | Occupation | Description |
|---|---|---|---|---|---|---|---|---|
| Report | PROTECT MARRIAGE WA | Redacted | | | N | | | |
| | 1 | | | | | | | Displaying items 1 - 1 of 1 |

HOME / PRIVACY NOTICE / EMPLOYMENT / SITE MAP

PUBLIC DISCLOSURE COMMISSION / 711 CAPITOL WAY #206 / PO BOX 40908 / CLYMPIA, WA 98504-0908
TOLL FREE - 1-877-601-2828 / PHONE 360-753-1111 / FAX (360)753-1112 / EMAIL pdc@pdc.wa.gov
OFFICE HOURS: 8:00AM - 5:00PM Monday - Friday  Closed Weekends & State Holidays.

Access
Washington™

Ex. 5    Date 9/24/10

Witness [Redacted]

Tracey L. Juran, CCR

Exhibit Six

**PUBLIC DISCLOSURE COMMISSION**
711 CAPITOL WAY RM 206
PO BOX 40908
OLYMPIA WA 98504-0908
(360) 753-1111
TOLL FREE 1-877-601-2828

# CASH RECEIPTS MONETARY CONTRIBUTIONS

**C3**
(1/02)

THIS SPACE FOR OFFICE USE

100314464

07-06-2009

Candidate or Committee Name (Do not abbreviate. Use full name.)
Protect Marriage Washington

Mailing Address
PO Box 501

| City | Zip + 4 | Office Sought (candidates) | Election Date |
|------|---------|---------------------------|---------------|
| Arlinton, WA | 98223 | | 2009 |

## 1. MONETARY CONTRIBUTIONS DEPOSITED IN ACCOUNT     Ex. 6 _____ Date 9/24/10

Witness [Redacted]
Tracey L. Juran, CCR

| Date Received | | Amount | Total |
|---------------|---|--------|-------|
| | a. Anonymous ............................................................ | | |
| | b. Candidate's personal funds deposited in the bank (include candidate loans in 1c).............. | | |
| | c. Loans, notes, security agreements. Attach Schedule L ............................. | | |
| | d. Miscellaneous receipts (interest, refunds, auctions, other). Attach explanation .................... | | |
| Various | e. Small contributions $25.00 or less not itemized and number of persons giving _____ (persons) | 185.00 | |

## 2. CONTRIBUTIONS OVER $25.00

| Date Received | Contributor's Name, Address, City, State, Zip | Contributions of more than $100:* Employer's Name, City and State | P R I | G E N | Amount | Aggregate* Total |
|---------------|----------------------------------------------|-------------------------------------------------------------------|-------|-------|--------|------------------|
| | Redacted | | | | | |

| | | | |
|---|---|---|---|
| ☒ Check here if additional pages are attached | **Sub-total** | 1,376.00 | |
| | **Amount from attached pages** | 250.00 | *See reverse for details. |
| 3. TOTAL FUNDS RECEIVED AND DEPOSITED OR CREDITED TO ACCOUNT Sum of parts 1 and 2 above. Enter this amount in line 1, Schedule A to C4. | | 1,626.00 | |

| 4. Date of Deposit | I certify that this report is true and complete to the best of my knowledge |
|--------------------|---------------------------------------------------------------------------|
| 07/03/09 | Treasurer's Signature                    Date |
| | 07-06-2009 |
| Treasurer's Daytime Telephone No.: | |

Exhibit Seven

Ex. 7    Date 9/24/10

Witness ▓▓▓Redacted▓▓▓

Tracey L. Juran, CCR

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### TACOMA DIVISION

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON,<br><br>                    Plaintiffs,<br>        vs.<br><br>SAM REED, in his official capacity as Secretary of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>                    Defendants. | No. 3:09-CV-05456-BHS<br><br>**DECLARATION OF**<br>▓▓Redacted▓▓<br>**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>NOTE ON MOTION CALENDAR: September 3, 2009<br><br>The Honorable Benjamin H. Settle |

I, ▓▓Redacted▓▓ make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am a resident of the state of Washington over 18 years of age, and my statements herein are based on personal knowledge.

2. I have been aware of Referendum 71 since it was filed in Olympia. Although I did not go out and gather signatures, I approved of having the petition available at the church where I am Pastor, so that members of my congregation could sign.

3. On July 27, 2009, I received a phone call at my office from an individual who identified herself as a transgender woman, who had previously been a member of special forces. The caller remained calm, but persistent, in asking why I would want to limit her rights.

Declaration of
▓▓Redacted▓▓
(No. 3:09-CV-05456-BHS)

1

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

4. After several statements back and forth, the caller asked how I would like it if a number of her friends were brought to picket the church or to attend a morning service.  I responded that the church is open to all who wish to come, but we expect everyone to conduct themselves in a way appropriate to a public worship service.  The caller assured me that this would be the case.

5. This caller was reserved in tone, but the spirit of the call was certainly one of challenge to the appropriateness of my stand.  The caller also communicated that my opinion justified some kind of retaliatory action on his/her part, so that I - and others who are like-minded - will pay some kind of bad consequence for the expression of our opinions.

6. On August 12, 2009, my secretary received a phone call while I was out of the office.  The caller identified herself as Krystal Mountaine, and called from the same number as the caller who called on July 27, 2009.  She stated that she would like to talk to the Pastor, and asked to have me call.  I have not returned this call.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.


Executed on: August ___, 2009.



_____

Signed: <span>Redacted</span>

Declaration of
Redacted
(No. 3:09-CV-05456-BHS)

2

BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, Indiana 47807-3510
(812) 232-2434

# CERTIFICATE OF SERVICE

1

2    I, Sarah E. Troupis, am over the age of 18 years and not a party to the above-captioned

3    action. My business address is 1 South Sixth Street; Terre Haute, Indiana 47807-3510.

4        On August @@, 2009, I electronically filed the foregoing document described as

5    Declaration of ▆Redacted▆ with the Clerk of Court using the CM/ECF system which will send

6    notification of such filing to:

7                          James K. Pharris
                          jamesp@atg.wa.gov
8              *Counsel for Defendants Sam Reed and Brenda Galarza*

9        I declare under the penalty of perjury under the laws of the State of Indiana that the above is

10   true and correct. Executed this @@ day of August, 2009.

11

12   Sarah E. Troupis
     *Counsel for All Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of
Redacted
(No. 3:09-CV-05456-BHS)                          3              BOPP, COLESON & BOSTROM
                                                                1 South Sixth Street
                                                                Terre Haute, Indiana 47807-3510
                                                                (812) 232-2434

Exhibit Eight

**Pastor** ████████ Redacted ████████

From: ████████ Redacted ████████
Sent: Wednesday, August 19, 2009 5:24 PM
To: 'Sarah Troupis'
Cc: ████████ Redacted ████████
Subject: RE: Declaration

Hi Sarah,

I have imbedded my responses in your initial e-mail.

████████ Redacted ████████

Ex. _8_____ Date _9/24/10_

████████ Redacted ████████
Witness
Tracey L. Juran, CCR

**From:** Sarah Troupis [mailto:stroupis@bopplaw.com]
**Sent:** Wednesday, August 19, 2009 1:03 PM
**To:** ████████ Redacted ████████
**Subject:** Declaration

Dear ████████ Redacted ████████

Thanks for helping us out with a declaration!  I just have a few questions to start; as I think I mentioned on the phone, once I start drafting a declaration for your review, I will probably have several others to help flesh out the contents of the declaration.

1.  I will need your full name and address.  We don't actually put the address in the declaration; we just use that here at the office if we need to get in touch with you.

████████ Redacted ████████

2.  How have you been involved with Referendum 71?  Were you out collecting signatures?  Are you working with any groups on it?

**I have been aware of Referendum 71 since it was filed in Olympia.  I was not out collecting signatures – though the petitions were available in our church by my approval.**

3.  You said you received a couple of phone calls.  Could you describe the phone calls for me?  Not just the message, but the tone of the caller, when it was received, etc.  If you could also tell me any emotional effects from the calls, that would be great.

**The first call was received in my office on July 27, 2009, from an individual who identified herself as a transgender woman who had previously been in special forces.  The caller remained calm but persistent in asking why I would want to limit her rights.  After some statements back and forth, the caller asked how I would like it if a number of friends were brought to picket the church or to attend a morning service.  I responded that the church is certainly open to all who wish to come but that we expect all to conduct themselves in a way appropriate to a public worship service.  I was assured that that would be the case.**

**The caller was reserved in tone – however, the spirit was certainly one of challenge to the appropriateness of my stand.  The caller certainly also communicated that my stand justified some kind of retaliatory ction on his/her part, so that I – and others who are likeminded – will pay some kind of consequence for the expression of our stand.**

The second call was on August 12, 2009, and was received by my secretary while I was out of the office. The call identified herself as Crystal Mountaine and called from the same number as the first phone call. She said that she would like to talk to the Pastor and asked to have me call.  I have not returned the call.

4.   If you have had any other harassment about R-71, I would like to hear about that, too.

**These are the only instances of harassment we have experienced so far.**

Thanks - and if you have any questions or concerns, please feel free to call or email me!

-Sarah-

Sarah Troupis
Bopp, Coleson & Bostrom
1 South 6th Street
Terre Haute, Indiana 47807

Phone: 812-232-2434
Fax: 812-235-3685
E-mail: stroupis@bopplaw.com