The Honorable Benjamin H. Settle

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON,

                    Plaintiffs,

     v.

SAM REED, in his official capacity as Secretary of State of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,

                    Defendants.

NO. 09-cv-05465-BHS

DESIGNATED DEPOSITION TESTIMONY OF [Redacted] [Redacte]

Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors Washington Families Standing Together and the Washington Coalition for Open Government and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the "Parties") hereby submit combined designated deposition testimony for [Redacted] [Redacte]

Defendants and Intervenors object to the admission of any deposition testimony taken of any witnesses who could be called to testify at trial.  Therefore, the designations of

DESIGNATED DEPOSITION
TESTIMONY OF [Redacted]
- No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

1   Defendants and Intervenors are being submitted in the event that the Court decides to admit

2   deposition testimony.

3        For the Court's convenience Defendants' designations have been highlighted in blue,

4   Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5   been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6   filing the redacted versions of these documents.

7        DATED this 6th day of September, 2011.

8   ROBERT M. MCKENNA
    Attorney General
9

10    s/ William Clark
    _____
    WILLIAM CLARK, WSBA #9234
11  Senior Counsel
    800 Fifth Ave, Ste 2000
12  Seattle, WA 98104
    206-464-7352
13  BillC2@atg.wa.gov
    ANNE EGELER, WSBA #20258
14  Deputy Solicitor General
    PO Box 40100
15  Olympia, WA  98504-0100
    360-664-3027
16  Annee1@atg.wa.gov
    _____
17

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION                     2                ATTORNEY GENERAL OF WASHINGTON
TESTIMONY OF Redacted                                         Complex Litigation Section
- No. 09-cv-05465-BHS                                       800 Fifth Avenue, Suite 2000
                                                            Seattle, WA  98104-3188
                                                                (206) 464-7352

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON,<br><br>              Plaintiffs,<br><br>    v.<br><br>SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 09-CV-05456-BHS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

Deposition Upon Oral Examination
Of
███████Redacted███████

_____

Taken by:  Tracey L. Juran, CCR
           CCR No. 2699

September 24, 2010

Everett, Washington

```
 1                      APPEARANCES

 2

 3

 4   For Protect Marriage Washington:

 5        Stephen Pidgeon, Attorney at Law
          3002 Colby Avenue, Suite 306
 6        Everett, Washington  98201-4081

 7

 8
     For the Defendants:
 9
          Anne E. Egeler, Deputy Solicitor General
10        Attorney General of Washington
          1125 Washington Street SE
11        P.O. Box 40100
          Olympia, Washington  98504-0100
12

13

14   For Washington Families Standing Together:

15        Ben Stafford, Attorney at Law
          Perkins Coie
16        1201 Third Avenue, Suite 4800
          Seattle, Washington  98101-3099
17

18

19

20

21

22

23

24

25
```

Tracey Juran, Certified Court Reporter

```
                                                        Page 3
 1                             INDEX

 2

 3

 4                                             Page No.

 5   EXAMINATION

 6       By Ms. Egeler                                 5
         By Mr. Stafford                              65
 7       By Mr. Pidgeon                               96
         By Ms. Egeler                               113
 8

 9

10   EXHIBITS MARKED

11       No. 1 (1-page double-sided printout          10
         of an article from the [Redacted]
12       [Redacted] Web site titled [Redacted]
         [Redacted]
13       [Redacted]         dated August 23, 2009)

14       No. 2 (1-page [Redacted] County              30
         Incident Report dated [Redacted]
15       [Redac]; 1-page [Redacted] Police
         Department Follow-Up Report dated
16       [Redacted]       ; 1-page [Redacted]
         County Supplemental Report dated
17       [Redacted]       ; 1-page Incident
         Statement Form signed by [Redacted]
18       [Redacted] on [Redacted]   , 2009; 1-page
         Incident Statement Form signed by
19       [Redacted]   on [Redacted]   , 2009)

20       No. 3 (3-page printout from the [Red]        34
         County Web site of an article
21       titled [Redacted]
         [Redacted]
22       [Redacted]
         [Redacte] August 3, 2010)
23
         No. 4 (1-page printout of a page             52
24       from YouTube titled [Redacted]
         [Redacted]
25       printed on September 22, 2010)
```

Tracey Juran, Certified Court Reporter

Page 4

1                        INDEX, continued

2

3

4                                                      Page No.

5      EXHIBITS MARKED, continued

6          No. 5 (2-page printout of an article           73
           from the █████████         Web site
7          titled ████████████████████
           ████████              dated
8          April 16, 2009)

9          No. 6 (9-page printout of the blog             84
           on the ███████████████████████
10         ████████   Web site, with
           postings dating from August 21,
11         2009, to June 16, 2010)

12         No. 7 (2-page printout from the                86
           ████████████████   Web site
13         showing ████████   responses to
           a survey, printed on September 23,
14         2010)

15         No. 8 (2-page printout from Facebook           90
           of an article titled ████████████
16         ████████████████████   by
           ████████   dated March 29, 2010)
17

18

19

20

21

22

23

24

25

Page 5

1              Be it remembered that the deposition upon oral

2        examination of Redacted was taken on

3        September 24, 2010, at the hour of 1:04 p.m. at 3501

4        Colby Avenue, Suite 200, Everett, Washington, before

5        Tracey L. Juran, CCR, Notary Public in and for the State

6        of Washington residing at Edmonds, Washington.

7              Whereupon the following proceedings were had,

8        to wit:

9                          * * * * *

10   Redacted                 having been first duly sworn on
                              oath by the Notary Public to tell
11                            the truth, the whole truth, and
                              nothing but the truth, was deposed
12                            and testified as follows:

13

14                        EXAMINATION

15   BY MS. EGELER:

16   Q.    Redacted    , as I stated earlier, my name's Anne Egeler

17        and I'm a Deputy Solicitor General with the state

18        Attorney General's Office.

19              Have you ever been deposed before?

20   A.    No.

21   Q.    I'll go over some ground rules.  Everything we say is

22        being taken down by our court reporter, and it's

23        important that we let each other finish speaking before

24        the other person talks so that she's able to get

25        everything down correctly.  It's also important that we

```
 1           indicate yes or no verbally rather than with a head nod
 2           or an mm-hm sound, because only that verbal response
 3           will show up on the record.  And it's also important
 4           that we understand each other.  So if I ask something
 5           and it's unclear or confusing, please let me know, okay?
 6     A.    Okay.
 7     Q.    Can you please tell me what your current employment is.
 8     A.    Currently, I am a homemaker and full-time ▓Redacted▓
 9           ▓Redacted▓
10     Q.    And was that the case in 2009 as well?
11     A.    Yes.
12     Q.    Any other employment in 2009?
13     A.    No.
14     Q.    And are you familiar with Referendum 71?
15     A.    Yes, I am.
16     Q.    Did you sign the petition?
17     A.    Yes, I did.
18     Q.    Do you remember where you were when you signed?
19     A.    No, I don't.  It's possible that I signed it at my
20           church.
21     Q.    And where is that church?
22     A.    ▓Redacted▓ in Edmonds.
23     Q.    And when you signed, was it in a public location or was
24           it in a private office of the church?
25     A.    I'm sorry; I don't remember exactly when I signed.  So
```

1      I'm just guessing that I signed it at church because the

2      petitions were available there.

3  Q.  Did you collect signatures for the petition at all?

4  A.  I did at church at a booth.  There were several people

5      collecting signatures over the course of -- I don't

6      remember how many Sundays.  Maybe three Sundays.

7  Q.  Did you collect signatures over all those three Sundays?

8  A.  No.  I had a shift.  We were assigned shifts.  So I

9      don't think I did.  I'm sorry; I don't remember exactly

10     how many times, but at least once.

11 Q.  In the course of collecting signatures, did you indicate

12     to anyone that you supported Referendum 71?

13 A.  Yes.

14 Q.  And did you indicate that you had signed the petition

15     yourself?

16 A.  Yes, I did, both while I was collecting signatures and

17     also later, when a reporter asked me several times if I

18     had signed the R-71 petition.

19 Q.  And that reporter, was that a reporter with the Redacted

20     Redacted

21 A.  Yes, it was.

22 Q.  And he asked you whether you had signed?

23 A.  He pressured me to say whether I had signed it.  It was

24     in the course of an interview about my candidacy and he

25     asked me if I had signed it and I said, no comment.  And

```
 1        then later in the conversation he asked me again and I
 2        said, I'd rather not say.  And he said, what, are you
 3        afraid of what might happen, in a kind of teasing,
 4        mocking kind of voice.
 5   Q.   And did you choose to answer his question?
 6   A.   And then I chose to answer.  Then I decided, if I don't
 7        stand up, who will?
 8   Q.   And when you answered his question, were you aware that
 9        he might publish that fact in the newspaper?
10   A.   I was highly aware, because I knew I was speaking to
11        [Redacted], who's a political reporter for the
12        [Redacted]
13   Q.   So your expectation was that he would publish that.
14   A.   I knew it was a distinct possibility.
15   Q.   And did he, in fact, publish that?
16   A.   He did.
17   Q.   And do you remember what month that was?
18   A.   I remember it very well, because I got a death threat
19        that night.  Actually, my son took the call.
20   Q.   What month was it that the article --
21   A.   That was --
22   Q.   -- was published?
23   A.   -- [Redacted] 2009.  It was in the Sunday-morning
24        paper.  I was on the front page.
25   Q.   And did the entire article focus on the fact that you
```

1     had signed the petition?

2  A.  No, it did not.  Only one sentence of the article

3     mentioned that I had signed the petition.

4  Q.  Did the article mention anything else about your

5     candidacy?

6  A.  Oh, yes.  It was a nice long article --

7  Q.  Did it --

8  A.  -- on the -- it was one column, the left-hand column on

9     the front page -- and it's still on-line on

10    [Redacted] if you'd like to see it -- and it was also

11    on page 4, maybe about a quarter of the page, an article

12    about places I had spoken and what I had done in the

13    campaign so far.  It was a little unusual for a

14    candidate to start so early for a [Redacted]

15    race --

16  Q.  I'm not --

17  A.  -- and my kickoff was to be the next day.

18       Oh, yeah, this is the [Redacted] -- yes, this is

19    the article as it's printed out when you click on print,

20    you know what I mean?

21  Q.  Why don't you --

22  A.  But yes, this is --

23  Q.  -- keep that copy.

24  A.  -- the article.

25  Q.  We'll mark that as Exhibit No. 1 to your deposition.

Page 10

```
1              [Off the record - discussion]

2         [Exhibit 1 marked for identification]

3    Q.   (by Ms. Egeler)  So you have in front of you what we've

4         marked as Exhibit No. 1.  And is that the article that

5         you referred to?

6    A.   Yes, it is.

7    Q.   And this is the Internet version -- as you can see on

8         the bottom, the Internet Web site is there -- but is

9         this the same article that was published on that Sunday,

10        ██Redacted██ of 2009?

11   A.   It appears to be, yes.

12   Q.   Can you tell me where the sentence is that you were

13        referring to that talked about you signing the --

14   A.   Yes.  If you look at the second page --

15   Q.   Which is on the back --

16   A.   Page 2.

17   Q.   -- of the --

18   A.   Mm-hm.  In the middle of that page, paragraph discussing

19        initiatives says, "██Redacted██████████████████████

██   ██████████████████████████████████████████████████████

██   ████████████████████████   ███████████████████████████

██   ████████████████████████████████████████████████████████

██   █████████████████████████████████████████████████████

██   ███████████████

25   Q.   And two paragraphs above that, does it also refer to you
```

Tracey Juran, Certified Court Reporter

Page 11

1      as being a staunch fiscal and social conservative who

2      belongs to the National Rifle Association?

3   A.   Yes.

4   Q.   And does it talk about your candidacy with respect to

5      any other issues other than gun rights and signing the

6      initiative?

7   A.   Could you rephrase the question.

8   Q.   Well, let me ask it a little differently.

9           Does this talk about the fact that you are a Tea

10     Party activist --

11  A.   Oh, yes.

12  Q.   And it also mentions your position on economic issues;

13     correct?

14  A.   Yes.  It does say -- well, fiscal conservative, that's

15     economic issues.

16  Q.   And the headline here mentions that you're a Tea Party

17     activist.  Was that same headline used in the newspaper?

18  A.   Yes, it was.

19  Q.   Did you make any other public statement about the fact

20     that you supported Referendum 71?

21  A.   Before the death threat?

22  Q.   We'll get to the death threat, I promise you.

23          But at --

24  A.   Mm-hm.

25  Q.   -- any time, have you made any other statements that --

Tracey Juran, Certified Court Reporter

Page 12

1   A.   Certainly.

2   Q.   Can you tell me what those times were.

3   A.   At the -- at my kickoff the following night, on

4        August 24th, I mentioned that I had -- I think I

5        mentioned that I had signed this petition.  There was

6        also a time when I spoke to a group at -- that was

7        meeting at Edmonds Church of God.  And they asked me

8        about my stance on social issues, such as abortion and

9        marriage, and I did mention that I had signed the R-71

10       petition.

11  Q.   The first event you talked about was the August 24th

12       kickoff.  How many people were in attendance for that?

13  A.   About 120.

14  Q.   And were there any members of the media there to cover

15       it?

16  A.   Not that I'm aware of.

17  Q.   And when you spoke at the church, how many people were

18       at that event?

19  A.   I think there were around 40 at that event.

20  Q.   And any members of the media there?

21  A.   No.

22  Q.   Have you made any statement about your stance on

23       domestic partnership in any sort of campaign literature

24       or voters' guides?

25  A.   No, but I have on candidate questionnaires.

Page 13

1    Q.   Would these candidate questionnaires be publicly

2         available?

3    A.   Yes, I believe so.  I believe the Family Policy

4         Institute of Washington questionnaire is available on-

5         line.

6    Q.   And that's one where you made a statement about domestic

7         partnership?

8    A.   If I recall correctly, they did ask about my stance on

9         marriage.  I can't remember how it was phrased or if it

10        was specifically about R-71, but because of the nature

11        of that group, I'm certain that the question of marriage

12        came up.

13   Q.   And did you hesitate to answer the question?

14   A.   No.

15   Q.   Why not?

16   A.   Because I had already crossed that mental hurdle.  I

17        knew the ramifications and the repercussions to myself

18        and my family.

19   Q.   Did you ever go to an R-71 rally?

20   A.   No, I don't believe I did.  I went to the R-71 -- there

21        was an election-night party.  I did go to that in

22        November.

23   Q.   And were there any members of the media there?

24   A.   There were many, many people with cameras in the hall.

25        I don't know if they were media members or not, but I

Page 14

1        wouldn't be surprised.
2   Q.   When did you first --
3   A.   And they were not -- they --
4   Q.   Oh, excuse me.
5   A.   I'll say this:  They filmed -- they took film of my
6        children -- I mean, they deliberately focused on my
7        children's faces and followed us down the hall with the
8        cameras as we walked by.  And that made me nervous
9        because of the death threat.
10  Q.   And by they, who do you mean?  Who was it that --
11  A.   I mean there were at least half a dozen people, maybe
12       ten, a lot of people with big, fancy cameras in the
13       hallway outside of that party.
14  Q.   And when you saw that there were people with cameras
15       outside that party, did you think about not bringing
16       your children to the party?
17  A.   It was too late.  We had already walked in the door.
18       They were filming people as we walked in.
19  Q.   Did you put a Referendum 71 sign in your yard?
20  A.   No.
21  Q.   Did you ever hold a Referendum 71 sign in a public
22       location?
23  A.   No.
24  Q.   Let's talk about that phone call that you referred to
25       earlier that you received after the article was run in

1    the [Redacted] that we've put in as Exhibit No. 1 to

2    your deposition.  Can you tell me about that.

3  A.  Certainly.  Sorry; I seem to be getting a little

4    emotional again.

5  Q.  That's okay.

6  A.  It was about 6:00 --

7  Q.  Do you want a moment?  We can take a --

8  A.  I'd like some --

9  Q.  -- break; it's okay.

10 A.  -- Kleenex available.

11           [Off the record - discussion]

12 Q.  (by Ms. Egeler)  Let's just pause for a second and talk

13    about something else for a moment before we move on to

14    that.

15        When did you first learn that you were a witness in

16    the Doe v. Reed case?

17 A.  I have a hard time placing it.  Sorry; my days are

18    pretty packed and I don't sleep very much.

19 Q.  Was it within the last few months?

20 A.  I believe so, but I can't be certain.

21 Q.  Do you know who contacted you, if you remember?

22 A.  No.  I know that I have been in contact with Larry

23    Stickney, and [Redacted] has talked to me once and

24    Stephen Pidgeon at least once, because I called

25    immediately after the death threat.

```
 1              And after reporting to the police via 911, I then
 2         called the ADF R-71 hot-line number, which I had
 3         programmed into my phone during the time that we at
 4         church were collecting signatures, because some people
 5         at church had expressed fear about signing the petition.
 6         And we were told, I think, by Joseph Backholm of Family
 7         Policy Institute that we could give this 1-800 hot-line
 8         number out as we collected petitions -- or collected
 9         signatures if people expressed fear or concern about
10         their name being on the petition.
11  Q.    When --
12  A.    So when this happened, I had it ready in my phone.  And
13         I called and said, my family just got a death threat.
14         What do we do from here?
15  Q.    My questions were about when you learned that you were a
16         witness in the case and --
17  A.    Yeah, I don't remember.  Now, that was more recent, but
18         I can't place it; I'm sorry.
19  Q.    Do you recall if you were informed that, as a witness in
20         the case, you may be required to publicly testify in a
21         federal court of law?
22  A.    No.  In fact, when I agreed to do the deposition, I said
23         that because I was a candidate, I would agree to do the
24         deposition, but that I didn't really want to publicly
25         testify because it's likely to make the papers and
```

1        possibly change the outcome of the election.

2                I haven't been hiding anything -- I answer frankly

3        when I am asked where I stand on issues -- but I do not

4        want to be portrayed as a single-issue candidate.  And

5        my focus all along has been on jobs, education, and

6        fiscal responsibility.  My campaign is not about the

7        social issues.

8   Q.   I can tell you that the trial in this case would not

9        occur prior to the election.  In fact --

10  A.   Mm-hm.

11  Q.   -- our next time that we go just to talk to the judge

12       about when the court date will be set isn't until

13       November 15th, so it will be after the election.

14               With that understanding, would you have any

15       concerns about publicly testifying in a federal court?

16  A.   No.

17  Q.   If you're ready now, I'd like to --

18  A.   Sure.

19  Q.   -- explore that phone call that you received.

20  A.   Yes.  So let me give a little bit of background.  My

21       parents were visiting from Illinois and my sister --

22       youngest sister, also from Illinois, were visiting and

23       were staying with us in order to attend the campaign

24       kickoff on the 24th.  On Sunday morning, the Redacte

25       the -- I was on the front page of the newspaper with the

Page 18

1    article that we've spoken about.

2        And at 6:00 that night, we received a phone call on

3    our unlisted home phone number.   My 13-year-old answered

4    the phone -- [Redacted] is his name -- and I heard him

5    say, yes, just a moment, please.   Mom, it's for you.

6    And I was in the living room, he was in the kitchen.

7    It's an open -- kind of open hallway there.   And as I

8    walked across the floor towards the phone, his face went

9    white and he said, Mom, you just got a death threat.   He

10   said, I will kill you and your family.

11       I continued walking towards the phone as he was

12   relaying this to me, and right when he finished I was at

13   the phone and picked it up, but the man had already hung

14   up.   My parents were in the room sitting on the couch

15   and my husband was in the room and my 6-year-old

16   daughter was in the room, and all of us became

17   immediately frightened and very aware of where the

18   windows are.   I was immediately angry and resolved --

19   Q.   Do you --

20   A.   -- that I would not back down from this candidacy from a

21   threat like that.

22   Q.   Do you have caller ID on your home phone number?

23   A.   We did not at that time.

24   Q.   Did you press star 69 to get the number?

25   A.   No, because we don't have caller ID.   So I thought about

Page 19

1    calling star 69, but since it would just call him
2    back -- call an angry person back, I wondered, well, how
3    is that going to help anything?  Then I have an angry
4    man on the other end.  I still don't know his number.
5  Q.   So it's your understanding that star 69 dials the number
6    that just called?
7  A.   Yes.  I thought it would redial.
8  Q.   Is that still your understanding?
9  A.   I know that star 57 will trace a call.  The policeman
10    told me that.
11 Q.   And did you press star 57?
12 A.   No.  I did not know that until after the cops came.
13 Q.   And did you call the police when you received that
14    phone --
15 A.   Yes.
16 Q.   -- call?
17        And how long did it take them to respond?
18 A.   We live very near the police station in downtown Redacted
19    and they were there, I would say, perhaps five minutes
20    or less.  It didn't take long.
21 Q.   So it was the Redacted Police Department that you called,
22    the --
23 A.   Yes.
24 Q.   -- city police?
25 A.   Well, I called 911 and I assume I was immediately

Page 20

```
 1        directly routed to the [Redacted] Police.
 2   Q.   And do you remember the name of the officer who
 3        responded?
 4   A.   Yes.  It was [Redacted]
 5   Q.   And did the officer take a report?
 6   A.   Yes.  He took two reports, one from me and one from my
 7        son.
 8   Q.   Did you make a written statement?  Is that the report
 9        that you're referring to?
10   A.   Yes, I believe I did.
11   Q.   And did the officer talk to you about the incident?
12   A.   Yes.  He tried to reassure me that death threats are
13        fairly common, which I found hard to believe.  He told
14        me that, if anything strange happened, that we should
15        call immediately.  He said, for example, if someone
16        seems to be watching the house or following you, you
17        need to report it.
18             He told us about how -- he said, put a Post-It note
19        by each one of your phones with star 57.  That will
20        redial -- or not redial, pardon me; will trace the call
21        and send the information to the police station.  So we
22        did that.  He recommended that we get phones with caller
23        ID and possibly even voice mail -- I mean, not voice
24        mail; what do you call it -- with an answering machine
25        so that we could tape messages or conversations.  We
```

1        haven't done that, but we did go out and purchase all

2        new phones.

3  Q.   And you said that you felt that this call was generated

4        as a result of the article that had run in the [Redacted]

5        newspaper; is that correct?

6  A.   Absolutely.  It was the same day.

7  Q.   And did the caller say that?

8  A.   No.

9  Q.   Did the caller indicate that any position that you were

10       taking on any issue was what was triggering the death

11       threat?

12  A.   All that he said I've already told you.  He said, I will

13       kill you and your -- he said, is [Redacted] there?

14       And -- oh, pardon me; I didn't tell you that.  But my

15       son told me and the policeman later that he had asked

16       for me by name and then had said to him, I will kill you

17       and your family, and he hung up.

18  Q.   So there was no indication of why he wanted to kill you

19       and your family.

20  A.   No.  But as you can see by reading the article, there's

21       nothing else in that article that would have elicited

22       such fury as to make a person dig to find an unlisted

23       home number and then call and then threaten a child.

24       There's nothing else in that article that could possibly

25       provoke that kind of emotional reaction.

Page 22

```
1    Q.   Do you know if Tea Party activists have received any
2         negative publicity or response in this country?
3    A.   In this country, yes, but I'm not aware of any around
4         here who have received threats.
5    Q.   Are you aware of any angry words being said about Tea
6         Party activists in this state?
7    A.   Oh, sure.  Posts on blogs, I suppose, mm-hm.  But I had
8         already been in the paper as a Tea Party activist before
9         in the [Redacted] and had not received a death threat from
10        those articles.  On [Redacted] of 2009, I was -- there
11        was not a picture of me, but my words were on the front
12        page of the [Redacted] and my name, and they said
13        that I was considering running for office.  So at that
14        point I was not yet a candidate, but I had spoken at a
15        large Tea Party rally in Everett on the 15th.
16             And so frankly, I think if it were based on just
17        the phrase "Tea Party," it would be likely that
18        something might have happened earlier.
19   Q.   But this [Redacted] article was the first article after you
20        actually had filed for candidacy?
21   A.   There was an article in July.  I don't remember the
22        length of the article or if I was mentioned -- I can't
23        recall -- but there was a Fourth of July tea party in
24        Everett that received news coverage from the [Redacted].
25   Q.   And that was after you had announced your candidacy?
```

Tracey Juran, Certified Court Reporter

```
 1   A.   Actually announced my candidacy at that rally --

 2   Q.   And was --

 3   A.   -- on the Fourth of July.

 4   Q.   -- that a front-page article --

 5   A.   No.

 6   Q.   -- as well?

 7   A.   No, it wasn't a front-page article.

 8   Q.   And you're not sure if you were mentioned in the

 9        article?

10   A.   No, I don't recall.  I might have been mentioned briefly

11        in it, but I don't recall.

12   Q.   So is it fair to say that given this newspaper article

13        that ran on [Redacted], you suspected that the

14        individual who called was angry and expressing this

15        death threat as a result of the one sentence regarding

16        Referendum 71, but you don't know and it's a guess?

17   A.   Well, my cell-phone number was published in the article.

18        I don't know if it's in this -- no, it's not.  This

19        printed-out version does not show -- on the newspaper,

20        there was also a little square next to it that talked

21        about the kickoff the next day.  It gave the time and

22        the place of the kickoff and it gave the Web site and

23        the phone number, the campaign phone number, which is

24        also my personal cell number.  And they did not call

25        that number.  The person who did this took the time to
```

1      dig and find the unlisted home phone number.

2  Q.  But my question is, it's -- it is -- I understand the

3      circumstances surrounding it and why you have your

4      belief, but it is just a belief and a guess and not

5      fact, correct --

6          MR. PIDGEON:  I'm going to object --

7  Q.  (by Ms. Egeler)  -- with respect to your --

8          MR. PIDGEON:  -- as to form of the question.

9          MS. EGELER:  Excuse me; I'm still asking the

10     question.

11 Q.  (by Ms. Egeler)  -- with respect to your assumption that

12     this individual was responding to the sentence in the

13     newspaper article that talked about Referendum 71?

14         MR. PIDGEON:  Objection to the form; calls for a

15     legal conclusion.

16             Go ahead and answer.

17 A.  Frankly, as I said before, I see no other possible

18     sentence in this article that could cause that kind of

19     emotional reaction.

20 Q.  (by Ms. Egeler)  Let me ask it differently.

21         Do you know if the individual who called was

22     mentally ill?

23 A.  How could I possibly know that when I don't know who it

24     is?

25 Q.  Is the answer no, then?

1    A.    I don't know anything about this person.

2    Q.    Do you know if they -- do you ever give out your home

3          phone number to school groups or organizations that your

4          children belong to?

5    A.    Yes.

6    Q.    Do you know for a fact that this individual did not

7          obtain your number by or through their association with

8          such a group?

9    A.    Highly unlikely.  My children are home schooled.  The

10         number of places that has our home number is limited.

11   Q.    Do you know for a fact that this individual did not

12         receive your home phone number through his association

13         with any organization or group that you gave your home

14         phone number to?

15   A.    How could I possibly know that?

16   Q.    So the answer's no?

17   A.    Of course it's no.

18   Q.    And you don't know why this individual gave you a death

19         threat, do you?  For a fact, do you know why this

20         individual gave you a death threat?

21   A.    No, but --

22              MR. PIDGEON:  Objection --

23   A.    -- I do have --

24              MR. PIDGEON:  Objection to -- I'm going to object

25         to the question; asked and answered.  Also, calls for a

1        legal conclusion.

2    Q.  (by Ms. Egeler)  You can go ahead and answer.

3    A.  I received another death threat a couple nights ago, and

4        this time there is no doubt.

5    Q.  My --

6            MR. STAFFORD:  Objection; nonresponsive.

7    Q.  (by Ms. Egeler)  My question --

8            MS. EGELER:  Let's read back the question, please.

9                [Record read back as requested]

10           MR. PIDGEON:  Is there a question?

11   A.  I cannot think of any other possible reason why someone

12       would have threatened my and my family's lives.

13   Q.  (by Ms. Egeler)  Did you ask this individual why they

14       did it?

15   A.  He hung up before I could speak to him.

16   Q.  So is the answer no?

17   A.  To what?

18   Q.  Did you ask him why he did this?

19   A.  No, I did not ask him.  I could not.  I never spoke to

20       him.

21   Q.  Do you know who he is?

22   A.  No.  And the police did not help me track down who he

23       was.

24   Q.  I misunderstood your comment about the police.  I

25       thought they came to your house within five minutes and

1       spoke to you about the incident.

2  A.   Yes.

3  Q.   Why are you saying the police didn't help you?

4  A.   I did --

5           MR. PIDGEON:   Objection as --

6  A.   -- not say that.

7           MR. PIDGEON:   -- to the form of the question.

8  Q.   (by Ms. Egeler)  Then I misunderstood.  Can you please

9       explain what you did say.

10  A.   My complete sentence was, the police did not help me

11       find who had done it.

12  Q.   Were you satisfied with the efforts of the police that

13       evening?

14  A.   No.  That night -- that evening, I did as they said and

15       I focused on preparing for the kickoff the next night

16       and making safe that my -- or making sure that myself

17       and my family would be safe.  That was my focus that

18       evening.  But it did bother me that the police did not

19       try to ascertain who had made this threat.

20  Q.   What --

21  A.   It's my understanding that it's a felony to make a death

22       threat by the phone.  But there seemed to be no follow-

23       up to actually figure out who did this.

24  Q.   What information did you provide to the police that

25       would have enabled them to figure out who did this,

Page 28

1    given that you did not have caller ID and that you did

2    not press star 57 or any other number to locate the

3    individual's telephone number?

4    A.   Well, for example, the police could have said right

5    then, dial 57, or, call the telephone company and get --

6    we will get the permission to look at the phone records

7    and see who called you.  They do have ways to do that.

8    But nobody -- the police did not bring that up that

9    night.

10   Q.   I misunderstood.  I thought you said that the police

11   informed you that by dialing star 57, you could obtain

12   an individual's number and that the officer who

13   responded that night told you to put stickies near each

14   phone that --

15   A.   Mm-hm.

16   Q.   -- had that number.

17   A.   Yes, immediately after -- for example, let's say the

18   phone rings, it's the threat, and then you hang up.  And

19   then if you call star 57 at that point, then I believe

20   it will send a trace, correct, to the police?  Is that

21   correct?

22   Q.   Well, this is sort of a one-way street.  I --

23   A.   Mm-hm.

24   Q.   During the deposition --

25   A.   My --

Page  29

1    Q.    -- I can ask you a question --

2    A.    My understanding --

3    Q.    -- but it doesn't go the other way.

4    A.    My understanding of the pound 69 is that you must call

5          immediately, before you make any more phone calls.  You

6          have to call pound 69 after the threat and then that

7          will call back the same number.  But I didn't want to do

8          that.  And the -- I already told you why:  Because it

9          still wouldn't give me the number or the name of the

10         person, it would just connect me with an angry man on

11         the other end.

12             But with -- so with the star 57, it would not have

13         helped me after I called 911.  If it only repeats the

14         call, it would have simply just called 911 again;

15         correct?

16   Q.    So did you feel the officer had done something incorrect

17         in not telling you about star 57 before you called the

18         officer?

19   A.    No, no.  What I wish is that the police had said, let's

20         call the phone company, or whatever they do when someone

21         important gets threatened, to get the phone records to

22         see the incoming phone calls to my house.

23   Q.    Did the --

24   A.    There must be a way to do that --

25   Q.    Did the --

Page 30

1    A.    -- but they didn't.

2    Q.    Did the police officer explain to you that there's a way

3          for you to do that?

4    A.    No.

5    Q.    Do you -- did you ever see the police incident report?

6    A.    No.

7          MS. EGELER:  Okay, let's mark this as Exhibit

8          No. 2.

9                [Exhibit 2 marked for identification]

10   Q.    (by Ms. Egeler)  We have marked as Exhibit No. 2 to your

11         deposition a police report dated Redacted 2009, and

12         this purports to be a report regarding an incident at

13         your home.

14   A.    Mm-hm.

15   Q.    The report states in the last paragraph --

16   A.    Mm-hm.

17   Q.    -- the third sentence, that the officer advised you that

18         he would do extra patrols of your house and advise the

19         other patrol squads.

20   A.    Mm-hm.

21   Q.    Do you know if the officers did that?

22   A.    No, I don't know.

23   Q.    Do you have any reason to believe that the police had --

24         that he promised you something that he didn't deliver?

25   A.    No.

```
 1   Q.   And then on the next page, it's dated ▇▇▇▇▇▇ and it
 2        states that there was a follow-up call to you.  Do you
 3        recall receiving a follow-up call the next day from the
 4        officer?
 5   A.   Yes.
 6   Q.   And I'll just read the first paragraph.  "I called
 7        V-1/▇▇▇▇ to inquire as to whether or not anyone had
 8        tried to do call tracing on the incoming call yesterday.
 9        V-1/▇▇▇▇ said that they had not as they were not
10        familiar with the service.  I provided her with
11        instructions for doing so should she get" any "more
12        suspicious/threatening calls."
13   A.   Yes.
14   Q.   Did he at that time explain to you how to call the phone
15        company and get incoming-call records?
16   A.   That is when he told me about star 57.  And this is, as
17        you noticed, the next day.
18   Q.   I'm confused, because earlier you said that when he came
19        to your house on the ▇▇▇▇ he instructed you to put
20        those stickies near all of your phones.
21   A.   Well, I must be misremembering.  He must have told us
22        that the next morning.  It was over a year ago.
23   Q.   And were you pleased that he called and followed up?
24   A.   Yes, I believe so.
25   Q.   And that day at your kickoff, did you see any suspicious
```

1      persons there?

2  A.   No.

3  Q.   Anybody make any attacks on your person?

4  A.   No.

5  Q.   Has anyone throughout this campaign physically attacked

6       you?

7  A.   Someone physically attacked my son.

8  Q.   Can you tell me about that.

9  A.   In January --

10  Q.   Oh, we'll get to that.  I'm going to wait and just talk

11       about things that happened during the R-71 campaign.

12       But I will absolutely give you a chance to --

13  A.   Mm-hm.

14  Q.   -- talk about that.  I'm just going to try and

15       chronologically cover the R-71 --

16  A.   Okay.

17  Q.   -- time period --

18  A.   No, no --

19  Q.   -- first.

20  A.   -- one has physically attacked me during this campaign.

21  Q.   Has there been any vandalism to your property?

22  A.   Yes.

23  Q.   And what was that?

24  A.   We have had several yard signs stolen from our front

25       yard.

1   Q.   Were those R-71 yard signs?

2   A.   No, they were not.

3   Q.   Were those campaign signs --

4   A.   Yes.

5   Q.   -- for you?

6        And have you had any other campaign signs stolen in

7       any other location?

8   A.   Yes.  Forty percent of our signs were stolen before the

9       primary.

10  Q.   Are you familiar with the Web site [Redacted]

11  A.   I am.

12  Q.   And do you have an opinion regarding that Web site?

13  A.   [Redacted] -- oh, yes.  It's a -- I haven't been on it

14      for a long time, but I know some of the people who write

15      for it.

16  Q.   And do you think they're credible individuals?

17      MR. PIDGEON:  Calls for speculation; objection.

18      MS. EGELER:  I'm asking a personal opinion.

19  Q.   (by Ms. Egeler)  Do you think the individuals that write

20      on that Web site are credible?

21      MR. PIDGEON:  Objection; lack of foundation, lack

22      of specificity, calls for a rash generalization.

23  A.   I can think of at least one person who writes for [Red]

24      [Redacted] that I would take with a huge lump of salt.

25  Q.   (by Ms. Egeler)  And who is that?

```
 1   A.   Oh, I don't want to say that.  How is that relevant?

 2   Q.   Then let me ask it to you differently.

 3             Is it --

 4   A.   I don't --

 5   Q.   -- Redacte  --

 6   A.   -- want to lose --

 7   Q.   Excuse me.

 8             Is it Redacted

 9   A.   No.

10   Q.   Do you think Redacted     is someone that --

11   A.   Redacted

12   Q.   Or Redacted

13             In your opinion -- in your personal opinion, is

14        this a credible individual?

15   A.   As far as I know, he is credible.

16             MS. EGELER:  Okay, mark this as Exhibit No. 3.

17                  [Off the record - discussion]

18             [Exhibit 3 marked for identification]

19   Q.   (by Ms. Egeler)  This is -- this Exhibit No. 3 is a

20        three-page exhibit taken from the Redacted      site,

21        and I want to direct your attention to the second page

22        of the article.  The article's entitled Redacted

23        Redacted

24        Redacte   And in the third paragraph on the second page it

25        states, Redacted
```

1       Redacted

2       Redacted            Would you agree with that?

3   A.  I would.  I have witnessed it with my own eyes.

4   Q.  So do you think Dem -- or, excuse me; Republican

5       candidates in general have their signs victimized quite

6       a bit in this area of the state?

7   A.  I have personally experienced it, yes.

8   Q.  So were you surprised when the signs at your home were

9       victimized?

10  A.  No, not surprised.

11  Q.  Do you know why people took signs from your property?

12  A.  Because they don't want people to know that I have a

13      chance of winning.  They don't want people to see my

14      name.  They want to stifle name recognition.

15  Q.  Have the signs been taken or have they been vandalized?

16  A.  Mangled.  Some have been stolen; some have been mangled,

17      and by mangled, I mean some of them have been sliced off

18      of their stakes with a very, very sharp implement of

19      some sort; some have been slashed repeatedly and left to

20      kind of dangle; some have been run over with vehicles.

21      One of my campaign volunteers has witnessed this

22      happening in Mukilteo.

23  Q.  And have they ever spray painted any words on the signs?

24  A.  No, not on my signs that I know of.  I'm not aware of

25      any spray-painted words.  But I have seen spray-painted

State Objects: Hearsay; Unrelated to R-71

```
 1          words on other Republican signs.
 2   Q.    And did you have the opportunity to speak to anyone when
 3          they were stealing your signs and talk to them about why
 4          they're doing it?
 5   A.    We captured video footage of one of the sign stealers,
 6          but we have been unable to determine exactly who that
 7          is.
 8   Q.    And in that video footage, does the individual speak?
 9   A.    No.
10   Q.    And do they wear anything that would indicate their
11          position on any particular issue?
12   A.    No.
13   Q.    Could you tell from the video footage whether the person
14          was gay or straight?
15   A.    No.
16   Q.    Any other vandalism of your property that you
17          experienced during the Referendum 71 campaign period in
18          2009?
19   A.    No.
20   Q.    And that includes vandalism of your home or automobiles?
21   A.    Our automobiles appear to have been tampered with by the
22          gas caps, but because we are not sure exactly when or
23          where that happened, we didn't report it.  And yeah, I
24          cannot say for certain that it had anything to do with
25          the R-71 --
```

```
 1   Q.   And --
 2   A.   -- campaign.
 3   Q.   -- could you say for sure whether it even had anything
 4        to do with politics, as opposed to just --
 5   A.   No, it could --
 6   Q.   -- criminal --
 7   A.   -- could just be vandalism, because we don't know where
 8        it happened.
 9   Q.   Did you report the sign thefts to the police?
10   A.   No.
11   Q.   Even the one that you had videotape of?
12   A.   Even the one with the videotape.  My husband was the
13        director of IT security for a large company at the time,
14        and he said that without specific information, it would
15        be pointless to tell the police or show them the video.
16   Q.   And we're -- again, I promise you we're going to get to
17        the incident involving your son.  But did you experience
18        any other harassment or things that you would consider
19        threats during 2009?
20   A.   No, not that I can recall.
21   Q.   And before we leave the year 2009, I want to --
22   A.   Although let me go back to that.  There were a number of
23        comments posted on the -- on this article (indicating)
24        on-line.  I don't know if you looked at the comments of
25        the [Redacted] , 2009, [Redacted] article.
```

```
 1   Q.   This is our Exhibit No. 1.
 2   A.   Yes.  On Exhibit No. 1, on the on-line version, readers
 3        can post comments.  And there were a number of comments
 4        posted on that article, and I do recall one comment
 5        where a man said that I shouldn't have said anything
 6        about -- I can't remember if he said R-71 or the social
 7        issues or something like that.  He said, a candidate
 8        worth her salt or who was getting good advice from a
 9        consultant wouldn't have said that.
10            So I do remember wondering -- it seemed that that
11        was something that stuck out to people as being more
12        information than a candidate would typically give.
13   Q.   Do you consider that comment to be a threat or
14        harassment?
15   A.   No.  No, just that it seemed to exemplify that that
16        piece of the article jumped out at people.
17   Q.   Did you receive any other threatening or harassing phone
18        calls?
19   A.   No.
20   Q.   Did you receive any threatening or harassing Emails?
21   A.   No.
22   Q.   Did you receive any threatening or harassing mail?
23   A.   No.
24   Q.   And did you -- as part of the subpoena that was issued
25        today, there was a request that you produce documents.
```

1    Did you have a chance to look for documents that would

2    be responsive?

3  A.  I -- responsive?

4  Q.  Mm-hm.

5  A.  Well, I found a couple of things related to this, yeah.

6    I did write about it on my Facebook page, a note, after

7    tea partiers were being accused of yelling racist words

8    at a congressman at a large Tea Party rally in

9    Washington, D.C.  And no footage still has surfaced of

10   that alleged incident.  The tea partiers are being

11   mischaracterized by the mainstream media, and I feel

12   that it is a direct misrepresentation of the tea

13   partiers' message, which has always been about fiscal

14   responsibility.  This --

15 Q.  As part of the subpoena, though --

16 A.  Mm-hm.

17 Q.  -- which is what I'm asking you about, you were --

18 A.  Mm-hm.

19 Q.  -- asked to produce any written or electronically stored

20   documents that --

21 A.  Yes.

22 Q.  -- would evidence --

23 A.  Let me point this out, that -- no, I was asked to --

24   according to this -- where is it -- all records,

25   regardless of whether they have been stored in paper or

1        electronic format, discussing or depicting images about

2        any harassment, threats, or retaliation you contend you

3        have experienced.  So I understood that to mean that if

4        I had talked about the threat any -- in any other

5        venues, that I needed to bring that in.  Did I

6        misunderstand?

7    Q.  Well, I was looking for anything about any threats or

8        harassment or reprisals you experienced.

9    A.  So this (indicating) is about the threat, but it's not a

10       threat.

11   Q.  So it's not about a threat to you; correct?

12   A.  It's about a threat to me.  This article, this piece

13       that I wrote, I said, "I would like to point out

14       rudeness and incivility from the anti-tea party crowd

15       that is not getting as much 'airtime.'  Who broke into

16       John Koster's office and stole two computers and then

17       threw a printer through a window?"  Et cetera.  "Who

18       called my family at home on our unlisted number, asked

19       for me, and then told my . . . 13-year-old son, 'I will

20       kill you and your family'?"

21   Q.  Do you have -- did you look for any documents that

22       evidenced threats or harassment that were experienced by

23       you?

24   A.  No.  There were no other threats or I --

25   Q.  And there --

Page 41

1    A.    -- would have reported them to the police.

2    Q.    And there are no documents -- no other documents,

3          nothing responsive to the subpoena.

4    A.    No, I don't believe so.

5    Q.    I just wanted to cover that and make sure that there

6          wasn't something that you'd brought with you that we

7          needed to discuss.

8    A.    Mm-hm.

9    Q.    So if something else had happened, you just said you

10         would call the police?

11   A.    Absolutely.

12   Q.    What's your opinion generally of police officers in this

13         state?

14   A.    I think I respect the police officers in this state.  I

15         think they do a good job.  I do have some concerns, but

16         overall, I think they're doing their job to the best of

17         their ability.

18   Q.    And after the Referendum 71 election had concluded in

19         November of 2009, there's an incident that you were

20         referring to regarding your son.

21   A.    Mm-hm.

22   Q.    Can you tell me about that now.

23   A.    Yes.  On -- at the end of January, the final weekend in

24         January, my son and I were at a conference for

25         Republicans at Ocean Shores.  And on Sunday morning, we

Page 42

1    checked out of our hotel and were walking to the car.

2    My son was following me in the lobby, but when I got to

3    the car, I realized he wasn't with me.  I began to put

4    the bags that I was carrying into the car and then

5    closed the back of the car, wondering what had happened

6    to him.

7        And then he showed up and he was covered head to

8    toe in applesauce:  On his hat, which was an **[Redacted]**

9    **[Redacte]** campaign hat, his coat, his blue jeans, his shoes,

10   his suitcase, and a hanging clothes bag that he had had

11   on one arm.  And I said, what happened to you?  And he

12   said, these people drove by and threw applesauce --

13   threw this all over me.  And I said, did you get the

14   license plate?  He said, no.

15       And I said, okay, well, let's get you cleaned up

16   and then go in and ask if there's a video camera,

17   security camera.  So I helped him get cleaned up and

18   then he went back in to ask.  And I've just finished --

19   I was cleaning off the bags before putting them in the

20   car.  He came back and said that the hotel did not have

21   security cameras outside.  This had happened right

22   outside the hotel in the portico.

23       And so at that point, I -- oh, and I remember I

24   also walked around the car to see if perhaps our car had

25   been vandalized.  I was concerned.  I didn't know if it

Page 43

```
1      was a direct threat because of his hat.  I didn't know
2      if it was based on my candidacy.
3   Q.  Was your car vandalized?
4   A.  It wasn't.
5   Q.  And was your son wearing -- okay, so the hat, did it
6      just say, "[Redacted]," on it?
7   A.  It said, "[Redacted]," on
8      the hat with the campaign logo.
9   Q.  And did he have a shirt with the campaign logo on as
10     well?
11  A.  No, he was wearing a black suit jacket.
12  Q.  Did he say that the person in the car was male or
13     female?
14  A.  There were two people in the car.  The male was -- he --
15     my son thought that both of them were around 25.  The
16     male was driving.  The female with long black hair was
17     the passenger and she, according to him, screwed up her
18     face and made an ugly face and then threw applesauce all
19     over him.
20  Q.  So it wasn't a gay couple driving the car.
21          MR. PIDGEON:  Objection; calls for speculation.
22  Q.  (by Ms. Egeler)  You just stated it was a man and a
23     woman, so I thought that was a pretty reasonable
24     question.
25          Do you think it was a gay couple driving the car?
```

Tracey Juran, Certified Court Reporter

Page 44

1   A.   I assume not.   But I don't know that they were even a

2        couple.

3   Q.   Did the woman say anything when she threw this?

4   A.   No.

5   Q.   Was your son wearing anything to indicate a position on

6        Referendum 71?

7   A.   No, except that the gay Twitter and blogs do talk about

8        me on -- they talk about my campaign.   In fact, I just

9        had a few more mentions this week on gay tweets and

10       blogs.   And another example -- for example, the Greater

11       Seattle Business Alliance is a pro-gay business group,

12       and they have told me several times that they are

13       watching this campaign with -- they told me directly

14       because they wanted me to come debate my opponent, who

15       is gay.

16            Anyway, so I -- there -- it's a -- it's highly

17       watched, is what I'm saying.   People in other states are

18       watching this race.

19   Q.   So --

20            MR. STAFFORD:   Objection; nonresponsive answer.

21   Q.   (by Ms. Egeler)   Your son, when he --

22   A.   No, I do know that for a fact.   Is that what you mean?

23       I have proof that -- on tweets.   I can show you if you

24       like.

25   Q.   (by Ms. Egeler)   When he makes an objection --

Page 45

1    A.    Yes.

2    Q.    -- you and I are still continuing our discussion, and

3          he'll possibly be questioning you later.

4    A.    Oh, okay.

5    Q.    I want to back up and talk about this as it occurred to

6          your son.

7                Was -- you said that this happened in the portico.

8          So was there sort of a drive-through area --

9    A.    Yes.

10   Q.    -- that was covered --

11   A.    Yes.

12   Q.    -- attached to --

13   A.    Exactly.

14   Q.    -- the hotel?

15   A.    Yes.

16   Q.    And --

17   A.    And they sped through, he estimated, around 30 miles an

18         hour.  He said it was very fast.  And they sped through,

19         she made the face, threw it at him, and they were gone.

20   Q.    And had your son just walked out of the hotel when this

21         occurred or had he been standing outside for a while?

22   A.    He had just walked out.

23   Q.    So he hadn't been standing there waiting for anyone.

24   A.    No, no.

25   Q.    So he just walked out and a car sped up at 30 miles an

```
 1        hour, and as it --
 2   A.   That's his estimate, his 14-year-old estimate, mm-hm.
 3   Q.   And did you think that his 14-year-old estimate as his
 4        mother would be wildly inaccurate?
 5   A.   Well, since he has yet to drive in city traffic himself,
 6        I don't know how good of a judge he is at 30 miles an
 7        hour, what that would be.
 8   Q.   Do you --
 9   A.   But he obvious -- he said it was very fast, so I believe
10        him on that, yeah.
11   Q.   So you believe it was very fast?
12   A.   I believe it was dangerously fast for a hotel portico,
13        yes.
14   Q.   With your sense of your son's accuracy, because I think
15        only a mother could have that, do you think that he was
16        correct within five to ten miles an hour?  Could it have
17        been as slow as 20 --
18   A.   It could have been 20, sure.
19   Q.   Could it have been less than 20?
20   A.   I doubt it.  He felt threatened by the speed of it --
21   Q.   Could it have been --
22   A.   -- I could tell.
23   Q.   Could it have been faster than 30?
24   A.   No.  I don't see how someone -- I don't under -- I can't
25        picture how someone would have been -- would have had
```

1    time to make a face and throw applesauce if it had been

2    faster than 30.  So --

3  Q. How do you think an individual going 20 miles an hour

4    would be able to read that sign on his hat or the words

5    on his hat and make a decision about this individual and

6    that this is the target for the applesauce?

7  A. Because it was a logo.  And the logo -- as you know,

8    logos can be instantly recognized.  That's the point of

9    a logo.  So for example, when you see Coca-Cola or, you

10   know, a gas-station logo, we instantly recognize it.

11 Q. And at the time that your son had this thrown at him,

12   was he facing straight out towards the street -- or

13   towards the portico drive or was he angled in one

14   direction or the other?

15 A. I can only assume, because I had been carrying my bags

16   ahead of him.  So frankly, I can't say with any

17   certainty.  But since he was behind me walking through

18   the hotel lobby, I assume that he was continuing on the

19   same trajectory walking behind me through the hotel

20   doors.

21 Q. And were you wearing anything, shirt or hat, that

22   contained the same logo?

23 A. I don't believe I was.

24 Q. Has your face been shown on the Web pages that you were

25   referring to that have been watching your candidacy?

Page 48

1   A.   Yes.

2   Q.   So do you think you're a recognizable individual to

3        those who are opposed to your viewpoint?

4   A.   Yes, I do.

5   Q.   And you were outside at the time that they --

6   A.   Yes.  I had walked out first.

7   Q.   You'd walked out first.

8        And can I get an idea of where your car was while

9        you were loading --

10  A.   Sure.

11  Q.   -- it.

12  A.   Okay, so let's just sketch it out here.  The portico --

13       let me get -- was immediately in front of the hotel.

14       Here's the hotel, here's the portico (indicating).

15  Q.   And we have --

16  A.   And --

17  Q.   -- to be mindful of --

18  A.   Yeah, I'm trying to --

19  Q.   -- using words.

20  A.   I'm trying to say words.

21       So there were -- there was one row of cars, two --

22       we were in the second row of cars and over to the left.

23       So there were probably about -- maybe eight to ten

24       cars -- well, make that --

25  Q.   In a parking --

Tracey Juran, Certified Court Reporter

Page 49

1    A.    -- 16 cars --

2    Q.    In a parking lot, then?

3    A.    In a parking lot.

4          So between myself and my son when this happened,

5          there may have been as much space as, you know, 16 cars.

6          Sorry; doubled, eight.  It would have been eight this

7          way (indicating).

8    Q.    And was this parking lot outside or was it a covered,

9          enclosed area?

10   A.    Outside.

11   Q.    And did only hotel guests have access to that parking

12         lot or could the public have driven through the parking

13         lot?

14   A.    The public could have driven through it, but the

15         location of this hotel was at the Shilo Inn on the

16         beach, so there was nothing beyond that hotel.  In other

17         words, you would have to intentionally be going to that

18         hotel and -- or through that hotel in order to end up in

19         that parking lot.

20   Q.    Or to end up in that hotel portico; correct?

21   A.    Correct, right.

22   Q.    And did you talk to any of your fellow Republicans at

23         the convention about the incident that occurred?

24   A.    I did, including Attorney General Rob McKenna.

25   Q.    And did Rob McKenna think that this had happened because

Page 50

1    of your position on Referendum 71?

2    A.   No, he didn't.   He said it's probably unrelated.

3    Q.   Did you talk to any other Republicans about this?

4    A.   Yes.   There were a number of Republicans there,

5         hundreds, and I did talk to several of them.

6    Q.   Did anything else happen during the conference that was

7         any sort of conflict between those at the conference and

8         members of the public?

9    A.   Yes.

10   Q.   Can you describe that for me.

11   A.   I didn't witness it myself, but I heard on Sunday that

12        on Saturday night at a karaoke bar -- and I don't know

13        if it was part of the hotel or just in the neighborhood,

14        but at a karaoke bar, there had been some nasty looks

15        from people in the bar who were upset at the choices of

16        songs that the Republicans at the bar were singing.   One

17        that comes to mind was "Sweet Caroline," that they

18        mentioned by --

19             MR. PIDGEON:   Neil Diamond.

20   A.   -- what's his name -- Neil Diamond, yes.   So they were

21        singing older songs, and apparently this irritated some

22        of the people there in the bar.   Now, when I told some

23        other Republicans that this had happened to Redacted,

24        they said -- this is how I found out about it.   They

25        said, well, it's possible that someone was just angry at

Tracey Juran, Certified Court Reporter

1    all the Republicans here for the weekend and didn't like

2    their choice of songs in the bar last night.  In fact,

3    it might have been Attorney General Rob McKenna who said

4    that; I can't recall.

5    Q.   (by Ms. Egeler)  Do you know whether the people that

6         were in the car and that threw the applesauce were in

7         the --

8    A.   I have no idea.  I wasn't at the karaoke bar, so I don't

9         know who was there.

10   Q.   Do you know the age of the people, roughly, that were at

11        the karaoke bar and disagreeing with the Republicans?

12   A.   Nope.  I did not hear anything about the age.

13   Q.   And did you talk to Attorney General McKenna about your

14        son's concerns about his personal safety?

15   A.   I did.

16   Q.   And can you tell me about that conversation.

17   A.   In fact, that's why I talked to Attorney General Rob

18        McKenna, because [Redacted] said, Mom, first it was in my

19        ear and now this time it was on my body, it was a

20        physical threat, and I'm afraid that next time it might

21        be sexual.  And he said, do you think they would allow

22        me to carry a gun?  And I said, no, I don't, because

23        you're so young.  And he said, well, why don't you ask

24        Rob McKenna.

25   Q.   And did you support the idea of your 13-year-old son

State Objects: Hearsay; the testimony is irrelevant even if not offered for the truth of the matter, unrelated to R-71.

Page 52

1     carrying a gun?

2  A.   If it were legal.   But it's not legal.   So yeah, I would

3       have no problem with it if it would make him feel safer.

4       I trust his judgment.   I don't think he would use it

5       wrongly.

6  Q.   And if it were legal --

7  A.   I think he would -- he would only use it in extreme

8       cause for self-defense.

9  Q.   So if it were legal, you would be supportive of his

10      carrying a gun at school if he felt the --

11 A.   He doesn't go to --

12 Q.   -- need to do so?

13 A.   -- school.  He's home schooled.

14 Q.   And any other incidents of harassment or threats --

15 A.   Yes.

16 Q.   -- that you perceived that we haven't talked about?

17 A.   Yes.  It just happened this week, actually, and I

18      brought --

19           MS. EGELER:  Let's mark this as Exhibit -- are we

20      on 4?

21           MR. PIDGEON:  Exhibit 4.

22           MS. EGELER:  Okay.

23                [Off the record - discussion]

24           [Exhibit 4 marked for identification]

25 Q.   (by Ms. Egeler)   Can you describe this for me.

Tracey Juran, Certified Court Reporter

State Objects: Hearsay; irrelevant even if not offered for the truth, unrelated to R-71.

1  A.    Yes.   In August there was a candidate forum, a large

2       number of candidates, at the Edmonds United Methodist

3       Church on Caspers Street.   And the state-representative

4       candidates from the 21st District were only asked one

5       question and that was our stance on gay marriage.   And

6       the first -- I was the fifth person to answer.   There

7       were six state-rep candidates, two for Position 1 and

8       four running for Position 2.

9          And the two sitting legislators support gay

10      marriage.   As incumbents, they were given the right to

11      answer first, so they did.   And again, my opponent is

12      one of the five or six gay representatives in our state

13      Legislature, which may have been why this question was

14      asked, but I don't know.   The League of Women Voters

15      selected the questions, which were submitted by the

16      audience on paper, but the League of Women Voters chose

17      which questions to ask.

18         So they asked, what is your stance on gay marriage,

19      and I was the fifth person to answer.   And because that

20      was the only chance at the mike that I had that night

21      and -- my answer did bring a round of applause and

22      people who said that they would vote for me based on

23      that answer.   They told me that as I was walking back to

24      my seat.   A lady said, you just got our vote.

25  Q.    So what would the --

State Obj: Hearsay

Tracey Juran, Certified Court Reporter

Page 54

1   A.   So because that was a good clip of how I can handle a

2        stressful situation and a difficult question, I posted

3        it on YouTube.  And two nights ago -- or maybe it's

4        three now -- this comment was posted where someone said,

5        "Oh my God, this woman is so" F'ing "stupid.  Someone

6        please shoot her in the head, again and again.  And

7        again."  It's someone named [Redacted]

8   Q.   Did you click on that name, [Redacted], to determine

9        who it was?

10  A.   Yes.  And the name I couldn't see, but the -- I could

11       see other videos that this person liked or talked about

12       or posted, and it does appear to be someone who is gay.

13  Q.   Does it list where the individual lives?

14  A.   No.  There was one -- it did -- somewhere on there it

15       said, I think, New Mexico, but I don't know if that is

16       the location of when they started the -- their -- what

17       do you call it -- account, their YouTube account, or --

18       you know, I don't know how that's -- how it's based.

19  Q.   Did you see a box that contained information about the

20       individual that they chose to put?

21  A.   Yes.  I believe that's where I saw New Mexico.

22  Q.   And did --

23  A.   But --

24  Q.   -- you see in that box in terms of location of residence

25       U.S. Virgin Islands?

State Objects: Hearsay

Tracey Juran, Certified Court Reporter

Page 55

1    A.   Oh, right, that's what it was.  Yeah, it was -- it's

2         Virgin Islands.  Yeah, New Mexico was someone else.

3              I did some more digging around on [Redacted] and

4         there was a guy -- I think his last name was Watkins,

5         and he's a student -- a 25-year-old student in New

6         Mexico.  So sorry; yeah, I'm confusing those two.  I

7         don't know if they're the same person, though.  But that

8         was -- I was looking on Twitter to see if there was

9         someone -- that's what it was.  I checked [Redacted] on

10        Twitter to see if they're -- if it's also a Twitter

11        name, and I believe that's how I found the name of -- I

12        think it was Watkins.

13   Q.   And did you see the U.S. Virgin Islands residence by

14        clicking [Redacted] on our Exhibit No. 4 --

15   A.   Yes.

16   Q.   -- to -- okay.

17              So that would show their account information for

18        YouTube; correct?

19   A.   Correct.  So it shows, I believe, the information that a

20        person puts in, which -- you know, you could change it,

21        you could lie, you could move and forget to update it.

22        I mean, I assume it's sort of like Facebook that way,

23        where people put down their hometown and it doesn't mean

24        that they live there.

25   Q.   But it might mean that they do.

Tracey Juran, Certified Court Reporter

Page 56

```
1    A.    It could, yeah.  It means they have some connection,
2          usually, to that, at least, you know, judging by
3          Facebook.
4    Q.    Did you let the police know about this?
5    A.    Yes, I did.
6    Q.    And when did you contact the police?
7    A.    On the  Redacte
8    Q.    Of this month?
9    A.    Yes.
10   Q.    Just the other day.
11         And was that the  Redacted   Police?
12   A.    It was.
13   Q.    Who did you speak to?
14   A.    Officer  Redacted
15   Q.    And did he take a report?
16   A.    He did.
17   Q.    And did he say he'd look into it?
18   A.    No, he didn't say he'd look into it, which is another
19         thing that bothers me, because now there are three
20         incidents.  And although I can't be certain that they're
21         related, they are -- I -- there are two death threats
22         and one physical assault to my family, and none of them
23         have been, I feel, really delved into by the police to
24         find out who is committing these crimes.
25   Q.    You know, I wanted to go back to that phone-call death
```

1        threat.  Did you ever contact the phone company and ask

2        about phone records for incoming calls?

3   A.   I did.  Yes, I did.  That night, actually, I called, and

4        they said that they couldn't do it without a police -- I

5        forget the terminology, but they -- the person on the

6        other line said -- I mean, on the end said that they

7        couldn't really do anything about it, that there needed

8        to be a court -- some kind of court procedure for them

9        to dig up the records of who had called me at that time.

10       I mean, I knew it was at 6:00, I knew the date, I knew

11       the number.  To me, it doesn't seem like it would be

12       that difficult to figure out who made that call.

13  Q.   Did they indicate that there was any legal prohibition

14       on their disclosure of that information?

15  A.   Yes, they did.  And so that's why I wish that the police

16       had walked me through whatever the legal steps are in

17       order to figure out who this criminal is.

18  Q.   Did you investigate what the law is that prohibits them

19       from giving you that information?

20  A.   No, I didn't.  I'm very busy --

21  Q.   Did you --

22  A.   -- right --

23  Q.   Did you contact an attorney to help you with that?

24  A.   No.

25  Q.   Did you ever ask the counsel for the Doe v. Reed case to

Page 58

1        help you get those records?

2   A.   No.

3   Q.   Did you ever go to the courts and ask them to help you

4        have that information released?

5   A.   No.

6   Q.   With respect to the incident where the applesauce was

7        thrown, did you contact the police?

8   A.   Yes.

9   Q.   And did they respond?

10  A.   They responded, but, again, I was not happy with their

11       response.  There --

12  Q.   Can you tell me about their response.

13  A.   Sure.  There was one policeman on duty in Ocean Shores.

14       He came.  He asked my son what happened.

15  Q.   How fast before he responded?

16  A.   It was probably about 15 or 20 minutes.  Maybe 20.

17  Q.   And were you in a location you felt was safe for those

18       20 minutes?

19  A.   Yes.  We had -- the convention center was across the

20       street from the hotel.  And I did not feel safe in the

21       hotel parking lot, and so we drove over to the -- across

22       the street and parked at the convention center, where I

23       felt it was friendlier territory.  The meetings had

24       already started, and so with hundreds of Republicans

25       around, I felt safer there.  And so we stayed in the

Page 59

1      lobby there until the policeman showed up.  And I'm

2      sorry; I don't have his number, but I -- or his name,

3      but I do have the case number.

4  Q.  What is that --

5  A.  Do you need that?

6  Q.  -- case number?

7  A.  That case number was ████████

8          And this officer listened to my son's description

9      of the incident.  He wrote down a couple of notes on a

10     little spiral-bound palm-sized notebook and didn't seem

11     very concerned and then began to get into his car.  And

12     I said, wait a minute.  Don't I get a case number?  And

13     he said -- he just sighed with exasperation, rolled his

14     eyes, and reached into the car for a little card and

15     then wrote down a number, the case number, on it.

16          And then after that, we went into the meeting and,

17     as I mentioned, talked it over with Attorney General Rob

18     McKenna.  And then that meeting was over around noon.

19     The incident happened around 8:30, I believe.  So when

20     the meeting was over at 11:30 or noon and everyone began

21     to leave, my son and I were headed to Olympia for the

22     week, instead of coming home, because my son was going

23     to serve as a Senate page for Paull Shin that week.

24          So before heading on to Olympia, I drove to the

25     police station, because I had decided I had probably get

Page 60

1      (sic) a copy of the report to take back with me to give

2      to the [Redacted] Police, because Officer [Redac] had

3      encouraged me, if anything else happened, to file a

4      report so that all these reports would be together.  So

5      I drove to the police station in Ocean Shores and it was

6      closed.  As I said, there appeared to only be one cop on

7      duty.

8   Q.  And what day of the week --

9   A.  So --

10  Q.  -- was that?

11  A.  It was a Sunday.

12        So I called and left a message and told them I

13      would like a copy of the report.  On Monday, I called

14      again and told -- spoke to a person that time and told

15      them I would like a copy of the report sent up to the

16      [Redacted] Police Department.  And I gave them the fax

17      number of the [Redacted] Police Department, and they

18      assured me that they would send that.  And on Thursday,

19      I called again -- if I remember correctly, Thursday or

20      Friday -- called again to follow up and see if it had

21      been sent and they said yes.

22        And then I just put it out of my mind and let the

23      matter rest.  But today and yesterday, I have been told

24      both days by the [Redacted] Police Department that they

25      never received a copy of that report, although

```
 1        Officer Redacted was able to get the case number of that
 2        report for me.
 3   Q.   And could you refresh my recollection:  Did you have a
 4        license-plate number to provide to the officers in Ocean
 5        Shores?
 6   A.   No.
 7   Q.   Or officer singular, rather.
 8   A.   No.  They -- the car sped by and Harry was so shocked,
 9        he did not get a license-plate number.  In fact, that
10        was my first question to him, was, did you get the
11        license-plate number?  He said no.  And that's when I
12        said, well, then we'll have to try to see if they have a
13        camera, a security camera, that might have captured it.
14        But --
15   Q.   Did your son know what state the license plate was from?
16   A.   No.
17   Q.   Was the car going too fast to determine that?
18   A.   I don't believe he -- I don't know if he even looked at
19        the license plate.  So I don't know.  I don't think he
20        looked.
21   Q.   Did he tell you what color the car was?
22   A.   He did.  I've forgotten now.  It's probably in the
23        report, though, in that police report.
24   Q.   And did he tell you what make and model the car was?
25   A.   It was a small car, but no, he didn't know the make and
```

```
 1        model.
 2   Q.   I want to turn back quite a bit and ask you a follow-up
 3        question about your collection of signatures at the
 4        church.
 5   A.   Mm-hm.
 6   Q.   You collected on one day; is that right?
 7   A.   At least once.
 8   Q.   At least once?
 9   A.   It's quite possible that I did it two or three times.
10        But yeah, I don't really remember.
11   Q.   Were you successful in getting any signatures?
12   A.   Oh, yes.  We were just standing at a table and people
13        would come up to us and ask about it and then sign.
14   Q.   And when someone signed, could the next person who came
15        up to sign the petition see the names of those that --
16        who had already signed?
17   A.   They could.
18   Q.   Do you think that that might have helped to encourage
19        some people when they saw that others had signed?
20   A.   Sure, it's possible.  It's a very large church, so I
21        don't know that people would recognize signatures, you
22        know, as being someone they knew.  I don't know.
23   Q.   How many people go to the church?
24   A.   I don't actually know, but it's big.
25   Q.   And you said some people felt uncomfortable signing; is
```

1       that right?

2   A.  Yes, they did.  They expressed fear, especially older

3       people, senior citizens.

4   Q.  Senior citizens expressed fear?

5   A.  Right.

6   Q.  And when they expressed fear, did they state that they

7       ever sign any petitions?

8   A.  No, they didn't say.  They didn't talk about other

9       petitions.

10  Q.  So you don't know if they were afraid only about this

11      petition or they were afraid about signing any

12      referendum or initiative petition that would reveal

13      their viewpoint on something, if you know?

14  A.  I'm trying to recall if there were any specific comments

15      about it being the R-71 petition specifically.  No, I

16      can't remember anything specific.  No.

17  Q.  Do you remember if anyone read the petition and

18      disagreed with it and for that reason said, no, thank

19      you, I don't wish to sign?

20  A.  Yes, there were at least one or two people who said

21      that -- they asked us what it was about and then they

22      said, oh, no, I don't want to sign that.  Is that what

23      you mean?

24  Q.  Yes.

25  A.  Yeah.

Page 64

1  Q.  And were the names on the petition hidden from those

2      people that didn't want to sign?

3  A.  No.  But the people who were asking were not looking at

4      the signatures.  They were standing -- the -- what I'm

5      remembering is that they were standing and just looking

6      at the display about, you know, R-71.  So they came over

7      to ask, what is R-71?  They weren't looking at the

8      actual petition.

9  Q.  Were they free to look at the petition and read it if

10     they wished to?

11 A.  Oh, sure.

12 Q.  Even if they might disagree with the position being

13     taken on the petition?

14 A.  Sure.

15 Q.  Is there -- has there been any instance of what you

16     believe to be harassment or threats as a result of your

17     involvement with Referendum 71 that we haven't talked

18     about?

19 A.  No.

20 Q.  I just want to make sure that we're absolutely complete

21     about your experiences.  So there's nothing else.

22 A.  No, nothing's coming to mind.

23 Q.  So --

24 A.  Nothing -- no other incidents where I have felt

25     physically threatened.

```
1          MS. EGELER:  Okay, then that concludes my questions
2      at this point.
3
4                          EXAMINATION
5  BY MR. STAFFORD:
6  Q.    So, Redacted      , again, my name is Ben Stafford.
7  A.    Mm-hm.
8  Q.    I am an attorney and I represent Washington Families
9      Standing Together, which was a coalition of civic and
10     religious organizations who supported Senate Bill 5688
11     and opposed the placement of Referendum 71 on the
12     ballot.  Are you familiar with that group?
13 A.    Vaguely.
14 Q.    So wanted to start just asking a few questions about the
15     Ocean Shores --
16 A.    Mm-hm.
17 Q.    -- incident.  And --
18 A.    Mm-hm.
19 Q.    -- you indicated that you felt that the police hadn't
20     really delved into that.  So without having a license-
21     plate number, a make or model of the car, or any video
22     footage of the car, what else was it that you thought
23     the police should have done that they didn't?
24 A.    My complaint about the Ocean Shores Police is not that
25     they didn't delve into it as much.  My complaint is that
```

Tracey Juran, Certified Court Reporter

Page 66

1      they didn't follow up on my requests to get the

2      information, the report, back up to the ▮Redacted▮ Police

3      Department.  That's -- that is my complaint with the

4      Ocean Shores Police.

5  Q.  And then we talked a little bit about tracing the call

6      back in -- the ▮Redacted▮ call.

7  A.  Yeah.

8  Q.  And you indicated that you'd called the phone company

9      about --

10  A.  Yes.

11  Q.  -- that that --

12  A.  Mm-hm.

13  Q.  -- night --

14  A.  Right.

15  Q.  -- on ▮Redacted▮.

16  A.  It was either that night or the next day.  But we did --

17      I did call and try to find out, how can we figure out

18      who did this?

19  Q.  And they indicated you needed some sort of legal

20      authorization --

21  A.  Correct.

22  Q.  -- before they could do that?

23  A.  Mm-hm.

24  Q.  Did you tell that to the police afterwards?

25  A.  No.

Tracey Juran, Certified Court Reporter

Page 67

1   Q.   Did you request any help from the police in getting any

2        legal authorization to check into that?

3   A.   No.

4   Q.   Did you ask the police at that point to get the records

5        for you?

6   A.   No.  In fact, if I -- I can't remember if the second

7        call for -- or the call the next day from Officer Mehl,

8        if that had been before we talked to the phone company

9        or after.  So I'm sorry; I don't recall whether I had

10       asked him what to do next.  And frankly, I was very busy

11       with planning my campaign kickoff for that night, so

12       there were a lot of things that were very high priority.

13  Q.   Lot of other balls in the air at that time?

14  A.   Mm-hm.

15  Q.   And after your campaign kickoff, did you ever after that

16       ask the police to go ahead and trace that call for you?

17  A.   No.  Can I do that?  Because what I asked about the

18       tracing the call was -- they said that immediately after

19       the call is made, that's when you have to dial the star

20       57.  And so there was never any indication to me from

21       the police that they would be able to trace the call or

22       figure out who had done it.

23  Q.   And I guess my question is a little bit different.

24            Have you ever asked the police if there's another

25       way besides using star 57 to determine who placed a

1          particular phone call?

2     A.   No.

3     Q.   And you haven't asked that in -- from August 2009 to

4          September 2010 here?

5     A.   No.

6     Q.   And jumping back to Ocean Shores for a second, you'd

7          indicated that your son's hat had a logo?

8     A.   Yes.

9     Q.   And what was that logo?

10    A.   It's the [Redacted] logo.

11         It's got three stars and my name with [Redacted] bigger and

12         then a little stripe under the -- between [Redacted]

13         [Redacted]

14    Q.   And how far is Ocean Shores from, say, Everett, about?

15    A.   Few hours.

16    Q.   Few hours.

17              So --

18    A.   Mm-hm.

19    Q.   -- 150 miles or somewhere around there?

20    A.   Sounds about right.  I'd have to Mapquest it.

21    Q.   And Ocean Shores isn't in the 21st District?

22    A.   No, it's not.

23    Q.   And so is it possible that people in Ocean Shores might

24         not instantly recognize the three-star [Redacted] hat?

25    A.   Yes, it's possible.  And with those people being at a

```
 1        hotel, I don't even know if those people were from Ocean

 2        Shores.  I'd say it's unlikely that they were from Ocean

 3        Shores or they wouldn't have been at that hotel.

 4   Q.   Do you know one way or the other whether the people in

 5        the car were from Ocean Shores or from elsewhere?

 6   A.   No, I don't know, because I never traced them.  We don't

 7        have the license-plate number.

 8             MR. STAFFORD:  Okay, let's see.  And did we mark

 9        the blog as an exhibit?

10             MS. EGELER:  I think we marked the --

11             THE WITNESS:  You mean the YouTube video?

12             MR. STAFFORD:  Not the YouTube video.

13                The blog regarding the Tea Party?

14             MS. EGELER:  No, we didn't.  Where'd that go?

15   A.   That is a Facebook note.

16   Q.   (by Mr. Stafford)  Facebook; I'm sorry.

17   A.   Facebook note.

18   Q.   That's right.

19             When we were talking about the sign vandalism --

20   A.   Mm-hm.

21   Q.   -- for your campaign signs, the Redacted      signs --

22   A.   Mm-hm.

23   Q.   -- you mentioned that you thought that what they were

24        trying to do is kind of stifle name recognition.

25   A.   Mm-hm.
```

1    Q.    And as a candidate for office, it's important to have

2          your name be publicly known?

3    A.    Absolutely.

4    Q.    It's hard to get elected if people don't know who you

5          are.

6    A.    You can't.

7    Q.    And so you have a number of ways in which you try to get

8          your name out there as a candidate; is that right?

9    A.    Correct.

10   Q.    And you have a campaign Web site?

11   A.    Yes.

12   Q.    Does that have any biographical information on it?

13   A.    Yes.

14   Q.    And what sort of information is included on the Web

15         site?

16   A.    Oh, it gives my career.  I taught English as a second

17         language for ten years here and overseas.  It lists the

18         community colleges where I taught.  It lists my -- that

19         I taught in China and the Middle East.  It lists -- I

20         believe it lists that I'm a member of several different

21         clubs:  The Evergreen Republican Women's Club, the NRA,

22         Farm Bureau, and Citizens Alliance for Property Rights.

23         It lists those.

24             It lists where I received my education:  Bachelor's

25         in linguistics at SPU and master's in teaching English

1        as a foreign language at Southern Illinois University.

2        And it listed my political activities up to the point

3        where I filed for office; specifically, serving as

4        the -- on the Citizens Levy Review Committee in Edmonds

5        in the spring of 2009.

6    Q.  So the Web site listed a lot of organizations that

7        you've been affiliated with and places you've worked

8        over the years.

9    A.  Correct.

10   Q.  And --

11   A.  On the bio page.

12   Q.  On the bio page.

13           And the campaign Web site, I imagine, has a picture

14       of you somewhere on it?

15   A.  Yes, many.

16   Q.  And you also have a Facebook page?

17   A.  Yes.  Actually, I have two.  I have --

18   Q.  A personal and a campaign?

19   A.  Exactly.

20   Q.  And you've spoken at a number of candidate forums?

21   A.  Correct.

22   Q.  And do you speak with voters at grocery stores or on the

23       street or during a campaign event?

24   A.  All the time.

25   Q.  Have you ever experienced a situation where a voter

1      disagreed with you about a particular issue?

2  A.  Regularly.  Daily.

3  Q.  And what do you do in that case, where someone says, I

4      don't agree with you about that?  How do you respond?

5  A.  Well, it depends on the situation, of course.  If I'm

6      doorbelling and someone disagrees with me, then usually

7      I just say, well, that's fine.  I mean, we can agree to

8      disagree on that issue.  I usually answer frankly when

9      people ask me questions.  There are some times when we

10      do debate -- for example, in a candidates' forum or a

11      situation like that -- where there's a disagreement.

12  Q.  And is that okay to disagree?

13  A.  Of course.

14  Q.  And does it ever get emotional or heated?  Does the

15      person ever get upset?

16  A.  Sometimes.  A man yelled at me while I was walking away

17      from his house in Lynnwood, yelled that we needed to

18      redistribute the wealth to all the people or that there

19      would be an armed revolution and that people were

20      grabbing their guns.  And I said, well, I hope it

21      doesn't come to that and, frankly, that's Marxism that

22      you're talking about.

23  Q.  And did you feel threatened when he talked about armed

24      revolution?

25  A.  Not really, because we had had a conversation for

1      several minutes before that and, frankly, I was a little

2      amused at his extreme views.  He was arguing that

3      communism would happen if we didn't redistribute the

4      wealth, and I said, no, communism is redistributing the

5      wealth.  So yeah, disagreements do happen.

6   Q.  And sometimes people express --

7   A.  But --

8   Q.  -- their beliefs a little bit hyperbolically, maybe?

9   A.  Well, I don't think he was -- I think he really did

10     believe that.  But I don't believe -- I recognized him

11     as a member of the extreme side of the left.  There are

12     extreme positions available on both the left and the

13     right, and people like that should be ignored or taken

14     with a grain of salt.  It's not the way to solve things.

15          MR. STAFFORD:  And what exhibit are we on at this

16     point?

17          THE REPORTER:  Five.

18          MR. STAFFORD:  Five, okay.

19  Q.  (by Mr. Stafford)  So handing you --

20          THE REPORTER:  Do you want me to mark it?

21          MR. STAFFORD:  That would be great.  Please mark

22     that as Exhibit 5.

23          [Exhibit 5 marked for identification]

24  Q.  (by Mr. Stafford)  So have you had a chance to take a

25     look at what we've marked as Exhibit 5?

1    A.    Yes.

2    Q.    And this is an [Redacted] article.  I believe we

3          discussed this earlier.

4    A.    Yes.

5    Q.    And it is an article issued on [Redacted], 2009?

6    A.    Yes.

7    Q.    And it's called, [Redacted]

8          [Redacted]

9    A.    Correct.

10   Q.    And so this article describes a rally that was held in

11         [Redacted] on tax day, [Redacted], 2009?

12   A.    Yes.

13   Q.    And did you speak at that rally?

14   A.    I did.

15   Q.    And about how long were you speaking at that rally?

16   A.    I would say about 10 to 15 minutes, including the phone

17         calls to our senators.

18   Q.    And beyond making some phone calls to the senators, what

19         else did you talk about?

20   A.    I gave examples of cities, states, and countries that

21         had cut taxes and then had seen enormous economic

22         growth.

23   Q.    And how would you describe the mood of the rally, the

24         mood of the crowd?

25   A.    They were cheering.  They were -- the mood -- I guess I

Page 75

```
 1        would say happy to be together with other people of
 2        similar mind; also, frustrated or they wouldn't have
 3        taken time off of their schedules to be there; and
 4        energized, yeah.
 5   Q.   And --
 6   A.   Happy, frustrated, and energized.
 7   Q.   And how many people were there?
 8   A.   Estimated 400.
 9   Q.   And you see in this article -- let's see.  I'm looking
10        about two thirds of the way down that first page.  It's
11        a paragraph that starts, [Redacted]
12   A.   Mm-hm.
13   Q.   And it says, [Redacted]
14        [Redacted]
15        [Redacted]           [Redacted]      Do you see that?
16   A.   I do see that.
17   Q.   And do you recall hearing anyone yell "traitors" at --
18   A.   No --
19   Q.   -- the rally?
20   A.   -- I don't.
21   Q.   Do you have any reason to believe that the reporter here
22        miswrote that?
23   A.   No, I don't.
24   Q.   And does shouting "traitors" strike you as an extreme
25        sort of statement to make?
```

1        MR. PIDGEON:  Objection; calls for speculation.

2              Go ahead and answer.

3   A.  Well, of course, you would want to know on what basis

4       were they saying -- why did they think and who were they

5       directing this to and based on what.  You know, it's

6       just one word, so you can't really tell, are they

7       shouting at the president for doing something that they

8       feel is unconstitutional, which is what I would predict

9       given the makeup of the crowd.

10  Q.  (by Mr. Stafford)  So you would predict that the

11      statement was that President Obama was a traitor?

12        MR. PIDGEON:  Objection; calls for speculation.

13      There's no evidence in the record, no foundation.

14  Q.  (by Mr. Stafford)  You can answer.

15  A.  That crowd was angry at both Republican leaders and

16      Democratic leaders for the bailouts, the overspending,

17      the stimulus package, yeah.  I mean, they were just as

18      angry at John McCain as anybody else.

19  Q.  So a lot of anger in the crowd and --

20        MR. PIDGEON:  Objection --

21  A.  Well --

22        MR. PIDGEON:  -- that's not a question, number one,

23      and number two, that doesn't support the facts on the

24      record.

25  Q.  (by Mr. Stafford)  So the statement "traitor," you're

1       aware that treason is defined in the Constitution?

2           MR. PIDGEON:  Now, I'm going to object to this line

3       of questioning.  First of all, it's not her statement;

4       second of all, it's not relevant to harassment in the

5       R-71 case; third of all, it's not even on point with the

6       R-71.  I'm not sure where this question is going.

7    Q.  (by Mr. Stafford)  You can answer the question.

8           MR. PIDGEON:  I'm not sure I'm going to have her

9       answer the question.  I want to know if you can

10      demonstrate any relevance whatsoever as to where we're

11      going on this.

12          MR. STAFFORD:  I think that the question posed is

13      about public statements on public issues, which is

14      precisely what we're talking about in the Referendum 71

15      matter.

16          MR. PIDGEON:  But this is --

17          MR. STAFFORD:  So --

18          MR. PIDGEON:  -- not her statement.

19          MR. STAFFORD:  So is your basis of objecting to the

20      question that it's an irrelevant question?  What's the

21      basis of --

22          MR. PIDGEON:  Yes.

23          MR. STAFFORD:  -- you instructing --

24          MR. PIDGEON:  It's --

25          MR. STAFFORD:  -- the witness --

Page  78

1              MR.  PIDGEON:   Well,  it's  --

2              MR.  STAFFORD:   --  not  to  answer?

3              MR.  PIDGEON:   It  is  --  it's  not  only  irrelevant,

4         it's  not  her  statement,  number  one.   Number  two,  this

5         was  about  a  political  event  that's  not  related  to  R-71

6         in  any  respect.   Number  three,  it's  the  --  the

7         statement  --  we  can't  even  corroborate  whether  the

8         statement  was  actually  made.   I  just  don't  see  what  the

9         relevance  is  if  some  reporter  said  that  somebody

10        screamed  "traitors"  when  it's  not  her  remark.

11             MR.  STAFFORD:   So  I  believe  ███Redacted███  is  a  nonparty

12        witness;  is  that  correct?   You're  not  representing

13        ███Redacted███

14             MR.  PIDGEON:   Is  this  the  counsel  that  you  just

15        received  from  AG  Anne  Egeler?

16             MR.  STAFFORD:   Are  you  representing  ███Redacted███

17             MR.  PIDGEON:   I'm  representing  Protect  Marriage

18        Washington.

19             MR.  STAFFORD:   Are  you  instructing  the  witness  not

20        to  answer  the  question?

21             MR.  PIDGEON:   I'm  not  instructing  the  witness  not

22        to  answer.

23             MR.  STAFFORD:   No,  okay.

24   Q.   (by  Mr.  Stafford)   So,  ███Redacted███  --

25             MR.  STAFFORD:   Could  you  read  back  the  question.

 1              [Off the record - discussion]

 2              [Record read back as requested]

 3    A.    Yes.

 4    Q.    (by Mr. Stafford)  And are you aware that treason is

 5          punishable by death?

 6    A.    Yes.

 7    Q.    So does asserting that somebody is a traitor strike you

 8          as an extreme statement to make, to your knowledge or in

 9          your belief?

10    A.    The words "traitor" -- you just jumped from treason to

11          traitor.  If we look up traitor in the dictionary, I

12          don't believe it would say only treason.  A traitor --

13          the word "traitor" can also mean someone who betrayed

14          someone or broke a promise and turned the other

15          direction as -- from what was expected.

16    Q.    So in your opinion, then, traitor can mean a host of

17          different things and it can mean that you betray

18          somebody.

19    A.    Exactly.  So for example, John McCain being Republican

20          and saying, therefore, that he believed in smaller

21          government, but then voting for -- going back during his

22          campaign to vote for higher spending, I believe some

23          people saw that as betraying his promise to them that he

24          would stand for smaller government.

25    Q.    And so it might be accurate in that instance, in your

Page 80

1       opinion, to call John McCain a traitor.

2   A.  Well, I didn't, and I don't know who did at this

3       article.

4   Q.  So let's move along.

5           So you called both the senators during the rally.

6   A.  Yes.

7   Q.  And you called Senator Cantwell.

8   A.  Yes.

9   Q.  And did you call the Olympia office, D.C. office?

10  A.  I believe I called the Olympia -- or the D.C. office

11      first.

12                      [Cell phone buzzing]

13          THE WITNESS:  Oh, pardon me; I thought I had that

14      on mute.  Lovely, it's Redacted         Perfect timing.

15          MR. STAFFORD:  In high demand.

16          THE WITNESS:  Where is he, downstairs?

17          MR. PIDGEON:  He's next.

18          THE WITNESS:  He's out by my car.

19  Q.  (by Mr. Stafford)  And did you get ahold of somebody --

20          MR. PIDGEON:  Just kidding.

21  A.  Hm?

22  Q.  (by Mr. Stafford)  Did you get ahold --

23  A.  Yes.

24  Q.  -- of somebody --

25  A.  I believe so.

1   Q.   I'm sorry; if you could --

2   A.   One of the calls --

3   Q.   -- just let me get the question out so we have a clear

4       transcript.

5   A.   Yeah.

6   Q.   Did you get ahold of somebody at the D.C. office?

7   A.   I'm sorry; I can't recall.  One -- we called both the

8       senators, Cantwell and Murray, and at one of them -- one

9       of their offices in Olympia there were too many

10      messages, and so we called the Everett office.  Sorry; I

11      meant to say D.C.  Did I say Olympia?

12   Q.   Mm-hm.

13   A.   I meant D.C.  No, I don't believe we called any offices

14      in Olympia.

15   Q.   So you got ahold of somebody at the Everett office for

16      Senator Cantwell?

17   A.   Yes.

18   Q.   And what did you say to them?

19   A.   Well, you can watch it on the video if you want the

20      exact words, but I believe I said something to the

21      effect of, we're down here at the Tenth Street Dock in

22      Everett and I'm here with a number of your constituents

23      and we'd like to let you know our opinion about the

24      stimulus and the bailouts.  And then I held out the

25      phone.

1   Q.   And after you held out the phone, what happened?

2   A.   People yelled.

3   Q.   Yelled --

4   A.   Boo.

5   Q.   Booed?

6   A.   Basically, boo, mm-hm.

7   Q.   Do you think, in your opinion, that that might have been

8        a threatening experience for someone on the other end of

9        the phone?

10  A.   No.

11  Q.   Passions run high sometimes in politics, in your view?

12  A.   Of course passions run high.  But I don't -- it would

13       not be a threat, unless you're talking about a threat to

14       her political career, to hear --

15  Q.   Do you think --

16  A.   -- that so many constituents were upset with the

17       direction she was taking.

18  Q.   So do you think it might be an uncomfortable

19       conversation to have, hundreds of people booing in your

20       ear on the phone?

21  A.   Sure, uncomfortable.  But legislators are used to

22       uncomfortable conversations.

23  Q.   It kind of comes with the territory --

24  A.   Sure does.

25  Q.   -- of being a public figure.

```
 1   A.   Yep.

 2   Q.   And did you call Senator Murray's office as well?

 3   A.   Yes.

 4   Q.   And was that, again, an Everett office?

 5   A.   I called the D.C. office.

 6   Q.   And were you able to get ahold of somebody in the D.C.

 7        office?

 8   A.   I believe so, yeah.

 9   Q.   And after you did so, what happened?

10   A.   Same thing.  I said, we'd like you to know what our

11        opinions are on the stimulus and the bailouts.

12   Q.   And after you let her know that you were going to give

13        the opinion on the stimulus and the bailout --

14   A.   Mm-hm.

15   Q.   -- what happened?

16   A.   What do you mean?  Then I held out the phone again.

17   Q.   You held out the phone again and --

18   A.   Mm-hm.

19   Q.   -- what did the crowd do?

20   A.   They booed again.  And I believe I also added -- you

21        know, now that I think about it, it was -- of course, it

22        wasn't her, it was an aide --

23   Q.   Right.

24   A.   -- on both calls.  And on the second call I said, tell

25        her it's time for her to start polishing her resume.  So
```

Page 84

1      I don't think that's threatening.

2           MR. STAFFORD:  Would you mark this as Exhibit 6.

3                [Off the record - discussion]

4           [Exhibit 6 marked for identification]

5   Q.   (by Mr. Stafford)  So, ▮Redacted▮, I am asking you to

6        take a look at what we've marked as Exhibit 6 here.  And

7        specifically, I'm going to be asking you to look at

8        page 6 --

9   A.   Page 6.

10  Q.   -- of this document.

11           And do you recognize this as a printout from your

12       blog on your Web site?

13  A.   Yes.

14  Q.   And you can see the Web page -- Web address down there

15       at the bottom?

16  A.   Yes.

17  Q.   So page 6 of this blog is titled ▮Redacted▮

18       answers to -- ▮Redacted▮

19  A.   Yes.

20  Q.   Do you see that?

21  A.   Yes.

22  Q.   And I'm going to ask you to take a look at the third

23       paragraph down from there.  It starts with, ▮Redacted▮

24       ▮Redacted▮

25  A.   ▮Redacted▮ -- yes.

Tracey Juran, Certified Court Reporter

1  Q.  And so this is describing a property-rights meeting that

2      you attended last Tuesday, which would have been in

3      September 2009?

4  A.  Yes.

5  Q.  And do you see the section about how there was an

6      elderly farmer with roughened hands --

7  A.  Mm-hm.

8  Q.  -- there and he swore in frustration?

9  A.  Yes.

10 Q.  And demanded of another candidate, I want to know what

11     you are going to do.

12 A.  Yes.

13 Q.  Do you recall what swear word he used at this meeting?

14 A.  I think it was the F word.

15 Q.  So used the F word.

16         Was it okay for him to use the F word, in your

17     opinion, in that kind of setting?

18 A.  It was inappropriate in that setting.

19 Q.  And was it threatening?

20 A.  Not to the -- no, I don't think it was threatening,

21     because the speaker was a candidate for Senate, U.S.

22     Senate; was a -- one of the Republican candidates who

23     dropped out a long time ago.  And he was speaking for a

24     long time about things that, frankly, were not well

25     tuned to the audience at hand.  So I believe that's why

1          this gentleman was upset, at the length of time spent on

2          irrelevant topics.

3     Q.   And so it appeared to you that, while the word used was

4          inappropriate, he was frustrated at the situation.

5     A.   Yes.

6     Q.   About something he cared about.

7     A.   He was frustrated because it was a candidate speaking

8          and, basically, this gentleman was saying -- in fact, I

9          remember he said more than that.  He said that -- he

10         said, I've heard what you're saying a million times over

11         and over again, and what I want to know is, what are you

12         going to do and how are you going to do it?

13    Q.   We talked earlier about candidate surveys --

14    A.   Mm-hm.

15    Q.   -- that you had filled out.

16    A.   Mm-hm.

17         MR. STAFFORD:  Would you please mark this as

18         Exhibit 7.

19              [Off the record - discussion]

20             [Exhibit 7 marked for identification]

21    Q.   (by Mr. Stafford)  So you now have Exhibit 7 in front of

22         you, and this is a Web-site printout from The Washington

23         Voter Guides.  You can see the Web address at the

24         bottom.

25    A.   Yes.

```
 1   Q.   And it is "View Candidates' Survey Responses,"
 2        indicating that these are your responses.  Do you
 3        recognize these answers?
 4   A.   Yes.
 5   Q.   And do you recall what organization it was that you
 6        answered the survey on behalf of?
 7   A.   No.  Is this from EFF?  I don't remember who does
 8        Washington Voter Guides.
 9   Q.   So this is your survey responses, but you don't
10        recognize who it's for.
11   A.   No, I don't.  But frankly, I have filled out dozens of
12        these things in the past few months.
13   Q.   So directing you to number 4 here, "Immigration" --
14   A.   Mm-hm.
15   Q.   -- do you see that?
16             And the question is whether you support granting
17        health-care benefits and taxpayer-funded assistance to
18        illegal immigrants, and it says, "Oppose."
19   A.   Correct.
20   Q.   In your experience, is immigration an issue that some
21        people disagree about?
22   A.   Yes.
23   Q.   And in your experience, is it an issue that people can
24        get emotional about?
25   A.   I suppose.  I mean, I see footage of rallies in Arizona
```

```
1        and California where people are upset, yes.  But I

2        haven't witnessed that level of frustration here.

3   Q.   And directing you to the second page of this document,

4        number 9, "Abortion" --

5   A.   Mm-hm.

6   Q.   -- the question is, "The U.S. Supreme Court's 1973 Roe

7        v. Wade decision legalizing abortion," and --

8   A.   Mm-hm.

9   Q.   -- it indicates, "Oppose."

10  A.   Correct.

11  Q.   And same question:  Is abortion, in your experience, an

12       issue that people can get passionate about?

13  A.   Yes.

14  Q.   And then how about number 7, "Domestic Partnerships:

15       Granting same-sex domestic partners the equivalent

16       rights and benefits of marriage."  And it says, Oppose."

17  A.   Mm-hm.

18  Q.   And -- sorry; is that what it says?

19  A.   Yes.

20  Q.   And number 8, "Redefining marriage to include same-sex

21       couples," it says, "Oppose."  Is that accurate?

22  A.   Correct.

23  Q.   And is that your view as to the proper definition of

24       marriage?

25  A.   It is.  I believe marriage is one man, one woman.
```

1   Q.   And these survey responses, will you -- when you fill

2        them out, do you expect them to be kept private?

3   A.   No.

4   Q.   Do you expect them to be publicly accessible to anyone

5        who wishes to look at them?

6   A.   Yes.  I'm a candidate.

7   Q.   And did you have any concerns about expressing your

8        views in this candidate survey?

9   A.   No.  As I mentioned, it's -- it went public last year in

10       the paper in August, so that hurdle was crossed.

11  Q.   So at this point for you, then, it's public -- would you

12       say it's public record that you signed Referendum 71?

13  A.   Oh, definitely.  It was in the paper.

14  Q.   And would you say it's public record as to what your

15       position is on same-sex marriage?

16  A.   It's very public.

17  Q.   And is it public record as to what your position is on

18       domestic partnerships?

19  A.   Yes, very public.

20            I would like to add one comment to that.  My

21       concern is for the people who are not running for office

22       and don't necessarily want their views to be public.

23  Q.   So --

24  A.   That's why I'm -- I agreed to participate in this case.

25  Q.   And speaking just in your own particular instance,

Tracey Juran, Certified Court Reporter

Page 90

```
 1          whatever happens in this litigation --
 2    A.    Mm-hm.
 3    Q.    -- the fact that you signed the petition for
 4          Referendum 71 is already public record; is that
 5          accurate?
 6    A.    Correct.
 7              MR. STAFFORD:  So could you please mark that as
 8          Exhibit 8.
 9                   [Off the record - discussion]
10                   [Exhibit 8 marked for identification]
11    Q.    (by Mr. Stafford)  So, Redacted    , you're taking a look
12          at what we've marked as Exhibit 8.  And could you
13          describe that document for us.
14    A.    Yes.  This is one that I held out earlier.  This is a
15          Facebook note called Redacted
16          Redacted                    2010.
17    Q.    And you wrote that in response to some of the
18          allegations about things that might have been said to
19          certain representatives or senators in D.C.?
20    A.    Correct.
21    Q.    Especially regarding the use of the N word?
22    A.    Yes.
23    Q.    And so could you describe some of the incidents in there
24          that you say were directed towards Tea Party candidates.
25    A.    Towards Tea Party candidates?  This was a personal note
```

1       on the Facebook page, so this note only talks about --

2       if I remember correctly, it only talks about my personal

3       experiences.

4   Q.  Is there --

5   A.  Yeah.

6   Q.  -- a description in there about an office being broken

7       into?

8   A.  Oh, yes, that's correct.  Yes, John Koster's office.

9   Q.  Could you describe that incident for us.

10  A.  John -- someone broke into John Koster's office and

11      stole two computers and threw the printer through the

12      window.

13  Q.  And do you know if Mr. Koster's ever expressed an

14      opinion about Referendum 71, to your knowledge?

15  A.  No, not to my knowledge.  But -- yeah.

16  Q.  And so was it your understanding as you were writing

17      this Facebook posting --

18  A.  You know, let me rephrase that.  Yeah, I'm sure he has.

19      I don't know that he mentioned R-71, but I'm sure that

20      he supports one-man-one-woman marriage, because it was

21      just in the Herald the other day in an article about him

22      that he's strong on the social issues.  And so I'm

23      assuming that that's -- that includes marriage.

24  Q.  You don't know one way or the other, but you would

25      assume that's what he thinks.

1    A.    I would assume.

2    Q.    And you don't know whether or not he's expressed that

3          belief --

4    A.    No.  I can't --

5    Q.    -- to anyone.

6    A.    -- think of any specific incidences where he has.

7    Q.    And so when you're describing in the space of a post the

8          computer incident --

9    A.    Mm-hm.

10   Q.    -- it's your understanding that action was taken against

11         him because of his stance as a member of the Tea Party

12         or his political beliefs?

13   A.    Of his political beliefs, yeah.

14   Q.    So when you were --

15   A.    He has spoken at tea parties and there is -- let me just

16         clarify.  When you say a member of the Tea Party, it's

17         not a party and there's no membership, so the phrase

18         doesn't really have any meaning or weight to it.  But he

19         has spoken at Tea Party events.

20   Q.    Understanding there's not an actual political party --

21   A.    Mm-hm.

22   Q.    -- that's registered that --

23   A.    Mm-hm.

24   Q.    -- one signs up for a membership --

25   A.    Right.

Page 93

1   Q.   -- Tea Party events, Mr. --

2   A.   Mm-hm.

3   Q.   -- he has spoken at.

4   A.   Mm-hm.

5   Q.   And so when we were talking earlier about the phone call

6        that you received --

7   A.   Mm-hm.

8   Q.   -- on Redacted --

9   A.   Mm-hm.

10  Q.   -- that came out the same day as this article in the

11       Redacted ; correct?

12  A.   Yeah.  Not this (indicating), but --

13  Q.   The --

14  A.   -- the article.

15  Q.   -- Redac --

16  A.   Yes.

17  Q.   -- Redacted article.

18  A.   Correct.

19  Q.   And that same day as the article came out, you received

20       a phone call?

21  A.   Correct.

22  Q.   And you stated earlier that you couldn't think of

23       anything in that article that would have prompted

24       somebody to place this phone call to you.

25  A.   Correct.

Tracey Juran, Certified Court Reporter

```
 1   Q.   And in this Facebook posting we've just been looking
 2        at --
 3   A.   Mm-hm.
 4   Q.   -- would you say that it appears from that article that
 5        the statement of political beliefs by this other
 6        individual prompted people to break into his office and
 7        throw computers out the window?
 8   A.   I can't guess exactly why these people attacked John
 9        Koster, but I'm sure it's for his political beliefs.
10   Q.   And you can't say that -- why they would have done it
11        because it's difficult to know what might make somebody
12        angry who's not you; is that right?
13   A.   True.
14   Q.   Something that upsets you might not upset somebody else?
15   A.   Correct.
16   Q.   So is it possible that somebody might oppose Tim Eyman's
17        initiative that's going to be on the ballot?
18   A.   To the point of making a death threat to a child?  No.
19   Q.   That's not possible?
20   A.   No.
21   Q.   Nobody would do that?
22   A.   To a child?  No, I don't think so.
23   Q.   And it's --
24   A.   I mean, I would find it very difficult to believe.
25   Q.   Do you --
```

1  A.   It's a huge stretch.

2  Q.   Do you know one way or the other?

3  A.   Well, how can I -- I don't know all the people on the

4       planet or what would push their button.

5  Q.   So you don't know --

6  A.   You know what I mean?

7  Q.   -- why somebody would place a phone call like that.

8            MR. PIDGEON:   Objection; asked and answered.

9  Q.   (by Mr. Stafford)   You can answer the question, if you

10      can.

11 A.   Say it again.

12 Q.   You don't know why somebody would place a phone call to

13      you if that person did not indicate why they placed the

14      phone call to you.

15 A.   Correct.   However, coupled with the post on the YouTube

16      video this week, it does solidify my belief that that

17      was the reason for the strong reaction on Redacted,

18      2009.

19 Q.   The YouTube video was posted a year later --

20 A.   Mm-hm.

21 Q.   -- by -- you don't know if it was post -- or you don't

22      know if the person making the comment on the video was

23      the same person who placed the phone call?

24 A.   Correct.   But it shows the level of intensity on this

25      issue.

Tracey Juran, Certified Court Reporter

Page 96

1    Q.    You mentioned that the original version of the Redac

2          Redacted    article --

3    A.    Mm-hm.

4    Q.    -- also included a box that had information about your

5          campaign kickoff?

6    A.    Correct.

7    Q.    And in that box, it listed your contact information?

8    A.    Correct.

9    Q.    And the contact information that was given was your

10         cell-phone number?

11   A.    Yes, mm-hm.

12   Q.    And that was your personal cell-phone number.

13   A.    Correct.

14   Q.    And no one has called that cell-phone number regarding

15         Referendum 71?  Was that your testimony?

16   A.    Correct.

17             MR. STAFFORD:  Okay, thank you.

18             MR. PIDGEON:  Okay.  All right.

19

20                      EXAMINATION

21   BY MR. PIDGEON:

22   Q.    Redacted    , I have a couple of questions for you.

23   A.    Mm-hm.

24   Q.    Now, you mentioned you taught English as a second

25         language?

1    A.    Yes.

2    Q.    And you said you were in China?

3    A.    Yes.

4    Q.    How long were you in China?

5    A.    Two years, right after the Tiananmen massacre.

6    Q.    Now, were you in Beijing?

7    A.    I was in Tianjin, two hours east of Beijing.  And many

8          of my students had participated in those protests.

9    Q.    So you were aware of the Tiananmen objective.

10   A.    Highly aware.

11   Q.    Did you take part in that movement at all?

12   A.    No.  I came -- I arrived two months after the Tiananmen

13         massacre.

14   Q.    And then you also taught English in the Middle East?

15   A.    Yes.  Three years in the United Arab Emirates, from '93

16         to '96.

17   Q.    Did you learn Arabic at that time?

18   A.    Just a little bit.  The signs are in English and Arabic

19         and English is widely spoken as the language of wider

20         communication, because 70 percent of the people there

21         are not natives.  It's an odd place to be.

22   Q.    Now, you're also a member of the NRA?

23   A.    Correct.

24   Q.    How long have you been with the NRA?

25   A.    Just one year.

Page 98

1    Q.    Just one year, okay.

2              I take it you are a supporter of Second Amendment

3          rights?

4    A.    Yes, I am, and I have spoken on that topic as well.

5    Q.    Have you ever been contacted from the antigun lobby

6          concerning your views on the Second Amendment?

7    A.    No, I haven't.

8    Q.    Has anyone ever called you and threatened you concerning

9          your Second Amendment rights?

10   A.    No.

11   Q.    Or your position on the Second Amendment?

12   A.    No.

13   Q.    Have you ever been harassed or stalked as a result of

14         your Second Amendment convictions?

15   A.    No.

16   Q.    You mentioned before that the Tea Party is not really a

17         party.

18   A.    Correct.

19   Q.    You're running as a Republican, aren't you?

20   A.    That's correct.  I've been a Republican my whole life

21         and have always voted for Republicans except for Ross

22         Perot, whom I thought would fix the budget,

23         interestingly enough.

24   Q.    So you would say your brand of Republicanism is really a

25         fiscal conservative?

1  A.   Staunch fiscal conservative.

2  Q.   Are you also a social conservative?

3  A.   I am.

4  Q.   Have you ever heard the term "tea bagger" used to

5       describe members of the Tea Party or followers of the

6       Tea Party?

7  A.   Many times.  And I have been called that many times,

8       including this week on tweets that I followed, yes.

9  Q.   And to your knowledge, what does the term -- well, let

10      me ask you this:  Who has been calling you a tea bagger?

11 A.   People on the left.

12 Q.   Now, what do you mean by people on the left?  Can you

13      describe what you mean by people on the left.

14 A.   Well, I would say left-wing bloggers.  Let's see; was

15      that Pam's -- is that called Pam's House --

16 Q.   Pam's House --

17 A.   -- House Blend.  House -- some -- I think that's it,

18      House Blend.  Pam's House Blend is a left-wing blogger

19      and she has called me a tea bagger, I believe.  And in

20      Utah -- and -- I believe it was in Utah earlier this

21      week, there was a person calling me a bagger simply now.

22      The tea's not even a part of it, I guess, so now I'm a

23      bagger.

24 Q.   Can you explain what you think they mean when they call

25      you a tea bagger.

1    A.    I know what the real term means and it's repulsive and

2          disgusting.

3    Q.    Well, can you give us --

4    A.    But --

5    Q.    -- any idea what it means?

6    A.    The real term?

7    Q.    Right.

8    A.    Do you want to know what they really mean?

9    Q.    Yes, I want to know what they really mean.

10   A.    Yes.  All right, if you must.  It is a sexual act where

11         you put the scrotum into someone's mouth, the testicles.

12         That is the tea bag.

13   Q.    Now, is this usually a --

14   A.    Dip it into --

15   Q.    -- homosexual act?

16   A.    -- someone's mouth.  That is a --

17             THE REPORTER:  I'm sorry; one at a time, please.

18                   [Off the record - discussion]

19   Q.    (by Mr. Pidgeon)  Is that typical -- is that describing

20         a homosexual act?

21   A.    I suppose technically it could be done heterosexually

22         between a man and a woman, one direction.  But I -- from

23         my understanding, it is a homosexual term that arose out

24         of the gay culture.

25   Q.    But is it used in a derogatory fashion by members of the

1      left?

2  A.  Extremely, yes.  It's used extremely often and it is

3      used in an extremely derogative way to dismiss people

4      who are upset about out-of-control spending.  It's used

5      to demonize people who disagree with political

6      decisions.

7  Q.  So do you think it dehumanizes people who are fiscal

8      conservatives?

9  A.  Absolutely.  It labels, and I believe it is an attempt

10     to shut down or quiet people who disagree with the

11     current Congress's policies.

12 Q.  But isn't it also a derogatory and discriminatory term

13     towards homosexuals as well and wouldn't it --

14 A.  No.

15 Q.  -- demean --

16 A.  I --

17 Q.  -- homosexuals to be called such a name as well?

18 A.  You've got me there.  I think it comes -- I think when

19     we talk about demeaning or demoralizing, you need to

20     consider the person on the other end and how they

21     interpret the term.  If that is a term that gays use

22     among themselves or find amusing, then it wouldn't be

23     interpreted as demeaning to them.  I think it depends on

24     who is listening.  And -- but in this case, this is

25     clearly designed to intimidate and embarrass the people

1      calling for fiscal responsibility.

2   Q.  Do you know any other blogs besides Pam's House Blend

3      that use the phraseology "tea bagger"?

4   A.  Yes.  Richard Davis used the term.  He writes for

5      WashACE.  And interestingly, I believe he is a fiscal

6      conservative.  So in this case, I believe he picked up

7      the name from other people like on MSNBC, like Keith

8      Olbermann, who uses the term regularly.  I believe

9      Richard Davis probably learned the term from him and did

10     not realize the connotations.

11  Q.  Do you know whether or not Keith Olbermann is a tea

12     bagger in his own mind?

13  A.  I am certain that he is not in his own mind, because he

14     pokes fun of -- are you talking about tea partiers or

15     are you talking about an actual doing the act?  I don't

16     know what he does in his free time.

17  Q.  Now, you mentioned that you had an interesting

18     confrontation with a fellow in Lynnwood who was

19     screaming about mandatory redistribution of wealth.

20  A.  Yes.

21  Q.  Have you ever been threatened by anybody who's an open

22     communist or Marxist?

23  A.  Well, I suppose that was probably the closest that I've

24     come to being threatened.  As I mentioned earlier, I was

25     amused by it and just walking away --

1    Q.    But besides him, has anybody else who has identified

2          themselves as a Marxist or a communist or a socialist

3          ever threatened you, harassed you, or stalked you?

4    A.    No.

5    Q.    Were you a contributor to R-71?

6    A.    No, I don't believe I was.  No.

7    Q.    Would you say -- do you know of anybody else in the

8          state of Washington that had a higher profile as a

9          signer of the R-71 petition than you did?

10   A.    No, I'm not aware.  Let's see.  Who else was running

11         then?  It was '09, so it was local races mostly, local

12         and county races that were being discussed in the news.

13         Mine was an unusual case because I started so early.  So

14         no.

15   Q.    So you would say you -- that you were highly public as

16         an R-71 signer.

17             MR. STAFFORD:  Objection; leading.

18   Q.    (by Mr. Pidgeon)  Were you highly public as an R-71

19         signer?

20   A.    Well, after it made the papers, yes, I felt that it was

21         extremely public.

22   Q.    And since then you've received two death threats; is

23         that correct?

24   A.    Correct, and one physical assault to my son, which -- I

25         don't know if it's related, but in my mind, these three

1        events are connected.

2   Q.   Let's talk a little bit about what happened to Redacted

3        You mentioned that you attended the election-night

4        party and that -- would that have been in November of

5        2009?

6   A.   Yes.

7   Q.   And at the election-night party, you also mentioned that

8        there were people taking pictures there?

9   A.   Yes, a number of people taking pictures with very

10       expensive, large cameras.

11  Q.   Were any of them making videos, to your knowledge, or

12       were they just snap photos?

13  A.   That I'm not sure.  I don't know if they were making

14       videos.

15  Q.   And did one of them or more of them go out of their way

16       to take pictures of your children?

17  A.   Yes, they did.  Several of them, as I mentioned,

18       followed the family as we walked down the hall, and I

19       know they were taking pictures of the children because

20       we were a little bit spread out as we were walking down

21       and they were focused on the children.

22  Q.   Do you think that members of the part of this community

23       that would give you a death threat would hurt your

24       children as well as you?

25  A.   I do.  After that death threat, yes.  The man said to a

State Objects: Lack of foundation (speculation)

1    child, I will kill you and your family.  Yes.  And he

2    had heard my son say, Mom, it's for you, so he knew that

3    he was speaking to a child.

4  Q.  Now, this incident that took place in Ocean Shores was

5       after that election party; isn't that correct?

6  A.  Correct.

7  Q.  So it's possible that someone could have had a picture

8       of Redacted from the election night; isn't that correct?

9  A.  Yes, it's quite correct.

10           I would like to point out also that my son also

11      spoke at that April 15th, 2009, tea party.  He wrote his

12      own speech and his video was posted on YouTube.  So it

13      would not be difficult to figure out what my son looks

14      like.  Also, when I introduced my speech, which was also

15      posted on YouTube, I said at the very beginning, that

16      was my son, and everybody clapped again.  So again,

17      it's -- yeah, his face is definitely out there.

18  Q.  But Redacted hasn't declared his run for any public

19      office; isn't that correct?

20  A.  Correct, although he has said that he would like to run

21      someday.

22  Q.  Does he still feel that way?

23  A.  Yes, even more so now.

24  Q.  Now, you indicate that somebody threw applesauce all

25      over him.

State Objects: Lack of foundation, speculation

Tracey Juran, Certified Court Reporter

```
 1   A.   Yes.

 2   Q.   How much applesauce would you estimate was being thrown?

 3   A.   Judging by how long it took me to clean up the mess, I

 4        would guess somewhere between -- I would guess around

 5        half a cup.

 6             And actually, I did find out later, just recently,

 7        that someone from the Roanoke conference went back to

 8        the hotel after that incident and found a container, a

 9        plastic container, that looked like it could have had

10        the applesauce in it that had been thrown.  So she

11        threw, apparently, the whole thing.  I don't know if it

12        was one of those little recyclable ones, you know what I

13        mean, the little snack-pack size.  I don't know; I

14        didn't see the container.  But someone did tell me that

15        they went back and found it.

16   Q.   Then you had a discussion with Rob McKenna at this

17        convention?

18   A.   Correct.

19   Q.   Did you tell Rob at the convention about the death

20        threat that had happened earlier?

21   A.   Yes, I did.

22   Q.   And you told him the express words that had -- that were

23        given to you?

24   A.   I don't remember if I told him the express words, but I

25        did say, we received a death threat last August.  And he
```

1       dismissed it as being probably not connected to the

2       physical assault that had happened that morning.

3   Q.  Right.

4           But did he realize that the death threat was

5       associated with the publication of the article on R-71?

6   A.  No.  I don't know if he -- I don't recall if I had

7       mentioned that or not, that part of it.  I might have,

8       but I don't recall if I had mentioned that to him when I

9       said, we received a death threat last August.

10  Q.  Are you aware that Anne Levinson, who is the

11      representative for Washington Families Standing

12      Together, has repeatedly said in public that there is

13      absolutely no evidence of any harassment in this case?

14  A.  I have -- I've not heard her say that, but I've heard

15      Secretary of State Sam Reed say it on the radio.

16  Q.  Do you think that the death threat to you and your

17      family is no evidence of harassment in this case?

18  A.  No, I don't.  In fact, I immediately called in to that

19      radio show to tell them that there had been, and I

20      believe it was on Carlson's show, John Carlson, on KVI.

21      I immediately -- it was John.

22          I immediately called in, and they were in a

23      commercial break and they put me on afterwards.  And I

24      said, it is happening.  It happened to me.  And I

25      briefly said, you know, I was on the front page of the

1    paper and then we got a call at 6:00 that night, and he

2    hung up immediately.  And I know John Carlson knows that

3    I'm a candidate and probably didn't want to get into the

4    legal ramifications of having a candidate on his show

5    without giving the opposing candidate equal time.  So

6    that may be why he hung up quickly.

7         Yeah, I suspect that I am not the only one who has

8    filed a police report and then had no follow-up to see

9    who actually did the threat.

10   Q.   Are you aware of this fellow John Bisceglia?  Does that

11        name sound familiar to you at all?

12   A.   No.  Bisceglia?

13   Q.   Yeah.

14   A.   John Bisceglia?  Maybe -- no, it's not.  If I've seen

15        the name, I'm not placing it.

16   Q.   Now, you also mentioned that some of your signs had been

17        slashed with a sharp instrument?

18   A.   Correct.

19   Q.   Could you tell me a little bit more about that.

20   A.   Yes.  There are two kinds of slashing that we've seen.

21        One is slashing the entire sign off the stake so that

22        it's not usable again, and then the other kind is where

23        it's just mangled, slashed in many places with some kind

24        of sharp instrument, but not going all the way through

25        the sign.  So then it's just kind of hanging in shreds.

Page 109

1    Q.    But the sign is essentially useless thereafter.

2    A.    Correct.

3    Q.    Now, can you describe how you think somebody could cut

4          one of your signs in multiple slices.  How would they do

5          that, in your own mind?  How would you do it if you were

6          going to make this -- you know, similar slices, do that

7          at a sign?

8    A.    I suppose you would need some kind of a machete or

9          something of similar nature, and you would have to

10         anchor the sign and -- I don't actually know.  I mean,

11         these signs are very firm material, so I can't picture

12         what kind of instrument they're using.  But it's nasty

13         looking.  It's quite frightening to come across a sign

14         like that, frankly.  It bothers me.

15   Q.    In what respect do you think that the -- do you think

16         that your opposition is deploying extremely sharp

17         weapons against your signs?

18   A.    I do.

19              MR. STAFFORD:  Objection; calls for speculation.

20   A.    It would take an extremely sharp instrument to destroy

21         the signs in such a manner.  And the fact that the sign

22         is not just merely stolen shows fury and anger.  I and

23         my husband both perceive those kind of signs as physical

24         threats to me.  It's as if they're slashing my face when

25         I see a sign like that.

State Objects: Lack of foundation (speculation).

Tracey Juran, Certified Court Reporter

1  Q.  (by Mr. Pidgeon)  Now, you also -- you took a position

2      in the candidate-survey response on immigration and

3      abortion.

4  A.  Mm-hm.

5  Q.  Have you ever had anybody who is pro-immigration call

6      you?

7  A.  No.

8  Q.  Have you ever had anybody who's pro-immigration blog

9      anything that you've ever seen?

10 A.  Blog anything?

11 Q.  Yeah.

12         Have you ever --

13 A.  You mean --

14 Q.  -- seen any blogs that mentioned you as a --

15 A.  No, I haven't.  No.

16 Q.  Have you ever received any threats, phone calls,

17     harassment, or stalking from somebody who is pro-

18     immigration?

19 A.  No, I haven't.

20 Q.  How about on the abortion issue?  Have you ever picketed

21     in public on abortion?

22 A.  I have.

23 Q.  Where have you picketed?

24 A.  I picketed in Illinois many years ago and I have also

25     picketed in -- let's see; where is that?  I guess it's

1        north Lynnwood, around 164th, several years ago.  And I

2        have been to pro-life rallies in Olympia, although not

3        for a couple of years.

4   Q.   Do you know whether or not Planned Parenthood was

5        created for the explicit purpose of aborting black

6        babies or African-American babies?

7             MS. EGELER:  Objection to relevance.

8   Q.   (by Mr. Pidgeon)  Just asking your -- whether or not you

9        know that.

10  A.   I do know that.  Margaret Sanger believed that eugenics

11       was a good way to eliminate the part of the population

12       that she thought was not worth living.

13  Q.   Do you know whether or not Planned Parenthood will

14       continue to accept donations right now that are

15       expressly reserved for only the abortion of African-

16       American babies?

17  A.   Yes.  I know this has been done -- exposed in several

18       cities in the last couple of years, with people calling

19       and pretending to be donors who want the money to be

20       used only to abort black babies, and the people on the

21       other end of the line at the Planned Parenthood clinics

22       agreed.  This has happened in at least three cities that

23       I've read about, different incidences.  It's very sad.

24  Q.   Now, as a result of your picketing and your notorious --

25       I mean, I take it you were in public when you were

1        picketing?

2   A.   Yes.

3   Q.   Did people see you?

4   A.   Yes.  It was on a busy street.

5   Q.   Were you ever photographed and your name in the paper

6        for doing this?

7   A.   No.

8   Q.   Did anybody threaten you, harass you, or stalk you as a

9        result of your picketing?

10  A.   No, never.

11  Q.   Has anyone who is pro-abortion in this state threatened

12       you, called you, harassed you, or blogged about you as

13       an opponent of being pro-abortion?

14  A.   Not that I'm aware of.

15  Q.   So is it your testimony here today that the only

16       difficulty you've had with your political campaign in

17       terms of threats, harassment, stalking, and so forth is

18       a result of your position on R-71?

19  A.   Yes, and my position on gay marriage in general, as

20       evidenced by the YouTube-video comment this week.    Redacted

21  Q.   Now, going to that YouTube comment -- can you hand me

22       that exhibit.  I believe it's Exhibit 6.

23  A.   Let's see.  I believe I gave --

24  Q.   Exhibit 4; excuse me.

25            Now, in this exhibit, he indicates here -- do you

State Objects: Lack of foundation; hearsay; authenticity

Page 113

1    see an advocacy that you should be shot?

2    A.   I do, yeah.  I think he's saying, can't someone shoot

3    her?  I think he is making it easier for someone who

4    lives near me to say, yeah, I think she needs to be done

5    away with.

6    Q.   And this is a particular -- and this isn't shoot to

7    wound, is it?

8    A.   No.  He wants me not only dead, but mutilated beyond

9    recognition.  He wants me shot at least three times in

10   the head, judging by this comment.

11        MR. PIDGEON:   Okay, I have nothing further.

12

13                    FURTHER EXAMINATION

14   BY MS. EGELER:

15   Q.   [Redacted], is there gay support for your campaign?

16   A.   There is.

17   Q.   Can you tell me about that.

18   A.   Yes.  There is a lesbian couple in my neighborhood who

19   have endorsed my campaign.  One member publicly endorsed

20   me and her name is listed on my Web site, though I did

21   not put any specifics about her.  And they -- that is

22   because they are also very concerned about the out-of-

23   control spending at the state level and they're very

24   concerned about our schools not doing a good job with

25   the money that they have.  And so they're very excited

Page 114

```
 1          about my platform.

 2    Q.    And is it fair to say that your platform is not

 3          predominantly -- or, rather, the predominant issue of

 4          your platform is not the domestic-partnership issue?

 5    A.    Correct.  In fact, the domestic-partnership issue is not

 6          a part of my platform at all.  I am only answering the

 7          social-issue questions when they're presented to me.

 8    Q.    So --

 9    A.    I don't initiate the conversation on the social issues

10          because my focus is on jobs, schools, and fiscal

11          responsibility.

12    Q.    And would you expect that those are the only gay people

13          in your district that are supporting you?

14    A.    No, I would not.  I would guess that there are other

15          gays and lesbians who are supporting me, again, because

16          they have similar concerns about the spending and the

17          higher taxes and money not being used wisely to support

18          the services that our state provides.

19    Q.    You said that you participated in some picketing

20          regarding the abortion issue.  Can --

21    A.    Several years ago.

22    Q.    Was it one incident, then?

23    A.    I can remember one incident here, yes, in Washington

24          State.

25    Q.    And that was at the State Capitol?
```

1    A.    No, that was at -- that was in Lynnwood on, I believe,

2          164th.  There's a church there where we met, and then we

3          walked down the street a few blocks, turned around, and

4          came back up the street.

5    Q.    So it wasn't picketing outside an abortion clinic.

6    A.    No.  I've never done that.

7    Q.    Was the picketing with respect to a pending legislative

8          issue regarding abortion?

9    A.    No.  It was just a general pro-life -- you know, we want

10         to respect life.  I don't remember that there was

11         anything hot on the ballot at the time or in the

12         Legislature.

13   Q.    Did you carry any signs, you being the group?

14   A.    Yes, the group did carry signs.  No pictures, you know,

15         of fetuses or anything like that.  It was just messages

16         like protect life, that type of thing.

17   Q.    And did the signs say anything negative about abortion,

18         as opposed to a positive statement about protecting

19         life?

20   A.    I don't recall.  I suppose -- I mean, it's possible it

21         might have said, abortion stops a beating heart, or some

22         kind of phrase like that, but I'm just speculating.  I

23         don't recall any specific signs.

24   Q.    And when you walked down the street, was that on a

25         residential street?

1    A.    No.   That was a business street with a lot of traffic.

2          164th in Lynnwood has a Wal-Mart on it and a number of

3          strip malls on there.

4    Q.    But you weren't advocating taking a position on an

5          election issue regarding abortion.

6    A.    No.

7    Q.    Have other Republican candidates in your district had

8          their signs stolen?

9    A.    Yes, but not to the same degree.

10   Q.    How do you know that?

11   A.    Because we see the signs when we're out canvassing the

12         neighborhood.   So for example, let's say there's a

13         corner with an Ed Borey sign -- he's running for

14         Position 1 and he's a Republican -- and a sign for me, a

15         sign for James Watkins, and a sign for Marko Liias, Mary

16         Helen Roberts, Paull Shin.   In many of these corners, my

17         sign will be the only one stolen.   So it is directly

18         targeted to this campaign.

19   Q.    Have you contacted all of the other campaigns in the

20         district to ask them how many of their signs have been

21         stolen?

22   A.    I did ask Ed Borey how many of his signs had been

23         stolen, and I don't recall the number, but it's not as

24         high.

25   Q.    And who is Ed Borey?

1   A.   Ed Borey is a candidate for State Representative

2        Position 1 for the 21st District.  He's running against

3        Mary Helen Roberts.

4   Q.   And what party does he associate with?

5   A.   He's a Republican.

6   Q.   And is he associated with the Tea Party movement?

7   A.   No, he's not.

8   Q.   Are there any other candidates in the district that are

9        associated with the Tea Party movement?

10  A.   Yes.  James Watkins has spoken at tea parties.  He's

11       running for Congress against Jay Inslee.  Let's see.

12       Who else is in the district?  Glen Sayes was running

13       against Paull Shin in the primary and --

14  Q.   Is he still in the election?

15  A.   He's not in it now.

16            The other fellow just filed a couple months ago and

17       he hasn't been involved with tea parties at all that I

18       know of.  Let's see; who else?  Well, Dino Rossi has

19       come to Tea Party groups and spoken.

20  Q.   And has he publicly stated that he's part of the Tea

21       Party movement?

22  A.   Probably not.  I don't know.

23  Q.   Did James Watkins speak at Tea Party rallies, to your

24       knowledge?

25  A.   Yes.

1    Q.   And did you ask --

2    A.   And John Koster has too.  He's not in my district, but

3         he's nearby, in the neighboring district, and he has

4         spoken.  Luke Esser has spoken.  He's the chairman of

5         the Republican Party in Washington State.

6    Q.   So he's not running for office.  He's not a candidate?

7    A.   No.

8    Q.   Just focusing on candidates in the district, have we --

9    A.   Okay.

10   Q.   -- listed them all?

11   A.   Yeah, all that are on the ballot right now.

12   Q.   Have you ever seen a campaign sign for another candidate

13        slashed?

14   A.   Yes.  Some other Republican-candidate signs have been

15        slashed.

16   Q.   Signs for whom?

17   A.   Clint Didier had a sign on Mukilteo Speedway that was

18        slashed repeatedly.

19   Q.   And he -- was he associated with the Tea Party movement?

20   A.   He was.

21        Dino Rossi -- I'm trying to think if I've seen

22        signs slashed for him.  In 2008, I did see signs for

23        Dino slashed, big, huge signs that -- I saw some that

24        were slashed and I saw some that were painted.

25   Q.   And why do you think people would have slashed or

1       painted Dino Rossi signs in 2008?

2   A.   Because they felt strongly that they didn't want him to

3        win and -- yeah, I guess that's it.

4   Q.   Do you think people might have slashed your signs

5        because they feel strongly that you shouldn't win?

6   A.   Yes.

7   Q.   And do you think that people who slashed Dino Rossi's

8        signs or painted them in 2008 had in mind what Dino's

9        position might be on future legislation regarding

10       domestic partnership?

11  A.   It's possible.  I don't know.  Definitely it would be

12       based on his future legislation on something.  I mean,

13       the reason why people feel propelled to -- or compelled

14       to do some -- do an act like that is that they're afraid

15       of the legislation that that person would either sponsor

16       or support.

17  Q.   Could it be they were afraid or opposed to something

18       other than domestic partnership that Dino might support?

19  A.   Sure, could be.  I don't know what the reason was.

20  Q.   Could that be true of you too and your signs, that

21       people are worried about what you might vote for with

22       respect to other issues other than domestic partnership,

23       which isn't even a key piece of your platform?

24  A.   It could be, mm-hm.

25  Q.   When you spoke with Rob McKenna at Ocean Shores, did you

1      ask him or did he tell you whether he's ever received

2      threats as a public figure?

3   A.  I think he might have mentioned that he -- or that some

4      candidates do get death threats.  I don't remember if he

5      said he had.

6   Q.  Have you talked to Marko Liias to ask him if there's

7      been any damage or theft of his signs?

8   A.  Yes.  He did say that one -- he mentioned one sign that

9      had been stolen and he named the street where it had

10     been stolen.

11  Q.  Was it a particularly big sign?

12  A.  I don't know.  He didn't tell me the size of the sign.

13  Q.  Did he tell you that he's only had one sign stolen in

14     all of his campaign?

15  A.  He only mentioned that one particular sign.

16  Q.  So he didn't say that that was the only sign that had

17     been stolen?

18  A.  No, he didn't, but that was the implication.

19  Q.  So do you think Republican candidates tend to be singled

20     out rather than Democratic?

21  A.  In this area, yes.

22  Q.  You talked about the party after the election on

23     Referendum 71 and the fact --

24  A.  Mm-hm.

25  Q.  -- that people were filming or taking pictures of your

1          children clearly without your permission.

2    A.    Yes.

3    Q.    Did you go and look on the Internet to see whether or

4          not such pictures were posted?

5    A.    We did.  That night, both my husband and I looked on-

6          line, because we were concerned.  We looked that night

7          and then my husband looked again the next few days to

8          see if we could find those pictures being posted, and we

9          didn't.  But we did find other pictures of Redacted

10         Redacted   in the hallway that had been taken that night --

11   Q.    Have you --

12   A.    -- and that were being used to mock her.

13   Q.    Have you seen any pictures from that night since then on

14         the Internet, pictures specifically of your children?

15   A.    I haven't.

16   Q.    Did you see footage of your children on the television

17         or hear about it from others?

18   A.    No.

19   Q.    Did the individual that called with the death threat

20         tell you -- or your son, rather, what his position was

21         on abortion?

22   A.    No.  He only said, I will kill you and your family.

23   Q.    So he did not --

24   A.    After he asked for me by name.

25   Q.    He did not indicate his position on abortion, gun

Tracey Juran, Certified Court Reporter

Page 122

1         control, immigration, or any other issue.

2    A.   No.

3    Q.   And he did not indicate anything regarding disagreement

4         with your position on any issue; correct?

5    A.   Correct, but I suppose it was implied.  Why else would

6         he want me dead unless I opposed him on some major issue

7         that he felt strongly about?

8    Q.   But my question is --

9    A.   Yes.

10   Q.   -- did he make any such indication?

11   A.   No.

12            MS. EGELER:  Okay, I have no further questions.

13            MR. STAFFORD:  Nothing from me.

14            MR. PIDGEON:  I'm good.

15

16                          (Whereupon the deposition
                            concluded at 3:47 p.m.)
17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2    STATE OF WASHINGTON )
                         )
3    COUNTY OF SNOHOMISH )

4              I, the undersigned Notary Public in and for the

5    State of Washington, do hereby certify:

6              That the foregoing is a full, true, and correct

7    transcript of the testimony of the witness named herein,

8    including all objections, motions, and exceptions;

9              That the witness before examination was by me duly

10   sworn to testify truthfully and that the transcript was made

11   available to the witness for reading and signing upon

12   completion of transcription, unless indicated herein that the

13   witness waived signature;

14             That I am not a relative or employee of any party

15   to this action or of any attorney or counsel for said action

16   and that I am not financially interested in the said action

17   or the outcome thereof;

18             That I am sealing the original of this transcript

19   and promptly delivering the same to the ordering attorney.

20             IN WITNESS WHEREOF, I have hereunto set my hand and

21   seal this 12th day of October, 2010.

22

23             _____
               Notary Public in and for the State of Washington
24                   residing at Edmonds, Washington.
                      (Notary expires 3/09/13)
25                        (CCR No. 2699)

Tracey Juran, Certified Court Reporter

# Exhibit One

Redacted

Redacted

# Exhibit Two

Redacted

Redacted



Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Exhibit Three



greenfaucet

CHIP HANLON'S
# RED COUNTY
The place for state and local conservative politics

SEARCH

Don't let Obama take 30% of your nest egg.
GO HERE and keep your money MAN!



(http://dev.redcounty.com/ad/redirect/140660/n140660?url=node/141130)



(http://www.redcounty.com/ad/redirect/141392/n141392?url=node/141130)



(http://redcounty.com/ad/redirect/141180/n141180?url=node/141130)



(http://redcounty.com/ad/redirect/140663/n140663?url=node/141130)



(http://redcounty.com/ad/redirect/140671/n140671?url=node/141130)

## 1st CD: Desperate Dem sign thieves show disrespect/arrogance to proud Vietnam vet

By Steve Beren (/user/674) | 8/03/10 | 12:16 AM EDT | 3 Comments (/content/1st-cd-desperate-dem-sign-thieves-show-disrespectarrogance-proud-vietnam-vet#comments)

ShareThis (http://www.redcounty.com/content/1st-cd-desperate-dem-sign-thieves-show-disrespectarrogance-proud-vietnam-vet)

2010 is shaping up to be a good year for Republicans, and a bad year for Democrats. That's no surprise, given the arrogance and disrespect towards the American people shown by the Obama administration and the Democratic Party congressional leadership. The Obama-Pelosi-Reid agenda has proven to be a highly partisan agenda. It is failing, it is backfiring, and it is being rejected by the American people.

It is no wonder that many Democrats - elected officials, candidates, bureaucrats, media hacks, and party activists - are feeling more and more desperate.



Redacted

Congressman Jay Inslee, one of the most partisan supporters of the Obama-Pelosi-Reid agenda, is likely facing his toughest re-election campaign in over a decade. And - judging from a recent sign-stealing incident in the 1st Congressional District - Inslee's campaign supporters are acting out in their desperation. It seems some of them are cracking under all the pressure.

James Watkins, candidate against the incumbent Democrat Inslee, **writes on his campaign website blog** (http://www.watkinsforcongress.com/posts/how-desperate-are-the-democrats-in-this-election-cycle) that one of his supporters, a proud Vietnam veteran, had several signs - for Watkins and other GOP candidates - in his yard out in front of his home.

They were all torn down. Sadly, it is not unusual for Democrats in this part of the state to tear down signs supporting GOP candidates. It is a disgraceful action in any case - disrespectful of fellow citizens, and disrespectful of the democratic process. But this incident really goes over the line. Watkins reports:

*"At an event in Bothell last weekend, one of my volunteers — a proud veteran who served his country in Vietnam — shared an amazing story. He and his wife live on a major street and use their own property to display political signs. They had one of my big signs on their fence, as well as a few from other Republican candidates. Last week, he came home to find all the signs ripped down and missing. Unfortunately, Republican candidates have gotten used to having their signs stolen or destroyed. But in this case, the thieves left a replacement...."*

The replacement, in big bold letters, says "REPUBLICANS ARE A DISEASE."



This obnoxious (and, let me stress again, desperate) and disgusting act of arrogance is a slap in the face to all Americans, of any viewpoint. It is out of bounds; it is contrary to free speech. That goes without saying.

But it shows how, in their blind rage, in their selfish desperation, in their unthinking hyper-partisanship, these Democrat sign thieves happened to pick on not just a random fellow citizen, but one who proudly fought for this country, serving in Vietnam.

These pro-Inslee sign stealers, in their actions, challenged and sought to thwart the right of free speech of a Vietnam veteran.

On the one hand, they thus revealed a bit of their true political nature - imagine what they would do if they had full power! Imagine what they would get away with - if they could. Imagine how they would treat the "disease" of being Republican - if they could.

On the other hand, their outrageous, anti-democratic, and hateful actions were directed against the very type of courageous and patriotic warrior without whom none of us would have any liberty, any free speech at all.

Watkins **pursues the matter further:** (http://www.watkinsforcongress.com/posts/how-desperate-are-the-democrats-in-this-election-cycle)

*"Is this the best the 'progressives' can do? The folks on my side of the political fence are talking about substantive issues: jobs, the economy, government spending, and good government. Meanwhile, the other side [is] calling us names, taking our stuff, and trying to loudly change the subject when adults ask uncomfortable questions.... Here's some free advice. Act like adults. The voters I talk to want real solutions and real statesmen. They don't want personal attacks, distractions, party politics, and scare tactics...."*

Regardless of your political point of view, and regardless of which candidate you support, Watkins' argument is unassailable. We need political diversity, not a one-sided political monologue. We need an exchange of views and open debate, not an arrogant shutting down of free speech.

Tags : Jay Inslee (/related-content/Jay Inslee) , James Watkins (/related-content/James Watkins) , sign stealing (/related-content/sign stealing) , Vietnam veterans (/related-content/Vietnam veterans)

Case 3:09-cv-05456-BHS Document 306 Filed 09/04/11 Page 138 of 158

## Comments

**The guys at Powerline said it pretty well.** *(//content/1st-cd-desperate-dem-sign-thieves -show-disrespectarrogance-proud-vietnam-vet#comment-52405)*
Submitted by Hairy Buddah (not verified) on Tue, 2010-08-03 02:00.

Progressives/liberals are more likely to lie to accomplish their goals because they think they have the moral high ground. That has led them to ends justifying the means kind of thinking and actions. Pulling out signs is no surprise.

http://powerlineblog.com/archives/2010/07/026894.php
*(http://powerlineblog.com/archives/2010/07/026894.php)*

---

**Sign theft and replacement** *(//content/1st-cd-desperate-dem-sign-thieves-show- disrespectarrogance-proud-vietnam-vet#comment-52406)*
Submitted by Anonymous (not verified) on Tue, 2010-08-03 02:37.

I hope this was reported to the police. It looks like the replacement sign may have been professionally printed. If so, the police should be able to find who the printer was. It should also be dusted for prints and the owner of the website on the poster should be investigated.

---

**I'm withholding judgment....** *(//content/1st-cd-desperate-dem-sign-thieves-show- disrespectarrogance-proud-vietnam-vet#comment-52444)*
Submitted by Rick (not verified) on Wed, 2010-08-04 02:04.

....until Max Cleland weighs in.

## Post new comment

**Your name:**
Anonymous

**E-mail:**

The content of this field is kept private and will not be shown publicly.

**Homepage:**

**Subject:**

**Comment: ***

- Web page addresses and e-mail addresses turn into links automatically.
- Lines and paragraphs break automatically.

More information about formatting options *(/filter/tips)*

CAPTCHA
This is for testing whether you are a human visitor and to prevent automated spam submissions.

**What code is in the image?: ***

Enter the characters shown in the image.

Save    Preview

# Exhibit Four

Redacted

# Exhibit Five

Redacted

Redacted

Redacted

# Exhibit Six

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

# Exhibit Seven

Redacted

Redacted

Exhibit Eight

Redacted

Redacted