The Honorable Benjamin H. Settle

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

JOHN DOE #1, an individual, JOHN
DOE #2, an individual, and PROTECT
MARRIAGE WASHINGTON,

                Plaintiffs,

     v.

SAM REED, in his official capacity as
Secretary of State of State of Washington,
BRENDA GALARZA, in her official
capacity as Public Records Officer for the
Secretary of State of Washington,

                Defendants.

NO. 09-cv-05465-BHS

DESIGNATED DEPOSITION
TESTIMONY OF ▓Redacted▓
▓Redacted▓

Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

Washington Families Standing Together and the Washington Coalition for Open Government

and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

"Parties") hereby submit combined designated deposition testimony for ▓Redacted▓

▓Redacted▓

Defendants and Intervenors object to the admission of any deposition testimony taken

of any witnesses who could be called to testify at trial.   Therefore, the designations of

DESIGNATED DEPOSITION
TESTIMONY OF SENATOR ▓Redacte▓
▓Redacted▓
- No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

1   Defendants and Intervenors are being submitted in the event that the Court decides to admit

2   deposition testimony.

3      For the Court's convenience Defendants' designations have been highlighted in blue,

4   Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

5   been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

6   filing the redacted versions of these documents.

7      DATED this <u>6th</u> day of September, 2011.

8   ROBERT M. MCKENNA
 Attorney General

9

10    s/ William Clark
             

11   WILLIAM CLARK, WSBA #9234
 Senior Counsel

12   800 Fifth Ave, Ste 2000
 Seattle, WA 98104

13   206-464-7352
 BillC2@atg.wa.gov

14   ANNE EGELER, WSBA #20258
 Deputy Solicitor General

15   PO Box 40100
 Olympia, WA  98504-0100

16   360-664-3027
 Annee1@atg.wa.gov

17         

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION
TESTIMONY OF Redacted
- No. 09-cv-05465-BHS

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7352

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

| | |
|---|---|
| JOHN DOE #1, an individual; JOHN DOE #2, an individual; and PROTECT MARRIAGE WASHINGTON, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| SAM REED, in his official capacity as Secretary of State of Washington; BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington, | ) ) ) ) ) ) |
| Defendants. | ) ) |

No. 09-CV-05456-BHS

_____

Deposition Upon Oral Examination
Of
Redacted

_____

Taken by:  Tracey L. Juran, CCR
            CCR No. 2699


September 28, 2010

Everett, Washington

```
 1                        APPEARANCES

 2

 3

 4   For Protect Marriage Washington:

 5        Stephen Pidgeon, Attorney at Law
          3002 Colby Avenue, Suite 306
 6        Everett, Washington  98201-4081

 7

 8
     For the Defendants:
 9
          Anne E. Egeler, Deputy Solicitor General
10        Attorney General of Washington
          1125 Washington Street SE
11        P.O. Box 40100
          Olympia, Washington  98504-0100
12

13

14   For Washington Coalition for Open Government:

15        Steven J. Dixson, Attorney at Law (by telephone)
          Witherspoon Kelley
16        422 West Riverside Avenue, Suite 1100
          Spokane, Washington  99201-0300
17

18

19   For Washington Families Standing Together:

20        Ben Stafford, Attorney at Law
          Perkins Coie
21        1201 Third Avenue, Suite 4800
          Seattle, Washington  98101-3099
22

23

24

25
```

1                              INDEX

2

3

4                                                      Page No.

5    EXAMINATION

6         By Ms. Egeler                              5
          By Mr. Dixson                             45
7         By Mr. Stafford                           49
          By Mr. Pidgeon                            64
8         By Ms. Egeler                             77
          By Mr. Stafford                           98
9         By Mr. Pidgeon                            99
          By Ms. Egeler                            103

10

11

12   EXHIBITS MARKED

13        Redacted                                  14
          Redacted
14        Redacted

15        Redacted

16

          Redacted                                  15
17        Redacted
          Redacted
18        Redacted
          Redacted
19

          Redacted                                  16
20        Redacted
          Redacted
21        Redacted
          Redacted
22

          Redacted                                  18
23        Redacted
          Redacted
24        Redacted
          Redacted
25        Redacte

Page 4

1                          INDEX, continued

2

3

4                                                          Page No.

5    EXHIBITS MARKED, continued

6    Redacted                                              20
     Redacted
7    Redacted

8    Redacted

9    Redacted                                              23
     Redacted
10   Redacted

11   Redacted

12   Redacted                                              24
     Redacted
13   Redacted
     Redacted
14   Redacted

15   Redacted                                              26
     Redacted
16   Redacted

17   Redacted                                              38
     Redacted
18   Redacted

19   Redacted                                              54

20

21

22

23

24

25

1          Be it remembered that the deposition upon oral

2      examination of [Redacted] was taken on

3      September 28, 2010, at the hour of 2:08 p.m. at 3501

4      Colby Avenue, Suite 200, Everett, Washington, before

5      Tracey L. Juran, CCR, Notary Public in and for the State

6      of Washington residing at Edmonds, Washington.

7              Whereupon the following proceedings were had,

8      to wit:

9                        * * * * *

10    [Redacted]          ,   having been first duly sworn on

11                            oath by the Notary Public to tell
                              the truth, the whole truth, and
                              nothing but the truth, was deposed

12                            and testified as follows:

13

14                      EXAMINATION

15    BY MS. EGELER:

16    Q.    [Redacted], as I stated earlier when we first met, my name

17          is Anne Egeler and --

18    A.    Mm-hm.

19    Q.    -- I'm a Deputy Solicitor General with the Attorney

20          General's Office, and I'm representing the defendants in

21          this case, Sam Reed's position.

22              Have you ever been deposed before?

23    A.    Oh, I can't remember.  I don't remember ever being

24          deposed.  I may have been.

25    Q.    Well, I will remind you of a few rules that we have.

1 Our goal here is to make sure that we make things easy

2 for our court reporter.  She's writing down everything

3 that we say today.  So if you and I can be careful not

4 to speak over each other, she'll be able to get a better

5 transcript of what we're saying.  And it's also

6 important that we say yes or no rather than use head

7 nods or mm-hms, because those aren't clear in the record

8 either.

9  And then finally, if you have any question about

10 what I'm asking you, if it's confusing or you need

11 clarification, please let me know.  I certainly don't

12 want to mislead you, and it's important that we

13 understand each other as we proceed through this.  Okay?

14 A. Yes.

15 Q. Would you like a glass of water before we start?

16 A. Sure.  Thank you.

17 Q. Redacted, can you please begin by stating how long you've

18 been a Redacted.

19 A. I have been through Redacted

20 Q. And do you hold any other employment currently?

21 A. No.

22 Q. And was that the case in 2009 as well?

23 A. Yes.

24 Q. Are you aware that you were named as a witness in the

25 Doe v. Reed case?

1   A.   Yes.

2   Q.   And when did you become aware of that?

3   A.   Sometime within the last year.

4   Q.   And are you aware that that may require you to testify

5        publicly in federal court?

6   A.   Yes.

7   Q.   And is that something that you would be concerned about

8        or is it something you're okay with?

9   A.   Depend on the timing.  If it happens during Redacted it

10       would definitely be a problem.

11  Q.   But your concern would not be with the public nature of

12       the proceeding in court?

13  A.   No.

14  Q.   Did you do anything to prepare for your deposition

15       today?

16  A.   I drove here and tried to find a place to park.

17  Q.   I apologize for that challenge.

18  A.   I've been there, done that before and I know it's always

19       a problem, and I never can figure out why they don't

20       have parking around this building.  But anyway, I always

21       forget at the last minute, that's right, you need to

22       allow another half hour for parking.

23  Q.   And did you bring any records with you in response --

24  A.   Yes, I did.

25  Q.   -- to the subpoena?

1              If I --

2    A.   I brought --

3    Q.   -- could take a quick look at those.

4    A.   -- two items you may have.

5              Do you need clarification in any way?

6    Q.   I will ask you questions about these in a bit.  We'll --

7    A.   Okay.

8    Q.   -- definitely get to this.

9              But for now, I just want to ask, is this -- this is

10        all that you found in response to the subpoena, though;

11        correct?

12   A.   All that I found?

13   Q.   Well, the subpoena asked you to bring all records in

14        paper or electronic format discuss --

15   A.   This is the subpoena that I have (indicating).

16   Q.   Yes.

17   A.   Okay.

18   Q.   And I am referring to the paragraph just under the

19        heading.

20   A.   Mm-hm.

21   Q.   It says you are --

22   A.   Okay.

23   Q.   -- you are commanded --

24   A.   Mm-hm.

25   Q.   -- to appear and bring with you --

1   A.   Mm-hm.

2   Q.   -- all records, just to paraphrase, that refer to

3        threats or harassment, et cetera.  And I just wanted to

4        be clear that you've had a chance to look for such

5        records and these two documents (indicating) reflect all

6        that you were able to locate; correct?

7   A.   Everything else is in my head.

8   Q.   Do you recall signing the R-71 petition?

9   A.   Yes.

10  Q.   And do you remember where you were when you did that?

11  A.   No.

12  Q.   And before there was an R-71, did you participate in

13       planning the referendum or meeting regarding a proposed

14       referendum?

15  A.   Well, if you will remember, the referendum is a direct

16       result of the legislation.  So naturally, I was involved

17       in the legislation.  So I don't know if that would

18       qualify in your mind or not, but certainly it did in

19       mine.  What we dealt with in the Legislature was a

20       direct result -- or this -- I should say R-71 was a

21       direct result of what happened in the Legislature.

22  Q.   And how were you involved with the legislation?  Were

23       you a sponsor of the bill?

24  A.   No.

25  Q.   And did you go on record as opposing the bill?

1   A.   ==Yes, I believe I did.==  Now, there have been several

2        pieces of legislation dealing with this particular issue

3        in one framework or another.  And to be honest with you,

4        I cannot remember if I testified on this particular one

5        on the floor or not.  That would be a matter of public

6        record and you could check it out.

7   Q.   And prior to the legislation that spawned Referendum 71,

8        were you involved in the issue as a legislator of

9        domestic partnership?

10  A.   Yes.  In what way do you -- what -- I mean, involved?

11       Of course, I voted on it --

12  Q.   Did you --

13  A.   -- or against it.

14  Q.   -- sponsor legislation in years past concerning domestic

15       partnership or same-sex marriage?

16  A.   To be honest with you, I cannot remember.  I know that I

17       have been involved in the fact that we've dealt with the

18       issue, I have voted.  Whether or not I was a sponsor --

19       we deal with many, many bills, and I do not remember

20       sponsoring that kind of legislation.

21  Q.   Have you ever taken a public stance regarding the

22       possibility of a state constitutional amendment

23       addressing same-sex marriage?

24  A.   Have I taken a stance?  You mean have I spoken against

25       it?

```
 1   Q.   Have you ever spoken in favor of creating an amendment

 2        to the state constitution to prevent same-sex marriage?

 3   A.   DOMA, yes.

 4   Q.   And that's D-O-M-A?

 5   A.   Yes.

 6   Q.   And can you state what those letters stand for.

 7   A.   Isn't it terrible?  We forget what acronyms stand for.

 8   Q.   I have to confess I've forgotten myself, but --

 9   A.   Yeah.

10   Q.   -- I think it may be Defense of Marriage Act?

11   A.   There we go.  That's it; thank you.

12   Q.   Can you explain your involvement with DOMA.

13   A.   [Redacted]

14        [Redacted]

15   Q.   And that was a case that was an action seeking a ruling

16        that denying homosexuals the right to marry would be a

17        constitutional violation, is that correct, if you

18        remember?  I don't want you to say anything you don't

19        remember.

20   A.   I know that there was a challenge to the bill that

21        passed.  The legislation that passed was specifically

22        stating that marriage is between one man and one woman.

23        And there was a challenge to that in court and [Redacted]

24        [Redacted]

25        Does that help?
```

Tracey Juran, Certified Court Reporter

```
 1   Q.   It does.
 2   A.   I think I've got that right.  This has been so many
 3        years ago and this issue's been going on for so many
 4        years, I get foggy on what overlaps with what.  But I
 5        believe that pretty well describes it.
 6   Q.   And that was, if you recall, approximately 2004; is that
 7        right?
 8   A.   No, no, it was before that.  I don't remember; I'm
 9        sorry.
10   Q.   But prior to 2004?
11   A.   Yes, I'm sure it was.  Seems like it was about 2001,
12        right in there.  But there again, that's a matter of
13        public record too.
14   Q.   And is it your recollection that Redacted            , the
15        Attorney General's Office was defending your side of the
16        case?
17   A.   My side of the case?
18   Q.   Yes, in defense of the legislation.  Again, if you don't
19        recall, that's all right.
20   A.   I remember the attorney's name was Steve O'Ban, but
21        other than that, I don't remember.  I was not in the
22        courtroom, so I do not remember.
23   Q.   Do you recall if Bill Collins is a name that you --
24   A.   No --
25   Q.   -- recall?
```

1   A.   -- I don't know that name.

2   Q.   Let's turn to the time period after the legislation that

3        spawned Referendum 71 was addressed by the Legislature.

4        After the Legislature voted, did you meet with anyone

5        about a referendum?

6   A.   Before it was drafted, you mean?

7   Q.   Yes.

8   A.   Not that I recall.  I might have, but I do not recall

9        such a meeting as being before.  I certainly talked

10       about it after it was filed.  I do not remember a

11       discussion beforehand.

12  Q.   And --

13  A.   But again, that doesn't mean it didn't happen.  I just

14       don't recall the timing.

15  Q.   I understand.

16            Do you remember participating in the rally to

17       support traditional marriage on March 19th of 2009?

18  A.   I believe -- in 2009, we would have been in session.

19       And was it in Olympia?

20  Q.   Yes.

21  A.   I don't recall, but --

22  Q.   Don't recall?

23  A.   -- but it's not to say that I wasn't there.  We attend

24       so many rallies.

25  Q.   I want to show you -- why don't we mark this as

1       Exhibit 1 to your deposition, and then we'll ask if

2       you're familiar with this.

3              [Off the record - discussion]

4           [Exhibit 1 marked for identification]

5  A.   Well, then, I guess you didn't need to ask me the

6       question.  You've got the evidence right here.

7  Q.   (by Ms. Egeler)  Well, this is a page --

8           MR. PIDGEON:  Well, wait.  Before you do that --

9           MS. EGELER:  Excuse me.

10          MR. PIDGEON:  Well, I guess I'll -- I am going to

11      post an objection on lack of foundation.  But that's

12      okay, go ahead and proceed from there.

13  Q.  (by Ms. Egeler)  What's been marked as Exhibit No. 1 is

14      a page that I printed from YouTube, and I don't know if

15      you're familiar with this or not.  I wanted to ask you

16      about this.  And this is a videotape that contains what

17      appears to be a speech that you made at the rally in

18      [Redacted]     Does that refresh your recollection

19      about that rally?

20  A.   No, not at all.  I can't read what that says there.  Can

21      you?  What does that sign say?

22  Q.   Well, having seen it on the Internet, it looked like it

23      stated, "Don't bring Sodom and Gomorrah to Washington."

24  A.   Okay.

25  Q.   If you -- do you -- does this help you to remember that

1      rally?

2  A.   No.

3  Q.   Do you recall endorsing the referendum?

4  A.   I think I previously stated that I did sign it.  Is that

5      what you mean?

6  Q.   In addition to signing, do you recall whether you

7      permitted Protect Marriage Washington to state that you

8      support reject R-71?

9  A.   Yes.  Was that the -- say that question again, please.

10  Q.   I'm not sure if I'll be able to state it exactly the

11      same, but did you authorize Protect Marriage Washington

12      to state that you support the reject R-71 effort?

13  A.   Yes.

14           MS. EGELER:  Okay, let's mark this as Exhibit 2.

15             [Off the record - discussion]

16           [Exhibit 2 marked for identification]

17           MR. PIDGEON:  No objection to this exhibit.

18  Q.  (by Ms. Egeler)  And, [Redacted], you have what's been

19      marked as Exhibit No. 2 before you.  This is a two-page

20      exhibit from the [Redacted]

21      And on the back of the first page, the second-to-the-

22      last paragraph --

23  A.   Mm-hm.

24  Q.   -- is attributed to you as a quote from you.  Could you

25      please look at that and tell me if that's accurate.

1   A.   Yes.

2   Q.   It's a correct quote from you?

3   A.   Yes, mm-hm.

4   Q.   And they were authorized to post that?

5   A.   Mm-hm.

6   Q.   Pass out another exhibit for you.

7            MS. EGELER:  If you'd mark this as No. 3.

8            [Exhibit 3 marked for identification]

9   Q.   (by Ms. Egeler)  And what we've marked as Exhibit No. 3

10       is a two-page exhibit from the ▓Redacted▓ Web

11       site.  And, ▓Redacted▓, if you could look on the back of

12       the first page, in the middle of the page, paragraph

13       number 7 is, again, a quote attributed to you.  If you

14       could review that and tell me if you authorized this Web

15       site to post that.

16   A.   Yes.  I see it as essentially the same as the one in the

17       second exhibit.

18   Q.   And they -- this Web site had authority to post that

19       statement of yours?

20   A.   Well, to say a Web site has authority, I don't -- quite

21       describes --

22   Q.   Do you --

23   A.   Let's just say that this was a statement that -- I would

24       have said it, and certainly the First Amendment to the

25       Constitution guarantees their right that they can post

1       it if they wish.

2   Q.  Did they ask if they could post this?

3   A.  I don't remember.  I certainly have no objection, but I

4       don't remember them asking me specifically.

5           MR. PIDGEON:  Okay, and I want to go back also and

6       I'm going to post another objection to this exhibit.

7       And I want to be specific on this objection.  One

8       objection that I have in terms of downloads from the

9       Internet is that this particular download does not

10      indicate the date of the posting on the Internet and it

11      does not indicate the time of the download.  So the long

12      and short of it is that the objection is on the basis of

13      insufficient foundation and unreliability of the

14      document.

15          MS. EGELER:  And I'll respond to that by stating

16      that this Web site chose not to state when this was

17      uploaded onto its Web site.  But the date that it was

18      downloaded and printed appears on the lower-right-hand

19      corner of each page of the document.

20          MR. PIDGEON:  So its download date is 9/28/2010?

21          MS. EGELER:  Yes.

22          MR. PIDGEON:  Okay, thank you.

23  A.  So that was today.

24  Q.  (by Ms. Egeler)  That was today.

25  A.  So this could have been posted at any time; is that

1         correct?

2    Q.   It could have, yes.

3    A.   Okay.

4    Q.   But it currently appears today on their Web site.

5              MS. EGELER:  Okay, let's mark this as Exhibit

6         No. 4.

7              [Exhibit 4 marked for identification]

8    Q.   (by Ms. Egeler)  Exhibit No. 4 is from the

9         Redacted       Web site, again, downloaded today,

10        September 28th, 2010.  In the bottom third of the page

11        it states that, Redacted

12        Redacted

13        Redacted              And I believe your

14        name, Redacted , appears about three quarters of the way

15        down that list.  Do you see that?

16   A.   Yep.  Yes; sorry.

17   Q.   And is this Web site correct in stating that you either

18        endorsed the campaign or served on the steering

19        committee?

20   A.   Certainly I endorsed the campaign.  Served on the

21        steering committee -- I do not remember serving on a

22        steering committee.

23   Q.   So you endorsed, but do not recall serving on a steering

24        committee.

25   A.   Correct.

Page 19

1   Q.   Did you personally gather any petition signatures?

2   A.   One.

3   Q.   Can you tell me about that.

4   A.   My husband.

5           And let me say this:   Gather, what does that mean

6        to you?

7   Q.   Well --

8   A.   Does it mean did I hand them a petition and say, would

9        you sign this?

10  Q.   Yes.

11  A.   Was I a petition gatherer in the sense of that?

12  Q.   Yes.

13  A.   I would say yes.

14  Q.   But that was your only work to gain a signature to the

15       petition -- excuse me; let me withdraw that question.

16          That was the only signature to a petition that you

17       personally gathered.

18  A.   I can't say that.   You asked me if I remembered, and

19       that's what I remember.

20  Q.   Do you remember attending any rallies for Referendum 71?

21  A.   Well, you have a picture here that shows that I did.   So

22       I hesitate to say, no, I didn't, but I do not remember

23       the time, the place.   I attend a lot of rallies and that

24       may have happened.   I do not specifically remember a

25       time and a place.

Tracey Juran, Certified Court Reporter

1   Q.   Do you remember speaking in public about Referendum 71?

2   A.   Then you're going to ask me what I said, and I don't

3        remember.  I don't remember.  I'm -- it's very possible.

4        As I said, I speak at many rallies, I'm at many rallies.

5        If I was there, I was probably asked to say a word or

6        two.  But honestly, do I remember it?  No.

7   Q.   Do you remember if you had a Referendum 71 yard sign?

8   A.   I don't.  I don't even know -- did they have yard signs?

9   Q.   Do you recall whether you donated to the campaign?

10  A.   Yes, I did that.

11           MS. EGELER:  Okay, we're on Exhibit 5 now.

12           [Exhibit 5 marked for identification]

13  Q.   (by Ms. Egeler)  And, Redacted , are you aware that

14       donations to campaigns of $25 or more are public record?

15  A.   I'm sorry?

16  Q.   Are you aware that donations to political campaigns of

17       $25 or more are public record?

18  A.   Mm-hm.

19  Q.   Yes?

20  A.   Yes.  You couldn't run for office and not know that.

21  Q.   Absolutely.

22           And so you're aware, are you not, that those

23       donations are reported to the Public Disclosure

24       Commission by candidates and committees?

25  A.   Yes.  And -- however, they don't necessarily get

1      reported or recorded correctly.  Example:  I am not a

2      Redacted

3  Q.  Looking at Exhibit No. 5, I believe that's where you

4      were pointing out that they've listed you in the entries

5      here for Redacted as --

6  A.  Mm-hm.

7  Q.  -- under "Occupation," Redacted  And as

8      you've stated, you are not a Redacted ,

9      you're a Redacted .

10 A.  Mm-hm.

11 Q.  But with respect to the contributions listed here, is

12     that accurate?

13 A.  I would have to go back and check my own records.  I --

14     obviously, the PDC does not always get everything

15     accurately.  So to -- if you're asking me, are they

16     correct here, I don't know.

17 Q.  Do you recall whether you made multiple donations to the

18     referendum -- excuse me; to Protect Marriage Washington?

19 A.  I don't recall, but here it shows it.  So I would have

20     to say if their records are correct, yes.

21 Q.  Do you have a memory of making any contribution?

22 A.  You mean do I remember writing the check?

23 Q.  Yes.  Even if you don't remember the amount, do you

24     remember writing the check to Protect Marriage

25     Washington?

1  A.  Let me put it this way:  I would assume that I did.  Do

2       I remember it specifically?  No.

3  Q.  And there are a number of listings here for ▮Redacte▮

4      ▮Redacted▮   Is that your husband?

5  A.  Yes.

6         And I don't know if you're aware or not, but it is

7      the responsibility of whoever files to generally break

8      out the check in -- two people are the joint account

9      holders.

10  Q.  And by that you mean, for example, if my husband and I

11      wrote a check -- or, rather, I wrote the check, but it

12      was on our checking account --

13  A.  Yes.

14  Q.  -- where both of our names appear, for a hundred

15      dollars, the PDC would need to report that as $50 from

16      me --

17  A.  No, no.

18  Q.  No?

19  A.  It's the responsibility of the person who's doing the

20      filing with the PDC.  The PDC can take it either way,

21      but generally speaking, it is reported as two --

22  Q.  So in that instance --

23  A.  -- if they are joint account holders.

24  Q.  So in that instance, the group that we've given money to

25      could report it as $50 from myself and 50 from my

```
 1        husband.
 2   A.   Generally, that is the case.
 3   Q.   And do you recall whether you and your husband file --
 4        or, excuse me; contributed separately or does this look
 5        to you like probably a single check was broken out, if
 6        you would even know looking at this?
 7   A.   Yeah, I don't know.  I mean, I really -- yeah.  It's
 8        weird.  I don't know what to say.
 9   Q.   As you look at this, on the far-left-hand column, do you
10        see the word "Report" on --
11   A.   Mm-hm.
12   Q.   -- each line?
13             MS. EGELER:  That we'll mark as Exhibit No. 6.
14             [Exhibit 6 marked for identification]
15   Q.   (by Ms. Egeler)  So I clicked on that word "Report" just
16        for one of the lines.  I don't think we need to do this
17        for every single report.  But are you familiar with the
18        Public Disclosure Commission reports that are filed by a
19        candidate or committee?
20   A.   I try not to be.  I have a treasurer that does all of my
21        filings, and I want to know nothing about it.
22   Q.   Well, this is a report regarding Protect Marriage
23        Washington and --
24   A.   Mm-hm.
25   Q.   -- contributions.  And if you could turn to the back
```

```
 1        page --
 2   A.   Mm-hm.
 3   Q.   -- on the second and third lines -- or boxes of the back
 4        page, it lists [Redacted]              and
 5        contributions on [Redacted]            Is the address
 6        listed correct?
 7   A.   Yes.
 8   Q.   And we've talked before about the fact that the
 9        occupation is incorrect, is that right, on the box for
10        [Redacted]      ?
11   A.   Oh, yes, that is incorrect.  I'm a state senator, not a
12        state representative.  But that's a common mistake that
13        often happens.
14             MS. EGELER:  Then one last exhibit.  We'll mark
15        this Exhibit No. 7, I think.
16             [Exhibit 7 marked for identification]
17   Q.   (by Ms. Egeler)  And what we've marked as Exhibit 7 to
18        your deposition is a page printed on September 16th,
19        2010, from the [Redacted]              site.
20        Are you familiar with this letter that appears on this
21        exhibit?
22   A.   If I read it, I might be.  Do you want me to read it?
23   Q.   Please.
24   A.   The whole thing?
25   Q.   Until you can determine whether or not this message that
```

State Objects to Exhibit 7, hearsay, lack of foundation; impermissible lay witness testimony under ER 701.

```
 1           appears under the headline, ██████████
 2           ██████████████ exclamation point, is
 3           something that you actually wrote.
 4    A.     Okay, what was the question again?
 5    Q.     Do you recognize this letter as something that you
 6           wrote?
 7    A.     Yes.  Not specifically I wrote, but I endorsed.
 8    Q.     And on page 2 (sic) of this Exhibit No. 7 --
 9    A.     Mm-hm.
10    Q.     -- it ends with, "Sincerely," and a signature of
11           ██████
12    A.     Mm-hm.
13    Q.     -- ██████████████   Is that your writing of
14           ██████
15    A.     Yes.  Well, it's an electronic signature.  Is that what
16           you're asking me?
17    Q.     Did you authorize an electronic signature of this
18           letter?
19    A.     Yes.
20    Q.     And did you state to ██████████████ that
21           they could post this on their Web site?
22    A.     Yes.
23    Q.     So now I wanted to ask you about anything that you
24           perceived as harassment or threats that you suffered as
25           a result of your association and involvement with
```

Tracey Juran, Certified Court Reporter

Page 26

1   Referendum 71.

2   A.   Well, it started with -- and I don't know what point it

3        started.   I can't give you dates specifically.   Here

4        (indicating) you see a date of 11/27/09.

5           MS. EGELER:   Let's mark that as Exhibit No. 8.

6   Q.   (by Ms. Egeler)   This is something that you produced in

7        response to the subpoena duces tecum; correct?

8   A.   Yes, as per your request.

9              [Off the record - discussion]

10             [Exhibit 8 marked for identification]

11  Q.   (by Ms. Egeler)   What we've marked as Exhibit No. 8 is

12       a -- it looks like a photocopy of a letter that you

13       produced.   And in the upper-left-hand corner there's a

14       date, 10/27/2009, Tuesday, 12, colon, 51, and a fax

15       number that appears.

16  A.   Mm-hm.

17  Q.   Can you please describe this exhibit for me.

18  A.   It's a letter that I -- that was faxed to me as per the

19       fax number that you can see. [Redacted] is the phone

20       number, the fax phone number.   And this is -- was sent

21       to me on my personal home fax machine.

22  Q.   And on the fifth line down it states, [Redacted]

23       [Redacted] and, in parens, "bigot," and it has a fax

24       number that's a 360 number.   But this didn't come in --

25  A.   That's my fax number.

State  Objects to testimony: Hearsay

Tracey Juran, Certified Court Reporter

Page 27

```
 1   Q.   The 360 is.

 2   A.   Yes.   That's my number that they're sending it to.

 3   Q.   So was this faxed to the 360 number or the 206 number

 4        that appears at the top of the page?

 5   A.   No, this (indicating) is their footprint of the person

 6        who sent it to me.

 7   Q.   So it was sent to you at the [Redacted] number.

 8   A.   Correct.

 9   Q.   Is that the fax machine at your legislative office?

10   A.   No, no.   This is my home, personal home.

11   Q.   And do you know how someone would have obtained that fax

12        number?

13   A.   Yes, I know exactly.   In fact, that is not my fax

14        number, that is my home line.   So if you'd like, I will

15        explain this whole thing to you.   This is the result of

16        several harassing, nasty messages that were -- first of

17        all, they were to me personally.   When I would answer

18        the phone, I would hear comments of my involvement --

19        against my involvement in the referendum.

20             And after I don't remember how many of those -- but

21        this is the line that I use to take care of my

22        legislative business.   And how they got that number, I

23        don't know, but it is my husband's phone.   My husband's

24        name is in the phone book, so I presume that's how they

25        got the number.   And often it is also printed on
```

1    campaign brochures.  So that could have been another

2    means by which they got that number, to answer that

3    question as to how they got that number.

4         So I answered a number of calls not realizing that

5    they were not something that I wanted to listen to,

6    thinking it was to do with my -- either personal or my

7    legislative responsibilities.  And finally, they were

8    tying up my phone, number one, and number two, they were

9    very, very embarrassing and -- I guess if I could give a

10   physical response, they would make the hair stand up on

11   the back of my neck.  And I certainly don't want this to

12   be used in any way for anybody in this room to take this

13   as they worked, so let's keep doing it.

14   Q.  I understand.

15   A.  I want to make that very clear.  This is very, very

16       chilling experience.

17   Q.  Can you tell me how many phone calls there were?

18   A.  I would say there were -- well, finally, I stopped

19       answering the phone and they went to my answering

20       machine.  And I know the number was 15 on my answering

21       machine.  I can't tell you how many I answered

22       beforehand; I don't know.  It was a very emotional, gut-

23       wrenching experience.

24   Q.  Let's start with the ones that you did answer and talk

25       about those in detail.  I understand some of these

1       questions are unpleasant and I'm asking you possibly to

2       repeat something ugly.

3   A.  I can't repeat them.  You know what happens when you've

4       had a traumatic experience?  You blank it out.  I happen

5       to know this and this (indicating) because it's in

6       writing.  But quite honestly -- and I did not even

7       listen to all those messages.  I deleted them.

8   Q.  With respect to the phone calls, do you recall anything

9       that was said specifically?

10  A.  The word "bigot" was used a lot and "bitch."

11  Q.  And --

12  A.  Those were two that really stick out in my mind.  Beyond

13      that, be honest with you, I really blocked it out.

14                  [Cell phone ringing]

15          THE WITNESS:  Oh, excuse me.

16  Q.  (by Ms. Egeler)  Do you recall whether the caller said

17      anything about Referendum 71 or domestic partnership?

18  A.  They must have, because I knew that's what it was.  But

19      maybe it was just the language and the vitriolic

20      intimidation.

21  Q.  So are you uncertain whether they mentioned

22      Referendum 71 or same-sex marriage?

23  A.  I knew that's what it was.

24  Q.  But do you recall specifically that they mentioned it?

25          MR. PIDGEON:  Objection; asked and answered.

State Objects: Hearsay

1   Q.   (by Ms. Egeler)  You can go ahead and answer.

2            THE WITNESS:  I'm sorry; what'd you say?

3            MR. PIDGEON:  You can answer.

4   A.   I remember the words "homosexual," but I don't remember

5        it in specific reference to this (indicating).

6   Q.   (by Ms. Egeler)  And by to this, you mean to --

7   A.   I mean --

8   Q.   -- Referendum 71?

9   A.   -- to Referendum 71, yeah; excuse me.

10           I don't recall that they actually said, because

11       you're involved in Referendum 71, we are calling you.  I

12       don't recall that.  But I -- there was no -- there was

13       not a doubt in my mind.  Just -- because I don't get

14       these kinds of phone calls.  I mean, you know, people

15       are generally very polite and intelligent sounding.

16       These were obviously people who had an agenda that I

17       fully understood.

18   Q.   And how many calls did you answer?

19   A.   I am thinking two to four before I figured out what was

20       going on.

21   Q.   Were you able to determine what number the calls that

22       you answered were --

23   A.   No.

24   Q.   -- coming from?

25   A.   No.  I don't have caller ID.

State  Objects: Hearsay

Tracey Juran, Certified Court Reporter

Page 31

```
 1   Q.   And did you afterward dial star 69 or any combination to
 2        try and find that phone --
 3   A.   You know --
 4   Q.   -- number?
 5   A.   -- it was such an emotional -- I did not dial star 69
 6        because it was a very gut-wrenching, emotional
 7        experience.  It was a kind of thing that made the hair
 8        stand up on the back of my neck.
 9   Q.   Did you ask the individual who they were?
10   A.   No, I didn't.  I didn't --
11   Q.   Did you contact --
12   A.   I did not --
13   Q.   Oh, excuse me.
14   A.   Excuse me.
15            I did not want to engage them in conversation.
16   Q.   Did you contact the police after these phone calls?
17   A.   I mentioned it to my office and my office then proceeded
18        to contact our security, because we do this at the
19        Redacted
20   Q.   So your Redacted                    contacted Redacted
21        Redacted
22   A.   I -- no.  I asked them -- my office staff what I might
23        be able to do with Redacted        , because that's
24        what we usually do in these cases.  And she said,
25        because it is an initiative, we -- our office is not
```

Tracey Juran, Certified Court Reporter

1      allowed to be involved in this.  But -- and being it was

2      a phone call, no.

3   Q.  Was it --

4   A.  If they had threatened me with -- when you are in the

5      [Redacted], for example, then we do.  We definitely

6      report it and it is investigated.

7   Q.  And the person who said that nothing could be done since

8      this was about an initiative, was that someone on your

9      staff or someone in [Redacted]

10  A.  No, I did not talk to [Redacted]

11  Q.  And --

12  A.  Now, let me go -- let me continue this.  So how did

13      they -- how did I get this (indicating)?  What happened

14      when I continued to get the harassing phone messages

15      was, I had two choices:  Turn my answering machine

16      office and just -- off and don't answer the phone.  And

17      I knew that they would continue to tie up my phone line,

18      so instead, I called my office and said, I am forwarding

19      my lines to my fax number.  It's a dedicated number.

20          So I forwarded to my fax number.  And then calls

21      were coming in and they would naturally get the fax

22      tone, and then eventually they quit.  Because I knew

23      that just turning my answering machine off or whatever,

24      they were going to continue to tie up my phone line.  I

25      wasn't going to have use of my phone line anyway, so I

Page 33

1    decided I would forward it to my fax-machine line.  So

2    that's why they started sending this (indicating), was

3    because they heard the fax tone and then they could send

4    this.

5  Q.  And by this, you mean what we've marked as Exhibit

6      No. 8.

7  A.  Yes, and Exhibit No. 9.

8  Q.  Which we will definitely get to, but I want to explore a

9      little bit more with you about the phone calls.

10 A.  Okay.

11 Q.  When your office staff advised you that ███Redacted███

12     ███Redacted███ couldn't do anything, did you call the police?

13 A.  No.

14 Q.  And why not?

15 A.  Because I went ahead and forward it to my fax line.

16 Q.  And that took care of things.

17 A.  Well, it did after two faxes came in.  I think they

18     figured it out.  And I only got two faxes.  However --

19     excuse me -- the fax did ring a few times after I

20     forwarded it without anything coming in.  I just

21     remembered that.  It didn't stop immediately.

22 Q.  And in reference to the phone calls, you've been using

23     the word "they."  Do you think it was more than one

24     person that you heard on the phone?

25 A.  They being the opponents of the initiative, I am

Page 34

```
 1        concluding.
 2  Q.    Did you hear more than one voice on the telephone calls
 3        that you did pick up?
 4  A.    You mean did I hear a bunch of people in the background
 5        yelling or something?  Is that your question?
 6  Q.    Well, let's start with that.
 7              Did you hear just one voice or did you hear people
 8        in the background?
 9  A.    You have to realize the emotional impact of this.  And
10        when you're hearing something that is foreign to the way
11        you generally communicate with people, number one, and
12        number two, that -- the disrespect and the vitriolic
13        attack, you don't much -- I could tell you they were
14        speaking English and I could tell you it was a man's
15        voice.  I didn't have any women call.  So beyond that --
16        was there more than one man's voice on the phone?  I
17        don't recall that.
18  Q.    In the two to four phone calls that you did answer, if
19        you're able to recall, was it the same man's voice, to
20        your --
21  A.    No.
22  Q.    -- recollection?
23  A.    No.  I definitely know it was more than one person
24        making different phone calls.  And I don't know -- the
25        same man might have called more than once, but of the
```

Tracey Juran, Certified Court Reporter

1        calls that I answered, it was different voices.

2    Q.  Was it always a man's voice?

3    A.  I never had a call from a woman.  If it was a woman, it

4        sounded like a man.

5    Q.  And you mentioned that there were about 15 answering-

6        machine messages; is that right?

7    A.  Yes.

8    Q.  Are you sure of that number?

9    A.  No.  You said about and that's what I said.

10   Q.  So could it have been more than 20?

11   A.  I really believe it was -- you know, the number 15

12       flashes in my mind, but I could be mistaken in that.

13   Q.  And did the answering machine record the phone number

14       that the call came from?

15   A.  No.  My machine does not do that.

16   Q.  And do you recall what was said in any of those

17       messages?

18   A.  Well, as I said, I listened to one, maybe two, and then

19       I didn't listen to the rest.  I wasn't always present in

20       the room.  Is that your question?  I wasn't always there

21       to hear them coming in.  I wasn't monitoring it per se.

22       So there were a few that I heard right after, you

23       know -- seemed like they came in within a matter of a

24       three-day period of time.  And then I just -- I would

25       listen and knew that it wasn't any voice I recognized

```
 1          and I would delete them.  I did not listen to the --
 2    Q.    Do you --
 3    A.    -- a rant, I would call it.
 4    Q.    Do you recall the text of the -- of any of the messages
 5          at all?
 6    A.    Well, other than what I've already told you, you mean?
 7    Q.    Yes.
 8    A.    I don't recall anything more than what I've already told
 9          you.
10    Q.    And when you say a three-day period, did that include
11          both the calls left on the answering machine and those
12          that you picked up?
13    A.    When I forward -- when I figured out -- it took me a
14          while to figure out to forward my lines to my fax
15          machine.  They stopped after they -- after a couple of
16          calls came in, they stopped, because they could hear
17          that I -- I presume they figured out what I had done,
18          that I'd forwarded it to my fax machine or somehow there
19          was a fax picking it up.  These two (indicating) came in
20          as messages on the fax machine and that was it.
21    Q.    So from the time that you first answered the phone and
22          had one of these calls --
23    A.    Mm-hm.
24    Q.    -- to the time that you forwarded the line to your fax
25          machine --
```

1   A.   Mm-hm.

2   Q.   -- how much time passed?

3   A.   I would have to say I don't remember.

4   Q.   So the three-day period you were referring to, what --

5   A.   I said about three days, yeah.

6   Q.   And what happened in that three-day time period?  All of

7        this, the phone calls --

8   A.   Yeah.

9   Q.   -- you answered up through -- up until the time that you

10       forwarded to the fax machine?

11  A.   Yes.  At the time I forwarded it to the fax machine, I

12       had a few calls come in.  And they would get a fax tone

13       and that was the end of it.

14  Q.   And was that in October of 2009?

15  A.   Well, there's the date right there (indicating).  So --

16       and these came in -- this one, he didn't -- oh, yeah,

17       there is a date.  There's the footprint (indicating).

18  Q.   Well, we have on Exhibit No. 8 two dates listed.  In

19       handwriting in the upper-left-hand corner and -- there's

20       a --

21  A.   Right.

22  Q.   -- handwritten date of 11, slash, 27, slash, 9.

23  A.   Oh, good point.

24  Q.   And then in the upper -- very, very upper-left-hand --

25  A.   Yeah.

1    Q.    -- top, we've got 10/27/2009 listed as a machine-

2          stamped --

3    A.    Yeah.

4    Q.    -- time.

5    A.    Go figure.  I don't know.  I honestly don't know.  Now,

6          over here, though, on this one (indicating) it's

7          October 22 and there is no date on -- handwritten date

8          on this one.  So --

9    Q.    I'm going to stop you right there, if I could.

10   A.    Okay.

11   Q.    We keep referring to this additional page, so let's mark

12         it as an exhibit so we'll have a clear record.

13             MS. EGELER:  And this'll be Exhibit No. 9.

14   A.    Now, that one says --

15             MS. EGELER:  Just a moment, please.

16             THE WITNESS:  I'm sorry.

17             MS. EGELER:  Let her mark it.

18                 [Off the record - discussion]

19             [Exhibit 9 marked for identification]

20   Q.    (by Ms. Egeler)  So just a moment ago, before we marked

21         this Exhibit No. 9 --

22   A.    Uh-huh.

23   Q.    -- which I'll identify as having a date stamp in the

24         upper-left-hand corner of October 22nd, '09 --

25   A.    Mm-hm.

 1   Q.   -- and the time 05:47p --

 2   A.   Mm-hm.

 3   Q.   -- and it states, [Redacted]   dash,  [Redacted]

 4   A.   Mm-hm.

 5   Q.   Just a moment ago, you were pointing to Exhibit No. 9

 6        and talking about the difference in dates.

 7   A.   Right.

 8   Q.   So that's where we were, and I'll let you continue.

 9   A.   Okay.  I cannot explain the difference in dates in the

10        footprint.  I call this (indicating) a footprint.  It's

11        their stamp of their fax machine that -- when they send

12        it out.  Because October 22nd -- I know these both came

13        in the same day.  I know they both came in the same day.

14        So --

15   Q.   And do you know whether they came in before the

16        election?

17   A.   Yes.

18   Q.   Yes, they did come in --

19   A.   Yes.

20   Q.   -- before the election?

21   A.   Oh, yes.  All this took place before the election.

22   Q.   So the 11/27/9 that appears on Exhibit No. 8 must be --

23   A.   Good point.  That would have been after the election.

24        Good point, yeah.  No, I can't explain that.  No, this

25        was prior to the election.  So I would say that he wrote

1       the wrong date.  I'm -- I don't know.  You can contact

2       Dr. Barry Burnett, Burditt, something.  You can contact

3       him and ask him why he wrote 11/27.  I suspect that he

4       wrote the wrong month, that he meant to say 10/27.  I'm

5       just guessing, because that's -- that is -- that would

6       be more accurate, because this was before the election.

7   Q.  And I'm going to take a wild guess that you did not

8       choose to call the man who sent this letter, this

9       Dr. Barry Brumitt or whatever his name is.

10  A.  That is a very perceptive thought on your part.  You are

11      exactly right, I did not call him.

12  Q.  And --

13  A.  I knew that I did not want to make an appointment with

14      this doctor, let me put it that way.

15  Q.  Did you report these two faxes to any police officers or

16      [Redacted]

17  A.  No.  No, because, as I pointed out, this was a campaign

18      issue.  And certainly when a [Redacted] is

19      threatened, we -- that's why I asked, was because I

20      wanted to know whether or not I had any grounds for

21      being threatened physically as a senator.

22          The State Patrol's responsibility is to protect

23      [Redacted], and they do that very well.  And

24      anytime we have -- even outside of [Redacted] duties,

25      while we are on the [Redacted], they do protect us or they

Tracey Juran, Certified Court Reporter

1    do investigate, or if we're going to be speaking at a

2    meeting and we have been in any way harassed, they will

3    come out and provide security for us.  And they

4    generally contact the local law enforcement and they may

5    also produce security.

6  Q.  Have you ever had to call in Redacted

7  A.  Yes, I have.

8  Q.  Do you remember when that was?

9  A.  Years and years and years ago.  It was like -- we had a

10    gubernatorial candidate that was going to be speaking

11    and I was going to be present, and that person had had

12    harassing threats.  And so since I was going to be at

13    the same meeting with this person, I called and asked if

14    that was grounds.  And they said, yes, indeed, it was,

15    and they came out.  That's how I happen to know that

16    they do provide that.

17  Q.  And were you pleased with the services that they

18    provided, the Redacted ?

19  A.  There was no -- it wasn't necessary, as it turned out,

20    you know.  And yeah, it was very comforting to have them

21    there.  And they called, I believe, the sheriff -- I

22    don't think it was the local police, I think it was the

23    sheriff -- and they sent a deputy as well.

24  Q.  And in this instance, though, you didn't feel

25    comfortable calling Redacted or you didn't feel the

Page  42

1   need following receipt of these faxes?

2   A.   I did not call.  And here again, maybe I should have.

3   20/20 hindsight, maybe I should have, but I did not.

4   Q.   And if you had called, do you think they would have

5   responded or would have ignored your calls?

6   A.   Oh, no, no, they would have responded.

7        You know, you have to think twice about tying up

8   your law-enforcement officers.  And so long as it did

9   not progress beyond phone and fax messages, I didn't

10   feel that it was necessary to bother them.  If they had

11   come to my home, certainly I would have.  And maybe they

12   did and I just didn't know about it.  But I did not

13   know.  Shortly after this, we put in a security gate, I

14   will tell you that.

15   Q.   It sounds like, with respect to these faxing and calling

16   individuals, your plan was quite clever and did stop

17   them from continuing, though; is that right?

18   A.   Yes.  I don't know how clever it was.  It was a

19   temporary -- I want to get away from this kind of a

20   feeling and how can I possibly get them to stop doing

21   this?  And that was my strategy.

22   Q.   Did you experience anything else that you felt was a

23   threat or harassment as a result of your involvement

24   with Referendum 71?

25   A.   Personally?

Page 43

1    Q.    Yes.

2    A.    I don't recall.  Because I was not directly connected

3          with the campaign, I -- no.  And I might add here too,

4          had I been directly connected -- in other words, had I

5          been working in an office or someplace where I felt

6          insecure -- I probably would have taken other measures.

7          But because I was not -- and this all happened in my

8          home.

9    Q.    After the election, did you make any sort of public

10         statement in the media or in any campaign literature, on

11         any Web pages regarding same-sex marriage?

12   A.    I don't have a Web page and I don't do that.  I don't

13         recall.

14   Q.    Have you worked on any ████Redacted████ issues that would

15         carry forward the issue of domestic partnership or

16         preservation of traditional marriage since the time of

17         the election?

18   A.    There have certainly been -- you mean have we had

19         legislation beyond this, since this?  Is that your --

20         I'm not clear of the question.

21   Q.    I'm wondering if you've worked on anything in the

22         ███Redacted███ that actually has been dropped as

23         ███Redacted███ or any ████Redacted████

24         regarding preservation of traditional marriage or the

25         issue of same-sex domestic partnership since the time of

```
 1        the --

 2   A.   Initiative?

 3   Q.   Yes.  And specifically, the election on the initiative.

 4   A.   I'm trying to put the time frame and the chronologic --

 5        the sequence of chronological order in place.  I don't

 6        think so.

 7   Q.   So I think that the -- and correct me if I'm wrong.

 8        Well, we know that the election occurred in November of

 9        2009.

10   A.   Right, a year ago.

11   Q.   So you would have been in [Redacted]

12        after the election; correct?

13   A.   Yes.

14   Q.   And during the last [Redacted], did you have

15        the opportunity to work on issues regarding protection

16        of traditional marriage or --

17   A.   Or against it?

18   Q.   Or against it, yes.

19   A.   You know, we [Redacted] dealing with special

20        rights for homosexuals and -- golly, I'm trying to

21        think.  I'm believing that the first one happened before

22        this and then the second one was to take the rest of it.

23        In other words, we [Redacted] a portion of domestic

24        partnership, which gave special rights to homosexuals in

25        regard to domestic partnership, one year and then the
```

Page 45

1   next we [Redacted] the remainder.  Do you understand what

2   I'm saying?

3 Q.   I do, I do.

4 A.   Okay.

5 Q.   But you're not able to recall which [Redacted] addressed

6   the issue.

7 A.   I should remember that.  But quite frankly, I believe

8   that this (indicating) came after the second one, the

9   second half.  The initiative came after the second half.

10 Q.   Do you recall any threats or harassment you received as

11   a result of your involvement with Referendum 71 that

12   occurred after the election?

13 A.   No.

14       MS. EGELER:  Okay, I think that's all the questions

15   I have, so --

16       MR. STAFFORD:  Steve, would you -- do you have any

17   questions?

18       MR. DIXSON:  I just had one real quick question.

19

20                      EXAMINATION

21 BY MR. DIXSON:

22 Q.   [Redacted], this is Steve Dixson in Spokane,

23   Washington.  I'm an attorney for the Washington

24   Coalition for Open Government.  And recognizing the

25   inherent difficulties of participating by phone, I'll

```
 1        try to keep this incredibly brief.

 2             My question was to the content of the deleted voice

 3        mails.  And I think it was your testimony that you

 4        listened to one or two and then deleted the rest; is

 5        that correct?

 6   A.   Could you repeat that question.  Did you call it an

 7        elitist phone call?  What did you say?

 8   Q.   No, deleted voice mails.

 9   A.   Oh, deleted.

10   Q.   I'm sorry.

11   A.   Oh, okay.

12   Q.   So as to the deleted voice mails --

13   A.   Yes.

14   Q.   -- I think you testified that you listened to one or two

15        and then deleted the remainder?

16   A.   Yes, after I would understand who was calling.  And I

17        customarily do that to all solicitation calls as well.

18        I don't listen to them.  I just find out that -- for

19        example, if someone calls and said, [Redacted], I know

20        they don't know me and I delete them.  I don't listen to

21        the message.  So once I had determined that they were

22        not a message that I wanted to receive, I would delete

23        them, yes.

24             Now, let me make it clear that there were two

25        message -- two -- I think, two phone calls that I
```

1    answered.  I did not give -- I did not allow it to go to

2    my answering machine.  And they came in rapid succession

3    and then I let them go to my answering machine.  And

4    then I recall that I left the house because I had -- I

5    don't know -- went to the grocery store, went to the

6    post office, had an appointment -- I don't remember --

7    and then that many others came in while I was not

8    present.

9  Q.  So the voice mails all came in the space of one

10    afternoon?

11  A.  You know, I believe so.  I think so.  I could be wrong,

12    but I know that I left my -- I notified the people that

13    I knew would be calling me to call my cell phone, that I

14    was not taking calls, and that my phone was forwarded to

15    my fax machine.

16        Now, there became a period of time where I began to

17    recognize that I was no longer hearing the beep on the

18    fax machine.  People don't generally fax today; they

19    Email or something else.  And so it didn't take me long,

20    because I don't get very many faxes.  It didn't take me

21    very long to realize that when that fax tone stopped,

22    they had figured out and they quit calling that --

23    calling my phone.  So then I discontinued the

24    forwarding.  Now, the forwarding took place for a longer

25    period of time than what I was actually hearing it ring.

```
 1             I don't know if I'm giving you more information

 2        than you wanted, but does that answer --

 3   Q.   No, I want all the information.

 4             So -- and then how -- two follow-up questions.

 5        How -- were you able to determine whether or not the

 6        voice mails, the brief time that you listened to each

 7        one, were left by different people or the same person

 8        repeatedly?

 9   A.   They were not the same person repeatedly.  Now,

10        repeatedly mean -- does not mean that they, maybe,

11        didn't call twice; I don't know.  But it was not the

12        same one person, let me say that.

13   Q.   And finally, how did you determine that these were

14        messages that you did not want to listen to further and

15        could be deleted without listening to their entirety?

16   A.   Well, had to do with the time frame.  And I think I

17        explained that when people called in and it wasn't a

18        voice that I recognized -- strangers don't generally

19        call my home phone.  When it's a [Redacted]            ,

20        they call my office.  I have an indistrict phone line

21        where people can call to my office toll free from

22        anywhere in the district -- excuse me; anywhere in

23        Snohomish County.  I don't think that works for Skagit.

24        Anywhere in Snohomish County, they can call my office

25        toll free.
```

```
 1            So they don't generally call my home unless it's

 2       some -- and when they do -- if somebody calls my home, I

 3       generally recognize the voice, let me put it that way.

 4  Q.   So if you did not recognize the voice, you deleted the

 5       message regardless of the content that may or may not

 6       have followed.

 7  A.   Yes.

 8            MR. DIXSON:  Okay, that's all that I have.  Thank

 9       you.

10            THE WITNESS:  Mm-hm.

11            MR. STAFFORD:  Okay.  All right.

12

13                         EXAMINATION

14  BY MR. STAFFORD:

15  Q.   And, [Redacted], again, my name is Ben Stafford --

16       I introduced myself briefly in the hall -- and I

17       represent Washington Families Standing Together.  Are

18       you familiar with that organization?

19  A.   No.

20  Q.   It's an organization that supported Senate Bill 568

21       (sic) and then opposed the placement of Referendum 71 on

22       the ballot.  And I just have a few questions as well.

23            So starting, again, with the voice messages we've

24       been talking about, have you retained any of those

25       messages?
```

Page 50

```
 1    A.    No.
 2    Q.    So you've deleted all of the messages during that time
 3          period.
 4    A.    Yes.  Certainly I would not want to have anyone else
 5          hear them.
 6    Q.    So there's -- you didn't keep a copy of them in --
 7    A.    No.
 8    Q.    -- any way?
 9    A.    No, no.  I have these two (indicating), these two
10          meaning the two faxes.
11    Q.    The two faxes that are marked as Exhibit 8 and 9?
12    A.    Yes.
13    Q.    And with regard to, it sounds like, the two phone calls
14          during this period that you did take, you don't recall
15          anything that was said during those calls except the
16          words "bigot" and -- I'm sorry, but -- "bitch"; is that
17          correct?
18    A.    As I stated earlier, I'm not naive in having heard
19          people use vulgar, foul language.  And I heard vulgar,
20          foul language, four-letter words, et cetera, and I don't
21          care to repeat them now.  And the reason I don't care to
22          repeat them is because it was not worthy of my even
23          retaining them.  They were, in my mind, meant to
24          intimidate me and to scare me off, so to speak.
25    Q.    And we looked at a fax from -- I think it was
```

```
 1          Dr. Brumitt.  We were having a little trouble with his
 2          name, but --
 3  A.      Yeah.
 4  Q.      -- I think it's Exhibit 8.
 5  A.      Mm-hm.
 6  Q.      And why didn't you call Dr. Brumitt after receiving
 7          that?
 8  A.      Why would I?
 9  Q.      What would lead you to think that you'd have no reason
10          to call him back?
11  A.      Say that again.
12  Q.      You said, why would you call him back.  And I guess my
13          question is a little bit different.  Why wouldn't you?
14          What about receiving that fax would make you not want to
15          call him back?
16  A.      Well, you have to realize that this fax followed the
17          messages -- the first two messages that I heard and then
18          the other messages that I deleted.  And it's obvious
19          from his writing that he had nothing to say that I would
20          want to talk to him about.
21              First of all, he has a title, doctor.  Now, maybe
22          that isn't right.  Maybe it's -- maybe that's false; I
23          don't know.  But I believe that this message is
24          certainly beneath the professional conduct of somebody
25          who -- maybe he's a professor.  He could be, I guess,
```

1       Ph.D. instead of an M.D.  But certainly with the title

2       of doctor, to write a message like this is beneath the

3       dignity of his profession and it's beneath the dignity

4       of a woman that he would care to send this to.  And no,

5       I have nothing to say to him.

6    Q.  And what about that fax do you find beneath the

7       professional dignity of a doctor, be it a Ph.D. or a

8       medical doctor?

9    A.  Well, first of all, he calls me a bigot.  That would be

10       number one.  He doesn't know me or, if he does, I -- you

11       know, he certainly didn't -- I don't know that I've ever

12       met the man.  And I am not a bigot, number one.  And

13       number two, there appears to be some ignorance about the

14       issue, because this is not about racism, which bigotry

15       generally implies.  And so -- it's about a lifestyle.

16       And I found no reason to need to talk to him.

17   Q.  Did you find that letter threatening?

18   A.  Most certainly.

19   Q.  What about that did you find threatening?

20   A.  Well, just starting off with the word "bigot," I think

21       that is -- that's a threatening remark, because people

22       who use that word tend to not be thinking clearly.

23   Q.  Thank you.

24   A.  Mm-hm.

25   Q.  So wanted to back up a little bit.

Tracey Juran, Certified Court Reporter

Page 53

1          So you have been a [Redacted] for -- let's

2     see -- how many [Redacted] did you say it was?

3   A.  [Redacted]

4   Q.  So [Redacted] is when you were --

5   A.  Mm-hm.

6   Q.  -- [Redacted]

7          And so how many times would you have been

8     reelected, do you recall?

9   A.  Well, I was [Redacted], and then I was

10    [Redacted]

11    I mean -- excuse me; each -- no, not [Redacted]   Each

12    [Redacted]

13  Q.  And over the course of your career as [Redacted]

14    [Redacted], have your views on same-sex marriage changed

15    or have they remained the same?

16  A.  I've been married for 50 years and marriage is between

17    one man and one woman and it's always been that way.

18  Q.  And that's how you felt about that issue from the time

19    that you first became [Redacted]

20          MR. PIDGEON:  Objection; mischaracterizes her

21    testimony.

22  Q.  (by Mr. Stafford)  Is that how you have felt since the

23    time that you first became a [Redacted]

24  A.  Well, I've been in the [Redacted] and

25    I've been married 50 years.  Does that answer your

Page 54

1        question?

2   Q.   So just to make sure that I understand, so from the time

3        that you first entered the Redacted

4   A.   Mm-hm.

5   Q.   -- in Redacte and you were married at that time --

6   A.   Mm-hm.

7   Q.   -- you --

8   A.   Same man.

9   Q.   -- to the same man, you have felt that marriage is

10       between one man and one woman.

11  A.   Yes.

12  Q.   And have you taken that position publicly since the time

13       that you first entered the Redacted

14  A.   When necessary.  Mostly -- I would like to say that it

15       has been assumed amongst most people.  The majority of

16       people believe that marriage is between one man and one

17       woman, and it's not been necessary to state that in

18       previous years.

19  Q.   So I am going to be handing you what we will mark as

20       Exhibit 10.

21            [Exhibit 10 marked for identification]

22  Q.   (by Mr. Stafford)  And, Redacted , do you

23       recognize what I've handed to you as Exhibit 10?

24  A.   Yes.

25  Q.   And what is this?

1    A.    It's a [Redacted]

2    Q.    And it indicates here that [Redacted]

3          [Redacted]

4    A.    I was the [Redacted]

5    Q.    So you were the [Redacted]?

6    A.    Yes.

7    Q.    And that was introduced in [Redacte]

8    A.    Yes.

9              MR. PIDGEON:   I'm going to object as to the

10         relevancy of this exhibit.

11              Go ahead.

12         MR. STAFFORD:   Yeah.

13   Q.    (by Mr. Stafford)  And this is -- and I'm just going to

14         read this and could you let me know if I read it

15         accurately.   This is [Redacted]

16         [Redacted]

17         [Redacted] ."  Did I read that --

18   A.    Mm-hm.

19   Q.    -- correctly?   Okay.

20              And so you were the [Redacted]

21   A.    (Witness nodded head.)

22   Q.    Did you feel uncomfortable in any way [Redacted]

23         [Redacte]  Did -- afraid in any way [Redacted]

24   A.    Afraid of what?

25   Q.    Of anything at all.   Did it give you any fear that

1        something might happen to you if you [Redacted]

2        [Redacte]

3  A.    I have never been fearful of [Redacted]

4        i[Redacted]

5  Q.    After you [Redacted], did you have any

6        reason to contact [Redacted]

7  A.    During testimony?

8  Q.    During the -- let's say the six months after you

9        [Redacted], did you have any reason to contact

10       [Redacted]

11  A.    I might have.

12  Q.    Do you recall if you contacted [Redacted]?

13  A.    Well, I did comment about the time that I spoke in

14       public and we -- let me see.  That was -- would that

15       have been this year?  I cannot remember.  It was when

16       Senator Ellen Craswell was running for governor and we

17       were in a public meeting, and you heard me say that I

18       did contact [Redacted] at that time and asked for

19       security.

20  Q.    And that --

21  A.    Is that your question?

22  Q.    And that was because Senator Craswell at the time, who

23       was running for governor, had received some threats.

24  A.    Yes.

25  Q.    And you would be appearing at the same location --

Page 57

1   A.   Yes.

2   Q.   -- as her?

3        And so other than that incident that we've talked

4        about, have you contacted Redacted?

5   A.   Oh, yes, many times.

6   Q.   And do you recall if you contacted Redacted

7        about anything to do with this Redacted,

8        in particular?

9   A.   I don't recall.

10       MR. PIDGEON:  Again, I'm going to post an objection

11       under ER 402(b), which is that this evidence is being

12       offered to somehow predict that past behavior comports

13       with future behavior or present behavior.  Excuse me; I

14       think it's ER 404(b).

15  Q.   (by Mr. Stafford)  And we talked a little bit about

16       DOMA.  Do you recall that conversation?

17  A.   Yes.

18  Q.   And --

19  A.   Here today, you mean?

20  Q.   Today; sorry.

21  A.   Yes.

22  Q.   Yes.

23  A.   Uh-huh.

24  Q.   And did you Redacted

25  A.   In the Redacted?

Page 58

1   Q.   In the [Redacted]

2   A.   Yes.

3   Q.   And did you [Redacted]

4   A.   Yes.

5   Q.   And after your --

6   A.   In fact, I believe I was [Redacted]

7        [Redacted]

8   Q.   And the fact that you would have been a [Redacted]

9        would be a matter of public record?

10  A.   Yes.

11          If it wasn't the [Redacted], it was a similar

12      [Redacte]  In other words, there was one introduced in one

13      chamber and another one introduced in another chamber,

14      and to be honest with you, I don't remember which one

15      passed.

16  Q.   [Redacted]

17      [Redacted]   One of the two passed.

18  A.   Yes.

19  Q.   And you were the [Redacted]

20  A.   In fact, I think that --

21  Q.   -- one of them.

22  A.   -- that -- I believe there was more than [Redacted]

23      [Redacted].  And that bill has quite a

24      history.  I don't know if you want me to go into it

25      here.  But we had more than [Redacted] that -- one of

Page 59

```
1      them -- and I believe it was the one that I [Redacted]

2      [Redacted]

3      another [Redac] that went forward, I believe.  And it could

4      have been [Redacted]; I'm not sure.

5  Q.  And do you recall receiving any threats in relation to

6      you being a [Redacted]

7  A.  I remember receive -- I don't -- at my home I did not,

8      because I wasn't home.  But when we were [Redacted], my

9      office has had occasion to, yes.  Now, was it

10     specifically that particular [Redacte]  I do not remember.

11 Q.  So over the course of your [Redacted], it's the

12     case that your [Redacted] has received what you

13     would call a threat?

14 A.  Yes.

15 Q.  And you don't recall as to what particular issue that

16     was.

17 A.  No.  [Redacted] is a long time.

18 Q.  Do you recall [Redacted], which was passed in [Redac]?

19 A.  No.

20 Q.  Do you recall a [Redac] that prohibited discrimination

21     against gay people with respect to employment?

22 A.  What about employment?

23 Q.  Do you recall a bill that came before the Legislature

24     regarding discrimination against a person on the basis

25     of sexual orientation?
```

Tracey Juran, Certified Court Reporter

1   A.   I don't remember the specific bill, no.  What was the

2        number again?

3   Q.   House Bill 2661.  And I understand there's been a lot of

4        bills --

5   A.   Yeah.  I --

6   Q.   -- over Redacted

7   A.   Yeah.

8   Q.   Do you recall House Bill 3104 that was passed by the

9        Legislature in 2008 --

10  A.   No.

11  Q.   -- regarding domestic partnerships?

12  A.   No.  You have to realize that the Redacted

13       are like two separate word -- Redacted , and

14       I don't even know if that Redacted

15       Did it?

16  Q.   Do you recall a bill being passed that established

17       rights and responsibilities for domestic partners?  You

18       said there was a series of --

19  A.   Yes.

20  Q.   -- bills.

21  A.   Yes.  There were two.

22  Q.   And --

23  A.   Two --

24  Q.   -- do you recall the --

25  A.   Two that passed.

Page 61

```
 1   Q.   -- first one --

 2   A.   Yes.

 3   Q.   -- that passed?

 4        [Redacted]

 5   A.   [Redacted]

 6   Q.   And do you recall receiving any threats after you [Redacted]

 7        [Redacted]

 8   A.   Keep in mind that I don't answer the phone in my office.

 9        And it could be, because I do remember -- I remember

10        discussions.  I don't remember the timing.  And was it

11        that particular bill?  To tell you the truth, I cannot

12        remember.

13   Q.   So --

14   A.   Do you remember my receiving those?  Is that why you're

15        asking the question?

16   Q.   I'm asking the question just to see what information you

17        might know.

18             So to your personal knowledge, do you know if you

19        received any threats in relation to [Redacted]

20        [Redacted]

21   A.   I did not take any calls.

22   Q.   So is that a yes, you don't, to your personal knowledge,

23        recall receiving any threats?

24             MR. PIDGEON:  Asked -- objection; asked and

25        answered.
```

1    A.    Yeah.  I don't know how else to say it.

2    Q.    (by Mr. Stafford)  To your personal knowledge, do you

3          recall receiving a threat in relation to Redacted

4          Redacted

5    A.    A personal threat or a personal recollection?

6    Q.    A personal recollection.

7    A.    I'd have to dig deep.  I guess I would have to say off

8          the top of my head specifically to that question, no.

9    Q.    Thank you.

10              You mentioned that you would have described

11         yourself as a petition circulator or a petition

12         gatherer?

13              MR. PIDGEON:  Objection; mischaracterizes her

14         testimony.

15   Q.    (by Mr. Stafford)  Do you recall testifying earlier that

16         you were a petition gatherer?

17              MR. PIDGEON:  Objection; mischaracterizes her

18         testimony.  Objection as to form of the question.

19   Q.    (by Mr. Stafford)  Did you have anyone sign a

20         Referendum 71 petition?

21   A.    Well, as I said, as is customary in our household, I

22         often receive petitions in the mail.  And if I'm in

23         favor of them, I will generally sign them and ask my

24         husband to sign them, and he generally follows my lead.

25         And we are -- as I say, we've been married 50 years, so

1    we kind of think alike.  And that is very possible.  Do

2    I recall specifically?  No.

3  Q.  And I take the same position with my wife.  I find

4    that's the best policy.

5       Do you recall asking anyone besides your husband to

6    sign the Referendum --

7  A.  No.

8  Q.  -- 71 petition?

9  A.  No, I don't remember.

10  Q.  And you mentioned, I think, that you at a certain point

11    began forwarding your phone to your fax line.  Am I

12    saying that correctly?

13  A.  That's right.

14  Q.  Did you stop having your phone forwarded to your fax

15    machine --

16  A.  Yes.

17  Q.  -- at a certain point?

18       And about how long after you'd received these calls

19    was that?

20  A.  Well, when it stopped ringing.  And I'm trying to think.

21    It was three to five days, somewhere in there, that I

22    finally realized, hey -- because I'm not home all the

23    time, so I didn't necessarily sit and listen to see if

24    it was still ringing.  But finally, I concluded that

25    this is past.

1  Q.   And after you concluded that it had passed, you then

2       stopped forwarding your phone to --

3  A.   Yes.

4  Q.   -- your fax line?

5            And after you stopped forwarding your phone to your

6       fax line, did you receive any other calls of that nature

7       on your home phone?

8  A.   I don't recall any.  I don't recall.  If there was, it

9       was not significant enough that I remember it.  So no.

10           MR. STAFFORD:  Okay, thanks.  That's all I have.

11           MR. PIDGEON:  Okay, I have just a few.

12

13                          EXAMINATION

14  BY MR. PIDGEON:

15  Q.   I have only a few questions, Redacted

16           If we could, let's begin with this Exhibit 1.

17  A.   Okay.

18  Q.   I want you to take a look at that.  And just for sake of

19       clarification, now, you're not the one holding that

20       sign, right?  That's someone else holding that sign?

21  A.   Yes, that's correct.  I'm not holding it.

22  Q.   So the representation --

23  A.   I'm gesturing with my hand, whatever I'm saying.

24  Q.   So the representation that's made on that sign, which

25       reads something like, "Don't bring Sodom and Gomorrah to

Page 65

```
 1          Washington," is a representation that's being made by

 2          somebody else at the rally and not you; is that correct?

 3     A.   That's correct.  And I don't even know that that sign

 4          was per -- had anything to do with the rally.

 5               MS. EGELER:  And if I can make a -- just a point of

 6          clarification on the record, because I think, in looking

 7          now at the picture, I understand your concern.  And I

 8          just want to represent that from the video, it was very

 9          clear that you, ▇Redacted▇, were not holding that

10          sign.  So there's just no question there.

11     A.   Can I ask a question?

12     Q.   (by Mr. Pidgeon)  I can't guarantee you'll get an

13          answer.

14     A.   Well, my question, then, is, is this taken from -- is

15          this a still picture or is this from a clip?

16               MS. EGELER:  It's a video clip on YouTube.

17               THE WITNESS:  I see.  Oh, I can see down here

18          (indicating) the things that -- okay.

19     A.   So it's a video clip, but not of a continued testimony

20          per se?

21     Q.   (by Mr. Pidgeon)  I think I can answer that.  Typically,

22          when you do a -- when you do this kind of a thing, it's

23          what's called a screen shot.

24     A.   I see.

25     Q.   And so even though this may be an active video, what
```

```
 1        appears on the page is just a screen shot.

 2   A.   I gotcha.

 3   Q.   Now, on Exhibit -- let's see if we can find this -- the

 4        exhibit that's the PDC record --

 5   A.   Mm-hm.

 6   Q.   -- this one here (indicating) --

 7   A.   Okay.

 8   Q.   -- where you are mislabeled as a [Redacted]        --

 9   A.   Right.

10   Q.   -- it is true that a [Redacted]

11   A.   That's true.

12   Q.   Right?

13             So --

14   A.   Yes.

15   Q.   So this could be true if this were, shall we say,

16        uncapitalized.  Of course, it's all in caps, right?

17   A.   Yes.

18   Q.   So it could be an accurate statement that you were a

19        person employed by [Redacted]   who did [Redacted]

20   A.   That's correct.

21   Q.   But it's inaccurate if it's used as a proper noun.

22   A.   That's right.  But this does -- this often happens.

23   Q.   Understood.  People that didn't follow the campaign

24        closely enough.

25   A.   Either that or I was in a database as having been a
```

Page 67

1    **Redacted** back when and that just kind of follows.

2    And the PDC could have made that mistake, but I don't

3    think that's the case here.  I think it's probably

4    the -- what was filed.

5    Q.  Now, in terms -- let's go, if we can, to Exhibit 8 and

6    Exhibit 9 --

7    A.  Okay.

8    Q.  -- again.  I'd like to explore these just a little bit

9    more.  Now, when you had the --

10         MS. EGELER:  Just a minute, please.

11         MR. PIDGEON:  Sorry.

12   Q.  (by Mr. Pidgeon)  When you had the phone calls directed

13   to the fax machine --

14   A.  Mm-hm.

15   Q.  -- do you have your phone set up in such a way that if I

16   were to call your home phone and you weren't home, it

17   would say, okay, you've reached the **Redacted**

18   **Redacted**, or whatever, but if you -- you

19   know, leave a message, but if you wait a certain period

20   of time, you can also leave a fax?  Did you have it --

21   A.  No.

22   Q.  -- set up that way?

23   A.  No, no.  It's a dedicated line.

24   Q.  It's a dedicated line.

25   A.  This -- the fax machine is on a separate line totally.

```
 1   Q.   So you actually switched the lines?

 2   A.   I actually call forwarded my phone.  From my home

 3        number, I just call forwarded it to the fax number.

 4   Q.   Now, is it your experience that someone who might be

 5        leaving threatening phone calls with lots of bad

 6        language, if they knew it was going to be in writing,

 7        they might mitigate some of that language?

 8   A.   I would expect so.  But this is a -- I mean, the fact

 9        that they would document this (indicating) in writing

10        tells me that the elevator doesn't go all the way to the

11        top.  I mean, I just didn't think that was a very bright

12        thing to do.  So --

13   Q.   Well, let's talk a little bit about the phone calls that

14        you did receive.  You mentioned that you may have heard

15        the word "homosexual."  Is that true?

16   A.   I said that?  Okay.  It would not have been that -- that

17        would be my interpretation.  They would say gay, as he

18        (indicating) referred to it, you know, the way they have

19        taken the word "gay" and applied it to the homosexual

20        activities.  So that's my interpretation of what was

21        said.

22   Q.   Now, these phone calls, this was during the actual

23        course of the R-71 campaign, is that right, when this

24        flurry came in?

25   A.   Yes.
```

1    Q.   And is it your -- is -- are you -- is it your idea that

2         it pretty much came in around this time in October; say,

3         between October 22nd and October 27th?  Is that about

4         the timing that all this happened, this flurry?

5    A.   It was with -- this -- these came in the same day.

6    Q.   The same day.

7    A.   Yeah.  So, see, these dates just don't -- I don't know

8         why they're -- but they came in the same day.  And it

9         was -- and I know that -- I remember that because it

10        wasn't long after that that they stopped calling,

11        realizing that they were getting a fax.  These two, for

12        some reason, decided that they were going to write out

13        their animosity.

14   Q.   Now, taking a look at Exhibit 8 --

15   A.   Mm-hm.

16   Q.   -- let's look up here (indicating) at this signature

17        block up here.

18   A.   Yes.

19   Q.   Do you see where it -- where Barry Brumitt appears,

20        97 -- or 910 17th Avenue East, Seattle --

21   A.   Mm-hm.

22   Q.   -- Washington, 98112; Email address, barry6@gmail.com?

23   A.   Yes.

24   Q.   Do you see how that margin lines up like that?

25   A.   I caught it.

1  Q.  So it looks like the "Dr." has been added onto that,

2      doesn't it?

3  A.  I caught that too.

4  Q.  Is that why you thought that maybe he's not really a

5      doctor and he just kind of added that to it?

6  A.  In the back of my mind, it was a thought, because more

7      than any -- I mean, you examine this and it doesn't

8      quite gel.  Why would a doctor give himself away in this

9      fashion?  And so I saw -- I mean, that's the first

10     thought:  Why would a doctor do this?  I mean, he's got

11     a professional business to run and why would he take

12     time, number one?  Number two, why would he document

13     himself in that fashion?  And then number three, you

14     look at this (indicating) -- and I did.  I saw that too,

15     yeah.

16 Q.  Interesting.

17 A.  And it looks like an add-on.  It doesn't say, M.D., it

18     doesn't say, Ph.D., he just puts "Dr." in front.  So

19     maybe it was an afterthought.  Maybe he decided, gee

20     whiz, I want her to know I'm really somebody important

21     and I think this about what she's doing.  I don't know.

22 Q.  But in this letter, he does call you misguided.

23 A.  Mm-hm.

24 Q.  Backward.

25 A.  Mm-hm.

1  Q.    Ignorant.

2  A.    Yeah.  Tragic.

3  Q.    Tragic.

4        What is --

5  A.    Coward?

6  Q.    A coward?

7  A.    I'm not -- no, no, this has a G on the end.  I'm not

8        sure what that word is.  Something.  He writes better

9        than a doctor too.

10 Q.    Let's take a look at Exhibit 9 for a second.  In the

11       footprint --

12 A.    Mm-hm.

13 Q.    -- this indicates that it came in about 5:47 p.m.?

14 A.    Mm-hm.

15 Q.    And can you say -- can you see in the footprint whose

16       fax machine was being used here?

17 A.    Jim Robinson and Jim Brown, yeah.

18 Q.    Or Jim Richardson?

19 A.    Richardson; excuse me.  Yes.

20 Q.    And this is signed by --

21 A.    Jim.  So I'm not sure which Jim sent it, but --

22 Q.    And this particular exhibit has reference to rectal

23       exams --

24 A.    Yeah.

25 Q.    -- and about the misplacement of a head.

1   A.   Uh-huh.

2   Q.   Now, are you familiar with -- just one second.

3        Are you familiar with RCW 9A.46.020, the statute

4        that defines harassment?

5   A.   No.

6   Q.   Let me ask you, if you received a phone call that you

7        believed -- any phone call that you received, do you

8        believe that it was intended to substantially harm you

9        with respect to your physical, mental health or safety?

10       MR. STAFFORD:  Objection; calling for a legal

11       conclusion.

12  Q.   (by Mr. Pidgeon)  Go ahead.

13       THE WITNESS:  I'm sorry; what did you say?

14       MR. PIDGEON:  His objection on asking for a legal

15       conclusion.

16  Q.   (by Mr. Pidgeon)  I'm just asking you your lay opinion

17       if you believe that the phone call threatened you with

18       harm to your physical safety or your mental health and

19       safety.

20  A.   Oh, most definitely.  Like I said, it just caused the

21       hair to stand up on the back of my neck.  And that isn't

22       a physical term, that's an emotional term that

23       describes -- I just don't know how else to say it.  It's

24       scary, you know, to imagine that -- I don't know.

25       Maybe other people are accustomed to being talked

State Objects: Witness lacks foundation for the testimony; hearsay

Tracey Juran, Certified Court Reporter

Page 73

State Objects: Witness lacks foundation for the testimony;hearsay

1    to that way.  I am not.  I'm accustomed to being talked

2    to with respect, not because of my office, but because

3    I'm a woman and because I'm a human being and because of

4    the people that I associate with.  They don't treat each

5    other that way.  And so to have somebody call you -- and

6    it was obvious to me that it was a deliberate attempt to

7    intimidate me and to cause me to think twice about my

8    involvement in the process of the referendum.

9    Q.   Now, during these phone calls, did anybody -- did you

10        hear anybody identify themselves as Krystal Mountaine?

11        Have you ever heard that name before?

12   A.   A woman?  No.  No, all the people who called were men.

13   Q.   Did any --

14   A.   I didn't hear any women.  And nobody identified

15        themselves by name except for these two (indicating).

16   Q.   Did anyone identify themselves as being a member of the

17        special forces?

18   A.   As in military?  No.

19   Q.   Did anybody threaten to actually kill you?

20   A.   Well, to have somebody say these words (indicating) in

21        writing, I think that would be rather physically

22        damaging.  Kill me dead, I'm not sure.  But just to say,

23        your head has been up your ass way too long, I mean,

24        that would be a rather physical thing and certainly -- I

25        know it's an expression.  However, it would have very

Page 74

1       physical consequences.

2   Q.  So did you feel that the phone calls were dehumanizing

3       enough that you did feel threatened?

4   A.  Oh --

5           MR. STAFFORD:   Objection; leading.

6   A.  I felt threatened.   Most definitely I felt threatened

7       and I felt that they were designed to do that.   That was

8       the most unsettling part of it, was -- it wasn't the

9       actual words, it was the fact that they were designed to

10      intimidate me and to make me feel lowly.   I don't know

11      if that's a word, but lowly is kind of the way that --

12      it made you feel dirty and a nonperson.   It was very

13      demeaning.

14  Q.  (by Mr. Pidgeon)   Now, you've been in the Redacted

15      Redacted       Do you recall any other Secretary of State

16      prior to Sam Reed releasing names and addresses of

17      petition signers?

18  A.  Never.   I have not, no.   I have -- I find it very

19      difficult to believe, because of the prescription and

20      the requirements of somebody signing -- in other words,

21      you sign this under penalty of law -- or you sign this

22      under penalty of perjury, I think it's worded.   And if

23      you sign twice or if you don't sign it exactly the way

24      you're registered to vote, it's thrown out.   In other

25      words, I consider it to be an official document that you

State Objects: Witness lacks foundation for the testimony; hearsay

Tracey Juran, Certified Court Reporter

1       are filing with the State.

2           And then to say that we should release that

3       information without -- like the PDC makes it very, very

4       clear that anything that you -- that's filed with the

5       PDC is a matter of public disclosure and it is a matter

6       of public record.  That's made very, very clear.

7       There's nothing such as that on an initiative or a

8       referendum that makes it clear to the person who signs

9       that this -- your name may be made public.  There's

10      nothing.  And I've never heard of such a thing.

11  Q.  Now, Washington Families Standing Together raised the

12      issue of Redacted which was apparently a Redacted that

13      was going to block discrimination at the state level

14      based on sexual orientation.  Can you give me what your

15      understanding of the term "sexual orientation" means as

16      a matter of law, at least from a Redacted point of

17      view.

18          MS. EGELER:  Objection; calls for a legal

19      conclusion.

20          THE WITNESS:  I'm sorry; what?

21          MS. EGELER:  Calls for legal conclusion.

22  Q.  (by Mr. Pidgeon)  Well, I'm not asking you to state what

23      the law is or to make a legal conclusion.  I'm just

24      asking you what the term "sexual orientation" would mean

25      to you if you saw it in a bill.

1  A.  It means that somebody chooses to engage in sexual

2      behavior that they would like to have given

3      consideration.

4  Q.  So does sexual orientation include, for instance,

5      homosexuality?

6  A.  I see the two as interchangeable.

7  Q.  Would it also include polygamy?

8  A.  I wouldn't -- I guess it could.

9  Q.  How about child molestation?

10  A.  It does not prescribe what it does include or what it

11      does not include, in my mind.  It could include --

12      sexual orientation could include necrophilia.

13  Q.  Now, let me ask you something about this act here, which

14      is marked as Exhibit 10, which was a ▇▇▇▇▇▇▇ Redacted ▇▇▇▇▇▇▇

15      ▇▇▇ Redacted ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

16  A.  Mm-hm.

17  Q.  This is an act relating to prohibiting schools from

18      presenting homosexuality as positive, normal behavior.

19      And do you know whether or not there are any initiatives

20      currently in place -- did this -- first of all, did this

21      act pass?

22  A.  No.

23  Q.  Do you know whether or not it is the practice of the

24      schools in this state to promote homosexuality?

25  A.  I know for a fact that here in Snohomish County,

1       children as young as 14 years of age were being

2       solicited to attend an opportunity to be introduced to

3       the lifestyle and they were solicited through the

4       school.  The school allowed the solicitation.

5            And, in fact, there are newspaper articles, if

6       anyone would care to look it up, where another

7       Redacted        -- another Redacted      from Snohomish

8       County and I objected to that solicitation.  And it was

9       a point of an article in the Redacted      .  And I

10      refer to that because, to be honest with you, I cannot

11      recall the name of the organization that put it

12      together.  I know that there were several county

13      organizations that were sponsors.

14  Q.  Do you know whether or not curriculum has been proposed

15      for special-education students, elementary-school

16      students, or even kindergarteners to introduce them to

17      the homosexual lifestyle?

18  A.  I have not specifically seen it.  I have been told that

19      in some schools, that has been done.

20           MR. PIDGEON:  Okay.  Okay, I have nothing further.

21           MS. EGELER:  I have a few more questions.

22

23                  FURTHER EXAMINATION

24  BY MS. EGELER:

25  Q.  First, I wanted to ask you --

Page  78

1   A.   Are we going to have dinner?

2   Q.   We might have to do that.

3        First, with respect to public records, in your Re

4        Redacted           , has any Secretary of State ever

5        notified you when he or she received a public-records

6        request?

7   A.   Yes.

8   Q.   Can you tell me about that.

9   A.   No.  I mean, what can I -- what do you -- you want to

10       know what they requested?  Or can -- or do you want me

11       to tell you about the fact that they notified my office?

12  Q.   Yes, please, the fact --

13  A.   Okay.

14  Q.   -- that they notified you.

15  A.   Well, they didn't notify me, they notified my office.

16       And that's why I say no so quickly, because my office

17       handles all of that and I just don't know the details.

18  Q.   So when the Secretary of State receives a public-records

19       request, the Secretary of State always notifies your

20       office?

21  A.   Yes.

22  Q.   And is that true of other state agencies as well?

23  A.   I would presume so.

24  Q.   Do you know --

25  A.   I don't know.  I mean, maybe they're receiving them and

 1        not notifying us.  I don't know of those.  But to my

 2        knowledge, they are required.  And I don't know -- you

 3        probably know that RCW better than I do -- but I think

 4        they're required by law to notify us.  How else would

 5        they get the records?

 6   Q.   For example, when the Secretary of State receives a

 7        public-records request for disclosure of records that

 8        are possessed by the Secretary of State's Office --

 9   A.   Oh, I'm sorry; I thought you meant they are contacting

10        our office to get the records.

11   Q.   No.  Rather, instead --

12   A.   Oh, I'm sorry.

13   Q.   -- looking at -- when the Secretary of State receives a

14        request for public disclosure --

15   A.   Uh-huh.

16   Q.   -- of records that are retained by the Secretary of

17        State's --

18   A.   I see.

19   Q.   -- Office, has any Secretary of State notified you or

20        your office that they have received the public-records

21        request?

22   A.   Not if it doesn't pertain to us.

23   Q.   Do you recall them ever notifying your office or you

24        when they've received a public-records request for

25        records maintained by the Secretary of State's Office?

```
 1   A.   That doesn't pertain to my office?

 2   Q.   Correct.

 3   A.   I wouldn't think so.  I mean, it might have happened,

 4        but I don't know why they would do -- why they would

 5        notify us.

 6   Q.   Do you know, are, generally, the only things that are

 7        public record things that people are informed if they

 8        file this with the -- with a public agency, it will be

 9        public record?

10   A.   Say that again.

11   Q.   That wasn't very clear, was it?

12   A.   I don't know.  I don't get -- I didn't hear it.  That

13        didn't come -- I didn't hear it very clear.

14   Q.   When people file something or send a letter to a public

15        office, is it your understanding that that letter, for

16        example, would only be a public record if the individual

17        were informed that it was going to be a public record?

18   A.   Now, are you -- I don't know about Secretary of State,

19        if that's what you're asking me.  But I can tell you in

20        our office, our office, some things are discoverable and

21        some are not.

22   Q.   And my understanding in my work capacity is that the

23        [Redacted] rules are a bit different --

24   A.   Yes.

25   Q.   -- than other state agencies.  Is that yours as well?
```

Page 81

1    A.    Yes.

2    Q.    For example -- let's look at a real specific example.

3          If you wrote a letter to Attorney General McKenna --

4    A.    Mm-hm.

5    Q.    -- is it your understanding that that letter would be a

6          public record that someone could request from the

7          Attorney General's Office or would that be a private

8          communication?

9    A.    I honestly don't know.  That is probably something for a

10         discussion between Philadelphia lawyers.  I don't know.

11   Q.    So when you were talking about the fact that generally,

12         if something's going to be public that is filed with the

13         government, the public would be told that, were you

14         referring to things filed with the ▓Redacted▓

15   A.    I know where you're going with this line of questioning.

16         And what you're doing is, you're asking me, because

17         people do not know when they sign a petition that it is

18         going to --

19   Q.    I'm not asking you --

20   A.    Okay.

21   Q.    -- that.  I'm asking you about the fact that, as we

22         discussed a minute ago with respect to public records --

23   A.    Yes.

24   Q.    -- the ▓Redacted▓ is in a bit of a different situation

25         with respect to public records than all other state

Page 82

1         agencies; correct?

2    A.   Not all.  Department of Social and Health Services, for

3         example, has -- their records -- their nondedacted (sic)

4         records are very specifically guarded from the public.

5              And so I honestly cannot tell you about other

6         agencies.  I know that some things within the

7         <span style="background:black;color:white">Redacted</span> are discoverable and some are not, and I

8         can't tell you which is which.  But for the most part,

9         where an office is concerned, it is often a matter of

10        harassment to ask for records that are confidential, and

11        <span style="background:black;color:white">Redacted</span> -- for example, <span style="background:black;color:white">Redacted</span> -- communication

12        with <span style="background:black;color:white">Redacted</span> are guarded, for example.

13   Q.   So --

14   A.   And so I'm not sure I'm answering your question.  I

15        think you're above my pay grade.

16   Q.   Well, you did make reference to something that I think

17        is special to the <span style="background:black;color:white">Redacted</span>  And you explained that a

18        little bit further, that con -- I'm sorry for being so

19        tongue-tied -- <span style="background:black;color:white">Redacted</span>

20   A.   Yes.

21   Q.   -- when a <span style="background:black;color:white">Redacted</span> writes you, <span style="background:black;color:white">Redacted</span>, a

22        letter, that is not necessarily going to be disclosed;

23        correct?

24   A.   That is correct.  And vice versa, if we write a letter

25        to a <span style="background:black;color:white">Redacted</span>

Tracey Juran, Certified Court Reporter

1  Q.  And in stating that, my understanding is that you don't

2      mean to be making a general statement about all letters

3      written to state agencies or all letters written to

4      people from state agencies; correct?

5  A.  Correct.

6  Q.  When is the last time that you campaigned for

7      reelection?  What year was that?

8  A.  Two years ago.

9  Q.  So in 2008?

10 A.  Mm-hm.  Well, 2007.  I was elected -- I campaigned in

11     2007, was elected, and serve -- started serving in 2008

12     the last time.

13 Q.  And what Redacted are you in?

14 A.  Redacted

15 Q.  Do you recall if any of your campaign signs were stolen?

16 A.  Oh, yes.

17 Q.  Were there quite a few of those?

18 A.  Uh-huh.

19 Q.  Is that a yes?

20 A.  Yes.  That is a yes.

21         And --

22 Q.  Did you --

23 A.  -- some -- and one was burned --

24 Q.  Oh, my goodness.

25 A.  -- several times.

Tracey Juran, Certified Court Reporter

1   Q.   Has that been your experience in all of your elections,

2        that --

3   A.   I've never had one burned.  That was a first.  But yes,

4        often they are stolen, they are demolished.

5   Q.   Have you ever had a campaign sign slashed with a knife?

6   A.   Yes.

7   Q.   And has that happened --

8   A.   I mean, I don't know how they slashed it -- an ax, a

9        knife, I don't know -- but yes.

10  Q.   And have you ever seen a sign for a Democrat that was

11       vandalized, slashed, or burned, destroyed in some way?

12  A.   Never burned.  I've never seen anybody else's sign

13       burned, especially as many times as mine was, the same

14       one.  But -- same location.  We replaced it and it would

15       be burned again.  But, you know, I think I just saw one

16       the other day, and I'm trying to remember if it was -- I

17       don't know whose sign it was.  Let's just say it was --

18       I don't know whose sign it was, if it was a Democrat or

19       a Republican.  I don't know.  But I did see one the

20       other day on I-5.

21  Q.   Do you have any idea why someone would have burned your

22       sign?

23  A.   None.  Fire department would like to know too.  Fact,

24       they called my office and wanted to know why I kept

25       putting the sign back up, because they had to go out and

Page 85

```
 1        put the fire out.
 2   Q.   Oh, my goodness.
 3             I wondered on Exhibit No. 9, which is one of the
 4        two letters that was faxed to you --
 5   A.   Yes.
 6   Q.   -- the last word before the "Thanks" --
 7   A.   Mm-hm.
 8   Q.   -- do you know what that word is?
 9   A.   I think it means taxes.
10   Q.   Why --
11   A.   Texas or taxes, I don't know.
12   Q.   Do you know why this person would have asked about your
13        taxes?
14   A.   I don't know.  I have no idea.  That was a real
15        curiosity.  It doesn't fit any of the rest of the
16        letter.
17   Q.   And in reading the rude language in the sentence that
18        precedes that --
19   A.   Mm-hm.
20   Q.   -- do you think that this individual literally thought
21        your head was up your ass, as they wrote, or do you
22        think that the individual was using an expression?
23   A.   Well, I think there are some types of what I would
24        consider very uneducated people that would use that
25        language.
```

1    Q.    I understand.

2          But --

3    A.    But he's talking about the doctor.

4    Q.    Yes.

5    A.    So obviously, this is a physical thing.  It doesn't

6          appear to be an expression.  He's talking about next

7          time you consult your doctor.  That would indicate to me

8          it's physical.

9    Q.    But the sentence that says, "Your head has been up your

10         ass way too long," do you think that's physically

11         possible?

12   A.    I didn't write the note.

13         MR. PIDGEON:  Objection; calls for speculation.

14   Q.    (by Ms. Egeler)  Well, I'm going to ask you to

15         speculate.

16   A.    I didn't write the note.

17   Q.    But do you think this person --

18   A.    Do I think this person thinks that?

19   Q.    That that's physically possible or that they were using

20         that as a rude expression?

21   A.    Well, as I say, you gotta take it in context.  The next

22         time you consult a doctor, you should do -- you

23         shouldn't do your own rectal exam.  Now, we're talking

24         about physical.  I mean, I am thinking like you, that

25         this is probably an expression, but he's putting it in

Page 87

1      the context of physical.  So let me just put it this

2      way:  I think it's meant to be intimidating.  And you

3      have to take it in context.

4           Now, you take that part and then you put in the

5      taxes and you think, now, what does that have to do with

6      the rest of this?  So I don't know.  The person is not

7      rational, number one.  That's all I can say.

8  Q.  In Exhibit No. 8, if a [Redacted]  -- and I don't even

9      want to use your name to suggest you'd ever propose such

10     [Redacted]  But if you -- if someone in the

11     [Redacted], for example, stating that

12     black children are barred from attending kindergarten

13     with white children, and if that [Redacted] received a

14     letter like this that called them a bigot, used the

15     words "untenable," "misguided," "backward," "tragic,"

16     "ignorant," and "wrong," would you think that this

17     language would be appropriate in that context?

18 A.  They aren't mentioning anything about black children in

19     here.

20 Q.  No, they're not.

21          So my --

22 A.  I got --

23 Q.  -- question to you is, if we had a [Redacted] that did

24     propose something like that, something segregating the

25     races, if that [Redacted] received a letter that used

1    the language in Exhibit No. 8, would this language be

2    appropriate in that context?

3  A.   I believe it is wrong to label a [Redacted] based on

4    [Redacted] that they introduce.

5  Q.   Do you believe it would be wrong -- if a [Redacted]

6    [Redacted] that stated that black children cannot

7    attend kindergarten with white children because of their

8    skin color, would it be wrong for a [Redacted] to call

9    that [Redacted] a bigot?

10  A.   Yes, because the [Redacted] does not necessarily

11    reflect the attitude of the individual.  Now, let me

12    phrase the question this way:  If that [Redacted] were

13    to say that, I think this should happen, then I think

14    that maybe you could make the case that they were a

15    bigot.  I think that's two different things.  Now, maybe

16    I'm -- maybe this is just semantics; I'm not sure.  But

17    usually you believe that the person who introduces

18    [Redacted] believes in what they are introducing.  I

19    do, but I don't know that about everybody.

20  Q.   Let's assume that the [Redacted] speaks publicly in

21    favor of this hypothetical bill that would bar black

22    kindergarten children from attending school with white

23    children and said, I firmly believe this, we should not

24    allow black children to mix with white.  Would it in

25    that context be appropriate for a constituent to call --

```
 1   A.   The person --

 2   Q.   --  Redacted          --

 3   A.   -- stating it?

 4   Q.   Yes.

 5             -- a bigot, to state that their position is

 6        untenable, misguided, and backwards?

 7   A.   You know, name-calling is a very low-life thing to do

 8        and I don't like to call people names.  And I think that

 9        people who call other people names are -- I guess I

10        would have to agree, though.  But I don't like to be

11        depicted in that manner myself, and so I would hesitate

12        to depict some other person as being that.  I would want

13        to talk to them personally and see what they really

14        believe.  So, you know --

15   Q.   In that context, though, of our hypothetical bill that

16        treats black children and white differently --

17   A.   Now, that's a different question.  And then I would say

18        yes.

19   Q.   Yes, it would be acceptable to make the statement that

20        the position is untenable, misguided, and backward?

21   A.   I think so, yeah, mm-hm.

22   Q.   And in that --

23   A.   Misguided and backward, yeah, I think so.

24   Q.   And in that context of our hypothetical bill that would

25        treat children differently, would it be --
```

 1    A.    Mm-hm.

 2    Q.    -- fair for a ▮Redacted▮ to say, I'm certain history

 3          will perceive you in this light:  Tragic, ignorant, and

 4          wrong?  In that context of our hypothetical bill

 5          involving separation of races, would that statement be

 6          acceptable?

 7    A.    This (indicating) doesn't have anything to do with race.

 8    Q.    This Exhibit No. 8 does not have anything to do with

 9          race.

10          So I'm asking you, if we had a different situation

11          that involved race, not sexual orientation, would this

12          kind of language -- and I'm quoting from --

13    A.    Yes.

14    Q.    -- this --

15    A.    I hear you.

16    Q.    -- be appropriate?  Would it be appropriate in that

17          context as opposed to this one?

18          MR. PIDGEON:  I'm going to object to the moral-

19          equivalency --

20    A.    Yeah.

21          MR. PIDGEON:  -- argument.

22    Q.    (by Ms. Egeler)  And I'm not trying to equate anything

23          morally.  I'm just asking you, in that context of our

24          hypothetical bill separating black and white children,

25          would -- this language stating, "I am certain history

1       will perceive you in this light:  Tragic, ignorant &

2       wrong," in that context, would this language be

3       acceptable?

4            Or let me state it differently.  In that context of

5       a bill trying to separate children of different races,

6       would you perceive it to be threatening for a

7       ████████ to express that they believe that history

8       will perceive our hypothetical ████████ as tragic,

9       ignorant, and wrong?

10  A.  I think that the ████████ would be very entitled to

11      their opinion that history might reflect that.  I might

12      agree or I might not agree.  It depends totally on the

13      context.  It's really difficult -- you have to

14      understand, this is not a rational person who wrote

15      this.  This is not a rational statement.  So you're

16      mixing apples and oranges in this -- you know, to my way

17      of thinking, the homosexual movement is a movement.  It

18      is not a race.  It is not about discrimination regarding

19      a race.

20  Q.  And I understand.  I'm not trying --

21  A.  Okay.

22  Q.  -- to equate the two things.

23           I'm asking --

24  A.  Okay.

25  Q.  -- would this language -- what I'm trying to get at is,

Tracey Juran, Certified Court Reporter

1        would this type of language be acceptable in any context

2        whatsoever?  I mean, to remove it completely from

3        categorizing people, if the bill was to euthanize all

4        puppies in the state of Washington --

5  A.   Careful.  I -- be careful; I have a dog.

6  Q.   There you go.

7        So --

8  A.   And he's a member of the family.

9  Q.   -- would it be threatening for a [Redacted] to express

10       that they find support of a bill to euthanize all

11       puppies in Washington to be untenable, misguided,

12       backward, tragic, ignorant, and wrong?

13  A.   In that context, I would say it's okay for a [Redacted]

14       to say that if they want to, yes.  In that context,

15       yeah.  It takes it out -- it gives it a different

16       connotation.  And I understand where you're going.  It's

17       just that too often, the homosexual movement tries to

18       paint themselves as a downtrodden -- as a woman, I am a

19       minority.  Homosexuals are not.  And they want to put

20       themselves in that category and I object to that.

21  Q.   I understand.

22  A.   Okay.

23  Q.   On both Exhibits 8 and 9, the letters show the fax

24       number that the letter was sent to as [Redacted]  And

25       I'm confused by that, because my understanding is that

```
 1        you forwarded a phone line to the fax.  So I'm

 2        wondering, how would they know what fax number they were

 3        sending --

 4   A.   They didn't.  They didn't.

 5   Q.   Is that the fax number that they were sending it --

 6   A.   No.

 7   Q.   -- to?

 8   A.   They were sending it to my phone line -- I mean, they

 9        began to believe that they had received the wrong number

10        for a phone, because when they called it, they got a fax

11        tone back in their ear.  So they thought -- they

12        concluded, then, that that was my fax number, but, in

13        fact, it is not.

14   Q.   I understand.

15   A.   Does that make sense?

16   Q.   Absolutely.

17             And Mr. Pidgeon asked you if the phone calls that

18        you did pick up threatened physical harm to you, harm to

19        your physical safety or emotional safety.  And I heard

20        you answer -- please correct me if I'm wrong -- that you

21        felt that it was a threat to your emotional safety; is

22        that right?

23   A.   Yes.

24   Q.   Did you feel that there was an expression of harm to

25        your physical safety or just emotional safety?
```

Tracey Juran, Certified Court Reporter

Page 94

```
 1   A.   You know, I have tried to remember, and quite honestly,

 2        I don't remember.  A threat to your physical safety

 3        would be very emotional.  And what I remember is the

 4        emotion.  I don't remember -- I didn't think somebody

 5        was going to shoot me.  I didn't get that.  That wasn't

 6        my fear.  And my fear was what it was doing to me

 7        emotionally.

 8   Q.   And isn't it possible that someone could say things that

 9        were quite disturbing, that would upset you greatly

10        emotionally, even if physical harm wasn't threatened?

11   A.   Oh, yes, certainly.  And you have to realize, as a

12        [Redacted]            I've got pretty thick skin.

13   Q.   So have you had rude phone calls from [Redacted]     or

14        from anyone in your [Redacted]   other than these phone

15        calls?

16   A.   Well, my office has, and certainly that's why security

17        was called.  We've had people come to my office who I

18        think we could categorize as not mentally all there, and

19        we've had some of those kinds of things.  To my home, I

20        do remember receiving calls in a prior time from

21        homosexuals, and I cannot remember if it was in regard

22        to [Redacted]            I'm not certain.

23   Q.   Do you remember --

24   A.   But I do remember that I had received them before and I

25        would hang up the phone on them.  I never listened to
```

```
 1          the entire harangue.

 2  Q.   Do you know when that was, those --

 3  A.   No --

 4  Q.   -- other calls?

 5  A.   -- I can't remember.  I really can't.  It didn't upset

 6       me like this did, I will say that, because there were so

 7       many of them and it was in a short period of time.  And

 8       then when you get -- I mean, you know, for somebody to

 9       document this kind of thing is very unsettling.  And

10       like I said, after this many years of being a

11       [Redacted], I've got pretty thick skin.

12  Q.   When your office has received calls in the past from

13       angry or rude individuals --

14  A.   Uh-huh.

15  Q.   -- do you recall any issues that generated those sorts

16       of calls?

17  A.   No.  Like I said, we've even had people walk into the

18       office that my aide has felt threatened by and would

19       call security.

20  Q.   And have you always been pleased by the response of the

21       State Patrol to those situations, those --

22  A.   Well --

23  Q.   -- calls?

24  A.   -- it isn't always State Patrol.  Sometimes it's on-

25       campus security.  But yes, I've always been -- yeah,
```

Page 96

1    they've always -- they take very good care of us.

2  Q.  And are they prompt in responding?

3  A.  Very prompt.  They're right there on campus and they're

4      very prompt.

5          I do remember feeling intimidated years and years

6      ago.  We had an initiative -- or we objected to a Redacted

7      Redacted    And there were hundreds of people for

8      and against, and I remember being very intimidated at

9      that time by -- I was in the House at that time -- by

10     homosexuals who were there to -- in favor of the

11     Redacted .  I can't remember what the Redacted was,

12     but it was to further special rights for homosexuals, I

13     do remember that.

14  Q.  Do you remember what people did that you found to be

15     intimidating?

16  A.  Spitting and in your face -- it was a very tight

17     hallway, as I remember.  There was a lot of State

18     Patrol, a lot of people on both sides of the issue, so

19     it was -- the hallway was very packed.  That was the

20     year that there were -- the only year in history that I

21     know of -- and I'm thinking I'm right -- ever in history

22     that there were so many testifying that the test --

23     there was such a large audience that it had to be moved

24     to the Redacted out of the hearing room.  And I

25     remember that.

1          That time is very vivid in my mind.  It was a very

2     frightening time.  But I was a ⬛Redacted⬛ then and

3     not accustomed to, you know, that kind of treatment.

4   Q.   So that would have been in the '90s, then.

5   A.   '90s, yeah.  Probably '93, '95, right in there.

6   Q.   And did the State Patrol do a good job of controlling

7     that --

8   A.   Yes.

9   Q.   -- crowd?

10  A.   Yes.  I mean, as good they -- as well as they could.

11    They got that many people, it was difficult.  Like I

12    said, they had to move them out of the ⬛Redacted⬛ over

13    to the -- or out of the hearing room over to the ⬛Red⬛

14    ⬛Redacted⬛

15  Q.   And when they did that, were they able to -- was the

16    State Patrol able to control the crowd?

17  A.   I believe there were some people in the balcony that had

18    to be escorted out.  But yes, they did.  They did what

19    they needed to do.

20  Q.   So if anyone was out of control, the State Patrol took

21    them out.

22  A.   Mm-hm.

23  Q.   Yes?

24  A.   Yes; sorry.

25          MS. EGELER:  Okay, that's it for my questions.

1      Thank you.

2         MR. STAFFORD:  Steve, did you have any questions?

3         MR. DIXSON:  No, I'm good.  Thank you.

4         MR. STAFFORD:  And I have just a couple of

5      questions.

6

7                  FURTHER EXAMINATION

8  BY MR. STAFFORD:

9  Q.   Could I ask you to take a look at Exhibit No. 7.

10  A.   I didn't write the numbers.  Okay, there we are.  Yes.

11  Q.   And I'm just going to read the first paragraph here.

12  A.   Okay.

13  Q.   **Redacted**

14     **Redacted**

15     **Redacted**    Did I read that correctly?

16  A.   Mm-hm.

17  Q.   Do you consider that to be name-calling?

18        MR. PIDGEON:  Objection; calls for a legal

19     conclusion.

20  A.   You mean the word "homosexual"?

21  Q.   (by Mr. Stafford)  I refer to the phrase "depraved

22     lifestyle" in reference to homosexuals.

23  A.   No.

24  Q.   And why don't you consider that to be name-calling?

25  A.   It's talking about a lifestyle, it's not talking about

1      individuals.  It's depicting a lifestyle, depraved

2      lifestyle.  It's not calling them depraved, it's talking

3      about the lifestyle.

4   Q.  So in your view, someone can engage in a depraved

5      lifestyle and not be depraved themselves?

6   A.  I think so, mm-hm.

7   Q.  And would you think -- or in your view, is saying that

8      somebody has a depraved lifestyle dehumanizing towards

9      that person?

10  A.  No.  I think that humans can have a depraved lifestyle.

11          MR. STAFFORD:  Okay, thank you.

12          THE WITNESS:  Mm-hm.

13

14                  FURTHER EXAMINATION

15  BY MR. PIDGEON:

16  Q.  I've got just a couple more questions and then we can

17      get out of here and go get some dinner, I think.

18  A.  Okay.

19  Q.  Exhibit 9.

20  A.  Yes.

21  Q.  On this last phrase, "Oh yea what about your taxes,"

22      now, is Jim Richardson your accountant or CPA?

23  A.  No.  Neither is Jim Brown.

24  Q.  Neither one of them.  They're -- neither one, okay.

25          And then here they said, "Next time" you "consult a

1       Dr."  They're not referring to Dr. Barry Brumitt, are

2       they?

3   A.  Could be.  I have no idea.  In fact, that's very

4       interesting that you bring that up, because I did think

5       of that.  I thought, hm, coincidence.  This (indicating)

6       is kind of an add-on.  I don't know.  It'd be

7       interesting to have an analyst analyze that.  I have no

8       idea.

9   Q.  Now, let me -- I wanted to -- as to Exhibit 8, I want to

10      ask you another hypothetical concerning that.

11  A.  Okay.

12  Q.  If you would take -- hypothetically, if you were looking

13      at Nazi Germany and you were arguing against the

14      majority position that was in favor of the Final

15      Solution and the extermination of Jewry in Europe and

16      their -- you know, their incarceration in concentration

17      camps, would you be concerned if a person you knew to be

18      a Brown Shirt sent you a fax like this calling you a

19      bigot, tragic, ignorant, and wrong?

20  A.  Yes, because there is an obvious lack of understanding

21      of the homosexual movement.  And this person -- would

22      you rephrase the question.

23  Q.  Sure.

24          If you were --

25  A.  I want to get it --

Tracey Juran, Certified Court Reporter

Page 101

1   Q.   Let's --

2   A.   -- right.

3   Q.   Let's say you were living in Nazi Germany -- you were a

4        Redacted        in Nazi Germany.

5   A.   Okay.

6   Q.   And it's 1942.

7   A.   Okay.

8   Q.   So the Nazis are firmly ensconced in power.

9   A.   And I'm not one of them.

10  Q.   And you're not one of them.  In --

11  A.   Oh, thank you.

12  Q.   -- fact, somebody --

13  A.   Okay.

14  Q.   -- comes -- somebody comes into --

15  A.   Okay.

16  Q.   -- the Reichstag and says, we propose the Final Solution

17       that will kill all the Jews we have in concentration

18       camps.

19  A.   Yes.

20  Q.   And you took a position opposed to that publicly.

21  A.   Yes.

22  Q.   Would you feel intimidated if you received a fax from a

23       person that you knew to be a Brown Shirt calling you a

24       bigot, tragic, ignorant, and wrong?

25  A.   I'd be scared to death.

1  Q.  Given the context.

2  A.  Given the context and knowing their agenda and knowing

3      what they had done to other people and that this was the

4      kind of language that they used, yes.

5  Q.  So the context, then, is very critical in terms of

6      understanding why such a thing as this would be

7      threatening; isn't that right?

8  A.  Yes, most certainly.  And that is -- you've hit the nail

9      right on the head.  That's exactly the issue, is the

10     context.  Taking things separately -- just sitting here

11     in this room, this (indicating) isn't intimidating.

12         But to receive it in the context of what we were

13     trying to do, the other messages that I had received, et

14     cetera, and hearing from other people of death threats

15     that they had received from the homosexual community,

16     people who had -- well, a friend of mine was a

17     Redacted  many years ago, fought this very issue, and

18     told of how they would call his home and describe in

19     detail -- and he didn't hang the phone up, he listened.

20     I guess men do that.

21         But he listened to the descriptions of what they

22     were going to do to his son and -- very, very

23     intimidating.  And he did not run for reelection.  He

24     served one term and that was it.  And I know that

25     because he's a personal friend.  And because of that,

1        it -- in the context -- and as you -- you're describing

2        a context.  It gives it a different flavor in my mind

3        and what it does to me.

4             MR. PIDGEON:  Okay, I have nothing further.

5             MS. EGELER:  I have just a couple questions.

6

7                      FURTHER EXAMINATION

8    BY MS. EGELER:

9    Q.   At the top of --

10   A.   I gotta quit talking here.

11   Q.   At the top of Exhibit 9 --

12   A.   Mm-hm.

13   Q.   -- on the right-hand side of the paper, there's a 206

14        phone number:  206-329-1334.

15   A.   Mm-hm.

16   Q.   Do you think that that's the phone number that the fax

17        was sent from?

18   A.   I think it's the fax number.

19   Q.   That it was sent from.

20   A.   Yes.

21   Q.   And then on the top of Exhibit 8 there's a fax number:

22        206-876-1702.  Do you think that was the fax number --

23             MR. PIDGEON:  Excuse me; I think that's 1701.

24             THE WITNESS:  Yeah.

25             MS. EGELER:  Thank you very much.

1   Q.   (by Ms. Egeler)   1701.

2        Do you think that's the fax number it was sent

3        from?

4   A.   Yes, but let me qualify that.  I believe in the case of

5        some machines you can program in the number that you

6        want to be reflective of what -- the number it's coming

7        from.  You can put in a different name if you wanted to,

8        you could put in a different date if you wanted to.  So

9        I don't know.  I -- you -- taking it at face value, I

10       would say that's what that is; however, I do know that

11       those can be changed.  On mine, for example, I choose

12       not to have anything across the top.

13  Q.   So it purports to be the fax number it was sent from --

14  A.   Yes.

15  Q.   -- but we don't really know.

16  A.   No.

17  Q.   And on Exhibit 8, we have the name of an individual and

18       an address and an Email account.

19  A.   Yes.

20  Q.   And I assume, again, it could be the name, address, and

21       Email of the individual, but we don't really know;

22       correct?

23  A.   No, correct.  Just like we don't know this person is

24       really a doctor.

25  Q.   And on Exhibit No. 9, we don't know if this came from

```
 1         Jim Richardson or Jim Brown, the names that appear at

 2         the top.

 3   A.    No.  Anyone who would send a message like this, I find

 4         it very difficult to believe that -- I believe that it

 5         was done out of frustration because they couldn't get

 6         through to my number.  They got a fax.  And it was my

 7         thought at the time that this was done out of

 8         frustration.  And I doubt seriously that they thought

 9         far enough ahead to change the footprint at the top, but

10         who knows.

11   Q.    But you didn't ask the State Patrol or local police to

12         check into this to see if these individuals sent it or

13         to ask these individuals to stop it?

14   A.    No.

15   Q.    And why is that?  Why didn't you contact the State

16         Patrol or local police --

17   A.    Well --

18   Q.    -- given --

19   A.    -- I think I answered that question before to say that

20         rather than tie up their time to come to my home to

21         investigate something that was obviously sent by people

22         who were, to use the expression, shooting from the hip

23         did not seem logical or reasonable.  If they had been,

24         as I said, parked outside my gate or in some way

25         physically present, spitting in my face, that kind of
```

Tracey Juran, Certified Court Reporter

Page 106

1      thing, I certainly would have called them.  If this had

2      gone any farther than this, if it hadn't stopped when it

3      did, I would have.

4  Q.  And I assume that, if either of these exhibits or the

5      phone calls voiced a threat that they were going to come

6      and harm you, that you would let the police know about

7      that.

8  A.  Most certainly.

9          MS. EGELER:  Okay, no further questions.

10          MR. STAFFORD:  Nothing further for me.

11          MS. EGELER:  I think we're finally done.

12

13                              (Whereupon the deposition
                               concluded at 4:36 p.m.)
14

15                              (Upon agreement by the parties,
                               the reading and signing of the
16                             deposition was waived by the
                               deponent.)
17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE

 2   STATE OF WASHINGTON )
                         )
 3   COUNTY OF SNOHOMISH )

 4            I, the undersigned Notary Public in and for the

 5   State of Washington, do hereby certify:

 6            That the foregoing is a full, true, and correct

 7   transcript of the testimony of the witness named herein,

 8   including all objections, motions, and exceptions;

 9            That the witness before examination was by me duly

10   sworn to testify truthfully and that the transcript was made

11   available to the witness for reading and signing upon

12   completion of transcription, unless indicated herein that the

13   witness waived signature;

14            That I am not a relative or employee of any party

15   to this action or of any attorney or counsel for said action

16   and that I am not financially interested in the said action

17   or the outcome thereof;

18            That I am sealing the original of this transcript

19   and promptly delivering the same to the ordering attorney.

20            IN WITNESS WHEREOF, I have hereunto set my hand and

21   seal this 12th day of October, 2010.

22

23            _____
             Notary Public in and for the State of Washington
24                  residing at Edmonds, Washington.
                       (Notary expires 3/09/13)
25                       (CCR No. 2699)
```

Tracey Juran, Certified Court Reporter

# Exhibit One

Redacted

Redacted

# Exhibit Two

Redacted

Redacted

Redacted

Redacted

9/28/2010

# Exhibit Three

Redacted

Redacted

Redacted

Redacted

9/28/2010

# Exhibit Four

Redacted

Redacted

Redacted

# Exhibit Five

Redacted

# Exhibit Six

Redacted

Redacted

# Exhibit Seven

Redacted

Redacted

Redacted

Redacted

# Exhibit Eight

11/22/9

Dr. Barry Brumitt
910 17th Ave E
Seattle, WA 98112
barry b @gmail.com

*(handwritten marginal note, left side, rotated)* Thanks. Show how this note who knows of you who will have the courage to I hope one of you is reading this; who is wrong will have the courage to That your boss is wrong

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

I just read your note on the ___ and I am surprised to find you supporting such an untenable, misguided & backward cause.

Your position and tone sounds like the bus driver in Mississippi who insisted that blacks should sit in the back of the bus - and I am certain history will perceive you in this light: tragic, ignorant & wrong.

I feel nothing but pity for you.

I hope you will release your fear, hate & judgement and join me in this century.

A completely heterosexual, happily engaged, and fortunately unbigotted

# Exhibit Nine

Redacted

Redacted

Next time consult a Dr.
you shouldn't do your own
rectal exams. Your head
has been up your ass
way too long.

Oh yea what about your
Texes

Thanks

Redacted

# Exhibit Ten



Redacted