1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

| | |
|---|---|
| JOHN DOE #1, an individual, JOHN DOE #2, an individual, and PROTECT MARRIAGE WASHINGTON,<br><br>                  Plaintiffs,<br><br>    v.<br><br>SAM REED, in his official capacity as Secretary of State of State of Washington, BRENDA GALARZA, in her official capacity as Public Records Officer for the Secretary of State of Washington,<br><br>                  Defendants. | NO. 09-cv-05465-BHS<br><br>DESIGNATED DEPOSITION TESTIMONY OF Redact Redacted |

19         Pursuant to Local Rule 32(e), Defendants Sam Reed and Brenda Galarza, Intervenors

20  Washington Families Standing Together and the Washington Coalition for Open Government

21  and Plaintiffs John Doe #1, John Doe #2, and Protect Marriage Washington (collectively, the

22  "Parties") hereby submit combined designated deposition testimony for RedacteRedacted

23         Defendants and Intervenors object to the admission of any deposition testimony taken

24  of any witnesses who could be called to testify at trial.  Therefore, the designations of

25  Defendants and Intervenors are being submitted in the event that the Court decides to admit

26  deposition testimony.

DESIGNATED DEPOSITION
TESTIMONY OF Reda Redacted
- No. 09-cv-05465-BHS

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Section
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7352

1        For the Court's convenience Defendants' designations have been highlighted in blue,

2    Intervenors' designations have been highlighted in pink, and Plaintiffs' designations have

3    been highlighted in yellow. Objections have been noted in the margins. Plaintiffs will be

4    filing the redacted versions of these documents.

5        DATED this <u>6th</u> day of September, 2011.

6    ROBERT M. MCKENNA
    Attorney General

7

8     s/ William Clark
    _____
    WILLIAM CLARK, WSBA #9234
9    Senior Counsel
    800 Fifth Ave, Ste 2000
10   Seattle, WA 98104
    206-464-7352
11   BillC2@atg.wa.gov
    ANNE EGELER, WSBA #20258
12   Deputy Solicitor General
    PO Box 40100
13   Olympia, WA  98504-0100
    360-664-3027
14   Anne1@atg.wa.gov
    _____

15

16

17

18

19

20

21

22

23

24

25

26

DESIGNATED DEPOSITION          2        ATTORNEY GENERAL OF WASHINGTON
TESTIMONY OF Redacted                  Complex Litigation Section
- No. 09-cv-05465-BHS                     800 Fifth Avenue, Suite 2000
                                     Seattle, WA  98104-3188
                                     (206) 464-7352

Page 1

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF WASHINGTON

_____

                              )
JOHN DOE #1, et al.,          )
                              )
            Plaintiffs,       )
                              )
        vs.                   )  NO. 09-cv-05456-BHS
                              )
SAM REED, et al.,             )
                              )
            Defendants.       )
_____

        DEPOSITION UPON ORAL EXAMINATION OF Redacted
_____




                    October 1, 2010

                  Olympia, Washington




                DIXIE CATTELL & ASSOCIATES
         COURT REPORTERS & VIDEOCONFERENCING
            (360) 352-2506  **  (800) 888-9714

Page 2

```
 1    APPEARANCES:

 2          FOR THE PLAINTIFF
            PROTECT MARRIAGE
 3          WASHINGTON:                MR. STEPHEN PIDGEON
                                       ATTORNEY AT LAW
 4                                     3002 Colby Avenue
                                       Suite 306
 5                                     Everett, WA  98201

 6          FOR THE DEFENDANTS:        MS. ANNE E. EGELER
                                       DEPUTY SOLICITOR GENERAL
 7                                     P.O. Box 40100
                                       Olympia, WA  98504-0100
 8
            FOR THE INTERVENOR
 9          WASHINGTON COALITION FOR
            OPEN GOVERNMENT
10          (Via Telephone):          MR. STEVEN J. DIXSON
                                       WITHERSPOON KELLEY
11                                     422 W. Riverside Avenue
                                       Suite 1100
12                                     Spokane, WA  99201

13          FOR THE INTERVENOR
            WASHINGTON FAMILIES
14          STANDING TOGETHER:        MR. KEVIN J. HAMILTON
                                       PERKINS COIE
15                                     1201 Third Avenue
                                       Suite 4800
16                                     Seattle, WA  98101

17

18

19

20

21

22

23

24

25
```

Page 3

1                              INDEX

2     EXAMINATION                                PAGE/LINE

3     MS. EGELER                                 6    13

4     MR. HAMILTON                               76   3

5     MR. DIXSON                                 127  23

6     MR. PIDGEON                                132  13

7     MS. EGELER                                 147  18

8

9

10

11                            EXHIBITS

12    EXHIBIT        DESCRIPTION                  PAGE/LINE

13    1              Blog post from ▓Redacted▓   13   22
                     ▓Redacted▓ ; 1 pg.
14
      2              Article from Protect Marriage      19   4
15                   Washington Web site; 3 pgs.

16    3              Article in ▓Redacted▓ by     20   9
                     ▓Redacted▓ ; 3 pgs.
17
      4              Article from ▓Redacted▓     23   8
18                   site; 2 pgs.

19    5              Article from ▓Redacted▓     24   5
                     Web site; 3 pgs.
20
      6              Web page from ▓Redacted▓    24   18
21                   Political Action Committee; 2 pgs.

22    7              Expenditure statement for ▓Redacted▓   29   8
                     ▓Redacted▓ 1 pg.
23
      8              Printout from ▓Redacted▓    43   18
24                   site; 7 pgs.

25    9              Printing from ▓Redacted▓    43   18

           site; 11 pgs.
           Dixie Cattell & Associates (360) 352-2506

Page 4

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE/LINE | |
|---|---|---|---|
| 10 | Article in USA Today; 3 pgs. | 72 | 11 |
| 11 | Blog posting on ██████ Network; 2 pgs. | 74 | 5 |
| 12 | Biography of ████████ 1 pg. | 76 | 12 |
| 13 | ██████ perspective on candidates; 1 pg. | 80 | 17 |
| 14 | ████ web site printout; 1 pg. | 82 | 20 |
| 15 | Article in ██████ on ██████; 4 pgs. | 84 | 17 |
| 16 | Article by ██████ ██ ; 2 pgs. | 85 | 24 |
| 17 | ████████████████ ; 2 pgs. | 90 | 8 |
| 18 | Article in ██████ published ██████ ; 1 pg. | 91 | 23 |
| 19 | ██████ article published ██████ ; 3 pgs. | 93 | 1 |
| 20 | ██████ article published ██████ ; 2 pgs. | 95 | 10 |
| 21 | ██████ article published ██████ ; 2 pgs. | 96 | 16 |
| 22 | ██████ blog; 4 pgs. | 98 | 23 |
| 23 | Collection of blog postings from ██████ ██████ blog; 51 pgs. | 101 | 2 |
| 24 | Blog postings on ██████ Network; 25 pgs. | 104 | 11 |
| 25 | Political Committee Registration; 3 pgs. | 108 | 19 |

Page 5

1                              EXHIBITS

2    EXHIBIT         DESCRIPTION                          PAGE/LINE

3    26         Political Committee Registration form    112   24
                for Committee for Judicial Restraint;
4               5 pgs.

5    27         Registration form for [Redacted]          116   10
                [Redacted]            ; 1 pg.
6
7    28         Twitter posts; 6 pgs.                     118   13

8    29         Civil judgment filing record; 10 pgs.    122   6

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dixie Cattell & Associates (360) 352-2506

EGELER (Redac Redacted   10/1/10)

                                                              Page 6

1                   BE IT REMEMBERED that on Friday, October 1, 2010,

2            at 8:58 a.m., at 1125 Washington Street, Suite 601, Olympia,

3            Washington, before REBECCA S. LINDAUER, Notary Public in and

4            for the State of Washington, appeared Redac Redacted   the

5            witness herein:

6                   WHEREUPON, the following proceedings were had, to

7            wit:

8

9    Redac Redacted              having been first duly sworn by

10                               the Notary, testified as follows:

11

                            EXAMINATION

12   BY MS. EGELER:

13   Q   So good morning, Mr. Redacted   My name is Anne Egeler, and

14       I'm a deputy solicitor general representing the State in

15       this matter, specifically, Sam Reed and the defendants in

16       the case.

17          Before we get started, I wanted to ask:  Have you ever

18       been deposed before?

19   A   Yes.

20   Q   Can you tell me about that?

21   A   I don't really recall the details.  A number of times.  I

22       was in the music and entertainment industry.  We were just

23       talking about Nashville and we had an office there.  I

24       can't.  I don't remember.  It was just issues.  I don't even

25       know what it was.

EGELER (Redac Redacted    10/1/10)

1   Q   Okay.

2   A   It's been some time ago.

3   Q   Since it's been some time --

4   A   Years.

5   Q   -- I'm going to go over some basic rules.

6   A   Okay.

7   Q   Everything we're saying, of course, is being taken down by

8       our court reporter.  And to help her with that and to get an

9       accurate transcript, it's going to be very important that we

10      not speak over each other.  We want to let each other finish

11      our sentences before we jump in and speak.

12          It's also important that we indicate yes or no

13      verbally, rather than with a head nod or an um-hmm, because

14      those things don't show up in the record clearly either.

15  A   Really?

16  Q   And, of course, if you're confused about anything or I've

17      asked something in a way that doesn't make sense to you,

18      please stop and ask for clarification.

19  A   Okay.

20  Q   Do you have any questions, before we get started, about the

21      deposition itself or how this works?

22  A   Can I have a copy of the transcript of this?

23  Q   When this is done, the court reporter will give you the

24      option of reviewing it and signing, so absolutely.  That is

25      something that will be provided to you.

EGELER  (▮Redac▮ ▮Redacted▮  10/1/10

Page 8

```
 1   A   Good.  Thank you.
 2   Q   Let's just start with some general information.  Can you
 3       tell me where your residential address is?
 4   A   My primary residence is ▮Redacted▮
 5       ▮Redacte▮.
 6   Q   And you said primary residential address.  Do you have more
 7       than one residential address?
 8   A   That's my primary residence.
 9   Q   So are you a registered voter in the state of Oregon?
10   A   Yes.
11   Q   Which I assume means you're not a registered voter in
12       Washington?
13   A   Yes.
14   Q   Was that true in 2009 as well?
15   A   Yes.
16   Q   Was Oregon your primary residence in 2009?
17   A   Yes.
18   Q   Can you tell me about your current employment?
19   A   I'm retired.
20   Q   And when did you retire?
21   A   2001.
22   Q   And are you a business owner?
23   A   Yes.
24   Q   And where are your businesses located?
25   A   They're not.  I have a ▮Redacted▮ ▮Redacted▮, which is
```

EGELER (Redac Redacted  10/1/10)

Page 9

1          left over from my working years.

2     Q    Is that --

3     A    It isn't active today.

4     Q    Isn't active.  Was it active in 2009?

5     A    No.

6     Q    What state was that registered in?

7     A    Oregon.

8     Q    And are you associated with any nonprofit organizations?

9     A    Redacted

10    Q    Okay.

11    A    Redacted

12    Q    Are those different organizations?

13    A    Yes.

14    Q    Can you explain how they're related, if at all?

15    A    Yeah.  It's on our Web site.  It's a statement that the IRS

16         actually gave me to put on so it would clarify it the way

17         they would like to see it.  I can't quote it, but it's on

18         the Web site.  But they're separated -- they're related, but

19         separate organizations.

20    Q    So it's Redacted                    Redacted

21    A    Redacted

22    Q    Redacted

23             What is the work of those organizations?

24    A    The Redacted    is education.  The Redacted  is advocacy.

25    Q    Looking at the Redacted        Redacted              what

EGELER (Redac Redacted    10/1/10)

Page 10

```
 1        is your association with that organization?
 2   A    I'm Redacted
 3   Q    And is that registered as a nonprofit with the Washington
 4        Secretary of State?
 5   A    Yes.
 6   Q    Redacted                    what is your association with
 7        that?
 8   A    I'm Redacted
 9   Q    And is that registered with Washington State?
10   A    No.  It's registered with Oregon.
11   Q    When did you learn that you were named as a witness in the
12        Doe v. Reed case?
13   A    I think when your office contacted me.
14   Q    Are you aware that being a witness in this case may require
15        you to publicly testify in federal court?
16   A    I am.
17   Q    And is that acceptable to you?
18   A    Yes.
19   Q    Did you do anything to prep for the deposition today?
20   A    In regards to?
21   Q    Anything.  Did you prep in any way?
22   A    I looked up some slanderous remarks that have been made
23        about me and copied them off the Internet.
24   Q    The subpoena you received contained a request for documents.
25        Did you have a chance to search for responsive documents?
```

EGELER (Redac Redacted   10/1/10)

Page 11

```
 1   A    I did.  I didn't have much time, but I had a few days, as
 2        you know, and so I went on the Internet.  Would you like to
 3        hear about that now?
 4   Q    I don't want to hear the details of it.  I would like to see
 5        what you have that's in response to that production request.
 6             Have you brought any documents with you?
 7   A    There are copies of statements I would like to share with
 8        you.
 9   Q    Okay.
10   A    (Documents passed.)
11   Q    Thank you.  We'll go through all of this during the course
12        of the deposition.
13             At this point, I just wanted to ask if you had a
14        chance --
15   A    Yeah, I did.
16   Q    -- to produce and look at this.
17             Do you feel that you had adequate time to go through
18        all of your records and fully respond to the subpoena?
19   A    No.  But, you know, I had some time, not adequate time.
20   Q    So you can't say then that you have fully responded to the
21        subpoena?
22   A    To the best of my ability in the time that I had, given my
23        other responsibilities.
24   Q    So are you saying that there may be responsive documents
25        that you have not brought with you today?
```

EGELER (█Redac█ █Redacted█   10/1/10)

Page 12

1    A    There could be.  If I knew what they were, I would have

2         brought them, but I mean, there could be others.

3    Q    What else do you need to do in order to determine whether

4         there are other responsive documents?

5    A    Well, I just have to have more time to research, I suppose.

6              MS. EGELER:  Let's be off the record for a second.

7                              (Recessed at 9:05 a.m.)

8                              (Reconvened at 9:11 a.m.)

9              MS. EGELER:  So just to memorialize on the record

10        what we discussed off, Mr. █Redacted█ will take until next

11        Friday to research and see if there is anything else

12        responsive to the subpoena duces tecum, and he will respond

13        to me by e-mail at the Attorney General's Office by 4:00

14        p.m. next Friday with any responsive documents.

15             Alternatively, if there are no more responsive

16        documents, Mr. █Redacted█ will provide me that notice by e-mail

17        Friday at 4:00 and also will, by Saturday, put a written and

18        signed statement in the mail to me, so stating.

19             If there are responsive documents, then the parties

20        have agreed that we will preserve the right to come back in

21        with follow-up questioning regarding those documents, and

22        the deposition will be promptly scheduled probably by the

23        middle of the following week.

24             Everybody in agreement?

25             MR. PIDGEON:  I'm in agreement.

EGELER (Redac Redacted   10/1/10)

Page 13

```
 1                    THE WITNESS:  Yes.

 2                    MR. DIXSON:  Yes.

 3                    MR. HAMILTON:  Yeah, that works.

 4    Q    (By Ms. Egeler)  Mr. Redacted did you -- let me back up.

 5              Prior to Referendum 71, in years past, have you, as the

 6         Redacted                                or Redacted

 7         Redacted   Redacted        made any statements about same sex

 8         partnership?

 9    A    Yes.

10    Q    And can you tell me about that?  Again, I'm asking about

11         periods prior to Referendum 71.

12    A    I don't remember what I said, but it would have been

13         consistent with my Judeo-Christian values and beliefs, the

14         Biblical position on marriage.

15    Q    And in 2009 there was a bill, a senate bill, in the

16         Washington State legislature, Senate Bill 5688.

17              Do you have any knowledge of that bill?

18    A    Yes.

19    Q    And what's your understanding of that bill?

20    A    It was to expand civil rights -- civil union benefits to be

21         equal with marriage.

22                    MS. EGELER:  I'm going to mark this as Exhibit

23         No. 1.

24                        (Exhibit No. 1 marked.)

25    Q    (By Ms. Egeler)  I've handed you a copy of what's been
```

EGELER (█Redac█ █Redacted█  10/1/10)

Page 14

1    marked as Exhibit No. 1 to your deposition, Mr. █Redacted█

2    This is a page that I printed from the █Redacted█ Web

3    site.  The address is found at the bottom of the page and

4    the date that I printed it, today, is shown in the lower

5    right-hand corner.

6         Do you recognize this as a blog posting that you made

7    on the █Redacted█ blog?

8    A    It appears to be.

9    Q    About one-third of the way down, there is a -- in parens

10   there's numeral 3.  Can you read that paragraph slowly for

11   our court reporter into the record?

12   A    █Redacted█

     █  ████████████████████████████████

     █  ██████████████████  ██████████████████

     █  ███████████████████  ████████████

     █  █████████████████████████████████

     █  █████████  ██████████████████████████

     █  ████████████████████████████████████

     █  ██████████████████████████████████

     █  ██████████████████████████████████

     █  █████████████████████████

22   Q    Is this blog posting about Senate Bill 5688?

23   A    It's about my personal belief.

24   Q    Your personal belief about that senate bill?

25   A    My personal belief about the behavior of homosexuality.

EGELER (█Redac█ █Redacted█   10/1/10)

Page 15

```
 1    Q    Can you look -- you just read from that paragraph that

 2         follows the 3 in parens.  Looking down two more paragraphs,

 3         the paragraph, "Beginning last Thursday" --

 4    A    Um-hmm.

 5    Q    -- are you with me?

 6    A    I'm with you.

 7    Q    It appears that you are, in this blog posting, speaking

 8         about Senate Bill 5688.  Am I mistaken?

 9    A    I am speaking about Senate Bill 5688 in that paragraph.  In

10         3 above, just referenced, I'm talking about my own personal

11         belief.

12    Q    And are you talking as the representative of the █Redacted█

13         █Redacted█ as well or just in your personal capacity?

14    A    Well, I'm speaking about my personal belief.

15    Q    And at the bottom, did you sign that as the █Redacted█ of the

16         █Redacted█

17    A    I don't know if I signed it or not.

18    Q    Did you post those words, "█Redac█ █Redacted█ █Redacted█

19         █Redacted█

20    A    I did not, but our organization probably did.

21    Q    Did you authorize that posting?

22    A    It would have been authorized.

23    Q    At the very bottom of the posting, it says, "Posted by █Redac█

24         █Redacted█ at 10:46 a.m."

25              Is that inaccurate?
```

EGELER  (▮▮▮▮ ▮▮▮▮▮▮▮▮▮  10/1/10)

                                                          Page 16

 1   A    I don't -- the time?  I don't know.

 2   Q    The fact that, "Posted by ▮▮▮▮ ▮▮▮▮▮▮▮▮  is that a

 3        misstatement?

 4   A    Yes.  It's -- all of the blogs that are put out through the

 5        blogging company that we use puts that -- I mean, it's on

 6        everything that comes out.

 7   Q    Would you have sent this blog to your blogging company?

 8   A    No.

 9   Q    Who would have done that?

10   A    Someone in our office.

11   Q    And who would have written this blog?

12   A    I would have written it.

13   Q    And would this have been something that you authorized the

14        posting of?

15   A    Yes.

16   Q    And right before the closing there on the blog, there is a

17        line that is underlined and it states, "Your tax-deductible

18        donation today would help a great deal."

19            Do you see that?

20   A    Um-hmm -- yes.

21   Q    Help a great deal with what?

22   A    Our educating the public.

23   Q    About?

24   A    About all the Judeo-Christian issues.

25   Q    So it wasn't seeking donations to oppose Senate Bill 5688?

EGELER (▮Redac▮ ▮Redacted▮)   10/1/10)

```
                                              Page 17

 1   A    No.

 2   Q    And did ▮Redacted▮ do any sort of lobbying

 3        with regard to Senate Bill 5688?

 4   A    The Network did because it's an advocacy organization.

 5   Q    Can you tell me about that?

 6   A    The ▮Redacted▮ did not.

 7   Q    Can you tell me about any lobbying ▮Redacted▮

 8        did with respect to Senate Bill 5688?

 9             MR. PIDGEON:  I'm going to pose an objection on

10        the basis of relevance.

11             Go ahead.

12   A    We lobbied.

13   Q    (By Ms. Egeler)  How?

14   A    ▮Redacted▮ Talked to lawmakers, asking them

15        to consider not supporting it, the Network, not the

16        ▮Redacted▮

17   Q    Did you personally participate in those discussions with

18        Washington legislators?

19   A    Probably.

20   Q    Do you remember any such discussions?

21   A    I don't have any memory of any specific one.

22             MR. PIDGEON:  I'm going to go on the record as

23        objecting to this line of testimony.  I believe that Counsel

24        is using this as a fishing expedition.  It's not relevant to

25        the discussion of whether or not ▮Redac▮ ▮Redacted▮ has
```

EGELER (█████ ████████)   10/1/10

Page 18

```
 1          experienced threats, harassment, or intimidation in
 2          relationship to R71.  That's my official objection.
 3     Q    (By Ms. Egeler)  Did you speak at any public hearings
 4          regarding Senate Bill 5688?
 5     A    No.
 6     Q    Did anyone from ████████████████████ speak at any
 7          public hearings regarding the senate bill?
 8     A    Let me correct.  I did speak at a hearing, house hearing,
 9          that was open to the public and it's on the record.
10     Q    Do you remember how many members of the public were in
11          attendance, roughly?
12     A    Hundreds.
13     Q    Hundreds?
14     A    Yeah.  Far more than the room could accommodate.
15     Q    When you spoke, did you speak in your personal capacity or
16          as the ██████████ of the ███████████████████
17     A    I don't recall.
18     Q    Did you meet with anyone to discuss development of a
19          referendum regarding Senate Bill 5688?
20     A    I met with Larry Stickney.
21     Q    And did you help Mr. Stickney develop Referendum 71?
22     A    We had discussion.
23     Q    Did you assist in the drafting of Referendum 71?
24     A    I don't recall that I did.
25     Q    After the Referendum 71 was filed with the Secretary of
```

EGELER (Redac Redacted   10/1/10)

Page 19

1    State, do you remember whether you formally endorsed or

2    supported Referendum 71?

3  A  I did support it.

4          MS. EGELER:  Mark this as Exhibit No. 2.

5                        (Exhibit No. 2 marked.)

6  Q  (By Ms. Egeler)  I've handed you what's been marked as

7     Exhibit No. 2 to your deposition, and the Web site that this

8     is printed from appears at the bottom of the page and the

9     print date of September 30 of 2010 appears in the lower

10    right-hand corner.  This is from the Redacted

11    Redacted    Web site.

12        And if you could look about three-quarters of the way

13    down the page -- well, about halfway down the page, there

14    are two paragraphs that are attributed to Redac Redacted

15    Redacted      and Redacted

16        Do you see where I am?

17  A  Yes.

18  Q  And did you make these statements?  If you want to take a

19     minute, you're welcome to read through this.

20  A  I'm only seeing one statement.  Where can I find the other

21     one?

22  Q  There are two paragraphs.

23  A  Two paragraphs, okay.

24  Q  Starting in the middle of the page.

25  A  Okay.  I see the paragraphs.  I was looking for a separate

EGELER  (RedacRedacted  10/1/10)

```
                                                     Page 20

  1      statement.  Yes.

  2   Q  Do you recall making these statements that appear in the two

  3      paragraphs?

  4   A  Yes.

  5   Q  And did you authorize Larry Stickney or Protect Marriage

  6      Washington to post this statement in support of the reject

  7      R71 effort?

  8   A  Yes.

  9            MS. EGELER:  Mark this as Exhibit No. 3, please.

 10                         (Exhibit No. 3 marked.)

 11   Q  (By Ms. Egeler)  And this Exhibit No. 3, as it states at the

 12      bottom of the page, is from the [Redacted] and was

 13      printed on October 1st, today.  The article, however, was

 14      originally printed, as shown in the upper portion of the

 15      document, Saturday, May 16, 2009.

 16         Do you recall, Mr. [Redacted] speaking with the Seattle

 17      Times about gay marriage?

 18   A  I've spoken to the [Redacted] many times about gay

 19      marriage.

 20   Q  Do you recall this article?

 21   A  I think this article was [Redacted] with the [Redacted]

 22      [Redacted]

 23   Q  So you spoke with [Redacted] with the [Redacted]

 ██  █  I've spoken with [Redacted] many times.  I was just correcting

 25      she isn't the [Redacted]
```

EGELER (Redac ▮Redacted▮  10/1/10)

```
                                                          Page 21
```

1   Q   I understand.

2           So it looks like the ▮Redacted▮ ran an ▮Redacted▮

3   ▮Redacte▮ story?

4   A   Her story.

5   Q   When you've spoken to Rachel LaCorte about gay marriage, did

6       you do so with the assumption that your statements may be

7       published?

8   A   Yes.

9   Q   And to your knowledge, in addition to the ▮Redacted▮

10      have your statements regarding gay marriage or Referendum 71

11      appeared in any other newspaper publications?

12  A   Could you restate that?

13  Q   Do you recall whether you've been quoted in any other

14      newspaper regarding your position regarding gay marriage?

15  A   Yes, I have been.

16  Q   Do you recall which newspapers?

17  A   No.  Many.

18  Q   Do you recall any of the newspapers?

19  A   The ▮Redacte▮, the ▮Re▮.  I don't know.

20  Q   No others come to mind?

21  A   It's been a long time ago.  I don't know.

22  Q   Okay.

23  A   There was a lot of press on this.

24  Q   A lot of press that mentioned your name as well?

25  A   A lot of press.  I don't know how often I was mentioned.

EGELER (Redac Redacted    10/1/10)

```
                                                        Page 22

 1   Q   Do you recall speaking to any reporters, other than Redacted

 2       Redacted  , even if you don't recall their names?

 3   A   Yes.

 4   Q   Can you estimate for me how many reporters you spoke to

 5       about Referendum 71?

 6   A   No.

 7   Q   Do you know whether it was more than five?

 8   A   I don't recall.

 9   Q   Is it fair to say that you certainly didn't make any effort

10       to keep your opinion regarding Referendum 71 a secret?

11   A   Yeah, that's correct.

12   Q   And to the contrary, you were actually a spokesman regarding

13       Referendum 71.  Is that correct?

14   A   Yes.

15   Q   And I assume you signed the petition -- no, excuse me.  You

16       wouldn't have signed the petition because you're not a

17       Washington voter, correct?

18   A   Yes, that's correct.

19   Q   Did you gather signatures on petitions?

20   A   No, not personally.

21   Q   Did you send out petitions to others for them to collect

22       signatures?

23   A   I didn't.

24   Q   Did the Redacted                          send out petitions to

25       others?
```

EGELER (Redac Redacted   10/1/10)

```
                                                        Page 23

 1   A    Yes.

 2   Q    Do you know how many petitions were sent out by the Redacted ?

 3   A    I don't know how many.  Many.

 4   Q    More than 500?

 5   A    Oh, yes.

 6   Q    More than 2,000?

 7   A    Yes.

 8               MS. EGELER:  Mark this as Exhibit No. 4.

 9                         (Exhibit No. 4 marked.)

10   Q    (By Ms. Egeler)  And you have in front of you what's been

11        marked as Exhibit No. 4.  This was printed from the Redacte

12        and Redacted   site today.

13           Do you recognize this?

14   A    It appears to have been on our Web site.

15   Q    And do you see your name in the upper portion of the

16        document?

17   A    I do.

18   Q    Do you recall writing this?

19   A    I don't recall.

20   Q    Do you recall seeing it?

21   A    I don't recall seeing it.

22   Q    On the back page, do you see the signature at the bottom of

23        the page?

24   A    I do.

25   Q    Is that your signature?
```

EGELER (█Redac█ █Redacted█  10/1/10)

Page 24

1   A   Yes.

2   Q   Do you think this is an accurate indication that you wrote

3       this?

4   A   Probably.

5           MS. EGELER:  Mark this as Exhibit No. 5.

6               (Exhibit No. 5 marked.)

7   Q   (By Ms. Egeler)  And you have in front of you what's been

8       marked as Exhibit No. 5.  This, as reflected at the bottom

9       of the page, is from the █Redacted█ site, and the

10      print date of September 30, 2010, is marked in the lower

11      right-hand corner.  This is a two-page document.

12          Do you recognize this, Mr. █Redacted█

13  A   It appears from our Web site.

14  Q   Under paragraph 3, that appears to be a statement from you.

15      Can you please look at those two paragraphs and tell me

16      whether it indeed is a statement from you?

17  A   It appears to be.

18          MS. EGELER:  And Exhibit No. 6.

19              (Exhibit No. 6 marked.)

20  Q   (By Ms. Egeler)  And you have what's been marked as Exhibit

21      No. 6.  The Web page, again as shown on the lower left-hand

22      side, is from the █Redacted█ Web site, and the date

23      of the printing is in the lower right-hand corner, today's

24      date.

25          Do you recognize this page, Mr. █Redacted█

EGELER (Redac Redacted     10/1/10)

Page 25

1    A    I recognize the picture.

2    Q    And do you appear in that picture?

3    A    Yes.

4    Q    Do you recognize anyone else in that picture?

5    A    Yes.

6    Q    Who do you recognize?

7    A    Redacted

8         Redacted      I recognize all of them, but I don't recall their

9         names.

10   Q    When lobbying was done on -- regarding Senate Bill 5688, you

11        stated that there were discussions with some Washington

12        State legislators.

13             Do you recall speaking to Matt Shea regarding Senate

14        Bill 5688?

15   A    Yes.

16   Q    Do you recall speaking with Redacted    regarding Senate

17        Bill 5688?

18   A    Yes.

19   Q    In both instances, were those conversations in the context

20        of lobbying regarding Senate Bill 5688?

21   A    No.

22   Q    Can you tell me about the context of those discussions?

23   A    The context was just in passing and it wasn't -- they were

24        very much opposed to Senate Bill 5688 and did not need

25        lobbying.

EGELER (Redac Redacted    10/1/10)

Page 26

1    Q    Did you ever have any discussions with either of those

2         legislators regarding formation of a referendum?

3    A    I did not.

4    Q    Do you recall when this photo was taken?

5    A    Probably the day the petitions were turned in to the

6         Secretary of State's office.

7    Q    So the day that the petitions were turned in, did you assist

8         in that activity?

9    A    I was present, obviously.

10   Q    And from the looks of the picture, that was at the state

11        capitol.  Is that correct?

12   A    Yes.

13   Q    Do you recall if there were any media there?

14   A    I don't recall.  I don't think so.  I don't know.

15   Q    In the written portion above the picture, just directly

16        above, it states, "Referendum 71," correct?

17   A    Yes.

18   Q    And in the line above that, there's a bolded portion that's

19        underlined that says, "To make a donation, click here."

20             Was the Redacted                    accepting donations

21        for activity regarding Referendum 71?

22   A    Not at that point.

23   Q    Was it at any point?

24   A    I don't recall.

25   Q    You don't recall whether or not the Redacted

EGELER  (Redac   Redacted   10/1/10)

1      Network or its political action committee accepted donations

2      for support of Referendum 71?

3   A  That isn't what you asked.

4   Q  Okay.

5   A  That wasn't the question you asked previously.

6   Q  Do you recall whether the Redacted Political Action

7      Committee accepted donations for work on Referendum 71?

8   A  Yes.

9   Q  Can you tell me what the Redacted Political Action

10     Committee is?

11  A  Well, it's a continuing political action committee.

12  Q  Is it associated with the Redacted or Faith

13     and Freedom Redacted

14  A  Network.

15  Q  Yes, it's associated with the Network?

16  A  Yes.

17  Q  What's your association with the Redacted Political

18     Action Committee?

19  A  I'm the Redacted

20  Q  And the Redacted Political Action Committee did

21     actively solicit donations for work in promotion of

22     Referendum 71?

23  A  Yes.

24  Q  And do you recall how much the Redacted Political

25     Action Committee received in support of the Referendum 71?

EGELER (Redac Redacted    10/1/10)

```
                                                            Page 28

 1    A    No.  Not much, because we directed most of it to the

 2         referendum committee itself, Protect Washington Marriage --

 3         Protect Marriage Washington or whatever.

 4    Q    And by "directed," do you mean that the Redacted

 5         PAC accepted the money and then sent it on?

 6    A    We told people to give to the other because I was involved

 7         with that.

 8    Q    Did you also tell them to give directly to the Faith and

 9         Freedom Political Action Committee?

10    A    We raised some money.

11    Q    So in answer to my question --

12    A    Yes.

13    Q    -- yes, you did tell people to give directly to Redacted

14         Redacted as well?

15    A    Yes, Political Action Committee.

16    Q    And do you recall how much, roughly, was given to Redacted

17         Redacted Political Action Committee?

18    A    No.  Very little.

19    Q    Do you recall roughly how much Redacted Political

20         Action Committee spent in support of Referendum 71?

21    A    No, but it's a matter of record.

22    Q    Do you know if it was more than $500?

23    A    I would assume it is.

24    Q    Do you know if it was more than $10,000?

25    A    Not likely.  I don't know.
```

EGELER (Redacted) 10/1/10

```
                                                         Page 29
 1   Q    And did the [Redacted] Political Action Committee

 2        register with the Washington Public Disclosure Commission?

 3   A    Yes.

 4   Q    Did it regularly file reports with the Public Disclosure

 5        Commission?

 6   A    Yes.

 7                                 (Exhibit No. 7 marked.)

 8   Q    And you have in front of you now what's been marked as

 9        Exhibit No. 7 to your deposition and is reflected at the

10        bottom of the page, this is a page that I printed from the

11        Public Disclosure Commission's Web site.  The date of that

12        printing is reflected in the lower right-hand corner.

13             Do you see on that page any expenditures that were made

14        by the [Redacted] PAC to support Referendum 71?

15   A    I don't understand your question.

16   Q    Let me walk through line by line.  The first entry there, it

17        states under name, [Redacted]

18             Do you see that?

19   A    I do.

20   Q    There's an amount of $1,544.

21   A    Yes.

22   Q    And over in the right-hand column, under description, it

23        states, "[Redacted]

24   A    Yes.

25   Q    Can you describe for me what that was, the F&F PAC share of
```

EGELER  (█Redac█ █Redacted█  10/1/10)

```
                                                      Page 30

 1        printing flyer?

 2   A    I don't recall.  I assume it was for printing some of the

 3        materials that were put out on the referendum.

 4   Q    So that was money that the █Redacted█ PAC sent to the

 5        Protect Marriage Washington organization?

 6   A    Apparently.  I don't -- I don't even sign checks for the

 7        PAC.  Colleen Morse manages the PAC.

 8   Q    Okay.

 9   A    And all of the records are with, as you knew when you asked

10        me, with the PDC.  And whatever is there is what we

11        presented to them, what she has presented to them as the

12        manager of the PAC.

13   Q    And I understand that she would do the actual filing.  Is

14        that correct?

15   A    Yes.  She manages the PAC completely.

16   Q    As the █Redacted█ of the PAC, do you have responsibility for

17        management of the funds?

18   A    Legal responsibility?

19   Q    Yes.

20   A    I don't know.  Probably.  I don't know.

21   Q    And do you --

22   A    Because she's very competent.  We've never had a question

23        about any of it until now.

24   Q    Is she authorized to expend funds without any authorization

25        from you?
```

EGELER ( Redac Redacted   10/1/10)

Page 31

```
 1   A    No.

 2   Q    So when funds are spent, do you authorize that?

 3   A    Yes.

 4             MR. PIDGEON:  Again, I'm going to object to this

 5        line of questioning.  I thought this was a deposition about

 6        threats and harassment associated with R71.  It appears that

 7        it's an in-depth exam of the records of the PAC, rather than

 8        whether or not there's threats of harassment.  I don't even

 9        know how this is related to threats, harassment, or

10        intimidation in any way related to R71.

11             MS. EGELER:  I'll respond generally with respect

12        to all of these relevance questions.  It's very clearly

13        relevant to address  Redacted    extremely public

14        involvement with Referendum 71 that relates directly to any

15        harassment or threats that may have been received and the

16        contrast between what Mr.  Redacted   may have experienced as

17        opposed to those who simply signed the initiative.

18             MR. HAMILTON:  I'll just interject, not to wade

19        into the particular dispute, but to note, this is a federal

20        action.  The only objections that are appropriate are as to

21        the form of the question or to protect a privilege.

22        Speaking objections are absolutely inappropriate, so I would

23        just advise Counsel to just state your objection briefly for

24        the record, and argument isn't appropriate.

25             MR. PIDGEON:  Okay.  I'll abide by that, and with
```

EGELER (Redac Redacted   10/1/10)

Page 32

```
 1       that, I'm going to object as to the form of the question.
 2   Q   (By Ms. Egeler)  The fourth line down, looking still at
 3       Exhibit No. 7, are you with me?
 4   A   Yes.
 5   Q   In the description of that line item, it states,
 6       "Website" -- it looks like an abbreviation for --
 7       "management for Ref 71."
 8           Do you know what that would be for?
 9   A   Yes.
10   Q   Can you describe that for me?
11   A   It was for the fee for the woman who manages our Web site
12       because we used it nearly exclusively -- not exclusively,
13       but nearly so, for the referendum -- for the PAC, I'm sorry,
14       which was addressing the referendum.
15   Q   So would that Web site have been the Redacted
16       Network Web site?
17   A   It would have been -- yes.  It would have been the Redacted
18       Redacted Web site dedicated to the PAC, and the PAC
19       was paying for it during that period of time, as I've been
20       instructed --
21   Q   So --
22   A   -- by the IRS.
23   Q   Just to make sure I understand you, did you state that in
24       2009 that Web site was used almost exclusively to address
25       Referendum 71?
```

EGELER (Redac Redacted  10/1/10)

Page 33

1   A    I did not say that.  I said there was a period of time

2        during the petition gathering that it was used primarily for

3        that, not exclusively.

4   Q    Okay.

5   A    It was reimbursed from the PAC, the Redacted

6   Q    And so it was used primarily to promote Referendum 71

7        petition gathering, correct?

8   A    During a very short and defined period of time.

9   Q    Do you know what that short and defined period of time was?

10  A    I don't recall now.

11  Q    Would it be the time period between the filing of the

12       Referendum with the Secretary of State and the submission of

13       the signatures to the Secretary of State?

14  A    It would have been from maybe June to October.

15  Q    Of 2009?

16  A    Um-hmm, probably.

17  Q    The seventh line, pretty much in the middle of the box,

18       states, "Steven Pidgeon."

19           Do you see that?

20  A    Yes.

21  Q    Looking to the description, it says, "Legal fees

22       Referendum 71."

23  A    Yes.

24  Q    Can you describe that for me?

25  A    Steve Pidgeon did a lot of pro bono work for the

EGELER (Redac Redacted  10/1/10)

Page 34

1      Referendum 71.  Our PAC and others that were involved tried

2      to help a little bit with his expenses, and that was a check

3      in that regard.

4    Q  Were those legal services with respect to the Doe v. Reed

5      case?

6    A  Yes -- no.

7    Q  No?

8    A  No.  Let me correct that.  That was -- I don't recall.

9    Q  But you do recall it wasn't with respect to the Doe v. Reed

10     case?

11   A  I don't recall specifically what it was from because he

12     worked from the beginning a lot of pro bono on the petition,

13     and at some point, the decision was made to file the Doe

14     v. Reed case.  I don't know what date that was, and I don't

15     know how that matches with this date, so I couldn't give you

16     an honest answer on that.  I don't recall.

17   Q  But those expenses would have been related to services

18     regarding Referendum 71?

19   A  Yes.

20   Q  And looking two more lines down, it says an expense of $900,

21     and in the description box, it says, "Web site management

22     for Internet promotion of Ref 71."

23         Do you see that?

24   A  Yes.

25   Q  Can you describe that expenditure for me?

EGELER (▇Redac▇ ▇Redacted▇  10/1/10)

Page 35

1   A   I don't recall.

2   Q   Do you know whether that would have been the ▇Redacted▇

3       ▇Redacted▇ associated Web site?

4   A   I don't recall.

5   Q   And the fourth line from the bottom, the name there is

6       ▇Redacted▇ --

7   A   Yes.

8   Q   -- ▇Redacted▇ and in the description box it says, "Reimb postage

9       for Ref 71 materials."

10          Do you see that?

11  A   Yes.

12  Q   Can you describe that expenditure?

13  A   Reimbursement for postage for R71 materials.

14  Q   So was the ▇Redacted▇ PAC sending Ref 71 materials

15      directly or would it have been reimbursing another group for

16      its sending of materials?

17  A   I don't understand the question.

18  Q   Can you describe for me what that expenditure was?

19  A   It was reimbursement of postage for R71 materials.

20  Q   And it was a reimbursement of ▇Redacted▇?

21  A   Yes.

22  Q   Who is ▇Redacted▇?

23  A   He's a pastor.

24  Q   A pastor in Olympia?

25  A   Yes.  I think he's actually in Chehalis or Centralia now in

EGELER (Redac Redacted   10/1/10)

Page 36

```
 1      a church.
 2   Q  So would Redacted        have sent out Ref 71 materials
 3      and you were giving --
 4   A  As a volunteer, yes.  We were reimbursing his expenses for
 5      postage.
 6   Q  Did you speak at any rallies regarding Referendum 71?
 7   A  Yes.
 8   Q  Can you tell me about that?
 9   A  I made a few comments on the steps of the capitol at a
10      rally.
11   Q  Do you remember roughly when that was?
12   A  No.
13   Q  Was it during the time that signatures were being gathered?
14   A  I don't recall the time of the rally in relation to the
15      petition.  The governor didn't act for a long period of
16      time, so there was no real action on the petition until she
17      acted.  I don't recall how that matched up with her
18      schedule.
19   Q  Do you recall the nature of your comments?
20   A  Yeah.
21   Q  Can you tell me about that?
22   A  Just talked about Judeo-Christian values and it's -- talked
23      about the importance of them in a healthy society.
24   Q  Specifically, did you talk about those values as they relate
25      to gay marriage?
```

EGELER (Redac Redacted  10/1/10)

1   A   I don't recall.

2   Q   So you may have just talked generally about Judeo-Christian

3       values without referencing gay marriage?

4   A   I don't recall how -- what I referenced.

5   Q   What was the --

6   A   I was one of many speakers.

7   Q   What was the subject matter of that rally?

8   A   I think it was called Standing for Marriage, I believe.  I

9       don't recall.  I believe it was called Standing for

10      Marriage.

11  Q   Do you think it's possible you spoke without mentioning

12      marriage?

13  A   Not likely.

14  Q   Do you think it's possible you spoke without mentioning

15      homosexuality?

16  A   That would be possible, but I don't know.  I don't know what

17      I said in that.  It's been more than a year ago.

18  Q   Do you think that would be highly unlikely you didn't

19      mention it?

20  A   I wouldn't speculate.

21  Q   Did you speak at any other rallies?

22  A   I spoke at one in Spokane.

23  Q   Do you remember roughly when that was?

24  A   I don't.

25  Q   Was it hot out?

EGELER ( Redac Redacted     10/1/10)

Page 38

1   A   I don't know if it was hot out or not.  It was during the

2       period of time of R71.  I don't know.

3   Q   And what was the subject matter of that rally?

4   A   It was a Protect Marriage rally, so I probably talked about

5       the value of natural marriage.

6   Q   What's natural marriage?

7   A   Well, DOMA.

8   Q   Can you state what DOMA is?

9   A   Marriage is between one man and one woman.

10  Q   Would you have said or -- excuse me.  Did you say anything

11      regarding marriage between persons of the same sex?

12  A   I don't recall.

13  Q   And was that discussed at all at the rally by anyone?

14  A   I don't recall.

15  Q   Do you recall anyone else who spoke at that rally?

16  A   Larry Stickney did.

17  Q   Do you know roughly how many were in attendance?

18  A   I don't recall.

19  Q   Do you think it was more than five people?

20  A   Yes.

21  Q   Do you think it was more than 100?

22  A   Yes.

23  Q   Do you think it was more than 500?

24  A   I don't know.

25  Q   Do you think it was more than 200?

EGELER (Redacted) 10/1/10

Page 39

```
 1   A   I really -- I don't know.  I don't remember.

 2   Q   And the rally in Olympia on the steps of the capitol, do you

 3       recall whether members of the public attended that?

 4   A   Did members of the public attend that?

 5   Q   Yes.

 6   A   Yes.

 7   Q   Do you recall roughly how many people were in attendance?

 8   A   Yes.

 9   Q   How many?

10   A   2,400, according to the state patrol estimate.

11   Q   Do you recall any other speakers at that rally?

12   A   Well, I've already stated I was one of many.  Stickney.

13       There were pastors, Redacted .  I don't recall the

14       list.  It was long.  There were many.

15   Q   So we discussed a rally in Spokane and one on the steps of

16       the state capitol.  Do you recall any other rallies

17       regarding R71?

18   A   I don't recall any more.

19   Q   Did you attend any public debates?

20   A   I don't recall that I did.

21   Q   Did you speak to any television reporters regarding

22       Referendum 71?

23   A   Yes.

24   Q   Do you recall what station?

25   A   No, probably -- no.
```

Dixie Cattell & Associates (360) 352-2506

EGELER (████ ████████  10/1/10)

```
                                                        Page 40

  1   Q   Do you know if you were shown on TV?

  2   A   I believe so.  I know there was one piece that ████████ did on

  3       John Bisceglia advocating that Larry Stickney and myself be

  4       killed.

  5   Q   KIRO was advocating that --

  6   A   God help us.

  7   Q   -- or John?

  8   A   John Bisceglia was advocating that Larry Stickney and █████

  9       ████████ be killed.

 10   Q   Okay.

 11   A   And so KIRO 7 ran a story on that because they interviewed

 12       me.

 13   Q   Can you tell me who John Bisceglia is?

 14   A   I would like to.  The pieces I gave you that we couldn't

 15       discuss is in there, and I would like to get that on the

 16       record.  I would like to talk about it.

 17   Q   Is there any reason we can't discuss that?

 18   A   Absolutely.  Right now?

 19   Q   Yeah.  I would like to turn now to any of -- well, actually,

 20       let's wait a moment more.

 21           Did you have any other, other than KIRO 7, any other

 22       television interviews regarding Referendum 71?

 23   A   Yes.

 24   Q   Can you tell me about that?

 25   A   I don't recall.  There were many.
```

EGELER (Redac Redacted   10/1/10)

Page 41

1    Q    Many.  Okay.

2         Did you participate at all in the oversight of the

3    signature checking at the Secretary of State's office?

4    A    Could you restate the question?

5    Q    The signatures on the petitions were examined by the

6    Washington State's Secretary of State.  Are you aware of

7    that?

8    A    Yes.

9    Q    Did you go to the Secretary of State's office at any time

10   during that signature checking process?

11   A    Did I go to or oversee?  You said oversee previously.

12   Q    Did you oversee?

13   A    No.

14   Q    Did you go to the Secretary of State's office during that

15   process?

16   A    Yes.

17   Q    Were you present in the room at any time when signatures

18   were being checked?

19   A    Yes.

20   Q    And were there press in that room as well?

21   A    I don't recall.

22   Q    Did you speak on the radio regarding Referendum 71 at any

23   point?

24   A    Yes.

25   Q    Can you tell me about that?

EGELER (Redac Redacted   10/1/10)

Page 42

1   A   They were soundbites.  I don't -- I don't recall what
2       stations.
3   Q   Do you recall whether you ever spoke on the Christian News
4       Network regarding Referendum 71?
5   A   The Christian News Network?
6   Q   I may not have stated that correctly.
7   A   I'm not aware, yeah.  No.  I'm not aware of a Christian News
8       Network, so no.
9   Q   Are you aware of speaking on any Christian media outlets --
10  A   Yes.
11  Q   -- regarding Referendum 71?
12  A   (Witness nods head.)
13  Q   "Yes"?
14  A   Yes.
15  Q   Can you tell me about what that was?
16  A   Well, they called and I talked to them about it and said
17      what I believed about marriage as an institution that needs
18      to be protected.
19  Q   Who was it that called?
20  A   Well, there were a lot of them.  I honestly don't know.  I
21      mean, many.  As far as Christian, there are only so many
22      Christian stations, so probably was the Salem stations,
23      Salem owned, Salem Broadcasting.
24  Q   Are those television or radio?
25  A   They're radio.

EGELER (█Redac█ █Redacted█   10/1/10)

Page 43

```
 1   Q    So you would have spoken on the air?

 2   A    Probably.  I was on the phone.  I assumed I was on the air.

 3        I don't know.

 4   Q    So let's talk about any threats or harassment you feel you

 5        suffered as a result of your involvement with Referendum 71.

 6        Would it be easiest if we go through the exhibits that

 7        you've brought?

 8   A    Yeah, that would be great.  I would like to go through that

 9        with you.  And, you know, I brought -- I only brought the

10        one for you, so could I reference that and then I'll give it

11        back to you?

12   Q    You know what I think would be easiest if we go off the

13        record and make some copies.

14   A    Super.  That would be great.  I appreciate it.

15                              (Recessed at 9:58 a.m.)

16                              (Exhibit Nos. 8 & 9 marked.)

17                              (Reconvened at 10:06 a.m.)

18   Q    (By Ms. Egeler)  We've got Exhibits 8 and 9, and so, as

19        you point to things, if you want to say, "This says," if

20        you could indicate what exhibit you're looking at.

21   A    I'm sorry.  I didn't note which is.

22   Q    The note that begins at the top, "So what are we to do," is

23        Exhibit 8.

24   A    8, okay.

25   Q    The one that starts, █Redacted█ is 9.
```

EGELER ( Redac Redacted   10/1/10)

Page 44

```
 1   A   9.

 2   Q   What it might be helpful to do, before we discuss the

 3       details of them, is to have you describe what each of these

 4       exhibits are.  If you want to start with Exhibit No. 8, if

 5       you could tell me what that is.

 6   A   Okay.  Are we on now?

 7   Q   We are on.

 8   A   Exhibit 8 is one of two examples that I took from the

 9       Internet just, I believe, yesterday, the date that I pulled

10       these.  Actually it was Monday, I guess, the 27th.  There's

11       two examples of pages of Google or Bing about me, about

12       Redacted           and that are attack.

13   Q   I don't understand what Exhibit No. 8 is.  I don't see a Web

14       site listed on this.  Is this a printing from a Web site?

15   A   It is a printing from a Web site.

16   Q   It was printed when?

17   A   It was printed Monday, the 27 -- September 27th.

18   Q   What is the Web site?

19   A   It's John Bisceglia and his name is on the first page of the

20       8.

21   Q   But what's the Web site?

22              THE WITNESS:  What's the name of his Web site?  I

23       don't know.

24   Q   (By Ms. Egeler)  You don't know what Web site this came

25       from?
```

EGELER (Redac Redacted    10/1/10)

Page 45

1    A    I don't know the name of it.  I didn't realize that I should

2         have brought the whole Web site.  I brought his most recent

3         advocating for death.

4    Q    Did you copy things from a Web site and put them --

5    A    Yes.

6    Q    -- in another document and then print?

7    A    No.  I just printed them off his Web site.

8    Q    Okay.  I'm --

9    A    Directly to the printer.

10   Q    Because there's no Web site listed at the bottom of the

11        page, but you're representing that John Bisceglia has a Web

12        page?

13   A    Yes.

14   Q    And you did not alter in any way what appears there by

15        deleting some of it, including other parts?

16   A    I did not, no.

17   Q    So you just pressed print and this is what came out?

18   A    Yeah, that's correct.  I apologize for not getting -- I was

19        trying to save a little paper.

20             8, No. 8, is -- there's a list of people there:

21        Senator John McCain, Tony Perkins.  These are national

22        people.  Larry Stickney, Redac Redacted    Stephen Pidgeon, Red

23        Redacted                , Senator Dan Swecker,

24        Representative Matt Shea.

25   Q    It's okay.  You don't need to read them off.  This will be

EGELER (Redac Redacted 10/1/10)

Page 46

1    in the record, so all of these names will be there.

2         What is your concern?

3  A  Okay.  The title of -- well, he's advocating that someone

4     kill us.

5  Q  Where is that stated?

6  A  On the next page and throughout the Web site, he states that

7     we are trying to hurt him and his children and other

8     people's children of -- that are gay.

9         And he said on page 2 -- and this is just recent.  You

10    can go back years on this -- "Now just try to tell me that

11    we don't have serious reasons to defend ourselves and our

12    children and maybe your children also of all sexual

13    orientations from the hate speech spewed from Christian

14    mouths."

15        So how does he suggest that they protect themselves?

16 Q  Can you show me where you're reading that?  I'm not tracking

17    you.

18 A  Page 2.

19 Q  So is that the back of the first page?  Correct?

20 A  No.  I'm sorry.  It's the -- it would be page 3 --

21 Q  So --

22 A  -- the way this is copied.

23 Q  So at the --

24 A  No, the middle, middle of page 3.

25 Q  But just to identify what page we're on, at the very top

EGELER (Redac Redacted 10/1/10)

Page 47

1    there, it's got in parens 44.6 percent?

2  A    Yes.

3  Q    Are we on the same page?

4  A    Yes, that's correct.

5  Q    So where on the page did you want me to look?

6  A    Right in the middle, the bold type, "Now to just try to tell

7    me that we don't have serious reasons to defend ourselves

8    and our children and maybe your children also of all sexual

9    orientations from the hate speech spewed from Christian

10    mouths."

11        This is -- on the last page of this is --

12  Q    Can we stay with this page and the piece that you just

13    identified?  Can you explain to me what your concern is with

14    this?

15  A    Well, my concern is that there's a continued advocacy or

16    violence on the part of this man.

17  Q    I see the piece that you've just read about defending

18    ourselves.  Can you show me where there's an advocacy for

19    attacking or killing someone?

20  A    On the previous page, it says, "You see," and there's a

21    check beside it --

22  Q    Right.

23  A    -- would be the back of page 1 per the copies you just made.

24    "You see, I get very angry and feel an intense need to

25    defend innocent people from harm's way when I read about the

EGELER (Redac Redacted 10/1/10)

Page 48

1   family tragedies below. Knowing that they are a direct

2   result of the ignorance, lies, misinformation, bigotry,

3   pure-evil hatred of LGBTQ people is promoted daily by many

4   Christian groups. I feel an intense need to defend innocent

5   life from these assaults. As a child advocate and early-

6   childhood teacher, I especially feel compelled to protect

7   children."

8   Q   Yes. And what is your concern with that paragraph that you

9       just read in?

10  A   The list on the previous page, the first page, says, "Here

11      is a list of people whose mere existence is a serious threat

12      to our safety." The fact that we exist is the threat.

13  Q   Okay.

14  A   The last page that I copied here and there's -- there is

15      reams.

16  Q   Let's stop. Let's stop. I just asked you about the

17      paragraph that appears on the back of page 1. You read in a

18      paragraph that begins, "You see, I get very angry and feel

19      an intense need to defend innocent people," et cetera,

20      et cetera.

21          Please explain to me how you feel that that is a threat

22      or harassment.

23  A   Because he's advocating using a gun on his Web site.

24  Q   Please show me where he advocates using a --

25  A   That's what I was doing.

EGELER (Redac Redacted   10/1/10)

Page 49

1   Q   Okay.

2   A   The last page, there's a picture and it's very prominent on

3       his Web site, "The abuse needs to stop.  Now.  Armed gays

4       don't get bashed.  Pinkpistols.org."

5   Q   And where does it advocate using guns on people and killing

6       them as opposed to defending one's self from attack?

7   A   I'm suggesting that listing a list of names who are

8       pro-marriage, talking about the violence that these people,

9       myself included, are perpetrating upon the gay community and

10      advocating that abuse stops -- needs to stop now and the

11      picture of a gun held in the hands of an individual is

12      suggesting violence against this list, and that's exactly

13      what he's doing.

14  Q   Mr. Redacted  do you belong to the NRA?

15  A   I do not.  I resigned.

16  Q   Do you support individuals' rights to bear arms?

17  A   I do.

18  Q   Do you support the right of individuals to defend themselves

19      if attacked?

20  A   I do.

21  Q   Does that mean that you support assertively going up to

22      people that you don't agree with who have not physically

23      attacked you, and rather than defending yourself,

24      aggressively killing them?

25  A   You'll have to restate that question.

EGELER (Redac Redacted   10/1/10)

Page 50

1   Q   I thought it was an easy one.

2   A   I didn't realize I was on trial.

3   Q   Do you believe that individuals have a right to bear arms to

4       defend themselves --

5   A   Yes.

6   Q   -- or to -- do you feel that individuals, therefore, also

7       have a right to bear arms to attack others who have not

8       physically attacked them?

9   A   No.

10  Q   Can you please show me in this document, Exhibit No. 8,

11      where this individual asserts that it would be appropriate

12      to assertively attack someone as opposed to defending one's

13      self?

14  A   There is a very easy, if one wants to make that

15      assumption --

16  Q   I'm not asking for assumptions.

17  A   -- easy transition --

18  Q   Sir, I'm asking you to show me the words that assert that an

19      assertive attack would be appropriate as opposed to

20      defending ones' self.

21  A   The whole Web site is hate.

22  Q   I'm asking you --

23  A   It is not on the page -- he does not advocate pulling the

24      trigger on Redac Redacted   on these pages.

25  Q   Where in this document does he advocate pulling the trigger

EGELER (Redacted)   10/1/10

Page 51

1          on anyone who has not attacked physically innocent people?

2     A    He does not.

3     Q    Thank you.

4          Can you describe for me what Exhibit No. 9 is?

5     A    This is a Web site that was apparently set up as a mock to

6          mock faith-based or traditional value-based organizations.

7          They define themselves as Faith Not Freedom News.

8     Q    And that's the Web site that appears at the bottom left-hand

9          corner of what you've printed.  Is that correct?

10    A    Yes.

11    Q    And the date that you printed it, is that reflected in the

12         bottom right-hand corner?

13    A    Yes.

14    Q    Okay.

15    A    "Faith Not Freedom is an organization dedicated to

16         supporting the work of Washington State theocrats, most

17         notably Redacted et cetera.  They --

18         page 2 -- 3.

19    Q    And because what I copied for us in the original are a bit

20         different --

21    A    Yes.

22    Q    -- and our copies are two-sided, let's identify the page

23         you're on.  Is that the one at the top that says, "Pam's

24         Blend" --

25    A    "Pam's Blend of Perversion Tries to Out Our Agenda."

EGELER (█Redac█ █Redacted█  10/1/10)

Page 52

1  Q  Okay.

2  A  Keep in mind that these people are speaking in a mockery

3     position, okay, as though they agree with █Redacted█

4     and █Redac█ █Redacted█  "It should be of no surprise that the

5     radical lesbian, Pam Spaulding tries to out my hero, █Redac█

6     █Redacted█  I'm not their hero.

7        They quote Pam Spaulding here as saying, "From

8     █Redacted█ point of view, if I disagree with someone who says

9     that I should be executed because I'm gay, then somehow I'm

10    being intolerant of that person's religion.  The kind of

11    tolerance █Redacted█ is looking for leads to violence.  Should

12    I condone my own execution?  █Redacted█ apparently thinks so.

13    █Redacted█ sickeningly ended his post with a plea for

14    donations to what he calls this ministry.  He is using his

15    authority as a Christian minister to broadcast to the world

16    his certainty that I and every other gay person deserve

17    death.  When we" -- "when will the press and general society

18    stop giving people like █Redacted█ a pass because he calls

19    himself a Christian and a pastor and uses nice words like

20    'faith.'  Let's recognize his words for what they are:  a

21    condoning of lethal violence against gay people."

22       Now, there -- surely we can make a linkage because

23    these people are all reading these sites.  Surely we can

24    make a linkage between Pam Spaulding saying and being

25    requoted on this mock site that █Redac█ █Redacted█ is advocating

EGELER  (▮▮▮▮ ▮▮▮▮▮▮▮▮▮ )   10/1/10)

Page 53

```
 1        lethal violence against gay people.  That is a lie and that

 2        is slander, I am certain.  I'm certain it is and we'll find

 3        out about that.

 4             But I will tell you that, with those kinds of words

 5        being fed into the community, you have to create some kind

 6        of linkage between what these people are saying and what

 7        Bisceglia is saying and has said, and he did directly say

 8        that Larry Stickney, ▮▮▮▮ ▮▮▮▮▮▮▮▮ any churches and

 9        government buildings that are involved in supporting Senate

10        Bill 5688 should be destroyed.  He's scrubbed that from his

11        Web site, but KIRO caught it before he scrubbed it and they

12        ran a story about it.

13   Q    Wait.  He said what now?  Can you repeat that?

14   A    There should be linkage because these people are all

15        communicating with one another.  They're all aware of each

16        other.

17   Q    My question is:  What did Bisceglia say that you claim was

18        scrubbed from his Web site?

19   A    John Bisceglia put on his Web site -- I saw it.  I did not

20        copy it.  KIRO 7 saw it and reported on it.  He said that

21        ▮▮▮▮ ▮▮▮▮▮▮▮▮ Larry Stickney should be killed, and that

22        church buildings and government buildings that were involved

23        with or supportive of the R71 effort should be destroyed.

24        That's why KIRO news picked it up, KIRO 7, not the radio,

25        and reported on it.
```

EGELER ( Redac Redacted    10/1/10)

Page 54

1   Q   Do you remember those words --

2   A   He scrubbed it.

3   Q   -- exactly or are you guessing?

4   A   Well, I'm not guessing.  I remember it because, when people

5       advocate that I get killed, that tends to stick in your

6       mind.  Is it an exact quote?  I don't know.  He scrubbed the

7       site.

8   Q   When was it posted on his Web site?

9   A   I don't know.  But KIRO, especially if there's a legal

10      action taken, we can get the information from KIRO because

11      they ran the story because they called me about it and

12      interviewed me.

13  Q   When did you see it on his Web site?

14  A   When he put it up.

15  Q   When was that?

16  A   I don't remember the date.  I don't know, Anne.

17  Q   So you don't remember when you saw it, but you're certain of

18      the words?

19  A   Absolutely.

20  Q   So you can -- you're saying under oath now that --

21  A   Back then I didn't know it would be on trial now over this

22      having to recall that.  And I'm not out to get anybody.  If

23      I was out to get someone, I would have put out in the press

24      a long time ago that Senator Murray's foster son accuses him

25      of abusing him when he was a little boy.  I would have put

EGELER  (Redac Redacted   10/1/10)

Page 55

```
 1        that out in the news, and I haven't done it.
 2   Q    I'm asking you --
 3   A    I'm not trying to hurt gays.  I've never had a problem
 4        with -- as a pastor, I've reached out to gays.  I've helped
 5        them over the years when I was pastor in North Hollywood,
 6        when I was a pastor in Portland, and even when I was a
 7        pastor here in Bellevue 40 years ago.
 8   Q    I'm not asking you --
 9   A    I'm not trying to hurt anyone.
10   Q    -- if you want to hurt anyone.  I'm asking you:  Do you
11        remember, and can you state under oath, that the words that
12        you told me appeared on that Web site are exactly the words?
13   A    No.  I can't say under oath they were exactly, but that was
14        the message.  KIRO got the message.  Anyone who's not blind
15        by their bias will get the message:  kill Redacted kill
16        Stickney.  They got it.
17   Q    And Exhibit No. 8, which you stated came from Bisceglia's
18        Web page, do you know when this information was posted on
19        his Web page?
20   A    It was -- the list of John McCain, Tony Perkins, Redac
21        Redacted Stephen Pidgeon, et cetera, looks like it was
22        posted at 9:37 a.m. on a certain day.  I'm -- I don't know
23        that he'll hear of this deposition today and get it scrubbed
24        by this afternoon, but anyone can go on there and check it
25        out.
```

EGELER (Redac Redacted   10/1/10)

Page 56

1   Q   Do you know the date this material in Exhibit No. 8 was

2       posted by him?

3   A   I don't have -- I don't have access to what he does on

4       certain days.  All I know is, you go on his Web site --

5   Q   So is the answer no?

6   A   You go on his Web site, this is what you get.

7   Q   Is your answer --

8   A   This is a recent post.

9   Q   Is your answer, no, you do not know when this information

10      was posted?

11  A   I know that it was very recent.

12  Q   How recent?

13  A   I don't know the date, but it was very recent.

14  Q   I need a range.  Approximately when?  What does "very

15      recent" mean to you?

16  A   During the month of September.  Because September 18, 2010,

17      is referenced on his -- right here on the first page.

18  Q   On the first page?

19  A   Yeah.  That list is above that, so it looks like to me it

20      was sent September 18th.

21  Q   The material in Exhibit No. 9, when was this posted?

22  A   Well, the first page is an idea of their organization.  The

23      other, I don't know when it was posted.  It looks like maybe

24      March.

25  Q   Does anything in Exhibit 9 reference Referendum 71?

EGELER (█Redac█ █Redacted█   10/1/10)

Page 57

1    A    No.

2    Q    Does anything in Exhibit 8 reference Referendum 71?

3    A    No.

4    Q    Do you know John Bisceglia?

5    A    No.

6    Q    Do you know what his practices are with respect to reading

7         Web pages?

8    A    No.

9    Q    So you don't know whether or not he read this Faith Not

10        Freedom material in Exhibit No. 9?

11   A    No.  I know there's a lot of communication in the gay

12        community.

13   Q    How do you know that?

14   A    I've been told that.

15   Q    By whom?

16   A    People.

17   Q    By whom?

18   A    I don't recall who, but a lot of communication.  They know

19        what's going on.  Any community that is driven by a single

20        or -- single belief or a single item is -- communicates.

21        It's normal.

22   Q    It's normal.

23             So do you know everybody who's communicated about

24        Referendum 71?

25   A    No.

EGELER  (Redac Redacted   10/1/10)

Page 58

1   Q   Do you know everything they've said?

2   A   No.

3   Q   So is this abnormal, that you wouldn't know everything

4       that's said and everyone who said it?

5               MR. PIDGEON:  Objection as to form.

6   Q   (By Ms. Egeler)  You can go ahead and answer.

7   A   What's the question?

8   Q   Is this abnormal, that you wouldn't know everyone in the

9       Referendum 71 effort and what they've said?

10  A   No.

11  Q   So isn't it possible as well that, in the gay community, not

12      every gay person knows each other in the state?

13  A   I didn't say, for the record, that all gay people knew

14      everybody in the state that was gay.  I said there's a lot

15      of communication within the gay community.

16  Q   Isn't it possible that some gay people put things on the

17      Internet that other gay people in the state do not see?

18  A   Anything is possible.

19  Q   Have you ever publicly discussed the position of another

20      religion with respect to homosexuality?

21  A   A specific religion?

22  Q   Yes.

23  A   No.

24  Q   Have you ever talked about the position of Islam with

25      respect to homosexuality?

EGELER ( Redac Redacted    10/1/10)

Page 59

1   A   Not that I recall, I haven't.  I know what their position

2       is, but I don't recall that I've ever discussed it openly --

3       publicly.

4   Q   Do you know, looking at Exhibit No. 8, what expression you

5       may have publicly made that may have caused this response?

6               MR. PIDGEON:  Objection as to the form of the

7       question.

8   Q   (By Ms. Egeler)  You can go ahead and answer.

9   A   I believe that my beliefs are in opposition to their

10      beliefs, and if one does not support the gay agenda, one is

11      a bigot and they have labeled me as a bigot.  I am not.

12  Q   Are you aware of any discussion that took place on the

13      Internet, in which you were involved, which discussed

14      execution in some Islamic countries of homosexuals?

15  A   You better do the question again.

16  Q   Are you aware of ever publicly referring to Islamic religion

17      or any religion executing people for engaging in homosexual

18      acts?

19  A   I don't believe I've ever made that statement, although it

20      is true they do.

21  Q   Have you ever publicly discussed anyone else's reference to

22      execution of homosexuals?

23  A   Not that I recall.

24  Q   In addition to the materials in Exhibits 8 and 9, have you

25      experienced anything else that you would consider harassment

EGELER (Redac Redacted  10/1/10)

Page 60

1    or threats as a result of your involvement with

2    Referendum 71?

3  A  There is a river of advocating against me personally on the

4    Internet.

5  Q  Do you have anything specific that you would like to

6    discuss?

7  A  No.

8  Q  When did you first see -- excuse me.  Exhibit No. 8, is the

9    exhibit you said you saw recently?

10 A  Both Exhibit 8 and Exhibit 9 were copied off the Internet on

11   September 27th.

12 Q  Was that the first date that you saw those?

13 A  No.

14 Q  What was the first date that you saw Exhibit 8?

15 A  I don't recall.

16 Q  Is that the exhibit that you said you saw extremely

17   recently?

18 A  I saw it on September 27th.  I copied it.

19 Q  Did you see it before then?

20 A  I don't recall if I did.  I don't -- I try not to spend a

21   lot of time on those Web sites.  It's a little depressing.

22 Q  On September 27th, is that the -- yeah.  September 27th, did

23   you contact the police or any other law enforcement about

24   the material in Exhibit No. 8?

25 A  No.

EGELER  (Redac Redacted  10/1/10)

Page 61

1   Q   Why not?

2   A   I wasn't thinking about my own protection.  I was thinking

3       about trying to make a reasonable expression of the kind of

4       slander and violent advocacy that's made toward me on an

5       ongoing daily basis.

6   Q   And you feel Exhibit No. 8 is violent advocacy, correct?

7   A   I think it's a part of that.  It's all linked, and I was

8       trying to make the linkage.  And I was denied that by you,

9       but there is linkage there and violence will happen at some

10      point.  I'm certain of that.

11  Q   If you do feel violence will happen at some point, are you

12      now going to contact the police about Exhibit No. 8?

13  A   I don't know.  There's so much evidence of advocacy towards

14      violence on the part of some of the gay activists, not all,

15      but some, I don't know if I will contact the police or not.

16  Q   Why wouldn't you?  What causes your uncertainty?

17  A   I don't know that that would be the best evidence to give

18      them.  It was recent evidence.  I inadvertently and naively

19      thought that this deposition today was about whether the

20      names of the people who signed Referendum 71 should be

21      released.

22  Q   And I'm asking you:  For what reason would you consider not

23      contacting the police about the contents of Exhibit No. 8?

24  A   And I answered that question.

25  Q   Why would you -- why would you not contact the police?  I

EGELER   (Redac Redacted   10/1/10)

Page 62

1          haven't had an answer to that.

2     A    You have had an answer.  It's on the record.

3     Q    What's your answer?

4     A    My answer is that I don't know that that would be the best

5          evidence.  As a result of sitting through this, I would want

6          to go back and look at the evidence, other evidence, but

7          there is a river of evidence.

8               And whether or not this affects the release of a bunch

9          of innocent people who signed -- names of people who signed

10         Referendum 71, there is evidence and it is linked because

11         they're quoting one another from one Web site to the other.

12         It is linked.

13    Q    What causes you to think that this might not be the best

14         evidence?

15              MR. PIDGEON:  Objection as to form.

16    A    I would want to review other evidence and I would want to

17         hire a professional to review it.

18    Q    (By Ms. Egeler)  I'm asking you about Exhibit No. 8.  What

19         makes you feel that Exhibit No. 8 would not be the best

20         evidence to provide to the police?

21    A    There may be stronger evidence.  I need to look.

22    Q    What about Exhibit No. 8 do you feel isn't strong?

23    A    I have no comment on that.  I can't comment on it.  I can't

24         compare it.  I'm not a lawyer.

25    Q    I'm not asking for your legal impression.  I'm asking why

EGELER (Redacted)   10/1/10

Page 63

1    you do not feel Exhibit No. 8 is sufficient to take to the

2    police.  And you stated --

3  A  I thought it was a sampling that would just be accepted as

4    what it was on face value in an honest deposition of what is

5    being said out there.  I can make a greater case before I

6    would go to the police.

7  Q  Okay.

8  A  But I believe there is a case to be made.

9  Q  Turning to Exhibit No. 9, did you first see this on

10    September 27th?

11  A  I've been aware of that Web site for some time.

12  Q  Did this material that's reflected in Exhibit No. 9 exist in

13    the past on the Web site?

14  A  Much exists on the Web site.  I don't know.

15  Q  Do you know if the material in Exhibit No. 9 existed on the

16    Web site before September 27th of 2010?

17  A  I don't know.

18  Q  Did you inform the police about the material in Exhibit

19    No. 9?

20  A  No.

21  Q  And why not?

22  A  Because I copied it for the purpose of bringing it here

23    today because I thought this was a deposition about R71

24    names, whether they should be released or not.

25  Q  Do you feel the material in Exhibit No. 9 constitutes a

EGELER (Redac Redacted   10/1/10)

Page 64

1       threat of physical violence to you?

2   A   When linked to other Web sites and what is being said, of

3       course it does.

4   Q   And would Exhibit No. 8 be one of those Web sites that you

5       would link to Exhibit No. 9 as evidence of a threat of

6       physical violence?

7   A   It would in its totality.  I've isolated a few pages here,

8       ignorantly, I now know.

9   Q   Have you contacted the police to tell them about the

10      totality of these Web sites?

11  A   No.

12  Q   Why not?

13  A   I've been focused on doing what I could do to protect the

14      people who signed the petitions.  I've been compromised, and

15      this is clear indication of that today.  I'm already

16      compromised.  I don't think that the people, 138,000 people

17      or whatever, that signed those petitions need to be put

18      through what I've been through and what Stickney's been

19      through.

20  Q   So if I understand correctly, you feel that you are at risk

21      currently of a physical attack by the individuals who have

22      posted material publicly on Web pages, but you do not feel

23      it's sufficient to report to the police?

24  A   I didn't say that.

25  Q   Do you feel it's sufficient to report to the police?

EGELER  (Redac  Redacted    10/1/10)

Page 65

```
 1   A   It very well could be.

 2   Q   Do you intend to report to the police?

 3   A   I intend to review it with my lawyer.

 4   Q   If you do report it to the police, do you trust your state

 5       or local officers to protect your safety?

 6   A   I've always trusted law enforcement.

 7   Q   During the period that Referendum 71 was being promoted, did

 8       you suffer any physical attack?

 9   A   No.

10   Q   Do you know anyone who did?

11   A   Yes.

12   Q   Who?

13   A   Redacted

14   Q   Redacted

15   A   Um-hmm.

16   Q   This is the son of Redacted

17   A   Yes.

18   Q   And who is Redacted

19   A   She's a citizen.

20   Q   Of what state?

21   A   Washington.

22   Q   And what occurred with her son?

23   A   She received a death threat over the phone.  It's a matter

24       of the record.

25   Q   But what physical attack occurred with her son that you're
```

EGELER (Redac Redacted   10/1/10)

Page 66

1      aware of?

2   A   Following a -- the phone call that he took, it's my

3       understanding, I've been told that he took this call.  It

4       was a death threat directed at his mother.  Traumatized him

5       for sure.  They were at a campaign shortly after that.

6       She's running for office in District -- I don't recall which

7       district now.  Someone drove by and threw food or some

8       substance on her son.

9   Q   And was that related to Referendum 71?

10  A   She believes it was.

11  Q   Do you --

12  A   I don't know the details.

13  Q   Do you know where she was?  You said she was campaigning.

14      Where was she?

15  A   She was at a meeting where Rob McKenna was in attendance.

16  Q   Where was that meeting?

17              THE WITNESS:  Do you know where the meeting was?

18      I don't know.

19  Q   (By Ms. Egeler)  I'm sorry.  But you can't confer with

20      Counsel.

21  A   I don't recall.

22  Q   Do you recall if she was even in the state when it occurred?

23  A   She was in the state.

24  Q   Do you know any of the details of the incident?

25  A   I told you what I know.  I don't know further details.

EGELER  (Redac  Redacted   10/1/10)

Page 67

| | | |
|---|---|---|
| 1 | Q | And is it your understanding that a homosexual attacked the |
| 2 | | son? |
| 3 | A | It's my understanding that she felt that was the case. |
| 4 | Q | That a homosexual attacked her son? |
| 5 | A | An activist. |
| 6 | Q | An activist, but not necessarily someone who is gay? |
| 7 | A | An activist. |
| 8 | Q | An activist on what? |
| 9 | A | On equal rights, gay rights. |
| 10 | Q | Do you know why she would feel that? |
| 11 | A | No. |
| 12 | Q | Do you know whether the event happened during the time that |
| 13 | | Referendum 71 was an issue?  In other words, did it happen |
| 14 | | prior to the election? |
| 15 | A | I believe it was shortly after the -- it was after the |
| 16 | | election. |
| 17 | Q | Do you know if the son was in any way indicating orally or |
| 18 | | visually to the person that threw food that he had a |
| 19 | | position on Referendum 71? |
| 20 | A | No. |
| 21 | Q | Who told you about this event? |
| 22 | A | Several people have told me about it.  Larry Stickney told |
| 23 | | me about it.  Redacted has told me about it. |
| 24 | Q | Any other physical attacks you're aware of? |
| 25 | A | No. |

EGELER (Redac Redacted 10/1/10)

Page 68

1  Q   Did you receive any e-mail or phone calls that you felt were

2      threats or harassment during the time Referendum 71 was

3      pending?

4  A   No.  More slander, mostly slander.

5  Q   Mostly slander where?  Through e-mail or phone calls?

6  A   Yeah, phone calls.

7  Q   Can you tell me about each of those phone calls?

8  A   I don't recall.

9  Q   So is it fair to say you don't recall whether you received

10     any slander or any other threats or harassment via phone

11     calls?

12 A   That wouldn't be fair.

13 Q   Tell me what you do recall.

14 A   It would be fair to say that I recall getting slanderous

15     phone calls, several of them from The Stranger.  Others, I

16     don't recall.  I didn't keep a record of it.

17 Q   Slanderous in what regard?  What was said?

18 A   I don't recall.  It was slanderous.  It was offensive for

19     sure, but I felt it was slanderous.  I felt I didn't want to

20     pursue it because it wasn't about me.  It was about the

21     referendum.

22 Q   How many of these calls were there?

23 A   I don't know.

24 Q   Do you know if it was more than two?

25 A   Yes.

EGELER  (Redac Redacted  10/1/10)

Page 69

1   Q   Was it more than five?

2   A   It could have been.  I don't know.

3   Q   How do you know it was more than two?

4   A   Because it was.  I don't know, two to five.  I don't know

5       how many calls because I stopped taking them.

6   Q   So they didn't make enough of an impression on you that you

7       remembered when it occurred?

8   A   They made a profound impression on me.  That's why I stopped

9       taking the calls.

10  Q   So let's talk about the call from The Stranger.  What was

11      said?

12  A   It wasn't a call.  There were a number of calls.

13  Q   A number of calls from The Stranger?

14  A   Yeah.

15  Q   From a reporter at The Stranger?

16  A   Yeah.

17  Q   And what was said by the reporter?

18  A   I don't remember.  It was just adversarial.  It was a

19      fishing expedition.

20  Q   What was said that was offensive?

21  A   Just the tone and the attack of the conversation.

22  Q   Can you tell me about the attack?

23  A   Yeah.  They didn't threaten my life.

24  Q   What did they say that you found to be an attack?

25  A   I don't recall.

EGELER (Redac Redacted   10/1/10)

Page 70

1  Q   Could it simply be that they disagreed with your position?

2  A   No.  It was much more than that.

3  Q   You said it had profound impact and yet you don't remember

4      anything?

5  A   Yeah.  I don't recall the words.  I couldn't quote them.

6  Q   Do you know when it occurred?

7  A   During Referendum 71.

8  Q   Do you recall what season it was?

9  A   It was 2009 during the referendum after Governor Gregoire

10     signed the bill and up to the election, during that period.

11  Q   So you don't even remember what season it was, but it was

12     just sometime --

13  A   I just told you the season.  It was two thousand -- I

14     misunderstood the question.

15  Q   Do you recall the season:  fall, spring, summer?  Do you

16     recall the season that it was when you were called by The

17     Stranger?

18  A   When did Governor Gregorie sign Senate Bill 5688?

19  Q   At the time she signed, that's when you received the call?

20  A   It was after that, prior to the election.

21  Q   We went through a lot of seasons there, so you don't recall

22     what season, correct?

23  A   I don't recall that there were a lot of seasons there

24     because she waited until the last possible day to sign that

25     bill, which impacted our ability to do what we had publicly

EGELER (Redac Redacted   10/1/10)

Page 71

1    said we were going to do, so we're talking about summer and

2    maybe the first part of fall.

3    Q   I believe the election was in November --

4    A   Yeah.

5    Q   -- of 2009.

6    A   I said it was prior to the election.  It was after she

7        signed the bill --

8    Q   Correct.

9    A   -- and prior to the election.

10   Q   Do you remember if it was summer or fall when this occurred?

11               MR. PIDGEON:  Objection.

12   A   No.

13   Q   (By Ms. Egeler)  And yet it made a profound impact on you?

14   A   Yeah.  The tone, the approach, sure.

15   Q   And any other phone calls that you recall?

16   A   No.

17   Q   Any other threats or harassment that you received that you

18       think was related to Referendum 71?

19   A   No.

20   Q   No.  Anything after the election --

21   A   No.

22   Q   -- that occurred?  No.

23           Have you continued to, after the election, be outspoken

24       on the issue of same sex marriage?

25   A   The Bible is outspoken on same sex relations, and I believe

EGELER  (Redac Redacted   10/1/10)

Page 72

1        the Bible.

2    Q   Have you continued?

3    A   I've been a minister my entire life, since 1960.

4    Q   Have you continued to be outspoken on same sex marriage

5        since the time of the election on Referendum 71?

6    A   Yes.

7    Q   Do you recall speaking in the press about same sex marriage

8        since November of 2009?

9    A   No, I don't believe so, because they haven't asked me about

10       it since then.

11           MS. EGELER:  Mark this Exhibit No. 10.

12                          (Exhibit No. 10 marked.)

13   Q   (By Ms. Egeler)  Looking at Exhibit No. 10, this is an

14       exhibit that, as reflected at the bottom of the page, was

15       printed from the Redacted .  It was printed today, as

16       reflected in the bottom right-hand corner, and it is stated

17       just above the picture on the page the article was updated

18       on Redacted

19           Are you familiar with this article, Mr. Redacted

20   A   No.

21   Q   If you turn to the back of the first page, at the top of the

22       page, it begins with a quote, Redacted

23       Redacted

24           Do you see where I am?

25   A   I do.

EGELER (Redac Redacted   10/1/10)

```
                                                      Page 73

  1   Q    If you turn -- if you stay with that page, go down to the

  2        third paragraph, it talks about Redac Redacted    Redacted    of

  3        the Bellevue, Washington-based Redacted

  4             Do you see that and the following paragraphs?

  5   A    Yes.

  6   Q    Would you take a minute to read that.

  7   A    Yeah, I've read it.

  8   Q    Do you recall speaking to an AP reporter about this

  9        incident?

 10   A    I never spoke to an AP reporter about that.

 11   Q    Did you speak with anyone at Redacted

 12   A    No.

 13   Q    Do you recall who you did speak to about this?

 14   A    I didn't speak to anyone about that, in regards to this

 15        article.

 16   Q    So to the best of your knowledge, the paper simply made this

 17        up?

 18   A    I didn't say they made it up.

 19   Q    Let's read that third paragraph.  It states that this is a

 20        quote of your blog.

 21   A    Yes.

 22   Q    Do you see that?

 23             Do you think this is an accurate quote from your blog?

 24   A    Yes.

 25   Q    Would that be a Redacted              blog?
```

EGELER (Redac▮ ▮Redacted   10/1/10)

Page 74

```
 1   A    I don't recall if it was a Network or PAC blog.

 2   Q    But it would be fair to say that this quote did come from a

 3        blog posting that you made?

 4   A    Yes.

 5             MS. EGELER:  Let's mark this as Exhibit No. 11.

 6                    (Exhibit No. 11 marked.)

 7   Q    (By Ms. Egeler)  And Exhibit No. 11 at the bottom states

 8        it's from the ▮Redacted▮  Web site, again printed

 9        today, October 1, 2010.  At the top of it states this is a

10        blog posting from Thursday, February 4, 2010.  The headline

11        is, ▮Redacted▮

12             Do you recall making this blog posting?

13   A    It looks familiar.  This could be accurate.  Could be mine.

14   Q    Can you turn to the back page of that exhibit and read the

15        last two paragraphs, the first one beginning with, "We need

16        to get real"?

17   A    ▮Redacted▮
```

▮

▮

▮

▮

▮

```
23   Q    Do you know if the material in Exhibits 8 and 9 was posted

24        following --

25   A    I do not.
```

EGELER (Redac Redacted   10/1/10)

Page 75

1    Q    -- your blog in Exhibit No. 11?

2    A    I do not.

3    Q    So you don't know if Exhibits 8 and 9 relate to comments you

4         made regarding Referendum 71 or whether it relates to

5         comments you made regarding the issue of same sex marriage

6         generally.  Is that right?

7    A    I know it relates to me personally.  I don't know.

8    Q    You don't know if it relates to Referendum 71?

9    A    No.  I don't know what they're thinking, no.  I don't know

10        what the bloggers were thinking.

11             MS. EGELER:  I have no further questions at this

12        point.

13             THE WITNESS:  Great.  Thank you.

14             MR. HAMILTON:  I have a few, and I'm going to

15        suggest that we take a five-minute break before we go.

16          Steve, I don't know if you have a few questions as

17        well.

18             MR. DIXSON:  So long as you're going over the

19        August 6th blog post, I will let you do that.  I have very

20        few questions we can do after the break.

21             MR. HAMILTON:  Okay.  Let's take five minutes.

22                                (Recessed at 10:53 a.m.)

23                                (Exhibit No. 12 marked.)

24                                (Reconvened at 10:58 a.m.)

25    ///

1                         EXAMINATION

2    BY MR. HAMILTON:

3    Q    Mr. Redacted   good morning.  My name is Kevin Hamilton.  We

4         introduced ourselves before the deposition began, but let me

5         do it again on the record.  I represent Washington Families

6         Standing Together, an organization I think you're familiar

7         with, of organizations and religious groups that were

8         opposed to the effort to put Referendum 71 on the ballot.

9         So I'm just going to ask you a few questions about some of

10        the materials and some of the issues that we've been talking

11        about.

12             In front of you is Exhibit No. 12.  Are you familiar

13        with this document?

14   A    Yeah.

15   Q    What is it?

16   A    Well, it's probably from a bio on me.

17   Q    And do you know where this bio is?  Who wrote it?

18   A    I don't recall.  I would have been involved in the writing

19        of it.

20   Q    It's accurate, an accurate sort of biographic summary of

21        your life and career?

22   A    I think so.  I haven't read it recently, but yes, I would

23        think it would be.

24   Q    This is something that is posted on your Web site?

25   A    I believe it is, yeah.

HAMILTON (Redac Redacted    10/1/10)

```
                                                      Page 77

 1   Q    Available for anybody who wants to --

 2   A    I think so.

 3   Q    -- know more about who Redac Redacted  is, what he does?

 4   A    I believe it is, yeah.

 5   Q    It says you've -- you were perhaps best known for nearly

 6        20 years on the radio and television.  Is that true?

 7   A    Yes.

 8   Q    So it sounds like you hosted a talk show in Portland,

 9        Oregon, for 12 years, from 1978 to 1990?

10   A    Yes.

11   Q    Included a number of highly prominent people that you name

12        here?

13   A    Yes.

14   Q    And then you also hosted a daily radio program for eight

15        years, also aired in various cities in the Pacific

16        Northwest?

17   A    Yes.

18   Q    You know, I'm looking down about the middle of the page.  It

19        says in 1993 you cofounded something called Redacted

20        Redacted

21   A    Yes.

22   Q    Do you see that?  What was that?

23   A    It was a holding -- Redacted                        was a

24        holding company.  It's now called Redacted        , but

25        it was originally called Redacted              .  It was
```

HAMILTON (Redac Redacted    10/1/10)

Page 78

1      cofounded by Redacted, and it included

2      Christian supply stores, which was a company, for-profit

3      company, Redacted, which was Pamplin, which

4      was a separate company, and Redacted

5      and it's what it is.  It's what it was.  I retired ten years

6      ago.

7   Q  It says you left the company in March 2001?

8   A  Yes.

9   Q  And it says since that time you've been a frequent speaker

10     for churches, service clubs, conventions, and leadership

11     groups?

12  A  I was.

13  Q  And you continue to, aren't you?

14  A  No, not necessarily.  I'm not that active now.

15  Q  Fair to say, over the last ten years, you've been a frequent

16     speaker for churches, service clubs, conventions, and

17     leadership groups?

18  A  It would be fair to say, the five years following my

19     retirement, I was.

20  Q  So from about 2001 to about 2006?

21  A  Probably.

22  Q  You're fairly comfortable in a public speaking role,

23     correct?

24  A  Yes.

25  Q  You've been on television and radio and frequently speaking

HAMILTON (Redac Redacted   10/1/10)

Page 79

```
1         in front of community groups?
2    A    Yes.
3    Q    2004 you founded the Redacted
4    A    Yes.
5    Q    And then in 2005 it says the Redacted
6         was merged into Redacted
7         Redacted , which now operates as Redacted
8    A    That's not exactly correct.
9    Q    Okay.
10   A    It's a misstatement, and I was not aware of that.
11   Q    That's fine.  Why don't you just tell us and correct it, if
12        you could?
13   A    Yeah.  Why I don't trust you and just get right to what I
14        think you're after here.  Redacted the name, not
15        the foundation, the name Redacted was merged with
16        Redacted .  It
17        became Redacted and that's a 501 C4
18        advocacy organization.
19   Q    And Redacted --
20   A    Redacted
21   Q    -- is a separate entity?
22   A    Yes.
23   Q    A 501(c)(3)?
24   A    Yes.
25   Q    That means it's tax exempt and --
```

HAMILTON (Redac Redacted    10/1/10)

```
                                                        Page 80

 1    A    Yeah.

 2    Q    -- tax --

 3    A    It's not a church, but it's like a church, yes.  Or it's

 4         like -- I assume, Washington, your client, is a 501(c)(3), I

 5         believe.  I don't know.  But it's a 501(c)(3) and the

 6         Network is a 501(c)(4) and they've been audited.

 7    Q    Thank you.

 8              The last line says you're married to Redacted    That's

 9         your spouse?

10    A    Yes.

11    Q    You've only been married once?

12    A    Yes.

13    Q    You have three children and three grandchildren?

14    A    I have four grandchildren now.

15    Q    Congratulations.

16    A    Thank you.

17              MR. HAMILTON:  Let me mark Exhibit 13, if I

18         could.

19                        (Exhibit No. 13 marked.)

20    Q    (By Mr. Hamilton)  I'm handing you what's been marked as

21         Exhibit No. 13.  Are you familiar with this document?

22    A    Yes.

23    Q    What is it?

24    A    It was a comparative educational item for voters.

25    Q    What was the purpose of it?
```

HAMILTON (Redac Redacted    10/1/10)

Page 81

1    A    To show voters the difference between two candidates.

2    Q    Were you intending to promote one or the other?

3    A    Not through the Network, I wasn't.

4    Q    No.  I mean with this document -- I'm sorry --

5    A    No.

6    Q    With this document, were you intending to -- sometimes

7         you're going to anticipate what I'm going to ask, but for

8         the court reporter, you have to wait.  I'll promise not to

9         interrupt you, if you promise not to interrupt me.

10            There's some language in here that sort of appears to

11        focus on both the top and bottom with respect to these

12        candidates and the position on gay rights.  I'm just -- I

13        guess my question is:  By picking out those bullets and

14        preparing this, were you intending to suggest voters should

15        vote for one or the other?

16   A    The intention of this was purely educational.  People wanted

17        to know the difference between the two candidates on certain

18        issues.

19   Q    Was there a reason you just didn't say vote for Steve

20        Johnson and against Susan Owens?

21   A    Well, because it wasn't an advocacy piece.  It was an

22        educational piece.  It was a perspective.

23   Q    How was this distributed?

24   A    You know, I don't recall.

25   Q    How was it paid for?

Page 82

1    A    Through the Network.

2    Q    And was it treated as a contribution, an in-kind

3         contribution, to either candidate?

4    A    No.  Because it was educational.

5    Q    So it was paid for by the Network, not the Political Action

6         Committee?

7    A    I honestly don't recall.  We're talking a couple years ago

8         here.

9    Q    But this was posted on the Web site?

10   A    It was.

11   Q    And it was intended to highlight the differences between the

12        two candidates for educational purposes?

13   A    For educational purposes, yes.

14   Q    I guess it's possible that people who supported Susan Owens

15        might not have been very happy about this?

16             MR. PIDGEON:  Objection as to form.

17   Q    (By Mr. Hamilton)  You can answer.

18   A    I don't know the people who supported Susan Owens.

19                            (Exhibit No. 14 marked.)

20   Q    Hand you what's been marked Exhibit 14.  I'm handing you

21        what's been marked Exhibit No. 14.  It is a screen shot

22        taken from a Web site that contains a video of your

23        statements at a rally at the state capitol.

24        First of all, let me just ask:  Are you familiar with

25        this particular Web site?  Have you seen it before?

HAMILTON (█Redac█ █Redacted█   10/1/10)

Page 83

```
 1   A   Which Web site is it?

 2   Q   Well, it's Vimeo, which hosts videos that can be posted.

 3       I'll direct your attention here right underneath the caption

 4       that says, "█Redac█ █Redacted█   █Redacted█

 5       Right below that, it says, "By █Redacted█

 6           That suggests to me that your organization posted the

 7       video here.  That's really what I'm asking you.

 8   A   I don't know if we did or not.  We could have.  There were

 9       several volunteers working with us during that time and some

10       of them were video production people and they very well

11       could have.

12   Q   And it wouldn't -- certainly wouldn't have been offensive to

13       you to have your speech at the state capitol put up on the

14       Web?

15   A   No.

16   Q   In fact, you would have been happy about that because it got

17       your message out?

18   A   It was not offensive to me for them to put it up.

19   Q   Right below the little video box, it says, "█Redac█ █Redacted█

20       █Redacted█

21           Does that sound like about the time that you were

22       speaking at that rally?

23   A   I don't know.  It probably is.  I don't remember the date of

24       the rally.

25   Q   Right.  You don't have any reason to disagree with the
```

Dixie Cattell & Associates (360) 352-2506

HAMILTON (Redac Redacted   10/1/10)

```
                                                            Page 84

 1          representation?

 2     A    No.  I don't know that it wasn't March 19.  I don't know

 3          that it was.  I don't know what date it was.  I don't

 4          recall.

 5     Q    In the box, in the big black box, where the video would be

 6          if this were something other than a piece of paper, there's

 7          a little number, 7 minutes, 37 seconds.  Does that sound

 8          like about how long you spoke at the rally?  Do you know?

 9     A    Sure.  I don't know.

10     Q    Roughly five to ten minutes?

11     A    Yeah -- yes.

12     Q    Now, during the first part of your deposition, you were

13          asked a bunch of questions about your statements in the

14          press during the time of the Referendum 71 effort.

15               Do you recall those questions?

16     A    I recall that there were a lot of them.

17     Q    I'm going to quickly move through a series of articles

18          here just to see if we can refresh your recollection about

19          statements you made in the press.  First will be Exhibit 15.

20                                      (Exhibit No. 15 marked.)

21     Q    I will represent to you, this is an article that was printed

22          yesterday from the Redacted   Web site, but it relates to

23          an article originally published on October 14, 2009.

24               Do you see the -- let's see.  The third to the last

25          paragraph on the first page describes you as a 68-year-old
```

HAMILTON (Redac Redacted   10/1/10)

Page 85

1        ordained minister and former TV show host?

2    A   Yes.

3    Q   And did you speak with the reporters in connection with this

4        article?  Does this refresh your recollection?

5    A   Yes.

6    Q   Let's look at -- that was voluntary, by the way.  Nobody

7        compelled you to speak to the reporters in connection with

8        Referendum 71 on this occasion, right?

9    A   I'm not sure I understand that question.

10   Q   Well, let me ask it a little bit broader, stepping back.

11       During the Referendum 71 campaign, one of your roles with

12       respect to the referendum process was to be a spokesperson,

13       correct?

14   A   Yeah.  They asked me to speak.

15   Q   And take a public role in promoting people -- getting people

16       to sign the referendum, right?

17   A   Yes.

18   Q   And so we're going to look at a few of these, but you spoke

19       on a regular basis to the media about Referendum 71 and why

20       people ought to sign it?

21   A   Yes.

22   Q   Let's look at another one.

23                          (Exhibit No. 16 marked.)

24   Q   I'm handing you what's been marked Exhibit 16, and this

25       was printed from The Redacted Snohomish County Web site, and

HAMILTON (Redac Redacted     10/1/10)

Page 86

```
1        it's actually an article that you published.  Isn't that

2        true?

3    A   I was not aware of this in the Redacted Net.

4    Q   The date it was published was October 11, 2009.

5            Do you see that?

6    A   I see that, yes.

7    Q   And the headline is, Redacted

8        Redacted

9    A   Yes.

10   Q   Author is Redac Redacted

11   A   I see that.

12   Q   You wrote the article, didn't you?

13   A   I think I did.  I was not aware that the Redacted Net carried

14       it, but it looks familiar.  This could be accurate.

15   Q   At the bottom, it says, "Redac Redacted is the Redacted and

16       chairman of the Redacted

17   A   Yes.

18   Q   You wrote this piece and tried to have it published in as

19       many places as possible.  Is that a fair statement?

20   A   No.  I wrote the piece and there was some people that wanted

21       it.  I didn't try to get it published in as many places as

22       possible.

23   Q   The people who wanted it were media outlets?

24   A   Probably.  I don't recall that that many people wanted it.

25   Q   Fair enough.
```

HAMILTON (Redac Redacted    10/1/10)

Page 87

1       You were happy to see it published.  It's why you wrote

2       the article, isn't it?

3    A    Yes.

4    Q    Let's look at Exhibit 17.

5                              (Exhibit No. 17 marked.)

6    Q    Before we get to Exhibit 17, if I can direct your attention

7       back to Exhibit 16.  Is it fair to say that the purpose of

8       this article, the reason you wrote it, was to try to

9       convince people to sign Referendum 71, the petitions to get

10      it on the ballot, and then when it's on the ballot, to vote

11      it down?

12   A    I think it's fair to say that I wanted people to sign the

13      petition.

14   Q    And you were explaining your view of homosexuality and its

15      role in society in this article?

16   A    No.  I was explaining the importance of R71.

17   Q    As it relates to homosexual rights?

18   A    As it relates to the legislation that had been passed.

19   Q    Because you don't believe that gay relationships and

20      heterosexual relationships are equal?

21   A    I believe that the Bible teaches that homosexual relations

22      are not appropriate and not normal and are forbidden and

23      taught against in the Bible.  That's my position.

24   Q    And that's what you were trying to say, or in part?

25   A    I wasn't trying to teach the Bible there.  I was trying to

HAMILTON (Redac Redacted    10/1/10)

                                                            Page 88

1       encourage people to sign Referendum 71.

2    Q  Let's just look at the bottom of page 1 of Exhibit 16.  You

3       wrote, quote, ████████ ████████████████████████████████████

████   ██████████████████████████████████████████████

████   ███████████████████████████████████████████████████

████   ████████████████████████████████████  ████████████

████   █████████████████████████████████████████████████

████   ██████████████████████████████████████████████████

████   █████████████████████████████████████████████

████   ██████████

11          First of all, did I read it correctly?

12   A  I don't know.  I couldn't find it.  I didn't want to

13      interrupt.  Where is it again?

14   Q  The bottom of the first page.

15   A  Okay.

16   Q  The paragraph begins, "Homosexuality is not equal."

17   A  Got it.

18   Q  Take a moment.  My question, again, is:  Did I read that

19      correctly into the record?

20   A  Could you . . . ?

21   Q  Do it again?  Sure.

22   A  Yeah.

23   Q  ████████████████████████████████████████████████████

████   ████████████████████████████████████  ████████████████████

████   ████████████████████████████████████████████████████

HAMILTON (Redac Redacted   10/1/10)

Page 89

1       Redacted

5    A    And your question is?

6    Q    Did I read it correctly?

7    A    Yes.

8    Q    It's possible, isn't it, that some people might disagree

9         with the statements in that article we just read.  Not

10        everybody agrees with you on this?

11   A    I can't imagine that, that anyone would disagree with me.

12   Q    Are you being sarcastic?

13   A    Of course people disagree with it.

14   Q    Thank you.

15             And you mentioned a moment ago about your view of what

16        the Bible teaches.  It's also possible that people might

17        disagree with your interpretation of what the Bible teaches,

18        isn't it?

19   A    It is possible.

20   Q    And if they do disagree with your beliefs, I'm sure you

21        agree with me that they have a First Amendment right to

22        take -- you know, publish articles and state their beliefs

23        on these issues.  Isn't that true?

24   A    Do I have a fundamental right to state my beliefs without

25        being interrogated?

HAMILTON (Redac Redacted   10/1/10)

Page 90

```
 1   Q   No.  That's not my question.  Let me say it again.  My
 2       question is:  If people disagree with you, they have an
 3       equal right, as you do --
 4   A   Okay.
 5   Q   -- to make statements about what they think the role of
 6       marriage or gay rights are?
 7   A   Yes.
 8   Q   Now, let's look at Exhibit 17, if we could.  Do you have
 9       that one in front of you?
10   A   My aren't numbered.  Is it, Redacted
11   Q   Yes.  Now, this is an article that was published in the
12       Redacted on September 1, 2009.
13           Do you see that right up at the top?
14   A   I do.
15   Q   And you're quoted here as saying, and this is five -- the
16       fifth paragraph of the article starts, "I'm very pleased."
17           Do you see that?
18   A   I do.
19   Q   Is that an accurate quote?
20   A   What was I pleased about?
21   Q   Well, I'll read the paragraph.  I'm very pleased, said Redac
22       Redacted one of the main organizers behind the R71 effort.
23       We -- meaning a lot of people across the state -- worked
24       hard on this, closed quote.
25           Is that more or less an accurate quote?
```

HAMILTON (Redac Redacted    10/1/10)

Page 91

```
 1   A   I can't speak for Redacted    Let me see what she was quoting

 2       me as being pleased about.  The count, yes, that's accurate.

 3   Q   And, again, you were speaking with Redacted , who is a staff

 4       reporter at the Redacted

 5   A   I don't know what her title is, but I was speaking to Janet

 6       Tu.

 7   Q   You knew at the time you were speaking to her she was a

 8       reporter?

 9   A   Yes.

10   Q   For the Redacted

11   A   Yes.

12   Q   Is it accurate that you were one of the main organizers

13       behind the R71 effort?

14   A   I never considered myself main.  I was one of the

15       organizers.

16   Q   So it would be accurate to say you were one of the

17       organizers of the Referendum 71 effort?

18   A   Yes.

19   Q   And in your -- when you gave this quote to Ms. Tu at the

20       Redacted       that was, again, in your role as one of the

21       spokespeople for the Referendum 71 campaign?

22   A   Yes.

23   Q   Let's look at Exhibit 18.

24                          (Exhibit No. 18 marked.)

25   Q   Exhibit 18 is an article that was published on the Seattle
```

HAMILTON (Redac Redacted   10/1/10)

Page 92

1    Times Web site, and it's entitled, Redacted
2    Redacted
3         And this is shortly before they -- the signatures were
4    turned in to the Secretary of State.  The second day of the
5    blog posting -- I'm sorry.  The second paragraph of this
6    article has your name in it.
7         Do you see that?
8  A  Yes.
9  Q  It says, quote, Redac Redacted    whose Redacted
10   Redacted
     ███
     ███
     ███
14        Do you see that?
15 A  I do.
16 Q  Did you send an e-mail to the Redacted    to that effect?
17 A  I don't recall.
18 Q  Is it fair to say that the Redacted    was
19   part of a coalition that's spearheading the Referendum 71
20   effort?  Is that a fair description?
21 A  I would have to get legal counsel on that.  I'm not sure
22   that "coalition" is the right word.  Redacted
23   Network supported the effort.  I was certainly a part of it.
24 Q  And was helping to lead it?
25 A  I was helping to lead it personally.

HAMILTON (█████ ██████████) 10/1/10)

Page 93

```
 1   Q   Let's go to Exhibit 19.

 2                                 (Exhibit No. 19 marked.)

 3   Q   Exhibit 19 is an article that was originally published in

 4       the ████████████ on August 27, 2009.

 5           Do you see that up on top?

 6   A   I do.

 7   Q   And the headline of the article is, quote, █████████

██  ████████████████████████████████████████████████████

██  ████████████████

10           Do you see that?

11   A   Yes.

12   Q   It's the fourth paragraph from the bottom there's -- your

13       name appears in that paragraph.

14           Do you see that?

15   A   "I'm not personally interested"?

16   Q   Yeah.

17   A   Yeah.

18   Q   And you're quoted as saying, quote, ██████████████████

██  ████████████████████████████████████████████████████████

██  ███████████████████████████████████████████████

██  ████████████████████████████████████████████ closed

22       quote.

23           Did you say words to that effect?

24   A   Yes.

25   Q   Now, you say that -- the article says, "████ ████████ with
```

HAMILTON (Redac Redacted    10/1/10)

```
                                                     Page 94
 1        Protect Marriage Washington."
 2             Did you have a role with Protect Marriage Washington?
 3   A    I was on the board.
 4   Q    Were you speaking on behalf of Protect Marriage Washington?
 5   A    Yes.
 6   Q    And, again, this was part of your role as one of the
 7        spokespeople for the Referendum 71 side?
 8   A    Yes.
 9   Q    You were, in fact, in the room during the signature checking
10        process?
11   A    Well, that was what, a month?  I was not in the room, but I
12        was there a couple of times.
13   Q    Is it fair to say --
14   A    There were people that were there pretty much for the
15        duration.  I was not one of those.
16   Q    Sure.  Is it fair both sides had observers that were
17        watching the process the State was using to verify the
18        legitimacy of the signatures on petitions?
19   A    Yes.
20   Q    And both sides were complaining about the process?
21   A    I wasn't talking to the other side, but evidently Lornette
22        Turnbull was, so . . .
23   Q    So your side --
24   A    I called you and you didn't return my call.  No.  I wasn't
25        talking to the other side.  I don't know what they were
```

Page 95

1      saying.

2   Q   Is it fair to say you were supervising some of the

3       observers?

4   A   No.

5   Q   Were you helping to advise some of the observers?

6   A   No.  Larry Stickney was supervising that and advising.  I

7       was observing when I was there and just talking to them, but

8       I wasn't advising or supervising.

9                              (Exhibit No. 20 marked.)

10  Q   Exhibit 20 is an article from the ▮Redacted▮ originally

11      published on March 11, 2009.

12          Do you see that up at the top?

13  A   Yes.

14  Q   And this is another in a series of articles in which you're

15      quoted.  Let me just direct your attention to -- the sixth

16      paragraph contains your name.

17          Do you see that?

18  A   From the top?  Yes, I got it.

19  Q   And you're quoted as saying, quote, ▮Redacted▮

▮ ▮Redacted▮

▮ ▮Redacted▮

▮ ▮Redacted▮ closed internal quote, said ▮Redac▮ ▮Redacted▮ head

23      of the ▮Redacted▮ which opposes the measure,

24      closed quote.

25          Do you see that?

HAMILTON (Redac Redacted     10/1/10)

```
                                                    Page 96
 1    A    Yes.

 2    Q    And did you make something similar to that statement to

 3         these reporters?

 4    A    Yes.

 5    Q    And, again, this was part of your role as one of the

 6         spokes- --

 7    A    Yeah.  I was quoting really Ed Murray and Jamie Patterson on

 8         that.

 9    Q    But my point is, you were speaking with the media as one of

10         your -- as one of the spokespeople --

11    A    Yes.

12    Q    -- for the Referendum 71?

13    A    Yes.  And this may have been shortly after the editorial

14         board in the Redacted        called on the legislature to go

15         ahead and give them the name.

16    Q    Let's look at Exhibit 21.

17                                    (Exhibit No. 21 marked.)

18    Q    Exhibit 21 is an article that appeared in the Redacted

19         on May 18, 2009.

20              Do you see that at the top of the page?

21    A    Yes.

22    Q    And this is an article that generally concerns the signing

23         of the bill by Governor Gregoire expanding same sex domestic

24         partner rights, correct?

25    A    It appears that it is.
```

HAMILTON (█Redac█ █Redacted█  10/1/10)

Page 97

```
 1   Q    And looking down at the bottom of the page, there's sort of
 2        an indented paragraph that begins with your name.
 3             Do you see that, "█Redac█ █Redacted█
 4   A    I do.
 5   Q    And in the article you're quoted as wondering aloud whether
 6        there was a concerted effort on Gregoire's part to delay the
 7        signing to give opponents a shorter time to collect
 8        signatures.
 9             Do you see that?
10   A    I do.
11   Q    And is that something that you wondered aloud to the █Redacted█
12        █Redacte█ reporter?
13   A    I don't recall wondering aloud to her, but I wondered aloud
14        and she may have heard me say that because I did.
15   Q    And you certainly didn't dispute the attribution of the
16        information to you?  In other words, you didn't call up the
17        █Redacted█    and say, wait a minute.  I didn't say that or
18        I didn't mean to be quoted?
19   A    Uh-uh -- no.
20   Q    Thank you.
21             So we've gone through all these articles and there are
22        plenty more, but the point is, you, during the course of
23        Referendum 71 campaign, you were frequently quoted in the
24        press?
25   A    I was.
```

HAMILTON (Redacted Redacted   10/1/10)

Page 98

1  Q   Now, the Redacted also has a blog, doesn't

2      it?

3  A   Yes.

4  Q   And it's fairly active?

5  A   Yes.

6  Q   You mentioned earlier this morning that you had a blog

7      company that helped you with that?

8  A   No.  I didn't say we had a blog company that helped us with

9      it.  There are services and companies that process blogs

10     and, you know, I'm -- I grew up in a different generation

11     than Bill Gates.

12 Q   And I don't mean to get into --

13 A   There are service organizations.  I'm sorry.  Go ahead.

14 Q   Yeah.  I'm not trying to get into too much detail here, but

15     basically you or someone in Redacted write

16     the text and then you give it to somebody else to actually

17     upload it onto the Internet?

18 A   Yeah, that's close.  If you're asking if I'm responsible for

19     the content, the answer is yes.

20 Q   Right.  You don't get involved in the mechanics of how it

21     gets there?

22 A   No.  These are services that everybody uses.

23 Q   Let's take a look at Exhibit No. 22.

24                          (Exhibit No. 22 marked.)

25 Q   Now, Exhibit 22 is printed off of the Redacted Web

HAMILTON (Redac Redacted   10/1/10)

```
                                                      Page 99

 1        site.

 2             Are you familiar with this as a form?  This is part of

 3        your blog, isn't it?

 4    A    It appears to be.

 5    Q    And this one's dated back in January of 2006.

 6             Do you see that?

 7    A    Yes.

 8    Q    And it deals with House Bill 2661 that apparently was

 9        pending in the legislature at that time.

10    A    It appears that it does.

11    Q    And you wrote, All of us in the faith community fought a

12        good fight.  We prayed and we took action, but in the end,

13        the bill passed today by a vote of 25 in favor and 23

14        opposed, one excused, closed quote.

15             Do you see that?

16    A    Yes, I see it.

17    Q    Did you write that?

18    A    I don't recall if I wrote this or not.

19    Q    It was posted under your name with your authorization.

20    A    Yeah, I see that.  I would have authorized it.

21             MR. PIDGEON:  Objection as to the form of the

22        question.

23    Q    (By Mr. Hamilton)  And so at the bottom of Exhibit 22, you

24        wrote, or it was attributed to you, the words, Redacted
```

HAMILTON (Redac Redacted   10/1/10)

Page 100

1       Redacted

████████████████████████████████

████████████████████████████████ close quote.

4            Do you see that?

5    A   I do.

6    Q   That statement was posted under your name with your

7        authorization?

8    A   It appears it was, yes.

9    Q   So it's fair to say that, at least since 2006, you've taken

10       a fairly public position opposing any expansion of gay

11       rights or domestic partnership?

12   A   Yes.  Let me correct my -- let me restate my answer.  The

13       answer is no.

14   Q   Well, let's just say, in 2006, your position was in

15       opposition to House Bill 2661?

16   A   Yes.

17   Q   And in 2006, you took steps to make sure that a network of

18       people -- anybody who wanted to knew of your position with

19       respect to gay rights?

20   A   Yes.

21   Q   That --

22   A   I'm not opposed to rights for gays.  I'm opposed to the

23       redefinition of marriage.

24   Q   And you were opposed to House Bill 2661?

25   A   Apparently.  I don't know.  I don't recall what that bill

HAMILTON (Redac Redacted   10/1/10)

Page 101

1        was, so I don't know.

2    Q   Let's take a look at Exhibit 23.

3                               (Exhibit No. 23 marked.)

4    Q   Exhibit 23 is a collection of blog postings from the Redacte

5        Redacted

6            Do you see that?

7    A   I see Exhibit 23, yes.

8    Q   Take a moment and flip through there.  And my question is:

9        These are all articles or blog postings posted by you --

10   A   Okay.

11   Q   -- on the Redacted          Isn't that true?

12   A   I don't know.

13   Q   Take a moment to look through them.  It goes on for 28

14       pages, and we can go through each page one by one, but my

15       question is really the same.  These were all written and

16       posted under your name with your authorization?

17   A   It appears that they are, yes.

18   Q   In each case, you sign it as Redac Redacted    Redacted    of

19       Redacted

20   A   I haven't read each one.

21   Q   The majority of cases, that's the way it's signed?

22   A   It appears that it is.

23   Q   And in most cases, these blog postings deal with gay

24       marriage, true?

25   A   I believe you just said there are 28 pages.  I haven't read

HAMILTON (Redac Redacted    10/1/10)

```
                                                   Page 102

 1        each of these.  I don't know --

 2   Q    Let's start at page 1.

 3   A    Okay.

 4   Q    First one is, Redacted

 5        Redacted

 6   A    Yes.

 7   Q    Turn to page 2 -- actually page 3.  The article on Monday,

 8        April 27, 2009, Redacted

 9        Redacted

10   A    Yes.

11   Q    That was an article about gay marriage?

12   A    Correct.

13   Q    And a poll by Northwest pollster Redacted    on gay

14        rights?

15   A    That's correct.

16   Q    Page 4 is from April 24, 2009, and the article is entitled,

17        Redacted

18   A    Yes.

19   Q    Page 5 --

20   A    I didn't write that.

21   Q    I understand.

22   A    He wrote it.

23   Q    But it was posted --

24   A    Yes.

25   Q    -- on the Protect Marriage Web site, true?  I'm sorry.  The
```

HAMILTON (Redac Redacted      10/1/10)

Page 103

1       Redacted

2   A   I don't know.  Yes.

3   Q   Page 5, there's a blog posting, April 23, 2009, Redacted

        ▮       Redacted

5           Do you see that?

6   A   Yes.

7   Q   Turn to page 8.

8   A   I see several here that are not on gay marriage.

9   Q   Are you at page 8?

10  A   Yes.

11  Q   Bottom of the page is a blog posting from April 20, 2009,

12      and it's reprinting a Redacted      article.  No, it's --

13  A   Yes.

14  Q   -- discussing a Redacted      article.

15  A   No.  It's referencing a Redacted      article and that's the

16      editorial piece that the Times put out following the passage

17      of 5688.  It's, "Redacted

18      Redacted

19  Q   That one's also about domestic partnerships and --

20  A   Well, the Redacted      was about domestic partnerships.

21  Q   Reprinted and posted on Redacted

22  A   Referenced, yeah.

23  Q   And then page 10 is a blog posting on April 16, 2009, under

24      the title, Redacted

25      Redacted

HAMILTON (█Redac█ █Redacted█   10/1/10)

```
                                                            Page 104
 1    A    Yes.

 2    Q    So fair to say that there were at least a number of articles

 3         posted, during this time frame, dealing with that subject?

 4    A    Yes, there were a number of them.

 5    Q    Let's take a look at Exhibit 24.  I'm not going to spend the

 6         time to go through all of the blog postings.  It will be in

 7         the record.

 8                              (Exhibit No. 24 marked.)

 9              MR. PIDGEON:  I'm going to post an objection to

10         Exhibit 23 on the basis of foundation.

11    Q    (By Mr. Hamilton)  Handing you what's been marked as

12         Exhibit 24, I want you to take a moment and flip through

13         these pages.  And my question is going to be:  This is more

14         of the same.  These are pages from the █Redacted█

15         blog posted under your name with your authorization,

16         correct?

17    A    I'm looking at page 1 that appears to be, yeah.

18    Q    Take a moment, flip through the whole exhibit.  Tell me when

19         you're done.

20    A    It appears that they are.

21    Q    So let's turn in this exhibit to page 20, and it's numbered

22         up in the upper right-hand corner.

23    A    Yeah.

24    Q    Tell me when you're there.

25              MR. PIDGEON:  Page what?
```

HAMILTON (Redac Redacted   10/1/10)

```
                                                        Page 105

 1                  MR. HAMILTON:   20.

 2    A    I'm there.

 3    Q    (By Mr. Hamilton)  And actually page 19 is where the article

 4         or the blog posting starts, at the very bottom of the page.

 5         Do you see where it says, "Friday, August 6, 2010"?

 6    A    Yes.

 7    Q    And then it's entitled, [Redacted]

 8    A    Yes.

 9    Q    And it's signed at the bottom of page 20 by you?

10    A    It isn't signed, but my name is on it.

11    Q    This was, again, posted --

12    A    Yes.

13    Q    -- under your name or over your name --

14    A    Yes.

15    Q    -- with your authorization?

16    A    Yes.

17    Q    The second paragraph on page 20 says, quote, [Redacted]

22         Do you see that?

23    A    Yes.

24    Q    How many people told you that they didn't really care if

25         their names were released?
```

HAMILTON (Redac Redacted    10/1/10)

                                                        Page 106

 1    A    I don't know.

 2    Q    Was it more than five?  I'm trying to get an approximation.

 3    A    I know.

 4    Q    Was it a flood of 1,000 e-mails?

 5    A    I know what you're trying to do, and I'm trying to give you

 6         an honest answer.  I don't know.  It was not 1,000, but it

 7         was some.

 8    Q    Some.

 9              Did you keep those e-mails?

10    A    No.

11    Q    What e-mail service do you use?

12    A    I don't know.

13    Q    I notice somewhere it says AOL.  Are you on America Online?

14    A    Are you talking about me personally?

15    Q    Well, let's start there, sure.

16    A    I am personally, yes.  Redacted       is not.  I don't

17         know which -- who their server is -- I mean our server.

18    Q    When you say, "Many of you have told me through e-mail,"

19         does that mean -- do you know whether those e-mails came to

20         you personally or to the Redacted

21    A    They ended up with me, but I don't know how they got to me.

22         There are people around the state and I would suspect that

23         the people that told me that, and they did -- I understand

24         what you're getting at here.

25              But in truth, they did and they were, I think, as I

HAMILTON (Redac Redacted   10/1/10)

1        recall, mostly people that were actively involved in it.

2        And they were a little angry at the -- at the moment about

3        whatever and they were saying I don't care, you know.

4        Let . . .

5    Q   Let the names be public?

6    A   Let the gays come after me.  I mean, that was the tone of

7        that.

8    Q   What you said was, they didn't care if --

9    A   -- they have their name or not.

10   Q   Their name or not?

11   A   Yeah.  "They" meaning the gay activists.

12   Q   Or the rest of the public?

13   A   No.  They're not concerned about the rest of the public.

14   Q   Right.  They don't care if their names are released to the

15       rest of the public because they're not worried about it?

16   A   They're worried about gay activists.

17   Q   So at least some people told you they didn't care whether

18       the names were released?

19   A   Some did.

20   Q   Some did.

21           And you can --

22   A   No.  Some did tell me they weren't, but whatever the number

23       is, it's minute up against the 130,000, plus or minus, that

24       signed the petition.

25   Q   Did you contact all the 130,000 that signed the petition to

HAMILTON (Redac Redacted   10/1/10)

1        ask them whether they cared or not?

2    A   No.

3    Q   Do you have an e-mail list of all the people who signed

4        that?

5    A   No.

6    Q   Was there an effort to collect or harvest the e-mail

7        addresses and names off of those lists to use them for other

8        purposes?

9    A   I don't know.  I didn't.

10   Q   Do you know whether Mr. Stickney did?

11   A   I don't know what Mr. Stickney did.

12   Q   Have you ever tried to communicate with all the people who

13       signed the petition as a group?

14   A   No.

15   Q   No mass mailings or phone calls or --

16   A   I don't have the names of the people who signed.

17   Q   Mr. Stickney does?

18   A   I don't know.

19   Q   Hand you what's been marked as Exhibit 25.

20                              (Exhibit No. 25 marked.)

21   Q   Exhibit 25 is a political committee registration form for

22       Protect Marriage Washington.

23           Have you seen this form before?

24   A   This particular one?

25   Q   Yes.

HAMILTON (Redacted Redacted    10/1/10)

Page 109

```
 1   A    No.

 2   Q    It reflects the registration of Protect Marriage Washington

 3        as a political committee in Washington State as of May 13,

 4        2009.

 5             Do you see that?

 6   A    I do.

 7   Q    And it identifies you Redacted

 8             Do you see that?

 9   A    Yes.

10   Q    Are you currently Redacted


     Redacted

12   A    I don't know.  I don't know if it hasn't -- yes, I believe I

13        am.

14   Q    You're not sure about the legal status of the organization?

15   A    No.  I don't have any question about the legal status of it.

16        I don't know if -- what the term was for the board member.

17        I'm just trying to be completely honest with you in my

18        answer.  I don't know what the term was, and it may have had

19        a term and it may have expired.  I don't know that.  As far

20        as I know, I am, but I could not be.  I don't know because

21        it was -- Protect Marriage was created specifically for the

22        referendum.

23   Q    And if you look at the third page of this exhibit, it's a

24        different Political Committee Registration form for the

25        Redacted        Political Action Committee.
```

HAMILTON (█████ ███████) 10/1/10)

```
                                                        Page 110

  1           Do you see that?

  2  A    I do.

  3  Q    And is this the political action committee you were talking

  4       about earlier this morning?

  5  A    It was an early version of that political -- what is this

  6       dated?  The 9th?

  7  Q    This is dated January 17, 2009.

  8  A    This isn't accurate to the PAC now.

  9  Q    So there was the █████████ Political Action

 10       Committee that was formed -- I'm sorry, that registered as a

 11       political committee with the Public Disclosure Commission on

 12       January 17, 2009?

 13  A    It appears that.

 14  Q    You were the chair of that political committee?

 15  A    It states that I was, yes.

 16  Q    And so I guess I'm trying to understand.  Is there another

 17       political committee that supplanted this one?

 18  A    I was on a political action committee that myself, ████

 19       ████████ and someone else, █████████ or somebody -- I don't

 20       even remember -- and I withdrew from that, and this one was

 21       formed.  So no, the answer is no.  There's not another

 22       political action committee.

 23  Q    So this █████████ Political Action Committee is the

 24       one that you were referring to this morning?

 25  A    Yes, yes.
```

HAMILTON (Redac Redacted    10/1/10)

Page 111

```
1   Q    This is ongoing political committee?

2   A    Yes.

3   Q    If we were to go to the Public Disclosure's Web site, we can

4        see all the material that the committee has filed?

5   A    Yes.

6   Q    Other than participating -- well, strike that.

7            What was the purpose of Redacted         Political

8        Action Committee?

9   A    The purpose has changed.  It's been different.  And, again,

10        we've discussed that with PDC.  Originally it was for

11        candidate -- candidates and then we made it exclusively

12        during the period of R71 to be for R71.

13  Q    Okay.

14  A    And, again, that was with conversation with PDC.

15  Q    And is that your signature at the bottom of this form?

16  A    No.

17  Q    Whose is it?

18  A    You know, I don't know.

19  Q    Who is the treasurer of the committee?

20  A    Rick Wilson.

21  Q    Does that appear to be Rick Wilson's signature?

22  A    It could be.  It isn't mine.  It probably is.  It says

23        treasurer signature, you know.

24  Q    Fair enough.

25            Who is Rick Wilson?
```

HAMILTON (Redac Redacted   10/1/10)

Page 112

```
 1   A    He's the secretary of the PAC.

 2   Q    It says under box 7 here that Jennifer Lee was the

 3        secretary.

 4   A    That was -- that's an error.  I don't know.  That's why I

 5        hesitated on this because Jennifer Lee worked for us.  I

 6        didn't realize she was with us until 2009.  I think that's

 7        an error.  She could have been on a PAC, but I don't recall

 8        that she was on this one.  She is not and Rick Wilson is the

 9        secretary.

10   Q    And the treasurer?

11   A    And the treasurer.

12   Q    And what is CAM Consulting?

13   A    Colleen Morse who manages our PAC and a number of others in

14        the state.

15   Q    From Centralia?

16   A    Yes.

17   Q    When you say she manages the PAC, what sort of things does

18        she do?

19   A    She handles the money, not much in our case.  We haven't

20        raised very much any time.  But she handles the money, picks

21        it up, banks it, writes checks.  She's an authorized check

22        signer and manages it and manages all of our reporting.

23                              (Exhibit No. 26 marked.)

24   Q    Handing you what's been marked as Exhibit 26, this is

25        another political committee registration form and it was
```

HAMILTON (Redacted Redacted   10/1/10)

Page 113

```
 1          filed on September 1, 2006, the first page is.
 2              So looking at the first page, are you familiar with The
 3          committee for Judicial Restraint?
 4     A    I could be.  I don't recall that was the name of it.  Who
 5          else is -- can I ask you a question to better help me
 6          answer?  Do you mind?
 7     Q    Sure.  Go ahead.
 8     A    Have you discovered that I'm somehow associated with this?
 9          Because I don't believe I am.
10     Q    Well, that -- you know, let's just ask.  Let me just ask
11          you.
12     A    Ask me that question.
13     Q    Sure.  It says the campaign manager's name is Redacted
14          Do you know Redacted
15     A    Yes.
16     Q    Who is he?
17     A    Redacted   he's a pastor in Bothell.
18     Q    And so apparently Redacted   registered a political
19          committee called Redacted
20     A    Yeah, it appears that way.
21     Q    And if you look down at the last couple of pages of this
22          exhibit, there's an attached article from the Redacted
23          Web site that quotes Redacted
24     A    Redacted   yeah.
25     Q    And he's described at the beginning as the pastor of Cedar
```

HAMILTON (█Redac█ █Redacted█  10/1/10)

Page 114

```
 1      █Redacted█      and  █Redacted█

 2      █Redacted█   .   That's the reason why I'm sort of

 3      wondering about your relationship with --

 4    A  Yeah, I get that.  Where is that again?  I'm not finding

 5      that.  I've never seen this.

 6    Q  Second to the last paragraph -- I'm sorry.  Second to the

 7      last page of Exhibit 26.

 8    A  Page?

 9    Q  Yeah.  You're on the right page, right up on top.

10    A  Okay.

11    Q  Underneath the little picture of David Postman.

12    A  Okay.

13    Q  It says, "█Redacted█  robo call for conservative judges."

14    A  Yeah, I got that.

15    Q  And then right underneath that, it says, "I just got a

16      recorded call."

17           Do you see that?

18    A  Yeah, I got that.

19    Q  And it describes █Redacted█  as the chairman and CEO of Faith

20      and Freedom Network.

21    A  No.  It says █Redacted█  e-mails to say that he is longer heading

22      █Redacted█

23    Q  "He is doing his overt political work through the two PACS

24      he operates, Committee for Religious Freedom and Committee

25      for Judicial Restraint"?
```

HAMILTON (Redac Redacted  10/1/10)

Page 115

```
 1   A   I see that, yeah.  I don't know anything about it.

 2   Q   Did you replace him as the Redacted

 3       Redacted

 4   A   I replaced him as Redacted          of Redacted

 5       Network.

 6   Q   And was that just the ending of his term and --

 7   A   No.  He wanted to go a different direction.

 8   Q   Okay.

 9   A   He wanted to do this.

10   Q   You didn't want to?

11   A   I didn't want to do it with him.

12   Q   And why was that?

13   A   I don't know.  Just he was wanting to do it on his own, I

14       presume.  I don't know.

15   Q   Fair to say, you just had a difference of opinion about

16       which way the organization was going to go?

17   A   Well, it was a choice for him to do his own thing, more

18       based out of his church, I think, than a disagreement over

19       policy.  I wouldn't say that.  I don't know.  We just went

20       our separate ways.

21   Q   And so is it a fair statement that you don't have anything

22       to do with the Committee -- or didn't have anything to do

23       with the Committee for Judicial Restraint?

24   A   As far as I know, I didn't, no.  Nothing.  There was no

25       involvement on my part, to my knowledge.
```

HAMILTON (Redac[Redacted]   10/1/10)

Page 116

 1   Q   And there's this other PAC that's mentioned in the
 2       article --
 3   A   Yeah.
 4   Q   -- Committee for Religious Freedom.
 5   A   Yeah.  That's the PAC I referred to a few moments ago.  I
 6       was on that board.  [Redacted] myself, and Alex Hayes.  If you
 7       drill in deep enough, you can probably find that in the
 8       records.  That did exist and that would be, I think,
 9       previous to this date.
10   Q   Let's take a look at Exhibit No. 27.
11                                    (Exhibit No. 27 marked.)
12   Q   This is a political committee registration form for the
13       Committee for Religious Freedom.
14           Do you see that?
15   A   I do.
16   Q   Dated April 13, 2006?
17   A   Yes.
18   Q   You were listed there with [Red][Redacted]
19   A   That's the one I was making reference to.
20   Q   I wanted to get this into the record.
21           So at that point, you were involved with, back in 2006,
22       with the Committee for Religious Freedom.  As a general
23       proposition, what was that political committee organized to
24       advance?
25   A   You know, [Red][Redacted] and Hayes are guys -- I'm not sure what

HAMILTON (Redac Redacted  10/1/10)

Page 117

```
 1       they did really.
 2   Q   You were a committee officer?
 3   A   I was.
 4   Q   And at some point you were no longer?  You resigned from
 5       this?
 6   A   Yes.
 7   Q   Do you recall when that was?
 8   A   No.  But it would have -- I can tell you approximately.  It
 9       was after it was formed, obviously, and it would have been
10       prior to like July or August of that same year.
11   Q   So let me ask you a -- if somebody was upset about something
12       that the Committee for Religious Freedom did and went back
13       and looked at this form, which I pulled off the registration
14       from the Public Disclosure Commission, the two people who
15       they would have to express their displeasure would be the
16       two people that are listed as committee officers here,
17       right?
18   A   Possibly.
19   Q   Yeah.  Well, I mean, there's only two committee officers
20       listed.
21   A   Right.
22   Q   You and Red  Redacted
23   A   That's correct.
24   Q   So if somebody's upset about something they're doing, this
25       is the record of who's involved, right?
```

HAMILTON (⬛Redac⬛ ⬛Redacted⬛   10/1/10)

```
                                                      Page 118

 1    A     Yes.

 2    Q     Thank you.

 3              Is it fair to say, sir, that you have -- even though

 4          you're not -- that you said you're not the same generation

 5          as Bill Gates, you do use Twitter, though, don't you?

 6    A     I'm on Twitter.

 7    Q     Right.

 8    A     Yeah.

 9    Q     And you post tweets?

10    A     Okay.  I think we do, yeah.  I don't read it.  I honestly

11          don't.

12                              (Exhibit No. 28 marked.)

13    Q     Let me hand you what's been marked as Exhibit 28.  These

14          are two separate collections of what I think in the -- is

15          referred to as tweets from Twitter.

16    A     I think you're right.

17    Q     So the first couple of pages deals with tweets from you,

18          ⬛Redac⬛ ⬛Redacted⬛

19              Do you see that?

20    A     I do.

21    Q     And then the last few pages are tweets from Faith and

22          Freedom?

23    A     Now, Let me clarify the question.  Are you asking me if some

24          of these are some from ⬛Redacted⬛ and some are from

25          me?
```

Dixie Cattell & Associates (360) 352-2506

HAMILTON (Redac Redacted   10/1/10)

Page 119

```
 1   Q    Yes.

 2   A    I don't believe so.  I don't know.

 3   Q    Well, let's just go through it then.  Let's look at the

 4        first page of Exhibit 28.  It says, "Get short timely

 5        messages from Redac Redacted

 6   A    Yes.

 7   Q    And then you join by following the at sign, Redacted .

 8             Do you see that?

 9   A    I see.

10   Q    Is your middle initial E?

11   A    Yes.

12   Q    And so if we look on page 2, your name, Redacted

13        appears in bold letters at the middle of the page?

14   A    Yes.

15   Q    And is that a -- there's a little picture there.  It's not a

16        very good reproduction.  Is that picture of you sitting at

17        your desk?

18   A    Yes.

19   Q    Now, it seems to indicate that you have 98 followers and

20        you're following 182 other people who participate in

21        Twitter?

22   A    Yeah, I see that.  I have no idea.

23   Q    So there's a series of tweets that are numbered 1, 2, 3, 4,

24        and so on.  Do you have somebody in your organization that

25        writes these and posts them under your name?
```

HAMILTON (Redac Redacted   10/1/10)

Page 120

 1   A    Apparently.

 2   Q    You don't --

 3   A    We're not that big.  Because we're so small, a few people do

 4        a lot, so I would -- yeah.  I mean, I'm not disputing this.

 5        I'm saying honestly I don't know.

 6   Q    But you're familiar with the fact that there are messages --

 7   A    On Twitter.

 8   Q    -- on Twitter?

 9   A    Yes.

10   Q    They're being attributed to you?

11   A    Yeah.  I mean, it looks like it.

12   Q    And they're posted with your authority?

13   A    Yes.

14   Q    You use this in part to further advance the opposition to

15        gay marriage legislation in Washington State, for example,

16        true?

17   A    No.  We would use Twitter to further advance our mission and

18        that's to advance Judeo-Christian values.

19   Q    Including opposing what you refer to as gay marriage

20        legislation?

21   A    No.  We opposed the redefinition of marriage.

22   Q    The post No. 8 -- we're on Exhibit 28, page 2 -- says,

23        quote, Growing chorus of dissent against gay marriage

24        legislation in Washington State.  Join the chorus, and then

25        there's a Web site.

HAMILTON (Redac Redacted   10/1/10)

                                                        Page 121

 1    A    Okay.

 2    Q    That was posted under your name --

 3    A    Okay.

 4    Q    -- true?

 5    A    It appears that it was.

 6    Q    Tweet No. 2, "Marriage hangs in the balance in Washington

 7         State.  Next 30 days critical.  Please respond," and a Web

 8         site, true?

 9    A    It appears so.

10    Q    Post No. 9, page 3, Exhibit 28, says, quote, Growing concern

11         in Washington State over gay rights expansion, and then

12         there's a Web site.

13             Do you see that?

14    A    I do.

15    Q    That was posted over your name with your authorization?

16    A    Okay.

17    Q    True?

18    A    It appears that it was.

19    Q    Thank you.

20             Mr. Redacted   you've had a number of judgments of tax

21         liens filed against you, isn't that true, over the years?

22    A    I've had some.

23    Q    Five?

24    A    It could be.

25                                   (Exhibit No. 29 marked.)

HAMILTON (Redac Redacted  10/1/10)

Page 122

1   Q   Your address -- do you live in Redacted

2   A   Yes.

3   Q   And is the specific address Redacted

4       Redacted

5   A   Yes.

6   Q   So Exhibit 29 is a collection of judgments and releases of

7       tax liens that were filed in the Oregon State courts, and so

8       let's just start with page 1.

9   A   Okay.

10  Q   This is Redacted , right?

11  A   Yes.

12  Q   And it appears to be a tax lien in the amount of $3,281?

13  A   It does.

14  Q   And if you turn to page 2, the creditor is listed as Metro

15      Area Collection Service.

16          Do you see that?

17  A   I do.

18  Q   Was this for unpaid taxes?

19  A   I don't recall.

20  Q   Do you recall what the debt was for?  It's a small-claims

21      judgment in the amount of $3,281.

22  A   I don't recall.

23  Q   You don't recall.  It's dated 2006.  Do you know if you've

24      paid off this judgment?

25  A   Yes.

HAMILTON (Redac Redacted   10/1/10)

Page 123

 1   Q   And have you?

 2   A   Yes.

 3   Q   And that is your address that's accurately reflected on this

 4       court record?

 5   A   Yes.

 6   Q   Next page, we're dealing with the third page of Exhibit 29,

 7       is another small-claims judgment, this time from Washington

 8       County, Oregon, true?

 9   A   Yes.

10   Q   And it's back in 2004 and shows a judgment in the amount of

11       $947?

12   A   Yes.

13   Q   The creditor was Quick Collect, Inc.

14           Do you see that?

15   A   Yes.

16   Q   And do you recall what that is about?

17   A   Yes.  It was a disputed tax return charge.

18   Q   A federal or state tax return?

19   A   I don't recall.  I don't recall.

20   Q   And I just want to be clear because I'm not --

21   A   It was an accountant who charged me way more than he said he

22       would.

23   Q   This is dispute with the accountant, not with the taxing

24       authority?

25   A   Yes, that's correct.

HAMILTON (Redac Redacted   10/1/10)

Page 124

1  Q    Has this been resolved?

2  A    Yes.

3  Q    Let's go to the third page.  This is a federal tax lien

4       release filing in Clackamas County, Oregon.

5            Do you see that?

6  A    Yes.

7  Q    And it was in the amount $1,525?

8  A    Yes.

9  Q    From 1992?

10 A    Yes.

11 Q    And so it looks like it was filed in March of 1992 and then

12      released in October of 1992.

13           Do you remember this one?

14 A    No.  I remember that it happened.  I don't -- I mean, it's

15      nearly 20 years ago.

16 Q    And what happened?

17 A    What happened?  Well, I didn't get all my taxes paid and

18      they wouldn't wait for me, so . . .

19 Q    They filed a lien?

20 A    Yeah.

21 Q    And it took about seven months and then you paid it off?

22 A    I did.

23 Q    Let's look at the next page.  This is the second to the last

24      page of Exhibit 29.  This appears to be another federal tax

25      lien, this one from just two years ago.

HAMILTON (██████ ███████   10/1/10)

```
                                                      Page 125

 1    A     Yes.

 2    Q     In the amount of $21,436?

 3    A     Yes.

 4    Q     What is this one about?

 5    A     It's related to some property that I sold that had been

 6          investment property.  And the accountant didn't get it

 7          right, in my opinion, and so we disputed some things, and

 8          that's the number we ended up on and they filed a lien.

 9    Q     And has this one been paid off?

10    A     Yes.  I do not owe the IRS any money.

11    Q     And do you know why this lien has not been released?

12    A     It has been.  I have a release on it.

13    Q     All right.  When was it released?

14    A     I don't know, but I have the release.

15    Q     At the same year, 2008, a year after that, last year?  Do

16          you know?

17    A     It would be after 8/15/2008.  I don't know the date.  It

18          isn't recent.  I mean, it's closer to that date than it is

19          this date.

20    Q     Fair enough.

21             Last page deals with a judgment release filed in 1994.

22          The debtor here was ██████ ████████  Ministries in Lake Oswego.

23          Is that your organization?

24    A     It was.  It isn't active now.

25    Q     And the creditor was the Commercial Agency.  Do you know
```

HAMILTON (Redac Redacted    10/1/10)

Page 126

1       what that is?  Or maybe I should ask you more generally, do

2       you recall the dispute?

3   A   I don't for sure.  I know there was a dispute.  I mean,

4       we're talking about 1989.  There was a dispute on a printing

5       bill.  That could be it.  I don't know.

6   Q   It looked like there was a judgment that was filed in 1989

7       and not released until about five years later in 1994.

8   A   Yeah.  I don't know.

9   Q   It's fair to say, if somebody wanted to find your -- find a

10      way to communicate with you, you're pretty easy to find on

11      the Web?

12  A   I would say so.  Anne found me.

13  Q   And it would be pretty easy to find the location -- your

14      street address because it's printed all over the place on

15      the Web?

16  A   Well, I know there are the -- it's not particularly easy to

17      find.

18  Q   It's possible?

19  A   It's possible.

20  Q   Going to go back through a couple of questions that you were

21      asked this morning.  One of the PDC forms that you were

22      asked about deals with legal fees to Mr. Pidgeon.

23          Do you recall that?

24  A   Um-hmm -- yes.

25  Q   And you indicated that he had done a lot of work pro bono

DIXSON (Redac Redacted   10/1/10)

Page 127

1        for the Referendum 71 campaign?

2   A    Yes.

3   Q    Do you know if those are reported in-kind contributions to

4        Mr. Pidgeon?

5   A    I don't know.

6   Q    You were subpoenaed in order to appear at the deposition

7        today, right?

8   A    Yes.

9   Q    And the subpoena asked you to produce a number of documents,

10       and you've produced what you could, as I understand your

11       testimony, in the time that was available to you?

12  A    Yes.

13  Q    As you sit here today, you're not aware of any other

14       responsive documents that you failed to produce?

15  A    I'm aware that there could be some because I was -- I didn't

16       have the time to put into it.  I'm not aware of any that I'm

17       going to go get, but I'm going to do some more research.

18              MR. HAMILTON:  That's all the questions I have for

19       you.  Thank you.  Mr. Dixson may have some more.

20              MR. DIXSON:  Yes, thank you.

21                          EXAMINATION

22  BY MR. DIXSON:

23  Q    And this is Steven Dixson.  I represent the Washington

24       Coalition for Open Government.  I'm in Spokane and

25       recognizing the inherent difficulties of doing this by

DIXSON (Redacted Redacted   10/1/10)

Page 128

1        telephone, I will try to keep my questions very brief.

2              I think it was your testimony that, in addition to

3        several harassing phone calls and what you viewed on the

4        Web, you also received e-mails either to your personal

5        address or to the Redacted address.  Is

6        that correct?

7   A    Threatening e-mail?

8   Q    Correct.

9   A    No, I don't believe I said that.

10  Q    Okay.

11  A    If I did, I misspoke.

12  Q    So the harassment was limited to the phone calls and the Web

13       pages that we have previously discussed today; is that

14       correct?

15  A    Yes.

16  Q    I think you earlier said that you continued to, I don't want

17       to misquote you, but something along the lines of protect

18       the petition signers.  Is that correct?

19  A    Yes.

20  Q    Now, what are you doing to continue to protect the petition

21       signers?

22  A    I'm sitting through this grilling today.

23  Q    In addition to this deposition, any other affirmative steps

24       that you're taking to protect the petition signers?

25  A    No.

DIXSON (Redac Redacted   10/1/10)

Page 129

1  Q   And my last line of questioning was, I think you have in

2      front of you Exhibit 24 regarding -- it's a collection of

3      blog posts from the Redacted

4  A   I'm sure I do.  I'm looking for it.

5  Q   Tell me when you're there and then I would ask you to turn

6      to pages -- probably page 20, which is the August 6th blog

7      post that you discussed with Mr. Hamilton.

8  A   I'm on page 6.  Could I ask who am I speaking to?

9  Q   Yeah.  My name is Steven Dixson.  I'm an attorney for the

10     Washington Coalition for Open Government.

11 A   Okay.

12 Q   My law firm is the name of Witherspoon Kelley.

13 A   Okay.

14 Q   I would be happy to -- I don't know if anyone there has a

15     business card.  I would be happy to provide you any

16     information about the organization or our law firm at any

17     time.

18 A   Thank you.

19 Q   Yeah.

20 A   Proceed.

21 Q   Turn to page 20, I believe the date is August 6th.

22 A   Okay.  I'm on page 20.

23 Q   And I would like to turn -- I don't have the exhibit as it

24     exists in your form in front of me, but the paragraph

25     begins, "There are college students who."

DIXSON (Redac Redacted    10/1/10)

Page 130

```
 1   A    Okay.  Got it.

 2   Q    Do you see that?

 3   A    Yes.

 4   Q    Redacted




 8        Did I read that accurately?

 9   A    Yes, you did.  Yes.

10   Q    Did you speak to any college students who told you this?

11   A    Their families spoke to me.

12   Q    Do you remember what they said?

13   A    Essentially they told me what they -- what I wrote.

14   Q    Do you remember how many families told you this?

15   A    One family told me that.

16   Q    Do you remember the college that their son or daughter was

17        attending?

18   A    University of Washington.

19   Q    Did they mention a particular professor by name?

20   A    No.

21   Q    So one family spoke to you about their fear that their son

22        or daughter would face recrimination in the classroom?

23   A    Yes.

24   Q    Do you know if it was the student's fear or the parents'

25        fear?
```

Dixie Cattell & Associates (360) 352-2506

DIXSON (Redac Redacted  10/1/10)

Page 131

```
 1   A   Certainly the parents' fear, but I believe they expressed

 2       that it was their -- I believe it was a son, the son's fear.

 3   Q   Did you have any follow-up with that family regarding

 4       whether or not the son faced any recrimination from that

 5       particular professor?

 6   A   No.

 7   Q   And I don't know what page this is on, but the same exhibit,

 8       the paragraph begins, "Some in the faith community."

 9           Do you see that paragraph, approximately a paragraph

10       below where we just were?

11   A   Yes.

12   Q   Did you receive some criticism from members of the faith

13       community regarding Referendum 71?

14   A   I believe there -- I wouldn't have written that, had I not

15       heard that.  I believe there were some who said that we

16       should let it go, but there were people also that weren't

17       really involved in it and didn't support it necessarily.

18   Q   Do you remember the substance of any of those conversations

19       in particular or the origin of those conversations, any

20       particular faith-based organizations?

21   A   It wasn't -- I don't think it was an organization.  I think

22       it was individual comments.  And no, the answer is no.

23   Q   So you don't remember any of those particular conversations,

24       but they must have occurred for you to write what you wrote,

25       correct?
```

PIDGEON (Redac Redacted 10/1/10)

                                                        Page 132

1   A    I heard the comment.  I heard some comments, two or three

2        maybe.

3   Q    To you personally or how did you hear of these comments?

4   A    I don't recall.  A lot of people were saying a lot of things

5        to me at that time.  I don't know.

6   Q    I understand.

7   A    It could be either.

8              MR. DIXSON:  That's the extent of my questions for

9        now.  Thank you, sir.

10             THE WITNESS:  Thank you.

11                        EXAMINATION

12  BY MR. PIDGEON:

13  Q    Mr. Redacted  I have a few follow-ups.  If we could, I

14       would like to go back to Exhibit 8 and 9.  Let's begin with

15       Exhibit 8, if we can.

16  A    Okay.

17  Q    This is Stephen Pidgeon, on behalf of Protect Marriage

18       Washington.

19            Now, let's begin.  Now, it was your testimony earlier

20       that this was from some blog site that John Bisceglia

21       posted?

22  A    Yes.

23  Q    And this upper part here, you believe, was posted

24       September 18, 2010?

25  A    Yes, or even after that.

State Objects: Witness lacks foundation for the testimony; hearsay; irrelevant.

PIDGEON (█████ ████████)   10/1/10

```
                                                            Page 133

  1   Q    So within the last 25 days?

  2   A    Yes.

  3   Q    And he begins with -- can you read the first sentence to me

  4        before he gives this roster of people?

  5   A    "Here is a list of people whose mere existence is a serious

  6        threat to our safety."

  7   Q    So in your view, does that mean to you that Bisceglia takes

  8        the fact that we're living as a threat to his safety?

  9   A    Yes.

 10   Q    Because my name appears on that list.  Isn't that correct?

 11   A    It is.  It does.

 12   Q    Your name appears on that list?

 13   A    Yes.

 14   Q    Let's see if there's any public figures that are on that

 15        list.  Senator John McCain is on the list?

 16   A    Yes.

 17   Q    Is Senator ████████ on that list?

 18   A    Yes.

 19   Q    Senator Dan Swecker?

 20   A    Yes.

 21   Q    Representative Matt Shea?

 22   A    Yes.

 23   Q    Isn't Justice Antonin Scalia from the U.S. Supreme Court on

 24        that list?

 25   A    Yes.
```

PIDGEON (Redac Redacted   10/1/10)

Page 134

| | | |
|---|---|---|
| 1 | Q | Former presidential candidate Mike Huckabee? |
| 2 | A | Yes. |
| 3 | Q | Senator John Cornyn? |
| 4 | A | Yes. |
| 5 | Q | Now, in your view, just asking your personal opinion, given |
| 6 | | the tenor of what's in this entire exhibit, does that |
| 7 | | constitute a threat of violence or even a death threat to |
| 8 | | those people? |
| 9 | A | Yes.  It does in the context of what is being said.  That's |
| 10 | | the point I was trying to make earlier.  In the context of |
| 11 | | what is being said and advocated day after day after day on |
| 12 | | this Web site and others that are interconnected, which are |
| 13 | | often quoted, cross quoted, in that context, yes, it does. |
| 14 | Q | Would you take a look at -- would you look at page -- it's |
| 15 | | page 4.  Page 4. |
| 16 | A | Yes. |
| 17 | Q | And if you will look, do you see where he's written in large |
| 18 | | print, "But I gots me a sneakin' suspicion that things- |
| 19 | | will-be-a-changin'-soon"? |
| 20 | A | Yes. |
| 21 | Q | Let's look down at the paragraph below then and let's see if |
| 22 | | Mr. Bisceglia sets out any more justifications for acting -- |
| 23 | A | Okay. |
| 24 | Q | -- as he's proposing at this site. |
| 25 | | Can you read that whole paragraph into the record that |

State Objects: Witness lacks foundation for the testimony; hearsay;  irrelevant.

State Objects: Lack of foundation; hearsay; irrelevant.

Dixie Cattell & Associates  (360) 352-2506

PIDGEON (▮Redac▮ ▮Redacted▮)   10/1/10
                                                        Page 135

1        begins with, "Because more and more"?

2    A   "Because more and more of us are connecting the dots between

3        those power hungry hate groups do and the results that

4        assault us.  I still maintain that if, if I were legally

5        allowed to go into your home and traumatize your children,

6        steal your nest egg, deport your wife, take your home or

7        cause severe psychological distress, I would not blame you

8        for slitting my throat with a hunting knife.  Sure, it may

9        not be legal, in quotes, and have ramifications, but just

10       how many men would sit idly by and do nothing while they

11       watched their loved ones harmed."

12   Q   Let's explore that paragraph for just a moment.  Would it be

13       reasonable to assume that he is setting forth justification

14       for why someone could slit someone else's throat with a

15       hunting knife?

16                MR. HAMILTON:  Object to the form of the question;

17       calls for speculation.

18   A   Clearly he's setting that.

19   Q   (By Mr. Pidgeon)  And is one of those justifications going

20       into your home?

21   A   Yes.

22                MR. HAMILTON:  Same objection.

23   Q   (By Mr. Pidgeon)  Is one of those justifications

24       traumatizing your children?

25   A   Yes.

State Objects: Witness lacks foundation for the testimony; hearsay; irrelevant.

Dixie Cattell & Associates (360) 352-2506

PIDGEON (Redacted Redacted    10/1/10)

Page 136

1            MR. HAMILTON:   Same objection.

2    Q   (By Mr. Pidgeon)   Is one of those justifications stealing

3    your nest egg?

4            MR. HAMILTON:   Same objection.

5    A   Yes.

6            MR. PIDGEON:   I'll go slower if you're going to

7    object on each one.

8            MR. HAMILTON:   Well, if you give me a standing

9    objection to the line of questions, I won't need to.

10           MR. PIDGEON:   Go ahead and assert your standing

11   objection.

12           MR. HAMILTON:   I object to all of these on the

13   same basis as I previously articulated.

14   Q   (By Mr. Pidgeon)   Is one of the justifications that he sets

15   forth in this paragraph for not blaming someone who would

16   slit the throat of another deporting someone's wife?

17   A   Yes.

18   Q   Is one of the justifications taking someone's home?

19   A   Yes.

20   Q   And is it also a justification for slitting someone's throat

21   with a hunting knife if another person was to cause severe

22   psychological distress?

23   A   Yes.

24   Q   Do you know of any statute in Washington that would

25   authorize the execution of another person for causing severe

State Objects: Witness lacks foundation for the testimony; hearsay;  irrelevant.

Dixie Cattell & Associates (360) 352-2506

PIDGEON (Redacted Redacted)   10/1/10

Page 137

1      psychological stress?

2   A  No.

3   Q  How about entering into someone's home?

4   A  No.

5   Q  Let's continue.  Can you take a look at the top of page 5,

6      the very next page?  Do you see the very first sentence

7      says -- what is the dating there?

8   A  January 31, 2009.

9   Q  Will you read the whole sentence.

10  A  The paragraph?

11  Q  No.  The sentence that you just said had the date, would you

12     read that the whole sentence?

13  A  "First posted January 31, 2009."

14  Q  Now, can you read -- so January 31, 2009, that would have

15     been before the election, correct?

16  A  Yes.

17  Q  Can you read that paragraph for us?

18  A  "The more visibility we have and the more long overdue," in

19     parentheses, "rights we are given, the more we become

20     targets of hatred and violence in America.  Perhaps when the

21     dead bodies of straight men start to pile up and gay men

22     start walking away from attempted gay bashings wiping off

23     their knives and putting away their guns,     quote --

24     parentheses, "used for justified self-defense, future gay

25     bashers may pause and think before acting out their evil

State Objects: Witness lacks foundation for the testimony; hearsay; irrelevant.

Dixie Cattell & Associates (360) 352-2506

PIDGEON (Redacted Redacted )   10/1/10

Page 138

1    hatred on us."

2  Q   Now, does, in your view, does this paragraph imply that

3        Mr. Bisceglia would seek to see dead bodies of straight men

4        starting to pile up?

5  A   Yes.

6  Q   And he also has an articulation here that -- well, let me

7        ask you this:   Does he indicate that gay men should be using

8        knives?

9  A   Yes.

10  Q   Does he also indicate they should be using guns?

11  A   Yes.

12  Q   And is the justification for self-defense here, is that

13        referring back to what he talked to back here in the

14        paragraph you read before?

15  A   Yes.

16  Q   So in other words, can you surmise, from putting these two

17        paragraphs together, that, in Mr. Bisceglia's mind, it would

18        be okay to use a knife and a gun to kill a straight man and

19        to pile up the bodies of dead people if they caused severe

20        psychological distress?

21  A   Yes.

22                    MR. HAMILTON:   Object to the form of the question.

23  A   Yes.

24  Q   (By Mr. Pidgeon)  Would Mr. Bisceglia be justified,

25        according to your reading of what he's got here on the blog,

State Objects: Witness lacks foundation for the testimony; hearsay; irrelevant.

PIDGEON (Redacted | Redacted)  10/1/10

Page 139

1  to slit someone's throat, use a knife, or use a gun for

2  traumatizing your children?

3  A  Yes.

4           MR. HAMILTON:  Same objection.

5  Q  (By Mr. Pidgeon)  Now, this particular site below that

6  paragraph, this site, this particular page, shows a

7  particular kind of knife.  Isn't that correct?

8  A  Yes.

9  Q  Let's go to the second to the last page.

10  A  Okay.

11  Q  Do you know whether or not an FBI report was ever entered

12  concerning Mr. Bisceglia's blog posting?

13  A  I don't know.

14  Q  Do you know whether or not he made an express threat against

15  government employees?

16  A  I recall very vividly reading what has now been scrubbed

17  from his site, that he made a threat against Larry Stickney,

18  myself, and the buildings of churches and government

19  buildings that supported -- that stood against, I believe.

20  I can't remember the word he used, but that was opposed to

21  expansion of gay rights.

22  Q  Now, on the last page of this particular Web site, does

23  Mr. Bisceglia make direct references to where somebody might

24  be able to get handguns in the ad there?

25  A  I don't see a reference as to where to get them.

State Objects: Witness lacks foundation for the testimony; hearsay; irrelevant.

PIDGEON (Redacted  Redacted      10/1/10)

Page 140

1  Q   Do you see this www.pinkpistols.org?

2  A   Yes.  I didn't see it.  Yes, of course.

3  Q   Have you ever gone to that Web site?

4  A   No.

5  Q   So you don't know whether or not it's possible to order a

6      handgun on that Web site?

7  A   I don't.

8  Q   Do you see what it says above the hands holding the

9      automatic weapon there?

10 A   Yes.

11 Q   What does it say?

12 A   It says three times, "Armed gays don't get bashed."

13 Q   So in your view, is that John Bisceglia recommending

14     firearms again?

15            MR. HAMILTON:   Objection to the form of the

16     question; calls for speculation.

17 A   It is because of the linkage to the whole flow of what he's

18     saying.  To take that out of context, it's an ad.  To put it

19     in the context of what he's saying here and has been for

20     months, perhaps years, of course it is.

21 Q   (By Mr. Pidgeon)  Let's take a look at Exhibit 8 for a

22     minute -- or Exhibit 9, rather.

23 A   (Witness complies.)

24 Q   I would like to look at this page here that begins with

25     "Pam's Blend of Pervision Tries to Out Our Agenda."

State Objects: Witness lacks foundation for the testimony; hearsay; irrelevant.

Dixie Cattell & Associates (360) 352-2506

PIDGEON (Redacted Redacted  10/1/10)

Page 141

1    A    Yeah.

2    Q    Now, do you see the two indented paragraphs there, the one

3         begins with, "From Redacted  point of view"?

4    A    Yes.

5    Q    Can you read those two paragraphs, please?

6    A    Yes.  "From Redacted  point of view, if I disagree with

7         someone who says that I should be executed because I'm gay,

8         then somehow I'm being intolerant of that person's religion.

9         The kind of tolerance Redacted  is looking for leads to

10        violence.  Should I condone my own execution?  Redacted

11        apparently thinks so.

12             "Redacted  sickeningly ended his post with a plea for

13        donations to what he calls this ministry.  He is using his

14        authority as Christian minister to broadcast to the world

15        his certainty that I and every other gay person deserve

16        death.  When will the press and general society stop giving

17        people like Redacted  a pass because he calls himself a

18        Christian and a pastor uses nice words like faith.  Let's

19        recognize," in bold, "Let's recognize his words for what

20        they really are, a condoning of lethal violence against gay

21        people."

22   Q    Now, Mr. Redacted  we've seen a number of exhibits, for

23        instance, looking at Exhibit 28, your Twitter messages.

24   A    28?

25   Q    Exhibit 28, your Twitter messages.

PIDGEON (▮▮▮ ▮▮▮▮▮▮▮▮   10/1/10)

Page 142

```
 1            MR. HAMILTON:  Let's go off the record for a
 2      second.
 3                         (Discussion off the record.)
 4  Q   (By Mr. Pidgeon)  In these Twitter posts, Mr. ▮▮▮▮▮▮▮ do
 5      you see any of these Twitter posts of yours from Faith and
 6      Freedom Network that makes a death threat to gays?
 7  A   There are none.
 8  Q   Do you see anything that posted that says gays should be
 9      executed?
10  A   No.
11  Q   Do you see anything that says people should use violence
12      against gays?
13  A   No.
14  Q   So there's nothing on the Twitter posts.
15          How about on your blog site?  Have you ever called for
16      the execution of gays on your blog site?
17  A   No, absolutely not.
18  Q   Have you ever called for violence to be used against gays --
19  A   No.
20  Q   -- on your blog site?
21  A   No.
22  Q   So let me see if I have this.  She makes a statement that
23      you think that gay people should be executed here in
24      paragraph 2.  Is that a true statement or not?
25  A   That's not true.  That's false.
```

PIDGEON (█Redac██Redacted█   10/1/10)

Page 143

1   Q   It also says --

2   A   It's true she thinks that, but it's false that I believe

3       that.

4   Q   And says, "█Redacted█ is looking to lead to violence."  Are you

5       looking to lead something to violence?

6   A   No.

7   Q   So that's a false statement too.  Is that correct?

8   A   Yes.

9   Q   Now, have you ever taken a position publicly of condoning

10      lethal violence against gay people?

11  A   No, nor privately.

12  Q   Now, in your view, if John Bisceglia read this defamatory

13      statement and false statement which demonizes and

14      dehumanizes you, do you think that this would be sufficient

15      justification as to what he set forth on his Web site, to

16      get a gun and shoot you?

17          MR. HAMILTON:  Object to the form of the question.

18  A   Yes.  That's why I brought this to the deposition today.

19  Q   (By Mr. Pidgeon)  Do you think this would be a sufficient

20      justification, if someone in a gay blog anywhere in the

21      country read this and believed it and read Bisceglia's and

22      believed it, would they also find that there was sufficient

23      justification to slit your throat or shoot you with a

24      handgun?

25  A   Yes.

PIDGEON (█Redac██████ █Redacted█████   10/1/10)

Page 144

1          MR. HAMILTON:   Object to the form of the question.

2     A    Yes.

3     Q    (By Mr. Pidgeon)   Now, as to Pastor █Red█ █Redacted███ there was a

4          question that was asked, have you ever received a death

5          threat as a result -- or any kind of threat as a result of

6          your work with Committee for Religious Freedom?

7     A    No.

8     Q    Has anyone ever sent you an e-mail --

9     A    No.

10    Q    -- concerning -- has anyone, to your knowledge, ever

11         complained to you about █Red█ █Redacted███ or John Vasco committing

12         acts of violence or threatening to execute someone?

13    A    No.

14    Q    Or threatening violence against anyone?

15    A    No.

16    Q    So to your knowledge, there's never been anything associated

17         with Committee for Religious Freedom in terms of threats or

18         violence?

19    A    No.

20    Q    You've also taken a position that's in opposition to

21         abortion.   Is that corrects?

22    A    Yes.

23    Q    And have you ever been threatened with violence from the

24         proabortion lobby?

25    A    No.

PIDGEON (⬛Redac⬛Redacted⬛ 10/1/10)

Page 145

1   Q   Now, have you ever taken a position that's opposed to

2       divorce?

3   A   As a pastor, I taught against divorce.

4   Q   Have you ever had anybody threaten you for taking a position

5       against divorce?

6   A   No.

7   Q   Did you ever teach against alcoholism and drug abuse?

8   A   I have.

9   Q   Have you ever had anybody threaten you because you were

10      opposed to alcoholism?

11  A   No.

12  Q   How about because you were opposed to drug abuse?

13  A   No.

14  Q   So is it safe to say the only threats you've ever had have

15      come from the homosexual community?

16  A   Yes.

17          MR. HAMILTON:   Objection to the form of the

18      question; assumes facts not in evidence.

19  A   Yes.  I will say I have lived, as was reviewed in this

20      deposition, I've lived a very public life, not only on

21      television on Channel 6 and other stations around the

22      country where they sent the program out to, but a number of

23      things that I've done have been extremely visible.  And I

24      have never had threats from anyone about anything, except

25      maybe in the deep jungle of somewhere where we were building

PIDGEON (Redac Redacted   10/1/10)

Page 146

1    a church.  I've had no threats.  It's only on the issue of

2    defending marriage.

3  Q  (By Mr. Pidgeon)  Now, let me ask -- I have one last

4    question.  This goes to Exhibit 29, which you don't need to

5    look at, but this is the exhibit of your civil judgment

6    filing record.

7  A  Um-hmm.

8  Q  Now, the account that was from -- apparently from 2006 for

9    $3,281 that Metro Area Collection Service was going after,

10   did they threaten you or harass you?

11 A  No.

12 Q  Stalk you?

13 A  No.

14 Q  Was this debt in any way related to R71?

15 A  No.

16 Q  And let's look at this debt that goes back from the $974,

17   the dispute you had with your accountant.  Did your

18   accountant give you a death threat?

19 A  No.

20 Q  Did he threaten, harass, or stalk you?

21 A  No.

22 Q  Was this $947 dispute over R71?

23 A  No.

24 Q  The federal tax lien from 1992, that lien is 18 years old.

25   Is that correct?

EGELER (Redac Redacted   10/1/10)

Page 147

1   A   Yes.

2   Q   And that was $1,525 from 18 years ago?

3   A   Yes.

4   Q   And I assume that wasn't related to R71?

5   A   No.

6   Q   Did the IRS threaten, harass, or stalk you?

7   A   No.

8   Q   And the amount that came in in 2008 over real estate

9       transaction, I think you said property sale, that

10      transaction, did anybody make any threats, harass, or stalk

11      you?

12  A   No.

13  Q   Did that amount of money have anything to do with R71?

14  A   No.

15                  MR. PIDGEON:  That's it.

16                          EXAMINATION

17  BY MS. EGELER:

18  Q   I have just a few questions, Mr. Redacted

19          Looking at Exhibit No. 24, page 20, the same page we've

20      been on with respect to that particular exhibit.

21  A   Page which?

22  Q   Page 20.

23  A   20.

24  Q   Now, the fourth paragraph down, if I understood your answers

25      to Mr. Dixson, there was just one family that you spoke to

EGELER (Redac Redacted  10/1/10)

Page 148

```
 1         that was concerned about an activist professor.  Is that
 2         correct?
 3    A    One family contacted me and told me they were very
 4         concerned.  Their son, and he was concerned, was in law
 5         school or prelaw -- I'm not sure what his program is -- but
 6         anyway, he had a law professor at University of Washington
 7         that is very active and is very open about his activist
 8         activities in the classroom.
 9    Q    How did this family contact you?
10    A    I don't recall.  I get calls.  I don't know.
11    Q    But are you sure it was telephone?
12    A    I just said I don't recall.  They contacted me.  They told
13         me this.  They said we're not concerned about ourselves as
14         much because whatever happens, happens.  But we don't want
15         to see our son be jeopardized or -- in the classroom.
16    Q    Have you ever heard of these people before, the family?
17    A    I could.  A lot of people contact me.  I get e-mail every
18         day from people.  I mean, I don't know if I heard of them
19         before.  Are they personal friends?  No.
20    Q    Do you know what the last name of the family is?
21    A    No.  I don't remember their name.
22    Q    Do you know if they donated to the Referendum 71 effort?
23    A    I don't.
24    Q    Do you know if they signed the petitions?
25    A    They said they did.
```

EGELER  (Redac Redacted   10/1/10)

Page 149

1   Q   Did they say their son did?

2   A   Yes.

3   Q   So you don't know if they were publicly involved in the

4       referendum promotion?

5   A   I don't.  They could have been.  I don't know.  I don't

6       know.  They said they signed it.

7   Q   Okay.

8   A   And their son was concerned.

9   Q   But didn't say whether or not they had any further

10      involvement?

11  A   No.  And I didn't have a follow-up conversation with them.

12  Q   Did they state how they had your phone number?

13  A   Goodness, no.  I mean, I think the other gentleman said that

14      I'm pretty easy to find, so . . .

15  Q   I know counsel for the Doe plaintiffs certainly had a hard

16      time contacting you and finding a number, as did I.  Can you

17      tell me how they would have found your phone number?  Is it

18      in the phone book?

19  A   No.  It's on the Web site.

20  Q   Your personal phone number is?

21  A   My -- there's a phone number on the Web site where I can be

22      reached.

23  Q   And the paragraph above that talks about a mother who helped

24      gather signatures.  Do you remember who that was?

25  A   I'm looking for the paragraph.

EGELER  (Redac Redacted  10/1/10)

Page 150

1   Q   It's the third paragraph.

2   A   Okay.  Yes.  It was Redacted Redacted

3   Q   Redacted Redacted   Did you talk to her personally?

4   A   I have.

5   Q   Did you talk to her in person or on the phone?

6   A   On the phone.  Larry Stickney is the person who told me

7       about the incident and then I've spoken to her about it

8       since then.

9   Q   You've spoken to her since then?

10  A   Yes.

11  Q   So she told you that she helped gather signatures?

12  A   I don't know that she told me that.  It's common knowledge

13      that she did.

14  Q   And how old is her son?

15  A   I don't know.

16  Q   But you know that he's a young boy?

17  A   He's young.

18  Q   Can you give me an age range that you think he's in?

19  A   I've never met her son, but I assume, from what I've been

20      told, he's, I don't know, five to ten.  I don't know.  I

21      would guess he's in that range.  In fact, I would be certain

22      he is.

23  Q   And you're certain for what reason?  Who told you?

24  A   Well, just the context in which it was described, he's a

25      little boy.

Dixie Cattell & Associates (360) 352-2506

Page 151

1    Q    So you gathered this from the context?

2    A    Yeah.  I gathered that from what Larry Stickney told me.

3    Q    Do you think sometimes, when people gather things from the

4         context, that they make mistakes?

5    A    I think a lot of people make a lot of mistakes.

6    Q    Do you think you might have made some mistakes in gathering

7         things from context?

8    A    Not on those two issues, I didn't.

9    Q    Not on these two issues --

10   A    No.

11   Q    -- in Exhibit 24?

12   A    No.

13   Q    So it wouldn't surprise you -- would it surprise you to

14        learn that the boy is actually 14 years old?

15   A    It would shock me.

16   Q    And that he's in high school?

17   A    It would shock me.

18   Q    Would it shock you to hear that Redacted Redacte may actually be

19        named Redacted    Redacted

20   A    No.  That wouldn't shock me because I may have misstated her

21        name.

22   Q    Would it shock you --

23   A    Because I don't know her personally.

24   Q    Would it shock you to learn she never gathered any

25        signatures for Referendum 71?

EGELER (Redac Redacted   10/1/10)

Page 152

1    A    It would because I was told that she did.

2    Q    Again, she told you this?

3    A    No.  I don't recall that she told -- my conversation with

4         her was not about gathering signatures.  It was about the

5         incident with her son.  I called her to ask her about it

6         because Larry Stickney told me about it.

7    Q    I think I mischaracterized your testimony.  I think what you

8         said was, it was common knowledge.  Is that correct?

9    A    That she gathered signatures?

10   Q    Right.

11   A    I felt -- I thought it was.  I thought she was involved in

12        gathering signatures.

13   Q    Can you look at Exhibit No. 8 for me for a minute.

14   A    (Witness complies.)

15   Q    Looking at this again, it appears you've made some marks on

16        this exhibit.  Is that correct?

17   A    Yes.

18   Q    There's some check marks throughout?

19   A    Yes.

20   Q    Would you have made those check marks?

21   A    Yes.

22   Q    Then on page 4, looks like you've done some underlining.  Is

23        that correct?

24   A    That's not correct.

25   Q    If you could look to -- there's a very large statement,

EGELER  (Redac Redacted    10/1/10)

                                                    Page 153

 1        "Have you had enough abuse yet?!"?

 2   A    Yes.

 3   Q    Do you see that?

 4   A    Um-hmm.

 5   Q    There's a paragraph that begins, "Unfortunately," do you see

 6        where I am?

 7   A    I'm sorry.  Yes, I did.

 8   Q    Just to ask you again, if I were to go to this Web site,

 9        other than that underlying and the check marks, this is

10        exactly how it would have appeared on September 27th,

11        correct?

12   A    Yes, correct.

13   Q    Do you know if -- on page 7, do you know if Mr. Bisceglia

14        posted this "Armed gays don't get bashed" section or whether

15        that was an advertisement on the Web site?

16   A    The picture?

17   Q    Yeah.

18   A    I don't know if it's paid advertisement or not.  It's on

19        there.

20   Q    Have you heard of gay bashing?

21   A    Have I heard of gay bashing?

22   Q    Yes.

23   A    Yes.

24   Q    What's your understanding of that term?

25   A    My understanding of gay bashing would be the violent acts,

EGELER (Redac Redacted   10/1/10)

Page 154

1         physical acts that we hear.  When they happen, we hear.

2         They are highlighted in the news.

3    Q    This would be violent physical acts against people who are

4         gay?

5    A    I would certainly consider that gay bashing.

6    Q    And would that include murder of individuals who are gay?

7    A    I don't know that I would -- I don't know.

8    Q    Have you ever heard of anyone being murdered simply because

9         they are gay?

10   A    I have heard of people being accused of murdering people

11        because they were gay.  Matthew Shepard is a pretty well

12        known case that has been disputed, I guess, but I've heard

13        of it.

14   Q    Do you think, if individuals are physically attacked, that

15        they have the right to arm themselves and defend themselves

16        from attack?

17   A    Of physical attack?

18   Q    Yes.

19   A    If someone physically attacks them?

20   Q    Yes.

21   A    Of course.

22              MS. EGELER:  I have no further questions.

23              MR. HAMILTON:  I have nothing further.

24              MR. DIXSON:  Nothing further here.

25              MR. PIDGEON:  I'm fine too.  Nothing further.

Page 155

1                              (Concluded 12:46 p.m.)

2                              (Signature reserved.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 156

1                    C E R T I F I C A T E

2        I, REBECCA S. LINDAUER, a duly authorized Notary Public in

3    and for the State of Washington, residing at Lacey, do hereby

4    certify:

5        That the foregoing deposition of ▮▮▮▮ ▮▮▮▮▮▮▮ was taken

6    before me and completed on the 1st day of October, 2010, and

7    thereafter transcribed by me by means of computer-aided

8    transcription; that the deposition is a full, true, and complete

9    transcript of the testimony of said witness;

10       That the witness, before examination, was by me duly sworn

11   to testify the truth, the whole truth, and nothing but the truth,

12   and that the witness reserved signature;

13       That I am not a relative, employee, attorney, or counsel of

14   any party to this action or relative or employee of any such

15   attorney or counsel, and I am not financially interested in the

16   said action or the outcome thereof;

17       That I am herewith securely sealing the deposition of ▮▮▮▮▮

18   ▮▮▮▮▮▮▮ and promptly mailing the same to MS. ANNE E. EGELER.

19       IN WITNESS HEREOF, I have hereunto set my hand and affixed

20   my official seal of this 9th day of October, 2010.

21

22

23

24   _____
                                   Rebecca S. Lindauer, CSR#2402
                                   Notary Public in and for the State of
25                                 Washington, residing at Lacey.

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted