1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

John DOE # 1, et al.,

                Plaintiffs,

       v.

SAM REED, in his official capacity as
Secretary of State of Washington, et al.,

              Defendants.

CASE NO. C09-5456BHS

ORDER GRANTING SUMMARY
JUDGMENT IN FAVOR OF
DEFENDANTS AND
INTERVENORS AND DENYING
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

       This matter comes before the Court on the parties' cross motions for summary

judgment (Dkts. 196, 204, 208, 209). The Court has considered the pleadings filed in

support of and in opposition to the motions, the remainder of the file, and heard oral

argument on October 3, 2011, and hereby grants summary judgment in favor of

Defendants and Intervenors and denies Plaintiffs' motion for summary judgment. The

Court also lifts its injunction preventing the disclosure of the Referendum 71 ("R-71")

petitions and closes this case.

# I. PROCEDURAL & FACTUAL BACKGROUND

On July 28, 2009, Plaintiffs (collectively "Doe") filed this action to object to and enjoin the disclosure of R-71 petitions on two constitutional bases: Count I, that disclosure of any referendum or initiative petitions is unconstitutional as a general matter; and Count II, that disclosure of R-71 petitions would be unconstitutional as applied to Doe (i.e., R-71 initiative signers). *See* Dkt. 2 (Complaint). On September 10, 2009, the Court granted preliminary injunctive relief on Count I but declined to rule on Count II. Dkt. 62.

Defendants appealed the Court's ruling and the Ninth Circuit reversed. *Doe v. Reed*, 586 F.3d 671 (2009). The Supreme Court accepted review and affirmed the Ninth Circuit. *Doe v. Reed*, 130 S. Ct. 2811 (2010). The Supreme Court left open the possibility of relief under Count II (Doe's as-applied challenge to disclosure).

On June 29, 2011, the parties each filed motions for summary judgment regarding Doe's as-applied challenge. Dkts. 196, 204, 208, and 209. The parties fully briefed these matters. Additionally, the Secretary of State of Washington moved to strike certain evidence relied upon by Doe. Dkt. 231 (motion to strike and reply to Doe's response in opposition to summary judgment).

## A.    Prior to Remand

In denying relief under Count I of Doe's Complaint, the Supreme Court of the United States set out the following factual and contextual background, which remains relevant in resolving the instant motions before the Court:

The State of Washington allows its citizens to challenge state laws by referendum. Roughly four percent of Washington voters must sign a petition to place such a referendum on the ballot. That petition, which by law must include the names and addresses of the signers, is then submitted to the government for verification and canvassing, to ensure that only lawful signatures are counted. The Washington Public Records Act (PRA) authorizes private parties to obtain copies of government documents, and the State construes the PRA to cover submitted referendum petitions.

This case arises out of a state law extending certain benefits to same-sex couples, and a corresponding referendum petition to put that law to a popular vote. Respondent intervenors invoked the PRA to obtain copies of the petition, with the names and addresses of the signers. Certain petition signers and the petition sponsor objected, arguing that such public disclosure would violate their rights under the First Amendment.

***

The Washington Constitution reserves to the people the power to reject any bill, with a few limited exceptions not relevant here, through the referendum process. Wash. Const., Art. II, § 1(b). To initiate a referendum, proponents must file a petition with the secretary of state that contains valid signatures of registered Washington voters equal to or exceeding four percent of the votes cast for the office of Governor at the last gubernatorial election. §§ 1(b), (d). A valid submission requires not only a signature, but also the signer's address and the county in which he is registered to vote. Wash. Rev. Code § 29A.72.130 (2008).

In May 2009, Washington Governor Christine Gregoire signed into law Senate Bill 5688, which "expand[ed] the rights and responsibilities" of state-registered domestic partners, including same-sex domestic partners. *Doe v. Reed*, 586 F.3d 671, 675 (9th Cir. 2009). That same month, Protect Marriage Washington, one of the petitioners here, was organized as a "State Political Committee" for the purpose of collecting the petition signatures necessary to place a referendum on the ballot, which would give the voters themselves an opportunity to vote on SB 5688. App. 8-9. If the referendum made it onto the ballot, Protect Marriage Washington planned to encourage voters to reject SB 5688. *Id.*, at 7, 9.

On July 25, 2009, Protect Marriage Washington submitted to the secretary of state a petition containing over 137,000 signatures. See 586 F.3d, at 675; Brief for Respondent Washington Families Standing Together 6. The secretary of state then began the verification and canvassing process, as required by Washington law, to ensure that only legal signatures were counted. Wash. Rev. Code § 29A.72.230. Some 120,000 valid signatures were required to place the referendum on the ballot. Sam Reed, Washington Secretary of State, Certification of Referendum 71 (Sept. 2, 2009). The secretary of state determined that the petition contained a sufficient number

1   of valid signatures, and the referendum (R-71) appeared on the November
    2009 ballot. The voters approved SB 5688 by a margin of 53% to 47%.

2           The PRA, Wash. Rev. Code § 42.56.001 *et seq.*, makes all "public
    records" available for public inspection and copying. § 42.56.070(1)

3   (2008). The Act defines "[p]ublic record" as "any writing containing
    information relating to the conduct of government or the performance of

4   any governmental or proprietary function prepared, owned, used, or
    retained by any state or local agency." § 42.56.010(2). Washington takes

5   the position that referendum petitions are "public records." Brief for
    Respondent Reed 5.

6           By August 20, 2009, the secretary had received requests for copies
    of the R-71 petition from an individual and four entities, including

7   Washington Coalition for Open Government (WCOG) and Washington
    Families Standing Together (WFST), two of the respondents here. 586

8   F.3d, at 675. Two entities, WhoSigned.org and KnowThyNeighbor.org,
    issued a joint press release stating their intention to post the names of the R-

9   71 petition signers online, in a searchable format. *See* App. 11; 586 F.3d, at
    675.

10          The referendum petition sponsor and certain signers filed a
    complaint and a motion for a preliminary injunction in the United States

11  District Court for the Western District of Washington, seeking to enjoin the
    secretary of state from publicly releasing any documents that would reveal

12  the names and contact information of the R-71 petition signers. App. 4. . . .
    Count II of the complaint alleges that "[t]he Public Records Act is

13  unconstitutional as-applied to the Referendum 71 petition because there is a
    reasonable probability that the signatories of the Referendum 71 petition

14  will be subjected to threats, harassment, and reprisals." *Id.*, at 17.

15  *Doe*, 130 S. Ct. at 2815-2817. The Supreme Court did not rule on Count II, which is the

16  issue now before this Court.

17  **B.    After Remand**

18          On remand, the parties engaged in discovery. During discovery, Doe identified

19  nineteen witnesses, including John Does Nos. 1 and 2. Discovery closed on October 22,

20

21

22

1   2010. Dkt. 128 (scheduling order).[1] Doe's witnesses include individual plaintiffs and

2   declarants that are each already known to the public as being supporters of R-71 and none

3   have testified by declaration that they would be seriously concerned if their personal

4   identifying information related to R-71 (e.g., name, address, etc.) is disclosed pursuant to

5   the PRA. The planned testimony of these witnesses and the other discovery that was

6   supplied in preparation for trial is discussed in detail below. These witnesses and other

7   pieces of documentary evidence comprise the only evidence Doe has offered in direct

8   relation to actual R-71 signers in support of the instant as-applied challenge to the PRA.

9                              **II. DISCUSSION**

10  **A.      Summary Judgment Standard**

11          Summary judgment is proper only if the pleadings, the discovery and disclosure

12  materials on file, and any affidavits show that there is no genuine issue as to any material

13  fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

14  The moving party is entitled to judgment as a matter of law when the nonmoving party

15  fails to make a sufficient showing on an essential element of a claim in the case on which

16  the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

17  323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

18  could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

19  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

20  _____

21          [1]Defendant Secretary of State Sam Reed moves the Court to strike any evidence relied
    upon that Doe did not disclose prior to the discovery cutoff date. *See* Dkt. 231. The Court denies
22  this motion because, even if such evidence were considered, the ruling herein would be the same.

present specific, significant probative evidence, not simply "some metaphysical doubt").
*See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists
if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or
jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d
626, 630 (9th Cir. 1987).

      The determination of the existence of a material fact is often a close question. The
Court must consider the substantive evidentiary burden that the nonmoving party must
meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477
U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual
issues of controversy in favor of the nonmoving party only when the facts specifically
attested by that party contradict facts specifically attested by the moving party.  The
nonmoving party may not merely state that it will discredit the moving party's evidence
at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.
Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255).  Conclusory,
nonspecific statements in affidavits are not sufficient, and missing facts will not be
presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

      Applied here, the Court finds that Doe has failed to raise a material question of
fact. Because the evidence submitted in support of the parties' cross-motions is not in any
meaningful way controverted, the Court can resolve the issues presented herein as a
matter of law.

**B.    Standards**

    **1.    Exacting Scrutiny**

In *Doe*, the Supreme Court set out the standard of scrutiny to be applied in electoral cases such as this:

> We have a series of precedents considering First Amendment challenges to disclosure requirements in the electoral context. These precedents have reviewed such challenges under what has been termed "exacting scrutiny." *See, e.g., Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam ) ("Since *NAACP v. Alabama* [357 U.S. 449 (1958),] we have required that the subordinating interests of the State [offered to justify compelled disclosure] survive exacting scrutiny"); *Citizens United, supra*, at ----, 130 S.Ct., at 914 ("The Court has subjected [disclosure] requirements to 'exacting scrutiny' " (quoting *Buckley, supra*, at 64)); *Davis v. Federal Election Comm'n*, 554 U.S. ----, ----, 128 S.Ct. 2759, 2775, 171 L.Ed.2d 737 (2008) (governmental interest in disclosure "'must survive exacting scrutiny'" (quoting *Buckley, supra*, at 64)); *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 204 (1999) ( *ACLF* ) (finding that disclosure rules "fail[ed] exacting scrutiny" (internal quotation marks omitted)).
>
> That standard "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United, supra*, at ----, 130 S.Ct., at 914 (quoting *Buckley, supra*, at 64, 66). To withstand this scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis, supra*, at ----, 128 S.Ct., at 2774 (citing *Buckley, supra*, at 68, 71).

130 S. Ct. at 2818. The Court further noted that "The State's interest in preserving the integrity of the electoral process is *undoubtedly important*. 'States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally.'" *Buckley v. ACLF*, 525 U.S. 182, 191 (emphasis added).

Therefore, exacting scrutiny applies in this case.

1        **2.      Reasonable Probability**

2        In as-applied challenges such as the instant case, the Supreme Court has

3    "explained that those resisting disclosure can prevail under the First Amendment if they

4    can show 'a reasonable probability that the compelled disclosure [of personal

5    information] will subject them to threats, harassment, or reprisals from either

6    Government officials or private parties.'" *Doe*, 130 S. Ct. at 2820 (quoting *Buckley,*

7    *supra*, at 74; *see also Citizens United*, 558 U.S. at ----, 130 S. Ct. at 915).[2]

8        To prevail on an as-applied challenge, Doe will have to satisfy this reasonable

9    probability standard with "respect to those who signed the R-71 petition." *See id.* at 2820-

10   2821 (leaving this narrow issue open on remand); *see Buckley, supra*, at 74 ("minor

11   parties" may be exempt from disclosure requirements if they can show "a reasonable

12   probability that the compelled disclosure of a party's contributors' names will subject

13   them to threats, harassment, or reprisals from either Government officials or private

14   parties"); *Citizens United, supra*, at ----, 130 S. Ct. at 915 (disclosure "would be

15   unconstitutional as applied to an organization if there were a reasonable probability that

16   the group's members would face threats, harassment, or reprisals if their names were

17   disclosed") (quoting *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 198 (2003)).

18

19

20          [2]Doe brings its as-applied challenge based upon Doe's belief that a reasonable probability

21   exists that disclosure would result in threats, harassment, or reprisals from private parties. Doe
     has supplied no evidence or argument that any governmental agency engaged in such conduct.

22   Therefore, the Court limits its analysis to evidence regarding private parties.

1    Additionally, while the majority opinion in *Doe* provides only a minimal

2  discussion as to the ability of Doe to prevail on an as-applied challenge, the concurrences

3  in *Doe* elaborate on this issue and aid the Court in resolving this case. *See* 130 S. Ct. at

4  2822-2837 (concurring opinions).

5         **a.    Justice Sotomayor, Concurring**

6    Justice Sotomayor, with whom Justice Stevens and Justice Ginsburg join, stated

7  the following with respect to as-applied challenges such as the instant matter:

8         Case-specific relief may be available . . . in the rare circumstance in which
          disclosure poses a reasonable probability of *serious and widespread*
9         *harassment* that the State is unwilling or unable to control. *Cf. NAACP v.*
          *Alabama ex rel. Patterson*, 357 U.S. 449 (1958). Allowing case-specific
10        invalidation under a more forgiving standard would unduly diminish the
          substantial breathing room States are afforded to adopt and implement
11        reasonable, nondiscriminatory measures like the disclosure requirement
          now at issue. Accordingly, courts presented with an as-applied challenge to
12        a regulation authorizing the disclosure of referendum petitions should be
          deeply skeptical of any assertion that the Constitution, which embraces
13        political transparency, compels States to conceal the identity of persons
          who seek to participate in lawmaking through a state-created referendum
14        process.

15  *Doe*, 130 S. Ct. at 2829 (Sotomayor, concurring) (emphasis added).

16         **b.    Justice Stevens, Concurring**

17    Justice Stevens, with whom Justice Breyer joins, explained the following with

18  respect to Doe's as-applied challenge:

19         There remains the issue of petitioners' as-applied challenge. As a
          matter of law, the Court is correct to keep open the possibility that in
20        particular instances in which a policy such as the PRA burdens expression
          "by the public enmity attending publicity," *Brown v. Socialist Workers '74*
21        *Campaign Comm. (Ohio)*, 459 U.S. 87, 98 (1982), speakers may have a
          winning constitutional claim. "'[F]rom time to time throughout history,'"
22        persecuted groups have been able "'to criticize oppressive practices and

1    laws either anonymously or not at all.'" *McIntyre v. Ohio Elections Com'n*,
     514 U.S., 334, 342.

2              *In my view, this is unlikely to occur in cases involving the PRA.* Any
3    burden on speech that petitioners posit is speculative as well as indirect. For
     an as-applied challenge to a law such as the PRA to succeed, there would
4    have to be *a significant threat* of harassment directed at those who sign the
     petition *that cannot be mitigated by law enforcement measures.* Moreover,
5    the character of the law challenged in a referendum does not, in itself, affect
     the analysis. Debates about tax policy and regulation of private property
6    can become just as heated as debates about domestic partnerships. And as a
     general matter, it is very difficult to show that by later disclosing the names
7    of petition signatories, individuals will be less willing to sign petitions. *Just
     as we have in the past, I would demand strong evidence before concluding
8    that an indirect and speculative chain of events imposes a substantial
     burden on speech.* A statute "is not to be upset upon hypothetical and
9    unreal possibilities, if it would be good upon the facts as they are." *Pullman
     Co. v. Knott*, 235 U.S. 23, 26 (1914).

10   *Doe*, 130 S. Ct. at 2831-2832 (footnotes omitted) (emphasis added); *see also id.*, n. 4

11   (citing but not agreeing with Justice Scalia's concurrence at 2832, which concluded that

12   granting relief to Doe on its as-applied challenge would amount to establishing a right to

13   anonymous speech).

14   **C.    Doe's As-Applied Challenge**

15           Doe makes an as-applied challenge to the PRA, seeking to prevent the disclosure

16   of the personally identifying information of 137,000 R-71 petition signers. To succeed in

17   this challenge, Doe must establish that such disclosure that is otherwise proper under the

18   PRA would cause the signers to face a reasonable probability of threats, harassment, or

19   reprisals. In opposition, Defendants and Intervenors assert that Doe has not supplied the

20   Court with competent evidence to meet such a showing on an as-applied basis;

21   Defendants and Intervenors also contend that Doe cannot or has not supplied adequate

22

1  authority upon which it can succeed in its challenge based on the evidence that has been

2  supplied by Doe and could be admissible at trial.

3        **1.**     **The Progeny of As-Applied Challenges**

4        The as-applied exemption that Doe seeks has been upheld in only a few cases. *See*

5  *Buckley,* 424 U.S. at 31-35; *Brown,* 459 U.S. at 102 (granting exemption to Socialist

6  Worker Party ("SWP") deemed to have minor party status due to its 60 members, little

7  success at the polls, and small amount of financial backing); *NAACP*, 357 U.S. at 466

8  (holding that disclosure of rank and file membership of NAACP would restrain members'

9  exercise of freedom of association); *but see ProtectMarriage.com v. Bowen*, 599 F. Supp.

10  2d 1197, 1213 (2009) (rejecting an as-applied challenge for failure to supply adequate

11  evidence and failure to establish minor party status).

12        In *NAACP*, the Supreme Court found that "Petitioner [ ] made an uncontroverted

13  showing that on past occasions revelation of the identity of its rank-and-file members has

14  exposed these members to economic reprisal, loss of employment, threat of physical

15  coercion, and other manifestations of public hostility." 357 U.S. at 462-463. The *NAACP*

16  Court concluded that:

17        Under these circumstances, we think it apparent that compelled disclosure
      of petitioner's Alabama membership is likely to affect adversely the ability

18        of petitioner and its members to pursue their collective effort to foster
      beliefs which they admittedly have the right to advocate, in that it may

19        induce members to withdraw from the Association and dissuade others
      from joining it because of fear of exposure of their beliefs shown through

20        their associations and of the consequences of this exposure.

21  *Id.*

22

1    Similarly, in *Brown*, the Supreme Court determined that "the evidence of private

2    and government hostility toward the SWP and its members establishe[d] a reasonable

3    probability that disclosing the names of contributors and recipients [would] subject them

4    to threats, harassment, and reprisals." 459 U.S. at 100. Specifically, the *Brown* Court

5    found that the SWP had uncontroverted and ample evidence of its experience with

6    pervasive hostility by the government and private parties. *Id*. at 98-99 (evidence of

7    threatening phone calls and hate mail; the burning of SWP literature; the destruction of

8    SWP members' property; police harassment of a party candidate; the firing of shots at an

9    SWP office; and evidence that, in the 12-month period before trial, 22 SWP members,

10    including four in Ohio, were fired because of their party membership).

11    In contradistinction, the district court in *ProtectMarriage.com* declined to extend

12    an as-applied exemption to a group challenging the California PRA disclosure

13    requirements with respect to a ballot measure adopted by California citizens. The

14    measure, "Proposition 8, [ ] changed the California Constitution such that marriage would

15    only thereafter exist 'between a man and a woman.'" 599 F. Supp. 2d at 1199. In

16    *ProtectMarriage.com*, the plaintiffs, much like Doe in this case, sought injunctive relief

17    on the basis that they are "entitled to an as-applied blanket exemption from [their State's]

18    compelled disclosure provisions because Plaintiffs have demonstrated a reasonable

19    probability that compelled disclosure will result in threats, harassment, [or] reprisals

20    because of their support for [the measure]." 599 F. Supp. 2d at 1204 (quotations omitted).

21    The *ProtectMarriage.com* court found that plaintiffs did not and could not allege

22    that a movement to define marriage as being between a man and a woman "is vulnerable

1    to the same threats as were socialist and communist groups, or, for that matter, the

2    NAACP." *Id.* at 1217.

3        After a thorough analysis of precedent, the *ProtectMarriage.com* court further

4    concluded that "it would appear that . . . minor status is a necessary element of a

5    successful as-applied claim." *Id.* at 1215. In fact, Doe has not supplied and the Court has

6    not found any case wherein a court granted an as-applied exemption to the disclosure

7    laws to a group, organization, or political party that did not have minor status. *See, e.g.,*

8    *Buckley,* 424 U.S. at 31-35; *Brown,* 459 U.S. at 102; *NAACP*, 357 U.S. at 466.

9        Notably, a common thread exists among the cases wherein an exemption has been

10   extended on an as-applied challenge. The *Protectmarriage.com* analysis highlights this

11   common thread:

12           Since *Buckley*, as-applied challenges have been successfully raised
         only by minor parties, . . . having small constituencies and promoting
13       historically unpopular and almost universally-rejected ideas. The parties'
         "aim [in *Brown*] was the abolition of capitalism and the establishment of a
14       workers' government to achieve socialism." The party was historically
         unsuccessful at the polls though its members regularly ran for public office.
15       Additionally, campaign contributions and expenditures . . . averaged
         approximately $15,000 annually.
16           Similarly, in *Hall-Tyner*, a committee supporting the Communist
         Party successfully sought exemption from state disclosure laws.
17
     599 F. Supp. 2d at 1216 (citations omitted).
18
         In short, *"Brown* and its progeny each involved groups seeking to further ideas
19
     historically and pervasively rejected and vilified by both this country's government and
20
     its citizens." *Id.* at 1215. Doe has not provided adequate authority to support any
21

22

1   departure from requiring such a showing in order to bring a successful as-applied

2   challenge to the PRA disclosure laws.

3          Based on this precedent, Defendants and Intervenors assert that, absent minor

4   party status, Doe's as-applied challenge must fail. If the term "minor party" were

5   attributable only to minor political parties, Doe's claims absolutely fail; indeed, the

6   people making up the collective Doe cannot be categorized as a political party.

7          However, Defendants and Intervenors argue more subtly that the "minor party"

8   rule in *Buckley* and the cases following it actually refer to fringe organizations, similar to

9   the NAACP in the 1950s. Specifically, they argue that R-71 signers are not a fringe

10  organization and have not established that they can qualify for minor party status as an

11  organization because there is no cohesion in the 137,000 people who signed the R-71

12  petition or the 838,842 people who voted to reject the expansion of rights for same sex

13  partners. The Court is persuaded that it is difficult to categorize the R-71 signers as a

14  group or an organization; the only fact known to be common among these signers to any

15  reasonable certainty is that they signed the R-71 petition. Significantly, in each of the

16  cases where a court upheld an as-applied challenge to the disclosure laws, the party or

17  organization making the challenge established that their constitutional right to associate

18  freely would be illegally infringed upon should disclosure be ordered. Here, it is not clear

19  that the R-71 signers have actually sought to associate with each other in a

20  constitutionally protected manner.

21         However, even if the Court considered the R-71 supporters to be such a group or

22  organization, Doe has not and cannot with any credibility analogize their situation to that

1    of a small group of rank and file members of the SWP or the NAACP, discussed above.

2    Instead, they are much more akin to the petitioners in *ProtectMarriage.com* who

3    "orchestrated a massive movement to amend the California Constitution. Proponents of

4    the initiative were successful in their endeavor, raising nearly $30 million, securing

5    52.3% of the vote and convincing over seven million voters to support Proposition 8."

6    599 F. Supp. 2d at 1215.

7         Similarly here, PMW was able to secure 137,000 signers for R-71 and obtained

8    nearly half the vote with 838,842 votes. And Doe has not supplied competent evidence or

9    adequate authority to support its claim that the R-71 signers constitute a fringe

10   organization with unpopular or unorthodox beliefs or one that is seeking to further ideas

11   that have been "historically and pervasively rejected and vilified by both this country's

12   government and its citizens." *Id*. This fact makes Doe's case quite similar to

13   *ProtectMarriage.com* wherein the district court rejected plaintiffs' as-applied challenge

14   to the California PRA. *Compare id*. at 1214 ("Plaintiffs succeeded in persuading over

15   seven million voters to support their cause") *with Brown*, 459 U.S. at 88 (sixty-member

16   SWP party unable to garner public support at the polls or sufficient financial resources to

17   be successful due to being unpopular, vilified, and historically rejected by the

18   government and the citizenry).

19        Finally, the as-applied exemption is intended to prevent an organization from

20   being forced to retreat from the marketplace of ideas, which would materially diminish

21   discourse. Doe has not provided competent evidence that it is in any material way similar

22   to the organizations, groups, or parties who have received the as-applied exemption in the

1  past. Instead, the evidence before the Court logically leads only to the opposite

2  conclusion.

3      Therefore, if minor party status (a.k.a. fringe organization) is required, as it

4  appears that *Buckley* and its progeny require, Doe's claim fails in all material respects.

5      **2.    Doe's Evidence of Threats, Harassment, or Reprisals**

6      Assuming *arguendo* that Doe can get by the hurdles discussed above, Doe would

7  still have to produce sufficient evidence of threats, harassment, or reprisals. In the cases

8  where the exemption Doe seeks has been granted, the plaintiffs have supplied the courts

9  with ample, uncontroverted evidence of a reasonable probability that disclosure will

10  result in threats, harassment, or reprisals. As the *ProtectMarriage.com* court correctly

11  summarized:

12      Indeed, the *Brown* Court was confronted with countless acts of
    government harassment and retribution against members of the SWP,
13      which are detailed above. Furthermore, in *Hall-Tyner*, the Second Circuit
    stated, "[t]he evidence relied on by the district judge included the extensive
14      body of state and federal legislation subjecting Communist Party members
    to civil disability and criminal liability, reports and affidavits documenting
15      the history of governmental surveillance and harassment of Communist
    Party members, as well as affidavits indicating the desire of contributors to
16      the Committee to remain anonymous." 678 F.2d at 419.

17  599 F. Supp. 2d at 1217.

18      In *Doe*, the Supreme Court accurately and succinctly described the issue now

19  before this Court: whether the PRA "is unconstitutional as applied to the [R-71] petition."

20  130 S. Ct. at 2817. Doe has provided the Court with a mountain of anecdotal evidence

21  from around the country that offers merely a speculative possibility of threats,

22  harassment, or reprisals. Doe has also provided the Court with numerous examples of

1 what may be considered threats, harassment, or reprisals experienced by those supporting

2 Proposition 8 in California.

3    In *Buckley*, the Supreme Court articulated that the proof of threats, harassment, or

4 reprisals "may include, for example, specific evidence of past or present harassment of

5 members due to their associational ties, or of harassment directed against the organization

6 itself. A pattern of threats or specific manifestations of public hostility may be

7 sufficient." 424 U.S. at 74. Such evidence is to be specifically and directly related to a

8 group or organization. Here, to the extent Doe could be characterized as a group or

9 organization, Doe would be required to present evidence pertaining directly to R-71

10 signers and perhaps to the PMW donors. What is not included in the type of evidence that

11 can be relied upon, Defendants and Intervenors argue, is random anecdotal evidence from

12 around the country that pertains to individuals that did not sign the R-71 petition.

13    To the extent Doe argues that it is permitted to rely on the historical evidence of

14 others that it believes to be similarly situated to the R-71 signers, Defendants and

15 Intervenors argue that Doe is largely mistaken given the circumstances of this case. In

16 *Buckley*, the Court noted that "[n]ew parties that have no history upon which to draw may

17 be able to offer evidence of reprisals and threats directed against individuals or

18 organizations holding similar views." *Id*.

19    The R-71 signers, however, cannot be characterized as a group or an organization

20 that could be considered new. The vote at issue took place nearly two years ago and

21 petition signatures were being gathered well before the vote. Perhaps if the posture of this

22 case were as it existed just before the vote at issue when the R-71 petition had just been

1   submitted, Doe might persuade the Court that it is "new." However, it is now long past

2   that point, and Doe has the ability to produce historical evidence from the past few years

3   related to R-71. Doe also has the ability to draw on the experiences of those who

4   financially supported PMW's efforts during the heat of the R-71 petition signing and

5   prior to the vote. Therefore, Doe is limited to evidence from among its own number, R-71

6   petition signers. Doe has not supplied adequate authority to the contrary.[3]

7        The Court turns now to Doe's historical evidence that may be considered relevant

8   and admissible to establish that Doe would face a reasonable probability of threats,

9   harassment, or reprisals if disclosure of the R-71 signers' information were required. The

10  majority of evidence supplied by Doe includes individuals' claimed experience of threats,

11  harassment, or reprisals that Doe contends is connected to R-71.

12  **Ronald Perkins, John Doe # 1.** Ronald Perkins ("Perkins") is a known public

13  supporter of R-71. He has announced his opposition to same-sex marriage in an internet

14  video, and signed the R-71 petition publically. Declaration of William B. Stafford

15  (Stafford Decl.), Ex. A at 11-15, 16-17 (Perkins Dep.) 8:14-12:22, 22:19-23:19. In his

16  deposition, Perkins also expressed his willingness to participate publically in this case

17  and that he was aware of no threats to him should he testify in this case. *See, e.g.,* Perkins

18  Dep. 31:3-17, 45:3-21, 47:17-48:7. Although Perkins stated that the concern of

19

20        [3]Additionally, even if Doe could rely on evidence from the Proposition 8 experience,
21  such events are now stale and occurred during the "heat of an election battle surrounding a hotly
    contested ballot initiative." *ProtectMarriage.com*, 599 F. Supp. 2d at 1217. This case may have
22  begun during the heat of an election but such is not the case now.

1   harassment remains, he also stated that no one has ever threatened him for his

2   involvement with R-71 in any way, shape, or form at work or at home. *Id.*

3      **Matthew Chenier, John Doe # 2.** Matthew Cheiner ("Chenier") gathered

4   signatures for R-71 in public locations and waved an R-71 banner in a high-traffic area

5   with approximately seventy other people. *See* Stafford Decl., Ex. B (Chenier Dep.)

6   10:19-11:17, 14:17-15:10. Cheiner has stated he does not have concerns over the

7   publication of his name and that he joined this action as a John Doe for the benefit of

8   other people. Chenier Dep. 19:8-13, 38:6-17. The only negative events that Cheiner

9   testified about in his deposition included (1) an angry text message from his brother; (2)

10  being "mooned" by an unidentified passenger in a passing car; and (3) being "flipped off"

11  by people in passing cars. *Id.* 19:17-20:4, 22:23-23:6, 25:7-23, 29:9-23. Absent from the

12  record is any competent evidence, other than a text from Cheiner's brother, that these

13  incidents pertained to R-71.

14     **Richard Long, John Doe # 3.** Pastor Richard Long ("Long") publically endorsed

15  R-71 on several occasions. Stafford Decl., Ex. C (Long Dep.) 10:10-18, 12:19-20, 13:1-

16  24. Long likely signed the petition at his church and publically encouraged others to do

17  so. *Id.* 9:23-10:21. Long stated in his deposition that he has no problem testifying

18  publically in this matter and that his involvement with R-71 need not be kept secret. *Id.*

19  8:13-24.

20     Long testified that he experienced harassment related to R-71 when he received a

21  call from a purported transgender woman. *Id.* 20:1-9. Long claims the woman stated that

22

1  she and her friends would picket the church or attend a morning service, but she affirmed

2  they would conduct themselves appropriately. *Id*. 20:10-17.

3      Long also testified that he only received two calls about R-71 and that these were

4  the only "harassing" events. Long testified that he did not receive other calls about R-71

5  or other types of "harassment" before or after the R-71 election. *See, e.g., id.* 28:2-5.

6      **Roy Hartwell, John Doe # 4.** Roy Hartwell ("Hartwell") testified about R-71 in

7  front of the Washington State legislature, gathered signatures for the petition in public

8  places, and participated in television interviews regarding R-71. Stafford Decl., Ex. D

9  (Hartwell Dep.) 7:13-8:18, 16:1-17:16, 25:17-23, 30:24-31:10.

10     Hartwell testified in his deposition that one harassing incident involved two ladies

11  that glared at him and one said "we have feelings too." This occurred while Hartwell was

12  collecting signatures for R-71 at a grocery store. *Id*. 18:3-12 (also discussing that the

13  comment appeared to shake an older lady up, who signed the petition anyway). Hartwell

14  also testified about others who he believed harassed him about the R-71 petition. *See,*

15  *e.g., id*. 19:1-20:25 (discussing a woman who approached him at the grocery and asserted

16  she would bring her friends to the church, which did not occur); 21:10-22:16 (discussing

17  a lady who took Hartwell and Hartwell's wife's picture while they were collecting

18  signatures at a Wal-Mart and said she would post them on Facebook to enable her friends

19  to see what the Hartwells look like; Hartwell is unaware if the Facebook posting

20  occurred); 22:23-23:10 (discussing a customer at Wal-Mart that asked a manager to ask

21  the Hartwells to leave; the manager did not ask them to leave). In none of the events

22  described by Hartwell did he feel the need to contact the police. *See id*. 23-11-25:9.

**Valerie Hartwell, Jane Doe # 5.** Ms. Hartwell's involvement with R-71 and claimed experience with harassment related thereto is not materially different than Mr. Hartwell's, discussed above.

**Viktor Anishenko.** Viktor Anishenko ("Anishenko") was a public advocate for R-71 and solicited signatures for the petition on five or six occasions. Stafford Decl., Ex. F (Anishenko Dep.) 16:12-23, 23:12-25:6. Anishenko also posted an R-71 sign in the yard of his residence. *Id*. 25:7-8.

Although Anishenko claims to have had two or three Post-It notes containing vulgar language placed on his vehicle, he does not know if it was related to R-71. *Id*. 28:21-30:24. Anishenko does not allege any other instances of threats, harassment, or reprisals. *Id*. 28:5-14.

**Ken Hutcherson.** Pastor Ken Hutcherson ("Hutcherson") is a senior pastor at Antioch Bible Church. Stafford Decl., Ex. G (Hutcherson Dep.) 6:1-6. Hutcherson has long been a public opponent of gay marriage and has been covered extensively regarding this in the media. *See, e.g., id*. 13:25-17:8, 18:15-19:2 (asserting that "Googling" his name results in approximately 300,000 hits related to his stance opposing gay marriage).

Although Hutcherson points to many examples of phone calls his church has received regarding his stance on gay rights, he does not point to any calls or other methods of contact that relate specifically to R-71. *Id*. at 38:22-39:2, 46:4-22, 63:7-64:10, 66:3-13, 71:10-21, 75:22-76:19. Hutcherson is also not aware of any death threats, attacks, or harassment of his congregation as it relates to R-71. *Id*. 64:24-66:2, 48:3-8, 69:5-10.

1    **Alexander Kaprian**. Pastor Alexander Kaprian ("Kaprian") hosted and attended a

2    meeting to support R-71. Stafford Decl., Ex. H (Kaprian Dep.) 8:24-9:7, 14:4-11.

3    Kaprian signed the R-71 petition at his church and posted an R-71 sign in front of his

4    residence. Kaprian testified in his deposition that some woman took photographs of his

5    home and that he felt he was being watched; however, he points to no incident directly

6    attributable to R-71, and he did not report these incidents to the police. *Id*. 42:11-43:2,

7    48:10-50:22, 52:19-53:3, 38:11-22.

8    **Dmitry Kozlov.** Dimitry Koslov ("D. Koslov") was actively involved in gathering

9    R-71 signatures, waving R-71 signs at intersections, engaging in campaign organization

10   and other involvement between two and three times a week for three months. Stafford

11   Decl., Ex. I (D. Koslov Dep.) 33:23-34:5. D. Koslov remained involved with R-71

12   following the close of voting on the referendum, and he is not concerned about testifying

13   publically in this case. *Id*. 14:8-9, 33:21-22, 9:14-22.

14   D. Koslov testified regarding three incidents that he characterized as harassment:

15   (1) a man directed expletives at him and pushed him; (2) a man mooned the group and

16   threw garbage at the group from a van, no physical injuries; and (3) a woman approached

17   him and said "we'll do everything to stop what you're doing" and a man said "we'll have

18   your kids." *Id*. 30:20-32:1. D. Koslov did not claim to have been concerned for his safety

19   regarding any of these incidents, and he did not inform the police. *Id*. 32:2-12, 33:8-20.

20   **Sergey Koslov.** Sergey Koslov ("S. Koslov") publically supported R-71 and

21   "people knew [his] view about this matter." Stafford Decl., Ex. J (S. Koslov Dep.) 8:6-

22   10. S. Koslov is not concerned about testifying publically, and he does not claim to have

1    experienced any harassment related to R-71. *Id*. 11:25-12:16. However, he did testify that

2    notes were left near his church stating "you're worse than the fascists," "get out of here,"

3    and "your children . . . will be homosexuals"; he also testified that he did not feel

4    threatened by these notes and did not call the police. *Id*. 11:25-12:16, 15:15-16:16.

5        **Leonid Pisarchuk.** Leonid Pisarchuk ("Pisarchuk") actively supported R-71 by

6    publically gathering signatures, waving signs, and placing a bumper sticker on his car and

7    a sign in his yard. Stafford Decl., Ex. K (Pisarchuk Dep.) 8:25-10:25, 13:17-14:14.

8    Pisarchuk also interviewed with a reporter who published a story identifying him as an R-

9    71 supporter.

10        Though he is not concerned about testifying in this matter, Pisarchuk testified in

11    his deposition that he felt harassed on a couple occasions. *See id*. 39:25-40:4.

12    Specifically, he claims that passing motorists made offensive gestures and shouted insults

13    but he was not threatened by these events. *Id*. 21:12-24:20, 47:20-25. He experienced

14    being yelled at with profanity and his name was placed on a pro-gay rights website but

15    neither of these events left him feeling concerned for his personal safety, and he did not

16    call the police. Pisarchuk Dep. 31:1-5, 33:7-12, 34:6-11. Pisarchuk does not point to any

17    events of threats, harassment, or reprisals following the R-71 vote. *Id*. 35:7-10; 51:22:4.

18        **Gary Randall.** Gary Randall ("Randall") is the president of the Faith and

19    Freedom Network ("FFN") and was one of the organizers/spokesmen for R-71. Stafford

20    Decl., Ex. L (Randall Dep.) 9:25-10:2; 91:16-18, 94:6-8. Randall has expressed his

21    support for R-71 on websites, in public speeches, and in interviews and articles published

22    by news organizations. *Id*. 19:6-20:8, 20:11-22:14, 36:6-39:10, 40:19-25, 41:22-43:3,

1   83:2-18, 85:10-21. Randall also authorized the FFN's political action committee to spend

2   funds on R-71 activities, which are disclosed at the Public Disclosure Commission's

3   website. *Id*. 29:8-31:3.

4       Randall testified that he received death threats via a blog site; however, when

5   asked to demonstrate where in the copy of the blog posting he believed a threat of his or

6   another's life was made he could not do so without relying on assumptions. *Id*. 43:4-51:3

7   (finally conceding that no actual death threat was made on the website).[4]

8       **Elizabeth Scott.** Elizabeth Scott ("Scott") was a state legislative candidate who

9   publically endorsed R-71, including the gathering of signatures for R-71. Stafford Decl.,

10  Ex. M. (Scott Dep. 7:11-18, 11:19-13:12, 62:6-13, 89:11-13). Scott is not concerned

11  about testifying in this matter. *Id*. 17:11-16.

12      The Everett Herald (a local paper) published an article on Scott, which included

13  the fact that she signed the R-71 petition. *Id*. 8:25-9:17, 10:25-11:18. The article

14  contained her cell phone number and other contact information; notably, Scott did not

15  receive any calls on her mobile phone regarding R-71. *Id*. 23:12-24-1, 96:1-16.

16      However, Scott's family did receive a phone call to its residence and the caller

17  asked for Scott and said "I will kill you and your family," and then hung up the phone. *Id*.

18  17:19-18:18, 21:9-25. However, other than speculation, Scott does not attribute to R-71

19  this death threat or any other incident that she claimed could be considered harassment

20

21          [4]The blog site that Randall relied on for his claims of a death threat is
    www.pinkpistols.org. This website appears to advocate for homosexuals to be armed if desired to
22  use only in self defense. Doe has not supplied competent evidence to the contrary.

that occurred before or after the R-71 vote. *See, e.g., id.* 32:10-20, 37:16-20, 38:17-234, 40:21-41:11, 64:15-19. Additionally, she called the police about the death threat and it was handled without further incident. *Id.* 19:13-21:2, 30:10-31:24.

**Valera Stevens.** Valera Stevens ("Stevens"), a Washington State Senator, had her picture and statement of support printed on the back of each R-71 petition. Dkt. 27, Ex. A at 12. She endorsed the websites of PMW and FFN. Stafford Decl., Ex. N (Stevens Dep.) 15:6-17:4, 24:17-25:22.  Stevens also wrote a fundraising message for the PMW website and made six donations to PMW. *See id.* 24:17-25:22. Stevens has no concern about testifying in this case, except if it occurs during the legislative session. *Id.* 7:4-13.

Stevens testified that she received several calls and two faxes in October of 2009 that she believed related to her support of R-71. *Id.* 26:17-28:13, 36:21-37:13, 46:12-48:2. Although she recalls the callers using vulgar language she does not recall being told her support of R-71 motivated the calls. *Id.* 29:8-30:17. None of these contacts made Stevens feel threatened, and she did not notify the police; she has not experienced any other harassment, threats, or reprisals due to her involvement with and support of R-71. *Id.* 42:22-43:8, 45:10-13.

**Larry Stickney.** Larry Stickney ("L. Stickney") served as PMW's campaign manager. Stafford Decl., Ex. O (L. Stickney Dep.) 6:1-13, 7:7-11. L. Stickney testified that his involvement in R-71 is "extremely public." *Id.* 22:14-17. L. Stickney has spoken with reporters and been discussed on the Internet and in print regarding R-71; he has also had upwards of twenty radio appearances, appeared on TV, participated in public

debates, and spoken in front of approximately 2000 people regarding R-71. *Id*. 22:18-23:15, 35:23-37:15, 38:7-39:20.

L. Stickney did not personally experience any physical harassment or violence during the campaign for R-71. *Id*. 48:16-49:9, 73:1-2. He did testify, however, that the PMW campaign received threatening and/or hostile emails. *Id*. 48:16-49:9, 73:1-2. He also testified that he felt threatened by a Bellingham, WA blogger who wrote "[w]hy can't we go to Arlington and harm his family?" *Id*. 53:2-24, 130:15-131:2. L. Stickney contacted the police who said they would investigate the matter; he never reported any further incidents regarding the blogger. *Id*. 56:20-58:2, 140:21-142:6. L. Stickney also received a "bothersome" phone call from a transgendered individual. *Id*. 86:9-87:15, 90:7-91:3, 124:22-125:1.

The only other time L. Stickney felt threatened was when his daughter informed him that a man took a photo of his home. However, L. Stickney cannot point to any facts other than speculation to contend that this event related to R-71. L. Stickney did not contact the police with regard to the unknown photographer.

Following the R-71 vote, Stickney has remained in the public's eye and occasionally received emails calling him a "rat" or a "homophobic bigot." *Id*. 83:17-85:21.

**Matt Stickney.** Matt Stickney ("M. Stickney") publically participated in R-71 events and was listed in newspaper articles connected to the campaign. Stafford Decl., Ex. P (M. Stickney Dep.) 5:24-25, 7:3-24, 10:3-15, 11:16-25. M. Stickney commented online regarding an article about R-71 published by The Stranger, a local publication. *Id*.

8:4-13. M. Stickney testified that, although people responded to his comment and made

comments about his father, L. Stickney, and their family in general, "[t]hey never said

anything about me – you know, they never said, you know, I am a jerk for working on

the campaign or whatever." *Id.* 13:17-23. M. Stickney did not testify about any personal

experience of harassment, threats or reprisals due to his involvement with R-71, before or

after the vote.

**Robert Struble.** Robert Struble ("Struble") acted as a spokesman for PMW and

shared his opinions on R-71 in public debates, on the radio, at a public state legislative

hearing, and in a letter to the Kitsap Sun editor. Stafford Decl., Ex. Q (Struble Dep.)

11:8-12:8, 13:17-21, 14:4-17, 17:25-18:15. Struble testified that the fact he signed the R-

71 petition is "so minuscule compared to the fact that [he's] a public spokesman, so it's

not really – [his] signature is hardly the issue." *Id.* 19:1-24; *see also id.* 20:25-21:2

(Struble does not believe he would be at risk if the R-71 petitions were publically

released).

Struble testified about one incident he considered to be harassment. While handing

out brochures on a ferry, one person receiving a brochure, crumpled it up and threw it

back at Struble stating it was "a bunch of shit" and that he and his partner "had just as

much right to get married" as did Struble. *Id.* 23:13-20. The person attempted to get other

passengers to "vote" on the issue. *Id.* Eventually ferry workers stopped the person from

following Struble around on the ferry. *Id.* 29:1-3, 31:4-9.

**Barbara "Rachel" Whaley.** Rachel Whaley is Hutcherson's assistant. Stafford

Decl., Ex. R. (Whaley Dep.) 5:13-16. Whaley did not testify to any personal experience

with threats, harassment, or reprisals related to her involvement with R-71 or for having

signed the petition. *See generally*, Ex. R. (Whaley Dep.). She did testify, however, that

the church did receive several phone calls telling the church to "shut up" and that failure

to do so would result in the church being "taken down," but nobody followed through on

these statements. *Id*. 15:21-16:13, 24:2-10, 40:9-16.

The Court turns now to Doe's other evidence that comes in the form of written

discovery. Defendants requested that Doe produce documents "relating to any alleged

harassment, threat or retaliation relating directly or indirectly to R-71." Stafford Decl.,

Ex. S. Doe produced 1,542 pages of documents, which predominantly included

newspaper articles regarding the California Proposition 8 campaign and the R-71

campaign in Washington.

Significantly, in his deposition, L. Stickney testified that he solicited R-71 signers

to share any experiences they had with harassment. Stickney Dep. 30:3-35:8. If any

responses were obtained by Doe, none were included within their production to

Defendants' request.

Further, on August 15, 2011, the Court ordered Doe to identify for the Court:

> specific documents already in evidence that Plaintiffs believe will establish
> a material question of fact as to whether disclosure of R-71 signers'
> identities would result in the reasonable probability of threats, harassment,
> or reprisals. These documents shall only include the declarations,
> depositions, and documentary evidence already in the record of actual R-71
> signers who have not already made themselves public figures on this issue
> (e.g., information regarding Prop 8 in California, op-ed publications, and
> the like will not be considered relevant for purposes of this request).

Dkt. 250 at 3.

1    In response to the Court's order, Doe stated unequivocally that "[o]f course there

2    is no such evidence." Dkt. 259 at 2 (stating that Doe's theory is that "[u]nless and until

3    the identities of the signers are publically exposed, there will be no harassment of R-71

4    signers (who signed the petition but did not make that fact public knowledge)."

5    **3.      Sufficiency of Doe's Evidence**

6    The record in this case of what might be considered evidence of a reasonable

7    probability of threats, harassment, or reprisals of actual R-71 signers has been limited by

8    the evidence supplied by Doe. That evidence is comprised of experiences shared only by

9    publicized individuals who have taken public stances on the R-71 issue and against same-

10   sex marriage in general. *See, e.g.,* L. Stickney Dep. This evidence, however, does not rise

11   to the level or amount of uncontroverted evidence provided in cases wherein a group was

12   able to obtain an as-applied exemption to otherwise permissible disclosure. *See Brown*

13   and *NAACP, supra*. Further, Doe has failed to provide competent evidence or adequate

14   authority from which this Court could conclude that disclosure of the R-71 petitions

15   would result in similar experiences for those who signed the petition.

16   To begin with, it is undisputed that L. Stickney has a list containing the names and

17   contact information of people he knows that signed the R-71 petition. This list was

18   compiled prior to the vote at issue. Doe has, therefore, had ample opportunity and time to

19   contact these individuals to obtain information about their experiences that might support

20   Doe's request for an as-applied exemption to disclosure. No such evidence has been

21   produced. In fact, L. Stickney solicited such evidence from these individuals. Doe has not

22   supplied any such evidence to the Court nor informed it that such evidence exists.

1   Moreover, no doubt the majority of people who signed an R-71 petition did so in a public

2   place or forum and could have been contacted by mass publication or other means to

3   obtain their testimony as to any threats, harassment or reprisals they had experienced in

4   connection to their signing of the petition. However, no such evidence exists in the record

5   before the Court.

6          Further still, PMW secured donations to finance the campaign for R-71. It is

7   undisputed that between May and November of 2009, PMW reported 857 contributions

8   to its cause. The names and other personally identifying information of these donors has

9   been public knowledge for over two years. Doe has had ample time and opportunity to

10  contact these individuals, some of which likely signed the R-71 petition in addition to

11  donating to PMW's R-71 campaign. Even if none of these donors signed the R-71

12  petition, their experiences are far more closely related to the issues at hand than the

13  random "evidence" supplied by Doe based on experiences of individuals around the

14  country and the now stale experiences of those persons involved with Proposition 8.

15  However, Doe has failed to supply sufficient, competent evidence that the publically

16  known donors – as active supporters of R-71 – have experienced sufficient threats,

17  harassment, or reprisals based on the disclosure of their information in connection to R-

18  71 that would satisfy the reasonable probability standard that Doe must meet in this case.

19  The Supreme Court has previously rejected a similar as-applied challenge based on such

20  a failure. *Citizens United*, 130 S. Ct. at 916 (rejecting Citizens United's as-applied

21  challenge because it "has offered no evidence that its members may face similar threats

22  or reprisals. To the contrary, Citizens United has been disclosing its donors for years and

1   has identified no instance of harassment or retaliation."). The same can be said for

2   PMW's donors.

3   **D.      Widespread Evidence, Strong Evidence, Police Mitigation**

4           As concluded above, the Court finds that Doe's as-applied challenge cannot meet

5   the threshold required to obtain an as-applied exemption to the PRA in this case. Doe's

6   claim would also fail under the standards – if considered distinguishable from the

7   applicable standards discussed above – articulated by a majority of the concurring

8   Justices in the Supreme Court's opinion in *Doe*, 130 S. Ct. 2811.

9           As discussed above, Justice Sotomayor, with whom Justice Stevens and Justice

10  Ginsburg concurred, would require evidence of "serious and widespread harassment that

11  the State is unwilling or unable to control." Justice Stevens, with whom Justice Breyer

12  concurred, also stated that the Court would "demand strong evidence before concluding

13  that an indirect and speculative chain of events imposes a substantial burden on speech."

14  *Doe*, 130 S. Ct. at 2829.  While Doe correctly points out that the concurrences in *Doe* are

15  dicta, their opinions remain instructive on what may likely be the standard applied by the

16  Supreme Court if it were to hear this case on appeal.

17          In any event, Justice Sotomayor and those Justices concurring in her opinion

18  would require a showing of "*serious and widespread harassment* that the State is

19  unwilling or unable to control." *Doe*, 130 S. Ct. at 2829 (emphasis added). To the extent

20  this is a different standard than what is required to satisfy the reasonable probability

21  standard from *Buckley*, it is more stringent. Otherwise, it is merely an explanation as to

22

1    what the reasonable probability standard requires in this case. In any event, Doe cannot

2    satisfy such a requirement under either understanding of the law.

3           Applied here, the Court finds that Doe has only supplied evidence that hurts rather

4    than helps its case. Doe has supplied minimal testimony from a few witnesses who, in

5    their respective deposition testimony, stated either that police efforts to mitigate reported

6    incidents was sufficient or unnecessary. Doe has supplied no evidence that police were or

7    are now unable or unwilling to mitigate any claimed harassment or are now unable or

8    unwilling to control the same, should disclosure be made. This is a quite different

9    situation than the progeny of cases providing an as-applied exemption wherein the

10   government was actually involved in carrying out the harassment, which was historic,

11   pervasive, and documented. To that end, the evidence supplied by Doe purporting to be

12   the best set of experiences of threats, harassment, or reprisals suffered or reasonably

13   likely to be suffered by R-71 signers cannot be characterized as "serious and

14   widespread."

15   **E.    Conclusion**

16          In this case, Doe asked the Court to grant an exemption to the PRA based on a few

17   experiences of what Doe believes constitutes harassment or threats, the majority of which

18   are only connected to R-71 by speculation. If Doe's position were correct, then Doe

19   would have prevailed on Count I's facial challenge to the PRA because anyone could

20   prevail under such a standard in the context of referenda, which are often heated,

21   regardless of the subject matter. Indeed, if a group could succeed in an as-applied

22   challenge to the PRA by simply providing a few isolated incidents of profane or indecent

1    statements, gestures, or other examples of uncomfortable conversations that are not

2    necessarily even related or directly connected to the issue at hand, disclosure would

3    become the exception instead of the rule.

4         Considering the foregoing, Doe's action based on Count II falls far short of those

5    wherein an as-applied challenge has been successfully lodged to prevent disclosure of

6    information otherwise obtainable under the PRA. Thus, the State's undoubtedly

7    important interest in disclosure prevails under exacting scrutiny.

8         While Plaintiffs have not shown serious and widespread threats, harassment, or

9    reprisals against the signers of R-71, or even that such activity would be reasonably likely

10   to occur upon the publication of their names and contact information, they have

11   developed substantial evidence that the public advocacy of traditional marriage as the

12   exclusive definition of marriage, or the expansion of rights for same sex partners, has

13   engendered hostility in this state, and risen to violence elsewhere, against some who have

14   engaged in that advocacy. This should concern every citizen and deserves the full

15   attention of law enforcement when the line gets crossed and an advocate becomes the

16   victim of a crime or is subject to a genuine threat of violence. The right of individuals to

17   speak openly and associate with others who share common views without justified fear of

18   harm is at the very foundation of preserving a free and open society.

19        The facts before the Court in this case, however, do not rise to the level of

20   demonstrating that a reasonable probability of threats, harassment, or reprisals exists as to

21   the signers of R-71, now nearly two years after R-71 was submitted to the voters in

22   Washington State.

1

## III. ORDER

2  Therefore, it is hereby **ORDERED** that:

3  (1)     Defendants and Intervenors' motions for summary judgment are

4          **GRANTED**;

5  (2)     Doe's motion for summary judgment is **DENIED**;

6  (3)     The injunction preventing disclosure of R-71 petitions is **LIFTED**;

7  (4)     All other pending motions are **DENIED as moot**; and

8  (5)     This case is **CLOSED.**

9  Dated this 17th day of October, 2011.

10

11

12          BENJAMIN H. SETTLE
            United States District Judge

13

14

15

16

17

18

19

20

21

22